#058744

ORIGINAL

ECF

FILED
SEP 2 2 2003
U.S. COURT OF FEDERAL CLAIMS

IN THE
UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| **ENGLEWOOD TERRACE LIMITED PARTNERSHIP, a Michigan Limited Partnership,** | ) | |
| **Plaintiff,** | ) | **No.** 03-2209C |
| **v.** | ) | |
| **UNITED STATES OF AMERICA, and MEL MARTINEZ, Secretary of the Department of Housing and Urban Development,** | ) | |
| **Defendants.** | ) | |

**COMPLAINT**

Plaintiff Englewood Terrace Limited Partnership, through its General Partner, Don S. Samuelson (Englewood Terrace Limited Partnership and Don S. Samuelson being referred to as "Englewood"), complains against defendants the United States of America and the Department of Housing and Urban Development ("HUD"), as follows:

**NATURE OF ACTION**

1. This is a breach of contact action by Englewood against HUD. It results from HUD's improper purported termination of a four-year Housing Assistance Payment ("HAP") contract between HUD and Englewood to provide Section 8 housing subsidies to Englewood for use at South Pointe Towers ("South Pointe"). South Pointe is a 23-story, 303-unit apartment building located at 6425 South Lowe in the Englewood community on the South Side of Chicago.

2. For some time there has been a severe shortage of project based Section 8 housing for families in Chicago. In response to this condition, HUD agreed to provide housing

subsidies to Englewood through a series of HAP contracts beginning in 1992: a five year contract through 1997, and then periodic contract renewals, the most recent multi-year contract of which was a four-year renewal contract signed in October 2000.

3. This suit is based on the HUD's breach of its obligation to provide housing subsidies to Englewood pursuant to a HAP renewal contract that was to run for an initial one year period from October 1, 2000 through September 30, 2001, and then to renew automatically for three additional one-year terms.

4. Less than two months later, on December 6, 2000, HUD informed Englewood that it was unilaterally amending the October contract from one year to three months and from three automatic one year renewals to none. Englewood did not acquiesce, and HUD never raised the subject thereafter, instead subverting the contract in other ways.

5. On March 2, 2001, HUD made its annual inspection of South Pointe which resulted in a Report dated March 8, 2001 listing physical deficiencies at the site for which a response was required from Englewood within 30 days.

6. The deficiencies were minor. All were easy to correct. None required major expenditures. Englewood corrected the deficiencies listed in the Report during the month of March and informed HUD of this in detailed letters of April 5, 2001 and April 8, 2001.

7. HUD did not acknowledge these responses. Rather, on April 9, 2001, HUD wrote that Englewood was in default of the HAP Contract, ignoring the fact that Englewood had just demonstrated that the problems HUD identified had already been corrected.

8. On October 1, 2001, HUD informed Englewood officially that it would not renew the HAP Contract or make further payments under its terms.

9. On October 29, 2001, Englewood filed a federal complaint against HUD, alleging that it had improperly terminated the HAP Contract in violation of the Multifamily Assisted Housing Reform and Affordability Act (MAHRA), 42 U.S.C. § 1437f, et seq., and seeking a preliminary injunction to prevent the termination.

10. On November 15, 2001, District Judge Ruben Castillo issued an Order concluding that the HAP Contract had not been terminated: "HUD never formally terminated Englewood's HAP Contract . . . If HUD decides to terminate the HAP Contract, then its actions will be governed by the MAHRA and it must provide Englewood with the proper notice and the opportunity to assert procedural rights. At this time . . . the HAP Contract, in fact, has not been terminated and is not yet in the process of being terminated." (No. 01 C 8285, U.S. District Court, Northern District of Illinois).

11. On November 30, 2001, as soon as HUD gotten past Englewood's injunction motion, HUD notified Englewood once again that the HAP Contract had been terminated. Englewood followed the proper administrative procedures and completed the administrative review process on May 2, 2002. It then renewed its suit in federal court (No. 02 C 4033, U.S. District Court, Northern District of Illinois). Both Judge Castillo and the parties subsequently concluded that the proper forum for Englewood was the Court of Federal Claims. Accordingly, Englewood's suit was dismissed without prejudice on March 11, 2003.

