# In the United States Court of Federal Claims

No. 03-2209C
(Filed August 10, 2004)

| | | |
|---|---|---|
| **ENGLEWOOD TERRACE LIMITED PARTNERSHIP,** Plaintiff, v. **THE UNITED STATES,** Defendant. | * | Subject matter jurisdiction; waiver of sovereign immunity; claims arising under express contract; Multifamily Assisted Housing Reform and Affordability Act of 1997. |

*Peter V. Baugher*, Schopf & Weiss LLP, Chicago, Illinois, for plaintiff.

*Lisa B. Donis*, Commercial Litigation Branch, Civil Division, Department of Justice, with whom were *Peter D. Keisler*, Assistant Attorney General, *David M. Cohen*, Director, and *Brian M. Simkin*, Assistant Director, all of Washington, D.C., for defendant. *Gregory G. Gustin* and *Maria Baguio*, Department of Housing and Urban Development, Departmental Enforcement Center, Chicago, Illinois, of Counsel.

## OPINION AND ORDER

WOLSKI, Judge.

Defendant has moved for a dismissal of this case under Rule 12(b)(1) of the Rules of the United States Court of Federal Claims, arguing that this Court lacks subject matter jurisdiction. At issue is whether provisions of the Multifamily Assisted Housing Reform and Affordability Act of 1997 ("MAHRA"), which preclude judicial review of certain decisions by the United States Department of Housing and Urban Development ("HUD"), insulate defendant from claims for breach of a contract entered into under MAHRA. The Court concludes that they do not.

## BACKGROUND

When ruling on a motion to dismiss, the Court will normally accept as true all factual allegations made by the pleader and draw all reasonable inferences in a light most favorable to that party. *Scheuer v. Rhodes*, 416 US 232, 236 (1974). If a motion for dismissal due to lack of

subject matter jurisdiction is based on disputed facts bearing on the issue of jurisdiction, however, evidence beyond the pleadings may be considered and the plaintiff must demonstrate jurisdiction by a preponderance of the evidence. *Reynolds v. Army & Air Force Exchange Service*, 846 F2d 746, 747-48 (Fed Cir 1988). Disputed jurisdictional facts are not at issue here, as defendant United States makes a purely legal argument against this Court's jurisdiction, and thus the facts recited below are as pled in the complaint.[1]

Plaintiff Englewood Terrace, L.P. ("Englewood"), is the owner of South Pointe Towers, a 303-unit apartment building located in Chicago, Illinois. In return for providing housing for low income families, Englewood had, since at least 1992, received subsidies from HUD under a series of Housing Assistance Payments ("HAP") contracts. These HAP contracts were initially entered into pursuant to HUD's authority under Section 8 of the United States Housing Act of 1937, 42 USC § 1437 *et seq.* After the enactment of MAHRA in 1997, HAP contracts and contract renewals were executed under that authority, as well. *See* MAHRA, Pub. L. 105-65, Title V, Subtitle A, 111 Stat. 1384-1409 (as amended at 42 USC § 1437f (note) (2000)); Exs C, D to Complaint.

In October, 2000, HUD and Englewood signed a HAP renewal contract that was to "run for an initial 1 Year period," beginning October 1, 2000. The contract expressly provided that, "[a]fter expiration of the initial term, this Contract *shall renew automatically* for 3 additional one-year terms, subject to the availability of appropriations in any year." Ex D to Complaint, ¶ 2 (italics added). The contract stated that it was entered into pursuant to section 524(a) of MAHRA, and that rent adjustments "shall be determined in accordance with section 524(c) of MAHRA." *Id.* and ¶ 5. An addendum provided that "[i]f HUD notifies the Owner that it has failed to maintain a dwelling unit in decent, safe, and sanitary conditions and the Owner fails to take corrective action within the time prescribed in the notice," then HUD might reduce or suspend the housing assistance payments, and might use the abated payments "for the purpose of rehousing" families. Ex D to Complaint. A second page of the addendum included the following:

> Owner agrees as a condition of renewing the Section 8 Contract that, in the event HUD's Real Estate Assessment Center (REAC) issues a physical inspection report to the Owner that has a score which evidences Owner failure to comply with HUD's Uniform Physical Condition Standards and Physical Inspection Requirement . . . HUD may terminate the Contract after the renewal providing the Owner a reasonable period, as determined by HUD, to correct deficiencies or if the Owner fails to perform under an approved Correction Action Plan to Repair.

---

[1] The United States did submit, at the Court's request, copies of executed contracts between the parties. These contracts were referenced in the complaint, *see* Complaint ¶¶ 52, 61, 92, and are not disputed for purposes of this motion.

