IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| ENGLEWOOD TERRACE LIMITED PARTNERSHIP, Plaintiff, | ) | No. 03-2209C (Judge Wolski) |
| v. | ) | |
| THE UNITED STATES, Defendant. | ) | |

DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERTED FACT

Pursuant to Rule 56 of the Rules of the United States Court of Federal Claims ("RCFC"), defendant, the United States, submits the following proposed findings of uncontroverted fact in support of our motion for summary judgment.[1]

Background Facts

1. Plaintiff is Englewood Terrace Limited Partnership, through its general partner, Don S. Samuelson (together referred to as "Englewood"). Compl. at 1.

2. Englewood is a limited partnership organized pursuant to Michigan state law that owns South Pointe Towers ("South Pointe"), a 23-story, 303-unit apartment building located at 6425 South Lowe in Chicago, Illinois. Compl. ¶¶ 1, 17.

3. During much of the period relevant to this dispute, P.M. Group served as Englewood's general partner. P.M. One, an

[1]"Compl." refers to plaintiff's complaint. "App." refers to the appendix attached to defendant's motion for summary judgment.

affiliated company, served as the managing agent for South Pointe. App. 300.

4. In October 2002, Mr. Samuelson's sole proprietorship, DSSA, replaced PM Group as Englewood's general partner. DSSA Management, a company affiliated with DSSA, replaced P.M. One as South Pointe's managing agent in December 2001. App. 215, 373-75, 384, Samuelson Tr. 68-70, 90.

5. In response to a housing shortage in Chicago's Englewood community, Englewood and the United States. Department of Housing and Urban Development ("HUD") entered into a Housing Assistance Payment contract (the "HAP Contract") pursuant to the United States Housing Act of 1937, 42 U.S.C. § 1437. Compl. ¶ 2; App. 1, Compl. Ex. B. In accordance with this contract, HUD agreed "to make housing assistance payments on behalf of Families for the Contract Units; to enable the Families to lease decent, safe, and sanitary housing pursuant to Section 8 of the Act." App. 1, Compl. Ex. B.

6. Paragraph 6 of the HAP Contract required Englewood "to maintain and operate the Contract Units, unassisted units, if any, and related facilities to provide decent, safe, and sanitary housing including the provision of all the services, maintenance and utilities." App. 3, Compl. Ex. B. Pursuant to the HAP Contract, HUD possessed the right to "inspect or cause to be inspected at such times as may be necessary to ensure that the

Owner is meeting its obligations to maintain the units in decent, safe, and sanitary condition including the provision of the agreed-upon utilities and other services." App. 4, Compl. Ex. B.

7. The HAP contract stated that "[a] default by the Owner under this Contract shall result if . . . Owner has violated or failed to comply with any provision of, or obligation under, this Contract or of any Lease, including failure to correct any deficiencies identified by HUD in connection with any inspection." App. 11, Compl. Ex. B.

8. In the event of a default by Englewood, the HAP Contract required HUD to notify Englewood of "(i) The nature of the default; (ii) The actions required to be taken and the remedies to be applied on account of the default (including actions by the Owner to cure the default); and (iii) The time within which the Owner shall respond with a showing that all the required actions have been taken." App. 11, Compl. Ex. B.

9. If Englewood failed "to respond to or take action to the satisfaction of HUD" to cure a default, HUD possessed the right to terminate the HAP Contact. App. 11, Compl. Ex. B. Specifically, HUD could "take corrective action to achieve compliance, in accordance with paragraph [20](b)(3) or to terminate th[e] Contract with HUD approval, in whole or in part, or to take other corrective action to achieve compliance in its discretion, or as directed by HUD." App. 11, Compl. Ex. B.

10. HUD could also "reduce or suspend housing assistance payments" in response to Englewood's default. App. 11, Compl. Ex. B.

The 1999 REAC Report

11. On April 28, 1999, HUD's Real Estate Assessment Center ("REAC") performed a physical inspection of 25 units at South Pointe. Out of a possible numeric score of 100, Englewood received an overall score of 42. HUD's REAC Report also noted exigent health and safety items at South Pointe. App. 15, 22-23.

12. On May 19, 1999, representatives of Pinnacle Realty Management Company visited South Pointe and found that Englewood had not corrected "severe findings" from the REAC inspection. App. 27.

