**IN THE**
**UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **ENGLEWOOD TERRACE LIMITED PARTNERSHIP,** | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **No. 03-2209C** |
| | ) | **Judge Marian Blank Horn** |
| **UNITED STATES OF AMERICA,** | ) | |
| **Defendant.** | ) | |

**JOINT STIPULATIONS OF FACT**

Pursuant to the Court's order dated February 10, 2006, the parties agree to the following stipulations regarding facts.

## I. DEFINITIONS

1. "Englewood" refers to plaintiff, Englewood Terrace Limited Partnership, a limited partnership organized pursuant to Michigan law and the sole beneficiary of a land trust that owns South Pointe Towers. [Compl. ¶¶ 1, 17 (JA 3, p. 30 at 34).][1]

2. "South Pointe" refers to South Pointe Towers, a 23-story, 303-unit apartment building located at 6425 South Lowe in Chicago, Illinois. [Compl. ¶¶ 1, 17 (JA 3, p. 30 at 34).]

3. "DSSA" refers to DSSA New Englewood Terrace LLC, a sole proprietorship of Don S. Samuelson. DSSA replaced P.M. Group as Englewood's general partner in December 2002. [Samuelson Submission dated August 21, 2001 at 1

[1] "JA _, p. _" refers to the tab number and page number of the parties' joint appendix.

(JA 104, p. 1120), Samuelson Deposition Transcript ("Samuelson Tr.") at 68-70 (JA 14, p. 587).]

4. "DSSA Management" refers to a company affiliated with DSSA. DSSA Management replaced P.M. One as South Pointe's managing agent in December 2001. [Samuelson Tr. at 93 (JA 14, p. 570 at 593).]

5. "P.M. Group" refers to Englewood's general partner during the period relevant to this dispute and until December 2002. [Samuelson Tr. at 70 (JA 14, p. 570 at 587).]

6. "P.M. One" refers to a company affiliated with P.M. Group. P.M. One served as the managing agent for South Pointe during the period relevant to this dispute until December 2001. [Samuelson Tr. at 93 (JA 14, p. 570 at 593); Taft, Stettinus Letter dated February 6, 2003 at 1, 4 (JA 133, p. 1259 at 1262); P.M. One Letter dated September 26, 2002 at 1 (JA 132, p. 1257).]

7. "1998 HAP Contract" refers to the Housing Assistance Payments Contract executed by HUD and Englewood that covered the period from October 1, 1998 through September 30, 1999. [1998 HAP Contract at 1 (JA 19, p. 677).]

8. "1999 HAP Renewal Contract" refers to the first one-year renewal to the 1998 HAP Contract that covered the period from October 1, 1999 through September 30, 2000. [1999 HAP Renewal Contract (JA 20, p. 691).]

9. "October 2000 HAP Renewal Contract" refers to the second renewal of the 1998 HAP Contract. [2000 HAP Renewal Contract (JA 21, p. 696).] The 2000 HAP Renewal Contract stated that the "Contract shall run an initial 1 Year period" and that, "[a]fter expiration of the initial term, this Contract shall renew automatically for

3 additional one-year terms, subject to the availability of appropriations in any year." [2000 HAP Renewal Contract at 1 (JA 21, p. 696).]

10. "2001 90-Day HAP Renewal Contract" refers to the 90-day renewal contract from October 1, 2001 through December 31, 2001. [2001 90-Day HAP Renewal Contract (JA 24, p. 719).]

11. "180-Day HAP Renewal Contract" refers to the 180-day renewal contract from January 1, 2002 through June 30, 2002. [180-Day HAP Renewal Contract (JA 25, p. 737).]

12. "2002 90-Day HAP Renewal Contract" refers to the short-term renewal contract from July 1, 2002 through September 30, 2002. [2002 90-Day HAP Renewal Contract (JA 26, p. 746).]

13. "REAC" refers to HUD's Real Estate Assessment Center, which conducted inspections at South Pointe on April 28, 1999 and March 2, 2001. [REAC Report dated April 28, 1999 at 1 (JA 27, p. 760); REAC Report dated March 8, 2001 at 1 (JA 28, p. 767).]

## II. THE HOUSING ASSISTANCE PAYMENT ("HAP") CONTRACTS

### <u>The 1998 HAP Contract – October 1, 1998 to September 30, 1999</u>

14. In 1998, in response to the shortage of affordable housing for the low income residents of Chicago's Englewood community, Englewood and the United States Department of Housing and Urban Development ("HUD") executed a Housing Assistance Payment Contract (the "1998 HAP Contract") pursuant to the United States Housing Act of 1937, 4 U.S.C. § 1437. [1998 HAP Contract at 1 (JA 19, p. 677).] The 1998 HAP Contract stated that its purpose was "to make housing assistance payments on behalf of families for the contract units; to enable the families to lease decent, safe, and

sanitary housing pursuant to Section 8 of the Act." [1998 HAP Contract at 1 (JA 19, p. 677).]

15. The term of the 1998 HAP Contract was for one year beginning on October 1, 1998 and continuing through September 30, 1999. [1998 HAP Contract at 1 (JA 19, p. 677).]

16. Paragraph 6 of the 1998 HAP Contract stated that Englewood was "to maintain and operate the Contract Units, unassisted units, if any, and related facilities to provide decent, safe, and sanitary housing including the provision of all the services, maintenance and utilities." [1998 HAP Contract at 3 (JA 19, p. 677 at 679).] The 1998 HAP Contract also stated that HUD "shall inspect or cause to be inspected at such times as may be necessary to ensure that the Owner is meeting its obligations to maintain the units in decent, safe, and sanitary condition including the provision of the agreed-upon utilities and other services." [1998 HAP Contract at 4 (JA 19, p. 677 at 680).]

17. Paragraph 20(b)(1)(i) of the 1998 HAP Contract defined an event of default: "A default by the Owner under this Contract shall result if . . . Owner has violated or failed to comply with any provision of, or obligation under, this Contract or of any Lease, including failure to correct any deficiencies identified by HUD in connection with any inspection." [1998 HAP Contract at 11 (JA 19, p. 677 at 687).]

18. Paragraph 20(b)(2) of the 1998 HAP Contract provided: "Upon a determination that an event of default has occurred HUD shall notify Englewood of (i) The nature of the default; (ii) The actions required to be taken and the remedies to be applied on account of the default (including actions by the Owner to cure the default);

and (iii) The time within which the Owner shall respond with a showing that all the required actions have been taken." [1998 HAP Contract at 11 (JA 19, p. 677 at 687).]

19. Paragraph 20(b)(2) of the 1998 HAP Contract further provided that if Englewood "fails to respond or take action to the satisfaction of HUD, HUD shall have the right to take corrective action to achieve compliance, in accordance with paragraph [20](b)(3) or to terminate th[e] Contract with HUD approval, in whole or in part, or to take other corrective action to achieve compliance in its discretion, or as directed by HUD." [1998 HAP Contract at 11 (JA 19, p. 677 at 687).]

20. Paragraph 20(b)(3)(iv) of the 1998 HAP Contract provided that HUD could also "[r]educe or suspend housing assistance payments" in response to Englewood's default. [1998 HAP Contract at 11 (JA 19, p. 677 at 687).]

21. Paragraph 21 of the 1998 HAP Renewal Contract provided: "This Contract, including the exhibit(s), is the entire agreement between HUD and the Owner. No changes in this Contract may be made except in writing signed by both the Owner and HUD." [1998 HAP Contract at 12 (JA 19, p. 677 at 688).]

**The 1999 HAP Renewal Contract – October 1, 1999 to September 30, 2000**

22. The 1998 HAP Contract was scheduled to expire in 1999. [1998 HAP Contract at 1 (JA 19, p. 677).] It was renewed for one year in September of 1999. [1999 HAP Renewal Contract at 1 (JA 20, p. 691).] Paragraph 2 of the 1999 HAP Renewal Contract provided that "All terms of the Expiring Contact are renewed except for those provisions relating to contract rents and rent adjustments." [1999 HAP Renewal Contract at 1 (JA 20, p. 691).]

**The October 2000 HAP Renewal Contract – October 1, 2000 to September 30, 2004**

23. The October 2000 HAP Renewal Contract stated that the "Contract shall run for an initial 1 Year period" and that "after the expiration of the initial term, this Contract shall renew automatically for 3 additional one-year terms, subject to the availability of appropriations in any year." [2000 HAP Renewal Contract at 1 (JA 21, p. 696).]

24. Paragraph 4 of the 2000 Renewal Contract provided that: "All terms of the Expiring Contact are renewed except for those provisions relating to Contract Rents and rent adjustments." [2000 HAP Renewal Contract at 1 (JA 21, p. 696).]

25. The 2000 HAP Renewal Contract contained an addendum stating:

> Owner agrees as a condition of renewing the Section 8 Contract that, in the event HUD's Real Estate Assessment Center (REAC) issues a physical inspection report to the Owner that has a score which evidences Owner failure to comply with HUD's Uniform Physical Condition Standards and Physical Inspection Requirement, or if the Owner is negotiating a Corrective Plan of Action to repair deficient items on the REAC inspection, or, if the Owner agreed to a Corrective Plan of Action and has endorsed said Plan, HUD may terminate the Contract after the renewal providing the Owner a reasonable period, as determined by HUD, to correct deficiencies or if the Owner fails to perform under an approved Correction Action Plan to Repair.
>
> Notwithstanding the foregoing, HUD may, at its option, continue the contract or renew said contract to facilitate the provision of vouchers for such reasonable time (not to exceed 180 days) as may be necessary to relocate eligible residents with Section 8 Vouchers. The Owner agrees to cooperate in the relocation of the residents by providing to HUD such information on income and occupancy as may be necessary to relocate the tenants. Upon relocation of such residents the Contract shall be terminated.

[2000 HAP Renewal Contract at 4 (JA 21, p. 696 at 699).]

**2001 90-Day HAP Renewal Contract – October 1, 2001 to December 31, 2001**

26. The 2001 90-Day HAP Renewal Contract stated at Section 4(c) that, "Previously, the Contract Administrator and the Owner entered into a HAP Contract ('expiring contract') to make Section 8 assistance payments to the Owner for eligible families living in the Project. The term of the expiring contract will expire prior to the beginning of the term of the Renewal Contract." [2001 90-Day HAP Renewal Contract at 6 (JA 24, p. 719 at 724).]

27. At Section 4(d)(i) the 2001 90-Day HAP Renewal Contract stated: "The purpose of the Renewal Contract is to renew the expiring contract for an additional term." [2001 90-Day HAP Renewal Contract at 6 (JA 24, p. 719 at 724).] At Section 5(a) the 2001 90-Day Renewal Contract stated: "Except as specifically modified by the Renewal Contract, all provisions of the Expiring Contract are renewed (to the extent such provisions are consistent with statutory requirements in effect at the beginning of the Renewal Contract term)" and except for specific provisions "not renewed" as described in ¶ 5B i-iv. The 2001 90-Day Renewal Contract also stated: "The term of the Renewal Contract begins on 10/01/2001 and shall run for a period of .3 years." [2001 90-Day HAP Renewal Contract at 4 (JA 24, p. 719 at 724, 722).]

**The 180-Day Renewal Contract – January 1, 2002 to June 30, 2002**

28. The 180-Day HAP Renewal Contract stated: "Previously, the Contract Administrator and the Owner entered into a [Housing Assistance Payments] Contract ('expiring contract') to make Section 8 assistance payments to the Owner for eligible families living in the Project. The term of the expiring contract will expire prior to the beginning of the term of the Renewal Contract." [180-Day HAP Renewal Contract at 4 (JA 25, p. 737 at 740).]

29. The 180-Day HAP Renewal Contract stated: "The purpose of the Renewal Contract is to renew the expiring contract for an additional term." [180-Day HAP Renewal Contract at 4 (JA 25, p. 737 at 740).] The 180-Day HAP Renewal Contract also stated: "Except as specifically modified by the Renewal Contract, all provisions of the Expiring Contract are renewed (to the extent such provisions are consistent with statutory requirements in effect at the beginning of the Renewal Contract term)" and except for those specific provisions "not renewed" as described in ¶ 5B i-iv. [180-Day HAP Renewal Contract at 4 (JA 25, p. 737 at 740).] The 180-Day Renewal Contract also stated: "The term of the Renewal Contract begins on 01/01/2002 and shall run for a period of .5 years, beginning on the first day of the term." [180-Day HAP Renewal Contract at 2 (JA 25, p. 737 at 738).]

**2002 90-Day HAP Renewal Contract – July 1, 2002 to September 30, 2002**

30. The 2002 90-Day HAP Renewal Contract stated: "Previously, the Contractor Administrator and the Owner entered into a [Housing Assistance Payments] Contract ('expiring contract') to make Section 8 assistance payments to the Owner for eligible families living in the Project. The term of the expiring contract will expire prior to the beginning of the term of the Renewal Contract." [2002 90-Day HAP Renewal Contract at 8 (JA 26, p. 746 at 753).]

31. The 2002 90-Day Renewal Contract stated: "The purpose of the Renewal Contract is to renew the expiring contract for an additional term." [2002 90-Day HAP Renewal Contract at 8 (JA 26, p. 746 at 753).] The 2002 90-Day HAP Renewal Contract also stated: "Except as specifically modified by the Renewal Contract, all provisions of the Expiring Contract are renewed (to the extent such provisions are consistent with statutory requirements in effect at the beginning of the Renewal Contract

term)" and except for those specific provisions "not renewed" as described in ¶ 5B i-iv. [2002 90-Day HAP Renewal Contract at 8 (JA 26, p. 753).] The 2002 90-Day Renewal Contract also stated that "[t]he term of the Renewal Contract begins on 07/01/2002 and shall run for a period of .3 years." [2002 90-Day HAP Renewal Contract at 6 (JA 26, p. 746 at 751).]

## III. REFERRAL FROM HUD MULTI-FAMILY HOUSING ("MFH") TO THE HUD DEPARTMENTAL ENFORCEMENT CENTER ("DEC")

32. Edward Hinsberger, Director of HUD's Chicago Multifamily Housing Division ("MFH"), referred South Pointe from MFH to the Departmental Enforcement Center ("DEC") in September of 1998. [Property Referral dated September 13, 1998 (JA 29, p. 779).]

33. Freddie Batchelor was the Enforcement Analyst assigned to South Pointe for the time that it was in the DEC from the summer of 1998 through the spring of 2000. [Batchelor Decl. at 1 ¶¶ 3, 4 (JA 15, p. 630 at 631).] Ms. Batchelor prepared in early 1999 a "Draft Team Report" recommending that South Pointe be accepted for further review and possible sanctions. [Batchelor Decl. at 4 ¶ 11 (JA 15, p. 630 at 633); Draft Team Report at 7 (JA 30, p. 780 at 786).]

34. On March 23, 1999, P.M. One wrote to HUD requesting a rental increase for FY 1999. [Letter from Harth to Thomas dated March 23, 1999 (JA 31, p. 787).]

35. On April 9, 1999, Veronica Coleman, Director of Project Management for HUD's Chicago Multifamily Hub, responded that HUD was unable to process the request because "your contract is due to expire in fiscal year 1999." [Letter from Coleman to Prendergast dated April 9, 1999 (JA 32, p. 788).]

36. On April 28, 1999, REAC performed a physical inspection of 25 units at South Pointe, as well as the site, building exterior, building systems and common areas. Out of a possible numeric score of 100, Englewood received an overall score of 42. [REAC Report dated April 28, 1999 at 1 (JA 27, p. 760).]

37. On May 18, 1999, Englewood renewed its request for a rent increase of 5% stating it was supported by a market comparability study it prepared to offset the costs of utilities, vandalism, security and the physical repairs needed to correct the physical deficiencies identified in the REAC Report of April 28, 1999. [Letter from Sanders to Thomas dated May 18, 1999 at 1 (JA 33, p. 790).]

38. On May 19, 1999, representatives of Pinnacle Realty Management Company, a HUD contractor, conducted a comprehensive management review. Pinnacle's written report, which was completed on August 10, 1999, stated that Englewood had not corrected "severe findings" from the REAC inspection "that adversely affect the provision of decent, safe, and sanitary housing as required by the HAP contract." [Pinnacle Initial Report dated August 10, 1999 at 4 (JA 36, p. 802 at 805).]

39. The Pinnacle Property Description also stated that the "property is a physically distressed development in a very dangerous neighborhood" and that it is "drug infested and controlled by gangs." The Report continued: "The building is currently in a state of transition. The agent has 'locked down' the building with a new security service. . . .This has removed 20 plus undesirables from the building with another half dozen in process waiting to be served. This has also brought death threats to the agent's staff, and led to the change in site security of off-duty Chicago Police officers

as of mid-April. The officers are armed, have powers of arrest and are actively involved in gaining control of the site." [Pinnacle Initial Report dated August 10, 1999 at 5 (JA 36, p. 802 at 806).] "Units are in hard shape judging from the current vacancies. Extensive repairs, cleaning, and painting are needed for most turnovers. This results in higher cost time, materials and effort. . . .The agent is trying to lock out the drug dealers through evictions. The evictions and number of turnovers are blowing out the budget." [Pinnacle Initial Report dated August 10, 1999 at 5 (JA 36, p. 802 at 812).]

40. Carl Sanders, Property Manager, wrote to HUD on June 14, 1999 asking for a copy of the April REAC Report so that he could be "pro-active in correcting the findings from the above inspection." [Letter from Sanders to Kiening dated June 14, 1999 (JA 34, p. 796).]

41. On June 30, 1999, Ms. Batchelor prepared a draft "Final Action Plan." [Batchelor Decl. at 5 ¶ 15 (JA 15, p. 630 at 634).] This document stated that "[t]he building has an infestation of roaches and rats. There are leaking pipes throughout the building. The elevators are all non-operable." [Draft Final Action Plan at 1 (JA 35, p. 797).] Ms. Batchelor's draft noted that South Pointe should have received a score lower than 42 in the April 1999 REAC Report, that there had been many people harmed due to guns, gangs and drugs, the property had been referred to the City of Chicago Violent Crimes Division, and that the management company wrote of their desire to be "proactive" in developing solutions to problems. [Draft Final Action Plan at 1 (JA 35, p. 797 at 798).]

42. Ms. Batchelor's draft final action plan stated that unless various improvements were agreed to and funded by Englewood, and if there was non-

compliance by the owner, the Section 8 units would be abated. [Draft Final Action Plan at 2 (JA 35, p. 797 at 798).]

43. On August 18, 1999, John Hayes, then President of Englewood's general partner, wrote to Ms. Kiening regarding the status of discussions with the Community Investment Corporation ("CIC") with respect to a rehab loan to complete planned repairs. [Letter from Hayes to Kiening dated August 18, 1999 at 1 (JA 37, p. 813).]

44. On August 20, 1999, Mr. Hayes wrote to Mr. Hinsberger and stated that "[a]ll Health and Safety items such as non working Smoke Detectors, GFIs, etc. listed in the above referenced report have been corrected." [Letter from Hayes to Hinsberger dated August 20, 1999 (JA 38, p. 815).]

45. On September 2, 1999, Mr. Sanders wrote to Joan Kiening, HUD Supervisory Enforcement Analyst, and indicated that Englewood's owner and management agent were completing a rehabilitation loan application with their lender, the Community Investment Corporation ("CIC") and that they needed assurance that the 1998 HAP Contract was going to be renewed. [Sanders letter to Kiening dated September 2, 1999 at 1 (JA 39, p. 816).] Mr. Sanders described the need for a HAP Contract renewal to respond to lender concerns with the assurance of rent revenue. [Sanders letter to Kiening dated September 2, 1999 at 1 (JA 39, p. 816).] Mr. Sanders reported that Englewood was applying for a loan "to not only assist in bringing the building into compliance with HUD regulations, but to implement a minor rehabilitation to the units in the building and replace the major systems (see attachment)." [Sanders letter to Kiening dated September 2, 1999 at 1 (JA 39, p. 816).]

46. The 1998 HAP Contract was renewed for one year by the 1999 HAP Renewal Contract, which was signed by Englewood and HUD on September 28, 1999. [1999 HAP Renewal Contract (JA 20, p. 691).]

47. On October 18, 1999, Ms. Gray wrote to Englewood informing them that their request for a rental increase to accompany the 1999 HAP Renewal Contract was denied. [Gray letter dated October 18, 1999 (JA 42, p. 830).]

48. On November 11, 1999, Alan Cravitz, President of Developers Mortgage Corporation, submitted to HUD a loan application on behalf of Englewood for a construction amount of $2,450,880 to complete a rehab program. [Request for Pre-Application Conference dated November 11, 1999 (JA 43, p. 832 at 835).]

49. On December 8, 1999, Mr. Sanders submitted to Ms. Kiening a document titled "Management Improvement and Operating (MIO) Plan," developed in response to the REAC Report dated April 28, 1999. [MIO Plan dated December 8, 1999 at 1 (JA 45, p. 840).] This document included information regarding a "status update and work in progress," responding to problems identified in the April 28, 1999 REAC inspection. Ms. Batchelor, Ms. Thomas and Ms. Gray were copied on the letter. [MIO Plan dated December 8, 1999 at 1 (JA 45, p. 840, 841).]

50. On December 15, 1999, Kelly Brown, Executive Administrator for Englewood's property manager, wrote to Ms. Thomas, enclosing a Resident Support Service collaborative where four social service agencies had agreed to provide services to the families at South Pointe. [P.M. One letter dated December 15, 1999 at 1 (JA 46, p. 853).]

51. A Final Team Report - Resolution ("Final Team Report") was signed on January 26, 2000 by Ms. Batchelor as the final report on the DEC referral. Its conclusions received "concurrences" from her DEC colleagues: Ms. Kiening (Team Leader), Ms. Baguio (Attorney) and Mr. Gustin (Lead Attorney) [Final Team Report – Resolution at 10 (JA 47, p. 860 at 869).] It also received "approvals" from: Mr. Zale (Satellite Office Director); Mr. Hinsberger (MFH HUB Director, Chicago); Ms. Edge (Acting Director of Operations, DEC HQ); and Mr. Kraus (National Director, DEC). [Final Team Report – Resolution at 9 (JA 47, p. 860 at 868).]

52. The Final Team Report referred to the April 28, 1999 REAC Report [Final Team Report at 1 (JA 47, p. 860)]; Englewood's submission of a MIO Plan on December 8, 1999 [Final Team Report at 2 (JA 47, p. 860 at 861)]; its tentative approval for finalization subject to identifying sources of funding beyond the $770,000, which the report stated had been advanced in 1999 by Englewood; a DEC site visit on April 14-15, 1999 and the REAC inspection on April 8, 1999; the owner's commitment to complete the 1999 REAC Repairs [Final Team Report at 2 (JA 47, p. 861)]; and noted in a DEC Headquarters visit to the property on August 30, 1999 [Final Team Report at 3-4 (JA 47, p. 862-63)].

53. The Final Team Report stated: a) the "property is in poor physical condition; however the owner has corrected some of the identified repairs revealed by the REAC Inspection Report" [Final Team Report-Resolution at 8 (JA 47, p. 867)]; b) "substantial progress has now been made on the findings outlined in the REAC report, therefore the DEC should return the case to the Multifamily HUB Office for servicing" [Final Team Report at 8 (JA 47, p. 867)]; and c) "the Chicago HUB office should

continue the finalization of the MIO Plan received on December 8, 1999." [Final Team Report at 8 (JA 47, p. 867)].

