No. 03-2209C
(Judge Wolski)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

ENGLEWOOD TERRACE LIMITED PARTNERSHIP,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

# DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

BRIAN M. SIMKIN
Assistant Director

PAUL R. WELLONS
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
1100 L Street, N.W.
Attn: Classification Unit
8th Floor
Washington, D.C. 20530
Tel: (202) 616-8253
Fax: (202) 307-0972

JUNE 2, 2005

Attorneys for Defendant

# TABLE OF CONTENTS

Page(s)

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT . . . . . . . . . . . . . 1

DEFENDANT'S BRIEF . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . 2

I. Nature Of The Case . . . . . . . . . . . . . . . . . . . . . 2

II. Issues Presented . . . . . . . . . . . . . . . . . . . . . 2

III. Statement Of Facts . . . . . . . . . . . . . . . . . . . . 3

SUMMARY OF THE ARGUMENT . . . . . . . . . . . . . . . . . . . . 4

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

I. The Applicable Standard For Summary Judgment Under RCFC 56 . . . . . . . . . . . . . . . . . . . . . . . . . 5

II. Summary Judgment Is Appropriate As To Both Counts In Englewood's Complaint Because Englewood Defaulted On Its Obligation To Maintain South Pointe In Decent, Safe, And Sanitary Condition . . . . . . . . . . 6

A. The Terms "Decent, Safe, And Sanitary" Are Well-Defined Pursuant To The HAP Contract . . . . . . . 7

B. HUD's Remedies For Englewood's Failure To Maintain South Pointe In Decent, Safe, And Sanitary Condition . . . . . . . . . . . . . . . . . . . 9

C. There Can Be No Genuine Dispute That Englewood Defaulted On Its Obligation To Maintain South Pointe In Decent, Safe, And Sanitary Condition . . . . . . . . . . . . . . . 10

III. Summary Judgment Is Appropriate As To Count One Of Englewood's Complaint Because HUD Did Not Illegally Terminate The HAP Contract . . . . . . . . . . . . . . . . 20

A. That HUD Did Not Illegally Terminate The HAP Contract Is Demonstrated By The Plain Terms Of The HAP Renewal Contracts Executed By Both Parties . . . . . . . . . . . . . . . . . . . 22

B. The Undisputed Facts Demonstrate That HUD Did Not Illegally Terminate The HAP Contract . . . 26

IV. The Court Should Dismiss Count II Of Englewood's Complaint Because The Undisputed Facts Demonstrate That HUD Did Not Fail To Make Any Required Payments . . 32

A. HUD Owes Englewood No Damages For Unpaid Rental Assistance . . . . . . . . . . . . . . . . . . . . . . 32

B. HUD Owes Englewood No Reimbursement For Energy Costs . . . . . . . . . . . . . . . . . . . . . . . . . 34

C. HUD Did Not Breach The HAP Contract By Failing To Implement A Rent Increase After August 2001 . . . . 35

D. HUD Owes Englewood No Money For Vacancy Claims . . 36

E. HUD Owes Englewood No Money For Special Claims Related To Unpaid Rent And Damage Caused By South Pointe Residents . . . . . . . . . . . . . . . . . . 37

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . 38

## TABLE OF AUTHORITIES

CASES


Anderson v. Liberty Lobby, Inc.,
477 U.S. 242 (1986) . . . . . . . . . . . . . . . . . . . . . 5

California Sand and Gravel, Inc. v. United States,
22 Cl. Ct. 19 (1990) . . . . . . . . . . . . . . . . . . . . 22

Celotex Corp. v. Catrett,
477 U.S. 317 (1986) . . . . . . . . . . . . . . . . . . . 5, 6

Dewakuku v. Martinez,
226 F. Supp. 2d 1199 (D. Ariz. 2002) . . . . . . . . . 7, 8

E. Walters & Co. v. United States,
576 F.2d 362 (Ct. Cl. 1978) . . . . . . . . . . . . 23, 36

Green Mgt. Corp. v. United States,
42 Fed. Cl. 431 (1998) . . . . . . . . . . . . . . 31, 32

