Specifically, Englewood claims that the HAP contract was to run for one "initial one year period from October 1, 2000 through September 30, 2001, and then to renew automatically for three additional years." Compl. ¶ 3. Englewood alleges that HUD "informed Englewood that the HAP Contract was terminated" on October 1, 2001. Compl. ¶ 53.

Yet plaintiff's complaint repeatedly contradicts itself regarding whether HUD wrongfully terminated the HAP Contract or whether the parties extended the Contract with short term renewals. <u>Compare</u> Compl. ¶¶ 91 and 92. Further, in its April 1, 2004 letter to the Court, both of plaintiff's "two comments" asserted plaintiff's position that "<u>the contract was renewed</u>." App. 370 (emphasis in original). Plaintiff's inconsistency is unsurprising. Fatal to plaintiff's termination claim are the undisputed terms of the Renewal Contracts themselves.

In fact, the parties executed Renewal Contracts that extended the terms of the HAP Contract as follows:

- On September 26, 2001 the parties formed a Renewal Contract extending the terms of the HAP Contract "for a period of .3 years." App. 220.

- On December 21, 2001 the parties formed a Renewal Contract extending the terms of the HAP Contract "for a period of .5 years." App. 290.

-21-

- On July 3, 2002, the parties formed a Renewal Contract extending the terms of the HAP Contract "for a period of .3 years." App. 317.

Thus, HUD never illegally terminated the HAP Contract. Instead, its terms expired in September 2002 in accordance with the parties' Renewal Contracts.

A.    That HUD Did Not Illegally Terminate The HAP Contract Is Demonstrated By The Plain Terms Of The Renewal Contracts Executed By Both Parties

The undisputed facts demonstrate that the parties executed multiple HAP Renewal Contracts that established and then extended the duration of the parties' mutual obligations pursuant to the HAP Contract. In accordance with these agreements' plain terms, the terms of the HAP Contract expired in September 2002.

It is well-established that parties may amend or alter a contract with subsequent written agreements. See Williston on Contracts § 73:17 (4th ed. 2003); California Sand and Gravel, Inc. v. United States, 22 Cl. Ct. 19, 26 (1990). However, the parol evidence rule prohibits "parties from varying integrated agreements by introducing evidence of inconsistent prior or contemporaneous terms." California Sand and Gravel, 22 Cl. Ct. at 25 (granting summary judgment after determining that contract was not automatically renewable).

-22-

In applying these general principles, "a court must give reasonable meaning to all parts of the contract and not render portions of the contract meaningless." Pacificorp Capital, Inc. v. United States, 25 Cl. Ct. 707, 716 (1992).

Contrary to plaintiff's allegations in paragraphs 28 and 52 of its complaint, HUD did not and could not unilaterally alter the terms of the HAP Contract or change its duration.   People to End Homelessness, Inc. v. Martinez, 2002 WL 32158861 at *3 (D.R.I. March 29, 2002) (stating that "HUD is neither required nor authorized to unilaterally extend HAP contracts against the will of owners").

Regardless, a party that fails to object to wrongful alteration of a contract, including an alteration of that contract's duration or the wrongful exercise of an option clause, waives any right to object.  Whittaker Elect. Systs. v. Dalton Security, 124 F.3d 1443, 1446 (Fed. Cir. 1997).

Thus, it is well established that the "doctrine of waiver precludes a contractor from challenging the validity of a contract . . . where it fails to raise the problem prior to execution, or even prior to litigation, on which it later bases its challenge."  Id.  See also E. Walters & Co. v. United States, 576 F.2d 362, 367-68 (Ct. Cl. 1978) (holding that failure to object to alleged improper exercise of option constituted waiver and estoppel).

-23-

Englewood is correct that, in October 2000, the parties affixed signatures to a HAP Renewal Contract that mistakenly contained a one year term with three one-year automatic renewals. Compl. ¶ 3; App. 108, Compl. Ex. D. However, plaintiff's claim that HUD unilaterally amended the contract is misleading. Compl. ¶ 4. Equally misleading are plaintiff's claims that Englewood did not acquiesce, and HUD "never raised the subject thereafter" Compl. ¶ 4.

