IN THE UNITED STATES COURT OF FEDERAL CLAIMS

ENGLEWOOD TERRACE LIMITED PARTNERSHIP,
Plaintiff,
-vs-
THE UNITED STATES,
Defendant.

No. 03-2209C
Judge Wolski

The deposition of JOAN KIENING, called by the Plaintiff for examination, pursuant to subpoena and pursuant to the Federal Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before Judith T. Lepore, Certified Shorthand Reporter and Notary Public within and for the County of Cook and State of Illinois, at 312 West Randolph Street, 4th Floor, Chicago, Illinois, commencing at the hour of 10:10 a.m., on the 11th day of April, A.D., 2005.



00000000-0000-0000-0000-000000000000

APPEARANCES:

SCHOPF & WEISS LLP, By
MR. PETER BAUGHER
312 West Randolph Street, Suite 300
Chicago, Illinois 60606-1721
(312) 701-9300
On behalf of the Plaintiff;

U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION, By
MR. PAUL R. WELLONS
1100 L Street, N.W.
Washington, DC 20530
(202) 616-8253

and

U.S. DEPARTMENT OF HOUSING AND URBAN
DEVELOPMENT, By
MS. MARIA T. BAGUIO
77 West Jackson Boulevard, Room 2202
Chicago, Illinois 60604
(312) 353-6236
On behalf of the Defendant.

Also Present:
Don Samuelson
Joseph Johnson

* * *



INDEX

| WITNESS | DX | CX | RDX | RCX |
|---|---|---|---|---|
| JOAN KIENING | | | | |
| By Mr. Baugher | 4 | | | |
| By Mr. Wellons | | 219 | | |
| By Mr. Baugher | | | 220 | |

EXHIBITS


| KIENING DEPOSITION EXHIBIT | MARKED FOR ID |
|---|---|
| No. 1 | 36 |
| No. 2 | 61 |
| No. 3 | 150 |
| No. 4 | 156 |
| No. 5 | 160 |
| No. 6 | 168 |
| No. 7 | 176 |
| No. 8 | 178 |
| No. 9 | 184 |
| No. 10 | 195 |
| No. 11 | 200 |
| No. 12 | 210 |
| No. 13 | 212 |


(Exhibits were retained by counsel.)



MR. BAUGHER: This is the deposition of Joan Kiening taken pursuant to notice and agreement of the parties.
Could you swear the witness, please.
(Witness duly sworn.)
JOAN KIENING,
called as a witness herein, having been first duly sworn, was examined and testified as follows:
DIRECT EXAMINATION
BY MR. BAUGHER:
Q. Could you please state your full name.
A. Joan Mary Kiening.
Q. Where do you live, Ms. Kiening?
A. In River Forest.
Q. What's the address, please.
A. 1515 Clinton Place, River Forest, Illinois, 60305.
Q. How long have you lived there?
A. 24 years.
Q. Where did you live before that?
A. Elmwood Park, 2531 74th Court, Elmwood Park
Q. Did you grow up in the Chicago area?
A. Yes, I did.



Q. In Elmwood Park?
A. No, in Chicago.
Q. Did you go to high school here?
A. In Chicago, yes.
Q. Where did you go?
A. Lakeview High School.
Q. When did you graduate?
A. 1966.
Q. Did you go to college?
A. No.
Q. Did you have any education after Lakeview High School?
A. I had courses at University of Maryland through HUD and University of Wisconsin.
Q. Again through the Housing and Urban Development Department?
A. Yes.
Q. Did you go to work after you graduated from Lakeview High School in 1966?
A. I sure did.
Q. Then you have a very long work career?
A. Yes, I have 39 years.
Q. Can you tell us where you've worked in a very telescoped fashion. You've worked for HUD for





00000000-0000-0000-0000-000000000000

Page 6

the last 30 years, that will simplify it.
A. 36 years with HUD.
Q. That does simplify it then.
So you began your work with HUD in 1969?
A. Yes.
Q. What year was the Department of Housing and Urban Development created?
A. 1970.
Q. That's what I thought.
A. '69, '70, in those couple years.
Q. So you were an employee at the outset of the department?
A. I was an employee of FHA when it combined with HUD.
Q. Did you work with FHA after you graduated from high school?
A. I worked for IRS when I graduated from high school.
Q. What did you do there?
A. I was a clerk stenographer.
Q. Then where did you go?
A. Then I went to HEW, Health, Education and Welfare, and I was also a clerk stenographer.
Q. And then?

Page 7

A. Then I came to HUD. And I don't know if my title was clerk stenographer or secretary, something in that range.
Q. All right. Well, you've had a long tenure at the agency. Have you been in the Chicago office for all 36 years?
A. No, I have not.
Q. Why don't you give us a brief chronology of your years at HUD.
A. In 1970, I went to the Denver HUD office when it opened, and I was there for approximately six months. And then I was selected in an upward mobility position as a mortgage credit specialist in the San Francisco office. Did not like that work, went back to HUD in Denver for another six months. And then there was a position, I wanted to get back home. Couldn't get to Chicago but got into the Milwaukee office, and I was secretary to the director of the office there. And then I was there for approximately a year, and then an opening came open in the office of personnel in HUD in Chicago. I was there for approximately a year, and I got into housing as a management assistant or program assistant, one of those two titles. I can't remember

Page 8

exactly. And then stayed in housing from then until 1997, at which are time I -- well, I like went up through the ranks.
Q. So roughly from 1973 --
A. '73 or something like that until 1997 I was in housing, and worked my way up from an assistant to a program analyst to a -- well, I shouldn't say that. I was a supervisor -- oh, I don't know exactly what my title was. I supervised the construction analysts and the contract specialists, the subsidy specialists.
Q. During this 24-year period?
A. Right, yeah, during my last couple years, I did that with housing.
Q. This is both construction and contracts?
A. Yeah. Section Eight, yeah. We prepared the documents for the asset managers.
Q. What happened in 1997?
A. There was a reorganization, and in order to keep my grade, I took a position as a special assistant to the director of personnel.
Q. In Chicago?
A. In Chicago.
Q. How long did you hold that position?

