Page 62

BY MR. BAUGHER:
Q. Ms. Kiening, I would ask you to take just a quick overview so you have in mind at least the nature of the documents, and then I'll ask you more specific questions about specific documents.
Ms. Kiening, have you had a chance to literally page through Kiening Deposition Exhibit 2?
A. Yes.
Q. Can you tell us generally what Kiening Deposition 2 consists of?
A. Mostly REMS screens.
Q. Are there some items in Kiening Deposition Exhibit 2 that are not REMS screens?
A. Yes.
Q. Can you give us an example of one that is not a REMS screen, please.
A. D1097, it's the fourth package and about seven sheets -- after seven sheets. There's no number on it.
Q. Could you just hold it up and show us what it is.
It's a piece of correspondence?
A. Right. There's no number, no Bates number.
Q. An unsigned letter from Carl Sanders to you

Page 63

but with no Bates number on it?
A. Correct. That's one.
MR. WELLONS: I'm sorry. Was this document that she's referenced, the unsigned letter, was that produced by HUD or was this document obtained in some other way?
MR. BAUGHER: I don't really know that. It is not a REMS document, and so it was not intended to be in the compilation.
THE WITNESS: There was one more.
Package D1155, starting with that, second page. It's a LOCCS, line of credit contract detail screen. Actually, it's called A1971. It's the second sheet after D1155.
BY MR. BAUGHER:
Q. This is A1971. It says line of credit control system. Is that a government -- it looks like it's a government document but not a REMS document; is that right?
A. Correct.
Q. Do you know what system this document A1971 is part of?
A. It's the LOCCS system, L-O-C-C-S.
Q. And what does that stand for, if you know?

Page 64

A. Line of credit control system.
Q. Thank you.
A. I wouldn't have known that otherwise.
Yeah, right, the last document where you have. . .
Q. A2012?
A. Yeah.
Q. And that's a couple of pages of excerpts from HUD's handbook?
A. I don't know if it's from a handbook, because it doesn't have --
Q. Well, it does say --
A. -- handbook indication.
Q. -- at the top of that page 2012 insert HUD handbook 4065.1 entitled "Previous Participation 2530 Handbook." Do you see what I'm talking about?
A. I see what it says. But HUD handbooks have headers and footers on them.
Q. Well, in any event, these last two pages are not REMS documents?
A. Exactly.
Q. Thank you for going through that so carefully.
The rest, however, appear to be REMS screen

Page 65

prints, correct?
A. Except the very top page where it says REMS update. You know, the sheet on the top.
Q. What is the top sheet?
A. D0424.
Q. What is that document? It says REMS update but you're saying it's not a REMS document?
A. It's not a REMS document, no.
Q. Do you know what it is?
A. I've never seen one before.
Q. Well, let's look at the second page in this deposition exhibit, which is D425, the page that follows what was styled as REMS update. Is this a typical page that one would see on REMS with the different categories or screens listed on the upper left?
A. Yes, it is.
Q. And when I say list of screens, the top of that list says AFS. What does that stand for?
A. Annual financial statement.
Q. Now, if you clicked on that screen, AFS, would you expect to see an annual financial statement or notes about an annual financial statement or what?
A. You would see tables showing you the date





00000000-0000-0000-0000-000000000000

Page 66

the annual financial statement is due, when it was received, an annual -- I'm trying to think of the performance indicators on there. There's like four or five, six different columns on there that you would see, and there would be -- if you would click on the link of that annual financial statement, it would take you to the next screen, which would be this screen, the annual financial statement list.

Q. So if we clicked on AFS, then the subitem, or first of the subitems in annual financial statement would be the annual financial statement list; is that right?

A. There's a table and it will show you all the different annual financial statements over the years. That's the first screen you would come to, when it was due, when it was received. If you want to see more on a particular financial statement, you click on that particular year that that one was due and that will take you to the next screen, which is the annual financial statement list, which is this screen here.

This is what the list looked like back in '99. It's different today. But it still has those three buttons on them, compliance flags, performance

Page 67

indicators, and annual financial statement.

Q. And those three gray bars are under links to FASS --

A. Right.

Q. -- what was FASS?

A. Financial -- I don't know, what does FASS stand for? It's a system for financial analysis that REAC does.

MR. WELLONS: Ms. Kiening, I'm just going to remind you to allow Mr. Baugher to finish his questions before answering, so we can get both the question and the answer on the record.

BY MR. BAUGHER:

Q. So if we were looking at annual financial statement list and pushed the button for compliance flags, then you would expect to find whatever compliance flags that would have pertained to annual financial statements at that location; is that right?

A. That's correct, for that particular annual financial statement.

Q. Well, now, on this annual financial statement list, I don't actually see any list. Is that because this is just a cover sheet for it or would you -- we're looking at page 425 -- would you

Page 68

actually expect to see 1994, 1995, 1996, et cetera?

A. That would be the previous screen from this. Say it was 1998, you would click on that. When you click here on the AFS button, right here.

Q. Yes.

A. 1994, '95, '96, '97, '98 all come up. You click on 1998, then a screen like this would come up, and you would go -- if you clicked on compliance flags, it would show you the compliance flags for the 1998 financial statement.

Q. And if we actually wanted the text of the financial statement, presumably we'd hit the bar that says annual financial statement --

A. Exactly.

Q. -- for 1998, which we had picked from the previous screen?

A. Exactly.

Q. And at least, if you look at the bottom of page 425 in Deposition Exhibit 2, there's a Web site address, which is where this particular screen apparently was accessed, correct?

A. Correct.

Q. And we know from the date in the lower right-hand corner, that this particular screen was

Page 69

apparently printed on July 29, 1999, right?

A. Correct.

Q. So this particular screen was printed during the period of time in which South Pointe had been referred to DEC under your administration as team leader, correct?

A. Correct.

Q. Do you have any recollection as to why this particular screen was printed back in July of 1999?

A. Yes.

Q. And what is your recollection?

A. We printed all REMS screens for the file.

Q. In July of 1999?

A. Well, whenever. I'm not sure. To my best recollection, we printed them sometimes when things were changed, but we always printed a full list of the REMS screens.

