Page 126

don't know.
Q. And then that money, according to this note, was apparently spent on repairs to the project itself, correct?
A. Correct.
Q. Do we know from looking at 994 and 992 who entered that information? I mean, I see Freddie Batchelor as being responsible, but that doesn't necessarily mean she entered it, I suppose.
A. It doesn't mean she entered it, but only a DEC -- somebody with a DEC role could enter that screen and enter any data. So I assume it was her, but I don't know that for a fact.
Q. Well, if it wasn't her, then was it probably you?
A. Yeah, but I doubt that I did. I didn't do any of those. I always had the analyst do that.
Q. Then on 991, it's upsidedown, D0991. Whoever stamped it had it upsidedown. But do you see that page?
A. Yes.
Q. And under recovered funds, it says recovered as a result -- it talks about the $770,000, correct?
A. Correct.

Page 127

Q. Then it says recovered as a result of DEC action plan, and it's checked no. Do you see that?
A. It says DEC preaction plan, and the no is if the money went to our lockbox, not -- that's really a check -- wait a second. I see here.
Q. See where it says recovered as a result of DEC action plan?
A. Correct, because there was no action plan.
Q. And because the owner made a voluntary contribution. It wasn't something that was required by DEC; it was something that the owner did in order to be able to fund repairs?
A. Right. It didn't get to the action plan stage evidently.
Q. Because the owner was forthcoming with the money before that, right?
A. It could be, yes.
Q. Now, the last couple of pages, 1090 says: Final team report sent to MFH for concurrence on January 27, 2000.
Is that approximately when the final team report was sent to Multifamily Housing for concurrence?
A. I don't have recollection. I assume it is

Page 128

since the date is there, but I don't know that for a fact.
Q. And part of the process is to send your final team report to Multifamily Housing before it's finally approved, right?
A. Correct.
Q. Because you want to make sure that Multifamily Housing concurs in the team report before you issue it?
A. That's correct.
Q. Then turn to the next page please, which is showing a few days later February 1, 2000, MFH concurs with final team report. And does that accurately reflect MFH's concurrence?
A. I assume this was, yes.
Q. And then finally, on 1083, here we've actually got an entry for you. And it looks like update user name Joan Kiening. Does that mean that's an entry that you put in?
A. That's me.
Q. And you say: On February 6, closed and return to Hub?
A. Correct.
Q. Now, it actually took a little bit longer

Page 129

before everyone actually signed off on the final team report, I gather, because there was an early March date or March date with that. But as of February 6, with the concurrences and approvals all in place, then South Pointe was returned to Hub?
A. Correct.
Q. The next two pages that I have are marked 4355 and 4356 and are not all that productive. I would ask you to comment on the text, Ms. Kiening, but inasmuch as every line is blacked out and there are no dates that one can see, there isn't any very good way of doing that.
It does say three of six and four of six and has a print date of May 31, 2001. However, that's about as much as you can tell from this document. Do you have any idea what these entries were?
A. I have no idea what these entries are, none whatsoever.
Q. We do have a privilege log, but it is fairly general in its description. And this is one of the sets of documents that are blacked out that we have very -- we have no real information on?
MR. WELLONS: Object to counsel's characterization of the privilege log as general.

MR. BAUGHER: Well, then I would ask you, Mr. Wellons, who happily did not have to undergo the process of putting that log together, to look at the description for pages 4355 and 56 and tell me how forthcoming you think it is in its description.
BY MR. BAUGHER:
Q. The next pages that I have begin at A2148. Do you have that?
A. 21...
Q. And that does have some text.
A. What was the number?
Q. A2148.
A. Okay.
Q. A number of entries. I take some responsibility for the compilation of these. But they didn't come to us in any sort of chronological or other fashion, and there were lots of duplicates. And this particular several pages, which starts out, say, on the bottom it says seven of nine and then eight of nine and then nine of nine, didn't have the other six pages in front of it.
So just starting where this is, at the top of the page, we're at 2148, there's an entry by Gwendolyn Thomas. Do you see that?



A. Yes.
Q. And this entry was made on June 24, 2002, right?
A. Correct.
Q. Apparently, just looking at this top entry, the entry made on June 24, 2002, has to do with events in 1999. I'm just reading the text. Do you have any idea why Ms. Thomas was entering information about events in 1999 on June 24, 2002?
A. No, I don't.
Q. Look at the next item, again, a Gwen Thomas item dated June 24, 2002. And on that one, it starts -- I mean, the first numbers appear to be August 23, 2001, and then it starts talking about a December 1, 1999 preapplication meeting. We're reading the same text, right?
A. Correct.
Q. Do you have any information on why in June of 2002, Ms. Thomas is entering information about a preapplication meeting in 1999 for which she also enters a date that appears to be August of 2001?
A. No, I don't.
Q. Now, these REMS records where there are narrative sections are sequential with the most



recent entry being at the beginning of the document, correct?
A. Correct.
Q. So as we're moving back, you know, to page seven of nine, page nine, for example, we're going earlier in time, right?
A. It should be, correct.
Q. You'll see, again on, page 2148, there's a September 2001 entry from Ms. Thomas. You see that down towards the bottom of the page?
A. Yes, I do.
Q. And the next earlier entry is November 17 of 1999, correct?
A. Correct.
Q. And then there are, you know, four or five different November 1999 entries, right?
A. Correct.
Q. Now, that appears to me to tell us that between November 17, 1999, and September 26, 2001, there are no REMS entries for this project?
A. No REMS entries in the history section. This is a history section.
Q. How do you know that's the history section? I believe you.



A. I know it, because it comes after the problem statement section and right before the Multifamily Housing action plan section, which is on the next page. So I'm just kind of going backwards.
Q. So there's nothing in history from -- when I say nothing, I mean no entries --
A. Right.
Q. -- in history from November '99 until September '01, correct?
A. That's correct.
Q. And what type of information or narrative is supposed to be contained in the history section?
A. I think people get it mixed up. Sometimes they put in -- it's really supposed to be the history of the property, and I really don't know much other than that. You would have to ask housing.
Q. Well, when you say the history of the property, what do you mean by that?
A. You know what, I really don't know. I really don't know Multifamily.
Q. You were coordinator for the whole country.
A. No, for DEC, for DEC. I am the coordinator for DEC. And our instructions were our analysts were not supposed to even enter anything into the history.

