Page 190

A. No.
Q. Do you recall that South Pointe was attempting to get new financing, among other reasons, so that it could stretch out the payment of principal due on its mortgage loan?
A. No, I was not.
Q. In general, did DEC support or encourage the effort of owners to obtain additional financing to help put money into the building?
A. We wanted them to put money into the building. You know, I don't know if we would encourage them to get loans for it or have them take it out of their own pocket. I don't remember that.
Q. In general, though, you would encourage investment into the building --
A. Oh, definitely, yeah.
Q. -- for obvious reasons?
A. Right.
Q. And so to the extent that HUD could assist or cooperate with an owner in obtaining additional financing, in general, you would want to do that, right?
A. Correct.
Could we take a quick break?

Page 191

(Whereupon a short break was taken, after which the following proceedings were had:)
BY MR. BAUGHER:
Q. Before we took a recess, I had asked you some questions about the 1999 contract renewal, and you said you really hadn't had any experience with that. But during the years 1973 to 1997, when you were working Multifamily, you had a considerable amount of experience with the HAP contracts, correct?
A. I worked with HAP contracts from 1993 or somewhere around that to '97. Prior to that, my experience with Section Eight was allocating funds to offices for the Section Eight program, not with contracts.
Q. But let's talk about what you learned through your experience in 1993 to 1997 at the Chicago office of HUD. What was the contract renewal process during those years in which you were with Multifamily Housing?
A. Well, the recollection, we worked with the asset managers. My staff actually prepared the contracts for Section Eight and the contract renewals

Page 192

for Section Eight based on what the asset managers asked us to do.
Q. And who are the asset managers; what do they do?
A. That's like a Gwen Thomas, she would be -- project manager. I'm sorry. They've changed names over the years, project managers.
Q. So you worked with the project manager, Gwen Thomas, for South Pointe, for example, to do what, to prepare the renewal papers?
A. To prepare the renewal papers to send to the owner to get signed. And then once signed, they came back, and they were input into a system, into our -- from our accounting division.
Since then, the system has changed. I know after I left, the system changed. There is a lot of automatic type things, and I'm not exactly sure how it works anymore.
Q. What was the decision-making process in 1993 to '97 on contract renewals?
A. Sometimes it had to do with, you know, how much money there was available first as to how you would -- if you would renew it for six months or a year or two years or three years, whatever it might

Page 193

be. It was generally the project managers let us know after the decision was made to renew the contract, and then my staff actually did the paperwork on it.
Q. What was your staff called, administration or something like that?
A. I can't remember the name of my -- that's terrible. I really can't remember the name of my -- I supervised construction analysts and these program analysts who did all the Section Eight work. I don't remember.
Q. Do you recall any instances in which contracts were not renewed? I'm not saying that there were any, but do you recall any such instances?
A. I might not have known about it, because the asset managers or project managers actually came and told us to do the renewing. So it wouldn't have come to us.
Q. Am I correct that Gwen Thomas was the asset manager or project manager on South Pointe from its outset?
A. Oh, I have no idea.
Q. She was the project manager for South Pointe when you were working in Multifamily, correct?

Page 194

A. Correct -- no, when I was in EC as team leader.
Q. Before that, when you were at Multifamily, she was also the project manager then early in the '90s?
A. I have no idea.
Q. When you talk about the contract records being input into the system, is that the TRACKS system that you're talking about or some other system?
A. Back then, it went into an accounting system. It went to our administrative division into an accounting system.
Q. And later that became the TRACKS system that it went into?
A. There was always TRACKS, but somehow I think they combined the contracts later into TRACKS. I'm not exactly sure the sequence of that.
Q. We've mentioned and, I guess, saw in the REMS notes references to a management improvement and operating plan or plans?
A. Yes.
Q. Can you state again, in general terms, what the purpose or function of a MIO plan is?

Page 195

A. MIO man is to -- it's a plan that the owner or management agent puts together to address all of the items that are needed to be repaired and fixed, you know, on the property, and it should have target dates as to when it should be repaired.
Q. And over the years, you've reviewed many MIO plans?
A. I have not. No, I have not.
Q. Did you review one for South Pointe in late 1999?
A. I vaguely recollect reviewing that based on the documents that I did review for this.
Q. You saw the MIO plan for South Pointe, correct?
A. I saw the MIO plan.
MR. BAUGHER: Well, let me show you another copy and let you identify it, please.
Will you mark that please as Kiening Deposition Exhibit 10.
(Whereupon, Deposition Exhibit No. 10 was marked for identification, JTL.)
MR. WELLONS: Could you counsel identify the documents that are being removed from what's been

Page 196

identified as Exhibit 10, please.
MR. BAUGHER: No. Why should I do that?
MR. WELLONS: You're refusing to identify the documents that were removed?
MR. BAUGHER: I'm not going to tell you how many note pads I have either.
BY MR. BAUGHER:
Q. What is Kiening Deposition Exhibit 10, please.
A. It is a MIO plan based on the REAC inspection dated 4/28/99, and it's a letter addressed to me.
Q. Did you read this letter in December 1999?
A. I think I did.
Q. And what do you recall about reading the letter in December 1999?
A. I really don't recall anything.
Q. Do you recall that the letter and the MIO plan addressed the items deemed to be deficient in the April 1999 REAC inspection?
A. I don't remember. I mean, it appears that it is, but I don't recollect.
Q. For instance, one of the items that you noticed particularly when you were on the

Page 197

South Pointe -- your first visit to South Pointe was that the mailboxes were broken?
A. Correct.
MR. WELLONS: Objection, misstates prior testimony. Go ahead and respond.
BY MR. BAUGHER:
Q. Did I misstate your testimony?
MR. WELLONS: Ms. Kiening, responded to the documents. She noted --
BY MR. BAUGHER:
Q. Did I misstate your testimony when I said that you found broken mailboxes at South Pointe when you made your first visit there in April 1999?
A. I indicated I saw punched-out mailboxes.
Q. Right. And I correctly said that you saw punched-out mailboxes or damaged mailboxes, right?
A. You might have, yeah. I don't remember that you said that.
Q. 30 seconds ago.
A. Oh, just now?
Q. Yes.
A. Okay.
Q. And you were agreeing that I correctly stated that when you were there in April of 1999, you





00000000-0000-0000-0000-000000000000

Page 198

saw damaged mailboxes?
A. Okay.
Q. Right?
A. Yeah.
Q. Now, look at page one of Deposition Exhibit 10, please. You see mailboxes on the front page?
A. Yes.
Q. And you see the status that's listed there?
A. Yes.
Q. What does that say?
A. Complete mailbox system replacement 12/8/99, see Exhibit Number 16.
Q. And then along with this letter were exhibits with work orders and cancelled checks, right? I know they are not attached to this, because they were quite bulky. But does that lead you to believe, as to the mailboxes, for example, that had caught your attention back in April of 1999, that those had, in fact, been replaced by December of 1999?
A. This indicates it was in this letter.
Q. Similarly, going throughout the rest of the report, does the report state either when a

Page 199

particular item was fixed or what the schedule was for it being fixed?
A. It appears to, yes.
Q. Did you or anyone on your staff conduct any investigation to check on these particular statements about repairs?
A. I don't remember that.
Q. Do you believe that as of December 1999, that South Pointe had put together a MIO plan that was acceptable to HUD?
A. I don't remember that it either was acceptable or unacceptable. It appears to be acceptable.
Q. Well, actually, going back to the REMS documents that we looked at. Do you recall -- I know this was a couple of hours ago -- seeing that there was a reference to the MIO plan being accepted by the end of December 1999?
A. Yes, I do remember that.
Q. And Deposition Exhibit 10 is the MIO plan from South Pointe that was accepted?
A. Correct.
Q. Now, to the extent that you were dissatisfied with something in this MIO plan, what

Page 200

would you have done?
A. We probably would have, I don't know, worked with the owner a little bit more on it, tell him what we needed, but we might have gone into sanctions depending on what it was.
Q. Or you could have asked him to revise the plan?
A. Right.
Q. But you didn't do that --
A. Right.
Q. -- in this instance?
A. And actually, Multifamily is the one that would go and talk to them about revising the plan, not DEC.
Q. Well, in any event, in this particular instance, that didn't take place; the plan as presented to you on December 8 was, in fact, accepted, correct?
A. Correct.
MR. BAUGHER: Will you mark this please as Exhibit 11.
(Whereupon, Deposition Exhibit No. 11 was marked for identification, JTL.)

