IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| ENGLEWOOD TERRACE LIMITED PARTNERSHIP, | ) | |
| Plaintiff, | ) | |
| -vs- | ) | Case No. 03-2209C |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

Deposition of GWENDOLYN THOMAS, taken before MARGARET A. BACHNER, CSR, RMR, CRR, and Notary Public, pursuant to the Federal Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions for the purpose of discovery, at Conference Room 4 South, 312 West Randolph Street, Chicago, Illinois, on the 12th day of April, A.D. 2005, at 10:13 a.m.

There were present at the taking of this deposition the following counsel:

SCHOPF & WEISS, LLP
BY: MR. PETER V. BAUGHER
312 West Randolph Street, Suite 300
Chicago, Illinois 60606-1721
312-701-9315

on behalf of the Plaintiff;

U.S. DEPARTMENT OF JUSTICE
BY: MR. PAUL R. WELLONS
1100 L Street, N.W.
Washington, D.C. 20530
202-616-8253
-and-
U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT
BY: MR. GREGORY G. GUSTIN and MS. MARIA T. BAGUIO
77 West Jackson Boulevard
Chicago, Illinois 60604
312-353-6236
on behalf of the Defendant.

ALSO PRESENT:
MR. JOSEPH JOHNSON
MR. DON SAMUELSON
DSSA Management Inc.



INDEX


| WITNESS | EXAMINATION |
|---|---|
| GWENDOLYN THOMAS | |
| By Mr. Baugher | 4 |

EXHIBITS

| THOMAS DEPOSITION EXHIBIT | FOR IDENTIFICATION |
|---|---|
| Number 1 | 4 |
| Number 2 | 99 |
| Number 3 | 114 |
| Number 4 | 167 |
| Number 5 | 172 |
| Number 6 | 179 |
| Number 7 | 182 |
| Number 8 | 187 |
| Number 9 | 212 |
| Number 10 | 213 |
| Number 11 | 223 |
| Number 12 | 236 |
| Number 13 | 246 |
| Number 14 | 254 |
| Number 15 | 257 |
| Number 16 | 275 |
| Number 17 | 281 |
| Number 18 | 288 |
| Number 19 | 297 |
| Number 20 | 305 |


Exhibits Retained by Counsel.



(Thomas Deposition Exhibit Number 1 was marked for identification.)

MR. BAUGHER: This is the deposition of Gwendolyn Thomas taken pursuant to Notice and the agreement of the parties.

Would you please swear the witness?

(The witness was duly sworn.)

GWENDOLYN THOMAS,

called as a witness herein, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. BAUGHER:

Q. State your full name, please.

A. Gwendolyn Thomas.

Q. Where do you live, Miss Thomas?

A. In the City of Chicago.

Q. What address?

MR. WELLONS: Peter, Miss Thomas prefers not to provide personal information today. She's here just to testify about the facts relevant to the dispute.

MR. BAUGHER: And I'd like to know her address in the City of Chicago.

MR. WELLONS: Miss Thomas, do you wish to



answer the question?

THE WITNESS: No, I do not.

BY MR. BAUGHER:

Q. There may be other questions you don't wish to answer, but you're not here just for us to have a conversation. What's your address?

A. My contact address is 77 West Jackson.

Q. That's your office, Miss Thomas. What's your home address?

MR. WELLONS: Pursuant to the Rules of the Court of Federal Claims, specifically Rule 26, she is only obligated in here to testify to facts relevant to this dispute and reasonably calculated to lead to discoverable evidence. Her personal information does not fall into that category.

MR. BAUGHER: Well, right now she works for the Department of Housing and Urban Development, by the time we have a trial in this case, she may not. I may need to get ahold of her. I may need to subpoena her as a witness. There may be other reasons that we need to find her, and she may not be readily available through HUD. You don't know that and I don't know that.

BY MR. BAUGHER:





00000000-0000-0000-0000-000000000000

Page 6

Q. What's your street address?
MR. WELLONS: Miss Thomas, will you answer the question?
THE WITNESS: No.
MR. WELLONS: Counsel, I suggest we move on and address this issue at another time.
MR. BAUGHER: What other time would you propose to address it?
MR. WELLONS: You can contact me tomorrow about it. But Miss Thomas has indicated she will not answer the question. I suggest we move on.
BY MR. BAUGHER:
Q. Miss Thomas, are you represented at this deposition?
A. Yes.
Q. By an attorney?
A. Yes.
Q. Who are your attorneys?
A. Paul Wellons, Greg Gustin and Maria Baguio.
Q. Do you have an attorney of your own, a private attorney that you consulted with respect to this case?
A. No.
Q. Have you been contacted by the Inspector

Page 7

General's office?
A. Regarding?
Q. Concerning South Pointe and other matters having to do with HUD?
A. Previously.
Q. When was that?
A. I can't recall. It was sometime ago.
Q. Have you had any recent contact with the Inspector General's office?
A. Not pertaining to this case, yes.
Q. When was the last time you spoke with someone from the Inspector General's office?
A. Friday.
Q. And what was the general topic of that conversation?
A. It was property relative to HUD, but not South Pointe.
Q. What was the property involved?
A. It's a cooperative.
Q. What's the property involved?
A. Carmen Marine. Carmen Marine Cooperative.
(Mr. Joseph Johnson entered the deposition proceedings.)
MR. WELLONS: If the record could reflect

