Page 62

History.
Q. What do you mean "an update from Project History"?
A. Meaning I had it in the wrong place. I had it in History as opposed to Problem Statement. And if you put any entries in, it's gonna put that date in there of when you put it there. It's just the system automatically does that.
Q. So, the protocol that you're -- that you've told us about came down around July 3rd, 2002, and you moved all your entries on July 3rd, 2002?
A. No.
Q. Well, you moved five entries on July 3rd, 2002?
A. Yes.
Q. Did you make any changes in the text?
A. Don't recall.
Q. Then look at the bottom of page 2143 and continuing through to page 2146. There are then three or four pages of entries that were all made on June 24th, 2002, right?
A. Yes.
Q. And why did you make all those entries on June 24th, 2002?

Page 63

A. Same thing, moving them.
Q. I made a rough count and I got 20 different entries that were made on June 24th, 2002; is that right?
A. Mm-hmm, yes.
Q. Now, do you know -- it's your testimony that these are entries that were originally in the Project History portion of the notes, which you then moved on June 24th, 2002 over into the Problem Statement portion of the record?
A. Yes.
Q. What changes, if any, did you make in the text? Do you recall any changes one way or the other?
A. Maybe some typos or something, but no, I don't recall anything specific, no.
Q. You think you did make some changes?
A. I don't recall.
Q. You don't recall one way or another whether you made any revisions?
A. Other than some typos.
Q. You know you made some typographical corrections?
A. Yes.

Page 64

Q. Would you make some date corrections if you had a date wrong?
A. Yeah, I guess, if I had any. But I don't recall.
Q. And you could have made other changes, but you just don't recall those now?
A. Some updates probably.
Q. You mean if there was additional information that you subsequently learned, you could add that?
A. Yes.
Q. So that the entries that you made on June 24th, 2002 were updated to the information that you had or knew as of June 24th, 2002, correct?
A. Yes.
Q. Now, as to the original date on which various of these entries was made, you can't really tell that from the record we're looking at at this point; is that right?
A. Yes.
Q. Yes, that is correct?
A. Repeat your question.
Q. Looking at the entries, the 20 entries that you made on June 24th, 2002, there are some dates

Page 65

that are mentioned in those entries but we really can't tell what dates the entries were made initially, correct?
A. Correct, yes.
Q. Now, if someone had printed a screen, or this Problem Statement/Problem History screen before June 24th, 2002, then presumably they would have found the original entries as you made them on the dates in which you actually made them; is that right?
A. I guess.
Q. But obviously what we're looking at is something that was generated in 2004, right?
A. Yes.
Q. Do you remember getting these screens printed on February 13th, 2004?
A. No.
Q. Do you recall anyone asking you in 2004 or later to print screens of your REMS notes?
A. No.
Q. Did you do that for any purpose of your own?
A. No.
Q. Now, with this updating and re-entry of

your notes on June 24th, 2002, did the timing of that have anything to do with the dispute between South Pointe and HUD?
A. Don't recall.
Q. Did anyone ask you to do the re-entry and updating that you did on June 24th, 2002?
A. There was a protocol that came down. That's all I remember.
Q. But I mean, was -- did Debbie Gray or Veronica Coleman or Ed Hinsberger or someone else ask you to update and re-enter or enter these 20 items on June 24th, 2002?
A. I can't recall specifically. I just know it was a protocol.
Q. Did any attorney ask you to do that?
A. No.
Q. Now, if you would, turn, please, to the last page, 2147. And you see the last two entries are from Ed Hinsberger and you, Ed Hinsberger on September 8, '98. Do you see that?
A. Yes.
Q. And then the next entry chronologically in this document is September 26th, 2001, an entry that you made, right?



A. Yes.
Q. What happened to entries between September 1998 and September 2001?
A. They're in here updated in the June 24th stuff. The dates are kind of mixed.
Q. You say the dates are kind of mixed. Where are there entries from the three-year period from 1998 -- excuse me -- September 1998 to September 2001?
A. Maybe there were no entries made. I don't know. There's a July 27, 1999.
Q. What are you referring to?
A. An entry on 6/24. There's October 21st, 1999.
Q. This is on page 2144?
A. Yes.
Q. There's a reference in the text --
A. Yes.
Q. -- to a meeting on October 21st, 1999. Is that what you're referring to?
A. Mm-hmm, yes.
Q. Okay. Anything else?
A. And there's one July 27, 1999.
Q. All right. Anything else?



A. November 1999.
Q. Where do you see November 19th?
A. 17th, on the same page.
Q. All right.
A. April 1999, at the top of the page. April 1st, 1999.
MR. WELLONS: You can let the record reflect that counsel assisted Miss Thomas by pointing out that date.
BY MR. BAUGHER:
Q. All right. Well, you've pointed out on page 2144 four entries that have within the text 1999 dates, correct?
A. Yes.
Q. Now, they were all entered on June 24th, 2002, but they refer apparently to some events that took place in 1999, right?
A. Yes.
Q. I don't find any events that are discussed, let alone dated, for the year 2000 or for the year 2001 until April of that year, do you?
MR. WELLONS: Miss Thomas, I'm going to counsel you to please do your best to keep those pages in order, as you are reviewing the originals



of the exhibit.
MR. BAUGHER: Off the record.
(Discussion off the record.)
THE WITNESS: Now, what was your question again?
BY MR. BAUGHER:
Q. I said looking at this collection of materials from Kiening Deposition Exhibit 2 Bates numbered A2142 and following, which are your Problem Statement/Project History notes, I find no entries for the years -- for the year 2000 nor any entries in 2001 until April 9th, 2001. And I was asking you if you found any in that time frame.
A. I don't see any dated at that time frame.
Q. Or events that are noted there that had to do with 2000 or the first quarter of 2001. I didn't see any.
A. I didn't see any.
Q. Now, during the period January 2000 through March of 2001 you were working on the South Pointe project, correct?
A. I was off on maternity leave.
Q. For the whole time?
A. From May of 2000 till approximately the --

Page 70

sometime in September.
Q. Did anyone fill in for you while you were gone?
A. I don't know.
Q. With the exception of the one entry towards the -- at the end from Mr. Hinsberger -- well, and I guess I see one here from Catherine Paul, all of these entries appear to be from you. Were there others that made entries into REMS for South Pointe at various times?
A. I guess. I can't see the Enforcement Center stuff, so I don't know.
Q. All right. Now, do you recall that shortly after you became the asset manager for South Pointe the project was referred to the Department Enforcement Center?
A. Yes.
Q. And what does it mean for a project to be referred to the Department Enforcement Center?
A. That means that it has some problems.
Q. What is the purpose of sending it to the -- or referring it to the Department Enforcement Center; to work those problems through?
A. Depends.

