Page 126

Q. And in fact, no flag was put on the owner or agent for South Pointe concerning South Pointe until 2001; isn't that right?
A. I don't know.
Q. You don't have any recollection of that right now?
A. I have to see the records.
Q. But in November of 1999 you're sending, with the first sentence in your bullet points, you're telling your fellow HUD employee that the owners and agent are being flagged?
A. Yes.
Q. And you didn't check it, and you can't tell us today whether or not in fact it was two years later that you put a flag on South Pointe?
A. That's correct.
Q. Now, you say later in this first point, "The project received a score of 42 on the REAC inspection, and they have 46 open City Code violations."
Now, by November 1999 which of the items, problem items identified in the REAC Inspection Report had -- had not been corrected?
A. I don't know.

Page 127

Q. And you didn't know that as of November 1999, either, did you?
A. No.
Q. 'Cuz you didn't go out there and check, right?
A. No, no.
Q. And you didn't think you needed to check?
A. There was just a REAC inspection conducted.
Q. All right. Did you have any reason to believe that the items listed in that REAC Report hadn't been corrected by the time you sent this e-mail to Miss O'Connor November 30th, 1999?
A. They didn't send anything into the office saying that they were corrected, either.
Q. Well, how do you know that?
A. 'Cuz it would have come to me.
Q. Did you in fact get an MIO -- I thought we talked earlier this afternoon about a MIO report around the same time, and you said you hadn't seen it?
A. Right.
Q. Is that right?
A. That's correct.
Q. And that's because -- is that because the

Page 128

property was at the DEC at this time?
A. Yes.
Q. So, did you check to see if -- you're reporting to Ms. O'Connor that there is a REAC inspection. Did you check to see what the follow-up to that inspection was before you wrote this e-mail to Ms. O'Connor?
A. No.
Q. Did you not care?
A. I care.
Q. Well, what did you do to find out what the current status of the property was?
A. This was a short time after the inspection. I don't think much could have been done.
Q. But you don't know that, right?
A. It was not done.
Q. How do you know that?
A. 'Cuz I have been out there several times to the property after this.
Q. When?
A. To pass out flyers, to do inspections, to do --
Q. You passed out flyers in what year?
A. I had to walk 22 flights of stairs because

Page 129

the elevators were not working. I got tenant complaints on a daily basis because the elevators were not working. I got tenant complaints on a daily basis because of rodents and drugs and so forth and so on.
Q. What year were you out to pass out flyers? 2001, right?
A. It was several times I went out and passed out flyers. It was more than one.
Q. 2001, 2002?
A. Don't recall.
Q. Did you make any record about passing out flyers in any of your REMS notes?
A. I don't know. There might be some in there.
Q. You say, "In addition, the owners have not met in person with the Enforcement Center regarding the referral. Only the agent has made contact with the EC."
How do you know that?
A. Might have been a conversation that I had with the DEC.
Q. All right. Turn to the third page, which is an e-mail from Janet Hanks to Maggie O'Connor.

Page 130

Who is Janet Hanks?
A. She's a financial analyst.
Q. And you'll see that she picks up in her e-mail to Maggie your statement that "Asset Management has indicated that the owners and management are in the process of being flagged in the 2530 previous participation system."
Do you see that?
A. Yes.
Q. So, did you understand that when you told Maggie O'Connor that the owner and agent were being flagged, that that information would be passed on through HUD and that people would make decisions based on that information?
MR. WELLONS: Objection. Assumes facts not in evidence.
You can answer.
BY THE WITNESS:
A. Yes.
BY MR. BAUGHER:
Q. And you intended that to be the result?
A. Yes.
Q. Because you didn't want the owner or agent of South Pointe to do anymore business with HUD,

Page 131

correct?
MR. WELLONS: Objection. Assumes facts not in evidence. Misstates prior testimony.
Go ahead and answer.
BY THE WITNESS:
A. That's not true.
BY MR. BAUGHER:
Q. In fact, you wanted to make sure that they did not get financing for the project, correct?
A. I don't make those decisions, so I can't -- all I can do is follow the procedures.
Q. Well, you were trying to help Maggie O'Connor make that decision by offering your opinion on the subject, correct?
A. She asked my opinion, and I gave it to her.
Q. And your opinion was that the owner and agent of South Pointe should be taken out of the business of managing HUD properties, correct?
MR. WELLONS: Objection. Misstates prior testimony.
Go ahead and answer.
BY MR. BAUGHER:
Q. Is that correct?
A. No, that's not correct.

Page 132

Q. You thought they should continue to manage that property?
A. I have no comment in regards to whether they manage HUD properties or not.
Q. Well, you do have a comment about it, and you're making it to Maggie O'Connor in Deposition Exhibit 3, right?
A. At that time.
Q. At that time what?
A. At that time that's what my recommendation was based on my experience with South Pointe.
Q. And based on your experience you wanted the owner and the manager of South Pointe taken out of the HUD system, right?
MR. WELLONS: Objection. Misstates the document and prior testimony.
Go ahead and answer.
BY THE WITNESS:
A. I have no comment in regards to that, no.
BY MR. BAUGHER:
Q. You didn't want them to get new loan funds?
A. If they were not going to spend them correctly, no.
Q. How did you know they weren't going to

Page 133

spend them correctly?
A. I didn't know. But those are my comments based on the condition and my overseeing of the project.
Q. Well, the money that was going to be spent to try to improve the condition, right?
A. Yes.
Q. And you didn't have any reason to believe that they weren't going to spend that money appropriately, did you?
A. Yes.
Q. And why do you say yes?
A. Because they had just recently had got a loan from IDHA in 1992, and the work -- they were doing the work, and the property still never came the part.
Q. Well, it's a property in a troubled area in which you hadn't been able to be of much assistance, correct?
MR. WELLONS: Objection. Misstates prior testimony, vague.
Go ahead and answer.
BY THE WITNESS:
A. As much as possible.

