Michelle Gee before?

MR. WELLONS: Objection, asked and answered. Go ahead.

THE WITNESS: I've already responded to that, no.

BY MR. BAUGHER:

Q. They were South Pointe employees, but you weren't aware of that?

MR. WELLONS: Objection, assumes facts not in evidence, asked and answered. Go ahead.

BY MR. BAUGHER:

Q. And then if you look through the pages of this summary report, you can see there's a physical inspection log beginning with Apartment 301 and running through Apartment 2214. Do you see that?

A. Yes.

Q. And, for example, do you see the different items that were surveyed that are summarized in Deposition Exhibit 6?

A. Yes.

Q. Do you have any information, beyond what is shown on the pages of Coleman Deposition Exhibit 6, about the conditions that are reported on this physical inspection log?



A. Could you repeat his question?

(Whereupon, the record was read as follows:

Q. Do you have any information, beyond what is shown on the pages of Coleman Deposition Exhibit 6, about the conditions that are reported on this physical inspection log?)

THE WITNESS: Do I have any information beyond what's reported on this log about the condition of South Pointe?

BY MR. BAUGHER:

Q. Yes.

MR. WELLONS: Just going to object to the question as vague. Ms. Coleman, go ahead and respond.

THE WITNESS: I agree that the question is quite vague. And in looking at this log, this log is basically dealing with the interior, just units.

BY MR. BAUGHER:

Q. Yes, it's an inspection of all of the apartments in the building.

MR. WELLONS: Objection, counsel is



testifying.

BY MR. BAUGHER:

Q. Do you have any further information about the condition of the units in the building as of November 2000 that's different from what we're seeing in Deposition Exhibit 6?

MR. WELLONS: Objection, vague. Go ahead and answer.

THE WITNESS: Other information that I have I don't know if I was made aware of the information in October of 2000. But you know, common areas, there was a penthouse or something about housing on the roof that was in extreme substandard condition that was always mentioned to be just a place where the infestation where the rats were just housed and they ran throughout the building.

BY MR. BAUGHER:

Q. Ms. Coleman, I was asking you about the apartments; that is, Unit 300 through those on the 22nd floor.

A. I thought you asked about South Pointe.

Q. I asked for whether you had any different information about the units whose physical inspection is logged here and is shown in Deposition Exhibit 6



as of around November 2000.

MR. WELLONS: Objection, there's no question pending. You don't need to respond.

MR. BAUGHER: Yes, there is a question pending, and I just put it to her again.

MR. WELLONS: You made a statement as to what you had previously been asking. You did not ask her to answer a question.

MR. BAUGHER: You're going to make me ask it a third time?

MR. WELLONS: She's answered the question you've asked at least three times. If you want to ask it again, go ahead.

MR. BAUGHER: I don't think we've gotten an answer.

BY MR. BAUGHER:

Q. I was asking you about the units in the building. You understand that's apartments, right?

MR. WELLONS: Objection, argumentative. Go ahead.

BY MR. BAUGHER:

Q. You understand that?

A. Proceed with your question.

Q. There's a physical inspection log with

information about all of the apartments beginning on the third floor and going up to the 22nd floor in the building. Do you have any different or contrary information about the condition of those apartments as of the time of this inspection report in around November of 2000?

MR. WELLONS: Objection, compound, vague, asked and answered. Go ahead.

THE WITNESS: Your question is very vague, as Mr. Wellons has stated. I did not prepare this report. I did not do a 100 percent unit inspection of South Pointe. Therefore, I cannot say that I have other information as it relates to the condition of these units. As I previously stated, I do not recall seeing this document.

BY MR. BAUGHER:

Q. Was one of the purposes of doing a 100 percent inspection to determine the appropriate scope of work for a refinancing loan?

A. I'm not in a position to speak to what's required to refinance a loan. That's within the jurisdiction of Mary Anderson, director of operations.

MR. BAUGHER: Mark this please as the next



exhibit.

(Whereupon, Deposition Exhibit No. 7 was marked for identification, JTL.)

BY MR. BAUGHER:

Q. Ms. Coleman, I've asked the court reporter to mark as Coleman Deposition Exhibit 7 a letter from Carl Sanders to Gwen Thomas dated December 8, 2000 concerning status of items remaining on the MIO plan. Have you seen that document before?

A. I do not recall seeing this document.

Q. Do you recall hearing about this document from Ms. Thomas?

A. I do not recall.

Q. Do you have any information at all about this letter or the status of repairs as described in Coleman Deposition Exhibit 7?

MR. WELLONS: Objection, vague. Go ahead and answer.

THE WITNESS: I don't have any status of the repairs.

BY MR. BAUGHER:

Q. I'm sorry. What did you say?

A. I do not have any knowledge of any status of



repairs listed in Exhibit 7.

Q. Did you ever hear from Ms. Thomas in 2000 that she was receiving periodic letters from South Pointe about repairs that were being made at the building?

A. I can't say for sure, but I might have.

Q. Well, what do you recall?

A. It's been a long time, and I just cannot recall any specifics concerning the repairs of South Pointe, if any were made.

Q. Do you think she did tell you that she was receiving regular reports from South Pointe on repairs that were being made on the building?

A. I do not recall. As I previously stated, it's been a considerable period of time.

Q. Do you know if she replied to any of the letters that we've looked at in the last 20 minutes, these update letters on the December 1999 MIO?

A. I can't recall.

Q. You've never seen any letters from her or notes from her about responding to these letters from South Pointe; is that correct?

A. I do not recall. It's been a long period of time.



Q. There was a REAC report on South Pointe that was dated April 29, 1999. Do you know what, if any of the items identified in that April 29, 1999, REAC report were not repaired by South Pointe?

A. There was a REAC report dated April?

Q. 29, 1999.

A. And you're asking if I know if the repairs were completed?

Q. Do you know if there were any items that were identified in that 1999 report that were not taken care of or completed?

A. I do not recall the dates of these inspections. What was that inspection score?

Q. I think it was in the 40s.

A. I did not inspect South Pointe, and I have no knowledge as to what was repaired or what was not repaired in the April 1999 physical inspection report.

Q. There was a another REAC report that was prepared around March of 2001, so that's about two years later. Did you ever see that REAC report?

A. What was the score?

Q. In the 30s?

A. Yes.

Page 178

Q. Can you identify any physical deficiencies at South Pointe that were listed in the March 2001 REAC report that were not corrected by Englewood in March or April of 2001 or were not planned for short-term repair?
MR. WELLONS: Objection, vague, compound. Go ahead and answer.
THE WITNESS: The report was issued by REAC. And as I indicated on the 1999 inspection report, I did not do an inspection of the report to determine if the ownership corrected any of the deficiencies. However, for that report, the report that was in the 30s, staff went out and confirmed that the owner submitted a false certification on the health and safety items.
BY MR. BAUGHER:
Q. Who is staff?
A. Staff from Multifamily.
Q. Well, what person?
A. Project manager and some other staff members and Ms. Simmons, construction analyst.
Q. What are the names of the people that you say went to the property?
A. Gwendolyn Thomas, Lilly Simmons.

Page 179

Q. Anyone else?
A. Other staff members went out, but I don't know their names.
Q. How do you know other people went out?
A. It was a team of them. More than two went, I do recall that, but I do not recall the names.
Q. You were one of the people on this team?
A. No.
Q. So you don't have any firsthand knowledge of what the condition was?
A. I have firsthand knowledge from my staff. My staff, I had a construction analyst out there.
Q. Who was the construction analyst?
A. Lilly Simmons.
Q. Let me show you what was marked at yesterday's deposition as Thomas Deposition Exhibit 18, a draft of a notice of Section Eight suspension and abatement letter.
Have you seen Thomas Deposition Exhibit 18 before?
A. No, I don't recall seeing this.
Q. I showed it to Ms. Thomas yesterday, because on the second page at the bottom, it says draft GT, 3/15/01, and I thought that might have suggested that

Page 180

she had drafted this document.
Did you ever ask Ms. Thomas to draft an abatement letter?
MR. WELLONS: I'm going to object to this question as vague. Go ahead and answer.
THE WITNESS: I'm trying to recall if I've seen that. I don't recall.
BY MR. BAUGHER:
Q. There's handwriting on the top of the first pages that says wasn't mailed. Is that your handwriting?
A. No.
Q. Do you know whose it is?
A. No.
Q. Did you ever hear of Ms. Thomas drafting a letter of this sort of Deposition Exhibit 18?
A. Did I ever hear of Ms. Thomas drafting this letter?
Q. Or something like it.
A. I don't recall.
Q. And you never asked her to draft a letter of default or termination or abatement or anything like that for South Pointe, did you?
MR. WELLONS: Objection, vague, asked and

