# Transcript of the Testimony of **Margarita Maisonet**

**Date:** April 29, 2005
**Volume:** 1

**Case:** Englewood Terrace Limited Partnership v. The United States

Printed On: May 6, 2005

Ace-Federal Reporters, Inc.
Phone: 202-347-3700
Fax: 202-737-3638
Email: info@acefederal.com
Internet: www.acefederal.com

IN THE UNITED STATES

COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - -x

ENGLEWOOD TERRACE LIMITED :
PARTNERSHIP, :
Plaintiff, : No. 03-2209C
vs. :
THE UNITED STATES :
Defendant. :

- - - - - - - - - - - - - - -x

DEPOSITION OF MARGARITA MAISONET

Washington, DC
Friday, April 29, 2005

REPORTED BY:
VICTORIA L. WILSON

Page 2

Deposition of MARGARITA MAISONET, called for examination pursuant to notice of deposition, on Friday, April 29, 2005, in Washington, DC; at the law offices of Miller & Chevalier, 655 15th Street, N.W., Suite 900, at 10:45 a.m., before VICTORIA L. WILSON, a Notary Public within and for the District of Columbia, when were present on behalf of the respective parties:

PETER V. BAUGHER, ESQ.
Schopf & Weiss, LLP
312 West Randolph Street, Suite 300
Chicago, IL 60606-1721
(312) 701-9315
On behalf of Plaintiff

PAUL R. WELLONS, ESQ.
U.S. Department of Justice, Civil Division
1100 L Street, N.W.
Washington, D.C. 20530
(202) 616-8253
On behalf of Defendant

Page 3

APPEARANCES (Continued):
GREGORY G. GUSTIN, ESQ.
U.S. Department of Housing and Urban Development
Office of General Counsel
77 West Jackson Boulevard
Chicago, IL 60604
(312) 353-6236
On behalf of HUD

ALSO PRESENT: Don Samuelson

Page 4

PROCEEDINGS

(Maisonet Deposition Exhibits 1 through 4 identified.)

MR. BAUGHER: The record should reflect that this is the deposition of Margarita Maisonet taken pursuant to notice and agreement of the parties. Before we get into -- before we swear the witness and get into the testimony, I have been handed some additional documents this morning that were requested during earlier depositions a couple of weeks ago and I'll be asking the witness a few questions about these documents. In addition to that, Mr. Wellons and I had a brief conversation and his current expectation is that he will be responding to our letter of April 19th on open discovery issues next Monday, which is May 2nd, and he will also check on the verification of the Government's interrogatory answers served a month or month-and-a-half ago.

MR. WELLONS: That is correct.

MR. BAUGHER: Could you swear the witness, please?

Whereupon,

Page 5

MARGARITA MAISONET

was called as a witness and, having first been duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. BAUGHER:

Q State your full name, please.
A Margarita Maisonet.
Q How do you pronounce that?
A "Mice' so net."
Q "Mice' so net."
A Yes.
Q Where do you live, Ms. Maisonet?
A I live at 6214 Clara Edward Terrace, Alexandria, Virginia.
Q Okay. How long have you lived there?
A Since August of last year or around August 1st.
Q Where did you live before that?
A 600 South Dearborn Street.
Q In Chicago?
A Yes.
Q How long did you live at that address?

Page 6

A Since 1992, about August of 1992.
Q So you moved to Washington in August of last year?
A Yes.
Q Were you working here at least part of the year during the last several years?
A Yes, I had been on detail here since January 2003.
Q And what does it mean to be on detail?
A Temporary --
Q What did it mean in your case to be on detail since January 2003?
A It is temporary duty travel and I'm not -- I wasn't here in a permanent position, I was in an acting position, and I was on detail so my -- but my permanent duty station was in Chicago so I was assigned to Chicago, temporarily working in Washington during that time period.
Q Did that mean, though, that during a typical week, you would be here in Washington all week?
A Yes, and I would occasionally travel home

Page 7

on the weekends.
Q So you, basically, have been in Washington since the beginning of 2003; is that right?
A Yes.
Q Did you have any business meetings this morning?
A No -- business meetings for HUD?
Q Yes.
A Sorry. No business meetings for HUD.
Q Do you have any at the end of the day?
A No.
Q Is there any business reason why you couldn't have been in Chicago today?
A Oh, I'm sorry. I had -- there is going on today a fairwell party for an assistant secretary with whom I have worked for the last two years and I was scheduled to be there; however, because of the time factor, I agreed to be here but I was originally scheduled to be at a session today, yes.
Q There were no duties -- there are no duties that you are undertaking for HUD today that would have precluded you from being in Chicago; is that

Page 8

right?
A Right, if I had -- right.
Q And, in fact, do you still get to Chicago fairly frequently?
A Yes.
Q When was the last time you were in the city?
A I was in there Friday the 22nd for my mother's birthday.
Q When was the time before that?
A February 2005.
Q And your mother lives in Aurora?
A Yorkville, Illinois.
Q Are you married?
A No.
Q Have you been married?
A No.
Q When were you born?
A June 21st, 1963.
Q Where did you grow up?
A Aurora, Illinois.
Q Tell us what your educational background

Page 9

was, please.
A Attended Aurora High School in Aurora, Illinois and Waubonsee Community College in Sugar Grove, Illinois for an associate's degree and Aurora University, bachelor's degree in marketing.
Q What year did you graduate from Aurora?
A 1991.
Q Did you have a minor at Aurora?
A Major.
Q I know your major was marketing.
A Yes. No, I did not.
Q What were the principal topics that you studied in your marketing major?
A General business courses, marketing, advertising.
Q Did you have any training in college, whether at Waubonsee or Aurora in real estate or real estate finance?
A No.
Q So everything you have learned about real estate and real estate finance you have picked up during your tenure at HUD; is that right?

