Page 78

back in, probably, March of 2005?
A Yes, I did. I did read it. I don't -- yes. I don't remember everything exactly but I did read it, yes.
Q What comments or suggestions did you make on the draft?
MR. WELLONS: I want to instruct you not to reveal the contents of any discussions you had with myself, Mr. Gustin or Ms. Baguio.
THE WITNESS: Can I answer what my -- I only recall one.
BY MR. BAUGHER:
Q Well, let me ask the question a little bit differently. Did you make any written notes or markups on the draft?
A Yes.
Q All right. Can you tell us what those notes or revisions were to the draft itself?
THE WITNESS: Can I?
MR. WELLONS: I'm going to instruct you not to answer. I believe that would be work product.
MR. BAUGHER: I don't think so.

Page 79

MR. WELLONS: She was participating in the drafting process of our interrogatories.
MR. BAUGHER: Yes, I want to know what changes she made or what she thought was either incorrect or could have been said in a better way and I asked the question narrowly enough that it doesn't ask her to testify as to what she said to you or Mr. Gustin or anyone else.
MR. WELLONS: I believe it would qualify under the work product doctrine. I'm going to instruct the witness not to answer that question.
MR. BAUGHER: Do they have a different work product doctrine here in Washington, D.C. than out in the hinderlands?
MR. WELLONS: I suggest we move on.
BY MR. BAUGHER:
Q You recall where you made some notes on the draft interrogatories, do you?
A Yes.
Q Do you know if those corrections that you made were, in fact, incorporated in the final answers?

Page 80

A I don't know if everything was.
Q Were the -- were the draft interrogatory answers that you saw correct and complete as far as you knew?
A I don't know how to answer that and not --
MR. WELLONS: You can answer that question.
THE WITNESS: As far as I know, yes, correct.
BY MR. BAUGHER:
Q They were correct?
A Again, I'm not sure how to answer that without -- if it violates any discussions I may have had with counsel.
MR. WELLONS: You can answer the question. I believe the question that was asked was whether or not what you reviewed was accurate.
THE WITNESS: I'm not trying to be -- yes, it was accurate, although I did -- for the most part was accurate, although I did have a correction.
MR. WELLONS: Actually, Peter, I believe we can resolve this. There was a correction that we notified you in writing regarding Ms. Maisonet's

Page 81

dates of various positions. I believe that she identified a typographical error that we made regarding when she assumed her present responsibilities.
Is that what you are referring to?
THE WITNESS: Yes.
BY MR. BAUGHER:
Q It wasn't a typographical error, it was an error which you then south to correct?
MR. WELLONS: Is that what you are referring to, Ms. Maisonet?
THE WITNESS: That's exactly what I am referring to.
MR. WELLONS: Okay. Thank you.
BY MR. BAUGHER:
Q The other answers that were made seemed to you to be correct?
A Yes.
Q Did you discuss the interrogatory answers with anyone other than Mr. Wellons?
A Mr. Gustin.
Q Was that in a single telephone call or

Page 82

multiple calls?
A I believe so.
Q Did you talk with anyone else about the interrogatory answers?
A Not that I remember, no.
Q But, otherwise, as far as you are concerned, these interrogatory answers were correct?
A Yes.
Q What was the process for referring projects from Multifamily to DEC?
A I'm sorry. During which time period?
Q Late 1990s, early 2000s.
A Properties scoring between zero and 30 points on a REAC inspection were automatically referred by REAC to the DEC. Properties scoring above 30 points could be referred electively by Multifamily.
Q Now, is there some reason that Multifamily was reluctant to refer projects to DEC in the early 2000s?
A There could be a number of reasons. In some cases they may have already been working through

Page 83

resolution on the property.
Q Well, look at Maisonet Deposition Exhibit 2, please, and the attachment on Chicago properties.
A Yes.
Q Virtually every one of these listed projects, and there are probably a total of 30, the beginning statement is do not -- or the ending statement is, "Do not refer to DEC." Did DEC -- am I -- take a look at it for yourself but am I --
A Right.
Q -- reporting that correctly?
A It is the ending statement for each of the paragraphs.
Q For each one of them, almost, it is, "Do not refer to DEC."
A Well, this one is already with the DEC.
MR. WELLONS: I'm sorry. Of -- could you describe for us what item you are referring to, Ms. Maisonet?
THE WITNESS: I'm sorry. The -- well, on the second one, I don't know if it was already referred but they recommended that Pinnacle, who was

Page 84

DEC's contractor, conduct a confirmatory review. The one, two, three -- the fourth property, it was already referred to the DEC. The fifth property makes no reference to referred or not referred or whether it was at that time with the DEC. The second page, the first one just says, "Property is under plan." The fourth one, no reference to the DEC. On the fourth page, South Pointe currently in the DEC. And then the last three make no reference to the DEC.
BY MR. BAUGHER:
Q You see the repeated refrain, "We do not want this referral to the DEC. We do not want this property referred to the DEC. We do not want this property referred to the DEC"?
A Yes.
Q Et cetera. Was there some tension or set of issues between Multifamily Housing and DEC at this time?
MR. WELLONS: Objection; assumes facts not in evidence and mischaracterizes the document's contents. Go ahead and answer.
THE WITNESS: Looking at those properties,

Page 85

I don't know which ones they are because the names are blacked out, but it looks like for those properties where Multifamily -- where someone stated, I don't know who wrote the document, not to refer, that those properties were already under plan, therefore, it appears, I would have -- if I were to speculate, that they didn't feel the need to refer them to the DEC.
BY MR. BAUGHER:
Q What does it mean to be under plan?
A Under plan, either a corrective action plan or a management improvement and operating plan and, again, I'm speculating because I don't know. I didn't write that document. Some of those reference refinance, new loans.
Q Well, during your tenure at the DEC in Chicago 2000 to the end of 2002, how many projects were at the DEC?
A In the Chicago office?
Q Yes.
A When I left, we probably had 2,000 referrals but you could have multiple referrals for

Page 86

one property.
Q 2,000?
A Probably.
MR. WELLONS: I'm sorry. Just to clarify the record, was that in Chicago or was that nationally?
THE WITNESS: No, 2,000 referrals to the Chicago DEC when I left there but not 2,000 properties. Properties could have multiple rematerials.
BY MR. BAUGHER:
Q How many properties?
A I don't know. We counted by referrals. We didn't count by properties.
Q But you worked on matters by properties; right?
A Yes.
Q Okay. Approximately how many properties during the years 2000 to 2002 while you were at DEC in Chicago did you have at any given point?
A I don't -- I really don't know because we did not count by properties. We kept counts by

Page 87

referrals. Hundreds of properties, if I had to say, but I can't give you a number.
Q And how many people were on the staff of DEC in Chicago in the period 2000 to 2002 handling these hundreds of properties?
A About 25.
Q So if there were 200 properties, say, at DEC and you had 2,000 referrals, does that mean that each one of those properties was referred roughly 10 times?
A No. The -- no. Those numbers, you know, we would have had out of -- like I said, we would have had hundreds of properties, several hundred properties, probably higher than that, for 2,000 referrals. It wouldn't have been -- some properties had one referral, some properties had four referrals or anywhere in between.
Q So you think you may have had something on the order of 500 properties that were in DEC --
A At least.
Q -- at any given time?
A Well, no. Later on we received many

