Page 162

were specifically corrected.
BY MR. BAUGHER:
Q And you can't name a single deficiency that was not corrected by 2001; isn't that true?
MR. WELLONS: Objection; asked and answered.
THE WITNESS: I can't list a specific one that was or was not corrected.
BY MR. BAUGHER:
Q Okay. Now, you knew that the owner was asking for some financing.
A Yes.
Q That was for a long-term -- that was for a refinancing of the mortgage on the property; correct?
A Yes.
Q And you knew that the mortgage on the property that had been taken out in the early 1990s was a ten-year mortgage loan; right?
A I don't recall that.
Q Had you ever seen information on what financing there was on the property at that time?
A I knew there was financing on the property

Page 163

but it was not HUD insured so I don't remember seeing anything related to that existing loan.
Q And you knew that the owner wanted to refinance that mortgage; correct?
A Yes.
Q And the reason that the -- one of the reasons the owner wanted to refinance it is because it was just a ten-year loan and you had half-a-million-dollar-a-year principal repayments on the loan; correct?
MR. WELLONS: Objection; assumes facts not in evidence, calls for speculation. Go ahead and answer.
THE WITNESS: I don't know why specifically he wanted to -- what the terms of the mortgage were and why he wanted to refinance from that standpoint.
BY MR. BAUGHER:
Q And the owner also wanted to make long-term capital improvements to the building; correct?
MR. WELLONS: Objection; calls for speculation, assumes facts not in evidence. Go ahead and answer.

Page 164

THE WITNESS: I believe so.
BY MR. BAUGHER:
Q And when you looked back at the DEC file, as you said you did, to review the circumstances of the case, you also saw in that file a number of letters from -- and other documents from the owner detailing work that the owner had paid for to correct deficiencies and improve the property in 1999, 2000 and into 2001; correct?
A I recall, yes, seeing documents related to an owner's update in terms of repairs that had been made.
Q And you knew that the owner had put an additional $770,000 into the building to pay for repairs; correct?
MR. WELLONS: Objection; assumes facts not in evidence. Go ahead and answer.
THE WITNESS: I don't recall the amount that the owner stated he had infused.
BY MR. BAUGHER:
Q Well, do you have any reason to believe that the owner didn't put additional money into the

Page 165

building of his own?
A I don't know whether or not he did.
Q And when I say, "of his own," what I mean is money -- additional money that was put in by the owner that was not out of the cash flow from the building. You understood my question?
A Yes, I understand your question. I don't know whether or not he put money in other than from the building operations. I just don't know.
Q And do you know if -- if that was one of the topics that was discussed in the final resolution in early 2000, at the end of the first referral of this project to the DEC?
A What I recall from that report was that some progress had been noted -- had been noted. I don't recall discussion of amounts of money being brought in.
Q Do you think that wasn't in the final report?
A It may have been. I just don't remember. I remember the general gist was that some progress had been made. Multifamily felt they had a plan for

Page 166

getting the deficiencies -- getting the property back in condition.
Q But it didn't apparently make an impression on you that the owner was putting a substantial amount of money into the property?
MR. WELLONS: Objection; argumentative. Please allow the witness to complete her answer before asking an additional question.
Ms. Maisonet, you can go ahead and respond.
THE WITNESS: No, I don't recall the dollar amount.
BY MR. BAUGHER:
Q Well, what factor did that play in your consideration of whether or not a default should be declared on the amount of money that the owner was putting into the project?
MR. WELLONS: Objection to the extent it calls for a legal conclusion. Go ahead and answer.
THE WITNESS: It is looking at the most recent information we had on the conditions, specifically the March 2001 indicated that the

Page 167

property was not in decent, safe and sanitary condition.
BY MR. BAUGHER:
Q Well, you listed the reasons you thought it wasn't in decent, safe and sanitary condition and that is ponding, infestation, wiring and kitchens; right?
MR. WELLONS: Objection; misstates prior testimony. Go ahead and answer.
THE WITNESS: Those were some of the things that I recall.
BY MR. BAUGHER:
Q Was -- did the owner respond to the REAC report, do you recall?
A Yes, I recall that the owner submitted the certification on the EH&S, the exigent health and safety.
Q Other than -- or in addition to the certification on exigent health and safety issues, do you recall receiving other responses or responses from the owner on other aspects of the March 19 -- the March 2001 REAC report?

Page 168

A I recall seeing correspondence from the owner, something that they called a MIO plan -- excuse me -- management improvement and operating plan, but it was not in the form of a MIO plan. Excuse me. It was a letter.
Q A letter detailing corrections that had already been made?
MR. WELLONS: Objection; assumes facts not in evidence.
THE WITNESS: From what I remember, an update on items completed and items to be done.
BY MR. BAUGHER:
Q You didn't look at that letter before you issued your default notice, did you?
A I don't recall the timing, if it was submitted before or after. If it had been submitted before, then I would have reviewed it if I had it.
Q Have you -- let me go back for a moment. On this discussion of exigent health and safety issues, what were -- as of the time of your default letter, what were, in your view, the outstanding exigent health and safety issues at South Pointe?

Page 169

When I say, "outstanding," I mean uncorrected or unsatisfactory.
A I don't recall breaking it down by exigent in that manner, by what exigent health and safety items had been corrected and which ones had not. You know, with the inspection is a snapshot of a point in time and that's what -- you know, that's what I was looking at and it is not like if the exigent health and safety items -- while it turned out in this case that it turned out not to be true, that not everything had been corrected, you know, and I believed at the time even if they had been, that there was still enough systematic problems at the property, it was indicated by the REAC inspection, that the property owner was still in default of the contract.
Q What were the systematic problems?
MR. WELLONS: Object to the extent it calls for legal conclusion. Go ahead and answer.
THE WITNESS: To see some of the violations that I referenced before, very similar to ones in the prior inspection. I know there was significant

Page 170

problems with -- in terms of kitchen appliances. I know electrical items were of concern.

BY MR. BAUGHER:

Q But as far as you know, the 1999 problems were all taken care of; right?

MR. WELLONS: Objection; assumes facts not in evidence. Go ahead and answer.

THE WITNESS: Or not. I didn't -- the thing with the REAC inspections, we don't require owners simply to correct those things identified in the REAC inspection. That's simply a -- that's simply a sample of the property. The owner is then required to survey the entire property to see what deficiencies are needed. So to simply say that the 1999 deficiencies cited by REAC is not sufficient, the owner has to -- has a requirement they have to maintain the entire property. We are subsidizing the entire property so, you know, just because an owner corrects everything cited by REAC doesn't mean that the rest of the property hasn't -- is in satisfactory condition.

BY MR. BAUGHER:

Page 171

Q As of April 2001 when you were writing and approving the default notice, what information did you have about the physical condition of South Pointe other than the REAC report that had just recently been issued?

A I had the 1999 inspection. I had the team report. I believe --

Q What year was the team report?

MR. WELLONS: Excuse me, Counsel. Do not interrupt the witness. If you continue to do that, we are just going to end the deposition.

Please complete the answer you were just giving, Ms. Maisonet.

THE WITNESS: Okay. I had the team report that was done when the property was first referred to the enforcement center.

BY MR. BAUGHER:

Q What else? Anything else?

A I'm -- I don't recall if there was another -- it may be a site visit report.

Q What site visit report?

A I don't recall, I mean, if -- I would have

Page 172

looked at, you know, anything that was in the file. I don't recall if there was a site visit report done prior to returning the property to Multifamily Housing.

Q There wasn't any site visit report before that that you recall seeing, was there?

A I don't remember. I don't remember seeing one. There may have been.

Q None has been produced to us.

A Okay. Okay. No, I'm trying to think that procedurally what I would look at in terms of going ahead and issuing a notice of default.

