topics that were discussed at the meeting?
A. I don't know. I can't recall the meeting. I just -- when I take notes, I just jot down certain things, whether they may or may not have relevance to something someone said or not.
Q. There's a reference towards the top of the document. It says, "P.M. One meeting." That refers to the owner, P.M. One, is that right, of South Pointe?
A. Yes.
Q. And then on South Pointe there's a reference to 221D4. What does that mean?
A. That's the type of loan that they were coming in for.
Q. That's a particular section of code?
A. Section of the Act.
Q. All right. Then there's a comment about elevators. What does this have to do with?
A. I don't know 'cuz I was taking notes.
Q. Well, I want to know what your notes say.
A. That's the conversations that they were saying, that they're saying probably elevators needed to be replaced. I don't know. I was just writing what people were saying. Whether or not it



was true, I don't know.
Q. Was somebody lying to you?
A. I don't know.
MR. WELLONS: Objection. Argumentative.
BY MR. BAUGHER:
Q. Were you making misstatements?
MR. WELLONS: Objection. Argumentative.
BY THE WITNESS:
A. Misstatements of what?
BY MR. BAUGHER:
Q. When you were taking notes, did you write down things that you thought were untrue?
A. I was just taking notes.
Q. Okay. Elevators are very expensive, correct?
A. Yes.
Q. And in high-rise buildings, at least public housing buildings, they are frequently breaking down, correct?
MR. WELLONS: Objection. Assumes facts not in evidence. Vague.
Go ahead and answer.
BY THE WITNESS:
A. I assume so.



BY MR. BAUGHER:
Q. Well, you know that; you've been in housing for many years. And elevators are a vulnerable point in high-rise Section 8 housing, correct?
MR. WELLONS: Previous objection.
Go ahead and answer.
BY THE WITNESS:
A. I don't know if it's just in Section 8 housing. Elevators get a lot of wear because of the building. We work in a high-rise.
BY MR. BAUGHER:
Q. You've got a different tenant mix at 77 West Wacker than at South Pointe and at Englewood, correct?
MR. WELLONS: Objection. Argumentative.
BY THE WITNESS:
A. It's not an apartment building that I work in.
BY MR. BAUGHER:
Q. Okay. Do you have any reason to believe the two elevators have not been replaced?
A. Yes.
Q. Why?
A. Because I was on one and it dropped on me.



I was on the elevator, and the elevator dropped while I was on it three floors. When we tried to take the elevators up to do some inspections, the elevator -- 'cuz we got off after they drop.
BY MR. BAUGHER:
Q. What year was this?
A. I can't recall the year, but I was with Carl Sanders. He was like, oh, it's okay. The elevator man, he's here. He was up there. He's doing something.
So, whatever year that was I don't recall.
Q. Well, it is included in your March 2000 occupancy review, correct?
A. I don't recall. I don't know. But I was on that elevator when it fell down and I ended up walking all those stairs. So, yes, I had doubts about the elevators.
Q. Based on your experience in March 2000?
A. I don't know exactly when it was, but possibly that's when it was.
Q. Let's continue. In your notes, Deposition Exhibit 8 --
MR. WELLONS: I'm sorry. One moment. Ms. Thomas has requested to look at a document.

Page 194

(Short interruption.)
BY MR. BAUGHER:
Q. Are you looking in Thomas Deposition Exhibit 5 to see what it says about elevators?
A. Yes.
Q. Okay. Well, then, look at page 4282.
"The elevators are not working and are not working properly. During our review the elevator dropped three floors and skipped" something "floor while HUD and management staff were on it."
Is that what you're referring to?
A. Yes.
Q. Okay. So, the episode with the elevator was in March 2000, correct?
A. Yes.
Q. And this meeting we're talking about is in October 2000, correct?
A. Yes.
Q. So, you don't know -- you hadn't been to the property between March 2000 and October 2000, right?
A. I know definitely not the summer months. We got that established. But I don't recall if I

Page 195

went there in October or not.
Q. So, you have no reason or have no information to suggest that two elevators had not been repaired as of October 18th, 2000, right?
A. If they said that they were replaced in the meeting, that's what I wrote down.
Q. And you have no information to contradict that, correct?
A. After I was at the property after this date, so, yes.
Q. They could have been in full working condition on October 18th and subsequently additional problems in that building arose as far as you know, correct?
A. I don't know.
Q. Or the elevator that dropped could have been the one that was still being repaired, correct?
A. Why would I be on the elevator that's being repaired, that's not working? That didn't make sense. If two is fixed, why would I not be on one that's fixed?
Q. Did you ever make a note after your visit to the property in March of 2000 about any elevator not working?

Page 196

A. I wrote it in my occupancy review.
Q. In March of 2000?
A. Yes.
Q. And your notes here in Deposition Exhibit 8 are six months later -- nine months -- seven months later, right?
A. Okay.
Q. All right. The next item says, "Heating and water has been replaced." Do you have any reason to believe that's not correct?
A. I was just writing what they were saying. I have no idea if it was fixed or not.
Q. What is the reference to "needs a 100 percent inspection"? Is that your suggestion or something that they proposed to do?
A. That was a proposal that they need to do a hundred percent inspection to decide what type of rehab they need to do.
Q. And is that something that HUD suggested, or is that something they said they were going to do?
A. I don't know who made the suggestion. I was taking notes.
Q. Do you know if -- if there was a 100

Page 197

percent inspection conducted by the owner shortly after this meeting on October 18th, 2000?
A. No, I don't know.
Q. Did you ever receive a letter from Mr. Sanders talking about such a review?
A. I'm not sure. I'm not aware.
Q. If you got it, it didn't make any impression on you?
MR. WELLONS: Objection. Misstates the testimony.
Go ahead and answer.
BY THE WITNESS:
A. I don't know. I don't have -- I don't recall any at this time.
BY MR. BAUGHER:
Q. Well, if you had gotten a letter from Mr. Sanders with a 100 percent inspection report, would you have read it?
A. Yes.
Q. Why?
A. Because it would have been addressed to me.
Q. And do you always read things that are addressed to you?
A. Yes.





