A. I don't know when I learned about it.
Q. Did you make any note about the fact that there was going to be a REAC inspection?
A. No.
Q. Did you make any note in your Project History or Problem Statement about a REAC inspection in 2001?
A. I might have. I'm not sure. I don't know.
Q. Only if it was important to you would you make a note of it; is that right?
MR. WELLONS: Objection. Assumes facts not in evidence. Misstates prior testimony.
Go ahead and answer.
BY THE WITNESS:
A. I just don't remember if I did or didn't.
MR. BAUGHER: All right. Will you please mark this document as Thomas Exhibit 14?
(Thomas Deposition Exhibit Number 14 was marked for identification.)
(Document tendered to the witness.)
BY MR. BAUGHER:
Q. Miss Thomas, let me show you Thomas Deposition Exhibit 14. Tell us what that is, please.



(Short interruption.)
BY THE WITNESS:
A. It's a REAC Inspection Report.
BY MR. BAUGHER:
Q. Have you seen this before?
A. Yes.
Q. When did you first see it?
A. When I first saw it was when it came up on our system when the report was released. I don't recall when.
Q. Well, the letter is dated March 7th, 2001. Is that about when you saw it?
A. Possibly.
Q. Did you see it before that?
A. No.
Q. Or do you think it was sometime in April you saw it for the first time?
A. It's around this time when they released it. Sometimes the systems don't download at the same time they mail out.
Q. So, you think you saw it sometime in March?
A. 2001.
Q. Of 2001?
A. Yes.



Q. And what did you do when you got this Inspection Report?
A. What did I do when I got this Inspection Report?
Q. Yes.
A. We contact the owner in regards to the health and safety items.
Q. Did you do that?
A. Yes.
Q. Who did you call or how did you contact somebody?
A. Sometimes there's a phone call; sometimes there's a fax; sometimes owners submit them before we even get the reports.
Q. What were the health and safety items at issue in this Inspection Report?
A. I need to see the exigent items screen to determine that.
Q. And that's not attached to this particular exhibit.
A. Let me check and see.
MR. BAUGHER: Would you mark this as 15, please?



(Thomas Deposition Exhibit Number 15 was marked for identification.)
(Document tendered to the witness.)
BY THE WITNESS:
A. No.
BY MR. BAUGHER:
Q. Miss Thomas, look at what I've marked, please, as Thomas Deposition Exhibit 15, a letter to you from John Hayes dated March 6th of 2001, and I think you'll find the health and safety item checklist attached to that letter.
(Short interruption.)
THE WITNESS: Okay.
BY MR. BAUGHER:
Q. And am I correct that the health and safety issue checklist is attached?
A. Yes.
Q. To Deposition Exhibit 15?
A. Yes.
Q. And that's --
MR. WELLONS: I'm sorry, counsel. Just one moment.
(Short interruption.)
BY MR. BAUGHER:





00000000-0000-0000-0000-000000000000

Page 258

Q. Miss Thomas, there are --
A. These are two different things. That's the same thing. One is exigent and one is health and safety. It's part 1 and part 2. So, there are health and fire and safety hazards and exigent health.
Q. These two pages that immediately follow the cover letter are the pages that list items that in the view of REAC constituted health and safety hazards that needed to be taken care of right away; is that correct?
A. And exigent items, yes.
Q. What is an exigent item?
A. An item that needs to be taken care of immediately. It's a safety hazard.
Q. That's sort of like saying it has to be taken care of right away, isn't it?
A. Yes.
Q. So, the -- those items are all listed on -- as a part of this Deposition Exhibit 15, correct?
A. Yes.
Q. And the -- just looking at the -- the page under Exigent Health and Safety Hazards Part 1, let's go down that list. The first item has to do

Page 259

with the custodian's rooms, and some outlet covers were missing. Is that what this says?
A. I don't know what it says.
Q. Well, you can read it, can't you?
A. Yeah, it just says, "Custodian room outlet covers." I don't know if it was missing or not because it doesn't say, "missing."
Q. All right. It's not too difficult to replace an outlet cover, is it?
A. I don't know if that's what is needed. It just says, "Custodian room outlet covers." I don't know what they mean by it.
Q. And in the next item, there are some light fixtures that are missing; is that right?
A. That's what it looks like, yes.
Q. And then the third item -- it's difficult to read item 3. I don't know if you can make it out. I can't. Something about the trash room.
A. I'm sorry. Can you repeat the question?
Q. Let's look at item 4. Item 4 has to do with a missing breaker. Do you see that?
A. Yes, I see it.
Q. And item 5, outlet cover missing?
A. Yes.

Page 260

Q. And again, an outlet cover missing may be something that needs to be taken care of promptly, but it's not difficult to take care of, is it?
A. No.
MR. WELLONS: Objection. Vague. Go ahead and answer.
BY THE WITNESS:
A. No, it isn't.
BY MR. BAUGHER:
Q. And apparently, looking at the next section, Part 2, Fire Safety Hazard, do you see that?
A. Yes.
Q. And apparently there were some fire extinguisher tags that were missing. Do you see that?
A. Yes, I see that.
Q. All right. Let's look at the next page, "Notification of exigent and fire safety hazards observed." This appears to me to be a repeat in a little bit different format of the same information on the preceding page. Am I right about that?
A. No. This is additional.
Q. All right. And looking down the list of

Page 261

comments for a particular -- when it says Unit 1201, presumably that's apartment 1201?
A. Yes.
Q. And that's an outlet cover missing, correct?
A. Yes.
Q. And in 1305 a breaker is missing, according to this report, right?
A. Yes.
Q. And in Unit 2208 an outlet cover is missing?
A. Yes.
Q. And in Unit 405 an outlet cover is missing?
A. Yes.
Q. And in Unit 910, it's missing breakers. Do you know what it means by "missing breakers"?
A. Yes.
Q. What does it mean?
A. It means there's a breaker missing in the circuit breaker.
Q. You've got to install -- or reinstall a breaker in that?
A. Or a dummy.
Q. Okay. That's not a hard thing to do, is





00000000-0000-0000-0000-000000000000

Page 262

it?
A. No.
MR. WELLONS: Objection. Vague.
Go ahead and answer.
BY MR. BAUGHER:
Q. And then the last item, "Exhaust fan room missing covers on electrical panel," it looks like to me. Do you see that?
A. Yes.
Q. So, according to that last item, a cover needed to be put on an electrical panel?
A. I don't know exactly what was needed.
Q. Well, I'm just going from the description on this page.
A. I don't know what needed to be done.
Q. Well, it says there was a missing cover.
A. I can't read that word, so I'm not sure.
Q. You can't read, "Missing cover"?
A. I could see "missing," but I don't know what that other word is.
Q. All right. Now, the -- these that we've just been talking about in Deposition Exhibit 15 are all of the exigent health and safety and fire hazards observed by the REAC inspectors in March of

