IN THE UNITED STATES COURT OF FEDERAL CLAIMS

ENGLEWOOD TERRACE LIMITED PARTNERSHIP, )
Plaintiff, )
-vs- ) No. 03-2209C
) Judge Wolski
THE UNITED STATES, )
Defendant. )

The deposition of VERONICA COLEMAN, called by the Plaintiff for examination, pursuant to subpoena and pursuant to the Federal Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before Judith T. Lepore, Certified Shorthand Reporter and Notary Public within and for the County of Cook and State of Illinois, at 312 West Randolph Street, 4th Floor, Chicago, Illinois, commencing at the hour of 9:30 a.m., on the 13th day of April, A.D., 2005.

APPEARANCES:

SCHOPF & WEISS LLP, By
MR. PETER BAUGHER
312 West Randolph Street, Suite 300
Chicago, Illinois 60606-1721
(312) 701-9300
On behalf of the Plaintiff;

U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION, By
MR. PAUL R. WELLONS
1100 L Street, N.W.
Washington, DC 20530
(202) 616-8253

and

U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, By
MR. GREGORY G. GUSTIN
MS. MARIA T. BAGUIO
77 West Jackson Boulevard, Room 2202
Chicago, Illinois 60604
(312) 353-6236

On behalf of the Defendant.

Also Present:

Don Samuelson
Scott Samuelson

* * *



INDEX



| WITNESS | DX | CX | RDX | RCX |
|---|---|---|---|---|
| VERONICA COLEMAN | | | | |
| By Mr. Baugher | 4 | | | |

EXHIBITS

| COLEMAN DEPOSITION EXHIBIT | MARKED FOR ID |
|---|---|
| No. 1 | 140 |
| No. 2 | 142 |
| No. 3 | 146 |
| No. 4 | 147 |
| No. 5 | 153 |
| No. 6 | 164 |
| No. 7 | 175 |
| No. 8 | 184 |
| No. 9 | 191 |
| No. 10 | 195 |
| No. 11 | 217 |
| No. 12 | 219 |
| No. 13 | 231 |
| No. 14 | 252 |
| Nos. 15 & 16 | 268 |



(Exhibits were retained by counsel.)



MR. BAUGHER: Let the record show that this is the deposition of Veronica Coleman taken under the rules of the Court of Federal Claims and pursuant to notice and agreement.
Swear the witness, please.
(Witness duly sworn.)

VERONICA COLEMAN,

called as a witness herein, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. BAUGHER:
Q. What is your full name, please.
A. Veronica Coleman.
Q. Where do you live, Ms. Coleman?
A. In Chicago, Illinois.
Q. Where?
A. I'm not going to provide my place of residence. My business address is 77 West Jackson Boulevard, Chicago, Illinois, 60604, 23rd Floor.
MR. WELLONS: Mr. Baugher, we will accept service of process for Ms. Coleman in the future if you have a concern about contacting her. But she is not here to provide testimony regarding personal



matters. She's here to testify to facts relevant to this case.
MR. BAUGHER: Today she works for the Department of Housing and Urban Department. Tomorrow or next month she may not. At that point, the Department of Housing and Urban Development may or may not be able to accept process or anything else for Ms. Coleman. That's something that neither you nor I can predict. I would like to know her address. Coleman is a frequent name in Chicago and finding her address otherwise could be difficult.
BY MR. BAUGHER:
Q. So what's your street address?
MR. WELLONS: Asked and answered. If necessary, the Department of Justice will accept service of process for Ms. Coleman. I suggest that we move on.
MR. BAUGHER: The Department of Justice doesn't have the power to accept service of process for someone that is not affiliated with the government.
MR. WELLONS: The question has been asked and answered. I suggest we move on to facts relevant to this dispute.





00000000-0000-0000-0000-000000000000

BY MR. BAUGHER:
Q. Are you refusing to provide your home address?
A. I answered your question.
Q. I said are you refusing to provide your --
A. I answered your question.
MR. WELLONS: Objection, asked and answered.
BY MR. BAUGHER:
Q. Are you familiar with the terminology of a housing project being referred to the Department Enforcement Center at HUD?
A. Can you restate that, please?
MR. BAUGHER: Read it back, please.
(Whereupon, the record was read as follows:
Q. Are you familiar with the terminology of a housing project being referred to the Department Enforcement Center at HUD?)
MR. WELLONS: Objection, vague. Answer the question if you can.
THE WITNESS: I'm familiar with the term of referring projects to the Department Enforcement



Center.
BY MR. BAUGHER:
Q. And what does that mean?
A. That means that a project would be referred or has been referred to -- can I refer to it as DEC or must I say the Department Enforcement Center -- can be referred to the Department Enforcement Center for various reasons.
Q. And what does it mean when a project is referred to the Department Enforcement Center? What then happens functionally between your division, the Multifamily Housing Division and DEC?
A. It depends on the situation, but --
Q. Go ahead.
A. It depends on the situation.
Q. Were you about to say something else?
A. I was going to ask you could you be more specific.
Q. You're familiar with the South Pointe project?
A. Yes.
Q. Was that project referred to DEC?
A. Yes.
Q. How many times?



A. I believe twice.
Q. When was the first time that it was referred to the DEC?
A. These referrals occurred a long time ago, and I do not know the date.
Q. Well, approximately.
A. I'm not going to give an approximation, because I'm not sure of any dates.
Q. How would you find out the dates?
A. Information may be in the files at work.
Q. What files?
A. South Pointe files.
Q. Well, what South Pointe files would you look in to find referral dates?
A. Projects were referred differently when we first began referring projects, and I might be able to obtain the information in REMS.
Q. Where would you look in REMS?
A. I would look in maybe problem statement or the enforcement screens, the Department of Enforcement screens.
Q. Did you look at any papers in preparation for your deposition?
A. I just might have just glanced at a file.



Q. What file did you glance at?
A. Physical.
Q. What is the physical file?
A. Physical inspection file.
Q. Can you describe the physical inspection file for South Pointe?
A. Not in its entirety, because I didn't look at it in-depth.
Q. What did you look at?
A. Physical inspection.
Q. What physical inspection?
A. I believe the last one.
Q. And when you say the last one, the last physical --
A. The physical inspection --
Q. -- inspection?
A. -- score where it scored 31C asterisk.
Q. That was a REAC inspection --
A. REAC inspection.
Q. -- report?
A. That's our physical inspection.
MR. WELLONS: Ms. Coleman, it will be helpful if you allow Mr. Baugher to finish his question and then respond. We'll have a clear





00000000-0000-0000-0000-000000000000

question and answer on the record.
THE WITNESS: No problem.
BY MR. BAUGHER:
Q. Is there a paper physical inspection file concerning South Pointe that has in it all the physical inspections that were conducted at that site?
A. Can you restate the question, please?
Q. Yes. You said you were looking at a physical inspection file. In that file, are there copies of all of the physical inspections that were done on the property?
A. I don't know.
Q. How large is the file on physical inspections for South Pointe?
MR. WELLONS: Objection, vague. Go ahead and answer.
THE WITNESS: I really can't say. I don't know how large the file is.
BY MR. BAUGHER:
Q. Well, you looked at it?
A. Yes.
Q. Would you say it's several inches or is it a box or file cabinet drawer or what?



A. It's not a box.
Q. Is it in a file cabinet?
A. It's in a file cabinet, but it's just a folder.
Q. A manila folder about the size of the one that I'm showing you right now, which is, I'd say, two inches?
A. Possibly, approximately.
Q. You just looked at this folder within the last month, right?
A. It's a few weeks ago.
Q. And you did that to prepare for this deposition?
A. Yes.
Q. And did you look at any documents other than the REAC inspection report that you mentioned?
A. I looked at the use agreement.
Q. What is the use agreement?
A. It's a business agreement that was signed with the department by the owner.
Q. What is the subject of that use agreement or business agreement, as you term it?
A. What is the subject?
Q. Yes.



