by Mary Anderson, the operations director.
BY MR. BAUGHER:
Q. And you believe that she did that after the contract had been amended, correct?
MR. WELLONS: Objection, asked and answered. Go ahead.
THE WITNESS: I believe they were sent out after the contracts were amended with Mary's signature, with Mary Anderson's signature. I can only speculate, because I did not officially send it out, and this has been a long time ago.
BY MR. BAUGHER:
Q. What is the process for amending a HAP contract?
MR. WELLONS: Objection, vague. Go ahead and answer. Also, to the extent it calls for a legal conclusion. Go ahead and answer.
THE WITNESS: Since I don't issue the contracts, I can't -- there's not any specific process that I know of. But that question would be better posed to someone in operations.
BY MR. BAUGHER:
Q. Someone like Ms. Anderson or Mr. Tesler or someone else in operations?



A. Someone on the contract side. Mr. Tesler is not on the contract side. He's in operations, but he doesn't deal specifically with contracts.
Q. Is there an official process for amending a HAP contract?
MR. WELLONS: Objection, asked and answered. Object to the extent it calls for a legal conclusion. Go ahead and answer.
THE WITNESS: That question, as I indicated, would be better directed to someone in operations that actually issues the contracts.
BY MR. BAUGHER:
Q. So typically, if there are to be amendments to a contract, those are made in operations or through operations?
A. To be clear, some amendments might be made in operations, but they confer, they do talk to the project manager.
Q. Do you know if operations has any written guidelines or procedures for amending HAP contracts?
A. I've never seen them.
Q. When you were telling us that you looked at REMS screens a short time ago, do you recall seeing anything on the REMS screens concerning



South Pointe's HAP contract?
A. No, I don't recall. I really don't recall. Like I said, I glanced at the REMS screens, and I did not -- I was not trying to retain any specific information concerning the project.
Q. Do you recall seeing anything on the REMS screen concerning what you say was Mr. Hinsberger's decision that the South Pointe contract would not be renewed for any long period of time?
A. No, I don't recall.
Q. Do you recall any memoranda or e-mails or other written communications internally between management and operations concerning the South Pointe renewal contract that you say was the required amendment?
MR. WELLONS: Objection to the extent it misstates prior testimony. Go ahead and answer.
THE WITNESS: It was a long time ago, and I do not recall.
BY MR. BAUGHER:
Q. Just so we're clear on that, with respect to the need for amendment, what the amendments were going to be, or the manner in which those amendments would be conveyed to the owner, do you recall any



written materials internally concerning those subjects?
A. I recall a letter that was sent to the owner.
Q. That was a letter that you sent to the owner?
A. Yes, yes.
Q. Other than that, do you recall any e-mails or memoranda or handwritten notes on the subject of the need for amendments to the South Pointe renewal contract?
A. It was a long time ago, and I do not recall.
Q. If there had been any such written communications on that subject, where would you find them?
A. As I indicated earlier, Mr. Hinsberger does not direct his staff to do anything via memorandum. He verbally communicates to us what he wants. Sometimes we receive e-mails, but I do not recall any e-mail regarding the South Pointe amendment. There may have been some, but I do not recall.
Q. Do you have access to the DEC REMS screens?
A. No, we don't have access to the DEC's REMS screens.

Q. I wrote down right at the outset of the questions this morning a note that when you looked at the REMS screens that you were looking, as my note says, for information on DEC enforcement. I may have made the note in error. But did you look at any DEC screens?
A. We don't have access to their screens.
Q. Let me show you what was marked yesterday at Ms. Thomas' deposition as Thomas Deposition Exhibit 1.
MR. WELLONS: Actually, Counsel, by my watch we've been on for about two hours. Why don't we take a short break before getting into the documents.
MR. BAUGHER: Fine.
(Whereupon a short break was taken, after which the following proceedings were had:)
BY MR. BAUGHER:
Q. Ms. Coleman, did you look at any documents or papers during the break that we just took?
A. No.
Q. All right. Will you turn please to Thomas Deposition Exhibit 1.



A. This?
Q. Yes. You'll see the court reporter puts a note on the first page of a document when we mark it as an exhibit, so that one happens to be Thomas Deposition Exhibit 1.
Do you know what that document is?
MR. WELLONS: Why don't you take a moment to review the document in its entirety.
BY MR. BAUGHER:
Q. Let me try to shorten it up a little bit.
The Department has informed us that Thomas Deposition Exhibit 1 are screens that were printed from the DEC REMS screens on February 8, 2005. Does that description appear to be to you accurate?
A. I don't have access to the DEC screens, so I don't know if it's accurate or not.
Q. Have you ever seen materials from the DEC screens in REMS?
A. No.
Q. One of the questions I asked you right at the outset of the deposition was about referrals of properties to DEC, and specifically, I asked you about the number of instances in which South Pointe had been referred to the DEC. Do you recall that?



A. Yes.
Q. Can you look at Thomas Deposition Exhibit 1, and particularly looking at the first page, tell us on what dates South Pointe was referred to the DEC?
A. The date, according to the DEC team report, says it was referred 9/13/98.
Q. Does that comport with your recollection that South Pointe was referred to DEC in the fall of 1998?
A. I cannot -- I don't recall the exact date that we made the referral if it's on their team report I can assume. But I do not recall the exact date.
Q. Do you have any reason to believe that the first referral was some date other than in September 1998?
A. No.
Q. And you see in the status column to the right that at some point, the referral was closed and the project was returned to Hub, correct?
A. Yes.
Q. And Hub, h-u-b, means what?
A. The Chicago Multifamily Hub.
Q. Which is your department?



A. Ed Hinsberger's department. I'm within that department, yes.
Q. And then there was a second referral on October 23, 2001, correct?
A. According to the DEC team report, that's the referral date.
Q. Do you have any reason to doubt that that was the date of the second referral?
A. No.
Q. And what happened with respect to that referral?
A. According to the DEC team report, under the status column, it was closed and returned to Hub.
Q. Does that comport with your recollection of what took place with respect to the second referral of South Pointe to DEC?
A. I really don't recall when the second referral was returned.
Q. Well, this document, Thomas Deposition Exhibit 1, at least on the first page, doesn't tell us the date of the return, at least as far as I can see, does it?
A. No.
Q. I'm paging through Thomas Deposition 1

Page 90

myself, and I see at page 1119 another copy of this same screen that's in the first page, but it seems to have the same information.

Does the DEC team report view generate a place that if you wanted to find out the dates for referral, you would go to?

A. We do not have access to the DEC fields in REMS. But we have an area in REMS where we could look at referral dates.

Q. What is the screen that would show that?

A. I'm not exactly sure. It might be a screen in problem statement. It's a screen someplace in REMS where the PM can actually see referral dates.

Q. Well, let me show you Kiening Deposition Exhibit 2, which is a compendium of REMS documents and on the second page in the left, there are a list of the screens that one can get in REMS.

Do you know what screen you would look at for information on referral dates?

A. I believe it's in problem statement.

Q. And that was one -- that was the screen that you looked at very briefly to help prepare for this deposition?

A. The narrative portion, not referral dates.

Page 91

Q. So any time you wanted to know what the referral dates were for a referral from Multifamily to DEC, you would be able to get that information by going on REMS to the problem statement area and pulling up one of the subscreens that would show that information, right?

MR. WELLONS: Objection, misstates prior testimony. Go ahead and answer.

THE WITNESS: I believe that is correct. However, I do not have a REMS screen in front of me to verify. So I believe my answer is correct.

BY MR. BAUGHER:

Q. But you believe that information is available from REMS for you?

A. Yes, I do. I believe that to be accurate.

Q. Now, what was your involvement with South Pointe during the years in which it was first referred to DEC beginning in the fall of 1998?

A. I was not the project manager. And most of the day-to-day activities with South Pointe after it was referred to the DEC was with the project manager and the enforcement analyst in the DEC.

Q. Now, for South Pointe in the years 1998 to early 2000, who were the project managers and DEC

Page 92

analyst who were responsible for South Pointe?

A. I believe Ms. Thomas was the project manager. The enforcement analyst, I believe, was Freddie Batchelor, and I'm not sure if she remained the enforcement analyst the entire time.

Q. Who do you think her successor was?

A. I do not recall.

Q. Physically can you describe the relation of the DEC offices and the management portion of the Multifamily Housing office?

A. Both offices are located in the same building, 77 West Jackson. We're on the 23rd floor, and DEC is on the 22nd floor.

Q. Do you go down to the 22nd floor very often to talk or meet with people at DEC?

MR. WELLONS: Objection, vague, assumes facts not in evidence. Go ahead and answer.

THE WITNESS: No.

BY MR. BAUGHER:

Q. Does DEC very often come up to your part of the 23rd floor?

MR. WELLONS: Objection, vague. Go ahead and answer.

THE WITNESS: No.

Page 93

BY MR. BAUGHER:

Q. Were you at 77 West Wacker in 1998 to 2000?

MR. WELLONS: Just to correct the record, I believe the address that you referenced was West Jackson; is that correct?