12. Concurrent with the HAP Contract, there was another business relationship between the parties during the first quarter of 2001. HUD and Englewood were negotiating a new 40-year loan for a major capital improvements program at South Pointe. However, HUD summarily dismissed Englewood's proposed plan, ended the discussions and demanded a change in site management and project ownership.

13. HUD improperly sought to force Englewood to agree (or punish Englewood for not agreeing) to a new long term capital improvement loan on terms HUD favored by terminating then extending for only short periods the HAP Contract that should have provided Englewood and its residents with regular, uninterrupted HAP payments through September 2004. HUD also failed to provide Englewood with the normal and exceptional rent increases needed by a property in a neighborhood with a high incidence of gangs and drugs.

14. Because HUD asserted that South Pointe's proposed repair program for the new capital improvements loan was not sufficiently comprehensive to meet its underwriting standard for a new 40-year loan, HUD wrongly contended that Englewood was in default of the HAP Contract—even though Englewood corrected in a timely manner all the deficiencies identified in HUD's March REAC Report.

15. HUD's breach of contract caused Englewood's occupancy to drop from 300 units in October 2001 to 80 units in September 2002, resulting in lost revenue to Englewood of approximately $547,012 from October 2001 through September 2002, and an additional $1,666,748 from October 2002 through September 2003. These losses are continuing, and HUD also wrongly refused $557,349 in separate claim requests through July 2002.

16. HUD's actions in this matter are contradictory and illegal. On the one hand HUD has now insured a new refinancing and rehabilitation loan to Englewood of $11,500,000. On the other, HUD has denied Englewood the benefits—and security to itself as insurer of the loan—of the regular project based rental subsidy HUD agreed to provide in October 2000. HAP benefits are essential to the proper operation of the project in a neighborhood with a high incidence of drugs, crime and gangs. HUD should be required to pay damages for the project based subsidy revenue it improperly withheld from Englewood. HUD

should also be required to reinstate the remaining year of the October 2000 renewal contract through September 2004.

## PARTIES

17. Englewood Terrace Limited Partnership ("Englewood"), a limited partnership organized and existing pursuant to the laws of the State of Michigan, owns and operates South Pointe Towers, a business restricted to a "very low income" multifamily housing development located at 6425 South Lowe, Chicago, Illinois, and subsidized under a Housing Assistance Payments Contract ("HAP Contract") by Section 8 of the National Housing Act, 42 U.S.C. § 1437f, et seq.

18. Defendants United States of America and Mel Martinez, Secretary of the United States Department of Housing and Urban Development are named as parties pursuant to the waiver of sovereign immunity contained in 42 U.S.C. § 1404a, and 5 U.S.C. § 702.

## JURISDICTION AND VENUE

19. This Court has jurisdiction over this claim for money damages against the United States, pursuant to 28 U.S.C. § 1491(a)(1), and 41 U.S.C. § 609.

20. This Court also has the authority under 28 U.S.C § 1491(a)(2) to take such other actions as may be necessary to "provide an entire remedy and to complete the relief afforded by the judgment" and to order any appropriate official of the United States to take actions that are incident of and collateral to the Court's judgment.

21. Venue is appropriate in this Court pursuant to 28 U.S.C. § 1491(a)(1).

## FACTUAL BACKGROUND

**Satisfaction of the Year 2000 Occupancy Review**

22. On March 14, 2000, HUD conducted its annual on-site review of South Pointe's operations. The findings of this inspection were sent to Englewood by HUD on June 16, 2000. HUD requested a written response to the findings in the report within 30 days.

23. HUD identified problems with torn and missing screens, the condition of the landscaping and grounds, dirty floors, graffiti on the walls, a missing smoke detector in the laundry room, the need for repairs in kitchens and baths, the need for drywall and painting repairs, housekeeping and infestation problems, elevators not working properly, drug and gang problems, the files not in order, tenants complaining that management was "rude," and the maintenance staff needed to be increased.

24. On July 10, 2000, Englewood responded that the listed items had been corrected or would be corrected during the remainder of July and August 2000.

25. On October 3, 2000, HUD wrote to Englewood that: "We have reviewed your response to our year 2000 Occupancy Review and find it acceptable. This review is now closed" (Exhibit A).