> Notwithstanding the foregoing, HUD may, at its option, continue the contract or renew said contract to facilitate the provision of vouchers for such reasonable time (not to exceed 180 days) as may be necessary to relocate eligible residents . . .

*Id.*[2]

A REAC inspection of South Pointe Towers was conducted on March 2, 2001, and on March 8, 2001, a REAC physical inspection report was issued to Englewood. Ex F to Complaint. This report identified a number of deficiencies found in common areas and in 25 randomly-sampled units, including the lack of safety inspection certificates, a blocked emergency exit, exposed wires, missing covers to electrical outlets, damaged kitchen stoves, plumbing problems, damaged walls, and the presence of cockroaches. Because of a low score on the inspection, Englewood was given "30 days in which to submit a Proposed Plan of Correction," which required that Englewood "conduct a survey of [its] property to determine if any additional deficiencies exist." *Id.* Englewood responded with two letters, dated April 5 and April 8, 2001, purporting to provide the requested information. *See* Exs G, H to Complaint.[3]

On April 9, 2001, HUD sent "formal notice" by letter to Englewood declaring the HAP contract to be in default for "failure to keep and maintain the Project in a decent, safe, and sanitary condition," and giving Englewood another thirty days to correct the problems. Ex I to Complaint. This letter did not mention Englewood's letters dated April 5 and 8, but did mention a different letter dated March 16, as well as HUD's April 3, 2001 rejection of an Englewood application for federal insurance for a proposed rehabilitation loan. *Id.*; *see also* Complaint ¶ 33; Ex J to Complaint. This April 3, 2001 letter listed eighteen reasons for rejecting the application, including the concern that the loan Englewood sought was not large enough to pay for all of the repair work needed. Ex J to Complaint. In this regard, HUD noted that deficiencies were uncovered in an April 28, 1999, REAC inspection, and in an inspection conducted on March 22 and 23, 2001, by a HUD construction analyst. *Id.*

Representatives of Englewood and HUD met on April 13, 2001, to discuss their differences in opinion concerning the scope of the rehabilitation work to be done at South Pointe Towers. Englewood sought a loan for $3.4 million to make what it described to be "some large scale capital improvements related to the roof, the exterior, mechanical systems and other

---

[2] This second page has a heading, "ADDENDUM TO SECTION 8 HAP CONTRACT RENEWAL," which differs from the first, and it is not clear to the Court whether these are two separate addenda, or just one. Only the second page is signed. For purposes of this opinion, the two pages will be treated as composing one addendum.

[3] The second letter has an attachment that bears the date April 9, 2001, which would be beyond the thirty day deadline. *See* Ex H to Complaint. For purposes of the motion to dismiss, the Court will assume that the attachment and not the letter itself contains a typographical error in its date, as Englewood has alleged that this response was timely made. *See* Complaint ¶ 32.

'capital' upgrades," none of which related to the deficiencies identified in the REAC report. Complaint ¶ 36-38. HUD wanted Englewood to borrow $6.2 million to be used for "the complete replacement of the floors, cabinets, appliances and fixtures in the kitchens and baths, air conditioning and electrical upgrades, the complete repainting of all interior spaces," and new security and safety systems. *Id.* At this meeting, HUD allegedly "refused to let Englewood explain its analysis and reasoning." Complaint ¶ 38.

In a letter dated May 15, 2001, HUD informed Englewood that the latter's response to the March 8 REAC report "will not be accepted due to impending negotiations with HUD . . . concerning [Englewood's] proposed refinance and substantial rehabilitation of the property." Ex K to Complaint. HUD stated that Englewood's response to the REAC report would be returned to sender, and contended that Englewood's application for mortgage insurance "acknowledged" that "the condition of this property is beyond" the point of being redressed through a plan of correction. *Id.* But on the following day, HUD sent a letter to Englewood which discussed the March, 2001 REAC inspection and stated: "HUD did not receive an acceptable plan addressing all the physical deficiencies from either the Owner or . . . managing agent. Instead, on April 3, 2001, the Chicago Multifamily HUB rejected the Owner's application" for mortgage insurance. Ex L to Complaint. This May 16 letter explained that because Englewood's "default of the HAP Contract is uncured and continues," HUD was "proceeding with its process to secure vouchers for the relocation of eligible tenants." *Id.*