13. Pinnacle's written report further stated that "[t]he owner has not corrected conditions that adversely affect the provision of decent, safe, and sanitary housing as required by the HAP contract." App. 27.

14. On August 20, 1999, John Hayes, President of Englewood's Property Manager, P.M. One, wrote to Ed Hinsberger, Director of HUD's Multifamily Housing Division. Mr. Hayes's letter stated that "[a]ll Health and Safety items such as non working Smoke Detectors, GFIs, etc. listed in the above referenced report have been corrected." App. 53.

15. On October 12, 1999, the City of Chicago Department of Buildings notified P.M. One that an inspection conducted on September 23, 1999 disclosed multiple City Municipal Code violations, including roach and rodent infestations (App. 55, 56), missing fire extinguishers (App. 56), "garbage chutes with garbage everywhere" (App. 57), and "raw standing sewage." App. 58.

16. On December 8, 1999, Carl Sanders, P.M. One's Property Manager, provided Joan Kiening, HUD Supervisory Enforcement Analyst, a "status update and work in progress." This document purported to address problems identified in the April 26, 1999 REAC inspection. App. 64.

17. Although Mr. Sanders claimed to have submitted a Management Improvement Operating ("MIO") plan to Ms. Kiening (App. 64), he did not submit a HUD-approved MIO plan, which must contain a complete survey of needed improvements, a plan of correction, and sources of funding. App. 160.

18. On March 14, 2000, HUD personnel returned to South Pointe and conducted an on-site review. Compl. ¶ 22. This review resulted in findings of a "big problem with drugs and gangs," that "stairwells were dirty and smell of urin[e]," and that elevators were not functioning properly. App. 78-79.

19. During this time, Englewood applied for reimbursement for unpaid rent as well as tenant-caused damage at South Pointe.

However, Englewood failed to include required documentation and, therefore, HUD denied its application. App. 126.

20. Mr. Sanders wrote to Ms. Kiening again on June 7, 2000 and provided another "status update" regarding "work in progress" at South Pointe.[2] App. 84. Among other items, Mr. Sanders indicated that "[t]two (2) new elevators have been installed and the completion date for [the] 3rd elevator is July 15, 2000." App. 85.

21. On June 16, 2000, Veronica Coleman, Director of Project Management for HUD's Chicago Multifamily Hub, informed Mr. Hayes of the results of HUD's March 14, 2000 on-site review. Ms. Coleman warned him that HUD could "not allow management to continue at this level of performance." App. 97.

22. P.M. One submitted a response to this on-site review. HUD deemed this response acceptable and informed P.M. One that "[t]his review is now closed." App. 107. However, HUD also informed P.M. One that "[o]n the next review, findings will be verified for corrections made. This includes items identified in the REAC physical inspection report." App. 107.

23. On November 3, 2000, P.M. One employed inspectors to "determine the physical status" of South Pointe. App. 124. In their summary report, these inspectors noted that South Pointe's

---

[2] Mr. Sanders mistakenly addressed this letter to Gwendolyn Thomas of HUD's Chicago Multifamily Housing Hub. App. 84.

"elevators are constantly out of order and it's always the same problem." App. 125. These inspectors also determined that conditions around garbage chutes were "unsanitary" and "a danger to children." App. 125. Finally, P.M. One's inspectors discovered an average of six rodent holes in each unit inspected. App. 124.

The October 2000 Renewal Contract

24. On October 16, 2000, Mr. Hayes executed a new HAP Renewal Contract by which "[a]ll terms of the Expiring [HAP] Contract are renewed except for those provisions relating to Contract Rents and rent adjustments." App. 108, Compl. Ex. D.

25. As a "condition of renewing the Section 8 Contract," Mr. Hayes agreed to an addendum stating that, in the event REAC issued a physical inspection report evidencing Englewood's failure to "comply with HUD's Uniform Physical Condition Standards and Physical Inspection Requirement," HUD "may terminate the Contract after the renewal providing the Owner a reasonable period, as determined by HUD, to correct deficiencies or if the Owner fails to perform under an Approved Correction Action Plan to Repair." App. 111, Compl. Ex. D.