54. The Final Team Report was sent to MFH for its concurrence with the DEC recommendation on January 27, 2000 and MFH indicated its concurrence with the Final Team Report [REMS entry dated February 1, 2000 (JA 49, p. 871)]; Ms. Thomas noted in HUD's Real Estate Management System ("REMS") that the "MIO Plan [was] accepted by enforcement." [REMS entry dated February 2, 2000 (JA 50, p. 872)]; and Ms. Kiening closed out the referral to the DEC in early February and returned South Pointe to MFH. [REMS entry dated February 6, 2000 (JA 51, p.873).]

55. On June 7, 2000, Mr. Sanders wrote to Ms. Thomas to provide an update on the MIO Plan. "This is the update to the Management Improvement and Operating (MIO) Plan for the above referenced REAC Inspection dated April 28, 1999 as of May 31, 2000." [Letter dated June 7, 2000 at 1 (JA 54, p. 908).] On June 20, 2000, HUD received the update from Englewood. [REMS entry on June 20, 2000 (JA 56, p. 931).]

56. On July 20, 2000, Mr. Cravitz wrote to Ms. Coleman indicating that Englewood would meet with Henry Chiano, HUD's former Director of Construction, to develop the rehab work program and budget and to confirm that a rehab loan application would be submitted by Mr. Cravitz on behalf of Englewood "which should allow work to commence within approximately four months." [Letter from Cravitz on July 20, 2000 at 1 (JA 58, p. 940).]

57. Mr. Sanders provided HUD with additional updates on the progress of the MIO Plan on July 27, 2000 [Sanders letter and HUD confirmation of

receipt (JA 59, p. 941, 947); August 15, 2000 Horton letter and HUD confirmation of receipt (JA 62, p. 956, 957); October 17, 2000 Sanders letter and HUD confirmation of receipt (JA 66, p. 964, 970); and December 8, 2000 [Sanders letter (JA 147, p. 1505)]. In each letter, Englewood asked HUD to respond if there were any questions. Each of the five letters was acknowledged as being received by HUD.

## IV. HUD'S YEAR 2000 MANAGEMENT/OCCUPANCY REVIEW AND REPORT

58. On March 14, 2000, Ms. Thomas conducted a review of South Pointe. [Compl. ¶ 22 (JA 3, p. 30 at 35).] Ms. Thomas's Management Review Questionnaire recorded a "big problem with drugs and gangs in area and building" and noted that Englewood had hired "off duty police where persons in violation can be arrested on [the] spot." [Management Review Questionnaire dated March 13, 2000 at 3 (JA 52, p. 874 at 876).]

59. During her review, Ms. Thomas visited three occupied apartments and five vacant units at which evictions had recently been made. Ms. Thomas recorded that "stairwells were dirty and smell of urin[e]," and that elevators were not functioning properly. [Management Review Questionnaire dated March 13, 2000 at 2 (JA 52, p. 874 at 875).] The final version of the letter was sent sometime after May 7, 2000. [Deposition Transcript of Gwendolyn Thomas ("Thomas Tr.") at 172 (JA 11, p. 521 at 294-95).]

60. On June 16, 2000, Ms. Coleman wrote to Mr. Sanders informing him of the results of HUD's March 14, 2000 on-site review and the specific actions that were to be taken by Englewood in response to HUD's "Schedule of Findings," which described the specific problems which needed correction and the corrective action to be

taken. Ms. Coleman's letter apologized for the delay in transmitting the results of the on-site review. [Letter from Coleman to Sanders dated June 16, 2000 at 1 (JA 55, p. 921).]

61. Mr. Sanders wrote Ms. Coleman a response to her letter of June 16, 2000 on July 10, 2000. The reply by Mr. Sanders was an 8-page document that replied to each of the "findings" and the specific "actions to be taken" set out in the letter of June 16, 2000. [Letter from Sanders to Coleman dated July 10, 2000 (JA 57, p. 932.]

## V. THE 2000 HAP RENEWAL CONTRACT

62. On July 27, 2000, Mr. Hayes requested a "subsequent renewal of my section 8 contract without restructuring . . . with a requested duration of four years and a listed comparable rent potential of $2,714,196." [Renewal Worksheet for Option 2 at 1 (JA 60, p. 948 at 952).]

63. On September 27, 2000, HUD personnel entered into REMS the request for a contract amount of $2,513,000 for Englewood, approximately $200,000 less than had been requested by Englewood. [Note dated September 27, 2000 (JA 62, p. 958).]

64. Mr. Hayes signed the HAP Renewal Contract on October 16, 2000. [2000 HAP Renewal Contract at 2 (JA 21, p. 696 at 697).] Ben Tessler signed the 2000 HAP Renewal Contract on behalf of Mary Anderson, OMF Chicago HUB Director of Operations, on October 18, 2000. [2000 HAP Renewal Contract at 2 (JA 21, p. 696 at 697).]

65. HUD representatives met with Carl Sanders, P.M. One's Property Manager, on October 18, 2000. John Hayes had already signed the contract on behalf of Englewood on October 16, 2000. Mr. Sanders received a signed copy of the 2000 HAP Renewal Contract from HUD following his October 18 meeting at HUD in Chicago.

## VI. ALLEGED ERRORS AND AMENDMENTS

66. HUD alleges that the 2000 HAP Renewal Contract contained an error and that the intended term of the contract was not one 1 year with three automatic one-year renewals but three months with zero renewals. During depositions, both Ms. Thomas and Ms. Coleman testified to this "error" and stated that it was discussed at a meeting at HUD on October 18, 2000 and was understood by Mr. Sanders and other Englewood representatives. [Coleman Tr. at 73-76 (JA 12, p. 365 at 383-84); Thomas Tr. at 202-11 (JA 11, p. 251 at 302-04).] Ms. Thomas's meeting notes do not mention the contract or an error, and Mr. Sanders denies there was any discussion of this topic. [Thomas notes (JA 67, p. 971); Sanders Decl. at 10 ¶ 39 (JA 17, p. 655 at 664).]

67. On December 6, 2000, Veronica Coleman, Director of Project Management for HUD's Chicago Multifamily Hub, transmitted a letter to Mr. Hayes that stated: "This letter is to inform you that we have amended your Section 8 HAP Contract from (one) 1 year to a (three) 3 month short term renewal with zero renewal terms." [Letter dated December 6, 2000 (JA 71, p. 1014).] The letter further stated: "As we stated in our meeting on October 18, 2000, the contract will be renewed under a three month short term contract, due to the physical conditions of the subject property." [Letter dated December 6, 2000 (JA 71, p. 1014).]

68. During depositions, Ms. Thomas and Ms. Coleman testified that they possessed no individual authority to amend HAP contracts. [Coleman Tr. at 281-84 (JA 12, p. 365 at 435-36); Thomas Tr. at 229-32 (JA 11, p. 251 at 308-09).] Ms. Coleman and Ms. Thomas testified that Ms. Thomas made notations recording the amendment of the 2000 HAP Renewal under the direction of Ed Hinsberger, Director of HUD's Chicago Multifamily Housing Division, and HUD's Funding Department.

[Coleman Tr. at 272-82 (JA 12, p. 365 at 433-36); Thomas Tr. at 229-31 (JA 11, p. 251 at 308-09).]

69. Ms. Thomas testified that she made notations recording the amendment of the 2000 Renewal Contract after obtaining direction from Mr. Hinsberger and HUD's Funding Department. [Thomas Tr. at 231, 242 (JA 11, p. 251 at 309, 312); Undated Edits to 2000 HAP Renewal Contract at 1 (JA 22, p. 705); Edits to 2000 HAP Renewal Contract dated January 10, 2001 at 1 (JA 23, p. 712).]

70. There were references to "amendments" in an email from Ken Horton, Vice President of P.M. Group, to Ms. Coleman dealing with the status of the rehab loan application. Mr. Horton noted that in a conversation with Ms. Thomas she informed him that "the HAP contract would be further amended to reflect the original expiration date of September 30, 2001." [Email message dated January 23, 2001 between Coleman and Horton at 2 (JA 72, p. 1015 at 1016).] He requested that a copy of the "amended, amended HAP contract" be sent "to my attention at the following address." [Email message dated January 23, 2001 between Coleman and. Horton at 2 (JA 72, p. 1015 at 1016).]

## VII. THE MARCH 2, 2001 REAC INSPECTION AND MARCH 8, 2001 REAC LETTER

71. On March 2, 2001, REAC conducted an inspection of the site, building exterior, building systems, common areas and 25 sample units at South Pointe. The "Inspection Summary" of March 2, 2001, resulted in the preparation of a "Report" dated March 8, 2001. [REAC Report dated March 8, 2001 (JA 28, p. 767 at 769, 776).]

72. The "Inspection Summary" identified deficiencies observed during the inspection and directed Englewood to: (a) correct the identified exigent health and

safety ("EH&S") deficiencies; (b) describe the work to be done to correct other "identified deficiencies"; (c) conduct a survey of the building to identify other deficiencies; (d) determine the needs in all of the units for the types of physical problems identified in the "findings" from the 25 sample units inspected; and submit to HUD a Proposed Plan of Correction. [REAC Report dated March 8, 2001 at 1 (JA 28, p. 767).]

73. The REAC "Letter" also described HUD responsibilities. "Upon receipt of the Plan, the Project Manager will review it to ensure that it has sufficient detail regarding plans and resources for correction, and that the time frames are appropriate. The Project Manager will contact you to discuss any required amendments and the process that will be used to verify completion of the Plan." [REAC Report dated March 8, 2001 at 2 (JA 28, p. 767 at 768).]

74. Out of a possible total score of 100, South Pointe received a REAC score of 31. [REAC Report dated March 8, 2001 at 3 (JA 28, p. 767 at 769.]

75. Englewood's score recorded a 38.5 point reduction for "health and safety" deficiencies which consisted of an expired fire extinguisher tag and missing cover on an electrical panel in the rooftop mechanical space, the parking gate not working, five missing outlet covers, three missing breakers, a broken window, a cable TV line on the floor in a doorway, three instances of roaches in kitchen cabinets, exposed nails, bare wires, and an inoperable exit door. [REAC Report dated March 8, 2001 at 4-9 (JA 28, p. 767 at 770-75).]

76. Additional problems identified with respect to the site, building exterior, building systems and the common areas included: repairing window screens, correcting the ponding of water on the roof, repairing damaged corridor walls on the 1st

and 13th floors, repairing the locks in the laundry room, replacing the garbage chute doors and replacing the exit signs. [REAC Report dated March 8, 2001 at 4-9 (JA 26, p. 767 at 770-75771-75).] The repairs identified in the REAC Report were planned to be corrected as part of the proposed plan of corrections and rehab loan. [BABCO Rehab Program (JA 80, p. 1061); Hayes Decl. at 8-10 ¶¶ 39-43 (JA 16, p. 640 at 647-49); Sanders Decl. 4 ¶¶ 14-15 (JA 17, p. 655 at 658).]

## VIII. ENGLEWOOD AND HUD RESPONSES TO THE MARCH 8, 2001 REAC REPORT

77. At the end of the March 2, 2001 inspection, the inspector Frank Caperton gave Mr. Sanders a list of 13 "exigent health and safety" deficiencies. Englewood was required to correct all EH&S items immediately and report its repairs to HUD within 72 hours. These items included one inoperative smoke detector, five missing or broken outlet covers, three missing breakers, a light fixture missing in the maintenance room, a fire extinguisher without a current tag in the penthouse, a blocked exit in the trash room, and a missing cover on an electrical panel in the penthouse. [Notification of Exigent and Fire Safety Hazards Observed at 1-2 (JA 74, p. 1019-20).]

78. Mr. Sanders stated that all of the items were corrected within the 24 hours following the inspection. [Sanders Decl. 12-13 ¶ 45 (JA 17, p. 655 at 666-67).] On March 6, 2001, based on information supplied to him by Mr. Sanders, Mr. Hayes provided Ms. Thomas with a "certification" that exigent health and safety items identified in the REAC inspection had been corrected. [Letter by Hayes dated March 6, 2001 (JA 76, p. 1054).]

79. Ms. Thomas visited South Pointe on March 7, 2001. On March 9, 2001, based on the report given her by Ms. Thomas, Ms. Coleman wrote to Mr. Hayes

stating that HUD had conducted its "confirmatory review" with P.M. One staff members present. [Letter dated March 9, 2001 at 1 (JA 77, p. 1055).] Ms. Coleman's letter stated that "only a few of the EHS items had been mitigated and not all as you certified." [Letter dated March 9, 2001 at 1 (JA 77, p. 1055).]

80. On March 16, 2001, Mr. Hayes submitted a written response to Ms. Coleman's letter confirming his "belief from investigation with property management" that the previous certification "was correct." [Hayes letter dated March 16, 2001 at 1 (JA 79, p. 1059).] Mr. Hayes stated that the "General Partner relies solely on the information received from the property management company." [Hayes letter dated March 16, 2001 at 1 (JA 79, p. 1059).] Mr. Hayes wrote that he had enclosed "photos of those items cited on the March 2, 2001 inspection." [Hayes letter dated March 16, 2001 at 1 (JA 79, p. 1059).]

**Correcting the Other Identified Deficiencies**

81. On April 5, 2001, Englewood sent HUD a document it identified as a MIO Plan that described the status of work that had been done to correct the "other identified deficiencies" in the REAC Inspection Summary. [Letter dated April 5, 2001 at 1 (JA 84, p. 1076).] All of the repairs were reported as made except those requiring the replacement of doors and door hardware, plumbing, smoke detector replacement, and the decorating and drywall repairs which Englewood intended to take care of as part of a rehab loan. [Letter dated April 5, 2001 at 1 (JA 84, p. 1076).]

82. On April 8, 2001, Kelly Brown on behalf of Englewood sent Ms. Coleman a letter intended to be the (30 day) "response" to the March 8, 2001 letter, which Englewood was required to submit to HUD. [Letter from Brown dated April 8, 2001 at 1 (JA 86, p. 1086).]

**Englewood's Proposed Rehabilitation Program**

83. On March 19, 2001, Englewood submitted the application for the rehab loan. Englewood intended the centerpiece in the loan application to be the BABCO rehab work program. This program related to doors, bath and kitchen appliances and fixtures, and painting and drywall repairs, it proposed $700,000 in concrete repairs to the exterior spandrels, a new roof and rehabilitation of the hot water system. [Rehab program proposed by BABCO (JA 80, p. 1061).]

**HUD's Proposed Rehabilitation Program**

84. On March 22 and 23, 2001, HUD's inspector Ray Etzkorn conducted an inspection of South Pointe. Mr. Etzkorn prepared a report that recorded the "physical condition," "needed maintenance," and the "estimated cost" of repairs of "items inspected" at South Pointe. [Rehab Report Prepared by HUD at 1 (JA 81, p. 1066).] This report also recorded Mr. Etzkorn's additional comments. [Rehab Report Prepared by HUD at 2 (JA 81, p. 1066 at 1067).]

85. Etzkorn's report listed additional estimated costs of $650,000 for the replacement of the penthouse, $666,000 for the replacement of all kitchen cabinets, $151,000 for the replacement of countertops, $242,000 for the replacement of appliances, $240,000 for electrical service and distribution upgrades, $437,000 for bathrooms upgrades, $303,000 for the installation of air conditioning, $150,000 for the replacement of an emergency generator, and $257,000 for individual heating controls. [Rehab Report Prepared by HUD (JA 81, p. 1070).]

**HUD's Rejection of Englewood's Rehab Loan Application**

86. On April 3, 2001, Mr. Hinsberger informed Mr. Hayes that HUD was rejecting Englewood's application for mortgage insurance because "the repairs

outlined in your application are inadequate when compared to the needs of the property." [Letter dated April 3, 2001 at 2 (JA 82, p. 1071 at 1072).] Mr. Hinsberger's letter further stated that HUD rejected Englewood's application because the appraisal value was overstated and because HUD "would not process this refinancing with P.M. One remaining in the position of management agent due to their poor past performance." [Letter dated April 3, 2001 at 2 (JA 82, p. 1071 at 1072).] Finally, Mr. Hinsberger's letter listed required documents that he identified as missing or that were incomplete. [Letter dated April 3, 2001 at 2-3 (JA 82, p. 1071 at 1072-73).]

**IX. HUD'S APRIL 9, 2001 NOTICE OF HAP CONTRACT DEFAULT**

87. HUD completed a Notice of Default on Friday, April 6, 2001. [Email from Maisonet on April 6, 2001 (JA 85, p. 1085).]

88. On April 9, 2001, HUD issued a notice of HAP Contract default to Englewood [Notice of Default dated April 9, 2001 at 1 (JA 89, p. 1090).] This notice, signed by Mr. Hinsberger and Margarita Maisonet, Director, Chicago Satellite Office, Departmental Enforcement Center, stated: "This letter constitutes formal notice by the Secretary of the U.S. Department of Housing and Urban Development (HUD) to Englewood Terrace Limited Partnership (Owner), owner of South Pointe Towers Apartments (Project), that the Owner is in default of its obligations under the HAP Contract entered into between HUD and the Owner." [Notice of Default dated April 9, 2001 at 1 (JA 89, p. 1090).]

89. The Notice also stated: "Pursuant to Paragraph 20 of the HAP Contract, the Owner is hereby notified that if the foregoing events of default are not corrected to the satisfaction of HUD within 30 days from the date of this Notice, HUD may seek any and all available remedies, including, without limitation, suspending or

abating the HAP Contract." [Notice of Default dated April 9, 2001 at 2 (JA 89, p. 1090 at 1091).]

90. HUD's notice of default stated: "The Project was inspected on March 2, 2001 by HUD's Real Estate Assessment Center (REAC) and, out of a possible 100 points, scored a 31c. Some of the outstanding deficiencies noted in the inspection include: holes and cracks in hallway and unit walls; broken windows; inoperable stoves and faucets; cockroaches in the units; and ponding on the roof." [Notice of Default dated April 9, 2001 at 1 (JA 89, p. 1090).]

91. HUD's notice of default cited HUD's March 9, 2001 letter regarding EH&S deficiencies and stated that "few of the EHS items had been mitigated at that time," and "the Project was not in good repair, placing the Owner in violation of the Housing Assistance Payment (HAP) contract." [Notice of Default dated April 9, 2001 at 1 (JA 89, p. 1090).]

92. HUD's notice of default referred to HUD's April 3, 2001 letter that had stated that the rehab program proposed by Englewood in its loan application was "inadequate when compared to the needs of the property." [Notice of Default dated April 9, 2001 at 1 (JA 89, p. 1090).]

93. HUD's notice of default stated that Englewood had not brought the property "into compliance" during the 23 months since the April 28, 1999 REAC inspection. [Notice of Default dated April 9, 2001 at 1 (JA 89, p. 1090).]

94. HUD's notice of default stated that Englewood had failed to maintain South Pointe in "decent, safe and sanitary" condition with respect to HUD's Physical Condition Standards. "All of the Project, its units, systems, common areas and

building(s) must satisfy HUD's Physical Condition Standards, 24 C.F.R., Part 5, Subpart G." [Notice of Default dated April 9, 2001 at 2 (JA 89, p. 1091).] The notice also stated that the "failure to keep and maintain the Project in a decent, safe, and sanitary condition is a default of the HAP contract." [Notice of Default dated April 9, 2001 at 1 (JA 89, p. 1090 at 1091).]

## X. ENGLEWOOD MEETING WITH HUD ON APRIL 13, 2001

95. Englewood scheduled a meeting with HUD on Friday, April 13, 2001. According to Mr. Hayes, the purpose of the meeting was to discuss the need for updating the earlier MIO, amending it to reflect the REAC Report of March 8, 2001 and Englewood's response, and to work toward an agreed upon scope of work and rehab loan financing so that all of the physical and operational needs of South Pointe could be addressed in a comprehensive manner. [Hayes Decl. at 11 ¶ 45 (JA 16, p. 640 at 650).]

96. On April 4, 2001, Mr. Hinsberger sent an email to his staff indicating that Englewood wanted to meet to discuss the Occupancy Review and REAC Inspection. [Hinsberger Email of April 4, 2001 (JA 83, p. 1075).]

97. On April 9, 2001, Mr. Sher, one of the mortgage brokers working on rehabilitation financing for South Pointe, sent an email to Mr. Hinsberger indicating that he believed that a loan of $5.5 million could be financed by HUD programs, and Englewood wanted to meet to discuss the scope of work and structure for the rehab loan. [Sher email of April 9, 2001 (JA 88, p. 1089).]

98. At the meeting on April 13, 2001, HUD informed Mr. Hayes that it would not insure a rehab loan unless a new property manager replaced P.M. One. [Maisonet Tr. at 207 (JA 13, p. 474 at 527).]

99. Mr. Hayes reported his progress regarding finding a new owner to Mr. Hinsberger in a letter dated May 2, 2001. [Hayes Decl. at 12 ¶ 48 (JA 16, p. 640 at651); Letter dated May 2, 2001 (JA 91, p. 1096).]

100. On May 15, 2001, Ms. Coleman returned P.M. One's April 8, 2001 response to the March 8, 2001 REAC Report. Ms. Coleman's cover letter stated that HUD would not accept Ms. Brown's response "due to impending negotiations with HUD . . . concerning your proposed refinance and substantial rehabilitation of the property." [Letter dated May 15, 2001 (JA 93, p. 1098).] Ms. Coleman's letter also stated that "[a]lthough the letter from REAC directs you to prepare a Management Improvement and Operating (MIO) Plan subject to our approval, the condition of this property is beyond that point as acknowledged by your application to refinance that we rejected due to major deficiencies." [Letter dated May 15, 2001 (JA 93, p. 1098).]

101. On May 16, 2001, Mr. Hinsberger and Ms. Maisonet sent P.M. One a Notice of Continuing Default. This notice responded to the May 2, 2001 letter from Mr. Hayes and requested that P.M. One "provide adequate, timely information describing the immediate efforts that the Owner is making to address the HAP default and the sale of the Project and proposed assumption of the HAP contract." [Notice of Continuing Default dated May 16, 2001 at 2 (JA 94, p. 1099 at 1100).] This notice also advised P.M. One that HUD was "proceeding with its process to secure vouchers for relocation of eligible tenants." [Notice of Continuing Default dated May 16, 2001 at 2 (JA 94, p. 1099 at 1100).]

102. On May 16, 2001, Mr. Hinsberger sent an email to his staff indicating that he had “received a couple of calls from” a potential buyer of South Pointe. [May 16, 2001 email at 1 (JA 95, p. 1101).]

103. On June 1, 2001, Ms. Thomas requested that Ms. Anderson order vouchers for South Pointe at the request of Mr. Hinsberger. [June 1, 2001 email at 1 (JA 97, p. 1103).]

104. On June 11, 2001, Ms. Anderson wrote that the HAP Contract would be abated as of September 30, 2001, and that the Chicago Housing Authority would be administering the contract. [June 11, 2001 email (JA 98, p. 1104).]

105. On August 6, 2001, Englewood submitted a request for reimbursement of $55,230.29 for extraordinary gas costs during the winter of 2000-2001. [Energy Reimbursement Request dated August 6, 2001 (JA 103, p. 1116 at 1119).] The amount of the excess cost reimbursement requested was eventually determined by Englewood to be $139,187 in Rental Adjustments for Escalating Energy Costs. [May 31, 2002 South Pointe Financial Claims at 2 (JA 128, p. 1251 at 1252).]

106. On August 21, 2001, Mr. Samuelson prepared for Englewood a request for a rental increase and renewal of the 2000 HAP Renewal Contract. [Samuelson Submission dated August 21, 2001 at 1 (JA 104, p. 1120); Samuelson Tr. at 68-70 (JA 14, p. 570 at 587-88).]