Marshall v. Cuomo,
192 F.3d 473 (4th Cir. 1999) . . . . . . . . . . . . . . . 8

Pacificorp Capital, Inc. v. United States,
25 Cl. Ct. 707 (1992) . . . . . . . . . . . . . 23, 24, 25

People to End Homelessness, Inc. v. Martinez,
2002 WL 32158861 (D.R.I. March 29, 2002) . . . . . . . . 23

Pleasant East Assocs. v. Martinez,
2004 WL 840290, 02 Civ. 4144 (LLMM)
(S.D.N.Y. April 19, 2004) . . . . . . . . . . . . . 35, 36

San Carlos Irrigation & Drainage Dist. v. United States,
111 F.3d 1557 (Fed. Cir. 1997) . . . . . . . . . . . . 6, 33

Sweats Fashions, Inc. v. Pannill Knitting Co., Inc.,
833 F.2d 1560 (Fed. Cir. 1987) . . . . . . . . . . . . 5, 6

United States v. Intervest Corp.,
67 F. Supp. 2d 637 (S.D. Miss. 1999) . . . . . . . . . . 8

Whittaker Elect. Systs. v. Dalton Security,
124 F.3d 1443 (Fed. Cir. 1997) . . . . . . . . . 23, 26, 36

STATUTES AND REGULATIONS

28 U.S.C. § 1491 . . . . . . . . . . . . . . . . . . . . . . 2

42 U.S.C. § 1437 . . . . . . . . . . . . . . . . . . . . . . 3

24 C.F.R. § 5.703. . . . . . . . . . . . . . . . . . . . . . 8, 9

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| ENGLEWOOD TERRACE LIMITED PARTNERSHIP,<br>Plaintiff,<br>v.<br>THE UNITED STATES,<br>Defendant. | ) | No. 03-2209C<br>(Judge Wolski) |

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Rules of the United States Court of Federal Claims ("RCFC"), defendant, the United States, respectfully requests the Court grant summary judgment in defendant's favor upon the grounds that there are no genuine issues of material fact and defendant is entitled to judgment as a matter of law. In support of this motion, we rely upon the pleadings, the following brief, the attached appendix, and our proposed findings of uncontroverted fact filed simultaneously with this motion.[1]

[1] "Compl. ¶ ___" refers to plaintiff's complaint. "App. ___" refers to the attached appendix.

DEFENDANT'S BRIEF

STATEMENT OF THE CASE

I. Nature Of The Case

Plaintiff Englewood Terrace Limited Partnership, through its general partner, Don S. Samuelson (together referred to as "Englewood"), seeks relief pursuant to the Tucker Act, 28 U.S.C. § 1491, based upon (1) an alleged "breach of contract for illegal termination" (Compl. at 20); and (2) an alleged breach of contract for failure to make payments. Compl. at 23. Plaintiff seeks damages in the amount of "at least $3 million." Compl. at 24.

II. Issues Presented

1. Whether defendant is entitled to summary judgment upon plaintiff's breach of contract claims because the undisputed facts demonstrate that plaintiff defaulted on its contractual obligations.

2. Whether defendant is entitled to summary judgment upon plaintiff's breach of contract claim for illegal termination because the undisputed facts demonstrate that defendant did not illegally terminate the contract at issue.

3. Whether defendant is entitled to summary judgment upon plaintiff's breach of contract claim for failure to make payments because the undisputed facts demonstrate that defendant was under

no contractual obligation to make the payments for which plaintiff seeks damages.

III. Statement Of Facts[2]

Englewood is a limited partnership organized pursuant to Michigan state law that owns South Pointe Towers ("South Pointe"), a 23-story, 303-unit apartment building located at 6425 South Lowe in Chicago, Illinois. Compl. ¶¶ 1, 17.

During much of the period relevant to this dispute, P.M. Group served as Englewood's general partner. P.M. One, an affiliated company, served as the managing agent for South Pointe. App. 300. In October 2002, Mr. Samuelson's sole proprietorship, DSSA, replaced PM Group as Englewood's general partner. DSSA Management, a company affiliated with DSSA, replaced P.M. One as managing agent in December 2001. App. 215, 373-75, 384, Samuelson Tr. 68-70, 90.