On September 26, 2001, the parties executed a HAP Renewal Contract that extended their mutual obligations pursuant to the HAP Contract through December 31, 2001 App. 227; Compl. ¶ 52. The Renewal Contract the parties signed contained plain language stating that the parties previously "had entered into a HAP Contract ('expiring contract') to make Section 8 housing assistance payments to the Owner for eligible families living in the Project." App. 222. The Renewal Contract stated that its purpose was "to renew the expiring contract for an additional term" and defined the length of that term as "0.3" years." App. 220.

There was nothing in the language of this Renewal Contract "which can be interpreted as continuing or in any manner extending the contract beyond the [period] for which it was

-24-

written." Pacificorp Capital, 25 Cl. Ct. at 718.  Thus, the

parties agreed that the terms of the HAP Contract would expire on

December 31, 2001 unless they were extended again.

In fact, the parties agreed to another Renewal Contract on

December 21, 2001 -- months after HUD allegedly informed

Englewood that the HAP Contract had been terminated.  App. 297;

Compl. ¶ 61.  Finally, the parties formed yet another Renewal

Contract on June 26, 2002, this time extending the terms of the

HAP Contract through September 30, 2002.  App. 317.

As noted, we anticipate that Englewood may argue that HUD

unilaterally extended the HAP Contract.  In fact, Englewood may

assert the creative argument that the Renewal Contracts

themselves somehow constituted a breach of the HAP Contract on

HUD's part.  See Compl. ¶¶ 3, 27, 55, 93.  This argument would

depend upon a legal and logical impossibility.  After all,

Englewood's representatives signed the Renewal Contracts (App

297, 324) and HUD could not extend the HAP Contract's terms

without Englewood's agreement.  Id.

Thus, the Court need not look beyond the terms of the

Renewal Contracts themselves to ascertain that HUD did not

illegally terminate the HAP Contract.  Although Englewood clearly

regrets agreeing to these Renewal Contracts now, Englewood cannot

alter the fact that it did so agree.  To the extent it possessed

reservations regarding the wisdom of its course, Englewood waived

-25-

its right to assert objections long ago.  <u>Whittaker Elect.</u>
<u>Systs.</u>, 124 F.3d at 1446.

However, if the Court decides to examine parol evidence to
determine the circumstances surrounding the HAP Contract's
renewal and ultimate expiration, the Court likewise will find
that the undisputed evidence demonstrates that HUD did not
illegally terminate the HAP Contract.

> B.   The Undisputed Facts Demonstrate That HUD
>      Did Not Illegally Terminate The HAP Contract

As noted, the parties executed a Renewal Contract that
contained incorrect dates in October 2000.  The undisputed facts,
including communications from Englewood's representatives to HUD,
demonstrate that the parties promptly corrected this mistake and
executed additional Renewal Contracts extending the HAP
Contract's terms through September 2002.

Specifically, on October 16, 2000, Mr. Hayes executed a
contract Renewal Contract by which "[a]ll terms of the Expiring
Contract are renewed except for those provisions relating to
Contract Rents and rent adjustments."  App. 108.  Compl. Ex. D.

HUD executed the Renewal Contract on October 18, 2000 in the
name of Mary E. Anderson, Director of Operations.[3]  App. 109,
Compl. Ex. D.  At the time of execution, this copy of the renewal
contained an error indicating that the contract would be renewed

---

[3] A subordinate executed the agreement on behalf of
Ms. Anderson, who was absent.  App. 424, Thomas Tr. 202.

-26-

for "an initial 1 Year period" and would "renew automatically for 3 additional one year terms, subject to the availability of appropriations in any year." App. 108, Compl. Ex. D. HUD officials informed Mr. Hayes and other P.M. One representatives of this error during a meeting on October 18, 2000, the very same day. App. 423-32, Coleman Tr. 72-77, Thomas Tr. 201-04.