Page 9

A. About a year. And then in 1998, I applied for the position as team leader in the enforcement center and got it.
Q. Was the enforcement center new at that time?
A. Yes, the enforcement center was brand new at that time.
And then I was team leader until approximately March of 2000. And then I went on the payroll of our headquarters' office as the senior enforcement analyst and coordinating some of the REMS efforts and other miscellaneous duties. And that's what I was until I retired.
Q. Now, when you say the headquarters' office?
A. Washington D.C.
Q. You were in Washington?
A. No, I was outstationed in Chicago. I was on the payroll of the Washington D.C., DEC operations division.
Q. So you were still in the department enforcement center?
A. Yes, I was still in DEC.
Q. However, you were in Washington D.C.'s headquarters?
A. On their payroll.

Q. But on their payroll, located in Chicago?
A. Right, outstationed in Chicago.
Q. Why did DEC headquarters have people on its payroll who were located in Chicago as distinguished from just the DEC office in Chicago?
A. Because I would be doing nationwide type things as opposed to just what the Chicago jurisdiction had. I was the REMS coordinator for the DEC nationwide. I did some other special projects for them that were nationwide types of projects. It's not uncommon.
Q. So what were the years in which you held that position, from March --
A. From March of 2000 until a week ago when I retired.
Q. Well, congratulations. You've retired, and you've won yourself a deposition.
A. I know.
Q. What a way to start your retirement.
A. That's right.
MR. WELLONS: Peter, at this point, I would just like to state on the record that Ms. Kiening has been diagnosed with lesions on her brain, which led to her retirement, and may effect her ability to



recall certain facts and dates.
MR. BAUGHER: Well, she's certainly doing pretty well so far. We've been back to 1966 already with better recall than I would have going back that far.
BY MR. BAUGHER:
Q. Do you have trouble -- did you have any trouble remembering the things that we've been talking about for the past 15 minutes?
A. I actually had to look up some of them, because I used some of that in my retirement speech. So I did look up items.
Q. Well, what sorts of things are you unable to remember?
A. Well, like --
Q. What's the impact of what Mr. Wellons was just referring to?
A. Generally, when I'm reading something, I don't have very good recall of what I've read.
Q. So it's your short-term memory?
A. Yeah.
Q. If I were to hand you something, a document right now and you read it, it would be comparatively more difficult for you to remember it today than it



would have been a year ago?
A. Oh, definitely, definitely.
Q. But your longer-term memory has not been affected in ways that you are aware of?
A. I don't know if you -- you know, longer term, I mean, you know, documents from back in 2000 I don't remember. I mean, I don't know what you mean by longer term. Can I ask you?
MR. WELLONS: Perhaps if you could qualify the question.
THE WITNESS: I mean, personal things I can remember for some reason. I don't why. I think they stick in your head a little bit more than some work-related stuff. I don't know. I can't remember names. I can't remember names of things. You know, if you're talking about something -- maybe it's short term, maybe it is short-term memory. You know, I was talking about something -- like yesterday I was talking about a kind of pants to wear, and I couldn't think of the name of the pants. Finally, after about 10 minutes, oh, they're capris. I don't know. I don't know what you call it.
BY MR. BAUGHER:
Q. Did you do anything to prepare for this



deposition?
MR. WELLONS: Joan, before you answer that question, I just want to remind you not to reveal the content of any discussions you've had with myself or other attorneys on this case.
THE WITNESS: Well, I went over some documents that were during the time that I was team leader.
BY MR. BAUGHER:
Q. What documents did you go over?
A. The REMS documents.
Q. When you say the REMS documents, can you describe what it is that you were looking at?
A. REMS screens, mostly the DEC screens. There are many, many, many screens in REMS. I went over the property referral screen, the problem statement screen, the high level indicators, high level date screen, recovered funds screen, team report screen, DEC narrative screen. Yeah, those are the ones I actually looked at. Those are the ones that DEC is responsible for.
Q. REMS stands for real estate management system?
A. Real estate -- yes, real estate management





00000000-0000-0000-0000-000000000000

system.
Q. And tell us what your responsibilities were as national coordinator for DEC with respect to REMS.
A. My duties were to coordinate any kind of new developments for REMS with the contractors who are in charge of our system and programers, any changes, any problems with REMS, and testing with REMS, any testing of new development and changes that were coming out. And I coordinated with all of our satellite offices on that, in addition to the contractors.
Q. For a period of approximately four years?
A. Yeah, almost five years, actually.
Q. Five years.
A. Five years, from 2000.
I also had biweekly meetings with the housing coordinator and headquarters and the contractors to go over any problems and new development and issues with the REMS system.
Q. Well, we'll come back to that in just a minute, because I'd like to tap your knowledge of this system.
But coming back to what you did to prepare for this deposition, did you access these DEC screens



in the REMS system online or did you look at papers?
A. I looked at papers -- well, no, I did both. I did both.
Q. And how do you access it online?
A. Well, you have to have access to it. You have to have, you know, a REMS ID to go in under -- or your user ID, I'm sorry. Your user ID and password to get into the REMS system. And then you have to be assigned to that property in order to get into that property. Not all screens, but many screens you have to be assigned to it. The housing screens you should be able to see. The DEC screens you need to be assigned to the property.
Q. So does that mean that -- I'm thinking of South Pointe, which was, for a time, at the DEC. Does that mean the people in Multifamily Housing could not access the DEC screens in REMS?
A. If they were assigned a property, that property, they could access everything except one screen.
Q. What screen was that?
A. The DEC narrative screen.
Q. And those are the progress notes made by DEC personnel as they're handling a particular matter?