Q. When you say we always did that, you did that with respect to each new property coming into DEC or at some other point, like when you were about to put together an action plan, for example?

A. It could be both; for when it came in, for when you're getting ready to do an action plan, when you're ready to go to a meeting.

Page 70

Q. Now, when you'd print those, let's say in July of 1999, if you're printing a full list of the screens in 1999, would that printed copy be itself imaged and put into the imaging system?
A. I don't think we did. I'm not positive, but I don't think we did.
Q. Would the hard copy of papers that you printed from REMS go into the green files?
A. Yes.
Q. So in the DEC green files for 1999, one would expect to see a complete copy of all the screens that existed at that point in time for South Pointe on REMS; is that right?
A. That's right.
Q. And the methodology for that would be literally to go down all of the different screens on the left side and print whatever was there to be printed, correct?
A. Correct.
Q. Let me ask you a few more questions about what these different screen titles refer to, because there are a few of them that are in addition to those that you already mentioned.
What does assignment refer to?

Page 71

A. Assignment means those are the people who have been assigned that property and can get into the REMS screens and see, view the REMS screens, either view or edit depending on what their roles are.
Q. Well, actually, the next page, 426, appears to be the property assignment page; is that what you understand it to be?
A. Yes.
Q. And actually, the next quite a few pages are all apparently printed in July of 1999. So does looking at the next 20 or so pages refresh your recollection about a printing of all the REMS screens as of July 1999?
A. I don't understand what you mean, refresh my recollection.
Q. Well, I'm looking ahead, and it appears to me that documents number stamped 425 through 456 are additional REMS screens that were printed on July 29, 1999.
A. Correct.
Q. And my question is, whether this refreshes your recollection that someone did a complete printing of screens in July 1999?
A. I don't remember them doing it. I can see

Page 72

here she did this, Freddie probably did this, because she entered something in property history on that date.
Q. So 426 is property assignment, and that's got a list of people assigned different roles with respect to South Pointe, correct?
A. Correct.
Q. And so I don't have to repeat myself, at least for the next several questions, we're all taking about the status of events as of July 1999, when these papers were printed. Okay?
A. Okay.
Q. What does property association have to do with?
A. Property association?
Q. Look at 427.
A. That really has nothing to do with it. It's just a screen in there that you can see that -- I take that back. If a contract, a Section Eight contract is associated with an FHA number, this is the screen that that would be on.
Q. Now, the next category on the left-hand side is baseline, and the one after that is DEC narrative records. But the next page that actually got printed

Page 73

here is loan information. Do you see that, 428?
A. Yes.
Q. So do you know what -- and maybe they're just out of order. But do you know what happened to baseline or DEC narrative records?
A. DEC narrative records is further back, I saw.
And baseline, I don't know, I didn't really recollect. Baseline, it just gives you the name -- the FHA number and the name of the property, that's all it is. And you just click on that to get into the other screens.
Q. Is it like a home page?
A. It's similar to a home page, but it's a different way to get in, because a home page is a little different also. I'm trying to see if there's one in here.
There's no other information other than the project number and project name on the baseline. It's not in this group right here.
Q. Actually, I'm looking right below the list of screens, and under that, it says user ID: Guest. Do you see that?
A. Yes.

Page 74

Q. Do you know what that refers to?
A. Yes. That means the user that was in here did not have a REMS -- was not assigned to this property. It was a HUD employee but not assigned to this property. So there are certain screens that that person cannot get.
Q. Which ones can a guest or another HUD employee not get?
A. They cannot get the financial statements; they cannot get the REAC inspections; and they cannot get the DEC narrative records or any other DEC narrative screen.
Q. 428 is loan information list. This makes reference to whatever mortgages or loans are outstanding on the property?
A. Well, either current or inactive. This one was inactive.
Q. And then loan information detail is a subpage of loan information list, is it?
A. That's correct.
Q. That's page 429 and following.
Now, I see, just looking at the last page of that particular screen, which is -- I'm on 432 now, Ms. Kiening, it says last modified July 26, 1999.

Page 75

Does that mean that this particular page, loan information detail, was modified by someone on July 26, 1999?
A. No, it doesn't.
Q. What does last modified refer to?
A. Means the last time anybody modified within any screen in the REMS system.
Q. So someone made some sort of a modification or entry to the South Pointe REMS entries on July 26?
A. Right.
Q. Now, that raises another general question. To what extent can the REMS system be altered as opposed to just added to? I mean, I understand about adding new entries. But under what circumstances can old entries be changed?
A. It would be -- you would have to be specific on a particular entry, I think, because there are certain things that can be and certain things that cannot be.
Q. What are the things that can be changed?
A. I can tell you the things that I don't think cannot be changed, how's that.
Q. Wait a minute. That's a double negative. Things that you don't think can be changed or --

Page 76

which is the small are category?
A. The smaller category are the items that -- well, you know what, I really don't know. There are many, many, many categories that cannot be changed and many categories that can be changed.
Q. Then tell us which ones can be changed and which ones cannot.
A. I can only attest to DEC categories, because I do not have knowledge of the housing categories.
DEC analysts can only edit or add items on the DEC screens with the exception of the project action screen, which they can go in and close out the DEC project action and put comments in. And the DEC problem statement screen, they can add in a statement under -- I know there's a couple categories; one is called history and the other is just called -- it's just problem statement.
Q. So a DEC person can edit the DEC portion of a problem statement or history, but not something entered by housing, for example?
A. That's correct.
Q. And can housing people edit statements made by DEC?
A. No.

Page 77

Q. Well, actually, I guess going back to something you said earlier, am I right that someone from housing would not be able to access a DEC narrative?
A. Housing cannot access a DEC narrative, the DEC narrative screen. They can access the DEC problem statement.
Q. I see.
A. The only person that can change a DEC problem statement would be the same person that entered that data. So if Freddie Batchelor put in a statement and wanted to go back there and add to it or change it, she would be the only one that could do that. I could not go in there, into her statement and do that. I would have to have my own separate statement on the problem statement screen, and it would show that.
Q. And you could add a statement?
A. Yes.
Q. Or supplementing what she'd say?
A. Exactly.
Q. Or contradicting it, for that matter, but then it would say Joan Kiening and the date that you entered that, right?