Q. Well, Ms. Batchelor did.
A. But this was way back. I mean, that was when it was first started, and we didn't know what we were doing at that time for REMS. We did do a few of them, but that was one place we were not supposed to enter data.
Q. On page 2149, there's a reference to MFH action plan?
A. Yeah.
Q. Do you know what that refers to?
A. Multifamily Housing action plan. That's where Multifamily would put in any action plan items.
Q. And then DEC action follows that?
A. Correct.
Q. Well, now, there's no reference here to any DEC action plan, I mean, on 2149 or 50. But you did have an action plan?
A. It was a preaction plan.
Q. Well, you had an action plan and you had a final report?
A. Well, in REMS, there was no action plan. It was a preaction plan. It was a task list. It wasn't on the DEC action plan.
Q. Why not?



A. I don't know. If I could see a screen, I could probably tell you.
Q. You're looking at all the screens that got printed and what, I acknowledge, is a somewhat cumbersome document.
If you look at 2150, there is a reference to referrals with September 1998 and October 2001. Does that indicate when projects were -- when South Pointe was referred?
A. I'm sorry. I didn't hear the first part. Was it under referrals?
Q. Yes, under referrals, does that tell us when South Pointe was referred to DEC?
A. That's correct.
Q. But then it also says DEC status closed and returned to Hub. I guess, that's by February 13, 2004?
A. Correct.
Q. And did you have anything to do with printing screens in February of 2004?
A. I don't think I did.
Q. When you did your entry-by-entry review, you were given a compendium of printouts and then went back to check to make sure that was complete?



A. Let me make sure. It was in February.
Q. What, again, is the sequencing as to problems and then history; does problem come first and then history?
A. Correct.
Q. Well, a little bit further down, I'm seeing now a document that starts as A2142 and then runs through some of the numbers that we were just looking at, but not all of them. And that does start at one of nine. And it's got the same print date.
Again, I apologize for this being awkward. These documents were produced to us in terrible organization or lack of organization, and I compiled them more or less the way we got them.
So now, the top part of the document is the problem statement, and there most of the entries seem to be from Gwen Thomas. Will you look please at page 2143 where there's an entry for June 24, 2002, the last line on the page.
A. Correct.
Q. Do you see that?
A. Yes.
Q. Then all of the entries on page 2144, 2145, and much of 2146 that are made by Ms. Thomas are made



on June 24, 2002. Do you see that?
A. Yes, I do.
Q. But just skimming through this, it appears to me that the dates of events involved in the item at the top of page 2144, is 1999, 1999, 1999, going down to 2001. Do you have any idea, looking at this three pages or so of Thomas notes, why on June 24, 2002, Ms. Thomas made a dozen or more entries into the REMS system?
A. No, I have no idea.
Q. Most of which had to do with events that were considerably before June of 2002, I mean, as the text shows, right?
A. Correct.
Q. Do you have a procedure, or did you have a procedure, when you were telling people how to make their entries into REMS that they should make their entries reasonably promptly after whatever event they were describing?
A. In the DEC, we did that.
Q. In fact, were they supposed to enter their notes preferably the same day that they had a meeting?
A. They were supposed to enter data into REMS

Page 138

within 48 hours, I think. Two or three days. I'm not sure. It could be three days. I'm not sure. One of those, two or three days after an event.

Q. As distinguished from two or three years after the event?

A. Correct.

MR. WELLONS: I'm sorry. Did you have any direct knowledge of when Ms. Thomas made these entries?

THE WITNESS: No, I did not.

MR. WELLONS: And did you supervise her entering the entries?

THE WITNESS: No, I did not.

BY MR. BAUGHER:

Q. And when you say no, you didn't, that's because you wouldn't put up with somebody entering information into REMS three years after the events that occurred, would you?

A. No, I would not.

Q. And when Mr. Wellons asked if you had any direct knowledge of when she entered this, is there any reason to believe that these entries weren't made on June 24, 2002?

A. No, I believe these were made on June 24,

Page 139

2002, because the system puts the date in.

Q. Now, these may end up being the same papers we just talked about, but I've got documents that start B8273. Do you see those? It's more a property history. Here's what I'm looking at.

A. I got it.

Q. Now, this particular printout, at least the top couple of pages, is October of 2004. And then we see some more of these on the top page, these June 24, 2002 entries. And look at 8274, November 17, 1999, Gwendolyn Thomas, which is entirely blacked out. Do you have any idea what the subject matter of that was?

A. No, I don't.

Q. I think my pages then are copies of the previous ones that follow that.

And again, in the 8200s, I think these seem to be largely either the same or a different date on which the same items were printed. So let's go, if we can -- and I'm going to show you this again, because I know we're getting somewhat out of order, 2133. It says renewal contract option selection.

A. Okay.

Q. This is a contract screen printed in

Page 140

February of '04, or at least the top two pages were, pertaining to the HAP contract for South Pointe, right?

A. Correct.

Q. Now, the entries under short term renewals seem to be in a little bit different order than one would expect. The top item listed there has an expiration date. It says of December 31, 2000. Do you see that?

A. Correct.

Q. And then the next one says December 31, 2001, but then the third item is September 30, 2001. Do you know of any reason why those were entered in reverse order?

A. I have no idea, because it comes over from a different system.

Q. This comes over from the TRACKS system?

A. Right.

Q. Now, there's a document -- well, the top page on my copy is D1155.

A. Right.

Q. Do you see that?

A. Yes.

Q. I believe that we've looked at some of these

Page 141

pages before. Although I have to say they're all beginning to look somewhat similar to me.

Can you point out in this -- well, there's a narrative that starts at 1056 that says summary narrative occupancy, which is a category that I don't remember seeing before. What is that?

A. Summary and narrative, that's actually from this page back here where they're doing a narrative from each of the comments section from that screen in REMS. And there's an occupancy screen, and there is a comment section there. So there are no comments, that's all. It's blank.