Page 201

BY MR. BAUGHER:
Q. Can you tell us please what Deposition Exhibit 11 is.
A. This is final team report resolution on South Pointe Towers dated January 26, 2000.
Q. And was it your office that drafted this?
A. Yes. My office, it was the Chicago Enforcement Center that drafted this or prepared this.
Q. And looking back to the last two pages on this document, 1610 and 1611, does that show the concurrences and approvals?
A. Yes, it does.
Q. Each of those of you who are listed here concurred in late January of 2000; is that right?
A. Correct.
Q. And then looking at the last page with the approvals from Zale, Hinsberger, Edge, and Krause, all of those approvals were received either the end of January or beginning of February 2000, right?
A. Yes, middle of February, right.
Q. And what happened to Frank Malone who signed with an X?
A. I think -- I'm not sure at that point if we

Page 202

had to get headquarters housing to concur. I don't remember that.
Q. That's not a dissent; that's a cross-out of the signature line, right?
A. Yeah, that's what I would assume.
Q. Now, do you recall any meetings in January of 2000 in which this final team report was discussed?
A. I don't really recall, no.
Q. What about meetings along the way with your team and perhaps with people from Multifamily Housing to discuss what action would be taken or what you were observing from the project itself?
A. To tell you the truth, I really do not remember meetings. I'm sure I had meetings, but I don't remember them.
Q. What about meetings between people on your staff and the owners or managers of the project, did those take place?
A. Those would have taken place, but it would not have just been an analyst. It would have either been myself or Jim Zale or an attorney that would have been present if an owner was involved.
Q. Do you recall any such meetings?

Page 203

A. Not really.
Q. If there were meetings, whether with owner or an owner's rep or amongst the team, would that ordinarily be reflected in REMS?
A. It could. It doesn't necessarily have to be reflected in REMS.
Q. Do you recall any -- I guess, I just asked you this. But thinking about it with respect to REMS, do you recall any meeting of the entire team or which what was to be done with South Pointe was discussed or debated amongst you?
A. I don't recall this project in particular. I recall being in meetings with the team and housing being involved in it, but I don't recall this one in particular.
Q. You see on the first page, the last sentence under project summary, the owner has infused $770,000 into the property and continues to add additional funds in order to correct all physical deficiencies identified in the REAC inspection?
A. Yes, I see that.
Q. Is that a correct statement?
A. Well, to the best of my knowledge, it is.
Q. And a similar, slightly more elaborate

Page 204

statement is made on the second page under physical condition both about the infusion of $770,000 of owner capital into the company, as well as completing repair of the items identified in the REAC inspection. Do you see that?
A. Yes, I do.
Q. And in particular, amongst the various repairs that had either been made or were to be made there is a list of them following on item six, correct?
A. Correct.
Q. And then turn, if you will, to page three. Towards the bottom, it says: Another site visit by the DEC staff in August 1999 revealed the deficiencies identified above and the following REAC items were corrected.
And this was the visit that you were on in August 1999, right?
A. Correct.
Q. And will you read the list of items please that were corrected as of August 1999?
A. Fixed broken light fixtures, replaced all mailboxes, removed all graffiti, replaced elevators, repaired foundation cracks, replaced damaged doors,

Page 205

replaced broken windows, replaced fire protection equipment, repaired ceiling, completed rehab of laundry facility, repaired trash chutes, monthly extermination increased, repaired all broken doors, this is internal repairs, repaired ceiling, replaced heating, and plumbing system.
Q. Now, if you would turn please to page six under site visit report, and the site visit report is referred to as in April of 1999, right?
A. Correct.
Q. And this particular portion talks about the difficulties stemming from heavy drug-related activities and activities that involved the City's Violent Crimes Division, right?
A. Correct.
Q. So according to this apparently, the City's Police Department helped out and agreed to investigate and send a team to the property. Does that comport with your recollection?
A. I recollect something like that, yes.
Q. And then it says: Since then, the property has new security. Is that something that the owner brought in at that time?
A. I assume the owner brought in, yeah.

Page 206

Q. And then the last sentence in that paragraph on the site visit report says: The property owners have also attempted to address the social issues of the property, putting in place new house rules and adding a social service program to be made available to the residents of South Pointe Towers.
Do you see that?
A. Yes, I do.
Q. Tell us what you recall about the property owners attempt to address social issues.
A. I don't remember anything, sorry.
Q. But you remember that they did -- or the owners did put in measures to try to address the rules that would govern how people behaved in the building?
A. Yes.
Q. And that there was a social service program?
A. I remember there was a social service program to be done, but that's about all I remember.
Q. On page eight, paragraph 12, much of the same commentary is repeated there, that the property has been in poor physical condition, however, the owner has corrected some of the identified repairs and are in the process of entering into contracts to

Page 207

correct the remainder of these items, right?
A. Correct.
Q. The owners have started the repairs, this report says, and are showing good faith in starting some of the repairs with their own funds; is that correct?
A. Correct.
Q. Plus, they were attempting to secure new -- a new loan to offset the cost of the remaining work, right?
A. Correct.
Q. And the legal analysis was that all legal issues had been satisfactorily addressed, correct?
A. Correct.
Q. That's in item 13 on page eight?
A. Correct.
Q. And so what was recommended as next steps recommendations?
A. Substantial progress has now been made on the findings outlined in the REAC report. Therefore, the DEC should return the case to the Chicago Multifamily Hub office for servicing and the Chicago Hub office should continue the finalization of the MIO received on December 8, 1999.

Page 208

Q. And that MIO is Kiening Deposition Exhibit 10, right, the document we were just looking at?
A. Correct, yes.
Q. Now, your tenure at DEC, or at least DEC when you were to be a team leader, you said ended in March of 2000?
A. Correct.
Q. So almost as soon as you got the South Pointe problem taken care of, you were on to other things; is that right?
MR. WELLONS: Objection, misstates prior testimony. Go ahead and answer.
THE WITNESS: I was on to other things.
BY MR. BAUGHER:
Q. Nonetheless, did you have further contact with South Pointe after February or March of 2000?
A. I might have. I don't really -- I don't recall.
Q. Did you participate in any decision making or receive any correspondence or make any REMS entries after February or March of 2000?
A. I don't remember.
Q. Since you were the team leader at the time

Page 209

the MIO was presented to HUD and approved, apparently you continued to get correspondence about the MIO?
A. Okay.
Q. And there are, therefore, a number of four or five of MIO-related letters that were addressed to you. Do you recall receiving any letters about the further satisfaction of the provisions in the MIO plan?
MR. WELLONS: Objection, assumes facts not in evidence. Go ahead and answer.
THE WITNESS: I could say that I recollect getting correspondence.
BY MR. BAUGHER:
Q. What did you do with correspondence concerning South Pointe in 2000?
A. I would have given it to the analyst or the other team leader that followed me.
Q. But now, as of that point, South Pointe was no longer in referral to DEC; it was back at Multifamily so you would have given it to somebody else at DEC?
A. Yeah, I would have given it to a Chicago DEC employee to deal with since I was not a Chicago DEC employee at that point in time.