Page 8

that Mr. Johnson has joined us. Mr. Johnson, are you here on behalf of Englewood?
MR. JOHNSON: Yes, I am.
BY MR. BAUGHER:
Q. How do you spell Carmen Marine?
A. C-a-r-m-e-n, M-a-r-i-n-e.
Q. Where is that located?
A. On the north side. I don't know the address.
Q. And you have no private attorney that you've hired with respect to this matter or the Inspector General; is that correct?
A. That's correct.
Q. Are you from Chicago?
A. Yes.
Q. Have you lived here all your life?
A. Yes.
Q. Are you married?
A. Yes.
Q. What's your husband's name?
MR. WELLONS: Miss Thomas, will you answer the question?
THE WITNESS: No.
BY MR. BAUGHER:

Page 9

Q. Why won't you say your husband's name?
A. It's not relevant to this case. I'm here to testify regarding South Pointe. My personal life doesn't involve South Pointe.
(Mr. Don Samuelson entered the deposition proceedings.)
BY MR. BAUGHER:
Q. Is your husband Linford Coleman?
A. No, it isn't.
Q. Probably because that's Veronica Coleman's husband. How long have you been married?
A. Four years.
MR. WELLONS: If the record could reflect that Mr. Samuelson has joined us?
Mr. Samuelson, are you or Mr. Johnson the designated plaintiff's representative for this deposition?
MR. BAUGHER: Paul, don't ask my clients questions.
MR. WELLONS: Peter, is Mr. Samuelson or Mr. Johnson the designated plaintiff's representative for this deposition?
MR. BAUGHER: Both. They're here to assist -- they're here to assist me at the

Page 10

deposition. Mr. Samuelson doesn't need three lawyers for this, but he does have an assistant who's helped him and helped me with putting documents together. That's why they're here.

MR. WELLONS: Mr. Johnson, are you taking notes during this deposition?

MR. JOHNSON: Yes, sir.

MR. WELLONS: And are you an attorney, sir?

MR. BAUGHER: Excuse me. No more questions from you at this deposition. This is my deposition. I'm taking the deposition of Miss Thomas. That's it.

MR. WELLONS: Peter, I'm happy to refer questions to your client representatives through you. But it's certainly proper for me to ask them about why they're here and whether or not they're taking notes.

Is Mr. Johnson taking notes during this deposition?

MR. BAUGHER: I'm not discussing those questions with you.

MR. WELLONS: So, you refuse to respond to that question?

MR. BAUGHER: Yes.

Page 11

MR. WELLONS: We would like to put you on notice that this is our formal request for any notes that Mr. Johnson takes during this deposition.

MR. BAUGHER: Mr. Johnson is assisting me in this case. And to the extent that he is taking notes, those notes are for my benefit. Those notes are the subject of our conversations. They are attorney-client privilege and work product. And so, you will not receive copies of those notes.

Now, if you want to order a transcript of the deposition or take your own notes, you're welcome to do that.

MR. WELLONS: I understand that's your position. We are formally requesting Mr. Johnson's notes.

MR. BAUGHER: That request is declined.

BY MR. BAUGHER:

Q. Where were you educated, Miss Thomas?

A. City of Chicago public school.

Q. Where did you go to high school?

A. Jones Commercial.

Q. Did you graduate?

A. Yes.

Q. What year?

Page 12

A. '84.

Q. Did you do any schooling after that?

A. Yes.

Q. Where?

A. Columbia College.

Q. In Chicago?

A. Yes.

Q. And what education did you have at Columbia College?

A. Communications.

Q. Did you graduate?

A. Yes.

Q. With a B.A.?

A. Bachelor's degree, yes.

Q. What year?

A. '89.

Q. Can you briefly summarize -- well, have you done any education work after Columbia College?

A. No.

Q. Can you briefly summarize your work history?

A. I've been working for the government since I was 16.

Q. Where?

Page 13

A. First with the Department of Health and Human Services, and then with HUD.

Q. What years did you work for Health and Human Services?

A. 1983 to 1989.

Q. What did you do there?

A. I was a clerk.

Q. What were your responsibilities as clerk?

A. Filing and typing.

Q. After you served at HHS where did you go next?

A. HUD.

Q. And what years have you worked at HUD?

A. From July 1989 to the present.

Q. What have your positions at HUD been over that 15-year period?

A. I came in as a clerk/typist. I was promoted to an assignment clerk. I was promoted to an occupancy specialist. Promoted to an asset manager.

Q. Is that your current position?

A. Yes.

Q. What were your responsibilities as an assignment clerk?

Page 14

A. Single-family homes, dealing with people whose homes were in danger of foreclosure.
Q. And what did you do for those people or with those people?
A. Oh, I just made appointments for them. They'd meet with the representatives.
Q. All right. When did you become an occupancy specialist?
A. I can't recall exactly. I think it was '90.
Q. What were your responsibilities as an occupancy specialist?
A. To service the public of insured properties, take tenant complaints, do home inspections, do Section 8 voucher renewals, conduct audits on tenant files.
Q. And what is an audit on a tenant file?
A. What is an audit on a tenant file?
Q. Yes.
A. Can you be more specific?
Q. How do you audit a tenant file or what does that mean?
A. That means you go to the property and audit a file. You make sure the books and records are in

Page 15

accordance with HUD guidelines.
Q. By looking through a paper file?
A. Yes, tenant file.
Q. When did you become an asset manager?
A. 1996.
Q. And you've served in that capacity for the last nine years?
A. Yes.
Q. What are your responsibilities as an asset manager?
A. To conduct management reviews, occupancy reviews on HUD insured and uninsured properties.
Q. What is a management review?
A. Review financial documents of the HUD insured properties.
Q. What training do you have to review financial documents concerning HUD projects?
A. I've had several in-house trainings in regards to that and I've went to several trainings in Washington.
Q. So, what, for example, do you look for when you're conducting a management review?
A. Proper insurances are in place, the expenses of the project, the rents that they're