Page 71

Q. On what?
A. If they could be worked through.
Q. Well, the objective is to try to solve the problem, correct?
A. Yes.
Q. And what is your objective as the asset manager of a project? What is your broad goal?
MR. WELLONS: Objection. Vague.
Go ahead and answer.
BY THE WITNESS:
A. Just to protect the Secretary's interest.
BY MR. BAUGHER:
Q. And how do you best do that?
A. Just making sure that the management company and the owners are following HUD regulations.
Q. Well, do you want to see the project succeed?
A. That's part of succeeding, following the regulations.
Q. Is that an important part?
A. Yes.
Q. Is the -- is part of HUD's mission to do what it can to see that the projects run as smoothly

Page 72

for the owners and the tenants as possible?
MR. WELLONS: Objection. Vague.
Go ahead and answer.
BY THE WITNESS:
A. Don't know. Owner's property. HUD just insures it.
BY MR. BAUGHER:
Q. So, HUD's interest in this is just to protect its insurance interest?
A. And to make sure that the tenants will live in decent, safe and sanitary conditions and affordable housing.
Q. And in that sense you want to see the project flourish, correct?
A. I don't understand what you mean.
Q. Well, when you serve as an asset manager trying to enhance the success of the asset?
A. That's the owner's responsibility.
Q. And you don't care about that?
MR. WELLONS: Objection. Misstates former testimony.
Go ahead and answer.
BY THE WITNESS:
A. Yes, I do. We work together.

Page 73

BY MR. BAUGHER:
Q. What projects are you now working on with L. C. Higginbotham?
A. The two that I can recall just was put in my portfolio. It's Washington Scene, but I don't do much of that. They have a contract administrator.
Q. What does that mean?
A. They have someone, another contract administrator like Ida that monitors their Section 8 funds. I don't.
Q. Who does?
A. CHAC.
Q. Okay. What else?
A. Leigh Johnson.
Q. Do you currently live in an apartment that is owned by Higginbotham?
A. No.
Q. Have you ever?
A. Never.
Q. Have your relatives lived in one of his apartment buildings?
A. No.
Q. What do you recall, going back to 1999, about your work on South Pointe during 1999 and

early 2000 when the project was referred to DEC?
A. Can you be more specific?
Q. No.
A. I can't answer your question.
Q. Do you have any recollection of work that you did with respect to South Pointe in 1999 or 2000?
A. Not other than what I told you about previously.
Q. Well, the only thing I remember you telling us about previously is an occupancy review that you did in which there was one apartment in particular that had some shower and other problems.
A. Yes, it was an occupancy review.
Q. And you think that occupancy review was in 1999 or 2000?
A. I don't know when it was.
Q. Okay. So, at least without further prompting you have no recollection about any of the work that you did concerning South Pointe in 1999 and 2000?
A. Other than the inspections. I just don't know the time frames, inspection of the properties. I inspect it. I did do a management review of South



Pointe each year of the time that I had it.
Q. Did you have any interaction with the Department Enforcement Center during 1999 and 2000 concerning South Pointe?
A. There was a meeting held at our office with Freddie Batchelor and representatives of South Pointe.
Q. When did that take place?
A. I don't know. I don't recall the date.
Q. Okay. Who's Freddie Batchelor?
A. She was an enforcement analyst.
Q. For DEC?
A. Yes.
Q. And who was at this meeting that you recall?
A. Representatives from South Pointe Towers, myself and Mr. Gilmore, I think, 'cuz it was about some tenant organization that they were trying to do to help the residents at South Pointe.
Q. You said they were representatives of South Pointe. Do you remember who?
A. I know Mr. Carl Sanders was one.
Q. You've had dealings with him over a long period of time, correct?



A. Yeah. Exactly, yes. And I can't recall. Miss Brown, somebody named Miss Brown.
Q. Tracy Brown?
A. No, I don't think it was Tracy Brown. Kelly Brown.
Q. Kelly Brown?
A. Kelly Brown.
Q. So, this was at a meeting that you recall with Batchelor, Sanders, Brown and Gilmore?
A. Yes.
Q. And yourself?
A. Yes.
Q. That took place at HUD?
A. Yes.
Q. And the purpose of the meeting was to discuss a tenant organization and service programs that South Pointe hoped to initiate?
A. Yes.
Q. What was the nature of those programs?
A. I guess -- I don't know exactly. They just had some ideas that they would think about implementing, tenants helping better their selves, educate themselves.
Q. Did it sound like a good program?



A. Yes. We encourage it.
Q. That's what -- I mean, this is an example of what I was asking you about before in terms of HUD's interest in doing what it could to make the projects run as well as they could. And did you see part of your responsibility being to encourage, for example, tenant service programs?
A. We've always encouraged tenant service programs and safe housing.
Q. In your experience with Carl Sanders, do you view him to be a competent manager?
A. I have no comment on Carl Sanders. I don't know what type of manager he is.
Q. Well, you've had dealings with him over the years. What's your impression?
A. I don't have an impression.
Q. How did he do in the meeting that you referred to sometime in 1999 or 2000?
A. They presented some information, and we said if it works, then go for it.
Q. Do you have any negative assessment of Carl Sanders?
A. I have no assessment of Carl Sanders.
Q. What about Kelly Brown?