Page 134

BY MR. BAUGHER:
Q. And what did you do to help out?
A. I -- they got drug elimination grants, which we recommended for them. Not recommended, but HUD offered drug elimination grants, and we advised them that they should, and HUD gave them money to assist in them trying to resolve that issue.
Q. Let me show you what was marked at yesterday's deposition as Kiening Deposition Exhibit 10. Have you seen that document before?
(Document tendered to the witness.)
BY THE WITNESS:
A. No.
BY MR. BAUGHER:
Q. Now, you said that very quickly, Ms. Thomas. Why are you so sure you've never seen it before?
A. 'Cuz you just showed it to me earlier and I told you no.
Q. I didn't show that to you earlier?
A. Yeah, you did.
MR. WELLONS: Ms. Thomas, why don't you take a few moments and examine the document.
BY THE WITNESS:

Page 135

A. Or you mentioned it or something.
BY MR. BAUGHER:
Q. I did mention it, yes. But now I'm showing you the document. And you've never seen Kiening Deposition Exhibit 10 before?
A. No, not until now.
Q. This is the first time, this afternoon?
A. Yes.
Q. All right. Do you know what it is?
A. It's a letter saying that this is an MIO plan.
MR. WELLONS: Ms. Thomas, if you haven't seen this document, I advise you to take a few moments and examine the document, its contents.
(Short interruption.)
MR. BAUGHER: Off the record.
(Discussion off the record.)
BY MR. BAUGHER:
Q. I think you told us earlier today that you had not seen a late 1999 MIO plan from South Pointe. And I then asked you specifically, I think, one from December 1999. You said you hadn't seen it, correct?
A. Correct.

Page 136

Q. So, you haven't seen Deposition Exhibit 10, either, right?
A. Is that what you're holding in your hand?
Q. Yes.
A. No.
Q. Did you -- and I -- I think I asked you whether you had any conversations with Ms. Kiening or others at DEC about this MIO plan, Deposition Exhibit 10. And I think when I asked you that you said no. Is that correct, that you did not have conversations about this MIO plan?
A. No, I have not had conversations regarding that MIO plan.
Q. Now, I also asked you this morning about the final team report resolution that came out of DEC in late January 2000. Will you take a look at Deposition Exhibit 11, please, from Miss Kiening's deposition yesterday?
(Document tendered to the witness.)
(Short interruption.)
BY MR. BAUGHER:
Q. Am I correct that this is the team report that you said you saw but did not read?
A. Yes.

Page 137

Q. Do you know -- have you -- have you read -- did you read the final team report in connection with your preparation for the deposition today?
A. No.
Q. Did you see it in your preparation for today's deposition?
A. No.
Q. Were you aware that the team report spoke about the owner's infusion of $770,000 of capital into the project?
A. No.
Q. Do you know what the conclusion of the report was?
A. No.
Q. Do you know what it reported in terms of correction of deficiencies identified in the 1999 REAC Report?
A. No.
Q. There are a number of items that it says as of this report date had already been corrected. Are you aware of those?
A. No.
Q. Do you know who signed off on this final team report?



KRUSE & ASSOCIATES, LTD.
312-345-1500

00000000-0000-0000-0000-000000000000

Page 138

A. No.
Q. Have you ever participated in a team report where there were sign-offs required?
A. No, no.
Q. Have you ever been involved in a project in which you were one of a number of signatories on a document that was to go out?
A. Our correspondence. I concur on correspondence that I prepare.
Q. Well, if you prepare it, it's likely that you concur in it, correct?
A. Correct.
Q. Do you know what the conclusion of the final team report was?
A. No.
Q. Were you ever curious about that? This is your asset that was at DEC for a year and a half or so. Were you curious as to what the result was?
A. Possibly.
Q. Well, what do you mean "possibly"? Yes or no?
A. Possibly.
Q. You were a little curious?
A. Yeah.

Page 139

Q. Did you ask anybody what the result was?
A. No. It was returned to the Hub, and I just had to service it. So, I didn't know what the team report had come up with. When they brought the team report, no, I didn't read it.
Q. Did you know that in the view of the team and those that signed off that substantial progress had been made on this property in the view of those signing the team report?
MR. WELLONS: Objection. Assumes facts not in evidence.
Go ahead and answer.
BY THE WITNESS:
A. No.
BY MR. BAUGHER:
Q. One of the comments in the team report is that the -- the owner -- owners are showing good faith in making various repairs and using their own funds to do that. Did you believe that the owners were acting in good faith?
MR. WELLONS: Objection to the extent it assumes facts not in evidence and misstates the document.
Go ahead and answer.

Page 140

BY THE WITNESS:
A. I can't comment on that because I don't know what she's referring to.
BY MR. BAUGHER:
Q. Well, it's not just she. This is a document signed by Batchelor, Kiening, Baguio, Gustin, Zale, Hinsberger, Edge and Krause. Are you aware of that?
A. No, I don't know who signs off on them.
Q. Do you want to take a look? The last two pages are the signature pages.
(Document tendered to the witness.)
THE WITNESS: Okay.
BY MR. BAUGHER:
Q. Now, in fact one of the times that you went to South Pointe was in late August of 1999 with a whole group of people from HUD in Chicago and some from Washington, D.C. Do you remember that?
A. No.
Q. Were you present with a delegation that went out for a tour of South Pointe in August 1999?
A. No.
Q. Alberta Zinno was one of the people who went?

Page 141

A. No.
Q. Are you sure of that?
A. Yes.
Q. Do you know what Interrogatories are? Have you ever heard that term?
A. I've heard the term.
Q. In the Answers that we just received from HUD a couple of weeks ago there is a reference to who was in attendance at a -- at a tour and meeting at South Pointe in August of 1999, and you're one of the people listed.
A. No, I was not there.
Q. Did you hear anything about that meeting?
A. No.
Q. The government's Answer to Interrogatory 17, talking about this site visit, lists as those in attendance there and in the immediately subsequent meetings Alberta Zinno, Marilyn Edge, James Zale, Joan Kiening, Freddie Batchelor, Patrice Harris, Gwen Thomas and Kathy Merritt.
A. I wasn't there.
Q. Was there a meeting immediately following the tour and site visit of South Pointe that you participated in it?