Page 181

answered. Go ahead and answer.
THE WITNESS: I don't recall.
BY MR. BAUGHER:
Q. Did you ever ask Ms. Thomas to draft any letters for you concerning South Pointe?
A. I might have asked her to draft a letter going to the owner when he submitted us the false certification of the REAC health and safety issues. And staff went out and inspected the property, and they saw that the certification was false. And they came back and prepared a letter. When they returned they prepared the letter. Ms. Thomas most likely was the person that drafted that letter.
Q. Now, you made a reference to false certifications. Did you receive a response to the letter that you are talking about from South Pointe, not only answering the charge of a false certification, but including along with that response photographs to demonstrate that the charge of false certification was itself false?
A. I do not recall a letter as you indicate. I recall Mr. Hays submitting a letter indicating that he had to rely on his staff when he submitted these certifications to our office. And I believe his





00000000-0000-0000-0000-000000000000

letter acknowledged that, you know, he actually didn't inspect the property himself, but he relies on information -- he relied on information provided by his staff.
Q. And did you receive photographs showing that the work claimed to be done had, in fact, been done?
A. I don't recall if there were photographs. But at the time when my staff went out after he submitted the certification that those repairs had been made, they went out and inspected, and it was determined at that time, at the time of their inspection, that those corrections had not been made.
Q. Did you --
A. Excuse me. Let me complete.
And at the time of that inspection, there was a maintenance person or engineer on staff at South Pointe that walked the premises with them when they had to walk up and down the stairs, because I do not believe -- they had to walk the stairs and confirm that the health and safety items were not addressed properly and that was a false certification submitted where they saw -- there was a maintenance person that worked for South Pointe, and they saw -- according to my staff, they saw that those items had



not been corrected.
Q. Did you disregard the photographs that were sent by South Pointe showing that the repairs had been made?
MR. WELLONS: Objection, assumes facts not in evidence.
THE WITNESS: I didn't say that I disregarded any photographs. All I'm telling you is it was a false certification submitted, and my staff verified it by a subsequent inspection to the certification that Mr. Hays submitted. Now, when Mr. Hays responded to that letter...
BY MR. BAUGHER:
Q. You didn't believe the photographs that he sent you?
MR. WELLONS: Objection, let the witness finish her answer.
THE WITNESS: I did not say that. I said when Mr. Hays submitted his response, they could have corrected it. But I have a professional staff, and they went out and they certified that it was a false certification submitted. And a letter was issued.
BY MR. BAUGHER:
Q. And on the 15 items that were at issue, you



got 15 photographs back; you didn't take those into account in making your assessment as to whether the certification was accurate or not?
MR. WELLONS: Objection, assumes facts not in evidence, argumentative. Answer if you can.
THE WITNESS: I don't recall what the 15 photographs were about.
BY MR. BAUGHER:
Q. Did you ever look at the photographs?
A. Whatever he submitted in response, I'm sure I looked at it. But it was a long time ago and something that occurred in 2001. And my memory is not that vivid on those facts concerning pictures.
MR. WELLONS: Object to the previous question as assuming facts not in evidence.
(Whereupon, Deposition Exhibit No. 8 was marked for identification, JTL.)
BY MR. BAUGHER:
Q. Ms. Coleman, I've asked the court reporter to mark as Coleman Deposition Exhibit 8 a letter from Babco Construction, Inc., in Evanston to P.M. Group concerning South Pointe Tower apartments proposed scope of work summary, revision three.



Have you ever seen that document before?
A. I don't recall.
Q. Do you remember seeing this proposed scope of work summary from Babco in connection with South Pointe's proposal for a rehab loan on the property?
A. I don't recall seeing this document. And the rehab loan submission would have been submitted to Mary Anderson, director of operations.
Q. So do you think you never saw a loan application from South Pointe to HUD?
A. That document was submitted to Mary Anderson.
Q. And did you ever see that document?
A. I don't recall. I really don't. I don't think so. I don't recall.
Q. Were you asked by Mary Anderson or Ed Hinsberger to review the plan -- the loan application?
A. No.
Q. Looking at Coleman Deposition Exhibit 8, can you determine from this document, in general, the scope of work that was being proposed by South Pointe for its rehab loan?

Page 186

A. Can I determine what?
Q. The scope of work that was being proposed. Are you able to understand what this document refers to?
A. Yeah, I understand what it says. It's proposed scope of work summary, revision number three.
Q. And did you have any involvement in determining whether the scope of work proposed here in this Coleman Deposition Exhibit 8 was appropriate for the rehab of South Pointe?
A. That would have been determined by Mary Anderson, director of operations.
Q. You were not involved in formulating a view on the appropriate scope of the work; is that right?
MR. WELLONS: Objection, asked and answered. Go ahead and answer.
THE WITNESS: The scope of work for the rehab loan would have been approved by Mary Anderson Ed Hinsberger.
BY MR. BAUGHER:
Q. And you were not involved in that?
MR. WELLONS: Same objection. Go ahead and respond.

Page 187

THE WITNESS: No, I was not involved in the loan application to the extent that Mr. Baugher is referring.
BY MR. BAUGHER:
Q. Well, what I was asking you about is the appropriate scope of work for the loan that was being contemplated, and you say you were not involved in that aspect.
A. I do not know -- there are certain requirements for all of our insurance programs, and all of that's determined by Mary Anderson and/or her staff. And I'm not in that department, so scope of work and requirements for them to receive the 221(d)(f) loan, I don't know what he had to satisfy in order to get the loan.
Q. Well, did you have any participation in the decision-making on whether a new rehab loan would be approved or not approved based on whether the proposed work would be adequate to appropriately rehab the building?
MR. WELLONS: Objection, asked and answered Go ahead and respond.
THE WITNESS: I did not have the authority to approve or disapprove the 221(d)(f) loan for

Page 188

South Pointe. My involvement was with the REAC physical inspection, and we supported the owner getting the loan to rehab the property. So my involvement was just to restore the property to decent, safe, and sanitary housing.
BY MR. BAUGHER:
Q. When you say that you supported the owner getting the loan to rehab the property, are you referring to management, the management group within Multifamily Housing?
MR. WELLONS: Objection, vague. Go ahead and answer.
THE WITNESS: You need to clarify that question.
MR. BAUGHER: Read back the witness' answer, please. And then I would like you to tell us who is the we that you're referring to in that answer.
THE WITNESS: You don't have to read the question back. I can refer to the we.
We, myself, Ed Hinsberger.
BY MR. BAUGHER:
Q. Anyone else?
A. I don't recall anyone else, but the two of us for sure. We wanted this property to be restored

Page 189

to decent, safe, and sanitary conditions. That's why Mr. Hinsberger supported this ownership entity getting the 221(d)(4) FHA mortgage insurance.
Q. And was Mr. Hinsberger supporting this management -- strike that.
Read back the answer, please.
(Whereupon, the record was read as follows:
A. I don't recall anyone else, but the two of us for sure. We wanted this property to be restored to decent, safe, and sanitary conditions. That's why Mr. Hinsberger supported this ownership entity getting the 221(d)(4) FHA mortgage insurance.)
BY MR. BAUGHER:
Q. And Mr. Hinsberger supported this ownership entity getting the 221(d)(f) rehab loan as of the spring of 2001, correct?
MR. WELLONS: Objection, calls for speculation. Go ahead and answer.
THE WITNESS: The support started after the





00000000-0000-0000-0000-000000000000

Page 190

preapplication conference, which I previously stated occurred, I think, in late -- around December of '98.
BY MR. BAUGHER:
Q. And it was consistent from that point going forward; is that correct?
A. Yes. They received a loan, yes.
Q. And as of March 2001, Mr. Hinsberger and you supported the current ownership getting a substantial rehabilitation loan; is that right?
MR. WELLONS: Object to the extent Ms. Coleman has to speculate regarding Mr. Hinsberger's opinion. But go ahead and answer.
THE WITNESS: Yes, we wanted the property restored to decent, safe, and sanitary conditions.
BY MR. BAUGHER:
Q. Well, and you were willing to work with a then current owner in order to accomplish that, correct?
MR. WELLONS: Objection, vague. Go ahead and answer.
THE WITNESS: Yes, the owner of record is who we were working with.
BY MR. BAUGHER:
Q. That's P.M. Group or P.M. One, John Hays?

Page 191

MR. SAMUELSON: P.M. Equities.
BY MR. BAUGHER:
Q. Yes, that collection of humans and companies?
A. If that's their official title, but I can safely say Mr. Hays.
(Whereupon, Deposition Exhibit No. 9 was marked for identification, JTL.)
BY MR. BAUGHER:
Q. I've asked the court reporter to mark as Coleman Deposition Exhibit 9 a report prepared by HUD.
Can you tell us what this is, please.
A. This is our old physical inspection form 9822. And I recall Mr. Hinsberger -- I'm not sure if it was -- I believe it was Mr. Hinsberger and Mary Anderson, Ray Etzkorn worked for Mary Anderson, they instructed him to go out and assess the property with this report.
Q. What was the purpose of that report?
A. For the rehab loan.
Q. Have you ever seen this report before?
A. I've seen this.