Page 10

A Yes.
Q Did you go to work for the Department of Housing and Urban Development immediately following your graduation in 1991?
A Several months later.
Q So you started with the Department in 1991?
A July 1991.
Q What was your starting position?
A An intern -- I came in an intern program, my title was program analyst, but I was a HUD intern.
Q And what were your responsibilities as a program analyst?
A I was on a two-year -- it was like a career development doing developmental activities, rotating to other program offices within HUD, taking training, so it was very general in nature.
Q What was your starting GS grade?
A Seven.
Q And when you say you moved from -- around different offices, was that different offices within the Chicago Area or throughout the country?
A Almost all within Chicago and I also did,

Page 11

like, a four-week rotation to Washington D.C.
Q But principally you were assigned to the Chicago office?
A Yes.
Q Who was the head of the Chicago office at that time?
A Which part of -- we had a regional director.
Q Yes, who was the regional director?
A I'm sorry. Regional administrator at the time was Gertrude Jordan.
Q When did Mr. Hinsberger become the regional director?
A He is not the regional director. He is the Chicago Multifamily hub director.
Q Who is the regional director now?
A Joseph Galvan, G-a-l-v-a-n.
Q How long -- Mr. Hinsberger is the director of Multifamily Housing; is that the correct title?
A Yes, Chicago -- he is the Multifamily hub director for Chicago.
Q How long has he been in that position, do

Page 12

you know?
A No. No, I don't know exactly how long he has been in that position.
Q Was he in that position as long as you can recall during your tenure at HUD?
A He has been in Multifamily during my tenure at HUD but he held previous positions, other positions, as well.
Q Do you know what those were?
A They were management positions. I can't tell you specifically. He was -- he may have been a branch chief when I started and then a housing director but the titles change throughout the years.
Q Sure.
A Right. He has been in management there.
Q So for the first two years that you were at HUD, would you describe those years as training years in which you were familiarizing yourself with the agency and its issues?
A Yes.
Q All right. Then starting in 1993, did you take on a new position?

Page 13

A Yes, I became an asset manager in Multifamily.
Q And what does an asset manager do or what did you do as an asset manager in '93?
A I had a portfolio of multifamily properties that I serviced, basically loan servicing.
Q What does it mean to do loan servicing?
A Process rent increases, process reserve releases, conduct management reviews.
Q What are the loans that you were servicing? Were these HUD guaranteed loans or are they HUD loans directly or what?
A It could be a combination, HUD loans either insured or with the mortgages held by the Department or they might have just had subsidy or they might have had an insured mortgage and subsidy. We say, "insured and/or assisted."
Q Okay. And about how many assets were there in your portfolio?
A At the time, probably about 45.
Q Did that number fluctuate substantially over time or was it always something in the order of

Page 14

magnitude of 45?
A I'm sure it fluctuated.
Q But it -- well, let me ask you this: How long did you stay in the position of asset manager?
A Let's see. Until sometime in 1994 when I went to work on a task force.
Q What was the task force?
A Like November. It was called the special workout assistance team.
Q Tell us about that. What did you do on that task force?
A On that task force, I worked with different Multifamily offices around the country on troubled properties, doing an analysis of the property and coming up with recommendations as to how -- how HUD should proceed on the properties.
Q And what is the analytical approach to a troubled property as you performed it in 1994?
A Review the financial data.
Q What does that mean?
A Look at the financial statements, look at the monthly accounting reports.

Page 15

Q And what are you looking for?
A Trying to see where the -- the financial condition of the property, if it is generating income, how the funds are being spent.
Q Do you look at the capital structure of the -- of the entity, see, for example, how much it is borrowing, how much it has to pay in interest and principal?
A If that's part of the financial data, yes. If it is submitted on the financial statements, yes.
Q If there is a loan --
A Right.
Q -- then the loan is going to show interest on that loan presumably; correct?
A Yes.
Q And principal retirement, as well, presumably?
A Yes.
Q Do you recall instances in which because of debt issues, that is the mortgage and maybe even a second mortgage, that projects got into trouble?
A Yes.

Page 16

Q And what, in general, was HUD's approach to troubled projects that had a heavy debt overhang?
MR. WELLONS: Objection; vague. Go ahead and answer.
THE WITNESS: Well, depending on the -- on the actual financial statements and whether or not a workout was feasible or refinance was feasible, it just -- it depended on what the entire situation of the property was.
BY MR. BAUGHER:
Q Were there instances in which you recommended that the property be refinanced?
A I don't remember specifically recommending that. I mean it -- it is an option but I don't remember that I specifically recommended that on any particular property.
Q Now, were the guidelines that you followed or protocols that you followed in -- in approaching the question of workouts on troubled properties?
A I'm sorry. Could you repeat that?
Q Were there guidelines or protocols that you followed?

Page 17

A Yes, we had guidelines.
Q And who promulgated those?
A It would have been the SWAT director.
Q SWAT director?
A Well, special workout assistance team, SWAT for --
Q Somebody felt good about that acronym, didn't he or she?
A (Laughter.)
Q Do you still have a copy of the guidelines or the protocols that were used for the SWAT team?
A I do not.
Q How long were you on that task force? For a year?
A About a year.
Q And then did it go out of existence?
A No.
Q Is that why you moved off of it?
A It continued. I received a promotion to a supervisory position in Chicago, Multifamily.
Q And when was that? '95?
A Yes.

Page 18

Q What was your -- supervisor of what?
A Multifamily asset managers, project managers.
Q So project managers as you had been for the preceding several years --
A Yes.
Q -- reported now to you?
A Yes.
Q Or you were one of the people they reported to?
A Yes.
Q How many project managers reported to you as of 1995?
A I don't remember.
Q Well, several? Ten?
A Several. I think less than ten.
Q How long did you hold the position of supervisor of Multifamily Housing in Chicago?
A Guess about two years.
Q Okay. What was your next position?
A I was on detail to a reengineering team, working from Chicago but reporting to Washington.

Page 19

Q What were you asked to reengineer?
A Asset management functions.
Q And what were you trying to accomplish?
A Efficiencies in processing.
Q What are the issues that you were involved in in this reengineering?
A Could you reduce the time in, like, processing a reserve release request.
Q What is a reserve release request?
A Properties are required to maintain an escrow account, in some cases they are required to maintain an escrow account and need to come to HUD for permission to draw the money down or have the mortgagee release those funds, so they would submit a package and we would review it and determine if it was an eligible request.
Q Was part of your responsibility to prepare a report on how the asset management function should be reengineered?
A Yes.
Q Did you prepare a report?
A With my team members, yes.

Page 20

Q What year was that report issued?
A I would say 1998, I believe.
Q Do you still have a copy of that report?
A I don't physically have a copy, no.
Q Do you have it in some other way? Do you have it electronically?
A It is probably in the HUD system. I haven't used it in years so I don't know if it is still there but I don't physically have a copy.
Q Do you know how you would find a copy of that report?
A Yes.
Q How would you do it?
A I would search in the system.
Q And how would you search?
A I would go to the web page.
Q To the HUD web page, HUD Apps?
A HUD Clips.
Q HUD Clips?
A Yes.
Q And what would you look for?
A Try to do a key term by streamline and see what comes up.