Page 88

referrals for late or nonsubmission of audited financial statements that would have caused a significant increase in the number of referrals.
Q What about in 2000 and 2001?
A I don't know. A few hundred. Several hundred.
Q Have you received any instruction or training in the REAC report process or how to look at a REAC report, how to understand it?
A Yes, I have met with REAC employees who have explained how to read the REAC report.
Q What are exigent health and safety issues? What does that refer to?
A Those are items, deficiencies noted by an inspector that require immediate attention.
Q And do you know what those categories are?
A Things like exposed wiring.
Q Anything else that is in that category?
A Just malfunction -- if -- anything that would be considered health- or life-threatening.
Q Is it that broad, anything that's life-threatening or is there more specific --

Page 89

A Probably more specific.
Q -- terminology that's used?
A I just don't recall specifically what the different -- what falls under the different categories.
MR. WELLONS: Ms. Maisonet, please allow Mr. Baugher to finish the question before you answer.
BY MR. BAUGHER:
Q You think there is some definition of that term but you just don't remember it?
A Yes.
Q Now, as -- as someone working in DEC, did you have any responsibility for contracts between owners and HUD?
A What type of contracts?
Q Well, housing assistance program contracts, for example?
A I'm sorry. My better question would have been what type of responsibilities?
Q That's what I am asking you.
A Okay. I mean we would receive the referral and determine if -- whether or not the owner was in

Page 90

compliance.
Q So did you do contract reviews?
A Not review of the HAP contract.
Q Did you have any responsibility for renewing or entering into new HAP contracts?
A No.
Q Who was responsible for that?
A Multifamily Housing.
Q And specifically at Multifamily Housing, who in that department?
A We have a division. It used to be the program support division would handle parts of it, certain functions, and certain functions are handled by the project management side.
Q Do you know what that process is of -- of either renewing a contract or entering into a new contract?
A In general terms. In terms of --
Q Tell us what you know about that process.
A Okay. For a renewal, then the submission is made to the project manager. They would review it to make sure that the submission is complete.

Page 91

Q Then what?
A Conduct a review of the package.
Q And then what's the next step?
A If it is acceptable, then it would go to the other division within Multifamily -- I don't remember what they call it now, used to be called program support -- and they would do the mechanics of it in terms of drafting the agreements, verifying that sufficient funds were available to renew -- excuse me -- to renew the contract.
Q So it only goes to program support once it is deemed to be acceptable; is that right?
A Yes.
Q And then when it is in program support, there a determination is made as to whether there is sufficient funds available to pay for that contract?
A Yes.
Q For whatever the time frame is?
A Right.
Q And then what happens to the contract?
A Once it is drafted, then it would be sent to the owner for execution but I don't know if that

Page 92

is done by the support division or by the project manager.
Q Are there approvals along the way other than you have just described that are required?
A Well, within those divisions.
Q What approvals are required?
A Well, I can speak for the time that I was in Multifamily. The supervisor and --
Q Go ahead.
A Right. I mean depending on what functions were being performed by that person's staff person, then you would need supervisory approval and approval by whoever had the delegated authority, director of operations for some functions, and project management director for some functions.
Q And if a contract is -- has been entered into but for one reason or another there are changes that need to be made in that contract or amendments to the contract, is there a process for that that you are familiar with?
A Well, it would still need to be approved by whoever has the authority to approve it.

Page 93

Q Okay. Do you recall any instance that you were involved in in which a contract that had been entered then needed later to be changed or amended?
A No. I'm sure there were some. Maybe the ownership entity name was wrong or something like that.
Q None that you recall right now, though?
A Not specific projects, no.
Q Are there any projects that you have been involved in in which you remember the contracts being changed or amended?
A I can't remember specific project names but -- you know, I'm sure that at some point in time there would have been some that would have required revisions, yes.
Q Okay. But there are none that you recall now specifically?
A Not the project names, no.
Q I have already asked you that question with respect to South Pointe and you said you were not aware of any; right?
A Right. Well, I don't -- what I said was I

Page 94

didn't recall seeing the amendment.
Q Well, you don't recall any amendment or change?
A Well, the amendment that I referred to, the relocation amendment.
Q Okay. Now, what is the -- what is the process that is undertaken if an owner is deemed to be in default of a HAP contract?
MR. WELLONS: I'm going to object to the extent it calls for a legal conclusion. Go ahead and answer.
THE WITNESS: Okay. A notice of default is provided to the owner outlining what is required with a cure period.
BY MR. BAUGHER:
Q Is that it?
A And what, you know, remedies the department may take.
Q What's the process for determining that a default notice will be sent out?
MR. WELLONS: Object, again, to the extent it calls for a legal conclusion. Go ahead and

Page 95

answer.
THE WITNESS: Reviewing the administrative record, physical inspection reports, if a site visit had been conducted.
BY MR. BAUGHER:
Q Well, who does that?
A Well, it could -- would have been done at any one point by -- could have been done by DEC staff, DEC contractor, Multifamily staff.
Q Well, let's assume an instance in which the project has not been referred to DEC.
A I'm sorry. Has now been?
Q Has not been referred.
A Has not. Okay.
Q So it is not explicitly in DEC and, therefore, is still presumably at Multifamily.
A Uh-huh.
Q What is the process for -- the decision-making process for declaring a default?
A The physical inspection reports would have been reviewed, any site visit reports would have been reviewed.

Page 96

Q By whom?
A By the project manager, supervisor, director.
Q All of those?
A Yes.
Q Is there a sign-off process or some protocol that is -- or guideline that is set up as to what the decision-making process is for -- before a default notice goes out?
A I'm not familiar with a written process.
Q That isn't something that the reengineers came up with as to what ought to be done with respect to instances in which a default might be declared?
A Well, there are handbooks with notices. I can't speak specifically to what written procedures are currently in place in Multifamily Housing if they don't refer the case to the enforcement center, but it would have been reviewed by the project managers I stated, supervisor, the director, prior to issuance of a notice of default.
Q If the -- if the project is in Multifamily, and let's talk about the -- start over.

Page 97

During the time period that you were director of DEC in Chicago 2000 to 2002, if the project itself had not been referred to DEC, would your office have any involvement in sending out a default notice on a project that is at Multifamily?
A Yes, we would have -- we, on occasion, work with Multifamily on properties not referred to us where we have provided assistance.
Q And how does that happen? When the property hasn't been referred, how do you get -- how does DEC get involved in the time period 2000-2002?
A Might get a phone call from the Multifamily -- from a Multifamily director. Might get an e-mail. Sometimes we got formal memorandums. Any one of a number of ways.
Q And for what purpose? Why would you be involved but the property not be referred to DEC?
A Sometimes because of our -- our expertise in -- you know, because we have done so many of them -- well, more recently, than Multifamily, because of our experience working with them.
Q Working with default notices?