Q Well, so far you have mentioned two 1999 documents and the March 2001 REAC report. Is there anything else?

A I would have asked Multifamily Housing for correspondence subsequent to the -- subsequent -- subsequent to the referral to the enforcement center, anything related to the physical condition of the property.

Q What else did you see that you relied on in concluding that the property's physical condition was

Page 173

such that the owner was in default under the HAP contract?

MR. WELLONS: Object to the extent it calls for a legal conclusion. Go ahead and answer.

THE WITNESS: The primary document that I use as a basis would have been the March 8, 2001 inspection. The -- I just don't remember if Multifamily went out prior to that but any -- anything related to documents produced during that time period from the time that the enforcement center went out -- once the property left the enforcement center and then subsequently came back to the enforcement center, I would have reviewed any documents related to that. I just don't specifically remember which ones.

BY MR. BAUGHER:

Q There were no inspections that you are aware of between the 1999 and 2001 REAC reports, were there?

A There were no REAC inspections.

Q Were there other inspections that you remember looking at?

Page 174

A I don't -- that's what I am saying. I don't remember if -- what I am saying is if had they gone out, Multifamily Housing, specifically, had they gone out to review the property for any other reason, if there was anything related to a site visit report, then I would have reviewed that, as well.

MR. WELLONS: It is now 2:30. We are going to go off the record and take a break for a while.

MR. BAUGHER: Do you want to do that now because the questioning is too sharp? Can we -- I would like to continue a little while longer.

MR. WELLONS: No. I'm doing that because we have been on the record for several hours. It is now 2:30. No one has had lunch.

MR. BAUGHER: Well, this is not the -- let the -- let me go another few minutes and let's get through this.

MR. WELLONS: We are taking a break now, Peter.

MR. BAUGHER: Well, I object to that. The witness is asking -- is answering questions and if she comes back with different testimony on what this

Page 175

default was, that will be an unacceptable result.

MR. WELLONS: We are taking a break.

(Whereupon, at 2:32 p.m., the deposition was recessed, to be reconvened at 3:15 p.m. this same day.)

Page 176

AFTERNOON SESSION (3:19 p.m.)

Whereupon,

MARGARITA MAISONET

resumed the stand and, having been previously duly sworn, was examined and testified further as follows:

MR. BAUGHER: Would you mark this, please, as 5?

(Maisonet Deposition Exhibit 5 identified.)

MR. BAUGHER: And then this will be 6; 6, 7 and 8.

(Maisonet Deposition Exhibits 6, 7 and 8 identified.)

BY MR. BAUGHER:

Q Ms. Maisonet, before lunch you testified that while you were head of DEC in Chicago, there were something on the order of magnitude of 2000 referrals; correct?

A Yes.

Q And 500 different projects that had been referred to DEC in one respect or another?

A I don't know the number of projects. That was, like, an estimate.

Page 177

Q You said several hundred?

A Several hundred.

Q And several dozen default letters that were sent out?

A Yes.

Q In how many instances that you can recall during your tenure, 2000 to the end of 2002, were HAP contracts terminated?

A Probably, I don't know, 10 or 12.

Q Total?

A I'm estimating. Yes. Could have been more.

Q Do you recall receiving a copy of a letter that was sent by John Hayes to Veronica Coleman in March of 2001 concerning South Pointe's response to the March 2001 REAC report?

A Yes.

Q Let me show you what's been marked as Maisonet Deposition Exhibit 5. Is this a copy of the letter that you are recalling?

(Witness reviewed the document.)

THE WITNESS: Yes.

BY MR. BAUGHER:
Q When did you see that, this letter, Maisonet Deposition Exhibit 5 for the first time? Sometime in early April 2001?
A Yes.
Q The letter itself is dated March 16th, 2001 addressed to Veronica Coleman; correct?
A Yes.
Q And in the letter, Mr. Hayes refers to -- or encloses the response from Carl Sanders, property manager for South Pointe Tower Apartments, relating to EHS issues observed on March 2nd, 2001. Do you see that reference?
A I see the reference.
Q And do you see the next sentence where it says, "This includes photos of those items cited on the March 2, 2001 inspection"?
A Yes.
Q As you are looking at this now, do you recall seeing back in April 2001 that there was this further response from South Pointe concerning EHS issues?



A I recall the correspondence, yes.
Q Okay. You just don't remember seeing the photographs?
A That's correct.
Q But you are not denying that photographs were sent to Ms. Coleman in mid March 2001, are you?
A I'm not denying that.
Q Did you ask Ms. Coleman for copies of the photos so that you could satisfy yourself as to whether or not they depicted what they were purported to show?
A Well, they weren't attached. I'm sure I would have asked to see them. I just don't specifically remember looking at them.
Q So you may have seen the photographs?
A I may have seen the photographs.
Q And you don't have any recollection, do you, that the -- that the statement that Mr. Hayes makes in Maisonet Deposition Exhibit 5 about all of the EHS items being corrected is an incorrect or a false statement, do you?
A I'm sorry. Could you repeat that?



Q Sure. Mr. Hayes says in this letter that we are looking at dated March 16, 2001, to Ms. Coleman, Maisonet Deposition Exhibit 5, that all of the items that were EHS issues on the March 2001 REAC had been repaired; correct?
A My impression from the letter is that Mr. Hayes was saying that he relied upon the information from the property management company and that's why he certified that they had been corrected.
Q Yes. And then he goes on to say that he is enclosing further response from Mr. Sanders and that includes photographs showing the items that were in need of correction and showing that they had been corrected; right?
A Yes.
Q So when you saw this letter, Maisonet Deposition Exhibit 5, in early April 2001, you knew that the EHS issues identified in the March 2001 REAC had been taken care of; correct?
MR. WELLONS: Objection; assumes facts not in evidence. Go ahead and answer.
THE WITNESS: I know that Mr. Hayes stated



that they had been. I don't specifically recall, since I don't remember seeing the photographs, if they -- each photograph identified which EH -- EH&S item had been cited, showing that they had been corrected.
BY MR. BAUGHER:
Q As of early April 2001 when you had Maisonet Deposition Exhibit 5 in front of you, you had no information with which to contradict Mr. Hayes's statement in this letter or any of the photographs that were attached to the letter; isn't that right?
MR. WELLONS: Objection; assumes facts not in evidence. Go ahead and answer.
THE WITNESS: Without me even recalling that I had looked at the photographs; I don't know if the photographs submitted actually correlated directly to each of the EH&S items so I can't say whether or not they were corrected.
BY MR. BAUGHER:
Q Did you make a comparison of the photographs and a list of E&H items in the REAC

Page 182

report?
A I don't even recall seeing the photographs so I would not have made -- I can't tell you that I made a comparison.
Q Well, the EHS issues were important to you in early April 2001; correct?
A Sure, but they weren't the sole basis for the default.
Q Well, apparently, as of March 16, 2001, they weren't any basis for default; right?
A I said they weren't the sole basis for the default.
Q Well, let me ask this: If the statement made in this letter and the photographs supposedly substantiating the statements in Mr. Hayes's letter to Ms. Coleman of March 16 were correct, if that were true --
A Yes.
Q -- then EH&S issues would not have been a basis for default in April 2001; correct?
MR. WELLONS: Objection to the extent it calls for a legal conclusion. Go ahead and answer.

Page 183

THE WITNESS: If -- yes. If these statements were correct, were true, and the photographs demonstrated that, then the EH&S items in and of themselves would not have been the basis for default.
BY MR. BAUGHER:
Q Okay. And as of early April 2001, after you reviewed Maisonet Deposition Exhibit 5, you didn't know whether the statements that were made in Maisonet Deposition Exhibit 5 and the accompanying photographs were true or not, one way or the other; is that what you are telling us?
MR. WELLONS: Objection; misstates prior testimony. Go ahead and answer.
THE WITNESS: I don't -- since I don't remember reviewing the photographs, I mean some of -- at that point in time I may have known that maybe some of the deficiencies -- some of the EH&S items were corrected and maybe others weren't. I just don't recall.
BY MR. BAUGHER:
Q Which ones were not?