00000000-0000-0000-0000-000000000000

Q. And what would you have done with it after you read it?
A. Depends on what it was saying.
Q. There's a reference to four on the office staff. Does that refer the office staff at South Pointe at this time, site manager, assistant, leasing and office? Is that what that refers to?
A. I'm not sure.
Q. "No code violations at this time." Do you believe that that was correct or incorrect?
A. I don't know why that was written.
Q. Well, you're the one who wrote it.
A. I know. But I don't recall why.
Q. All right. And the last line appears to be, "Need to provide us a plan on how they can do scope of work work." It looks like "work" is there twice.
What are the last two words, please?
A. "Work," both of them.
Q. "They can do scope of work work." What does that mean?
A. That's something they need to submit, the development of scope of work. It wouldn't go to me.
Q. Okay. And did they do that?



A. I don't know.
Q. You're the project asset manager. You didn't know whether they submitted a plan to production?
A. No, because it doesn't come to me. Production is separate from what I do.
Q. And you don't have anything to do with that?
A. Not until it comes on-line with me.
Q. Unless you --
A. Unless they have -- because it was not insured, the comments about what the property was like before, that's why they ask. Anything after and during the loan, we have no control over it and how -- in the Multi-Family Housing Project management side.
Q. All right. There are a few notes at the top of Deposition Exhibit 8 which are difficult to read. Can you read either of those?
A. I don't know. It's kind of -- from the copy it's kind of -- it just says --
Q. Well, read the one on the left first as best you can.
MR. WELLONS: Excuse me. I'm going to ask



counsel to stop interrupting the witness. Several times now she's been speaking and you've cut her off.
MR. BAUGHER: No, I haven't cut the witness off.
MR. WELLONS: We can have the record read back. But I'm going to ask in the future please do not interrupt the witness when she's speaking.
MR. BAUGHER: I haven't been interrupting the witness. I'm trying to keep the testimony moving. And I'm trying to direct the witness' attention to the left side because there are difficult to read notes on both sides.
BY THE WITNESS:
A. It looks like something in regards to comp studies. John is an appraiser. So, he probably would have done a comp study. That's all I --
BY MR. BAUGHER:
Q. All right. And what about the right-hand side?
A. It just looks like somebody's gonna set an appointment when they come back with a plan or something.
Q. Now, having gone through these notes, does



that refresh your recollection some as to topics that were discussed at the meeting on October 18th, 2000?
A. It was about South Pointe and what they're going to do to fix it.
Q. Well, is there anything that you recall beyond the notes that we've just gone through concerning that meeting?
A. No.
Q. And I know there were a number of people there. Approximately how long did the meeting take?
A. Probably 30 to 45 minutes.
Q. Are you sure that's all it was?
A. I'm not sure.
Q. Given the number of people involved?
A. That's an estimate.
Q. Okay. Were you there for the whole meeting?
A. Yes.
Q. Do you recall any topics coming up other than as at least referred to in your notes?
A. Other topics other than my notes, yes.
Q. What?
A. Mr. Sanders had brought a Section 8

Page 202

contract up that day, and Ben Tessler was acting on behalf of Mary, Mary Anderson. And apparently the wrong contract was mailed out to them. And we corrected that situation in this meeting.
Q. What was done? What was corrected?
A. The contract. We informed the owner's representative that the contract that they received was in error.
Q. Who did what? You don't have authority to inform anyone about a contract, do you?
A. We informed them --
Q. Who's "we"?
A. HUD informed them --
Q. What person?
MR. WELLONS: Excuse me, counsel. Stop interrupting the witness.
Now finish your answer.
BY THE WITNESS:
A. HUD. We informed them in the meeting that the owner -- and they accepted, they understood. They knew that the contract was submitted in error because we, the field office, did not have the authority to renew any contracts beyond a year.
BY MR. BAUGHER:

Page 203

Q. Who is the person who said that?
A. I don't know who said it.
Q. You didn't say it, did you?
A. I don't have authority to approve contracts.
Q. So, you didn't make that statement to anybody, correct?
A. We informed them that it was signed -- it was the wrong contract sent out.
Q. Ms. Thomas, please listen to the question.
A. HUD informed the owner --
Q. HUD --
MR. WELLONS: Counsel, please stop interrupting the witness.
Miss Thomas, please complete your answer. Then counsel may question the witness.
BY THE WITNESS:
A. HUD informed the owners that this contract was signed in error. A letter was later sent out to confirm the conversation.
BY MR. BAUGHER:
Q. Who is it that made a statement concerning the contract at the meeting on October 18th, 2000?
A. I made my supervisor aware of it,

Page 204

Miss Coleman, that it was now -- that it was in error on that contract.
Q. So, you had a conversation with Miss Coleman?
A. Yes.
Q. Did you say something at the meeting?
A. Yes, we did.
Q. No. Who did?
A. I don't know specifically.
Q. But you are not the person who said anything at a meeting, correct?
A. I don't recall.
Q. You understand that you took an oath to tell the truth before we started this deposition, correct?
A. Yes.
MR. WELLONS: Objection. Argumentative.
BY THE WITNESS:
A. Yes. I'm telling the truth.
BY MR. BAUGHER:
Q. And you understand that especially with respect to government records, tampering with government records, that there are penalties for that, correct?

Page 205

MR. WELLONS: Objection. Argumentative.
Go ahead and answer.
BY THE WITNESS:
A. Yes.
BY MR. BAUGHER:
Q. You read the warnings that are at the end of contracts concerning -- HAP contracts?
MR. WELLONS: Objection. Argumentative.
BY THE WITNESS:
A. That owner read them. As terrible as that building was, we were still paying for it. He was certifying every month that that building was in safe and sanitary condition --
BY MR. BAUGHER:
Q. Miss Thomas, that wasn't the question.
MR. WELLONS: Go ahead. Finish your answer, Miss Thomas.
BY THE WITNESS:
A. -- and it was not. He was collecting Section 8 funds and the building was not livable. So, do that owner understand the penalties that he was certifying every month, that these units were in decent, safe and sanitary condition when they were not?