Page 263

2001, correct?
MR. WELLONS: Objection. Assumes facts not in evidence.
Go ahead and answer.
BY THE WITNESS:
A. These are the exigent items cited in the REAC inspection, yes.
BY MR. BAUGHER:
Q. All right. And the point penalty that was assessed for these particular problems was what?
A. It appeared to be 38.5 points.
Q. And you're taking that from the upper left-hand portion of page 1 of Deposition Exhibit 14, the REAC Report, correct?
A. Yes.
Q. Showing in that column a total deduction of 38 and a half points from the possible hundred points, right?
A. Yes.
Q. So, to the extent that those deductions had not been made, or if they had not been made, then instead of the final score being 31, the final score would have been 69 and a half; is that correct?
A. Well, that's what it looks like, yes.

Page 264

Q. All right. Then the report -- in order for a deficiency to be considered systemic, it has to be present in more than half the units; isn't that right?
A. I don't know how REAC conducts their inspection. I know that on this report, you're referring to the 38 points, the 38 points does not just reflect to the health and safety items and exigent items that was on the report. It also has something to do with building systems. So, --
Q. Okay. Look a little bit further, please, in this document to Physical Inspection Summary Reports.
Excuse me. Could you look, please, to the instructions, or the information at the back of the document, Physical Inspection Summary Report, do you see that?
A. Yes.
Q. And if you go to the second page of that, about a third of the way down the page, do you see where it says, "Systemic deficiencies"?
A. Yes.
Q. And then what does it say about what systemic deficiencies are?

Page 265

A. "Defective observed in at least half of the inspected units for the building are listed by whether or not they are repaired. Generally require large cash outlays."
Q. Or smaller cash outlays, which are ordinary items, right?
A. Yes.
Q. Okay. And then will you look on page 1 of Deposition Exhibit 14, please, where there is a listing of supposed systemic deficiencies? Do you see that?
A. You said page 1.
Q. Well, all right. Page 1 of the report.
A. All right. Now where do you want me to look?
Q. Systemic deficiencies.
A. Yes.
Q. And look at the percentage of units with the defect that's identified. Are there any of those percentages that are 50 percent or more?
A. I don't know how REAC calculates this, so I can't -- I don't -- I can't testify to this.
Q. Well, there are percentages there.
A. I don't know how they do this. So, I see

Page 266

what it says --
Q. Can you read the title?
A. No, none of them says 50 percent.
Q. They're all under 50 percent, right?
A. But their total is more than 50 percent.
Q. Yes, if you add 36 and 44 and 40 and 36, you will get considerably more than 50 percent, right?
A. I assume so.
Q. But that would make no sense?
A. I don't know how REAC calculates this, so I have no comment on this.
Q. And of the items that are listed as systemic deficiencies, three of the different items, plumbing, damaged hardware locks and missing doors are listed as ordinary items. Do you see that?
A. Yes.
Q. And ordinary items, according to this report, are repairs that require smaller cash outlays such as light fixtures, fire extinguishers and smoke detectors, right?
A. I don't know.
Q. Well, can you read that?
A. Where? Read it where? Oh, here?

Page 267

Q. The double asterisk for ordinary items.
A. Okay. Yes.
Q. So, the only item identified by REAC as being anything that might involve a larger cash outlay are for some -- some of the stoves, correct?
A. It looks like that was one of the capital repair items.
Q. Now, in looking at these different items that are listed in the report, there is a severity gauge that is -- that is used, level 1, level 2, level 3. Are you familiar with that?
A. Yes.
Q. And only the level 3 items are considered important enough to require a description of a location or any comments; is that right?
A. I don't know why that's there.
Q. Well, you'll look through the document, and there are no location or comments on any of the items that are labeled as level 1 or 2. Do you see that?
A. Yes, I see that.
Q. And that's because they're not considered to be as significant, correct?
MR. WELLONS: Objection. Assumes facts not

Page 268

in evidence.
BY THE WITNESS:
A. Don't know. I don't do the REAC Reports, so I can't tell you what it means.
BY MR. BAUGHER:
Q. Well, do you use the REAC Reports for any purpose?
A. I look at it and see work needs to be done. I don't care whether it's small or large. It needs to be done.
Q. Well, it makes a difference whether it's small or large, doesn't it?
MR. WELLONS: Objection. Argumentative.
BY THE WITNESS:
A. No, if it needs to be done, it needs to be done. If it's broke, it needs to be fixed, whether it's large or small.
BY MR. BAUGHER:
Q. What did you do with the REAC Report when you got it other than to take a look at it?
A. I don't recall if it was referred -- we followed whatever the protocol was at that time.
Q. Do you know what the protocol was?
A. I can't remember offhand.

Page 269

Q. Well, does it include sending a copy to the owner?
A. At this time apparently the reports were mailed out to the owners automatic from REAC, not through our office. Never was.
Q. And then the owner is supposed to review the Inspection Report and respond back to HUD with what the owner plans to do with respect to repairs, correct?
A. They're supposed to reply in accordance with the letter attached to the REAC inspection.
Q. And the letter, which is the first page of Deposition Exhibit 14, says that the owner is supposed to complete the survey and forward a proposed plan and management improvement and operating plan format within 30 days of the letter, correct?
A. Yes.
Q. So, the owner is supposed to put together a MIO plan in response to the REAC Report in a month, right?
A. Yes.
Q. Now, in fact you heard first back from the owner, John Hayes, about this REAC Inspection Report

Page 270

on March 6th, 2001, right? Look at Deposition Exhibit 15.
A. Yeah. That's the date of his letter, yes.
Q. All right. And you received it around that date?
A. Yes.
Q. Whose handwriting is it in the upper right-hand corner? "3/7/01, Mike Marlene" it looks like. Is that your notation?
A. No, that is not my handwriting.
Q. Do you know whose it is?
A. No, I don't.
Q. Okay. And the letter's addressed to you. Did you actually receive it?
A. Yes, I did.
Q. Do you recall reading it?
A. Yes, I did.
Q. And what was your -- I know you read mail when it comes in, but what was your function in reading this letter as it came in?
MR. WELLONS: Objection. Vague. Go ahead and answer.
BY THE WITNESS:
A. My function was to review the letter,

Page 271

review what they replied and put it in the system whether or not the owners certified that the exigent items had been repaired, that the owners certified that they had been repaired.
BY MR. BAUGHER:
Q. All right. And with respect to the exigent health and safety items that were identified in the March -- well, I was about to say the March 7th REAC Report, you got a response on it from the owner on March 6th?
A. Yeah. That's because exigent items are given to them on site.
Q. All right. So, you got an immediate response from the owners on site. And what was reported to you by Mr. Hayes on March 6th, 2001?
A. Actually, this response was late. It's supposed to be within 72 hours.
Q. Does it make a difference if the inspection is on a Saturday and there's an intervening Sunday?
A. No, at that time it didn't. They said 72 hours.
Q. Who says 72 hours?
A. That was the protocol.
Q. Where does it say that?