A. The use agreement was executed at the time the property was prepaid, and it details the owner's obligations to the department.
MR. WELLONS: I'm going to object to the extent counsel is asking Ms. Coleman to make a legal conclusion.
MR. BAUGHER: That really was not my intent. I'm looking for a description of a document that I hadn't heard of previously.
BY MR. BAUGHER:
Q. You say this is a document that was executed at the time the property was prepaid. What year was the property prepaid?
A. I believe in 1992.
Q. Now, when you say it was prepaid in 1992, is that when the initial financing for the project was taken out?
A. That's when the HUD mortgage was prepaid.
Q. There was a HUD mortgage on the property up to 1992, and then that mortgage was paid off; is that correct?
A. Yes.
Q. And at the time the mortgage was paid off in 1992, some sort of an agreement was signed between



HUD and the owner; is that right?
A. Yes.
Q. And what are the principal terms that you looked at in the use agreement when you reviewed it within the last month?
A. I looked at the area where it sort of spelled out how the owner was supposed to maintain the property going forward. He's supposed to maintain the property, you know, in decent, safe, and sanitary condition.
Q. What does that mean?
MR. WELLONS: Objection to the extent it calls for a legal conclusion. Go ahead and answer.
THE WITNESS: He's supposed to maintain a certain standard.
BY MR. BAUGHER:
Q. And how is that standard interpreted?
MR. WELLONS: Same objection. Go ahead and answer.
THE WITNESS: Decent, safe, and sanitary housing.
BY MR. BAUGHER:
Q. Is there any more content to it than that phrase "decent, safe, and sanitary" in the use





00000000-0000-0000-0000-000000000000

Page 14

agreement that you looked at within the last several weeks?

MR. WELLONS: Same objection. Go ahead and answer.

THE WITNESS: I don't remember the exact wording.

BY MR. BAUGHER:

Q. Were you looking specifically for provisions concerning the owner's obligation?

A. Yes.

Q. Why were you doing that?

A. To see if -- I wanted to make sure that a provision was in the use agreement of how this property was supposed to be maintained.

Q. Why did you want to do that?

A. Because I was preparing for the deposition.

Q. When was the last time before March of 2005 as you were preparing for this deposition that you reviewed or read the use agreement apparently entered into in 1992 with South Pointe?

A. I never read it.

Q. Well, how did you know it existed?

A. Because the property prepaid in 1992, and the section of the act required the owner to execute

Page 15

a use agreement with the department to keep certain restrictions going forward.

Q. So the first time you looked at the use agreement that you've referred to was in about March 2005; is that right?

A. Yes.

Q. And was that use agreement in the physical inspection file for South Pointe?

A. No.

Q. What file was the use agreement in?

A. I don't know.

Q. Well, how did you happen to come by it?

A. I asked the project manager to give me a copy of the use agreement.

Q. And who is the project manager, Ms. Thomas?

A. Yes.

Q. Why did you ask her for a copy of the use agreement?

A. Because, as I previously stated, I wanted to see that provision in the use agreement of maintaining this property.

Q. Do you know where she obtained a copy of the use agreement?

A. No.

Page 16

Q. What else did you ask Ms. Coleman to get for you -- excuse me.

What else were you asking Ms. Thomas to find for you yesterday?

MR. WELLONS: Objection, misstates prior testimony, assumes fact not in evidence. Go ahead and answer.

BY MR. BAUGHER:

Q. What else did you ask Ms. Coleman to provide to you other than the use agreement?

A. I'm Ms. Coleman. You mean Ms. Thomas.

Q. I apologize. What else did you ask Ms. Thomas to provide to you?

(Enter Mr. Scott Samuelson.)

THE WITNESS: That was it.

BY MR. BAUGHER:

Q. Now, other than the use agreement and the 2001 REAC inspection report, did you review any other papers in connection with this deposition?

A. I looked at -- I didn't review anything specifically other than those two documents.

MR. WELLONS: I would like to state for the record that Scott Samuelson, an employee of DSHS, has joined us in the deposition.

Page 17

Mr. Baugher, is Scott Samuelson here at your request?

MR. BAUGHER: Yes. He is assisting us in the case. He's also Mr. Samuelson's son.

MR. WELLONS: We want to state for the record that we object to there being two client representatives being present at today's deposition.

MR. BAUGHER: There's nothing that I'm aware of in the rules that limits the number of client-related personnel or Schopf & Weiss personnel that can be at a deposition. So he's going to be here as long as it's useful for him to be here.

MR. WELLONS: We'd also like to formally state for the record that if Mr. Scott Samuelson stays in the deposition, we are formally requesting the notes that he takes during the deposition today.

MR. BAUGHER: Well, I don't know that he's taken any notes. If he does take --

MR. DONALD SAMUELSON: He'll be happy not to take notes.

MR. BAUGHER: I have instructed all personnel who are here to take notes, because I'm trying to ask questions and it's helpful for me to have some notes as to is being said. Obviously, if





00000000-0000-0000-0000-000000000000

Page 18

you have trouble remembering what the witness is saying and need something to prompt you, you can ultimately get the transcript, which will tell you exactly what the witness is saying.
MR. WELLONS: Did you note my request for the record?
THE COURT REPORTER: Yes.
MR. WELLONS: Thank you.
BY MR. BAUGHER:
Q. You are telling us what papers you looked at to prepare for your deposition. And am I correct that the two documents that you looked at were the 1992 use agreement and the 2001 REAC inspection report?
A. Yes.
Q. And there were no others?
A. I glanced at, but I did not read, just glanced at a couple of the REMS screens.
Q. What REMS screens did you look at?
A. Project history, problem statement.
Q. Why did you do that?
A. Those are the two areas that the project managers usually populate for information, populate with information.

Page 19

Q. Do you give instructions to project managers as to what sort of information they are to put in the project history, problem statement section of REMS?
A. No, these directives come out of headquarters.
Q. And there's written directives as to what information a project manager is supposed to put into REMS in the project history, problem statement section?
A. We usually receive information via e-mail.
Q. Information from?
A. Headquarters.
Q. And there are directives from headquarters which you've received by e-mail as to what types of information the project manager is supposed to put into REMS?
A. Yes.
Q. Including information on project history and problem statement?
A. Yes.
Q. Do you keep a notebook of those or do you have those e-mails someplace?
A. I forward them to the project managers when I receive that information.

Page 20

Q. Is there some sort of a handbook or a compendium of e-mailed directives on what information a project manager is supposed to be recording in REMS?
A. I would have that in the file somewhere.
Q. What would that look like; is that a memorandum or a collection of e-mails or what?
A. I believe it was an attachment to an e-mail. It was just a document.
Q. It's a memorandum?
A. No.
Q. Can you describe the attachment to the e-mail?
A. A document.
Q. Several pages, one, or what?
A. Maybe two or three.
Q. And what year did you receive that in approximately?
A. I don't know.
Q. This is a directive from the headquarters of HUD on inputs to REMS that you're referring to?
A. Yes.
Q. Where do you have that?
MR. WELLONS: Objection, asked and answered.

Page 21

Go ahead and respond.
THE WITNESS: I said in the file.
BY MR. BAUGHER:
Q. Well, what file do you have that in?
MR. WELLONS: Objection, asked and answered. Go ahead.
THE WITNESS: I've already answered your question. I said in a file.
BY MR. BAUGHER:
Q. Yes. And I'm asking you does the file have a name; where is it located? Can you give us some identification on it?
A. A file in my office.
Q. Does the file have a name?
A. I can't say for sure. I keep certain information in files. It's in a file in my office. I've answered your question.
Q. Is it in your desk, a credenza in your office?
A. In my office.
MR. WELLONS: Objection, asked and answered
BY MR. BAUGHER:
Q. Where in your office?
A. In my office.