THE WITNESS: Yeah, he said West Wacker.

BY MR. BAUGHER:

Q. I did say West Wacker, and I meant it. But I'm wrong done. It's West Jackson.

You've been at the 77 West Jackson address for how long?

A. I'm not sure of the date we moved in, but we were there in 1998.

Q. Did you have any oversight or monitoring role during the period 1998 to 2000 when the South Pointe project was at the DEC or had been referred to the DEC?

A. Yes.

Q. And what was your responsibility?

A. I was a supervisor in the department, and it was my responsibility to work with the project manager in attempting to bring this property into compliance.

Q. Was that your goal during this period, to



KRUSE & ASSOCIATES, LTD.
312-345-1500

00000000-0000-0000-0000-000000000000

Page 94

attempt to bring the property in compliance?
A. That was our goal.
Q. Now, in fulfilling your responsibility to work with the project manager on this, during the period 1998 to 2000, how often did you speak with Ms. Thomas or meet with Ms. Thomas on the subject of South Pointe?
A. I don't recall. It's a long time ago.
Q. Was it frequently or from time to time; do you recall that?
A. I do not recall. It was quite some time ago, and I don't want to speculate.
Q. Do you keep any files of memoranda or notes about meetings on specific projects that you attend?
A. No.
Q. Do you make entries yourself into REMS and some of the narrative fields in REMS, like problem statement, project history, or similar narrative fields?
A. I've made a few entries in REMS.
Q. What are the circumstances in which you make entries into REMS of that sort?
MR. WELLONS: Objection, assumes facts not in evidence, misstates the prior testimony. Go ahead

Page 95

and answer.
THE WITNESS: Information, I don't recall the specific information that I input. But I have made some annotations in REMS over the years, but I do not recall the specific situation.
BY MR. BAUGHER:
Q. You do that when they're important matters that you want to record in the way that you want to describe them?
A. No. The times that I've -- as I recall that I've gone into REMS and made some data entries, it might be if headquarters directed a project manager to update a field. And they aren't in the office, and I need to update an area so that maybe an owner can transmit his annual financial statement. We stress to the project manager to update the problem statement and the project history field.
Q. I'm sorry. What do you mean by that, that you stress to the project manager to update; you mean you urge them to do frequent updates?
A. Yeah, it's the project manager's responsibility to update those fields for their portfolio, so yeah.
Q. What do you mean by we stress to them; is

Page 96

that something --
A. Encourage. Remove stress, correction. Just it's a project manager's responsibility to update REMS in those fields.
Q. Do you also instruct project managers that when they make entries, they should do so as promptly at they can after whatever event they're recording or writing about?
A. It's good if they make the entries after the event, but sometimes that does not occur.
Q. Well, sometimes the project manager may be very busy on something and may not be able to enter the note on the same day the meeting took place, right?
A. Sometimes it does not occur. Sometimes they do not update those areas as quickly as they should.
Q. Sometimes it takes -- it could take a couple days or even a week, right?
A. I'm not going to pinpoint a specific time frame. You know, sometimes it's done properly; sometimes it is not.
Q. And as director, you urge the project managers to make their entries promptly?
MR. WELLONS: Objection, asked and answered,

Page 97

vague. Go ahead and respond.
THE WITNESS: Project managers know they should update REMS, and that's something they do.
BY MR. BAUGHER:
Q. And you tell them they should do that promptly?
MR. WELLONS: Same objection. Go ahead and answer.
THE WITNESS: I can't -- I really can't -- you're asking me if I tell a project manager to update REMS promptly all times. I mean, what is your exact question? I answered your question. I told the project managers to update REMS. Sometimes they do it promptly; sometimes they do not update REMS promptly.
BY MR. BAUGHER:
Q. And your direction to them, in general, is that they should update those records promptly, correct?
MR. WELLONS: Same objection. Go ahead and answer.
THE WITNESS: Yes.
BY MR. BAUGHER:
Q. Now, who else was involved with South Pointe

in 1998 to early 2000 when the project was in referral to DEC?
A. Hub director, Ed Hinsberger, and DEC staff.
Q. What was Mr. Hinsberger's role?
A. He's the Hub director. He has responsibility oversight for the projects under his jurisdiction.
Q. And as to the DEC staff, who was involved with respect to South Pointe 1998 to 2000?
A. I do not recall who the director was at that time, and I believe the team supervisor was Joan Kiening. I believe she was Freddie Batchelor's supervisor.
Q. Ms. Thomas told us yesterday that she reported to Debbie Gray?
A. Yes.
Q. Was Ms. Gray involved with South Pointe during the first DEC referral period?
A. If she had any involvement, it was limited.
Q. Well, during that several-year period, fall of 1998 into early 2000, was your involvement similarly fairly limited?
MR. WELLONS: Objection, vague. Go ahead and answer.



THE WITNESS: I was more involved than Debbie Gray. Ed Hinsberger and myself, we were more involved.
BY MR. BAUGHER:
Q. Do you recall during this period, 1998 to early 2000, ever writing an e-mail or an internal memorandum or any other written internal communication concerning South Pointe?
A. Between 1998 and 2000?
Q. Yes.
A. Did I write any e-mails? I might have. I did not recall, but quite possibly there could have been some e-mails.
Q. What do you do with your e-mail files, your sent files and your received files, what do you do with those e-mails?
A. We delete them.
Q. Do you keep them in -- do you keep at least some e-mails in subfiles on your computer itself?
A. I keep some there, but they're usually directives.
Q. Do you use the Outlook system? Do you know what Outlook is?
A. No, we don't have an Outlook system.



Q. What e-mail system do you use?
A. Lotus Notes.
Q. And Lotus Notes allows you to create files online, correct? You could have a file of directives from headquarters, for example, online?
A. Yes.
Q. And then put whatever you receive electrically into that online file?
A. Yes.
Q. Do you have an online file for South Pointe?
A. I don't recall.
Q. Have you ever had an online file for South Pointe?
A. I do not recall.
Q. How would you check that?
A. By going into my e-mail when I return to the office.
Q. When the plaintiff in this lawsuit, Englewood, asked HUD to produce documents, were you asked to check your computer for e-mails or computer files that contained documents or other information on South Pointe?
A. Yes.
Q. And did you do that?



A. Yes.
Q. What did you find?
A. I did a search, and whatever documents came up, I provided the attorney information.
Q. Who was the attorney who asked you to do that?
A. I do not recall. It might have been a paralegal.
Q. Again, coming back to the first referral to DEC. I've been, in my questions, putting an end date on that referral in early 2000, and that's because one of the documents we've discussed in depositions in the last couple of days has been a team report which was issued at the early end of -- early in 2000.
Have you ever seen the team report that was issued concerning the first referral to DEC?
A. I don't recall.
Q. Let me show you what was marked at Ms. Kiening's deposition as Deposition Exhibit 11, which is the January 2000 team report concerning South Pointe. Have you seen that before?
A. I really don't recall seeing it. I might have. It's been a long time ago.





00000000-0000-0000-0000-000000000000

Page 102

Q. As far as you know, the first time that you saw the January 2000 final team report-resolution on South Pointe is this afternoon?
A. It's been a long time, and I do not recall. I cannot say for sure that I've seen this document. I do not recall, and I'm not going to speculate.
Q. Do you recall anyone asking you to do anything with or about this team report, Kiening Deposition Exhibit 11?
A. I do not recall. As I stated before, it's been a long time ago. I don't recall.
Q. Do you recall asking Gwen Thomas to do anything with respect to or in follow-up of this team report, Deposition Exhibit 11?
A. No, I do not recall instructing. . .
Q. Did you finish your answer?
Excuse me. Counsel for the government has paged through the document and seems to be pointing to some things. I don't have any objection to the witness looking at this document, especially if she's looking at it for the first time, you know, at this deposition today. However, it's really not appropriate for counsel to be pointing things out to the witness in the middle of a question.

Page 103

MR. WELLONS: Ms. Coleman, have you had an opportunity to sufficiently review this document?
THE WITNESS: Let me be clear. I do not recall. I'm may have seen this document, but I'm not going to speculate. It's been a long time ago. When projects are returned from the DEC, it's the project manager's responsibility to continue servicing and, in fact, they service the project even when it's in the DEC.
BY MR. BAUGHER:
Q. The question that I had asked you that I think you finished answering but then there was an interruption, so let's me make sure you finished answering it, is, do you recall instructing Gwen Thomas to do anything with or about or in follow-up of this team report, Deposition Exhibit 11, from Ms. Kiening's deposition?
A. I do not recall specifically making any comments to Gwen, Ms. Thomas on this specific team report. However, when properties are returned from the DEC, the project manager is required to continue full servicing. The DEC is no longer involved at that point in time, and they are to continue full service on the project.