**The HUD HAP Contract Renewal in October 2000**

26. Englewood and HUD entered into the original Housing Assistance Payments Contract ("HAP Contract") in October 1992, as part of an overall purchase and physical rehabilitation plan supported by a renewable five-year HAP Contract with HUD. HUD renewed the HAP Contract on October 1, 1998 (Exhibit B). It was renewed again for one year from October 1, 1999 through September 30, 2000 (Exhibit C).

27. On October 18, 2000, HUD signed a renewal of the HAP Contract that extended the contract from October 1, 2000 through September 30, 2001 (Exhibit D ¶ 1). The agreement also provided for three one-year automatic renewals, subject to the availability of appropriations. Id. ¶ 2.

28. On December 6, 2000, HUD's Veronica Coleman wrote to Englewood (Exhibit E) that HUD had unilaterally amended the contract: shortening it with handwriting and cross-outs, from one year to three months and from three one year renewals to none. HUD, however, abandoned this claim, never thereafter denying the validity of the October 18, 2000 contract.

**The REAC Inspection Report**

29. The 1998 contract (Exhibit B) provides in Paragraph 20(b)(1) that a default by the Owner occurs upon an Owner's "failure to correct any deficiencies identified by HUD in connection with any inspection." Paragraph 20(b)(2) provides that "HUD shall notify the Owner of: (i) the nature of the default; (ii) the actions required to be taken . . ., and (iii) the time within which the Owner shall respond with a showing that all of the required actions have been taken." These procedural safeguards in the contract require that the facts upon which determinations of default are made must be specific, and that there is an opportunity for cure.

30. The Real Estate Assessment Center (REAC) conducted its annual physical inspection of South Pointe on March 2, 2001. Its Report was issued on March 8, 2001, describing physical deficiencies at the property (Exhibit F). The Report dealt with "health and safety" issues, "systemic deficiencies," which were to be problems found in at least half of the inspected units, and specific problems found in the site, the building and in the individual units.

31. According to the March 8, 2001 REAC Report, the following ordinary maintenance work needed to be done at the property: GFI outlets needed to be repaired. Missing breakers had to be replaced. Some electrical outlet covers had to be replaced. There were plumbing repairs to be done in the bathrooms. Some kitchen stoves and refrigerators had to be repaired. Repairs were needed for some bathtubs, bath sinks and toilets. Door locks needed repair. There was a need for improved exterminating services. Some wall repairs and painting were needed. The corrective work that needed to be done on the property could be accomplished by normal maintenance and work order procedures.

**Englewood's Response to the REAC Report**

32. Englewood responded completely and fully to HUD's REAC Report of March 8, 2001 in letters to HUD on April 5, 2001 (Exhibit G) and April 8, 2001 (Exhibit H). The April 5, 2001 letter provided detailed responses to each of the deficiencies noted in the March 8, 2001 Report. In the April 8, 2001 letter, Englewood provided HUD with the Health and Safety (EH&S) Certification, the MIO Plan for Correction (showing that almost all of the deficiencies noted in the REAC Report had already been corrected) and plans to address capital improvements appropriate for the property. It was a comprehensive and timely response, covering every point raised in the REAC Report.

**HUD's Refusal to Accept Englewood's Response**

33. On April 9, 2001, *the day after Englewood provided HUD with its full response to the REAC Report*, HUD sent Englewood a formal Notice of Default (Exhibit I). It cited the deficiencies in the March 2, 2001 inspection, concluding that: "The REAC inspection confirms that the project suffers from ongoing serious neglect, disrepair, and unsafe and unsanitary conditions throughout the units, common areas and the building." HUD made no

reference to the full response to the REAC Report that was sent to HUD by Englewood on April 8, 2001. HUD simply ignored the Englewood response, as if it had never been made. Instead, it referred to an April 3, 2001 letter from HUD rejecting Englewood's application for a new 40-year loan (Exhibit J).