HUD obtained vouchers for the residents of South Pointe Towers and began issuing these in place of the project-based subsidy that had previously been paid to Englewood for their housing. With the first year of the current HAP contract due to expire at the end of September, Englewood requested in August, 2001, that the contract be renewed. It also requested a rent adjustment, apparently invoking a paragraph from its 1998-99 HAP contract that no longer applied. Complaint ¶ 50 (quoting from paragraph eight of Ex B to Complaint); *but see* Ex D to Complaint, ¶ 4 ("All terms of the Expiring Contract are renewed except for those provisions relating to Contract Rents and rent adjustments."); *id.* ¶ 5 (stating "all subsequent adjustments to Contract rents shall be determined in accordance with section 524(c) of MAHRA"). Rents at South Pointe Towers were still at their 1998 levels, although the project's expenses exceeded revenues by $200,000, on average, over a three-year period. Complaint ¶ 51.

Despite the October, 2000 HAP renewal contract's express term providing that the contract "shall renew automatically" for three one-year terms, in late September, 2001, HUD executed a short-term, three-month renewal of the HAP contract. Complaint ¶ 52. This extension provided for no rent increase. On October 1, 2001, the day the extension took effect, HUD informed Englewood that the HAP contract was terminated, and that the short-term extension was designed to provide South Pointe Towers residents with adequate time to use housing vouchers to move to different housing. *Id.* ¶ 53.[4]

---

[4] Consistent with the allegation that the October, 2000 HAP contract had been terminated, the renewal contract executed in September referenced MAHRA section 524(a) as

On October 29, 2001, Englewood sued HUD in the United States District Court for the Northern District of Illinois, seeking declaratory relief and an injunction to stop the issuance of vouchers to the South Pointe Towers tenants. *Id.* ¶ 55. Englewood argued that HUD should have renewed the HAP contract; should have granted the rent increase request; should not be issuing vouchers; and cannot terminate the HAP contract unless procedures dictated by MAHRA are followed. *Id.* The District Court denied Englewood's motion for a preliminary injunction, finding that "HUD never formally terminated Englewood's HAP contract" and that termination would have to follow the notice and appeal procedures of MAHRA. Ex O to Complaint at 3 (*Englewood Terrace Ltd. Partnership v. United States*, No. 01-C-8285 slip op. (Nov. 15, 2001, N.D. Ill.)). The District Court also found that the loss of revenues due to tenants' use of vouchers to relocate was not irreparable because it "may be compensated at the conclusion of this litigation." *Id.* at 4.[5]

Fifteen days after the District Court ruled, HUD sent Englewood a letter regarding a "Notice of Abatement and Termination of Housing Assistance Payments Contract." Ex P to Complaint. This November 30, 2001 letter explained that Englewood had failed to cure the deficiencies identified in the April 9 letter and "failed to maintain the property according to the physical conditions standards acceptable to HUD." The letter stated that it constituted "Owner's notice that HUD intends to abate the HAP Contract" and that "pursuant to Section 516(a) and (b) of [MAHRA,] HUD will terminate the HAP Contract upon HUD's determination that the relocation process of eligible residents at the Project is concluded." *Id.*[6] This letter informed Englewood of the MAHRA procedure requiring a written objection or a cure of the default within thirty days.

Englewood appealed this abatement and termination decision according to the MAHRA procedures.[7] It responded to the notice on December 21, 2001, contending that the deficiencies identified in the March REAC report and the April 9 letter "have been addressed and complied with, leaving no cause for termination of the HAP Contract." Complaint ¶ 60. HUD met with Englewood on January 22, 2002, to consider its objections. On February 7, 2002, HUD affirmed

---

the basis for renewal, and not the automatic renewal clause from the October, 2000 contract. *See also* Ex D to Complaint (addendum to October, 2000 contract).

[5] Englewood contends that this "language is taken word for word from the Government's brief" opposing the motion for an injunction. Pltf's Resp to Mot to Dismiss at 5. The United States does not refute this contention. *See* Deft's Reply to Pltf's Resp at 3 n.1.

[6] "Abatement" is HUD's reduction or suspension of the housing assistance payments that would have gone directly to a project owner, and may be done to cover the payment of housing vouchers to relocating tenants. *See* Ex B to Complaint ¶¶ 6(c),(d), 20(b)(3)(iv).

[7] Englewood was following the administrative review procedures adopted by HUD for determinations under MAHRA. *See* 24 CFR §§ 401.645, 401.650-51 (2004).

its decision to terminate Englewood's HAP contract, and on February 13, 2002, Englewood requested that an independent reviewing HUD official be designated to hear its appeal. *Id.* ¶¶ 62-64. The appeal was heard on April 16, 2002, and the reviewing official issued his decision on May 2, 2002, affirming HUD's termination of the HAP contract. Ex Q to Complaint.