26. HUD executed the Renewal Contract on October 18, 2000 in the name of Mary E. Anderson, Director of Operations.[3] App. 109,

[3] A subordinate executed the Renewal Contract on behalf of Ms. Anderson, who was absent. App. 424, Thomas Tr. 202.

Compl. Ex. D. The copy of the Renewal Contract executed in Ms. Anderson's name contained an error indicating that the HAP Contract "shall run for an initial 1 Year period" and would "renew automatically for 3 additional one year terms, subject to the availability of appropriations in any year." App. 108, Compl. Ex. D.

27. HUD officials informed Mr. Hayes and other Englewood representatives of this error during a meeting on October 18, 2000. App. 423-32, Coleman Tr. 72-77, Thomas Tr. 201-04.

28. On December 6, 2000, Ms. Coleman transmitted a corrected copy of the Renewal Contract to Mr. Hayes. This copy contained an amendment changing the duration of the "HAP Contract from (one) 1 year to a (three) 3 month short term renewal with zero (0) renewal terms." App. 155, Compl. Ex. E.

29. Subsequent to this letter, HUD and Englewood (through its general partner) agreed that the HAP Contract would be amended to expire on September 31, 2001 with no automatic extensions. In fact, on January 22, 2001, Ken Horton, Vice President of P.M. Group, wrote to Ms. Coleman via e-mail that P.M. Group agreed to amending the contract to reflect a September 31, 2001 expiration date: "On a separate note, pursuant to my conversation with Ms. Thomas last week, she informed me that the HAP contract would be further amended to reflect the original expiration date of September 30, 2001. Please forward the

amended, amended HAP contract to my attention at the following address." App. 157. Mr. Hayes received a copy of this e-mail. App. 157.

30. Ms. Coleman responded to Mr. Horton by encouraging him to expedite P.M. One's efforts to obtain a new mortgage to "substantially repair the property." App. 156. Ms. Coleman warned Mr. Horton that HUD was only continuing to subsidize the property "to protect the tenants" and that HUD would be prepared to issue vouchers that tenants could spend on rent at other properties "should the need arise." App. 156.

31. Following this exchange, Mr. Hayes responded to Ms. Coleman's e-mail and informed her that Mr. Horton would no longer be responsible for the loan application efforts. App. 159. Mr. Hayes expressed no objection to a HAP Contract expiration date of September 2001. App. 159.

The 2001 REAC Inspection

32. On March 2, 2001, REAC again inspected a sample of 25 units at South Pointe. This time, out of a possible total score of 100, South Pointe received a score of 31. App. 160, Compl. Ex. F. HUD subsequently informed P.M. One that "you have 30 days in which to submit a Proposed Plan of Correction to your local HUD field office." App. 160, Compl. Ex. F.

33. HUD also directed P.M. One that "[b]efore you can prepare your plan, you are required to conduct a survey of your

property to determine if any additional deficiencies exist." App. 160, Compl. Ex. F.

34. HUD instructed P.M. One to "complete your survey and forward your Proposed Plan in Management Improvement Operating Plan (MIO) format, within 30 days of the date of this letter." App. 160, Compl. Ex. F.

35. Finally, HUD directed P.M. One to correct "exigent health and safety deficiencies" identified in the REAC Report "within 72 hours of receipt of the report." App. 161, Compl. Ex. F.

36. On March 6, 2001, Mr. Hayes provided Gwendolyn Thomas of HUD's Chicago Multifamily Housing Hub with a "certification" that exigent health and safety items identified in the REAC inspection had been corrected. App. 171.1.

37. Mr. Hayes's certification was inaccurate. On March 9, 2001, Ms. Coleman wrote to Mr. Hayes stating that HUD had conducted a "confirmatory review" with P.M. One staff members present. App. 171.1. This review confirmed that "only a few of the EHS items had been mitigated and not all as you certified. When the confirmatory review concluded, all items found to be inaccurately certified were discussed with your staff." App. 171.1.

38. Ms. Coleman warned Mr. Hayes that HUD could not continue to ignore P.M. One's failure to provide decent, safe, and

sanitary housing to its residents: "Also, the fact that your property is not in good repair places you in violation of your Housing Assistance Payment (HAP) Contract (refer to Section 542 (a) Addendum)." App. 171.1.