107. On September 4, 2001, a revised rehabilitation loan request was submitted to HUD by Alan Cravitz on behalf of Englewood. [Cravitz Letter of September 4, 2001 at 1 (JA 105, p. 1135).] On September 5, 2001, Paul Seliga reported to Mr. Hinsberger that the market study which accompanied the loan application

supported the proposed rents. [Seliga email dated September 5, 2001 at 1 (JA 106, p. 1140).] On September 6, 2001, Mr. Hinsberger sent an email to Mr. Samuelson stating that the "rent comp study supports the proposed rents. The submission was made by you. It needs to be signed by the owner or the current managing agent. There was a spot on your 8/21/2001 letter authorizing you to submit, but Mr. Hayes didn't sign it." [Hinsberger email of September 6, 2001 (JA 107, p. 1144).]

108. On September 25, 2001, Mr. Hinsberger responded to Mr. Cravitz detailing the additional information that "must be submitted in order to process the application." [Hinsberger Letter to Cravitz of September 25, 2001 (JA 109, p. 1150).] On September 28, 2001, Mr. Cravitz responded to Mr. Hinsberger stating that the eight issues raised by Mr. Hinsberger had been or were being addressed, including that a "total scope of work" would be submitted "by Friday, October 5." [Cravitz Letter to Hinsberger of September 28, 2001 at 1 (JA 110, p. 1151).]

## XI. THE THREE MONTH RENEWAL CONTRACT BEGINNING OCTOBER 2001

109. On September 25, 2001, Mr. Hinsberger sent Mr. Hayes a signed short-term renewal contract. [2001 90-Day HAP Renewal Contract at 11 (JA 24, p. 719 at 729).]

110. Mr. Hayes signed the 90-Day HAP Renewal Contract the next day, September 26, 2001. [2001 90-Day HAP Renewal Contract at 11 (JA 24, p. 719 at 729).]

111. On October 1, 2001, Mr. Hinsberger notified Mr. Hayes and Mr. Samuelson via email that the Chicago Housing Authority "will begin issuing vouchers for the residents at South Pointe today." [Email from Ed Hinsberger dated October 1, 2001 at 2 (JA 111, p. 1160 at 1161).] Mr. Hinsberger's email stated that "the

Sec. 8 contract will be terminated once all of the residents receive their vouchers." [Email from Ed Hinsberger dated October 1, 2001 at 2 (JA 111, p. 1160 at 1161).]

112. Mr. Hayes responded to Mr. Hinsberger's email by writing that this seemed "unconscionable and unfair." [Email from John Hayes dated October 1, 2001 (JA 112, p. 1162).] Mr. Hinsberger forwarded a portion of an email from Ms. Coleman dated January 23, 2001 "addressing the same issue." [Email from Ed Hinsberger dated October 1, 2001 at 1 (JA 111, p. 1160).]

113. On October 2, 2001, Mr. Samuelson sent an email to Mr. Hinsberger: "I presume that the termination of the Section 8 contract - rather your decision not to extend the 90-day extension - follows a set of delineated due process procedures." [Email from Don Samuelson dated October 2, 2001 at 1 (JA 113, p. 1163).]

114. On October 11, 2001, Mr. Samuelson sent an email to Mr. Hinsberger and Mr. Hayes stating that, "I'm surprised with the rigidity of your position. It is completely at odds with the Section 8 renewal assumptions we were all making in August and September. Conceding, of course, that there was the possibility of the use of vouchers." [Email from Don Samuelson dated October 11, 2001 (JA 114, p. 1165).]

## XII. THE INJUNCTION SUIT IN THE FEDERAL DISTRICT COURT

115. On October 29, 2001, Englewood filed a complaint in the Federal District Court for the Northern District of Illinois seeking a declaratory judgment that HUD: "1) failed to renew the Housing Assistance Payment contract ('HAP contract'); and (2) issued Section 8 vouchers to tenants in violation of the Multifamily Assisted Housing Reform and Affordability Act (MAHRA)." [Declaratory Judgment/Injunction Complaint filed in the District Court for the Northern District of Illinois dated October 29, 2001 (JA 1, p. 1).]

116. The Court denied Englewood's request for an injunction against the issuance of vouchers. Judge Castillo concluded that "HUD never formally terminated Englewood's HAP contract. Rather, HUD provided Englewood with notice that it was in continuing default under the HAP contract and that HUD would begin the process of providing vouchers for relocation of eligible tenants." [Order dated November 15, 2001 at 3 (JA 7, p. 146 at 148).] The Court also held that "the harm that Englewood asserts is not irreparable because it is a loss of project-based revenue provided by the HAP contract which, should Englewood prevail, may be compensated at the conclusion of this litigation." [Order dated November 15, 2001 at 3 (JA 7, p. 146 at 148).]

## XIII. HUD'S NOTICE OF ABATEMENT AND TERMINATION

117. Following the issuance of Judge Castillo's decision, on November 30, 2001, HUD issued a "Notice of Abatement and Termination." This document stated that Englewood had failed to demonstrate that it had maintained the units in decent, safe and sanitary condition as defined by 24 C.F.R. Part 5, Subpart G within 30 days of HUD's formal notice of default. [Notice of Abatement and Termination dated November 30, 2001 at 1 (JA 117, p. 1176).] This notice further stated that Englewood "has not cured the conditions complained of in the notice" and that, if Englewood did not provide a written objection or cure the underlying default within 30 days, HUD's decision to terminate the contract would become final. [Notice of Abatement and Termination dated November 30, 2001 at 1 (JA 117, p. 1176).] HUD informed Englewood that it intended to terminate the contract after completing "its voucher and relocation process for all eligible residents in the Project." [Notice of Abatement and Termination dated November 30, 2001 at 1 (JA 117, p. 1176).]

118. This notice also stated that the voucher and relocation process "may extend beyond the expiration date of the current HAP Contract Renewal." [Notice of Abatement and Termination dated November 30, 2001 at 2 (JA 117, p. 1176 at 1177).] HUD stated that "[t]o safeguard the residents, and not affecting HUD's determinations as set forth above, HUD will provide Owner with a HAP Contract Renewal with Addendum. Please execute the extension and return it to HUD promptly." [Notice of Abatement and Termination dated November 30, 2001 at 2 (JA 117, p. 1176 at 1177).]

119. On December 6, 2001, Mr. Hinsberger sent an email to Mary Anderson, Veronica Coleman, Gwen Thomas, Maria Baguio and Greg Gustin: "You need to extend the HAP at Southpointe for another 90 days. It expires 12/31/01. The vouchers will not be in place by then so extend the contract again." [Email from Ed Hinsberger dated December 6, 2001 (JA 118, p. 1178).]

120. Greg Gustin wrote to Englewood's then-attorney on December 7, 2001: "As we discussed, and as HUD's November 30th letter references, HUD expects that the HAP Contract will need to be extended to accommodate HUD's actions in protection of the residents. HUD will act in that regard in due course." [Letter dated December 7, 2001 at 1 (JA 119, p. 1179).]

121. On December 19, 2001, Mr. Hinsberger sent another email to HUD employees, including Margarita Maisonet and Victor Taylor: "Please extend the contract for 180 days.... I took a look at the Sec 8 guidebook. Greg pointed out that the guidebook indicated that extensions should be for 120 days to cover the time to get the vouchers issued. Out of the 303 units at the project, CHAC still hasn't completed the process for even a third of the tenants. So I am making the decision to go the six-month

extension, June 30, 2002. Gwen will be putting the info into REMS and getting whatever the paperwork is together for Victor." [Email from Hinsberger dated December 19, 2001 (JA 120, p. 1181).]

## XIV. ENGLEWOOD'S ADMINISTRATIVE CHALLENGE TO THE NOTICE OF ABATEMENT AND TERMINATION

122. On December 21, 2001, Englewood's attorneys transmitted its response to HUD's "Notice of Abatement and Termination of Housing Assistance Payment Contract." Englewood's attorneys informed HUD that Englewood was appealing HUD's "notice of non-renewal" and was exercising its right to appeal the HUD decision "pursuant to Chapter 13 of MAHRA." [Letter dated December 21, 2001 at 1 (JA 121, p. 1182).]

123. Representatives of the parties met at HUD's Chicago office on January 22, 2002. On February 7, 2002, Greg Gustin, Lead Enforcement Attorney, informed Englewood's attorney that HUD's final decision was to uphold its right to "continue to act as it stated in its November 30, 2001, Notice of Abatement and Termination." [Letter dated February 7, 2002 at 1 (JA 123, p. 1215).] Mr. Gustin further explained that HUD "affirms its original final decision" and that the issues had already been decided against Englewood by Judge Castillo in his Order on the injunction suit. [Letter dated February 7, 2002 at 1 (JA 123, p. 1215).]

124. HUD conducted a hearing regarding Englewood's claims in Washington, D.C. on April 16, 2002. [Compl. at 17 ¶ 65 (JA 3, p. 30 at 46).] On May 2, 2002, Howard Mayfield, Deputy Director, Office of Asset Management, informed Englewood that he affirmed HUD's February 7, 2002 final decision. [Notice of Reviewing Official's Appeal Decision at 2 (JA 126, p. 1223 at 1224).]

# PLAINTIFF'S STATEMENT OF ADDITIONAL FACTS

## I. INTRODUCTION

In addition to the stipulated facts, there are other facts material to issues in dispute that are supported by the record and as to which there will be evidence at trial. Most of these facts are presented in chronological order, corresponding (and with some overlap to provide context) to the presentation of the stipulated facts above. At the outset, however, Englewood's statement also includes a reprise on the analysis embodied in the August 2004 orders entered by Judge Wolski, and a section reporting HUD's interrogatory answers stating that various matters concerning the physical condition or repair of South Pointe were irrelevant to issues in the case.

## II. DEFINITIONS

1. "1st Altered 2000 HAP Renewal Contract" refers to HUD's first alleged amended contract dated December 6, 2000, which purported to reduce the initial term from 12 months to three months and eliminated the three years of automatic renewal provisions.

2. "2nd Altered 2000 HAP Renewal Contract" refers to HUD's second alleged amended contract dated January 10, 2001, which purported to restore the initial term from three months to 12 months and maintain the elimination of the three years of automatic renewal provisions.

## III. PREVIOUS DECISIONS BY THE COURT (JUDGE WOLSKI)

**<u>Analysis From August 10, 2004 Wolski Opinion Denying Defendant's Motion to Dismiss</u>**

3. In October 2000 the parties signed the 2000 HAP Renewal Contract. "Englewood entered into a contract with HUD that was 'automatically'

renewable for three one-year periods, subject only to the condition that appropriated funds be available." [Wolski Opinion of August 10, 2004 at 7 (JA 8, p. 152 at 158).] Plaintiff's Complaint was based on "HUD's breach of its obligation to provide housing subsidies to Englewood pursuant to a HAP contract that was to run for an initial one-year period from October 1, 2000 through September 30, 2001 and then to renew automatically for three additional one-year terms. [Complaint dated September 22, 2003, at 2 ¶ 3 (JA 3, p. 30 at 31).]

4. The 2000 HAP Renewal Contract was a four-year contract, made up of four one-year terms. "Although the initial term had expired at the time Englewood was first informed of the termination (October 1, 2000), the contract by its very terms was not to expire until the three additional one-year terms had run." [Wolski Opinion of August 10, 2004 at 10 (JA 8, p. 152 at 161).]

5. The Court of Federal Claims has jurisdiction to review and resolve the claims made by Englewood. "[N]o laws or regulations incorporated into that contract deprive this Court of jurisdiction." [Wolski Opinion of August 10, 2004 at 11 (JA 8, p. 152 at 162).]

6. HUD had the right to terminate the 2000 HAP Renewal Contract under the provisions set out in Paragraph 20 of the 1998 HAP Renewal Contract, which were incorporated into the 2000 Renewal Contract. "HUD could still, of course, exercise its right to terminate the contract for default" under the procedures set out in Paragraph 20. [Wolski Opinion of August 10, 2004 at 11 (JA 8, p. 152 at 162).]

7. HUD also had the right to terminate the 2000 HAP Renewal Contract under the provisions of the "addendum" to the contract and its procedures for

HUD inspections and Englewood's responses. "This addendum specifically states that HUD may terminate the contract if Englewood does not timely correct deficiencies identified in a REAC inspection report, and may continue the contract or renew said contract to facilitate the provision of vouchers to aid tenants in relocation." [Wolski Opinion of August 10, 2004 at 10 (JA 8, p. 152 at 161).]

**Wolski Order of August 31, 2004 Denying Defendant's Motion for Reconsideration**

8. In rejecting Defendant's Motion for Reconsideration because the Court relied on an allegedly invalid contract (Exhibit D to Complaint, which HUD said was made in error), the Court noted that "defendant's motion borders on the frivolous" and referred to Defendant's position at the Oral Argument. "[I]s there any dispute that this contract was entered into between Plaintiff and HUD and was executed by HUD?" (Tr. (March 18, 2004) at 5:17-19). Counsel for defendant answered, "No." (*Id*. at 5:20.) [Wolski Opinion of August 31, 2004 at 1 (JA 9, p. 163).]

9. The Court later discussed Defendant's argument that the contract was amended by HUD's letter of December 6, 2000. Plaintiff's counsel pointed out that Defendant's counsel stated to the Court that "she believed that Exhibit D was the contract between the parties. (*Id*. at 35:2-17, at 35:24-36:3.)." The Court then concluded: "In light of the oral argument, and the fact that the defendant did not even mention the alleged invalidity of Exhibit D in either of its briefs submitted in support of its motion, it is rather odd that it now alleges that it is the Court that is mistaken or in error on this point." [Wolski Opinion of August 31, 2004 at 2 (JA 9, p. 163 at 164).]

10. The Court continued its analysis: "Further, the question of what contract, beginning October 1, 2000, was entered into by the parties, at best involves

disputed facts that are not properly decided in the context of a motion to dismiss." [Wolski Opinion of August 31, 2004 at 2 (JA 9, p. 163 at 164).]

11. The Court discussed the final argument made by Defendant, "that the short-term extensions that were in effect after September 30, 2001, were ignored by the Court and somehow superseded the express promises in the October, 2000 HAP Contract." [Id. at 2.] The Court noted that "[P]laintiff has alleged that the failure to automatically renew the October 2000 HAP contract – that is, HUD's recourse to these particular short-term extensions – constitutes in part, the breach at issue in this case. *See, e.g*. Complaint ¶¶ 3, 27, 55, 93." [Wolski Opinion of August 31, 2004 at 2 (JA 9, p. 163 at 164).]

12. In discussing the import of the short-term extensions, the Court asked counsel: "[i]s there anything in the subsequent contracts in which the Plaintiff waived any right [it] had under any previous contract." Defendant's counsel replied, "*I don't think they waived their rights*, but they signed the contract and with the provision that you know it was subject to MAHRA and renewed for three months. (Tr. (March 18, 2004) at 12:21-13.2 (emphasis in original)." [Wolski Opinion of August 31, 2004 at 2 (JA 9, p. 163 at 164).]

## IV. DEFENDANT'S POSITION THAT PHYSICAL CONDITIONS AND ACTUAL OR PLANNED CORRECTIONS ARE IRRELEVANT

13. HUD's position is that the actual or planned correction of the physical deficiencies identified on the April 29, 1999 REAC Report are "irrelevant to the issues being litigated in this case." [Defendant's Responses to Plaintiff's Interrogatories at 19-20, Int. 11 (JA 5, p. 66 at 84-5).]

14. HUD's position is that the actual or planned correction of the physical deficiencies identified on the March 8, 2001 REAC Report are "irrelevant to the issues being litigated in this case." [Defendant's Responses to Plaintiff's Interrogatories at 20, Int. 12 (JA 5, p. 66 at 85).]

15. HUD's position is that the actual or planned correction no physical deficiencies on any "official HUD inspection report" are "irrelevant to the issues being litigated in this case." [Defendant's Responses to Plaintiff's Interrogatories at 20-21, Int. 13 (JA 5, p. 66 at 85-6).]

16. HUD's position is that the differences in the scope of work proposed by Englewood and by HUD in their discussions of a rehabilitation loan in March 2001 are "irrelevant to the issues being litigated in this case." [Defendant's Responses to Plaintiff's Interrogatories at 20, Int. 14 (JA 5, p. 66 at 86).]

17. HUD's position is that Englewood's evidence that there was no discussion, or acceptance, of the error in the 2000 HAP Renewal Contract at the October 18, 2000 meeting at HUD is not "material to defendant's motion for summary judgment." [Sanders Decl. at 10-11 ¶¶ 39, 40, 42 (JA 17, p. 655 at 665); Defendant's Reply to Plaintiff's Proposed Statement of Facts, Proposed Fact # 10 at 47 (JA 137, p. 1291 at 1338).]

## V. ADDITIONS TO THE SOUTH POINTE CHRONOLOGY

**<u>Referral from HUD Multi-Family Housing ("MFH") to the HUD Departmental Enforcement Center ("DEC")</u>**

18. Freddie Batchelor was the Enforcement Analyst assigned to South Pointe for the time that it was in the DEC from the summer of 1998 through the spring of 2000. [Batchelor Decl. at 1-2 ¶¶ 3, 4 (JA 15, p. 630 at 630-31).] The purpose of HUD's

Departmental Enforcement Center (the "DEC") was to centralize HUD supervision and management of troubled properties and to restore public trust in HUD's ability to employ subsidies to assist owners in providing decent, safe and sanitary housing. [Batchelor Decl. at 4 ¶ 10 (JA 15, p. 630 at 633).]

19. On March 23, 1999, P.M. One wrote to HUD requesting a rental increase for FY 1999 to pay for the increased utility, security and repair costs. [Letter from Hayes to Thomas dated March 23, 1999 (JA 31, p. 787).]

20. Ms. Batchelor's draft final action plan stated that, unless various improvements were agreed to and funded by Englewood and if there was non-compliance by the owner, the Section 8 units were to be abated. [Draft Final Action Plan at 2 (JA 35, p. 797 at 798).] Her Final Action Plan recommendations were agreed to by all of the senior managers in MFH and the DEC both in Chicago and Washington, D.C. [Concurrences in Final Action Plan at 4-5 (JA 35, p. 797 at 800-01).]

21. Mr. Sanders wrote to HUD on September 2, 1999, inquiring about the status of the rehab loan and rental increase. Englewood's lender "needs some indication from HUD as to what their position is with regard to the HAP contract for the property." [Letter from Sanders to HUD dated September 2, 1999 at 1 (JA 39, p. 816).]

22. On August 18, 1999, Mr. Hayes wrote to HUD describing the need for the HAP Contract renewal to respond to lender need for assurance of rent revenue. [Hayes Decl. at 6 ¶ 24 (JA 16, p. 640 at 645); Letter from Hayes to HUD dated August 18, 1999 (JA 37, p. 813).] Mr. Sanders reported that Englewood was applying for a loan "to not only assist in bringing the building into compliance with HUD regulations, but to implement a minor rehabilitation to the units in the building and replace the major

systems (see attachment)." [Letter from Sanders to HUD dated September 2, 1999 at 1 (JA 39, p. 816).] The loan was to be a rehab loan to complete MIO Plan repair work related to the mailboxes, elevator repairs, drywall and painting and an entry and interior door replacement program. [Sanders Decl. at 7 ¶ 25 (JA 17, p. 655 at 661).]

23. Senior DEC representatives from Washington visited South Pointe on August 30, 1999. [Deposition Transcript of Joan Kiening ("Kiening Tr.") at 174-75 (JA 10, p. 165 at 209).] They were impressed with the progress that had been made during the summer in security, resident services and repairs. [Sanders Decl. at 7-8 ¶¶ 27, 28 (JA 17, p. 655 at 661 - 62); Batchelor Decl. at 6 ¶17 (JA 15, p. 630 at 635).]

24. On September 14, 1999, a letter was prepared by Ms. Batchelor for Ms. Kiening's signature. The letter thanked Englewood for the "courtesies extended to our Washington visitor and the rest of our staff during our trip on August 30, 1999" and stated that "[w]e were pleased to see the obvious benefits of your increased security program, the potential your social programs hold, and the progress of the ongoing rehabilitation work." [Letter from Zale, Batchelor and Kiening to Englewood at 2 (JA 40, p. 818 at 819); Batchelor Decl. at 6-7 ¶¶ 18-19 (JA 15, p. 630 at 636-___).]

25. On November 30, 1999, Ms. Thomas wrote an internal email to HUD staff recommending that HUD not accept Englewood's application for a rehab loan. [Thomas email dated November 30, 1999 at 1 (JA 44, p. 838).] Ms. Thomas explained the owner was being "flagged" [Thomas memo dated November 30, 1999 at 1 (JA 44, p. 838); Thomas Tr. at 116-31 (JA 11, p. 251 at 280-84)], that there was a flag on the owners and managers at South Pointe in November 1999 [Thomas Tr. at 121 (JA 11, p. 251 at 281)], and that she intended that her statements as a Project Manager would be

used by other HUD staff in making their decision on whether to accept the Englewood rehab loan application. The 1999 rehab loan was rejected by HUD as Ms. Thomas recommended. [Thomas Tr. at 130 (JA 11, p. 251 at 284).]

**Year 2000 Follow-up to the 1999 MIO Plan and Final Team Report**

26. Ms. Batchelor was concerned that Ms. Coleman and Ms. Thomas would not follow through on the MIO Plan or the recommendations in the Final Team Report. [Batchelor Decl. at 8 ¶¶ 23-24 (JA 15, p. 630 at 637).] She was also concerned that they were personally hostile to the operating and rehab efforts at Englewood and P.M. One. [Batchelor Decl. at 8 ¶ 24 (JA 15, p. 630 at 637).] Finally, she was troubled to learn that Ms. Thomas had consistently rejected Englewood's requests for rental increases and rehab loans to improve the property to achieve the objective of the MIO Plan. [Batchelor Decl. at 8, 9 ¶¶ 25-28 (JA 15, p. 630 at 637-38).]

27. Ms. Coleman never visited South Pointe. [Coleman Tr. at 127-28 (JA 12, p. 365 at 397).] She did not read or review the Final Team Report or the MIO Plan. [Coleman Tr. at 134-36 (JA 12, p. 365 at 399).] Ms. Coleman did not assume any responsibility for "the finalization" of the MIO Plan. [Coleman Tr. at 135-36 (JA 12, p. 365 at 399).]

28. Ms. Thomas did not read or review the Final Team Report or the MIO Plan. [Thomas Tr. at 139 (JA 11, p. 251 at 286).] Ms. Thomas did not believe she had any special obligations to follow up on or monitor the progress of the MIO. [Thomas Tr. at 86-90 (JA 11, p. 251 at 273 - 74).]

29. HUD did not take any action or communicate in any way with Englewood or P.M. One with respect to any of the MIO progress reports from Englewood during 2000. [Sanders Decl. at 9 ¶ 33 (JA 17, p. 655 at 663).]

30. On October 3, 2000, Ms. Gray wrote to Mr. Sanders informing him that HUD had reviewed the Englewood "response to our year 2000 Occupancy Review and find it acceptable. The review is now closed subject to deficiencies in the REAC inspection." [Letter dated October 3, 2000 (JA 64, p. 961).]

**Englewood's Compliance Status as of October 2000**

31. As of October 3, 2000, Englewood was in compliance with all of its contract obligations with HUD. [Letter dated October 3, 2000 (JA 64, p. 961).] A MIO Plan had been approved. [REMS Entries (JA 50, p. 872).] The referral to the DEC had been completed and South Pointe had been returned to MFH for the finalization of the MIO Plan. [Final Team Report at 8 (JA 47, p. 860 at 867).] All of the senior HUD officials in the DEC and MFH in both Chicago and Washington, D.C. concurred with the decision of the Final Team Report – Resolution, that "substantial progress had been made" and that South Pointe could be returned to MFH for the monitoring of the MIO Plan and loan servicing. [Final Team Report at 8 (JA 47, p. 860 at 867).] Englewood's response to the Year 2000 Occupancy Review was accepted and the case was closed. [Letter dated October 3, 2000 (JA 64, p. 961).] All of the elements were in place for a multi-year HAP Renewal Contract to be executed so that there would be security for a rehab loan to complete all of the improvements remaining to be made to complete the 1999 MIO Plan. [Hayes Decl. at 6 ¶ 24, at 7 ¶ 29 (JA 16, p. 640 at 645, 646); (Sanders Decl. at 10 ¶ 38 (JA 17, p. 655 at 664).]