In response to a housing shortage in Chicago's Englewood community, Englewood and the United States Department of Housing and Urban Development ("HUD") entered into a Housing Assistance Payment contract (the "HAP Contract") pursuant to the United States Housing Act of 1937, 42 U.S.C. § 1437. Compl. ¶ 2; App. 1, Compl. Ex. B. In accordance with this contract, HUD agreed "to make housing assistance payments on behalf of Families for

[2] Additional facts are set forth in defendant's proposed findings of uncontroverted fact.

the Contract Units; to enable the Families to lease decent, safe, and sanitary housing pursuant to Section 8 of the Act." App. 1, Compl. Ex. B.

Englewood filed its complaint in this Court on September 22, 2003. On December 22, 2003, the Government filed its motion to dismiss for lack of subject matter jurisdiction. The Court denied this motion on August 10, 2004, and denied the Government's motion for reconsideration on August 31, 2004.

The parties conducted discovery, including exchanging documents and conducting depositions. Discovery closed in this case on May 2, 2005. The Government submits this motion pursuant to the Court's March 24, 2005 scheduling order.

SUMMARY OF THE ARGUMENT

The United States is entitled to summary judgment because plaintiff cannot establish that the Government breached any contract between the parties. Specifically, plaintiff cannot demonstrate that the Government illegally terminated -- or improperly purported to terminate -- the parties' HAP Contract. Further, plaintiff cannot demonstrate that the Government breached the HAP Contract by withholding any payments to which plaintiff was entitled.

Instead, the undisputed facts -- including the deposition testimony of plaintiff's representative Mr. Samuelson and numerous documents authored by plaintiff's managers, officers,

and employees -- demonstrate that plaintiff defaulted on the HAP Contract by failing to maintain South Pointe in decent, safe, and sanitary condition.

Further, the undisputed facts demonstrate that HUD did not illegally terminate the HAP Contract. To the contrary, the parties executed multiple Renewal Contracts, pursuant to the November 2001 Notice of Abatement and Termination, until the HAP Contract's terms ultimately expired in September 2002. Finally, the undisputed facts demonstrate that HUD withheld no payments to which Englewood was entitled.

ARGUMENT

I. The Standard For Summary Judgment Under RCFC 56

Summary disposition is appropriate where there are no genuine disputes as to any material fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-52 (1986); RCFC 56(c). Summary judgment is "a salutary method of disposition 'designed to secure the just, speedy and inexpensive determination of every action.'" Sweats Fashions, Inc. v. Pannill Knitting Co., Inc., 833 F.2d 1560, 1562 (Fed. Cir. 1987) (quoting Celotex Corp. v. Catrett, 477 U.S. 317 (1986)). "[T]he burden is not on the movant to produce evidence showing the absence of a genuine issue of material fact." Id. at 1563 (emphasis in original). Rather, "'the burden on the moving party may be discharged by "showing" – that is, pointing out to the [Court of Federal Claims] – that

there is an absence of evidence to support the non-moving party's case.'" Id. (emphasis in original) (quoting Celotex, 477 U.S. at 325).

A "material fact" is one "that might affect the outcome of the suit under the governing law." Anderson, 477 U.S. at 248. "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

A plaintiff may not maintain a breach of contract action unless it can demonstrate the following elements: "(1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by the breach." San Carlos Irrigation & Drainage Dist. v. United States, 111 F.3d 1557, 1563 (Fed. Cir. 1997). For these reasons, as discussed below, disposition of this case through summary judgment is appropriate.

## II. Summary Judgment Is Appropriate As To Both Counts In Englewood's Complaint Because Englewood Defaulted On Its Obligation To Maintain South Pointe In Decent, Safe, And Sanitary Condition

Plaintiff alleges that its breach of contract action is based upon "HUD's improper termination of a four year Housing Assistance Payment ("HAP") contract between HUD and Englewood." Compl. ¶ 1. According to plaintiff, HUD informed Englewood that it was in default of the HAP Contract "ignoring the fact that

Englewood had just demonstrated that the problems HUD identified [at South Pointe] had already been corrected." Compl. ¶ 7. Plaintiff alleges that HUD notified Englewood that the HAP contract was terminated in October 2001 and that the only basis for this alleged termination was "stalled rehabilitation loan negotiations." Compl. ¶ 53, 54. The undisputed facts demonstrate that plaintiff is wrong.