On December 6, 2000, Ms. Coleman transmitted a corrected copy of the Renewal Contract reflecting an amendment "from (one) 1 year to a (three) 3 month short term renewal with zero (0) renewal terms." App. 155. Compl. Ex. E.

Subsequent to this letter, HUD and P.M. One agreed that the contract would expire on September 31, 2001 with no automatic extensions. Contrary to plaintiff's allegation that "Englewood did not acquiesce and HUD never raised the subject thereafter," Englewood agreed to this amendment.

In fact, on January 17, 2001, in an e-mail message cc'd to Mr. Hayes, Ken Horton, P.M. Group's vice-president, informed Ms. Coleman that, "pursuant to my conversation with Ms. Thomas last week, she informed me that the HAP contract would be further amended to reflect the original expiration date of September 30, 2001. Please forward the amended, amended HAP contract to my attention at the following address." App. 157.

Subsequent to this agreement, Englewood requested that HUD agree to renew the HAP Contract's terms beyond their scheduled

-27-

**Page 127**

expiration of September 2001.  Compl. ¶ 50.  As noted, on
September 26, 2001, the parties formed a HAP Renewal Contract
extending the HAP Contract's terms through December 31, 2001.
App. 220; Compl. ¶ 52.

On October 1, 2001, Mr. Hinsberger, Director of HUD's
Multifamily Housing HUB, notified, Mr. Hayes via e-mail that the
Chicago Housing Authority "will begin issuing vouchers for the
residents at South Pointe today."  App. 236.  Mr. Hinsberger also
expressed HUD's intention to terminate the HAP Contract "once all
the residents receive their vouchers."  App. 236.

Despite HUD's frequent communications regarding its
intention to issue vouchers -- and Englewood's subsequent
agreement to a Renewal Contract expressly acknowledging HUD's
right to issue vouchers (App. 222, Compl. Ex. D) -- Mr. Hayes
informed Mr. Hinsberger in an e-mail that he considered HUD's
actions "unfair."  App. 236.  Mr. Hinsberger responded by
forwarding previous correspondence between them reflecting
Mr. Hayes's prior knowledge of HUD's intentions.  App. 235-36.

In fact, on October 11, 2001, Mr. Samuelson sent an e-mail
to Mr. Hinsberger and Mr. Hayes confirming that, although
Mr. Samuelson was "surprised at the rigidity" of HUD's position,
he conceded "of course that there was the possibility of the use
of vouchers."  App. 237.

Despite Mr. Samuelson's admission, Englewood sought to
enjoin the issuance of vouchers by filing suit in the United

-28-

States District Court for the Northern District of Illinois. Compl. ¶ 55. In addition to denying Englewood's request for an injunction against the issuance of vouchers, the court rejected the position that HUD had terminated the HAP contract: "Rather, HUD provided Englewood with notice that it was in continuing default under the HAP contract and that HUD would begin the process of providing vouchers for relocation of eligible tenants." App. 280, Compl. Ex. O.

As noted, on November 30, 2001, HUD issued its "Notice of Abatement and Termination." This document stated that Englewood had failed to demonstrate that it maintained the units at Englewood in decent, safe, and sanitary condition as defined by 24 C.F.R. Part 5, Subpart G within 30 days of HUD's April 9, 2001 formal notice of default. App. 283, Compl. Ex. P. HUD informed Englewood that it intended to "abate the HAP contract" and that HUD ultimately would terminate the contract after completing "its voucher and relocation process for all eligible residents in the Project." App. 283, Compl. Ex. P.

However, this notice also informed Englewood that the voucher and relocation process "may extend beyond the expiration date of the current HAP Contract Renewal." App. 284, Compl. Ex. P. HUD invited Englewood to extend the terms of the HAP Contract to "protect the residents," but emphasized that such an

-29-

agreement would not affect "HUD's determinations as set forth above." App. 284, Compl. Ex. P.

Englewood considered these terms acceptable. On December 21, 2001, consistent with HUD's November 30, 2001 notice, Englewood and HUD executed a Renewal Contract renewing the terms of the HAP Contract for six more months. App. 290; Compl. ¶ 61.