A. Exactly.
Q. And that they couldn't even access for read only?
A. No.
Q. Correct?
A. Housing could not, no.
Q. Now, one of the screens that you looked at was the DEC narrative; is that correct?
A. Yes.
Q. When did you look at these screens?
A. Right before I retired.
Q. Late in March?
A. Yeah, the 31st.
Q. Did you print any of the screens?
A. No.
Q. In addition to looking at the screens you've mentioned, did you look at any papers?
A. Yes, I did.
Q. What did you look at?
A. I actually looked at the screens that they printed out, because they also printed out the screens.
Q. Now, when you say they --
A. Well --



Q. Someone gave you a collection of printed out screens?
A. Right, yeah.
Q. And who as that?
A. Jadranka Berkec.
Q. Can you help us with the name?
MR. WELLONS: Again, I'm going to caution you not refer to any conversation or meeting with counsel.
If you would like to ask her about a specific document.
MR. BAUGHER: I'm asking her for the name right now.
BY MR. BAUGHER:
Q. Mr. Wellons was referring to communications that you had with attorneys at HUD, which would include Ms. Baguio, Mr. Wellons, or others and maybe this woman, whose name we're working on right now.
But the question was, who gave the documents to you. And you were giving us a name but we didn't get the spelling.
MR. WELLONS: Go ahead, answer the question.
THE WITNESS: Jadranka, it's J-a-d-r-a-n-k-a, and her last name is B-e-r-k-e-c.





00000000-0000-0000-0000-000000000000

I'm not sure how to pronounce it.
BY MR. BAUGHER:
Q. And is she an attorney?
A. She is a paralegal or she was a paralegal. She is now an analyst.
Q. An analyst in DEC?
A. Yes, she's in the DEC.
Q. All right. Can you describe what she gave you, some of the printed screens; is that correct?
MR. WELLONS: You can go ahead and answer the question.
THE WITNESS: Yeah, she had all of the REMS screens printed out.
BY MR. BAUGHER:
Q. And about what volume of papers was that, Ms. Kiening?
A. That was probably 75 pages or 100 pages, somewhere in that range.
Q. Did that include anything other than REMS printouts or just REMS?
A. That was just REMS printouts.
Q. Now, some of the documents that were produced to us in this lawsuit have number stamps on the bottom. I don't know if you've noticed those.



A. Yes, I did.
Q. What are they, D, A?
MR. WELLONS: I think they're various series.
BY MR. BAUGHER:
Q. They have various letterings, but there will be a letter and then a multi-digit number.
On the REMS printouts that you looked at, do you recall if they had number stamps at the bottom?
A. Yes, they did.
Q. Now, in those REMS screens that you looked at, did those include DEC screens or were they Multifamily Housing only?
A. They were all screens, DEC and housing.
Q. Did you have any sense as to whether the collection of printed materials was complete or not?
A. It was complete.
Q. How do you know that?
A. I confirmed it with the system.
Q. How did you do that?
A. I went online.
Q. On a page-by-page basis or category-by-category basis?
A. Page-by-page basis.



Q. This took a while?
A. Yes, it did.
(Enter Mr. Johnson.)
BY MR. BAUGHER:
Q. You have listed a few minutes ago the screens that you looked at. Let me make sure -- I took notes. Let me make sure I've got the complete list. Property referral?
A. Yes.
Q. And then my second note is property?
A. Problem statement.
I should clarify. On March 31, I looked at those screens. On a previous date, I confirmed all of the screens.
Q. When was that?
A. That was probably -- not sure of the exact date, but it was probably two or three weeks prior to this date.
Q. And when you did that, that was a multi-hour operation, I assume?
A. That was a couple hours, yes, it was.
Q. To go back to these screens, property referral, problem statement, high level. . .
A. Tracking dates and high level tracking



indicators. They're separate screens.
Q. Refunds?
A. No, recoveries. It's actually called recovered funds screen.
Q. Team reports?
A. Team report.
Q. And narrative?
A. DEC narrative, uh-huh, only DEC narratives.
Q. Is there a contract screen?
A. Not DEC. But I only looked at the DEC screens that day. There is a contract screens, which I looked at further back when I looked at all the screens, yes.
Q. Earlier in March?
A. Right.
Q. When you made a review of all of the REMS documents?
A. Right.
Q. There's a contract screen that is available to housing?
A. Yes.
Q. As well as DEC?
A. Right.
MR. WELLONS: Excuse me. I'd just like to





00000000-0000-0000-0000-000000000000

Page 22

state for the record that it appears we've had a new individual join us. And I'm hoping this gentleman could identify himself for the record, please.
MR. BAUGHER: This is Joseph Johnson. He works with Mr. Samuelson.
BY MR. BAUGHER:
Q. Did you make any notes when you went through the DEC screens on March 31?
A. No.
Q. Have you ever in connection with this suit made any notes?
A. No.
Q. Or written anything?
A. In connection with the suit?
Q. Well, in connection with the lawsuit itself, not the events of 1999, 2000.
A. No, I have not made any.
Q. Who asked you to go through the 75 or 100 pages of REMS materials early in March?
A. I think it was Greg Gustin. He's our lead attorney.
Q. Were there other documents that Ms. Berkec or others gave to you to look at in preparation for your deposition?

Page 23

A. There were some documents. I looked at documents that were -- I can't remember what it was. It was some kind of document that -- something with a MIO that came in.
Q. During your tenure with DEC when you were the project leader for South Pointe, during 1999 and into 2000, South Pointe presented a MIO to DEC?
A. Right.
Q. Do you remember that?
A. Yes.
Q. Is that the MIO that you remember looking at?
A. Yes.
Q. So that's a MIO from probably late 1999?
A. Probably.
Q. What else do you recall looking at?
A. I really don't recall.
Q. There was a point at which this South Pointe project was declared to be in default, and there was a variety of correspondence that followed that in 2001. Did you look at any of those documents?
MR. WELLONS: I'm going to object to that question as stating facts that are not currently in evidence.