Page 78

A. That's right.
Q. Property management, 433, gives the name and personnel related to the manager; is that right?
A. This is a Multifamily Housing screen, property management screen. It is the property manager of the property with the management agent and the agent contact, site manager.
Q. When you say it's a Multifamily Housing screen, it's one that, since they're responsible for operations, is particularly something that they use; is that right?
A. This is one that they input data on.
Q. Occupancy, that, I assume, means number of apartments occupied. Is this also a Multifamily Housing screen?
A. This is a Multifamily Housing screen. It tells you how many units are in the building and how many are under contract under subsidy.
Q. In the case of South Pointe, all of the units that were rented were rented under Section Eight subsidy, right?
A. That's what this says, correct.
Q. I believe you when you say that's what it says, but where does it say that on here, that all

Page 79

are subsidized?
A. Well, they're contract units. The first column that says number of contract units, that means how many are under subsidy, 303.
Q. Meaning contracts between HUD and the owner?
A. Exactly.
Q. There's also a reference here, rent information from TRACKS, in solid caps. What is TRACKS?
A. TRACKS is tenant rental -- I can't remember what it stands for. It's the Section Eight system, I think. Something to do with that.
Q. Is that part of the system that pays the owner for the number of units that are part of the contract?
A. Yes, I think it is.
Q. Other participants refers to what, 437?
A. From my recollection, other participants I thought pertained to like, I don't know, developers or somebody. I'm not sure, to tell you the truth. I known on an elderly project, it's a sponsor or something. But I'm not sure on this.
Q. And the next category is ownership, and let's move past that to physical condition, that's at

Page 80

441. What is physical condition?
A. The physical condition screen will tell you a little bit about the property, what kind of building it is, and the dates of the physical inspections.
Q. So as of July 1999, there were physical inspections listed for 1993 and 1994?
A. Correct.
Q. Now, does that tell us there weren't physical inspections other than those two?
A. At that point in time, that's what this says. Now, this is a guest on here asking for this information. Remember, I said a guest does not see all information. So there should be another little chart -- if there was a REAC inspection, there would be another little chart here with a button to go to the REAC inspection.
Q. But this doesn't tell us that there was no REAC inspection?
A. Well, this is a guest. This was not -- she must not have been assigned to the property. I don't know how this came up.
Q. Well, actually, I think it's possible that these screens I think are also in the Pinnacle report

Page 81

that was prepared, and I think it may have been Jim Campbell who printed these.
A. Maybe that's why.
Q. So he's a guest, although an authorized guest?
A. Yes, he would have been authorized to go into anything on the physical condition screens other than this.
Q. But if there were REAC reports, and I think this was one from March of 1999, then this screen, if accessed by you or Ms. Batchelor, presumably would show the results of the REAC report?
A. Right. It should, yes.
Q. And the REAC report would be in the imaging system as well?
A. In the imaging system, as well as being able to click on it right here in REMS. Not the imaging, click on the report to go to the REAC system to pick it up.
Q. And I believe -- and we'll look at it this afternoon. I believe that there was an April of 1999 REAC report. One would assume that that document would have been imaged so it would be in the imaging system; it would be in the green files; and it would

Page 82

be noted in the physical condition screen under REMS?
A. Correct.
I would like to make one point, though, too. I'm not exactly sure at what date REMS connected with REAC so that we could link on it to those physical inspections. I don't know if it was '99 or early 2000. I know it wasn't when we first started the system.
Q. The next screen is problem statement. You've spoken a couple of times about, at least as I understand it, a DEC problem statement and also housing problem statement. What is it that we're looking at on pages 442 and 443?
A. There's only one problem statement. There are two sections to the problem statement.
There are problem statements that if somebody wants to make a statement about the property or problem of the property, they can click -- there's a little button that will says add. You click on that add button, and it will automatically enter the date, who it was updated by, and that role of that person. And then they have a comment field to put that in.
The second portion is property history,

Page 83

which is -- it works exactly the same way as the problem statement does. There's a button to click on add, and you put it in.
Q. What's the difference between problem statement and property history? I mean, I understand the difference in the words, but what's the functional difference?
A. The functional difference, way back it was anything in property history was just supposed to be about the history of the property. Anything else was to be put into the problem statement. So I mean, I really don't know much other than that.
Q. But now, I don't see a separate bar for property history.
A. Yeah, there is. Right down there. Right here, property history.
Q. But apparently, that comes up when you're in the problem statement screen, you get both problem statements and property history, right?
A. Right.
Q. So as of July 29, 1999, apparently there were only three entries in the problem statement screen, is that right; one by Gwen Thomas, one by Ed Hinsberger, and one by Freddie Batchelor?

Page 84

A. That's what it appears, correct.
Q. And in terms of modifications of any of these three entries, only Gwen Thomas could modify her entry, only Ed Hinsberger could modify his, and only Freddie Batchelor could modify hers, correct?
A. That's correct.
Q. But any one of you could have gone in the system and put in an entry that would have been recorded as July 29, 1999, and made whatever statement you thought appropriate?
A. If it was on that date.
Q. Yes, that's what I mean.
A. Yeah, the date comes up automatically when you put it in. So if I were to put something in now, I couldn't put in July 29, 1999.
Q. If you went in today it would be April 11, 2005?
A. Yes. I just want to clarify.
Q. Ms. Thomas says, in the first of these entries, that apparently there was a REAC report that was in process around April 1999. Do you see that entry?
A. Yes.
Q. Do you have any recollection of that REAC

Page 85

inspection report?
A. No.
Q. Mr. Hinsberger says, in his entry, that there's a potential abatement of some or all of the Section Eight units because of conditions. That is physical conditions; is that what he's referring to?
A. I would assume that's what he's referring to.
Q. Did you have any conversations with Mr. Hinsberger about abatement of South Pointe?
A. No, I did not.
Q. Ms. Batchelor has an entry about an action plan having been prepared and forwarded to EC team leader. Does that EC team leader refer to you?
A. Yes, it does.
Q. So apparently, by June 29, 1999, she had prepared at least a draft of an action plan and sent it to you; is that correct?
A. That's correct.
MR. WELLONS: Ms. Kiening, do you recall that or are you basing your answer on the statement in the document?
THE WITNESS: I'm basing my answer on the statement in the document, sorry.