Q. I see. Then we're into problem statements?

A. Right.

Q. And problem statements, again, that's a Multifamily set of categories, that's not your DEC narrative?

A. That's correct.

Q. So the entries beginning at D1056 are Multifamily Housing entries running back quite a few pages to 1065?

A. Correct.

Q. Except for that one June 29, 1999, entry by Freddie Batchelor, the last entry?





00000000-0000-0000-0000-000000000000

Page 142

A. I only go to 1062 on this batch. I only go to 1062, so they must be in another batch.
Q. I apologize for that. But all of this is Multifamily Housing --
A. Here it is.
Q. -- pages, correct?
A. Correct. Except once in a while -- I do need to correct that. Whenever we make a statement on the DEC property referral screen under problem statement, that automatically goes on the Multifamily Housing problem statement screen.
Q. Well, apparently, as of the printing in February 2005, the only item that fit that category was Ms. Batchelor's June '99 comment?
A. Correct.
Q. Now, I have a few additional pages in this document, but they are like 4354, which is entirely blanked out.
In all of this compilation of Deposition Exhibit 2, I don't find any DEC narrative statement or DEC narrative?
A. There was a DEC narrative. We went over that already.
Q. So your belief is that the entire -- what

Page 143

we've looked at in Deposition Exhibit 2 includes the entire DEC narrative on South Pointe?
A. The DEC narrative screen is in this pile here. We went over it. It is B8276.
Q. And that's the one that summarized the DEC team report, for example, that we talked about at some length?
A. Correct.
Q. So this is the entirety then, pages 8276 through 8279, the entirety of the DEC narrative for South Pointe?
A. Correct, that is the entirety of DEC narrative.
Q. Now, are there any other DEC exclusive -- what I'll call DEC exclusive documents describing your tenure over South Pointe?
A. My tenure over South Pointe, this would be the only document, B8276.
Q. Now, apparently, South Pointe went back to DEC in October of 2001. We saw there was an entry few minutes ago that talked about referrals, and there was apparently a second referral in October of 2001?
A. Correct.

Page 144

Q. In Deposition Exhibit 2, is there any DEC narrative that you see for the later period; that is, 2001 going forward?
A. No.
Q. Do you remember seeing a DEC narrative for 2001 or later when you looked at the DEC screen a week or two ago?
A. There was none, because there is only one -- there is a DEC narrative screen, and it's at what we call the property level as opposed to a referral level.
We get referrals on properties. We could get 10 referrals on a property, and they will each have separate DEC referral screens for each referral, with the exception of the DEC narrative screen, which is only at the property level. So if you want to enter some data in, you have to go back to that same DEC narrative screen where the first referral was and just put a date in there and say, you know, second referral, you know, data on second referral or something.
However, since I was a team leader, there are many more DEC screens. When I was a team leader, this was more or less the only DEC screen there was.

Page 145

There was really one or two DEC screens. Now there's, you know, 10 or 12 DEC screens. So you don't necessarily have to go into the DEC narrative. You don't put a team report in here anymore. There's a team report screen now.
Q. So where does that leave us as to DEC entries for the second referral beginning in October of 2001?
A. They should be within the property referral screen. The dates, the high level tracking dates, if there were any, would be separate, a separate screen; high level tracking indicators would be a separate screen; DEC status would be a separate screen; recovered funds would be a separate screen; team report would be a separate screen. It's not an AFS non-filer, so that would have been a separate screen. So it would have been separate screens for a separate referral.
Q. Did you see any of those screens in this compilation, Deposition Exhibit 2?
A. Good question.
No I don't.
MR. WELLONS: Are you certain that's all the documents from that exhibit or are there more?

Page 146

THE WITNESS: I'll go through this real quick.

All the ones for referral number one are all there.

BY MR. BAUGHER:

Q. When you say all the ones, the DEC screens for referral number one are included in Deposition Exhibit 2?

A. Yes.

Q. But there are no DEC papers in Deposition Exhibit 2 for the second referral to DEC; is that right?

A. That's correct.

Q. And to be even more specific, as recently as March 31, 2005, about two weeks ago, you sat down at a computer at HUD and went screen by screen through the DEC files, which included materials from the second referral, correct?

A. Correct.

Q. And you had earlier, maybe a month or so earlier gone through materials that had been given to you from HUD. Do you recall seeing DEC materials from the second referral in those paper records that you received in February or March?

Page 147

A. I'm trying to remember. I don't really remember. I think I was looking -- I don't know, to tell you the truth. I don't know.

Q. Well, you recall, I gather, from your earlier testimony thinking that the first referral to DEC records were in what you looked at back in February or March of 2005, correct?

A. Correct.

Q. But you don't recall seeing anything from the DEC files for the second referral, correct?

A. I wouldn't say I don't recall seeing them. I don't remember.

Q. You don't remember whether you saw them or not?

A. Correct.

Q. You know you saw some on March 31, because there were screens that you were looking at to prepare for this deposition, right?

A. Correct.

Q. And you know that those screens -- or copies of those screens are not in Deposition Exhibit 2, right?

A. Those are in here.

Q. Well, when you looked on March 31, 2005,

Page 148

were there no DEC entries for the second referral?

A. When I looked on March 31, 2005, I was looking at the screens that were pertinent to when I was a team leader.

Q. Do you recall seeing any screens from a second referral 2001 and following to DEC of South Pointe project?

A. I really don't remember.

Q. But in any event, they're not in Deposition Exhibit 2?

A. That's correct.

MR. BAUGHER: Well, Mr. Wellons, without taking up anymore time than a sentence or two on this, HUD has repeatedly said to us in writing and said to the Court that we have all of the REMS records including, as we repeatedly questioned, all of the DEC materials. It sounds as though there's some checking that you need to do on the second referral, in particular. And the fact that we don't have those materials compromise our ability to take a complete deposition of these three witnesses in the next couple of days. And obviously, we should go ahead and do that. But I would ask that that be something that be checked on tonight or perhaps even

Page 149

take a break now to call back to the office so that we have those at least for Ms. Thomas and Ms. Coleman's depositions.

MR. WELLONS: Our understanding is that we've complied with our obligations under Rule 26. But we will, of course, before the depositions tomorrow, look and confirm that.

Peter, that may be something we should clarify on the record, that Ms. Kiening, I believe, previously testified that the documents she had reviewed were documents that already had been Bates stamped; meaning they were documents that had been produced.

Is that correct, Ms. Kiening?

THE WITNESS: It is. It is correct, right.

MR. WELLONS: But once again, our understanding is that we have complied.

MR. BAUGHER: Well, then she obviously wasn't looking at any documents that included second referral to DEC, none. Although the government has told the Court and has told us in writing on numerous occasions that 100 percent of those documents had been produced, past tense.