Page 210

Q. Right. Do you have any recollection of doing that with respect to correspondence that came in on South Pointe?
A. I always did that on all of the correspondence that came in. So I can't say specifically South Pointe, but it happened on many cases.
MR. BAUGHER: Let me show you as an example Kiening Deposition Exhibit 12.
(Whereupon, Deposition Exhibit No. 12 was marked for identification, JTL.)
BY MR. BAUGHER:
Q. Actually, a letter addressed to Gwendolyn Thomas but then beginning dear Ms. Kiening and dated June 7, 2000.
This letter is actually addressed to Ms. Thomas, so probably it went there. Do you recall seeing this?
A. No, I don't.
Q. Who is Leulla Kirkman?
A. Leulla Kirkman is a project manager, I think, or she could be a project assistant up in Multifamily Housing. I think she is an assistant.

Page 211

Q. Do you recall that she worked with Gwen Thomas on the South Pointe project?
A. I don't recall personally, no.
Q. Again, looking at this letter I just showed to you, Kiening Deposition 12, there are a number of cc's on the letter. The first is to Debbie Gray. Is she in Multifamily Housing?
A. Yes, she is.
Q. And then Freddie Batchelor was still at this point, I assume, in DEC?
A. Correct.
Q. Now, this is not a letter drafted by HUD so maybe the answer to this is that it was sent to the wrong person. But why is somebody in DEC continuing to get materials on South Pointe in June 2000 when the project is back at Multifamily Housing?
MR. WELLONS: Objection, calls for speculation. Go ahead and answer.
THE WITNESS: I can speculate they just wanted us to see how they were doing.
BY MR. BAUGHER:
Q. But DEC didn't have any continuing responsibility to monitor this project after the project was returned to Multifamily, did it?

Page 212

A. I'm trying to remember what our policy was at that time. I don't think we had that at that time, because we returned it, we closed it in the system.
Q. Well, just to prove that once you get involved in a project, you can't get out of it, here's a letter from April of 2001 to you from Shawn Mintz. Have you ever heard of that person?
A. No.
Q. Well, I'll show it to you just in case looking at this refreshes any recollection of yours.
MR. BAUGHER: Mark that please as Kiening Deposition Exhibit 13.
(Whereupon, Deposition Exhibit No. 13 was marked for identification, JTL.)
BY MR. BAUGHER:
Q. Can you tell us what this letter is, please.
A. This is a letter to me, as supervisory enforcement analyst, a management MIO plan based on the REAC inspection dated 3/8/01.
Q. So this is a March 2001 REAC, not the April --
A. Correct.

Page 213

Q. -- 1999 REAC?
A. Correct.
Q. Do you recall receiving this letter?
A. No.
Q. Did you have any responsibilities for reviewing MIOs on South Pointe in 2001?
A. No.
Q. Were you being brought back into service because of your knowledge of the project from two years before?
A. No.
Q. Do you recall what you did with this letter?
A. I would have passed it on to the team leader or the analyst at that point, most likely the team leader.
Q. Who would that be?
A. I think it was Sandy Surter at that time.
Q. S-u-r-t-e-r?
A. Yeah. Either Sandy Surter or Jim Pollack. I'm not sure. One of those two.
Q. Did you have any conversation with anyone at DEC about South Pointe after you went to work for headquarters in 2000?
A. No.

Page 214

Q. I know I asked that in an absolute fashion. Any conversations from March of 2000, can you state it that categorically that you didn't have any conversations with anyone at DEC about South Pointe?
A. Other than for preparing for this deposition.
Q. What about conversations with anyone at Multifamily Housing about South Pointe after February of 2000?
A. No, none.
Q. And is that same answer true for people at the HUD headquarters office?
A. Yes, that's the same answer.
Q. Now, there was an administrative review that Englewood -- or that South Pointe took in or concluded in May of 2002. Were you involved in that in any respect?
A. No.
Q. Ultimately that appeal was decided by a fellow named Howard Mayfield. Have you ever heard of him or met him?
A. I've heard the name. It's headquarters.
Q. But you don't know?
A. I don't know him.

Page 215

Q. And you haven't talked to him about South Pointe?
A. No.
Q. One of the first phrases you used in this deposition was that DEC is responsible for -- well, what is the broad phrase that is used about making sure that property is in satisfactory condition?
A. Decent, safe, and sanitary condition.
Q. Decent, safe, and sanitary. Sometimes issues having to do with what is decent, safe, and sanitary perhaps have to do with maintenance issues and others could be having to do with longer term capital expenditures made in a building. Does that distinction mean anything to you?
A. Yes.
Q. Do you know or were you a participant in any of the discussions about whether there would be a long-term capital renewal refinancing for South Pointe?
A. I don't remember that.
Q. Do you know are there different personnel at HUD that are responsible for evaluating shorter-term operational and maintenance sorts of issues having to do with the building as distinguished from

Page 216

longer-term capital needs and major capital projects in a building?
A. Not that I know of.
Q. So that Multifamily Housing is responsible for evaluating both those types of refinancings?
A. As far as I know. I really don't know.
Q. Do you know Margarita Maisonet?
A. Yes, I do.
Q. And what roles has she had at HUD during your tenure there?
A. She was in Multifamily Housing when I first met her as a project manager. Then she was a supervisory project manager. She supervised them, I think. And then she became the director of the DEC for the Chicago office.
Q. Did she succeed Jim Zale?
A. Yes, she did. And now she has -- she's now the DEC director nationwide.
Q. When did she become director nationwide?
A. Oh, a year ago. But she was on detail for, I don't know, maybe close to a year.
Q. So she has been in Washington for two years?
A. Somewhere in that range. I'm not positive of the dates. Could be a year and a half.

Page 217

Q. Now, one of the people listed on your team and who signed off on the final team report was Greg Gustin. What has his role been?
A. Greg Gustin is the lead attorney for the Chicago satellite office, DEC satellite office.
Q. Who does he report to?
A. I think he reports to the DEC director, but also -- I mean, it's changed now, so I'm trying to remember back then.
No, he reported to the head of counsel for DEC in headquarters, John Harold. I don't know the exact title.
Q. As opposed to Jim Zale or Margarita Maisonet?
A. I'm not sure exactly.
Q. Who is the current head of the DEC here?
A. Jim Pollack, James Pollack.
Q. I didn't mean to slight you, Ms. Baguio, because I didn't ask about you. But I'm just noticing now that one of the signatories to the team report back in January or February 2000 was Maria Baguio. What was her role on the team?
A. Her role would have been satellite attorney for the Chicago satellite office.





00000000-0000-0000-0000-000000000000

Page 218

Q. With Gustin also participating in that?
A. Well, Greg Gustin was the lead attorney, so he was like supervisory attorney. So he signed off on all team reports.
Q. I see. But was Ms. Baguio actually the one who was detailed?
A. She was the one that would have been, yeah, with all the detail on her.
Q. So what happened to Patrice or Patricia Harris?
A. Patricia Harris left HUD I don't know exactly when.
Q. Does Ms. Baguio have the same role as an attorney for DEC today?
A. Yes.
Q. That's probably why your business card says that?
MS. BAGUIO: That's right.
MR. BAUGHER: Thank you very much.
THE WITNESS: That's it.
MR. BAUGHER: Yes.
MR. WELLONS: Peter, can we have five minutes? We may or may not have very brief redirect for Ms. Kiening.

Page 219

(Whereupon a short break was taken, after which the following proceedings were had:)

CROSS-EXAMINATION

BY MR. WELLONS:
Q. Ms. Kiening, my name is Paul Wellons. I would like to ask you just one or two follow-up questions to clarify the record.
If you could hand me what was previously identified as Exhibit 1, and this document is the chart that's labeled "EC Big Picture Process Flow," correct?
A. Correct.
Q. And I believe that you described this document as describing the process flow when a property had been referred to DEC; is that correct?
A. That's correct.
Q. Is this the only chart of its kind that you have seen?
A. Oh, no.
Q. And have you seen then different charts similar to this one?
A. Yes, I have.