Page 16

charging to make sure they're in compliance with HUD regulations, of HUD-approved rents.
Q. And what are occupancy reviews?
A. That deals mostly with the tenant, dealing with tenant complaints. Occupancy reviews can be done on-site when you're reviewing the tenant files, inspects -- make sure the rents are calculated correctly, the rent the tenants are being charged, the correct amount of rents, checking the units to make sure that they meet housing quality standards.
Q. How do you do that?
A. You inspect the unit.
Q. Do you inspect units?
A. Yes.
Q. As part of your job?
A. Yes.
Q. Is that a frequent occurrence?
A. Yes.
Q. Have you had any training in building or construction or physical management of a property?
A. I'm confused.
Q. Have you had any building trade training?
A. No.
Q. Do you know anything in particular about

Page 17

the construction of buildings or plumbing systems or electric systems, things like that?
A. Some.
Q. And what's the basis of your knowledge in that area?
A. Well, basic training. We were trained by an engineer at HUD.
Q. When was that?
A. It's been a while. I can't recall the exact date.
Q. Around the time that you started back in 1996?
A. I was an occupancy specialist.
MR. WELLONS: Miss Thomas, I'm just going to advise you to please let Mr. Baugher finish his question before you respond so that the reporter can record both his question and your answer. Thank you.
BY MR. BAUGHER:
Q. So, the training that you got was then back earlier, in 1990 or so when you became an occupancy specialist?
A. I don't recall the exact time frame.
Q. Have you had any other employment than what





00000000-0000-0000-0000-000000000000

you've just described to us?
A. No.
Q. Solely for the government?
A. Yes.
Q. What is your current grade at the government?
A. 12.
Q. GS 12?
A. Yes.
Q. Have you ever had any relationship or dealings with East Lake Development?
A. I've serviced properties that were managed by East Lake.
Q. Are you currently working with East Lake on any properties?
A. I have a few.
Q. How many?
A. Don't know exactly.
Q. Now, from the period of '96 to the present is there a general number of properties that you've been responsible for?
A. It varied.
Q. Give us the range, please.
A. Don't know.



Q. How many properties are -- when it says asset manager in your title, the "asset" is an apartment building, correct?
A. Correct.
Q. How many properties are you currently the asset manager for?
A. I don't know. I didn't count them.
Q. Approximately.
A. Thirty, 40.
Q. How many properties were you responsible for approximately in 1999, 2000, 2001; about the same number, 30 or 40?
A. Don't recall.
Q. Well, was it a hundred?
A. Don't recall.
Q. Why is it that you don't recall whether you were responsible --
A. Because I don't keep my portfolio --
Q. Excuse me. Let me finish the question. Why is it that you don't remember whether there were a hundred properties that you were responsible for five years ago or a substantially smaller number?
A. I don't recall.
Q. Can you recall the names of any of the



properties that you were responsible for in 1999?
A. No, other than South Pointe.
Q. That's the only property whose name you recall from 1999?
A. No. There may be some others, but --
Q. Well, what are the others?
A. I don't know them all.
Q. Do you know any of them?
A. Yes.
Q. Name one.
A. Parkview.
Q. What else?
MR. WELLONS: Please answer the question.
BY THE WITNESS:
A. Spring Grove.
BY MR. BAUGHER:
Q. What else?
A. Mays Lake.
Q. M-a-y-s?
A. Yeah.
Q. Mays Lake?
A. Mm-hmm.
Q. Any others that you remember?
A. It was various. Those are some that I just



can remember off the top of my head.
Q. And you can't remember any others off the top of your head?
A. Not at this moment, no.
Q. And you think that you may have had as many as a hundred in 1999?
MR. WELLONS: Objection. Misstates former testimony. Objection asked and answered.
Go ahead and answer.
BY THE WITNESS:
A. Don't recall.
BY MR. BAUGHER:
Q. Do you remember any properties for which you were the asset manager in 1999 that were not managed by -- or owned by John Hayes?
A. I gave you some.
Q. Parkview is owned by John Hayes, right?
A. Yeah, but Mays Lake isn't.
MR. WELLONS: Excuse me, Miss Thomas, again, please wait till the question is finished here.
BY MR. BAUGHER:
Q. So, there's only one property that you can recall from 1999 that was not owned by John Hayes;

is that right?
A. Not that I'm -- you're asking me --
Q. Well, you only remember Mays Lake?
A. You asked me for some names of some properties off the top of my head. That's what I gave you.
Q. You've mentioned four. Three of those are owned by John Hayes, correct, or were?
A. Yeah.
Q. You know that, correct?
A. Yes.
Q. And you knew that when you answered the question, right?
A. Wasn't directed.
Q. No, I didn't ask you if you knew which apartments John Hayes owned in 1999. I asked you what apartments you were responsible for in that year. And the only additional one that you were able to mention was Mays Lake; is that right?
A. Those are the properties I gave you, yes, correct.
Q. And you don't recall any others?
A. There are some others.
Q. But you don't remember them right now?