A. I have no assessment of Kelly Brown.
Q. And that's because you don't believe in having an opinion about them or you don't have information on which to make an assessment?
A. Just don't have an assessment of them.
Q. Do you have an assessment of anyone connected with South Pointe?
A. No.
Q. Have you ever?
A. No.
Q. You have no opinion one way or another?
A. No.
Q. And you have no opinion one way or another despite the fact that you've been the asset manager on this property now for six or seven years?
A. No.
Q. Do you recall any other meetings or events concerning South Pointe while it was in referral to Department Enforcement Center 1998 to 2000?
A. No, I don't recall any off the top of my head, no.
Q. Now, when the project was referred to DEC in 1998 a team was formed at DEC to work on the project; is that right?



A. I don't know how the DEC works.
Q. Well, did you know that there was a team leader, Joan Kiening, who was to be overall responsible for South Pointe while it was at the DEC?
A. I don't know what Joan's responsibilities was going to be.
Q. You didn't know that she was the team leader of --
A. I know she was a team leader. That's it.
Q. Okay. Did you know that she was the team leader for South Pointe when it was at the DEC from 1998 to 2000?
A. No.
MR. WELLONS: If we could go off the record for a few minutes and take a break?
MR. BAUGHER: That's fine. Could we go just a few minutes more and let me exhaust her recollection without looking at documents about the initial DEC period and break then?
MR. WELLONS: Do you know how much longer you'll need? Exhaust is definitely the operative word.
Miss Thomas, are you okay to go another



five minutes?
THE WITNESS: I'm fine.
MR. BAUGHER: Let's just go another five minutes and then we'll break.
MR. WELLONS: I'll hang in there.
BY MR. BAUGHER:
Q. If I told you that Joan Kiening was the team leader for South Pointe when it was at the DEC in 1998 to 2000, would that be new information to you?
A. She was a team leader. I didn't know what her duties were. I knew that she worked at HUD and she was a team leader. That's all I knew.
Q. All right. But you didn't know that she had a responsibility for South Pointe in 1998 to 2000?
A. No.
Q. All right. Her -- I think the title is enforcement analyst, the person who worked under her on the South Pointe team from 1998 to 2000 was apparently a woman named Freddie Batchelor. You know of her?
A. Yes.
Q. Did you know that she was the analyst



working on South Pointe for the time in which it was then the Department Enforcement Center 1998 to 2000?
A. I don't know the time frame, but yes.
Q. Did you ever have conversations with Miss Batchelor about South Pointe during the time in which the project was at DEC?
A. Yes.
Q. What conversations do you remember having with her?
A. She called and we had to take the files to the DEC, and she needed to know the contact person, owner's name, phone number, stuff like that.
Q. It sounds, from what you've just recounted, that your contact with Miss Batchelor was at the outside of the referral as she was gathering information from Multi-Family Housing to start her work?
A. Yes.
Q. Is that right?
A. Yes.
Q. Do you recall anything after that?
A. No.
Q. Did you have meetings with her or others at DEC?





00000000-0000-0000-0000-000000000000

A. Just the one that I mentioned.
MR. WELLONS: Again, Miss Thomas, if you could allow Mr. Baugher to finish his question before responding.
BY MR. BAUGHER:
Q. So, during the period in which the project was at the DEC from '98 to 2000, your only recollection of involvement was in getting materials to DEC at the outset of the referral to DEC and the one meeting that you described with Mr. Sanders and Miss Brown?
A. Yes. I don't know the time periods, though, but that's exact.
Q. And you remember no conversations during this period of time, 1998 to 2000, with Miss Batchelor, Ms. Kiening or others concerning South Pointe?
A. No.
Q. Do you recall learning that a -- an action report was being put together for South Pointe by DEC?
A. That was their responsibility, yes.
Q. And did you know that they were in fact putting together an action plan for South Pointe in



1999?
A. I don't know when they put it together.
Q. Do you know that they were putting together an action plan for South Pointe?
A. That was their procedure.
Q. Yes, but I mean did you have any specific knowledge of an action plan for South Pointe while it was at the DEC?
A. No.
Q. You never reviewed any draft of a --
A. No.
Q. -- of an action plan?
A. No.
Q. And you never spoke with anyone about an action plan?
A. No.
Q. And no one from the DEC consulted with you to ask for your opinions or suggestions with respect to an action plan?
A. No.
Q. Did anyone from DEC ask you any questions about the status of the property or your views on the property?
A. They had the files.



Q. So, they had your written work?
A. Yes.
Q. Other than that written work, though, you offered no information or views to anyone at DEC about the South Pointe project while the project was at DEC in 1998 through 2000?
A. If they asked me any questions about it, I gave them the assistance of the questions they asked, if they did.
Q. Do you recall any questions that were ever put to you?
A. No, I don't recall anything right now. But your time frames are different.
Q. Than what?
A. What you're saying, you're going '99 to 2000, and I don't recall Freddie Batchelor having it in 2000.
Q. Do you know when the project was at the DEC?
A. No. I just have to review my records and see.
Q. Well, go back and look at your records.
(Short interruption.)
BY THE WITNESS:



A. During this time frame Freddie Batchelor was not the enforcement analyst.
BY MR. BAUGHER:
Q. Who was?
A. I don't know, but it wasn't Freddie Batchelor.
Q. How do you know that?
A. Because she turned in her report and closed it out. It went down to the DEC a second time.
Q. Well, a final team report was issued in early 2000; isn't that correct?
A. I don't know when it was issued.
Q. Did you ever see the final team report?
A. Yes.
Q. Did you read it?
A. I've seen it.
Q. Did you read it?
A. I've seen it.
Q. Did you read it?
A. I've seen it.
Q. Okay. We're in a little duel here. I take you at your word that you have seen it. Sometimes that just means seeing. You can see that I have a pad of paper, but you haven't read my notes. Did