A. I don't even recall that at all. No, I've never visited South Pointe with those people.
Q. Did you hear anything about South Pointe being showcased to management of DEC in Washington, D.C.?
A. No, I'm not aware of that at all.
MR. WELLONS: Let me clarify for the record the Interrogatory response counsel refers to states the defendant believes one or more of the following HUD staff were likely to have participated in the site visit. It does not state that Miss Thomas was in fact there.
MR. BAUGHER: Well, it says that it's likely that she was there. Apparently she wasn't.
BY MR. BAUGHER:
Q. Right?
A. Right.
Q. Now, the final team report returns South Pointe to Multi-Family Housing for monitoring. Who is supposed to do that; that is, the monitoring?
A. I do.
Q. How could you do -- what were you supposed to monitor?
A. Just to continue my normal business,



continue to do my occupancy reviews and do my site visits and do my inspections, deal with my tenant complaints, normal project processing.
Q. Well, did you have any responsibility for follow-up on the outstanding Management Information and Operations Report that you had not seen?
A. I didn't have that, so no.
Q. Because nobody told you about it?
A. I did not have it, so no.
Q. Was there anyone other than yourself that was monitoring this project, South Pointe in 2000?
A. I was the project manager.
Q. And there was nobody working with you on this, correct?
A. I've taken people out on training to South Pointe, new project managers.
Q. But there was no one working with you on this project, correct?
A. No.
Q. Now, you mentioned occupancy reports. Did you do an occupancy report in 2000?
A. I don't recall when it was that I did an occupancy review. Most likely no.
Q. Now, why is it unlikely that you did one in



2000?
A. Because I was pregnant.
Q. I'm sorry. Let me back up. I was asking you about this site visit in August of 1999. One of the other things that happened around that time, I guess the next month, September of 1999, was that the HAP contract was extended for a year, correct, the HAP contract for South Pointe?
A. The HAP contract for South Pointe was being processed, yes.
Q. Okay. Well, I think we both used the wrong word on that. I said, "extended." In fact it was renewed for a year; isn't that the correct terminology?
A. It was renewed in stages.
Q. What does that mean?
A. That's what it is; it was renewed in stages.
Q. So, on September 30th, 1999 the existing HAP contract expired, correct?
A. Yes.
Q. And then beginning October 1st, 1999 what happened with respect to the contract?
A. It was renewed for three months.



Q. Now, how do you recall that it was renewed for three months in 1999?
A. Because that was the time we were discussing our plan and to see what the owners were going to do in reference to South Pointe and in accordance with the contract renewal guidelines. We were processing the -- the contract renewal.
Q. Do you have anything to add to your answer?
A. No.
Q. Who is the "we" that were processing the contract renewal?
A. Funding.
Q. What is Funding?
A. That's the Funding section.
Q. Is there a human connected with Funding?
A. That's the Funding section. I don't recall who was in charge of it at the time, but it's the Funding people who process the contract renewal in HUD.
Q. Do you remember the names of any of those people?
A. The person that oversees it is Mary Anderson.
Q. Did you meet with Mary Anderson in 1999?

Page 146

A. I don't recall.
Q. I want to make sure we've got the right dates here. In 1999 South Pointe had been referred and was at the DEC, although you remained the asset manager; is that right?
A. Yes.
Q. Okay. And in 1999 through the normal process the HAP contract expired, correct?
A. Yes.
Q. All right. So, what's -- what was the procedure in 1999 for considering what was to be done with the contract beginning October 1st, 1999?
A. What was the procedure?
Q. Yes.
A. For renewing a contract?
Q. Yes.
A. In accordance with the Section 8 contract renewal guidelines, we renewed the contract in accordance with that and at the Director's discretion.
Q. What Director are you talking about?
A. Ed Hinsberger.
Q. And in September 1999 the HAP contract was renewed for a year; isn't that right?

Page 147

A. It was renewed in stages.
Q. So, it was not renewed for a year?
A. Eventually it was renewed for more than a year, but it was renewed in stages.
Q. When there's a contract -- or let me back up.
How does a contract get renewed in stages? Strike that.
With respect to South Pointe in 1999, what do you mean when you say the contract was renewed in stages?
A. It was renewed in short terms.
Q. How do you know that?
A. Because I'm the project manager. It's my job to know that.
Q. Well, why do you say it's your job to know for how long the contract is renewed?
A. Because I track the funding for my occupancy issues.
Q. So, you're sure that in 1999 the contract was renewed for just three months and not for a full year?
A. It was renewed in stages, in short terms.
Q. Well, who has the authority to do that?

Page 148

A. Ed Hinsberger.
Q. So, Ed Hinsberger made the renewal decisions with respect to South Pointe?
A. Yes.
Q. Was anyone else involved in those decisions?
A. Recommendations were made from his staff, yes.
Q. All right. Well, now, again we're talking about 1999. There are a number of years in which this project was a matter of some interest and controversy at HUD. So, I'm directing this question to 1999. Who was involved in the decision to renew the HAP contract in 1999?
A. Ed Hinsberger makes the decisions on all contract renewals, the approvals. Mary Anderson, although she's over -- and she signs the contract, decisions are made by the Director, HUD Director.
Q. Does she participate in the decisions, or is she just the signatory on HAP contracts?
A. I'm not sure.
Q. Or somebody from her office is the signatory on HAP contracts?
A. She's the signatory.

Page 149

Q. But she's not a decision maker, or you just don't know?
A. I don't know.
Q. All right. In 1999 was anyone other than Mr. Hinsberger involved in deciding whether South Pointe's HAP contract would be renewed?
A. Recommendations from his staff.
Q. Who?
A. Veronica Coleman and myself.
Q. Now, do you recall making a recommendation on contract renewal in 1999?
A. Yes.
Q. What form did your recommendation take? Was this a memo, an e-mail, a meeting?
A. Meeting, in-house meeting.
Q. Do you recall an in-house meeting to discuss the 1999 contract renewal?
A. Yes.
Q. Approximately when did that take place in relationship to the expiration of the contract?
A. If I recall correctly it was a meeting when the owner's representative was there, 'cuz they brought in the contract, and they were discussing the refinancing of the mortgage. At that time we,





00000000-0000-0000-0000-000000000000

Page 150

HUD, informed them that we will be renewing the contract in stages, in short terms, till they come up with a -- I guess -- I don't know the proper way of saying it, but the rehab stuff, you know, the documents that they sent to HUD for the -- to submit for insurance.
Q. What entries do you typically make in REMS concerning the status of contracts?
A. At what time frame?
Q. Well, the questions that I've just been asking you about are 1999. So, let's start there.
A. We input when the information is received, when it was executed by the owners, and we put in the selection that they've chosen and --
Q. I'm sorry. When you say "selection of what they've chosen," what does that mean?
A. They have six options, the owners have six options in the contract renewal to select if they qualify. There's different options for different types of properties.
Q. Well, in 1999 did you input the information about the contract into REMS, or did a number of people do that, somebody from Mary Anderson's staff, for example?