Page 192

Q. When did you see it?
A. Sometime after he completed it. Exactly when, I do not recall.
Q. The report is dated March 27, '01. Do you think you saw it around that date or sometime in April?
A. I do not recall when I saw this report, but I have seen it.
Q. And have you discussed it with anyone?
A. No. The discussions on this report was -- I'm only speculating -- was probably with staff and production, Mary Anderson's staff.
Q. Were you asked to do anything with this report?
A. No.
Q. Do you actually remember reviewing Coleman Deposition Exhibit 9 or did you just see it?
A. I just saw it. I did not review it.
Q. You weren't asked by anyone to look at it and offer any thoughts on Coleman Deposition Exhibit 9; is that right?
MR. WELLONS: Objection, asked and answered.
THE WITNESS: I answered the question. I've seen this report. I have not reviewed the report for

Page 193

the validity of this report. I have seen the report.
BY MR. BAUGHER:
Q. And did you offer any opinions or comments to anyone concerning the report?
A. I do not recall.
Q. Well, I guess it's unlikely you offered any opinions if you didn't actually review the report; is that right?
A. This report was prepared by Mr. Etzkorn, because Mary Anderson and Ed Hinsberger instructed him to go out.
Q. And I assume --
A. And he worked for Mary Anderson.
Q. I assume you didn't check the arithmetic on the estimate of repairs at $62 million dollars as opposed to some other number, right?
A. I don't recall. I've seen the report as I've previously stated.
MR. WELLONS: I just want to clarify for the record, Coleman Exhibit 9 consists of Bates numbered pages 4770 through 4774. Also attached is a document beginning HUD scope of construction work-Ray Etzkorn.
Ms. Coleman, if you could clarify, when you indicate that you've seen the report, if you're

Page 194

referring to particular pages within this document or the document in its entirety.

THE WITNESS: I recall seeing this, this portion, the physical.

BY MR. BAUGHER:

Q. Just the Bates numbered documents?

A. The 9822, the form, this is what I recall seeing, the 9822 that Mr. Etzkorn prepared.

MR. WELLONS: Let the record indicate that Ms. Coleman has indicated the Bates numbered pages within the document.

THE WITNESS: I do not recall any of the supplemental documents by Babco or Mr. Etzkorn.

MR. BAUGHER: The additional pages are my work product, which was inadvertently attached, and appreciate you catching that when you did.

MR. WELLONS: Counsel has removed those pages from the exhibit.

Actually, it's after 4:00 now. Do you just want to take a short break?

MR. BAUGHER: Sure.

(Whereupon a short break was taken, after which the following proceedings were

Page 195

had:)

(Whereupon, Deposition Exhibit No. 10 was marked for identification, JTL.)

BY MR. BAUGHER:

Q. Ms. Coleman, will you look please at what I've asked the court reporter to mark as Coleman Deposition Exhibit 10, which appears to be a letter from Mr. Hinsberger to John Hays dated April 3, 2001. Have you seen that letter before?

A. Yes.

Q. When did you see that first?

A. Prior to Mr. Hinsberger issuing the letter.

Q. Did you see a draft of it?

A. Probably.

Q. Did you participate in drafting the letter?

A. No.

Q. Who did draft the letter?

A. You can tell by the last page.

Q. What does that tell us?

A. Marlese Adams.

Q. How can you tell that?

A. By the last page of Exhibit 10 numbered A0810. And that's a line of concurrence and it

Page 196

starts with Marlese.

Q. How do you know that she is the one who drafted it?

A. This is the process in our office, the person that drafts the letter is the first person on the concurrence page.

Q. And who is McMahon?

A. Her supervisor.

Q. And Anderson is Mary Anderson?

A. Yes.

Q. And Coleman refers to you?

A. Yes.

Q. But you didn't concur on this letter?

A. No.

Q. Why not?

A. It wasn't given to me. Mary concurred and Ed signed off.

Q. Well, there's a line for you to sign, and you apparently got a copy of it along with the firm file and Thomas and King?

MR. WELLONS: Objection, counsel's statement assumes facts not in evidence and misstates prior testimony.

BY MR. BAUGHER:

Page 197

Q. Well, is there another copy of this letter that you did, in fact, concur on?

A. I don't know if there's another copy. I'm sure this is the copy from our file as it was concurred and signed off by Ed Hinsberger. It states application deficiencies, that's all under Mary's department. There was no need for me to sign off.

Q. Did you review it and consider signing it and then decide not to or what?

A. I don't think so. There was no need. As I previously indicated, there was no need for me to sign off. This was application deficiencies, that was submitted to Mary Anderson for FHA mortgage insurance.

Q. Did you participate at all in the deliberations concerning whether the application would be rejected?

A. No. Whether the application would be rejected?

Q. Well, do you know if the application was accepted or rejected?

A. The application was accepted.

Q. Was this letter from Mr. Hinsberger -- -- strike that.

What was the purpose of this letter from Mr. Hinsberger?
A. Application deficiencies.
Q. As of April 3, 2001, did you understand that the deficiencies referred to in this letter were something that the current ownership of South Pointe would be able to correct?
MR. WELLONS: Objection, calls for speculation, assumes facts not in evidence. Go ahead and answer.
THE WITNESS: I can only speculate, because I don't know what's required to correct a deficiency in an application for mortgage insurance. It's determined by Mary Anderson and her staff.
BY MR. BAUGHER:
Q. As you understand this letter, it is not a rejection of an application for financing, but instead a recitation of deficiencies that would have to be corrected before the application could be accepted; is that right?
MR. WELLONS: Objection, calls for speculation, assumes facts not in evidence. Go ahead and answer.
THE WITNESS: I can speculate that that is



correct.
BY MR. BAUGHER:
Q. So that as of April 3, 2001, the South Pointe rehab loan financing application as it had been submitted by the then current ownership of South Pointe had not been accepted, but if the deficiencies identified in this April 3, 2001, letter were taken care of, then the application would be approved, correct?
MR. WELLONS: Objection, compound, assumes facts not in evidence, calls for speculation. Go ahead and answer.
THE WITNESS: This letter was prepared by Mary Anderson's staff. And it says that it was prepared as an application deficiency letter detailing the deficiencies in the application they submitted for mortgage insurance.
BY MR. BAUGHER:
Q. If the deficiencies described in the letter were remedied, is there any reason that you know of that the loan would not be made?
MR. WELLONS: Same objection. Go ahead and answer.
THE WITNESS: I can only speculate. This



letter was prepared by Mary Anderson's staff, and the loan was approved.
BY MR. BAUGHER:
Q. Ms. Coleman, I'm showing you Thomas Deposition Exhibit 20, an e-mail from Gwen Thomas to you dated April 4, 2001.
Have you seen that e-mail before?
A. I was copied on it, I'm sure.
Q. Well, when you're reading a string of e-mails, you start at the bottom and then go to the top, correct? So that the first -- they're actually two e-mails here, and the earliest of the two e-mails is the one at the bottom from Thomas to you, right?
A. Yes.
Q. And at 3:33 in the afternoon on April 4, Ms. Thomas is reporting to you and Mr. Hinsberger and Ms. Gray that she received a call from P.M. One's corporate office, and that they wanted to come in and meet regarding an occupancy review and REAC inspection. Do you recall that?
A. I do not recall this e-mail. I'm on it. I received it. I do read my e-mails. But to recall this specific e-mail, I cannot say that for sure.
Q. Then Mr. Hinsberger wrote back about an hour



later to you and Veronica Coleman and Debbie Gray saying let's all meet tomorrow on this one so we can plan what our next step will be. Do you see that?
A. I'm sure I did.
Q. Did you meet with Mr. Hinsberger and Ms. Coleman and Ms. Gray --
MR. SAMUELSON: Ms. Thomas.
BY MR. BAUGHER:
Q. (Continued) -- Ms. Thomas on April 5 to discuss or plan what your next step would be?
A. I can't say for sure.
Q. Well, did you meet shortly after this to decide or plan when your next step would be?
A. If Ed requested a meeting, I can only speculate that we met. I do not recall an exact meeting date to discuss this occupancy review and REAC inspection.
Q. Do you recall that there was such a meeting?
A. I truly do not recall.
Q. Do you recall having any meeting with Mr. Hinsberger in April of 2001 concerning a South Pointe occupancy review or REAC inspection?
A. As I previously indicated, it's been a long time. I cannot recall dates. If Mr. Hinsberger