Page 21

Q Was one of the recommendations of your 1998 report to create a department enforcement center?
A No.
Q That came separately out of Washington, D.C., did it, that idea?
A Yes. I don't know exactly where it came from but that was not one of our functions.
Q As supervisor for the Multifamily Housing unit from 1995 to, roughly, 1997, did either Gwen Thomas or Veronica Coleman report to you?
A No. I reported to Veronica Coleman and -- and at one point, I don't know how much -- what time frame because we would sometimes switch project managers. At one point Gwen Thomas did report to me but I don't know what amount of time but at some point, yes, she did.
Q Do you think it was back in the time period '95, '97 or later after you finished your reengineering detail?
A I don't remember if it was both. I want to say 1995. Sometime during '95 to '97 and then she

Page 22

may have part of the time when I finished my detail.
Q When you finished your detail, you went back to being a supervisor of Multifamily?
A Yes.
Q And how long did you hold that position after the detail?
A Just for a few months. In June of 1998, I became a senior project manager.
Q What were your responsibilities as senior project manager?
A I serviced the portfolio of troubled properties.
Q All of these properties in Illinois?
A Yes.
Q How many properties, approximately, were there in your portfolio?
A About 40.
Q And who did you report to in that position as senior project manager?
A Veronica Coleman.
Q Was the position a new one in June of 1998?
A Yes, it was.

Page 23

Q How long did you hold the position of senior project manager?
A Two years.
Q Until mid 2000?
A April -- about April 2000 or so.
Q What happened in April 2000?
A I was promoted to be the satellite office director of the Departmental Enforcement Center in Chicago.
Q Say that list of words again, please.
A I was promoted to the position of satellite office director --
Q Okay.
A -- of the Departmental Enforcement Center.
Q In Chicago?
A In Chicago.
Q And you were a satellite because DEC is, itself, headquartered in Washington, D.C.; is that right?
A Yes.
Q Okay. Now, let's go back to when you were the senior project manager. Who was reporting to you

Page 24

in your position as senior project manager from June of 1998 until April of 2000?
A No one. I was not a supervisor.
Q You were by yourself?
A I was not a supervisor, that's correct.
Q So what was your role then?
A Servicing troubled properties, I would also assist project managers if they had questions on their properties. I did some work, I don't remember if it was -- if any of it carried into my senior project manager position but I also did some work on Section VIII contract administration for headquarters, although I don't remember exactly when that was concluded, and I was also liaison to the enforcement center at that time.
Q When was the Department Enforcement Center created, do you know?
A In 1998, I want to say the fall of 1998.
Q At that time in the fall of 1998, the satellite office director of DEC in Chicago was Jim Zale; is that right?
A Yes.

Page 25

Q So you succeeded Mr. Zale?
A Yes.
Q Where did he go?
A Retired.
Q Do you know where he is now?
A I thought -- I heard he was doing some work for a greeting card company but I don't know where specifically he works.
Q Does he still live in Chicago, as far as you know?
A As far as I know.
Q When you say, "a greeting card company," do you mean, like, Hallmark?
A Yes.
Q Was it Hallmark?
A I don't know if it was Hallmark, I just know it was a greeting card company.
Q Now, while you were senior project manager, was South Pointe in your portfolio of troubled properties; do you recall?
A No. I don't believe so, no.
MR. WELLONS: Ms. Maisonet, I'm just going

Page 26

to ask you to let Mr. Baugher complete his questions before giving answers so we will have a clear record.
THE WITNESS: Okay.
BY MR. BAUGHER:
Q What were your principal responsibilities as director of the DEC in Chicago?
A Supervising two teams with enforcement analysts, later financial analysts, working with the legal folks in the office and providing assistance to multifamily offices within our jurisdiction.
Q How long did you hold that position?
A Until January 2003.
Q And in January 2003, you were detailed to Washington, D.C. to work in the headquarters office?
A Yes.
Q Of DEC?
A Yes.
Q Was that a lateral move or a promotion?
A Initially, it was lateral. The detail was lateral.
Q What is your current position?
A Director of the DEC.

Page 27

Q When did you become director of the DEC?
A May 2004.
Q So this is your anniversary?
A Yes.
Q Almost?
A Monday, yes.
Q We could have been doing this deposition on Monday, you know, and you would have missed all the parties on Monday. So what GS grade are you now?
A I am a senior -- I'm in the Senior Executive Service. I'm no longer in the GS.
Q Well, you have tapped out -- well, not entirely tapped out but you are supergrade?
A I guess.
Q What were your responsibilities when you were detailed here in January of '03?
A From January '03 to May '03, I was the acting deputy director working with our satellite offices and the divisions within headquarters.
Q Who was the director at that time?
A John Gant.
Q G-a-n-t?

Page 28

A Yes.
Q Where is he now?
A He is still with HUD, with the Office of Fair Housing and Equal Opportunity.
Q Okay. And who do you report to now that you are the director of DEC?
A Report to the general counsel.
Q Who is that?
A We have an acting general counsel, Kathleen Koch.
Q Is that with a C or a K?
A K-o-c-h.
Q So you are considered part of the legal team?
A I'm not an attorney but my office is within the Office of General Counsel.
Q Has that been true since the inception of the DEC in 1998, that it's been within the Office of General Counsel?
A No, it went under the general counsel November, I want to say, 2001.
Q Where was it before that?