Page 98

A Yes.
Q During your tenure as director of DEC in Chicago, approximately how many notices of default do you suppose were sent out?
A Probably dozens.
Q Thirty? Six?
A No, more -- definitely more than six.
Q No, I said 36.
A Oh, 36. I really don't know.
Q Were you involved in all of those default notices in the sense that you were a signatory on them?
A The ones that when I was there, yes, I would have been the signatory.
Q For all default notices that went out?
A During my tenure.
Q Yes.
A Yes.
Q That's what I meant.
A Yes.
Q Is there anyone else at DEC during the time in which you were the director of the Chicago office

Page 99

that would sign default letters or was that one of your responsibilities to be the signatory on such letters?
A It was my responsibility but if I was out of the office, if I left someone acting, they would have signed on my behalf.
Q But assuming you were there --
A Yes.
Q -- you were the person who would sign such notices?
A That's correct.
Q Now, before you signed a default notice, did you have to get any approvals from anyone else at HUD?
A I would obtain -- we would obtain concurrences on them.
Q From whom?
A And including internal to the enforcement center, the analysts, supervisors, legal counsel, Multifamily director.
Q One of the types of documents that was mentioned at the depositions a couple of weeks ago,

Page 100

Ms. Thomas and Ms. Coleman and I guess Ms. Kiening, too, were concurrences.
A Uh-huh.
Q What do those look like?
A Just a blank page and, generally, the person who would be concurring on it provides a place for them to initial.
Q All right. So for a default notice that you would be signing as director of DEC in Chicago, who are the -- or what are the job positions or the names of individuals for whom you would get concurrences?
A The enforcement analyst or it could be a financial analyst but the team leader.
Q Who else?
A Staff attorney.
MR. SAMUELSON: I'm sorry?
THE WITNESS: Staff attorney. Lead attorney.
BY MR. BAUGHER:
Q Is that different than the staff attorney?
A Sometimes. Sometimes the lead attorney was

Page 101

the staff attorney. Sometimes it was a different staff attorney assigned.
Q So, for example, it might be Ms. Baguio and Mr. Gustin --
A That's right.
Q -- or just Mr. Gustin?
A Yes.
Q Who else?
A Early on in the process, defaults would go to headquarters for approval.
Q Who at headquarters?
A It would be the operations director.
Q Mr. Spearman?
A No, Mr. Spearman works in Multifamily Housing. Operations director, Marilyn Edge was the operations director when I was the satellite office director and then it would go to the DEC director until the satellite office directors were delegated authority directly.
Q When did that happen?
A Well, it was after I came --
Q '02?

Page 102

A -- to the enforcement center. I'm thinking probably '01. I'm thinking sometime in 2001.
Q Early in the year? Late in the year?
A Gosh.
Q Middle of the year?
A I don't remember. I know it came up after -- we would have quarterly management meetings and it came up after one of those but I don't remember when that was -- when that was delegated where they would no longer have to go to headquarters for physical defaults.
Q The person at headquarters was, during your tenure at DEC in Chicago, Marilyn Edge?
A Was the director of operations.
Q And just so I can -- I have an image of this physically, it would be a piece of paper with a number of -- of names and titles to be either signed or initialed by the people that you mentioned?
A Yes.
Q Along with, presumably, the notice of default itself or a draft of that notice?
A Yes. I don't recall that headquarters

Page 103

initialed off. They went up there for approval but I don't recall that they signed the concurrence pages.
Q How did you know they approved?
A They would usually e-mail, send an e-mail saying it was acceptable and if a report was required to have been done, it would have been signed in headquarters.
Q Now, when you say, "a report," what would be the report?
A A team report.
Q Would there usually be a team report if there was going to be a default notice?
A Yes.
Q And who would draft the team report?
A Enforcement analyst.
Q And then that team report would have its own set of signatures --
A Yes.
Q -- is that right?
A Yes.
Q Now --
MR. BAUGHER: Excuse me.

Page 104

MR. GUSTIN: It is not me.
(Telephone ringing.)
(Discussion off the record.)
BY MR. BAUGHER:
Q Excuse me for the interruption -- well, I'm not responsible for it. It is probably your phone.
MR. SAMUELSON: It could be. I'm so hard of hearing, it might have been.
MR. BAUGHER: Don, it is your phone.
MR. WELLONS: It may be the phone in the conference room in the corner.
MR. BAUGHER: Okay.
BY MR. BAUGHER:
Q Your recollection, Ms. Maisonet, is that into 2001, when there were default notices to be issued, that there would -- that the first main document in that process would be a team report; is that right?
A Yes.
Q And then the team report, assuming it recommended a default notice, would be followed up by the default notice itself?

Page 105

A Yes.
Q That would then have concurrences by the enforcement analyst, the financial analyst, if applicable, the team leader, the staff attorney, the lead attorney, and Marilyn Edge, the director of operations?
A Yes, and the Multifamily director.
Q And where -- where would the team report and later the draft notice with the concurrences be retained? What files would that be kept in?
A Satellite office files and they would maintain copies, I'm sure, in headquarters.
Q Would those documents be imaged?
A Yes, in the field.
Q "In the field" meaning in the Chicago office?
A Yes.
Q Now, on the Multifamily side -- on the Multifamily side, what reports or concurrences would be used with respect to default notices?
A I don't know what each Multifamily office did.

Page 106

Q I'm talking about the Chicago office in the time frame 2000 to 2002.
A We would work with the project manager and the -- you know, and they would route it up through their chain of command.
Q Well, that's what I am asking you.
A Project manager.
Q Would there be a team report?
A Well, there would be one team report. There was not a separate, unless they did their own that I am not aware of.
Q But typically that would be a joint?
A Team report. A joint team report.
Q And "jointly" meaning between Multifamily and DEC?
A Yes.
Q Okay. And then that team report would move up both through DEC, in your department, and through Multifamily; is that right?
A Yes.
Q And do you know who would be signatories on the team report and concurrences on the draft default

Page 107

notice in Multifamily?
A Signature would be the Multifamily director. I believe the team leader would have concurred on the team report. I don't remember whether or not they concurred on the notices.
Q And then is there anyone in the headquarters in Washington that Multifamily would obtain concurrences or an approval from?
A No.
Q Was there anyone in the legal department in Washington that would be contacted for approval or concurrence with respect to a default notice?
A Yes, there were headquarters attorneys who would review the notices, as well.
Q And is Marilyn Edge an attorney?
A No.
Q Okay. I didn't think she was. So in addition to Marilyn Edge, then there would also be, for default notices during the time period in which you were at DEC, 2000 to 2002, review and approval by attorneys in Washington?
A Yes.

Page 108

Q And how would you know that you had gotten an approval by the attorneys in Washington?
A Usually e-mail.
Q Do you know Richard Pace?
A Yes.
Q Is he an attorney at the headquarters in Washington?
A No, he is a -- works in Multifamily Housing. I don't know what his position is.
Q Now, in addition to imaging the team report and then the default notice or draft default notice and the various approvals and concurrences, would there also be a notation made in the REMS files?
A Yes.
Q And what types of references in the REMS file would you expect to find?
A Dates of the notices, next steps, reference to any responses received.
Q And who would be responsible for entering that information?
A Through the enforcement center, the enforcement analyst.