Page 184

A I don't know. I just can't say --
Q Did you send somebody -- did you direct someone else from your staff to make a further visit to -- to South Pointe after March 16th, 2001, to see whether the photographs accurately depicted what they supposedly showed?
A I don't believe so.
Q What checking did you do to determine whether or not the statements made in Maisonet Deposition Exhibit 5 were true or not?
A I didn't do any.
Q Do you know of anyone who did do any checking to see if the statements made in this letter to Ms. Coleman on March 16, 2001 were correct?
A I don't know that anyone did.
Q Let me show you what was marked at Ms. Coleman's deposition as Coleman Deposition Exhibit 8. Do you know what Coleman Deposition Exhibit 8 is?
A Looks like a letter from the general contractor to the ownership entity, PM Group Management Company.

Page 185

Q Well, it is a letter dated March 19, 2001 from PM Group -- or excuse me -- from BABCO Construction to PM Group. Have you seen this before?
A Yes.
Q When did you see it?
A Well, definitely this week.
Q Did you see it before this week?
A I may have.
Q Do you recall?
A I don't specifically recall.
Q Are there any deficiencies in the 2001 REAC report on South Pointe that would not have been covered or repaired if the work outlined in Coleman Deposition Exhibit 8 had been done?
A I would need to look at the inspection.
Q Did you do that in April of 2001 before you decided to issue a notice of default?
MR. WELLONS: Objection; vague. Go ahead and answer.
THE WITNESS: I would have looked at the document but the notice of default was on the basis of the condition of the property and not based on

future work that was being proposed to be done.
BY MR. BAUGHER:
Q Because in your view, future work to be done on the property was not relevant?
MR. WELLONS: Objection; misstates prior testimony. Go ahead and answer.
THE WITNESS: Future work to be done was simply that. The notice was on the basis of the condition of the property at the time that REAC went out and inspected it.
BY MR. BAUGHER:
Q And if the deficiencies that were identified in that REAC report were corrected or repaired, then there would be no basis for a default; right?
MR. WELLONS: Objection; calls for a legal conclusion, misstates prior testimony. Go ahead and answer.
THE WITNESS: If the deficiencies in the REAC inspection were correct that it would have been just for those units that REAC looked at in those parts of the building that REAC looked at, it still



doesn't solve the -- the issue of looking at the entire property that the owner is required to do so you can correct what's in the REAC -- what's cited specifically by REAC and still have a default under the contract if other repairs aren't made.
BY MR. BAUGHER:
Q What other repairs needed to be made as of April 2001?
A Whatever the owner's survey would have found using the REAC as a starting point.
Q What survey are you referring to?
A The survey the owner is required to do.
Q By whom for what?
A Required by HUD.
Q When did HUD ask for a survey?
A In its letter transmitting the inspection.
Q An inspection of 100 percent of the units that at that time had not taken place, of course; is that right? Is that what you are saying?
A 100 percent inspection by whom?
Q Let me rephrase the question. Other than the deficiencies identified in the March 2001 REAC



report, there were no specific deficiencies that you were aware of, for example, in units that had not been inspected as part of that March 2001 REAC report; right?
A Well, in specific units, no, but this would have given me an indication as to other work that needed to be done at the property.
Q The "this" that you are referring to is Coleman Deposition Exhibit 8 --
A I'm sorry. Yes.
Q -- which is a proposal made to -- or that was transmitted to HUD by the owner of South Pointe who said that he would like to make those -- make an investment in the property and undertake the work described in Coleman Deposition Exhibit 8; right?
MR. WELLONS: Objection; vague, assumes facts not in evidence. Go ahead and answer.
THE WITNESS: Yes, this letter is proposed scope of work for the property.
BY MR. BAUGHER:
Q Now, what did you do with Coleman Deposition Exhibit 8 when you saw it in April of



2001, if you did?
A I would have just seen it as further evidence that the property needed substantial work, I mean to me this is a lot.
Q Which the owner proposed to undertake; correct?
MR. WELLONS: Objection; assumes facts not in evidence. Go ahead and answer.
THE WITNESS: Well, presumably as part of their application for loan insurance, they would -- you know, that's why they would have asked for a scope of work from a general contractor, yes.
BY MR. BAUGHER:
Q Coleman Deposition Exhibit 8 is what the owner wanted to do; right?
MR. WELLONS: Objection; calls for speculation, assumes facts not in evidence. You're questioning her about a document she has already said she doesn't recall seeing at the time.
Answer the question, if you can.
THE WITNESS: Presumably this is work that -- I'm speculating -- work that the owner would

Page 190

have wanted done as part of the scope required under the -- the new mortgage.
BY MR. BAUGHER:
Q Well, you say you are speculating. Are you uncertain as to whether you saw this document, Coleman Deposition Exhibit 8, in 2001 at all?
A Well, I said earlier I know definitely I saw it this week.
Q Yes, but I'm not asking about this week. I'm asking about in 2001.
A I may have seen it in 2001. I -- I'm not positive. I believe I did and we asked for correspondence between the owner and HUD after the prior DEC referral and up until the time leading to the time of the physical inspection so if this was included, then I would have looked at it.
Q Were you -- let me show you what has been marked as Coleman Deposition Exhibit 11. Coleman Deposition Exhibit 11 includes several e-mail exchanges in which you were one of the recipients concerning the April meeting that you testified about earlier today; is that right?

Page 191

(Witness reviewed the document.)
A Yes, it is an e-mail from what appears to be maybe somebody from the PM Group. Ed Hinsberger then forwarded it to myself and some Multifamily folks setting up a meeting to talk about the property.
Q Well, it is an e-mail that -- the one at the bottom to Hinsberger is from Ed Sher.
MR. SAMUELSON: Doug Sher.
BY MR. BAUGHER:
Q Doug Sher. Excuse me. And the gist of it is that Mr. Sher of the mortgage company believes that five-and-a-half million dollars in improvements could be supported in a loan. Do you see that?
A Yes.
Q And do you have any reason to believe that five-and-a-half million dollars of loan financing would not have enabled the owner to make all of the repairs and improvements that you had in mind?
A I have no reason to believe that the five-and-a-half-million dollars wasn't sufficient. I don't know one way or the other.

Page 192

Q And you didn't know one way or the other on that particular score in April of 2001; correct?
A Correct.
Q Let me show you what has been marked as Coleman Deposition Exhibit 12. Is that an e-mail from you?
A Yes.
Q This is sent Friday afternoon, April 6th; correct?
A Yes.
Q Just before the end of the day, the end of the week; right?
A I don't know what day of the week it was but it was before the end of the day.
Q All right. And you say, "Thank you all so much for your efforts on this." What is "this" that you were thanking everyone for their efforts on?
A I would have to speculate is the drafting of the notice.
Q And you were very appreciative of that?
A Yes.
Q Why were you so appreciative of it?

Page 193

A Because I felt folks did a good job.
Q Why did you think they did a good job?
A Because I thought that it was a good notice. I'm guessing -- I'm speculating. They did a good job.
Q Was this a -- was the drafting of this notice of default a milestone in your view for the DEC which you headed at that time?
A Hardly.
Q Was this a great accomplishment?
A I routinely sent out messages telling people they have done good work. That's part of my management style.
Q Apparently the work must have been pretty quick because you say your first meeting on this was in April 2001 and here you are April 6th and you are congratulating everybody on the staff that they have done such a good job terminating a contract.
MR. WELLONS: Objection; assumes facts not in evidence. Go ahead and answer.
THE WITNESS: We had not terminated the contract, we had issued a notice of default. I

Page 194

believe we met in early April. Conceivably, it could have been late March but, yes, I think they did a good job at it. Did this stand out as a particular milestone? No. Like I said, I routinely do try to thank the folks that I work with for their assistance.