Page 206

BY MR. BAUGHER:
Q. Miss Thomas, --
A. And the government continued to pay him.
Q. Who is it at the meeting on October 18th that made a statement to Mr. Sanders about the 2000 contract?
A. I don't recall.
Q. Inasmuch as you've told us that you do not have the authority to make decisions, really, on any substantive subject, you are not the person who made such a statement to Mr. Sanders; is that correct?
MR. WELLONS: Objection. Misstates prior testimony.
Go ahead and answer.
BY THE WITNESS:
A. I don't recall.
BY MR. BAUGHER:
Q. Did Ms. Coleman make a statement at that meeting about the 2000 contract?
A. I don't recall.
Q. Did Mr. Hinsberger make a statement about the contract?
A. I don't recall.
Q. In fact, you recall that Mr. Hinsberger did

Page 207

not; isn't that correct?
MR. WELLONS: Objection. Misstates prior testimony.
BY THE WITNESS:
A. I don't recall.
BY MR. BAUGHER:
Q. What you do remember is that, or think you remember, is that you had a conversation with Ms. Coleman about the contract; is that correct?
MR. WELLONS: Objection. Misstates prior testimony.
BY THE WITNESS:
A. I don't recall.
BY MR. BAUGHER:
Q. You don't recall ever discussing the contract with Ms. Coleman?
A. Yes, we discussed the contract.
Q. When did that conversation take place?
A. I don't recall.
Q. It was after the meeting on October 18th, wasn't it?
A. No, it was not.
Q. Was it during the meeting?
A. Actually, we discussed the contract issue

Page 208

in the meeting because the owners wanted to take their copy with them.
Q. And did they take a copy with them?
A. Yes, they did. And they took a corrected copy with a letter. We informed them that it was incorrect, and then we later sent them a letter and a copy of a corrected one. And it was stated in the e-mail from Ken Horton who was there at the meeting that he was aware that the contract was in error to Ms. Coleman.
Q. You're talking about an e-mail months later. I'm talking about October 18th, 2000, right?
A. I understand.
Q. Where in your notes do you make any reference to the contract?
A. I didn't have to write any notes.
Q. There's nothing in your notes?
A. No.
Q. Did you -- did you put anything in REMS about the contract?
A. Possibly. I'm not sure.
Q. What did you say in your REMS notes?
A. I didn't say I put anything in REMS. I said I'm not sure.

Page 209

Q. Did you make any notes anywhere memorializing what you say was the disposition of the 2000 contract? Did you personally make any notes of any sort?
MR. WELLONS: Objection. Compound. Argumentative.
Go ahead and answer.
BY THE WITNESS:
A. I don't know. I don't recall.
BY MR. BAUGHER:
Q. Do you remember speaking with anyone between October 18th, 2000 and early December 2000 about the South Pointe contract?
A. I don't recall exactly, no.
Q. Do you --
A. I don't recall.
Q. You might have had a conversation or you just don't remember or what?
A. I don't remember, don't recall.
Q. What was done to process the 2000 contract? Did you have any role in that?
A. The same way it was processed in '99.
Q. Which is what?
A. You input it in REMS and you turn it over

Page 210

to the Funding section.
Q. Now, are you aware that the owner had filed a request for a one-year contract with three automatic one-year renewals; that is, a four-year contract?
A. That was the contract that was sent out in error.
Q. Can you answer my question?
A. I just did.
Q. Are you aware that the owner submitted a request for a four-year contract?
MR. WELLONS: Objection. Assumes facts not in evidence.
Go ahead and answer.
BY THE WITNESS:
A. He submitted a request for a four-year contract. At that time we could not accept contracts longer than a year. So, no, I'm not aware.
BY MR. BAUGHER:
Q. I'm asking you what was requested. And what was requested was a one-year contract with three automatic one-year renewals, right?
A. I don't know what was requested. I have to

Page 211

see the document.
Q. That's the contract that was fully signed; is that correct?
MR. WELLONS: Objection. Assumes facts.
BY MR. BAUGHER:
Q. A one-year contract with three automatic one-year extensions?
MR. WELLONS: Objection. Assumes facts not in evidence.
Go ahead and answer.
BY THE WITNESS:
A. I'd have to see the document.
BY MR. BAUGHER:
Q. Well, I thought you just answered that that is in fact the contract that was signed?
A. I said that was a contract that was sent out in error.
Q. Well, it was sent out with a signature or not?
A. Yes, with a signature.
Q. Well, actually, I -- I misspoke.
When a contract is sent out, what happens; three copies of the original of the contract are sent out to the owner for his signature; is that

Page 212

right?
A. I don't send out contracts, so I don't know.
MR. BAUGHER: Will you mark this document as Thomas Exhibit 9, please?
(Thomas Deposition Exhibit Number 9 was marked for identification.)
(Document tendered to the witness.)
BY MR. BAUGHER:
Q. Ms. Coleman, I'm showing you what is marked as --
A. I am not Ms. Coleman.
Q. I'm sorry. Ms. Thomas, I'm showing you Thomas Deposition Exhibit 9, which is an Owner's Request for Contract Renewal. Have you seen this before?
MR. WELLONS: I'd like to correct something in the record. This document is entitled "Cover Sheet Owner's Checklist for Use at Contract Expiration."
MR. BAUGHER: And is there a point?
MR. WELLONS: I stated I was correcting the record. You identified this as a request. The document is entitled "Owner's Checklist."

Page 213

BY MR. BAUGHER:
Q. Is this a document to be submitted asking for a four-year contract renewal? Look at page 1894.
A. I'm looking at the entire document.
(Short interruption.)
BY THE WITNESS:
A. Yes, it looks like a request for -- for a four-year.
BY MR. BAUGHER:
Q. And this request, Deposition Exhibit 9, came in while you were out of the office, right?
A. It's dated, yes, 7/27. I don't know when it came into the office.
Q. You were on maternity leave in July?
A. Yes.
MR. BAUGHER: Will you mark this, please, as Thomas Deposition Exhibit 10?
(Thomas Deposition Exhibit Number 10 was marked for identification.)
(Document tendered to the witness.)
BY MR. BAUGHER:
Q. Miss Thomas, look, please, at Deposition Exhibit 10, which appears to be a copy of this

Page 214

Owner's Checklist that we just looked at as Deposition Exhibit 9, but with some additional handwriting on it and one additional TRACs page at the end. Can you tell us what that document is, please?

A. Which document?

Q. Deposition Exhibit 10.

MR. WELLONS: Miss Thomas, would you like to review the document before responding?