Page 272

A. It's in the REAC protocol book. You can go on-line and see it.
Q. Did you read the letter when it came in?
A. Yes, I read it when I got it.
Q. What did it say with respect to the repair of the items?
A. It says, "This letter and certifications listed in the above-captioned inspection have been corrected. The EH&S Report is attached. These items were corrected the day of the inspection, Friday, March 2nd, and the following day of the inspection, Saturday, March 3rd, 2001.
"Also, we are requesting that you advise us on how to get a hard copy of the report from the internet so that we may expeditiously reply to the rest of the report."
Q. All right. Do you have any information that tells you that this letter, Deposition Exhibit 15, is not correct and that the items listed were not in fact corrected on Friday, March 2nd, 2001 and the day following the inspection, Saturday, March 3rd, 2001?
A. No.

Page 273

MR. WELLONS: Just to clarify the record, the reference to the 72-hour deadline after the date of the inspection appears on page 2 of Exhibit 15.
MR. BAUGHER: Well, actually, Mr. Wellons, that's not what it says.
THE WITNESS: No, he said page 2 of the exigent item report.
BY MR. BAUGHER:
Q. Yes. In Deposition Exhibit 15 on page 2 it says you are required to correct those items, correct the items within 72 hours of receipt of the report. And in fact that's what Mr. Hayes wrote to you that South Pointe had done, correct?
MR. WELLONS: I'm referring to a document that states, and I'll simply read from the document in case our exhibits are actually out of order, "The Office of Housing requires a written report to be filed with the local office within 72 hours of the date of the inspection."
I believe that Ms. Thomas had indicated that that only appeared somewhere on either HUD's website or in a regulation. I just wanted to clarify the record and indicate that it appears in the document.

Page 274

BY MR. BAUGHER:
Q. But to go back to what presumably HUD is concerned with, which is circumstances at a property where there are health and safety hazards, you have no information to suggest to you that the problems identified in the REAC Report concerning health and safety were not corrected within 72 hours of the inspection; is that right?
MR. WELLONS: Object to the question to the extent it states what HUD is concerned with.
Go ahead and answer, please.
BY THE WITNESS:
A. There were no records that show that they -- that show that they would not have done it. I don't -- you know, no, there's nothing here. They certified that they did it.
BY MR. BAUGHER:
Q. And you didn't do any subsequent check to determine whether or not that was correct, right?
A. Yes, I did. We went out to the site to check to see that they were done.
Q. And they were?
A. No, they were not. Some were; all were not.

Page 275

Q. All of the REAC --
A. All the exigent and safety items were not. We took pictures of each and every one.
Q. Where are those pictures?
A. They should be attached.
Q. To what?
A. The pictures were -- pictures were taken.
Q. I'm sure they were.
MR. WELLONS: Objection. Argumentative. Let the record reflect plaintiff and counsel are conferring regarding documents.
MR. BAUGHER: Will you mark this, please, as Thomas Deposition Exhibit 16?
(Thomas Deposition Exhibit Number 16 was marked for identification.)
(Document tendered to the witness.)
BY MR. BAUGHER:
Q. Miss Thomas, let me show you what has been marked as Thomas Deposition Exhibit 16, a letter to Joan Kiening from Shawn Mintz at South Pointe concerning the REAC inspection of March 2001. And if you could share that for a moment, I'll get you a copy.
Have you seen that document before?

Page 276

A. I don't know. I can't remember if I've seen this before. It's addressed to Joan. I don't know.
Q. Well, she told us yesterday in her deposition that after she transitioned from DEC Chicago to DEC headquarters in March of 2000 that any time correspondence came in to her it was forwarded to the appropriate person to handle that because she did continue to get correspondence after she had moved.
Do you have any reason to believe that you did not receive Deposition Exhibit 16?
MR. WELLONS: Objection to the extent it misstates Miss Kiening's testimony.
Go ahead and answer.
BY THE WITNESS:
A. I can't say whether I did or didn't receive this.
BY MR. BAUGHER:
Q. Do you know what it is?
A. It's a letter saying it's a MIO plan. But this is not a MIO plan. A MIO plan has a form, an actual form for a MIO plan.
Q. Do you know what it's about?

Page 277

A. Looking at it now, it's talking about the conditions at South Pointe.
Q. And what information does it purport?
A. Status of abate work in process.
Q. With respect to the status that is shown in the left-hand column -- excuse me. In the right-hand column of Deposition Exhibit 16, in many instances there's a note in solid caps, "Completed." Do you see that?
A. Yes.
Q. Now, as of April 5th, 2001 do you have any reason to believe that those items that are listed as being completed were not in fact completed?
A. Don't know. I continued to get tenant complaints, so I don't know.
Q. Is there any building for which you are the asset manager in which you don't from time to time get tenant complaints?
A. I get complaints from this property every day, not time to time.
Q. There's no building that you manage that you don't get complaints from, correct?
A. I get complaints from all properties, yes.
Q. And as to the items that are listed here --

Page 278

many of these items have a notation, "Completed with tenant's signature." Do you have any reason to believe that the tenants' signatures were not obtained as indicated in Deposition Exhibit 16?
A. I don't see any tenants' signatures.
Q. Well, look at the bottom of page 1. Do you see that item? The last item on page 1 of Deposition Exhibit 16 says, "Completed with tenant's signature." Do you see that?
A. I don't see a tenant's signature.
Q. My question to you was do you have any information that suggests to you that a tenant did not sign off on "electrical missing covers exhaust fan penthouse"?
A. Well, why would a tenant be up in the penthouse? That's the boiler room. Why would a tenant sign off on it? A tenant wouldn't even be up there.
Q. All right. Look at page -- look at the third page where the -- where they're going unit by unit. Unit 1007, a missing door, do you see that top item there? It says, "Completed with tenant's signature."
Do you have any information to dispute that

Page 279

this item was completed and that there's a tenant's signature that substantiates that?
A. They didn't provide us with anything to say that it was done other than this, like work orders that show that they signed off on the work order.
MR. WELLONS: Let the record reflect plaintiff and plaintiff's counsel are conferring regarding documents.
MR. BAUGHER: Is there anything that is improper about me talking with my client?
MR. WELLONS: Of course there's nothing improper about it. I'm simply stating it for the record so it's noted.
MR. BAUGHER: And why do you want to note that for the record?
MR. WELLONS: Well, one possible reason is we started this deposition at 10:00, and it's already past six o'clock. And we're not going to have Miss Thomas here all night. And I'd like it reflected that you've spent substantial amount of time today conferring about documents.
MR. BAUGHER: Well, there are a lot of papers in the case.
MR. WELLONS: There are a lot of papers.