Page 22

Q. In your personal office or in the HUD office that you work at?
A. In my personal office.
Q. The reason I was asking for those specifications, Ms. Coleman, is because I'm going to ask the Department to produce a copy of that to us, and I wanted to make sure we were clear that it existed and knew where to look.
MR. BAUGHER: Will you be able to produce that to us, Mr. Wellons? I don't need to see it right now obviously.
MR. WELLONS: We'll certainly take it under advisement.
BY MR. BAUGHER:
Q. Do you remember having any reactions to any of the materials that you saw in the REMS screens under project history or problem statement?
MR. WELLONS: Objection, vague.
BY MR. BAUGHER:
Q. When you looked at it in the last month to prepare for this deposition?
A. No.
Q. Did review of the project history, problem statement REMS entries provide a good overview for

Page 23

you of the history of the project?
MR. WELLONS: Objection, vague. Go ahead and answer.
THE WITNESS: As I previously indicated, I just glanced at that.
BY MR. BAUGHER:
Q. Yes. And I'm asking you did it provide a good overview of the history of this project?
MR. WELLONS: Same objection. Go ahead and answer.
THE WITNESS: I did not read that information in-depth. I glanced at it.
BY MR. BAUGHER:
Q. When you glanced at it, did you read any of it?
A. I glanced at the information.
Q. Why did you do that?
A. In preparation for the deposition.
Q. And what did you think that you would learn by looking at the project history, problem statement section of the REMS entries?
MR. WELLONS: Objection, asked and answered.
THE WITNESS: Could you please restate your question?

Page 24

BY MR. BAUGHER:
Q. What did you think you would learn by looking at those screens?
MR. WELLONS: Objection, asked and answered. Go ahead and respond.
MR. BAUGHER: Well, wait a minute. Ms. Coleman asked me to state the question again, so I did it at her request. And now you're objecting to it.
MR. WELLONS: I was simply restating the objection. I believe the question and the objection are both on the record.
Ms. Coleman, please respond to the question.
THE WITNESS: Could you restate your question again? I want to be clear.
MR. BAUGHER: No, because he's going to object and say I've already asked it. Yes, I will say it again.
BY MR. BAUGHER:
Q. You said that you looked at the REMS screens on project history and problem statement. Why do you do that?
MR. WELLONS: Same objection.
Ms. Coleman, I do want you to answer the

Page 25

question.
THE WITNESS: In preparation for the deposition.
BY MR. BAUGHER:
Q. Okay. And what did you think you were going to learn by looking at those screens?
MR. WELLONS: Same objection.
Ms. Coleman, respond to the question.
THE WITNESS: I don't believe I was trying to -- I wasn't trying to learn anything. I glanced at an area in REMS that had some project history.
BY MR. BAUGHER:
Q. To see if there was any project history that had been recorded; is that why you looked at it?
A. I knew that the project manager had populated those fields.
Q. Well, and you wanted to remind yourself of what the project history was; is that why you looked at it?
A. I glanced at it in preparation for the deposition.
Q. Maybe you didn't understand the question that I've put a couple of times.
MR. WELLONS: Objection, argumentative.

BY MR. BAUGHER:
Q. You said that you looked at these REMS records. I'm trying to find out from you what it is that you hoped to discover or to remind yourself of or to check out by looking at these REMS entries, which you say you looked at sometime in the last month, very recently. What's the answer?
A. I glanced at the REMS entries in preparation for today's deposition.
Q. How long did you spend looking at the REMS entries?
A. Not long at all, very short period of time.
Q. How short?
MR. WELLONS: Objection, vague. Go ahead and answer.
THE WITNESS: Approximately two minutes.
BY MR. BAUGHER:
Q. Were you able to skim the REMS entries in that two minutes?
A. Yes.
Q. And did that give you a summary of the history of the project?
A. I did not read it in detail.
Q. Well, did you read it at all?



MR. WELLONS: Objection, argumentative. Go ahead and answer.
THE WITNESS: I glanced at it.
BY MR. BAUGHER:
Q. Ms. Coleman, we're going to be here all day with questions and answers. We can fence back and forth and you can give what, in my view at least, are less than candid answers.
MR. WELLONS: Objection.
BY MR. BAUGHER:
Q. And it's really not going to be very productive for either one of us. Can you answer the question, please. I'm trying to find out why you wanted to look at these screens and what, if anything, you learned from it?
MR. WELLONS: Objection, compound, argumentative, asked and answered. You can respond.
THE WITNESS: In preparation for today, I glanced at the REMS screens.
BY MR. BAUGHER:
Q. Is there any thought that looking at those screens kindled in your mind when you looked at them within the last month?
MR. WELLONS: Objection, argumentative.



THE WITNESS: I didn't hear the last word of your sentence.
BY MR. BAUGHER:
Q. Was there any thought that was kindled in your mind when you looked at those screens during the last month?
MR. WELLONS: Same objection.
THE WITNESS: There was no thought kindled. I knew I had to be deposed sometime in the near future, and I glanced at the REMS screens.
BY MR. BAUGHER:
Q. Do you remember any fact or statement that you read on the REMS screen in the last month?
A. I cannot give you any specific fact that I read or that I glanced at on that REMS screen today. I cannot factually state I recall seeing this statement on the REMS screen.
Q. And you weren't looking for anything in particular going back in the history of the problem statement?
A. No.
Q. Now, did you do anything else to prepare for your deposition; did you talk with Ms. Thomas or anyone else about it?



MR. WELLONS: Ms. Coleman, before you answer that, I just want to state that I don't want you to reveal the content of any discussion you had with or in the presence of myself, Ms. Baguio, or Mr. Gustin. You can go ahead and answer the question.
THE WITNESS: Your question? Did I talk to anyone about my deposition today?
BY MR. BAUGHER:
Q. Yes.
A. My boss, Ed Hinsberger.
Q. Did you talk about the South Pointe project in that context?
A. No, we talked about the deposition had been rescheduled on several occasions, and basically, we hoped that it took place this week.
Q. Who else did you talk with about your deposition?
A. The project manager, Gwen Thomas.
Q. Did you talk about the substance of the project?
A. We basically talked about the depositions taking place this week, and I don't recall any specifics about the substance of the property that we discussed.





00000000-0000-0000-0000-000000000000

Page 30

Q. Have you ever talked with her about the litigation generally; that is, the litigation that we're here for the deposition on today?
A. Other than these depositions that are about to take place. We talked -- restate your question. I want to be clear.
Q. Have you talked with Ms. Thomas about the this lawsuit?
A. Yes.
Q. When?
A. This week, the other weeks leading up to the deposition dates, the prior date.
Q. What are the topics that you've discussed with her?
A. For one, I asked her for the use agreement. And on occasion, she reminded me of the physical condition of the property.
Q. Are there any other topics that you've spoken about with Ms. Thomas concerning South Pointe and this litigation?
A. The topics that Ms. Thomas and I have discussed have been, you know, the physical condition.
Q. Did you discuss the use agreement with her?

Page 31

A. No, I just asked her for a copy.
Q. Did you discuss any other agreements with her?
A. No.
Q. Are you sure?
A. We discussed the physical condition of the property.
Q. Yes, and the use agreement. And I was asking you if you discussed any other agreements with Ms. Thomas?
A. Are you referring to other business agreements?
Q. Agreements, contracts.
A. Gwen, excuse me, Ms. Thomas brought up some things concerning their HAP contract.
Q. This is in a conversation with you recently?
A. Yes.
Q. Was it just the two of you at this conversation?
A. Yes.
Q. What did she bring up with you?
A. It was concerning the HAP contract that was issued erroneously that should not have been issued.
Q. What did she say about that?