Page 104

BY MR. BAUGHER:
Q. Full servicing, meaning all of the different functions that are to be undertaken by a project manager with respect to a project in the Chicago office of HUD, correct?
A. Yes.
Q. But just so we're clear, you don't recall giving any specific instructions to Ms. Thomas, who was the project manager on South Pointe as of 2000 --
MR. WELLONS: Objection.
BY MR. BAUGHER:
Q. (Continued) -- about what she should do on the project in light of the team report?
MR. WELLONS: Objection, asked and answered. Go ahead.
THE WITNESS: It's been a long time. And I'm not going to speculate on what I did or did not say to Ms. Thomas at the time this report was issued.
BY MR. BAUGHER:
Q. And you don't recall writing anything to Ms. Thomas about what she should do in follow-up to the team report, Kiening Exhibit 11?
A. As I indicated, it's been a long time, and I do not recall.

Page 105

Q. Now, you'll see, looking at the last two pages of Kiening Deposition Exhibit 11, there are a number of signatures on this team report. Do you see those?
A. Yes, the last page -- or the last two, okay.
Q. One of the signatures is Mr. Hinsberger's. Do you see that on the last page?
A. Yes.
Q. Do you recall talking with Mr. Hinsberger about the final team report-resolution, Kiening Deposition Exhibit 11?
A. I don't recall.
Q. Do you recall any conversations with Mr. Hinsberger about South Pointe while it was in its first referral at the DEC?
A. Nothing about the team report.
Q. Do you remember discussing with Mr. Hinsberger action plans that were developed during the time frame in which South Pointe was at the DEC in 1998 to 2000?
A. I do not recall discussing any action plans relative to this team report.
Q. Do you recall having any discussions during the period 1998 to 2000 about whether South Pointe





00000000-0000-0000-0000-000000000000

Page 106

should be declared in default under its HAP contract?
A. I cannot be specific about the contents of the discussions back then, because it was a long time ago. But we did have discussions about South Pointe, the substandard physical condition and the contract and the financing of the property.
Q. And that was in 1998, 1999?
A. You asked me -- your question was between 1998 and 2000 did I have any conversations with Mr. Hinsberger about South Pointe.
Q. And do you remember any specific conversations with him?
A. I answered the question.
Q. Which was no, you don't recall any specific conversation?
MR. WELLONS: Object to the extent it misstates prior testimony.
THE COURT REPORTER: I need to change my disk.
MR. BAUGHER: Sure.
(Whereupon a short break was taken, after which the following proceedings were had:)

Page 107

THE WITNESS: Can you restate the question or read his prior question?
BY MR. BAUGHER:
Q. I'll restate it. You don't recall having any specific conversation with Mr. Hinsberger during the time period '98 to 2000; is that right?
MR. WELLONS: Objection, asked and answered. Go ahead and respond.
THE WITNESS: I do not recall specific conversations with Mr. Hinsberger concerning South Pointe. However, we did engage in discussions concerning South Pointe, the substandard physical condition of this property, discussions concerning financing the property, and discussions regarding the HAP. The specifics of these conversations, I do not recall the specifics. It's been a long time.
BY MR. BAUGHER:
Q. Now, look please at Kiening Deposition Exhibit 11, this final team report dated January 26, 2000. Do you see in the project summary on the first page that there is a reference to the owner investing an additional $770,000 in the property?
A. Yes, I see that.
Q. Were you aware that the owner had invested

Page 108

$770,000 additional into the property around this time?
A. No, I was not.
Q. What is the significance of the owner putting $770,000 into the property?
MR. WELLONS: Objection, vague. Go ahead and answer.
THE WITNESS: I can't respond to that. I don't know.
BY MR. BAUGHER:
Q. And the first time that you heard that the owner had put an additional $770,000 in the property in 1999 or beginning of 2000 is today; is that right?
A. This is my first time reading this. This might have been -- something might have been said in a meeting or a discussion. But this is my first time reading this, so I'm not going speculate.
Q. Well, if there was something that was said in a meeting about the $770,000 investment in 1999 in South Pointe, you don't remember it?
A. I don't recall.
Q. That sentence continues by saying that the owner continues to add additional funds in order to correct all physical deficiencies identified in the

Page 109

REAC inspection. Were you aware of that fact as of January 2000?
MR. WELLONS: Object to the question to the extent it assumes the statement in the document is accurate. Go ahead and answer.
THE WITNESS: No, I wasn't -- no, I don't recall, not aware.
BY MR. BAUGHER:
Q. You don't know anything about that?
A. About the owner infusing -- anything about the owner continues to add additional funds in order to correct all physical?
Q. Yes.
A. No, I'm not aware.
Q. You don't have any reason to dispute that statement, do you?
A. I'm not aware.
Q. You just didn't know about it?
A. I'm not aware of it.
Q. You're not aware of it, because you didn't read the final team report; is that correct?
A. I'm not aware of the owner adding any additional funds to correct the physical deficiencies of South Pointe.

Page 110

Q. Because you didn't read the final team report in January 2000 until your deposition in April of 2005, right?

MR. WELLONS: Objection, misstates prior testimony. Objection, asked and answered. You can respond.

THE WITNESS: I'm not aware of the owner infusing any dollars in South Pointe.

BY MR. BAUGHER:

Q. Do you dispute that that's a correct statement?

MR. WELLONS: Objection, asked and answered Go ahead and answer.

THE WITNESS: I'm not aware. The property was in substandard physical condition and that was the reason the decision was made to renew the contract on a short-term basis. And I'm not aware of any dollars being infused into this property to correct any problems physical.

BY MR. BAUGHER:

Q. Now, Mr. Hinsberger was one of the signatories to this final team report in January 2000, Kiening Deposition Exhibit 11. However, the report is issued from the DEC. Is that report a

Page 111

report -- are reports from the DEC, like these final team reports, kept confidential and not shown to people within Multifamily Housing?

A. Team reports are provided to Multifamily.

Q. I just wanted to make sure it's not -- this document, Kiening Deposition Exhibit 11, is not an internal DEC document like their REMS system that you don't have access to, right?

A. That's correct.

Q. Look further at Kiening Deposition Exhibit 11, please.

A. What page?

Q. Look at page two under physical condition. Under current, the first sentence says: The owner submitted a MIO plan to this office on December 8, 1998. The MIO has been tentatively accepted with two modifications. And then it continues.

Are you aware that a MIO plan was submitted to this office on December 8, 1999?

MR. WELLONS: Objection, assumes facts not in evidence. Go ahead and answer.

THE WITNESS: No, I'm not aware.

BY MR. BAUGHER:

Q. What is a MIO plan?

Page 112

A. Management improvement operating plan.

Q. Are you familiar with those?

A. Yes, I am.

MR. WELLONS: I'm sorry, Ms. Coleman, did you want to complete your answer to the previous question?

THE WITNESS: The MIO plan is a HUD document and details rehab or work to be completed at a particular property, and it also provides a source of funding for the work.

BY MR. BAUGHER:

Q. Have you ever seen a December 8, 1999 South Pointe MIO plan?

A. No.

Q. Or anything similar to that in which a listing is made of items that need to be repaired or corrected and then what the status or disposition is of those items?

A. No.

Q. Let me show you what was marked as Kiening Deposition Exhibit 10, a letter to Joan Kiening dated December 8, 1991 from South Pointe.

Have you seen that document before?

A. I don't recall.

Page 113

Q. You don't remember reviewing Kiening Deposition Exhibit 10?

A. No, I never reviewed this document.

Q. How do you know that?

A. I do not recall seeing it.

Q. Do you know if this MIO plan was approved by DEC?

MR. WELLONS: Object to the extent the question mischaracterizes the document. Go ahead and answer.

THE WITNESS: The document is not a MIO plan.

BY MR. BAUGHER:

Q. Do you know if it is the document that is referred to in the team report as being a MIO plan?

A. I don't know that.

Q. At the place that I was just directing your attention to, it says the owner submitted a MIO plan to this office on December 8, 1999. Do you know if what you're looking at, Deposition Exhibit 10, is the MIO plan that was submitted to the office on December 8, 1999?

MR. WELLONS: Same objection. Go ahead and answer.

Page 114

THE WITNESS: I didn't know that then. Based on what you're telling me now, I see the document, and I see the team report. So I'm looking at it.
BY MR. BAUGHER:
Q. So looking at it now, April 2005, you can see that there was a MIO plan that was submitted by South Pointe to HUD on December 8, 1999?
MR. WELLONS: Same objection. Go ahead and answer.
THE WITNESS: First, this is not a MIO plan. And I see that this was submitted to Joan Kiening in the Department Enforcement Center. It was not submitted to me. And I see that something was written in the team report relative to a MIO plan, but this is not a MIO plan.
BY MR. BAUGHER:
Q. Well, people who prepared the team report seem to think that Deposition Exhibit 10 was a MIO plan, right?
MR. WELLONS: Objection, argumentative.
BY MR. BAUGHER:
Q. Is that right?
A. I don't know what they thought. I can't

Page 115

speak to that.
Q. Because you haven't seen either Deposition Exhibit 10 or Deposition Exhibit 11 until April 13, 2005?
A. As I indicated, I do not recall.
Q. Do you know if Ms. Thomas ever saw a copy of the December 1999 South Pointe MIO plan, which is Kiening Deposition 10?
A. I don't know.
Q. Will you look please at page three of the team report. You see under the first two set of bullet points the text: By infusing capital into the property, the owner has shown a good faith effort to correct REAC deficiencies identified. Do you see that statement?
A. Yes, I do.
Q. Do you have any reason to doubt the truthfulness of that statement?
A. This property was in substandard condition.
Q. Do you need to have the question read back to you?
MR. WELLONS: Objection, argumentative.
THE WITNESS: The property was in substandard condition. That's my response to you.