34. More than a month later, on May 15, 2001, HUD Project Management Director Veronica Coleman wrote to Englewood, finally acknowledging the receipt of the Englewood April 8, 2001 response. She said, however, that it "will not be accepted due to impending negotiations with HUD concerning your proposed refinance and substantial rehabilitation of the property (Exhibit K). *HUD refused the package and returned it to Englewood.*

35. On May 16, 2001, HUD formally rejected Englewood's response to the REAC Report of March 8, 2001 (Exhibit L). HUD asserted that the very fact of an application for a 40-year rehabilitation loan was an acknowledgement of the substantial physical deficiencies at the project justifying the termination of the HAP Contract. It remained entirely silent on Englewood's response

**HUD and Englewood Differ on the Scope of the New Rehabilitation Loan**

36. During March and April 2001, Englewood and HUD discussed the scope of the new rehabilitation loan. Englewood wanted to make some large scale capital improvements related to the roof, the exterior, mechanical systems and other "capital" upgrades that would be needed by the project in the future. None of the proposed improvements to be financed through the new loan were required by the REAC Report.

37. In addition to Englewood's proposed improvement program, HUD wanted the complete replacement of the floors, cabinets, appliances and fixtures in the kitchens and

baths, air conditioning and electrical upgrades, new mechanical systems, the complete repainting of all interior spaces (units, corridors, common areas and stairwells), a new security and life-safety system, and the expenditure of $650,000 for the replacement of the mechanical penthouse.

38. The Englewood 40-year rehab loan improvement program was projected to be $3,359,048 (Exhibit M). HUD's proposed improvement program was $6,221,880 (Exhibit N). At a meeting at HUD on April 13, 2001, the purpose of which was to discuss the various approaches to the improvement program, HUD refused to let Englewood explain its analysis and reasoning behind its proposed improvement program and simply said that it wanted a new loan, a new owner and new management.

**The REAC Report, Not the New Loan, Had to be the Basis for the Default**

39. Englewood's response to the REAC Report was never read, reviewed or considered by HUD, prior to the HUD determination of default on April 9, 2001. However, the REAC Report was the sole factual basis on which HUD both based its decision to hold Englewood "in default" of the HAP Contract, and its later decision not to renew the HAP Contract on September 30, 2001.

40. On May 15, 2001, HUD for the first time acknowledged the receipt of Englewood's April 8, 2001 response to the March 8, 2001 REAC Report. But instead of welcoming the response, HUD wrote that it "will not be accepted due to impending negotiations with HUD (Departmental Enforcement Center and Chicago Multifamily Hub) concerning your proposed refinance and substantial rehabilitation of the property." The letter continues: "Although the letter from REAC directs you to prepare a Management Improvement and Operation (MIO) Plan subject to our approval, the condition of this property is beyond that point acknowledged by your application to refinance that we rejected due to major deficiencies."

the REAC Report were minor repair items that were easily corrected. All of the "non-life threatening" health and safety problems listed on the REAC Report were also minor and easily corrected. The remaining physical deficiencies listed in the REAC Report related to: missing closet doors, some stove burners that would not operate, leaking faucets, a clogged toilet, damaged lavatory sinks and tubs, damaged hardware in some apartment doors, peeling paint and some damage to walls—all minor maintenance matters that were corrected.

46. All of the "deficiencies" listed in the REAC Report represent normal maintenance service calls in a 303-unit apartment project like South Pointe. None were major physical problems at the building. It was to be expected, therefore, that these problems were reported as corrected in the April 5, 2001 letter from Building Manager Shawn Mintz, to Joan Kiening, Enforcement Analyst in the Chicago HUD office.

47. On the other hand, the rehabilitation program proposed by both Englewood and HUD consisted of major improvements, not maintenance repairs: a $700,000 program of concrete repair to the exterior of the building, power washing of the brick, coating and painting of the exterior concrete, the replacement of the roof, adding window blinds to the apartments, spending $130,000 for the replacement of boiler burner controls, a building-wide program of replacing and repairing plumbing and electrical fixtures, refinishing the kitchen cabinets, and an overall program of drywall repairs and painting.

48. The two programs were entirely different. The problems on the REAC Report were solved through work orders and normal maintenance. The substantial rehabilitation program proposed by Englewood required a new long-term loan to fund the major capital expenditures that would be appropriate to prepare a building for a new 40-year HUD loan.