Having thus run the course of administrative appeals, Englewood brought the matter back before the District Court on June 5, 2002. While Englewood was exhausting administrative remedies, an additional six-month renewal of the HAP contract was executed, running through June, 2002. Complaint ¶ 61. One final short-term renewal was later agreed to, running through September, 2002. *Id.* ¶ 92. In the District Court, Englewood's motion for a preliminary injunction was opposed by HUD, which argued that "inasmuch as [that] action involve[d] a claim [for] money damages over $10,000 resulting from an alleged breach of the HAP contract, jurisdiction would appear to lie with the Court of Federal Claims."[8] For reasons unknown to this Court, Englewood's motion for a preliminary injunction was withdrawn, its counsel also withdrew, and the District Court matter was dismissed--first without prejudice, and then with prejudice for failure to prosecute.[9]

In mid-2002, Englewood submitted claims to HUD for money it believed it was owed under the HAP contract, for the period from October 1, 2001, through July 31, 2002. These claims, reflecting energy cost increases, payments related to vacant units, rent increases, and other claims, were denied by HUD. Complaint ¶¶ 94-95; Ex S to Complaint. Englewood filed suit in this Court on September 22, 2003, alleging that HUD breached the HAP contract by improperly terminating it. Complaint ¶¶ 78-90. Englewood seeks damages for the rent payments it would have received had its HAP contract been renewed for each of the three one-year periods beginning October 1, 2001--including general rent adjustments, rent increases due to energy costs, and payments for vacant units. Complaint ¶¶ 91-95. Embedded in these damages are rent payments that would have been received from HUD for tenants who instead were encouraged by HUD to relocate, through the use of rent vouchers. Complaint ¶¶ 67-74.

---

[8] Pltf's Resp to Mot to Dismiss at 11 (quoting Fed Govt.'s Resp to Emerg Motion for Prelim Inj'n at 8, case no. 02-CV-4033 (N.D. Ill.)).

[9] *See* App to Deft's Mot to Dismiss (docket sheet for case no. 02-CV-4033 (N.D. Ill.)). The Court will infer from the sparse record on this point that Englewood dropped its District Court litigation upon concluding that jurisdiction for its claims properly rested here.

## DISCUSSION

Like every other federal court, our Court's jurisdiction is determined by Congress.[10] The primary grant of our jurisdiction was accomplished through the Tucker Act, which provides in relevant part:

> The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 USC § 1491(a)(1) (2003).

Defendant United States ("Government") argues that this Court lacks jurisdiction over this matter, contending that Englewood must "establish some substantive provision of law, regulation, or the Constitution, which can be construed fairly as mandating compensation." Deft's Mot to Dismiss at 9. The October 2000 HAP renewal contract was entered into pursuant to HUD's authority under section 524(a) of MAHRA, *see* Ex D to Complaint, and MAHRA contains another section stating that certain determinations "shall not be subject to judicial review," MAHRA § 516(c). Ergo, the Government argues, no court--including this one--has jurisdiction over "disputes arising under contracts entered into pursuant to MAHRA." Deft's Mot to Dismiss at 11-12.

There are several problems with this argument. In the first place, the Government seems to misunderstand the Tucker Act's waiver of sovereign immunity. While it is true that the Tucker Act does not itself create a substantive right to recover money damages, a plaintiff does not need an act of Congress to create such a right. Rights to money damages may be created by the Executive branch, by simply entering into a contract. *See* 28 USC § 1491(a)(1) (our Court has jurisdiction over claims founded "upon any express or implied contract with the United States"); *United States v. Testan*, 424 US 392, 400 (1976) (looking for a money-mandating statute upon which to base jurisdiction under the Tucker Act, because the plaintiffs "do not rest their claims upon a contract"); *United States v. Connolly*, 716 F2d 882, 885 (Fed Cir 1983) (en banc) (holding it is settled that "the prospective claimant must invoke substantive rights *grounded expressly or by implication in a contract*, an act of Congress or a regulation of an executive department") (emphasis added). And unlike situations in which jurisdiction is based on a law or regulation, the contract need not explicitly state that money damages are an available remedy. *United States v. Winstar Corp.*, 518 US 839, 885 (1996) (plurality opn.) (holding

---

[10] This is even true for the Supreme Court, whose appellate jurisdiction is subject to "such Exceptions . . . as the Congress shall make." U.S. Const. Art III, § 2, cl. 2.