39. Ms. Coleman warned Mr. Hayes that HUD would not tolerate further "false certifications and contract violations." App. 171.1. She explained that, "[s]hould actions like these continue, we will not hesitate to exercise our rights and/or remedies under the HAP contract, including reduction, suspension, abatement, or termination of the Section 8 Assistance Payments." App. 171.1.

40. Mr. Hayes responded to Ms. Coleman's letter by acknowledging that HUD requirements had not been complied with and that he had submitted his certification without direct knowledge of the conditions at South Pointe: "The General Partner relies solely on the information received from the property management company." App. 171.17.

41. In fact, HUD was not the only party to discover that the exigent health and safety items identified in the March 2, 2001 REAC report were not corrected on March 6, 2001. On March 8, 2001, representatives of the Illinois Housing Development Authority inspected South Pointe. App. 433. In addition to finding exposed wires and non-functioning fire alarms, the Illinois Housing Authority documented that smoke detectors were

missing or non-functioning and that light fixtures and outlet covers were missing -- items Mr. Hayes had certified were corrected just two day before. App. 433-36.

42. During this time, Englewood submitted an application asking HUD to insure a new mortgage. HUD rejected this application because the "repairs outlined in [Englewood's] application are inadequate when compared to the needs of the property" as well as because the application was missing several required documents. App. 173, Compl. Ex. J. HUD also informed P.M. One that, "due to poor past performance," HUD could not insure a new mortgage if "P.M. One would continue to manage the project." App. 173, Compl. Ex. J.

43. On April 5, 2001, P.M. One sent HUD a document it identified as a MIO plan that purported to show the status of work performed in response to the March 2, 2001 REAC inspection. App. 176, Compl. Ex. G. However, this document contained no MIO form, did not contain a survey identifying the property's overall needs and did not identify sources of funding with which to correct problems. App. 176, Compl. Ex. G.

44. On April 8, 2001, Kelly Brown, Regional Property Manager for P.M. One, sent Ms. Coleman a letter with attachments also purporting to contain a "Management Improvement and Operating Plan (MIO) and the Emergency Health and Safety (EH&S) Certification from the owner." App. 185, Compl. Ex. H. However,

this document, which P.M. One submitted one day beyond the 30-day deadline contained in HUD's March 8, 2001 transmittal of the REAC inspection, also failed to meet the requirements of a HUD-approved MIO plan. App. 185., Compl. Ex. H.

<u>HUD Issues Notice Of Default</u>

45. On April 9, 2001, HUD issued a notice of contract default to Englewood. App. 192, Compl. Ex. I. This notice, executed by Mr. Hinsberger and Margarita Maisonnet, Director of HUD's Departmental Enforcement Center's Chicago Satellite Office, referred Englewood to HUD's Physical Condition Standards, 24 C.F.R. Part 5, Subpart G. App. 192, Compl. Ex. I. It further identified South Pointe's physical condition as a grounds for default under the HAP contract: "The failure to keep and maintain the Project in a decent, safe, and sanitary condition is a default of the HAP contract." App. 193, Compl. Ex. I. Mr. Hinsberger and Ms. Maisonnet also instructed Englewood that failure to correct the events of default "to the satisfaction of HUD within 30 days from the date of this Notice" could cause HUD to "seek any and all available remedies including, without limitation, suspending or abating the HAP contract." App. 193, Compl. Ex. I.

46. On April 13, 2001, Mr. Hayes met with HUD representatives to discuss "the various approaches to the improvement program" needed at South Pointe. Compl. ¶ 38. HUD

representatives reiterated to Mr. Hayes that HUD could only assume the obligation of insuring a new mortgage if Englewood received new management. Compl. ¶ 38.

47. On May 15, 2001, Ms. Coleman returned P.M. One's late and defective response to the March 8, 2001 REAC Report. Compl. ¶ 40; App. 199, Compl. Ex. K. Ms. Coleman's letter stated that HUD would not accept Ms. Brown's response "due to impending negotiations with HUD . . . concerning your proposed refinance and substantial rehabilitation of the property." Compl. ¶ 40; App. 199, Compl. Ex. K. Ms. Coleman further noted that, although Englewood had been obligated to submit a MIO plan in response to problems identified in the 25 units covered in the REAC Report, "the condition of this property is beyond that point as acknowledged by your application to refinance that we rejected due to major deficiencies." Compl. ¶ 40; App. 199, Compl. Ex. K.