**The 2000 HAP Renewal Contract**

32. The 2000 HAP Renewal Contract went through the normal HUD review process. The request was reviewed and approved by the Project Manager, reviewed and approved by the supervisor Ms. Gray, and transferred to Operations for the

reservation of funds and entry into TRACS. There is a decision making process involving approvals and concurrences in the execution of HAP Contracts. [Coleman Tr. at 43-44 (JA 12, p. 365 at 376).] The contract was prepared by HUD and signed by the parties. [Coleman Tr. at 37–52 (JA 12, p. 365 at 374 - 78); Hayes Decl. at 6 ¶ 24 (JA 16, p. 640 at 645); Sanders Decl. at 10, 11 ¶¶ 38-40 (JA 17, p. 655 at 664 - 65).] Under the terms of the 2000 HAP Renewal Contract HUD, if HUD terminated the contract, it had the option of continuing or renewing the contract "to facilitate the provision of vouchers" for such reasonable time (not to exceed 180 days) as may be necessary to relocate eligible residents with Section 8 vouchers. [2000 HAP Renewal Contract Addendum (JA 21, p. 696 at 699).]

33. Both Mr. Hayes and Mr. Sanders regarded the multiyear HAP Contract as essential to obtaining rehab funding. [Hayes Decl. at 6 ¶ 24 (JA 16, p. 640 at 645); Sanders Decl. at 11 ¶¶ 40, 41 (JA 17, p. 655 at 665).]

34. The notes taken by Ms. Thomas at the meeting on October 18, 2000 summarized matters raised during the meeting, principally comments concerning the Englewood rehab loan. No mention was made of any error in the 2000 HAP Renewal Contract or the contract in her notes. [Thomas notes taken at October 18, 2000 meeting (JA 67, p. 971).] Mr. Sanders who attended the meeting for Englewood denies that the subject came up:

> At the meeting on October 18, 2000 there was absolutely no discussion of an "error" in the HAP contract. Ms. Thomas never mentioned it. Neither did Ms. Coleman. It was simply not discussed. We finished the meeting. Ken Horton and I met with Ben Tessler to have the HAP contract signed for HUD. We left with a signed contract. I was comfortable that we would get a rehab loan, complete the MIO, reduce our principal payments, or get them

> deferred for a year, so that we could pay for the security and utility costs and pay for repairs out of the rehab loan. HUD's idea that there was an "error" in the contract must have occurred at some later point in time. There was absolutely no discussion of it at the meeting on October 18, 2000, or at any time after the meeting. Neither Ken Horton nor I learned about it until the Veronica Coleman letter of December 6, 2000.

[Sanders Decl. at 11 ¶ 40 (JA 17, p. 655 at 665).]

35. On October 30, 2000 Ms. Thomas used her HUD User ID to modify the earlier contract information in the system, which was made on October 9, 2000 to alter the original term of the contract to reflect a short-term renewal contract of three months, from October 1, 2000 to December 31, 2000. [REMS Entry dated October 30, 2000 at 1 (JA 68, p. 972).] There are no HUD internal or other communications or concurrences during September, October or November 2000 concerning this correction to the initial term of the contract and the elimination of the provision for three one-year automatic renewals. [Wellons letter dated January 20, 2006 (JA 142, p. 1372).]

36. Defendant agrees that it has not produced documents dated in or around October 18, 2000 suggesting the Renewal Contract executed on that day contained an error regarding the agreement's duration. There are no documents showing HUD concurrences or approvals of this alteration/amendment to the document by Ms. Thomas and Ms. Coleman other than the document itself. [Wellons letter dated January 20, 2006 (JA 142, p. 1372).]

37. Ms. Coleman testified that, although she signed the December 6, 2000 letter amending the 2000 Renewal Contract, she was unsure who drafted it. [Coleman Tr. at 280 (JA 12, p. 365 at 435).]

38. HUD has produced no concurrence or approval documents showing that anyone other than Ms. Coleman drafted and executed the December 6, 2000 letter, which purported to amend the 2000 Renewal Contract. [Wellons letter dated January 20, 2006 (JA 142, p. 1372).] "The impact of the proposed amendment is that the contract would only have three additional weeks to run and it would end on December 31, 2000." [2000 HAP Renewal Contract with handwritten notes dated December 6, 2000 at 1 (JA 22, p. 705).] However, HUD has produced an email exchange between Mr. Horton and Ms. Coleman which it believes is evidence that Englewood agreed to amend the HAP Contract. [Email dated January 23, 2001 at 2 (JA 72, p. 1015 at 1016).] A copy of an altered version of the 2000 HAP Renewal Contract was attached. [First altered 2000 HAP Renewal Contract (JA 22, p. 705 at 706).]

39. Both Ms. Thomas and Ms. Coleman testified that, while Ms. Thomas was the person who actually altered the contract to reduce the time from one year to three months and from three automatic renewals to zero renewals attached to the December 6, 2000 letter, and then altered the documents once again by changing the three months to 12 months, but keeping the zero renewal provision, she did so at the direction of Mr. Hinsberger. [Thomas Tr. at 237-44 (JA 11, p. 251 at 310-12); Coleman Tr. at 282-84 (JA 12, p. 365 at 436).] Ms. Thomas testified that it was Mr. Hinsberger who authorized Ms. Coleman and herself to make two alterations to the terms of the 2000 HAP Renewal Contract. [Thomas Tr. (JA 11, p. 251 ).]

40. The proposed amendments were made by HUD with no involvement of Englewood. Englewood did not accept or sign the HUD proposed

amendment to the Contract made on December 6, 2000, or the additional amendment made by HUD on January 10, 2001. [Hayes Decl. at 7 ¶¶ 31-2 (JA 16, p. 640 at 646).]

41. The 1998 HAP Contract states the procedures for amending contracts. Paragraph 21 of the HAP Contract provides that: "No changes in this Contract may be made except in writing signed by both the Owner and HUD." [1998 HAP Contract at 21 (JA 19, p. 677 at 688).] Mr. Hayes did not agree to amend the Contract and there is no evidence that Englewood agreed to either of the two proposed amendments to the 2000 HAP Renewal Contract. [Hayes Decl. at 7 ¶¶ 31, 32 (JA 16, p. 640 at 646).]

**March 8, 2001 REAC Report**

42. These were the types of physical deficiencies that were found in the units, and the number and percentage of units in which the particular deficiencies were found:

| Item | Number | Percentage |
|---|---|---|
| Smoke detector not working | 1 | 4% |
| Repair kitchen sink | 1 | 4% |
| Repair kitchen light fixture | 1 | 4% |
| Repair bathroom cabinet | 1 | 4% |
| Repair bath toilet | 1 | 4% |
| Paint walls | 1 | 4% |
| Repair kitchen cabinets | 2 | 8% |
| Repair/paint ceiling | 2 | 8% |
| Repair windows | 2 | 8% |
| Missing breakers (EH&S) | 3 | 12% |
| Roaches in kitchen cabinets (EH&S) | 3 | 12% |
| Repair bath tubs | 4 | 16% |
| Replace missing outlet covers (EH&S) | 5 | 20% |

| Item | Number | Percentage |
| --- | --- | --- |
| Repair handles or gaskets on refrigerators | 5 | 20% |
| Repair bathroom sinks | 5 | 20% |
| Leaky faucets in kitchens | 6 | 24% |
| GFI replacements | 6 | 24% |
| Repair door surfaces | 6 | 24% |
| Repair walls | 7 | 28% |
| Repair/replace closet doors | 9 | 36% |
| Problems with ovens and burners in stoves | 9 | 36% |
| Leaky faucets in bathrooms | 10 | 40% |
| Repair door hardware | 11 | 44% |

43. All of the cited physical deficiencies were either normal work order repairs (plumbing and appliance repairs), or were repairs that were scheduled to be made as part of Englewood's response to the 1999 MIO Plan (painting and drywall, door repair/replacement). [Sanders Decl. at 12, 14-5 ¶¶ 44, 48, 51 (JA 17, p. 655 at 666, 667-69).]

44. All of the repairs identified on the REAC Report were planned to be corrected as part of the rehab loan. [BABCO Rehab Program (JA 80, p. 1061); Hayes Decl. at 8-10 ¶¶ 39-43 (JA 16, p. 640 at 647-49); Sanders Decl. at 14-15 ¶¶ 50-3 (JA 17, p. 655 at 668-69).]

45. Mr. Hayes wrote that he had enclosed "photos of those items cited on the March 2, 2001 inspection," and enclosed a copy of the reinspection report prepared by Mr. Sanders – with photos – which had been conducted the day they received the Coleman letter to confirm that the work had in fact been done as certified. [Hayes

letter dated March 16, 2001 at 1 (JA 79, p. 1059); Sanders Decl. at 13 ¶ 47 (JA 17, p. 655 at 667).]

**Building Surveys**

46. In November 2000, the P.M. One staff spent four days conducting inspections of 100% of the units at South Pointe to determine the physical needs of the property that were to be addressed as part of the rehabilitation loan that was being discussed by Englewood and HUD. Their report stated: "Tenant Damages: Should the tenant pay for these repairs? Nine times out of ten . . . YES! This section shows which unit's repairs are a direct result of tenant damage or neglect." The report concluded: "The building is not as bad of shape as we may have thought." [Report of four-day physical inspection dated November 3, 2000, conducted by Sanders and P.M. One staff (JA 69, p. 975 at 976).] P.M. One's staff created an inspection "Log" and "Physical Inspection Summary" concerning the physical needs of each of the units as well as an overall narrative summary of their findings. [Report of four-day physical inspection dated November 3, 2000, conducted by Sanders and P.M. One staff (JA 69, p. 975).]

47. On March 4, an architect retained by Englewood, Ted Dunaj, completed his detailed inspection of the building and 100% of the units at South Pointe, which he had been engaged in for several months, and converted his field notes into 25 pages of architectural drawings, describing the construction needs of each unit at South Pointe. [Architectural Drawings dated March 4, 2001 (JA 75, p. 1021).]

48. There was no mention of any need for these types of capital repairs in the March 8, 2001 REAC Report. Compare the physical deficiencies described in the REAC Report of March 8, 2001 (JA 28, p. 767), with the long-term capital repairs required by HUD. [Rehab Report Prepared by HUD at 1-5 (JA 81, p. 1066).]

**HUD's Rejection of Englewood's Rehab Loan Application**

49. A new loan was necessary in order to develop responses to the REAC Reports of 1999 and 2001. HUD rejected Englewood's refinancing and rehab loan application in December 1999 and again on April 3, 2001. [Letter from Hinsberger dated April 3, 2001 (JA 82, p. 1071).] It was not possible for operating revenue to fund capital improvements. The 10- year amortization provision of the CIC loan created a situation where 20% of the operating revenue ($500,000) was required to pay principal on the 10-year $5 million loan. One financing option was a long term HUD insured loan. It could provide immediate capital for repairs, and require minimal principal payments. Another option was a loan with a conventional lender where an escrow would be established from savings in principal payments to pay back a $2 million loan in four years. With a conventional lender, it was essential that the four-year HAP Contract be in place to assure the lender of the revenue stream to pay back the loan. [Hayes Decl. at 7-9 ¶¶ 29-41 (JA 16, p. 640 at 646-48); Sanders Decl. at 10 ¶ 38 (JA 17, p. 655 at 664).] All of the Englewood rehab loan requests (November 1999, Summer 2000, March 19, 2001) were rejected by HUD without real discussion, for technical reasons that could have been solved by collaboration and cooperation.

**Englewood's Proposed Plan of Correction**

50. On April 8, 2001, Kelly Brown on behalf of Englewood sent Ms. Coleman a letter which was the "30 day response" to the March 8, 2001 Letter, which Englewood was required to submit to HUD. [REAC Letter dated March 8, 2001 (JA 28, p. 767).] The REAC Letter of March 8, 2001 stated the response was to be a Proposed Plan of Correction in MIO format without any reference to any specific HUD form. [REAC Letter dated March 8, 2001 (JA 28, p. 767).] Englewood's April 8, 2001 letter

included reference to the EH&S certifications that had been made on March 12, 2001 [Hayes letter of March 16, 2001 (JA 79, p. 1059)]; it referenced the MIO Plan for existing deficiencies that had been made on April 5, 2001 [Mintz letter to Kiening on April 5, 2001 (JA 84, p. 1076)], as well as the BABCO scope of work and Dunaj Drawings, which had been submitted as part of the rehab loan application [BABCO Scope of Work Letter dated March 19, 2001 (JA 80, p. 1061)]. The MIO submission on April 15, 2000 was in the same format that HUD approved on December 8, 1999. Finally, both HUD and Englewood knew that the source of the funding for the rehab program was going to be the loan proceeds and the dramatic reductions in principal payments, a plan under discussion between the parties since HUD's approval of the MIO Plan in December 1999. [Hayes Decl. at 6 ¶¶ 24-25 (JA 16, p. 640 at 645).]

**HUD's Response to Englewood's Response to the REAC Letter**

51. Neither Ms. Coleman nor Ms. Thomas followed the instructions to HUD in the March 8, 2001 REAC Letter. [March 8, 2001 REAC Letter (JA 28, p. 767).] Neither reviewed the sufficiency of the Englewood submission. Neither determined whether there was sufficient detail regarding plans and resources for correction. Neither made any contact with Englewood to discuss any required amendments, including the format of the MIO or the reference to Englewood's loan application to fund the plan. [Coleman Tr. at 225-26 (JA 12, p. 365 at 421-22); Thomas Tr. at 168-83 (JA 11, 251 at 293-97).]

52. HUD did not "accept" the Englewood response for purposes of consideration. Instead, it returned Englewood's submission without consideration. "We are in receipt of the plan to correct the deficiencies identified in the subject Real Estate Assessment Center (REAC) inspection. The response to that inspection was submitted

by Ms. Kelly Brown, Regional Property Manager for P.M. One. Ms. Brown's response will not be accepted due to impending negotiations with HUD (Departmental Enforcement Center and Chicago Multifamily Hub) concerning your proposed refinance and substantial rehabilitation of the property." [Letter from Ms. Coleman to Mr. Hayes dated May 15, 2001 (JA 93, p. 1098).]

53. HUD's position is that it is irrelevant to Englewood's breach of contract whether Englewood had corrected or planned to correct the physical deficiencies identified in the March 8, 2001 REAC Report. [Defendant's Responses to Interrogatories, 19-20, Ints. 11, 12 (JA 5, p. 66 at 84-5).] HUD further contends that the correction or planned correction of the deficiencies noted in the April 29, 1999 REAC Report or any other deficiencies identified as a result of HUD inspections are similarly irrelevant. [Defendant's Responses to Interrogatories at 20-21, Ints. 13, 14 (JA 5, p. 66 at 85-6).]

**The HUD April 9, 2001 Notice of Default**

54. HUD completed the Notice of Default on Friday, April 6, 2001, the week before Englewood's response was due. In developing this Notice of Default, HUD did not follow its normal procedures in generating a Team Report by an enforcement analyst with concurrences for the Team Report and the Notice of Default from the enforcement analyst, the financial analyst, the team leader, the staff attorney, the lead attorney, attorneys in Headquarters and the DEC Director of Operations. [Maisonet Tr. at 104-05 (JA 13, p. 474 at 501).] Ms. Maisonet said these procedures were not followed because the decision and notice were being "fast tracked." [Maisonet Tr. at 208 (JA 13, p. 474 at 527).] Ms. Maisonet and Mr. Hinsberger thanked the lawyers for their good

effort. [Email from Ms. Maisonet on April 6, 2001 to lawyers in the DEC who worked on preparing the Notice of Default during the week of April 2, 2001 (JA 85, p. 1085).]

55. On April 9, 2001 HUD issued a notice of contract default to Englewood. The Notice did not refer or otherwise acknowledge Englewood's REAC Report response of April 8, 2001. [Notice of Default dated April 9, 2001 (JA 89, p. 1090).]

56. The Notice also stated: "Pursuant to Paragraph 20 of the HAP Contract, the Owner is hereby notified that if the foregoing events of default are not corrected to the satisfaction of HUD within 30 days from the date of this Notice, HUD may seek" to "terminate the contract" as well as "any and all (other) available remedies; including, without limitation, suspending or abating the HAP Contract." The Notice did not describe or explain "the actions required to be taken and the remedies to be applied on account of the default as required under Paragraph 20(b)(2)." [Notice of Default dated April 9, 2001 at 2 (JA 89, p. 1090 at 1092); 1998 HAP Contract (JA 19, p. 677).] In addition, HUD also states that the actual or planned correction of physical deficiencies on any official HUD inspection report are 'irrelevant to the issues being litigated in this case." [Defendant's Responses to Plaintiff's Interrogatories at 20-21, Int. 13 (JA 5, p. 66 at 85-6).]

57. HUD's first alleged "event of default" was the 31 score that Englewood received on the REAC inspection of March 2, 2001. Ms. Maisonet testified in her deposition that the March 8, 2001 REAC Report was the reason that Englewood was in default of the HAP Contract. [Maisonet Tr. at 157 (JA 13, p. 474 at 514).] However, HUD also states that the actual or planned correction of the physical

deficiencies identified on the March 8, 2001 REAC Report are "irrelevant to the issues being litigated in this case." [Defendant's Responses to Plaintiff's Interrogatories at 20, Int. 12 (JA 5, p. 66 at 85).]

58. HUD's second alleged "event of default" was that allegation by HUD on March 9, 2001 that "few of the EHS items had been mitigated at that time," and "the Project was not in good repair." [Notice of Default dated April 9, 2001 (JA 89, p. 1090).] However, HUD also states that the actual or planned correction of the physical deficiencies identified on the March 8, 2001 REAC Report are "irrelevant to the issues being litigated in this case." [Defendant's Responses to Plaintiff's Interrogatories at 20, Int. 12 (JA 5, p. 66 at 85).]

59. HUD's third alleged "event of default" was that the rehab program proposed by Englewood in its loan application was "inadequate when compared to the needs of the property." [Notice of Default dated April 9, 2001 (JA 89, p. 1090).] HUD's proposed rehab program was not tied to the correction at findings in the March 8, 2001 REAC letter, or to any reasonable standard of "decent, safe and sanitary." [See Joint Fact ¶ 85, p. 23] All of the HUD recommended improvements, except for the replacement at the penthouse which was wholly impractical, could have been financed by the $5.5 million rehab loan, which Mr. Sher represented could have been underwritten. [Hayes Decl. at 10-11 ¶ 44 (JA 16, p. 640 at 649); Sher email dated April 9, 2001 (JA 88, p. 1089).] In addition, HUD states that the differences in the work proposed by Englewood and by HUD in their discussion of a rehabilitation loan in March 2001 are "irrelevant to the issues being litigated in this case." [Defendant's Response to Plaintiff's Interrogatories at 21, Int. 14 (JA 5, p. 66 at 86).]

60. HUD's fourth alleged "event of default" was the fact that Englewood had not brought the property "into compliance" during the 23 months since the April 28, 1999 REAC inspection. [Notice of Default dated April 9, 2001 (JA 89, p. 1090).] However, a MIO Plan had been approved by the DEC and MFH in December 1999. [DEC Approval of MIO (JA 48, p. 870); Sanders Decl. at 8 ¶ 31 (JA 17, p. 655 at 662).] The MIO Plan submitted by Englewood on April 15, 2001 was in the same format as the one approved by HUD in December 1999. [Sanders Decl. at 8 ¶ 31 (JA 17, p. 655 at 662); Englewood Letter dated April 5, 2001 (JA 84, p. 1076).] The Final Team Report directed that South Pointe be returned from the DEC to MFH for servicing and the finalization of the MIO: "Substantial progress has now been made on the findings outlined in the REAC Report, therefore the DEC should return the case to the multifamily HUB for servicing." The Report directed further that: The Chicago HUB office should continue the finalization of the MIO Plan received on December 8, 1999." [Final Team Report at 8 (JA 47, p. 860 at 867).] In addition, HUD has stated that the actual or planned correction of the physical deficiencies identified on the April 19, 1999 REAC Report are "irrelevant to the issues being litigated in this case." [Defendant's Responses to Plaintiff's Interrogatories at 19-20, Int. 11 (JA 5, p. 66 at 84-5).]

61. HUD's fifth alleged "event of default" was Englewood's failure to maintain South Pointe in a "decent, safe and sanitary" condition with respect to HUD's Physical Conditions Standards. The HUD staff responsible for making the decision that Englewood was in default of the 2000 HAP Renewal Contract believed that the mere declaration that South Pointe was not decent, safe and sanitary was sufficient for making the determination that Englewood was in default of the HAP Contract and that HUD had

no further obligation to honor the automatic renewal provisions or other financial obligations under the Contract. Ms. Thomas stated that the reason that Englewood was in default in the spring of 2001 was Englewood's failure "to maintain the property in decent, safe and sanitary condition." [Thomas Tr. at 295 (JA 11, p. 251 at 325).] Ms. Coleman's position was: "The minute a property cannot meet the standard of being decent, safe and sanitary, owners are in default." [Coleman Tr. at 210 (JA 12, p. 365 at 418).] Ms. Maisonet explained the default: "The default was due for failure to maintain the property in decent, safe and sanitary condition." [Maisonet Tr. at 156 (JA 13, p. 474 at 514).] Like Ms. Coleman, Ms. Maisonet had never visited South Pointe. [Maisonet Tr. at 45-47 (JA 13, p. 474 at 486-87).]

62. Other than the reference to the REAC score of 31, and the dispute concerning the correction of EH&S deficiencies, HUD made no reference in the April 9, 2001 Notice of Default to any failure of Englewood regarding required responses set out in the REAC Letter of March 8, 2001. [Notice of Default dated April 9, 2001 at 1 (JA 89, p. 1090).]

63. Paragraph 20(b)(2) of the HAP Contract provides that upon a determination that an event of default has occurred, "HUD shall notify the Owner of (i) The nature of the default; (ii) The actions required to be taken and the remedies to be applied on account of the default (including actions by the Owner to cure the default); and (iii) The time within which the Owner shall respond with a showing that all the required actions have been taken." [1998 HAP Contract, Paragraph 20(b)(2) (JA 19, p. 677 at 687).] HUD gave no such notice to Englewood. [Hayes Decl. at 10-11 ¶¶ 43-44 (JA 16, p. 640 at 649).]

64. While HUD stated in its Notice of Default that Englewood was being notified of the foregoing events of default "pursuant to Paragraph 20 of the HAP Contract," there was no notification of any of the "actions required to be taken and the remedies to be applied on account of the default, including actions by the owner to cure the default." [Notice of Default dated April 9, 2001 (JA 89, p. 1090); Joint Fact ¶ 18, pp. 4-5.] Compare the detailed "findings" and required "actions to be taken" in the HUD June 16, 2000 Report on the 2000 Management Review [Letter from Coleman to Hayes dated June 16, 2000 (JA 55, p. 921)] with the absence of any reference to specific actions "required to be taken and the remedies to be applied" in the April 9, 2001 Notice of Default. [Notice of Default dated April 9, 2001 (JA 89, p. 1090).]