In fact, the testimony of Mr. Samuelson, inspections performed by HUD as well as local housing authorities and agents hired by Englewood, and documents authored by Englewood's representatives demonstrate that there can be no genuine dispute as to the fact that South Pointe was not in decent, safe, and sanitary condition. Instead, it was overridden by gangs and drug dealers, infested by pests, and, in the words of Mr. Samuelson "wasn't for the faint-hearted anyone." App. 419, Samuelson Tr. 144.

A. The Terms "Decent, Safe, And Sanitary" Are Well-Defined Pursuant To The HAP Contract

Pursuant to the HAP Contract, Englewood was obligated to maintain South Pointe in "decent, safe, and sanitary condition." App. 1, Compl. Ex. B. Several courts have interpreted this language and held that summary judgment is appropriate where a plaintiff defaults upon its contractual obligation to maintain housing in decent, safe, and sanitary condition. See Dewakuku v.

Martinez, 226 F. Supp. 2d 1199, 1205 (D. Ariz. 2002) (holding as a matter of law that home was not decent, safe, and sanitary "under any possible interpretation of the phrase"); Marshall v. Cuomo, 192 F.3d 473, 482 (4th Cir. 1999) (upholding debarment of section 8 owner and rejecting owner's attempt to create a factual dispute by blaming tenants where "there appears to be no genuine dispute that substandard conditions did exist.") United States v. Intervest Corp., 67 F. Supp.2d 637, 647 (S.D. Miss. 1999) (finding that "there is no genuine issue of material fact as to whether the condition of the property was 'decent safe, or sanitary' under the general meanings of those terms. It was not.").

In addition to this judicial guidance, the HAP Contract incorporated explicit standards regarding Englewood's obligations "pursuant to section 8 of the Act." App. 2, Compl. Ex. B. Pursuant to these standards, the HAP Contract prohibited items such as "excess accumulation of trash, vermin or rodent infestation or fire hazards." 24 C.F.R. § 5.703(f). These standards further required that "areas and components of the housing must be free of health and safety hazards. These areas include, but are not limited to, air quality, electrical hazards, elevators, emergency/fire exits, flammable materials, garbage and debris, handrail hazards, infestation, and lead-based paint." 24 C.F.R. § 5.703(f).

Unsurprisingly, the regulations applicable to the HAP Contract also required Englewood to ensure that South Pointe had "no evidence of infestation by rats, mice, or other vermin, or of garbage and debris." 24 C.F.R. § 5.703(f). Finally, Englewood was required to ensure "[c]ompliance with State and local Codes" 24 C.F.R. § 5.703(g).

B. HUD's Remedies For Englewood's Failure To Maintain South Pointe In Decent, Safe, And Sanitary Condition

The HAP Contract provided HUD with powerful remedies to ensure that South Pointe's residents received decent, safe, and sanitary housing. Once HUD notified Englewood of the nature of a default and provided a time to cure, HUD possessed the right to "take corrective action to achieve compliance, in accordance with paragraph [20](b)(3) or to terminate th[e] Contract with HUD approval, in whole or in part, or to take other corrective action to achieve compliance in its discretion, or as directed by HUD." App. 11, Compl. Ex. B. HUD also could "reduce or suspend housing assistance payments" in response to Englewood's default. App. 11, Compl. Ex. B.

In October 2000, the parties executed a Renewal Contract that incorporated an addendum stating that, if HUD's Real Estate Assessment Center ("REAC") issued a physical inspection report indicating that the property was in sub-standard condition, HUD

could "terminate the Contract after the renewal providing the Owner a reasonable period, as determined by HUD, to correct deficiencies." App. 111, Compl. Ex. D.

The undisputed facts demonstrate that Englewood triggered HUD's right to exercise these remedies by defaulting on the HAP Contract and failing to cure this default.