Mr. Samuelson, who had taken over management of South Pointe by this time, understood that HUD had decided to fund vouchers for tenants but had not illegally terminated the HAP Contract: "By the end of December, nobody moved. And then there was an extension for six months from January 1 to July 30. So at the end of three months, you know, my conclusion was there is going to be no more Section 8 as far as I can tell. People ought to be prepared to leave and move out." App. 417-18, Samuelson Tr. 142-43. _____

In fact, Mr. Samuelson favored vouchers as a means of removing "undesirable" tenants and actively encouraged tenants to use their vouchers elsewhere. App. 415-17, Samuelson Tr. 143. According to Mr. Samuelson, "there was a very aggressive effort during those three months to move people out or help move people out." App. 418, Samuelson Tr. 143.

Thus, it is unsurprising that the parties executed yet another Renewal Contract on June 26, 2002. This time, the parties extended the terms of the HAP Contract through September

2002.  App. 317.  As Mr. Samuelson explained in an e-mail to Mr. Hinsberger and Mr. Hayes, this extension was important to Englewood because it confronted foreclosure by its mortgagor. App. 313.

However, events did not unfold as Mr. Samuelson had anticipated.  "Local authorities issuing housing vouchers" funded by HUD "determined that Englewood is not an appropriate location for the use of housing vouchers."  Compl. ¶ 69.  After "none of the revenue assumptions we had made were materializing," Mr. Samuelson filed this suit and informed Mr. Hinsberger in a letter that Englewood's claims "relate to generating money to complete this project properly, something you are going to have to do voluntarily as part of the [mortgage] assignment process, or you may be obliged to do it by Court order."  App. 340.

Thus, HUD did not illegally terminate the HAP Contract. Instead, consistent with HUD's Notice dated November 30, 2001, the parties formed Renewal Contracts so that HUD could protect residents' interests and Englewood could receive management fees and rental payments.[4]  Rather than refuse to agree to HUD's

---

[4]    An alternate ground for dismissing Count I of Englewood's Complaint is that the parties' Renewal Contracts constituted an accord and satisfaction by which HUD was able to aid South Pointe's residents and Englewood received continued funds, including management fees and rent.  "The essential elements of an effective accord and satisfaction are proper subject matter, competent parties, meeting of the minds of the parties, and consideration."  Green Mgt. Corp. v. United States,

(continued...)

-31-

position, Englewood encouraged tenants to use vouchers to leave. Although Englewood may regret the fact that the anticipated "market" did not arise, it cannot avoid summary judgment upon the issue that HUD never illegally terminated the HAP Contract.

For these reasons, we respectfully request that the Court grant our motion for summary judgment and dismiss Count I of Englewood's complaint.

IV. **The Court Should Dismiss Count II Of Englewood's Complaint Because The Undisputed Facts Demonstrate That Englewood Was Entitled To No Payments That HUD Failed To Make**

Even if this Court determined that HUD's obligations under the HAP Contract were not excused by Englewood's default, summary judgment is appropriate because the undisputed facts demonstrate that Englewood is not entitled to the damages it claims.[5]

A. **HUD Owes Englewood No Damages For Unpaid Rental Assistance**

Although it acknowledges that the "HAP Contract was renewed from October 1, 2000 through September 30, 2001, and for the various short term renewals that extended the HAP contract" through September 2002, plaintiff brazenly demands damages for

---

[4] (...continued)
42 Fed. Cl. 411, 431 (1998).

[5] At least one court has considered similar claims by Mr. Samuelson. That court determined that he "violated his fiduciary duty" and that his claims were "either unsubstantiated, inflated or specious." App. 335-36, Affordable Comm. Housing Trust-Theta v. Samuelson, No. 98 CH 892 (Order dated Aug. 1, 2002).

-32-

unpaid rental assistance through 2004.  Compl. ¶¶ 92, 93.  In fact, HUD owes Englewood no unpaid rental assistance.