Page 24

Please go ahead and answer the question.
MR. BAUGHER: Is there something wrong with what I said?
MR. WELLONS: Just it's assuming facts that are not in evidence in this deposition.
MR. BAUGHER: Well, this whole exercise -- there's nothing in evidence at this point. There's no trial. There are no exhibits other than to the complaint. So if I, in introducing a question, misstate the history or have the wrong dates or just am off base generally, then you're welcome to point that out. In fact, I would appreciate having that pointed out. But otherwise, most of the questions that I'm going to ask this witness are not supported by any evidence that has yet been put to a court.
MR. WELLONS: Yes, and the question was proper; it's been recorded for the record. And, Ms. Kiening, you may answer it.
THE WITNESS: No, I did not look at any other documents.
BY MR. BAUGHER:
Q. Did you talk with anyone about your deposition?
A. No.

Page 25

Q. How did you know you were going to be deposed today?
A. Well, I was told I was going to be deposed.
Q. But did you meet with any attorneys or anyone else at HUD to help prepare for your deposition?
MR. WELLONS: I'm going to instruct you not to answer that question.
MR. BAUGHER: What's the reason for the objection?
MR. WELLONS: Well, you may answer whether you met with anyone. I do not want you to reveal the content of any discussions that you've had.
THE WITNESS: I met with the attorney this morning.
BY MR. BAUGHER:
Q. You've got two attorneys here.
A. I met with two attorneys this morning.
Q. You met with both Mr. Wellons and Ms. Baguio?
A. That's right.
Q. How long did you meet this morning?
A. About a half hour.
Q. Have you met with anyone else concerning

Page 26

this suit?
A. No.
Q. You met with Mr. Gustin?
A. No.
Q. Mr. Hinsberger?
A. No.
Q. Anyone at the HUD office, at the headquarters' office in Washington?
A. No.
Q. Did you, in particular, review any materials on the REMS system in preparation for the deposition? I know it's your specialty, but did you review anything --
A. Just what I told you, that's all.
Q. Now, as you were looking at the DEC screens just a couple of weeks ago, was there anything that you saw that took you by surprise or that you particularly noted in looking at those screens?
A. No.
Q. What about when you looked at the materials that were given to you by Ms. Berkec, is there anything that particularly caught your attention?
A. No.
Q. Have you had any communications; that is,

Page 27

conversation, telephone call, an e-mail, with anyone on the subject of this lawsuit other than you've already described?
A. No.
Q. Have you had any contact with anyone at Eastlake? Do you know what I'm talking about, Eastlake?
A. Yeah, I know, management company.
Q. Anyone at Eastlake about this lawsuit?
A. No.
Q. Do you know Elzie Higgenbottom?
A. I know the name, yes.
Q. Have you ever met him?
A. Yes.
Q. Have you ever had any business dealings with him?
A. I've been in housing for 36 years, so not personally I haven't.
Q. Do you know if he has any special relationship with either Gwen Thomas or Veronica Coleman or her husband, Lynford Coleman?
A. No, I have no idea.
Q. Now, you said that you became a team leader at Department Enforcement Center when it was created

Page 28

in 1998. What is the Department Enforcement Center?
A. Well, the enforcement center is there to take sanctions against owners who are not keeping their properties in decent, safe, and sanitary condition.
Q. And why was it set up?
A. I don't know. It would just be speculation if I said anything. I mean, I don't know.
Q. Well, you were one of the initial employees. What was described to you by those that were setting it up as the mission of the Department Enforcement Center?
A. To take sanctions against, you know, owners that didn't keep their properties in decent, safe, and sanitary condition, to try to get them to bring their properties back up to safe conditions, and to follow HUD regulations.
Q. So one purpose was to invoke sanctions, but another was also to encourage or to compel these owners to bring their properties back up to standards?
A. That's what we wanted to do. But if they didn't do that, we would take sanctions against them.
Q. Well, when you say you wanted to do, I

Page 29

understand from that that HUD wanted these projects to succeed?
A. Right, HUD wants the projects or succeed, right.
Q. So to the extent that DEC could assist --
A. Right.
Q. -- as well as prod the owners to bring their properties up to standards, then you would want to do that?
A. Oh, definitely, definitely.
MR. WELLONS: Ms. Kiening, I'm going to caution you to allow Mr. Baugher to finish his questions so the court reporter can record both the question and the answer.
THE WITNESS: Okay.
BY MR. BAUGHER:
Q. Did you receive any special training for the work that you did at the Department Enforcement Center?
A. Yes.
Q. Can you describe that to us, please.
A. We had specialists come in from headquarters and from the Chicago office who were experts in reading financial statements to show us how to read





00000000-0000-0000-0000-000000000000

Page 30

financial statements and to go over REAC inspections and what we should look for. We had training in how to write reports. Quite a bit of training in financial analysis training.
Q. What was the reporting arrangement between the Department Enforcement Center and the local satellite office here in Chicago; were they separate entities?
A. When you say enforcement center, do you mean headquarters enforcement center?
Q. Well, it was not a good question. There was a Department Enforcement Center office here in Chicago, correct?
A. Right.
Q. And that was initially headed by James Zale?
A. Right.
Q. And then there was also the Multifamily Housing office here, correct?
A. Right.
Q. And that was headed by Mr. Hinsberger, Ed Hinsberger?
A. Right.
Q. As of 1998 when DEC was set up in Chicago, were those independent operations?

Page 31

A. Yes, they were.
Q. And did Mr. Zale then report to somebody at the headquarters in Washington D.C.?
A. Yes, he did.
Q. As distinguished from reporting to Mr. Hinsberger?
A. Right.
Q. And Mr. Hinsberger reported to somebody in Washington at the headquarters also?
A. Yes.
Q. So when a property was put into the Department Enforcement Center -- is that the right word "referred"?
A. Referred to the enforcement center.
Q. When the property was referred to the Department Enforcement Center, then am I correct that it was at the point under the jurisdiction of DEC as long as it remained there?
A. Yes.
Q. While a property was at DEC, what remaining role, if any, did the people at Multifamily Housing have?
A. Oh, they still serviced the property. We coordinated with each other.