00000000-0000-0000-0000-000000000000

BY MR. BAUGHER:
Q. Now, at least as of July 29, it appears that you hadn't made any entries in either problem statement or property history. Is there anything unusual about that?
A. No, there's nothing unusual about that.
Q. Apparently, at that stage in the proceedings, was most of the DEC work on this project being done by the analyst?
A. That's correct.
Q. All right. The next screen is project action, and what does that refer to?
A. Those are project actions. The bulk are housing actions that they have set up almost like a tickler kind of system as to what the action is, you know, when it's started, when the target date is, and when they've actually done it. We have a couple of them for EC, but I don't know if we had them back then. I don't recollect.
Q. Is there a relationship between project action and the action reports that you would generate for the DEC or are those two separate?
A. Two separate things.
Q. And then you have residence and



neighborhoods. Let's pass by that to subsidy status. What does that refer to?
A. This is a screen that gives you all the information on a subsidy for this property, systems contracts and any other subsidies that it might have.
Q. So if there is a housing assistance program Section Eight contract, that's reflected on this screen?
A. That's correct.
Q. So what information do we have here? Under assistance contract, there's a contract number, and is that the contract number for the HAP contract?
A. Yes, it is.
Q. And we know it's a HAP contract, because under program it says eight. Is that for Section Eight?
A. Yes, it is.
Q. What's PD?
A. Property disposition/Section Eight, existing housing.
Q. And we know the contract is active, because that's what it says?
A. At that point in time, right.
Q. And the contract expired September 30, 1999,



as of July 1999?
A. Right.
Q. What does staged mean?
A. That it -- I think what it means is that it got its subsidy in stages, but I'm not totally positive.
Q. What does the column contract authority refer to?
A. That's the annual contract authority.
Q. That a dollar amount?
A. That's a dollar amount, yes.
Q. So here, at this time, it was $2,313,000?
A. Two million, yes, 313,000.
Q. So that is the total amount that could be paid under this particular contract that's referred to on this page?
A. Annually, correct.
Q. And then budgetary authority is the maximum amount that could be contracted for; is that correct?
A. That's correct.
Q. Now, in this instance, the actual contract authority was $350,000 less approximately, right?
A. What do you mean?
Q. Well, the budget authority was $2,682,000



and the contract authority was $2,313,000, if I'm reading that right.
A. It's 26 million, the budget authority.
Q. No, I think --
A. 26,832,062.
Q. No, I think you got your digits wrong. I think it's $2,682,000 -- no, it's 26 million.
A. That's correct.
Q. Okay. And what does that refer to?
A. That's what we call the run-out cost for the whole contract over as many years as we're contracting for. That's the total cost for the whole contract. That's probably 15 years, or maybe not quite 15 years, 10 or 15 years.
Q. Are the contract authority and budgetary authority related in the sense that you could multiply contract authority by a certain number of years and you would come up with 26.8 million or is it a more complex relationship?
A. At one time, it was like that. But it could be a very complex relationship at this point in time depending on if they renewed it for a year, if they renewed it for half a year. It just doesn't quite come out like that.





00000000-0000-0000-0000-000000000000

Page 90

Q. Because if you multiplied 2.3 million times 10, that's about 23 million, and the budgetary authority is several million dollars more than that?
A. I couldn't tell you, sorry.
MR. WELLONS: Ms. Kiening, did you need to go off the record?
THE WITNESS: I need to take my medication, that's all.
MR. BAUGHER: Let's go off the record for just a moment.
(Whereupon, a discussion was had off the record.)
BY MR. BAUGHER:
Q. Does the budget authority that's referred to in this column refer to budget authority that the Department of Housing and Urban Development already has or is that some congressionally approved authority?
A. From my recollection, I think it's the budget authority that's already been approved.
Q. Now, going down this subsidy status page, the next category on this page is renewal-related data. Do you know what that pertains to?
A. Not really, sorry.

Page 91

Q. Does it have to do with renewal of the housing assistance program contract?
A. I would assume it does to my recollection.
Q. The next graph element or chart is comparability study. What does that pertain to?
A. I don't know.
Q. Where it says current rent potential, it looks like a number of about 2,681,000, and then it's got comparable rent potential, 2,819,000. Do you see those two entries?
A. Yes.
Q. Do you know what that pertains to?
A. No, I don't.
Q. In determining the appropriate amount of subsidy -- well, let me begin again.
In determining the amount of rents that a Section Eight project owner would be allowed to charge, would the Section Eight owner be allowed to charge rental rates based on what comparable rental rates there were in the area?
A. I have no idea.
Q. Who is responsible for those sorts of determinations; that is, the rent rates?
A. Multifamily Housing, I think. I'm not even

Page 92

sure.
Q. And then the next category is renewal budget. Do you know what that has to do with?
A. No, I don't.
Q. And other public subsidy?
A. No, I don't.
Q. Is this the screen that one would look at in REMS for any information about the status of the HAP contract?
A. Yes.
Q. Are there other sources of information on the -- or other documents sources that you would go to to determine the status of a HAP contract?
A. Definitely.
Q. And what would be those sources?
A. Well, the HAP contract itself.
Q. Go to the contract itself?
A. Right, definitely.
Q. And the HAP contract would be in the file of imaged documents?
A. That's correct.
Q. And it would also be in green files presumably?
A. That's correct.