MR. WELLONS: Again, it's our understanding





00000000-0000-0000-0000-000000000000

Page 150

that we've complied with Rule 26. I understand your representation that based on this compilation you've created, that may, in fact, not be true. We will, of course, double-check to make sure we have fulfilled our obligations under the rules.

MR. BAUGHER: Okay. As I say, if you want to break for five minutes now to make a phone call, that's okay with me. I don't want you to get back to HUD at 6:00 o'clock and not be able to access what you need to access.

MR. WELLONS: Why don't we go off the record now anyways. It's probably a good idea too.

MR. BAUGHER: Fine.

(Whereupon a short break was taken, after which the following proceedings were had:)

MR. BAUGHER: Mark that as Deposition Exhibit 3, please.

(Whereupon, Deposition Exhibit No. 3 was marked for identification, JTL.)

BY MR. BAUGHER:

Q. Ms. Kiening, I'm handing you a document

Page 151

that's been marked Kiening Deposition Exhibit 3, which is a handwritten list of some of the papers that have been produced by HUD that purportedly comprise the DEC records concerning South Pointe, and you'll see that that list, which Ms. Baguio compiled, includes the titles of various of the screens.

Looking at Deposition Exhibit 3 and the titles of the screens, does that list sound as though that's the list of screens that you looked at back on March 31, 2005?

A. Yes.

Q. And supposedly, these documents were printed February 8, 2005.

A. Let me -- I don't know if I looked at them on March 31. I looked at them on February 8. I think I produced them on that date.

Q. Now, you didn't tell us that you produced copies of documents.

A. I think I produced them or I told them about them or something. I know I was involved in confirming them on that date.

Q. Did you participate in helping the government to gather together records to produce to us in this lawsuit?

Page 152

A. When you mean gathering them, I was asked to confirm. I think I came up with some additional documents. These documents, I think -- I'm not sure if these are the documents or not, but I know there were some additional REMS documents that were produced. I think these were them.

Q. Well, the government had represented on a number of occasions in December and January, including to Judge Wolski, that all the REMS documents had been produced and then some additional were produced in February, perhaps including these.

Do you recall being asked to gather records in response to a document request served by Englewood in this lawsuit?

MR. WELLONS: Ms. Kiening, I'm going to ask you not to answer any questions that reveal conversations you had with counsel for HUD or with myself.

THE WITNESS: Okay.

BY MR. BAUGHER:

Q. Well, you can answer that question. Did you gather documents in response to Englewood's documents request in this case?

A. What I did was they asked me to confirm the

Page 153

documents that were gathered to make sure they were all there.

Q. Did you suggest some additional places that papers might be kept concerning South Pointe?

A. Some additional REMS documents, yes.

Q. And what were the additional areas that you suggested?

A. I think that these were them.

MR. WELLONS: Let the record state she's referring to the list of Bates numbered documents that we have identified as referring to the second DEC referral and that have been previously produced to plaintiffs.

BY MR. BAUGHER:

Q. Now, do you recall seeing screens that had papers concerning the second referral of South Pointe to DEC?

A. Yes.

Q. And it was when you looked at the screens and then printed those screens that you saw entries having to do with the second referral?

A. I don't know if I printed them or if I had somebody else print them, but I discovered that they needed some additional documents.





00000000-0000-0000-0000-000000000000

Page 154

Q. And how did you discover that?
A. Because I went through a list that I have, knowing all the screens there are, and looked for them in the information that was given to me to confirm that all the REMS documents were there.
Q. Did you have any -- when you looked at documents back in February, did you look at any documents that were produced from DEC's green files?
A. No.
Q. You only saw REMS documents; is that right?
A. No, I saw -- can you restate that?
Q. Yes. When you looked at documents back in February of 2005, did you only see REMS materials or did you also see materials from green files or that had been imaged and then printed?
A. I did see some of those files, yes.
Q. Did you go through any of DEC's paper files, its green files, to see if all the materials that had been requested had actually been produced?
A. I don't know what was requested. But I looked at them to see what was produced that was during my regime as team leader.
Q. Did anyone ask you to go back to paper files, to the green files, and locate those files and

Page 155

give those files to attorneys either at the Chicago office or at the Justice Department in Washington?
A. Well, they didn't ask me for that, no.
Q. Where are the paper files of DEC kept?
A. They're kept right in the Chicago office.
Q. Do you know if anyone made a search for records concerning South Pointe in connection with this lawsuit?
A. Yes, they did.
Q. How do you know that?
A. I saw some kind of e-mail or somebody mentioned it to me that they were looking for all the documents on South Pointe.
Q. Did you participate in that search?
A. No, I did not.
Q. Let's go back to 1999 when you were the team leader in the DEC portion on the South Pointe project. Did you receive a copy of a REAC report in connection with South Pointe?
A. I'm sure I did. I mean, I don't remember it personally.
MR. BAUGHER: Can you mark this please as Deposition Exhibit 4.
(Whereupon, Deposition

Page 156

Exhibit No. 4 was marked for identification, JTL.)
BY MR. BAUGHER:
Q. What is Kiening Deposition Exhibit 4, please.
A. Are you asking me?
Q. Yes.
A. Sorry. It has a top page, a REMS screen, a tracking item date detail with a REAC on demand inspection and then it has the actual REAC inspection and then April 29, 1999, REAC analysis. I've never seen that document.
Q. Let me have that back, if I could, because I think we've got some misstapled. I'm sorry. I'll give it right back to you.
Did you receive a copy of this inspection report shortly after April 28, 1999?
A. I'm sure I did.
Q. Did you read the report?
A. I'm sure I did.
Q. What were you looking for when you read the report?
A. I'm looking for -- first, I look at the score.