Page 220

Q. And did the actual protocols that this chart described change at different times?
A. Yes, it did.
Q. Is it fair to say that this protocol depicted on this chart may have been in effect at some point?
A. Yes.
Q. It is also fair to say the protocol depicted on this chart may differ from the actual protocol at another point during your tenure?
A. Yes.
Q. Do you recall a time when this particular protocol was in place?
A. I'm not sure if this was the first one or the second one. I don't really recall, no.
MR. WELLONS: I have no further questions. I just wanted to clarify that point.

REDIRECT EXAMINATION

BY MR. BAUGHER:
Q. Looking at Kiening Deposition Exhibit 1, is this the protocol that you followed with respect to South Pointe?
A. I do not know.
Q. Well, we just looked at a number of the

Page 221

documents, and we looked at the REMS entries. And you had previously, a week or so ago, tried to refresh your recollection by going back to the REMS entries and reviewing those.
Does Deposition Exhibit 1 seem to you an apt summary of the procedural steps taken when South Pointe was referred to the DEC under your direction as team leader?
A. It could have been, yes.
Q. Well, was it or not?
A. I don't know if it was or not. There are many -- there were many flow charts prepared during the inception of the enforcement center to the time I left the -- left that particular role in the enforcement center. It changed. This is very similar to what I think was in place when I was in South Pointe, but I would not attest to the exact one.
Q. How do you recall the South Pointe procedure differing from what is depicted on Deposition Exhibit 1?
A. I'm not positive -- well, I know the CB we didn't have in the meetings. I think when we first started, we were going to have the CB in our initial





00000000-0000-0000-0000-000000000000

meetings, and then after -- I don't know, after so many months, we decided that wasn't going to be. So I think this was probably one of our first charts.

Q. Other than the fact that the community builders were not present in your meetings, what differences do you recall between the procedures utilized with respect to South Pointe 1998 through 2000 and what is shown in Deposition Exhibit 17?

A. I don't know the differences, because I don't have the next chart.

Q. You can't think of any differences at this point?

A. Correct.

MR. BAUGHER: Thank you.

MR. WELLONS: Signature is reserved.

AND FURTHER DEPONENT SAITH NOT.



IN THE UNITED STATES COURT OF FEDERAL CLAIMS

ENGLEWOOD TERRACE LIMITED )
PARTNERSHIP, )
)
Plaintiff, )
)
-vs- ) No. 03-2209C
) Judge Wolski
THE UNITED STATES, )
)
Defendant. )
________________________)

I, JOAN KIENING, being first duly sworn, on oath, say that I am the deponent in the aforesaid deposition, that I have read the foregoing transcript of my deposition taken April 11, 2005, consisting of Pages 1 through 225 inclusive, taken at the aforesaid time and place and that the foregoing is a true and correct transcript of my testimony so given.

_____ Corrections have been submitted
_____ No corrections have been submitted

____________________________
JOAN KIENING, Deponent

SUBSCRIBED AND SWORN TO before me this _______ day of ____________ A.D., 2005.

________________________
Notary Public



THE UNITED STATES COURT OF FEDERAL CLAIMS

I, Judith T. Lepore, Certified Shorthand Reporter and Notary Public in and for the County of Cook, State of Illinois, do hereby certify that on the 11th of April, A.D., 2005, the deposition of the witness, JOAN KIENING, called by the Plaintiff, was taken before me, reported stenographically and was thereafter reduced to typewriting through computer-aided transcription.

The said witness, JOAN KIENING, was first duly sworn to tell the truth, the whole truth, and nothing but the truth, and was then examined upon oral interrogatories.

I further certify that the foregoing is a true, accurate and complete record of the questions asked of and answers made by the said witness, at the time and place hereinabove referred to.

The signature of the witness was not waived by agreement.

Pursuant to Rule 30(e) of the Federal Rules of Civil Procedure for the United States District Courts, if deponent fails to read and sign this deposition transcript within 30 days or make other



arrangements for reading and signing thereof, this deposition transcript may be used as fully as though signed, and the instant certificate will then evidence such failure to read and sign this deposition transcript as the reason for signature being waived.

The undersigned is not interested in the within case, nor of kin or counsel to any of the parties.

Witness my official signature and seal as Notary Public, in and for Cook County, Illinois, on this 23rd day of April, A.D., 2005.

Judith T. Lepore, CSR
Notary Public

License No. 084-004040





00000000-0000-0000-0000-000000000000

A
abatement 85:4,10
abating 57:1
ability 10:24 148:20
able 15:12 77:3 81:16 117:13 121:3,6 127:12 150:9
absolute 214:1
abstract 55:14
acceptable 124:15 124:17,21 199:10 199:12,13
accepted 109:12 199:17,21 200:18
access 14:24 15:4,5 15:17,19 16:2 40:8 44:18,20 77:3,5,6 94:3 102:4 103:16,20 150:9,10
accessed 68:21 81:11
accomplished 174:9,10
accounting 192:14 194:11,13
accurate 224:16
accurately 37:23 128:14
acknowledge 135:4
acronyms 112:12
action 53:17,18,21 54:3,11,18,20 55:12,15 58:5 69:21,23 76:12,13 85:12,17 86:12,15 86:21,21 102:11 104:9 117:17,18 127:2,7,8,13 133:3 134:8,11,12 134:13,16,17,19 134:21,23 168:4,7 168:9 170:24 171:3,6,9 172:14 172:23,24 173:3,8 173:11 174:4,12 202:12
actions 56:21 58:18 58:23,24 59:5 86:13,14 174:7
active 87:21 96:18 96:19,24
activities 205:13,13
actual 88:21 156:10 173:11 184:15 220:1,9
add 76:10,14 77:12 77:18 82:19,20 83:3 106:22 203:18
added 44:9 75:13 108:1 125:6
adding 75:14 206:5
addition 14:10 16:16 70:22 108:2 116:12 189:7
additional 71:18 116:15 125:5,21 142:16 152:2,5,10 153:3,5,6,24 188:23 189:11,17 190:8,20 203:18
address 4:16 68:20 195:2 206:3,10,13
addressed 196:11 196:19 207:13 209:5 210:14,17
administration 69:5 94:1 96:2 176:6 193:5
administrative 194:12 214:14
administrator 121:16
adoption 173:11
aforesaid 223:10 223:11
AFS 65:19,21 66:9 68:4 145:15
afternoon 81:21 102:10
agency 7:5 44:8
agent 57:4,6,7,8 78:6,7 195:2
ago 10:14 12:1 20:5 26:16 94:22 122:4 143:21 144:7 146:15 167:19 181:12,13 197:19 199:16 216:20 221:2
agree 54:10 188:21
agreed 111:19 205:17
agreeing 197:23
agreement 4:2 224:20
ahead 17:22 18:10 24:1 71:16 116:22 117:11 124:12 148:23 164:17 170:1 181:4 182:21 185:5 187:21 188:12 197:5 208:13 209:10 211:18
Alberta 35:18 175:8,24 176:5 180:4 181:7,17
alike 160:5
allocating 191:14
allow 29:12 67:10
allowed 47:14 91:17,18
altered 75:12
amount 88:10,11 88:14,19 91:14,16 113:20 125:16,17 191:11
amounts 162:23
analysis 30:4 49:24 50:13 51:8 67:7 156:11 207:12
analyst 8:7 9:10 18:5,6 35:2,10 42:2,5,8,8 44:3 45:2 50:23 51:1,7 53:10 56:8 59:15 60:1 86:9 95:16 95:18 105:9,13 106:21 107:14,19 115:17,17 126:17 161:12 171:24 172:9,11 202:21 209:16 212:20 213:14
analysts 8:9 76:10 102:16 133:23 193:9,10
annual 65:20,22,23 66:1,2,6,8,10,11 66:14,20 67:1,14 67:17,19,21 68:13 88:9 100:16
Annually 88:17
answer 13:2 17:22 18:10 24:1,18 25:8,11 29:14 44:7 55:14 59:23 67:12 85:21,23 98:19 116:22 117:11 152:16,21 164:17 169:15 170:1 181:15 182:1,5,21 185:5 185:14 188:13 208:13 209:10 211:13,18 214:11 214:13
answered 160:11 187:20
answering 67:11
answers 181:12 224:17
anybody 75:6
anymore 121:9 145:4 148:13 192:18
anyway 40:9 56:5
anyways 103:15 150:12
apartment 158:8
apartments 78:14 165:5
apologize 136:11 142:3 160:11
apparent 176:10
apparently 68:21 69:1 71:10 83:17 83:21 84:20 85:16 86:7 96:19 103:8 105:23 108:3,17 113:10 114:12 122:5 123:23 126:3 131:5 142:12 143:19,22 166:10 205:16 209:1
appeal 214:19
appear 64:24 119:16 131:13 168:20
appears 22:1 71:5 71:16 84:1 86:2 104:23 106:17 111:18 114:14 117:8 131:21 132:18 137:3 166:18 172:12 178:21 196:21 199:3,12
application 57:18
applications 187:17
applied 9:1
appreciate 24:12
appropriate 84:10 91:14
approval 109:8,23
approvals 58:10 129:4 173:1 201:12,18,19
approve 109:19,20