A. The Mayfair.
Q. Anything else?
MR. WELLONS: Miss Thomas, it may be helpful if you could tell Mr. Baugher all of the properties from that period --
THE WITNESS: I can't tell them all because I don't know them all.
MR. WELLONS: The ones that you can remember.
MR. BAUGHER: Mr. Wellons, that's the question I put to her three or four times. She doesn't want to answer it or she doesn't remember or she didn't go to work that year. I don't know what the answer is, but apparently she doesn't, either.
MR. WELLONS: Objection. Counsel is testifying. I am attempting to go clarify the question for Miss Thomas.
MR. BAUGHER: There's nothing unclear about the question.
BY THE WITNESS:
A. Foxview Apartments I and II, Grant Manor, Drexel Towers, Greenwood Manor. That's all I can recall.
BY MR. BAUGHER:



Q. Did you do anything to prepare for this deposition?
A. No. Just looked at some REMS screens.
Q. What REMS screens did you look at?
A. Just about the Problem Statements.
Q. How did you access the REMS screen?
A. Through my code. I have an access code through the computer.
Q. Yes. What's your access code?
A. That's personal. We can't give that away. That's a private code that is given.
Q. Well, actually, your I.D. code is HO 4971; isn't that right?
A. No, it is not.
Q. 5190; is that right?
A. No, that's not it.
Q. Okay. One more. 229?
A. No, that's not it.
Q. When did you review the Problem Statements in your REMS screen?
A. Sometime this morning.
Q. Did you look at any other papers in preparation for today's deposition?
A. No.



Q. Now, you knew that there was a lawsuit between Englewood and HUD beginning in 2003, correct?
A. Yes.
Q. Have you had any participation in collecting documents for that lawsuit?
A. Yes.
Q. Did you see the Request For Production of Documents that was served in fall of 2004?
A. I saw something. I don't recall when it was. But yes.
Q. What did you do to gather documents to respond to the Document Request in this case?
A. I printed out e-mails.
Q. And what was your methodology in printing out e-mails?
A. I have a folder that I keep a certain set of my projects in and my e-mail when I'm working on certain --
Q. This is your own e-mail folder on your computer?
A. Mm-hmm.
Q. You said, "Mm-hmm." It would be better if you said "yes" as opposed to "mm-hmm."





00000000-0000-0000-0000-000000000000

A. Yes.
Q. And what is that folder called?
A. It's called South Pointe.
Q. So, what did you do with respect to the e-mails in your South Pointe folder?
A. I printed them out as requested.
Q. When did you do that?
A. I didn't hear the question.
Q. When did you do that?
A. When they asked me for them.
Q. When was that?
A. I don't recall when they asked me for them.
Q. What year?
A. Was it last year? I don't know. I don't know when they asked me for them. Whenever they asked me for the information, I gave it to them.
Q. Who asked you?
A. My attorney.
Q. Which attorney?
A. Gregory Gustin.
Q. Did you gather materials from anyone else?
A. From anyone else?
Q. Yes.
A. No.



Q. Did you retrieve any other documents to collect -- to send to your attorneys?
A. All of the tenant files. Not tenant files. I'm sorry. Records for South Pointe were sent to the Enforcement Center.
Q. And where did you find those records?
A. In our files. We have file cabinets. In the file cabinets.
Q. And what did you look under?
A. They have an FHA number.
Q. So, you went to your green files? Is that what you call them?
A. No. We call them just files. They're just project files.
Q. And those project files are by FHA number?
A. Correct.
Q. What was the volume of -- of papers for that FHA file for South Pointe?
A. I don't recall.
Q. Was it a small folder, three boxes or what?
A. It was paper.
Q. It was paper?
A. A lot of paper.
Q. And what -- did you get the entire file?



A. Mm-hmm, yes.
Q. Did you access the imaged database for South Pointe?
A. I don't recall an image database.
Q. When documents, papers, come in on a particular project, they're imaged, correct?
A. I don't know. I never imaged.
Q. When you get a letter -- sometimes you get letters. Is that correspondence ever imaged?
A. Not that I'm aware of.
Q. What did you do with the project file that you collected on South Pointe?
A. I gave it to my attorney.
Q. Mr. Gustin?
A. Yes.
Q. Have you talked with anyone about this lawsuit?
MR. WELLONS: Before you answer that, I just want to caution you not to reveal the contents of any conversation you've had with myself or any attorneys representing HUD in this case.
Go ahead and answer the question.
BY THE WITNESS:
A. Yes.



BY MR. BAUGHER:
Q. I think you said yes, but your head seemed to shake no.
A. Yes.
Q. Who have you spoken with?
A. My attorneys and my Director.
Q. When did you speak with your attorneys?
A. I spoke with my attorneys today, previously.
Q. Which, today or previously?
A. Both.
Q. When previously?
A. Previously, a couple weeks ago, a month ago, often with them in regards to the case.
Q. And who are the attorneys that you've spoken with often with regard to the case?
A. Gregory Gustin and Maria Baguio.
Q. What about Mr. Wellons or Ms. Donnis?
A. Today.
Q. Have you ever spoken with Lisa Donnis?
A. No.
Q. Do you know who she is?
A. I've heard of her name.
Q. All right. You say you also spoke with





00000000-0000-0000-0000-000000000000

your Director. Is that Mr. Hinsberger?
A. No.
Q. Who's your Director?
A. Miss Coleman.
Q. What is her title?
A. Director, Project Management.
Q. When did you speak with her?
A. Today.
Q. Is that the only time you've spoken with her about this case?
A. We've spoken previously, but I don't recall exactly.
Q. And what did you say to her and what did she say to you today?
MR. WELLONS: Again, to the extent those conversations also involved Mr. Gustin, Miss Baguio and myself, I don't want you to answer that question. If you had conversations with Miss Coleman that did not involve your attorneys, you may respond.
Go ahead and answer.
BY THE WITNESS:
A. She asked me was I ready. I said yes.
BY MR. BAUGHER:



Q. That was the totality of the conversation?
A. Yes.
Q. When have you spoken with her previously about this lawsuit?
A. Only when it was time to meet with the attorneys.
Q. Have you talked with her about particular aspects of the South Pointe case, issues in the case?
A. No, not that I can recall.
Q. Never?
A. No, not never, but not recently. You asked me today.
Q. No, I didn't ask you about today. I was asking you about your previous conversations. What issues do you recall discussing with Ms. Coleman about this case?
A. The conditions of the property.
Q. Anything else?
A. That was the main thing, the conditions of the property.
Q. When did you talk with Miss Coleman about the conditions of the property?
A. It's been a while back.