00000000-0000-0000-0000-000000000000

Page 86

you read the team report?
A. I've seen the team report. I haven't reviewed the team report, no.
Q. All right. You say you haven't reviewed it. Have you read it?
A. No.
Q. When did you see the team report?
A. Whenever she -- when they brought it upstairs, during that time period. I don't know the time frame it was back then.
Q. Why didn't you read it?
A. Pardon me?
Q. Why didn't you read it?
A. I just didn't, not at that time, no, I didn't.
Q. Well, did you read it at some subsequent point in time?
A. Maybe.
Q. When?
A. I don't know. I don't remember.
Q. Well, now, let's get this pinned down. I asked you before if you'd ever read the team report.
A. And I said no.
Q. And you balked at that question, and then

Page 87

finally you said no. Is that true?
MR. WELLONS: Objection. Misstates prior testimony.
BY MR. BAUGHER:
Q. Is it true that have you not read the team report?
A. Yes, it's true.
Q. Okay. But you did have a copy of it?
A. A copy of it was delivered to Multi-Family.
Q. And signed off at Multi-Family by Ed Hinsberger, among others, right?
A. I assume.
Q. You don't know that because you haven't read it?
A. Right.
Q. Did anyone describe it to you?
A. I've seen it.
Q. No, I mean describe to you what it says.
A. No.
Q. Or tell you about it? No?
A. Not --
Q. Did you ever -- I'm sorry. I interrupted your answer.
A. I don't have anything else to say.

Page 88

MR. BAUGHER: Read the question back.
(Record read as requested.)
BY MR. BAUGHER:
Q. I broke into your answer. Did anyone tell you about it?
A. Tell me about what?
Q. About the content of the report.
A. I've heard it, yes.
Q. From whom?
A. Different people.
Q. When?
A. During the get-together with this stuff. But no, not back in the -- whenever it was. I'm not sure.
Q. In the course of getting together papers and preparing for your deposition in this lawsuit, you've heard of the final team report; is that what you're saying?
A. Yes.
Q. But back in 2000 when the -- when the report had just been completed, then you saw it but didn't do anything else with it?
A. I don't know when the team report was brought up, so I can't say in 2000. Remember, I was

Page 89

on maternity leave, so I don't know.
Q. Well, you weren't on maternity leave until later in the year, correct?
A. Mm-hmm.
Q. May.
A. Okay. Well, I don't know when the team report was done.
Q. January.
A. Okay.
Q. Did you know that as part of the DEC process there was a Management Improvement and Operations Plan?
A. I've heard.
Q. Did you ever read one?
A. Did I ever read one?
Q. Yes.
A. Or did I ever read South Pointe's?
Q. Well, good point. Did you ever read South Pointe's?
A. No.
Q. There was a MIO that was delivered by South Pointe to HUD, to Department Enforcement Center, Miss Kiening, in late 1999. You never read that MIO plan?

Page 90

A. No.
Q. Until I told you a few seconds ago that there was a MIO plan that was delivered by South Pointe to HUD in late 1999, were you aware that there was such a MIO plan?
A. Yes.
Q. How did you know about that?
A. During preparing for this.
Q. So, did you see a copy of the late 1999 MIO plan when you were preparing for your deposition?
A. I saw it.
Q. Did you read it?
A. No, I didn't.
Q. So, when you saw the -- read the question back, please?
(Record read as requested.)
BY MR. BAUGHER:
Q. Did you just become aware of the December 1999 MIO when you were preparing for your deposition in the last month or two?
A. Yes.
Q. Did you have any conversations with Debbie Gray or her superior, Veronica Coleman, that you recall in 1999 or 2000 about South Pointe?

Page 91

A. Repeat your question.
Q. In the time frame 1999 to 2000 do you recall having any conversations with either your immediate superior, Debbie Gray, or your two levels up superior, Veronica Coleman, about South Pointe?
A. Yes.
Q. What do you recall talking about with them?
A. I remember conversations, but I don't recall exactly what.
Q. You can't remember the content?
A. Basically it's just the conditions of the property. That's basically what we talked about, the conditions of South Pointe.
Q. With both Gray and Coleman?
A. With Miss Coleman.
Q. But not Miss Gray?
A. Right.
MR. BAUGHER: Paul, I said five minutes, and I stretched that. Why don't we take our break?
MR. WELLONS: I think it's a good time.
MR. BAUGHER: Do you want to come back at 1:00, 1:15?
(Discussion off the record.)
BY MR. BAUGHER:

Page 92

Q. If we could, let's go back to your notes and Problem Statements and Project Histories and REMS. Do you recall the format of this protocol from Washington, D.C. that you mentioned? Was it a memorandum or directive of some sort?
A. No.
Q. What was it?
A. I don't know.
Q. Well, was it a written direction?
A. It was -- I don't know if it -- it was -- I don't know if it's written or what. I'm not sure. I was told by my Director to do it.
Q. And your Director meaning Debbie Gray?
A. Veronica Coleman.
Q. Okay. Did she tell you to do that, meaning move or change records with respect to South Pointe only or with respect to all of your REMS entries for all of the projects that you were asset manager for?
A. All the REMS entries for all the projects that I was asset manager for.
Q. And so, you did make changes in all of the REMS entries for all of the assets that you managed?
A. Yes.
Q. At the same time?

Page 93

A. I don't recall.
Q. Look at page A2144. This is part of Kiening Deposition Exhibit 2. And there is a reference, appears to be a reference in the middle of the page to a meeting on October 21st, 1999. Do you see that, where it says, "To date we have not received a written recommendation from Enforcement Center, George Gilmore," et cetera?
A. Yes.
Q. Is that referring to the meeting that you told us about a little bit earlier?
A. Yes.
Q. And was the Neighborhood Network Program the one that was the service program they were proposing?
A. Yes.
Q. Who's Mr. Gilmore?
A. Senior Project Manager.
Q. At HUD; is that right?
A. Yes.
Q. And what is his responsibility with respect to HUD projects like South Pointe?
A. I don't understand what you mean.
Q. Why was he at this meeting?