Page 151

A. I don't recall if that part of the system was up at that time, but if it was up, I would have been the one to have put it in.
Q. Now, what about your Project History notes, do you make notes about meetings that you have concerning the contract?
A. Yes. No. I mean, repeat your question. I'm sorry.
Q. Well, in the REMS notes that you make when there are meetings or other significant events concerning the property, what do you write about contract to contract renewals?
A. With reference to South Pointe it was in -- it was the notes or discussions of meetings we had in reference to the contract renewal.
Q. So, your REMS -- you did put your notes about your meetings on contract renewal in the REMS Project Histories/Problem Statements?
A. Yes, in looking at the information you gave me, yes.
Q. And did that also include notes about meetings that you had with Veronica Coleman or Ed Hinsberger in which you were discussing what ought to be done with the contract?

Page 152

A. May or may not.
Q. But any meetings with owners or owners' agents concerning the contract you would note in your REMS notes, correct?
A. Yes, to the best of my ability.
Q. And if there was anything that you were supposed to follow up on or was an action plan on how the contract would unfold, that's something else you would put in your REMS notes?
A. Maybe.
Q. If it's something that you were supposed to do, you would put it in your notes?
A. If it was something that I was supposed to do, maybe.
Q. Let me show you what was marked at yesterday's deposition as Kiening Deposition Exhibit 9.
(Document tendered to the witness.)
BY MR. BAUGHER:
Q. What is Deposition Exhibit -- Kiening Deposition Exhibit 9?
A. Are you asking me what this is?
Q. Yes.
A. It's REMS screens.

Page 153

Q. Do you know how to read those screens?
A. Yes.
Q. Well, what do those screens tell us about contract renewal for South Pointe in 1999?
A. This is saying the type of contract renewal it is.
Q. Okay. And what type of contract renewal was it?
A. A subsequent.
MR. WELLONS: Miss Thomas, please take a moment to actually examine the document before you answer questions based upon it.
BY THE WITNESS:
A. A subsequent.
BY MR. BAUGHER:
Q. What does "a subsequent" mean?
A. Meaning that it expired the previous year.
Q. Well, it expired the current year, 1999, right?
A. This is a subsequent renewal. It expired the year before. We renewed it for a year, and this is the subsequent renewal.
Q. HUD renewed the HAP contract from '98 to '99, you say, and then this was the subsequent

Page 154

renewal to that?
A. Yes.
Q. Is that what you're saying?
A. Yes.
Q. And does that document say that the contract was renewed from 1998 to 1999 for a one-year period?
A. No. This is the 1999 subsequent renewal.
Q. Okay. And what is the period of the renewal that's written there?
A. The contract effective date is 10/1/99 to 9/30/2000.
Q. And is that as far as you know a correct statement of the contract renewal in 1999?
A. According -- looking at this, yes.
Q. Well, now, where's the three-month -- or the reference to the three-month renewal?
A. You're missing a screen.
Q. What screen is missing?
A. It's a short-term screen that goes on first.
Q. Now, are you sure that you're not mistaken, Miss Thomas, and that the contract was not in fact renewed for a year in 1999?

Page 155

A. It was renewed in stages, which ended up being a year and more.
Q. There's no reference that I can see anywhere in Deposition Exhibit 9 to any stages. Do you see something there concerning stages?
A. Not with the information you've given me, no.
Q. Is the contract signed?
A. Yes.
Q. Do the signatures look right?
A. Yes.
Q. And the document that you're looking at says that the expiration date of the new renewed contract is September 30th, 2000, right?
A. Yes.
Q. But you're saying that's incorrect.
MR. WELLONS: Objection. Misstates prior testimony.
Go ahead and respond.
BY THE WITNESS:
A. No, I'm not saying it's incorrect. I'm saying it was renewed in stages.
BY MR. BAUGHER:
Q. I'm trying to understand about a document

Page 156

that has both a REMS screen and then an actual contract attached to it with a specific term. And, for example, looking at page 962, which is the second page of the contract, can you read that, what it says about contract expiration?
A. Yes.
Q. What does it say?
A. It says September 30th, 2000.
Q. Okay. But this isn't an operable -- an operative contract for some reason?
MR. WELLONS: Objection. Misstates prior testimony.
BY THE WITNESS:
A. That's the contract you're showing me as it was executed.
BY MR. BAUGHER:
Q. Okay. Do you have any knowledge as to whether in fact Deposition Exhibit 9 is the correct, valid contract between HUD and South Pointe for the year October 1st, 1999 through September 30th, 2000?
A. The contract looks like it's legitimate, but the contract was renewed in stages. It equaled a year, but it was still in stages.
Q. Who did you discuss the staging of this

Page 157

contract with?
A. I don't recall.
Q. You didn't have authority to make any decision about this, correct?
A. No.
Q. And for that matter, Ms. Coleman, who was in on the discussions, didn't have authority to make that decision, right?
A. We make recommendations to her -- her Director. We can discuss it. I can recommend it, discuss it with her. If she feels she needs to go further, as I say, Ed Hinsberger makes the decisions on all contract renewals.
Q. Well, she doesn't have to take the matter to Ed Hinsberger?
A. She did take the -- I just said that.
Q. Is she required to do that?
A. I don't know what she's required to do.
Q. But in this instance with respect to South Pointe, Hinsberger is the one that you say made the decision?
A. Yes.
Q. And what did you recommend?
A. Three months' renewal.