00000000-0000-0000-0000-000000000000

Page 202

requested a meeting, we probably met. Do I recall the specifics of this meeting that's requested in the e-mail dated 4401, I do not recall any specifics.
Q. Do you recall developing a plan with respect to South Pointe in April 2001?
A. No, I do not.
Q. What was the next step that Mr. Hinsberger was referring to, a default letter or notice that would go out with respect to South Pointe?
MR. WELLONS: Objection, calls for speculation. Go ahead and answer.
THE WITNESS: As I've previously answered regarding this e-mail, I'm sure we met. I do not recall the specifics of this meeting.
BY MR. BAUGHER:
Q. Do you recall any discussion with Mr. Hinsberger about a default notice going out concerning South Pointe in April of 2001?
A. I don't recall the dates of any notices.
BY MR. BAUGHER:
Q. Do you recall a meeting with Mr. Hinsberger about a default notice going out on South Pointe?
A. I do not recall a meeting.
Q. Do you recall a telephone call with

Page 203

Mr. Hinsberger about a default letter pertaining to South Pointe?
A. I do not recall.
Q. Do you recall exchanging written communication with Mr. Hinsberger, an e-mail or a memo, concerning a default notice or letter on South Pointe?
A. I do not recall any e-mail correspondence. There might have been some, but it's -- as I previously stated, it's been a considerable period of time, and I just do not recall all of the facts concerning South Pointe.
Q. Do you recall Mr. Hinsberger consulting with you on whether or not South Pointe should be declared in default under its HAP contract?
MR. WELLONS: Objection, asked and answered Go ahead and respond.
THE WITNESS: Can you repeat his question, please.
(Whereupon, the record was read as follows:
Q. Do you recall Mr. Hinsberger consulting with you on whether or not South Pointe should be

Page 204

declared in default under its HAP contract?)
THE WITNESS: There was discussion about the HAP and the owner being in default of that contract. Exactly when, you know, the dates, I do not recall.
BY MR. BAUGHER:
Q. And this was a conversation with you or you just heard about there being some consideration that South Pointe was in default?
A. I don't recall if it was a conversation just with me or might have been in a meeting with other staff, the project manager might have been there and might have been staff from the DEC. I don't recall any dates or any specifics, but there have been conversations about the owner being in default on his contract.
Q. And what was the default?
MR. WELLONS: Objection, calls for a legal conclusion. Go ahead and answer.
THE WITNESS: The notice of default was issued on the substandard conditions of the property. The owner failed to maintain the property according to HUD standards.
BY MR. BAUGHER:

Page 205

Q. Well, what specifically was substandard?
MR. WELLONS: Same objection. Go ahead and answer.
THE WITNESS: The entire building.
BY MR. BAUGHER:
Q. Well, what parts?
MR. WELLONS: Same objection.
BY MR. BAUGHER:
Q. Was there some list or specification of what was substandard?
MR. WELLONS: Same objection. Go ahead and answer.
THE WITNESS: I'm sure you can review some of the reports that you have to determine what the substandard conditions are. They detail substandard conditions of South Pointe.
BY MR. BAUGHER:
Q. Who details?
A. The inspection reports, code violations issued by the City of Chicago.
Q. What code violations, at what point in time?
MR. WELLONS: Objection, compound. Go ahead and answer.
THE WITNESS: I don't recall the dates, but





00000000-0000-0000-0000-000000000000

we were provided code violations from the City of Chicago on occasion.

BY MR. BAUGHER:

Q. Do you remember what year?

A. No, I do not.

Q. By the time you were involved in the discussion about South Pointe being held in default under its HAP contract, had the decision already been made to declare South Pointe in default?

MR. WELLONS: Objection, assumes facts not in evidence. Go ahead and answer.

THE WITNESS: Restate the question, please.

MR. BAUGHER: Read it back.

(Whereupon, the record was read as follows:

Q. By the time you were involved in the discussion about South Pointe being held in default under its HAP contract, had the decision already been made to declare South Pointe in default?)

THE WITNESS: By the time -- read that first part again.



(Whereupon, the record was read as follows:

Q. By the time you were involved in the discussion about South Pointe being held in default under its HAP contract, had the decision already been made to declare South Pointe in default?)

THE WITNESS: By the time I became aware -- go back, because that question. . .

BY MR. BAUGHER:

Q. If the question is difficult for you, let me --

A. It's not difficult.

Q. -- reask it.

A. You can reask it. I would like her to restate what you said initially, please.

(Whereupon, the record was read as follows:

Q. By the time you were involved in the discussion about South Pointe being held in default under its HAP contract,



had the decision already been made to declare South Pointe in default?)

THE WITNESS: I can't speculate on when a decision was made, but this contract -- this owner had been in default of this contract for a period of time.

BY MR. BAUGHER:

Q. You said that you were in some -- a meeting, possibly more than one meeting about declaring South Pointe in default under the HAP contract, at least that's what I understood you to say, right?

MR. WELLONS: Objection, misstates prior testimony. Go ahead and answer.

THE WITNESS: Yes, I've been in discussion with Mr. Hinsberger. And I said it might have been a meeting, might have been a discussion, and I had said others may have in the meeting, project manager and/or staff in the DEC.

BY MR. BAUGHER:

Q. The meeting could have been with Mr. Hinsberger, just the two of you, or it could have been with some other people at Multifamily or it could have been with some people at Multifamily or



DEC and you can't recall?

MR. WELLONS: Objection, compound, asked and answered. Go ahead and answer.

THE WITNESS: I already responded to that and told you there was discussion. The meeting could have been with Mr. Hinsberger, myself, Ms. Thomas, the project manager, could have been a part of it, as well as staff from the DEC.

BY MR. BAUGHER:

Q. Whenever that meeting was, if there was a meeting, had Mr. Hinsberger by the time you were talking with him decided that the project should be declared in default?

MR. WELLONS: Objection, calls for speculation. Go ahead and answer.

THE WITNESS: I can't speculate. As I previously stated, the owner had been in default of his contract for some time.

BY MR. BAUGHER:

Q. Did you ever participate in a discussion in which the issue was debated as to whether or not South Pointe owners should be held in default under the HAP contract?

MR. WELLONS: Objection, asked and answered.





00000000-0000-0000-0000-000000000000

Page 210

Go ahead and answer.
THE WITNESS: Please restate that.
(Whereupon, the record was read as follows:
Q. Did you ever participate in a discussion in which the issue was debated as to whether or not South Pointe owners should be held in default under the HAP contract?)
THE WITNESS: As evidenced by the physical condition of this property of South Pointe, the substandard physical condition, the owner was in default of his HAP contract. The minute a property cannot meet the standard of being decent, safe, and sanitary, owners are in default.
BY MR. BAUGHER:
Q. I'll ask you the question again. Did you ever participate in a meeting or a discussion with Mr. Hinsberger in which the question that was being discussed was whether or not to declare the owner of South Pointe in default under his HAP contract?
MR. WELLONS: Objection, asked and answered. Go ahead and answer.

Page 211

MR. BAUGHER: Well, it was asked before but it was not answered.
MR. WELLONS: Objection, asked and answered. Ms. Coleman, please answer the question again.
THE WITNESS: For the record, the question was answered. And my answer was, I probably was in a meeting with Mr. Hinsberger, the two of us, project manager could have been in the meeting, and/or staff in the DEC to discuss the default of South Pointe's contract.
BY MR. BAUGHER:
Q. To discuss whether or not South Pointe should be held to be in default, whether a notice of default or a letter of default should go out, you were in such a discussion?
MR. WELLONS: Objection, compound, asked and answered. Go ahead and answer the question again.
THE WITNESS: The question has been answered and --
MR. WELLONS: Ms. Coleman, please answer the question again. It's okay.
THE WITNESS: As I previously stated, Mr. Hinsberger, myself, Gwen Thomas, and/or the DEC

Page 212

probably conducted a meeting concerning the ownership's default of the HAP.
BY MR. BAUGHER:
Q. At that meeting, which you say probably took place, did you discuss whether or not a notice of default, a letter announcing that there had been a default, should be issued?
MR. WELLONS: Same objection. Go ahead and answer.
THE WITNESS: We're required to issue letters to owners when they're in default of a business agreement with the Department.
BY MR. BAUGHER:
Q. Can you answer the question, please.
A. I do not recall --
MR. WELLONS: Objection, argumentative. Go ahead and answer.
THE WITNESS: I do not recall specifically. But we're required to issue a notice of default to an owner that's in default of a business agreement, notice of default or notice of violation. In this case, it was a notice of default.
BY MR. BAUGHER:
Q. Now, you said a few minutes ago that

Page 213

South Pointe had been in default of its business agreement with HUD perhaps for years; is that right?
MR. WELLONS: Objection, misstates prior testimony, argumentative, calls for a legal conclusion. Go ahead and answer.
THE WITNESS: This property was in substandard condition some years ago.
BY MR. BAUGHER:
Q. That's what I just said.
MR. WELLONS: Objection, argumentative.
BY MR. BAUGHER:
Q. But no notice of default was issued in 1999 or 2000 or the early part of 2001, correct?
MR. WELLONS: Objection, compound, argumentative. Go ahead and answer.
THE WITNESS: I don't recall.
BY MR. BAUGHER:
Q. There may have been a notice of default issued in 1999?
A. I do not recall.
Q. Or in 2000?
A. I do not recall any dates as it's been a considerable period of time, and I do not recall dates.