Page 29

A It was independent.
Q And why was it brought within the Office of General Counsel?
A I don't know specifically why.
Q Well, generally?
A There were changes made at the beginning of that administration and that was one of them.
Q When you were senior project manager in Chicago from 1998 to early 2000, what sort of files did you maintain on the projects that you had responsibility for or commented on?
A I maintained regular project files and my own correspondence files.
Q What sort of project files did you keep?
A Well, the general office project files with financial statements, management reviews, responses received.
Q So when you say you maintained project files, these are the general multifamily housing project files --
A Yes.
Q -- to which you made contributions --

A Yes.
Q -- and reviewed from time to time; right?
A Yes.
Q So to recap what you said, could you generally describe what the contents of a project file would include? You mentioned financial statements, management reviews, responses to those reviews. What other sorts of documents would be in the -- in a project file?
A Business agreements.
Q You mean, like, a HAP contract?
A Like a HAP contract.
Q When you say, "business agreements," that includes contracts?
A Regulatory agreement, HAP contracts, yes.
MR. WELLONS: Again, Ms. Maisonet, please let Mr. Baugher finish his question.
THE WITNESS: I'm sorry.
BY MR. BAUGHER:
Q What else would be in a project file?
A Any tenant complaint letters.
Q Now, some of the projects that the Chicago



office is responsible for and you had responsibility for have existed for quite a long time; correct?
A Yes.
Q So the files must build up over the years.
A Yes.
Q How long are the records kept?
A Probably varies. I mean certain documents you keep, like the business agreements; other documents you might purge.
Q Is there a retention -- document retention policy that HUD has?
A There is a -- yes, there is a general retention. I don't remember specifics.
Q Well, the materials concerning financial statements, management reviews, responses supposed to be maintained in the project file for extended periods of time?
A Some documents were maintained at least three years. Others were maintained longer. I just don't remember specifically. I know the business agreements always stayed in there. We did not purge business agreements. I just don't remember



specifically which of the servicing documents we kept for what period of time.
Q Are there specific guidelines that -- that HUD has issued to its field offices on how long documents are supposed to be kept?
A Yes, I'm sure.
Q Have you seen such directives?
A Yes. Yes.
Q And how are they titled? How would you categorize those documents? I referred to them as document retention policies.
A Memorandum, just a memorandum to staff.
Q Now, another place that I gather you maintain documents is electronically; is that right?
A Yes.
Q What electronic systems were available to you?
A Word processing.
Q What else?
A E-mail.
Q Anything else?
A REMS, the Real Estate Management System.



Q What is REMS? What does that file consist of?
A It is an database of multifamily properties with different screens relating to the makeup of the property, the ownership entity, the physical condition, financial statements.
Q Did you make entries onto REMS?
A Yes.
Q And, now, I was asking specifically about the time period in which you were a senior project manager.
A Yes. I don't remember when REMS came on line but it would have been during that time period, yes.
Q All right. What kind of entries do you recall making while you were senior project manager?
A If I conducted a management review, I would input that in there. I would maintain current ownership information, who owned the property, who managed the property, that type of information.
Q Would you put in information about meetings that you had concerning a particular property?

Page 34

A Sometimes.
Q What about enforcement actions or the need for enforcement actions?
A I don't recall specifically.
Q Are you familiar with the project screens or the REMS screens on project history and problem statement?
A More problem statement, yes.
Q And have you ever made entries on problem statements with respect to or in REMS?
A Yes.
Q Did you do that while you were a senior project manager or was that later when you were at DEC?
A Senior -- as a senior project manager.
Q And what would be the circumstances in which you would input data on the problem statements?
A If I wanted to record, like, a response I had received to a particular letter.
Q Were you encouraged, if there was a letter that had come in in response, say, to a management review which you conducted, were you encouraged to

Page 35

put in a note in REMS about the response that you got?
A Sometimes. We had some things that were critical, data fields, and then other things were discretionary. I don't remember specifically. It depended on the property and the review.
Q What were the critical fields?
A Who owns the property, how many units does it have, HAP contract number, those were the critical fields, some of them, anyway.
Q When you were director of -- became director of the satellite DEC office in April of 2000, you said you supervised two teams. Who were on the two different teams?
A Each team had a team leader and I had enforcement analysts on there and later hired financial analysts and we had assistants, as well.
Q So you had two team leaders?
A Yes.
Q Was that true from 2000 until you took off for Washington, D.C. in 2003?
A Yes.

Page 36

Q Who were the team leaders in 2000?
A Walter Mozdzierz and the second team at times had different people acting in that position but the permanent team leaders at that point or eventually were Sandra Suiter.
Q And before her Joan Kiening?
A Joan was not a supervisor when I started there.
Q I thought she was a team leader.
A She was a team leader prior to my coming to the enforcement center.
Q And then by the time you got to the enforcement center, she h ad left; is that right?
A She was no longer a team leader. She was still with the enforcement center.
Q And how did her responsibilities shift?
A She became, like, REMS coordinator.
Q When you say, "REMS coordinator," what was she supposed to coordinate about REMS?
A The -- any changes to the system, coordination with Multifamily Housing.
Q Did you do anything to prepare for this

Page 37

deposition?
A Yes.
Q What?
MR. WELLONS: Ms. Maisonet, before you answer that question, I just want to instruct you not to reveal the contents of any discussions you have had with myself or any other attorney representing HUD. Please go ahead and answer.
THE WITNESS: I met with Mr. Wellons and also reviewed documents.
BY MR. BAUGHER:
Q When did you meet with Mr. Wellons?
A This morning and Monday.
Q Monday of this week?
A Monday morning -- I'm sorry. Monday afternoon.
Q How long did you spend with Mr. Wellons this morning?
A About an hour.
Q Was Mr. Gustin there, too?
A No.
Q And how much time did you spend with

Page 38

Mr. Wellons last Monday?
A About three hours.
Q Now, had you met with Mr. Wellons before on the subject of this lawsuit?
A No.
Q What about Ms. Donis, Lisa Donis?
A No.
Q Do you know who she is?
A I know she is Mr. Wellons' predecessor but I never met with her.
Q Did you meet with anyone else concerning this deposition?
A No.
Q Or talk with anybody by telephone?
A Yes, I spoke with Mr. Gustin and Mrs. Baguio.
Q When did you do that?
A Throughout -- during this week.
Q Only this week, not before this?
A Yes, I'm sure before, too. I don't know the exact dates.
Q Okay. How many calls did you have with

Page 39

Mr. Gustin and Ms. Baguio?
A During what time period?
Q This week.
A Maybe three. A few.
Q How long were those calls?
A Anywhere from a few minutes to maybe 20 minutes.
Q Did Mr. Wellons or Mr. Gustin and Ms. Baguio or anyone else furnish you documents to look at?
A Yes.
Q And what documents did you look at?
A Documents pertaining to South Pointe.
Q What were they?
MR. WELLONS: You can identify documents that you have reviewed in preparing.
THE WITNESS: Okay. Notice of default, loan application, the letter regarding an occupancy review, the physical inspection report, the documents from the ownership entity to HUD, enforcement protocol, HAP contracts.
BY MR. BAUGHER:

Page 40

Q Were you shown papers that had been marked at -- as exhibits at other HUD employees' depositions?
A I don't --
Q Did they have identification on it that referred to other depositions?
A Some had identifications. I don't know from, you know, where.
Q Okay. What's the notice of default letter that you referred to?
A That's an April 2001 notice of default letter.
Q Do you remember writing that letter?
A I remember signing that letter, yes.
Q You didn't write it?
A I had input on different letters all the time. I don't remember specifically writing that one.
Q Well, on that one, you are a signatory.
A Yes.
Q But that was your -- your role on that particular letter was just to be a signatory;

Page 41

correct?
MR. WELLONS: Objection; misstates prior testimony. Go ahead an answer.
THE WITNESS: I remember providing input.
BY MR. BAUGHER:
Q On that specific notice of default?
A Yes.
Q What was your input?
A I don't remember specifically, the specific input.
Q What do you recall generally?
A Well, I mean, in general, when I received notices, I would review them, obviously, before signing them and would provide input so --
Q Well, you don't draft notices of default, do you?
A I'm sorry. Track?
Q You don't draft notices of default?
A Draft? No. No.
Q You said there was a loan application. What was that for or about?
A For insurance, mortgage insurance.

Page 42

Q Is that -- that a loan application for mortgage insurance that ultimately was approved by HUD?
A I don't know if it was approved with those specific terms.
Q Do you recall the year of the mortgage or of the loan application that you looked at?
A No, I don't.
Q You said that there was a letter regarding an occupancy review. What do you remember about that?
A That the occupancy was being closed out -- that occupancy review was being closed out with confirmation of physical condition items to be confirmed at a subsequent REAC inspection.
Q Had you seen that letter before?
A I don't recall.
Q One way or another or you think you did not?
A I just don't remember. I don't remember having seen it.
Q I think the letter that you are referring

Page 43

to is one from Deborah Gray; is that right?
A Yes.
Q And it -- at the time that letter was written, she was in Multifamily Housing, I believe --
A Yes.
Q -- isn't that right? And you were at that time in DEC; correct?
A I don't remember the date of the letter.
Q You mentioned a physical inspection report. What was that?
A It was a March 2001 REAC inspection.
Q Had you seen that before?
A Yes.
Q When had you seen that for the first time?
A For the first time, I want to say April 2001.
Q What was the -- what was the occasion in which you saw that report in April of 2001?
A Meeting with Multifamily Housing to discuss the property and the most recent physical inspection.
Q And you said there were some documents from the owner to HUD. What do you recall those being?

Page 44

A Remember a letter or -- letter being submitted in response to the physical inspection.
Q This particular March '01 physical inspection?
A Yes.
Q Had you seen that before this week?
A It did look familiar. I don't remember when I specifically saw it.
Q Any other documents from the owner?
A I don't remember. I don't remember if there were other -- oh, I believe there was one where the owner had stated that repairs had -- or exigent health and safety items had been corrected.
Q And had you seen that at the time or around the time the letter was sent?
A Yes.
Q Did you see any response or other papers concerning the owner's report on exigent health and safety issues?
A Yes.
Q What was that?
A A letter that HUD had confirmed that the

Page 45

repairs, in fact, had not been made.
Q And when you say HUD had confirmed that, who from HUD?
A HUD staff. I don't remember that it said who specifically.
Q You weren't the one that confirmed that?
A No. No.
Q Have you ever been to South Pointe?
A No, not inside. I have been outside.
Q But never inside?
A Never inside.
Q How many times have you seen the outside of the building? Once? Twice?
A Once or twice.
Q Do you remember what year?
A No. It -- no. I don't remember specifically what year.
Q You drove past it?
A No, I had a -- a property across the street was in my portfolio, which I visited, and I remember seeing South Pointe.
Q What was the property across the street?

A It was called Lowe Avenue Terrace.
Q That was in your portfolio when you were an asset manager or at some other part of your responsibilities with HUD?
A As a supervisor.
Q So what years would that have been?
A 1995 to '97.
Q So in the course of visiting Lowe Avenue Terrace, you saw South Pointe across the street --
A Yes.
Q -- sometime in 1995 or to 1997; correct?
A Yes. I believe I saw it afterwards, too. As a senior project manager, I went to Lowe Avenue, as well. At that point -- let me correct myself. That property may have been in my portfolio -- actually, I believe it was. It went through foreclosure so I would have visited Lowe Avenue between 1998 and 2000.
Q Lowe Avenue went through foreclosure?
A Yes.
Q Which is why you are pretty sure it was in your portfolio --



A Yes.
Q -- later?
A Yes.
Q And so you made at least two visits to Lowe Avenue Terrace during which time you had an opportunity to look across the street and see South Pointe; is that right?
A Yes.
Q But you didn't go in?
A No.
Q Were you ever invited to take a tour or make a visit to South Pointe?
A Not that I recall.
Q Did you ever ask to tour the facility?
A I don't believe so.
Q Another document you said you looked at this past week to prepare for your deposition was an enforcement protocol --
A Yes.
Q -- is that right? Let me show you what has been marked as Maisonet Exhibit 1. Is that the enforcement protocol that you looked at?



A Yes.
Q Can you tell us what it is, please?
A It is a protocol between the Enforcement Center and the Office of Housing and the Real Estate Assessment Center and it covers referrals made to the Enforcement Center and how they are -- how they were being processed.
Q The first line of this document, Maisonet Deposition Exhibit 1, says, "The protocol is effective beginning about March 1, 1999." Is that correct?
A Yes.
Q And it says, "When REAC," R-E-A-C, solid caps, "begins to provide physical inspections and related scores to multifamily owners." What is REAC?
A REAC is the part of HUD that one of their functions is to conduct physical inspections. They also have systems to review financial statements.
Q And so REAC is part of the Department of Housing and Urban Development?
A Yes.
Q So the people who make the REAC inspections



are HUD employees; is that right?
A Some are.
Q And some are not?
A Some are contractors.
Q I see. Now, Lowe Avenue Terrace went into foreclosure. Is there a reason why that wasn't referred to the DEC or handled by DEC?
A It may have already been in foreclosure. I don't remember when it went in.
Q What was your responsibility for Lowe Avenue Terrace?
A As a senior project manager? Working on the -- making the foreclosure recommendation.
Q You recommended a foreclosure?
A Well, putting together the foreclosure recommendation package.
Q What is that package? I mean can you describe the package, by which I mean the elements in the package?
A Elements in the package include a description of the property, what the current rents are, what the expenses are at the property, what

Page 50

recommendation there might be for disposition of the property.