Page 109

Q And for Multifamily, it would be the project manager?
A Generally project manager.
Q In terms of the pros and cons or issues to be evaluated in determining an approval or a concurrence, was that decision memo essentially embodied in the team report that you have referred to?
A Yes.
Q With respect to -- do you know what flags are?
A Yes.
Q What's the process for flagging an owner or deciding that a flag should be applied?
A Evaluate if there is an instance of noncompliance, a recommendation is made to place a flag.
Q Who makes the recommendation?
A Recommendations can be made by enforcement center or it may be made by a project manager to their supervisor.
Q All right. And then what is -- let's take

Page 110

DEC first. The recommendation is made by an enforcement analyst at DEC?
A Yes.
Q Who does that recommendation get made to?
A Recommendation is made in the team report and it is made to Multifamily Housing.
Q So they -- is the format, if it comes from DEC, this suggestion that there should be a flag, is the format in which it comes a team report?
A It could be and it could be in the team report, it could also be via e-mail.
Q Okay. And then that goes to whom within DEC for review or approval or concurrence?
A If it is an e-mail, it could be just through the team leader making a recommendation, it could be to the satellite office director.
Q At least one of those two?
A Yes.
Q Do you -- when you were the satellite office director, 2000 to 2002, did you to -- were you asked to sign off or concur in any proposed flags?
A I would sign the team reports if it was

Page 111

incorporated in the team report.
Q Were you other -- if it was in an e-mail that was less formal than a team report, would you be asked to sign off on that?
A Well, I might send the e-mail myself or be asked, yes.
Q And if you -- assuming you weren't the sender in the first place but you were approving or concurring, how would you show that approval or concurrence?
A We might have -- you know, it might even be a discussion with the team leader and have them tell me, "I'm going to recommend a flag for these reasons," and I may have orally concurred and said, "That's fine," and they would send the e-mail or, again, if it is in the team report, I would have denoted my approval by signing it.
Q Okay. And in Multifamily, what was the process there?
A Well, they would have their own, I'm sure, process for whether or not they agreed with it in terms of their chain of command, who it would go to,

Page 112

and then I can only speak for Chicago Multifamily. I know mechanically placing the flag in the system is done by the production side of the house, not the asset management side of the house.
Q Well, all my questions, at least at this point, have to do with Chicago.
A Yes.
Q So in Chicago Multifamily, what would be the chain of command that a recommendation for a flag would go through?
A Well, depends who the recommendation went to. If it went to the project manager, they would route it through their supervisor, whatever -- the chain of command is the supervisor and then the director of project management.
Q And then over to operations.
A Yes.
Q And what was operations supposed to do? Were they supposed to concur on this, as well?
A I don't believe concurrence is required. I believe they would enter it into the system.
Q Before they would enter it into the system,

Page 113

though, they would expect to see approvals or concurrences from project manager, the supervisor, or who -- what was the other person that you mentioned, other title you mentioned? The director --
A Director of project management.
Q So the operations person would expect to see those approvals or concurrences?
A When I was in Multifamily, a memo would go from the director of project management to the director of operations requesting that the flag be placed.
Q And with respect to flags, was there any notification to anyone in Washington, D.C. or at the headquarters office?
A Not to place a flag, no, not to my knowledge, not to place a flag, no.
Q What is the -- what was the process, 2000 to 2002, in the Chicago office for requests for new financing or refinancing that HUD was going to be involved in?
A Do you mean, like, a request for an application?

Page 114

Q Well, let's say the application had already been submitted. Who does that get submitted to and then how is that -- how is the decision on that made? Who is involved?
A The submission would be received by the production side of the house.
Q "Production" meaning the operations portion --
A Right, operations division.
Q -- division of Multifamily?
A Yes.
Q Okay.
A It would be, you know, assigned to someone within that office, a Multifamily Housing rep and then other people, technical folks, would be assigned to review it, their parts of the application.
Q They are in operations, also?
A Yes. And a project manager would be assigned, as well, on the asset management side of the house.
Q And who was involved in approvals on that?
A Well, ultimately, it is approved by the hub

Page 115

director but each person would, as it went through the process, would require supervisory approval by their supervisors.
Q Now, were you involved in making determinations on financings?
A No, did not. And just to be clear, you mean from 2000 to 2002.
Q Yes.
A Right. No, I did not.
Q When did you first learn of the existence of South Pointe? Was it when you were out visiting the Lowe Avenue Terrace Apartments?
A I'm sure I knew of South Pointe prior to that.
Q What's your first recollection of South Pointe?
A It was considered a troubled property, large, at least 300 units in Englewood, a neighborhood of Chicago, noninsured property.
Q Now, you say, "troubled." What do you mean by that and what was your source of information on it?

Page 116

A Physically troubled. The source -- we would routinely have meetings on troubled properties and this was on our list for troubled properties and we would routinely go through them.
Q When did you first have any responsibility for South Pointe?
A I don't recall if it was assigned to one of my project managers when I was supervising in the nineties and it wasn't my -- in my portfolio when I was a senior project manager. My more direct involvement was while I was in the enforcement section. It may have been assigned to one of my project managers in the late nineties. I just don't remember specifically if that one was on my team.
Q I thought I asked you that before during your tenure at Multifamily --
A Right.
Q -- whether you had had any -- admittedly supervisory responsibility and I thought you said no.
A Yes, I don't recall having it. I don't believe I did but I don't recall. I had about 700

Page 117

properties, you know, when I was supervising because I had half the office.
Q What years is it in which you had 700 properties, half the office?
A '97, '98.
Q Okay. When do you first remember having some responsibility for South Pointe?
A Satellite office director in Chicago, in the DEC.
Q So sometime in the spring of 2000?
A No, 2001.
Q Well, you were satellite office director of DEC in 2000; correct?
A Yes.
Q Was South Pointe referred to DEC in 1998 through early 2000?
A It was referred in 1998. I don't remember how long it was there. I believe it was prior to my moving to the DEC.
Q Did you have anything -- any involvement with the first referral of South Pointe to the DEC in '98 through 2000?

Page 118

A Not that I remember.
Q Were you aware of -- did you know anything about that first referral to DEC?
A I knew it was referred to the DEC.
Q How did you know that?
A Because I was also the senior project manager and liaison with the enforcement center.
Q And did you have any oversight or other responsibilities with respect to South Pointe when it was in its first referral to the DEC in 1998 to early 2000?
A I may have reviewed the team report before it went to the hub director. I just don't remember seeing -- reviewing that one while I was in that position specifically. Sometimes the project managers worked more directly with it and then sometimes I did more of the coordination on some of the properties with the enforcement center.
Q Do you recall ever seeing the team report that was prepared by DEC in 1999 concerning the South Pointe referral?
A I don't remember seeing it during that

Page 119

time, no.
Q Did you see it at some later time?
A I remember, yes, in the spring of 2001.
Q Do you recall seeing a final team report or resolution of the first DEC referral dated in January of 2000 at or around that time?
A I don't recall seeing it at or around that time.
Q When did you see it?
A I remember seeing it in the spring of 2001.
Q Your recollection at this point is that you had no responsibilities with respect to South Pointe until the spring of 2001?
A That's correct.
Q As of the spring of 2001 when you did have some direct responsibilities for South Pointe as you are recalling it now, did you start out with the impression that South Pointe was a physically troubled property?
A Yes.
Q And that was based on things that you had heard from other people?