BY MR. BAUGHER:

Q All right. Let me show you Thomas Deposition Exhibit 19, which is a letter from you and Mr. Einsberger to Englewood Terrace dated April 9th, 2001. Is this the default notice that you thought the staff did such a great job on?

A Yes.

Q Look at the second paragraph of your letter referring to the March 2nd REAC inspection. Do you see that?

A Yes.

Q And you list some of the outstanding deficiencies noted in the inspection and you have got a list of some of the points; correct?

A Yes.

Q Had you, as of that time, received

Page 195

responses from South Pointe on whether those deficiencies had been corrected?

A Received -- I received -- or HUD received, I don't remember specifically to whom, correspondence that some deficiencies had been corrected.

Q When did you receive that -- those communications?

A Prior to issuance. I remember seeing some communication prior to issuance of the notice and some subsequent, I believe, to the issuance of the notice.

Q Well, you wouldn't want to issue a notice of default about deficiencies that either had been corrected or were soon about to be corrected, would you?

MR. WELLONS: Objection; argumentative. Go ahead and answer.

THE WITNESS: I wouldn't accept it simply on the basis of an assertion by an owner that corrections had been made and I would have wanted some confirmation that the repairs, indeed, had been done. And, again, it is not simply the deficiencies

Page 196

cited in the inspection, it is the deficiencies sited after the inspection and after the owner's survey of the entire property. So if an owner says, "I corrected everything in the inspection," it doesn't mean that the property is now in decent, safe and sanitary condition. It means he corrected the items cited in the REAC inspection.

BY MR. BAUGHER:

Q What information did you have as of April 9th, 2001 about holes and cracks in hallway and unit walls? Did you have any information other than what was stated in the REAC report itself?

A Not that I recall.

Q And the same is true of broken windows, inoperable stoves and faucets, cockroaches in the units and ponding on the roof; correct?

A Well, some of the deficiencies appeared to overlap the prior exhibit that you showed me from BABCO, so that would have been additional information that some of the deficient -- some of these same deficiencies were cited by the contractor proposing to do work.

Page 197

Q There was no subsequent inspection by HUD of South Pointe after the March 2001 REAC report, was there?

MR. WELLONS: Objection; assumes facts not in evidence. Go ahead and answer.

THE WITNESS: Well, HUD went out to confirm, subsequent to the March 2nd inspection, whether or not the H&S items had, in fact, been completed.

BY MR. BAUGHER:

Q Yes, and then there were photographs that showed that either HUD was wrong or that whatever they thought had been a problem had been taken care of and we just talked about that; right?

MR. WELLONS: Objection; argumentative, assumes facts not in evidence. Go ahead and answer.

THE WITNESS: Apparently, based on communication, there were photographs purporting to show that the deficiencies had been corrected.

BY MR. BAUGHER:

Q And no one from HUD went out after that point to inspect the property; correct?

Page 198

A Not to my knowledge.
Q And so no one from HUD went out to check on holes and cracks in the hallway and unit walls or any of the other items listed in this second paragraph of Thomas Deposition Exhibit 19; right?
MR. WELLONS: Objection; misstates prior testimony, assumes facts not in evidence. Go ahead and answer.
THE WITNESS: Not to my knowledge.
BY MR. BAUGHER:
Q Now, look at the third paragraph. This paragraph refers to correspondence on the EHS items that we have already discussed; correct?
A Yes.
Q But the EHS items that were -- that are being referred to in this paragraph are exclusively those cited in the 2001 REAC inspection; correct?
A Yes.
Q Nothing additional that had been added between March of 2001 and April 9th of 2001; right?
A It refers to those items cited in the REAC inspection.

Page 199

Q Okay. The bottom paragraph of the first page of this letter refers to a rejection of the owner's application for a firm commitment on funding under Section 221(d)(4). Were you part of that process or -- were you part of the decision-making process on the rejection of the owner's application?
A I was not.
Q You don't have any -- you weren't asked to evaluate whether or not the -- a firm commitment should or should not have been made; correct?
A Correct.
Q Now, looking at the second paragraph on page 2 of your default letter, the reference is made in the first line to "the foregoing events of default." What are the foregoing events of default as you understand them?
MR. WELLONS: Object to the extent it calls for a legal conclusion. Go ahead and answer.
THE WITNESS: To understand them, it is the items that were cited on the first page.
BY MR. BAUGHER:
Q And both the specific deficiencies and the

Page 200

EHS deficiencies all come out of the March 2001 REAC report; correct?
A Yes.
Q Then there is a reference to correcting those events of default to the satisfaction of HUD within 30 days. So what was the owner supposed to correct within 30 days?
MR. WELLONS: Object to the extent it calls for a legal conclusion. Go ahead and answer.
THE WITNESS: The owner was supposed to make sure that the property was maintained in accordance with the HAP contract, our physical conditions standards, some of which were cited in the REAC inspection.
BY MR. BAUGHER:
Q Well, this is a direction, and an important one, in this default notice, that the owner was supposed to make corrections; right?
A Yes.
Q All right. What specifically was South Pointe supposed to do within 30 days to correct these events of default?

Page 201

MR. WELLONS: Objection; asked and answered. Object to the extent it calls for a legal conclusion. But go ahead and answer.
THE WITNESS: The owner was supposed to correct those deficiencies that meant the property was not in decent, safe and sanitary condition, supposed to maintain the units and, you know, the entire property. If I may read, it says, "All of the project, its unit, systems, common areas and buildings must satisfy HUD's physical conditions standards."
BY MR. BAUGHER:
Q What was the owner supposed to do in 30 days' time in order to correct defaults? Was the owner supposed to address the deficiencies noted on the first page? Was that what the owner was supposed to do?
MR. WELLONS: Objection; argumentative, asked and answered.
THE WITNESS: Answer?
MR. WELLONS: Go ahead and respond.
THE WITNESS: Okay. The owner was supposed

to not only correct the things that were listed on the first page of this letter but required to maintain the entire property and the owner was advised of that in the first letter transmitting the March 2001 physical inspection, that he must conduct an entire survey of the property and it is not simply satisfactory to just make connections to the REAC-cited items.

BY MR. BAUGHER:

Q Did you know if -- if an entire building survey had, in fact, been conducted?

A I saw -- well, the BABCO document --

Q No, that's not what I am referring to.

MR. WELLONS: Excuse me, Counsel. The witness is completing her answer. If you keep interrupting her, we are just going to terminate the deposition.

Ms. Maisonet, please complete your answer.

THE WITNESS: I saw the BABCO document which told me that -- I don't know if they looked at 100 percent of the units and the EH&S references from the owner, that those things had been corrected, some



of which were later found not to be, and a -- an update from the owner but I don't remember when that was dated. I don't remember timingwise if this was before or after in terms of corrections that had been made and corrections that were scheduled to be made.

BY MR. BAUGHER:

Q That wasn't my question. My question was did you know whether the owner had, in fact, already conducted a survey of all units in South Pointe?

A I don't recall. I don't know.

Q Did you look for such a document in the file to see if there was, in fact, a 100 percent survey of the building?

A I don't remember.

Q Well, you say that was one of the things they were supposed to do. Do you know whether South Pointe, in fact, had already done that?

MR. WELLONS: Objection; asked and answered.