THE WITNESS: Yes.

(Short interruption.)

BY THE WITNESS:

A. Okay. Looks like some --

BY MR. BAUGHER:

Q. Have you been through Thomas Deposition Exhibit 10 page by page?

A. Which page?

Q. You've looked through it page by page, right?

A. Yes.

Q. In the upper right-hand corner there's a handwritten note that says, "9/27, Randy." Who is Randy?

A. He was a staff member of HUD that worked on

Page 215

the funding, that worked on the contracts.

Q. Do you recall his last name?

A. Kramer.

Q. "Please request 2,513,000 in REMS," and then the initials, it looks like "VT, 9/27/00."

Who is VT?

A. Victor Taylor.

Q. Who is Victor Taylor?

A. A funding person.

Q. What was his title in September 2000?

A. I don't know.

Q. Can you tell from these notes whether what was being entered into REMS was a request for $2,513,000 in funding for this 2000 contract?

A. I have no idea what this is for.

Q. Have you ever seen it before?

A. No.

Q. Have you ever spoken with Mr. Kramer or Mr. Taylor about South Pointe or this contract?

A. I don't recall.

Q. What is the responsibility of Funding in entering and processing a renewal contract?

A. I think that should be told to you by the person who's in charge.

Page 216

Q. What do you know about it?

A. We turn over the information to them, and they process it. We input what the owners submit, and they -- and they do the rest.

Q. Well, apparently by September 27th the information on this particular contract request for a four-year renewal at South Pointe in 2000 had been turned over to Funding, correct?

A. That's what it looks like.

Q. All right. And look at the last page, if you will, of this exhibit, Deposition Exhibit 10. The last page is not paperclipped together, but it is a screen from the REMS system, correct?

A. Yes.

Q. And this screen was printed by someone whose identification number is HO 4971, right?

A. I don't know.

Q. Well, we can see that by looking at the bottom left-hand side. You see there it says HO 4971?

A. Okay. I don't know what that means. I don't know if it's somebody's number or not. It's just a number on this page.

Q. Well, it's an identification number, isn't

Page 217

it?

A. I don't know what it is. I don't want to assume what it is. I don't know --

Q. Well, your identification number --

MR. WELLONS: Counsel, if the witness could please finish her response.

Please continue, Miss Thomas.

BY THE WITNESS:

A. I don't know what it is, and I'm not going to assume whose it is.

BY MR. BAUGHER:

Q. When you put your identification number into REMS and then print a page or a screen from REMS, your number comes up in approximately that place, only it's your number instead of HO 4971, right?

A. I don't know.

Q. You don't remember ever having seen your number on a printed screen at REMS?

A. I don't recall. I don't know. We used to get a cover sheet when we would print and it would have our code on did. But as far as the pages and stuff out of REMS, I don't recall that.

Q. Okay. And from the dating on the lower





00000000-0000-0000-0000-000000000000

Page 218

left -- or excuse me -- the lower right corner, you can see that this particular page was presented June 11th, 2001, right?
A. Yes.
Q. Now, did you print this page?
A. I don't know.
Q. You're not HO 4971?
A. No.
Q. You have a different code?
A. Yes.
Q. Do you recognize that code number for anybody?
A. No.
Q. Do you recall being asked to print a screen with contract information on South Pointe in June of 2001?
A. I don't know. I don't remember.
Q. Now, on -- what was the effective date and expiration date for the 2000 contract as of June 2001?
A. Can you repeat that, please?
Q. Yes. What was the effective date and the expiration date of the 2000 HAP contract for South Pointe as of June 2001?

Page 219

MR. WELLONS: Is the witness being asked to respond based on the information in the document or her knowledge?
MR. BAUGHER: Well, I'm showing her a document that I assume is correct. If you have some contrary knowledge or I'm misreading it, then you should say so.
MR. WELLONS: Once again, is the witness being asked to answer the question based on her personal knowledge, or is she being asked to refer to the information in the document?
BY MR. BAUGHER:
Q. Well, let's do it this way: First of all, tell us what the document says about the effective date and expiration date of the 2000 contract.
A. What it shows is that this project had a number of staged contracts in the beginning. You had several of them where stages had different effective dates because units came on board at different dates. But they all had the overall expiration date of 9/30 -- well, here it looks like it has something about 10/14/1997.
But we don't have -- we didn't put this information in the system. This information was

Page 220

downloaded.
Q. Well, I heard that, but I don't know what that means. What can you tell about the status of the 2000 contract from looking at this screen that was printed off of HUD's REMS system?
A. That it was renewed from 10/1/2000 to 9/30/2001.
Q. All right. And that was -- and the TRACs status as of June 11th, 2001 was active, correct?
A. Yes.
Q. Meaning that that contract was in force and effective as of June 11th, 2001?
A. Yes.
Q. All right. Are you telling us that this information from the REMS screen in June of 2001, is wrong?
MR. WELLONS: Objection. Misstates prior testimony.
Please go ahead and answer.
BY THE WITNESS:
A. No. I just don't understand the dates above it, which I don't need to.
BY MR. BAUGHER:
Q. Well, then, to put it another way, the --

Page 221

strike the question.
Did you have authority to enter information onto REMS that would show the status of contracts? Did you have that authority?
A. I'm confused what you're asking.
Q. Well, there's information shown on the last page of Deposition Exhibit 9 about contract status and expiration dates. Did you have the authority to enter data into REMS that would affect these dates?
A. Yes.
Q. And who did you have to check with before you did that; anyone?
A. No, we would just have to put the information in the system.
Q. And you could do that on your own?
A. Yes, but it's not approved. It's just information in the system.
Q. But then the system reports that information, and that goes into the TRACs system, as well, correct?
A. No. It has to be turned over to my supervisor, who then turns it over to the funding person, who then requests the funding from headquarters. There's a process, and then they go

56 (Pages 218 to 221)

KRUSE & ASSOCIATES, LTD.
312-345-1500

00000000-0000-0000-0000-000000000000

Page 222

through all of this stuff. I don't know. We just put the information in there. If it's wrong, they come back. We just track it.
Q. Who's the "they" that comes back?
A. Funding, Mary Anderson's staff.
Q. And Funding is the place where Randy Kramer and Victor Taylor work, right?
A. Randy Kramer doesn't work there anymore.
Q. Well, he did in 2000, right?
A. Yes.
Q. What is the ARAMS system?
A. I don't know. I don't have access to that.
Q. You've never heard of that?
A. Yes, I've heard of it. It has something to do with funding, but I don't have access to that.
Q. That stands for Automatic Renewal Adjustment Management Subsystem?
A. I don't know what it stands for. I don't have access to it. I don't use it.
Q. Who operates that system?
A. Funding, the Funding Department, Mary Anderson's staff.
Q. And that's what also operates TRACs, right?
A. I don't know how it connects.