Page 280

MR. BAUGHER: And papers that we got from the government, which is most of these, came in a fashion that I can only describe as unhelpfully disorganized. And it's taken us a lot of time to look through these papers. And it is right now adding to the time of this deposition.
BY MR. BAUGHER:
Q. What did you do with Deposition Exhibit 16 after you read it?
A. I told you I wasn't sure if I received it or not.
Q. Well, if you did receive it, what would you have done with it?
A. I didn't receive it. I'm not sure. So, I can't tell you what I would have done.
Q. What did you do with owner responses to REAC Reports when you got them?
A. We reviewed them.
Q. And then what?
A. And discussed them.
Q. Did you discuss this letter with Veronica Coleman?
A. I don't know if I received this letter or not.

Page 281

Q. Well, I asked you if you discussed it with her?
A. No, you didn't. You asked me if other documents that I had received, did I discuss those.
Q. Did you discuss this, Thomas Deposition Exhibit 16, with Miss Coleman?
A. I told you. I don't recall seeing this. I didn't discuss it with anyone if I haven't seen it.
Q. You don't recall discussing it with Miss Coleman?
A. No, I don't recall receiving this.
MR. BAUGHER: Will you mark this, please, as Thomas Deposition Exhibit 17?
(Thomas Deposition Exhibit Number 17 was marked for identification.)
(Document tendered to the witness.)
BY MR. BAUGHER:
Q. Miss Thomas, let me show you what has been marked as Thomas Deposition Exhibit 17, a letter from Kelly Brown at P.M. One, Ltd. to Veronica Coleman dated April 8th, 2001. Have you seen this before?
A. Yes.
Q. When did you see that?





00000000-0000-0000-0000-000000000000

A. Around that time when it was delivered.
Q. And how did you happen to see it?
A. Because it was submitted to our section.
Q. Did Miss Coleman give you a copy of it?
A. We reviewed this, yes.
Q. Together?
A. Yes.
Q. And did you go through it page by page?
A. I don't recall -- remember, because they were coming in with a preapplication for a total rehab. So, there may have been some communication with Miss Coleman during that time to the ownership via e-mail.
Q. All right. If you'd turn -- the focus of this letter of April 8th is the owner's response to the REAC inspection, correct?
A. It's from the manager. I don't know if it's from the owner or not.
Q. Well, it's South Pointe's response to the March 2001 REAC Report, correct?
A. Findings, yes.
Q. And it's a statement of -- it includes a MIO plan, a scope of work for capital improvements and an owner certified letter for exigent health and



safety items, correct?
A. This is a proposed scope of work. I don't see a MIO plan. A MIO plan is a form that -- it's an actual HUD form that is supposed to be submitted on. I don't see that here. I see a letter saying something about a MIO plan. I see a proposed scope of work. I don't see a MIO plan.
Q. Well, in fact, beginning at page 4256 and following is the text that in fact we just were looking at in the Mintz letter to Kiening of April 6th, 2001, right?
A. What page?
Q. Well, look at B4256, about midway back in the document.
A. I don't know what it belongs to, but it appears to look like what I just looked at.
MR. WELLONS: I'll just state for the record that the copy Ms. Thomas is reviewing has a page 2 in the top left-hand corner, and it appears to be a handwritten notation that says no first page.
MR. BAUGHER: Yeah, it does seem to be missing the first page.
BY MR. BAUGHER:



Q. Well, let's do this: Will you compare, starting at B4256, just look at the previous Deposition Exhibit, please, 16, and start with the second page, please, of Deposition Exhibit 16, and it appears that the balance of Deposition Exhibit 16 is the pages that follow here, right, this letter from Shawn Mintz?
MR. WELLONS: It does appear to be the balance. Again, appears to be some information that's covered on page 4256, but it appears to be copies of the same original document.
BY MR. BAUGHER:
Q. Okay. So, having gone through this response, did you have any reason to believe that the repairs that had already been undertaken or in which the owner asserted that the repairs had already been undertaken had not in fact already been undertaken?
A. They didn't provide any documentation other than this that it was done, such as work orders. Also, they were in our office for refinancing to do work, some of it where they were unable to fund may not have been completed, so --
Q. Well, I'm not saying that every item on the



REAC Report was addressed. That isn't what that document says. But as to those that supposedly were completed, you don't have any contrary information to that, correct?
A. I don't have any documentation that says there was.
Q. I'm asking if you have contrary information, Ms. Thomas?
A. No, I don't have any contrary information.
Q. All right. And as to the work that was proposed, do you have any reason to believe that the owner didn't in fact intend to make the improvements that you suggested?
MR. WELLONS: Objection. Calls for speculation.
Go ahead and answer.
BY THE WITNESS:
A. I don't have any comment in regards to that.
BY MR. BAUGHER:
Q. In fact, you knew that the owner was seeking funding to make not only repairs suggested by the REAC Report, but many other improvements beyond that, right?





00000000-0000-0000-0000-000000000000

Page 286

MR. WELLONS: Objection. Assumes facts not in evidence.
Go ahead and answer.
BY THE WITNESS:
A. It appears.
BY MR. BAUGHER:
Q. Now, what happened to the attempt by South Pointe to get additional financing or to get HUD's support for additional financing for this project in April of 2001?
A. I don't know. That information doesn't come to me. I don't review that.
Q. You weren't involved in that at all?
A. I don't do the production work.
Q. Well, were you involved in the consideration of whether additional -- whether a rehab plan should be approved for South Pointe?
A. They -- you read my information prior to my e-mail in regards to my recommendation to Development when they initially started.
Q. Yeah, but that was back in November of 1999.
A. It continued on the same time frame.
Q. Did you participate in those discussions in

Page 287

the spring of 2001?
A. I don't recall any additional ones.
Q. You were not part -- there were discussions going on, but you were not part of them?
MR. WELLONS: Objection. Assumes facts not in evidence. Misstates prior testimony.
Go ahead and answer.
BY THE WITNESS:
A. I don't recall any -- I don't know exactly which meetings you're referring to, but we did have a meeting with John Hayes, and I don't recall when, but it was in the Enforcement Center.
BY MR. BAUGHER:
Q. Well, there was a meeting with Mr. Hayes on April 13th, 2001, correct? Was there a meeting with Mr. Hayes on April 13th, 2001?
A. I don't recall the date of the meeting with Mr. Hayes.
Q. Were you at a meeting with Mr. Hayes in April of 2001?
A. I was in a meeting with Mr. Hayes, but I don't know the date of the meeting.
Q. Did you record that date or your notes about the meeting in your REMS file?