Page 32

A. She reminded me that a HAP contract for South Pointe was sent out in error.
Q. What HAP contract was that?
A. I don't recall the date or the year. It was a HAP contract.
Q. How did it get sent out in error?
A. Our operations division, they're responsible for sending HAP contracts to owners for execution. And the operations director was off that day, and someone was acting for her. And the person that prepared the contract, they put it in her in-box in error, and he signed off on it, the person that was acting for the operations director.
Q. Are signed contracts sent out to the owners or are the contracts blank when they're sent out?
A. I don't send the contracts out. But they're sent to the owner for the owner's to execute, then it's returned to HUD. And then we're supposed to sign off on it, then we send the owner a signed copy of the contract back.
Q. Well, when you said operations sent out a copy of the contract, did they send one out that had already been signed by HUD?
A. No, no. Sent to the owner for the owner to

Page 33

sign first.
Q. And what role does Multifamily Housing have in what contracts will be sent out?
A. What role does Multifamily Housing have? State your question again.
Q. Is operations part of Multifamily Housing?
A. Yes.
Q. What part of the Multifamily Housing Division or office are you part of?
A. I'm on the management side.
Q. I see. So what role does management have in sending out contracts -- or strike that.
What role does management have in determining what contracts will be sent out?
A. The process of sending contracts out starts with the project manager. The project manager puts certain information in REMS. REMS then populates ARAMS, and the ARAMS 6 system kicks out the contract. And the operations director, or someone on her staff, then sends it out, sends it out with a letter under her signature.
Q. When an owner of a project applies for renewal of a HAP contract, does that owner -- strike that.





00000000-0000-0000-0000-000000000000

Page 34

When an owner is seeking renewal of a HAP contract, does that owner have to send in some sort of a request or application to the Department?
A. Yes.
Q. And where is that application sent?
A. To the office of Multifamily.
Q. So is it proper to term that an application or request?
A. A request.
Q. And then where within Multifamily does the request go?
A. To the project manager.
Q. Then what is the process or the deliberations that take place by the project manager or with others on what disposition is to be made of the request?
MR. WELLONS: Objection, assumes facts not in evidence, vague. Go ahead and answer.
THE WITNESS: The process is the contract comes in, goes to -- or the request comes in, goes to the project manager. The project manager determines what needs to be done, information is put into REMS REMS is then populated with that data. And then the request goes over to the operations division, and

Page 35

that person in operations downloads or that information is somehow fed into the ARAMS system And then ARAMS prints, you know, the -- he executes it, and the system just prints a contract. And it's sent to the owner with a cover letter from the director of operations.
BY MR. BAUGHER:
Q. Going back to the part of the process where the project manager has the request from the owner. You said that the project manager determines what needs to be done, I think, was your phrase. What do you mean by that?
A. Determines if appropriate documentation was submitted, if it was done in accordance with the applicable regulations at that time.
Q. Well, if the request is to renew a HAP contract, which is the premise of what we've been talking about, how is a decision made as to whether that request will be approved and forwarded on to operations or rejected or modified in some fashion?
MR. WELLONS: Objection, compound, vague, asked and answered go ahead and answer.
THE WITNESS: As I previously stated, the request comes in; the project manager determines what

Page 36

they should do with that particular contract; information is put in REMS, that's if it can be processed; REMS uploads or downloads into ARAMS; and the contract division sends out the contract to the owner.
BY MR. BAUGHER:
Q. Well, are all requests that come in for contract renewals approved?
A. No.
Q. Well, how is it decided whether a request would be approved or not approved?
MR. WELLONS: Objection, asked and answered. Go ahead.
THE WITNESS: Sometimes owners get confused on the options that they select under the contract renewal process. And if it comes in and if they chose an incorrect option, they have to return it, and they give the owner, you know, some guidance on how to submit.
BY MR. BAUGHER:
Q. The project manager is the one who returns it?
A. Yeah, the project manager. You know, they'll address whatever deficiencies are in the

Page 37

package, and they'll process it once they have the appropriate documentation and its in order and they can process it.
Q. And the processing of the renewal requests is, for the most part, a routine occurrence at HUD?
MR. WELLONS: Objection, vague. Go ahead and answer.
THE WITNESS: It can be routine. And sometimes it's -- you know, you've got to go back and forth with, you know, the ownership or the agent.
BY MR. BAUGHER:
Q. So from the way you've described it, it sounds to me as though the project manager for South Pointe, Ms. Thomas, is the one who would review and determine what was to be done with a request for South Pointe for a renewal of a HAP contract; is that right?
A. In normal circumstances, the request will come in to the project manager, and they would review the submission to determine what goes in REMS and from REMS to ARAMS and then there's a contract.
Q. So the project manager is the decision maker on approval, non-approval, modification, sending it back to the owner for additional or different

10 (Pages 34 to 37)

Page 38

documentation, as I'm understanding what you're saying?

A. Routine, if it's routine, if it's standard, if nothing else has taken place, the project manager prepares the contract to go to operations. Before it goes to operations, it goes through the contract administrator's supervisor.

Q. Who is that?

A. That's Debbie Gray.

Q. Now, is one of Ms. Gray's actual titles contract administrator supervisor?

A. It's a new title for us. Yes, contract administrator oversight supervisor, something like that, I believe that's correct.

Q. Now, just so we're clear, are you describing something -- are you describing the system as of 2005?

A. 2005.

Q. Let's go back in time. The questions that I'm asking you about are for the time period 1999, 2000. All right?

A. Okay.

Q. Now, was there either Ms. Gray, herself, or someone like Ms. Gray, who was supposed to review

Page 39

whatever the project manager determined with respect to a contract renewal request?

A. Yes.

Q. And was that Ms. Gray back in 2000?

A. Yes, the title just was not there.

Q. She didn't have a title then for that, but she had that responsibility?

A. Yes.

Q. And was that for your entire management department or just for the project managers or asset managers that reported through her or to her?

A. For all the contracts.

Q. How long has Ms. Gray had the responsibility for reviewing contract renewals?

A. Approximately around the time that we began this one-year renewal under MARA, which was probably in '99. And I'm just speculating, because the dates are not. . .

Q. It was sometime in the '90s --

A. Late.

Q. -- that MARA came into existence?

A. Late '90s, because the first notice was notice 9834.

MR. WELLONS: Ms. Coleman, it will be

Page 40

helpful if you let Mr. Baugher finish his questions. And also, were you able to complete your answer to the previous question?

THE WITNESS: I think so.

BY MR. BAUGHER:

Q. And the fact that the notice has a number 98 tells us that MARA is -- and the directives that followed from it, dates back to around 1998?

A. Yes.

Q. And then after that, 1999 going forward, Debbie Gray had the responsibility for reviewing requests for HAP contract renewals after the project manager had already reviewed those requests, correct?

A. Debbie Gray would make sure that it was submitted properly. It was a new process; owners were not familiar. She made sure that REMS was populated accurately by the project manager, and then she would forward the package to operations for further processing.

Q. Well, then, if we could, let's go back to the sequencing of the steps here. As I first described it, the project manager would receive the request for renewal, would review that, and would make a determination on it, populate REMS, and send

Page 41

that request on to operations.

As I understand it now, there is an additional step in the management group; and that is, that after the project manager reviewed the request and made a determination on it or an initial determination, then the request would go to Debbie Gray for her review and her final approval?

MR. WELLONS: Objection, misstates prior testimony, compound. Go ahead and respond.

THE WITNESS: That's correct, that's the process. The project manager receives the package; they do their review; Debbie does the review of that, concurs and forwards it to operations.

BY MR. BAUGHER:

Q. Now, is one of the things that Ms. Gray concurs in, not only the disposition of the request, but the correct entering of information about that request into REMS?