Page 116

MR. BAUGHER: Read the question back, please.
(Whereupon, the record was read as follows:
Q. Do you have any reason to doubt the truthfulness of that statement?)
THE WITNESS: Based upon my knowledge of the condition of the property, it was in substandard condition so...
BY MR. BAUGHER:
Q. You don't agree with this statement that's made on page three of the team report?
A. I really can't comment to that statement, because I didn't prepare this report; I didn't review any documents to make that statement.
BY MR. BAUGHER:
Q. But as far as you're concerned, based on what you do know, you don't agree with the team report that was issued in January 2000 or at least this statement in it?
MR. WELLONS: Objection, asked and answered.
THE WITNESS: I've answered the question. Maybe this statement -- maybe there was something

Page 117

shown at that time to the people that prepared the report. I'm not doubting those that prepared the report as to its accuracy. However, I did not prepare the report, nor did I review documents submitted by the owner to base that fact.
BY MR. BAUGHER:
Q. And one of the documents submitted by the owner was a document, Kiening Deposition Exhibit 10, addressed to Ms. Kiening: This is a management improvement and operating MIO plan for the above-referenced REAC inspection dated April 28, 1999, a document that you never saw?
A. I do not recall seeing this document.
Q. Immediately under the sentence that I read to you says: The property received a site visit by the DEC staff on April 15 and 16 revealing the following conditions.
Were you present on that site visit?
A. No.
Q. Do you know if Ms. Thomas was present at that site visit?
A. I do not recall.
Q. Then if you skip down a paragraph, it says: Another site visit by DEC staff in August 1999





00000000-0000-0000-0000-000000000000

Page 118

revealed the deficiencies identified above and the following REAC items were corrected, and then there is a listing.
Do you see that?
A. Yes.
Q. Were you present at the site visit in August 1999?
A. No.
Q. Did you hear about the site visit of August 1999 to South Pointe?
A. I might have, but I do not recall.
Q. Do you know who Alberta Zeno is?
A. She is someone in headquarters.
Q. She was head of the DEC in 1999, correct?
A. I do not recall.
Q. She is a high-ranking person in the DEC at that time?
MR. WELLONS: Objection, vague. Go ahead and answer.
THE WITNESS: I do not recall her position.
BY MR. BAUGHER:
Q. Have you ever met her?
A. I might have seen her.
Q. Did you know that she and others made a site

Page 119

visit to South Pointe in August 1999?
A. I do not recall.
Q. Do you know who Marilyn Edge is?
A. The name sounds familiar, but I don't. . .
Q. Marilyn Edge is actually one of the signatories to this team report, correct?
A. That's what I see.
Q. Was she acting director of operations at DEC in February of 2000?
A. I don't know.
Q. Had you ever met her?
A. I don't think so. I don't recall.
Q. Is she in Chicago or Washington?
A. She wasn't in Chicago to my knowledge.
Q. She was the acting director of operations for the entire Department Enforcement Center offices in Washington, correct?
A. That's her title here, and I assume that's the position she fulfilled at that time.
Q. Was she on the site visit to South Pointe in August 1999?
A. I don't know.
Q. You've never met her?
A. Not to my knowledge.

Page 120

Q. You weren't invited to participate in that site visit to South Pointe in August 1999?
A. Not to my knowledge. I was not there.
Q. Were you present at any of the meetings that followed the site -- immediately followed the site visit to South Pointe in August 1999?
A. I do not recall.
Q. Do you remember hearing about that site visit from Ms. Thomas?
A. I do not recall.
Q. Do you recall hearing about that visit from James Zale?
A. I do not recall.
Q. Do you know who James Zale is?
A. Yes.
Q. What was his position in 1999?
A. I'm not sure of his position in 1999. He was a director of the DEC in Chicago when it was initially established. The year, I do not know.
Q. Well, he was director of the DEC in Chicago in 1999, correct?
A. He was the director of the DEC when the DEC was established. I'm not -- it's too long ago for me to recall dates.

Page 121

Q. Well, look back at this team report. You see his signature on the second to last page?
A. Okay.
Q. What does that say?
A. James P. Zale, 1/27/00.
Q. Satellite office director?
A. Uh-huh.
Q. For DEC, correct?
A. Correct.
Q. Have you ever met him?
A. Yes.
Q. Have you ever talked to him about South Pointe?
A. I don't recall.
Q. Do you know if he was on the site visit to South Pointe in August 1999?
A. I don't know.
Q. Did you hear from him or others that the site visit was deemed by HUD to be very successful in that considerable progress had been made at South Pointe in correcting and repairing problems that had previously been identified?
MR. WELLONS: Objection, vague, assumes facts not in evidence. Go ahead and respond.





00000000-0000-0000-0000-000000000000

Page 122

THE WITNESS: I've never heard those comments made from anyone concerning South Pointe.
BY MR. BAUGHER:
Q. Well, the report at this place that we were talking about on page three lists a number of items that the report says were corrected. Do you see that list, starting with fixed broken light fixtures?
A. Okay.
Q. Replaced all mailboxes. Do you see what I'm referring to?
A. Yes.
Q. And do you agree that the list of items that had been corrected at the time of the DEC visit in August 1999, was a substantial list of corrected items?
MR. WELLONS: Objection, vague assumes facts the not in evidence. Go ahead and answer.
THE WITNESS: Can you read his question back?
(Whereupon, the record was read as follows:
Q. And do you agree that the list of items that had been corrected at the time of the

Page 123

DEC visit in August 1999, was a substantial list of corrected items?)
THE WITNESS: I don't know this list to be substantial.
BY MR. BAUGHER:
Q. Well, why do you say that?
A. Just based upon the overall physical condition of this property, substandard condition.
Q. Well, are you saying that the items shown on page three and four that the team report says were corrected as of its site visit in August 1999 were not substantial because these are routine maintenance items or some other reason?
MR. WELLONS: Objection, misstates prior testimony. Go ahead and answer.
THE WITNESS: The team report states that these are the things that they identified to be corrected. I don't know this to be substantial. This project is over 300 units, and I don't know if this is substantial or not.
BY MR. BAUGHER:
Q. Well, actually the team report didn't say that the items listed on page three and four were to

Page 124

be corrected. It says: The following REAC items were corrected. Am I reading that properly?
A. That's what I said, the team report said these items were corrected, but I don't know if this is substantial.
Q. Because you didn't go out to the property in August 1999?
A. I wasn't there.
Q. Because you weren't invited?
MR. WELLONS: Objection, argumentative.
BY MR. BAUGHER:
Q. Do you recall being invited to go on that?
A. I don't recall.
Q. Turn please to page six and item eight, there's a reference to new security on the property. Do you have any knowledge about a new security being employed at South Pointe as of late 1999 or early 2000?
A. Did I have any knowledge of new security?
Q. Yes.
A. I don't recall.
Q. The final sentence in that paragraph says: The property owners have also attempted to address the social issues of the property by putting in place

Page 125

new house rules and adding a social service program to be made available to the residents of South Pointe Towers.
Were you aware of the new house rules or the adding of a social service program?
A. I wasn't aware of new house rules, but I was aware that they were attempting to hire someone to bring in a social component there.
Q. Did you encourage that?
A. Yes.
Q. How did you encourage it?
A. A person had a meeting to introduce what she would be offering to the residents of South Pointe, and we were in favor of that. We were very supportive of that.
Q. Look please at page eight of this final team report, and particularly the problem statement where it says: The property is in poor physical condition. However, the owner has corrected some of the identified repairs revealed by the REAC inspection report. They are in the process of entering into contracts to correct the remainder the items cited by the REAC and the DEC. The owners have started repairs and are showing good faith by starting some

Page 126

repairs with their own funds. In addition, they are attempting to secure a lien to offset the cost of the remaining work.
Were you aware of those facts in early 2000?
MR. WELLONS: Objection, assumes facts not in evidence. Go ahead and answer.
THE WITNESS: I was not aware of the owner entering into contracts to correct any of the remainder of the items cited by the REAC. I was not aware personally of the owners starting repairs and showing good faith effort. But I was aware of them attempting to secure a loan with the Department.
BY MR. BAUGHER:
Q. And the reason that South Pointe wanted to obtain a loan was because many of the repairs that the owner wanted to make to the property were capital, long-term items that required substantial funding, correct?
MR. WELLONS: Objection, calls for speculation, assumes facts not in evidence. Go ahead and answer.
THE WITNESS: Capital repairs and repairs to the units, common areas. The entire building needed to be repaired.