**HUD Contends Englewood is in Default of the HAP Contract and Issues Vouchers**

49. From May 15, 2001 on, HUD asserted that Englewood was in default of the HAP Contract, and that HUD was relieved from its responsibilities under that contract. In the late spring and summer of 2001, the Chicago office of HUD asked Washington for vouchers to be given to the Chicago Housing Authority so that it could enable its agent, CHAC, to inform the residents at South Pointe that the project based Section 8 subsidy would be terminated on September 30, 2001. Residents would be given vouchers to leave South Pointe and to move to alternative housing. HUD met with residents and began to issue vouchers.

50. In August 2001, Englewood requested a renewal of the HAP Contract, along with a rent adjustment, with a supporting Rent Comparability Analysis, under the provisions of Section 8 of the HAP Contract: "The Owner may request a budget-based rental increase during the term of this contract of 5% of the initial rents set forth in the Notice. The Owner shall submit to HUD supporting data, financial statements and certifications which clearly support the increase."

51. Rents had not been increased at South Pointe since 1998, despite the fact that the project had expenses greater than revenues by an average of $200,000 a year for each of three consecutive years. In August 2001, Ed Hinsberger, the Multifamily Director of the Chicago HUD Office with the authority to approve rental increases, concurred in an email message that the Rent Comparability Analysis supported the increase.

52. On September 24, 2001, Mary Anderson, the Director of Operations of the HUD Chicago Office, signed a short term renewal of the 2000 HAP Contract from October 1 through December 31, 2001. But there was no provision for the rent increase.

53. Instead, on October 1, 2001, HUD informed Englewood that the HAP Contract was terminated, that residents had been instructed to apply for vouchers with which to leave South Pointe, and that the 90-day extension of the HAP Contract (through the end of 2001) was simply an expedient to provide temporary housing at South Pointe while the residents were attempting to find replacement housing in the marketplace.

54. There was no basis for HUD to terminate Englewood's HAP Contract premised on the findings of the REAC Report and Englewood's response. HUD's only justification for the termination of the HAP Contract was the stalled rehabilitation loan negotiations.

**The Federal Court Rules HAP Contract Not Terminated**

55. Englewood filed a complaint in the United States District Court for the Northern District of Illinois on October 29, 2001, seeking a declaratory judgment that HUD acted improperly in failing to renew the HAP Contract, in issuing vouchers to tenants before properly terminating the HAP Contract, in failing to implement Englewood's properly submitted request for a rent increase, and injunctive relief to compel defendants to comply with the legal requirements of the Multifamily Assisted Housing Reform and Affordability Act ("MAHRA") before terminating the HAP Contract.

56. Englewood regarded HUD's clear and consistent statements of its intent to terminate the HAP Contract, its issuance of vouchers to tenants and denial of Englewood's request for basic HUD benefits under the HAP Contract, and finally, the HUD representation that it was "terminating" the HAP Contract on October 1, 2001, as sufficient to conclude that the HAP Contract was terminated, and that HUD's wrongful actions would warrant a preliminary injunction.

57. Judge Ruben Castillo viewed the facts differently. He concluded that the suit was premature. On November 15, 2001, District Court Judge Castillo issued an Order denying Englewood's Motion for a Preliminary Injunction (Exhibit O). He found that the HAP Contract had not been terminated, "is not yet in the process of being terminated," and ruled that "if Defendants terminate the HAP Contract, Englewood will have thirty days within which to dispute this decision and cure any deficiencies, as well as to exhaust any subsequent appeal through the administrative process."

**HUD Purports to Terminate**

58. Just days after the court's ruling, on November 30, 2001, HUD issued a formal "Notice of Abatement and Termination of Housing Assistance Payments Contract" (Exhibit P). There had been no physical inspection of the property by HUD since the time of the Notice of Default on April 9, 2001, no review of Englewood's corrective actions described in its April 5, 2001 REAC Response, and no assessment of the physical condition of the property prior to the issuance of the Notice of Termination for reasons of physical deficiency. Nonetheless, the notice stated in the most vague and general terms that South Pointe was in default "for failure to maintain the Project's units and related facilities in decent, safe and sanitary condition." The notice referred to the May 16, 2001 letter to Englewood, and generally to "physical conditions standards acceptable to HUD," and HUD's intention under paragraph 20(b)(3) of the HAP Contract "to abate the HAP Contract."