"damages are always the default remedy for breach of contract");[11] *id.* at 919-23 (Scalia, J., concurring in the judgment).

This is not to say, of course, that a contract may not by its very terms specify that enforcement against a breach shall be by means other than money damages--say, for instance, specific performance--and thus not come within our Court's jurisdiction. But the essence of a contract is that it is binding on the parties, and if an agreement provided that one party could unilaterally determine whether the other was in breach, with no recourse to an independent arbiter, then it could hardly be called a contract.[12] On the other hand, a contract may contain terms giving a unilateral right to one party or the other--such as the right to exercise an option, whether to extend or terminate. As long as there is adequate consideration to create a contract in the first place, such terms are binding on the other party and enforceable.

The substantive rights asserted by Englewood in this case without question are grounded in an express contract, as alleged in the complaint. To recap, Englewood entered into a contract with HUD that was "automatically" renewable for three one-year periods, subject only to the condition that appropriated funds be available. HUD inspected Englewood's property and, finding deficiencies, required a plan for correcting these--as the addendum to the contract allows. But because Englewood and HUD were discussing insurance for a rehabilitation loan, the plan submitted by Englewood was returned to it by HUD, which then used the absence of a plan as the basis for terminating the HAP contract. Englewood claims that HUD thereby breached the contract.

The Government argues, however, that "specified in" the October 2000 HAP renewal contract are the MAHRA "administrative procedures." Deft's Reply to Pltf's Resp at 6. It is urged upon the Court that the MAHRA administrative scheme is a term of the contract, and gives HUD the final word concerning *any* dispute arising under a HAP contract. Putting aside the question whether a "contract" can give one party the absolute power to determine if the other is in default,[13] this argument requires a close look at both the contract and MAHRA. The contract *does* expressly state that it is entered into by the parties "pursuant" to "section 524(a)" of

---

[11] *Citing* Restatement (Second) of Contracts § 346, Comment *a* (1981) and 3 E. Farnsworth, Contracts § 12.8, p. 185 (1990). *See Winstar*, 518 US at 885 n30.

[12] Not every "agreement" with the Government is considered a contract for Tucker Act purposes. As our predecessor Court explained, it is particularly situations like the case at bar, "instances where the sovereign steps off the throne and engages in purchase and sale of goods, lands, and services," which give rise to contracts wherein the Government cannot be "the sole judge of law and fact." *Kania v. United States*, 650 F2d 264, 268 (Ct Cl, 1981).

[13] *But see Torncello v. United States*, 681 F2d 756, 760 (Ct Cl 1982) (noting "one of the most elementary propositions of contract law [is] that a party may not reserve to itself a method of unlimited exculpation without rendering its promises illusory and the contract void").

MAHRA. Ex D to Complaint. It also specifies that rent adjustments are to be "determined in accordance with section 524(c) of MAHRA." *Id.* ¶ 5. And the contract provides that it "shall be construed in accordance with all applicable statutory requirements, and . . . all HUD regulations and other requirements, including any amendments or changes in the law or HUD requirements." *Id.* ¶ 10. There is also a "Section 524(a) Addendum," which specifies Englewood's obligation to keep the South Pointe Towers property in "decent, safe, and sanitary condition," and gives HUD the right, if Englewood fails to so maintain the property, to reduce or suspend payments, terminate the contract, or renew it for short-term periods while tenants are relocated using vouchers. Ex D to Complaint. The addendum makes no reference to any administrative procedures, under MAHRA or otherwise.

The question, then, is can the automatic renewal provision, and the addendum concerning abatement, termination, and short-term renewal, be "construed" under MAHRA and its regulations to remove from this forum HUD's decision to terminate the contract and not follow the automatic renewal provision? Section 524(a) of MAHRA is of particular importance to this question, since it is the authority cited in the contract. In relevant part, this section (entitled "Renewal of expiring project-based section 8 contracts") reads:

> (a) In general.
>
> (1) Renewal. Subject to paragraph (2), upon termination or expiration of a contract for project-based assistance under section 8 for a multifamily housing project (and notwithstanding section 8(v) of the United States Housing Act of 1937 [subsec. (v) of this section] for loan management assistance), *the Secretary shall, at the request of the owner of the project and to the extent sufficient amounts are made available in appropriation Acts*, use amounts available for the renewal of assistance under section 8 of such Act [this section] to provide such assistance for the project. The assistance *shall be provided under a contract having such terms and conditions as the Secretary considers appropriate, subject to the requirements of this section*. This section shall *not require* contract renewal for a project that is eligible under this subtitle for a mortgage restructuring and rental assistance sufficiency plan, if there is no approved plan for the project and the Secretary determines that such an approved plan is necessary.
>
> (2) Prohibition on renewal. Notwithstanding part 24 of title 24 of the Code of Federal Regulations, the Secretary *may elect not to renew assistance for a project otherwise required to be renewed under paragraph (1)* or provide comparable benefits under paragraph (1) or (2) of subsection (e) for a project described in either such paragraph, *if the Secretary determines that a violation under paragraphs (1) through (4) of section 516(a) has occurred* with respect to the project. *For purposes of such a determination, the provisions of section 516 shall apply to a project under this section in the same manner and to the same extent*