48. By May 16, 2001, HUD had received no communication from P.M. One indicating that "any efforts had been taken to contain the declining physical condition of the property or to address ongoing site management deficiencies." App. 200, Compl. Ex. L. Instead, Mr. Hayes had written to HUD indicating that "a satisfactory acquisition agreement might be reached among the Owner and [an] acquirer within the next 30-days." App. 200, Compl. Ex. L.

49. On May 16, 2001, Mr. Hinsberger and Ms. Maisonnet sent P.M. One a notice of continuing default. They urged P.M. One "to provide adequate, timely information describing the immediate efforts that the Owner is making to address the HAP default and the sale of the Project and proposed assumption of the HAP contract." App. 201, Compl. Ex. L. They also advised P.M. One that HUD was "proceeding with its process to secure vouchers for relocation of eligible tenants." App. 201, Compl. Ex. L.

50. On May 22, 2001, Mr. Hayes wrote to Ms. Coleman and acknowledged that, "though we have addressed the REAC Inspection report with a management improvement and operating plan, [] the overriding issue is the meeting that was conducted on April 13, 2001 with the Departmental Enforcement Center and Mr. Ed Hinsberger." App. 202.

Don Samuelson's Tour Of South Pointe

51. One potential buyer of South Pointe was Don Samuelson, plaintiff's current representative. Mr. Samuelson previously had purchased and managed "troubled" projects. App. 374-75, Samuelson Tr. 69. At his deposition, Mr. Samuelson defined as "troubled" those projects "that have need for physical improvements, better marketing, better management, resident services, that can be more effective as places for people to live

and become an asset to the community rather than a toxic waste."[4] App. 374, Samuelson Tr. 69.

52. Mr. Samuelson toured South Pointe in the summer of 2001 and discovered a lack of physical security "because of locks on various entries and exits that had been broken or compromised and the relative freedom that gangs and gang-related and drug interests had in moving off the street, into the building, up into the units and around the building." App. 378, Samuelson Tr. 76.

53. Mr. Samuelson also found that gangs and drug dealers repeatedly sabotaged the elevators at South Pointe: "So the elevators had been vandalized, stopped, doors put off, lots of things that would keep them not operational so that there was relative greater capacity for people to roam the building stairwells than the elevator system." App. 380, Samuelson Tr. 78.

54. According to Mr. Samuelson's assessment, South Pointe's physical deficiencies could only be resolved after its management corrected its security problems: "In a building like that or like some of the CHA buildings, its very difficult to manage

[4] At least one court has considered claims for reimbursement for management expenses filed by Mr. Samuelson. That court determined that Mr. Samuelson "violated his fiduciary duty" and found that his claims were "either unsubstantiated, inflated, or specious." App. 336-37, Affordable Comm. Housing Trust-Theta v. Samuelson, No. 98 CH 892 (Order dated Aug. 1, 2002).

buildings if you don't have the security. If you don't have control over the building and the ability of eliminating gangs, drugs, and criminal activities, you are very hard-pressed. Everything else follows from that." App. 381, Samuelson Tr. 79.

55. In short, Mr. Samuelson found that South Pointe was not an appropriate living space for "faint-hearted" tenants. In fact, it "wasn't for the faint-hearted anyone." App. 419, Samuelson Tr. 144.

56. Mr. Samuelson's impression of the building's lack of security was confirmed in July 2001 when the Office of the State's Attorney for Cook County, Illinois declared South Pointe a public nuisance because "narcotics are being bought and sold in and around this property. In addition, the Chicago Police Department has expressed concern that this property is being used for illegal drug activity." App. 203.

57. Mr. Samuelson prepared written findings following his visit to South Pointe and submitted these to HUD along with a proposed plan of action. Mr. Samuelson reported that P.M. One's on-site staff "is relatively non-productive. Security is not effective" and that "the current condition of [South Pointe's] penthouse is inefficient and dangerous." App. 205. Mr. Samuelson confirmed the accuracy of these statements during his deposition. App. 383, Samuelson Tr. 81.