**Englewood Meeting with HUD on April 13, 2001**

65. Englewood scheduled a meeting with HUD on April 13, 2001. Mr. Hayes understood the purpose of the meeting would be to discuss the need for updating the earlier MIO, amending it to reflect the REAC Report of March 8, 2001 and Englewood's response, and to work toward an agreed upon scope of work and rehab loan financing so that all of the physical and operational needs of South Pointe could be addressed in a comprehensive manner. [Hayes Decl. at 11, ¶ 45 (JA 16, p. 640 at 650).]

66. On April 4, 2001, Mr. Hinsberger sent an email to his staff indicating that Englewood wanted to meet to discuss the Occupancy Review and REAC Inspection. [Hinsberger email of April 4, 2001 (JA 83, p. 1075).]

67. In anticipation of the April 13, 2001 meeting, Mr. Hayes was prepared to challenge the factual assumptions HUD had used in concluding the alleged "events of default" supported a Notice of Default. Paragraph 20(b)(2) of the 1998 HAP Contract requires that the nature of the default and the remedial actions to be taken be

explained. [1998 HAP Contract ¶ 20 (JA 19, p. 677 at 687).] The March 8, 2001 REAC Letter directed that HUD was to review Englewood's submission, evaluate its sufficiency, recommend amendments and make contact with Englewood. As Mr. Hayes states in his Declaration: "When I received the April 9, 2001 Notice of Default, I had fundamental questions about the factual accuracy of each and every "event of default" they referred to . . . . I didn't agree that any of the listed "events of default" referred to in the Notice – the failure to correct the EH&S deficiencies, the alleged inadequacy of our proposed scope of work, the failure to create an approved plan over the past 23 months – were factually supportable. . . . Our Proposed Plan of Correction was responsive to every type of repair need mentioned in the March 8, 2001 REAC Report and our own independent building survey. . . . There had been no mention that South Pointe was not decent, safe and sanitary and no mention of a 'default' while major repairs were being made in 1999 while South Pointe was in the DEC. There was a MIO Plan that everyone agreed to which set out the repairs to be made." [Hayes Decl. at 10 ¶¶ 43-44 (JA 16, p. 640 at 649).]

68. At the April 13, 2001 meeting, HUD refused to discuss any of the issues listed in the Notice of Default, or its refusal to honor Englewood's rights to automatic HAP Renewals, or its demand that Englewood transfer its HAP Contract rights and responsibilities to a new owner. [Hayes Decl. at 11-2 ¶¶ 45, 46 (JA 16, p. 640 at 650).]

69. Englewood understood from the meeting at HUD on April 13, 2001 that HUD would not deal any further with Englewood on the 2000 HAP Renewal or the rehab loan. Englewood's only remaining role was to find a new owner. There was

nothing to be done with respect to completing the remainder of the existing MIO or developing any additional response to the March 8, 2001 REAC Report. [Hayes Decl. at 12 ¶ 47 (JA 16, p. 640 at 651).] Hayes started to use his network to find a new owner and reported his progress to Mr. Hinsberger in a letter dated May 2, 2001. [Hayes Decl. at 12 ¶ 48 (JA 16, p. 640 at 651); Hayes letter dated May 2, 2001 (JA 91, p. 1096).] HUD has stated that there were no concurrences or approvals for Ms. Coleman's letter. [Wellons letter dated January 20, 2006 (JA 142, p. 1372).]

**Events Subsequent to April 13, 2001 Meeting with HUD**

70. On May 22, 2001, Mr. Hayes wrote to Ms. Coleman to confirm his understanding that the overriding issue in the meeting that was conducted on April 13, 2001 with the Departmental Enforcement Center and Mr. Hinsberger was Englewood's need to find a buyer, as Mr. Hayes stated in his letter to Mr. Hinsberger of May 2, 2001. [May 2, 2001 Letter (JA 91, p. 1096); May 22, 2001 Letter (JA 96, p. 1102).]

71. On July 30, 2001, Richard Pace of HUD headquarters in Washington wrote to Ms. Coleman requesting the South Pointe files related to the REAC Letter of March 8, 2001, the survey, the MIO Plan and other related documents. [Email dated July 30, 2001 (JA 100, p. 1107).]

72. Ms. Coleman testified at her deposition that she did not send the information to Mr. Pace, that she asked Ms. Thomas to handle the matter, and that she did not know what, if anything, was sent to Mr. Pace at HUD in Washington. It appears that Mr. Pace did not receive any of the Englewood materials submitted to HUD Chicago or the materials requested other than the email response from Ms. Coleman. [Coleman Tr. at 254-59 (JA 12, p. 365 at 429-30).]

73. On August 1, 2001, Ms. Coleman responded to the Pace email stating that: "the owner did not comply," it was the "second referral to the DEC," the owner had been "flagged," the plan had "been rejected," and the property was returned to the HUB with a plan instructing the owner "to address the rehab of every unit as well as the entire building and he did not." [Email of August 1, 2001 (JA 101, p. 1108 at 1109).] None of these statements was true. The owner was in full compliance with the REAC Report of 1999 [see Fact ¶ 96, Plaintiff's Facts, p. 26]. There was only one referral to the DEC [JA 29, p. 779]. The owner had not been flagged. Englewood's MIO Plan had been accepted. [Approval by DEC (JA 48, p. 870).] Finally, there was no statement in the Final Team Report that there were to be repairs to each of the units in order for the approved MIO Plan of December 8, 1999 to be "finalized." [Final Team Report (JA 47, p. 860).]

74. In the summer of 2001, Mr. Samuelson began visiting South Pointe in order to prepare a comprehensive refinancing and workout program. Mr. Samuelson's analysis was that there was a critical need to integrate physical security improvements with the presence of armed guards to secure elevator operations, repairs being made to the building and the eviction of problem tenants. The crime problems at South Pointe could only be solved by the coordination of physical security, armed guards, and evictions—all requiring money that was not there. The essential problem was the need for money for past due bills for these extraordinary expenses. [Samuelson Decl. at 2-3 ¶¶ 5-7 (JA 18, p. 671 at 672-73).]

75. On August 21, 2001, Mr. Samuelson applied on behalf of Englewood for the renewal of the 2000 HAP Renewal Contract and a $200,000 rent

increase—based on market rent comparables and expenses. The increase was critical to ending the $200,000 operating deficits that the project was experiencing and develop proper budgets for operations, security and repairs. [Samuelson Letter Requesting Contract Renewal and Rental Increases dated August 21, 2001 (JA 104, p. 1120).]

76. Given the importance of operating revenues to Englewood during the period from 1999 through 2001 to cover the expenses of producing appropriate quality housing, it was HUD's responsibility to work with Englewood to achieve their mutual objective to produce decent safe and sanitary housing for eligible families. "HUD hereby agrees to make housing assistance payments on behalf of Families…to enable the Families to lease decent, safe and sanitary housing pursuant to Section 8 of the Act." [1998 HAP Contract ¶ 3(b)(2) (JA 19, p. 677 at 678).] The purpose of the DEC was to restore trust in HUD's ability to employ subsidies to assist owners in providing decent, safe and sanitary housing. [Batchelor Decl. At 4 ¶ 10 (JA 15, p, 630 at 633).] HUD should have been working with Englewood to secure the operating and loan funds available to Englewood for purposes of completing the December 8, 1999 MIO Plan and providing for appropriate resident and security services. [Samuelson Decl. at 2 ¶ 6 (JA 18, p. 671 at 672); Sanders Decl. at 5 ¶¶ 16-7 (JA 17, p. 655 at 659); Hayes Decl. at 13-14 ¶¶ 52-3 (JA 16, p. 640 at 652-53).] HUD regularly used Englewood's absence of good standing based on the April 9, 2001 Notice of Default as its justification to reject Englewood's various rent increase and reimbursement claims. [Hayes Decl. at 13-14 ¶¶ 51, 53 (JA 16, p. 640 at 652-53).]

77. In an email from Mr. Hinsberger to Mr. Hayes in September 2001, Mr. Hinsberger explained the impact on the 2000 HAP Renewal Contract when vouchers

were issued: "Let me reiterate, once the housing authority issues vouchers, the Section 8 contract dies." Hinsberger continued: "Back in June [2001] when a sale was first being discussed, HUD had already started the abatement of the Section 8 contract and vouchers were ordered for the residents." [Email dated September 21, 2001 at 2 (JA 145, p. 1499 at 1500).] In another email, Hinsberger stated: "In email messages as recent as August 6th and September 21, 2001, I reminded you that you were running out of time that when vouchers were issued the contract would end." [Hinsberger email dated October 1, 2001 (JA 112, p. 1162).]

78. Mr. Hayes and Mr. Samuelson agreed that it would be cost effective to use the availability, and encourage the use of, vouchers to get rid of problem tenants. An effort was made to explain that they were jeopardizing their future voucher payments by ignoring their legal and financial obligations to Englewood. It made little difference. Many of the families had no income, a very small security deposit, if any, and access to the strategic/free use of a jury trial in response to an eviction action. [Samuelson Decl. at 3, 4 ¶¶ 9, 10 (JA 18, p. 671 at 673-74).] Englewood was prohibited by HUD from leasing units to new Section 8 families. [Notice of Abatement and Termination (JA 117, p. 1176).]

79. Mr. Samuelson's view of the utility of vouchers was: "I was very much in support of the effort by Mr. Hayes to use the injunction suit to seek a declaration that the HAP Contract should be automatically renewed and that vouchers could be used to get rid of bad tenants. These two objectives were not mutually exclusive." [Samuelson Decl. at 3 ¶¶ 8, 9 (JA 18, p. 671 at 673).]

80. There was no discussion or negotiation for the terms of the short-term renewal contract. On September 25, 2001, Mr. Hinsberger simply sent Mr. Hayes a signed short-term renewal contract. [2001 90-Day HAP Renewal Contract (JA 24, p. 719).]

81. Mr. Hayes signed the 90-Day HAP Renewal Contract the next day, September 26, 2001. [2001 90-Day HAP Renewal Contract (JA 24, p. 719 at 729).]

82. By September 28, 2001, Englewood had supplied HUD with a formal application for the automatic renewal of the 2000 HAP Renewal Contract [Samuelson letter of August 21, 2001 (JA 104, p. 1120)], a request for a rental increase that HUD indicated by email was approved [Hinsberger email of September 6, 2001 (JA 107, p. 1144)], a complete application for rehab loan that met the expanded requirements of HUD [Cravitz letter to Hinsberger of September 28, 2001 (JA 110, p. 1151)], a new owner acceptable to HUD (DSSA), and a new management agent (DSSA Management, Inc.).

83. On October 1, 2001, despite Englewood having met all of the conditions that HUD had set in order to renew the 2000 HAP Renewal Contract, HUD did not "automatically renew" the contract as it was required to do. [Hinsberger email to Hayes dated October 1, 2001 (JA 111, p. 1160).]

84. Ms. Coleman sent an email to Mr. Hinsberger on October 1, 2001, attaching the Pace email of July 30, 2001, and her reply, which was her response to their request for information "to determine if we handled the situation properly according to our new protocols for DEC and REAC." [Coleman email to Hinsberger dated October 1, 2001 (JA 101, p. 1108).]

**Provisions in the 2001 90-Day Renewal Contract Adopting Terms of Prior Contracts**

85. Nothing suggests that the parties intended to replace the basic terms and conditions of the 2000 HAP Renewal Contract, or to limit any rights or obligations either party may have had under the 2000 HAP Renewal Contract. Rather, HUD exercised its option to renew or extend subsidy benefits as provided for in the Addendum to the 2000 HAP Renewal Contract for the benefit of residents. [Addendum to 2000 HAP Renewal Contract (JA 21, p. 696).] Judge Wolski asked Defendant's counsel at the oral argument on HUD's motion to dismiss: "[I]s there anything in the subsequent contracts in which the Plaintiff waived any right it had under any previous contract?" Defendant's counsel replied: "I don't think they waived their rights. Tr. (March 18, 2004) at 12:21-13:2." [Wolski Opinion of August 31, 2004 at 2 (JA 9, p.163).]

86. Englewood never intended to give up its right to the automatic renewal provision in the 2000 HAP Renewal Contract. Full subsidy funding was necessary to fund MIO Plan repairs and the financing of the rehab loan. [Hayes Decl. at 14 ¶¶ 54-55 (JA 16, P. 640 at 653).] Mr. Hayes communicated his position to Mr. Hinsberger when HUD informed Englewood that the HAP Contract would not be renewed. [Hayes email dated October 1, 2001 (JA 113, p. 1163).] Finally, Englewood filed an injunction suit against HUD in the Northern District of Illinois seeking to compel HUD honor the automatic renewal provisions in the 2000 HAP Renewal Contract. [Complaint dated October 29, 2001 (JA 1, p. 1).]

87. There were no references in the 90-Day Renewal Contract to elimination of the automatic one-year renewal provision. There was, however, a specific

statement that "[a]ll provisions of the Expiring Contract are renewed," except those that were "specifically modified by the Renewal Contract." [90-Day HAP Renewal Contract (JA 22, p. 705).] Counsel for Plaintiff referred to renewal of these contract provisions in his letter to the Court on April 1, 2004. [Letter from Plaintiff's Counsel dated April 1, 2004 (JA 134, p. 1266).]

88. HUD exercised its option to extend the HAP contract for the benefit of the residents processing vouchers as contemplated by the Addendum to the October 2000 HAP Renewal Contract. On December 7, 2001 HUD attorney Greg Gustin wrote to Englewood attorney Peter Silverman on vouchers. [Gustin letter to Silverman regarding need for further extension (JA 119, p. 1179).]

89. On December 6, 2001, Mr. Hinsberger sent an email to Mary Anderson, Veronica Coleman, Gwen Thomas, Maria Baguio and Greg Gustin: "You need to extend the HAP at South Pointe for another 90 days. It expires 12/31/01. The vouchers will not be in place by then so extend the contract again." [Hinsberger email stating need for further extension (JA 118, p. 1178).]

## VI. THE INJUNCTION SUIT IN THE FEDERAL DISTRICT COURT

90. When Englewood sued to compel HUD to honor the automatic renewal provision and to stop issuing vouchers to residents, HUD argued to Judge Castillo that it had not terminated the Contract, nor had it even begun to terminate the Contract, despite the fact that HUD clearly told Englewood that it would not do business with Mr. Hayes and that it would not honor the automatic renewal provisions of the 2000 HAP Renewal Contract. [Hayes Decl. at 11-12 ¶¶ 46-47 (JA 16, p. 640 at 650-51); Hinsberger email to Hayes dated October 1, 2001 (JA 111, p. 1160).] Judge Wolski described the practical reality of the situation: "We are not presented with a circumstance

in which HUD elected not to renew a contract, which had the effect of terminating it; rather HUD decided to terminate a contract that it was contractually bound to renew." [Wolski Opinion dated August 10, 2004, p. 10 (JA 8, p. 152 at 161).]

91. Judge Castillo accepted HUD's argument that since Englewood had the right to an administrative review under MAHRA and would have the right to sue for breach of contract in the Court of Federal Claims, Englewood had not exhausted its administrative appeal within HUD. Any loss was not irreparable, and there was an adequate remedy at law. [Order of Judge Castillo dated November 15, 2001 (JA 7, p. 146).]

## VII. HUD'S NOTICE OF ABATEMENT AND TERMINATION

92. HUD provided Englewood with no updated inspection of the property between the date of the Court's Order on November 15, 2001 and HUD's issuance of the Notice of Abatement and Termination on November 30, 2001. Nor did it describe for Englewood the actions to be taken and the remedies to be applied on account of the default required under Paragraph 20 of the 1998 HAP Contract. [Notice of Abatement and Termination dated November 30, 2001 at 1 (JA 117, p. 1176).] HUD relied upon the REAC Reports of April 29, 1999 and March 8, 2001 [REAC Reports of April 29, 1999 and March 8, 2001 (JA 27, p. 760) (JA 28, p. 767).] Compare the descriptions of findings and specific actions to be taken in the 2000 Management Review. [Letter from Coleman dated June 16, 2000 (JA 55, p. 921).]

93. Mr. Gustin wrote to Englewood on December 7, 2001: "As we discussed, and as HUD's November 30th letter references, HUD expects that the HAP Contract will need to be extended to accommodate HUD's actions in protection of the

residents. HUD will act in that regard in due course." [Letter dated December 7, 2001 (JA 119, p. 1179).]

94. On December 19, 2001, Mr. Hinsberger sent another email to the HUD team, including Margarita Maisonet and Victor Taylor: "Please extend the contract for 180 days. . . . I took a look at the Sec 8 guidebook. Greg pointed out that the guidebook indicated that extensions should be for 120 days (the provision that was in the REAC Addendum to the October 2000 Renewal Contract) to cover the time to get the vouchers issued. Out of the 303 units at the project, CHAC still hasn't completed the process for even a third of the tenants. So I am making the decision (contrary to the provisions of the contract) to go the six-month extension, June 30, 2002. Gwen will be putting the info into REMS and getting whatever the paperwork is together for Victor." [Hinsberger email directing the 180-day extension of the HAP subsidy (JA 120, p. 1181).]

95. As tenants used vouchers to move out and subsidy payments were abated, HUD prohibited Englewood from leasing the units to its long waiting list of tenants seeking the benefits of project based Section 8. [Notice of Abatement and Termination dated November 30, 2001 at 2 (JA 1117, p. 1176 at 1177).]

**VIII. ENGLEWOOD'S ADMINISTRATIVE CHALLENGE**

96. HUD conducted a hearing regarding Englewood's claims in Washington, D.C. on April 16, 2002. [Complaint dated September 22, 2003 ¶ 65 (JA 3, p. 30 at 46).] A series of email exchanges between Mr. Gustin, Mr. Hinsberger and Howard Mayfield (the HUD official who would be making HUD's independent and final administrative review decision, and was therefore to have had no previous involvement in the issues in dispute) ensued. On May 1, 2002, Mr. Gustin sent to Mr. Mayfield a draft

of HUD's final decision. [HUD Privilege Log (JA 143, p. 1374); Maisonet Dep. at 252-54 (JA 13, p. 474 at 538-39).]

97. On May 2, 2002, Howard Mayfield, Deputy Director, Office of Asset Management, informed Englewood that he affirmed HUD's February 7, 2002 final decision. [Notice of Reviewing Official's Appeal Decision at 2 (JA 126, p. 1223 at 1224).] Chicago HUD Enforcement Attorney Greg Gustin, who was counsel to Margarita Maisonet and the Chicago DEC, drafted the decision for Mr. Mayfield. [HUD Privilege Log (JA 143, p. 1374); Maisonet Dep. 252-54 (JA 13, p. 474 at 538-39).] This is contrary to the provision in Chapter 13 of HUD Section 8 Handbook, which provided that HUD's "final decision" is to be made by someone with no prior involvement with the dispute: "HUD will designate an official to review any appeal, conduct the conference, and issue the written decision. The official designated will be the one who was **not directly involved in making the decision being appealed**." [HUD Chapter 13 Handbook at 3 (JA 146, p. 1502 at 1504); emphasis added.]

## IX. VIOLATION OF COVENANT OF GOOD FAITH AND FAIR DEALING

[Some of the facts stated in this section repeat facts stated or referred to earlier. They are gathered here to describe the course of dealing between the parties, showing that HUD did not fulfill its implied covenant of good faith and fair dealing.]

98. On April 9, 1999, Ms. Coleman rejected the Englewood request for a rent increase, and offered no assistance, despite the fact that it was incurring operating deficits of $200,000 per year. [Coleman letter of April 9, 1999 (JA 32, p. 788).]

99. On November 30, 1999, Ms. Thomas recommended against Englewood's request for the rehab loan to complete the much-needed repairs set out in the April 29, 1999 REAC Report, knowing that her colleagues would rely upon her

recommendations as the Project Manager. [Thomas memo of November 30, 1999 (JA 44, p. 838); Thomas Tr. at 130 (JA 11, p. 251 at 284).]

100. Neither Ms. Thomas nor Ms. Coleman did anything in the first three quarters of 2000 to work with Englewood as directed by the Final Team Report - Resolution to "finalize" the MIO Plan that had been returned from the DEC to MFH for processing. They did not read the MIO Plan. [Thomas Tr. at 86-90 (JA 11, p. 251 at 273-74); Coleman Tr. at 134-36 (JA 12, p. 1365 at 399).] They did not read the Final Team Report – Resolution. [Thomas Tr. at 86-90 (JA 11, p. 251 at 273-74); Coleman Tr. at 134-36 (JA 12, p. 365 at 399).]

101. Ms. Thomas did not process the special claims submitted to her by Englewood on March 31, 2000 on a timely basis. Instead, she left for a four-month maternity leave without transferring processing responsibility to anyone else, which led to HUD's decision to reject the claims because they were not received in a timely manner. [Letter from HUD Rejecting Englewood's request (JA 70, p. 985).] Compare the dates (March 31, 2000) the Claims were submitted by Englewood (JA 51, p. 873), with the dates the Claims were "received" and processed by HUD (JA 70, p. 985).

102. Ms. Thomas drafted #2530 "flags," which would have the effect of prohibiting Englewood and the P.M. Group from participating in HUD programs. At the same time that Englewood was informed by others at HUD, including Ms. Thomas, that Englewood had satisfied its 2000 Occupancy Review [HUD Approval of 2000 Management Review (JA 64, p. 961).] and would receive a multi-year HAP Contract [2000 HAP Renewal Contract (JA 21, p. 696)] to complete the MIO Plan developed in response to the April 29, 1999 REAC Report. [#2530 Flag drafted by Thomas on

September 29, 2000 (JA 63, p. 959); #2530 Flag drafted by Thomas on October 12, 2000 (JA 65, p. 962).]

103. Ms. Thomas testified at her deposition that there was a group discussion and the clear understanding by Englewood at the meeting on October 18, 2000 that the 2000 HAP Renewal Contract was intended by the parties to be for three months with zero renewals and not a multi-year contract. [Thomas Tr. at 201-09 (JA 11, p. 251 at 301-03).] There was no such discussion. This was her position despite the fact that the multi-year contract was critical to Englewood's goal of obtaining a rehab loan and there is nothing in her notes to suggest that this topic was even discussed at the October 18, 2000 meeting. [Thomas meeting notes taken October 18, 2000 (JA 67, p. 971); Sanders Decl. at 11 ¶ 40 (JA 17, p. 655 at 665).]

104. Within two weeks of the execution by HUD of the 2000 HAP Renewal Contract on October 18, 2000, Ms. Thomas made a formal computer entry on October 30, 2000 in REMS indicating the 2000 HAP Renewal Contract was to be for three months and not for one year. [REMS entry on October 30, 2000 (JA 68, p. 972).]

105. Ms. Coleman and Ms. Thomas stated in their letter to Mr. Hayes on December 6, 2000 that the 2000 HAP Renewal Contract was made in error and it was being amended to reflect a term of three months with zero renewals. [Letter from Coleman to Hayes on December 6, 2000 informing him of "error" and "amendment." (JA 71, p. 1014); First Altered 2000 HAP Renewal Contract (JA 22, p. 705).] Neither Ms. Coleman nor Ms. Thomas ever discussed these "corrections" or "amendments" with Mr. Hayes. Nor did they get official approval from individuals with authority to make these amendments. Ms. Coleman explained the decision making process in terms of

authors and concurrences: "The person that drafts the letter is the first person on the concurrence page." [Coleman Tr. at 195-97 (JA 12, p. 365 at 414).] HUD has failed to provide any concurrence sheets that describe by whom and when approvals were attained. [Wellons letter dated January 20, 2006 (JA 142, p. 1372).]