### C. There Can Be No Genuine Dispute That Englewood Defaulted On Its Obligation To Maintain South Pointe In Decent, Safe, And Sanitary Condition

The overwhelming and undisputed evidence in this case demonstrates that Englewood failed to maintain South Pointe in decent, safe, and sanitary condition. For example, Chicago Police responded to 794 incidents reported at South Pointe during the period relevant to this dispute. App. 369. In addition to two homicides (App. 369), more than 50 assaults (App. 356-58), and more than 100 batteries that occurred at South Pointe (App. 359-67), Englewood continually failed to satisfy its obligations pursuant to 24 C.F.R. part 5, subpart G. Examples of ongoing violations included standing garbage (App. 57), the smell of urine in common areas (App. 328), city code violations (App. 54), and the presence of drug dealers and gangs. App. 378-79, Samuelson Tr. 79-80.

On April 28, 1999, REAC reported findings from a physical inspection of 25 units at South Pointe. Out of a possible score of 100, Englewood received an overall score of 42. App. 15.

On May 19, 1999, representatives of Pinnacle Realty Management Company visited Englewood and found that Englewood had not corrected "severe findings" from the REAC inspection. App. 27. Pinnacle's written report also found that "[t]he owner has not corrected conditions that adversely affect the provision of decent, safe, and sanitary housing as required by the HAP contract. App. 27

John Hayes, President of Englewood's general partner, P.M. Group, wrote to HUD on August 20, 1999 and stated that "[a]ll Health and Safety items such as non working Smoke Detectors, GFIs, etc. listed in the above referenced report have been corrected." App. 53. However, on October 12, 1999, the City of Chicago Department of Buildings notified P.M. One that an inspection conducted on September 23, 1999 disclosed multiple City Municipal Code violations, including roach and rodent infestations (App. 55, 56), missing fire extinguishers (App. 56), "garbage chutes with garbage everywhere" (App. 57), and "raw standing sewage." App. 58.

HUD personnel returned to South Pointe on March 13, 2000, and found a "big problem with drugs and gangs," that "stairwells were dirty and smell of urin[e]," and that elevators were not functioning properly. App. 78-79.

On November 3, 2000, P.M. One had a physical inspection summary prepared regarding conditions at South Pointe. P.M.

One's inspectors determined that South Pointe's "elevators are constantly out of order and it's always the same problem." App. 125. These inspectors also determined that conditions around garbage chutes were "unsanitary" and "a danger to children." App. 125. Englewood's inspectors discovered an average of six rodent holes in each unit inspected. App. 124.

On March 2, 2001, REAC again inspected a sample of 25 units at South Pointe. This time, out of a possible total score of 100, South Pointe received a score of 31. App. 160. On March 6, 2001, Mr. Hayes provided Gwen Thomas of HUD's Chicago Multifamily Housing Hub with a "certification" that exigent health and safety items identified in the 2001 REAC inspection had been corrected. App. 171.1.

Mr. Hayes's certification was inaccurate. On March 9, 2001, Veronica Coleman, Director of Project Management for HUD's Chicago Multifamily Hub, wrote to Mr. Hayes stating that HUD had conducted a "confirmatory review" with P.M. One staff members present. App. 171.1. This review confirmed that "only a few of the EHS items had been mitigated and not all as you certified." App. 171.1.

Mr. Hayes responded to Ms. Coleman's letter by acknowledging that HUD's requirements had not been complied with in the past

and that he had submitted his certification without direct knowledge of the conditions at South Pointe: "The General Partner relies solely on the information received from the property management company." App. 171.17.

On March 8, 2001, representatives of the Illinois Housing Development Authority inspected South Pointe. In addition to finding exposed wires and non-functioning fire alarms, the Illinois Housing Authority documented that smoke detectors were missing or non-functioning and that light fixtures and outlet covers were missing -- items Mr. Hayes had certified were corrected just two day before. App. 433.

The true extent of problems at South Pointe was revealed when Mr. Samuelson first visited the property in the summer of 2001. Mr. Samuelson previously had purchased and managed "troubled" projects and attempted to turn them into "an asset to the community rather than a toxic waste." App. 374, Samuelson Tr. 69-71. Mr. Samuelson's description of South Pointe renders his use of the term "toxic waste" understandable.