As noted, a plaintiff may not recover upon a breach of contract claim without showing a valid contract, a breach, and damages caused by the breach." San Carlos Irrigation & Drainage Dist., 111 F.3d at 1563.  Englewood cannot satisfy this burden.

As explained previously, Englewood agreed to multiple Renewal Contracts with the understanding that HUD intended to fund voucher-based assistance for South Pointe's residents.  For example, Englewood executed the September 26, 2001 renewal agreement "[c]onceding of course that there was the possibility of the use of vouchers." App. 237.  The parties then executed Renewal Contracts on December 21, 2001 and June 26, 2002 with full knowledge that HUD was making vouchers available to tenants. App. 290, 317.

Further, Englewood cannot show that HUD's decision to issue vouchers was improper.  In fact, HUD properly exercised its remedies in order to protect residents from Englewood's failure to maintain the property in decent, safe, and sanitary condition. App. 235-36.

Finally, Englewood cannot demonstrate that HUD's issuance of vouchers caused Englewood to lose rental income when, in fact, one of Mr. Samuelson's strategies for managing South Pointe was to encourage tenants to use vouchers to move: "So there was a

-33-

very aggressive effort during those three months to move people out or help move people out." App. 418, Samuelson Tr. 143.

For these reasons, Englewood cannot demonstrate that it is entitled to any damages for unpaid rental assistance, and the Government is entitled to summary judgment.

   B.   HUD Owes Englewood No Reimbursement For Energy Costs

Englewood also alleges that HUD breached the HAP Contract by failing to process a request for energy costs reimbursements. Englewood is wrong.

In 2001, HUD initiated a program through which properties could request reimbursement for unusually high energy costs. App. 195-97. However, that program specifically precluded Englewood from participating because Englewood was in default under the HAP contract: "In order for owners to take advantage of the opportunity for a utility lump sum adjustment, properties must be acceptably managed and the owner must be in good standing with all Business Agreements signed with the Department." App. 197. Englewood filed a request seeking $55,230.29 in energy costs August 2001. (App. 211-14). However, by this date HUD had already determined that Englewood was in default on the HAP Contract. App. 192, Compl. Ex. I.

Further, Mr. Samuelson testified during his deposition that the request Englewood filed in August 2001 was inaccurate. App. 389, Samuelson Tr. 98. Englewood recalculated this amount and

-34-

asked for more than $139,000 in energy reimbursements in May
2002. App. 304, Compl. Ex. S. HUD properly declined
Mr. Samuelson's request because of Englewood's previous default,
and the Court should rule that HUD owed Englewood no energy
reimbursement as a matter of law.

   C.   HUD Did Not Breach The HAP Contract By Failing To
        Implement A Rent Increase After August 2001

      As noted, Englewood submitted a request for a renewal of the
HAP Contract in August 2001. At this time, Mr. Samuelson wrote
to Mr. Hinsberger and requested a rental increase on behalf of
Englewood. Mr. Hinsberger informed Mr. Samuelson that, although
he had provided information supporting a rent increase, HUD could
not grant Englewood a rent increase based upon information he
submitted when he was neither the owner nor the property manager.
App. 422. Mr. Hinsberger informed Mr. Samuelson that HUD would
implement a rent increase once he completed his purchase. App.
422.

      Thus, it cannot reasonably be disputed that HUD was under no
obligation to grant Englewood's request for a rent increase
because Englewood was in default on the HAP Contract and had not
submitted the required documentation. See Pleasant East Assocs.
v. Martinez, 2004 WL 840290, No. 02 Civ. 4144(LLMM) (S.D.N.Y.
April 19, 2004) (upholding HUD's decision to deny rent increases

-35-

when property was not maintained in decent, safe, and sanitary
condition and rental increase applications were incomplete).

Regardless, Englewood agreed to a Renewal Contract that
contained no rent increase and that contained agreed upon rental
rates.  App. 228.  Thus, Englewood waived any right to object to
HUD's refusal provide a rent increase in August 2001.  Whittaker
Elect. Systs., 124 F.3d at 1446; E. Walters & Co., 576 F.2d at
367-68.