Page 32

Q. So what does it mean for them to continue to service the property? What would their role be then while the property has been referred to DEC?
A. Well, I can speculate what they did, but I don't know what they did.
Q. I mean, what are their general responsibilities?
A. Well, they did their asset management responsibilities, which I do not know what they -- other than occupancy management reviews. But they had to coordinate all of that with the DEC.
Q. Any decision with respect to the property while it was referred to DEC would be made through the DEC; is that correct?
A. It would be coordinated with the DEC.
Q. Well, with the DEC being the lead decision-making body?
A. Not necessarily, no.
Q. What would be an instance in which housing would be the lead decision-making body while a property is referred to DEC?
A. I really don't know.
Q. Did Mr. Zale serve as the director of the DEC here throughout the time you served as project

Page 33

leader?
A. Yes, he did.
Q. Who else worked at the DEC during the period 1998 through 2000?
A. In Chicago?
Q. In Chicago.
A. List all the names of the people?
Q. Well, was it a lot of names?
A. About 25.
Q. Who were the highest ranking people at DEC during those three years?
A. Walter Mozdzierz, M-o-z-d-z-i-e-r-z. I think Greg Gustin. I think Greg was there.
Q. He was the attorney for DEC?
A. Right.
Q. Did he also during that time serve as an attorney to Multifamily Housing?
A. No.
Q. Okay. Could you continue, please.
A. Maria. I'm not sure if Maria was there at that time. She was another attorney. Patrice Harris was an attorney. We only had two team leaders and a director.
Q. Who was the other team leader?

Page 34

A. That was Walter Mozdzierz, and I was the other team leader.
Q. So you were the two -- you and Mr. Mozdzierz were the --
A. Right.
Q. Top ranking people under Mr. --
A. Under Mr. Zale, right.
Q. Did you have a certain group of people that worked on your team?
A. Yes, I did.
Q. Who was on your team?
A. Frank Swaba.
Q. How do you spell his name, please.
A. S-w-a-b-a. Freddie Batchelor, B-a-t-c-h-e-l-o-r, or something like that.
Q. That's male or female?
A. Female.
Lillian Garcia, Janice Gibson, Melody Thomas, Peter Holzer, H-o-l-z-e-r. I had one more, but I forgot his name. He left early on, so I don't remember his name.
Q. And which of these people on your team also had responsibilities for South Pointe?
A. Freddie Batchelor.

Page 35

Q. What was her position?
A. She was a DEC analyst.
Q. And throughout the time that South Pointe was at the DEC in '98, '99, 2000, she was the one who worked on it for you?
A. Yes.
Q. Did anyone else at DEC work on the South Pointe property during the time it was at DEC while you were the team leader?
A. No other analyst, no.
Q. There were some attorneys that had some responsibility?
A. Oh, the attorneys, yeah. I don't know which one, to tell you the truth, worked on it.
Q. Who did Mr. Zale report to in '98 through 2000; do you recall?
A. I think there were a couple people, Alberta Zinno, Z-i-n-n-o, and the other was Marlyn Edge. They were the director of operations. But I'm not sure if he reported to them or right to the director of the DEC. And I can't remember his name.
Q. When property was referred to DEC, was there a prescribed procedure that was supposed to be

Page 36

followed or number of steps that would be taken to work the property through your process?
A. There was a protocol.
Q. And how was that protocol recorded; was there a memo or a manual?
A. There was a document called something like protocol Multifamily -- I'm not exactly sure what the title was, but it was a protocol between housing and the DEC.
Q. Point of clarification. Am I correct that when you refer to housing, that's the Multifamily Housing department?
A. Yes.
MR. BAUGHER: Could you please mark this as Kiening Deposition Exhibit 1.
(Whereupon, Deposition Exhibit No. 1 was marked for identification, JTL.)
MR. WELLONS: Since this document is not Bates numbered, I would like to ask on the record how this document was obtained.
MR. BAUGHER: I don't have that in mind at this point.
MR. WELLONS: So counsel doesn't know or

Page 37

does not recall?
MR. BAUGHER: No, I'm not sure. I know what it is, so I'm going to ask the witness about it.
BY MR. BAUGHER:
Q. Ms. Kiening, will you please look at Kiening Deposition Exhibit Number 1. Is that a chart you've seen previously?
A. Yes.
Q. Can you tell us what it is, please.
A. This is the flow of work for the enforcement center for a referral that comes into the enforcement center for a physical referral.
Q. Do you know who prepared this paper?
A. Yes.
Q. Who?
A. Jim Zale.
Q. And do you know approximately when he did that?
A. I would say approximately sometime in 1998.
Q. So early during the DEC's existence?
A. Yes.
Q. And does this document, Kiening Deposition Exhibit 1, accurately reflect the process flow that was used during your tenure at DEC?





00000000-0000-0000-0000-000000000000

Page 38

A. Yes, it does.
Q. Was there a procedures manual that you also used or followed at DEC?
A. I recollect a binder that we had with certain procedures in it.
Q. Now, looking at Kiening Deposition Exhibit 1, the first item listed there -- and when I say first item, I'm going by the numbers. This is one of the relatively few charts that's actually pretty easy to follow.
Item one says REAC. What does that mean?
A. Real estate management or the real estate assessment division, the one who does the physical inspections.
Q. Real estate assessment center?
A. Yeah, center.
Q. And they do an assessment of a property, and depending on how that assessment comes out, that may be the cause for a referral to DEC?
A. Yes.
Q. Is that right?
A. Yes.
Q. So at the time that the property is referred, probably there has been an inspection, is