Page 93

Q. And then any contract would also be noted under subsidy status, the subsidy status screen of REMS; is that correct?
A. Correct.
Q. Who had authority to make entries in the subsidy status screen?
A. It comes from the TRACKS system. I think it's TRACKS system. Nobody can make any changes that I know of in this screen.
Q. TRACKS was something that we -- the tenants related or tenant rent?
A. Yeah, tenant rent -- I don't know what it stands for, sorry.
Q. But is TRACKS a stand alone -- let me start over again.
Is it a different database system than REMS?
A. Yes.
Q. And its purpose, at least broadly, is to manage payments for subsidized housing; is that correct?
A. That's correct.
Q. Who is responsible for the TRACKS system within HUD?
A. I would assume Multifamily Housing or it





00000000-0000-0000-0000-000000000000

Page 94

could be administration. It's not DEC.
Q. Well, when you were at DEC, did you have direct access to the TRACKS system?
A. No.
Q. So with respect to the status of contracts, you could get information on that, but you would get it through the subsidy status page of REMS?
A. That's correct.
Q. And do you believe that the information that's shown on the subsidy status page of REMS would actually be imported perhaps directly from the TRACKS system?
A. That's correct.
Q. So the data would be entered in TRACKS and then the results of that data or that data would be reflected on the subsidy status page?
A. That's correct. It was a nightly update.
Q. Have you ever seen a printout of a TRACKS summary on a particular contract?
A. Yes.
Q. Can you describe what it looks like?
A. No. It was a long, long time ago.
Q. For example, with respect to South Pointe, did you ever see a TRACKS page that had to do with

Page 95

the South Pointe contract?
A. No.
Q. To the extent that you were concerned about the contract, you just went to REMS and got the subsidy status page?
A. Well, I would have gotten the contract too.
Q. And do you recall getting a copy of the contract --
A. No.
Q. -- for South Pointe?
A. No.
Q. What method would you use to get the contract; would you go onto the imaged -- look for it on an imaged basis or just go to one of the green files?
A. It depends. If the analyst wasn't around, I would probably go to the imaging file. If the analyst was around, I would say gave me your green file, and I'll look at it there.
Q. Do you know who makes entries in the TRACKS system?
A. No, I don't.
Q. Is there any involvement in the TRACKS system by people who have financial management

Page 96

responsibilities at HUD, and maybe that's administration that you were referring to?
A. I don't know.
Q. In the satellite office in Chicago, are there people there who have specific responsibility for payment of monies like a Section Eight subsidy?
A. When you say satellite office, the DEC is a satellite office. Are you saying Multifamily Hub office.
Q. Yes, that's what I meant.
A. I don't know really who is involved there, sorry.
Q. Now, the next page 450, is assistance contract detail. Is that a subpage of subsidy status?
A. Yes, it is.
Q. Looking at this page 450, the TRACKS contract status is active, the current contract status is active, and then there are apparently five different contracts that had been entered into concerning South Pointe as of 1999 --
A. Correct.
Q. -- is that right?
And only the fifth of those was active, the

Page 97

current one expiring September 1999?
A. Correct.
Q. Then down in the lower right, Ms. Kiening, and it looks to me like it may have been cut off, there's a reference to contra. I'm not sure what -- I have a sense that maybe there are more letters that follow that. Do you know what that refers to?
A. Contract.
Q. Oh, contract.
A. It's contract dollars.
Q. And so the contract dollars here would be the $2.3 million that we saw on the other page?
A. Correct.
Q. And the budgetary number is, again, the $26 million number that was also identified on the other page, right?
A. Correct.
Q. And the TRACKS expiration date tells us when this particular contract expired, which is September 30, 1999?
A. That's correct.
MR. WELLONS: Again, Ms. Kiening, are you basing that response on your recollection or what the document seems to indicate?

Page 98

THE WITNESS: What the document seems to indicate.
MR. WELLONS: It might be helpful to make that clear as you're responding to the question.
THE WITNESS: Okay.
BY MR. BAUGHER:
Q. Well, looking back to the time in which you were a team leader, if you wanted to know something about the contract, you would either look at the contract or you would go to this screen, assistance contract detail or subsidy status, and you would find what you took to be reliable data on that contract?
A. We would take -- definitely we would look at the contract itself.
Q. Do you have any reservation about the reliability of data shown on subsidy status or assistance contract detail?
A. I would have to take look at the contract and compare it in order to answer that.
Q. You're not sure that the information reported in this part of the REMS system is necessarily correct?
A. I would assume it's correct, but we always double-check.

Page 99

Q. Do you ever remember an instance in which a record concerning a Section Eight subsidy contract was incorrectly stated in the REMS screen?
A. Not when I was team leader, no.
Q. At some other point in time?
A. No. I would not have checked it at any other point in time.
Q. Have you ever heard that there was a misstatement in the REMS reports on the South Pointe contract?
A. No.
Q. Did you ever hear at any point that there was a dispute or uncertainty about what the South Pointe contract, HAP contract was?
A. No.
Q. Or how long it would last?
A. No.
Q. The next screen we have is property summary, that's at 452. I don't see that on the list of screens at the left. Am I missing that or is that -- oh, summary refers to property and then it comes up property summary?
A. That's correct.
Q. What information does that provide?

Page 100

A. This is just a summary from a lot of the different screens throughout REMS so one can take like a quick view of what the property is all about.
Q. And then the next item that we have at 455 is property summary narratives. Again, is that a subscreen of summary -- no, I see. Excuse me. That's the last of the screens on this list?
A. That's correct.
Q. And who is responsible for property summary narratives?
A. This is just another compilation of all the narratives from -- not all of the narratives, but a lot of narratives from the different screens within REMS. So if you have something -- if somebody put anything under comments in the ownership screen, it should show up here. Same thing with annual financial statement, physical condition, so on and so forth.
Q. What about problem statements, would entries concerning problem statements end up here as well?
A. Yes, that's on the next page.
Q. I see. The heading for that is at the bottom of 455 and then the text is on 456?
A. Correct.