Page 157

Q. Which here is a 42B?
A. 42B asteric.
Q. And that score is made up or consists of a number of possible points, that is, 100, and then less various deductions, correct?
A. Correct.
Q. Now, there are no deductions in this particular REAC report, April of 1999, for health and safety issues; is that correct? I guess, four-tenths of a point only was deducted for health and safety questions, right?
A. Correct.
Q. Where do you look to find out the sorts of problems that were identified in the REAC report?
A. We look at everything actually in the REAC report. We look at things that could be -- especially on the site, if there's any, you know, problems with the parking lots and cracks and things like that. You know, the broken fixtures; the lighting, that would be major to me. You know, with the doors, the damaged hardware and locks, they call it minor there. To me, that's a little more major than that.
Q. Well, who writes down or who makes the





00000000-0000-0000-0000-000000000000

Page 158

characterization minor or major?
A. This is done by the REAC division.
Q. Which is a division of HUD?
A. Yes, it's a division of HUD.
The elevators, big one, not operable. Fire protection missing or damaged fire extinguishers.
Q. The report goes unit by unit, and for each apartment inspected, it has a list of items that were considered to be problems, correct?
A. Correct.
Q. And some are minor and some are more significant, right?
A. Correct.
Q. And then when you received the report, you and, I guess, Ms. Batchelor reviewed the report carefully to help you determine what physical remediation needed to be done on the project, right?
A. That's correct.
Q. Now, there was also, shortly after this REAC report was received, a report done by Pinnacle. Do you recognize that name?
A. Yes.
Q. What's the relationship between a REAC report and a Pinnacle report?

Page 159

A. A Pinnacle report, from my recollection, was a review -- and I'm not positive about this, so maybe I should say I don't really know. But to the best of my recollection, Pinnacle went out and did an -- I didn't think it was an inspection, but maybe it was an inspection. It was an inspection now that I think about it. But I don't remember why we had the other inspection. Sorry.
Q. Well, do you know what the different nature is in an inspection done by the real estate assessment group at HUD as distinguished from Pinnacle, which is a private contractor?
A. It's a private contractor, and I really do not remember.
Q. Well, when DEC took this project over in late 1998 into 1999, am I correct that you wanted to have in mind very specifically and very concretely what the physical condition of the property was?
A. Correct.
Q. And that in order to do that, you had a REAC report through the Department of Housing and Urban Development and also got a separate contracted report from Pinnacle, right?
A. We must have, yes.

Page 160

MR. WELLONS: I'm sorry, Ms. Kiening, did you remember this document, the REAC report?
THE WITNESS: I remember the REAC report, yeah. You know, partially. I mean, they all look alike after a while, so I don't know if I remember this one completely. But you know, I don't know what to say.
BY MR. BAUGHER:
Q. To come back to the purpose, though, of these inspections, I think I said this before, and if you just answered, I apologize. But the purpose was to make sure that you and DEC knew as precisely as you could exactly what you were dealing with on the property and what its problems were?
A. That's correct.
MR. BAUGHER: Will you mark this please as Kiening Deposition Exhibit 5.
(Whereupon, Deposition Exhibit No. 5 was marked for identification, JTL.)
BY MR. BAUGHER:
Q. Can you tell us what Kiening Deposition Exhibit 5 is, please.
A. This is the Pinnacle report, their initial

Page 161

report on South Pointe Towers.
Q. Now, I had been referring to this as having come from an -- or as a May 1999 report, and obviously, from the front, we can see it was submitted August 10, 1999, right?
A. Correct.
Q. But looking back at page two, the contractors site visit was actually conducted May 19, 1999, right?
A. Correct.
Q. Now, what was done with this report?
A. This report was looked at by the analyst and coordinated -- I think it was coordinated with the attorneys too.
Q. Did you read it?
A. I'm sure I read it at one point, yes. Yes, I did, because I have notes in here or I made notes on here.
Q. Where are your notes?
A. Page D0394 and D0395.
Q. And 96?
A. Yes.
Q. Now, look at 395, your note there. Can you read the handwriting to us, please.





00000000-0000-0000-0000-000000000000

Page 162

A. All being replaced per Carl Sanders and the owner's letter.
Q. You received a letter from the owner saying that a number of these vandalized portions of the buildings were being replaced?
A. All the elevators. These are the elevators.
Q. Which you said was an important matter?
A. Oh, sure.
Q. Obviously, it's important?
A. Yeah.
Q. This is a 303-unit building of how many stories, a dozen, 15?
A. I don't know how many stories.
MR. SAMUELSON: 23.
BY MR. BAUGHER:
Q. So elevators are obviously important?
A. Most important.
Q. And this building over the years had been a building that had a substantial crime and drug problem; is that right?
A. Correct.
Q. And along with the crime and the drug problem, came substantial amounts of vandalism as well; is that right?

Page 163

A. Yes.
Q. And in that environment, the elevators were particularly a target and a problem for the property, correct?
A. Correct.
Q. And they're expensive to repair, certainly to replace, right?
A. I would assume so.
Q. So in this instance, in the summer of 1999, one of the major problems in the building was non-working elevators, and you were informed by the owner and by Carl Sanders that all of them were being replaced, correct?
A. That's correct.
Q. And they were, in fact, replaced by the owner; is that correct?
A. I don't know that.
Q. Do you have any reason to believe that they weren't replaced by the owner?
A. I really don't know. I don't remember if they were. You know, unless I've seen something to prove it, I don't believe it.
Q. Well, do you not believe it or you just don't recall?

Page 164

A. I don't recall. I don't recall that it was done.
Q. One way or the other?
A. Yeah, I don't recall.
Q. Did you make any physical inspection of the property?
A. I went to the property and walked through it. The only thing I remember -- there was only a few things I do remember, that the elevators were not working; there was a urine smell in the common area and that the mailboxes were punched out or broken.
Q. And to take the mailboxes and the urine and the elevators as examples, none of those problems with the building were problems caused by the owner or the manager, correct?
MR. WELLONS: Objection, calls for speculation. Go ahead and answer.
THE WITNESS: Yeah, I mean, I don't know. I would assume it's not the owner's intent to have it like that.
BY MR. BAUGHER:
Q. Well, and the problem for the owner was that this building is in a troubled area, correct?
A. Correct.

Page 165

Q. And that particularly, given the tenants that were living there at that time and particularly earlier in the history of the building, those tenants included many people who did not take very good care of their apartments, correct?
A. Correct.
Q. And many of those people also had problems and frequent encounters with police, correct?
A. Correct.
Q. And that was something that the owner, as of 1999 when you were involved with the project, was trying very hard to change, correct?
A. That's correct.
Q. In fact, that was one of the reasons for the tenant -- tenant improvement is not the right word -- tenant services program developed by the owner of the property, correct?
A. Correct.
Q. And what do you recall about that?
A. I really don't.
Q. Will you look at page 418, please, and 419. There's some handwriting on those two pages. Is that yours?
A. Yeah.