109:22 172:22,23
**approved** 90:17,20 108:22,24 109:4 109:12,15 124:22 125:2,8 128:5 173:4 209:1
**approximate** 41:8
**approximately** 7:11,20,22 9:8 14:12 37:17,19 88:22 127:21
**April** 1:18 81:21 84:16,21 107:2,12 110:17 111:1 122:13 156:11,17 157:8 171:10,14 196:20 197:13,24 198:19 205:9 212:7,23 223:11 224:6 225:12
**apt** 221:5
**area** 4:23 42:22 47:12 91:20 164:10,23
**areas** 153:6
**argue** 188:20
**arrangement** 30:5
**arrangements** 225:1
**aside** 172:18
**asked** 22:18 49:11 54:13 109:18,20 120:19 138:20 152:1,12,24 170:6 176:13 181:13 187:20 188:4 191:6 192:2 200:6 203:7 214:1 224:17
**asking** 17:12 80:12 156:6 169:17
**assessment** 38:13 38:15,17,18 159:11
**assessments** 102:23
**asset** 8:17 32:8 191:23 192:1,3 193:16,19
**assigned** 15:9,11,13 15:18 71:2 72:5 74:3,4 80:21
**assignment** 70:24 71:1,6 72:4
**assist** 29:5 190:19
**assistance** 87:6,11 91:2 96:13 98:10 98:17
**assistant** 7:23,24 8:6,21 42:4,6,6 210:23,24
**associated** 72:20
**association** 72:13 72:15
**assume** 20:20 39:20 78:13 81:22 85:7 91:3 93:24 98:23 108:4 113:19 125:24 126:12 127:24 128:15 163:8 164:19 177:7 202:5 205:24 211:10
**assumes** 116:21 181:2 182:20 185:4,11 209:9
**assuming** 24:4 112:2 113:22 118:14
**asteric** 157:2
**attached** 104:20 198:16
**attempt** 112:23 206:10
**attempted** 206:3
**attempting** 116:12 190:3 207:8
**attempts** 189:11
**attended** 171:12
**attention** 26:22 198:19
**attest** 76:8 221:17
**attorney** 18:3 22:21 25:14 33:14,17,21 33:22 51:11 52:5 60:2,12,13 107:16 108:12,12 171:24 172:2 181:6 202:22 217:4,23 218:2,3,14
**attorneys** 13:5 17:16 25:4,17,18 35:11,13 155:1 161:14
**August** 131:14,21 161:5 167:22 174:24 179:9,20 180:4 181:14 182:9,17 204:14 204:18,21
**authority** 88:7,9,18 88:22,24 89:1,3 89:15,16,17 90:3 90:14,15,18,20 93:5
**authorization** 121:7
**authorized** 81:4,6 120:3
**automatic** 192:17
**automatically** 82:20 84:13 142:10
**available** 21:19 120:22 192:22 206:5
**aware** 12:4 116:14
**awkward** 136:11
**A.D** 1:18 223:19 224:6 225:12
**a.m** 1:18
**A1971** 63:13,16,22
**A2012** 64:6
**A2142** 136:7
**A2148** 130:7,12

B

**B** 3:7
**back** 7:15,16 11:3,4 12:6 14:20,23 20:22 21:12 28:16 28:20 40:1,2,4 42:8,9 46:15 47:17,24 48:1 49:4,6 54:13,16 54:18,21 55:11,18 59:17 66:22 69:9 72:19 73:6 77:1 77:12 83:8 86:18 98:7 110:17 111:15 117:13,14 117:15,18 118:2,5 118:14 119:5 122:6 124:18 132:4 134:2 135:24 141:8,20 143:19 144:17 147:6 149:1 150:8 151:9 154:7,12,23 155:16 156:13,15 160:9 161:7 166:22 170:21 172:6 179:24 192:13 194:11 198:19 199:14 201:10 209:19 211:16 213:8 217:9,21 221:3
**backwards** 119:11 119:13 133:4
**Baguio** 2:11 17:17 25:20 151:5 175:12 217:18,22 218:5,13,18
**balance** 186:21
**bar** 68:12 83:13
**bars** 67:2
**base** 24:11
**based** 50:13 91:19 112:3,16 124:16 150:2 192:1
195:11 196:10 212:20
**baseline** 72:23 73:5 73:8,9,19
**basing** 85:21,23 97:23
**basis** 19:22,23,24 95:14 189:23
**batch** 142:1,2
**Batchelor** 34:14,24 41:5 45:5 51:3 53:13 56:17 60:10 77:11 81:11 83:24 84:5 85:12 101:21 105:13 106:13,16 107:8 109:16 115:1 116:2 126:8 134:1 141:24 158:15 172:1,10 175:9 178:19 181:5 182:2 211:9
**Batchelor's** 41:9 46:8 110:20 111:6 142:14 166:1
**Bates** 36:20 61:15 62:23 63:1 149:11 153:10 168:20 169:2
**Baugher** 2:2 3:4,5 4:1,11 11:2,6 12:23 13:9 17:12 17:14 18:2,14 19:5 20:4 22:4,6 24:2,6,21 25:9,16 29:12,16 36:14,22 37:2,4 59:22 60:14,20 62:1 63:7,15 67:10,13 86:1 90:9,13 98:6 114:1,22 116:23 117:3,19 118:23 119:4 130:1,6 138:14 146:5 148:12 149:18 150:6,13,18,23