Q. This year?
A. I don't recall exactly when.
Q. You don't recall what year you spoke with Ms. Coleman about the condition of the property in connection with this lawsuit?
A. I've spoken to Miss Coleman on several occasions in regards to South Pointe, in regards to the condition.
Q. All right. What did you say to her about the condition of the property?
A. They were bad. They were terrible. And no one should live like that.
Q. What did she say to you?
A. I don't remember what she said to me.
Q. Now, you say the conditions at South Pointe were bad and terrible. When did you first become the asset manager for South Pointe?
MR. WELLONS: I'm just going to instruct you to answer the question that's been asked. Please answer the question.
BY THE WITNESS:
A. Okay. Around -- I want to say between -- I'm not sure exactly the date. Between sometime in '98 and '99 I became the asset manager for South



Pointe.
BY MR. BAUGHER:
Q. Did you have no involvement with South Pointe before 1998 or '9?
A. Yes, I've had involvement with South Pointe prior to that.
Q. And what was your involvement previously?
A. I was the occupancy specialist for South Pointe.
Q. For what years?
A. Approximately '94 to approximately '96.
Q. What was the condition of South Pointe when you were the occupancy manager from '94 to '96?
A. It was in bad condition.
Q. I'm sorry? It's hard to hear you.
A. Bad condition.
Q. Were there a lot of gang problems?
A. Yes.
Q. Drugs?
A. Yes.
Q. Vandalism?
A. Yes.
Q. And that all happened while you were the occupancy manager at South Pointe, correct?





00000000-0000-0000-0000-000000000000

A. Yes.
Q. What did you do to try to change that situation?
A. Worked with the management.
Q. What did do you in '94 to '96 when you were the occupancy manager for South Pointe to try to help them with the drug problem, the gang problem, the crime problem, the vandalism problem?
MR. WELLONS: Objection. Compound. Misstates Miss Thomas' responsibilities.
Go ahead and answer the question.
BY THE WITNESS:
A. HUD had a drug elimination grant in one of those years. We told them to apply for that to assist with the drug problems. They applied and they received it one time.
BY MR. BAUGHER:
Q. What did you do proactively, if anything, to assist or prod the owners of the South Pointe to clean up that project?
A. I was the occupancy specialist. That was the asset manager's job. We had two separate job titles at that time.
Q. But one of the things you were responsible



for as an occupancy manager was relationships with the tenants, correct?
A. Dealing with tenant complaints.
Q. And a lot of the tenant complaints were about drug problems and crime problems and vandalism, correct?
A. Yes.
Q. And what did you do to try to work on those problems?
A. I encouraged them to contact the police. I'm not the police.
Q. Well, apparently your efforts were not very successful, I gather, because when you then became the asset manager in 1998 what did you find?
A. The same thing.
MR. WELLONS: Object to that question. Misstates prior testimony. Misstates Miss Thomas' responsibilities.
BY MR. BAUGHER:
Q. Now, how long after you became asset manager for South Pointe was the project referred to the Department Enforcement Center?
MR. WELLONS: Just answer the question.
BY THE WITNESS:



A. I don't know.
BY MR. BAUGHER:
Q. The project was referred to the Department Enforcement Center in the fall of 1998, correct?
A. I guess you could say that.
Q. Well, is that a true statement or not?
A. I don't know when the Enforcement Center opened up.
Q. Well, you were working at HUD in 1998, correct?
A. Yes.
Q. Now, once the South Pointe project was referred to the Department Enforcement Center in the fall or late 1998, what was your role?
A. I was the asset manager.
Q. Did you have any responsibilities concerning South Pointe when it was in referral to the Department Enforcement Center in 1998 to 2000?
A. Yes.
Q. What were your responsibilities?
A. They varied.
Q. Tell us what they were.
A. To monitor the property the same as occupancy specialist because they at that time had



no insured mortgage. So, those type of records were not required for me to monitor, the financials, other than the occupancy financials, meaning subsidy funds.
Q. Meaning what?
A. Subsidy funds, Section 8 funds.
Q. So, what did you do to monitor subsidy funds?
A. You go out and you do occupancy review, review tenant files to see if there's any errors in calculation, make sure that the verifications and documentation were in the tenant files, to make sure that the information was in our system's certifications and that they were billing not above their subsidy amounts.
Q. Were there any significant issues that you recall in 1998 to 2000 with respect to the tenant files?
A. No.
Q. So, tenant files was your principal concern with respect to the property from '98 to 2000?
A. Tenant complaints.
Q. So, then, you had two principal responsibilities, the tenant files and then





00000000-0000-0000-0000-000000000000

Page 38

complaints from the tenants?
A. And inspections of the units, of the property.
Q. What inspections of the property did you make?
A. I would follow up on tenant complaints if they had a complaint about something in their unit to show me that it was broken or not fixed.
Q. So, you sometimes got a complaint from a tenant saying that a toilet wasn't working properly, and you would go out to see if they were correct about that or whether the problem had been taken care of or what?
A. Not exactly like that, no, not a toilet.
Q. Well, give me an example of something that happened. And again, I'd like you to focus on the period 1998 to 2000.
A. Tenant complaints are usually the tenant calls in, I'll call the management company, ask them to resolve it. I'll follow up with the tenant, ask the tenant did they resolve it. If the tenant tells me yes -- if the tenant tells me no, I'll call the complex back, and they will either -- sometimes it may be they were waiting on a part or they just