00000000-0000-0000-0000-000000000000

Page 94

A. Because he is the Neighborhood Network coordinator.
Q. And he is tasked with trying to encourage service programs at the various projects that you're responsible for?
A. In HUD's inventory.
Q. Yes. That's his responsibility?
A. In HUD's inventory, not just mine.
Q. Okay. Now, you say, "To date we have not received a written recommendation from Enforcement Center." That's a written recommendation on what? Do you know?
A. No, I don't at this time.
Q. Was that a written recommendation on what was supposed to happen to the property, or do you not recall?
A. They were supposed to send a recommendation, I guess, of an action plan. I'm not sure.
Q. And did you ever see an action plan?
A. No.
Q. You know there was an action plan, but you didn't see it?
A. I don't know if there was one.

Page 95

Q. In any event, you never read one?
A. Yes.
Q. From DEC?
A. Yes.
Q. Yes, you did not read one from DEC concerning South Pointe?
A. Yes.
Q. Did you have any involvement with budgets or approval of budgets for the projects that were within your province?
A. Yes.
Q. Did that include budgets for South Pointe?
A. Rent increases.
Q. Well, yes, including rent increases?
A. I'm saying rent increases. The only time I have involvement with budgets is with rent increases.
Q. And what's your responsibility on budgets and rent increases?
A. To review them and make recommendations of what come about to my supervisor, whether or not a rent increase can or cannot be approved according to the budget.
Q. And how do you decide that?

Page 96

A. Reviewing the budget in accordance with the handbook.
Q. What handbook?
A. 4350.1.
Q. What does 4350.1 mean?
A. What does it mean?
Q. Yes.
A. I don't know.
Q. Is that the title of the handbook?
A. Yes, the management handbook. Not management, but -- yes, that's the handbook, Asset Management Handbook.
Q. And that's what you use to determine whether or not there should be a rent increase?
A. We follow the guidelines, yes.
Q. Part of the guidelines calls on -- calls for rent increases if the costs of operating the project have increased; is that right?
A. Expenses have increased.
Q. Yes?
A. Yes.
Q. And under what circumstances if the expenses have been increased does that then lead to an approval of a rent increase?

Page 97

A. I don't understand what you mean.
Q. Well, supposing you get a budget and it shows that expenses have increased. Under what circumstances would that then make it appropriate for there to be a rent increase?
A. If they've submitted everything in accordance with the guidelines.
Q. And your function is to do what with respect to the budget that you receive? What are the steps that you go through?
A. Follow the steps in the Asset Management Guidelines.
Q. Can you tell us what those steps are?
A. Review the budget in accordance with the guidelines, and if everything is there, then you can approve it.
Q. Can you recall what the guidelines are?
A. No, other than -- I open my book and I go through the guidelines.
Q. But you have no independent recollection without looking at the book?
A. No.
Q. Do you remember receiving requests for rent increases from South Pointe?

Page 98

A. Yes.
Q. Do you recall ever granting any of those requests?
A. I only received one.
Q. When was that?
A. Around the time that the MHRA came out. Around the time that the contract renewal policy came out.
Q. When was that?
A. I think around March or something of -- March of -- I don't know when the MHRA came out.
Q. What is MHRA?
A. That's the Contract Renewal Policy Handbook.
Q. What's the title of it?
A. Contract Renewal Policy Handbook.
Q. What is the relationship between the MHRA Contract Renewal Handbook and a request for a rent increase?
A. The MHRA came out for contracts that were expiring. The handbook tells you how to just process rent increases in the Contract Renewal Policy in order to get a rent increase, you would have to also follow the guidelines in accordance

Page 99

with the MHRA because the contract was coming to expire the next fiscal year. Normal processing, we would use the 4350.1 if the contract was not coming to expire. If the contract was coming to expire, we follow the guidelines under the Contract Renewal Policy.
Q. All right. In 1999 was the South Pointe contract expiring?
A. Yes.
Q. Do you recall when it was expiring?
A. September 30th, 1999.
Q. So, for that year you had a different -- you had a contract renewal handbook that you should use with respect to rent increases?
A. Yes.
MR. BAUGHER: Would you mark this, please, as Thomas Deposition Exhibit 2?
(Thomas Deposition Exhibit Number 2 was marked for identification.)
BY MR. BAUGHER:
Q. Ms. Thomas, I'm going to show you what's been marked as Thomas Deposition Exhibit Number 2, the top page of which is a letter to you dated March 23, 1991 from Mary Harth at P.M. One. Have

Page 100

you seen that before?
(Document tendered to the witness.)
BY THE WITNESS:
A. Yes.
BY MR. BAUGHER:
Q. When do you recall seeing that?
A. Now that you showed it to me, yes, I recall it.
Q. All right. And this is what document?
A. This is a budget rent increase request.
Q. A budget rent increase expense?
A. Request.
Q. Request.
MR. WELLONS: Counsel for defendant would like to state on the record that based on a typed inscription on the first page of this document, it appears to be an Exhibit Number 2 of another document that is not present.
MR. BAUGHER: Well, Mr. Wellons, as you can see from the Bates stamp numbers, these are documents that were produced to us from the government.
MR. WELLONS: Is there an objection to my clarifying the record?

Page 101

MR. BAUGHER: Yes. I don't think what that "Exhibit 2" means. My suspicion is that it was something that was added to this document probably long after 1999, although I don't really know that. But it doesn't appear to me to be part of the original document. So, calling that to the attention of the witness and suggesting that then there's an Exhibit 1 or there's some other document I think leads us astray.
MR. WELLONS: Sorry. I'm simply trying to clarify the record. Please continue.
BY MR. BAUGHER:
Q. Now, you remember receiving Thomas Deposition Exhibit 2 in March of 1999?
A. Yes.
Q. And what did you do with this request?
A. I reviewed it.
Q. And how did you do that?
A. In accordance with the guidelines.
Q. Well, what did you do specifically?
A. I reviewed it in accordance with the guidelines.
Q. And what does that mean?
A. That means you look at it, you read it.