Page 158

Q. And what did Ms. Coleman recommend?
A. We agreed.
Q. And why was that?
A. Because we were waiting for them to bring in their insurance, what they were going to do to rehab. We were monitoring the property.
Q. So, in terms -- this is in terms of you and Ms. Coleman. Your view on whether or not the contract should be renewed depended on whether or not the rehab, the broad, long-term capital rehab plan for the project was or was not satisfactory, correct?
MR. WELLONS: Objection. Misstates prior testimony.
Go ahead and answer.
BY THE WITNESS:
A. That it was submitted for our review. And yes, to bring the property up to standards.
BY MR. BAUGHER:
Q. But the critical element on which -- in which both you and Veronica Coleman believed the renewal decision should be made was on the satisfactoriness of the proposal for long-term capital renewal of the project, rehab of the

Page 159

project?
MR. WELLONS: Objection. Vague. Misstates prior testimony. Asked and answered.
Go ahead and answer.
BY THE WITNESS:
A. Yes.
MR. BAUGHER: Okay. Thank you.
(Whereupon, at 2:00 p.m., the deposition was recessed, to reconvene at 2:30 p.m., this same day, April 12, 2005.)

Page 160

(Whereupon, the deposition resumed at 3:04 p.m.)
GWENDOLYN THOMAS,
called as a witness herein, having been previously duly sworn and having testified, was examined and testified further as follows:
EXAMINATION (Resumed)
BY THE WITNESS:
A. I'd like to correct my statement for the record. The contract we were just previously talking about, I can't recall the exhibit that you were referring to, it was a one-year, one-year contract. That one was not the short-term contract that I was thinking about.
BY MR. BAUGHER:
Q. Now, I asked you probably 30 questions about the renewal of the 1999 contract, and your answers to those questions in which you said there was some sort of staged contract were all incorrect, right?
A. It's short-term, yes. That was the one-year contract. The document you showed me was absolutely correct, one year.
Q. And your statements in response to at least

Page 161

a dozen if not more questions about the 1999 contract were incorrect; is that right?
MR. WELLONS: Objection. Asked and answered.
Go ahead. Answer the question.
BY THE WITNESS:
A. It depends on what particular question you're referring to. The time frame I'm referring to --
BY MR. BAUGHER:
Q. The 1999 contract was renewed for a year?
A. Yes.
Q. And all your answers about how it was renewed for some shorter period, or it was renewed for a year, but really only for three months, were all wrong?
A. Yes.
Q. And how did you figure that out?
A. I remembered.
Q. Did your lawyers talk to you at lunch about how you were off base?
A. No.
MR. WELLONS: Miss Thomas, I don't want you to reveal the contents of any discussions that you





00000000-0000-0000-0000-000000000000

Page 162

had with your lawyers. If you discussed this issue with your attorneys, it's okay to acknowledge that. But I don't want you to reveal the contents of the discussions that we have.
BY THE WITNESS:
A. We had conversations over lunch in regards to some things we talked about, yeah.
BY MR. BAUGHER:
Q. Do you have other corrections that you need to make to the record this morning?
A. No.
Q. And was one of the items that you talked about at lunch the renewal of the APPS contract?
MR. WELLONS: Miss Thomas, I'm going to instruct you not to answer that question.
BY MR. BAUGHER:
Q. Looking at the last couple of pages of Kiening Deposition Exhibit 2, again, please, where you've got some of your Problem Statement notes, will you look at those pages that are marked 2148, please? Do you see that?
A. Yes.
Q. In particular, as I was looking at these over lunch, I'm trying to understand again what the

Page 163

timing is on entries. Looking at the top entry, that entry is dated June 24th, 2002, and then -- correct?
A. Yes.
Q. And then the first date listed there is 11/17/99. Do you see that?
A. 11/17/99. Yes.
Q. Now, what does November 17th, 1999 have to do with this entry?
A. Those -- I told you I was moving them from the History up to the Problem Statement.
Q. So, you think maybe that was initially entered on November 17th, 1999?
A. Yes.
Q. But then the event referred to there talks about "last meeting in July 1999." Do you see that?
A. Yes.
Q. So, even assuming that you made an entry on November 17th, 1999, it was about an event that had taken place in July, four months before. Do you see that?
MR. WELLONS: Objection. Misstates the document. Misstates prior testimony.
Go ahead and answer.

Page 164

BY THE WITNESS:
A. I see it.
BY MR. BAUGHER:
Q. Well, why did you wait -- assuming you made an entry in November 1999, why did you wait four months to do that?
A. I can't recall.
Q. The next entry, also dated June 24th, 2002, correct?
A. Yes.
Q. Starts -- there is the apparent date of August 23rd, 2001. Do you see that?
A. Yes.
Q. But then what is discussed in the text talks about a preapplication meeting of December 1st, 1999, right?
A. Yes.
Q. So, do you think what you did is on August 23rd, 2001 you put in this long entry about a preapplication meeting on December 1st, 1999?
A. I don't recall when I put it in the system.
Q. Well, what's your explanation of the 8/23/2001 that is at the beginning of this entry?
A. I don't recall why.

Page 165

Q. Well, does it have anything to do with the -- does that date have anything to do with the text that follows concerning a December 1st, 1999 preapplication meeting?
MR. WELLONS: Objection. The witness has stated she does not recall the entry.
Go ahead and answer.
BY THE WITNESS:
A. I don't know why I have that date there offhand.
BY MR. BAUGHER:
Q. Well, do you think it's because you made this entry that we've just been referring to on August 23rd, 2001?
MR. WELLONS: Objection. Asked and answered.
Go ahead and answer.
BY THE WITNESS:
A. I don't recall why the date is there. Don't remember.
BY MR. BAUGHER:
Q. Is there any reason that you would wait for a year and nine months before you would put an entry into the South Pointe REMS records?

Page 166

A. Some information may not have been put in there and later found and later put in there. Could be.

Q. Almost two years later?

A. It might have been in there two years later. I'm not sure. I don't know when it was put in because these entries came from the history. So, I don't know exactly when I put this information in REMS.