Q. Did Mr. Hinsberger ever ask for your opinion or your advice or your comments on whether a notice of default, a letter to the owner announcing a default, should be issued?
MR. WELLONS: Objection, compound, asked and answered. Go ahead and answer the question.
THE WITNESS: I don't recall.
BY MR. BAUGHER:
Q. Did you ever offer any advice to Mr. Hinsberger or to someone at Department Enforcement Center on whether a notice of default letter should be sent out?
MR. WELLONS: Objection, compound, asked and answered. Go ahead and answer the question.
THE WITNESS: I don't recall.
BY MR. BAUGHER:
Q. You say that at this meeting that may have taken place if there was one, there may have been somebody from the Department Enforcement Center. Who might that have been?
A. It could have been the director at that time or team leader or enforcement analyst.
Q. You don't recall?
A. No.



Q. And you didn't even really recall if there was a meeting?
MR. WELLONS: Objection, misstates prior testimony, argumentative. Go ahead and answer.
THE WITNESS: As I previously indicated, I do not recall.
BY MR. BAUGHER:
Q. Now, there was a letter of default that was ultimately sent out in April of 2001. Did you concur in that letter?
A. I don't recall.
Q. What's the process for sending out a default notice or a notice of default?
A. I don't recall what the process was at that time.
Q. Were you expected to sign off on such letters?
A. If I recall, the Hub director and the satellite office director might have signed those documents jointly, but I'm not sure. I don't recall what the protocol was at that time.
Q. What approvals were needed from the headquarters office in Washington?
A. I do not recall.



Q. Do you know if there was any Washington involvement, headquarters involvement in notices of default?
A. I do not recall what the protocol was at that time. I do not recall what the protocol was at that time.
Q. Do you remember having any conversations on the issuance of a default notice with Margarita Maisonet?
A. I do not recall.
Q. Do you recall any conversations about a default letter with a DEC team leader?
A. I do not recall.
Q. Or with a DEC enforcement analyst?
A. I do not recall. As I indicated earlier, if there was discussion, if there was a meeting held on the default of that contract, the meeting or discussion could have been between Mr. Hinsberger, Ms. Thomas, and staff from the DEC.
Q. Do you recall attorneys being involved, Mr. Gustin, Ms. Baguio?
A. It's been a long time as I've indicated in prior testimony, and I cannot recall these meetings and the occurrences.



Q. Do you recall any memoranda or e-mails or decision documents being circulated concerning whether or not South Pointe should be held to be in default?
MR. WELLONS: Objection, vague, compound, asked and answered. Go ahead and answer the question.
THE WITNESS: I don't recall.
BY MR. BAUGHER:
Q. Do you recall anything being inputted into the REMS system concerning a notice of default or whether there should be one issued?
A. I didn't put anything REMS. The project manager could have put some data in, but I don't recall specifically.
MR. BAUGHER: Would you mark this as the next exhibit, please.
(Whereupon, Deposition Exhibit No. 11 was marked for identification, JTL.)
BY MR. BAUGHER:
Q. Deposition Exhibit 11 is a collection of a couple of e-mails. The first of which is from an associate of Mr. Cravats, Doug Cher, to

Page 218

Mr. Hinsberger on the morning of April 9.
Have you seen that e-mail before?
A. I do recall seeing this e-mail.
Q. Do you recall anything about it?
A. Nothing in particular.
Q. When Mr. Hinsberger received the e-mail, he forwarded it to you and Ms. Maisonet and Ms. Thomas, is that right, and Mary Anderson and Janet Hanks?
A. Yes.
Q. And do you see in this first e-mail from Doug Cher, that Mr. Cher is saying that he believes that based on the figures available to him, that a loan of roughly five and a half million dollars could be made on this property?
A. I see Mr. Cher's e-mail.
Q. Now, what is the significance of that number or of his comments to Mr. Hinsberger?
MR. WELLONS: Objection, vague, calls for speculation.
THE WITNESS: I have no idea what Mr. Cher's comments meant in this e-mail.
BY MR. BAUGHER:
Q. I'm sorry. I didn't get your answer.
A. I said I have no idea about his comments. I

Page 219

can't speculate.
Q. Was he telling Mr. Hinsberger that he believed a loan of about five and a half million dollars could be made on the property and supported?
A. According to Mr. Cher's e-mail, he says based upon on our figures, we could afford to spend about 5.5 million.
Q. On construction --
MR. WELLONS: Let her continue.
THE WITNESS: And improvements with only some fairly minor changes to our application.
BY MR. BAUGHER:
Q. So does this e-mail refer back to the application that's then in process for a rehab loan for South Pointe?
A. I can only speculate. I assume that's the application that he's referencing
(Whereupon, Deposition Exhibit No. 12 was marked for identification, JTL.)
BY MR. BAUGHER:
Q. Coleman Deposition Exhibit 12 is an e-mail from Margarita Maisonet to Greg Gustin, Maria Baguio Laura Arnolds re: South Pointe.

Page 220

Have you ever seen this e-mail before?
A. I don't recall. I'm not on the e-mail. I don't recall.
Q. It says: Thank you all so much for your efforts on this. I do appreciate it and Ed gave me his thanks as well. Greg, I did forward your comments to Veronica and Ed. I will keep you posted. Great job everyone, Margie.
Do you recall the Margarita Maisonet forwarding comments to you concerning South Pointe on or about April 6, 2001?
A. I don't recall.
Q. Do you have any recollection of talking with Ms. Maisonet about South Pointe in early April 2001?
A. I don't recall.
Q. Do you have any idea what this refers to, this e-mail?
A. No, I do not.
Q. Does it refer to the notice of default?
A. I don't know.
Q. Who is Laura Arnolds?
A. I have no idea.
Q. You've never heard the name Laura Arnolds?
A. No I have not.

Page 221

Q. Ms. Coleman, let me show you Ms. Thomas' Deposition Exhibit 19, which is a letter from Ed Hinsberger and Margarita Maisonet to Englewood Terrace and P.M. Group dated April 9, 2001.
Have you seen is this letter before?
A. Yes.
Q. When did you see it first?
A. I don't recall when I first saw it.
Q. Did you see it in April or May of 2001?
A. It was issued April 9, 2001.
Q. Did you get a copy of it -- I mean, were you copied on the letter?
A. I do not recall.
Q. Did anyone ask you to do anything concerning this letter, this notice of default?
A. No.
Q. Did you have any conversation with anyone about the letter of default, Thomas Deposition Exhibit 19?
A. As I previously stated, Mr. Hinsberger might have had a meeting to discuss the issues of this document. I do not recall.
Q. When you say there might have been a meeting, you think there might have been a meeting at





00000000-0000-0000-0000-000000000000

Page 222

which you received a copy of this letter and were informed that a default notice had been sent?
MR. WELLONS: Objection, compound, asked and answered. Go ahead and answer the question.
THE WITNESS: Not that it had been issued and sent. He might have met prior to the issuance to say that is what he was going to do.
BY MR. BAUGHER:
Q. Did you see a draft of Thomas Deposition Exhibit 19?
A. I don't recall.
Q. Did anyone discuss with you at any point a draft or text that was going to go into a draft for Thomas Deposition Exhibit 19, the default letter?
A. I don't recall.
Q. You weren't asked to comment on any of the text of Thomas Deposition Exhibit 19, were you?
MR. WELLONS: Objection, asked and answered. Answer the question.
THE WITNESS: I don't recall.
BY MR. BAUGHER:
Q. Did you provide any documentation or other information to anyone for the purpose of drafting this letter, Thomas Deposition Exhibit 19?