Q Is this like a decision memo?

A I think it is more like a summary of the status of the property and the pertinent data relating to rents and expenses.

Q But if there is a decision to foreclose, what's the -- is there a typical set of papers that are prepared as part of making the decision to foreclose on a piece of property?

A There would -- there could be -- well, there would be a 21-day -- what we call a 21-day foreclosure hearing letter to the owner. It depends on the type of default.

Q But I meant internally, what kind of paperwork typically exists internally for a foreclosure?

A Well, for financial default, you would have the billing -- if the mortgage is held by HUD, then you would -- you would have a billing statement showing that and then you would generally issue a foreclosure hearing letter. If it was a technical

Page 51

default, then you would issue a notice to the owner of the default. And I can't -- I can't remember specifically what other -- what internal documents. Internally, we do have a foreclosure -- the foreclosure package is now a recommendation to a property disposition center but I don't recall --

Q But that's now as of when?

A Well, currently. Since the property disposition centers came into effect.

Q Which is what year?

A 1996.

Q Well, so that's been for quite a while?

A Yes.

Q So there is a package that goes to the property disposition center?

A Yes.

Q That's prepared by the local office?

A Yes.

Q And when you were -- when you were an asset manager and then a supervisor of asset managers, including for Lowe Terrace, did you prepare such a package?

Page 52

A Yes.

Q Okay. So let's go back. What's included in that package?

A The summary of the -- the rents at the property, the expenses at the property, any disposition recommendation.

Q Was Maisonet Deposition Exhibit Number 1 the enforcement protocol throughout the period of time from March 1999 until you departed for Washington, D.C. in 2003?

A The new protocol November of 2002. We have one as of November 2002.

Q Is it different in any particular respect that you can think of now?

A It is more streamlined.

Q Has it been reengineered?

A In a manner.

Q I'm sorry. It was November '02?

A I want to say November 1st, 2002.

Q So Maisonet Deposition Exhibit 1 is the protocol from 1999 until late '02; is that right?

A Yes.

Page 53

Q And did you follow this protocol?

A When?

Q During that time period?

A Yes.

Q While we are on the subject of documents that were received this morning, including this Maisonet Deposition Exhibit 1, can you please look at and then identify Maisonet Deposition Exhibits 2, 3, and 4, which Mr. Wellons also produced to us this morning?

(Witness reviewed the documents.)

BY MR. BAUGHER:

Q Have you seen any of those three documents before?

A Yes.

MR. WELLONS: Ms. Maisonet, do you need more time to familiarize yourself with the documents' contents?

THE WITNESS: Yes, please

(Witness reviewed the documents.)

THE WITNESS: Okay.

BY MR. BAUGHER:

Page 54

Q What is Maisonet Deposition Exhibit 2?
A It is an e-mail from Veronica Coleman to, looks like, Chicago Multifamily project managers, working on property scoring between 31 and 59 on physical inspections.
Q Had you ever seen that before?
A I don't remember seeing it before this morning.
Q And there is a line blanked out on the first page. Do you know what that pertains to?
A No.
Q All right. What is Maisonet Deposition Exhibit 2?
A That is, I think, Exhibit 2.
Q I'm sorry. Three.
A Looks like the same e-mail.
Q And the e-mail is June 25th, 2002?
A Yes.
Q All right. And what is Maisonet Deposition Exhibit 3?
A Looks like instructions for making REMS entries.

Page 55

MR. WELLONS: To clarify the record, with that answer, Ms. Maisonet was looking at Maisonet Exhibit 4.
MR. BAUGHER: Did I misspeak?
MR. WELLONS: I believe you said, "3." I think the one we are on is 4.
MR. BAUGHER: I meant 4.
BY MR. BAUGHER:
Q What does 4 have to do with REMS?
A Yes.
Q And they are instructions?
A To project managers.
Q Had you seen that before?
A I don't remember seeing it before today.
Q Okay. Did you see it today, before I handed it to you?
A This morning.
Q From Mr. Wellons?
A Yes.
Q Did you get this -- did you gather Deposition Exhibits 1 through 4 from Mr. Wellons?
A I did not.

Page 56

Q Do you know where they came from?
A No.
Q Now, other than speaking with Mr. Wellons and Mr. Gustin and Ms. Baguio, did you talk with anyone else about this case?
A Yes.
Q Who?
A Edward Hinsberger.
Q When did you do that?
A Maybe two weeks ago, maybe three.
Q Was that a telephone conversation or was that when you were in Chicago?
A It was when he was in Washington.
Q Okay. And did the two of you meet?
A We just happened to meet each other in the HUD cafeteria. It was not a prearranged meeting.
Q Did you have lunch?
A We had coffee. I had coffee.
Q Okay. So this was sometime in April 2005?
A I believe so, yes.
Q Okay. What did he say to you about the lawsuit?

Page 57

A I don't remember that specifically he said anything about the lawsuit. We discussed the fact that depositions were taking place.
Q What did he say about that?
A That he didn't know that -- he hadn't been notified that he would be deposed. That's the only thing I remember him saying about the depositions.
Q And what did he say about his not being notified? Was he surprised? Did he express relief or say he was going to go on holiday to celebrate or what?
A I think he was surprised.
Q And what did he say about his surprise at that?
A He -- I just think he expected to have been called. I don't remember his exact words.
Q What did he say about the case?
A I don't -- I don't remember specifically talking about issues with the case. I just remember talking about the depositions and that I would probably be deposed and that he would -- that he hadn't been notified that he would be but I don't

Page 58

remember discussing particulars about the case.
Q What else did you say to Mr. Hinsberger?
A We talked about why he was in Washington and, you know, different things that we each had been working on.
Q Why was he in Washington?
A For an affordable housing meeting.
Q Okay. Have you spoken with Hinsberger on other occasions about this lawsuit?
A I'm sure I have.
Q And what do you recall about those conversations?
A Just recall talking to him when it had been filed.
Q What issues or subject matters concerning the lawsuit have you discussed with Mr. Hinsberger?
A The physical condition of the property.
Q Anything else?
A Different times the status of the loan.
Q What else?
A Issuance of vouchers. That's primarily what I remember.