Page 120

A Yes.
Q Not based on anything that you had seen for yourself because you have never been to the place; right?
A Never been inside.
MR. WELLONS: Objection. Go ahead and answer.
THE WITNESS: Never been inside the building.
BY MR. BAUGHER:
Q Have you met any of the personnel that were working either for the owner or the management company at South Pointe?
A Met John Hayes.
Q When did you meet him?
A April of 2001.
Q What was the occasion for your meeting with John Hayes?
A We had a meeting with Mr. Hayes and with Multifamily Housing in our office.
Q Who was at that meeting?
A Ed Hinsberger, Veronica Coleman, Gwendolyn

Page 121

Thomas, Mr. Gustin, Ms. Baguio, myself, Mr. Hayes and there were other people there. I just -- those are the people I specifically remember.
Q Do you remember when in the chronology relating to the notice of default that meeting took place? Was that before or after?
A The meeting was -- I believe it was right after we issued the notice.
Q What was the subject of that meeting?
A Concerned with the physical condition, the property was not being maintained in decent, safe and sanitary condition, the slow progress on Multifamily receiving an acceptable loan insurance application.
Q Did you say anything at that meeting?
A Yes, I'm sure I did.
Q What do you recall saying?
A One thing I recall saying was Mr. Hayes said something to the effect that HUD didn't like him, and I'll paraphrase, he felt that we were being unfair or picking on him and I remember taking exception to that because, you know, it was certainly was not personal. I had never met Mr. Hayes before

Page 122

that day.
Q Had you ever talked with him before?
A I don't remember ever speaking with him before.
Q Had you ever gotten any correspondence with him?
A Sure. Yes.
Q Had you gotten letters from him?
A Yes.
Q Addressed to you?
A When I was in Multifamily because I had other properties with PM-1 so I'm sure I did.
Q Okay. So do you have -- did you have any personal opinion about Mr. Hayes?
A No, I -- I mean I had never met him before so we were concerned with the condition of the property.
Q And was this one meeting in April of 2001 the only time you ever met or spoke with Mr. Hayes?
A To my recollection. I don't recall speaking with him after that. I certainly -- I know I didn't meet with him after that.

Page 123

Q Have you ever heard of a man named Carl Sanders?
A Yes.
Q Have you ever met or spoken with him?
A I don't remember meeting Mr. Sanders or if he was in that meeting or not. May have spoken to him while I was in Multifamily.
Q About South Pointe or other projects?
A Other properties.
Q Do you ever remember -- do you recall any meeting or conversation with Mr. Sanders about South Pointe?
A No, not specifically.
Q Have you ever heard of a man named Ken Horton?
A I have heard of him.
Q Have you ever met or spoken with Mr. Horton?
A I don't remember speaking to him or whether or not he was at that meeting. I know there were other people there with Mr. Hayes, I just don't remember who.

Page 124

Q You have no recollection of speaking or meeting Mr. Horton except perhaps at this one meeting in April 2001?
A That's -- that's correct.
Q Have you ever met or spoken with a Richard Sova?
A I think he may have been at that meeting.
Q How about Robert Sova? I think I misspoke.
A He may have been. I recognize the last name but I don't remember if he was at that meeting or not.
Q Other than that one meeting in April 2001, you have no recollection of having met or spoken with Mr. Sova?
A I don't remember.
Q Have you ever met or spoken with Joseph Johnson?
A No --
Q Have you ever met --
A -- not that I recall.
Q Or have you ever met or spoken with Don

Page 125

Samuelson?
A Yes.
Q When was that?
A Mr. Samuelson from a property called Northwest Towers, I was the property manager and that's the first time I remember meeting with Mr. Samuelson.
Q What year was that?
A 1998, probably, when I was a senior project manager.
Q And what was the meeting about?
A We did management review. I was also the project manager so I would have done the routine servicing for the property, so in that context.
Q And what do you recall about the management review?
A Resulted in a rating of unsatisfactory.
Q Why was that?
A It was primarily, as I recall, for financial -- because of financial conditions.
Q What financial conditions were unsatisfactory?

Page 126

A Real estate taxes were not being paid or paid late, high number of accounts payable.
Q And did you have a meeting with Mr. Samuelson about that?
A Yes.
Q What did you say at that meeting and what did Mr. Samuelson say to you?
A I discussed my findings at the meeting and advised Mr. Samuelson that I would follow up with a written report. We also spoke about the neighborhood networks center at the property.
Q What was the neighborhood networks center?
A The computer learning center for the residents, like, for kids to -- for after school programs or for adults either to -- to do, like, job training, that type of stuff.
Q And what did you learn about the neighborhood networks center?
A I liked it. I thought it was good.
Q What was the upshot of your meeting?
A The upshot of the meeting was that I would follow up my -- my visit with the actual written

Page 127

report.
Q Did you?
A Yes.
Q What did that report say?
A Report -- the report said it was an unsatisfactory rating and provided appeal procedures, as those always did, and included a copy of my actual report with the transmittal letter.
Q And then what happened?
A And then Mr. Samuelson requested a meeting with Mr. Hinsberger to appeal and I believe provided additional documentation. I don't recall specifically.
Q Was there rehabilitation going on in the property?
A There was a -- I want to say it was a 241 loan, an additional HUD insured loan to provide for rehab at the property.
Q And was that going along satisfactorily?
MR. WELLONS: Objection; vague. Go ahead and answer.
THE WITNESS: I believe that -- that -- it

Page 128

was more on the production side so I wasn't as involved in it but that there was a -- HUD had concern about the amount of time it was taking to close out that loan.
BY MR. BAUGHER:
Q Did it get closed out?
A As far as I know, it did.
Q Satisfactorily with HUD getting all of its money back or the -- or the lender getting all of its money back?
MR. WELLONS: Objection; compound, vague. Go ahead and answer.
THE WITNESS: Okay. It was -- I don't know how many years the loan was but I don't believe -- I don't believe it -- I don't know if it was five years or whatever but during my tenure, full payment would not have been required at that time. It was a newer loan.
BY MR. BAUGHER:
Q What was the result of Mr. Samuelson's appeal to Mr. Hinsberger?
A The rating was upheld.

Page 129

Q And then what happened with respect to Northwest Towers and the real estate taxes and the accounts payable?
A As far as I know, the taxes were paid, the accounts payable eventually were -- were started to be re -- were -- started to go down.
Q So the problem was ultimately taken care of?
MR. WELLONS: Objection; misstates prior testimony. Go ahead and answer.
THE WITNESS: The problems were -- well, the taxes were paid and everything but I believe it was subsequent to Mr. Samuelson's departure from the property as management agent.
BY MR. BAUGHER:
Q Do you know that or are you just -- you think that's the case or do you have some --
A That's my recollection, yes. I don't recall how long Mr. Samuelson managed the property after the review but the rest of my tenure in Multifamily Housing, I worked with -- with Carl Hall, who was the management agent.

Page 130

Q Carl Hall had been a DSSA employee; correct?
A Yes.
Q Was there ever a default notice issued to Northwest Towers?
A Not that I know of.
Q Other than what you have described, was there any remedial step or sanction that was taken with respect to Northwest Towers or Mr. Samuelson?
A Mr. Samuelson and DSAA were flagged in 2530.
Q And what happened to that? Was that flag lifted?
A I believe so.
Q When was the flag lifted?
A I don't know when. I don't know when it was lifted.
Q You concurred in that?
A I don't believe it was during my tenure in Multifamily Housing. I don't know when it was lifted.
Q Mr. Hinsberger concurred in the lifting of

Page 131

that flag?
A Probably.
Q Did you have any personal impression about Mr. Samuelson?
A I thought he had a lot of good ideas.
Q Now, is there anyone -- I have gone through a long list of names. Is there anyone whose name I didn't mention that worked either for the owner or the management company at South Pointe that you remember meeting or speaking with?
A Kelly Brown but I don't believe it was in her capacity at South Pointe.
Q What capacity was it?
A With another multifamily property.
Q What property?
A I don't remember if it was the Northwest or if it was -- I want to say it was a multifamily housing cooperative, a different property.
Q You don't think it was Northwest Towers?
A It might have been. For some reason I think it was -- it was a co-op. Northwest was not a co-op or is not a co-op.