THE WITNESS: I don't recall. I know they -- they went in and looked at the units. I don't know -- I don't recall if it was 100 percent



They provided a status of what had been done and what was scheduled to be done but I'm not going to sit here under oath and tell you that I know that they looked at 100 percent of the property, 100 percent of the units. I just don't know.

BY MR. BAUGHER:

Q You don't know one way or the other?

A I don't recall.

Q And you didn't know one way or the other in April 2001 whether the owner had conducted a survey of all units in the apartment building; isn't that correct?

A I may have known it at the time. Sitting here today, I don't recall that they had looked at 100 percent of the units.

Q Would it have made a difference if they had?

MR. WELLONS: Objection; argumentative. Go ahead and answer.

THE WITNESS: If had they done 100 percent survey, then they would have known what they needed to have done to make the corrections and we provided



a 30-day cure period for that, so failure to do 100 percent survey was not the basis for the default. The basis of the default was not maintaining the property.

BY MR. BAUGHER:

Q And how was the property not maintained other -- as far as you know, the signer of this letter, that's a default letter in April 2001, in what ways was the property not maintained appropriately other than you knew from the REAC report of March 2001?

MR. WELLONS: Objection; calls for a legal conclusion, asked and answered. Go ahead and answer the question.

THE WITNESS: I know from the 1999 physical inspection. I know from, you know, the property -- I think -- I don't remember what that score was. I think it was in the forties so the score had actually declined between the 1999 and the 2001 inspections. I know from conversations from Multifamily Housing that they were very concerned that the property was not being maintained. I know from the scope of the

Page 206

work, that if the property were being maintained, I sincerely doubt it would have been as extensive as what you just showed me so I know from all of that that the property, in addition to the March 2001 inspection, that the property was not being maintained.

BY MR. BAUGHER:

Q Was there subsequently, subsequent to this default notice, a meeting with Hayes and various other people that you referred to before?

A Yes.

Q And what was said at that meeting?

A HUD was very concerned with the condition of the property, the tenants, the -- the lack of progress in getting in a complete loan application.

Q Was anything stated about the condition of the property other than items mentioned in your default notice, Thomas Deposition Exhibit 19?

A I don't remember.

Q What else was said at that meeting, anything?

A Discussion about vouchers being secured,

Page 207

possibly being secured, for the residents and that -- that if the units later passed inspection, that the residents could use vouchers there.

Q What else?

A I recall that Multifamily Housing, because of the length of time, probably, I think, it was close to two years in getting an acceptable loan application, that in order to -- to ensure a new loan, that Multifamily wanted a new owner and agent or at least a general partner.

Q Well, in fact, wasn't that the thrust of the meeting, that no matter what the current owner pays and the PM Group did, it wasn't going to be sufficient, that HUD wanted a new owner on the property?

A Well, definitely a new management agent is a condition for the loan and I know that we talked about a new owner, as well, but I don't recall if -- if the loan hinged directly on both of those entities being replaced.

Q Now, I -- I showed you the letter, default letter, as it actually went out to the South Pointe

Page 208

owner. There isn't attached to any copy that we have of this letter any concurrence pages or anything else that shows approvals, whether internally at HUD in Chicago or in Washington. Do you know if any approvals with written concurrence pages, in fact, were obtained?

A I would have to guess that it would have gone through the staff attorney, the lead attorney, prior to Mr. Hinsberger and myself signing the notice.

Q Was this fast-tracked because you were especially anxious to get this out?

A Well, we were very concerned with the condition of the property. Since 1999 it had continued to decline.

MR. WELLONS: Ms. Maisonet, I believe the question was was this fast-tracked.

THE WITNESS: Yes, from the time that, yes, we met.

BY MR. BAUGHER:

Q The meeting that you were describing took place in approximately April 13th?

Page 209

A Roughly.

Q Let me show you what was marked as Coleman Deposition Exhibit 13. Have you seen Ms. Coleman's letter to John Hayes dated May 15th before?

A Yes.

Q When did you first see it?

A I don't recall if I saw it in 2001. I did see it this week.

Q Do you think you saw it for the first time this week?

A I don't recall if I saw it in '01. I may have -- I may have seen it back in 2001. I'm just not positive.

Q Well, was Ms. Coleman authorized to send out a letter of this sort, Coleman Deposition Exhibit 13?

MR. WELLONS: Objection; vague. Go ahead and answer.

THE WITNESS: I have no reason to believe she wasn't.

BY MR. BAUGHER:

Q She says -- well, did she send a copy of

Page 210

this letter to you at the time, that is in May of 2001?
A I don't remember.
Q You are not cc'd on the letter but that doesn't necessarily mean you didn't get it.
A Right. I may have received it. I just don't remember.
Q She says to Mr. Hayes, "We are in receipt of the plan to correct the deficiencies identified in the subject Real Estate Assessment Center inspection. The response to the inspection was submitted by Ms. Kelly Brown, regional property manager for PM-1." Now, have you ever seen Ms. Brown's response?
A Yes.
Q When did you first see it?
A I definitely saw it this week and I may have seen it in -- in the spring of 2001.
Q When in the spring of 2001 or -- sorry. Go ahead.
A I'm thinking maybe in April.
Q And what makes you think that you have seen

Page 211

this before?
A I remember it looked familiar when I saw it this week and there was a, if I remember correctly, a reference that it was a MIO plan but to me it was -- well, not just to me, it is not a MIO plan. It wasn't on a MIO plan form.
Q Is the principal information that is conveyed on a MIO plan form a listing of deficiencies or items to be corrected or repaired and then a statement as to whether they had already been repaired or what the time frame was in which they were going to be repaired?
MR. WELLONS: Objection; vague.
BY MR. BAUGHER:
Q Is that the basic subject matter of a MIO plan?
MR. WELLONS: Objection; vague, compound. Go ahead and answer.
THE WITNESS: A MIO plan consists of three parts. One of them is management objectives, such things as reducing tenant accounts receivable might be one of them, so they are objectives for the

Page 212

management company to improve. The second part of it, the largest part of it, is a part relating to action items and those are deficiencies, identification of repairs to be done at the property, when they are going to be done, a status as to when they are completed, and I believe an estimated cost. And then the final component of a MIO plan is a sources and uses statement.
BY MR. BAUGHER:
Q Sources and uses of what?
A Of funds.
Q Is there some requirement that a response to a REAC report has to be on a MIO form as distinguished from providing information on how action items are going to be taken care of?
MR. WELLONS: Object to the extent it calls for a legal conclusion. Go ahead and answer.
THE WITNESS: At that time, properties scoring between 46 and 59 could be on what we called a corrective action plan, which did not have to be on the MIO form. So --
BY MR. BAUGHER:

Page 213

Q So the answer with respect to South Pointe is that a corrective action plan, in terms of its format, would have sufficed?
MR. WELLONS: Objection; misstates prior testimony. Go ahead and answer.
THE WITNESS: No. No. Because of the score, it would have been -- it would have been on a formal MIO plan.
BY MR. BAUGHER:
Q Now, do you see that Ms. Coleman returned the correspondence and listing of action items from Ms. Brown to her?
A Yes.
Q Did she do that at your direction?
A No.
Q You didn't take the response from Ms. Brown into account in formulating your judgment as to whether or not South Pointe was in default; correct?
A I don't know the date of Ms. Brown's correspondence and when I received it but mere submission of a plan is not a basis to not issue a notice of default.