Page 223

Q. When a contract is signed by the government, a capped renewal contract, there's a dollar amount that's prescribed; is that correct?
A. A contract and budget authority.
Q. So, in this instance based on the papers that we've seen, it was going to be about two and a half million dollars, correct?
MR. WELLONS: Objection. Assumes facts not in evidence.
Go ahead and answer.
BY THE WITNESS:
A. I don't know what that is.
BY MR. BAUGHER:
Q. Did you not know how much money was approved for South Pointe?
A. I don't see the contract finance until it comes back.
MR. BAUGHER: Will you please mark this as Thomas Deposition Exhibit 11?
(Thomas Deposition Exhibit Number 11 was marked for identification.)
(Document tendered to the witness.)
BY MR. BAUGHER:
Q. Ms. Thomas, I'm going to show you what has

Page 224

been marked as Deposition Exhibit 11. Can you tell us what that document is, please?
A. Yes. It's the first contract that went out in error with the corrected letter and the corrected contract sent to the owner.
Q. Now look at the first page of Thomas Deposition Exhibit 11, please. You got that?
A. Mm-hmm, yes.
Q. Do you see in the middle of the page where it says, "The contract shall run for an initial one-year period beginning on the date on Exhibit A, Item 3"?
A. Yes.
Q. And then do you see in the next paragraph, "After expiration of the initial term, this contract shall renew automatically for three additional one-year terms"?
A. Yes.
Q. And then on the second page there are signatures of both the HUD representative and the owner's representative, correct?
A. Yes.
Q. As far as you know, are those signatures valid signatures?

Page 225

A. Yes.
Q. And they're dated respectively October 18th for Mr. Tessler and October 16th for Mr. Hayes, correct?
A. Yes.
Q. And those dates are correct as far as you're aware?
A. Yes.
Q. Then several pages back the owner has signed an addendum to Section 8, HAP contract renewal. Is that the owner's signature, Mr. Hayes, as far as you know?
A. Yes.
Q. Exhibit A, continuing through the document, says that the renewal effective date is October 1, 2000, and the renewal expiration date is September 30, 2001, right?
A. Yes.
Q. And then on Exhibit B for funding, the contract and budget authority is $2,513,000, correct?
A. Yes.
Q. And that's for a year, right?
A. I don't know how long it's for.

Q. Well, I guess there's a clue because it says "Annual contract authority."
MR. WELLONS: Objection. Argumentative.
BY MR. BAUGHER:
Q. So, that's for the year October 1st, 2000 to September 30th, 2001, right?
A. Yes.
Q. And then there's a notification of funds available signed by Mary Anderson, right?
A. Yes.
Q. With annual contract authority and budget authority of $2,513,000; is that right?
A. Yes.
Q. And the reason she has to sign this at that point is because -- is because there has to be budgetary authority before this contract can be effective, right?
A. Yes.
Q. And there was for South Pointe project in 2000, correct?
A. Yes.
Q. Now, what follows in this exhibit are -- is correspondence and several other copies of contracts. Have you read this letter, B3941, dated



December 6th, 2000 from Veronica Coleman?
A. Yes.
Q. Excuse me. Before I get into that, just with respect to the pages that you've already been to, this contract that we've just discussed was sent out by HUD to the owner, correct?
A. No, it was given to Carl Sanders the day it was signed, the day of the meeting on October the 18th when we discovered it was in error.
Q. Well, it was sent out by HUD to the owner before the October 18th meeting because Mr. Hayes signed it on October 16th, correct?
A. Yes, yes. The blank copy, yes. Not an executed copy.
Q. All right. And the copy that was sent to the owner sometime presumably in October of 2000 had all the provisions that we've just gone through about a one-year period with three additional one-year terms, correct?
A. Yes.
Q. And then Mr. Hayes signed that contract, correct?
A. Yes.
Q. And that contract was returned to HUD,



right?
A. Yes.
Q. And then the contract was signed for HUD on October 18th by Mr. Tessler?
A. Yes. He was acting for Mary Anderson.
Q. All right. And who is Mr. Tessler?
A. He works in mortgage credit.
Q. What's his title?
A. I don't know.
Q. Have you had any dealings with him over the years, or do you know him?
A. Yes.
Q. All right. So, he signed this agreement for HUD, and then the -- a copy of the signed contract was given to Mr. Sanders, correct?
A. Yes.
Q. Now, Ms. Coleman writes to John Hayes in December 2000 with respect to this contract, correct?
A. Yes.
Q. And she writes that "We," that is, HUD, "have amended your Section 8 contract," right? Do you see that? Do you see what I'm referring to? Talks about an amendment to the contract.



A. "Encloses your copy of amended Section 8 contract," is that what you're referring to?
Q. Are we looking at the same December 6th letter, B3941?
A. This says, "In the event we have amended your Section 8 contract," yes.
Q. All right. Did you write this letter?
A. Yes.
Q. Were there any changes in your draft?
A. I don't recall. I don't know.
Q. Who else looked at this letter than you?
A. Those two, my supervisor and then Ms. Coleman.
Q. Debbie Gray and Veronica Coleman?
A. Yes.
Q. Did either of them make any changes in your draft?
A. I don't remember.
Q. Well, the letter says, "This is to inform you that we have amended your Section 8 HAP contract."
Now, what authority did you or Veronica Coleman have to amend a Section 8 HAP contract?
A. I didn't amend it. I wrote the letter.