Page 288

A. I don't know. I have to check and see.
MR. BAUGHER: Mark this, please, as Thomas Deposition Exhibit 18.
(Thomas Deposition Exhibit Number 18 was marked for identification.)
(Document tendered to the witness.)
MR. WELLONS: Miss Thomas has asked me to clarify for the record that Thomas Exhibit 17 is a compilation of documents, some of which bear Bates numbers, some of which do not. And included within this compilation of documents is a letter addressed to P.M. Group on BABCO Construction, Inc. letterhead.
Can we go off the record for just a moment, please?
MR. BAUGHER: Sure.
(Discussion off the record.)
MR. WELLONS: Okay. I just want to state on the record it's by my watch now 6:20. We'll be concluding Ms. Thomas' deposition at or before 6:45. We can continue with questioning.
MR. BAUGHER: Well, I'm not agreeing with that, but let's move forward and get through the rest of the documents.

Page 289

BY MR. BAUGHER:
Q. Back on this BABCO, you reviewed the proposal from BABCO when you got the April letter; is that correct? You mentioned BABCO. Is there some significance to that?
A. That letter was addressed to the P.M. One group from their staff.
Q. But it was one of the exhibits to the letter that was delivered to Ms. Coleman on April 8th of 2001, correct?
MR. WELLONS: Objection. Assumes facts not in evidence.
Go ahead and answer.
BY THE WITNESS:
A. I'm not sure, but possibly.
BY MR. BAUGHER:
Q. And you looked at it?
A. Possibly.
Q. All right. What is Thomas Deposition Exhibit 18?
A. It looks like a letter that was prepared for John Hayes.
Q. Prepared to go to John Hayes?
A. Yes.

Q. Who drafted it?
A. I have no clue.
Q. Have you ever seen it before?
A. Possibly.
Q. Well, is it sort of familiar?
A. Several letters went out in regards to something of this nature, but I don't know.
Q. There's handwriting in the upper right that says, "Wasn't mailed." Is that your handwriting?
A. No, this isn't.
Q. Whose handwriting is it?
A. I don't know.
Q. Down in the lower left on page 2 it says, "Draft GT 3/15/01." Does that mean that you drafted this on March 15th, '01?
A. Possibly.
Q. Well, how else would the letter -- that notation get on this letter?
A. I may have started a draft, but this might not be the -- the part of it 'cuz they make corrections. So, I don't know.
Q. And if questions came up about the text of this letter, those questions were supposed to go to you; is that right?



MR. WELLONS: Objection. Assumes facts not in evidence. Misstates prior testimony.
Go ahead and answer.
BY THE WITNESS:
A. Yes, that's the protocol that comes to the project manager.
BY MR. BAUGHER:
Q. All right. So, did someone ask you to draft this letter?
A. I don't recall because I don't do notices of Section 8 suspensions and abatement letters.
Q. You've never written one?
A. I don't do them. That's not the protocol.
Q. I didn't ask if you don't do them. I asked if you've ever done one.
MR. WELLONS: Objection. Asked and answered. Argumentative.
BY THE WITNESS:
A. I don't do them. So, why would I have done one if I don't do them?
BY MR. BAUGHER:
Q. I don't know. Why are your initials down here with "Draft GT 3/15/01"?
MR. WELLONS: Objection. Asked and



answered.
BY THE WITNESS:
A. This letter could have been a different title. When I turned over a draft, it could be changed up in the whole system. My name could just be on there.
BY MR. BAUGHER:
Q. Did you draft some other letter to John Hayes on March 15th, '01?
A. Possibly. Possibly. I don't know.
Q. Have you ever read Deposition Exhibit 18?
A. No. This is the first I've seen this.
Q. So, you deny having drafted Deposition Exhibit 18; is that correct?
MR. WELLONS: Objection. Misstates testimony. Argumentative.
Go ahead and answer.
BY THE WITNESS:
A. There's a possibility I could have drafted something on this. But I wouldn't have drafted a notice of Section 8 suspension and abatement letter.
BY MR. BAUGHER:
Q. Did someone ask you to work on collecting information and grounds for an abatement of South



Pointe in March of 2001?
A. I don't recall anything like that, no.
Q. Did you have any involvement in determining whether South Pointe was in default of its HAP contract in the spring of 2001?
A. From my reviews and what I've seen, yes, my conversation was necessary, yes.
Q. And who did you discuss the possibility of South Pointe being deemed to be in default of its HAP contract in the spring of 2001?
A. My conversations was usually with my Director and on some occasions it may have been in the Enforcement Center, as you say, in spring. So, the Enforcement Center was involved probably at that time.
Q. So, the people that you discussed a default letter or notice with were either Ms. Coleman, your Director, or people from DEC; is that right?
MR. WELLONS: Objection. Assumes facts not in evidence.
Go ahead and answer.
BY THE WITNESS:
A. A possibility, yes.
BY MR. BAUGHER:





00000000-0000-0000-0000-000000000000

Page 294

Q. And you're not sure that you talked with any of them about any default or notice of default?
A. No, I'm sure we discussed it. I'm not saying that we didn't. Yes, but I don't know when exactly. It was sometime in spring. Yes, we discussed a default.
Q. And what was the default -- strike that.
What were the ways in which South Pointe was in default of its HAP contract in spring the 2001?
MR. WELLONS: Objection. Calls for legal conclusion.
Go ahead and answer.
BY THE WITNESS:
A. According to the HAP contract, not maintaining the property in decent, safe and sanitary condition.
BY MR. BAUGHER:
Q. Do you have any familiarity with the provisions of the HAP contract on defaults?
A. The information that's in the HAP contract we reference frequently.
Q. Have you read the HAP contract and do you know what the elements of default are or how you're