A. She reviews REMS for accuracy.

Q. And that's something that she's been doing since about 1999?

A. REMS is -- I really can't say that those fields were the same in REMS in 1999 as they are today.





00000000-0000-0000-0000-000000000000

Q. Well, there were fields -- the word you used is "populate," meaning entering data?
A. Yeah.
Q. Whether the fields in 1999 are precisely the same as those in 2005, there were fields for the entry of data about contracts back in 1999, correct?
A. Yes.
Q. And so, as I get what you're saying, it was for the project manager initially to do contract entries into REMS.
Excuse me. Off the record.
(Whereupon, a discussion was had off the record.)
MR. BAUGHER: Could you read my statement back.
(Whereupon, the record was read as follows:
Q. And so, as I get what you're saying, it was for the project manager initially to do contract entries into REMS.)
BY MR. BAUGHER:
Q. Start that one over.
Going back to the time frame 1999, 2000,



would the project manager, assuming approval of the request, then populate REMS or input into REMS whatever the appropriate information was about the contract to be renewed?
A. Yes.
Q. And then Ms. Gray, as part of her review and concurrence, would look at what information had been input into REMS along with the request and whatever other data had been gathered for her by the project manager, correct?
A. Yes.
Q. And then was it actually Ms. Gray who sent the approved request to operations for them to further process?
A. You're asking me if Ms. Gray sent the approved request to process? Are you asking me specifically about South Pointe or are you asking me about our process in general?
Q. Well, first tell us in general, please.
A. Okay, in general, then Debbie -- then Ms. Gray forwards -- concurs and forwards the package to operations.
Q. Is there a written record of any of this process that you've just described?



A. No.
Q. Does that include Ms. Gray's concurrence?
A. Yes.
Q. So her concurrence is an oral concurrence; is that right?
A. No, just in general, she usually initials.
Q. And then is she the one that typically would send those materials on to operations?
MR. WELLONS: Objection, asked and answered. Go ahead and answer.
THE WITNESS: Yes.
BY MR. BAUGHER:
Q. And then when operations gets the material -- well, let me rephrase that.
What exactly is sent by the management group to operations with respect to a contract that's being renewed?
A. I can't detail all the information in the package.
Q. It's a package that goes?
A. It's a package. They may print a REMS screen. It's a package of information. I cannot detail what's in the package. The project manager knows.



Q. Does Ms. Gray ever, or has Ms. Gray ever discussed with you contracts that were either about to be renewed or on which there was a decision not to renew a contract?
A. Yes.
Q. What instances do you recall of that?
A. Are we speaking in general?
Q. Yes -- well, no, I asked you for specific instances.
MR. WELLONS: Objection, vague. Go ahead and answer.
THE WITNESS: We've had discussion on various contracts. If it's going to OMAR -- I mean OAHP, formerly known as OMAR, you know, if an owner submits a request and his rents are over the comparables and we have to forward it on to our office, our preservation office formerly known as OMAR, we have those discussions. Or if they're requesting a rent increase that might be beyond the percent that our Hub director has told us to approve, just various reasons. I can't think of all of them off the top of my head.
BY MR. BAUGHER:
Q. Do you remember any conversations with





00000000-0000-0000-0000-000000000000

Page 46

Ms. Gray about a request that, for whatever reason, HUD had decided to refuse?
A. A request to renew?
Q. Yes.
A. No.
Q. Am I correct in understanding that the decision making with respect to a HAP contract renewal request is made in the management group at Multifamily Housing?
A. Can you clarify that question, please?
Q. Yes. In what part of the Multifamily Housing office is the decision made about whether a particular HAP contract renewal request will be approved or denied or modified?
MR. WELLONS: Objection, assumes facts not in evidence, compound. Go ahead and answer.
THE WITNESS: Your question is really not one question. As I indicated, if a contract comes in and the rents are over the comparables, the decision not to renew that contract can be made at the level of the project manager, because according to MARA regulations, that contract has to go to OMAR, now known as OAHP.
For other situations, it depends on the

Page 47

situation with the project as to who makes a decision on, you know, the renewal or not a renewal of a property.
BY MR. BAUGHER:
Q. Well, now, the only person that -- or the title that I heard you refer to was the project manager. Is there anyone, for instance, in operations who makes decisions about whether a contract will be renewed or not?
A. Once it gets to operations, they're basically printing the contract, issuing the contract, making sure that the contract gets back in to the office. You know, they issue it to the owner, and the owner is required to return the contract. And Mary Anderson, the operations director, she assigns it, and they forward the owner an executed copy of the contract. She signs it. We're talking about just a routine process. I'm not referencing anything specific with South Pointe.
Q. How is it determined or who makes the determination with respect to the dollar amount of a contract?
MR. WELLONS: Objection, vague. Go ahead and answer.

Page 48

THE WITNESS: The dollar amount of a contract?
BY MR. BAUGHER:
Q. Yes.
A. The dollar amount per unit, by unit, or are you talking about the contract for the year?
Q. Yes, the contract and the yearly amount that is identified to that contract or allocated for that contract.
A. That's done in operations.
Q. And they make a decision about what funds may be allocated for a particular contract?
A. Yes.
Q. So for example, if an owner, as I think was the case with South Pointe, asked for an annual amount of approximately $2.7 million and that amount is reduced to $2.5 million, who makes the determination on that?
MR. WELLONS: Objection, assumes facts not in evidence. Go ahead and answer.
THE WITNESS: I don't know. I really don't understand your question as it relates to South Pointe or this entire process, because contracts are determined by the rents, you know, the

Page 49

various rent structure of a development. Can you clarify that question?
BY MR. BAUGHER:
Q. The total annual contract amount is a number that is calculated based on rents for the units that are then multiplied out to give you a yearly total; is that right?
A. Yes.
Q. So the basic number that generates an annual total are the rent numbers for the specific units?
A. Yes.
Q. So that if you want to know what the annual amount is, the determinations on that go back to the question of what rents will be charged for each of the units during that contract year?
A. The approved rents.
Q. And so the issue is what rents will be approved for a particular project, for a particular year in determining then what the yearly total will be; is that right?
A. Yes.
MR. WELLONS: Objection, vague, misstates prior testimony. Go ahead and answer.
THE WITNESS: Yes, the contract amount is

based on approved rents.
BY MR. BAUGHER:
Q. And who makes the determination at HUD on the amount of rents that will be charged when there is a renewal request?
MR. WELLONS: Objection, assumes facts not in evidence. Go ahead and answer.
THE WITNESS: An owner submits a request to HUD for rent increase and analysis is done by the project manager to determine if the rents are appropriate or justified, you know. And if their rents can be approved, they put that data in. But it's a part of the process that goes into REMS.
BY MR. BAUGHER:
Q. So it's the project manager that makes the determination about the rent level as distinguished from someone in operations?
MR. WELLONS: Objection, misstates prior testimony, assumes facts not in evidence. Go ahead and respond.
THE WITNESS: They review all data submitted by the owner or his agent.
BY MR. BAUGHER:
Q. When you say they, that refers to the



project manager?
A. The project manager reviews the information submitted by the owner or his agent to determine if rents -- if a rent increase is justified.
Q. Does operations have any role in determining whether or not rent increases or rent changes are justified?
A. No.
Q. So the annual dollar amount of the contract; that is, the summation of all the rents, is also something that is determined in the management group in Multifamily Housing, right?
A. Yes.
Q. Is this procedure for contract renewal approval one that is prescribed by HUD regulations or a directive or the 1998 MARA set of directions that you were alluding to earlier?
MR. WELLONS: Object, compound, and object to the extent it calls for a legal conclusion. Go ahead and answer.
THE WITNESS: What procedures are you referencing?
BY MR. BAUGHER:
Q. Well, the sequence of steps that you have



described and we've been talking about for half an hour now of how a request for a contract renewal is processed in the Chicago office.
A. No, that information is not in any notice.
Q. So the procedure that you've described is one that has been developed in the Chicago office and has been in place over the course of the last half dozen years?
A. Yes.
Q. Is there any written set of procedures for contract renewal requests in the Chicago office?
MR. WELLONS: Objection, asked and answered. Go ahead and answer.
THE WITNESS: The procedures are outlined in the renewal guidelines.
BY MR. BAUGHER:
Q. What are the renewal guidelines you're referring to?
A. The contract renewal guide book.
Q. But that's a HUD document, correct? I mean, when I say HUD document, that comes out of headquarters?
A. Yes.
Q. That handbook, I gather, doesn't prescribe



exactly the procedure for a project manager reviewing a request and then that request being reviewed by someone in Ms. Gray's position and then it being sent on to operations, does it?
A. No.
Q. That's something that was developed in Chicago?
A. Yes.
Q. What I was asking is, is there anything written that describes that procedure for the Chicago office?
A. No.
Q. Notwithstanding that, that is the procedure that has been used for at least the last half dozen years?
MR. WELLONS: Objection, asked and answered.
BY MR. BAUGHER:
Q. Is that correct?
A. You're saying six years. I know -- yeah, approximately six years.
Q. Now, we got into this long set of questions and answers because you were saying that you and Ms. Thomas -- or Ms. Thomas had brought up to you some issues about the South Pointe contract?