Page 127

BY MR. BAUGHER:
Q. And that's because this building, given the tenants that it has and the area that it is, gets very hard wear and requires constant repair, correct?
MR. WELLONS: Objection, assumes facts not in evidence, vague. Go ahead and answer.
THE WITNESS: Physical condition of the property was substandard. You know, I was not out there. I cannot say how it became, you know, in such a substandard condition, but that's the condition of it. I don't know if it was for maintenance, owner neglect, tenant damage, but it's in substandard condition.
BY MR. BAUGHER:
Q. Well, there was a lot of tenant damage, wasn't there?
MR. WELLONS: Objection, assumes facts not in evidence, vague.
THE WITNESS: I didn't do an inspection of South Pointe.
BY MR. BAUGHER:
Q. You never did an inspection of South Pointe?
A. No.
Q. Have you ever been to South Pointe?

Page 128

A. Drive-by.
Q. Other than driving by, however, you've never done an inspection of the building?
MR. WELLONS: Objection, asked and answered. Go ahead and respond.
THE WITNESS: I've never been in South Pointe.
BY MR. BAUGHER:
Q. Why is it that you've never been in South Pointe when this is one of the larger projects that has been under your general jurisdiction for many years?
MR. WELLONS: Objection, argumentative, assumes facts not in evidence, vague. Go ahead and answer.
THE WITNESS: I don't have to visit the property. I mean, staff went to the property.
BY MR. BAUGHER:
Q. No, but I'm talking about you.
A. I've never been to South Pointe.
Q. How many apartment buildings have you been responsible for in the last half dozen years that have 300 or more units?
A. I do not know that number off the top of my

Page 129

head.
Q. Are there many?
A. I don't know that number off the top of my head. I'm not going to speculate.
Q. Isn't it true that South Pointe is one of the largest apartment buildings that has generally been within your jurisdiction?
A. South Pointe consists of 300 plus, 303 units, I think. But I'm not going to speculate how many.
Q. I'm not asking you to speculate. You're the director.
MR. WELLONS: Objection, argumentative.
BY MR. BAUGHER:
Q. Isn't that one of the larger apartment buildings that you're responsible for?
MR. WELLONS: Objection, argumentative, asked and answered. Go ahead and respond.
THE WITNESS: I've already responded. South Pointe is 303 units. How that relates to the other portfolios within our jurisdiction, I can't say.
BY MR. BAUGHER:
Q. Did anyone ever ask you to make an





00000000-0000-0000-0000-000000000000

inspection of South Pointe?
A. No.
Q. Did you ever go to South Pointe with Gwen Thomas or someone else from either Multifamily or DEC?
A. No.
Q. When you did your drive-bys, was that literally just driving by or did you slow down in particular to look at what you're passing?
A. Yes, we slowed down.
Q. Do you remember doing that once or twice or what?
A. It was more than twice.
Q. Three or four times do you think?
A. Yes, maybe three or four times.
Q. Do you recall who you were with when you made your drive-bys on three or four occasions?
A. Yes.
Q. Who?
A. Mr. Hinsberger.
Q. Do you recall what years the two of you made those drive-bys?
A. No.
Q. Have you ever driven past the property with



your husband?
A. No.
Q. Has he had any involvement with South Pointe?
A. To what degree?
Q. That's what I'm asking.
A. You asked the question.
Q. Has he had any involvement with South Pointe?
A. My husband is not an employee of Multifamily. He has not had any involvement with this project as it relates to the DEC.
Q. Where does your husband work?
A. He works in the Office of Public Housing.
Q. At the Chicago Housing Authority?
A. No, Chicago HUD office.
Q. And what is his job title?
A. Hub director, Office of Public Housing.
Q. Was he involved with the South Pointe project when vouchers were issued?
A. I cannot speak for public housing or how the process works in that department as I am not an employee of public housing. He's director of public housing. He does get involved with voucher issues.



Q. Well, did you talk with him about voucher issues concerning South Pointe?
A. No.
Q. Ever?
A. Not ever.
Q. Not once?
A. Not once.
MR. WELLONS: Objection, asked and answered.
BY MR. BAUGHER:
Q. Now, look please at the bottom of page eight of this final team report, Deposition Exhibit 11, where it says next steps and recommendations. And there were two next steps and recommendations, correct?
A. Correct.
Q. And the first is that substantial progress has now been made on the findings outlined in the REAC report. Therefore, the DEC should return the case to the Chicago Multifamily Hub office for servicing. And is that a correct statement as far as you know?
A. I didn't prepare the report, so I don't know if the statement is correct or not. And I did not inspect South Pointe.



Q. Ever?
A. Ever.
Q. And the second item on page eight of this report under next step and recommendations is the Chicago Hub office should continue the finalization of the MIO received on December 8, 1999. Do you see that?
A. Yes.
Q. Who at the Chicago Hub office was supposed to continue the finalization of the MIO received on December 8, 1999?
MR. WELLONS: Objection, assumes facts not in evidence. Go ahead and answer.
THE WITNESS: I do not recall a MIO being submitted. If you're talking about the document exhibit -- what is that exhibit over there?
BY MR. BAUGHER:
Q. Kiening 10.
A. If you're referencing Exhibit 10, that's not a MIO.
Q. Well, Exhibit 10, Ms. Coleman, refers to itself as a management improvement and operating plan, and the final team report in this bullet that we are both now reading on page eight refers to it as

Page 134

a MIO received on December 8, 1999, correct?
A. Yeah.
Q. So at least according to the signatories on this team report of January 26, 2000, Kiening Deposition Exhibit 10 is a MIO plan of some sort, correct?
MR. WELLONS: Objection, the document refers to a MIO being finalized. Go ahead and respond.
MR. BAUGHER: No, it doesn't. Excuse me. That misstates this. The Chicago Hub office should continue the finalization of the MIO received on December 8, 1999.
MR. WELLONS: That's what my objection was intended to convey. Go ahead and answer.
BY MR. BAUGHER:
Q. So who at the Chicago Hub office was supposed to continue the finalization of the MIO received on December 8, 1999?
THE WITNESS: Generally, that's a project managers responsibility. But given the fact that that is not a MIO plan, that's all I can say to your question, it's not a MIO. But finalization and oversight of MIO plans is the project manager if it's an actual plan.

Page 135

BY MR. BAUGHER:
Q. So reading the last bullet point on page eight of this team report, Kiening Deposition Exhibit 11, as far as you were concerned, there was nothing for your office to do with respect to the December 8, 1999, letter from South Pointe to Ms. Kiening; is that right?
MR. WELLONS: Objection, misstates prior testimony. Go ahead and answer.
THE WITNESS: I do not recall seeing that document, and I didn't provide any instructions or anything on it. I do not recall seeing that document, which I've stated in the past.
BY MR. BAUGHER:
Q. So as far as you were concerned or knew about, there was nothing for your department or the project manager, Gwen Thomas, to do in follow-up of this team report of January 2000; is that right?
MR. WELLONS: Objection, asked and answered misstates prior testimony. Go ahead and answer.
THE WITNESS: We were to continue servicing South Pointe Towers.
BY MR. BAUGHER:
Q. Yes. But in terms of specifying follow-up

Page 136

to the team report, as far as you knew, there was nothing for you or Ms. Thomas or Ms. Gray to do in specific follow-up to the team report of January 2000?
MR. WELLONS: Objection, asked and answered
THE WITNESS: I do not recall. As I indicated, I do not recall seeing this document nor the. . .
BY MR. BAUGHER:
Q. Nor what?
A. Nor the documents submitted to Joan Kiening as a MIO plan, which is not.
MR. BAUGHER: Let's go off the record.
(Whereupon, a discussion was had off the record.)
(Whereupon a lunch break was taken, after which the following proceedings were had:)
(Exit Mr. Scott Samuelson.)
BY MR. BAUGHER:
Q. Before we broke for lunch, I was asking you a lot of questions about the South Pointe project during the time period in which it was in the DEC in

Page 137

1998 through 2000.
One of the things I didn't ask you about but meant to was whether you were aware of the procedures that were followed in 1999 for renewing South Pointe's contract that year. Were you involved in that process at all?
A. No.
Q. Do you have any information on the renewal of South Pointe's contract in 1999?
MR. WELLONS: Objection, vague. Go ahead and answer.
THE WITNESS: No.
BY MR. BAUGHER:
Q. As far as you know, did it go through the same procedures that you described generally and for 2000 with the project manager and then Ms. Gray and then operations reviewing, approving, inputting, and issuing a contract?
A. I didn't have any involvement with the contract at that time, and I don't recall any particulars of processing the contract for '99.
Q. What is a management occupancy review?
A. It's a review performed by a project manager on the management practices or the occupancy





00000000-0000-0000-0000-000000000000

practices of the particular project.
Q. When are such reviews performed?
A. When the Department deems it appropriate for a review to be performed. It varies.
Q. That's not something that is done for each project each year?
A. No.
Q. Who decides when a management or occupancy review is to be performed?
A. It can be one of many people; project manager, supervisor, one of the directors.
Q. Do you ever recall directing that there be a management/occupancy review for South Pointe?
A. No, I don't recall.
Q. Do you know if there was a management/ occupancy review of South Pointe in 2000?
A. I recall a review. The date I don't know. I'm not sure of the date.
Q. You recall at some point in time, there was a management/occupancy review of South Pointe?
A. Yes.
Q. Do you remember one or more than one?
A. I remember one for sure. I'm not sure of any other, but I do remember one.