59. Significantly, there is no language in paragraph 20 (b)(3) of the HAP Contract according HUD any right to "abate" the Contract. There is also no reference by HUD to Englewood's letters of April 5, 2001 and April 8, 2001, which explained in detail that the

various physical problems outlined in the March 8, 2001 REAC Report had been or would be corrected within a month.

**Englewood Exhausts Its Administrative Remedies**

60. On December 21, 2001, Englewood responded to HUD's termination letter of November 30, 2001. It stated that all of the deficiencies described in the REAC Report of March 8, 2001 and the first HUD termination letter of April 9, 2001 "have been addressed and complied with, leaving no cause for termination of the HAP Contract for Englewood."

61. On December 21, 2001, Mary Anderson, the Director of Operations on behalf of HUD, renewed the HAP Contract for six months from January 1, 2002.

62. On the same date—December 21, 2001—Englewood responded to the HUD Notice of Non Renewal with formal objections: First, the Owner had already submitted a MIO Plan responding to the REAC Report of March 8, 2001, dealing with each item listed on the Report; and second, HUD wrote to Englewood on May 15, 2001 refusing to accept the MIO Plan claiming that it was superseded by the pending application for 221(d)(4) refinancing.

63. A meeting on the appeal was held at the HUD Chicago office on January 22, 2002. HUD rejected Englewood's appeal on February 7, 2002, stating "that the concerns, requests and claims stated by the owner at the January 22, 2002 meeting merely duplicates those already provided and addressed in the matter of Englewood Terrace Limited Partnership v. The United States of America, et. al (No. 101 C 8285, N. D. Ill.)." HUD misstated the Court's Order. Judge Castillo ruled that the injunction action was premature because there would be adequate judicial review under the provisions of MAHRA *if and when HUD decided to terminate the HAP Contract*, and that "the harm that Englewood asserts is not irreparable

because it is a loss of project-based revenue provided by the HAP Contract which, should Englewood prevail, may be compensated at the conclusion of this litigation" (Exhibit O).

64. On February 13, 2002, Englewood requested a review of the HUD decision of February 7, 2002: "We are requesting HUD to designate an official to review the appeal, conduct a conference and issue a written decision."

65. A hearing on the Englewood appeal was held at HUD in Washington on April 16, 2002. On May 2, 2002, HUD notified Englewood by letter that it had denied the appeal and affirmed the actions of the HUD Office in Chicago (Exhibit Q).

66. The basis for Englewood's appeal was fully disclosed in a lengthy compilation of relevant materials supplied by Englewood to HUD prior to the April 16, 2002 conference in Washington. By contrast, HUD provided no new or updated information throughout the entire administrative review process. It merely relied on the March 8, 2001 REAC Report findings as the basis for its finding of default and the termination of the HAP Contract. HUD failed to acknowledge Englewood's undisputed representations that it had corrected the physical problems, nor did in reinspect the actual physical conditions at the property before terminating the HAP Contract in November 2001. Accordingly, Englewood renewed its federal lawsuit (No. 02 C 4033, U.S. District Court, Northern District of Illinois), which was subsequently, in March 2003, dismissed without prejudice in favor of an action in this forum.

**Englewood Damages From Wrongful Termination of HAP Contract**

67. From October 2001 through September 2002, Englewood received a steadily decreasing amount of monthly rent from the HAP Contract because residents with

vouchers were moving out, and Englewood was prohibited by HUD from renting its units to new tenants whose rent payments would otherwise have been subsidized under the HAP Contract.

68. From October 2002 through July 2003, Englewood has received no HUD subsidy. Its "market" has been limited to renting to residents with housing vouchers, or to the very few residents who could afford to pay "market rent" despite having incomes less than 50% of the area median income.

69. The local authorities issuing housing vouchers have determined that Englewood is not an appropriate location for the use of housing vouchers. The combination of the limitations on Englewood as an appropriate location for the use of housing vouchers and the serious income limits on prospective Englewood tenants has dramatically limited the ability of Englewood to rent its units.