> *that the provisions of such section apply* to eligible multifamily housing projects, except that the Secretary shall make the determination under section 516(a)(4).

MAHRA § 524(a) (emphasis added).

Section 524(a) of MAHRA, thus, provides the following: HUD *must* renew HAP contracts, if funds are available, unless it is determined either that a rental assistance sufficiency plan is necessary[14] or that a violation of another section has occurred (in which case HUD *may elect* not to renew the contract). It also states that the renewal contract can have whatever terms HUD finds appropriate, subject to the *requirements* of section 524. This section does incorporate by reference the provisions of section 516 of MAHRA--the section stating certain determinations "shall not be subject to judicial review." *See* MAHRA § 516(c).[15]

One way to construe the October 2000 HAP renewal contract, in light of section 524(a), would be to say that the clause stating "this Contract shall renew automatically" merely refers to the section 524(a)(1) requirement that HUD *shall* renew HAP contracts "upon termination or expiration," subject to the exception of section 524(a)(2). The section 524(a)(2) exception allows HUD to elect not to renew where, as here, a violation of section 516(a)(1)-(4) arguably is found.[16] Since MAHRA section 516(c) states that final determinations under that section "are not subject to judicial review," HUD's decision not to renew the HAP contract thus cannot make its way into any court, under this view.

This reasoning, however, is flawed from the outset. The plain meaning of paragraph 2 of the October 2000 HAP renewal contract--that "this Contract shall renew automatically for 3 additional one-year terms, subject to the availability of appropriations in any year"--contradicts any interpretation that implies additional conditions and qualifications to renewal. The only

---

[14] Englewood's application for mortgage insurance for a rehabilitation loan did not involve a "mortgage restructuring and rental assistance sufficiency plan," but was instead under 12 USC § 1715*l*(d)(4) (1993). *See* Ex J to Complaint.

[15] Incidentally, the MAHRA provision concerning rent adjustments that is incorporated in the October 2000 HAP renewal contract--section 524(c)--does not state that the section 516 procedures apply. At oral argument, when asked if this Court had jurisdiction over the claims concerning rent adjustments, Government counsel answered, "I think probably yes." Tr. (March 18, 2004) at 20:10-16.

[16] Neither the "Notice of Abatement and Termination" nor the reviewing official's "Appeal Decision" specifically reference a violation of section 516(a)(1)-(4) of MAHRA. *See* Exs P, Q to Complaint. Instead, default is based on the HAP contract requirement that units be kept in "decent, safe and sanitary condition," and HUD's physical condition standards regulations. *See* Addendum, Ex D to Complaint; 24 CFR § 5.703. These violations would appear potentially to fall under section 516(a)(2)(A),(B),(H) and 516(a)(3) of MAHRA.

condition that is stated is the availability of funds. And the word "automatically" is hardly ambiguous, and certainly rules out the use of any discretion in the renewal of the contract.[17] Nor can it plausibly be contended that section 524(a) of MAHRA would not admit such a term into a HAP contract. Section 524(a)(1) gives HUD the discretion to include in a contract "such terms and conditions as the Secretary considers appropriate, subject to the requirements of this section." The automatic renewal term does not conflict with any *requirements* of section 524 of MAHRA, which contains nothing to forbid HUD from including such a term. Even when a violation of section 516(a)(1)-(4) is found, renewal is not forbidden, but is merely something HUD "may elect not to" do. MAHRA § 524(a)(2).

In short, when HUD renewed Englewood's HAP contract in October, 2000, under section 524(a) of MAHRA, it apparently chose to use its discretion *at that time* to elect to renew the contract for not just one initial year, but also three additional one-year terms. Section 524(a)(2) of MAHRA, which places beyond court review HUD's discretionary election not to renew contracts when violations of section 516(a) have been determined, no longer comes into play. It applies only when HUD makes a discretionary decision not to renew a HAP contract, not where, as here, that discretion had already been used to promise renewal for periods certain.