58. At this time, Mr. Samuelson began working as an "unpaid consultant" to P.M. One in hopes of "convert[ing] what was a very crime-ridden, drug-laden project into an attractive addition to the Englewood community." App. 385, Samuelson Tr. 91.

<u>The Parties Renew The HAP Contract And HUD Issues Vouchers</u>

59. In August 2001, Englewood requested a renewal of the HAP Contract's terms, which were scheduled to expire on September 30, 2001 pursuant to the parties' Renewal Contract. Compl. ¶ 50.

60. At this time, Mr. Samuelson also requested that HUD increase the rent Englewood could charge its residents. App. 215; Compl. ¶ 50. An August 21, 2001 letter Mr. Samuelson sent to HUD contained a place for Mr. Hayes to affix his signature in order to "acknowledged and agree[] to" Mr. Samuelson's request for a rent increase. App. 216. Mr. Hayes did not sign this document. App. 216.

61. Mr. Hinsberger notified Mr. Samuelson that a rent comparability study "supports the proposed rents," but that the submission was not signed by the current management company, P.M. One. App. 422. Mr. Hinsberger informed Mr. Samuelson that HUD would "allow the new rents to kick in at the time of closing" of Mr. Samuelson's purchase of South Pointe. App. 422.

62. In 2001, HUD initiated a program through which property owners could request reimbursement for high energy costs. App. 197. "In order for owners to take advantage of the opportunity for a utility lump sum adjustment," properties had to be acceptably managed and "in good standing with all Business Agreements signed with the Department." App. 197.

63. Englewood submitted a request for a lump sum reimbursement of $55,230.99 for its energy costs on August 6, 2001. App. 211-14. HUD declined this request because of Englewood's ongoing default. App. 197.

64. On September 26, 2001, the parties executed a new Renewal Contract extending the terms of the HAP Contract "for a period of .3 years." App. 220; Compl. ¶ 52.

65. This Renewal Contract stated that the parties previously "had entered into a HAP Contract ("expiring contract") to make Section 8 housing assistance payments to the Owner for eligible families living in the Project. The term of the expiring contract will expire prior to the beginning of the term of the Renewal Contract." App. 222. The Renewal Contract also stated that its purpose was "to renew the expiring contract for an additional term." App. 222.

66. The Renewal Contract gave HUD the right to abate housing assistance payments if it determined that South Pointe was not in "decent, safe, and sanitary condition" and to "use amounts

otherwise payable to the Owner pursuant to the Renewal Contract for the purpose[] of relocating or rehousing assisted residents in other housing." App. 222.

67. Finally, the Renewal Contract specified the "applicable contract rents" and contained no rental increase at the time of execution. App. 228; Compl. ¶ 52.

68. On October 1, 2001, Mr. Hinsberger notified Mr. Hayes via e-mail that the Chicago Housing Authority "will begin issuing vouchers for the residents at South Pointe today." App. 236. Despite HUD's frequent communications regarding its intention to issue vouchers -- and Englewood's subsequent agreement to a Renewal Contract acknowledging HUD's right to issue vouchers -- Mr. Hayes informed Mr. Hinsberger in an e-mail that he considered HUD's actions "unfair." App. 236.

69. Mr. Hinsberger responded by forwarding previous correspondence between them reflecting Mr. Haye's prior notice of HUD's rights and stated that, "to accommodate you, and the prospective purchaser, we are willing to continue to process the mortgage insurance application once a complete application is received that addresses the deficiencies." App. 235-36.

70. On October 11, 2001, Mr. Samuelson sent an e-mail to Mr. Hinsberger and Mr. Hayes confirming that, although he was "surprised at the rigidity of [HUD's] position," he conceded "of course that there was the possibility of the use of vouchers"

when the parties had discussed the Renewal Contract in August and September 2001. App. 237.

71. On October 22, 2001, HUD representative Lily Simmons visited South Pointe and reported that the property still was not in decent, safe, and sanitary condition. App. 238. Specifically, she recorded the smell of urine in common areas, exposed wires, and roaches in hallways and on walls. App. 238.