106. On January 10, 2001, Ms. Thomas subsequently sought to "amend" the 2000 HAP Renewal Contract a second time by changing its initial term from three months in the first altered contract which was to end on December 31, 2000 [First Altered 2000 HAP Renewal Contract (JA 22, p. 705)] to a term of one year on the second altered contract. [Second Altered 2000 HAP Renewal Contract (JA 23, p. 712).] There was no reference to the three automatic one-year renewals. [Emails between Coleman and Horton dated January 23, 2001 (JA 72, p. 1015); Second Altered 2000 HAP Renewal Contract (JA 23, p. 712).] Neither Ms. Coleman nor Ms. Thomas ever discussed these "corrections" or "amendments" with Mr. Hayes. [Hayes Decl. at 7 ¶ 31-2 (JA 16, p. 640 at 646).]

107. Ms. Thomas conducted an unannounced visit to South Pointe on the morning of the day by which Englewood was to have completed the EH&S repairs identified on March 2, 2001, but did not survey all the corrective work that had been done. There was time to correct any deficiencies that might have been presented on that day. But Ms. Coleman did not write to Mr. Hayes until a week later, on March 9, 2001, then indicating only in general that "some" but "not all" of the EH&S corrections had been made. [Coleman Letter to Hayes dated March 9, 2001 (JA 77, p. 1055).]

108. On March 15, 2001, Ms. Thomas prepared a draft letter for Mr. Hinsberger to send to Mr. Hayes stating that the subsidy payments under the 2000 HAP

Renewal Contract were being terminated. [Draft letter from Hinsberger to Hayes, authored by Thomas, dated March 15, 2001 (JA 78, p. 1057).] HUD has produced no records of concurrences or approvals – or rejections – regarding the ultimate disposition of this draft letter. [Wellons letter of January 20, 2006 (JA 142, p. 1372).] This draft letter illustrates the predisposed judgment that was held by Ms. Thomas and others at HUD. Ms. Thomas testified that she did not know the reason for the letter, her role, or the drafting/approval process that took place after she initiated some version of the document. [Thomas Tr. at 289-93 (JA 11, p. 251 at 323-24).]

109. On April 3, 2001, HUD rejected the Englewood application for a rehab loan to make repairs consistent with the directions of the March 8, 2001 REAC Report because Englewood did not propose repairs suggested by the HUD construction analyst, Ray Etzkorn. [Hinsberger letter dated April 3, 2001 (JA 82, p. 1071).] Compare the repairs required by the REAC Report [March 8, 2001 REAC Report (JA 28, p. 767).], with the Englewood proposed work program [March 19, 2001 BABCO Program (JA 80, p. 1061).], and with the more extensive work program unrelated to the March 8, 2001 REAC Report proposed by HUD [Rehab Report Prepared by HUD at 1-5 (JA 81, p. 1066).]

110. HUD's objective was to make the determination that Englewood was in Default several days before the day on which Englewood was supposed to reply to the March 8, 2001 REAC Report. On April 4, 2001, Hinsberger wrote to his staff to discuss "next steps," without having reviewed Englewood's response to the REAC Report due several days later. [Hinsberger email dated April 4, 2001 (JA 83, p. 1075).] HUD was preparing to reject the Englewood proposed Plan of Correction event before it

was received. HUD was in a hurry to issue the Notice of Default. Ms. Maisonet was not sure at her deposition whether there were concurrences created as part of this process. She referred to the efforts to complete the Notice of Default as being "fast tracked." (Maisonet Tr. at 208 (JA 13, p. 474 at 527).] On Friday, April 6, 2001, Ms. Maisonet emailed her staff her thanks for completing the Notice of Default. [Maisonet email dated April 6, 2001 (JA 85, p. 1085).]

111. The April 5, 2001 and April 8, 2001 Englewood letters to HUD with their proposed Plan of Correction and other responses to the March 8, 2001 REAC Report were not reviewed by HUD staff when they were received, considered or discussed with Englewood as required by the March 8, 2001 REAC Letter. Instead, purportedly because of HUD's view of the scope of needed rehab, the Englewood submission was merely returned to Englewood on May 15, 2001. [Coleman letter dated May 15, 2001 (JA 93, p. 1098).]

112. At the April 13, 2001 meeting, HUD refused to discuss any of the issues listed in the Notice of Default or its refusal to honor Englewood's rights to automatic HAP Renewals or its demand that Englewood transfer its rights and responsibilities to a new management agent and owner. [Hayes Decl. at 11-12 ¶¶ 46-47 (JA 16, p. 640 at 650-51).]

113. Englewood understood from the meeting at HUD on April 13, 2001 that HUD would not deal any further with Englewood on the 2000 HAP Renewal Contract or the rehab loan. Englewood's only remaining role was to help find a new owner. There was no practical way for Englewood to do anything with respect to completing the remainder of the existing MIO or developing any additional response to

the March 8, 2001 REAC Report. [Hayes Decl. at 12 ¶ 47 (JA 16. p. 640 at 651).] Hayes started to use his network to find a new owner and reported his progress to Mr. Hinsberger in a letter dated May 2, 2001. [Hayes Decl. at 12 ¶ 48 (JA 16, p. 640 at 651); Letter dated May 2, 2001 (JA 91, p. 1096).]

114. On May 15, 2001, HUD returned Englewood's proposed plan of correction, which responded to the items listed in the March 2001 REAC Report. [Coleman letter dated May 15, 2001 (JA 93, p. 1098).] The next day, HUD stated that Englewood was in "continued default" because of its failure to produce a plan of correction. [Hinsberger letter dated May 16, 2001 at 2 (JA 94, p. 1099 at 1100).] Judge Wolski summarized HUD's actions as described in the complaint: "But because Englewood and HUD were discussing insurance for a rehabilitation loan, the plan submitted by Englewood was returned to it by HUD, which then used the absence of a plan as the basis for terminating the HAP contract Englewood claims that HUD thereby breached the contract." [Judge Wolski Opinion dated August 10, 2004, p. 7 (JA 8, p. 152 at 158).] HUD wrote that it was continuing its efforts to process vouchers so that residents could move from Englewood. [Hinsberger letter dated May 16, 2001 at 2 (JA 94, p. 1099 at 1100).] On the same date, May 16, 2001, Hinsberger communicated that he was continuing to talk to prospective new owners. [Hinsberger email dated May 16, 2001 (JA 95, p. 1101).] HUD has stated that there were no concurrences or approvals for Ms. Coleman's letter. [Wellons letter dated January 20, 2006 (JA 142, p. 1372).]

115. On June 1, 2001, Ms. Thomas asked Ms. Anderson to accelerate her efforts to process vouchers for residents. [Thomas email to Anderson dated June 1, 2001 (JA 97, p. 1103).] On June 11, 2001, Ms. Anderson wrote to HUD in Washington

that it is the intention of HUD Chicago to abate the 2000 HAP Renewal Contract effective October 1, 2001. [Anderson email dated June 11, 2001 (JA 98, p. 1104).]

116. On July 30, 2001, Mr. Pace from HUD Washington sent an email to Ms. Coleman asking HUD Chicago to supply information concerning its termination of the HAP Renewal Contract with Englewood, to make sure Chicago is following proper procedures. [Pace email dated July 30, 2001 (JA 100, p. 1107).] On August 1, 2001, Ms. Coleman responded to Mr. Pace with statements concerning Englewood with respect to flags, and plans for compliance, but does not furnish the information he requested. [Coleman email dated August 1, 2001 (JA 101, p. 1108); Coleman Dep. at 254-59 (JA 12, p. 365 at 429-30).]

117. On August 22, 2001, Ms. Coleman notified Mr. Hayes that the HUD—2530, Previous Participation clearance was adversely flagged for the P.M. Group. P.M. One and their principals. The letter stated: "This flag will affect your ability to participate in HUD programs nationwide." Greg Gustin was copied on the letter. Englewood could not comply with its physical improvement requirements because HUD had stated clearly it would not honor its automatic HAP Renewal Contract obligation. There was no suggestion as to how Englewood could comply with HUD's conditions, nor any appeal or other review process prescribed. [Letter from Coleman to Hinsberger dated August 22, 2001 (JA 144, p. 1497).]

118. In September 2001, it was the first *term* of the 2000 HAP Renewal Contract that expired, not the *contract.* "Thus, although the initial *term* had expired at the time Englewood was first informed of the termination (October 1, 2001, the beginning of the first short-term extension) the *contract* by its very terms was not to expire until the

three additional one-year terms had run." [Wolski Opinion dated August 10, 2004 at 10 (JA 8, p. 152 at 161).] On September 25, 2001, Mr. Hinsberger sent Mr. Hayes a signed short-term renewal contract. [2001 90-Day HAP Renewal Contract (JA 24, p. 719).]

119. HUD had the unilateral right to extend the contract. Judge Wolski explained: "On the other hand, a contract may contain terms giving a unilateral right to one party or the other – such as the right to exercise an option, whether to extend or terminate. As long as there is adequate consideration to create a contract in the first place, such terms are binding on the other party and enforceable." [Wolski Opinion dated August 10, 2004 at 6 (JA 8, p. 152 at 157).] Mr. Hayes signed the 90-Day HAP Renewal Contract the next day, September 26, 2001. [2001 90-Day HAP Renewal Contract (JA 24, p. 719).]

120. By September 28, 2001, Englewood had supplied HUD with an application for the automatic renewal of the 2000 HAP Renewal Contract [Samuelson letter of August 21, 2001 (JA 104, p. 1120).], a request for a rental increase that HUD indicated by email was approved [Hinsberger Email of September 6, 2001 (JA 107, p. 1144)], a complete application for a rehab loan that met the expanded requirements of HUD [Cravitz letter to Hinsberger of September 28, 2001 (JA 110, p. 1151)], a new owner acceptable to HUD (DSSA), and a new management agent (DSSA Management, Inc.).

121. On October 1, 2001, despite Englewood having met all of the conditions that HUD had set in order to renew the 2000 HAP Renewal Contract, HUD did not "automatically renew" the contract as it was required to do. [Hinsberger email to Hayes dated October 1, 2001 (JA 111, p. 1160).]

122. HUD extended the HAP contract for the benefit of the residents processing vouchers as contemplated by the Addendum to the October 2000 HAP Renewal Contract. On December 7, 2001, HUD attorney Greg Gustin wrote to Englewood attorney Peter Silverman on this subject: "As we discussed, and as HUD's November 30th letter references, HUD expects that the HAP Contract will need to be extended to accommodate HUD's actions in protection of the residents. HUD will act in that regard in due course." [Gustin Letter to Silverman dated December 7, 2001 (JA 119, p. 1179).]

123. During the injunction litigation when Englewood sued to compel HUD to honor the automatic renewal provision and to stop issuing vouchers to residents, HUD argued to Judge Castillo that it had not terminated the Contract, nor had it even begun to terminate the Contract, despite the fact that HUD clearly told Englewood that the contract "had died," that it would not do business with Mr. Hayes, and that it would not honor the automatic renewal provisions of the 2000 HAP Renewal Contact. [Hayes Decl. at 11-12 ¶¶ 46-47 (JA 16, p. 640 at 650-51); Hinsberger email to Hayes dated October 1, 2001 (JA 111, p. 1160).] Judge Wolski described the practical reality of the situation: "We are not presented with a circumstance in which HUD elected not to renew a contract, which had the effect of terminating it; rather HUD decided to terminate a contract that it was contractually bound to renew." [Wolski Opinion dated August 10, 2004, at 12 (JA 8, p. 152-62).]

124. However, for purposes of ruling on the requested injunction, Judge Castillo accepted HUD's argument that since Englewood had the right to an administrative review under MAHRA and would have the right to sue for breach of

contract in the Court of Federal Claims, Englewood had not exhausted its administrative appeal within HUD. Any loss was not irreparable, and there was an adequate remedy at law. [Order of Judge Castillo dated November 15 2001, at 3-4 (JA 7, p. 146).]

125. HUD did not refer to or rely on any updated physical inspection of the condition of South Pointe before issuing its Notice of Abatement and Termination on November 30, 2001. Instead, it relied on the REAC Reports of April 29, 1999 (JA 27, p. 760) and March 8, 2001 (JA 28, p. 787), and the Notice of Default of April 9, 2001 (JA 89, p. 1090) and the Notice of Continuing Default of May 16, 2001 (JA 94, p. 1099). HUD developed no independent factual basis for its decision on November 30, 2001 to terminate either the 2000 HAP Renewal Contract or the 90-Day HAP Renewal Contract on November 30, 2001. [Notice of Abatement and Termination dated November 30, 2001 (JA 117, p. 1176).] HUD describes its actions as an intention to abate the HAP Contract according to the default and termination provisions of Paragraph 20(b)(3). [1998 HAP Contract (JA 19, 677).] It did not mention the 90-Day Renewal Contract ending by its terms on December 31, 2001, nor HUD's advanced implementation of its voucher program. [90-Day Renewal Contract (JA 24, p. 719).] There were no concurrences of approvals in this decision making process. The decision was apparently made by Mr. Hinsberger and Ms. Maisonet on their own.

126. As tenants used vouchers to move out and subsidy payments were abated, HUD prohibited Englewood from leasing the units to its long waiting list of tenants seeking the benefits of project based Section 8. [Notice of Abatement and Termination dated November 30, 2001 at 2 (JA 117, p. 1176 at 1177).]

127. When Englewood argued in its letter of appeal of December 21, 2001 [(JA 121, p. 1182)] that it had already responded comprehensively and completely to the March 8, 2001 REAC Report in its submissions of April 5, 2001 [(JA 84, p. 1076)] and April 8, 2001 [(JA 86, p. 1086)], Mr. Gustin's response in his letter of February 7, 2002 was that Judge Castillo had already considered those arguments, and that HUD would not consider them again. [Gustin letter dated February 7, 2002 (JA 123, p. 1215).]

128. When Englewood made its final appeal to HUD in the administrative process, in what was to be a review by an individual with no prior involvement in the dispute, Mr. Gustin wrote the opinion for Howard Mayfield that became HUD's final decision. [Email from Gustin to Mayfield dated May 1, 2002 (JA 125, p. 1222); Maisonet Dep. at 252-54 (JA 13, p. 474 at 538-39); Final Decision by Mayfield dated May 2, 2002 (JA 126, p. 1223).]

129. HUD responded to Englewood's complaint in the Court of Federal Claims with a motion to dismiss using an argument exactly opposite from the one that it made to the District Court in Chicago in November 2001. [Complaint dated September 22, 2003 (JA 3, p. 30).] In the District Court, HUD argued that the availability of the Court of Federal Claims remedy was the basis for denying Englewood's claim for an injunction. "In the District Court, Englewood's motion for a preliminary injunction was opposed by HUD, which argued that 'inasmuch as [that] action involved] a claim [for] money damages over $10,000 resulting from an alleged breach of contract, jurisdiction would appear to lie with the Court of Federal Claims." [Wolski Opinion dated August 10, 2004, at 6 (JA 8, p. 152 at 157).] In the Court of Federal Claims, HUD "moved for a dismissal of this case under Rule 12(b)(1) of the Rules of the United States Court of

Federal Claims, arguing that this Court lacks subject matter jurisdiction." [Wolski Opinion dated August 10, 2004, at 8 (JA 8, p. 152 at 159).]

130. In denying Defendant's Motion for Reconsideration, Judge Wolski stated, "defendant's motion borders on the frivolous." [Wolski Opinion dated August 31, 1004, at 1 (JA 9, p. 163).] HUD engaged in bad faith actions throughout the time South Pointe was returned to MFH from the DEC in January of 2000 to the time of HUD's final administrative decision authored by Greg Gustin in May of 2002. HUD has continued to violate its implied covenant of good faith and fair dealing from the beginning of this litigation when it challenged the jurisdiction of the Court of Federal Claims (exactly opposite to the position it argued in the District Court in the Northern District of Illinois in 2001 and 2002), through its resistance to legitimate demands by Englewood for DEC and concurrence records, to its elusive justification for its changing dispositive motions, and to its disengagement from meaningful discussion during the three months of negotiations. There is no justification for HUD's behavior and Englewood is entitled under the Equal Access to Justice Act to its attorney fees and litigation costs.

## X. HUD'S DENIAL OF ENGLEWOOD FINANCIAL REQUESTS, AND ENGLEWOOD'S DAMAGES

131. HUD rejected every request by Englewood for rent increases, special claims and rehab loans from the spring of 1999 through September of 2002. [Sanders Decl. at 5-6, ¶¶ 16, 19 - 20 (JA 17, p. 655 at 659-60).] Englewood was forced to operate South Pointe in 2002 on 1998 costs. These requests were denied even though HUD knew that Englewood was suffering operating deficits between $100,000 and $200,000 per year [Sanders Decl. at 4, 6, ¶¶ 15, 20 (JA 17, p. 655 at 658, 660); Thomas Tr. at 104 (JA 11, p. 251 at 277)], and that Englewood had to advance $770,000 of funds

during 1999 in order to fund the repairs, resident services and increased security costs that were noted in the April, 28, 1999 REAC Report. [Sanders Decl. at 10 ¶ 38 (JA 17, p. 655 at 664); Kiening Tr. at 113 (JA 10, p. 165 at 193); Final Team Report at 2 (JA 45, p. 840).]

132. Englewood applied to HUD for reimbursement for various types of expenses that it had incurred during 2000, 2001 and 2002 on May 31, 2002 [Letter from Englewood to HUD (JA 128, p. 1251)], and on July 31, 2002 [Letter from Englewood to HUD (JA 131, p. 1255)]. Both requests were denied because HUD said that Englewood was not in good standing which was a result of HUD's contested Notice of Default of April 9, 2001.

133. Englewood suffered contract **damages in 2002** – the difference in rent revenue that Englewood would have received had its 2000 HAP Renewal Contract been automatically renewed and the reduced amount that it actually received by marketing and leasing units to voucher holders and market rate tenants.

134. Englewood suffered contract **damages in 2003 –** the difference in rent revenue that Englewood would have received had its 2000 HAP Renewal Contract been automatically renewed and the reduced amount that it actually received by marketing and leasing units to voucher holders and market rate tenants.

135. Englewood suffered contract **damages in 2004 –** the difference in rent revenue that Englewood would have received had its 2000 HAP Renewal Contract been automatically renewed and the reduced amount that it actually received by marketing and leasing units to voucher holders and market rate tenants.

136. Englewood suffered damages from HUD's imposition of #2530 flags which prohibited Englewood from doing business with HUD programs thereby denying to the PM Group and DSSA their long standing businesses involving HUD insurance and subsidies.

137. Englewood suffered damages from HUD's refusal to honor the automatic renewal provisions of the 2000 HAP Renewal Contract thereby preventing Englewood from making a conventional market rate rehab loan and denying it the rental revenue which would enable Englewood to pay its operating costs and debt service, the absence of which ultimately led to the foreclosure of Englewood's ownership interest in South Pointe.

## XI. CONCURRENCES AND CLAIMS OF PRIVILEGE

138. HUD first claimed privilege against Englewood's request for the production of "concurrence" pages which contain the signatures and dates by which all official HUD decisions are made, and which would provide the paper trail of how, when and by whom HUD decisions were being made. [HUD Privilege Log (JA 143, p. 1374).]

139. When pressed on the basis for its privilege claims, HUD stated that Mr. Gustin's legal assistant verified that she could not find any concurrences in either hard copy or "imaged" files, so that they could not be produced. [Wellons letter dated May 27, 2005 (JA 138, p. 1349).] HUD has maintained this position despite the fact that concurrences have been referred to repeatedly by deposition witnesses to explain or expand upon their testimony or to help them remember relevant facts. In the spring of 2005, when the importance and location of concurrence files was raised in a status hearing before Judge Wolski, Englewood offered to make Ms. Batchelor available to work with HUD to look for the concurrences since she was familiar with the case, the

documents, HUD's filing and storage protocols, REMS and the imaging system. HUD said that it did not need her help to look for and find the relevant documents.

140. Ms. Kiening testified that all documents involved in DEC actions in cases like South Pointe are imaged. [Kiening Tr. at 43-44 (JA 10, p. 165 at 176).] She stated that the actions, which took place in the DEC generated "concurrences" [Kiening Tr. at 173 (JA 10, p. 165 at 208)], and that there were two pages of concurrences and approvals related to the Final Team Report [Kiening Tr. at 201 (JA 10, p. 165 at 215)]. She also testified that documents that are "imaged" can not be removed from the central electronic files stored in Washington, D.C. or could be otherwise "deimaged." [Kiening Tr. at 47 (JA 10, p. 165 at 177).]

141. When Ms. Coleman was questioned at her deposition about the circumstances involved in the execution of the 2000 HAP Renewal Contract, she testified that there would be concurrences from Ms. Gray and others related to the HUD decision to enter into the 2000 HAP Renewal Contract that provided for an initial one year term and three years of automatic renewals. There is a decision making process involved in the execution of HAP Contracts, she said. [Coleman Tr. at 43-44 (JA 12, p. 365 at 376).]

142. Ms. Coleman also testified that the names and dates of individuals involved in the decision making process with respect to a March 15, 2001 draft letter from Ms. Thomas and her own letter of May 15, 2001 returning to Englewood their response to the March 8, 2001 REAC Report could be determined by reference to "concurrences." [Coleman Tr. at 232-33 (JA 12, p. 365 at 423).]

143. When Ms. Coleman discussed the process whereby the December 6, 2000 letter asserting an error in the contract and proposing an amendment of the term

of the Contract to three months with no automatic renewals Ms. Coleman testified that she would need to see the "concurrence" pages to determine the process of drafting, reviewing, approving and executing the letter. [Coleman Tr. at 272-73, 280-81 (JA 12, p. 365 at 433-35).]

144. At the time of the Coleman deposition, Mr. Baugher asked Mr. Wellons for a copy of the concurrence page to the December 6, 2000 letter. Mr. Wellons responded that: "We will take your request under advisement." [Coleman Tr. at 286 (JA 12, p. 365 at 437).] None was ever produced.

145. Ms. Maisonet in explaining the record and filing procedures of the DEC indicated that there would be images of all of the concurrences made with respect to decisions and documents and that they would be imaged in the field and kept in Washington. [Maisonet Tr. at 105 (JA 13, p. 474 at 501).]

146. When Ms. Maisonet was asked about HUD procedures leading to the issuance of the Notice of Default, she said that the decision making process would be documented in a concurrence chain. [Maisonet Tr. at 149 (JA 13, p. 474 at 512).]

147. When Mr. Baugher asked again for copies of the concurrence pages with respect to key documents and decisions, Mr. Wellons responded that: "We will take it under advisement certainly and we would appreciate a written request, if we could have a formal request to identify the requested documents." [Maisonet Tr. at 150 (JA 13, p. 474 at 513).] Later in the deposition, Mr. Baugher asked for the concurrence pages with respect to the April 9, 2001 Notice of Default, the May 16, 2001 Notice of Continuing Default and the November 30, 2001 Notice of Abatement and Termination. [Maisonet Tr. at 254 (JA 13, p. 474 at 539).] Mr. Wellons again responded that the

request would be "taken under advisement." [Maisonet Tr. at 255 (JA 13, p. 474 at 537).] No concurrences for the documents or decisions in question were ever produced.

148. Mr. Baugher repeated Englewood's request for concurrences in September 2005. [Baugher letter dated September 2, 2005 (JA 139, p. 1351).] Mr. Wellons responded again that they were not to be found. [Wellons letter dated September 2, 2005 (JA 140, p. 1359).]

149. On January 4, 2006, Mr. Baugher wrote a final time to Mr. Wellons asking for the concurrence documents or an affidavit from a HUD official with knowledge and standing who could explain what efforts had been made to locate the requested documents and could testify under oath that the documents do not exist. [Baugher letter dated January 4, 2006 (JA 141, p. 1361).] Mr. Wellons responded that efforts had been made to locate the requested concurrences, that they could not be found and that they were not relevant to the issues of the case. [Wellons letter dated January 20, 2006 (JA 142, p. 1372).]