In his deposition, Mr. Samuelson testified that he found a building overrun with gangs and drug dealers. He described the "relative freedom that gangs and gang-related and drug interests

had in moving off the street, into the building, up into the units and around the building." App. 378, Samuelson Tr. 76.

According to Mr. Samuelson's assessment, South Pointe's physical deficiencies could only be solved after its management corrected security problems: "In a building like that or like some of the CHA buildings, its very difficult to manage buildings if you don't have the security. If you don't have control over the building and the ability of eliminating gangs, drugs, and criminal activities, you are very hard-pressed. Everything else follows from that." App. 381, Samuelson Tr. 79.

In short, Mr. Samuelson found that South Pointe was not an appropriate living space for "faint-hearted" tenants. In fact, it "wasn't for the faint-hearted anyone." App. 419, Samuelson Tr. 144. Mr. Samuelson began working "as an unpaid consultant" to P.M. One in hopes of "convert[ing] what was a very crime-ridden, drug-laden project into an attractive addition to the Englewood community." App. 385, Samuelson Tr. 91.

In a written report he transmitted to HUD on August 6, 2001, Mr. Samuelson confirmed his impression that South Pointe's on-site staff and security were "not effective" and that dangerous conditions existed at South Pointe. App. 205. At his

deposition, Mr. Samuelson confirmed the accuracy of his statements in this report. App. 383, Samuelson Tr. 81.

In fact, Mr. Samuelson's assessment of the building's lack of security was confirmed in July 2001 when the Office of the State's Attorney for Cook County, Illinois declared South Pointe a public nuisance because "narcotics are being bought and sold in and around this property. In addition, the Chicago Police Department has expressed concern that this property is being used for illegal drug activity." App. 203.

These problems still were not corrected when Lily Simmons of HUD visited South Pointe in October 2001 and discovered the "smell of urine throughout the building," and roaches in hallways and on walls. App. 238.

Englewood cannot reasonably dispute that it was failing to maintain South Pointe in decent, safe, and sanitary condition. Even if the Court discounts the reports of HUD employees and city and state inspectors who found standing garbage and sewage as well as gangs and drug dealers at South Pointe, Englewood's own representatives confirm that South Pointe was not decent, safe, and sanitary. This includes Mr. Samuelson's testimony that South Pointe was overrun by gangs and drug dealers (App. 381-82, Samuelson Tr. 79-80) and his written findings that on-site staff

and security were ineffective (App. 205) as well as Mr. Hayes's written acknowledgment that HUD's requirements were not met. App. 171.17.

In fact, in September 2002, P.M. One's new president, Michael McGhie, wrote to HUD acknowledging that "problems did exist in the operation of P.M. One properties in Chicago." App. 300. Mr. McGhie promised to operate properties in "decent, safe, and sanitary condition" in the future and offered for P.M. One "to be placed on probation." App. 300.

Perhaps the most devastating fact for Englewood's claims that problems at South Pointe were "minor" and "easy to correct" (Compl. ¶ 6) is Mr. Samuelson's testimony that the documents he claims could substantiate Englewood's entitlement to damages were destroyed in a "mysterious" fire in 2003. App. 411, Samuelson Tr. 136. According to Mr. Samuelson, drug interests broke into South Pointe's management office and set this fire: "And I think it became understood by the drug interests that the camera tapes would in fact be stored in the management office . . . . So at 5 o'clock or 4:30 a.m. one night, there was a mysterious fire that was set in the management office which destroyed most of the records in the management office." App. 411, Samuelson Tr. 136.

Englewood's default entitled HUD to exercise its remedies pursuant to the HAP Contract. HUD did so by providing Englewood notice of its default on April 9, 2001 (App. 192, Compl. Ex. I)

and by issuing notices regarding Englewood's continuing default in May 2001 (App. 200, Compl. Ex. L) and November 2001. App. 283, Compl. Ex. P. Finally, although HUD never illegally terminated the HAP Contract -- which expired pursuant to multiple Renewal Contracts executed by the parties -- HUD acted lawfully when it exercised its remedy of funding vouchers for use by South Pointe's tenants. App. 236. Thus, the Court should rule that HUD did not illegally terminate the HAP Contract as a matter of law.