For these reasons, the Court should grant the Government's
motion for summary judgment and rule as a matter of law that the
Government owes Englewood no damages for failing to implement a
rent increase.

D.   HUD Owes Englewood No Money For Vacancy Claims

_____Pursuant to the HAP Contract, HUD agreed to reimburse
Englewood a portion of unpaid rent for vacant units if Englewood
maintained the units in decent, safe, and sanitary condition and
took "all feasible actions to fill the vacancy."  App. 2, Compl.
Ex. B.

However, as demonstrated above, the units at South Pointe
were not in decent, safe, and sanitary condition.  Further,
Englewood did not take "all feasible actions" to fill vacancies.
Englewood's failure to maintain the property in a condition
acceptable for voucher users prevented voucher holders from
filling units.  Compl. ¶ 69.  Perhaps more significantly, as

-36-

property manager, Mr. Samuelson actually encouraged residents to
use their vouchers to move and even hired a full-time employee to
assist undesireable residents in vacating units.  App. 415,
Samuelson Tr. 140.

Thus, the Court should grant the Government's motion and
rule that HUD owes Englewood no money for lost rent from vacant
units.

    E.    HUD Owes Englewood No Money For Special Claims
            Related To Unpaid Rent And Damage Caused By South
            Pointe Residents

The HAP Contract contains no provisions entitling Englewood
for unpaid rent or tenant-caused damages whatsoever.  App. 1-14,
Compl. Ex. B.  However, as a matter of policy, HUD will reimburse
owners who file "special claims" for tenant-caused damages if
owners take all reasonable efforts to collect these debts.
App. 126.

In this case, Englewood never filed a proper special claim.
Instead, in October 2000, Englewood submitted untimely and
incomplete paperwork seeking reimbursement for special claims,
and HUD properly denied these requests.  App. 126-154.

In May 2002, Mr. Samuelson again requested reimbursement for
unpaid rent and tenant damages.  App. 304, Compl. Ex. S.
However, at his deposition, Mr. Samuelson admitted that Englewood
made no effort whatsoever to collect unpaid rent or reimbursement
from its tenants.  Instead, Englewood encouraged tenants to
abscond without paying their debts: "it struck me that it would

-37-

be just a waste of money to retain a lawyer and to try to collect rents." App. 419, Samuelson Tr. 144.

Mr. Samuelson also testified that any documents that might substantiate Englewood's claims for these damages were destroyed in the 2003 fire he claims "gang interests" set in South Pointe's management office. App. 396-97, 411, Samuelson Tr. 105-6, 136.

_____Thus, the Court should grant the Government's motion for summary judgment and rule that HUD owes Englewood no funds for unpaid rent and damage caused by tenants.

CONCLUSION

For these reasons, we respectfully request that our motion for summary judgment be granted, and that plaintiff's complaint be dismissed.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/ Brian M. Simkin
    by s/ Roger A. Hipp
BRIAN M. SIMKIN
Assistant Director

-38-

OF COUNSEL:

GREGORY GUSTIN
MARIA BAGUIO

Office of General Counsel
U.S. Department of Housing
and Urban Development


JUNE 2, 2005

s/ Paul R. Wellons
       by s/ Roger A. Hipp
PAUL R. WELLONS
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn:   Classification Unit
        8th Floor,
1100 L Street, N.W.
Washington, D.C.  20530
Tel: (202) 616-8253
Fax: (202) 307-0972

Attorneys for Defendant

CERTIFICATE OF FILING

I hereby certify that on June 2, 2005, a copy of the foregoing "DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND APPENDIX" was filed electronically.  I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

s/ Roger A. Hipp

Index To Appendix

Page

1. Oct. 1, 19998 Housing Assitance Payment Contract . . . 1

2. Apr. 26, 1999 REAC Inspection Summary Report . . . . 15

3. Aug. 10, 1999 Initial Report Prepared By Pinnacle
   Realty Management Company . . . . . . . . . . . . 24

4. Aug. 20, 1999 Letter From John Hayes, President,
   P.M. One, To Edward Hinsberger, Director,
   Multifamily Housing HUB . . . . . . . . . . . . . 53