Page 39

that correct, by REAC?
A. It could be.
Q. Or if there hasn't been an inspection and it has to do with the physical -- the problems have to do with the physical nature of the property, then a REAC report is likely to be generated promptly after the referral?
A. Yes.
Q. Number two says EC orders file. What does that refer to?
A. It means we request all the files from Multifamily on that property.
Q. And what does that mean physically?
A. It means every single document -- at that time when DEC was started, it meant every single document on that property from Multifamily.
Q. Literally every single piece of paper that could be gathered together?
A. Literally.
Q. Which, one might assume, could be a fairly large volume of papers?
A. Yes, it can be.
Q. Are those called green files?
A. Now they're called green files, yeah. I

Page 40

don't know if we called them that back then.
Q. Because back then, meaning 1998, was before the REMS system had been --
A. No, REMS was up. We had REMS back in 1998.
Q. Well, then in terms of ordering files, did that also include REMS materials?
A. No.
Q. Is that because you would have access to those on the computer anyway?
A. That's right.
Q. So item two refers to all -- gathering up all paper files?
A. Paper files, correct.
Q. And would those be physically moved from one part of the office to another?
A. Yes, they would.
Q. And did that procedure remain in place during your three years at DEC?
A. Yes, it was.
Q. Actually, I said three years at DEC. DEC in Chicago as a team leader?
A. Yes.
Q. So for South Pointe, which was referred to DEC, I think, in late 1998, as of that date, all of

Page 41

the paper files concerning South Pointe presumably moved from housing to DEC?
A. That's correct.
Q. Who had responsibility for all those papers in this case, Batchelor?
A. Yes.
Q. Do you have any recollection of the approximate volume of papers that then were under Ms. Batchelor's jurisdiction?
A. No, I don't.
Q. Was it a large volume?
A. I really don't know. We had cases that had boxes and boxes. We had some other just files. I really don't know.
Q. Item three, HSG sends file. What is HSG?
A. Well, that's housing, Multifamily Housing.
Q. What does the SG --
A. HSG is just short for housing.
Q. With respect to South Pointe, as far as you know, housing did send its files, correct?
A. Correct.
Q. Item four, EC image file and return file. What does that refer to?
A. We have an imaging system, and you have to

Page 42

prepare a header sheet for each document. The analyst was responsible for that. And we would put it through our imaging system, and as soon as we got confirmation from the -- our assistant did the imaging. The analyst gave the documents to the assistant. The assistant did the imaging. They would confirm that it took in the imaging system, give that back to the analyst, and the analyst would then return the whole file back to Multifamily Housing, the papers.
Q. With respect to South Pointe, was that procedure followed?
A. As far as I know, yes.
Q. Now, again, depending on the volume of documents, it sounds as though that could be a pretty large project?
A. It could be.
Q. And is the imaging then to go onto a commuter disk or what sort of a computer system receives these images?
A. It's a LAN, a server someplace, I don't know if it's the Virginia or Washington D.C. area, that holds all of these documents.
Q. Just so I'm sure I'm understanding this

Page 43

correctly. It sounds from what you said as if the entire files, all of them, would be imaged and then those images would reside on the LAN server in Washington D.C.?
A. That's correct.
Q. So it's not as if someone was making a judgment as to which documents were important and needed by the DEC; it was a comprehensive scanning project?
A. That's correct.
Q. And then how long were those documents maintained on the server in Washington D.C.; was there any protocol or understanding on that?
A. I do not have an understanding of how long.
Q. In the case of South Pointe, which, as I say, I believe was referred in late 1998 to DEC, it's your understanding that all of the South Pointe documents from housing would have been imaged and put onto this LAN server in Washington D.C. as of late 1998 or maybe early into 1999; is that right?
A. Probably 1999.
Q. And then what happens to new documents that are generated in the course of either housing servicing of the project or DEC's work on the project

Page 44

thereafter?
A. At that time, all new documents would be imaged also and the analyst would coordinate with the Multifamily project manager to get all new documents and vice versa.
Q. Now, again, you used the word "all" twice in that answer. Do you literally mean any new document that came in or that was generated by your agency would be imaged and would be added to this database in Washington?
A. Yes.
Q. And actually, I referred to it as a database. Is that a --
A. I don't know. I don't know what an imaging system is, if it's a database.
Q. Again, I'm talking particularly about the time you were a team leader, '98 through 2000. Supposing you wanted to access a document, how would you do that?
A. We had access to the imaging system right from our own computers. You had to have a user ID and password to get into the system.
Q. And because a header sheet was created for each document, the clerk did create those header

Page 45

sheets; is that right?
A. The DEC analyst created the header sheet.
Q. So in the case of South Pointe, that would be who?
A. Freddie Batchelor.
Q. So she creates a header, which has what information on it or what types of information?
A. From what I remember, which has been a while, it would have the REMS' ID, the name of the property, the FHA number. It would have a title for that document, so it could be -- and a category, I think. It might have the number of pages. I don't remember anything else.
Q. And the purpose of the header is so you could conduct a search?
A. Exactly.
Q. For example, you could get a search of all documents that corresponded with the REMS' ID, correct?
A. Well, all documents would have. . .
Q. I mean, all for South Pointe would have the same REMS' ID?
A. Exactly.
Q. If you did that search, you would get

Page 46

results, but it would be a fairly large volume probably?
A. Right.
Q. More precisely, if you were looking for a particular letter and you had the date, could you search by date?
A. Yes.
Q. And depending upon Ms. Batchelor's headings and to the extent to which they were descriptive, you could probably make some content-type searches as well, correct? Meaning, if -- would a typical title for a document be REAC report with a date?
A. Yes.
Q. So that if you went to your computer and did a search for REAC reports, you would get back those documents with REAC in the title?
A. I really don't recollect. I have not been on the system since 2000, so I don't remember exactly how you can do the search.
Q. Was there any procedure -- again, these questions, unless I say otherwise, are for the time period during which you were the team leader.
A. Right.
Q. I understand it's possible things have