Page 101

Q. So if you wanted to go to a single screen and get a comprehensive look at all comments on all subjects, you could go to property summary narratives?
A. That's correct.
Q. And that would give you everything except there's no DEC narrative here?
A. That's correct.
Q. So the property summary narrative that we're looking at is are all the narratives except for the DEC narrative?
A. It's all the narratives. At this point in time, there was only one screen for DEC, which is the narrative screen. Now there's many more screens, and there's many more narratives that we have. There's comment places that are not on this screen. So these are all housing narratives, that's a better way to put it.
Q. Well, now, --
A. Other than --
Q. -- the item from Ms. Batchelor, though, is a DEC -- or at least she's a DEC employee?
A. Correct. But this is on a housing screen. It's from a housing screen. The problem statement

Page 102

screen is a Multifamily Housing screen. So these show up on this summary of narratives.
Q. Now, since there's no -- oh, there is a button DEC narrative records. And if one had access to that screen as of July 1999, it would have printed out whatever is the narrative records as of that date, correct?
A. Correct.
Q. And inasmuch as by mid-1999, as we'll see a little later this afternoon, there were a number of interim and other action plans that were in process. Would you expect to see some DEC narrative in 1999 or in the first half of 1999, let's say?
A. There could be, yes.
Q. What, in general, was the direction to, I guess, analysts, in particular, as to what when they were supposed to put a narrative entry in?
A. Well, if they had any notes from meetings or telephone calls with the project manager of Multifamily Housing or with the owner, they could put their notes in the DEC narrative. And early on we put or team reports or initial reports, whatever we called them, preliminary assessments I think we called them to begin with -- we've had many names --

Page 103

into the DEC narrative.
Q. The full text?
A. Yeah, we put the full text in there for a short time.
Q. And then that got too long and you decided to just image it?
A. We made a separate screen for team reports.
Q. I see. Well, apparently, that took place after July of 1999?
A. Correct.
Q. Because there's no team report on this REMS menu?
A. The team report would be under -- yes, that took place afterwards, because you would never see this on this site anyways. It's kind of like hidden.
Q. Do you access that via the DEC narrative records?
A. No.
Q. That's got its own connection?
A. You access it through the problem statement screen. And then further down on the problem statement screen, there's a box that says referrals, which there is -- you could see it on here. And then there is a date of the referral and there is a link

Page 104

there. You click on that to get into the DEC referral screens. But in 1999, we didn't have those yet.
Q. When did those come into existence?
A. I think they came in like September of 2000, 2001, somewhere in that range. I'm not positive.
Q. Now, look please at the next couple of pages of documents starting with B4357. The top line says MFH action plan. The two pages that follow, 4357 and 4358, what are they?
A. This is the bottom half of the problem statement screen.
Q. Actually, it says five of six. Do you see that in the lower left?
A. Uh-huh.
Q. And then the last is six of six?
A. Yeah.
Q. So that sounds like that confirms what you're saying that one through four are not, at least, attached here?
A. Correct.
Q. And this particular -- these two pages, 4357 and 4358, were printed May 31, 2001, it appears, correct?

Page 105

A. Correct.
Q. Now, what four pages would have preceded the two that we're looking at?
A. It would have been the top half of the problem statement screen, which would be all of the statements that the project manager made, and then the property history. So there were probably a lot of statements by the project manager, and I mean, the analyst could have made some in there too.
Q. So mostly what we don't have in this first four pages before document 4357 are narrative statements from the project manager, Gwen Thomas, and perhaps from your analyst, Ms. Batchelor?
A. Could be, yes. Whoever made problem statements.
Q. Now, look at the next category that starts B8276 and runs through 8279. This is headed "Departmental Enforcement Center Narrative Records." And is that what it look like to you?
A. Yes.
Q. Can you look at these four pages and tell us whether as of October 28, 2004, when this was apparently printed, whether what we're looking at would constitute the entire DEC narrative records?





00000000-0000-0000-0000-000000000000

Page 106

A. This would constitute what was in this screen for narrative records, which I'm trying to think of -- there could be other items on this property or this referral if there was something after the time when we started to go to team reports and, you know, we had different screens in REMS. I don't know if that's the case on this. I don't remember.

This is all that's in the DEC narrative records at this point in time.

Q. Could there have been entries -- well, let's look at the first entry on page one. It's from Freddie Batchelor entered June 29, 1999, correct?

A. Correct.

Q. Now, it looks to me as though that's the only entry from Ms. Batchelor under the heading journal, because the next entry appears to be from Patrice Harris.

A. Right. The way we entered data in here -- let me see. We would sometimes put the date and then -- the analyst only had one block to put in data. So they would have to add data either before -- say they put something in in January of '99. They would put January 1999, and they would put

Page 107

whatever it was. Then if they went in again, they would put like April 1999 and enter the data, so on and so forth.

So I think the date that's up here, this 6/29/99, is the latest date, takes the latest date, because I'm seeing -- I'm trying to figure this out. She probably put this all in at one time.

Q. Freddie Batchelor, you think, made this entry in June of 1999?

A. Well, I think if you go down like three lines from the bottom on the first page where it says April 15 to 16, 1999 --

Q. Yes.

A. -- site visit completed by analyst present on the first day was team leader Joan Kiening and satellite attorney Patrice Harris reviewed the files and site review were completed. That may have been a separate entry. And then May 1999, she probably put that entry in there, EC analyst discussed property with the community builder. And then again she might have gone -- I don't know if she is -- the way we did that was we just any time we entered something new, we just put the date and what it was. She could have put this all in here at one time or she could have

Page 108

added to it at different times. I don't know.

Q. In which event, her last addition was apparently June 29, 1999?

A. I would assume that is, yes.

Q. Well, because if she had entered something after that, then that later date would have presumably shown up, right?

A. Right.

Q. And this print purports to be what someone printed out in October of 2004?

A. Correct.

Q. Now, there's an attorney, satellite attorney entry, Patrice Harris, and that's all blacked out. Do you have any idea what that refers to, what the topic is?

A. No, I don't.

Q. Whatever was entered there, was apparently last entered on March 16, 1999, correct?

A. Right, correct.

Q. And then going down to the bottom of 8277, summary of DEC team report, and that says date approved February 16, 2000. Did I interpret that correctly that that means that the DEC team report was approved on February 16, 2000?

Page 109

A. That's when it was actually entered, I think. That's when it was entered in the system there.

Q. And when do you think it was approved? On the next page, there are some dates.

A. Right, 3/15, 2000.

Q. I'm referring to page 8278. And are these sign-off or approval dates by the people that are listed?

A. Yes.

Q. So your listed as team leader as having accepted or approved the final report on March 15, 2000, correct?

A. Correct.

Q. And that report was also approved by Greg Gustin, Freddie Batchelor, and Jim Zale, right?

A. Correct.

Q. Now, was anyone in Multifamily Housing asked to approve your report? It was the DEC team, I know, but was anyone at housing asked to approve it?