00000000-0000-0000-0000-000000000000

Page 166

Q. Or perhaps Ms. Batchelor's?
A. No, I think this was mine. I think that was my handwriting.
Q. Can you read any of it?
A. It's just says still, so mean they're still missing. I don't know at what point I wrote that. There must have been still some there. And then on the bottom, the elevators, still two out.
Q. So some had been fixed, but there were three elevators apparently that were --
A. And one had been fixed, still two out.
Q. So I gather from those sorts of -- from those notes, that this is a report that you reviewed pretty carefully?
A. Yeah, exactly.
Q. Line by line in terms of the specific problems, correct?
A. It appears that way, yes. I don't really remember it. But it is my writing, so I must have.
Q. Well, and more than just being your writing, your responsibility at the DEC was to try to get this project back on track, right?
A. Correct.
Q. And in order to do that, you had to

Page 167

understand and be conversant specifically in what the building's physical problems were?
A. Correct.
Q. And then you saw as your responsibility making sure that if there were problems identified, that those problems were either resolved or that there was a program in place to get them resolved, right?
A. Our responsibility was to work with Multifamily Housing and the owner to try to get problems resolved so that we'd have decent, safe, and sanitary units for the tenants out there.
Q. And that's something that you pursued throughout 1999 with respect to South Pointe, correct?
A. That's right.
Q. Ultimately culminating in the final resolution report that we talked about an hour or two ago, right?
A. Correct.
Q. Now, you mentioned that you had visited the property on one occasion. Was that in around August of 1999?
A. My recollection is that I may have visited

Page 168

the property twice, but I can't quite remember. I don't remember the dates.
Q. Do you recall whether there was a final action plan in place before you visited the site, the sequencing of those?
A. I don't remember.
Q. You do recall that there was a final action plan that had been drafted for this?
A. A final report that had action items in it.
MR. BAUGHER: Can you mark this please as Kiening Deposition Exhibit 6.
(Whereupon, Deposition Exhibit No. 6 was marked for identification, JTL.)
BY MR. BAUGHER:
Q. Can you tell us what Deposition Exhibit 6 is, please.
MR. WELLONS: I'm sorry. If I could interject on the report. This document does not appear to have a Bates or an identification number. I would like to ask if it has been produced in discovery and what its origin is, where it was obtained from?
MR. BAUGHER: It has been produced.

Page 169

Although obviously this is a copy made before it was Bates stamped. As to anything beyond that, I don't know. I'm hoping that the witness can identify this handwriting.
MR. WELLONS: So does plaintiff's counsel not know where the document came from?
MR. BAUGHER: Not as I'm sitting here now, no. I know that it is a document that was included within the materials that we requested from HUD, but I don't think this particular one -- I can't really say whether this was produced by you. I know this is from an earlier point. But if it wasn't produced to us by HUD, then I would be interested in having you inform me why it wasn't produced by HUD? I'll take the answer to that question now or at some later point.
MR. WELLONS: I'm simply asking why we're looking at documents that have no identification number on them. I want to verify that it has been produced in discovery at some point.
MR. BAUGHER: It has Kiening Deposition Exhibit 6 on it.
BY MR. BAUGHER:
Q. What is this document, please.





00000000-0000-0000-0000-000000000000

Page 170

MR. WELLONS: Go ahead and answer.
THE WITNESS: This is -- first of all, it's not signed.
BY MR. BAUGHER:
Q. I didn't ask whether it was signed. I just asked what it was.
A. It's a document, it looks like, that came from John Gant, deputy director of our enforcement center and headquarters, to satellite office directors. And it may have included properties referred to the DEC or the goals for those properties.
Q. So the top two pages doesn't particularly relate to the document pages then; is that right?
A. That's correct.
Q. Is that your handwriting on the top of this document?
A. No, it's not.
Q. Do you know whose that is?
A. Jim Zale.
Q. Did you receive a copy of this document back in 1999?
A. I don't remember it.
Q. Look at please the final action plan

Page 171

documents that follows. Can you tell us what this part of Deposition Exhibit 6 is?
A. This looks like a final action plan on South Pointe Towers.
Q. Does this refresh your recollection that there was a final action plan?
A. This is like a draft copy, so I can't tell you for sure that there was one.
Q. Where it says action plan meeting dates, there are references to dates in March, April, May, and June. Does that remind you of meetings that you attended concerning this project?
A. Well, it reminds me that I did a site visit on April 15 and 16. I don't think I was there for both dates, but I think I was there for either the beginning or the end. I'm not sure which one.
Q. What do you remember about that site visit?
A. All I remember is that the elevators didn't work; there was a smell of urine and mailboxes were punched out; and there were a lot of people waiting to go upstairs.
Q. Did you go by yourself?
A. No, I would have gone with -- well, this one says I was with the analyst and the attorney. So

Page 172

that would have been Freddie Batchelor, and I think Patrice Harris was the attorney that went. This one says Maria, but I think it was Patrice.
Q. As you take a quick look at the problem statement, does that remind you about problems the building was facing back in 1999?
A. Yeah, it does.
Q. Who drafted this report; did you or the analyst or somebody else?
A. This would have been Freddie Batchelor, the analyst.
Q. Looking to the last page here, it appears that there are a range of -- well, nine or so people that have to sign off on an action plan; is that correct?
A. At that point, that was correct.
Q. And are the people that are listed on the last two pages of this document, aside from the deleted community builder -- I guess that's what you were referring to earlier?
A. Right.
Q. Are these the people who would approve a final action plan or who were to approve a final action plan for South Pointe?

Page 173

A. Well, there were concurrences and approvals, yes.
Q. And there was ultimately a final action plan that was approved for South Pointe?
A. I don't know that.
Q. If there's -- I was about to show you a document, but you see now it's the final team report, which was January of 2002. If there's an action plan that is being developed but then events seem to be moving in the right direction, do you sometimes skip the actual adoption of the action plan and move right into the final resolution?
A. You know what, I don't remember.
Q. Well, we already went over some of the highlights of the final resolution and the team report that led up to that in which the conclusion was that the owner had shown good faith and put money into the project and was making repairs, correct?
A. Correct.
Q. And that the property would therefore be returned to the Hub in February of 2002 -- 2000?
A. Correct.
Q. So does that refresh your recollection as to whether there was a draft final report, but that that

Page 174

report was subsumed in the final team report?
A. It does not.
Q. You were part -- an important part of the decision making on any draft action plan, correct?
A. Correct.
Q. And again, because what DEC was responsible for doing was making sure that whatever actions needed to be taken to bring the property into compliance were, in fact, either accomplished or in the process of being accomplished, right?
A. Right.
Q. Those would be the action items that you would insist on to the owner?
A. Correct.
Q. So to the extent those were taken care of, then is that something that would be noted in the final team report?
A. Yes.
Q. Now, you made a second visit to the property I think in the late summer of 1999. Do you recall that, with a group from Washington D.C.?
A. Yes.
Q. Tell us what you remember about that. Was that August?