152:20 153:14 155:22 156:3 160:8,16,21 162:15 164:21 168:10,15,24 169:7,21,23 170:4 176:17,22 177:11 178:4,9 181:10 182:23 183:24 184:10 185:8,15 185:20 187:23 188:14 191:5 195:16 196:2,5,7 197:6,10 200:20 201:1 208:15 209:13 210:8,13 211:21 212:12,17 218:19,21 220:19 222:14
began 6:4
beginning 132:1 141:2,19 145:7 171:16 201:20 210:15
behalf 2:5,14
behaved 206:14
belief 142:24
believe 43:16 52:23 53:1 54:5 56:13 78:23 81:20,21 94:9 110:10 132:24 138:22,24 140:24 149:9 163:18,22,23 177:23 179:20 198:18 199:8 219:15
benefits 179:10 180:12
Berkee 17:5 22:22 26:21
best 61:17 69:14 159:3 203:23
better 11:4 101:17
beyond 169:2
big 158:5 219:12
binder 38:4
bit 12:13 30:3 80:3 124:12 128:24 136:6 140:6 200:3
biweekly 14:16
blacked 108:13 129:10,21 139:12
blank 141:12 188:2
blanked 142:18
block 106:21
body 32:17,20
borrow 189:7
bottom 18:24 19:9 59:5 61:15,16 68:18 100:23 104:11 107:11 108:20 110:2 119:24 130:19 132:10 166:8 185:21 204:13
Boulevard 2:12
box 103:22
boxes 41:13,13
brain 10:23
brand 9:5
break 59:24 60:14 60:16 118:21,24 149:1 150:7,14 190:24 191:1 219:1
brief 7:8 218:23
bring 28:15,20 29:7 174:8
bringing 118:2
broad 215:6
broadly 93:18
broken 157:19 164:11 197:2,12 204:22 205:1,4
brought 54:16 181:24 205:23,24 213:8
budget 88:24 89:3 90:14,15,20 92:3
budgetary 88:18 89:15 90:2 97:14
builder 51:12 107:20 172:19
builders 51:15,17 52:13 222:5
building 78:17 80:4 162:11,18,19 163:10 164:14,23 165:3 172:6 176:15 188:24 189:12 190:9,11 190:15 206:15 215:13,24 216:2
buildings 162:5
building's 167:2
bulk 86:13
bulky 198:17
bullet 57:11
business 27:15 218:16
button 67:15 68:4 80:16 82:19,20 83:2 102:4
buttons 66:24
B-a-t-c-h-e-l-o-r 34:15
B-e-r-k-e-e 17:24
B4357 104:8
B8273 139:4
B8276 105:17 143:4,18

C

C 2:1
call 12:22 27:1 51:10 54:6 89:10 143:15 144:10 149:1 150:7 157:21 175:4
called 1:9 4:7 21:3 36:6 39:23,24 40:1 49:24 53:20 63:13 76:16,16 102:23,24 193:5
224:7
calls 102:19 164:16 211:17
Campbell 81:2
cancelled 198:15
capital 204:3 215:13,18 216:1,1
capris 12:21
caps 79:8
card 218:16
care 165:4 174:15 208:10
career 5:21
carefully 64:23 158:16 166:14
Carl 62:24 122:7 162:1 163:12 176:24
case 13:5 41:5 43:15 45:3 53:8 56:11 78:19 106:7 110:5 152:23 207:21 212:10 225:8
cases 41:12 210:7
categorically 214:3
categories 61:9 65:15 76:4,5,8,9 76:15 141:16
category 45:11 48:5 72:22 76:1,2 79:23 90:22 92:2 105:16 141:5 142:13
category-by-cate... 19:23
caught 26:22 198:19
cause 38:19
caused 164:14
caution 17:7 29:12
CB 51:12 221:22 221:24
cc's 211:6
ceiling 205:2,5
center 9:3,4,5,20 27:24 28:1,2,12 29:19 30:6,9,10 30:12 31:12,14,16 37:11,12 38:15,16 56:23 105:18 170:9 178:16 179:16 201:8 221:13,15
certain 11:1 34:8 38:5 74:5 75:18 75:18 89:17 121:17 145:23
certainly 11:2 163:6 182:11 186:14
certificate 225:3
Certified 1:14 224:3
certify 224:5,15
cetera 68:1 119:24
chance 62:6
change 77:9,13 165:12 220:2
changed 47:1 56:2 69:16 75:15,20,22 75:24 76:4,5,6 192:6,15,16 217:8 221:15
changes 14:6,8 93:8
characterization 129:24 158:1
charge 14:6 91:18 91:19
chart 37:6 80:15,16 91:4 123:18 124:16 219:12,19 220:1,5,9 222:10
charts 38:9 219:22 221:12 222:3
check 127:5 135:24 199:5
checked 99:6 127:2 148:24

checking 148:18
checks 198:15
Chicago 1:17 2:3 2:12 4:23 5:2,4 7:5,17,21 8:22,23 9:16 10:1,2,4,5,7 29:23 30:7,13,23 33:5,6 40:21 96:4 110:5 112:4 155:1 155:5 178:17 179:15 181:20 191:19 201:7 207:21,22 209:22 209:23 216:15 217:5,24
chronological 130:16
chronology 7:8
chutes 205:3
circumstances 75:14
citation 120:23
City's 205:13,16
Civil 1:11 2:6 224:22
CLAIMS 1:1 223:1 224:1
clarification 36:10
clarify 20:12 59:3 84:18 149:9 219:9 220:17
clear 98:4 180:16
clerk 6:20,23 7:2 44:24
click 66:5,17 68:3,4 68:7 73:11 81:17 81:18 82:18,19 83:2 104:1
clicked 65:21 66:9 68:8
Clinton 4:17
clips 61:8
close 76:12 115:11 216:21
closed 124:9 128:21 135:15 212:3
closure 123:15 124:2
Coleman 27:21,21
Coleman's 149:3
collection 17:1 19:16 184:3
collectively 61:12 184:5
college 5:9
column 79:3 88:7 90:15
columns 66:4
combined 6:13 194:17
come 14:20 29:22 47:17 50:19 54:13 66:15 68:6,7 89:18,24 104:4 130:16 136:3 160:9 161:3 189:21 193:17
comes 37:11 38:18 83:17 84:13 93:7 99:21 116:1 133:1 140:15,17 187:16 187:18
coming 14:9,23 69:19 120:12
commencing 1:17
comment 82:22 101:16 129:9 141:11 142:14 189:15
commentary 206:21
commenting 182:13
comments 76:13 100:15 101:2 121:21 125:12 141:9,11 188:4
common 164:10
communications 17:15 26:24 55:23
community 51:12 51:15,17 52:13 107:20 172:19 222:4
commuter 42:19
company 27:8 122:21 204:3
comparability 91:5
comparable 91:9 91:19
comparatively 11:23
compare 98:19
compel 28:19
compendium 135:23
compilation 61:3,4 63:9 100:11 119:6 119:14 130:15 142:19 145:20 150:2 183:24
compiled 136:13 151:5
complaint 24:9
complete 19:16,17 20:7 61:4 70:11 71:22 135:24 148:21 188:1 198:12 224:16
completed 107:14 107:17 205:2
completely 160:6
completing 204:3
completion 123:15 124:12
complex 89:19,21
compliance 66:24 67:15,17 68:8,9 117:17 118:1,2,5 174:9
complied 149:5,17 150:1
comport 205:19
comprehensive 43:8 101:2
comprise 151:4
compromise 148:20
computer 40:9 42:19 46:14 47:14 146:16
computers 44:21
computer-aided 224:10
concerned 95:3 118:7 182:16
concerning 25:24 41:1 47:8 54:3 96:21 99:2 100:20 123:20 151:4 153:4,16 155:7 171:12 184:4 209:15
conclude 188:18
concluded 214:16
conclusion 55:19 173:16
concretely 159:17
concur 202:1
concurred 112:1 187:4 201:15
concurrence 127:19,23 128:14
concurrences 129:4 173:1 201:12
concurs 128:8,13
condition 28:5,15 57:17 79:24 80:1 80:2 81:7 82:1 100:17 113:11 159:18 204:2 206:22 215:7,8
conditions 28:16 85:5,6
conduct 45:15 47:17 199:4
conducted 47:16 161:8
confirm 42:7 149:7 152:2,24 154:5
confirmation 42:4
confirmed 19:19 20:13
confirming 151:21
confirms 104:18
congratulations 10:16
congressionally 90:17
connected 82:4
connection 22:10 22:14,15 103:19 155:7,19 178:2
consider 58:3,7
considerable 191:10
considerably 137:12
consideration 56:24
considered 58:18 58:23,24 59:4 158:9 187:19
consisting 223:11
consists 62:10 157:3
constitute 105:24 106:1
construction 8:9,15 193:9
contact 27:5 78:7 208:16
contained 133:12
content 13:4 25:13
content-type 46:10
continue 32:1 33:19 55:22 112:5 117:16 207:23
continued 55:6 209:2
continues 113:14 113:16 203:18
continuing 114:13 211:14,22
contra 97:5