Page 39

couldn't get to it. I don't know the reason why. I will follow up with the tenants.
One specific case that I remember when I did occupancy review -- before I did the occupancy review, a tenant called and complained about her bathroom shower and the holes in the walls and the rats coming in and getting in the bed with her babies. And so, I made it my business to go to her apartment when I did my review. And the management is always with us when we do inspections. Management takes pictures, and so do we.
Q. What do you remember happening in that instance? Was the apartment repaired?
A. In this particular case the management wrote back on the findings, because it was written as a finding, management wrote back and said that it was repaired. The following year I went back to that same apartment because that tenant kept calling me again, and the repairs were not made properly because there still was holes and water damage and her shower still was not working.
Q. Were they new holes or the same old holes or do you know?
A. Same ones. I have pictures.

Page 40

Q. Did you take pictures?
A. Yeah.
Q. How many apartments did you go into at South Pointe?
A. On a review we usually did 10 percent.
Q. Well, did you do any reviews in 1998 to 2000?
A. Yes.
Q. How many?
A. I can't recall.
Q. Do you have any documents that show what review you did?
A. No, I don't.
Q. Well, do you think you did at least one occupancy review at South Pointe?
A. Yes.
Q. Do you recall what year that was?
A. No.
Q. Do you know if you did more than one occupancy review, or do you think it was --
A. We usually do one a year.
Q. For any building?
A. Mm-hmm.
Q. But in the case of South Pointe you don't

Page 41

remember any specific --
A. Date? No.
Q. And you don't remember any specific occupancy review?
A. Yes, the one I was just telling you about.
Q. Okay. You remember that one?
A. Yes.
Q. What year was that?
A. I can't recall the year.
Q. When you go out, do you take notes?
A. Yes.
Q. In handwriting or laptop computer or what?
A. It's part of the review, and it's with the review.
Q. Can you be more specific? Is there a form or something that you fill out?
A. Yes.
Q. What is the form called?
A. It's called management review form, management/occupancy review form, I guess.
Q. And the reason it's management/occupancy is because sometimes it involves financial issues with the management and sometimes it's issues having to do with tenants and individual units, correct?





00000000-0000-0000-0000-000000000000

Page 42

A. Yes.
Q. And there's a specific form to be filled out?
A. Yes.
Q. And you recall doing at least one such review for South Pointe?
A. Yes.
Q. In which you actually went out to the property?
A. Yes.
Q. Now, as far as you know, all of the management and occupancy reviews that were conducted at South Pointe were ultimately concluded satisfactorily; isn't that right?
A. Yes.
No. I'm sorry.
Q. When was there one that was not concluded satisfactorily?
A. The one that I last did.
Q. What year was that?
A. I don't recall the year.
Q. Is that in the papers that you gathered for your attorneys in this case?
A. Yes.

Page 43

Q. Was it sometime in 2002, 2003?
A. No.
Q. How do you know that?
A. Because the property became insured December 13th, 2002.
Q. How do you keep your notes about a project as you -- well, let me strike that.
What years were you the asset manager for South Pointe?
A. Like I said, approximately from 1996 -- no, '98 to present, somewhere along there. I'm not sure.
MR. WELLONS: Actually, I believe that question has been asked before. If we have that answer on the record, would it be possible to have the response read back to us?
MR. BAUGHER: Well, is this a different response? I don't remember asking that question. I asked her when she was the asset manager, an asset manager at HUD, and she said '98 to the present. This question was about her being the asset manager for South Pointe. Is there some -- something difficult about that question?
MR. WELLONS: Are you comfortable with the

Page 44

answer that you gave previously?
THE WITNESS: Yes.
BY MR. BAUGHER:
Q. Well, is there something untrue about the answer that you gave or difficult?
A. No. You asked it already.
Q. You didn't remember your answer? You thought you might say something different?
A. No. I was wondering why you were asking it again.
Q. Do you keep running notes about your work on the project?
A. In REMS.
Q. And in what screen or area of REMS?
A. It's called the Problem Statement/Project History.
Q. Is that one area or two?
A. One.
Q. And what is your practice on noting the work that you're doing on a particular project in the Problem Statement/Project History screen at REMS?
A. I need you to be more specific.
Q. Well, what sort of notes do you make as

Page 45

you're working on a project? What items do you typically record in REMS?
A. In those particular screens?
Q. I'm asking you about how you keep your running notes about a project, and you said you used typically the REMS Problem Statement and Project History screens. Now what I'd like to know is what type of items do you typically record in those screens?
A. It varies. If they had an inspection, type of inspection information. If they're troubled, we're required to put certain information in there pertaining to the property. If you have done any specific work on it, you just put the results. If you had a meeting, you put the results of the meeting or what happened in the meeting. Just tracking of just those particular type of things.
Q. So, if there are significant events concerning the property that you've been involved in, you make a note about that typically, correct?
A. Correct.
Q. Or if you've had a meeting with the owner or someone else about the property, typically you would make a note about that meeting?

A. Correct.
Q. And if there was some action that was to be taken with respect to the property, typically you would make a note of that?
A. Yes, correct.
Q. And if there were problems with respect to the property that you thought were important, you would make a note of that?
A. Correct.
Q. Or if there were disputes with the owner of the property or the manager of the property, you would note that at some point?
A. Correct.
Q. And did you go back to your REMS -- strike that.
Do you fairly frequently go back to your REMS notes on various projects to remind yourself what's taken place with respect to the project?
A. Yes.
Q. Or if there are dates that are coming up that are important for one reason or another, do you put a note as to a date that is something that you want to recall?
A. No.