Page 102

And it was not in accordance with the guidelines. I sent a letter and rejected it.
Q. What was not in accordance with the guidelines?
A. The budget was not in accordance with the guidelines, the contract renewal guidelines. The contract was coming to expire. Therefore, they had to process this in accordance with the contract renewal guidelines.
Q. And what different did South Pointe have to do than it did in this document?
A. They had to submit the paperwork that is in the contract renewal for this.
Q. Was there anything about the budget itself that you deemed to be inappropriate?
A. It's retroactive. We don't go retroactive to another fiscal year.
Q. Is there anything about the budget in the year 1999 that you considered to be an inappropriate or unsubstantiated, unsatisfactory entry?
A. Yes.
Q. What?
A. Can't tell what the budgeted year is for. It's not completed.

Page 103

Q. What does that mean?
A. That means it doesn't list the year that this budget is for.
MR. WELLONS: Miss Thomas, if I could just advise you, when you point at the document, the court reporter does not indicate that unless you tell her. So, if you can describe what it is specifically that you're indicating for her?
BY MR. BAUGHER:
Q. Can you see, looking at this budget, Miss Thomas, that the property lost approximately $120,000 in the previous year? Do you know how to read this document to find out whether there was a gain or a loss?
A. Yes.
Q. Where do you look for that?
A. You look at the end. Well, actually, it's got a page missing.
Q. What page is missing?
A. The signature page with the rest of the expenses on it that's signed by the owner certifying --
Q. Well, this is what was produced to us by the government. Where do you find the loss for the

Page 104

year?
A. It's not here.
Q. Well, look at the bottom of page 239. Does that tell you what the loss was, or do you know how to read this document?
A. Yes, I do.
Q. What's the loss?
A. I don't know what year this is for.
Q. What is the loss?
A. The loss? 120,000. They're saying that they could not pay their expenses. Their expenses exceeded their income.
Q. Okay. And that would be one of the grounds for a rent increase, correct?
A. Could be, yes.
Q. Do you see that the project was also making principal payments of over a half a million dollars a year on its outstanding loan?
A. The mortgage is not with HUD.
Q. Can you answer the question, please?
A. Yes.
Q. Where is that shown?
A. 7375.
Q. I'm sorry. I didn't understand what you

Page 105

said.
A. 7375 in the account number section.
Q. And do you see that the management reduced the fee that it was taking by a substantial amount, or proposed to do that in its new budget?
A. Yes.
Q. The reduction was going to be a $60,000 reduction in management fee, right?
A. Yes.
Q. In order to try to make the budget a balanced budget, correct?
MR. WELLONS: Objection. Assumes facts not in evidence.
Go ahead and answer.
BY THE WITNESS:
A. I don't know why they did it.
BY MR. BAUGHER:
Q. To help substantiate a request for a rent increase; is that one reason, do you think?
A. I don't know why they --
Q. Did you have any conversation with anyone for South Pointe on the subject of this budget?
A. No.
Q. And the rent increase?

27 (Pages 102 to 105)

Page 106

A. No.
Q. Who did you talk with about whether or not the rent increase should be approved or not?
A. I prepared the letter and gave it to my supervisor, Debbie Gray.
Q. Do you know if she independently reviewed the budget, or did your letter just go out?
A. I don't know what she did.
Q. Did you make any attempt to work with the owner so that the owner could submit a budget that would better meet the guidelines for expiring contracts?
A. I sent the letter and told them to resubmit it in accordance with the guidelines.
Q. Did you tell them what they had to do?
A. They needed to read the book.
Q. Did you send them the book?
A. Yes.
Q. Did you have any conversations with them about that?
A. No.
Q. Why not?
A. They didn't call me.
Q. And you didn't call them?

Page 107

A. No.
Q. Do you know if there was a REAC Report on South Pointe in 1999?
A. I know there was a REAC inspection, but I don't know the date.
Q. Did you receive a copy of the report of that inspection?
A. Yes.
Q. Did you look at it?
A. Yes.
Q. When did you look at it?
A. When it hits our system, our REMS system. It's downloaded into the computer.
Q. And did you do anything about it?
A. Yes, we have to follow through.
Q. What does that mean?
A. It means we have to contact the owners to make sure -- to make sure that they have mitigated the health and safety items that would be found on the property, and they have to certify that they have corrected those EH&S items. And it depended on the score whether or not they were referred to the Enforcement Center, or if they had to do a different plan. It was a different protocol at that time.

Page 108

Q. There was no EH&S items in the 1999 REAC Inspection Report, were there?
A. Yes.
Q. What?
A. I don't know. I need to see the report to see.
Q. What do you recall, anything?
A. No, I don't know right now.
Q. Let me show you what we marked yesterday as Kiening Deposition Exhibit 4. Is this the report of the 1999 REAC inspection that you say you saw in 1999?
(Document tendered to the witness.)
(Short interruption.)
BY THE WITNESS:
A. Yes.
BY MR. BAUGHER:
Q. Now, what does it say about E&H issues?
A. These are the E&H issues (indicating). This is a traffic ticket. It's left by the inspector.
MR. WELLONS: Miss Thomas, again, the reporter can't record your gestures. And if you want to describe something in the document, you need

Page 109

to refer to it specifically within the document.
BY MR. BAUGHER:
Q. Are you talking about the last page?
A. Yes.
Q. D36? In fact, there's "Thomas" written in the upper right-hand corner of it. Is that your handwriting?
A. No.
Q. Do you know whose it is?
A. No, I don't.
Q. Do you know when the items shown on the last page of Deposition Exhibit 4 were corrected or taken care of?
MR. WELLONS: Objection. Assumes facts not in evidence.
Go ahead and answer.
BY THE WITNESS:
A. They're supposed to be resolved within 72 hours.
BY MR. BAUGHER:
Q. Do you have any reason to believe they weren't?
A. I don't know what they are. I just showed you that.