Q. You don't even know what year you put information about a December 1999 meeting into REMS; isn't that right?

A. I'm not sure of the dates.

Q. It could have been 2001 or 2002?

A. I'm not sure of the dates.

Q. You said that one of the things that you did with respect to the South Pointe project was to do management and occupancy reviews; is that right?

A. Yes.

Q. But you said you did not do a management or occupancy review in 2000, right?

A. Yes.

MR. BAUGHER: Will you mark this, please, as Thomas Deposition Exhibit Number 4?

Page 167

(Thomas Deposition Exhibit Number 4 was marked for identification.)

(Document tendered to the witness.)

BY MR. BAUGHER:

Q. Miss Thomas, I'm handing you what has been marked as Thomas Deposition Exhibit 4. Can you tell us what that is, please?

A. It's a project action screen of asset management activities on South Pointe.

Q. Okay. And what is behind that?

A. A management review that I did in 2000. Thank you. I didn't recall that.

Q. No, you told us twice that you hadn't done one.

A. I just didn't remember. I thought it was in '99.

Q. So, does this make you think that perhaps you did not do one in '99 and in fact you did it in 2000?

A. Just don't recall the dates. I've done many occupancy reviews on South Pointe. As a matter of fact, I -- any new project managers that we were training, I actually took them to South Pointe to show them this is what you don't want your property

Page 168

to look like.

Q. Well, that's a nice volunteered answer. But when I've asked you about when you went to South Pointe to do occupancy reviews, you haven't been able to give us any dates, even any years as to when you did reviews. And now we're finding a review for the one year in which you said you did not do a review, right?

MR. WELLONS: Objection. Misstates prior testimony.

Go ahead and respond.

BY THE WITNESS:

A. I did one. Looks like I did one.

BY MR. BAUGHER:

Q. You also told us that when you did a review, you usually look at 10 percent of the units in the building, right?

A. Usually, yes.

Q. So, for South Pointe, which has 303 units, if you did what you usually do, you'd look at 30-plus units, correct?

A. Yes.

Q. How many did you look at in this review?

A. I can't recall. Don't know.

Page 169

Q. Well, look at Thomas Deposition Exhibit 4, please, and tell us.

MR. WELLONS: Miss Thomas, please take a moment to review the document, and take your time.

(Short interruption.)

BY THE WITNESS:

A. It looks like eight, approximately eight.

BY MR. BAUGHER:

Q. And some of those were unoccupied, correct?

A. According to this, yes.

Q. How many?

A. There appear to be five.

Q. So, you only went into three apartments that were actually occupied, correct?

A. According to this management review, yes.

Q. Well, now, you say, "According to this." Do you think that's in error?

A. No, I didn't say there were errors. According to this there were three.

Q. And you're not disputing it?

A. No, I'm not disputing it.

Q. So, actually, you only went into three occupied units at this particular inspection, correct?

Page 170

A. Yes.
Q. Which is not 10 percent of 303; it's 1 percent of 303, right?
A. I don't know what the percentage is.
Q. You don't know that three is approximately one percent of 303?
MR. WELLONS: Objection. Argumentative.
BY THE WITNESS:
A. Whatever you say.
BY MR. BAUGHER:
Q. Do you believe that you are competent in division and multiplication and subtraction and addition?
MR. WELLONS: Objection. Argumentative.
BY MR. BAUGHER:
Q. Do you understand percentages?
A. Yes, I understand percentages.
Q. Are you uncomfortable with numbers?
MR. WELLONS: Objection. Argumentative.
BY THE WITNESS:
A. No, I'm not uncomfortable with numbers.
BY MR. BAUGHER:
Q. Now, was this a management review that's referred to in Thomas Deposition Exhibit 4 or an

Page 171

occupancy review?
A. Occupancy review.
Q. Why does it say "Management Review"?
A. Because that's just what our form says. That's just a questionnaire. We just don't complete parts of it that has to do with financial. We just don't complete the parts that has to do with the financials.
Q. All right. And in this occupancy review conducted in March of 2000 you made some notes on problems that you saw at the property, correct?
A. Yes.
Q. And then what's the next step in an occupancy review?
A. We write up the findings and submit them for review to the supervisor, make any corrections necessary and submit it back to the supervisor for review. Then it's forwarded to Miss Coleman for review and for signatures and corrections that she may have.
Q. All right. And you prepared a draft management review letter for Ms. Coleman's signature; is that right?
A. That's how we start off. I always start

Page 172

off with a draft first.
MR. BAUGHER: Will you mark this, please, as Thomas Deposition Exhibit 5?
(Thomas Deposition Exhibit Number 5 was marked for identification.)
(Document tendered to the witness.)
BY MR. BAUGHER:
Q. Ms. Thomas, I'm showing you Thomas Deposition Exhibit 5. Is this a draft of your occupancy review letter?
A. Yes.
Q. Now, apparently the draft was written on May 7th, 2000, right?
A. Yes.
Q. And we know that because there's a handwritten note in the upper right-hand corner with your initials; is that right?
A. Yes.
Q. The GT there are your initials?
A. Yes.
Q. The date on which you went out to the property was March 14th. Why was it that it wasn't until about two months later that you're even drafting the report?

Page 173

A. I don't recall why.
Q. In the additional -- there's some handwriting on the first page. Is that yours?
A. No.
Q. Who wrote, "We apologize for the delay in transmitting these findings"?
A. I don't know. It was between my supervisors. I don't know which one.
Q. It was either Deborah Gray or Veronica Coleman?
A. Yes.
Q. And the problem was that you'd been out in mid-March to do your inspection, and here it was well into May, and you hadn't even gotten back to the owners, correct?
A. We have a time frame that we get reports out. There could have been something that took priority over this, the reason why it didn't go out. I don't know why it didn't go out.
Q. Well, one of the reasons that you may not have given this priority is that the items listed in your report were not all that significant; isn't that right?
A. No.