Page 223

MR. WELLONS: Same objection. Answer the question.
THE WITNESS: I do not recall.
BY MR. BAUGHER:
Q. Do you recall asking Ms. Thomas to provide information to anyone to assist in drafting the default letter, Deposition Exhibit 19?
A. I do not recall.
Q. Do you recall being involved in any follow-up to the issuance of the notice of default?
MR. WELLONS: Objection, vague. Go ahead and answer the question.
THE WITNESS: I do not recall.
BY MR. BAUGHER:
Q. Did you keep any notes pertaining to what was going on at the property with South Pointe at the time the default notice was issued in April of 2001?
MR. WELLONS: Objection, asked and answered Answer the question.
THE WITNESS: I don't recall.
BY MR. BAUGHER:
Q. Do you recall speaking with anyone about the property in the aftermath of this notice of default dated April 9, 2001?

Page 224

A. Can you read the first part of his question back?
(Whereupon, the record was read as follows:
Q. Do you recall speaking with anyone about the property in the aftermath of this notice of default dated April 9, 2001?)
THE WITNESS: I don't recall.
BY MR. BAUGHER:
Q. Do you recall anything about the notice of default, it's lead up or aftermath, that you haven't testified to this afternoon?
A. I do recall that after this notice was issued, HUD kept the contract alive for a considerable period of time to protect the residents, make sure the services continued to flow, and that the HAP dollars were not just shut off.
Q. Now, there was a REAC report that we talked about briefly in March of 2001. Do you recall seeing South Pointe's response to that REAC inspection report?
A. Who submitted the response?
Q. From South Pointe. Oh, you mean the name of

Page 225

the person?
A. Yes.
Q. Well, let me show you what was marked yesterday as Thomas Deposition Exhibit 16, which is a letter from Shawn Mintz at South Pointe to Joan Kiening dated April 5, 2001. This is Thomas Deposition Exhibit 16. Did you see that?
A. I do not recall seeing this document.
Q. Did you have any discussion with anyone, Gwen Thomas or anyone else, concerning the Mintz South Pointe letter to Ms. Kiening of April 5, 2001?
A. I do not recall.
Q. Now, you said you didn't recall seeing Thomas Deposition Exhibit 16. Does anything about it look familiar to you or are you just unsure one way or another whether or not you've seen it?
A. I do not recall. It was submitted to Joan Kiening. I just do not recall.
Q. Let me show you what was marked at Ms. Thomas' deposition as Thomas Deposition Exhibit 17, a letter from Kelly Brown at South Pointe to you, Veronica Coleman dated April 8, 2000.
Did you receive that letter?
MR. WELLONS: Just for clarification, I





00000000-0000-0000-0000-000000000000

Page 226

believe counsel may have referenced the date as April 8, 2000.

MR. BAUGHER: I didn't mean to. It's 2001.

THE WITNESS: Yes, I recall this letter.

BY MR. BAUGHER:

Q. What do you recall about it?

A. Kelly Brown submitted it for the ownership entity.

Q. Did you read it?

A. Yes.

Q. On or about April 8, 2001?

A. I read it sometime, yeah, on or about. I don't know the exact date that I --

Q. I'm sorry. I interrupted what you said.

A. I do not know the exact date that I read Kelly Brown's April 8, 2001, letter, but I do recall this letter.

Q. What is the letter about?

A. She submitted something in response to a REAC inspection that was performed where the score was -- I believe it was a 31C asterisk.

MR. WELLONS: If we could clarify, the letter that's been designated as Thomas Exhibit 17 has attachments to it. There appears to be three

Page 227

attachments referenced in the letter. When Ms. Coleman indicates she's seen the letter, I just want to verify that she's referring also to those exhibits?

THE WITNESS: I've seen the letter. I don't recall these exhibits. All though I do recall the letter.

BY MR. BAUGHER:

Q. Well, do you have any reason to believe that you didn't receive the exhibits that are attached?

A. As I previously stated, it's been a considerable period of time, and I do not recall.

MR. WELLONS: I also want to clarify the record that within Thomas Exhibit Number 17, some of the documents within the body have Bates numbers and appear to have been produced by the government; others do not have Bates numbers.

BY MR. BAUGHER:

Q. Yes, Mr. Wellons is correct. For example, beginning B4256 through 63 are Bates stamped documents, which is if you'll compare it with the previous exhibit, Thomas Deposition Exhibit 16, a copy, except for the first page, of the Mintz letter to Kiening of April 5, 2001.

Page 228

Do you see that?

A. I'm looking at the two documents that you're referring to.

Q. And you can see that the parts that I've described are the same, correct?

A. With some annotations on Exhibit 10 that are not on Thomas Exhibit 16.

Q. And that's one of the things that you say you read in April 2001 after it was submitted to you by Kelly Brown?

A. I recall Kelly Brown's letter. I do not recall these specific exhibits, but I do recall her letter.

Q. Do you remember taking time to study the letter?

A. I believe there was a response to this letter.

Q. What do you recall the response being?

A. If I recall, it was a response to the owner, Mr. Hays, from HUD.

Q. Who at HUD?

A. I believe I signed the letter.

Q. Did you write the letter?

A. I do not recall if I wrote the letter or if

Page 229

Ms. Thomas drafted it.

Q. But you're the one who sent the letter out?

A. I signed it.

Q. Well, did you read it first?

A. Yes.

Q. Did you think about it?

MR. WELLONS: Objection, argumentative. Go ahead and answer.

THE WITNESS: Yes.

BY MR. BAUGHER:

Q. Did you intend the letter to say what it said?

A. As I've previously stated, it's been a considerable period of time and the response probably was in 2001. The specific details in that letter, I cannot elaborate on them to the extent Mr. Baugher would like.

Q. Well, I'm just asking if you meant what you said in the letter, even if Ms. Thomas drafted it for you?

MR. WELLONS: Objection, argumentative, asked and answered. Go ahead and answer the question.

THE WITNESS: The letter was sent in





00000000-0000-0000-0000-000000000000

Page 230

response to Kelly Brown's letter to the owner advising him what HUD could or could not do as it relates to her submission.

MR. WELLONS: If we could clarify for the record. I want to verify something. Is Thomas Exhibit 17 being offered as a copy of the package that was submitted to Ms. Coleman by Kelly Brown on April 8, 2001? Is the compilation meant to represent accurately what Ms. Brown submitted to Ms. Coleman?

MR. BAUGHER: It is an attempt to compile records. But there may have been more, and that's why I'm asking this witness questions about it.

Could you reread the question, please.

(Whereupon, the record was read as follows:

Q. Well, I'm just asking if you meant what you said in the letter, even if Ms. Thomas drafted it for you?)

MR. BAUGHER: Go ahead.

MR. WELLONS: Objection, asked and answered. Go ahead and answer the question again.

THE WITNESS: Yes.

MR. BAUGHER: Mark this as Coleman 13.

Page 231

(Whereupon, Deposition Exhibit No. 13 was marked for identification, JTL.)

BY MR. BAUGHER:

Q. What is Coleman Deposition Exhibit 13?

A. It's a letter sent to John Hays in response to this letter from Kelly Brown.

MR. WELLONS: Let the record reflect Ms. Coleman referred to Thomas Exhibit 17.

BY MR. BAUGHER:

Q. So this is the response letter that you were speaking of a few minutes ago?

A. Yes.

Q. And now that you're looking at Coleman Deposition Exhibit 13, do you recall if you wrote the letter?

A. It says draft GT on the back. I do not recall. It's been a considerable period of time when this letter was prepared. I signed the letter.

Q. Referring to the second page, A2327, which says April 23, '01, draft GT, is that what you're referring to?

A. Yes.

Q. Well, that's the same sort of notation that

Page 232

was on that March 15, 2001, draft abatement letter, which Ms. Thomas said she didn't draft.

Do you know, does this notation 4/23/01, draft GT provide any information that one can rely on in terms of who was doing the drafting?

MR. WELLONS: Objection, calls for speculation. Go ahead and answer.

THE WITNESS: I can only speculate. I don't see the concurrence page where Ms. Thomas concurred. We're looking at these two sheets.

BY MR. BAUGHER:

Q. Does Ms. Thomas have to concur in this letter that you're sending out? You're two steps up in the management from her. Does she need to concur in that?

MR. WELLONS: Objection, argumentative. Go ahead and answer.

THE WITNESS: As you can see from other correspondence that you've shown today from HUD, we do have levels of concurrence, whether they're two or three steps up. So yes, she does concur on occasion.

BY MR. BAUGHER:

Q. Well, we haven't seen any example -- or I haven't seen any example in any document from HUD in

Page 233

which Gwen Thomas was listed for a concurrence.

A. I didn't say Gwen Thomas. I said correspondence. You saw the document where Marlese Adams drafted the letter, Kathy McMahon concurred, Mary Anderson concurred, and Ed Hinsberger signed the letter.

Q. I understand that.

A. I'm speaking about the Department and just the concurrence process. I do not recall who drafted the letter. I signed the letter.

Q. Did you read the letter before you signed it?

A. Yes.

MR. WELLONS: Objection, asked and answered. Go ahead and answer.