Page 59

Q No other topics that you can recall?
A I think everything would have been related to that.
Q Physical condition, status of the loan and issuance of vouchers?
A Yes.
Q And what did the two of you say to one another about the physical condition of South Pointe?
A The default, owners not maintaining it as decent, safe and sanitary and the need to issue vouchers to protect the residents.
Q Now, did you tell Mr. Hinsberger that the reason for the default was that the property was not maintained in decent, safe and sanitary condition?
A We discussed it. I'm sure he knew it. I don't know that I said, "This is the basis for the default."
Q Well, now, how do you know that he knew that?
A Because we had conversations prior to issuance of the notice.
Q One or two or --

Page 60

A A few. I don't remember how many.
Q Do you remember any of those specifically?
A Well, I remember talking about the concern about the most recent REAC inspection, the amount of time that had elapsed in getting an acceptable loan application in.
Q What did Mr. Hinsberger say to you about physical condition of South Pointe as you were discussing this after the filing of the lawsuit?
A That the property was not -- I mean it's been consistent. The property has not been maintained in acceptable condition.
Q Were there any specifics discussed?
A I remember discussing that -- the scope, that, you know, he wanted to ensure that the scope of the loan would make sure that the property was restored.
Q Is that something that he said to you in the last year in connection with this lawsuit?
A Not -- no, I think it would have been prior to that.
Q What about the issuance of vouchers? What

Page 61

did you say to him and what did he say to you about vouchers?
A Well, the need to do renewals to ensure that -- until the tenants could be issued their vouchers. We wanted to make sure we didn't adversely affect the residents.
Q And what do you mean, do renewals?
A Just, you know, make sure that the renewals stayed in place, that the contract didn't expire while the tenants were receiving their vouchers.
Q You mean that they were phase-out contracts?
MR. WELLONS: Objection; misstates prior testimony. Go ahead and answer.
THE WITNESS: Just that we wanted to ensure that the HAP contract was in effect while the vouchers were being issued.
BY MR. BAUGHER:
Q Why?
A To protect the residents.
Q What did he say to you about that?
A We were in agreement that we wanted to

Page 62

protect the residents. I don't remember what he specifically said.
Q Okay. Who else have you talked with about this lawsuit that you haven't mentioned to us yet?
A Veronica Coleman.
Q When did you talk with her?
A I talked to her over the last, I don't know, over the last few weeks.
Q Before or after her deposition?
A I have spoken to her after -- before and after her deposition.
Q After her deposition, she called up to talk to you about that deposition?
A Yes.
Q What did she tell you about the deposition?
A That it was long.
Q What else?
A Just went through the process in terms of the types of questions.
Q What questions did she mention to you that she had been asked?
A Questions about the HAP renewal, questions

Page 63

about a use agreement.
Q What did she tell you about a HAP renewal?
A That she received questions regarding the term of the HAP renewals.
Q Can you be more specific?
A I believe -- I believe she had questions regarding the process in terms of how renewals are handled.
Q She was asking you how renewals were handled?
A No, I believe -- she told me she was asked questions regarding how the renewals were handled.
Q Have you ever seen the HAP contract between South Pointe and HUD?
A Yes.
Q What years' contracts have you seen?
A Let's see. 1999, 2000, 2001.
Q Do you know of any amendments to those -- any of those contracts?
MR. WELLONS: Object to the extent it calls for a legal conclusion. Go ahead and answer.
THE WITNESS: I don't recall. I remember

Page 64

seeing those three contracts.
BY MR. BAUGHER:
Q Right. Do you recall seeing any amendments to any of those contracts?
MR. WELLONS: Same objection. Go ahead and answer.
THE WITNESS: I recall seeing an amendment with relocation language.
BY MR. BAUGHER:
Q Can you describe what it is you saw?
A Just a paragraph that the contract is being renewed but in the event that there is a default, that the owner would agree to an additional renewal, if necessary, to protect the tenants while the vouchers are being procured.
BY MR. BAUGHER:
Q With the possible exception of that, you don't recall seeing any amended HAP contracts; is that correct?
MR. WELLONS: Same objection. Go ahead and answer.
THE WITNESS: I don't recall.

Page 65

BY MR. BAUGHER:
Q What's the use agreement that you say Ms. Coleman mentioned to you?
A It is a use agreement entered into between the owners and HUD when a prior HUD insured mortgage was paid off.
Q And what was the year of the use agreement that you are referring to?
A I don't remember the year of the use agreement.
Q Had you ever seen a use agreement in connection with South Pointe?
A I recall seeing it some years ago, yes.
Q And what -- in what context?
A In reviewing documents prior to issuance of the note -- of the April notice of default.
Q What is a use agreement?
A Use agreement is a business agreement where the -- that the department enters into with owners where they agree to maintain the property under certain affordability restrictions, also required to maintain the property in acceptable physical

Page 66

condition.
Q What else did you and Ms. Coleman talk about after her deposition?
A She was going out of town and -- I mean, but --
Q What concerns did she express to you about her deposition, the things that she had been asked at that deposition?
A To me, she was just stating -- it was more of a recap of what happened during the deposition. I don't -- I don't know that she was concerned with anything in particular.
Q Did she tell you about conversations that she had had with Gwen Thomas on the subject of their depositions and problems that had occurred during those depositions?
MR. WELLONS: Objection; assumes facts not in evidence. Go ahead and answer.
THE WITNESS: I don't recall her telling me there were problems with the depositions.
BY MR. BAUGHER:
Q What did she tell you that -- about Gwen

Page 67

Thomas's deposition?
A That it was also extensive, an extensive deposition.
Q And what did she tell you with respect to the testimony Ms. Thomas gave?
A She just told me, like, the types of questions that Ms. Thomas got.
Q And what was her view on Ms. Thomas's answers to those questions?
A I don't know.
Q What did she say to you?
A She just -- I know there was some confusion in terms of Ms. Thomas was called Mrs. Coleman at some point but in terms of the specific answers, you know, I don't -- I don't recall specifically. It was more that these were the types of questions that were asked is what -- what I -- what stood out the most to me.
Q What did she say that she thought the important things for you to do at your deposition were?
MR. WELLONS: Objection; assumes facts not

Page 68

in evidence. Go ahead and answer.
THE WITNESS: She didn't state that. It was a recap of her deposition.
BY MR. BAUGHER:
Q How long did you talk with her?
A Maybe 20 minutes, 30 minutes.
Q But, now, you had also talked with her before her deposition.
A Yes.
Q Is that because she called you to help get herself prepared for the deposition?
A No. I don't think she was -- she called me to prepare herself for her deposition. We speak routinely.
Q What did you talk about concerning the case when she called you before her deposition?
A Just that the deposition was coming up.
Q What else?
A We spoke after Ms. Thomas's deposition.
Q But before Veronica's?
A Yes.
Q And what did you talk about then?