Page 132

Q Did you have any participation of any sort in the renewal of South Pointe's HAP contract in the early fall of 2000?
A No.
Q You know that the South Pointe HAP contract was renewed in October of 2000; correct?
A Yes.
Q What is it that got you involved in South Pointe in April of 2001?
A This meeting with Ed Hinsberger and Veronica Coleman, they brought it up along with the March 2001 physical inspection and their concern with the condition of the property and also the slow progress on getting an acceptable insurance application and asked my office to assist them with the property.
Q Is that an answer that you worked on in the last week and memorized?
MR. WELLONS: Objection; argumentative. You can respond to the question.
THE WITNESS: I thought back to when my first discussions were on the property and, yes, and

Page 133

that was my recollections so I did think about it. I mean it's been, what, four years, so I did have to stop and think when my first involvement with it was.
BY MR. BAUGHER:
Q All right. And your recollection is that that first involvement was April 2001?
A Yes.
Q And that the opening event in your involvement in April 2001 was a meeting?
A Yes. My recollection, yes.
Q Do you recall how that meeting got set up?
A No.
Q It was a meeting with you and Ms. Coleman and Mr. Hinsberger?
A Yes.
Q Anybody else?
A I don't remember anybody else being there.
Q Where did the meeting take place? Mr. Hinsberger's office or somewhere else?
A I think it may have been Mr. Hinsberger's office or Mrs. Coleman's office or their conference room.

Page 134

Q And what was the explanation as to why you were being involved?
A Because of my office's experience working on notices of defaults.
Q Who convened the meeting?
A I don't remember.
Q What was the problem or the subject meeting that was stated to you?
A It was concerned with the March 2001 physical inspection done by REAC of the property, concerned that the property was not being maintained in decent, safe and sanitary condition, the fact that Multifamily Housing had been working with the owners for a considerable amount of time trying to get an acceptable loan application in that would provide for rehab of the property.
Q And what were you asked to do?
A Provide assistance with the notice of default.
Q What assistance were you asked to provide?
A Typical assistance in reviewing the record and drafting a notice of default and ultimately

Page 135

issuing it.
Q At that point in time in April of 2001, did you have any firsthand knowledge of what the status of the South Pointe project was?
A In regards to --
Q Physical condition.
A I had the March physical inspection report and our file from the prior referral.
Q Well, let me ask it a little bit differently. You reviewed some -- you reviewed the file in April 2001?
A Yes.
Q And the information that you got on South Pointe was exclusively from that file as opposed to something that you knew because you had been out to the property or had had some direct dealings with it; correct?
A Information I received was from the file that we had in-house along with the March 2001 physical inspection.
Q That physical inspection was in the file, I assume, or not?

Page 136

A We received that from Multifamily Housing. The inspection took place after the property had left the enforcement center so, no, it would not have been in our file prior to that.
Q I see. So the file you looked at was a DEC file?
A Yes.
Q Aside from the DEC file, the other documents that you had included what? A REAC report?
A Yes, REAC inspection report and I'm sure I would have asked for any recent correspondence between HUD and the owner and just I don't remember specifically.
Q All right. And you were going to look at these documents and then what is it that you were supposed to do following your review of the documents?
A Make a determination whether or not I felt that the owner was, indeed, in default of the contract.
Q Now, did you enlist the assistance of other people at DEC in making that determination or

Page 137

gathering information on which you could make that determination?
A Counsel. I worked with my counsel.
Q Who was that?
A Mr. Gustin and Mrs. Baguio, probably Mrs. Arnolds at the time.
Q Who is she?
A She was another staff attorney.
Q Did you consult with any enforcement analysts or team leaders or other personnel on your staff as -- as opposed to attorneys?
A Yes.
Q Who?
A On the -- on the prior referral, getting information on the prior referral from -- I don't recall who was the team leader, what team -- if it may have been Sandra Suiter at the time.
Q Well, Joan Kiening; correct?
A Well, yes, but I'm talking about who was the actual supervisor at that time for whom the analyst would have worked and I believe it was -- it may have been Sandra Suiter at that time.

Page 138

Q Well, actually the team leader was Joan Kiening.

MR. WELLONS: Counsel, please permit the witness to complete her answer.

Ms. Maisonet, would you please complete your answer and if counsel has additional questions, he may ask them.

THE WITNESS: I would have first gone to the supervisor for whom the analyst was working. The current supervisor, the incumbent at that time, I believe, was Sandra Suiter. I may have gone to Mrs. Kiening for information but I know that Freddie Batchelor had been the enforcement analyst and at the time, I believe, Mrs. Batchelor reported to Sandra Suiter.

BY MR. BAUGHER:

Q Now, you knew that Sandra Suiter was not the team leader when South Pointe was referred to the DEC in 1998 through 2000; correct?

A That's correct.

Q You knew that was Ms. Kiening?

A Yes.

Page 139

Q All right. Did you talk with Ms. Batchelor?

A Yes.

Q Did you talk to anyone else in DEC other than your attorneys and Ms. Suiter and Ms. Batchelor?

A I may have spoken to Mrs. Kiening, as well. I don't think you mentioned her.

Q I tried to.

A Okay.

Q I had a hard time getting her back in as team leader. You did know that she was the team leader, correct, on the DEC referral of South Pointe for a year-and-a-half from late '98 to early 2000; right?

A Yes.

Q What did you learn from Ms. Suiter?

A At that point the referral had -- the prior referral had been closed so she really didn't have any involvement with the property that I recall.

Q What did you learn from Ms. Batchelor?

A The history of the property, once it was referred.

Page 140

Q What did she tell you?

A That ultimately it was returned, from what I remember, I mean this was quite a while ago, but when the property was -- when the property had been referred and the work that she did on it and when it was ultimately returned.

Q What did she tell you about the work she had done on it?

A That she had done a review of the property. I don't -- I don't remember whether or not she actually went to the property or not but that the property was returned when it was felt that it was under -- underway to getting resolved.

Q Who felt that?

A With the plan. When both the DEC and Multifamily office felt that they had an adequate plan in place to address the concerns with the property.

Q And was that something that Ms. Batchelor agreed with?

A As far as I know.

Q Did you ask Ms. Suiter to do anything?

Page 141

A I don't remember.

Q Did you ask Ms. Batchelor to do anything?

A I don't remember other than, you know, to provide me with -- with the materials.

Q What do you recall discussing with Joan Kiening, if anything?

A May have been -- just along the same lines, what information was available on the property.

Q Did you ask her about the final team resolution on that first referral in early 2000?

A I don't remember specifically asking her that.

Q Now, who was the -- or was there a team formed in the wake of your meeting with Ms. Coleman and Mr. Hinsberger in April of 2001?