Page 214

Q To the extent that the items referred to in the default notice either had been corrected by May 15th, 2001, or were within a short period of time to be corrected, what impact would that have on the question of default?
MR. WELLONS: Object to the extent it calls for a legal conclusion, asked and answered. Go ahead and answer.
THE WITNESS: Sorry. You said the items identified in the REAC inspection?
BY MR. BAUGHER:
Q Yes.
A If they had -- well, without confirmation of whether or not they had been actually fixed, again, it is not sufficient to submit a plan and say, "This is what I fixed and these are the items that I am going to fix."
Q Well, let's assume that they were actually fixed.
A I believe we still would have had a basis for default or I would not have signed that notice.
Q Well, you would have to -- you would have

Page 215

to have a new basis for a default and maybe there would be one but you would have to find a new basis since the original basis had been taken care of; correct?
MR. WELLONS: Objection; misstates prior testimony, assumes facts not in evidence.
THE WITNESS: If I received a plan from an owner showing that everything has, in fact, been corrected, then we would have done a confirmatory review prior to issuing the notice. If I received it subsequent to issuing the notice, then some type of confirmatory review would have been done prior to actually procuring -- starting to issue vouchers.
BY MR. BAUGHER:
Q After April 9th, 2001, HUD never did a confirmatory review concerning South Pointe; right?
A No, that's not correct.
Q When was a confirmatory review done?
A There was a review done prior to our issuing the notice of abatement in November of 2001.
Q When was that? When was it conducted and by whom?

Page 216

A I know it was -- it was prior to our November notice of termination.
Q There was another inspection?
A There was a confirmatory review done, not a REAC inspection. I don't mean to be technical but that's what we call it.
Q Well, let's be technical.
A Okay.
Q There was no REAC -- there was no further REAC report; correct?
A Between March and November.
Q Ever after March 2001?
A I don't believe so.
Q Okay. As to some other type of confirmatory report, we have asked very broadly for any inspection reports conducted by HUD and none -- this is my testimony but -- or my account -- none has been produced to us in this litigation after April of 2001. Do you know of an inspection report after that date?
MR. WELLONS: I'm going to state on the record I believe counsel's statement is incorrect.

Page 217

But go ahead and answer the question.
THE WITNESS: Yes, it was not in the form of a REAC physical inspection report but -- and I reviewed it again -- well, not the actual report but reference to it that I know that HUD staff went out prior to issuance of the November notice because I specifically asked that question because I know that has not been our practice to go ahead and issue a notice of intent to abate without some type of confirmatory once the owner's cure period has expired.
MR. BAUGHER: Mr. Wellons, is there some inspection report that you know of that -- that I don't that is between April 2001 and November of 2001 that I am just not thinking of right now?
MR. WELLONS: Counsel, I believe it is inappropriate for us both to be testifying in place of the witness answering questions; however, I believe that there are multiple documents that clearly reflect that HUD employees visited the property and found that its default continued. But, again, the purpose of this deposition is for you to

Page 218

ask questions of the witness.
BY MR. BAUGHER:
Q Was there any formal inspection report that you saw in this property after April 2001?
MR. WELLONS: Objection; vague. Go ahead and answer.
THE WITNESS: Not a formal inspection report similar to that done by REAC. A confirmatory site visit report, yes.
BY MR. BAUGHER:
Q And who was the site visit report from?
A I believe it was Lily Simmons and I don't know who else was there.
Q What month do you think that was from?
A If I had to guess, I would say October.
MR. BAUGHER: I would ask that copy of Ms. Simmons's report be produced to us or that if it has been produced and it just isn't obvious what that report was, that we be given the Bates numbers that correspond to that.
MR. WELLONS: We will take that request under advisement. I believe that, as with other

Page 219

documents you requested during depositions, it has been produced to you but we will take that request under advisement.
BY MR. BAUGHER:
Q Let me show you again the defendant's responses to plaintiff's interrogatories.
(Witness reviewed the document.)
BY MR. BAUGHER:
Q Will you look, please, at page 19, interrogatory number 11? The question posed in interrogatory number 11 is to identify the physical deficiencies at South Pointe that were listed on the April 29th, 1999 REAC report that were not corrected by Englewood or that were not to be corrected as part of a new rehabilitation loan request. And when you turn to the response on page 20, looking particularly at the first sentence, do you agree that the answer to that question is irrelevant?
MR. WELLONS: Objection; calls for a legal conclusion. You can respond.
THE WITNESS: Because the notice was based on the most recent physical inspection, yes.

Page 220

BY MR. BAUGHER:
Q And not the 1999 inspection?
A Which was -- correct, which was, again, a sample of the conditions at the property.
Q Okay. Now look at -- now look at interrogatory number 12, which is essentially the same question but directed to the March 8th, 2001 REAC report, and do you see that the response -- this is on page 20 -- is, "We refer plaintiff to our response to interrogatory number 11, which is that the answer to that question is irrelevant or that the question is irrelevant." Do you see that?
A Yes.
Q And do you agree with that?
MR. WELLONS: Objection to the extent it calls for a legal conclusion. Go ahead and respond.
THE WITNESS: The response is consistent with my prior testimony where I have stated that repairing just those things cited in the REAC inspection is not sufficient. We require 100 percent of the property be maintained.
BY MR. BAUGHER:

Page 221

Q But as of March or April of 2001, you didn't know anything about other parts of the property because other parts of the property hadn't been inspected by HUD; correct?
MR. WELLONS: Objection; misstates prior testimony, assumes facts not in evidence. Go ahead and answer.
THE WITNESS: The physical inspection was a sample of the property. Even if the owner submitted a plan for how everything else was going to be fixed doesn't mean that it was fixed at the time that we issued the notice. We issued -- it's a snapshot of the picture -- physical condition at the time that REAC was out there.
BY MR. BAUGHER:
Q Let me show you what has been marked as Maisonet Deposition Exhibit 6. Have you seen this letter, Maisonet Deposition Exhibit 6, before?
A Yes.
Q What is it?
A It is a continuation of default under the HAP contract issued by HUD to the owner of South

Page 222

Pointe.
Q What information did you have in -- on May 16th, 2001, that you didn't have on April 9th, 2001, or put another way, was there any new information that you had on March 16th -- excuse me -- May 16th, 2001, that you did not have on April 9th, 2001?
(Witness reviewed the document.)
A We had the meeting of April 13th. We were not advised that the property was then in acceptable physical condition. We had a May 2nd letter from Mr. Hayes to Ed Hinsberger, no mention that the property was then now at that time in acceptable physical condition.
Q Is there anything else new, new information that you had in May of '01 that you did not have in April '01?
A Other than what I have stated, I don't recall anything specifically.
Q Well, now, where in your letter, Maisonet Deposition Exhibit 6, do you address the statements from the owner or the owner's representative on corrections that had been made to deficiencies shown

Page 223

in the MIO -- excuse me -- in the March 2001 REAC report or is that treated in this letter?
A I don't see that in this letter -- well, that we did not receive an acceptable plan addressing all of the physical deficiencies.
Q Well, do you think you had seen the statements and proposals from the owner or the owner's rep, Kelly Brown, as of -- or at the time of your May 16th letter?
A Yes. I would have determined that it was not satisfactory.
Q How do you know that you had seen it?
A Well, I recall seeing it. I stated earlier that I recall seeing it sometime in April.
Q You don't say -- you don't make any reference to that letter, either seeing it, finding it to be unsatisfactory, or anything else in this letter of continuing default -- default; correct?
A That's correct.
Q Looking back on it, is that something that you should have addressed in this letter?
MR. WELLONS: Objection; argumentative. Go

Page 224

ahead and answer.
THE WITNESS: Could have been added but I'm still comfortable signing the notice without the continuation of the default -- without referencing it.
BY MR. BAUGHER:
Q You thought it was all right to ignore and, in fact, to send back to the owner or the owner's representative their statement as to what had been corrected and what their plans were for correcting what you said were defaults?
MR. WELLONS: Objection; compound, argumentative, assumes facts not in evidence. Go ahead and respond.
THE WITNESS: If significant progress would have been noted on the status report provided, then it would have been -- I would have -- it would have been incorporated into this letter.
MR. BAUGHER: Can you read back the answer, please?
(The reporter read the record as requested.)
BY MR. BAUGHER:

Page 225

Q Are you aware that the BABCO proposal that we talked about a little bit earlier was prepared in response to a 100 percent survey of the building conducted by the owner?
A I don't --
Q Did you know that?
A Like I stated earlier, I looked -- it looks extensive but I could not say specifically that it was the result of a 100 percent survey but it did look -- but it did look extensive.
Q That's information that you didn't have as of April and May 2001?
MR. WELLONS: Objection; misstates prior testimony.
THE WITNESS: I may have had it but that's not -- because someone submits a plan to correct 100 percent of deficiencies does not mean that those deficiencies have been corrected and the property was still in default. Submission of a plan does not cure a default.
BY MR. BAUGHER:
Q Was there a discussion that you

Page 226

participated in concerning the owner's response to the March 2001 REAC report?
A I'm sure that there were discussions.
Q Well, do you remember any?
A What was specifically said, no, you know, I recall that -- that the response was not adequate.
Q That wasn't the question. The question was --
A I'm sorry.
Q -- do you recall conversations or meetings with respect to the owner's response to the REAC report?
A Yes.
Q What meeting do you recall?
A Well, definitely the meeting that I initially had with Multifamily in early April. I recall meeting again after the notice had been issued, as well, the April 9th notice.
Q Do you know when the owner's response to the REAC report came in?
A I don't remember.
Q It hadn't come in -- had it come in before

Page 227

the default notice was sent out?
A I believe we had the communication on the exigent health and safety and I know we had a loan -- we had some parts of the loan application submitted.
(Pause.)
MR. BAUGHER: Mark this as the next Maisonet Deposition Exhibit, please.
(Maisonet Deposition Exhibit 9 identified.)
BY MR. BAUGHER:
Q Ms. Maisonet, let me show you Deposition Exhibit 9, which I am virtually certain was marked as a deposition exhibit at one of the earlier depositions but I'm not able to locate it now. The first page of Maisonet Deposition Exhibit 9 is a memo from Carl Sanders to residents of South Pointe dated in December of 2001 concerning a -- I think referring to an October 30, 2000 inspection of all units at South Pointe. Are you aware -- do you have any information on whether such an inspection took place in November of 2000?
A Well, November is not cited in here but what stands out at me is this memo is dated December

Page 228

of 2001 but it says beginning Monday, October 30th, 2000 --
Q That's why I was --
A -- a year before.
Q -- pausing because I think that's a typographical error and I think this is a December 20th, 2000 memorandum. The rest of the document is consistent with a late 2000 date.
A That would still be a prior date, though.
Q Yes. Do you know whether or not a -- an inspection of all of the units was conducted in November of 2000?
A But -- I'm sorry. But that -- I still can't reconcile those dates because even if that's a December 2000 memo, that still is past the November 2000 date that you are asking about so if this should have been dated 12/20/2000, the date that they are saying they are going to start the inspections is still before the date of the memo and I don't understand how that could be.
Q Yes, that's -- my question is did you know whether or not South Pointe had conducted a full

Page 229

survey of all units back in late 2000?
A I don't know. I didn't know that, no. I don't recall, anyway, if that came up subsequent -- subsequently.
Q When you were -- now look at the next page: South Pointe physical inspection summary. Do you see that?
A Yes.
Q Page S2193?
A Uh-huh.
Q "Inspection to determine the physical status of the property was completed on November 3, 2000 by Sean Mintz with the assistance of Ms. Michelle G." Do you see that?
A Yes.
Q Do you have any reason to believe that that's not correct?
A No.
Q And, in fact, you see that the number stamps in the lower right-hand corner, A2193 through 2201 -- do you see those numbers?
A Yes.

Page 230

Q Those are number stamps of documents that were produced to us by HUD.
A Okay.
MR. WELLONS: I just want to state for the record that no such number stamp appears on the first page of Maisonet Exhibit 9. This document appears to be a compilation of documents with Bates numbers that were produced by HUD and an additional cover memo that was not.
MR. BAUGHER: Yes.
BY MR. BAUGHER:
Q And is this South Pointe Tower physical inspection summary a document that you reviewed in April 2001 when you said you went through the DEC records to try to get up to speed on what the condition of the property was?
A I don't recall seeing this during that time frame.
Q When -- do you ever recall seeing it before?
A No. I don't remember seeing it.
Q Did you -- did you ask Ms. Coleman or

Page 231

Ms. Thomas whether there had ever been an inspection -- full inspection of all units in the property any time close to April of 2001?
MR. WELLONS: Objection; vague. Go ahead and answer.
THE WITNESS: Yeah, I don't recall asking them if a 100 percent survey had been done prior to the March 2001 inspection.
BY MR. BAUGHER:
Q Did you ever make a comparison or attempt to make a comparison -- well, you have never seen any part of Maisonet Deposition Exhibit 9 before; is that right?
A I don't recall ever seeing it.
Q And no one at HUD has ever said anything to you that you recall now about Maisonet Deposition Exhibit 9 or the survey that is referred to in Maisonet Deposition Exhibit 9; is that right?
A Not to my recollection.
Q Okay. Now, between your letter of May 16th, 2001 and November of 2001 when the HAP contract was abated and terminated, you say there was some

Page 232

sort of a site visit report from Lily Simmons. Did you ask Ms. Simmons to conduct a site visit?
MR. WELLONS: Objection; counsel's statement assumes facts not in evidence. Go ahead and answer.
THE WITNESS: I don't specifically recall asking for myself to go out.
BY MR. BAUGHER:
Q Does she work for you?
A No, she works in Multifamily Housing.
Q What was the extent of her -- what's your recollection of her survey? Was it a memo, an e-mail, several pages, several pages with photos? What do you recall from it -- of it?
A I know specifically from this week recall, a reference to it, and the fact that the property had not been -- that many of the same deficiencies that had been cited in the REAC inspection continued as of the time that she went out there.
Q How many pages was her document? Was it multiple pages?
A I don't know.

Page 233

Q Were there photographs?
A I don't recall. I recall photographs from that time but I don't know if it was specifically related to her site visit or if there was possibly another one.
Q Well, the photographs that the owners sent to you that you may have seen or may not have seen; right?
MR. WELLONS: Objection; assumes facts not in evidence. Go ahead and answer.
THE WITNESS: I don't recall seeing those specific photographs.
BY MR. BAUGHER:
Q Do you know who asked Lily Simmons to do a site visit, if she did?
A If I had to guess, it would have been probably --
Q Well, I don't want you to guess.
A Okay.
Q You don't know?
A Not specifically who asked her.
Q Do you know how many units she went into?

Page 234

A I do not.
Q Do you know if she went inside any units at all?
A I believe she did.
Q How do you know that?
A Just from the way that we normally conducted confirmatory reviews.
Q But not from your recollection of her specific review in this instance?
A I do recall that she did go into units. I don't know who she went with or how many units she went into but that would have been our standard practice.
Q And you wouldn't have issued an abatement and termination letter without conducting a further inspection; correct?
A That's correct.
Q Let me show you what's marked as Maisonet Deposition Exhibit 7. This purports to be a letter from you and Mr. Hinsberger to Englewood Terrace dated November 30, 2001. Have you seen this before?
A Yes.