00000000-0000-0000-0000-000000000000

Page 230

The authority came from the Director.
Q. Well, what authority did Ms. Coleman have to amend a Section 8 contract?
MR. WELLONS: Objection. Assumes facts not in evidence.
Go ahead and answer.
BY THE WITNESS:
A. Authority comes from the Director. So, she had authority to sign it, amend it.
BY MR. BAUGHER:
Q. I'm not talking about -- I'm sorry. Go ahead.
What is it that, or what is the source of Ms. Coleman's authority to amend a Section 8 HAP contract?
A. I don't know what her authority is.
Q. And what was the manner in which Ms. Coleman purported to amend the South Pointe 2000 Section 8 HAP contract?
MR. WELLONS: Objection. Assumes facts not in evidence.
Go ahead and answer.
BY THE WITNESS:
A. We prepared the letter. We did not amend

Page 231

the contract. The contract is amended by authorized persons, which is the Funding Department. We write the letters. Doesn't necessarily mean we did the action. We make the corrections, but doesn't mean that we, you know, amended the document.
BY MR. BAUGHER:
Q. Did you make any changes in the document?
A. Yeah. We get authority -- I got authority -- I got that one particular time, got authority to initial and change the contract. The reason we did that is so it will not be a problem with the funds. If we go back and redo all of this, it will start a whole process, and the money would have probably stopped. So, to insure that the money would continue to flow, we amended that particular contract that was executed, and the owners were aware of that.
Q. How did you amend it?
MR. WELLONS: Objection. Assumes facts not in evidence.
Go ahead and answer.
BY THE WITNESS:
A. Just initialed it and changed the date. We provided only with a copy which they were aware of.

Page 232

BY MR. BAUGHER:
Q. Well, look at page B3944. Do you see that?
A. Yes.
Q. Where one-year is crossed out and three additional one-year terms is crossed out; do you see that?
A. Yes.
Q. Whose handwriting is that?
A. I don't know. Looks like mine.
Q. So, who told you to cross out one-year and put three months?
A. I can't recall. I was just following directions.
Q. Well, who was the direction from?
A. I can't recall. I was just following directions. It came from upper management.
Q. "Upper management" meaning Miss Gray or Miss Coleman?
A. It could have been up higher. I don't recall.
Q. Was it Mr. Hinsberger who told you to do that?
A. I don't recall. I don't remember.
Q. When did you make this change in a HAP

Page 233

contract?
MR. WELLONS: Objection. Misstates prior testimony. Assumes facts not in evidence.
Go ahead and answer.
BY THE WITNESS:
A. During the time there was a letter being prepared.
BY MR. BAUGHER:
Q. So, in December of 2000?
A. That's when the letter went out.
Q. You didn't make this change in October; you made it in December; is that right?
A. I don't recall exactly the date, but the letter went out in December. So, it could have been around that time.
Q. Okay. And who told you to put in three months?
A. That's when it was agreed upon. That's when it was told to be done.
Q. By whom?
A. It was the Director's decision to renew the contract --
Q. Veronica Coleman's decision, and she told you to put in three months?

Page 234

MR. WELLONS: Objection. Argumentative. Misstates prior testimony.
BY THE WITNESS:
A. You want to talk to Ms. Coleman tomorrow. She'll let you know.
BY MR. BAUGHER:
Q. I'm asking you.
A. I don't know. I did what I was instructed by my Director. It could have -- the directive could have came from Mr. Hinsberger to Ms. Coleman down to Ms. Gray to me. I don't know.
Q. I'm asking you who you got direction from.
A. I get my directives from Debbie Gray and Veronica Coleman and sometimes Mr. Hinsberger. But I don't recall who this one came from directly.
Q. Now, did you go back to Mr. Tessler or Mary Anderson with respect to this amendment of the contract?
A. It goes back to them.
Q. No, did you talk with Mr. Tessler or Mary Anderson about the changes that you and Ms. Coleman were making in the contract?
MR. WELLONS: Objection. Misstates prior testimony. Assumes facts not in evidence.

Page 235

Go ahead and answer.
BY THE WITNESS:
A. Yes, it had to be discussed with them because they're the ones who process the contracts.
BY MR. BAUGHER:
Q. Did you have any conversation with either Mr. Tessler or Miss Anderson about this contract?
A. The conversation I recall with Mr. Tessler was to let him know that he signed the wrong contract. The wrong contract was mailed out. Miss Anderson was not in the office that day.
Q. Was there another contract that was available for him to sign?
A. Yes. It was a different of contract. These contracts were not being offered more than one year.
Q. Well, this one is one year and then it's got automatic renewals.
A. There was no automatic renewals. The field office did not have the authority to renew a contract more than one year.
Q. Now, look at page B3948. Is that your handwriting, crossing out 9/30/2001?
A. Yes.

Page 236

Q. And this is your amendment to the 2000 South Pointe HAP contract?
A. This is HUD's amendment, yes.
Q. Which you wrote?
A. Yes.
Q. HUD had you do this; you're the one who actually made the marks on the signed contract?
A. Yes.
MR. WELLONS: I need a break. We're going to go off the record now.
(Recess.)
MR. BAUGHER: Will you please mark this collection of documents as Thomas Deposition Exhibit 12?
(Thomas Deposition Exhibit Number 12 was marked for identification.)
(Document tendered to the witness.)
BY MR. BAUGHER:
Q. Miss Thomas, let me give you another copy of Miss Coleman's December 6th letter with a -- another copy of this purportedly amended South Pointe HAP contract attached to it, and ask you if you can tell us what this document is?
MR. WELLONS: Objection to counsel's

Page 237

characterization of the document.
BY MR. BAUGHER:
Q. Have you seen Deposition Exhibit 12 before?
A. Yes.
Q. When did you see it?
A. I reviewed it looking at documents.
Q. Had you seen it in December 2000 or early 2001?
A. Yes.
Q. How do you know that?
A. Because I made an amendment in 2001.
Q. All right. What's the amendment that you're referring to?
A. On, I guess, Exhibit A1020 page, paragraph 1, "Contract shall run for initial term," where I crossed out the three years -- I mean the three months to extend it for an entire year to the 9/30 expiration date per instructions from Mr. Hinsberger. That directive came directly from Mr. Hinsberger.
Q. So, you and Miss Coleman on December 6th, 2000 amended the Section 8 HAP contract for South Pointe first to make the contract run for an additional three-month period, correct?