Page 295

supposed to notify somebody of a default?
A. We followed it in accordance with what the HAP contract --
Q. Who is "we"?
A. Our Enforcement Center and Housing working together.
Q. But I'm talking about you.
MR. WELLONS: Objection. Argumentative. Is there a question pending?
BY MR. BAUGHER:
Q. Yes. I'm asking if you, personally, are familiar with the provisions in the HAP contract on default and notice of default?
A. Yes.
Q. All right. What as of the spring of 2001 was South Pointe in default of the HAP contract?
MR. WELLONS: Objection. Calls for a legal conclusion.
Go ahead and answer.
BY THE WITNESS:
A. Not maintaining the property in decent, safe and sanitary condition.
BY MR. BAUGHER:
Q. Well, there was a REAC Report, obviously,

Page 296

that was issued -- or a report that was issued in March of 2001. What physical deficiencies noted in that March 2001 report were not corrected by Englewood, the owner, between March 8th, 2001, the inspection, and a month later? Do you know?
A. The exigent items, all of them were not taken off. I went out there and saw that all of those items were not done.
Q. And you wrote a memorandum about that?
A. We wrote a memorandum and took pictures.
Q. And when did you do that?
A. After the owners certified that they had mitigated all of the exigent items.
Q. Was that before or after April 8th, 2001?
A. I don't recall exactly what date, but it was when they certified.
MR. WELLONS: Please let the record state that plaintiff and plaintiff's counsel are reviewing documents.
BY MR. BAUGHER:
Q. Are you familiar with the fact that a default letter was sent to South Pointe by HUD on April 9th, 2001?
A. Can I see it?

Page 297

Q. Just answer the question.
MR. WELLONS: Objection. Assumes facts not in evidence.
BY MR. BAUGHER:
Q. Do you know if there was a default letter that was sent out in April of 2001?
MR. WELLONS: Did you record my objection?
THE REPORTER: Yes.
MR. WELLONS: Thank you.
Go ahead and answer.
BY THE WITNESS:
A. I don't know. I have to see it.
MR. BAUGHER: Excuse me. We'll take a break for two minutes.
(Short interruption.)
MR. BAUGHER: Mark this, please.
(Thomas Deposition Exhibit Number 19 was marked for identification.)
(Document tendered to the witness.)
BY MR. BAUGHER:
Q. Miss Thomas, let me show you what has been marked as Thomas Deposition Exhibit 19, a letter from Ed Hinsberger and Margarita Maisonet to Englewood Terrace Limited Partnership dated April 9

2001. Have you seen this before?
A. Yes.
Q. When did you see it first?
A. Probably after it was signed and mailed out.
Q. Did you participate in any of the discussions about whether this letter should be sent?
A. I participated in meetings and discussing the default of South Pointe.
Q. And what meetings did you participate in?
A. There were several meetings.
Q. When did they take place?
A. I don't recall. There was a lot of meetings, so I don't know exactly.
Q. Well, did they take place in March or April or when?
A. Don't know.
Q. How many meetings did you participate in?
A. Don't remember. It was a lot.
Q. When was the decision made to declare South Pointe in breach of its Housing Assistance Payment contract?
A. Don't know. It looks like April 9th, 2001



to me.
Q. The decision was not made earlier than that?
A. This is when the letter went out.
Q. Well, apparently someone was drafting a default letter as of the middle of March, the exhibit that we just saw, Deposition Exhibit 18.
MR. WELLONS: Is there a question pending?
BY MR. BAUGHER:
Q. Yes. When did HUD decide to declare South Pointe's owner in default?
MR. WELLONS: Objection. Asked and answered.
Go ahead and respond.
BY THE WITNESS:
A. Don't know. Apparently April 9th, 2001.
BY MR. BAUGHER:
Q. Did you see the text of Deposition Exhibit 19 in draft form?
A. I don't remember.
Q. Did you participate in the drafting of this default letter, Deposition Exhibit 19?
A. No.
Q. Who did draft it?



A. I don't know. It came from the Enforcement Center.
Q. How do you know that?
A. Because it's on Enforcement Center letterhead.
Q. Was this drafted by Miss Maisonet, then?
A. I don't know who drafted it.
Q. After you saw this letter, were you asked to do anything with respect to the default situation that was announced in this letter?
A. No, 'cuz this letter's giving the owner 30 days from the date of this notice to remedy the problem.
Q. Did you receive further communications from the owner concerning remedying the issues that were noted in Deposition Exhibit 19?
A. All communications probably would have went through the Enforcement Center.
Q. All right. The second paragraph of the letter talks about the recent March 2001 REAC Report and notes, "Holes and cracks in the hallway and unit walls."
Do you know anything about the status of "Holes and cracks in the hallway and unit walls" as



of April 9th, 2001?
A. Yes.
Q. What do you know?
A. I had been to the property, as I told you, before.
Q. When were you at the property?
A. After they certified the exigent items. You said after the REAC inspection.
Q. "Holes and cracks in hallway and unit walls" is not an exigent health and safety issue, is it?
A. Yes, it is.
Q. That wasn't something that was listed on the health and safety report, was it?
A. I don't know how to --
Q. Well, we went through that it wasn't listed, was it?
A. I don't know.
MR. WELLONS: Objection. Asked and answered. Argumentative.
BY MR. BAUGHER:
Q. Broken windows wasn't listed as a health and safety item, was it?
A. No. This is just saying some of the





00000000-0000-0000-0000-000000000000

Page 302

outstanding deficiencies. It didn't say they were health and safety.

Q. None of the items listed in the second paragraph of this default letter, Deposition Exhibit 19, are health and safety issues, are they?

A. I can't say that they're not because they could be. Possibly broken glass can cut a child. That's a health and safety item. A child can fall out of a window if it's broken. That's a health and safety item. Cockroaches in a unit. That's a health and safety item.

Q. No, it's not a health and safety item under REAC, is it?

A. Yeah, it is a health and safety item.

MR. WELLONS: Objection. Counsel's arguing with the witness.

Go ahead and answer.

BY THE WITNESS:

A. I don't know what REAC considered as health and safety items as far as roaches, but it is a health and safety item, period, because it's unsanitary.

BY MR. BAUGHER:

Q. Miss Thomas, what you do know is that you

Page 303

looked at a copy of the March 2001 REAC Report and that none of the items listed in Deposition Exhibit 19 were listed in that March 2001 REAC Report as being health and safety items, correct?