00000000-0000-0000-0000-000000000000

Page 54

MR. WELLONS: Objection, misstates the record.
BY MR. BAUGHER:
Q. Correct? Did I misstate what you had said about a half an hour ago?
MR. WELLONS: Object to the extent counsel was explaining why it took half an hour to cover these questions. Go ahead and respond.
THE WITNESS: I don't recall exactly what I said about Ms. Thomas and the contract.
BY MR. BAUGHER:
Q. Ms. Thomas is the one who raised with you the question of the South Pointe contract?
A. When you say question, I believe -- I don't recall exactly what was said, but I don't think that was it.
Q. Well, what did she say to you?
A. Relative to what?
Q. About South Pointe's contract.
A. She brought to my remembrance the contract, as I believe I said, that was issued by operations in error.
Q. What did she tell you about that?
MR. WELLONS: Objection, asked and answered

Page 55

THE WITNESS: Do you remember that we issued the contract in error?
BY MR. BAUGHER:
Q. She asked you if you remembered that?
A. That we issued -- well, operations division. When I say we, I mean the Department issued the contract in error.
Q. What did you say to her?
A. Yes.
Q. Then what did she say to you?
A. It was nothing, nothing.
Q. That was the end of the conversation?
A. I don't recall any additional dialogue on that matter.
Q. Did she tell you how the Department had issued a contract in error?
MR. WELLONS: Objection, asked and answered
THE WITNESS: Did she tell me?
BY MR. BAUGHER:
Q. Yes.
A. I believe I responded that she, you know, brought it to my remembrance, you know, that the contract was issued in error.
Q. Well, how did that happen?

Page 56

MR. WELLONS: Objection, asked and answered
THE WITNESS: How did it happen?
BY MR. BAUGHER:
Q. Yes.
A. I believe I stated that the question that you asked, did we have any discussion on any documents concerning the deposition, and I told you that she brought that to my attention.
Q. Did you go back to look at any contract documents?
MR. WELLONS: Objection, asked and answered. Go ahead.
THE WITNESS: No, I didn't. She had the -- she had the contract in her hand when she asked me.
BY MR. BAUGHER:
Q. What was the contract that she had in her hand?
A. The one that the Department made corrections on that were issued in error.
Q. Where there some cross-outs and handwriting with amendments to the contract?
MR. WELLONS: Objection, assumes facts not in evidence. Go ahead an answer.
THE WITNESS: I didn't look through the

Page 57

entire contract. But I believe I saw a cross-out with her initial there.
BY MR. BAUGHER:
Q. What authority does or did Ms. Thomas have to amend the South Pointe HAP contract in 2000 or 2001?
MR. WELLONS: Objection to the extent it calls for a legal conclusion. Object to the extent it assumes facts not in evidence. Go ahead and answer.
THE WITNESS: Can you clarify that question? What authority did Ms. Thomas have to amend the contract, can you elaborate on that?
BY MR. BAUGHER:
Q. She was the project manager for South Pointe in 2000, 2001, correct?
A. I believe so.
Q. And as the project manager, from what you've said, requests for renewals would come to her?
A. Uh-huh.
Q. But once the contract had actually been signed, once it's gone through the process, what authority does she have to make changes or amendments to the signed contract?





00000000-0000-0000-0000-000000000000

MR. WELLONS: Same objection. Go ahead and answer.
THE WITNESS: The authority to amend that contract was done by our Hub director, Mr. Hinsberger.
BY MR. BAUGHER:
Q. She had the authority to amend the contract then because Mr. Hinsberger told her she could do that?
MR. WELLONS: Objection, misstates prior testimony, assumes facts not in evidence. Go ahead and answer.
THE WITNESS: It wasn't that Mr. Hinsberger told her that she could do that. As I indicated earlier, the contract was issued in error, and because it was issued in error, an amendment had to be made.
BY MR. BAUGHER:
Q. Do you know anything about the processing of the South Pointe contract renewal request in 2000 other than your statement that the contract was ultimately issued in error?
A. Can you state the question again?
MR. BAUGHER: Why don't you read it back.



(Whereupon, the record was read as follows:
Q. Do you know anything about the processing of the South Pointe contract renewal request in 2000 other than your statement that the contract was ultimately issued in error?)
THE WITNESS: On that particular contract that was issued in error, a decision was made by our Hub director not to renew that contract for an extended period of time due to the physical condition of that property.
BY MR. BAUGHER:
Q. How do you know that?
A. How do I know what?
Q. That the Hub director had made a decision not to extend the contract for a long period of time because of the condition of the property.
A. The Hub director and our office, the Department Enforcement Center, had been engaged in activities with this property based on the physical condition, the substandard physical condition.
There have been meetings with



representatives from the ownership entity, and the property was supposed to have been repaired, restored, you know, but these things never occurred. And as a result, our Hub director made a decision not to continue that project, that contract, the long-term contract.
Q. When was that decision made?
A. I don't know the exact date.
Q. How do you know there was such a decision?
A. Because the contract was not renewed for the -- it was renewed on a short-term basis, and we continued to renew the contract on a short-term basis until the vouchers were issued.
Q. You referred several times in the last few answers to the Hub director. That is Mr. Hinsberger?
A. Yeah, Mr. Hinsberger.
Q. Did Mr. Hinsberger say to you at some point that the South Pointe contract would not be extended for a long period of time because of the condition of the property?
A. There were meetings.
Q. Did Mr. Hinsberger make that statement at one of the meetings?
A. Based on the physical condition of the



property, the decision was made by the Hub director not to renew that contract.
Q. And how did you learn about the Hub director's decision?
A. Meetings.
Q. What meeting did you learn from the Hub director that he had decided that the contract should not be extended for a long period of time?
A. At what meeting?
Q. Yes.
A. I don't recall the date and time of the meeting.
MR. WELLONS: Counsel, just a moment.
(Whereupon, a discussion was had off the record.)
BY MR. BAUGHER:
Q. How did Mr. Hinsberger communicate his decision to you?
A. He verbally stated that we're only going to renew this contract for a short period of time due to the physical condition -- due to the substandard physical condition.
Q. Who was present when he said that to you?
A. I don't recall.