Q. And what is it that enables you to recall that there was one management/occupancy review of South Pointe?
A. Nothing specifically. I just recall a review being done there, an occupancy review.
Q. What's the difference between a management and an occupancy review?
A. The occupancy reviews were done on the projects where we only had -- the only business agreement associated with the project was a HAP contract.
Q. Do you recall who conducted the one occupancy review of South Pointe that you were speaking about?
A. I believe it was Gwen Thomas, the project manager.
Q. Do you recall any conversation with her about that occupancy review?
A. I don't recall any specific conversation.
Q. You didn't participate in that review?
A. No.
Q. Do you have any recollection of what the result of that occupancy review was or how it was concluded?



A. How it was concluded, can you be more specific?
Q. What the end point was, whether there was any action to be taken following it, and if so, what that action was?
A. I don't recall specifically.
Q. Do you recall generally?
A. No, I do not recall the specific details of the occupancy review that was done on South Pointe. I do not recall the specifics of that review.
Q. Do you remember being in attendance at any meetings in which that review was discussed?
A. No, I don't recall.
MR. BAUGHER: Will you mark this please as Coleman Deposition Exhibit 1.
(Whereupon, Deposition Exhibit No. 1 was marked for identification, JTL.)
BY MR. BAUGHER:
Q. Ms. Coleman, I'm showing you a copy of a letter marked Coleman Deposition Exhibit 1 that was addressed to Gwen Thomas by Carl Sanders of South Pointe on June 7, 2000.
Have you seen that letter before?



A. It's addressed to Ms. Thomas, then it says dear Ms. Kiening. I don't recall seeing it.
Q. Do you know what it is?
A. It appears to be something that P.M. One Limited sent to the HUD office.
Q. Do you believe that you've seen that before or you think you're looking at it for the first time?
MR. WELLONS: Objection, asked and answered.
THE WITNESS: As I previously stated, I do not recall.
BY MR. BAUGHER:
Q. The letter says in the first paragraph: This is the update to the management improvement and operating MIO plan for the above-referenced REAC inspection dated April 28, 1999 as of May 31, 2000.
Do you remember hearing from Ms. Thomas, the addressee on the letter, anything about South Pointe's update to its MIO plan concerning the 1999 REAC inspection?
MR. WELLONS: Objection, assumes facts not in evidence. Go ahead and answer.
THE WITNESS: I don't recall.
BY MR. BAUGHER:
Q. Do you know what Ms. Thomas did with this





00000000-0000-0000-0000-000000000000

letter?
A. No, I do not.
Q. Do you have any information about the status of the repairs that are described in this letter, Coleman Deposition Exhibit 1?
A. Do I know the status of the repairs that's indicated?
Q. Yes, do you have any information about that?
A. No, I don't have any information concerning any of these repairs. The letter wasn't addressed to me. I don't recall anything for this letter.
MR. BAUGHER: Will you mark this please as Coleman Deposition Exhibit 2.
(Whereupon, Deposition Exhibit No. 2 was marked for identification, JTL.)
BY MR. BAUGHER:
Q. Ms. Coleman, I've asked the court reporter to mark as Coleman Deposition Exhibit 2 a letter to you from Allan Cravats dated July 20, 2000.
Did you receive this letter?
A. I believe I recall receiving it.
Q. Who is Mr. Cravats?
A. He's president of Developers Mortgage.



Q. And what do they do?
A. They prepare financing packages and submit them to HUD so owners can receive HUD insurance.
Q. And had you suggested to Mr. Cravats and to South Pointe that Henry Chiano and Brad Mathis do some preliminary work to help prepare a proposal for a rehab loan for South Pointe?
A. This is Mr. Cravats' language, and I believe he presented that he was going to use Mr. Chiano to go out and inspect the property and come up with a scope of work, seeing that he was a former HUD construction analyst and that he, you know, knew how to address those issues. And that's Mr. Cravats wording.
MR. WELLONS: I'm sorry. Please complete your answer.
THE WITNESS: I do not believe I urged.
MR. WELLONS: Let the record reflect that the witness pointed at paragraph two of Coleman Exhibit 2 during her response.
THE WITNESS: And I'd just like to add that when he made the comment, you know, I'm sure I said you know, that would be fine.
BY MR. BAUGHER:



Q. Do you know Mr. Chiano?
A. Yes, he's a former HUD employee.
Q. And you believe he's competent to help someone determine an appropriate scope of work?
MR. WELLONS: Objection, calls for speculation. Go ahead and answer.
THE WITNESS: At the time he was a HUD employee, I believe that he could perform that task. But when he inspected the South Pointe property along with Mr. Mathis, he was no longer a HUD employee.
BY MR. BAUGHER:
Q. And did not only Mr. Cravats but representatives of South Pointe report back to you that they were working on putting together a rehab plan for the project?
A. The plan that the representatives for South Pointe were working on was to submit their application for financing, that was the plan that they're referencing in this letter.
Q. Yes, and they were reporting on --
A. Order for application for mortgage insurance.
Q. And they were reporting on that to you, correct?



A. Yes.
Q. Were you involved in the process of determining what type of rehab loan would be appropriate for South Pointe at this stage?
A. That's not within my jurisdiction to determine the type of loan that HUD would issue. That's under Mary Anderson, the director of operations.
Q. So you really were not particularly involved in a refinancing of this project; is that right?
A. I was involved from the standpoint that we wanted to make sure that the property was fully rehabed going forward after the refinancing occurred.
Q. But it was for others to determine exactly what loan would or would not be made, right?
A. The type of loan --
Q. And the extent of the loan?
MR. WELLONS: Ms. Coleman, please complete your previous answer.
THE WITNESS: The type of loan that would be made.
BY MR. BAUGHER:
Q. What about the extent of the size and the scope of work of the loan?





c0000000-0000-0000-0000-000000000000

A. The extent of size of what, the mortgage?
Q. Of the mortgage to pay for rehabing the project.
A. No, I have no jurisdiction over that. That would be Mary Anderson, director of operations.
MR. BAUGHER: Mark that, please.
(Whereupon, Deposition Exhibit No. 3 was marked for identification, JTL.)
BY MR. BAUGHER:
Q. Ms. Coleman, Deposition Exhibit 3 appears to be a letter from Carl Sanders to Leulla Kirkman dated July 27, 2000, further detailing the status of items remaining on the management improvement and operating MIO plan for the above-referenced REAC inspection.
Have you seen that letter before?
A. I do not recall seeing this letter.
Q. Who is Ms. Kirkman?
A. She's a project manager.
Q. Do you know what Ms. Kirkman did with this July 27, 2000 letter?
A. No, I do not.
Q. Do you have any information about the status of repairs being made as described in this letter,



Coleman Deposition Exhibit 3?
A. No.
Q. Do you see on the first page under elevators, there's a reference to two new elevators having been installed? Do you see that?
A. Yes.
Q. Do you know anything about installation of elevators at South Pointe in July of 2000?
A. No.
Q. Did you have any conversation with Ms. Kirkman about this letter or the status of South Pointe in July of 2000?
A. No.
MR. BAUGHER: Mark this, please.
(Whereupon, Deposition Exhibit No. 4 was marked for identification, JTL.)
BY MR. BAUGHER:
Q. What is the Deposition Exhibit 4, appearing to be a letter from Kenneth Horton to Leulla Kirkman to August 15, 2000?
A. Did you ask me a question?
Q. Yes, I asked you what it was.
A. According to the letter from Mr. Horton, it



says it's a certification letter.
Q. Have you ever seen this letter before?
A. I don't recall.
Q. Have you ever discussed this letter or the certification that it refers to with anyone?
A. I do not recall.
Q. The second page of Deposition Exhibit 4 has a comment down at the bottom L. Simmons. Do you see that?
A. Yes.
Q. Who is L. Simmons?
A. Lilly Simmons.
Q. Who is she?
A. She's a construction analyst in our department.
Q. Does she work for you?
A. Yes.
Q. She says -- or the note at the bottom of the second page in Deposition Exhibit 4 says: Received update (July 27, 2000) on status of the corrected action plan repairs. Do you see that?
A. Yes.
Q. What is the type of document in which this information is being entered? It says project action