70. Englewood received an average of $2,640,000 in rental income a year for the years 1999, 2000 and 2001—$220,000 per month.

71. From October 2001 through September 2002, the first full year following HUD's refusal to honor its obligations under the HAP Contract in October 2001, Englewood received rental income of $2,092,988, an average of just $174,415 per month—$547,012 less than the average for 1999-2001. This shortfall of roughly $45,585 per month increased over the year from $5,000 in November 2001 to $143,648 in September 2001.

72. Despite having vouchers for more than six months, more than 90% of the tenants continued to live at South Pointe through March 2002, and 80% through May 2000. The major tenant departures occurred in June (occupancy down to 68%), July (down to 59%), August (down to 51%), and September (down to 35%).

73. From October 2002 through September 2003, Englewood will have received a projected total of $973,252 in rent. This is an average of $81,104 per month, a monthly shortfall of approximately $140,000. Englewood will have received $1,666,748 less in rent during 2002-3 than it would have received in average income had the HAP Contract payments not been terminated (while the contract, in fact, continued to be extended).

74. Englewood has received $2,213,760 less in rent—$547,012 from October 2001 through September 2002, and $1,666,748 from October 2002 through September 2003—than it would have received had HUD not wrongfully terminated the HAP Contract.

**HUD Contract Authority to Make Subsidy Payments to Englewood**

75. HUD had annualized contract authority of $2,513,000 with which to satisfy its contract obligations to Englewood for the period from October 2001 through September 2002. HUD had comparable budgetary authority with which to satisfy its contract obligations to Englewood for the period from October 2002 through September 2003.

76. Englewood is thus entitled to over $2.2 million in rent shortfall damages from HUD—the difference between the rents Englewood received, and the amounts that it would have received for October 2001 through September 2003 (Exhibit R), had the contract not been wrongfully terminated.

77. These damages are continuing. In addition to lost rents, HUD's breaches are now jeopardizing the $7 million long-term capital improvements construction loan insured by HUD on December 13, 2002.

## COUNT I

## BREACH OF CONTRACT FOR ILLEGAL TERMINATION

78. Paragraphs 1 through 77 are incorporated herein by reference as if fully set forth herein.

79. In 2001, HUD's only formal relationship with Englewood was through the HAP Contract, under which HUD was to supply rent subsidies to South Pointe to be used for qualifying tenants. Under the terms of the HAP Contract, an Event of Default occurs when an Owner has "failed to comply with . . . or correct any deficiencies identified by HUD in connection with any inspection." The failure of Englewood and HUD to agree on the scope of work for a new rehabilitation loan to provide for the needs of the property for the 40-year term of the loan is not a proper basis for default under the HAP Contract.

80. HUD acted improperly when it based its determination of Englewood's default under the HAP Contract and its termination of the HAP Contract on the failure of HUD and Englewood to agree on the scope of work for a new rehabilitation loan and despite Englewood's correction of the conditions of the property listed in the March 8, 2001 REAC Report.

81. Englewood's willingness to enter into a loan arrangement with HUD for the substantial rehabilitation of the property was not a concession that there were uncorrected physical defects covered by the REAC inspection. The REAC inspection was directed to minor repairs and maintenance. The new rehabilitation loan was to be used for capital expenditures that would position the property for a significantly extended useful life.

82. HUD made a fundamental error in using the needs of a long-term rehabilitation program to be funded by a new capital loan to define the standards by which to judge the adequacy of an annual repair and maintenance program to be funded out of operations.

83. When HUD determines that a default has occurred in a HAP Contract, it is required to notify the Owner of: (i) the nature of the default, (ii) the actions required to be taken and the remedies to be applied on account of the default (including actions by the Owner to cure the default), and (iii) the time within which the Owner shall respond with a showing that all the required actions have been taken."

84. When HUD first notified Englewood of its alleged default under the HAP Contract on April 9, 2001, HUD referred to the specific problems in the March 8, 2001 REAC Report as the basis for its determination of default. On April 8, 2001, Englewood responded that it had corrected the problems. HUD ignored the Englewood response. Instead, HUD indicated in a letter to Englewood by HUD of May 15, 2001 that the Englewood responses "will not be accepted due to impending negotiations with HUD concerning your proposed refinance and substantial rehabilitation of the property."