The Government's primary argument, however, is that section 516 of MAHRA by itself makes HUD's determination in this case unchallengeable in court. The Government makes very broad claims for this section. It argues that section 516 gives HUD the right "to terminate" HAP contracts under certain conditions, and that the section "provides that the Government may act to cancel the HAP contract if" property is in poor condition or problems have not been timely cured. Deft's Mot to Dismiss at 10. The Government claims that among the determinations that "shall not be subject to judicial review" due to section 516(c) of MAHRA is "the decision to terminate" a HAP contract. *Id.* at 11. It states MAHRA is "plain upon its face" and that "Congress has clearly expressed its view that there is no judicial remedy for disputes arising under contracts entered into pursuant to MAHRA."[18] *Id.* at 11-12.

But far from being a sweeping provision that applies to all disputes arising under HAP contracts, section 516 of MAHRA is limited to very specific circumstances: "The Secretary may elect not to consider *any mortgage restructuring and rental assistance sufficiency plan or request for contract renewal* if the Secretary or the participating administrative entity determines" that

---

[17] *See, e.g.,* Webster's Third New International Dictionary 148 (1976) (defining "automatically" as "in an automatic manner : without thought or conscious intention;" providing as first definition of "automatic," "involuntary either wholly or to a major extent so that any activity of the will is largely negligible : of a reflex nature : without volition").

[18] It is hard to understand how the Government can argue that MAHRA so unambiguously deprives this Court of jurisdiction, when the Government itself argued in the District Court, with MAHRA squarely at issue, that the availability of compensation made any injury to Englewood subsequently reparable. *See* note 5, above, and accompanying text.

certain financial or managerial actions or omissions have occurred, including violations of laws or regulations, failure to cure poor housing conditions, or conditions so poor that they "cannot be remedied in a cost effective manner." MAHRA § 516(a). These are the only determinations to which the administrative review process of section 516(b) apply, and which are not subject to judicial review. Section 516 makes no mention of cancellation or termination of a HAP contract.

While they purported to be pursuant to section 516 of MAHRA, the notice Englewood received on November 30, 2001, and the appeal decision of May 2, 2002, specifically stated they concerned the *termination* of Englewood's HAP contract. *See* Exs P, Q to Complaint.[19] Neither document so much as hinted that the decision at hand was whether or not to renew the HAP contract. The Government argues that the difference between "contract renewal" and "termination" is "a difference without a distinction," and a mere "semantics issue," because the termination in this case occurred "at the end of a contract period." Deft's Reply to Pltf's Response at 4; Tr. (March 18, 2004) at 18:9. But section 516 clearly speaks of contract *renewal*. "Renewal" is defined in MAHRA as "the replacement of an expiring Federal rental contract with a new contract under section 8 of the United States Housing Act of 1937." MAHRA § 512(12). "Expiring contract" is defined as "a project-based assistance contract attached to an eligible multifamily housing project which, under the terms of the contract, will expire." MAHRA § 512(3). The October 2000 HAP renewal contract stated that it "shall run for an *initial* 1 Year period," and that "[a]fter expiration of this *initial* term, this Contract shall renew automatically for 3 additional one-year terms." Ex D to Complaint, ¶¶ 1-2 (italics added).

Thus, although the initial *term* had expired at the time Englewood was first informed of the termination (October 1, 2001, the beginning of the first short-term extension), the *contract* by its very terms was not to expire until the three additional one-year terms had run. Thus, it was natural for the HUD decisionmakers to declare that they were terminating the contract, since the contract was to run through September 30, 2004. The Government now has it exactly backwards: We are not presented with a circumstance in which HUD elected not to renew a contract, which had the effect of terminating it; rather, HUD decided to terminate a contract that it was contractually bound to renew. Section 516 of MAHRA does not cover such a situation.

It is clear that HUD was acting not pursuant to MAHRA's termination or cancellation procedures, for the statute has none, but instead pursuant to the addendum to the October 2000 HAP renewal contract.[20] This addendum specifically states that HUD may *terminate* the contract

---

[19] The Court does not consider Englewood's use of the MAHRA administrative appeal process to be a fatal concession that section 516(c) applied. As its counsel explained during oral argument, Englewood was merely hoping to persuade HUD to change its position, *see* Tr. (March 18, 2004) at 56:13-25, and in any event had been told by the District Court to "exhaust any subsequent appeal through the administrative process." *See* Ex O to Complaint at 4.