72. By October 2001, Mr. Samuelson regarded vouchers as potentially advantageous: "There is clearly a bad element at South Pointe. Intimidators. Have to be identified and moved. Perhaps vouchers could serve a useful purpose in this regard." App. 437. Mr. Samuelson had pursued this strategy at other properties he managed. App. 371-72, Samuelson Tr. 66-67.

73. Englewood's then-current owners disagreed. On October 29, 2001, Englewood filed a complaint in the United States District Court for the Northern District of Illinois seeking to enjoin HUD from issuing vouchers to tenants at South Pointe. Compl. ¶ 55. The court denied Englewood's request for an injunction against the issuance of vouchers. App. 280, Compl. Ex. O. The court also concluded that HUD had not terminated the HAP contract: "Rather, HUD provided Englewood with notice that it was in continuing default under the HAP contract and that HUD would begin the process of providing vouchers for relocation of eligible tenants." App. 280, Compl. Ex. O.

74. On November 30, 2001, HUD issued a "Notice of Abatement and Termination." This document stated that Englewood had failed to demonstrate that it had maintained the units at Englewood in decent, safe, and sanitary condition as defined by 24 C.F.R. Part 5, Subpart G within 30 days of HUD's April 9, 2001 formal notice of default. App. 283, Compl. Ex. P. HUD further stated that Englewood "has not cured the conditions complained of in the notice" and that, if Englewood did not provide a written objection or cure the underlying basis of default within 30 days, HUD's decision to terminate the contract would become final. App. 283. HUD informed Englewood that it intended to terminate the contract after completing "its voucher and relocation process for all eligible residents in the Project." App. 283, Compl. Ex. P.

75. This notice also informed Englewood that the voucher and relocation process "may extend beyond the expiration date of the current HAP Contract Renewal." App. 284, Compl. Ex. P. HUD invited Englewood to extend the terms of the HAP Contract to "protect the residents," but emphasized that such an agreement would not affect "HUD's determinations as set forth above." App. 284, Compl. Ex. P.

76. On December 21, 2001, Englewood and HUD agreed to a HAP Renewal Contract extending the terms of the HAP Contract for six additional months. App. 290; Compl. ¶ 61.

77. During this period, plaintiff's representative Don Samuelson understood that HUD was issuing vouchers and that the HAP Contract had been extended and not illegally terminated: "So we needed to get people moved because there had been uses of HAP extensions for periods of time . . . . By the end of December, nobody moved. And then there was an extension for six months from January 1 to July 30. So at the end of three months, you know, my conclusion was there is going to be no more Section 8 as far as I can tell. People ought to be prepared to leave and move out." App. 417-18, Samuelson Tr. 142-43.

78. As noted, Mr. Samuelson, who assumed management duties at South Pointe on December 1, 2001 (App. 384, Samuelson Tr. 90), favored vouchers as a means of removing undesireable tenants: "So there was a very aggressive effort during those three months to move people out or help move people out." App. 418, Samuelson Tr. 143. Mr. Samuelson even hired an employee to facilitate removing tenants who received vouchers. "We had a person named Charles Woods who was specifically hired to do nothing more than tend to tenant needs and interests and help them relocate . . . . we were particularly interested in having some of the tenants leave because we had had experience with difficulty -- records of difficulty with them and there had been efforts of trying to evict them in the past that hadn't been successful." App. 415-16, Samuelson Tr. 141-42.

79. As these tenants left, Englewood made no effort to seek reimbursement from them for unpaid rent or damage the tenants had caused to apartments: "it struck me that it would be just a waste of money to retain a lawyer and to try to collect rents"
App. 419, Samuelson Tr. 144.

Englewood Pursues Its Administrative Remedies

80. On December 21, 2001, Englewood's attorneys objected to HUD's November 30, 2001 notice. Specifically, Englewood's attorneys informed HUD that Englewood objected to HUD's "notice of non-renewal and seeks to exercise its right to cure, as required pursuant to Chapter 13 of MAHRA." App. 285.

81. Representatives of the parties met at HUD's Chicago office on January 22, 2002. Compl. ¶ 63. On February 7, 2002, Greg Gustin, Lead Enforcement Attorney, informed Englewood that HUD's final decision was to uphold its right to "continue to act as it stated in its November 30, 2001 Notice of Abatement and Termination." App. 298.