Chicago HUD's chief lawyer, Greg Gustin, appears to have been responsible for drafting or reviewing the key documents and decisions in this case. There appears to be no key document or decision for which he was not an author or participant in the decision making process. HUD has asserted privilege on 1152 documents in this case. [HUD Privilege Log (JA 143, p. 1374).] One such claim related to Mr. Gustin's authorship of HUD's final administrative decision, which was to have been decided by someone with no prior involvement in the subject matter of the dispute. Howard Mayfield was the person selected by HUD to provide the final independent decision. In fact, Mr. Gustin wrote the final decision for Mr. Mayfield, a document for which HUD claimed privilege.

[Email from Gustin to Mayfield dated May 1, 2002 (JA 125, p. 1222); Maisonet Dep. at 242-54 (JA 13, p. 474 at 536-39); Final HUD Administrative Decision by Mayfield dated May 2, 2002 (JA 126, p. 1223).] In administering its internal review, HUD ignored its own rules and regulations, as well as due process and good faith and fair dealing: "HUD will designate an official to review any appeal, conduct the conference, and issue the written decision. The official designated will be the one who was not directly involved in making the decision being appealed." [HUD Chapter 13 Handbook at 3 (JA 146, p. 1502 at 1504).]

## DEFENDANT'S STATEMENT OF FACTS

### I. ALTHOUGH ENGLEWOOD'S COMPLAINT ALLEGES THAT HUD ILLEGALLY TERMINATED THE HAP CONTRACT IN 2001, THERE IS NO GENUINE DISPUTE THAT THE PARTIES EXECUTED HAP RENEWAL CONTRACTS THROUGH SEPTEMBER 2002

1. On January 22, 2001, Ken Horton, Vice President of Englewood's general partner, transmitted to Ms. Coleman an e-mail acknowledging that the parties' 2000 HAP Renewal Contract had been amended and would expire in September 2001: "On a separate note, pursuant to my conversation with Ms. Thomas last week, she informed me that the HAP Contract would be further amended to reflect the original expiration date of September 30, 2001. Please forward the amended, amended HAP contract to my attention at the following address." [E-mail dated Jan. 23, 2001 between Coleman and Horton at 2 (JA 72, p. 1015 at 1016).] Mr. Horton cc'd Mr. Hayes, President of Englewood's general partner, on this e-mail. [E-mail dated Jan. 23, 2001 between Coleman and Horton at 2 (JA 72, p. 1015 at 1016).]

2. Ms. Coleman responded to Mr. Horton with an e-mail. Following this exchange, Mr. Hayes informed Ms. Coleman that Mr. Horton would no longer be responsible for Englewood's loan application efforts. [E-mail from John Hayes dated Jan. 23, 2001 (JA 73, p. 1018).] Mr. Hayes never expressed to anyone at HUD any personal belief on his part that the parties had not agreed to amend the HAP Contract so that its terms expired on September 30, 2001. [Hayes Decl. at 7 ¶¶ 31, 32 (JA 16, p. 640 at 646).]

3. Although the 2000 HAP Renewal Contract contained an addendum requiring Englewood to cooperate with any HUD efforts to relocate tenants "by providing HUD such information on income and occupancy as may be necessary to relocate the tenants," nothing in the 2000 HAP Renewal Contract obligated Englewood to sign future

renewal contracts if Englewood did not wish to do so. [2000 HAP Renewal Contract at 4 (JA 21, p. 696 at 699).]

4. On August 21, 2001, Mr. Samuelson submitted a request for another HAP contract renewal with a rent increase application. Mr. Samuelson's submission reflects the parties' shared understanding that the renewal was necessary because the parties' 2000 HAP Renewal Contract would expire on September 30, 2001: "The current Section 8 contract expires September 30, 2001." [Samuelson Submission dated Aug. 21, 2001 at 1 (JA 104, p. 1120.); see also Samuelson Submission dated Aug. 21, 2001 at 11 (JA 104, p. 1120 at 1130) (listing September 30, 2001 as the HAP Contract's expiration date); Samuelson Submission dated Aug. 21, 2001 at 14 (JA 104, p. 1120 at 1133) (calculating rent potential for an "EXPIRING" contract) (capitalization in original).]

5. Subsequent to this submission, the parties executed a renewal contract extending the HAP Contract's terms through December 2001. [2001 90-Day HAP Renewal Contract at 4 (JA 24, p. 719 at 722).] The parties executed subsequent renewal contracts from time to time—with the last renewal contract ending on September 30, 2002. [2002 90-Day HAP Renewal Contract at 6 (JA 26, p. 746 at 751).]

6. Each of the parties' renewal contracts executed in 2001 and 2002 contains a heading identifying it as a "Housing Assistance Payments Basic Renewal Contract." [Compare 2001 90-Day HAP Renewal Contract at 1 (JA 24, p. 719) and 180-Day HAP Renewal Contract at 1 (JA 25, p. 737) and 2002 90-Day HAP Renewal Contract at 3 (JA 26, p. 746 at 748).] Nothing in these renewal contracts indicates that they were unilateral extensions of Section 8 subsidies to tenants on HUD's part.

7. To the contrary, the parties' HAP renewal contracts executed in 2001 and beyond all stated: "The purpose of the Renewal Contract is to renew the expiring [HAP] contract for an additional term." [Compare 2001 90-Day HAP Renewal Contract at 6 (JA 24, p. 719 at 724) and 180-Day HAP Renewal Contract at 4 (JA 25, p. 737 at 740) and 2002 90-Day HAP Renewal Contract at 8 (JA 26, p. 746 at 753).]

8. The parties' HAP renewal contracts executed in 2001 and beyond explicitly stated that they did not renew those provisions specifically modified in the renewal contracts: "Except as specifically modified by the Renewal Contract, all provisions of the Expiring Contract are renewed (to the extent such provisions are consistent with statutory requirements in effect at the beginning of the Renewal Contract term.)." [Compare 2001 90-Day HAP Renewal Contract at 6 (JA 24, p. 719 at 724) and 180-Day HAP Renewal Contract at 4 (JA 25, p. 737 at 740) and 2002 90-Day HAP Renewal Contract at 8 (JA 26, p. 746 at 753).]

9. Among those terms explicitly modified were the contracts' expiration dates and term lengths. [Compare 2001 90-Day HAP Renewal Contract at 4 (JA 24, p. 719 at 722) and 180-Day HAP Renewal Contract at 2 (JA 25, p. 737 at 738) and 2002 90-Day HAP Renewal Contract at 6 (JA 26, p. 746 at 751).]

10. In its filings before the Federal District Court for the Northern District of Illinois, Englewood acknowledged that the parties repeatedly renewed the HAP Contract's terms through 2001 and 2002: "This contract has been renewed at various times, with the most recent renewal covering the period from October 1, 2001 through December 31, 2001." [Compl. Filed in N. Dist. Ct. Ill. dated Oct. 29, 2001 at 5 ¶ 15 (JA 1, p. 1 at 5); see also Compl. Filed in N. Dist. Ct. Ill. dated Jun. 6, 2002 at 8 ¶ 27 (JA 2, p. 15

at 22) ("This contract has been renewed continually . . . with the most recent renewal covering the period from December 31, 2001 to June 30, 2002.").]

11. In its pleadings before the district court, Englewood never claimed that its HAP Contract was renewable automatically for three additional years. Instead, Englewood claimed that HUD had refused to agree to future renewals, and invoked legislation pertaining to procedures applicable to certain expiring HAP contracts: "HUD and its agent, CHAC, breached that duty [to comply with the procedural requirements of the Multifamily Assisted Housing Reform and Affordability Act ("MAHRA")] by threatening non-renewal of Englewood's HAP Contract without complying with the procedural requirements of MAHRA and issuing Section 8 vouchers to South Pointe residents, the effect of which will be to deny Englewood the ability to exercise its procedural rights." [Compl. Filed in N. Dist. Ct. Ill. dated Oct. 29, 2001 at 13 ¶ 37 (JA 1, p. 1 at 13).]

12. In its letter to this Court dated April 1, 2004, when plaintiff was opposing the Government's motion to dismiss, plaintiff acknowledged that the parties renewed the HAP Contract through multiple renewal contracts: "Englewood's HAP Contract was renewed with the express incorporation of all the provisions related to this lawsuit--breach, notice, default, remedies." [Pl. Letter dated Apr. 1, 2004 (JA 134, p. 1266).]

## II. ENGLEWOOD CANNOT RECOVER THE REIMBURSEMENT AMOUNTS SOUGHT IN THIS CASE

### A. There Is No Genuine Dispute Of Fact Regarding Englewood's Claim That HUD Improperly Failed To Implement Rent Increase Requests

13. That HUD's decision to deny Englewood's application for a rent increase in 1998 was proper is demonstrated by Englewood's application itself. On April 9, 1999, Ms. Coleman wrote to P.M. Group's general partner and explained that HUD was "returning your request to you" because "your contract is due to expire in fiscal year 1999 and rent increase requests must be submitted in accordance with HUD Notice H 98-34." [Letter dated Apr. 9, 1999 at 1 (JA 32, p. 788).]

14. On May 18, 1999, P.M. One forwarded to HUD a re-submission of its 1999 request for a rental increase. [P.M. One Letter dated May 18, 1999 at 1 (JA 33, p. 790).] HUD denied this request because Englewood improperly requested a retroactive rent increase; submitted budget information only showing transactions through 1998; did not submit comparables acceptable to HUD, and did not justify claimed increased expenses to HUD's satisfaction. [Compare Letter dated Oct. 18, 1999 at 1 (JA 42, p. 830) <u>with</u> Letter dated May 18, 1999 at 1 (JA 33, p. 790).]

15. On August 21 2001, Mr. Samuelson transmitted to HUD a request for a budget-based rent increase along with his contract renewal request. At this time, Mr. Samuelson was an "unpaid consultant" hoping one day to obtain a controlling interest in South Pointe. [Samuelson Tr. at 90 (JA 14, p. 570 at 593).]

16. Mr. Samuelson's cover letter and request for rent adjustment included multiple places for Mr. Hayes, President of Englewood's general partner, to sign on Englewood's behalf. However, Mr. Hayes did not execute the cover letters authorizing

Mr. Samuelson to request the rent increase. [Samuelson Submission dated Aug. 21, 2001 at 2, 3 (JA 104, p. 1120 at 1121, 1122).] Neither did Mr. Hayes certify the accuracy of the Budget Worksheet submitted to justify the requested rent increase. [Samuelson Submission dated Aug. 21, 2001 at 5 (JA 104, p. 1120 at 1124).] Finally, Mr. Hayes did not certify as to purchasing practices and the reasonableness of expenses. [Samuelson Submission dated Aug. 21, 2001 at 8 (JA 104, p. 1120 at 1127).]

17. Mr. Samuelson's submission acknowledged that HUD's grant of any rent increase would be contingent upon his purchase of a partnership interest in South Pointe: "It is our understanding that the contract extension and rental increase will be granted contingent upon DSSA's purchase of the partnership interest within a time period satisfactory to HUD." [Samuelson Submission dated Aug. 21, 2001 at 2 (JA 104, p. 1120 at 1121).]

18. Mr. Hinsberger notified Mr. Samuelson in an e-mail that a rent comparability study "supports the proposed rents. The submission was made by you. It needs to be signed by the owner or the current managing agent. There was a spot on your 8/21/2001 letter authorizing you to submit, but Mr. Hayes didn't sign it." [E-mail from Ed Hinsberger dated Sept. 6, 2001 (JA 107, p. 1144).]

19. Nothing in Mr. Hinsberger's e-mail indicates that HUD had approved a rent increase request for South Pointe that would be effective immediately or apply to South Pointe in its current poor condition. To the contrary, Mr. Hinsberger confirmed that HUD would "allow the new rents to kick in at the time of closing" of Mr. Samuelson's purchase of South Pointe. [E-mail from Ed Hinsberger dated Sept. 6, 2001 (JA 107, p. 1144).]

20. Mr. Samuelson did not obtain the controlling interest in South Pointe until December 2002--after the terms of the parties' HAP renewal contracts ended. [Samuelson Tr. at 94 (JA 14, p. 570 at 594); 2002 90-Day HAP Renewal Contract at 6 (JA 26, p. 746 at 751).]

21. Moreover, the parties' 2001 and 2002 renewal contracts established the rental rates agreed upon by both parties. [See, e.g., 2001 90-Day HAP Renewal Contract at 12 (JA 24, p. 719 at 730).]

22. The renewal contracts also established that subsequent adjustment to Contract rents "shall be determined in accordance with section 524(c) of MAHRA." [2000 HAP Renewal Contract at 2 (JA 21, p. 696 at 697).] Thus, the rental increase request Mr. Samuelson submitted in August 2001 invoked "a paragraph from its 1998-99 HAP contract that no longer applied." [Wolski Opinion of August 10, 2004 at 4 (JA 8, p. 152 at 155).]

**B. Englewood's Claims For Reimbursement For Extraordinary Energy Costs Were Denied Properly And Are Not Reviewable In This Court**

23. The HAP Contract contains no provisions entitling Englewood to reimbursement for extraordinary energy costs, and no money mandating provision of law entitled Englewood to such costs. However, in 2001, HUD issued guidelines pursuant to which property owners could request reimbursement for high energy costs. "In order for owners to take advantage of the opportunity for a utility lump sum adjustment," properties had to be acceptably managed and "in good standing with all Business Agreements signed with the Department." [Guidelines for Processing Renewal Adjustment for Escalating Energy Costs at 3 (JA 90, p. 1092 at 1094); Memo To Owners Re: Energy Reimbursement Guidelines dated May 10, 2001 (JA 92, p. 1097).]

24. Englewood submitted a request dated August 6, 2001 seeking a lump sum reimbursement of $55,230.99 for its energy costs. [Energy Reimbursement Request dated Aug. 6, 2001 at 4 (JA 103, p. 1116 at 1119).] Mr. Samuelson requested a higher reimbursement amount in May and July of 2002. [See May 31, 2002 South Pointe Financial Claims at 2 (JA 128, p. 1251 at 1252); Letter From D. Samuelson To E. Hinsberger dated July 31, 2002 at 2 (JA 131, p. 1255 at 1256).]

25. However, HUD had determined that Englewood was in default of its HAP Contract in April 2001. Thus, Englewood was not in "good standing," and HUD correctly exercised its discretion in denying Englewood's request for an energy lump sum adjustment. [Notice of Default dated Apr. 9, 2001 at 1 (JA 89, p. 1090); Notice of Continuing Default dated May 16, 2001 at 1 (JA 94, p. 1099); Notice of Abatement and Termination dated Nov. 30, 2001 at 1 (JA 117, p. 1176).]

**C. South Pointe's Applications For Special Claims For Unpaid Rent And Tenant-Caused Damages Are Not Recoverable In This Case**

26. The HAP Contract contains no provisions entitling Englewood to reimbursement for unpaid rent or tenant-caused damage. In fact, the HAP Contract specifically states that HUD "has not assumed any obligation for the amount of rent payable by any Family or the satisfaction of any claim by the Owner against any family." [1998 HAP Contract at 3 (JA 19, p. 677 at 679).]

27. HUD's willingness to reimburse owners is wholly at HUD's discretion and is not based upon any contract or money mandating provision of law. [HUD Directive Number 4350.3 at 7-8 ¶ 6-15 (JA 136, p. 1273 at 1279-80).]

28. HUD requires owners to apply for reimbursement within one year of an apartment becoming available; to submit a complete form HUD-52671A; to provide

bids, estimates, invoices, receipts, and other documentation; and to certify that they billed tenants for damages and took all reasonable steps to collect the debt. [HUD Directive Number 4350.3 at 7-8 ¶¶ 6-15, 6-16 (JA 136, p. 1273 at 1279-80).]

29. Englewood representatives submitted special claims dated March 31, 2000 seeking reimbursement for unpaid rent and tenant caused damages. [Section 8 Special Claims for Unpaid Rent/Damages at 1 (JA 53, p. 881).]

30. On November 17, 2000, HUD informed Englewood that "we are unable to approve your claims due to the following reasons: Claims were received late (received 10/3/00, should have received no later than 9/7/00) and missing documentation. Listed below are the required documents that were not included in your claims." [Letter dated Nov. 17, 2000 at 1 (JA 70, p. 985).] Among the required documents that Englewood failed to submit were "HUD-52670A, Part 2 (Schedule of Section 8 Special Claims) . . . Copy of Owner's notice to HUD of vacancy . . . Copy of waiting list . . . Tenant Payment History." [Letter dated Nov. 17, 2000 at 1 (JA 70, p. 985).]

31. In May and July of 2002, Englewood again requested reimbursement for unpaid rent and tenant-cause damages. However, Englewood once again failed to submit the required documentation. [See May 31, 2002 South Pointe Financial Claims (JA 128, p. 1251); Letter From D. Samuelson To E. Hinsberger dated July 31, 2002 (JA 131, p. 1255).]

32. According to Mr. Samuelson, Englewood actually encouraged undesirable residents to leave the property: "there was a very aggressive effort during those three months to move people out or help move people out." [Samuelson Tr. at 143 (JA 14, p. 570 at 606).]

33. As tenants left, Englewood representatives explained that non-payment of debts could jeopardize tenant's entitlement to vouchers but failed to take any steps to collect unpaid rent. At his deposition, Mr. Samuelson explained that, "it struck me that it would be just a waste of money to retain a lawyer and to try to collect rents." [Samuelson Tr. at 144 (JA 14, p. 570 at 606).]

**D. There Is No Genuine Dispute Of Fact That Englewood May Not Recover Reimbursement For Vacant Units In This Suit**

34. Pursuant to paragraph 5 of the HAP Contract, HUD agreed to reimburse Englewood 80% of unpaid rent for vacant units in decent, safe, and sanitary condition for up to 60 days of vacancy:

> . . . if the Owner: (a) immediately upon learning of the vacancy or prospective vacancy (i) notified [HUD] of the vacancy and the reasons for the vacancy and (ii) took and continued to take all feasible actions to fill the vacancy including but not limited [to], contacting applicants on the waiting list and advising them of the availability of the unit; (b) has not rejected any eligible applicant except for good cause acceptable to HUD; (c) when the vacancy was created by the Owner action, administered the termination of the tenancy, eviction and all related notices in accordance with State and local law, the lease and HUD regulations and administrative procedures. (2) HUD will pay vacancy payments only for those days on which the unit was in decent, safe, and sanitary condition and available for occupancy."

[1998 HAP Contract at 2 (JA 19, p. 677 at 678).]

35. Paragraph 5(c) stated: "The Owner is not entitled to payment for vacant units to the extent it can collect for the vacancy from other sources (such as security deposits, other amounts collected from the Family, and government payments under other programs)." [1998 HAP Contract at 3 (JA 19, p. 677 at 679).]

36. In order to receive reimbursement for vacant units, owners also must comply with HUD Directive 4350.3's requirements that owners submit a signed and completed claim form HUD-52671B and certify that all feasible actions have been taken to fill vacancies, including advertising the unit. [HUD Directive Number 4350.3 at 9-11 ¶¶ 6-20, 6-23 (JA 136, p. 1273 at 1283).]

37. Englewood requested reimbursement for alleged vacant units in May and July of 2002. Contrary to both the HAP Contract's requirements and HUD directive, Englewood failed to notify HUD immediately upon learning of vacancies, failed to inform HUD of the reasons for vacancies, and did not take all feasible actions to fill vacancies. [May 31, 2002 South Pointe Financial Claims (JA 128, p. 1251); Letter From D. Samuelson To E. Hinsberger dated July 31, 2002 (JA 131, p. 1255).]

38. Englewood also failed to demonstrate that it could not collect for the vacancy from other sources and failed to take steps to collect payment for vacancies from other sources. [Samuelson Tr. at 144 (JA 14, p. 570 at 606).]

## III. ENGLEWOOD'S REPRESENTATIVES REPEATEDLY HAVE ACKNOWLEDGED THEIR FAILURE TO FOLLOW HUD REQUIREMENTS AND TO MAINTAIN SOUTH POINTE IN DECENT, SAFE, AND SANITARY CONDITION

39. On September 2, 1999, Mr. Sanders acknowledged that South Pointe was not in compliance with HUD regulations and required a rehabilitation loan "to not only assist in bringing the building into compliance with HUD regulations, but to

implement a minor rehabilitation to the units in the building and replace the major systems (see attachment)." [Letter from Sanders to Kiening dated Sept. 2, 1999 at 1 (JA 39, p. 816).]

40. On November 3, 2000, Englewood's property manager conducted inspections at South Pointe and found that "elevators are constantly out of order and it's always the same problem (address matter to elevator contractor)." [Physical Inspection Summary at 2 (JA 69, p. 975 at 976).] The inspection also stated that conditions around garbage chutes were "unsanitary" and "a danger to children." [Physical Inspection Summary at 2 (JA 69, p. 975 at 976).] P.M. One's summary recorded an average of six rodent holes in each unit inspected. [Physical Inspection Summary at 1 (JA 69, p. 975).]

41. On March 16, 2001, in response to HUD's 2001 REAC inspection, Mr. Hayes wrote that Englewood wished to "ensure total compliance with all HUD regulations" and "open lines of communications" but acknowledged that "over the last year or so this has not been met to HUD's satisfaction." [P.M. Group Letter dated Mar. 16, 2001 at 1 (JA 79, p. 1059).]

42. Englewood's response to the REAC inspection acknowledged that Englewood had not corrected all of the deficiencies identified in the inspection within 30 days, and would not correct them without obtaining refinancing. [Joint Stipulated Fact No. 81; Letter dated Apr. 5, 2001 at 9 (JA 84, p. 1076 at 1084).]

43. In 2001, a potential buyer of South Pointe was Don Samuelson, plaintiff's current representative. Mr. Samuelson previously had purchased and managed "troubled" projects. [Samuelson Tr. at 69 (JA 14, p. 570 at 587).] At his deposition, Mr. Samuelson defined as "troubled" those projects "that have need for physical

improvements, better marketing, better management, resident services, that can be more effective as places for people to live and become an asset to the community rather than a toxic waste." [Samuelson Tr. at 69 (JA 14, p. 570 at 587).]

44. Mr. Samuelson toured South Pointe in the summer of 2001 and discovered a lack of physical security "because of locks on various entries and exits that had been broken or compromised and the relative freedom that gangs and gang-related and drug interests had in moving off the street, into the building, up into the units and around the building." [Samuelson Tr. at 76 (JA 14, p. 570 at 589).]

45. Mr. Samuelson also found that gangs and drug dealers repeatedly sabotaged the elevators at South Pointe: "So the elevators had been vandalized, stopped, doors put off, lots of things that would keep them not operational so that there was relative greater capacity for people to roam the building stairwells than the elevator system." [Samuelson Tr. at 78 (JA 14, 570 at 590).]

46. One "major problem" Mr. Samuelson observed "was the absence of physical equipment–entry controls, locks, buzzers, intercoms, surveillance cameras, etc.–to support the efforts of the guards to control access to the building." [Samuelson Decl. at 2 ¶ 5 (JA 18, p. 671 at 672).] "Without a physical access control system, and the presence of an armed guard inspecting the stairwells, corridors, common areas and grounds 24 hours a day, there was little control of what went on within the building, particularly after hours and on the weekends when management was not present." [Samuelson Decl. at 2 ¶ 6 (JA 18, p. 671 at 672).]