Although HUD has withheld no funds to which Englewood became entitled, Englewood's default would have excused HUD from making the payments demanded in Count II of Englewood's complaint. Specifically, Englewood's default entitled HUD to abate payments to Englewood and to fund vouchers to South Pointe's residents. App. 11, Compl. Ex. B. Similarly, Englewood's lack of good standing pursuant to the HAP Contract disqualified it from receiving the reimbursements it seeks in Count II of its complaint. App. 2, 197.

Based upon its complaint, we expect Englewood to argue that HUD terminated the HAP Contract because of "stalled loan negotiations" (Compl. ¶ 54) and that the 2001 REAC Report "[h]ad to be the basis for the [d]efault." Compl. at 10.

To the contrary, the April 9, 2001 "notice of contract default" HUD sent to Englewood referred Englewood to the Physical Condition Standards contained at 24 C.F.R. Part 5, Subpart G. App. 192, Compl. Ex. I. It further stated that, "[t]he failure to keep and maintain the Project in a decent, safe, and sanitary condition is a default of the HAP contract." App. 192, Compl. Ex. I. HUD could not have been more explicit regarding the grounds of Englewood's default, and HUD reminded Englewood of these grounds in its May and November 2001 notices regarding Englewood's failure to cure its default. App 200, 283, Compl. Exs. L and P.

Englewood also may argue that it "corrected the deficiencies listed in the Report during the month of March and informed HUD of this in detailed letters of April 5 and April 9, 2001." Compl. ¶ 6. In fact, plaintiff did not correct the referenced deficiencies, and its attempt to limit its default to the 2001 REAC Report is a red herring.

As noted, correcting the deficiencies identified in the 25 units examined during the REAC inspection could not cure Englewood's failure to maintain the entire building in decent, safe, and sanitary condition. For this reason, HUD instructed Englewood to conduct a complete survey of the property and to "forward a proposed plan for correcting all deficiencies in an

official "Management Improvement Operating Plan (MIO) format, within 30 days of the date of this letter." App. 160, Compl. Ex. F. HUD also instructed P.M. One to correct "exigent health and safety deficiencies" identified in the REAC Report "within 72 hours of receipt of the report." App. 161, Compl. Ex. F. Instead, Englewood provided a late response to the REAC report and never submitted the required MIO plan. App. 176, 185, Compl. Exs. G and H.

Regardless, and perhaps more importantly, Englewood's failure to maintain South Pointe in decent, safe, and sanitary condition extended far beyond problems identified in the REAC report. This failure included, for example, the safety problems that caused Mr. Samuelson to describe South Pointe as a "a very crime-ridden, drug-laden project." App. 385, Samuelson Tr. 91.

We also anticipate Englewood to argue that HUD failed to provide sufficient notice of what required fixing at South Pointe and did not afford Englewood an opportunity to cure its default. However, as noted, the April 9, 2001, notice of default referred Englewood to the detailed physical standards contained at 24 C.F.R. Part 5, Subpart G. App. 192-93, Compl. Ex. I.

Further, the undisputed facts demonstrate that, from 1999 through 2001, HUD gave Englewood every possible opportunity to

cure its default. In fact, HUD even insured a new mortgage for South Pointe -- something HUD had no obligation to do under the HAP Contract. Compl. ¶ 38. Still, Englewood never complied with HUD's requirements that it present a timely and acceptable plan to correct deficiencies.

There can be no genuine dispute that the Government is entitled to summary judgment as to Englewood's entire complaint. Englewood's breach entitled HUD to exercise its remedies under the HAP Contract, including abating payments to Englewood and funding vouchers for use by South Pointe's tenants. Because of Englewood's undisputed, continuing default, the Court should dismiss Englewood's complaint in its entirety.

III. Summary Judgment Is Appropriate As To Count One Of Englewood's Complaint Because HUD Did Not Illegally Terminate The HAP Contract

In Count I of its complaint, Englewood claims that HUD "acted improperly when it based its determination of Englewood's default under the HAP Contract and its termination of the HAP Contract on the failure of HUD and Englewood to agree on the scope of work for a new rehabilitation loan and despite Englewood's correction of the conditions of the property listed in the March 8, 2001 REAC Report." Compl. ¶ 80.