5. Oct. 15, 1999 City Of Chicago Notice Of Violations
   And Summons . . . . . . . . . . . . . . . . . . 54

6. Dec. 8, 1999 Letter From Carl Sanders, P.M. One
   Property Manager, To Joan Kiening, Supervisory
   Enforcement Analyst Re: "Management Improvement &
   Operating (MIO) Plan" . . . . . . . . . . . . . . 64

7. March 3, 2000 Management Review Questionnaire . . . . 77

8. June 7, 2000 Letter From Mr. Sanders To Gwen Thomas
   Re: "Management Improvement & Operating (MIO)
   Plan" . . . . . . . . . . . . . . . . . . . . . . 84

9. June 16, 2000 Letter From Veronica Coleman, Director,
   Project Management, To Mr. Hayes Re: Occupancy
   Review. . . . . . . . . . . . . . . . . . . . . . 97

10. Oct. 3, 2000 Letter From Debbie Gray, Chief,
    Project Manager, To Mr. Sanders Re: Occupancy
    Review . . . . . . . . . . . . . . . . . . . . . 107

11. Oct. 18, 2000 HAP Renewal Contract . . . . . . . . . 108

12. Nov. 3, 2000 Physical Inspection Report . . . . . . 124

13. Nov. 17, 2000 Letter From Ms. Gray To Mr. Sanders
    Re: Special Claims . . . . . . . . . . . . . . . 126

14. Dec. 6, 2000 Letter From Ms. Coleman To Mr. Hayes
    Re: FY 2000 Section 8 HAP Contract . . . . . . . . . 155

15. Jan. 23, 2001 E-mail From Ms. Coleman To Ken Horton,
    Vice President, P.M. One, Re: South Pointe Tower . . 156

16. March 8, 2001 REAC Physical Inspection Report . . . .160

17. March 9, 2000 Letter From Ms. Coleman To Mr. Hayes
    Re: REAC EHS Certification . . . . . . . . . . . 171.1

18. March 16, 2000 Letter From Mr. Hayes To
    Ms. Coleman Re: EHS Certification . . . . . . . 171.17

19. Apr. 3, 2001 Letter From Mr. Hinsberger To
    Mr. Hayes Re: Application Deficiencies . . . . . . . 172

20. Apr. 5, 2001 Letter From Ms. Kiening Re:
    Management Improvement & Operating Plan (MIO). . . . 176

21. Apr. 8, 2001 Letter From Kelly Brown, Regional
    Property Manager, P.M. One, To Ms. Coleman
    Re: REAC Inspection . . . . . . . . . . . . . . 185

22. Apr. 9, 2001 Letter From Mr. Hayes To Ms. Thomas
    Re: REAC Inspection . . . . . . . . . . . . . . 187

23. Apr. 9, 2001 Letter From Mr. Hinsberger And
    Margarita Maisonett, Director, Chicago Satellite
    Office To Mr. Hayes Re: Notice Of Default
    Of HAP Contract . . . . . . . . . . . . . . . 192

24. May 10, 2001 Memorandum For Owners And/Or
    Agents Re: Guidance For Processing Rental
    Adjustments For Escalating Energy Costs . . . . . . 194

25. May 15, 2001 Letter From Ms. Coleman To
    Mr. Hayes Re: South Pointe Towers . . . . . . . . . 199

26. May 16, 2001 Letter From Mr. Hinsberger And
    Ms. Maisonett To Mr. Hayes Re: Continuing
    Default Of HAP Contract . . . . . . . . . . . . 200

-ii-

27. May 22, 2001 Letter From Mr. Hayes To Ms. Coleman
    Re: South Pointe Towers . . . . . . . . . . . . . . . 202

28. July 2, 2001 Notice Of Public Nuisance . . . . . . . 203

29. Aug. 6, 2001 Letter From Don Samuelson To
    Mr. Hinsberger Re: South Pointe Workout . . . . . . 205

30. Aug. 6, 2001 Energy Lump Sum Adjustment
    Supplement . . . . . . . . . . . . . . . . . . . . 211

31. Aug. 21, 2001 Letter From Mr. Samuelson To
    Mr. Hinsberger Re: Contract Renewal And Budget
    Based Rent Increase . . . . . . . . . . . . . . . 215