Page 47

changed thereafter. But while you were the team leader, was there any process by which documents could be taken out of the imaging system, sort of deimaged?
A. No.
Q. In fact, were there any rules or procedures that you followed that required that all papers concerning a particular project would be imaged and go into that LAN system?
A. Yes, there was.
Q. We've been using the term "LAN". It's LAN for local area network?
A. Yes.
Q. Do you know if the computer system allowed you to print just the header information? If you conducted a search, say, REAC reports, could you conduct such a search and have it come back with a listing as opposed to what might be the text of all the documents with REAC in the title?
A. I'm not quite following you.
Q. Is there some way that you could -- well, let me put it this way. Supposing you were to do a search and you put in REAC report, what would you expect to get back, what type of result would you get

Page 48

back from the system?
A. Well, again, I don't really remember how to do the searches. So I'm not sure if you could just put in REAC report or if you would just go under -- I kind of recollect a category being physical. I recollect that. I'm not positive if that's one of them. And then you would go to that folder or something and then see what's in that folder.
Q. When you say go to the folder, would it give you -- would you get a listing on the screen of, you know, what might be 20 different documents?
A. You know what, I'm really not positive, sorry. I think it might be, but I'm not positive.
Q. Would you either get a listing or you'd get the 20 documents, I suppose?
A. Right.
Q. Which you then scroll through?
A. Exactly.
Q. And did people in your department actually make use of the scanning of the imaging system in the sense that paper came in, it got imaged, and then from that point on, if they wanted to find a document, they went online as opposed to look in some paper file?

Page 49

A. It was some people made good use of the imaging system; some people did not.
Q. Because you still had paper files, correct?
A. No, we sent the paper files back.
Q. To?
A. Back to Multifamily Housing.
Q. What if new paperwork is generated, including DEC's own paperwork?
A. That would go into the green file, plus be imaged.
Q. And I asked you about that term before. The green file was a term that came into use at the point at which all documents were imaged, so it distinguished between the imaged documents on the system and the paper files, which you referred to as green files?
A. It's just the file. It was a green folder.
Q. It is literally green?
A. It's a green folder, yeah.
Q. Item five on this list, Deposition Exhibit 1, says EC orders contractor and delivers file. What does that refer to?
A. Okay. Well, orders contractor, we had a firm called Pinnacle, and we had them doing analysis





00000000-0000-0000-0000-000000000000

Page 50

work for us on properties, not on all properties, but I think on some. I'm not even -- I just have a slight recollection of that. So I'm not positive on that.
And delivers file, I don't know what delivers file means, sorry.
Q. Well, was there paperwork that was given by DEC to this outside contractor Pinnacle before it did whatever it was supposed to do?
A. I really don't remember, sorry.
Q. What does six refer to?
A. Contractor prepares initial recommendation. The contractor, based on their analysis, would prepare an initial recommendation on what we should do with the property -- or with the referral. I shouldn't say property, with the referral.
Q. Now, there's a question mark over that. Does that suggest that in some instances, that step would be skipped or perhaps would come later?
A. I don't know what the question mark represents. But that step could be skipped. If we did not have a contractor prepare initial recommendation, we would have an analyst prepare the initial recommendation.

Page 51

Q. And who was the analyst that would have done that with respect to South Pointe?
A. Freddie Batchelor.
Q. All right. Seven, EC convenes initial meeting/call. What does that refer to?
A. We would have a meeting to discuss what was found, what the analyst found or the contractor found in their initial analysis of the property. And it would either be a meeting, you know, in our offices or it would be a phone call. And it would be between the attorney, the team leader, the satellite director, the CB, which was the community builder -- we no longer have those -- and somebody from the Hub Multifamily Hub Housing.
Q. What happened to the community builders?
A. Phased out, as far as I know.
Q. Were there any community builders that were involved with South Pointe or have they been phased out?
A. I really don't remember, to tell you the truth.
Q. Did they work for DEC or some other group?
A. They did not work for the DEC.
Q. And with respect to satellite director and

Page 52

HUB, the satellite director would be the satellite director for DEC?
A. That's correct, James Zale.
Q. So with respect to South Pointe in 1998, '99, 2000, the attorney was Greg Gustin?
A. Greg or maybe Patrice.
Q. Harris?
A. Yeah.
Q. The team leader is you?
A. Yes.
Q. Satellite director is Zale?
A. Zale, correct.
Q. The community builders are unaccounted for?
A. Extinct, yeah.
Q. And HUB is?
A. Would be probably Gwen Thomas or Ed Hinsberger or Veronica. I'm not sure who came to those meetings. Somebody from the Multifamily Hub would have been there.
Q. Do you recall having an initial meeting to discuss South Pointe?
A. No, I don't.
Q. You believe there was such a meeting; you just don't recall it?

Page 53

A. I believe there was a meeting; I just don't recall it.
Q. Eight, what does that refer to?
A. Contractor fills gaps, prepares final recommendation. I really don't know, to tell you the truth. We didn't use the contractors very long, so I really don't remember.
Q. Well, then if that's the case and there's no contractor that's fulfilling that particular function, would that fall to the analyst then?
A. Yes, it would.
Q. So with respect to South Pointe in 1998 to 2000, I gather that's then Ms. Batchelor?
A. Yes.
Q. Nine, EC prepares prescription. What does that mean?
A. Well, that means just what -- the action plan, another word for action plan, who does what, when, and why they would do it.
Q. So there's actually a document that's called either prescription or action plan?
A. Yeah, something like that. Yeah, I don't remember the title.
Q. That sets out who is supposed to do what,

Page 54

when, and why?
A. Yes, exactly.
Q. And were there action plans concerning South Pointe?
A. I believe there were, but I'm not positive.
Q. 10, EC convenes final meeting and call. So this is your task force group gets together again to discuss the project?
A. Yes.
Q. And presumably to formulate or agree upon an action plan?
A. Yes.
Q. To come back to a point that I asked you about earlier, if possible, if you were receiving cooperation from the owner or otherwise optimistic that the project could be brought back up to standard, would the goal then be to prescribe an action plan that would put the project back to Multifamily Housing?
A. It was always -- the action plan was always a plan to try to get it back to Multifamily Housing.
Q. And then what is 11?
A. Fix it or enforce it. That would have been the outcome of what our meeting was, are we going to