A. From my recollection, they look at it prior to us going into the system to approve it.

Q. So that their approval would be before March 15, 2000?





00000000-0000-0000-0000-000000000000

A. Yes.
Q. Now, on the text here at the bottom of page 8277, it says: Substantial progress has now been made on the findings outlined in the REAC report. Therefore, the DEC should return the case to Chicago Multifamily Hub office for servicing.
Do you remember substantial progress being made by South Pointe as of early 2000?
A. I really don't recollect.
Q. Do you have any reason to believe that that statement isn't true?
A. No, I don't have any reason.
Q. You would expect that it is true?
A. Exactly.
Q. And the findings outlined in the REAC report, does that refer to the REAC report that was issued back in around April of 1999?
A. I don't know.
Q. Remember, I think there was an entry we saw earlier, maybe it's up in Ms. Batchelor's notes here about a REAC report?
A. REAC on demand inspections 4/28/99.
Q. Is it a fair interpretation of what's written here is that the items that were listed in



the REAC report of April 1999 had been substantially satisfied as of early 2000?
A. If that was the only REAC report. I would have to see if there was another REAC report.
Q. Well, if there was, you would expect to see a note about it somewhere in Ms. Batchelor's notes, wouldn't you?
A. I would expect so.
Q. And she doesn't refer to a second REAC report?
A. No.
Q. As of early 2000 then, your team's report was that enough -- well, that substantial progress had been made and that the South Pointe project should therefore be referred back or returned to Multifamily; is that right?
A. Correct.
Q. And it appears that everyone involved in the team agreed with that; is that correct?
A. Correct.
Q. There were no dissents that you were?
A. I don't recall.
Q. And that's true for the Multifamily Housing people who reviewed the report as well, correct, that



they all concurred in the result?
A. I'm assuming they did since they signed off on it based on this document.
Q. The next sentence says: The Chicago Hub office should continue the finalization of the MIO received on December 8, 1999.
MIO refers to management information and operation -- management improvement?
A. Improvement and operation, management improvement and operation, something like that.
Q. This might as well be the Department of Defense for all the acronyms you have.
So there was a management improvement and operations plan that was delivered to you by South Pointe on December 8, 1999?
A. Based on this document, yes.
Q. And am I correct that HUD encourages managers who have properties with problems to develop management improvement and operation plans to solve those problems?
A. Yes.
Q. And you view that as indicating cooperation and in an attempt to move a project in the right direction by the owner or project manager?



A. As part of it, yes.
Q. Now, the next sentence up at the top of 8278 says: The owner invested over a three- to four-month period $770,000 in this property after it was forwarded to the EC.
Do you recall that?
A. I vaguely recollect that. I see it here in the document, so yes.
Q. So the owner put another $770,000 into this project apparently to try to improve the physical condition of the property, correct?
A. Correct.
Q. And then the last sentence here: Shows good faith effort and continues -- its not the last sentence. Excuse me. It's the second to last sentence: Shows good faith effort and continues repairs.
What does that refer to?
A. Well, I would assume that, to my recollection, it refers to the amount of dollars that he put into it and, you know, trying to fix it up.
MR. WELLONS: Ms. Kiening, are you assuming or do you recollect?
THE WITNESS: I recollect.

Page 114

BY MR. BAUGHER:
Q. Who is the owner that you were dealing with at that time, was that John Hays?
A. I don't remember.
Q. Do you recall meeting the owner of the project; in fact, touring the project at one point?
A. I remember touring the project. I do not remember meeting the owner.
Q. Do you recall any of the people that you met at South Pointe?
A. I don't.
Q. And apparently, this owner was also continuing repairs; is that right?
A. It appears that way from this, yes.
Q. Then finally: Also implemented social service program for residents targeting TANF recipients.
That's a welfare grant, correct?
A. I don't know what TANF stands for.
Q. Well, it's for --
MR. SAMUELSON: Needy families.
BY MR. BAUGHER:
Q. Do you recall that they had a social service program that was initiated at the project?

Page 115

A. I do recall Freddie Batchelor talking about the social service program and something for the residents. I didn't know what it was until I saw this again.
Q. Well, you remember receiving information about it that is summarized in this single sentence here, right?
A. Exactly, yeah.
Q. Now, looking further down this page, there's a problem statement, and, again, a lot of the terminology is very close. Is this entry or what we're looking at a problem statement that was the problem statement for the final DEC team report or is it a problem statement that was extracted from some other narrative or what?
A. This would be a problem statement that the analyst would have put in here, the DEC analyst, not housing. And I'm not sure if it would have been -- there's no date on it, so I really don't know at what point it would have been put in there. My recollection is that it is put in there when the team report is put in there.
Q. So sometime around February of 2000?
A. Correct.

Page 116

Q. And so you think this comes from Ms. Batchelor?
A. Yes.
Q. And she says that the owners have started repairs and are showing good faith by starting some of the repairs with their own funds. Do you see that?
A. Yes.
Q. And that recapitulates what was said above, right?
A. Correct.
Q. In addition, they're attempting to secure loan to offset the cost of the remaining work. Are you aware that the owners were seeking loans to make additional repairs at that time?
A. I vaguely recollect something like that.
Q. It would sound, from the summary of the DEC team report, that the 1998 to 2000 referral to DEC was a success; is that correct?
MR. WELLONS: Objection, mischaracterizes prior testimony, assumes facts not in evidence. Go ahead and answer.
MR. BAUGHER: There is nothing in evidence so don't tell us that things are not in evidence.