Page 175

A. I have -- I don't know the date.
Q. It was the summer, late summer?
A. I really do not remember.
Q. Let's just call it the second visit.
A. Second visit, okay.
Q. And who was on that visit?
A. All I remember is it was either Marilyn Edge or Alberta Zeno from Washington D.C., I don't remember which one, and myself, Freddie Batchelor. I think there might have been somebody else, but I don't remember.
Q. Ms. Baguio or Ms. Harris?
A. I don't know.
Q. And Edge and Zeno were the DEC operations directors?
A. Right. Zeno was first and then Edge, so I'm not sure which one came.
Q. So Zeno was a high-ranking person from headquarters?
A. Correct.
Q. Now, why was he being taken on a visit of South Pointe?
A. It was she.
Q. Alberta, excuse me.

Page 176

A. You know what, I don't know.
Q. Well, was Jim Zale with you also?
A. I don't remember.
Q. Did you decide that you would take Alberta Zeno to South Pointe because real progress was being made there under the DEC administration?
A. I really don't know. It's not that I -- I don't remember.
Q. Is it correct to say that when you made your second visit, it was apparent that there had been some significant progress on the project?
A. I don't remember that either.
Q. Following your second visit, were you asked by Jim Zale to write a letter to the manager of the building?
A. I don't remember.
MR. BAUGHER: Will you mark this please as Kiening Deposition Exhibit 7.
(Whereupon, Deposition Exhibit No. 7 was marked for identification, JTL.)
BY MR. BAUGHER:
Q. Ms. Kiening, this a copy of a letter that you received from Carl Sanders, the manager of

Page 177

South Pointe, in and around September 2, 1999?
A. Do I remember it?
Q. Well, is that what it is?
A. That's what it is.
Q. A letter that you received?
A. It's a letter. I don't really remember it, but I assume.
MR. WELLONS: Do you remember whether you received the letter or not?
THE WITNESS: No, I don't remember.
BY MR. BAUGHER:
Q. Do you recognize any of the handwriting on this document?
A. No, I don't.
Q. Do you remember meeting Mr. Sanders?
A. Not really.
Q. Sanders was a property supervisor for P.M. One on the South Pointe project. You don't have any recollection of him?
A. I really don't, no.
Q. Did you write a response to this letter?
A. I don't know.
Q. I believe that this was around the time that you were out on the property for a second visit. And

Page 178

let me show you a document and see if you remember drafting a response to this letter in connection with your visit to the project.

MR. BAUGHER: Will you please mark this as Kiening Deposition Exhibit 8.

(Whereupon, Deposition Exhibit No. 8 was marked for identification, JTL.)

BY MR. BAUGHER:

Q. Do you recognize the handwriting on these three pages?

A. Yes.

Q. Whose handwriting is it?

A. This is Jim Zale's handwriting.

Q. And in September of 1999, he was the director of the Department Enforcement Center?

A. Yes, he was in Chicago.

Q. Now, is the top page of Kiening Deposition 8 a draft response that Ms. Batchelor had drafted for his signature; that is, for Mr. Zale's signature?

A. It appears to be.

Q. Then the second and the third pages are his redraft of that letter, correct?

A. Correct.

Page 179

Q. Although when I say his redraft of it, he also has you signing the letter?

A. Correct.

Q. And will you look please at the last paragraph that Mr. Zale drafted, and can you read his handwriting, please.

A. It says: We thank you again for the courtesies extended to our Washington visitor and the rest of our staff during our trip on August 30, 1999. We were pleased to see the obvious benefits of your increased security program, the potential the social programs hold, and the progress of the ongoing rehabilitation work.

Q. Sincerely?

A. Sincerely, Joan Kiening, Team Leader Chicago Enforcement Center.

Q. And did you send such a letter?

A. That, I don't know. I don't remember.

Q. Looking at this letter, does that lead you to believe that Mr. Zale was with you on August 30, 1999, when you made your second visit to South Pointe?

A. I don't know if he would have been with me. We could have reported back to him or, you know, he

Page 180

might have been with. I really do not remember.

Q. Do you recall courtesies being extended to the DEC staff and your Washington visitor, Alberta Zeno or Marilyn Edge, on August 30, 1999?

A. What do you mean by do I remember courtesies being extended?

Q. I'm looking at this last paragraph again, and Mr. Zale has you thanking South Pointe for the courtesies extended. Do you recall that?

A. Evidently they extended us courtesies, but I don't remember it.

Q. Were the benefits of the increased security program obvious?

A. I don't remember.

Q. Was the potential that the social programs hold clear in your view?

A. I really don't remember.

Q. And what about the progress of ongoing rehabilitation work, was that obvious to you when you made your second visit there?

A. Again, I do not remember.

Q. Well, either Mr. Zale was with you and this letter reflects his own observations; or you told him about your visit there and this must reflect what you

Page 181

told him, correct?

MR. WELLONS: Objection, assumes facts not in evidence. You can respond to the question. Go ahead.

THE WITNESS: Well, Freddie Batchelor could have told him. If an attorney was there, they could have told him. If Alberta Zeno and Marilyn Edge were, they could have told him. I don't remember if he was there or not. I'm sorry. That's it.

BY MR. BAUGHER:

Q. Actually, we just got a set of interrogatory answers from HUD about a week ago, week and a half ago, and one of the questions asked about an August 30, 1999 visit to South Pointe and who was present. And the answer to Interrogatory No. 17 refers to those who were at the site visit and immediately subsequent meetings, Alberta Zeno, DEC director, Washington; Marilyn Edge DEC operations director, Washington; James Zale, CSO DEC SOD.