**contract** 8:10 21:9 21:11,19 63:12 72:19,20 78:18 79:2,3,15 87:7,11 87:11,12,12,14,21 87:24 88:7,9,15 88:21 89:1,11,13 89:15,17 91:2 92:9,13,16,17,19 93:1 94:19 95:1,4 95:6,8,13 96:14 96:18,18 97:8,9 97:10,11,19 98:9 98:10,11,12,14,17 98:18 99:2,10,14 99:14 121:16 139:22,24 140:2 183:8,12,16,20 184:2,4 185:2,22 185:24 186:3,11 186:15,22 187:2,5 187:7,8 188:5,18 191:7,19,24 192:20 193:3 194:7
**contracted** 88:19 159:22
**contracting** 89:12
**contractor** 49:21 49:23 50:8,12,13 50:22 51:7 53:4,9 159:12,13
**contractors** 14:5,11 14:18 53:6 161:8
**contracts** 8:15 79:5 87:5 94:5 96:20 191:11,12,16,24 193:13 194:17 206:24
**contradicting** 77:22
**contrary** 183:4
**contribution** 125:22 127:10
**control** 63:17 64:1
**convenes** 51:4 54:6
**conversant** 167:1
**conversation** 17:8 27:1 213:21
**conversations** 85:9 152:17 183:19 214:2,4,7
**Cook** 1:15 224:5 225:11
**cooperate** 190:20
**cooperation** 54:15 112:22 118:12
**coordinate** 14:4 32:11 44:3 56:4,6
**coordinated** 14:9 31:24 32:15 161:13,13
**coordinating** 9:10
**coordinator** 10:8 14:3,17 133:21,22
**copies** 123:2 139:15 147:20 151:18
**copy** 70:3,7,11 95:7 122:12,22 140:20 155:18 156:16 169:1 170:21 171:7 176:23 195:17
**corner** 56:19 59:6 61:2 68:24
**correct** 16:5,8 18:9 30:13,18 31:16 32:14 36:10 39:1 40:13 41:3,20,21 43:5,10 45:19 46:11 49:3 52:3 52:12 55:4 58:9 61:20 63:2,20 65:1 67:19 68:21 68:22 69:2,6,7 70:18,19 71:20 72:6,7 74:20 76:21 78:22 80:8 82:2 84:1,5,6 85:18,19 86:10 87:9 88:17,19,20 89:8 92:21,24 93:3,4,20,21 94:8 94:13,17 96:22 97:2,13,17,21 98:22,23 99:23 100:8,24 101:5,8 101:23 102:7,8 103:10 104:21,24 105:1 106:13,14 108:11,18,19 109:13,14,17 111:17,19,20,24 112:17 113:11,12 114:18 115:24 116:11,19 117:22 117:23 118:5,6,8 118:20 119:22 120:4,5 121:5,8 121:16 122:1,2,9 122:10,24 123:3,5 123:9 124:13,15 125:10,19 126:4,5 126:23,24 127:8 128:6,10,23 129:6 131:4,17 132:2,3 132:7,13,14,17 133:9,10 134:14 135:14,18 136:5 136:20 137:14 138:6 140:4,10 141:18,22 142:6,7 142:8,15 143:8,12 143:24 146:13,18 146:19 147:7,8,10 147:15,19 148:11 149:14,15 157:5,6 157:9,12 158:9,10 158:13,18 159:16 159:19 160:15 161:6,10 162:21 163:4,5,13,14,16 164:15,23,24 165:5,6,8,9,12,13 165:17,18 166:17 166:23 167:3,15 167:20 170:15 172:15,16 173:18 173:19,22 174:4,5 174:14 175:20 176:9 178:23,24 179:3 181:1 182:14,15 183:8 183:22 184:24 186:1,11,17,20,23 187:5 188:16 189:1,5 190:23 191:11 193:19,24 194:1 195:14 197:3 199:22 200:18,19 201:16 203:19,22 204:10 204:11,19 205:10 205:15 207:1,2,6 207:7,11,13,14,16 208:4,8 211:11 212:24 213:2 219:13,14,17,18 222:13 223:12
**corrected** 204:16 204:21 206:23
**corrections** 223:13 223:14
**correctly** 43:1 108:23 197:15,23
**corresponded** 45:18
**correspondence** 23:20 62:22 208:21 209:2,12 209:14 210:2,5
**cost** 89:10,12 116:13 207:9
**counsel** 3:16 17:9 36:24 61:7 152:17 169:5 195:23 217:10 225:8
**counsel's** 129:23
**country** 133:21
**County** 1:15 224:4 225:11
**couple** 6:10 8:13 20:21 26:16 35:17 64:8 76:15 82:10 86:17 104:7 123:11 127:18 139:8 148:22 186:14 199:16
**course** 43:23 149:6 150:4
**courses** 5:13
**court** 1:1 4:22 24:15 29:13 60:21 148:15 149:21 223:1 224:1
**courtesies** 179:8 180:2,5,9,10 182:12
**Courts** 1:12 224:23
**cover** 67:23
**cracks** 157:18 204:24
**create** 44:24
**created** 6:7 27:24 44:23 45:2 150:3
**creates** 45:6 185:16
**creating** 117:5
**credit** 7:13 63:12 63:16 64:1
**crime** 162:19,22
**Crimes** 205:14
**CROSS-EXAMI...** 219:5
**cross-out** 202:3
**CSO** 181:19
**CSR** 225:17
**culminating** 167:17
**cumbersome** 135:5
**current** 74:16 91:7 96:18 97:1 217:16
**currently** 23:23
**cut** 97:4
**CX** 3:2