Q. Do you have a calendar file that takes care of that for you?
A. No.
Q. Do you have a day book?
A. No.
Q. Or a calendar notebook that you keep?
A. No.
Q. You don't have a personal calendar?
A. I have a calendar on my desk.
Q. Well, then, you do have a calendar.
A. It's not a personal calendar.
Q. It's a HUD calendar?
A. Yes.
Q. And what do you put on your HUD calendar?
A. Nothing.
Q. You don't use it?
A. No, it's for dates.
Q. Do you have your calendars for earlier years?
A. No.
Q. You throw them out?
A. Yes.
Q. At the end of each year?
A. Yes.



Q. Do you have any other system for keeping track of meetings that you've had?
A. No.
Q. Except in REMS where if you had a -- in the Problem Statement/Project History if you had a meeting, then you would make some notes of what that meeting had to do with, right?
A. Yes.
Q. Now, at the beginning of the deposition today your counsel handed me a copy of what I've asked the court reporter to mark as Thomas Deposition Exhibit 1, a collection of REMS screens, Bates numbers D 1101 through 1127, printed February 8, 2005.
(Document tendered to the witness.)
BY MR. BAUGHER:
Q. Have you seen this document before, Miss Thomas?
A. No.
(Short interruption.)
BY THE WITNESS:
A. No.
BY MR. BAUGHER:
Q. Do you know what it is?



A. It says, "DCT Report."
MR. WELLONS: Let the record reflect that the document is a compilation of what appear to be individual printed screens.
MR. BAUGHER: Well, it was purported, or asserted yesterday that these pages, Thomas Deposition Exhibit 1, were the totality of the DEC REMS files on the second referral of South Pointe to the DEC. Am I saying that correctly?
MR. WELLONS: That is correct. And they were previously produced as part of our production in this lawsuit. They have been compiled at the request of plaintiff's counsel and brought to the deposition today.
MR. BAUGHER: Yes, and I appreciate that. I wasn't able to find that in the production that we got. But I see it's got production numbers. I also see that it doesn't have any narrative sections at all, at least on these pages. But if this is the totality, I take it that's it.
BY MR. BAUGHER:
Q. Do you recognize Thomas Deposition Exhibit 1 as pages from REMS?
A. That's what it looks like.

Page 50

Q. All right. And you've used the REMS system since when? For many years now?
A. Yes.
Q. You're familiar with it?
A. Yes.
Q. When you make an entry on -- well, in order to get into REMS you have to use your code to get in?
A. Yes.
Q. And you have an individual personal code?
A. Yes.
Q. For entry into the REMS system. Then once you're into that REMS system, you can go to a particular screen, like history, Project History?
A. Yes.
Q. And you can add a note; is that correct?
A. Yes.
Q. How are those notes dated? When you make an entry, do you type in the date?
A. It depends on the screen.
Q. Well, let's take, for example, the one that you said you used to make your notes on the project, the Problem Statement and Project History. When you make an entry on that screen do you have to type in

Page 51

the date, or does that appear automatically?
A. The date appears automatically.
Q. And along with the date, since you've put in your code, does it also automatically put in your name and your position?
A. No.
Q. You have to type in your own name on each entry?
A. Oh, no. My name pops up when I'm in the system.
Q. And the system puts your name in because they associate that name with your code, correct?
A. Correct.
Q. And it puts your title in?
A. I don't know if it puts the title in or not.
Q. Or your role?
A. Yeah, I guess. I've never paid that any attention.
Q. So, when you go into Problem Statement/Project History, you have a box to type information into, correct?
A. Correct.
Q. And above that box already entered

Page 52

automatically by the system is the current date, your name and your role, right?
A. Correct.
Q. Now, ordinarily when you're entering items into the REMS system, am I correct that you make your notes the day that you've had a meeting or that there's an event or shortly thereafter?
A. Maybe.
Q. Well, isn't that what you usually do?
A. It depends.
Q. On what?
A. On my schedule.
Q. If you're very busy, maybe you don't put it in immediately; you put it in a couple of days later; is that right?
A. It depends.
Q. You don't have any practice?
A. No.
Q. Well, in those instances in which there is a longer interval, maybe a week or two weeks before you put in an entry, do you have paper notes that you've kept that you use in order to then input your notes onto REMS?
A. Maybe.

Page 53

Q. Do you keep paper files of notes on projects?
A. No.
Q. Never?
A. I keep my copies of what we type up and send out.
Q. You mean correspondence?
A. Correspondence.
Q. Do you have a file for South Pointe?
A. No.
Q. You've been the asset manager on South Pointe now since 1998, right?
A. Asset manager, yes.
Q. And you don't have a file, a paper file for South Pointe?
A. I don't have a personal file, no.
Q. Do you ever make notes about -- have you ever made notes about South Pointe?
A. Yes.
Q. What have you done with those notes?
A. They're in REMS or --
Q. Or what?
A. Or in the files I've given to -- they're just correspondence. I don't keep any paper.