Q. Well, it says, "No batteries," batteries in smoke detectors.
A. Okay.
Q. Do you have any reason to believe they weren't taken care of in the appropriate time period?
A. No.
Q. And as to the various other items delineated in Deposition Exhibit 4, were there any of those items to your knowledge that were not corrected?
A. I didn't inspect those units. I don't know if they were corrected or not.
Q. And as far as exigent health and safety issues, what was deducted from the REAC score in 1999 in that category?
MR. WELLONS: Let the record reflect that the witness is referring to page D 0836 within the document.
BY THE WITNESS:
A. According to this, it looks like a 0.4.
BY MR. BAUGHER:
Q. That's 0.4 out of a hundred, correct? It's a four-tenths deduction from a hundred points,



correct?
A. Overall points, yes.
Q. Now, do you know what a Pinnacle report is?
A. No.
Q. Have you ever heard of that term?
A. I've heard of it before.
Q. Did you know that there was a Pinnacle report on South Pointe in 1999?
A. Yes.
Q. Did you see a copy of the Pinnacle report?
A. No.
Q. How do you know there was one?
A. Enforcement document says that they requested a Pinnacle report. I mean a Pinnacle inspection. That's a company.
Q. It's a company. You never saw that inspection report, however?
A. Not that I'm aware of, no.
Q. Now, during 1999 were you aware that the owner of the South Pointe invested an additional $770,000 into the building?
A. No.
Q. Are you hearing about that for the first time today?



A. I've never seen it done, if he did.
Q. But you had never heard before this afternoon that the South Pointe owner put an additional $770,000 into the building, his own funds, in 1999?
A. No.
Q. Would it surprise you to hear that he had done that?
A. Yes.
Q. Would you consider that a positive event for the building?
MR. WELLONS: Objection. Vague.
Go ahead and answer.
BY THE WITNESS:
A. I don't know. It depends on what he did.
BY MR. BAUGHER:
Q. Well, if the $770,000 was invested in the building to make repairs, what would be your view on that?
A. It would help.
Q. Do you have any reason to believe that the owner of South Pointe did not put $770,000 into the property in 1999?
A. Yes.



Q. Why is that?
A. Because the conditions still remained the same.
Q. In addition to new funds being put into the building from the owner, do you know if the owner was also seeking to borrow funds for the purpose of rehab and repair of the building?
A. Yes.
Q. And what was your role in the owner's attempt to get financing of additional loan funds to put into the building's rehab and repair?
A. I don't have a role in that. I don't work in Production.
Q. What do you mean "in Production"?
A. Production does the loans. I'm not involved in Production.
Q. Do you have anything to say about that?
A. They ask about our last inspections or --
Q. Somebody asks you about that?
A. Yes. We have a meeting.
Q. You have a meeting to do what?
A. With the owner's representative bringing in their proposal to rehab the building.
Q. And did you consider proposals to rehab the





00000000-0000-0000-0000-000000000000

Page 114

building to be a good thing for the building?
A. Yes.
MR. BAUGHER: Will you please mark this as Thomas Deposition Exhibit 3?
(Thomas Deposition Exhibit Number 3 was marked for identification.)
MR. WELLONS: If the record could reflect, this is a compilation of documents, some of which are Bates numbered, some of which are not.
BY MR. BAUGHER:
Q. Let me show you Thomas Deposition Exhibit 3. In particular I'd like you to look at the first three pages of that exhibit.
(Document tendered to the witness.)
BY MR. BAUGHER:
Q. Can you tell us what the first three pages are?
MR. WELLONS: Take as much time as you need to examine the document.
(Short interruption.)
THE WITNESS: Okay.
BY MR. BAUGHER:
Q. Do you remember sending an e-mail to Maggie O'Connor on November 30th, 1999?

Page 115

A. Now that I see it, yes.
Q. And do you recognize this e-mail at the beginning of Deposition Exhibit 3 as one of your e-mails?
A. Yes.
Q. Is this one of the documents that you printed out from your e-mail folder on South Pointe?
A. I don't know if I printed it out or other people printed it out.
Q. Perhaps Miss O'Connor?
A. Could have.
Q. Who is she?
A. She's an employee at HUD in Production.
Q. In another department?
A. She's in Multi-Family.
Q. Which is another portion of that department?
A. Yes.
Q. And what's her responsibility with respect to loans?
A. I don't know.
Q. Well, why were you writing to her?
A. Because she asked me a question.
Q. And do you know why she asked you?

Page 116

A. Because I guess they were in for an insurance loan.
Q. Meaning that HUD would insure a loan on the property, right?
A. I don't know if HUD would insure a loan on the property, but --
Q. Well, when you say insurance on the property, they're not looking for property and casualty insurance, correct?
A. They're looking for money.
Q. Which means at HUD that the government insures the mortgage; is that correct?
A. Yes.
Q. And you understand -- you understood my question, didn't you?
A. You asked me a question. I answered.
Q. Now, you believed in November 1999 that South Pointe was in poor physical condition, correct?
A. Yes.
Q. And so, you believed that it needed to be repaired and rehabbed, correct?
A. Yes.
Q. And that money needed to be spent to make

Page 117

those repairs, correct?
A. Yes.
Q. So, in general, from your vantage point as asset manager for South Pointe one would imagine that you would be in favor of a rehab loan for the project, correct?
MR. WELLONS: Objection. Vague. Go ahead and answer.
BY THE WITNESS:
A. A rehab loan that was gonna put the property back into the condition it should be, not a band-aid job.
BY MR. BAUGHER:
Q. You recommended against the rehab loan that was being sought at the time by South Pointe in your e-mail to Maggie O'Connor, correct?
A. Yes.
Q. Who did you talk with about this recommendation before you made it?
A. No one.
Q. Now, I thought that you said that you didn't have the authority to make any decision on any substantive matter without the approval of at least your supervisor, Debbie Gray. Did I