00000000-0000-0000-0000-000000000000

Page 174

MR. WELLONS: Objection. Assumes facts not in evidence.
Go ahead and respond.
BY THE WITNESS:
A. No.
BY MR. BAUGHER:
Q. Do you know if an occupancy review letter ever went out on this particular review?
A. Yes.
Q. How do you know that?
A. I've seen the document. I prepared the document. I had to initial on it.
Q. And it went out sometime in mid-May of 2000; is that right?
A. I don't recall when it went out.
Q. About two months after you did your review?
A. I don't recall when it was dated.
Q. Well, it certainly wasn't before May 7th, right?
A. Apparently not.
Q. Okay. So, that letter went out, the final version of the letter went out sometime after May 7th. And then when did you leave for your maternity leave?

Page 175

A. In May.
Q. When in May?
A. I don't recall exact dates. The end of May closer.
Q. So, apparently the sequence was that you made your inspection and a letter on the occupancy review went out shortly before you left the office for your maternity leave?
A. I don't recall when it went out.
Q. It may have gone out in June for all you know; is that right?
MR. WELLONS: Objection. Asked and answered.
BY THE WITNESS:
A. I don't recall when it went out.
BY MR. BAUGHER:
Q. All right. But you were out of the office as of late May of 2000, right?
A. Possibly, yes.
Q. Well, possibly or --
A. I don't recall, but yes, my due date was in June, so --
Q. So, you left in May for that date?
A. Yeah.

Page 176

Q. And you didn't return to the office until sometime in September?
A. Yes.
Q. Do you remember when in September?
A. Earlier part of September, earlier half of September.
Q. So, with respect to the occupancy review others took over for you in the follow-up on that occupancy review, correct?
A. I don't know.
Q. Well, whatever was done with respect to the occupancy review was done while you were on maternity leave; is that right?
A. I don't know.
Q. Did you have any conversation with anyone after you drafted this -- this draft occupancy review letter concerning the 2000 occupancy review?
A. While I was -- after I drafted it? Sure. My supervisor gave it back to me after 5/7.
Q. And then what happened?
A. I guess we prepared -- I don't know exactly what happened because I don't recall the date that it was mailed out.
Q. Okay. On a particular date the letter was

Page 177

mailed out. Did you have any further involvement in the 2000 occupancy review after the letter was mailed out?
A. I don't recall because I don't know when the date was it was mailed out.
Q. Do you recall any review or other participation that you had on the 2000 occupancy review after May 2000?
A. Can you repeat that?
Q. Yes. Do you recall any involvement that you had on the 2000 occupancy review after May 2000?
A. I don't remember. I don't remember.
Q. Do you have any -- which of the items that you identified as problems or as needing repairs in your 2000 occupancy review were not corrected by the owner?
A. I can't say because I haven't had an opportunity to follow up except with -- the only ones I can recall offhand is the elevators. The elevators were always a problem. And according -- and the infestation problems and the broken -- one of these units I went to, which was -- it was common area was one of the items that were not repaired.
Q. By when?

Page 178

A. The next REAC inspection. There were several items that were noted on the REAC inspection that were still open from the things I found in the previous REAC inspection.
Q. Well, when you say "the next REAC inspection," the next REAC inspection was in March 2001, correct? Is that right?
A. I don't know the exact date. I would have to see the report to see.
Q. And you don't know what the condition of the property was between your inspection in March of 2000 and the REAC inspection of March 2001, do you?
A. I can't recall, but there were a number of visits after I came back.
Q. There were a number of what?
A. Visits to the property after I come back from maternity leave.
Q. Well, you weren't there in the summer of 2000, correct?s
A. No, I was not.
Q. Nonetheless, the occupancy review was in process during that summer, right?
A. I assume so. I don't know.
Q. With a response by the owner and further

Page 179

action by HUD, correct?
MR. WELLONS: Objection. Assumes facts not in evidence.
Go ahead and answer.
BY THE WITNESS:
A. I don't know. I don't know when it was sent out.
BY MR. BAUGHER:
Q. Well, in fact there was more work done that summer, and the occupancy review was concluded in September of 2000, right?
A. I don't know. I haven't seen the document. I can't recall.
Q. Miss Thomas, you were the asset manager for the property. How is it that you would not know that the occupancy review was closed?
A. I was not in the office at the time that the occupancy review may have went out. So, I don't know. I don't recall the dates.
MR. BAUGHER: Will you mark this, please, as Thomas Deposition Exhibit 6?
(Thomas Deposition Exhibit Number 6 was marked for identification.)
BY MR. BAUGHER:

Page 180

Q. Ms. Thomas, let me show you what is marked as Thomas Deposition Exhibit Number 6, a letter from Debbie Gray to Carl Sanders dated October 6th, 2000 and then a second copy that appears to be dated October 3rd.
Will you take a look at that, please, and tell us what that letter is?
(Document tendered to the witness.)
BY THE WITNESS:
A. It's a close-out letter.
BY MR. BAUGHER:
Q. And this is from your boss, Debbie Gray, correct?
A. Yes.
Q. So, if she has -- so, she has authority with respect to this occupancy review or any occupancy reviews under her jurisdiction, correct?
A. You didn't ask the question.
Q. Did Miss Gray have responsibility for making decisions with respect to occupancy reviews?
A. It depends.
Q. Well, did she for South Pointe in 2000?
A. It depends on what it was particularly.
Q. And tell us what it would depend on.

Page 181

A. It depends on what you're referring to. If you're referring to this letter, she can close out an occupancy review. She can sign a close-out letter.
Q. All right. And she did close out the 2000 occupancy review in October of 2000, right?
A. She signed the letter, yes.
Q. Well, now are you quibbling with me on whether she signed it or she closed it out? Does that make any difference?
MR. WELLONS: Objection. Argumentative.
Go ahead and answer.
BY THE WITNESS:
A. I recommend closures. She signs letters.
BY MR. BAUGHER:
Q. So, did you recommend that the occupancy review be closed?
A. Based on the information that the owners sent in, their certification certifying that they made the corrective actions or they were gonna take the corrective actions.
Q. And this letter in the first sentence says, "We have reviewed your response to our 2000 occupancy review and find it acceptable."