THE WITNESS: Yes, I did.

BY MR. BAUGHER:

Q. You say: We are in receipt of the plan to correct the deficiencies identified in the subject real estate assessment center, REAC inspection. The response to that inspection was submitted by Ms. Kelly Brown, regional property manager for P.M. One.

And as you've just said, that refers to





00000000-0000-0000-0000-000000000000

Page 234

Thomas Deposition Exhibit 17, correct?
A. Correct.
Q. And then you write: Ms. Brown's response will not be accepted due to impending negotiations with HUD (Departmental Enforcement Center and Chicago Multifamily Hub) concerning your proposed refinance and substantial rehabilitation of the property.
Now, why is it that Ms. Brown's response was not accepted due to negotiations about refinancing and rehabilitation of the property?
A. Her response -- let me correct that. The proposed rehabilitation of this property, as acknowledged by the ownership entity that we were dealing with at that time, Mr. Hays determined that the scope of work that was needed for this particular project was far beyond addressing items as stated in a REAC report. And the negotiations, as indicated in this letter that were going on with the DEC and Chicago Multifamily Hub concerning the refinance, those were the issues that he needed to address to bring this property into substantial compliance.
Q. There was a REAC inspection and Kelly Brown in her letter was responding to that REAC inspection, correct?

Page 235

A. Thomas Exhibit Number 17, Kelly Brown's letter, it states: Enclosed find a management improvement operating plan. First of all, that's not enclosed. I don't see a MIO enclosed.
Q. That's because your definition of MIO means that it has to be on a particular government form, correct?
MR. WELLONS: Objection, argumentative. Go ahead and answer.
THE WITNESS: It's not a MIO plan.
BY MR. BAUGHER:
Q. What is a MIO plan? What does it look like? Is it a form document that HUD has?
A. Yes, it is.
Q. And if you don't submit it on the specific form that HUD provides, then it's not a MIO plan; is that right?
MR. WELLONS: Objection, argumentative. Go ahead and answer.
THE WITNESS: This is not a MIO plan.
BY MR. BAUGHER:
Q. And a MIO plan is the --
A. I don't have a MIO plan in front of my face. And I'm not going to go into all the details of a

Page 236

MIO, but this is not a MIO plan.
MR. WELLONS: Let the record reflect that the witness referred to Thomas Exhibit 17.
BY MR. BAUGHER:
Q. In a MIO plan, does the owner set out those items that have been identified as being deficient or needing work or repair and then state either what work had already been accomplished or what was intended to be accomplished with target dates; is that the essence of a MIO plan?
MR. WELLONS: Objection, vague. Go ahead and answer.
THE WITNESS: That's some of the information that's contained in the MIO, but there's additional --
BY MR. BAUGHER:
Q. Like what?
A. -- things as well.
Sources.
Q. Sources of what?
A. Funds. A line where it's executed by the owner. There are, you know, target completion dates actual completion dates. This is not a MIO plan. And this was returned to the owner, Mr. Hays, to make

Page 237

sure that -- sorry.
MR. WELLONS: Please finish your answer. I just wanted to indicate that during her answer, Ms. Coleman was referring to Thomas Exhibit 17.
THE WITNESS: Thomas Exhibit 17 was returned to the owner to make sure that he was aware.
MR. WELLONS: And, Ms. Coleman, in the future, so I don't have to keep interjecting on the record, the court reporter can't take down gestures. So if you say this, please indicate to her what you're referring to.
THE WITNESS: Excuse me.
BY MR. BAUGHER:
Q. In Ms. Brown's letter to you, there's a description of the various items in the March 2001 REAC report that were deemed to be deficient or in need of repair, and then there's a statement as to which of those were corrected; is that right?
A. Would you like for me to look?
Q. Well, look at the Bates stamped pages that are part of Deposition Exhibit 17. For example, go to page 4256. Do you see that page?
A. I see the page.
Q. Take the item laundry room. This is in the

building one common areas. Do you see where it says doors damaged hardware/locks? Do you see that line?
A. Yes.
Q. I'm taking this as an example. Do you see where next to that it says completed?
A. Yes.
Q. Do you have any reason to believe that as of the date of this letter, the damaged hardware and locks on the doors in the laundry room at South Pointe had not been fixed?
A. I don't know if the laundry room was fixed or not.
Q. Well, a statement is made here that that repair item was completed. Do you have any information that suggests to you that it was not completed as of that date?
MR. WELLONS: Objection, vague, asked and answered. Answer the question.
THE WITNESS: That's exactly what it is, a statement.
BY MR. BAUGHER:
Q. And do you have any contrary information?
MR. WELLONS: Objection, vague, asked and answered.



Ms. Coleman, if you'd like, please complete your answer to the previous question.
THE WITNESS: I did not inspect this property to determine if this was completed. I do not know if it was completed or not. As you indicated, this is a statement.
MR. WELLONS: Let the record reflect that --
THE WITNESS: That Thomas Exhibit 17, page B4256, laundry room, doors, damaged hardware, locks, trash collection area, damaged chutes, it's a statement. I have no knowledge or verification if it was completed. This package was returned to Mr. Hays.
BY MR. BAUGHER:
Q. Well, you got a response promptly from South Pointe in which the items specified in the REAC report were responded to and you refused it, you sent it back, right?
MR. WELLONS: Objection, vague, mischaracterizes prior testimony, assumes facts not in evidence. Go ahead and answer.
THE WITNESS: Exhibit 13, a letter dated May 15, explains why it was returned.
BY MR. BAUGHER:



Q. Because regardless of whether all of the items in the REAC inspection report of March 2001 had been addressed, you still considered that level of repairs to be inadequate; is that correct?
A. Exhibit 13, a letter dated May 15, states that the condition of this property is beyond that point as acknowledged by your application to refinance.
Q. So as far as you know, as of May 15, 2001, all of the items that were noted in the March 2001 REAC report had either been repaired or were imminently about to be repaired, and it still wouldn't make any difference to you?
MR. WELLONS: Objection, vague, misstates prior testimony.
THE WITNESS: I did not state that. Can you repeat his question?
(Whereupon, the record was read as follows:
Q. So as far as you know, as of May 15, 2001, all of the items that were noted in the March 2001 REAC report had either been repaired or were



imminently about to be repaired, and it still wouldn't make any difference to you?)
THE WITNESS: I did not state that, that it would make -- that it would make any difference to me. And I have no knowledge if all of the items of repair were completed in the REAC inspection.
BY MR. BAUGHER:
Q. Well, as far as you know, they were?
A. The application was submitted.
MR. WELLONS: Ms. Coleman, please finish your response.
THE WITNESS: The application was submitted to correct the substandard physical condition of South Pointe. It was submitted by the ownership entity. The ownership entity was well aware of the true condition of that property, the substandard physical conditions as the letter indicated. There were negotiations with the DEC and Chicago Hub.
BY MR. BAUGHER:
Q. What negotiations were there with the DEC?
MR. WELLONS: Objection, asked and answered. Go ahead and answer.
THE WITNESS: As previously indicated, this





00000000-0000-0000-0000-000000000000

Page 242

all occurred a considerable period of time ago. And there was a meeting and the owner, Mr. Hays, met with Mr. Hinsberger and staff from the DEC, and you know, he was informed of what he needed to do.

BY MR. BAUGHER:

Q. Who did you inform at HUD about the receipt of the letters from Mr. Mintz and Ms. Brown concerning the March 2001 REAC report?

A. Who did I consult regarding the letters from Mr. Mintz?

Q. Shawn Mintz.

A. What letter from Mr. Mintz?

MR. WELLONS: Could you read the question back to the witness, please.

THE WITNESS: Where is there a letter from Mr. Mintz?

MR. BAUGHER: Thomas Deposition Exhibit 16.

MR. WELLONS: Could you please read back the question.

MR. BAUGHER: I believe it's been garbled up enough now. Let me just restate it.

BY MR. BAUGHER:

Q. Look at Thomas Deposition Exhibit 16 and Thomas Deposition Exhibit 17. Did you inform anyone

Page 243

else at HUD that you had received those two letters?

A. As I indicated when Thomas Exhibit 16 was presented to me, this document was sent to Joan Kiening, and I did not recall viewing it.

Thomas Exhibit 17, as I previously indicated, I recall Kelly Brown's letter. I do not recall the exhibits attached.

Q. Who did you inform at HUD that you had received either or both of these letters?

A. As I previously indicated, I do not recall receiving Thomas Exhibit Number 16.

Thomas Exhibit Number 17, when I received this letter from Kelly Brown, I can't say for sure, but because of the negotiations that was going on with our office and Mr. Hinsberger, he may have received a copy of this.