Page 69

A The same thing, just kind of a recap of the deposition.
Q Was she at Ms. Thomas's deposition?
A I don't believe so.
Q Was Ms. Thomas on the line with you, too?
A No.
Q How did she know what the -- what Ms. Thomas had said at her deposition or had been asked?
A They spoke.
Q They spoke after Ms. Thomas's deposition and before Ms. Coleman's deposition?
A Yes.
Q And Ms. Thomas had given Ms. Coleman a rundown as to what had been asked and what she had answered at the deposition; correct?
A Yes.
Q Now, have you talked with Gwen Thomas about this case or any aspect of it?
A Not recently.
Q When did you talk with her about the case?
A When I was the satellite office director in

Page 70

Chicago.
Q You mean back in 2002 --
A Yes.
Q -- '01 and earlier? Who else have you spoken with about this suit?
A I mentioned to my supervisor that I was being deposed.
Q Okay. In the general counsel's office?
A Yes.
Q All right. And who else?
A My division directors, again, letting them know that I was being deposed.
Q Did you talk to anyone about the substance of your testimony or what you thought you would be asked?
A Yes, I'm sure I -- well, you know, I spoke about the basis for the complaint. I don't recall saying, "This is what I expect to be asked."
Q Did you participate at all in gathering records, documents that were then produced in this lawsuit?
A I submitted e-mail messages that I had.

Page 71

Q You were asked to gather your e-mails concerning South Pointe?
A Yes, which I did.
Q Did you do anything else with respect to gathering documents?
A No. I looked to see if I had anything related and the e-mails were what I had.
Q And did you produce all of those to Mr. Wellons or was it Ms. Donis or --
A To Mr. Gustin.
Q To Mr. Gustin. When did that take place?
A It was earlier this year. I don't remember what month.
Q Do you know what interrogatory answers are --
A Yes.
Q -- or what interrogatories are?
A Yes.
Q Did you see the interrogatories that were posed by Englewood to HUD in this case?
A No.
Q Did you see the answers that were prepared

Page 72

by HUD in response to those interrogatories?
A No.
Q Did anyone ask you to help with the answers to those interrogatories?
A No.
Q Have you read the complaint in this case?
A Yes.
Q When did you do that?
A This week.
Q And did you read the -- did you look at the exhibits that are attached to the complaint, as well?
A Only the complaint.
Q Did you make notes on the complaint?
A A couple.
Q Do you still have a copy of the complaint?
A Yes.
Q What were the notes that you made on it?
MR. WELLONS: I don't want you to reveal the contents of any conversations taken between myself and you. Okay?
THE WITNESS: The one that I recall, there was a reference to an occupancy review and some

Page 73

reference -- the word "inspection" was in there. I don't recall exactly what I said and I made a note like, you know, "not in -- not a HUD inspection meeting, not a REAC inspection." I don't recall what the other note was. I only remember making two.
BY MR. BAUGHER:
Q Have you made any other notes as you got prepared for this deposition or in connection with this case?
A Maybe just a few.
Q And, what, to try to put together a chronology or --
A A chronology, yes. And questions.
Q Chronology and then some of the questions you thought you might -- you might be asked?
A No, questions I had in my head, in my mind.
Q I see. And can you describe your chronology? Was it on a yellow pad or an e-mail or what?
A Just a small pad.
Q Was it a page or a couple of pages or what?
A One page.

Page 74

Q When did you make this chronology and list of questions?
A Last night.
Q At the office or at home or what?
A At home.
Q And what did you do with that -- with those notes, the chronology and the questions?
A It is at home.
Q Okay. You still have that?
A Yes.
Q Where is it at your house?
A At my kitchen table.
Q Okay. Did you make any other notes concerning this case?
A Made a couple notes at Mr. Wellons' office.
Q When was that?
A Monday.
MR. WELLONS: I don't want you to reveal the contents of those notes that reflect our discussions.
BY MR. BAUGHER:
Q And what did you do with those notes?

Page 75

A They are either in my briefcase or on my desk in the office.
Q Is it a page or a couple of pages or what?
A Not more than a page.
MR. BAUGHER: Well, I would ask that the chronology and questions that Ms. Maisonet prepared yesterday evening and are currently on her kitchen table be produced to us, as well as the notes that she made Monday of this week which are apparently still in her office.
MR. WELLONS: We'll take that under advisement.
MR. BAUGHER: Okay. Why don't we take a short coffee and bathroom break.
(Recess.)
MR. WELLONS: Ms. Maisonet did want to amend one of her earlier responses to clarify the record.
THE WITNESS: Yes, I would like to correct myself. I did, in fact, see the interrogatories for this case.
BY MR. BAUGHER:

Page 76

Q The answers that the government had made to the interrogatories that we propounded, is that what you are referring to?
A Yes. Yes.
Q And you saw that when, this week?
A No, a few weeks ago, at least.
Q Were you asked to review those interrogatories?
A Yes.
Q And you did that?
A Yes, I did. I apologize. I did see them and comment.
Q And you went and you commented on the interrogatories?
A Yes.
MR. BAUGHER: Off the record.
(Discussion off the record.)
BY MR. BAUGHER:
Q Ms. Maisonet, let me show you Defendant's Objections and Responses to Plaintiff's Interrogatories, which is a document that's dated March 30th, 2005.

Page 77

A Okay.
Q Is this the set of interrogatory answers that you saw?
(Witness reviewed the document.)
Q Ms. Maisonet, I hesitate to interrupt you but the immediate question is just whether these are the interrogatory answers that you saw several weeks ago or a month ago.
A I believe so, yes.
Q All right. Were you -- were you shown a draft of the interrogatory answers that you were asked to comment on and make suggestions --
A Yes.
Q -- or corrections to?
A Yes.
Q All right. So you saw that sometime presumably in February of 2005? These are -- or excuse me -- sometime before March 30th, 2005?
A I want to say prior to April. I don't remember the exact date but it was prior to April.
Q Okay. And did you read through all of the interrogatory answers at the time that you got them