A A DEC team do you mean?

Q Well, a team that had some people from Multifamily, obviously, and some people from DEC.

A Yes, we would have worked with project manager for the property, supervisor, of course, Mr. Hinsberger and Mrs. Coleman and then -- then within the enforcement center, it would have been at

Page 142

least the legal counsel, myself, and then subsequently financial -- not financial -- enforcement analyst, Kathy Paul.
Q Kathy -- what's her name?
A Kathy Paul.
Q P-a-w?
A P-a-u-l.
Q Paul?
A Uh-huh. And then her team leader, Sandra Suiter.
Q And are Suiter and Paul the ones that were responsible for putting together a team report?
A I don't recall that we did a second team report.
Q What do you mean, a second one?
A Well, we would have done -- the first one would have been done by -- with Freddie Batchelor as the analyst and Joan Kiening as the team leader but I don't recall --
Q Back in 1999?
A Yes.
Q This is two years later?

Page 143

A Yes.
Q So there wasn't any new team report?
A I don't remember a new team report.
Q Well, now, ordinarily, in a situation in which a default is present or at least could be present, you would do a team report; right?
A For most cases, yes.
Q But that wasn't done in this case?
A Because of the subsequent -- it was not done because of the subsequent -- I mean the prior referral. We may have done an amended team report later just to provide an update.
Q Do you recall that amended team report?
A I know we did it on different properties. I don't remember one for South Pointe.
Q Now, what was in the DEC file that you reviewed in April 2001?
A Team report would have been there, the HAP contracts in effect at that time or prior to that time, any physical inspections, correspondence between HUD and the owner.
Q Did you make any notes or write any memos

Page 144

based on your review of the file?
A I don't recall.
Q Did you note anything in REMS concerning your review of the file?
A I would not have made REMS entries as a satellite office director so I don't recall -- I don't believe I did.
Q Did you ask anyone on your staff to make REMS entries?
A They would have been expected through the normal course to make REMS entries and it is not something I would routinely tell them to do.
Q Well, do you know if there is anything in REMS about DEC consideration of default or notice of default in April 2001?
A The -- the actual issuance of it would have been put into REMS --
Q What about the process of deciding it?
A -- the dates. No, not that I recall process being input into REMS.
Q So after you looked at the DEC file, what did you do next with respect to South Pointe?

Page 145

A Met internally within the enforcement center to discuss the case and I'm sure we had subsequent meetings with Multifamily Housing.
Q How many meetings do you recall having?
A Probably a couple subsequent to that initial meeting, at least.
Q Who was asked to prepare a decision memo or a -- an analysis of whether to proceed and, if so, in what fashion?
A I don't recall that we did a team report or an official memo on how to proceed. I believe we went to a notice of default.
Q So the only document you recall coming out of this deliberation was the notice of default itself; is that right?
A Yes.
Q There was no memorandum or discussion or analysis that led up to the decision to do a notice of default?
MR. WELLONS: Objection; misstates prior testimony. Go ahead and answer.
THE WITNESS: There was definitely

Page 146

discussion and analysis. I don't remember a new team report being done at the time or -- or some type of memorandum.

BY MR. BAUGHER:

Q Well, you understand I wasn't necessarily -- I didn't mean to limit that to something that formally says, "team report." If there was some other kind of memorandum or even an exchange of e-mails in which the pros and cons of a particular course of action were discussed, you don't recall any of that?

A Probably e-mails. I don't remember any formal memorandums.

Q Do you recall some e-mails in which there were issues that were discussed and perhaps debated in those e-mails or you don't recall those?

A I recall e-mails around the time that we were issued the notice. I don't recall specifically what was in them.

Q Were there any e-mails on that subject that you found when you did your search for documents that you -- e-mails that you sent to Mr. Gustin earlier

Page 147

this year?

A I believe my e-mails were later in the year.

Q You didn't have any e-mails from April 2001?

A No.

Q Had you deleted all your e-mails from April 2001?

A No. I -- when I was in Chicago, I would archive them. Once I went to Washington D.C., I didn't have access to these e-mails anymore.

Q Who drafted the notice of default?

A The notice was drafted with counsel.

Q Well, did you participate in -- did you do any drafting yourself? Did you write any words, word process any portion of a letter?

A I gave input on it. I don't remember if I physically sat down and either on electronically or on a hard copy made comments.

Q So who -- who did the draft of the notice?

A It was drafted by counsel.

Q Drafted by counsel and then sent to you and

Page 148

who else?

A And to Mr. Hinsberger and probably Mrs. Coleman.

Q Anyone else?

A I don't -- I don't know. It may have gone to Mrs. Thomas. I'm not sure. I know definitely it went to Mr. Hinsberger.

Q And then there were revisions made to the document or not?

A I don't remember. May have been. I know I gave input. There may have been revisions requested by Multifamily.

Q The counsel or the attorney who drafted this was Mr. Gustin?

A I -- Mr. Gustin or Mrs. Baguio --

Q Well, which?

A -- I think. One of the two. I want to say Mrs. Baguio.

Q What makes you think that?

A Because she was a primary staff attorney.

Q Okay. Do you recall there being revisions and drafts?

Page 149

A Vaguely.

Q And what was the approval process for the notice of default?

A Concurrence chain?

Q Yes.

A It would have been staff attorney, lead attorney, myself and the hub director.

Q What about Marilyn Edge?

A At this point I believe those notices had been delegated totally to the field and we didn't have to send them to headquarter anymore.

Q What about the general counsel's office in Washington?

A No.

Q There were no Washington approvals sought or obtained for this notice of default?

A I don't believe any were needed.

Q What manuals or references do you have that would tell us when it was that approvals from Washington, Marilyn Edge or the legal counsel's office were no longer required for notices of default?

Page 150

A I know we discussed it in a management meeting and there may have been a follow-up e-mail.

MR. BAUGHER: I would like to see that e-mail or whatever the statement is from Washington that approvals or concurrences were no longer needed from Marilyn Edge or others at DEC or from the general counsel's office in Washington.

MR. WELLONS: To clarify the record, the witness testified that such an e-mail may exist. We will certainly take the request under advisement.

MR. BAUGHER: I would also like to see the concurrence pages for the various people mentioned. We have no such concurrence documents in any of the records produced to us to date for this or many other points but including the default notice.

MR. SAMUELSON: Did I miss an answer? Did you say something?

MR. WELLONS: We will take it under advisement certainly and we would appreciate a written request, if we could have a formal request to identify the requested documents.

BY MR. BAUGHER:

Page 151

Q Do you know if there were any draft default notices that were prepared before April of 2001?
A I don't know.
Q Did you see any drafts before -- that were dated before April 2001?
A I don't recall seeing any for this property, no.
Q Do you know if Ms. Thomas drafted a default notice?
A I don't know.
Q Let me show you what is marked as Thomas Deposition Exhibit 18 and ask you if you have seen that document before.

(Witness reviewed the document.)

BY MR. BAUGHER:

Q Have you seen this before?
A I don't remember seeing it.
Q Does it look at all familiar?
A No.
Q Do you see that at the bottom of the second page of Thomas Deposition Exhibit 2 it says, "Draft GT 3/15/01"; do you see that?