Page 235

Q Is this your letter?
A Yes, it is.
Q Who drafted this letter?
A I don't recall.
Q Did you?
A Oh, no, I wouldn't have drafted it.
Q Did you do anything with respect to this letter other than sign it?
A I may have provided comments on it.
Q Do you know whether you did or not?
A I don't recall.
Q Do you recall any comments that you made on the -- on any draft of Maisonet Deposition Exhibit 7?
(Witness reviewed the document.)
A No, I don't recall any specific comments I might have made.
Q Do you recall any participation in drafting or deliberating on this letter other than signing it?
A I know I would have -- I recall reviewing it. I don't recall any specific comments I would have made. I'm sure that we would have had

Page 236

discussions on it.
Q Do you recall any discussions on Maisonet Deposition Exhibit 7?
A I'm sorry. Do I recall any what?
Q Discussions on Maisonet Deposition Exhibit 7.
A I recall discussions leading up to it.
Q What do you remember discussing and with whom?
A The fact that the confirmatory review showed that the property continued to be in default.
Q Where is there a reference in this November 30th, 2001 to any confirmatory review or other sort of review?
A There is not one that I see.
Q Was a copy of the supposed confirmatory review ever given to anyone connected with South Pointe?
A I don't know.
Q Do you have any reason to believe that this supposed confirmatory review was transmitted in any fashion to anyone at South Pointe?

Page 237

MR. WELLONS: Objection; argumentative. Go ahead and answer.
THE WITNESS: I don't know.
BY MR. BAUGHER:
Q Now, by November of 2001, South Pointe had been referred back to DEC; isn't that right?
A Yes.
Q What difference did that make, if any, in the decision-making process with respect to this November 30th, 2001 letter, Maisonet Deposition Exhibit 7?
MR. WELLONS: Object to the extent it calls for a legal conclusion. Go ahead and answer.
THE WITNESS: As compared to the prior notices -- or the April notice?
BY MR. BAUGHER:
Q Yes. Yes.
A None that I can think of.
Q Now, coming back to this supposed Lily Simmons site visit report, that wasn't intended to be secret or concealed from the owners of the property, was it?

Page 238

MR. WELLONS: Objection; argumentative. Go ahead and answer.
THE WITNESS: No, because they -- she would have notified the property that she was coming out to the -- to do the review so, at a minimum, the management agent would have been aware.
BY MR. BAUGHER:
Q Well, and beyond that, if she believed that there were deficiencies in the building, that's not something that would be kept from or secret from the owner; right?
A Not -- you know, I don't know. Not typically, no.
Q Typically, the owner would be given notice of whatever Lily Simmons or any other HUD person found at the building; right?
A Right, and I don't know that he wasn't.
Q So that if there was something that needed to be corrected at the building, the owner would know what he was expected to correct; right?
A The owner should have known all along what he was expected to correct.

Page 239

Q That's not my question, Ms. Maisonet. HUD is not trying to sneak up on an owner and record deficiencies or repeat recording of deficiencies and then not tell the owner; right?
A Not usually, no.
Q Is this a different case?
A Not to my knowledge.
Q Was it different because the property had already been declared in default and so you didn't want to share information with the owner on supposed problems on the property?
MR. WELLONS: Objection; argumentative, assumes facts not in evidence. Go ahead and answer.
THE WITNESS: No.
BY MR. BAUGHER:
Q That information should have been shared with the owner of the property; correct?
A I would think so.
Q Now, other than information from Lily Simmons, was there any other new information or additional information that you had about the condition of South Pointe on November 30th, 2001,

Page 240

that you didn't have in May and April of 2001?
A I know that at times the property was cited by the city for code violations. I don't know if any of those occurred during that time period that you described.
Q Well, and there is no reference to any City of Chicago code violations in Deposition Exhibit 7, is there?
A No, because we didn't typically incorporate those.
Q Well, for whatever reason, there is no reference --
A That's correct.
Q -- in your letter.
Now, as of November 30th, 2001, when an apartment at South Pointe was vacated, one of the residents moved out, no new resident could be moved into that apartment and receive a Section VIII subsidy; correct?
A And receive project-based Section VIII assistance, that's correct.
Q Someone could move in under a voucher but

Page 241

not under project-based Section VIII housing --
A Yes.
Q -- right? So that while the -- the HAP contract, as you say, towards the end of this letter, remained in effect after a fashion, it -- it pertained to a reducing number of units at the building; is that right?
MR. WELLONS: Objection; vague. Go ahead and answer.
THE WITNESS: Yes, it -- it resulted in fewer -- as units were vacated, fewer units receiving Section VIII subsidy.
BY MR. BAUGHER:
Q Which is, obviously, a major change in the contract and its status; correct?
MR. WELLONS: Objection; vague, calls for a legal conclusion. Go ahead and answer.
THE WITNESS: I don't understand what you mean by the status of the contract. If you could please clarify.
BY MR. BAUGHER:
Q Well, the contract, based on Maisonet

Page 242

Deposition Exhibit 7, your November 30th, 2001, notice of abatement and termination, applies each month to fewer units in the building as people move out; right?
A The available subsidy -- I'm sorry. I guess I don't understand. If you mean the existing contract covers fewer properties?
Q Yes. The Section VIII --
A Yes.
Q -- HAP contract covers fewer and fewer units --
A That's correct.
Q -- as people move out. So that the HAP contract did not -- did not, after November 30th, 2001, apply to the entire building and subsidize the entire building; correct?
MR. WELLONS: Objection; vague, calls for a legal conclusion. You can go ahead and answer.
THE WITNESS: Yes.
BY MR. BAUGHER:
Q Looking at the second-to-last paragraph, you say, "To safeguard the residents and not

Page 243

affecting HUD's determination as set forth above, HUD will provide the owner with a HAP contract renewal with addendum." And that is, then, just a renewal for specific units that still have Section VIII subsidized residents in them; correct?
MR. WELLONS: Objection to the extent it calls for a legal conclusion. Go ahead and answer.
THE WITNESS: Yes.
MR. BAUGHER: Can we take a short break?
MR. WELLONS: Sure.
(Recess.)
BY MR. BAUGHER:
Q Ms. Maisonet, directing your attention back to your May 16th, 2001 continuing default letter, Maisonet Deposition Exhibit 6, who authored that letter? Was it Mr. Gustin?
A It may have been Mr. Gustin or Ms. Baguio or the first stab may have been Kathy Paul.
MR. WELLONS: I just want to say for the record that Mr. Gustin is no longer present at the deposition.
MR. BAUGHER: Well, he may be here in his

Page 244

words.
BY MR. BAUGHER:
Q What about Maisonet Deposition Exhibit 7, the November 30th, 2001 abatement and termination letter, was Mr. Gustin the author of that letter?
A Again, I'm not sure. It may have been Ms. Paul, Ms. Baguio or Mr. Gustin.
Q What approvals did you get for Maisonet Deposition Exhibit 7, the abatement and termination letter?
A In terms of concurrences or approval beyond my level? I just want to be sure.
Q Approval beyond your level.
A None was required.
Q Did you communicate with anyone in Washington about either Maisonet Deposition Exhibit 6 or Deposition Exhibit 7?
A I may have referenced it just in terms of updating on different properties. This may have been one that I covered but not in terms of submitting draft notices to them.
Q Throughout the drafting and issuance of the

Page 245

notice of default and continuing default and abatement and termination, Mr. Gustin was serving as your counsel; is that correct?
A Yes.
Q And did that continue to be the case through the administrative review that followed on after this November 2001 letter in 2002?
A Yes.
Q Let me show you what has been marked as Maisonet Deposition Exhibit 8 --
MR. WELLONS: Thank you.
MR. BAUGHER: You are welcome.
BY MR. BAUGHER:
Q -- a memorandum from you and Mr. Hinsberger to Howard Mayfield dated March 8th, 2002. Is this your memorandum?
A Yes, it is.
Q Did Mr. Gustin draft this for you?
A I believe he did.
Q Did you have any input or make any changes in this memorandum from when it came to you as a draft from Mr. Gustin?