00000000-0000-0000-0000-000000000000

Page 238

MR. WELLONS: Objection. Misstates prior testimony. Assumes facts not in evidence.
Go ahead and answer.
BY MR. BAUGHER:
Q. Well, if it helps, please look back to the immediately previous exhibit, which is Deposition Exhibit 11. Do you have that in front of you?
A. Mm-hmm, yes.
Q. Now, the amendment that you and Miss Coleman made to the South Pointe HAP contract was first to shorten the renewal term to three months, correct?
MR. WELLONS: Objection. Misstates prior testimony. Assumes facts not in evidence.
Go ahead and answer.
BY THE WITNESS:
A. It was renewed for three months, short-term, due to the current physical conditions of the subject property. "Provide our office with an acceptable plan to cure it, and we will renew the contract as needed."
BY MR. BAUGHER:
Q. I thought that's what I just said. Your first amendment to the 2000 HAP contract was to

Page 239

shorten the renewal period to just three months, correct?
A. Yes.
Q. And that's why in Deposition Exhibit 11 you crossed out one-year and you wrote in three months, correct?
A. Yes.
Q. And was that document with your cross-out from one-year to three months sent to the owner, to Mr. Hayes?
A. Yes.
Q. All right. And that was in December of 2000, correct?
A. Yes.
Q. And you had authority; in fact, you were instructed to cross out the one-year and put in three months, right?
MR. WELLONS: Objection. Assumes facts not in evidence. Misstates prior testimony.
Go ahead and answer.
BY THE WITNESS:
A. The directive came from upper management.
BY MR. BAUGHER:
Q. That's not contrary to what I just said to

Page 240

you, is it?
A. I know. I'm saying it the way I want to say it.
Q. Well, when you say, "the directive," somebody told you --
A. With authority.
Q. -- to cross out one -- someone with authority told you to cross out one-year and write in three months, right?
A. Yes.
Q. Okay. And that was the first amendment that you and Miss Coleman made to the Section 8 housing assistance contract for South Pointe, right?
A. Yes.
Q. All right. And then there was a second amendment to the contract, right?
A. Yes.
Q. And that second amendment is shown in Deposition Exhibit 12, right?
A. Yes.
Q. And in Deposition Exhibit 12, apparently in January of 2001 you amended the contract again, right?
A. Yes.

Page 241

Q. And tell us how you amended the contract in January of 2001?
A. To keep the monies flowing and not have to do a new contract, we just crossed out the three months and put the one year. And that way we were able to amend this contract without holding up the funds for the property.
Q. Well, when you say, "We crossed out the three months and put in one year," who is the "we" that actually did the crossing out?
A. When I say "we," I'm just referring to HUD.
Q. But who -- whose handwriting is that?
A. That's my handwriting.
Q. In Deposition Exhibit 12 that's your handwriting?
A. Yes.
Q. And you crossed out the three months, wrote in one year, and then put your initials and a date, correct?
A. Yes.
Q. So, that's your initials GT, and the date is January 10, '01?
A. Yes.
Q. And then look further in Deposition





00000000-0000-0000-0000-000000000000

Exhibit 12 to page A1024. Do you see that?
A. Yes.
Q. Now, originally your First Amendment, the amendment that you and Ms. Coleman made to the agreement, to the contract in December 2000 was to limit the term just to December 31st, 2000, right?
MR. WELLONS: Objection. Misstates prior testimony. Assumes facts not in evidence.
Go ahead and answer.
BY THE WITNESS:
A. I just want to say this amendment was made by the Department of HUD. You keep referring to me and Ms. Coleman.
BY MR. BAUGHER:
Q. Well, Ms. Coleman sent the letter.
A. Yes.
Q. And you say she had authority to amend HUD contracts?
A. Yes, whatever her Director gives her authority to do. I don't know what those duties are.
Q. And you drafted the letter for her?
A. Yes.
Q. And -- yes?



A. Yes.
Q. And you're the one who actually crossed out what was written in the contract, the signed contract?
A. Yes.
Q.. And you were directed to do that by your superiors?
A. Yes.
Q. All right. So, originally you and Miss Coleman amended this 2000 contract to say that it would end on December 31st, 2000, correct?
A. Yes.
Q. And then, the next month, in January 2001 you were told to amend the contract again to extend the date of the renewal to September 30th, 2001, right?
A. Yes.
Q. And looking at page 1024, we see "Extend 9/30/2001," and then your initials and the date January 10, '01, correct?
A. Yes.
Q. And it was Mr. Hinsberger who told you to make that second amendment to the 2000 HAP contract with South Pointe, right?



A. Directly, yes, 'cuz I asked him about what did he want me to do.
Q. Now, was there a memorandum that you received from Mr. Hinsberger with his directions?
A. No.
Q. This was a direct, face-to-face conversation you had with him?
A. Yes.
Q. How did that conversation come about?
A. The contract was coming due to expire. The property needed money, and they hadn't submitted their plan yet. So, to protect the residents, Mr. Hinsberger decided to just renew till the end -- give the owners time to get their plan in and to renew it to September 30th, 2001.
Q. Did you confirm that instruction from Mr. Hinsberger with Miss Coleman?
A. Yes.
Q. Did you send a copy of the second amendment, the January 2001 amendment to the 2000 contract to Mr. Hayes or anyone at the owner of the property?
A. I don't remember. I don't know.
Q. You don't recall sending that to him?



A. No, I don't recall. I don't know. I don't know.
Q. There's no cover letter that I've seen for that.
A. I haven't seen one, either. I don't need to send that to him because it's just amending this contract.
Q. You don't need to send that to him because it's just an amendment to the contract? Is that what you said?
MR. WELLONS: Objection. Misstates prior testimony.
BY THE WITNESS:
A. No, I'm saying we were amending the same contract. Just the terms -- it was probably conversation because they probably --
BY MR. BAUGHER:
Q. Did you have any conversation with the owner about your second amendment to the contract?
A. To the -- the site, not the owner, owner's representative.
Q. The contract is with the owner, correct?
A. Yes.
Q. Do you know of any conversation that you

had with the owner about this contract?
A. No.
MR. BAUGHER: Will you mark this, please, as Thomas Deposition Exhibit 13?
(Thomas Deposition Exhibit Number 13 was marked for identification.)
(Document tendered to the witness.)
BY MR. BAUGHER:
Q. Miss Thomas, I'm handing you another copy, or another edition of the 2000 South Pointe contract that's marked as Thomas Deposition Exhibit 13. And in particular look at the first page, B3951, and then the -- well, strike that.
Well, go ahead. Look first at the first page. Do you see the cross out of the one-year date?
MR. WELLONS: I'm sorry. Does counsel have a copy --
MR. BAUGHER: Actually, I have three copies, perhaps more, none of which I can find at this moment, which is why I'm giving you the original.
MR. WELLONS: All right. Can we have a moment to review the document?