A. Inoperable stoves. We just went over that, right?

Q. Inoperable stoves was listed as a health and safety item?

A. Or in the report.

Q. Well, which?

A. As a systemic deficiency.

Q. That's not the same as a health and safety?

A. Yes, it is. If the stove doesn't work, it could be a hazard. It could be a gas leak, anything.

Q. I'm talking about what is listed in the REAC Report as being a health and safety item, and that was not one of the items that was on those two pages we looked at, was it?

A. But that doesn't address this issue, anyway, in paragraph 2. So, please explain to me what you're trying to get at.

Q. The items listed in the first page of Deposition Exhibit 19 were not listed by REAC as

Page 304

being health and safety items; isn't that right?

A. No, I can't say that that's correct, because, as I said before, holes in the walls is dangerous to children. Broken windows is dangerous to children. Inoperable stoves is dangerous to people. Here's level 3, inoperable stove. And a broken window, where is that? Window, not lockable, level 3. So, I don't see why you think it's not a safety issue. Insects, health and safety item on page 5 of 6.

Q. Miss Coleman --

A. I'm not Miss Coleman. Please don't call me Miss Coleman.

Q. Miss Thomas. Excuse me. Look back at Thomas Deposition Exhibit 15 where the two pages of exigent health and safety hazards are listed. And none of the items on the first page of Deposition Exhibit 19 are on that -- either of those pages, correct?

MR. WELLONS: I'll clarify for the record this refers to exigent health and safety hazards, part 1.

BY MR. BAUGHER:

Q. What's the answer?

Page 305

A. What's your question?

Q. Look at the first page of Deposition Exhibit 19. There are a number of items listed there.

A. Yes, there is.

Q. None of the items listed there were on the REAC Report as health and safety items, correct?

A. No, here it is right here. Page 5 of 6 of the report, Health and Safety. Sometimes these reports here that they leave does not reflect all of the health and safety items that they put on the report.

MR. BAUGHER: All right. Will you mark this, please, as Deposition Exhibit 20?

MR. WELLONS: To clarify the record, I just want to state that in a previous answer Miss Thomas was referring to documents beginning with a cover letter dated March 7th, 2001, addressed to P.M. One, Ltd. from U.S. Department of Housing & Urban Development Real Estate Assessment Center. Attached to that document is the REAC Report 109997. She was referring to page 5 of 6 of that report.

(Thomas Deposition Exhibit Number 20 was marked for identification.)

Page 306

(Document tendered to the witness.)
BY MR. BAUGHER:
Q. Miss Thomas, Deposition Exhibit 20 is an e-mail to you from Veronica Coleman, and then an e-mail from Veronica Coleman concerning a meeting with the South Pointe owners on April 12th, 2001.
A. Correction. The e-mail is from me to Miss Coleman and to Ed and Ed's response to all of us.
Q. All right. You got a call?
A. Yes.
Q. And this was to set up a meeting on April 12th, 2001?
A. Yes.
Q. I asked you about that meeting earlier, whether you'd met with Mr. Hayes. Do you recall that now?
A. I said that we had a meeting, but I didn't know the exact date.
Q. All right. Were you at the meeting?
A. Yes, apparently I was.
Q. And what do you remember about that meeting?
A. I don't remember anything at this time,

Page 307

nothing specific.
Q. What was the purpose of the meeting?
A. To discuss what he wanted, the occupancy and the REAC inspection.
Q. And who was present at the meeting?
A. I don't recall.
Q. Are you sure you were there?
A. Yes, I was there.
Q. How do you know you were there?
MR. WELLONS: Objection. Argumentative. Go ahead and answer.
BY MR. BAUGHER:
Q. How do you know you were at that meeting?
A. How do I know I was at that meeting?
Q. Yes.
A. I was there at work.
Q. You recall that?
A. Yeah, I recall the day -- I mean, I remember the meeting. This was probably the first meeting we met with John Hayes.
Q. You had never met him before?
A. Not before the meeting in the Department of Enforcement Center, no.
Q. The first time that you met Mr. Hayes was

Page 308

on April 12th, 2001?
A. Possibly 'cuz we were dealing with his representatives all the time.
Q. And what did he say at the meeting?
A. I don't recall exactly what he said.
Q. Do you know what the subject of the meeting was?
A. Yeah, it was South Pointe on how we can correct the issues.
Q. And also how a new rehab loan could be put into effect; is that right, too?
A. It was discussing how we can fix South Pointe.
Q. And what was said to him by the rest of the group there from HUD?
A. I don't remember.
Q. Who else was there from HUD?
A. I told you I don't remember.
Q. Was Mr. Hinsberger there?
MR. WELLONS: Objection. Asked and answered.
MR. BAUGHER: No, I didn't ask that before.
MR. WELLONS: Go ahead and answer the question.

Page 309

BY MR. BAUGHER:
Q. Was Mr. Hinsberger there?
A. I don't remember who all was in the meeting, but apparently he might have been in the meeting.
Q. And Ms. Coleman, was she there?
A. Apparently she might have been there. I don't know who all was in the meeting. I can't tell you everybody.
Q. Did you receive congratulations from Margarita Maisonet on the work that was done in declaring South Pointe in default in April of 2001?
A. What do you mean by that?
Q. Do you remember receiving a congratulatory e-mail from Ms. Maisonet on the work that had gone into declaring South Pointe in default in April of 2001?
MR. WELLONS: Objection to the extent it mischaracterizes the document referred to and assumes facts not in evidence.
Go ahead and respond.
BY THE WITNESS:
A. I don't know what you're talking about.
BY MR. BAUGHER:

Page 310

Q. Did you have any conversations with Ms. Maisonet in the spring of 2001 about South Pointe's supposed default?
A. Possible.
Q. Do you recall any of those conversations?
A. She may have been in some of the meetings. She was the Director.
MR. BAUGHER: All right. That's all I have for this witness at this time. I do, because I believe that there are other documents that we have not received and should have received from HUD, I do reserve the right to recall this witness with respect to new materials as and when they're produced to us. But I'm finished for the day.
MR. WELLONS: If we could confer off the record for just two minutes?
MR. BAUGHER: Sure.
(Discussion off the record.)
MR. WELLONS: Okay. We have no additional questions. I believe we're done here. Signature is reserved.
(Whereupon, the deposition was concluded at 6:51 p.m., this day, April 12, 2005.)

Page 311

STATE OF ILLINOIS )
)
COUNTY OF DU PAGE )

The within and foregoing deposition of the aforementioned witness was taken before MARGARET A. BACHNER, CSR and Notary Public, at the place, date and time aforementioned.

There were present during the taking of the deposition the previously named counsel.