Page 62

Q. Was it just you?
A. I don't recall. The project manager might have been in the room, been in the meeting. I don't recall.
Q. Do you recall where the meeting took place?
A. It's in our HUD office.
Q. Was there anyone from DEC present that you recall?
A. I don't recall.
Q. Was there anyone from operations present?
A. I don't recall.
Q. Was Mr. Hinsberger's decision that you're remembering put in writing in any place that you can remember?
A. I don't recall.
Q. Did you get an e-mail from Mr. Hinsberger on the subject of renewal of South Pointe's contract?
A. I do not recall.
Q. Did you get a memo from Mr. Hinsberger concerning the South Pointe contract in 2000?
A. No, we don't -- he would never have to direct me to do something with a memo.
Q. So there was nothing in writing that you received from Mr. Hinsberger concerning the renewa

Page 63

of South Pointe's contract in 2000?
MR. WELLONS: Objection, misstates prior testimony. Go ahead and respond.
THE WITNESS: Mr. Hinsberger gave the directive not to renew the contract for South Pointe due to the substandard physical condition of the property. The condition of the property had been longstanding and a decision was made not to renew.
BY MR. BAUGHER:
Q. Was that decision communicated in any way by Mr. Hinsberger in writing?
MR. WELLONS: Objection, asked and answered Go ahead and respond.
THE WITNESS: As I've previously stated, Mr. Hinsberger does not have to communicate directives to me in writing.
BY MR. BAUGHER:
Q. I didn't say he had to. The question is, did Mr. Hinsberger, in any written record that you recall, communicate that the South Pointe project would not be renewed for any long period of time?
A. I do not recall that being put in writing.
Q. Did you have any involvement in the processing of South Pointe's contract renewal request

Page 64

in 2000?
MR. WELLONS: Objection, vague. Go ahead and answer.
THE WITNESS: I did not have any hands-on processing of the contract renewal.
BY MR. BAUGHER:
Q. Did you know that a request for renewal had been made by South Pointe in the summer of 2000?
A. It's been a long time ago, but I vaguely recall that when a request was made, the decision was made by Mr. Hinsberger not to renew that contract due to the substandard physical condition of that property.
Q. You don't know when Mr. Hinsberger made that decision, do you?
MR. WELLONS: Objection, asked and answered. Go ahead and answer.
THE WITNESS: No. Not exactly, no.
BY MR. BAUGHER:
Q. Now, are you aware that a request was received by HUD from South Pointe for a four-year contract renewal?
MR. WELLONS: Objection, assumes facts not in evidence, asked and answered. Go ahead and

Page 65

answer.
THE WITNESS: I didn't know what the term was. I recall when the contract renewal came in, that the term -- I don't recall. I didn't look at the contract, no. I didn't see the contract when it came in.
BY MR. BAUGHER:
Q. Did someone tell you about it?
A. Yes.
Q. Who?
A. The project manager, Ms. Thomas.
Q. And what do you remember Ms. Thomas telling you about when she received the contract renewal request?
A. Nothing other than the renewal request was in for South Pointe.
Q. What did you tell her to do, if anything?
A. I believe she had some discussion with Mr. Hinsberger as well, because the financing was pending; there were other issues, concerns on the table; and she brought that to our attention.
Q. When you say our attention?
A. Mr. Hinsberger and mine.
Q. Was there a meeting of the three of you?

Page 66

A. No, she just walked by my office and said I have the contract in for South Pointe. And I believe she might have done the same for Ed. It's been a long time ago, so I'm speculating.
MR. WELLONS: I'm sorry. I just want to clarify for the record. When you refer to Ms. Thomas said she had the contract in, are you referring to the contract renewal request?
THE WITNESS: Yes, the request.
MR. WELLONS: Thank you.
BY MR. BAUGHER:
Q. Did Ms. Thomas tell you that she had spoken with Mr. Hinsberger about the renewal request?
A. I do not recall.
Q. So you don't know whether she talked with Mr. Hinsberger or not?
A. Because of the refinancing, I can speculate to say that she did.
Q. But you don't know that from your own knowledge?
A. Not at the time. I think you asked the question at the time that this came in. At some point in the process, yes, she did talk to Mr. Hinsberger.

Page 67

Q. Do you know when that was?
A. No, not exactly.
Q. Did she tell you about a conversation with Mr. Hinsberger?
A. I don't recall.
Q. There's none that you recall her telling you about now?
A. I don't recall her saying I had a conversation with Mr. Hinsberger concerning South Pointe's contract. However, at some point in time, during the processing stage, she had to have had a conversation with Mr. Hinsberger for him to make the decision of not to renew. Exactly when that conversation occurred, I do not recall.
Q. And Ms. Thomas never recounted any conversation that she had had with Mr. Hinsberger to you, did she?
MR. WELLONS: Objection, asked and answered. Go ahead and respond.
THE WITNESS: I do not recall.
BY MR. BAUGHER:
Q. So do you know that Ms. Thomas was the one who was the person who processed the South Pointe HAP contract renewal request in 2000?

Page 68

MR. WELLONS: Objection, asked and answered. Go ahead and respond.
THE WITNESS: I can't say for sure, because I was not there at her computer. You know, I would assume, because she's the project manager.
BY MR. BAUGHER:
Q. So you really don't know that?
A. No.
Q. Did Ms. Gray review and concur in the materials that she received from the project manager for South Pointe in 2000?
A. I don't know for sure.
Q. Have you ever had any conversations with Ms. Gray about the South Pointe renewal request in 2000?
A. I don't recall.
Q. Do you have any reason to believe that she didn't concur in the processing of that contract?
A. I don't recall.
Q. You don't have any recollection of that?
A. No. The HAP contract process for South Pointe in 2002, I don't know if -- I did not see Gwen actually input any data in the system; I did not see Gwen Thomas, Ms. Thomas take the contract to

Page 69

Ms. Gray for concurrence; and I did not see Ms. Gray take the contract to operations for concurrence.
Q. Well, you know that eventually the contract made its way to operations, correct?
A. Yes.
Q. And is it your belief that Ms. Thomas reviewed the materials and then Ms. Gray reviewed what she received from the project manager and then Ms. Gray passed it on to operations?
MR. WELLONS: Objection, compound, asked and answered. Go ahead.
THE WITNESS: I can only speculate that that's what occurred. I did not actually see Ms. Thomas input the data, nor did I actually see Ms. Gray concur and take it to operations.
BY MR. BAUGHER:
Q. So you don't have firsthand knowledge of that procedure, but that's what you believe took place; is that right?
MR. WELLONS: Objection, asked and answered. Go ahead.
THE WITNESS: I've answered that question repeatedly.
BY MR. BAUGHER:





00000000-0000-0000-0000-000000000000

Page 70

Q. What's the answer to the question I put?
MR. WELLONS: Same objection. Go ahead.
THE WITNESS: I can only speculate that that's how the process worked.
BY MR. BAUGHER:
Q. Do you have any reason to believe that it worked in some other way with respect to the South Pointe renewal request in 2000?
A. That was a long time ago.
Q. Do you have any reason to believe that the process functioned in any different way with respect to South Pointe in 2000?
A. I don't think so. But I can only speculate. It's been a long time ago.
Q. Did anyone ever tell you that Ms. Thomas did not process the application or that Ms. Gray did not review and concur on the request for contract renewal or that she did not then pass that information along to operations?
MR. WELLONS: Objection, compound. Go ahead.
BY MR. BAUGHER:
Q. Did anyone tell you ever anything about those statements being incorrect?

Page 71

MR. WELLONS: Same objection. Go ahead.
THE WITNESS: I do not recall any specific statements as such.
BY MR. BAUGHER:
Q. Now, you say that the -- that a 2000 renewal contract was entered, which then later had to be amended, correct?
MR. WELLONS: Objection to the extent it misstates prior testimony. Go ahead and answer.
THE WITNESS: I said that the contract was issued; it was forwarded to the owner in error and it had to be amended.
BY MR. BAUGHER:
Q. When did you first learn that the contract needed to be amended?
MR. WELLONS: Objection, assumes facts not in evidence. Go ahead and answer.
THE WITNESS: I believe it was during the meeting when one of the owner's representatives was bringing -- was returning the contract, the signed contract.
BY MR. BAUGHER:
Q. When was that meeting?
A. I don't recall the date of the meeting.

Page 72

Q. Who was present?
A. Ms. Thomas was in the meeting; I believe Mr. Horton and Mr. Sanders, representatives from the ownership entity; and I do not recall the other HUD participants.
Q. Was Mr. Hinsberger there?
A. I do not recall.
Q. Did you see a copy of a signed contract at that meeting?
A. The contract that they were returning was given to the project manager, and it was at that time that she noticed the contract term. And they were told -- the owner representatives were told during the meeting that this contract was forwarded to them in error.
Q. Now, I've been assuming that you were at this meeting; is that right?
A. Yes, I was in the meeting.
Q. Who had a copy of the contract, Mr. Sanders?
A. It was one of the owner's representatives that presented it to Gwen, Ms. Thomas.
Q. Did you see that?
A. I didn't look at the contract. I saw them just pass it to Ms. Thomas during the meeting.