detail at the top of this second page in the deposition exhibit.
A. This is in the project action on one of the project action screens in REMS.
Q. And that's used to record the receipt of documents; is that right?
A. It could be used for that, receipts of documents or dates, action dates, target completion dates on a particular project.
Q. Do you have any information, other than you can read looking at Deposition Exhibit 4, about the completion of a MIO plan update as of July 27, 2000?
A. Do I?
Q. Do you have any information about that?
A. About what Ms. Simmons recorded in REMS?
Q. Well, that or the enclosed management and operating MIO plan update dated July 27, 2000, that was Coleman Deposition Exhibit 3.
A. I don't recall any -- seeing any of these documents.
Q. Would you in the ordinary course expect to see documents of this sort?
A. No.
Q. If there was a problem about update

documents, then you would hear about it perhaps, correct?
A. Perhaps.
Q. But you didn't hear anything about the update reports that we've just been looking at, Coleman Deposition Exhibits 1, 3, and 4, correct?
MR. WELLONS: Objection, misstates prior testimony. Go ahead and answer.
THE WITNESS: Where is one?
BY MR. BAUGHER:
Q. Well, you have it.
A. No, I don't. I have three, four, and two. I believe you took one back.
As I previously stated, I do not recall Exhibits 1, 3, and 4.
Q. Now, Ms. Coleman, I would like you to look please at what was marked as Ms. Thomas' deposition yesterday as Thomas Deposition Exhibit 6. Can you tell us what that document is, please.
A. It's a close-out letter to occupancy review.
Q. From Debbie Gray to Carl Sanders dated apparently October 3, 2000, correct?
A. I don't see a date on the letter, but it says October zero here.



Q. Look at the second page of the document, please.
A. Okay.
Q. There are two copies of the same letter; one has a letterhead on it, the other does not. Does that make it possible to date this letter around October 3, 2000?
A. That's what the letter states, October 3, 2000.
Q. And what does it mean to close out an occupancy review?
A. It's a close-out letter advising the owner that the findings that we issued on the review are now closed.
Q. And in this case, Ms. Gray is writing to Carl Sanders at South Pointe to say that the response to the 2000 occupancy review has been found acceptable and that the review is now closed, correct?
A. Correct.
Q. Have you seen this letter before?
A. I don't recall seeing this letter.
Q. Did Ms. Gray usually consult with you when she was approving or closing out occupancy reviews?



A. No.
Q. Do you have any information to suggest to you that the 2000 occupancy review was not properly closed out?
A. I have no information to suggest other than what I'm seeing in this letter.
Q. Now, you told us that you recall that there was an occupancy review for South Pointe?
A. Yes.
Q. Looking at Thomas Deposition Exhibit 6, do you now recall that that occupancy review was in 2000?
A. I do not know the date of the review. This is the date that Ms. Gray closed the review out. It's still not triggering any date as to when the review was performed.
Q. Well, Ms. Gray, as we can see from Thomas Deposition Exhibit 6, closed out the review in October of 2000, but she also refers to it as a 2000 occupancy review. Do you see that?
A. Yes.
Q. And does that suggest to you that the occupancy review took place in 2000?
A. Our fiscal year begins the prior year, so I



don't know. It's not -- you know, it's not triggering a date. Our fiscal year is 10/1 to 9/30. And reviews that we conduct in October, November, and December, are considered reviews for the following year, so I don't really know. I don't know the date of the occupancy review.
Q. Well, whatever the date was, it was closed out satisfactorily in October 2000, right?
MR. WELLONS: Objection to the extent it misstates the document. Go ahead and respond.
THE WITNESS: Ms. Gray's letter says that the 2000 occupancy review was reviewed and they find it acceptable. The review is now closed.
MR. BAUGHER: Will you mark this as the next exhibit, please.
(Whereupon, Deposition Exhibit No. 5 was marked for identification, JTL.)
BY MR. BAUGHER:
Q. Coleman Deposition Exhibit 5 appears to be a letter from Carl Sanders to Gwendolyn Thomas dated October 17, 2000, along with a one-page project action detail reflecting the receipt of that letter.
Have you seen Deposition Exhibit 5 before,





00000000-0000-0000-0000-000000000000

Page 154

Ms. Coleman?
MR. WELLONS: Just to clarify, you're referring to either document within the exhibit?
MR. BAUGHER: Yes.
THE WITNESS: I do not recall seeing this document.
BY MR. BAUGHER:
Q. The letter dated October 17, 2000, is a further report on the MIO plan with respect to a REAC inspection. Do you have any information about the status of the work that's described in Deposition Exhibit 5?
MR. WELLONS: Objection, assumes facts not in evidence. Object to the extent it misstates the document. Go ahead and answer.
THE WITNESS: I don't have any knowledge of the status of any of these repairs.
BY MR. BAUGHER:
Q. And can you identify the project action detail showing that Ms. Simmons apparently received an update -- or this update on 10/17, 2000?
A. What was your question?
Q. Well, it was not a good one. Let me ask it again.

Page 155

What is the project action detail showing about the receipt of this letter from Mr. Sanders to Ms. Thomas?
A. Ms. Simmons indicated that document dated 10/17 was received on the corrective action plan repairs.
Q. Now, at the same time South Pointe was sending in to HUD these regular reports on the status of various repairs on the property. Were there also discussions going on with South Pointe concerning financing or refinancing of the property?
MR. WELLONS: Objection, vague, assumes facts not in evidence. Go ahead and answer.
THE WITNESS: Those discussions began, I believe, I'm not sure, like late '98 where our development team, they conducted a preapplication conference. And that was when Mr. Hinsberger agreed to refinance this project to bring the overall condition, you know, above the substandard condition that had been present for so many years.
BY MR. BAUGHER:
Q. Now, that preapplication meeting took place sometime in late 1999?
A. I'm not sure. I believe it was '98, but I

Page 156

am not -- it's been a long time.
Q. So either '98 or '99?
A. I believe it was the latter part of '98, but I'm not exactly sure.
Q. Were you present --
A. But there was a meeting. There was a preapplication conference.
Q. And were you present at that conference?
A. I don't recall.
Q. How do you know that there was a conference if you weren't present for it?
A. Because it was discussion within the office that South Pointe, it agreed, Mr. Hinsberger agreed that the project could be refinanced through one of our FHA insurance programs.
Q. I may not have been listening carefully enough. I thought you said Mr. Hinsberger agreed that it could be refinanced?
A. Yes, he makes that ultimate decision.
Q. Was his decision that the project could be refinanced something that was put into writing?
A. I'm not sure if they -- I'm not sure if they put it in writing.
Q. Did you ever receive a memorandum or an

Page 157

e-mail or anything else from Mr. Hinsberger reflecting his decision that the project could be refinanced?
A. No, I wouldn't have received it. If it was something that the director of operations, Mary Anderson, issued at that time, the owner would have received it.
Q. As of the dates in which we were looking at these letters, October 2000, Mr. Hinsberger was still in agreement that the project could be refinanced; is that correct?
MR. WELLONS: Objection, calls for speculation. Go ahead and answer.
THE WITNESS: As of what date?
BY MR. BAUGHER:
Q. Well, we were just looking at a letter of October 2000.
A. And your question is?
Q. Did Mr. Hinsberger continue to agree as of the fall of 2000 that the project could be refinanced?
A. Yes.
Q. And was there, in fact, a meeting in October of 2000 to discuss the refinancing of the project?

Page 158

A. I don't recall meeting dates. As I indicated, it's been a long time.
Q. There were some notes that were taken at a meeting in October 2000 by Ms. Thomas that were marked at her deposition yesterday. Let me show you Thomas Deposition Exhibit 8, which are her handwritten notes from a meeting that apparently took place on October 18, 2000.
Have you seen those notes before?
A. No, I've never seen those notes.
Q. Do you recognize the handwriting as being Ms. Thomas'?
A. No, not really.
Q. Her printing handwriting is pretty legible. Will you take a look at that and see if that refreshes your recollection about a meeting concerning the refinancing of South Pointe in October 2000.
A. As I previously stated, this is the first time I've seen Ms. Thomas' notes. And these items, as I indicated prior to lunch, I do recall a meeting with owner representatives Mr. Horton and Mr. Sanders. The meeting could have occurred around this time, October 2000, where we discussed rehab,

Page 159

and there was also statement of at the same time where we informed the ownership representatives that that HAP contract was issued in error.
Q. Do you see anything in these notes, Thomas Deposition Exhibit 8, concerning HAP contract or any other contract?
A. The first point says needs rent to support rehab, comps need to be reviewed, and new reg for comps or something, that's relative to HAP contract.
Q. Well, what's 221(d)(4)?
A. That's the section of the act.
Q. For a loan or insurance of HUD insurance?
A. Of FHA mortgage insurance.
Q. And in order to get HUD insurance for a loan, the owner or applicant needs appropriate rents to support the rehab with detailed information and comparables, correct?
A. You need to pose that question to someone in production. They're the experts in that area.
Q. Well, now, the reason I ask you about that is because you said that these two lines 221(d)(f) and then continuing on, needs rent, refer to a contract?
A. I didn't say 221(d)(f). I said rents to