85. The only specific description of physical deficiencies that HUD communicated to Englewood related to South Pointe occurred in the March 8, 2001 REAC Report. The April 9, 2001 Notice of Default referred to the REAC Report and described deficiencies as being: holes and cracks in hallway and unit walls; broken windows, inoperable stoves and faucets, cockroaches in the units, and ponding on the roof." Englewood had indicated to HUD in its April 8, 2001 letter that these problems had been corrected. The April 9, 2001 Notice then made a number of unsubstantiated, general references to physical conditions: that the Project "was not in good repair"; that the Project "suffers from ongoing serious neglect,

disrepair, and unsafe and unsanitary conditions throughout the units, common areas and the building"; and that the project is not in a "decent, safe and sanitary condition."

86. The April 9, 2001 Notice of Default made reference to HUD's rejection on April 3, 2001 of Englewood's application for a new rehabilitation loan: "The repairs outlined in your application are inadequate when compared to the needs of the property."

87. Two things are clear. First, the specific physical problems noted in the March 8, 2001 REAC Report were corrected before April 8, 2001. Second, the only formal inspection of the property that occurred during 2001 was the REAC inspection of March 2, 2001 and its Report of March 8, 2001.

88. HUD can declare an Owner in default of a HAP Contract for failure to correct any deficiencies identified by HUD in connection with an inspection. When a default occurs, however, HUD is obliged to notify the Owner of the actions required to be taken by the Owner to cure the default.

89. The REAC Report of March 8, 2001 was the proper procedure in that it provided Owner with the specifics to which the Owner could respond with a corrective strategy. Those corrections were made, a fact never disputed by HUD.

90. Other than the REAC Report, HUD simply used abstract and general labels to describe the physical conditions at South Pointe during 2001: "not in good repair," "serious neglect," "unsafe and unsanitary." These general, abstract words do not satisfy the default provisions in the HAP Contract.

**COUNT II**

**BREACH OF CONTRACT FOR FAILURE TO MAKE PAYMENTS**

91. Paragraphs 78 through 90 are incorporated herein by reference as if fully set forth.

92. HUD had contract obligations under the HAP Contract that was renewed from October 1, 2000 through September 30, 2001, and for the various short terms renewals that extended the HAP Contract from October 1, 2001 through December 31, 2001, from January 1, 2002 through June 30, 2002, and from July 1, 2002 through September 31, 2002.

93. HUD breached its contract obligations with Englewood to provide rental assistance under the terms of its renewal contract with Englewood that was to run from October 1, 2000 through September 30, 2001, with three automatic one year extensions.

94. HUD further breached its contract obligations: (a) by failing to process a request in August 2001 for an energy cost reimbursement for extraordinary energy costs for the 4th quarter of 2000 and the 1st quarter of 2001; (b) in failing to implement the rental increase that it acknowledged was proper in August 2001; (c) by failing to honor Englewood requests for vacancy claims; and (d) for special claims related to rent payments and damages caused by South Pointe residents subsidized by the HAP Contract.

95. The first claim request for $430,429 was made in a letter from DSSA Management, on behalf of Englewood, to HUD on May 31, 2002. Englewood updated its May 31st request, in a letter to HUD on July 31, 2002. The total owed was $557,349 through July 31, 2002 (Exhibit S). HUD wrongly refused both claims. Additional similar amounts are owed for the period August 2002 to the present.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff Englewood Terrace Limited Partnership prays that this Court enter judgment in its favor and against defendant HUD, as follows:

A. Damages in the amount of at least $3 million;

B. An order requiring HUD to provide the full four years of Section 8 project based subsidy benefits agreed to under the October 2000 HAP Contract, through September 30, 2004; and

C. Such other and further relief as is appropriate.

Dated: September 19, 2003

Peter V. Baugher

One of the Attorneys for Plaintiff
Englewood Terrace Limited Partnership

Peter V. Baugher
Schopf & Weiss
312 West Randolph Street
Suite 300
Chicago, IL 60606
312.701.9300