[20] Nor do the regulations enacted under MAHRA mention cancellation, termination, or abatement as among the decisions covered by the administrative appeal procedures and thus not

if Englewood does not timely correct deficiencies identified in a REAC inspection report, and may "continue the contract or renew said contract to facilitate the provision of vouchers" to aid tenants in relocation. *See* Ex D to Complaint. It also states that HUD may reduce or suspend housing assistance payments--in other words, abate payments--if timely corrective action is not taken by Englewood to restore apartments to a "decent, safe, and sanitary condition." *Id.* There is no indication that the MAHRA administrative appeals provisions apply to these determinations, and certainly no notice to Englewood that judicial review would be precluded.[21]

In sum, in October, 2000, HUD entered into a contract with Englewood in which it expressly promised that renewal would "automatically" occur for three one-year periods, conditioned only on the availability of appropriated funds. The contract is subject to MAHRA and applicable regulations, but these do not address the exercise of HUD's termination or abatement rights under the contract.[22] Englewood is suing for damages, arguing in essence that HUD acted precipitously in terminating the contract when the latter was not entitled to do so and thus breached the contract.[23] The Government cannot take refuge under the protection of section 516, for when it promised to "automatically" renew the HAP contract it removed the renewal decision from the sphere of its discretion and no longer had the right to "elect not to renew." While HUD could still, of course, exercise its right to terminate the contract for default, this determination is not covered by section 516 of MAHRA.

It bears stressing that HUD used its discretion to agree to a binding contract containing an automatic renewal term. Nothing in MAHRA precluded such a term, just as nothing would have precluded HUD from striking a bargain to make housing assistance payments for a four-year term, subject to the availability of appropriated funds. HUD could have instead included a term that said, "the Owner may apply for renewal for three additional one-year terms, pursuant to the procedures set forth in sections 516 and 524(a) of MAHRA." Or it could have used a term such as: "the contract shall be renewed in accordance with sections 516 and 524(a) of MAHRA." Or, if it were its intention, it could have employed a contract term stating, "the Owner need not formally apply for renewal for each of three succeeding one-year terms, but such application will be automatically assumed." Or, it could have been silent on the point, in which case section

---

subject to judicial review. *See* 24 CFR §§ 402.7, 401.645 (2004) (and regulations cited therein).

[21] Nor does section 516 mention abatement of housing assistance payments as one of the determinations not subject to judicial review. *See* MAHRA § 516.

[22] The express automatic renewal promise and the failure of the MAHRA statutory and regulatory scheme to address these actions distinguish this situation from that presented in cases such as *Simons v. United States*, 25 Cl Ct 685, 695-98 (1992) and *Doty v. United States*, 24 Cl Ct 615, 625-26 (1991). Review in this case, as in typical breach of contract cases, is *de novo*, and not under the Administrative Procedures Act, 5 USC § 706 (2003).

[23] *See, e.g.,* 2 E. Farnsworth, Farnsworth on Contracts § 8.18, p. 526 (2004).

524(a) of MAHRA would have nevertheless applied. But HUD cannot promise automatic renewal and subsequently use laws and regulations governing discretionary renewal to keep Englewood's breach of contract lawsuit out of this Court.[24]

The claims brought by Englewood are grounded in an express contract with the Government, and no laws or regulations incorporated into that contract deprive this Court of jurisdiction. The Government's motion to dismiss must thus be denied.

## CONCLUSION

For the reasons stated above, defendant's motion to dismiss is hereby **DENIED**. Defendant shall file an answer to the complaint within twenty days of the date of this opinion.

**IT IS SO ORDERED.**

/S/Victor J. Wolski
VICTOR J. WOLSKI
Judge

[24] It is well-settled that "[r]ights against the United States arising out of a contract with it are protected by the Fifth Amendment." *Lynch v. U.S.*, 292 US 571, 579, (1934), *citing United States v. Central Pacific R. Co.*, 118 US 235, 238 (1886), and *United States v. Northern Pacific Ry. Co.*, 256 US 51, 64, 67 (1921). *See also United States Trust Co. of N.Y. v. New Jersey*, 431 US 1, 19 n16 (1977) ("Contract rights are a form of property and as such may be taken for a public purpose provided that just compensation is paid."); *Cienega Gardens v. United States*, 331 F3d 1319, 1329-1330 (Fed Cir 2003) (noting "ample precedent for acknowledging a property interest in contract rights under the Fifth Amendment."). Thus, were it to attempt to nullify an express promise to renew a contract through a new interpretation of a statute or regulation, the United States may arguably be interfering with reasonable, investment-backed expectations, implicating the Fifth Amendment.