82. HUD conducted a hearing regarding Englewood's claims in Washington, D.C. on April 16, 2002. Compl. ¶ 65. On May 2, 2002, Howard Mayfield, Deputy Director, Office of Asset Management, informed Englewood that he affirmed HUD's February 7, 2002 final decision App. 303, Compl. Ex. Q.

The Aftermath Of Englewood's Appeal Process

83. On May 31, 2002 and July 31, 2002, Mr. Samuelson submitted letters to Mr. Hinsberger in which he claimed that Englewood was entitled to $430,429 in lost revenues. App. 304, Compl. Ex. S. These claims included a request for $139,187 in "Rental Adjustments for Escalating Energy Costs," as well as additional amounts for lost revenues for vacant apartments, unpaid rent, and tenant-caused damage to apartments. App. 304, 329, Compl. Ex. S. HUD denied these claims. App. 340.

84. In June 2002, Englewood renewed its lawsuit in Federal district court. That suit was dismissed with prejudice in March 2003. Compl. ¶ 66.

85. Ms. Thomas visited Englewood on June 28, 2002 and found that the smell of urine still filled common areas. App. 328. She also discovered exposed wires, non-functioning elevators, missing fire extinguishers, and garbage on the floors of common areas. App. 328.

86. After inspecting units at South Pointe, CHAC, Inc., the company administering HUD's voucher program, determined "Englewood is not an appropriate location for the use of housing vouchers." Compl. ¶ 69.

87. The parties executed another HAP Contract Renewal on June 26, 2002. This time, the parties extended the HAP Contract through September 2002. App. 317.

88. On July 3, 2002, Mr. Samuelson contacted Mr. Hayes and Mr. Hinsberger via e-mail and requested Mr. Hinsberger's assistance in obtaining the "release of the July HAP funds." App. 313. Mr. Samuelson informed Mr. Hinsberger that "money is needed" because Englewood confronted foreclosure by its mortgagor. App. 313.

89. On September 26, 2002, Michael G. McGhie, P.M. One's new President, wrote to HUD and acknowledged that "problems did exist in the operation of P.M. One properties in Chicago." App. 300. In recognition of P.M. One's "poor track record," Mr. McGhie offered for P.M. One "to be placed on probation." App. 300.

90. On December 10, 2003 and subsequent to filing this lawsuit, Mr. Samuelson wrote to Mr. Hinsberger and stated that "neither the voucher or 'market' market has materialized in the way we had projected, occupancy was 30%, and that none of the revenue assumptions we had made were materializing." App. 339. Mr. Samuelson stated his position that Englewood's claims "relate to generating money to complete this project properly, something you are going to have to do voluntarily as part of the [mortgage] assignment process, or you may be obliged to do it by Court order." App. 340.

91. In June 2003, a "mysterious" fire destroyed the documents that Mr. Samuelson claims would substantiate Englewood's entitlement to damages in this case. App. 411,

Samuelson Tr. 136. According to Mr. Samuelson, "drug interests" broke into South Pointe's management office and set this fire: "And I think it became understood by the drug interests that the camera tapes would in fact be stored in the management office . . . So at 5 o'clock or 4:30 a.m. one night, there was a mysterious fire that was set in the management office which destroyed most of the records in the management office." App. 411, Samuelson Tr. 136.

Incidents At South Pointe

92. Between January 1, 1999 and December 31, 2001, the Chicago Police responded to a total of 794 incidents at South Pointe. App. 369.

93. These included at least two homicides (App. 369), 39 burglaries (App. 355-56), more than 50 assaults (356-58), and more than 100 batteries. App 359-67.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/ Brian M. Simkin
by s/ Roger A. Hipp
BRIAN M. SIMKIN
Assistant Director

s/ Paul R. Wellons
by s/ Roger A. Hipp
PAUL R. WELLONS
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tel: (202) 616-8253
Fax: (202) 307-0972

Attorneys for Defendant

OF COUNSEL:

GREGORY GUSTIN
MARIA BAGUIO
Office of General Counsel
U.S. Department of
Housing and Urban Development

JUNE 2, 2005

CERTIFICATE OF FILING

I hereby certify that on June 2, 2005, a copy of the foregoing "DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERTED FACTS" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Roger A. Hipp