47. According to Mr. Samuelson's assessment, South Pointe's physical deficiencies could only be resolved after its management corrected its security problems:

"In a building like that or like some of the [Chicago Housing Authority] buildings, it's very difficult to manage buildings if you don't have the security. If you don't have control over the building and the ability of eliminating gangs, drugs, and criminal activities, you are very hard-pressed. Everything else follows from that." [Samuelson Tr. at 79 (JA 14, p. 570 at 590).]

48. When asked whether South Pointe was for faint-hearted tenants, Mr. Samuelson stated that South Pointe "wasn't for the faint-hearted anyone." [Samuelson Tr. at 144 (JA 14, p. 570 at 606).]

49. Mr. Samuelson prepared a six-page report on August 6, 2001. Mr. Samuelson's report stated that P.M. One's on-site staff "is relatively non-productive. Security is not effective" and that "the current condition of [South Pointe's] penthouse is inefficient and dangerous." [DSSA Report dated Aug. 6, 2001 at 1 (JA 102, p. 1110).] Mr. Samuelson confirmed the accuracy of these statements during his deposition. [Samuelson Tr. at 81 (JA 14, p. 570 at 590).]

50. At this time, Mr. Samuelson began working as an "unpaid consultant" to P.M. One: "I was helping as a buyer to put together a program that I thought would be financeable by HUD and successful in the marketplace and convert what was a very crime-ridden, drug-laden project into an attractive addition to the Englewood community." [Samuelson Tr. at 90-91 (JA 14, p. 570 at 593).]

51. On November 20, 2001, Mr. Samuelson wrote to Mr. Hinsberger regarding a woman "who was shot in the head, and then dropped out of the window" at South Pointe. [E-mail dated Nov. 20, 2001 (JA 116, p. 1175); Samuelson Tr. at 115-16 (JA 14, p. 570 at 599).]

52. In fact, between January 1, 1999 and December 31, 2001, the Chicago Police responded to a total of 794 incidents reported at South Pointe. [Report of Crimes Occurring at South Pointe at 29 (JA 122, p. 1186 at 1214).]

53. These included at least two homicides (Report of Crimes Occurring at South Pointe at 29 ( JA 122, p. 1186 at 1214)), 39 burglaries (Report of Crimes Occurring at South Pointe at 15-16 (JA 122, p. 1186 at 1201)), more than 50 assaults (Report of Crimes Occurring at South Pointe at 16-17 (JA 122, p. 1186 at 1202-03)), and more than 100 batteries. [Report of Crimes Occurring at South Pointe at 19-27 (JA 122, p. 1186 at 1205-14).]

54. On September 26, 2002, Michael G. McGhie, P.M. One's President, wrote to HUD and acknowledged that "problems did exist in the operation of P.M. One properties in Chicago." [P.M. One Letter dated Sept. 26, 2002 at 1 (JA 132, p. 1257).] In recognition of P.M. One's "poor track record," Mr. McGhie offered for P.M. One "to be placed on probation." [P.M. One Letter dated Sept. 26, 2002 at 1 (JA 132, p. 1257).]

55. On February 6, 2003, P.M. One's attorneys wrote to HUD and asked that HUD remove "risk flags placed on P.M. One, Michael McGhie and John Morrissey." [Taft, Stettinius Letter dated Feb. 6, 2003 at 1 (JA 133, p. 1259).]. P.M. One's lawyers also stated that in 1998 PM Group entered into a plan with DEC that called for the "refinancing and rehabilitation of South Pointe. After ample opportunity to do so, PMG failed to execute that aspect of the Plan." [Taft, Stettinius Letter dated Feb. 6, 2003 at 4 (JA 133, p. 1259 at 1262).] P.M. One's lawyers stated that HUD's "DEC

was correct that South Pointe required financing and rehabilitation that only PMG could provide." [Taft, Stettinius Letter dated Feb. 6, 2003 at 5 (JA 133, p. 1259 at 1263).]

56. In June 2003, a fire destroyed records at South Pointe relevant to this case. According to Mr. Samuelson, "drug interests" broke into South Pointe's management office and set this fire: "And I think it became understood by the drug interests that the camera tapes would in fact be stored in the management office . . . . So at 5 o'clock or 4:30 a.m. one night, there was a mysterious fire that was set in the management office which destroyed most of the records in the management office." [Samuelson Tr. at 136 (JA 14, p. 570 at 604).]

## IV. HUD PROVIDED ENGLEWOOD WITH THE PROPER NOTICE REGARDING ITS FAILURE TO MAINTAIN SOUTH POINTE IN DECENT, SAFE, AND SANITARY CONDITION

57. HUD was not responsible for managing Englewood's plans for correcting South Pointe's deficiencies. Further, HUD's knowledge of deficiencies at South Pointe's could not exceed that of the building's owner. However, Englewood received repeated communications regarding its need to correct deficiencies at the property.

58. On October 15, 1999, the City of Chicago Department of Buildings notified P.M. One that an inspection conducted on September 23, 1999 disclosed multiple City Municipal Code violations, including roach and rodent infestations, missing fire extinguishers, "garbage chutes with garbage everywhere," and "raw standing sewage" caused by an obstruction. [Notice of Violations and Summons dated Oct. 15, 1999 at 2-5 (JA 41, p. 820 at 821-824).]

59. HUD provided Englewood with the results of the April 28, 1999 REAC inspection in which Englewood received an overall numeric score of 42 out of a

possible 100. [REAC Inspection Summary Report dated Apr. 28, 2001 at 1 (JA 27, p. 760).] HUD "tentatively accepted" for "finalization" Englewood's plan to correct these deficiencies. [Final Team Report at 2 (JA 47, p. 860 at 861).]

60. On March 13, 2000, Ms. Thomas conducted a review of South Pointe that found "big problem with drugs and gangs in area and building." [Management Review Questionnaire dated Mar. 13, 2000 at 3 (JA 52, p. 874 at 876).] Ms. Thomas noted that Englewood's elevators were not operating properly at the time of her visit. [Management Review Questionnaire dated Mar. 13, 2000 at 2 (JA 52, p. 874 at 875).]

61. On June 16, 2000, Ms. Coleman informed Englewood that "[t]he Department does not allow management to continue at this level of performance. Failure to perform the necessary corrections will result in removal of the agent and denial of future participation in HUD's programs." [Letter dated June 16, 2000 at 1 (JA 55, p. 921).]

62. On October 3, 2000, HUD informed Englewood that it reviewed Englewood's "response to our year 2000 Occupancy Review and find it acceptable. The review is now closed." [Letter dated Oct. 3, 2000 at 1 (JA 64, p. 961).] However, HUD informed Englewood that, "<u>[o]n the next review, findings will be verified for corrections made. This includes items identified in the REAC physical inspection report</u>." [Letter dated Oct. 3, 2000 at 1 (JA 64, p. 961) (emphasis in original).]

63. On October 18, 2000, HUD representatives met with Englewood representatives and discussed South Pointe's physical conditions. [Thomas Notes at October 18, 2000 meeting at 1 (JA 67, p. 971).]

64. On January 23, 2001, Ms. Coleman reminded Mr. Hayes that "Your plan to correct the problems at South Pointe was to submit an application for mortgage insurance and substantially repair the property." [E-mail from Veronica Coleman dated Jan. 23, 2001 (JA 72, p. 1015).] Ms. Coleman observed that, because [s]ubmission of this application has taken far too long," and because it would take "approximately six months" to supply vouchers to South Pointe's tenants, HUD would order vouchers while Englewood was "working to submit your loan application." [E-mail from Veronica Coleman dated Jan. 23, 2001 (JA 72, p. 1015).]

65. On March 2, 2001, REAC conducted another REAC inspection, including 25 sample units at South Pointe. Out of a possible total score of 100, South Pointe received a REAC score of 31. [REAC Report dated Mar. 8, 2001 at 3 (JA 28, p. 767 at 769).]

66. Following the inspection, Ms. Thomas visited South Pointe and discussed exigent health and safety deficiencies with South Pointe representatives. Englewood's representatives acknowledge that they failed to demonstrate that health and safety deficiencies had been timely corrected because of staff members' lack of understanding regarding "the importance of the EH&S inspection." [Hayes Decl. at 8 ¶ 36 (JA 16, p. 640 at 647); Sanders Decl. at 13 ¶ 46 (JA 17, p. 655 at 667).]

67. Englewood acknowledged to HUD that it had not corrected all of the deficiencies cited in the REAC inspection, and only would correct them once it obtained a new rehabilitation loan. [Letter dated Apr. 5, 2001 at 9 (JA 84, p. 1076 at 1084).]

68. On April 9, 2001, HUD informed Englewood that it was in default for its failure to maintain South Pointe in decent, safe, and sanitary condition: "The failure to keep and maintain the Project in decent, safe, and sanitary condition is a default of the HAP Contract." [Notice of Default dated Apr. 9, 2001 at 2 (JA 89, p. 1090 at 1091).]

69. Nothing in HUD's Notice of Default stated that Englewood's default was limited to the 25 units inspected during the March 2001 REAC inspection: "All of the project, its units, systems, common areas and buildings must satisfy HUD's physical condition standards, 24 C.F.R. Part 5, Subpart G." [Notice of Default dated Apr. 9, 2001 at 2 (JA 89, p. 1090 at 1091).]

70. However, the March 2001 REAC inspection identified multiple deficiencies demonstrating Englewood's default: "The REAC inspection confirms that the Project suffers from ongoing serious neglect, disrepair, and unsafe and unsanitary conditions throughout the units, common areas, and the building. [Notice of Default dated Apr. 9, 2001 at 2 (JA 89, p. 1090 at 1091).] Examples included roaches, non-working smoke detectors, cracks and holes in walls, exposed wires, exposed points of nails, inoperable faucets and toilets, and broken windows. [REAC Report dated Mar. 8, 2001 at 4-9 (JA 28, p. 767 at 770-776).]

71. The notice of default specifically mentioned defects identified by the inspection: "The Project was inspected on March 2, 2001 by HUD's Real Estate Assessment Center (REAC) and, out of a possible 100 points, scored a 31c. Some of the outstanding deficiencies noted in the inspection include: holes and cracks in hallway and

unit walls' broken windows' inoperable stoves and faucets; cockroaches in the units; and ponding on the roof." [Notice of Default dated Apr. 9, 2001 at 1 (JA 89, p. 1090).]

72. HUD's notice of default informed Englewood that "if the foregoing events of default are not corrected to the satisfaction of HUD within 30 days from the date of this Notice, HUD may seek any and all available remedies, including, without limitation, suspending or abating the HAP Contract." [Notice of Default dated Apr. 9, 2001 at 2 (JA 89, p. 1090 at 1091).]

73. The notice of default provided Englewood with a phone number at which it could contact Ms. Maisonet with any questions. [Notice of Default dated Apr. 9, 2001 at 2 (JA 89, p. 1090 at 1091).] Englewood never informed HUD that it did not understand the notice of default.

74. Although authorized HUD personnel moved expeditiously to issue a notice of default in April 2001 because they were "very concerned with the condition of the property," HUD personnel complied with all applicable guidelines and regulations. [Maisonet Tr. at 208. (JA 13, p. 474 at 527).]

75. On April 13, 2001, HUD representatives met with Mr. Hayes and other Englewood representatives. HUD informed Englewood that HUD would not insure a rehabilitation loan unless Englewood obtained a new property management company because of ongoing deficiencies. [Maisonet Tr. at 207 (JA 13, p. 474 at 527).] Nothing in the parties' contracts obligated HUD to insure a loan to Englewood. Neither did the parties' contracts forbid HUD from requiring Englewood to obtain effective management as a condition of insuring a loan. [1998 HAP Contract (JA 19, p. 677).]

76. Englewood could not and would not correct all of the problems at South Pointe, including problems identified during the 1999 and 2001 REAC inspections, unless it obtained financing. However, Englewood failed to submit a complete loan application for more than two years. On May 15, 2001, Ms. Coleman returned P.M. One's April 8, 2001 response to the March 8, 2001 REAC Report. Ms. Coleman's cover letter stated that HUD would not accept Ms. Brown's response "due to impending negotiations with HUD . . . concerning your proposed refinance and substantial rehabilitation of the property." [Letter dated May 15, 2001 (JA 93, p. 1098).] Ms. Coleman's letter also stated that "[a]lthough the letter from REAC directs you to prepare a Management Improvement and Operating (MIO) Plan subject to our approval, the condition of this property is beyond that point as acknowledged by your application to refinance that we rejected due to major deficiencies." [Letter dated May 15, 2001 (JA 93, p. 1098).]

77. On May 16, 2001, HUD instructed Englewood to provide "adequate timely information describing the immediate efforts that the Owner is making to address the HAP default and the sale of the Project and proposed assumption of the HAP Contract." [Notice of Continuing Default dated May 16, 2001 at 2 (JA 94, p. 1099 at 1100).]

78. On July 2, 2001, the Office of the State's Attorney for Cook County, Illinois declared that a public nuisance existed at South Pointe because the Office had received information that illegal drug activity had taken place more than once within a one-year period, that narcotics were being bought and sold in and around the property,

and that "this property is being used for illegal drug activity." [Notice of Public Nuisance dated July 7, 2001 at 1 (JA 99, p. 1105).]

79. On October 22, 2001, HUD representative Lily Simmons visited South Pointe. In an internal e-mail, she reported the "smell of urine throughout the building," "exposed wires," and "roaches in the hallways and on the walls." [E-mail from Lilly Simmons dated 10/22/2001 at 1 (JA 115, p. 1166).]

80. On November 30, 2001, HUD once again instructed Englewood to "provide, within 30 days from receipt of this notice, written objection to this notice of termination of HAP or to cure the underlying basis for the default." [Notice of Abatement and Termination dated Nov. 30, 2001 at 1 (JA 117, p. 1176).] Englewood failed to comply with this instruction.

81. Englewood did not believe that "decent, safe, and sanitary" was an ambiguous contract term prior to this lawsuit. In fact, even after HUD allegedly terminated the parties' contract illegally, Englewood submitted monthly certifications to HUD stating that South Pointe was in fact "decent, safe, and sanitary" in order to receive project-based subsidies. [Thomas Tr. at 205 (JA 11, p. 251 at 302); E-mail from Don Samuelson dated July 3, 2002 (JA 130, p. 1254).]

## V. HUD WAS NOT RESPONSIBLE FOR ENGLEWOOD'S FINANCIAL PROBLEMS OR ITS FAILURE TO MAINTAIN SOUTH POINTE IN DECENT, SAFE, AND SANITARY CONDITION

82. In her 1999 Draft Team Report, Ms. Bachelor reported possible "equity skimming" and noted that South Pointe's owners and manager had charged "excessive maintenance and management fees" and had received "excessive profits for goods and Services provided, and goods and services not being provided." [Draft Team Report at 5 (JA 30, p. 780 at 784).] Ms. Bachelor noted that "various inappropriate

expenses exist, such as many of the second, third, etc. mortgages are being charged to the property. Property finances are going to pay off debts to the general partners." [Draft Team Report at 5 (JA 30, p. 780 at 784).]

83. Representatives of Englewood's general partner and management agent acknowledge that their own financing arrangements prevented them from making needed repairs for years before HUD allegedly breached the HAP Contract: "The financing structure set up in 1992 proved unworkable." [Hayes Decl. at 3 ¶ 11 (JA 16, p. 640 at 642).] According to Englewood's representatives, "[t]here was insufficient operating revenue to pay for the necessary security, resident services, or the extensive maintenance and janitorial services required by the property." [Hayes Decl. at 3 ¶ 11 (JA 16, p. 640 at 642).] "In order to have sufficient revenues to meet its operating expenses, South Pointe needed to refinance its CIC loan." [Hayes Decl. at 4 ¶ 15 (JA 16, p. 640 at 643).] Mr. Sanders's "review of the financial statements for the property revealed that the property was losing money. There wasn't adequate funding for proper security or evictions." [Sanders Decl. at 3 ¶ 7 (JA 17, p. 655 at 657).]

84. Englewood relied upon the receipt of a HUD-insured rehabilitation loan to fund the correction of deficiencies at South Pointe: "a rehab loan was clearly needed to complete the expensive repair work including the mail boxes, the elevator repair, drywall repairs and painting, and the entry and interior door replacement program." [Sanders Decl. at 7 ¶ 25 (JA 17, p. 655 at 657).]

85. However, Englewood took more than two years to submit a complete rehabilitation loan application, and failed to submit a complete application for more than six months after HUD notified Englewood of its default. On November 11,

1999, Alan Cravitz submitted to HUD an incomplete loan application on behalf of Englewood. [Request for Pre-Application Conference dated November 11, 1999. (JA 43, p. 832).] As of September 28, 2001, Englewood still had failed to submit a complete application for a HUD-insured loan. [Cravitz Letter to Hinsberger of Sept 28, 2001 at 1 (JA 110, p. 1151).]

86. On November 20, 2001, Mr. Hinsberger responded to an e-mail from Mr. Samuelson by reminding him that, although HUD was prepared to continue processing Englewood's application for a HUD-insured rehabilitation loan, Englewood needed to "clarify the rehab concerns that we cited in our most recent letter, and get us the missing data previously requested." [E-mail dated Nov. 20, 2001 (JA 116, p. 1175).]

87. Although Englewood has alleged that HUD illegally terminated the parties' contract in October 2001, as late as July 2002, Mr. Samuelson contacted Mr. Hinsberger regarding "the status of the July HAP payment which hadn't been received at that time." [E-mail from Don Samuelson dated July 3, 2002 (JA 130, p. 1254).] Mr. Samuelson inquired regarding Englewood's subsidy payment because: "Money is needed." [E-mail from Don Samuelson dated July 3, 2002 (JA 130, p. 1254).]

88. The parties ultimately agreed upon the conditions for a rehabilitation loan. As a result, HUD insured a repair and rehabilitation loan to Englewood worth more than $11.5 million in December 2002. [Compl. at 4 ¶ 16 (JA 3, p. 30 at 33).] Englewood defaulted on this loan.

89. Englewood understood that it would not receive HAP subsidy payments with which to repay this loan. After all, the HAP Contract's terms ended in September 2002. [2002 90-Day Renewal Contract at 6 (JA 26, p. 746 at 751).]

90. In fact, Englewood never requested HAP subsidies with which to repay its HUD-insured loan. In its application for insurance for its $11.5 million loan, Englewood did not check the box requesting "Approval of Housing Assistance Payments Contract (Section 8)." [Firm Commitment Application dated Apr. 26, 2002 at 5 (JA 124, p. 1217 at 1221).]

91. On May 3, 2002, HUD confirmed that the Section 8 contract was "being replaced by vouchers" and that the "rent structure used in underwriting this mortgage is based on said vouchers"—not Section 8 project-based subsidies. [Amended Commitment for Insurance of Advances dated May 3, 2002 at 6 (JA 127, p. 1225 at 1230).]

92. Representatives of Englewood's former property manager acknowledge that Englewood entered into a plan with DEC that called for the "refinancing and rehabilitation of South Pointe. After ample opportunity to do so, PMG failed to execute that aspect of the Plan." [Taft, Stettinius Letter dated Feb. 6, 2003 at 4 (JA 133, p. 1259 at 1262).] "DEC was correct that South Pointe required financing and rehabilitation that only PMG could provide." [Taft, Stettinius Letter dated Feb. 6, 2003 at 5 (JA 133, p. 1259 at 1263).]

## VI. ENGLEWOOD'S GENERAL PARTNERS HAVE SUFFERED NO DAMAGES AS A RESULT OF "FLAGS" DOCUMENTING VIOLATIONS OF HUD REQUIREMENTS

93. HUD may adversely "flag" program participants for violating HUD requirements. Flags do not bar recipients from doing future business with HUD. As risk indicators, flags may affect a participant's future ability to participate in HUD programs. [Kiening Tr. at 56-57 (JA 10, p. 165 at 179).]

94. Neither DSSA, P.M. Group, Mr. Samuelson, Mr. Hayes, nor any other Englewood general partner or representative are plaintiffs in this suit. Regardless, nothing in the parties' contracts prohibits HUD from flagging Englewood or these groups or individuals. [1998 HAP Contract (JA 19, p. 677).] Nor does any money mandating provision of law confer any right upon Englewood or its affiliates to seek damages in this Court for business opportunities allegedly lost because of flags. Finally, none of Englewood's general partners or representatives have exhausted the administrative remedies available for addressing program participant flags.

## VII. THE COURT'S PREVIOUS RULINGS

95. Defendant does not believe the Court's previous rulings are proper "facts" to be decided in this case. Further, defendant's motion to dismiss was limited to the issue of whether MAHRA precluded this Court from exercising jurisdiction to entertain Englewood's claims by establishing an exclusive administrative remedy.

96. Defendant notes that, in its August 10, 2005 ruling upon defendant's motion to dismiss, the Court properly stated that "the Court will normally accept as true all factual allegations made by the pleader and draw all reasonable inferences in a light most favorable to that party." [Wolski Opinion of August 10, 2004 at 1 (JA 8, p. 152).] In this case, the Court held that "[d]isputed jurisdictional fact are not at issue here, as defendant United States makes a purely legal argument against this Court's jurisdiction, and thus the facts recited below are as pled in the complaint." [Wolski Opinion of August 10, 2004 at 2 (JA 8, p. 152 at 153).]

97. With regard to the parties' contracts, the Court noted: "These contracts were referenced in the complaint, see Complaint ¶¶ 52, 61, 92, and are not

disputed for purposes of this motion." [Wolski Opinion of August 10, 2004 at 2 (JA 8, p. 152 at 153).]

98. The Court reserved ruling upon the legal effect of the parties' renewal contracts: "the parties have not briefed the issue of the legal effect of the short-term extensions, and a motion for reconsideration is not the appropriate vehicle to address the matter." [Wolski Opinion of August 31, 2004 at 2 (JA 9, p. 163 at 164).] The Court also did not address whether it possesses jurisdiction to entertain Englewood's "special claims" and claims concerning requests for rent increases.

## VIII. CONCURRENCES

99. Defendant does not believe that discovery disputes are properly addressed in these stipulations. However, defendant states that discovery closed in this case on May 2, 2005. Defendant further states that it has produced all concurrences relevant to this case in its possession, custody, or control

100. Defendant further states that HUD does not require concurrences to be generated or executed for all agency decisions, including decisions at issue in this case. Regardless, all agency decisions were made by appropriate authorized personnel acting within the scope of their authority. Plaintiff has identified no actions taken by HUD personnel that were not properly authorized, and has identified no violations of any applicable regulations on the part of HUD personnel.

## IX. ENGLEWOOD'S ADMINISTRATIVE REVIEW

101. Defendant's privilege log indicates that HUD attorney Gregory authored an e-mail to Mr. Mayfield, the deciding official in Englewood's agency appeal, regarding a draft of Mr. Mayfield's decision. However, Englewood's complaint contains no allegations that Mr. Gustin's work as agency counsel violated any provision of law or

the HAP Contract. Further, Mr. Gustin acted properly within his capacity as agency counsel, and his duties as agency counsel have no relevancy to this case.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

/s/BRIAN M. SIMKIN
BRIAN M. SIMKIN
Assistant Director

/s/Peter V. Baugher
PETER V. BAUGHER
Schopf & Weiss LLP
312 West Randolph Street, Suite 300
Chicago, IL 60606-1720
Tel: (312) 701-9315
Fax: (312) 701-9335

Attorneys for Plaintiff

/s/PAUL R. WELLONS
PAUL R. WELLONS
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
1001 L Street, N.W.
Attn: Classification Unit, 8th Floor
Washington, D.C. 20530
Tel: (202) 616-8253
Fax: (202) 307-0972

Attorneys for Defendant

February 16, 2006

**CERTIFICATE OF FILING**

I hereby certify that on February 16, 2006, a copy of the foregoing **"JOINT STIPULATIONS REGARDING FACTS"** was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ PAUL R. WELLONS