32. Sept. 26, 2001 HAP Renewal Contract . . . . . . . . 217

33. October 1, 2001 E-mail From Mr. Hinsberger
    To Mr. Hayes Re: South Pointe . . . . . . . . . . . 235

34. Oct. 11, 2001 E-Mail From Mr. Samuelson To
    Mr. Hinsberger Re: South Pointe . . . . . . . . . . 237

35. Oct. 22, 2001 E-mail From Lily Simmons To
    Ms. Coleman Re: South Pointe Towers . . . . . . . . 238

36. Nov. 20, 2001 E-mail From Mr. Hinsberger To
    Mr. Samuelson Re: South Pointe . . . . . . . . . . 277

37. Nov. 15, 2001 Order Of U.S. District Court
    Judge Ruben Castillo . . . . . . . . . . . . . . . 278

38. Nov. 30, 2001 Letter From Mr. Hinsberger And
    Ms. Maisonett Re: Notice Of Abatement And
    Termination . . . . . . . . . . . . . . . . . . . 283

39. Dec. 21, 2001 Letter From David S. Snyder To
    Mr. Hinsberger Re: Notice Of Abatement And
    Termination . . . . . . . . . . . . . . . . . . . 285

40. Dec. 21, 2001 HAP Renewal Contract . . . . . . . . 289

41. Feb. 7, 2002 Letter From Gregory G. Gustin,
    Lead Enforcement Attorney, To Mr. Snyder . . . . . 298

-iii-

42. Sept. 26, 2002 Letter From Michael G. McGhie,
    President, P.M. One, To Ms. Phyllis Conrad
    Re: HUD 2530 Flag . . . . . . . . . . . . . 300

43. May 2, 2002 Letter From Howard D. Mayfield,
    Deputy Director, To Mr. Snyder Re: Notice Of
    Reviewing Official's Appeal Decision . . . . . . . . 302

44. May 31, 2002 Letter From Mr. Samuelson To
    Mr. Hinsberger Re: South Pointe Financial Claims . . 304

45. July 3, 2002 E-mail From Mr. Samuelson To
    Mr. Hinsberger Re: July HAP Payment . . . . . . . . 313

46. June 26, 2002 HAP Renewal Contract . . . . . . . . 314

47. July 2, 2002 E-mail from Ms. Thomas To Mr. Gustin
    Re: South Ponte Tower Visit . . . . . . . . . . . 328

48. July 31, 2002 Letter From Mr. Samuelson To
    Mr. Hinsberger Re: HAP Billing . . . . . . . . . 329

49. Aug. 1, 2002 Order Of Judge Margaret J. Mullen . . . 331

50. Dec. 10, 2003 Letter From Mr. Samuelson To
    Mr. Hinsberger . . . . . . . . . . . . . . . . . 339

51. Chicago Police Department List Of Crimes Occurring
    1/1/1999 To 12/31/2001 At South Pointe . . . . . . 341

52. Apr. 1, 2004 Letter From Plaintiff's Counsel
    To The Court . . . . . . . . . . . . . . . . . . 370

53. Excerpts From Mr. Samuelson's Deposition . . . . . . 371

54. Undated E-mail From Mr. Hinsberger To Mr. Samuelson
    Re: Apartments-Rent . . . . . . . . . . . . . . . 422

55. Excerpts From Ms. Coleman's Deposition . . . . . . . 423

56. Excerpts From Ms. Thomas's Deposition . . . . . . . 444

57. Letter From Illinois Housing Development Authority
    To Mr. Sanders Re: Tax Credit Inspection . . . . . . 433

-iv-

58. E-mail from Mr. Hinsberger to Mr. Samuelson Re:
    South Pointe . . . . . . . . . . . . . . . . . . . 437

-v-