Page 55

pursue fixing it or take enforcement on it.
Q. If it's the happy face of fix it -- I'm referring to the document which has a happy face, correct?
A. Uh-huh.
Q. (Continued) -- then who would do the monitoring and the prescription -- the monitoring of performance thereafter?
A. You know, I'm not quite sure if I really remember. But my recollection is that we turned it back to Multifamily, and we were going to be monitoring the progress of the action plan.
Q. Well, let's be specific about South Pointe rather than answer this in the abstract. There was a final action plan, and I'll show you that in a little while, which was issued in early 2000, shortly before you left your responsibilities there. And part of that was that South Pointe was sent back to Multifamily Housing at the conclusion of your final report.
Was it your understanding that DEC would continue to monitor progress on the -- there was a MIO, there were other communications, or that that would be multi-family's responsibility then?

Page 56

A. I think at that time -- I think the protocol has changed a little since then. But I think at that time, Multifamily would be monitoring the MIO, but they would coordinate with us on it. That's my recollection anyway.
Q. And what does it mean to coordinate with DEC on that?
A. I guess the analyst would get together with the project manager to see if there was sufficient progress being made on fixing up the property.
Q. So in the case of South Pointe, the Multifamily Housing project manager was Gwen Thomas, I believe, during this period; is that your recollection?
A. That's my recollection.
Q. And she would get together then with Freddie Batchelor to discuss further monitoring?
A. Yes.
Q. Then finally, in the lower right-hand corner of Kiening Deposition Exhibit 1, there's a listing of possible enforcement actions. Do you recall whether with respect to South Pointe in the period in which it was in the Department Enforcement Center with you as team leader there was any consideration about

Page 57

abating or otherwise suspending the Section Eight subsidy?
A. I don't recollect, to tell you the truth.
Q. Or terminating the agent?
A. I don't recollect.
Q. Actually, when it refers to agent, who is the agent? Does that mean owner or manager?
A. Management agent.
Q. What does MIP refer to?
A. Mortgagee in possession.
Q. The next item there, next bullet is 2530 flag. What does that mean?
A. That means we would put a flag up so that if the owner came in with any new properties or something, they would be flagged as an owner who was not keeping their properties in decent, safe, and sanitary condition, something like that.
Q. 2530 refers to some sort of an application or registration form, doesn't it?
A. It's previous participation.
Q. Is that a form that has to be filled out by an owner or a manager or is that something that HUD keeps?
A. I really don't know the process on that,

Page 58

sorry.
Q. While the project is in DEC, is a 2530 flag something that DEC would consider doing?
A. DEC could recommend that housing put a 2530 flag on as part of the action plan.
Q. So it's housing that would actually implement that or consider whether or not a flag should be put on an owner's record?
A. That's correct.
Q. What approvals had to be obtained in order to put a flag on a particular owner?
A. I really don't know.
Q. Did you ever put a flag on any property that you recall -- or property isn't the right word -- on any participant that you recall?
A. I really don't recall.
Q. Do you have any recollection of any enforcement actions that were considered by DEC with respect to South Pointe while you were the team leader?
A. I don't recall, sorry.
Q. Now, to take the last question of whether any enforcement actions were considered for South Pointe, if such actions had been considered, am

Page 59

I right that that is something that would have been reflected in the REMS files?
A. Can you clarify that? I'm sorry.
Q. If DEC had considered taking one of these enforcement actions shown on the bottom right-hand corner of Kiening Deposition 1 against South Pointe during 1998 to 2000, is that something that you would expect to see noted in the REMS files?
A. I'm not sure if it would be noted. I don't think there's any particular place for that in the REMS file. At that time, there was not.
Q. Well, wouldn't you expect to see that in the DEC narrative?
A. The DEC narrative were notes that the analyst would make, you know, that -- I'm not sure, to tell you the truth.
Q. Thinking back to South Pointe, 1998 to 2000, what people at DEC would you expect to be making narrative notes?
(Whereupon there was a short interruption.)
BY MR. BAUGHER:
Q. Answer that question, then we'll take a quick break.

Page 60

A. Okay. The DEC analyst, the DEC team leader could, and the DEC attorney could.
Q. Do you recall making any notes about South Pointe?
A. No, I do not recall.
Q. Do you recall that you did not make any notes about South Pointe?
A. No, I do not recall.
Q. Do you have any recollection of whether Ms. Batchelor made any notes?
A. She made notes.
Q. What about the attorney?
A. I don't know if the attorney made notes.
MR. BAUGHER: Could we take a short break, please.
(Whereupon a short break was taken, after which the following proceedings were had:)
BY MR. BAUGHER:
Q. I have just handed the court reporter what's to be marked as Kiening Deposition 2, a folder full of what I would guess is probably 50 pages of documents. All of these documents were produced to

Page 61

us by HUD, and they have HUD production numbers in the lower right-hand corner. This is, however, a compilation of documents and it is intended to be a complete compilation of all of the REMS documents that we have received, taking out those that were duplicates. That's the intention of this document. And the reason, Ms. Kiening, and, Counsel, that there are paper clips along the way is that an effort was made to try to group particular screens or categories of the REMS documents. We think we did that successfully, but there's a fair number of pages. So collectively this will be marked as Kiening Deposition Exhibit 2.
When I ask you, Ms. Kiening, about specific pages, I'll give the Bates number at the bottom, the number stamp at the bottom, which is probably the best way to try to keep these straight. And we should have them all in the same order. If somehow they got out of order, we'll just hunt for the correct page number and then we should literally be on the same page.
(Whereupon, Deposition Exhibit No. 2 was marked for identification, JTL.)