Page 117

MR. WELLONS: It's a proper objection. It's noted for the record.
BY MR. BAUGHER:
Q. This is a question to you. We are now creating evidence by trying to remember what took place.
So the question is, looking at this summary of the DEC team report, it appears that this was a successful project for DEC; is that right?
MR. WELLONS: I would like to restate my previous objection. Go ahead and answer the question.
THE WITNESS: Sending it back, being able to send it back to Multifamily Housing is good for us. But it's going back to Multifamily Housing to continue monitoring the MIO plan and, you know, our action plan. And if they're not in compliance with the action plan, it can end up back with us.
BY MR. BAUGHER:
Q. But your purpose, as I understand it, DEC's purpose is to intervene in a situation and help to rectify whatever problems there are, correct?
A. That's correct.
Q. And in this instance -- well, Mr. Zale gave

Page 118

us two routes; either there is a compliance route and bringing a property back into compliance if it's been out or there's his unhappy face, which is sanctions of various sorts. And this project, in 1998 to 2000, took the compliance route and was sent back, correct?
A. That's correct.
Q. Which is good for everyone concerned --
A. That's correct.
Q. -- right?
And in your personal dealings with the owner and people on this project, you were satisfied with the cooperation that you received?
A. Since I don't recollect a lot of it, I'm assuming I was satisfied since we sent it back.
Q. Well, all right. Let's look at it the other way. If you were dissatisfied, you would have said that and it would have been reflected in the final report and the final report would have looked different?
A. That's correct.
MR. WELLONS: I'm going to have to break for lunch now.
MR. BAUGHER: Okay.
(Whereupon a short break

Page 119

was taken, after which the following proceedings were had:)
BY MR. BAUGHER:
Q. Ms. Kiening, please turn back to Kiening Deposition Exhibit 2, which is the compilation of REMS documents, and I wonder if you could look at the subgroup for which the first number is D1097. Do you have that?
A. Yes.
Q. And the numbers run backwards sequentially for a while and then they interrupt and then they run backwards some more. But from the lower right-hand portion of this compilation, which starts with 1097 and ends up with some wanderings at 1083, the dates all appear to be February 8 or February 4 of 2005. Do you see that?
A. Yes.
Q. Meaning that this particular group of documents was printed or these screens were printed in February of '05?
A. Correct.
Q. And again, there's the Web number at the bottom of the page, https@hudaps.gov, et cetera. Do

Page 120

you see that?
A. Yes.
Q. That is where someone who was authorized and at HUD presumably got these materials, correct?
A. Correct.
Q. It's not open to the public. I couldn't go online and type these numbers in and draw these screens down?
A. Not yet, no.
Q. You mean next week it's going to be different, and I can do that?
A. It's coming.
Q. But not now?
A. No.
Q. The reason I ask that specifically is that -- do you know what interrogatories are?
A. No.
Q. They're written questions that one side in a lawsuit can put to the other side. And we'd asked a number of interrogatories of the government, and one of the responses to some of the questions was that the materials were as readily available to us as they were to the government with the citation to this Web site. I couldn't go online now and recover materials

Page 121

from the REMS file for South Pointe, could I?
A. No.
Q. I mean, I wouldn't be able to even get the front page?
A. That's correct.
Q. In order for someone to be able to do that, that person would have to have authorization from HUD even as a guest or even to be a guest, correct?
A. There is no longer a guest role anymore. That's no longer.
Q. So guests aren't even permitted?
A. Right.
Q. You or somebody else would have to get whatever materials were being looked for for a person outside of HUD?
A. Correct. Now, a contract administrator can get certain views of REMS screens.
Q. Will you look please about a half a dozen pages in to page 1091, and it says tracking item date detail. And this particular subject has to do with the owner submitting comments on the DEC referral. Do you see that?
A. Yes.
Q. The date for this entry is June 14, 1999,

31 (Pages 118 to 121)

Page 122

correct?
A. Correct.
Q. Now, the next page is the letter that we talked about two hours ago, which you said was not part of the REMS system. But apparently, looking back at page 1091, is a letter sent by the South Pointe property manager, Carl Sanders, to you on June 14, 1999, responding on the DEC referral, correct?
A. Correct.
Q. And Mr. Sanders writes to you in June of 1999 to say that he has not received a copy of the REAC report that was done on April 28, 1999. Do you see that?
A. Yes.
Q. Is there any particular reason that that report wasn't sent to South Pointe as of mid-June 1999?
A. I really don't have any recollection, sorry.
Q. And then he also says that Pinnacle Realty Management Company was out on May 14, but he doesn't have a copy of that report either as of June 14, right?
A. Correct.

Page 123

Q. And is he telling you that he'd like to get copies of those reports so that South Pointe can begin working to correct whatever problems were identified?
A. Correct.
Q. And does that reflect -- this letter that follows page 1091, does that reflect the South Pointe management's willingness to try to understand and correct problems that had been identified?
A. I would say so, yes.
Q. Now, on page 994, which is a couple of pages later, DEC task management list. Do you see that?
A. Yes.
Q. At the top as headings, there are references to start date, target completion date, closure date. Do you see those?
A. Yes.
Q. And if you look at this chart, does that give you a rough schedule of some of the key dates in 1999 and 2000 concerning this DEC referral?
A. Yes. It gives me some dates, yes.
Q. So for example, for the MIO plan that was apparently received on December 8, 1999, and was to be reviewed by the end of January 2000?

Page 124

A. Yes.
Q. And what does closure date mean; does that mean that it actually was reviewed by the end of 1999?
A. It means that the MIO plan was received and reviewed -- it was reviewed 12/31/99.
Q. Actually reviewed on that date or by that date?
A. Well, by that date. We closed it out on that date.
Q. So you're actually, in that sense, a little bit ahead of the target completion date by a month?
A. Correct.
Q. And that's because the MIO plan was found to be acceptable as of December 31, 1999, correct?
A. Based on this chart, yes.
Q. And if it hadn't been acceptable, then you might have had to go back and forth with the owners, and that could have taken up another month, right?
A. Exactly.
Q. But in this situation, it was acceptable and it was, in fact, approved as --
A. Can I take say something?
Q. Sure.

Page 125

A. We received it and reviewed it by 12/31. The next one is we approved it -- well, actually by 12/31 too. I'm sorry. Okay.
Q. Yes. So it's possible you could have received a MIO plan that had additional things that you thought needed to be added to it. But in this instance, you received it in early December, you reviewed it, and you approved it by December 31, 1999?
A. Correct.
Q. And then the next two items are for earlier dates with owners' comments on referral and the site visit itself, which took place, I gather, by October and May of 1999 respectively?
A. Right.
Q. Then the next page, 992, refers to amount recovered by HUD or amount recovered by project of $770,000?
A. Correct.
Q. And the date given on that is December 8, 1999. Was the $770,000 additional development or contribution by the owner a portion of the owner's MIO plan?
A. I really don't know. I assume it is; but I