A. Chicago office something or another.

Q. DEC --

A. DEC satellite office director. SOD is satellite office director.

Q. This is brought to us by the U.S. Government





00000000-0000-0000-0000-000000000000

in its answer to Interrogatory No. 17, not me.
Joan Kiening, Freddie Batchelor, Patrice Harris, Gwen Thomas, and Kathy Merritt. This is quite an expedition. I'm reading from Interrogatory 17 answer just on March 30, 2005 by the government.
Now, having heard those names, do you recall a large group from HUD descending upon South Pointe in August of 1999?
A. I do not, not that large a group.
Q. And a group that size would certainly suggest that if courtesies had been extended, one could imagine commenting on that given the size and the status of the group, correct?
A. Correct.
Q. So at least as far as Mr. Zale was concerned as of the end of August, 1999, it happened at least that things were moving in the right direction at South Pointe; is that right?
MR. WELLONS: Objection, assumes facts not in evidence. Go ahead and answer.
THE WITNESS: Okay. I really don't know.
BY MR. BAUGHER:
Q. Did you ever talk to Mr. Zale about



South Pointe?
A. I may have. I don't remember.
Q. Do you ever remember saying anything to him or anyone else contrary to the handwritten text that we just read as part of Kiening Deposition Exhibit 8?
A. No.
Q. Now, around the same time, in September of 1999, the South Pointe HAP contract expired, correct?
A. I don't know.
Q. Well, there were a number of points when looking through the REMS documents in which there were references to the existing contract expiring September 30, 1999. Does that sound --
A. I remember seeing that on the document, right.
Q. Do you know what happened with that contract in September of 1999?
A. No, I don't.
Q. Do you recall any conversations about whether or not the contract should be renewed?
A. No, I don't.
Q. It was, in fact, renewed, correct?
A. I don't know.
MR. BAUGHER: Let me hand you a compilation



of documents pertaining to the renewal of the HAP contract in 1999. They are, as I'm looking at them now, a collection of documents from a number of different sources concerning that contract, but we'll mark them collectively as Kiening Deposition Exhibit 9.
(Whereupon, Deposition Exhibit No. 9 was marked for identification, JTL.)
BY MR. BAUGHER:
Q. Are you familiar with the type of documents that are included as part of Kiening Deposition Exhibit 9?
A. I have seen these documents in REMS.
Q. These actual documents or just documents like them? I mean, you probably have seen at least the first page, because that is a REMS document, right?
A. Right, that's a REMS document.
Q. Now, this particular one was printed January 19, 2005, and when I say that, I'm referring to the first three pages of Deposition Exhibit 9, right?
A. Correct.



Q. And these are the REMS pages printed in 2005 that show that the 1999 contract was renewed into 2000?
MR. WELLONS: Objection, assumes facts not in evidence. Go ahead and answer.
THE WITNESS: I'm trying to figure it out, sorry.
MR. BAUGHER: I don't understand the objection to facts not in evidence. Can you explain that to me?
MR. WELLONS: The question assumes facts that have not been entered into evidence at this point. I'm preserving the objection for the record. The witness is instructed to answer.
MR. BAUGHER: And the witness should also understand that nothing that I say creates evidence or will ever be offered at any hearing. What you say in response to it will.
THE WITNESS: Can you repeat the question?
BY MR. BAUGHER:
Q. Yes. Well, for instance, look at the bottom of page 824, second page in, contract effective date 10/1/99, and then go to the next page, 12 months, contract expiration date 9/30, 2000.





00000000-0000-0000-0000-000000000000

A. Correct.
Q. Does that refresh your recollection that the contract was renewed around this same time, September, October of 1999?
A. The document says that. I don't remember it.
Q. Well, if it hadn't been renewed, you would have known about it, right?
A. Probably, yes.
Q. And you weren't recommending non-renewal of the contract at that point, correct?
A. Not that I remember.
Q. Well, we have the final team report that came out a couple of months later. You certainly weren't recommending termination of the HAP contract, right?
A. Correct.
Q. And you weren't recommending that in September of 1999 either?
A. Correct.
Q. I think the balance of these papers are the contract itself?
A. Correct.
Q. So why don't we skip past that. Were you



involved in any discussions on the renewal of the contract?
A. I don't remember.
Q. Well if you were, you concurred in the contract being renewed, correct?
A. I mean, I don't remember it.
Q. What's the process for contract renewal at HUD for a HAP contract?
A. Well, that's Multifamily Housing, that's not DEC.
Q. Yes. What's the process?
A. I don't know the process in Multifamily Housing for HUD.
Q. You don't have any idea as to how they process --
A. It comes up for renewal and --
Q. -- applications?
It comes up for renewal, and how is that considered?
MR. WELLONS: Objection, asked and answered. Go ahead and respond.
THE WITNESS: I do not know.
BY MR. BAUGHER:
Q. You have no idea on that or just not a



complete understanding?
A. Right now I'm drawing a blank on it.
Q. When DEC has had a project referred to it, is it asked to participate in or make comments about contract renewal?
A. I really don't remember.
Q. If a project has been referred to DEC potentially for sections of various sorts, it would seem surprising if a renewal would be granted without DEC at least having an opportunity to offer a view on the subject if it had one --
MR. WELLONS: Objection, vague. Go ahead and answer.
BY MR. BAUGHER:
Q. -- right?
A. I would say correct.
Q. So inasmuch as we know that this particular contract was renewed in 1999, can we conclude from that that either DEC supported the renewal or at least it didn't argue against it?
A. I agree.
Q. Now, during the fall of 1999, South Pointe was also working to get additional financing to help with various repairs to the building; is that



correct?
A. I vaguely remember reading that, yes.
Q. It was seeking loan financing to help fund repairs?
A. Correct.
Q. The owner had put in $770,000, but then in addition to that, the owner was seeking to borrow money to help pay for further repairs?
A. That's my recollection, yes.
Q. Did you participate in evaluating or passing on any of the owner's attempts to get additional financing for the building?
A. I don't know what you mean by passing on, to who?
Q. Did you review and comment on or offer opinions on any of the owner's efforts to obtain additional financing?
A. I don't remember.
Q. Do you recall that one of the financial problems that this particular property had is that it had come into existence in the early 1990s with a 10-year mortgage so that principal was being repaid on a very substantial basis each year? Do you recall that fact about the financial structure?