**D**

D 3:1 19:2
damaged 157:21 158:6 197:16 198:1 204:24
data 77:11 78:12 90:23 94:14,15,15 98:12,16 106:19 106:22,22 107:2 126:12 134:6 137:24 144:17,20
database 44:9,13 44:15 93:16
date 13:17 20:13,17 20:18 40:24 46:5 46:6,12 65:24 68:23 72:3 77:23 82:4,21 84:11,13 86:16 97:18 102:7 103:24 106:20 107:4,5,5,23 108:6,21 115:19 121:19,24 123:15 123:15,15 124:2,7 124:8,9,10,12 125:20 128:1 129:3,3,14 131:21 136:10 139:1,18 140:8 144:19 151:16,21 156:9 175:1 185:22,24
dated 131:12 196:11 201:5 210:16 212:21
dates 11:1 20:24 24:10 80:4 109:5 109:8 119:15 123:19,21 125:12 129:11 137:4 145:10,10 168:2 171:9,10,15 195:5 216:24
day 1:18 21:11 107:15 137:22 223:18 225:12
days 128:12 138:1 138:2,3 148:22 224:24
DC 2:8
deal 209:23
dealing 114:2 160:13
dealings 27:15 118:10
dear 210:15
debated 203:11
Debbie 211:6
DEC 9:17,21 10:3,5 10:9 13:14,19,20 14:3,24 15:12,15 15:17,22,23 16:8 18:6,7 19:12,14 21:8,8,10,10,22 22:8 23:5,7 26:15 29:5 30:23 31:17 31:20 32:3,11,13 32:14,15,16,21,24 33:3,10,14 35:2,4 35:7,8,21,23 36:9 37:24 38:3,19 39:15 40:18,20,20 40:24 41:2 43:8 43:16 45:2 50:8 51:22,23 52:2 55:21 56:6 58:2,3 58:4,18 59:4,13 59:14,18 60:1,1,2 69:5,20 70:10 72:23 73:5,6 74:11,11 76:8,10 76:11,13,13,18,18 76:23 77:3,5,6,6,9 82:11 86:8,22 94:1,2 96:7 101:7 101:11,13,22,22 102:4,12,21 103:1 103:16 104:1 105:24 106:9 108:21,23 109:19 110:5 115:13,17 116:17,18 117:8,9 121:21 122:8 123:12,20 126:11 126:11 127:1,3,7 127:11 133:22,22 133:23 134:13,16 134:23 135:13,15 137:20 141:16 142:9,20,21,22 143:2,3,5,10,12 143:14,15,20 144:1,5,6,9,14,15 144:18,23,24 145:1,2,3,6,13 146:6,10,11,17,22 147:6,10 148:1,6 148:17 149:20 151:4 153:12,17 155:4,17 159:15 160:12 166:21 170:11 174:6 175:14 176:6 180:3 181:17,18 181:19,21,22 187:10 188:3,7,10 188:19 190:7 200:14 204:14 207:21 208:5,5 209:19,21,22,23 211:10,14,22 213:22 214:4 215:5 216:14,18 217:5,7,11,16 218:14 219:17 221:7
December 112:6,15 123:23 124:15 125:7,8,20 131:15 140:8,11 152:8 196:13,16 198:20 199:8,18 200:17 207:24
decent 28:4,14 57:16 167:11 215:8,9,10
decide 176:4
decided 103:5 214:19 222:2
decision 32:12 174:4 193:2 208:20
decision-making 32:17,20 192:19
declared 23:19
DEC's 37:20 43:24 49:8 117:20 154:8 154:17
deducted 157:10
deductions 157:5,7
deemed 196:19
default 23:19
Defendant 1:7 2:14 223:8
Defense 112:12
deficiencies 203:19 204:15
deficient 196:19
definitely 12:2,2 29:10,10 92:14,18 98:13 190:16
deimaged 47:4
deleted 172:19
delivered 112:14
delivers 49:21 50:5 50:6
demand 110:22 156:9
Denver 7:10,15
department 2:6,10 5:16 6:6,12 9:19 27:24 28:1,11 29:18 30:6,12 31:12,16 36:12 48:19 56:23 90:16 112:11 155:2 159:21 178:16 205:17
Departmental 105:18
depending 38:18 42:14 46:8 71:4 89:22 200:5
depends 95:16
depicted 220:5,8 221:20
deponent 222:16 223:10,16 224:23
deposed 25:2,3
deposition 1:9 3:8 4:1 10:17 13:1 14:24 22:24 24:5 24:23 25:6 26:11 36:15,16 37:6,22 38:6 49:20 56:20 59:6 60:22 61:13 61:22 62:7,10,12 65:12 68:19 119:6 142:19 143:1 144:1 145:20 146:7,10 147:18 147:21 148:9,21 150:18,20 151:1,7 155:23,24 156:4 160:17,18,22 168:11,12,16 169:21 171:2 176:18,19 178:5,6 178:18 183:5 184:5,7,12,22 195:19,20 196:8 198:5 199:20 200:22 201:2 208:1 210:9,10 211:5 212:13,14 214:6 215:5 220:20 221:5,20 222:8 223:10,11 224:6,24 225:2,5
depositions 1:13 149:3,6
deputy 170:8
descending 182:8
describe 13:13 18:8 29:21 94:21
described 27:3 28:10 219:15

220:2
describing 137:19 143:15 219:16
description 129:20 130:4,5
descriptive 46:9
detail 63:12 74:18 75:2 96:14 98:11 98:17 121:20 156:9 216:20 218:8
detailed 218:6
determinations 91:23
determine 92:13 158:16
determining 91:14 91:16
develop 112:18
developed 165:16 173:9
developers 79:19
development 2:11 5:16 6:7 14:8,19 90:16 125:21 159:22
developments 14:5
diagnosed 10:23
differ 220:9
difference 83:4,6,7 83:8
differences 222:6,9 222:11
different 48:11 65:15 66:4,14,23 70:16,21 72:5 73:15,16 93:16 96:20 100:2,13 106:6 108:1 118:19 120:11 132:16 139:18 140:6,16 159:9 184:4 215:21 219:22 220:2
differing 221:20
difficult 11:24
difficulties 205:12
digits 89:6
direct 4:10 94:3 138:8,21
direction 102:15 112:24 173:10 182:18 221:8
directly 94:11
director 7:18 8:21 32:23 33:23 35:19 35:21 51:12,24 52:1,2,11 170:8 178:16 181:18,19 181:22,23 216:14 216:18,19 217:7
directors 170:10 175:15
discover 154:1
discovered 153:23
discovery 168:22 169:20
discuss 51:6 52:21 54:8 56:17 202:12
discussed 107:19 202:8 203:11
discussion 90:11
discussions 13:4 25:13 187:1 215:17
disk 42:19
disposition/Section 87:19
dispute 99:13
dissatisfied 118:16 199:24
dissent 202:3
dissents 111:21
distinction 215:14
distinguished 10:4 31:5 49:14 138:4 159:11 215:24
District 1:12 224:22
division 2:6 9:18
38:13 158:2,3,4 192:14 194:12 205:14
document 11:22 17:11 23:3 36:6 36:19,21 37:22 39:14,16 42:1 44:7,18,24 45:11 46:12 48:23 53:20 55:3 61:6 63:3,5,8 63:18,19,21 64:4 65:6,7,8 81:22 85:22,24 97:24 98:1 105:11 112:3 112:16 113:8 129:15 132:1 135:5 136:7,15 140:19 142:17 143:18 150:24 152:13 156:12 160:2 168:19 169:6,8,24 170:7 170:14,17,21 172:18 173:7 177:13 178:1 183:14 184:17,19 186:5 201:11 208:2 219:11,16
documents 8:17 12:6 13:7,10,11 13:12 17:19 18:22 21:17 22:22 23:1 23:2,21 24:20 42:5,15,23 43:7 43:11,18,22 44:2 44:4 45:18,20 46:16 47:2,19 48:11,15 49:13,14 60:24,24 61:3,4 61:10 62:4,5 64:20 71:17 92:12 92:20 104:8 119:7 119:20 129:21 136:12 139:3 143:15 145:24
149:10,11,12,19 149:22 151:12,18 152:3,3,4,5,10,22 152:22 153:1,5,10 153:24 154:5,7,8 154:10,12 155:13 169:18 171:1 183:11 184:1,3,11 184:14,15,15 195:12,24 196:4 197:9 199:15 221:1
doing 10:6 11:2 49:24 58:3 71:24 129:12 134:4 141:8 174:7 210:2 211:20
dollar 88:10,11
dollars 90:3 97:10 97:11 113:20
Don 2:16
doors 157:21 204:24 205:4
double 75:23
double-check 98:24 150:4
doubt 126:16
dozen 121:18 137:8 162:12
draft 85:17 171:7 173:24 174:4 178:19
drafted 168:8 172:8 178:19 179:5 201:6,8 211:12
drafting 178:2
draw 120:7
drawing 188:2
drug 162:19,22
drug-related 205:12
due 66:1,16,18 190:5
duly 4:5,8 223:9
224:12
duplicates 61:6 130:17
duties 9:11 14:4
DX 3:2
D.C 9:14,17,22 31:3 42:22 43:4 43:12,19 174:21 175:8
D0394 161:20
D0395 161:20
D0424 65:5
D0991 126:18
D1056 141:19
D1097 62:17 119:8
D1155 63:11,14 140:20
D425 65:12

E

E 2:1,1 3:1,7
earlier 21:14 54:14 77:2 110:20 125:11 132:6,12 146:20,21 147:5 165:3 169:12 172:20
early 22:19 34:20 37:20 43:20 55:16 82:6 102:21 110:8 111:2,12 125:7 129:2 189:21 194:4
Eastlake 27:6,7,9
easy 38:10
EC 39:9 41:22 49:21 51:4 53:15 54:6 85:13,14 86:18 107:19 113:5 194:1 219:12
Ed 30:21 52:17 83:24 84:4
Edge 35:19 175:7 175:14,16 180:4