Q. What instructions have you gotten on what sort of notes you should make or how frequently you make them?
A. None.
Q. Any?
A. No.
Q. Who do you report to?
A. Debbie Gray.
Q. How long have you reported to her?
A. I don't recall.
Q. Well, approximately.
A. Approximately about three to four years.
Q. Who did you report to before that?
A. I had several supervisors 'cuz we were doing a reorganization. So, I don't know the time frames. Walter Mozdezierz, Margie Maisonet, Kathy McMahon. That's it.
Q. That's it?
A. Denise Johnson.
Q. Have you ever reported to Veronica Coleman?
A. She's not my first line of supervisor.
Q. What does that mean?
A. She's the director.
Q. So, Debbie Gray reports to her?



A. That's correct.
Q. Was that true that you reported to Debbie Gray and Debbie Gray reported to Veronica Coleman in 1999-2000?
A. Yes.
Q. What about 2001?
A. Yes.
Q. Was there anything that you had authority to decide on your own with respect to South Pointe or the assets that you managed?
A. No.
Q. Who would you have to get approval from for whatever it is you thought ought to be done?
A. Upper management.
Q. And who would that be?
A. It starts off with Debbie, then to Veronica, then to Ed.
Q. Now, I put together yesterday and showed to Ms. Kiening what was marked as Kiening Deposition Exhibit 2, which, at least as of yesterday without the inclusion of Thomas Deposition Exhibit 1, were all the REMS materials at least that we had been able to cull out of the government's production of documents. And I'm going to hand you this set.



It is a -- as Miss Kiening and I went through, it is a compilation that is taken from a variety of different screens at a variety of different times. It's not a single document.
But I'd like to pull out a couple of pages from that on which you have some notes and ask you questions about those notes.
Off the record.
(Discussion off the record.)
BY MR. BAUGHER:
Q. Ms. Thomas, I've shown you a compilation of documents, which is Kiening Deposition Exhibit 2, some REMS documents. And from that I'm directing your attention to some Problem Statement and Project History pages that seem to have some of your notes on it. They are Bates stamped A2142 through 2147 and were apparently printed on February 13th, 2004.
Now, do you see those in front of you?
A. Mm-hmm. Yes.
Q. The court reporter hears "mm-hmm," and we know what you mean, but it's hard to record it there.
A. Yes.
Q. When I refer to Bates numbers, that's the



stamp number in the lower right which the attorneys put on. And do you see the print date in the lower right?
A. Yes.
Q. Will you tell us what the compilation is that we're looking at, Ms. Thomas?
A. Yes. This is Project History and Problem Statement of South Pointe Towers.
Q. Is this the Project History/Problem Statement REMS screen that you looked at to prepare for your deposition?
A. No.
Q. Is it the same text? Does it have the same text?
A. Can you restate your question before?
Q. Yes. You said that you -- to prepare for your deposition you went back to the -- I think you said to the Problem Statement/Project History screen on your REMS files, right?
A. Yes.
Q. Okay. And the question is are the papers that you're looking at, A2142 and following, the entries that you reviewed to prepare for your deposition?





00000000-0000-0000-0000-000000000000

Page 58

A. Yes.
Q. And did the entries that you reviewed look like the ones that we're looking at right now in the printed version?
A. Yes.
Q. Could you look through those pages briefly and tell us if you remember seeing any other entries than those that are listed on pages 2142 and following?
A. This is correct.
Q. Did you need to get any approvals or did you seek any approvals for any of the entries that you made in REMS that we're looking at on these pages?
A. No approval was needed.
Q. Did you have any conversations with anyone about any of these entries at the time that you made them?
A. This is the protocol.
Q. What is the protocol?
A. To put the information in the system so Washington can view it.
Q. Why does Washington want to review it?
A. It's their asset. It's the secretary's

Page 59

asset. When the secretary wants to review an asset, he goes into REMS and he checks the history or the Problem Statement or any other screens.
Q. The secretary of Housing & Urban Development --
A. Yes.
Q. -- goes into REMS and looks at your notes?
A. Yes.
Q. Does anyone from the Chicago office ever look at your notes?
A. Yes.
Q. But you were expected to keep those notes up-to-date without having to ask for Debbie Gray's approval, for example, right?
A. Correct. However, if there was a problem, if there was something, then they can come to you and ask you to explain it.
Q. Did that ever happen with respect to South Pointe?
A. Just the update.
Q. What do you mean "just the update"?
A. Well, I had been putting them in Project History and they should have been in Problem Statement. So, I had to move it from the Project

Page 60

History into the Problem Statement. So, my dates may look confused.
Q. And what difference does it make whether an entry's in Problem Statement or Project History?
A. Don't know.
Q. When were you told to do that?
A. I don't recall exactly when, but when the protocol came down, we do it when they say it.
Q. Looking at the first page, the date the top entry was entered on was October 10th, 2002; is that right?
A. Correct.
Q. There is a reference there to TRACs, what is that?
A. Tenant Rental Assistance Contract Program.
Q. And what does that have to do with? What is the TRACs? What is TRACs used for?
A. TRAC Section 8 certifications, tenant certifications.
Q. What does that mean?
A. That means the owners have to put that information into the system as a personal record of tenants in the property, in the calculations of their rent, their household, family size, bedroom

Page 61

size, apartment size. It used to be paper. Now it's just computerized. And they transmit it to HUD in order to get paid.
Q. Who is responsible for taking the information about individual tenants and getting it into TRACs?
A. Management.
Q. Management of the project?
A. Of the project, mm-hmm.
Q. Do you have any involvement in that?
A. No.
Q. And then who administers TRACs at HUD?
A. I don't know.
Q. You don't have anything to do with that, though?
A. No.
Q. Now, turning to the -- well, looking at the bottom of the first of these pages and onto the second page, there are five entries that were made on July 3rd, 2002; is that right?
A. Yes.
Q. And is there any reason why you made five entries on July 3rd, 2002?
A. It must have been an update from Project