Page 118

misunderstand that?
A. No.
Q. This wasn't a decision; this was just your advice?
A. Yes.
Q. Did you discuss your advice with Miss Gray?
A. No.
Q. Or anyone else?
A. No.
Q. Why not?
A. I didn't have to.
Q. Why not?
A. Because I was making a recommendation, as I do to all my work.
Q. You say in the first numbered paragraph, "The owners and agent are being flagged for violation of the HAP contract."
What does it mean to be flagged?
A. Their participation in HUD programs, if they want to participate in any other HUD business that they will not clear in ours, in our computer system when we run the company's name or ownership name throughout the nation.
Q. Meaning that an owner or a manager that is

Page 119

flagged is not eligible for participation in further HUD projects; is that right?
A. Until they resolve the issue, that's correct.
Q. They're black listed, correct?
MR. WELLONS: Objection. Misstates prior testimony.
BY MR. BAUGHER:
Q. Well, is that correct?
A. I don't know what black listed means.
Q. Do you really not know what black listed means?
A. No, I don't know what black listed means.
Q. Okay. Where did the term "flagged" come from?
A. Our system is called a 2530 system.
Q. 2530 what?
A. That's just -- all I know is it's a previous participation form that the number is 2530 that owners have to submit or management agents before they do HUD business.
Q. And how does a flag get put on a particular owner or manager? How does that happen?
A. When the owner violates any HUD regulations

Page 120

or management company.
Q. And who puts the flag on?
A. It depends on what the problem is or who's the project manager, or it can come from headquarters. It just depends.
Q. Did you have the authority to put a flag on somebody?
A. Yes.
Q. By yourself?
A. I have to get approval from my supervisor first.
Q. From Miss Gray?
A. From Miss Coleman on 2530 issues. There's a protocol.
Q. Well, what's the protocol?
A. I don't know. I mean, I don't know exactly what you're looking for, but on 2530 flags, before you flag anyone it has to go through Miss Coleman.
Q. And the "it" is a paper document that proscribes further participation with a particular owner? Is there actually a form that you fill out for that?
A. No.
Q. How is that done?

Page 121

A. It's done in the computer system.
Q. And you can do that by yourself on the computer?
A. Yes.
Q. Now, as of November 1999, was there a flag on the owners or agent for South Pointe?
A. Yes.
Q. When was that flag put on?
A. I don't know of the other properties that they managed.
Q. Who put it on?
A. I did.
Q. For other properties than South Pointe?
A. Yes.
Q. What property?
A. Monterey Apartments.
Q. When was that put on?
A. I don't recall. It's been a while.
Q. Now, this says that they are being flagged. Does that mean -- do you interpret that to mean there was a flag on the owner or agent as of November 30th, 1999?
A. It means another flag can be put on them. There's different reasons --



KRUSE & ASSOCIATES, LTD.
312-345-1500

00000000-0000-0000-0000-000000000000

Q. For what?
A. For other things. You can be flagged for financials. You can be flagged for physical conditions.
Q. The owner and agent had not been flagged for South Pointe as of November 1999, correct?
MR. WELLONS: Objection. If counsel will permit the witness to complete her answer before asking another question, it would be appreciated.
BY MR. BAUGHER:
Q. The owner and agent had not been flagged for South Pointe as of November 1999; isn't that right?
A. I don't know. I can't recall if the flag was before or after.
Q. How would we know that? How would we be able to check on that?
A. We can pull the report from the APPS system.
Q. And you don't recall that?
A. I don't recall what?
Q. Whether as of November 1999 there was a flag for this owner or agent with respect to South Pointe?



A. Right. I don't remember if it was before or after, no.
Q. But we could check that?
A. Yes.
Q. So, the records that you have in your system today would allow you to know whether there was a flag as of November 1999?
A. Yes.
Q. And where would we look?
A. In the APPS.
Q. What would you do?
A. Put in the owner's name.
Q. You'd go to the REMS system?
A. No.
Q. Okay. Where do we go?
A. In APPS.
Q. And what is APPS?
A. I don't know.
Q. How do you get to APPS?
A. They're secure systems.
Q. Is that on the computer?
A. Yes. Secure systems.
Q. And the system is called APPS?
A. Yes.



Q. All right. Then what do you do once you're on APPS?
A. You do a flag search.
Q. How do you do that?
A. You put in the name or the PIN number or Social Security number of who you're looking for.
Q. All right. And that would come up with the dates on which flags were applied?
A. Yes.
Q. And that would go back to 1999?
A. I don't know how far back the system is maintained.
Q. Did you check the -- did you do a flag search in November 1999 to see if in fact the owner or agent were being flagged for a violation of HAP contract?
A. No.
Q. Did you check to see if there was a flag that had anything to do with South Pointe for this owner or agent?
A. Why? No, I wouldn't have done that. Why would I do that?
Q. Because you're writing to somebody else at HUD and you're making a statement that could or



could not be true.
A. I was gonna place the flag.
Q. Oh, this was something you were going to do?
A. Or have done.
Q. Which?
A. Don't know.
Q. Okay. You don't have authority to put the flag on yourself. Had you talked with Ms. Gray about putting a flag on South Pointe as of November 1999?
A. I talked to Miss Coleman in regards to 2530 flags.
Q. As of November 1999 you'd talked to Miss Coleman about a flag on the owner or agent for South Pointe?
A. I don't know what the time frame is, but the conversation did arise, yes.
Q. But not necessarily before November 30th, 1999?
A. Correct.
Q. In fact, you talked with Miss Coleman about that in 2000; isn't that right?
A. I don't know. I don't recall.