Page 182

Do you see that?
A. Yes.
Q. And you agreed with that?
A. Based on the documentation that the owners sent certifying that they will or have corrected the information.
Q. And this review is now closed, right?
A. Yes.
Q. And then on the next page of this exhibit, Deposition Exhibit 6, you actually even initialed the document on October 2nd; is that right?
A. Yes.
MR. BAUGHER: Will you mark this as 7, please?
(Thomas Deposition Exhibit Number 7 was marked for identification.)
(Document tendered to the witness.)
BY MR. BAUGHER:
Q. Ms. Coleman, let me show you what is marked as Thomas Deposition Exhibit 7. It appears to be a draft of a letter to John Hayes dated September 29th, 2000.
A. I'm Miss Thomas. I'm not Miss Coleman.
Q. I'm sorry. I'm getting anxious for

Page 183

tomorrow's deposition. What is Deposition Exhibit 7?
A. It's a draft.
Q. Of what?
A. Of a letter, 2530 for previous participation clearance.
Q. With respect to what properties?
A. South Pointe and Monterey.
Q. Does this refresh your recollection that as of September 2000 the owner of South Pointe and Monterey was not flagged?
A. No. What it looks like is I took this from flagging them previously, and this is gonna flag them again. I took a previous letter that was sent saying ownership and was about to flag them again and just had not made the corrections yet.
Q. Why do you believe that what we're looking at wasn't a draft of a letter that you did in September 2000?
A. Because I believe I flagged P.M. One and Englewood Group more than once.
Q. Well, if a group is flagged, what is added, or what happens, or why would there be a reason for a second or third or fifth flag?

Page 184

A. They have -- they own more than one property.
Q. But I thought you told us before that the flag that you think was on this particular owner was for the Monterey apartment? That's what you told us a little while ago.
A. That I thought one of them was, yes.
Q. Okay. So, if there was already a flag on the owner for Monterey apartment, then there's no reason to put another flag because the owner already has one, right?
A. As I said, this was a draft letter of a correction of something that I'm getting ready to flag again for, not necessarily that Monterey would have been there on the letter that may have went out. This letter previously, I'm sure, probably went out sometime ago.
Q. Well, it wasn't produced to us by the government in the document production, and I haven't seen one before. If there was already a flag on Monterey as of September 29th, 2000, why would another flag go out?
A. It could have been for physical or financial. Every time there's a violation, we can

Page 185

go in and flag that owner for that violation. So, an owner can have more than one flag for different violations. Every time we flag them, we have to send a letter.
Q. And did you continue on work on drafts of this letter for a flag in 2000, or did that effort to flag the property in 2000 go by the Boards? Or do you remember?
A. I don't recall. I know that they were flags. P.M. One and Englewood Terrace Group were flagged.
Q. But you don't know when?
A. No, not the exact dates.
Q. And you don't know how many times?
A. Several times.
Q. Because you really didn't like P.M. One?
MR. WELLONS: Objection. Argumentative. Misstates prior testimony.
BY MR. BAUGHER:
Q. And the place to find official copies of the flags would be where? You do a flag search; is that right?
A. Mm-hmm, yes.
MR. BAUGHER: Well, inasmuch as our





00000000-0000-0000-0000-000000000000

Page 186

Document Request clearly comprehended anything like flags, I ask that such a search be conducted and we be given copies of whatever comes out of that search.

MR. WELLONS: As we've stated several times, we feel we've fulfilled our obligations with Rule 26.

MR. BAUGHER: No, this is a more specific request. I'm not particularly criticizing the government. I'm just asking that you run such a search.

MR. GUSTIN: I believe we've produced it already, but we'll verify that. That's all you're asking.

MR. BAUGHER: Yes. Now, if you've produced it, then the Bates numbers of the documents will be fine.

BY MR. BAUGHER:

Q. One of the things that you became involved in when you came back from your maternity leave were the various proposals for a rehab loan for South Pointe; is that correct?

A. You need to explain more.

Q. Well, we already looked at an e-mail in

Page 187

which you were recommending against any new financing for the project in late 1999. But when you came back from your maternity leave in the fall of 2000, you took that subject up again as to whether there would be new financing for the project, correct?

A. I assume they were still proposing their application.

Q. Okay. And there were meetings in the fall of 2000 to discuss possible rehab financing for South Pointe?

A. Possibly.

Q. Do you recall some meetings on that topic?

A. Some, yes.

MR. BAUGHER: Will you mark this, please, as Thomas Deposition Exhibit 8?

(Thomas Deposition Exhibit Number 8 was marked for identification.)

(Document tendered to the witness.)

BY MR. BAUGHER:

Q. Let me show you, Miss Thomas, what has been marked as Thomas Deposition Exhibit 8. I believe these are a page of your handwritten notes from a meeting on October 18th, 2000. Can you confirm

Page 188

that, please?

(Document tendered to the witness.)

(Short interruption.)

BY THE WITNESS:

A. Yes, these are notes.

BY MR. BAUGHER:

Q. Is this your handwriting?

A. Yes, it is.

Q. And are these notes that you made at a meeting on October 18th, 2000?

A. Yes.

Q. Do you recall the meeting?

A. Yes.

Q. Who was present?

A. Our development staff.

Q. Well, when you say "development staff" --

A. Production staff. It's the staff that reviews the application process.

Q. The application for funding, or for insurance?

A. Yes.

Q. Is insurance the better way to phrase that?

A. Yes.

Q. Because HUD would insure the loan made by

Page 189

others, correct?

A. Yes.

Q. All right. So, who from the development or production staff was there?

A. I can't recall everyone, but Mary Anderson, I think Miss O'Connor, if she still was the person, Maggie O'Connor may have been there. I don't recall who the engineer was that was there. From Mr. Hayes' staff, Carl Sanders, Ken Horton.

Q. Who's Ken Horton?

A. He was the owner's representatives from Michigan.

Q. From where?

A. From Michigan.

Myself, I think Mr. Hinsberger was there and Miss Coleman. There may have been some other people, but I don't recall.

Q. Well, this was a large meeting, then?

A. Yes.

Q. And the purpose of the meeting was to discuss a new financing for South Pointe; is that right?

A. A rehab for South Pointe.

Q. And do your notes fairly well reflect the





00000000-0000-0000-0000-000000000000