Q. Did you send Mr. Hinsberger a copy of Thomas Deposition Exhibit 17?

MR. WELLONS: Objection, asked and answered. Go ahead and answer the question.

THE WITNESS: I do not recall for sure, but because of the negotiations that were going on with Mr. Hinsberger and the refinance of this property, more than likely, he received a copy or was

Page 244

consulted.

BY MR. BAUGHER:

Q. Who did he receive a copy from?

MR. WELLONS: Objection, assumes facts not in evidence, calls for speculation. Go ahead and answer.

THE WITNESS: I could only speculate that the project manager might have made him a copy.

BY MR. BAUGHER:

Q. You don't know that one way or another?

A. I cannot recall. As previously stated, this has been a considerable period of time ago, and I cannot recall all the facts.

Q. Did you send a copy of Thomas Deposition Exhibit 17 to anyone at DEC?

A. I don't recall.

Q. Did you send a copy to Ms. Maisonet?

A. I do not recall.

Q. You think it's likely that you sent a copy to Ms. Maisonet?

A. I do not recall. As you can look at Kelly Brown's letter, Thomas Exhibit 17, she did cc Joan Kiening, and Joan Kiening was the person on the DEC staff.

Page 245

Q. I'm asking if you sent it to anyone.

A. If I sent Thomas Exhibit Number 17 to anyone?

Q. Yes.

A. I do not recall.

Q. Do you know if a copy of Thomas Deposition Exhibit 17, a letter from Kelly Brown, was kept in the Multifamily Housing office files?

A. I do not recall.

Q. Well, you sent -- you say in your letter, Deposition Exhibit 13, that you were returning it and sending it back, and it shows on your letter that there was an enclosure. Did you keep a copy of what was sent back?

A. More than likely, we kept a copy, and we returned the original.

Q. As of May 15, 2001, was it your view that whatever was said or done with respect to the March 2001 REAC report on South Pointe, the project was in need of such repairs that it really didn't make any difference what the owner's response was on those specific REAC points?

MR. WELLONS: Objection, asked and answered. Go ahead and answer the question.

Page 246

THE WITNESS: The owner submitted an application for mortgage insurance where the scope of work was far greater than what was detailed in a REAC inspection. So by the owner's own submission of that application, he acknowledged himself that the work was far beyond the REAC.
BY MR. BAUGHER:
Q. Well, Ms. Coleman, on that basis, any time an owner sought a rehabilitation loan that was going to be insured by HUD and intended to use the money for repairs or rehabing of the building, that would necessarily show that the owner believed there were more repairs needed than was shown in a REAC report, correct?
MR. WELLONS: Objection, argumentative, misstates previous testimony. Go ahead and answer.
THE WITNESS: The owner had been working on his application since December of '99, and this REAC inspection was conducted in 3/01.
BY MR. BAUGHER:
Q. The application was for a 40-year loan, correct?
A. I don't recall.
Q. It was for a very long-term loan, right?

Page 247

A. I have no idea of the term of that application.
Q. You don't know if it was for a long-term loan or a six-month credit line?
MR. WELLONS: Objection, asked and answered
THE WITNESS: You need to verify the term of that loan with Mary Anderson, director of operations.
BY MR. BAUGHER:
Q. Why did you return the package from Ms. Brown instead of keep it and continue to work through issues concerning the REAC report and then have others in the Department, Ms. Anderson's group, for example, take up whatever issues there were with respect to the financing?
MR. WELLONS: Objection, vague, assumes facts not in evidence, asked and answered. Go ahead and respond.
THE WITNESS: Your question really isn't -- well, it doesn't make much sense, because what Mary Anderson's department was doing on the operation side with the refinancing, that was something totally -- that was, you know, separate from Kelly Brown's submission to me. You know, the application requirements for HUD financing is

Page 248

something that Mr. Hays and Mr. Cravats were working on. And what Kelly Brown submitted to me was something completely different.
BY MR. BAUGHER:
Q. Well, didn't you expect to get a response from the owner to the March 2001 REAC report?
A. I can't speculate on whether we should have -- well, you know, owners are required to respond when REAC reports are issued with deficiencies, but the response has to be adequate.
Q. The owner is instructed to respond to a REAC report, correct?
A. I can't recall the exact contents of the form letter that was issued with the report at that time. The letters have changed over the years.
Q. Well, Ms. Coleman --
A. Let me finish my statement.
The letters have changed over the years, and the exact content of the letter that was issued with this report, I do not recall what Mr. Hays was instructed to do.
Q. When South Pointe received notice of deficiencies in that March 2001 REAC report, didn't you expect that South Pointe would respond to you and

Page 249

tell you what it intended to do in terms of repairing or taking care of those deficiencies?
MR. WELLONS: Objection, asked and answered, assumes facts not in evidence. Go ahead and answer.
THE WITNESS: Whatever his response was, it had to be acceptable.
BY MR. BAUGHER:
Q. And what you're saying by refusing to accept the package sent to you by Kelly Brown is that no response to the specific items in the REAC inspection of March 2001 could be adequate given the overall condition of the property, right?
MR. WELLONS: Objection, asked and answered, misstates prior testimony. Go ahead and answer.
THE WITNESS: I did not say that.
BY MR. BAUGHER:
Q. Well, actually you did say that. You said that the response will not be accepted due to impending negotiations with HUD, and then you explain that by saying that the condition of the property as indicated in the application to refinance went way beyond the deficiencies referred to in the REAC report; isn't that the gist of what you wrote?
MR. WELLONS: Objection, vague,

Page 250

argumentative. Go ahead and respond.
THE WITNESS: The letter states Ms. Brown's response will not be accepted due to impending negotiations with HUD (Department Enforcement Center and Chicago Multifamily Hub) concerning your proposed refinance and substantial rehabilitation of the property.
BY MR. BAUGHER:
Q. So at that point in time, as of May 2001, there was nothing that the owner could do with respect to the REAC report that would be satisfactory except to successfully conclude negotiations with HUD on a comprehensive rehabilitation plan; is that right?
MR. WELLONS: Objection, asked and answered. Misstates prior testimony. Go ahead and answer.
THE WITNESS: In May 2001, the Department was looking for Mr. Hays to submit a complete application, one that could be accepted to refinance and rehabilitate South Pointe.
BY MR. BAUGHER:
Q. And that was the issue with respect to South Pointe at that time, correct?
MR. WELLONS: Objection, vague. Go ahead

Page 251

and answer.
THE WITNESS: And that was the issue?
BY MR. BAUGHER:
Q. Yes.
A. What do you mean, the rehabilitation?
Q. Whether or not a satisfactory rehabilitation loan program could be agreed on.
A. That is what the Department was working on with Mr. Hays.
Q. And that was the primary issue, which if it could be resolved successfully, the loan would be made and the project would go ahead; and if it weren't resolved successfully, then the project, in your view, would remain in default and would be closed out?
MR. WELLONS: Objection, vague, calls for speculation. Go ahead and answer.
THE WITNESS: I did not say that was the primary -- were your words focus of the Department? The Department had other concerns. The property was substandard, you know, tenants were living in substandard, deplorable conditions. And the Department had other concerns. But that was one, that the Department was working with the owner

Page 252

diligently to get mortgage insurance approved so that they could start the subrehab of this development.
MR. BAUGHER: Will you mark this as Coleman Deposition Exhibit 14.
(Whereupon, Deposition Exhibit No. 14 was marked for identification, JTL.)
BY MR. BAUGHER:
Q. Ms. Coleman, I've asked the court reporter to mark as Coleman Deposition Exhibit 14 a collection of e-mails between you and Richard Pace dated in July, and I think the dates are on e-mails, rather than we need to represent them, but beginning on July 30, 2001.
Will you look at these please and tell us if you've seen these e-mails before?
A. I've seen them.
Q. When did you see them?
A. On or about the dates of the e-mails.
Q. Who is Richard Pace?
A. He works in headquarters.
Q. What is his position?
A. I don't know.
Q. Have you ever met him?

Page 253

A. I think he might have been introduced at a training or something. But a personal one on one, I do not recall.
Q. Do you know what he does at headquarters?
A. He works for the Office of Housing.
Q. And do you know what his role is there?
A. He works for the Office of Housing. He works for Beverly Miller.
Q. And what does that office do?
A. It's the office of Multifamily Housing. They have oversight for the 18 hubs as it relates to the programs that we administer.
Q. So he works in an oversight capacity to what you were doing in Chicago; is that right?
A. In this particular case, he was getting some information for Kenneth Hannon.
Q. Who is Kenneth Hannon?
A. He's the director of business relationships, I believe that's his title.
Q. What does he do as director of business relationships?
A. He coordinates activities between the Departmental Enforcement Center, OAHP formerly known as OMAR, and REAC.