Page 152

A Yes.
Q Does that tell us who was the author of this document?
A It looks like it was Gwen Thomas.
Q Did you have -- you see at the top it says, "Wasn't mailed," at the top on page 1?
A Yes.
Q Do you know whose handwriting that is?
A No.
Q Did Mr. Hinsberger or Ms. Coleman or others tell you that -- that they had already started to work on a default notice?
A They may have. I just don't remember.
Q Do you know if the inspection report that you referred to, the HUD inspection report, REAC report, had been conducted and delivered to HUD by March 15th, 2001?
A I believe the inspection date was around March 8th. I don't know when it was delivered.
Q That's why I was asking you about the delivery. Do you know if Ms. Thomas or others had received that inspection report by March 15th?

Page 153

A They may have.
Q As of March 15th, do you know if the owner had responded to any inspection report?
A To the March 2001 inspection report?
Q Yes.
A I thought they had certified to exigent health and safety items being repaired around that time frame or maybe just before.
Q Now, had you seen -- well, at the time in which you were considering whether or not a notice of default should be issued to or for South Pointe, had you seen correspondence concerning exigent health and safety conditions?
A Yes.
Q What had you seen?
A The -- I don't remember who exactly it was from but certifying that the repair -- the exigent health and safety items had been corrected.
Q All right. Did you see anything else on exigent health and safety items?
A Prior to the notice being issued?
Q Yes.

Page 154

A I don't remember.
Q Well, had you seen anything from any HUD personnel concerning whether or not those exigent health and safety conditions had been corrected or had not been corrected?
A I don't remember the time frame but I -- I know that I did see correspondence from the HUD -- from HUD to the owner telling them that they had gone out to the property and confirmed that, indeed, not all of the exigent health and safety items had been corrected. I just don't remember --
Q Now, you didn't go out to the property?
A I did not.
Q And Veronica Coleman didn't go out to the property?
A Not as far as I know.
Q Do you know who did go out to the property?
A No.
Q Did you know that the owner had responded to a letter from HUD on the subject of exigent health and safety conditions with a follow-on letter that had photographs of all the items that had been

Page 155

corrected?
MR. WELLONS: Objection; assumes facts not in evidence.
BY MR. BAUGHER:
Q Are you aware of that?
A I know there was subsequent correspondence. I don't remember photographs.
Q You never saw any photographs?
A I may have seen them. I just don't remember.
Q Do you -- do you recall seeing several pages of photographs expressly showing particular items that had been corrected?
MR. WELLONS: Same objection. Go ahead and answer.
THE WITNESS: I don't recall seeing the photographs.
BY MR. BAUGHER:
Q That wasn't something that you took into account in deciding whether or not this owner was in default?
MR. WELLONS: Objection; misstates prior

Page 156

testimony. Go ahead and answer.
THE WITNESS: I recall reviewing the inspection, correspondence that had gone back and forth. I don't recall specifically seeing the pictures.
BY MR. BAUGHER:
Q You ultimately concluded that South Pointe was in default of its HAP contract as of early April 2001; is that correct?
A Yes.
Q What were the defaults?
MR. WELLONS: Objection to the extent it calls for a legal conclusion. Go ahead and answer.
THE WITNESS: I recall deficiencies. The default was due for failure to maintain the property in decent, safe and sanitary condition. I remember problems with ponding on the roof, problems with windows and infestation. I believe there may have been some tripping concerns, exposed wiring, kitchens, problems with the kitchens, as well.
BY MR. BAUGHER:
Q So the reason that South Pointe was in

Page 157

default of its HAP contract in April 2001 had to do with physical deficiencies that you just mentioned: Ponding, infestation, wiring, and kitchen problems?
MR. WELLONS: Objection; calls for a legal conclusion and misstates prior testimony. Go ahead and answer.
THE WITNESS: Those are the ones that I recall. There may have been more.
BY MR. BAUGHER:
Q And the list that you just gave -- ponding infestation, wiring, kitchens -- that is a list of deficiencies identified in the March 2001 REAC report; correct?
A I believe so.
Q And it is on the basis of that March 2001 REAC report and the deficiencies listed in that report that you believe that South Pointe was in default of its HAP contract?
A Yes.
MR. WELLONS: Objection; misstates prior testimony, calls for a legal conclusion. Go ahead and answer.

Page 158

THE WITNESS: Review of the inspection and the administrative record and, yes, we came to the conclusion that the property -- that the owner was in default of the contract.

BY MR. BAUGHER:

Q Well, I got the first part of what you said about review of the inspection. There you are talking about the March 2001 REAC report --

A Right.

Q -- correct? Then you said something about the administrative record. I'm trying to focus on what were the defaults as far as you perceived them in April 2001.

A The deficiency cited in the March 2001 physical inspection report.

Q All right. Did the -- well, let me ask it a little bit more broadly. In addition to the property being in default because of the physical deficiencies listed in that March 2001 REAC report, were there any other bases on which you believed that South Pointe was in default of its HAP contract as of April 2001?

Page 159

MR. WELLONS: Object to the extent it calls for a legal conclusion. Go ahead and answer.

THE WITNESS: I know there had been a prior REAC inspection in 1991 and I know that Multifamily Housing had been working with the owner to get an acceptable application in for insurance and a substantial portion of that mortgage, I don't remember how much, you know, would have been used for repairs so I knew that the property needed repairs and that the March 2001 REAC inspection confirmed that the property, in fact, was not in acceptable condition.

MR. WELLONS: Just to clarify, I believe that you said there had been a prior inspection in 1991?

THE WITNESS: 1999. I'm sorry.

BY MR. BAUGHER:

Q What deficiencies, if any, listed in the March -- or, excuse me -- in the 1999 REAC report concerning South Pointe had not been corrected as of April 2001?

A I don't recall comparing the two

Page 160

inspections side by side to see what wasn't cited. I mean the March 2001 inspection is a sample of units at the property. I don't know -- probably REAC would not have looked at the identical units twice in a row. In fact, I highly doubt it.

Q Do you have any information that -- on which to base a conclusion that the deficiencies identified in the 1999 REAC report had not been corrected by April of 2001?

A The fact that the owner was coming in for a substantial loan to make repairs at the property, I can't tell you specifically which items were cited by REAC that were covered in the loan but, you know, it was obvious to me that the property still was not in acceptable condition and that deficiencies were noted at the property in 1999 and continued through that 2001 time frame when that second inspection was done.

Q Let me ask you the question again.

A Okay.

Q My question to you was you don't have any information about any supposed deficiencies identified in the 1999 REAC report that had not been

Page 161

corrected between 1999 and 2001; correct?

MR. WELLONS: Objection to the extent the question referred to supposed deficiencies. Object as asked and answered. Go ahead and answer the question again.

THE WITNESS: During -- sometime in that period, I believe the owner had responded as to what -- certain items that had been completed, that they stated had been completed, and, in fact, including the most -- well, in the exigent health and safety items I mentioned before, I don't know specifically which items from the 1999 inspection were corrected and which weren't. I hope that answers your question.

BY MR. BAUGHER:

Q No, it does not. You don't have any information, can't cite a single deficiency identified in 1999, in that '99 REAC report, that had not been corrected by 2001; isn't that right?

MR. WELLONS: Objection; asked and answered.

THE WITNESS: I can't confirm which ones