BY MR. BAUGHER:
Q. Just look particularly at the first page.
MR. WELLONS: Miss Thomas, will you also review this document with me?
THE WITNESS: Yes.
MR. WELLONS: Thank you.
(Short interruption.)
BY MR. BAUGHER:
Q. Do you have that in front of you now, the first page?
A. Mm-hmm.
Q. Whose handwriting is the cross out of the one-year period? Is that your handwriting again?
A. Yes.
Q. And you write "three months"?
A. Mm-hmm.
Q. Now, this must be another edition of the cross out because this three months is under the line. Do you see that?
A. Mm-hmm.
Q. You mean yes?
A. I'm sorry. Yes.
Q. So, there were a number of copies of this contract that you marked up or amended; is that



correct?
MR. WELLONS: Objection. Vague.
Go ahead and answer.
BY THE WITNESS:
A. It appears, but this one --
BY MR. BAUGHER:
Q. Well, it appears that way because --
A. This one doesn't have a signature.
Q. So, you marked up another copy of it?
A. This is a blank copy.
Q. All right. Whose handwriting is the handwriting in the upper right-hand corner?
A. I don't know.
Q. Do you recognize it?
A. No, I don't.
Q. May I have it back, please?
Off the record.
(Discussion off the record.)
BY MR. BAUGHER:
Q. I think I asked you this question a few minutes ago. And if I did, I apologize for asking again. Do you remember having any conversations with anyone at South Pointe concerning -- concerning amendments to the 2000 South Pointe contract?



A. In the meeting they were aware that we were amending the contract. Yes, the conversation was --
Q. You know what -- go ahead.
But after that meeting, did you have any further conversations when you actually started making amendments to the contract?
MR. WELLONS: Miss Thomas, if you need to, finish your prior answer.
BY THE WITNESS:
A. They were aware that the contract would be amended in the meeting, and they knew that the letter and the amendment to the contract was coming. The owner's representative. So, they -- the contract was amended and the letter, and the contract was mailed to the owner after the meeting.
BY MR. BAUGHER:
Q. I don't think you heard my question, which was did you have any communications with anyone at South Pointe concerning your first or your second amendments to the HAP contract after your meeting on October 18th, 2001?
A. I don't recall.
Q. Do you recall hearing from anyone else whether anyone at HUD had any communications with





00000000-0000-0000-0000-000000000000

Page 250

anyone at South Pointe concerning either the first or the second amendment to the HAP contract?
A. Yes, the e-mail to Ken Horton.
Q. There was an e-mail?
A. Yes, John Hayes --
Q. It was an e-mail from whom to whom?
A. Veronica Coleman to Ken Horton.
Q. Okay. Any other communications that you're aware of on either the first or the second HUD amendment to the HAP contract?
A. Don't remember. Don't mean it didn't happen. Just don't remember.
Q. Other than the conversations that you've described with Mr. Hinsberger and then the drafting of the December 6th letter for Miss Coleman, did you have any conversations with anyone at HUD about the first or the second HUD amendment to the HAP contract?
A. As I told you before, the records came from the Director. So, the conversation exists.
Q. Well, I'm not saying it didn't exist. I'm saying other than the conversations that you describe with Mr. Hinsberger and with Miss Coleman about the December 6th letter, did you have any

Page 251

other conversations with anyone at HUD about the first or the second HUD amendments to the HAP contract?
A. There may be some. I don't remember.
Q. None that you recall?
A. Yes.
Q. Is there anyone else that you've discussed your amendments to the HAP contract with other than you've already described?
A. No. There wouldn't be a reason other than what we described.
Q. Now, early in 2001 did you order a REAC inspection on South Pointe?
A. I don't order REAC inspections.
Q. How do REAC inspections come about?
A. I don't know. It comes from headquarters. It just --
Q. Headquarters in Washington, D.C.?
A. Yes.
Q. Do you have any input as to whether there is going to be a REAC inspection or not?
A. No.
Q. Do you have any advance notice that there's going to be a REAC inspection?

Page 252

A. Unh-uh, not until recently when they started putting them on computers when they line them up, you know, pick out the ones that are gonna have inspections. But no.
Q. So, was it a surprise to you that there was a REAC inspection of South Pointe in March of 2001?
A. No. Sometimes the owners call us and tell us when they're having an inspection. The owners actually have access to see who's scheduled to have an inspection.
Q. So, you didn't have any notice that there was going to be a REAC inspection of South Pointe until the inspection actually took place in March of 2001; is that right?
A. No, because our Enforcement Center also is one sometimes would know in advance. And this property being in Enforcement, Enforcement would have known when the inspection was going to take place.
Q. It was in Enforcement in 2001?
A. As I recall, yes.
Q. Not in April -- not in March of 2001, was it?
A. Maybe. I don't know.

Page 253

Q. But I'm talking about what you knew. You didn't know about any REAC inspection in March of 2001 until it actually took place, right?
A. Not till it actually took place. I probably would have known because it was probably on the scheduler. They may have used to send Miss Coleman when the schools was inspected. I don't recall how it was then. Now the system --
Q. I don't care about the system now. I'm asking you about South Pointe in March of 2001.
A. No. My answer's no. It was not a surprise, no.
Q. It was not a surprise?
A. No.
Q. How did you learn of it?
A. I don't recall how, but I knew of it. I don't know how, but it was brought down how we found out about our inspections, but we knew. None of our REAC inspections are a surprise.
Q. Did you know about the REAC inspection in January 2001? Did you know that one was scheduled?
A. No.
Q. You learned about it on or about the time it took place, right?



KRUSE & ASSOCIATES, LTD.
312-345-1500

00000000-0000-0000-0000-000000000000