The said witness was first duly sworn and was then examined upon oral interrogatories; the questions and answers were taken down in shorthand by the undersigned, acting as stenographer and Notary Public; and the within and foregoing is a true, accurate and complete record of all of the questions asked of and answers made by the aforementioned witness, at the time and place hereinabove referred to.

The signature of the witness was not waived, and the deposition was submitted, pursuant to Rules 30(e) and 32(d) of the Rules of Civil Procedure for the United States District Court, to the deponent per copy of the attached letter.

Page 312

The undersigned is not interested in the within case, nor of kin or counsel to any of the parties.

Witness my official signature and seal as Notary Public in and for DuPage County, Illinois, on this 25th day of April, A.D. 2005.

______________________________
Margaret A. Bachner, CSR, RMR, CRR
Illinois CSR No. 84-1481

Page 313

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

ENGLEWOOD TERRACE LIMITED )
PARTNERSHIP, )
)
Plaintiff, )
)
-vs- ) Case No. 03-2209C
)
THE UNITED STATES, )
)
Defendant. )

I, GWENDOLYN THOMAS, hereby certify that I have read the foregoing transcript of my deposition given at the time and place aforesaid, consisting of Pages 1 to 313, inclusive, and I do again subscribe and make oath that the same is a true, correct, and complete transcript of my deposition so given as aforesaid, and includes changes, if any, made by me.

______________________________
GWENDOLYN THOMAS

SUBSCRIBED AND SWORN TO before me this ______ day of ________________ 2005.

______________________________
Notary Public

**A**

**abate** 277:4
**abatement** 291:11 292:21,24
**ability** 152:5
**able** 22:19 49:16 55:23 122:17 133:18 168:5 241:6
**above-captioned** 272:8
**absolutely** 160:23
**accept** 210:17
**acceptable** 181:24 238:20
**accepted** 202:20
**access** 24:6,7,9 28:2 222:12,15,19 252:9
**account** 105:2
**accurate** 311:16
**acknowledge** 162:2
**Act** 190:16
**acting** 139:20 202:1 228:5 311:14
**action** 46:2 82:19 82:24 83:4,7,12 83:15,19 94:18,20 94:22 152:7 167:8 179:1 231:4
**actions** 181:20,21
**active** 220:9
**activities** 167:9
**actual** 156:1 276:23 283:4
**add** 50:16 64:10 145:8 266:6
**added** 101:3 183:22
**addendum** 225:10
**adding** 280:6
**addition** 113:4 129:16 170:13
**additional** 22:18 64:8 111:20 112:4 113:10 173:2 195:13 214:2,3 224:16 227:18 232:5 237:24 260:23 286:8,9,16 287:2 310:19
**address** 4:17,23 5:6 5:7,9 6:1,6,8 8:9 303:20
**addressed** 197:21 197:23 270:13 276:2 285:1 288:11 289:6 305:18
**Adjustment** 222:17
**administers** 61:12
**administrator** 73:6 73:9
**advance** 251:23 252:16
**advice** 118:4,6
**advise** 17:15 103:5 135:13 272:14
**advised** 134:5
**affect** 221:9
**affordable** 72:12
**aforementioned** 311:5,7,17
**aforesaid** 313:11 313:15
**afternoon** 112:3 127:18 135:7
**agent** 118:16 121:6 121:21 122:5,11 122:23 124:15,20 125:15 126:2,11 129:18 130:11,23 131:17
**agents** 119:20 152:3
**ago** 7:7 19:22 29:13 29:14 90:2 141:8 184:6,17 248:21
**agreed** 158:2 182:3 233:18
**agreeing** 288:22
**agreement** 4:5 228:13 242:5
**ahead** 21:9 28:22 30:21 34:11 71:9 72:3,22 105:14 109:16 112:13 117:8 131:4,21 132:17 133:22 139:12,24 155:19 158:15 159:4 161:5 163:24 165:7,17 168:11 174:3 179:4 181:12 191:22 192:6 197:11 205:2,16 206:14 209:7 210:14 211:10 220:19 223:10 230:6,12 230:22 231:21 233:4 235:1 238:3 238:15 239:20 242:9 246:14 248:3 249:3 254:13 260:6 262:4 263:4 270:22 274:11 276:15 285:16 286:3 287:7 289:13 291:3 292:17 293:21 294:13 295:19 297:10 299:14 302:17 307:11 308:23 309:21
**ahold** 5:19
**Alberta** 140:23 141:18
**allow** 82:3 123:6
**amend** 229:23,24 230:3,9,14,18,24 231:18 241:6 242:17 243:14
**amended** 228:22 229:1,5,20 231:1 231:5,15 236:21 237:22 240:22 241:1 243:10 247:24 249:11,14
**amending** 245:6,14 249:2
**amendment** 228:24 234:17 236:1,3 237:11,12 238:9 238:24 240:11,16 240:18 242:3,4,11 243:23 244:20,20 245:9,19 249:12 250:2,10,17
**amendments** 248:24 249:6,20 251:2,8
**amount** 16:9 105:4 223:3 279:20
**amounts** 37:15
**analyst** 75:11 80:19 80:24 85:2 130:2
**Anderson** 145:23 145:24 148:16 189:5 202:2 226:9 228:5 234:17,21 235:7,11
**Anderson's** 150:23 222:5,22
**announced** 300:10
**annual** 226:2,11
**answer** 5:1,5 6:2,11 8:21 17:17 20:13 21:9 23:12,14 28:18,22 30:17,21 32:19,20 34:11 35:23 43:15 44:1 44:5,7 71:9 72:3 72:22 74:4 87:23 88:4 104:20 105:14 109:16 112:13 117:8 122:8 130:17 131:4,21 132:17 133:22 139:12,24 141:15 145:8 153:12 158:15 159:4 161:5 162:15 163:24 165:7,17 168:2 179:4 181:12 191:22 192:6 197:11 202:17 203:15 205:2,17 206:14 209:7 210:8,14 211:10 219:9 220:19 223:10 230:6,22 231:21 233:4 235:1 238:3,15 239:20 242:9 248:3 249:8 254:13 260:6 262:4 263:4 270:22 274:11 276:15 285:16 286:3 287:7 289:13 291:3 292:17 293:21 294:13 295:19 297:1,10 302:17 304:24 305:16 307:11 308:23
**answered** 21:8 22:12 116:16 159:3 161:4 165:16 175:13 211:14 291:17 292:1 299:13 301:20 308:21
**answers** 141:7 160:18 161:13 311:12,17
**answer's** 253:11
**anxious** 182:24
**anybody** 139:1 203:7 218:12
**anymore** 130:24 222:8
**anyway** 303:21