Page 73

Q. Did you know what was being passed?
MR. WELLONS: Objection, asked and answered. Go ahead.
THE WITNESS: It didn't -- nothing -- I mean, it wasn't -- it wasn't a big deal. It wasn't anything where -- you know, it wasn't that official, so I didn't know if he was giving her other information, a contract. But it was at that meeting when. . .
BY MR. BAUGHER:
Q. Well, was there any conversation about that or did he just; that is, Mr. Sanders or whoever it was, just give the signed copies signed by the owner to Ms. Thomas?
A. He gave them to Ms. Thomas. And it was during that meeting -- first, let me state the meeting was a long time ago, so I do not remember the details and the facts of the meeting precisely. But the contract was given to Ms. Thomas during the meeting. It was determined during the meeting that this contract was issued in error. They were informed during the meeting.
Q. Did you see the contract that was passed to Ms. Thomas?





00000000-0000-0000-0000-000000000000

Page 74

MR. WELLONS: Objection, asked and answered.
THE WITNESS: I saw paper given to Ms. Thomas.
BY MR. BAUGHER:
Q. Do you see if the contract was signed at that point?
A. I'm assuming it was signed, because they were returning it for the ownership entity.
Q. So your assumption is that it was signed by the owner but not by HUD at that point?
A. No, it wasn't signed by HUD.
Q. How do you know that?
A. If the owner -- it's not the process to have a signed contract. If the owner was returning a contract that he had executed, we would then take it and sign it and then forward him an executed copy.
Q. So you believe that what Mr. Sanders gave to Ms. Thomas were copies of the contract signed by the owner but not yet signed by HUD; is that right?
A. I believe that to be correct.
Q. And you said that somebody informed somebody else during the meeting something about the contract. Who said something about the contract at the meeting?
MR. WELLONS: Object to the extent it

Page 75

misstates prior testimony, vague. Go ahead and answer.
THE WITNESS: I believe Gwen took the contract and indicated that the time frame -- that the time period was not correct.
BY MR. BAUGHER:
Q. Well, you didn't say anything about the contract at that meeting, did you?
A. It was a known fact --
Q. Excuse me. Question was we're looking for who said something. Did you say anything about the renewal contract at this meeting that you're describing with Ms. Thomas, Mr. Horton, Mr. Sanders and perhaps others?
MR. WELLONS: Counsel is instructed not to interrupt the witness.
Ms. Coleman, have you finished your response to the previous question?
THE WITNESS: No.
MR. WELLONS: Would you like to finish your response at this time?
THE WITNESS: The fact that the contract was sent to the owner in error brought about discussion by the participants. As I indicated, I do not recall

Page 76

all participants in that meeting. I know I was there, Ms. Thomas was there, and Mr. Sanders and Mr. Horton, they were owner's representatives. So there was discussion about that contract being forwarded in error, and they were told at that meeting that we were only issuing a short-term contract.
BY MR. BAUGHER:
Q. And you say the comment about the contract was made by Ms. Thomas?
MR. WELLONS: Objection, misstates prior testimony. Go ahead and answer.
THE WITNESS: Ms. Thomas discovered the error that the contract was not for the correct period of time.
BY MR. BAUGHER:
Q. Who from HUD said something about the contract at this meeting that you're describing?
A. Everyone that was represented from the Department. You know, it was a discussion.
Q. What did you say?
A. I don't recall other than the contract was sent in error.
Q. You said that at this meeting?

Page 77

A. It was a discussion.
Q. What do you recall saying?
A. I do not recall my exact words.
Q. Do you recall saying anything about the subject of the contract yourself at that meeting?
MR. WELLONS: Objection, asked and answered.
THE WITNESS: There was discussion regarding the contract being sent in error from the participants.
BY MR. BAUGHER:
Q. But you don't remember --
A. I do not remember --
MR. WELLONS: Counsel is instructed not to interrupt the witness. If you continue to do that, we will end this deposition.
Ms. Coleman, please complete your answer.
THE WITNESS: I do not recall the specifics.
BY MR. BAUGHER:
Q. When was the next time after that meeting that you heard anything about the South Pointe contract?
A. I do not recall exactly when there was discussion about the South Pointe contract after that meeting.





00000000-0000-0000-0000-000000000000

Q. Did you have any further conversations with Ms. Thomas about the contract after the meeting?

A. Yes.

Q. What do you recall talking about with Ms. Thomas on that subject?

A. That we had to follow Mr. Hinsberger's directive and correct the contract for the period of time that he indicated that it should be extended.

Q. Was that conversation that you had with Ms. Thomas sometime in early December 2000 around the time that you sent a letter to the owners amending the contract?

MR. WELLONS: Objection, assumes facts not in evidence. Go ahead and answer.

THE WITNESS: We had conversations prior to the issuance of the letter. The exact dates, I don't know. It was a long time ago.

BY MR. BAUGHER:

Q. Do you remember anything specific about any of those conversations?

A. Other than that we had to adhere to Mr. Hinsberger's directive and make the corrections on the contract, that the contract was not being renewed due to the substandard physical condition of



South Pointe.

Q. Do you know what Ms. Thomas did with the signed contracts that she received from Mr. Sanders at this meeting that you described?

MR. WELLONS: Objection, assumes facts not in evidence. Go ahead and answer.

THE WITNESS: No.

BY MR. BAUGHER:

Q. Do you know if she took those contracts to operations to get the contracts signed?

A. Ms. Thomas knew when she received the contracts that they were issued in error, so why would she take an erroneous contract and have somebody in operations sign off on it?

Q. Was what you term the erroneous contract signed by somebody at HUD?

A. To my knowledge, I don't think -- I don't know. To my knowledge, it should not have been.

Q. Well, if the contract was erroneous, then presumably it should not have been signed, right?

MR. WELLONS: Objection, misstates prior testimony, assumes facts not in evidence.

THE WITNESS: The contract should not have been signed, and Ms. Thomas made some corrections to



the contract as directed by Mr. Hinsberger. And I believe the contract was signed by Mary Anderson after the corrections were made, and those corrections were stated to the owner's representatives during the meeting.

BY MR. BAUGHER:

Q. So the sequence that you remember is that Mr. Sanders gave the contract with the owner's signature to Ms. Thomas at this meeting, correct?

MR. BAUGHER: Excuse me. I object to counsel talking to the witness after I've just put a question to her. Obviously you can talk to the witness at other times, but I have a pending question.

MR. WELLONS: Objection noted for the record.

MR. BAUGHER: And now counsel is again talking with the witness, which I don't object to in general, but I do object to when it's right after I've asked a question.

MR. WELLONS: The objection is noted for the record.

MR. BAUGHER: Will you read the question back.



(Whereupon, the record was read as follows:
Q. So the sequence that you remember is that Mr. Sanders gave the contract with the owner's signature to Ms. Thomas at this meeting, correct?)

THE WITNESS: This occurred a long time ago. And as I recall, contracts were given by the owner's representative during the meeting and changes, the amendments, or how the contract was issued, it was done after the meeting at a later date and it was done under the direction of Mr. Hinsberger. And the contracts were issued to the owner.

BY MR. BAUGHER:

Q. So the mark-outs were made and then to comport with what you say was Mr. Hinsberger's direction and then the amended contracts were sent out to the owner with those changes, correct?

MR. WELLONS: Objection, asked and answered. Go ahead and answer.

THE WITNESS: I can only speculate that they were sent out to the owner with corrections. I do not know for sure, because the contracts are sent out





00000000-0000-0000-0000-000000000000