Page 160

support rehab comps. Your question was did I see anything in these notes concerning the contract, and I could -- these are not my notes, first. Let the record show that these are not my notes. So exactly what Ms. Thomas meant when she took these notes, I can't say specifically.
But your question was, did I see anything in Ms. Thomas' notes that related to the contract, and I pointed out some areas in that first line under South Pointe that could have related to the contract. However, I really do not know what she meant.
MR. WELLONS: In reference to Exhibit 8, I just want to make a standing objection to any questions to the extent it asks Ms. Coleman to speculate as to what Ms. Thomas intended in these notes.
BY MR. BAUGHER:
Q. Well, the reference to needs rent to support rehab, et cetera, doesn't have anything to do with the HAP renewal contract for 2000, does it?
MR. WELLONS: Objection, argumentative, asked and answered. Go ahead and respond.
THE WITNESS: These are Ms. Thomas' notes, and I'm not going to speculate on them. It's my

Page 161

first time seeing them. And notes are notes.
BY MR. BAUGHER:
Q. Did you make any notes at that meeting?
A. I don't recall.
Q. Do you ever take notes at meetings?
A. On occasion.
Q. But it's fairly unusual that you take notes at a meeting?
MR. WELLONS: Objection, vague. Go ahead and respond.
THE WITNESS: On occasion. Project manager was in this meeting, and she took the notes. I don't recall taking any notes at this meeting.
BY MR. BAUGHER:
Q. And you usually don't, because someone takes them for you; is that right?
MR. WELLONS: Objection, misstating prior testimony, vague. Go ahead and answer.
THE WITNESS: As I indicated, I do take notes on occasion. The project manager was in this meeting, and she took notes.
BY MR. BAUGHER:
Q. Did you put anything in writing following the meeting on October 18, 2000, concerning what took

Page 162

place at the meeting?
MR. WELLONS: Objection, asked and answered. Go ahead and respond.
THE WITNESS: As I previously stated, I'm not exactly sure of the date when we had this meeting. It appears that it was on 10/18, 2000. And following that meeting, a letter was issued to the owner indicating that this HAP contract was signed in error.
BY MR. BAUGHER:
Q. You sent that letter out sometime in December, correct?
A. I don't recall the date.
Q. There's a reference about the middle of the page to needs a 100 percent inspection to be able to do a scope of what work really needs to be done. Do you see that?
A. Yes.
Q. What do you recall being said about that?
A. I vaguely recall, just as stated, that a 100 percent inspection of the entire property needs to be done in order to determine the full scope of work.
Q. And who said that or made that suggestion?

Page 163

A. I don't recall.
Q. Was it someone from HUD or was it the owner or what?
MR. WELLONS: Objection, compound, asked and answered. Go ahead and respond.
THE WITNESS: I can only speculate that it was a HUD person.
BY MR. BAUGHER:
Q. Now, a 100 percent inspection of a 303-unit building is a substantial task, correct?
MR. WELLONS: Objection, vague. Go ahead and respond.
THE WITNESS: I don't know how substantial that is. But at that time, those were requirements for owners to do that receive substandard REAC inspection scores.
BY MR. BAUGHER:
Q. Well, why don't you know if it's a substantial task to go through 300 apartments?
MR. WELLONS: Objection, argumentative.
THE WITNESS: I can't say that it's substantial.
BY MR. BAUGHER:
Q. You don't know how long it would take to go

Page 164

through a large apartment building to inspect each one of the apartments, because that's not something that you do, correct?
A. I have no knowledge of what is required to inspect a 303-unit building and all common areas.
Q. Because you don't make inspections?
MR. WELLONS: Objection, asked and answered.
THE WITNESS: I've answered the question.
BY MR. BAUGHER:
Q. Now, do you know if South Pointe took any action or did anything in response to the suggestion that there be a 100 percent inspection?
A. I don't recall.
MR. BAUGHER: Mark this as the next exhibit.
(Whereupon, Deposition Exhibit No. 6 was marked for identification, JTL.)
BY MR. BAUGHER:
Q. Ms. Coleman, let me show you what has been marked as Deposition Exhibit 6. The top page of the deposition exhibit is a memo from Carl Sanders to all residents of South Pointe, and then following that, is a South Pointe Tower physical inspection summary, which has the government's Bates numbers showing in

Page 165

the lower right of the inspection summary pages.
Have you seen that document before?
A. I've never seen this document.
MR. WELLONS: I'm sorry, Ms. Coleman, I believe you were reviewing Exhibit 2 prior to counsel's question. Were you done reviewing that document?
THE WITNESS: Two?
MR. WELLONS: Yes.
MR. BAUGHER: I don't have a question about two. I'm asking about six.
MR. WELLONS: I'm asking Ms. Coleman if she had finished reviewing that document. She was looking at it at the time you handed her this document and asked her a question.
MR. BAUGHER: Well, she should be looking at the document that I'm asking her questions about.
MR. WELLONS: Ms. Coleman, have you finished reviewing Exhibit 2?
MR. BAUGHER: Mr. Wellons, if she wants library time, we will take a break, and she can review whatever she wants to review.
MR. WELLONS: This is a document that you handed her and asked her questions about. She's

Page 166

entitled to familiarize herself.
MR. BAUGHER: Half an hour ago I asked her questions. Now I have another exhibit, which we're taking testimony on.
MR. WELLONS: Ms. Coleman, have you completed your review of Exhibit 2?
THE WITNESS: Yes.
MR. WELLONS: Thank you.
BY MR. BAUGHER:
Q. Have you ever seen the South Pointe Tower physical inspection summary that is included in Coleman Deposition Exhibit 6?
A. I don't recall seeing this.
Q. The Bates numbers in the bottom lower right beginning A2193 through A2201 are a number stamping that was done on the government's production of documents to us in this lawsuit.
Do you have any reason to believe that this physical inspection summary was not received by Gwen Thomas or others at HUD in about November of 2000?
MR. WELLONS: I would like to state for the record that the numbers counsel is referring to are the Bates numbers beginning on the second page of the

Page 167

document. No Bates numbers are contained on the first page.
THE WITNESS: Ms. Thomas could have received the documentation.
BY MR. BAUGHER:
Q. Do you remember any conversations with Ms. Thomas about the South Pointe Tower physical inspection summary?
A. I don't recall any.
Q. Now, as of the fall of 2000, HUD was considering insuring a major new rehabilitation and refinancing loan to South Pointe, correct?
MR. WELLONS: Objection, vague, assumes facts not in evidence. Go ahead and answer.
THE WITNESS: Yes.
BY MR. BAUGHER:
Q. And one of the things apparently had been suggested at this meeting in October that you testified about was that there should be a 100 percent inspection of all the units, correct?
A. Yes.
Q. And apparently, within a month or two of that suggestion, such a physical inspection summary or physical inspection was conducted of South Pointe

Page 168

Tower, correct?
MR. WELLONS: Objection, assumes facts not in evidence. Go ahead and answer.
THE WITNESS: I don't know that a 100 percent unit inspection was done at South Pointe. I did not inspect the property, nor did I prepare this report or summary, whatever it is. They're calling it inspection summary.
BY MR. BAUGHER:
Q. Well, I understand that this is not your inspection report. This is an inspection report prepared by South Pointe, correct?
A. I know Mr. Sanders, he was an employee of South Pointe. This inspection said it was completed by Shawn Mintz and Michelle Gee. I don't know if they were South Pointe employees or not, so I don't know who actually did the summary inspection.
Q. At the October 2000 meeting that we talked about a little while ago, someone at HUD suggested to South Pointe that in order to pursue this refinancing rehab loan, that it should conduct a 100 percent inspection, and South Pointe then went out and conducted such an inspection, correct?
MR. WELLONS: Objection, assumes facts not

Page 169

in evidence, misstates prior testimony. Go ahead and answer.
THE WITNESS: Going back to Ms. Thomas' Exhibit 8 where she references needs 100 percent inspection, and I'm only speculating, you know, comments might have been made during this meeting about the 100 percent unit inspection as it related to the physical inspection letter that was issued. During that time, owners were instructed to do a 100 percent unit inspection. I'm only speculating, because these are not my notes.
BY MR. BAUGHER:
Q. And then HUD --
A. And she -- it appears that she might have been saying that, you know, this was needed, and it appears that this was -- like I indicated, I don't know Mintz or Ms. McGee to be -- or Ms. Gee to be South Pointe employees, you know, since it was --
Q. You never heard of Shawn Mintz --
MR. WELLONS: Ms. Coleman, please finish your answer.
THE WITNESS: He can proceed.
BY MR. BAUGHER:
Q. You never heard of Shawn Mintz or