IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| ENGLEWOOD TERRACE LIMITED PARTNERSHIP, Plaintiff, | ) |
| vs. | ) No. 03-2209C<br>) Judge Wolski |
| THE UNITED STATES, Defendant. | ) |

The deposition of DON SAMUELSON, taken in the above-entitled case, before Suzanne Thalji, CSR and Notary Public in and for the County of Cook and State of Illinois, at 77 West Jackson Boulevard, 22nd Floor, Chicago, Illinois, on April 28, 2005, at 10:07 a.m.

PRESENT:

SCHOPF & WEISS LLP
BY MR. PETER V. BAUGHER
312 West Randolph Street, Suite 300
Chicago, Illinois 60606
(312) 701-9300

appeared on behalf of the Plaintiff;

MR. PAUL R. WELLONS
U.S. Department of Justice
Civil Division
1100 L Street, N.W.
Washington, D.C. 20530
(202) 616-8253

and

MS. MARIA T. BAGUIO
MR. GREGORY G. GUSTIN
U.S. Department of Housing
and Urban Development
77 West Jackson Boulevard
Chicago, Illinois 60604
(312) 353-6236

appeared on behalf of the Defendant.

ALSO PRESENT:
MS. JADRANKA M. BERKEC



INDEX


WITNESS
DON SAMUELSON
EXAMINED BY PAGE
MR. WELLONS 4

EXHIBITS

SAMUELSON DEPOSITION EXHIBITS PAGE
No. 1 115
No. 2 119




MR. WELLONS: This is the deposition of Donald Samuelson, taken pursuant to the rules of the United States Court of Federal Claims in the matter of Englewood Terrace Limited Partnership versus United States.

DON SAMUELSON,
having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION
BY MR. WELLONS:
Q. Mr. Samuelson, could you please state your address for the record, sir?
A. My name is Don Samuelson, not Donald. My address is 1745 Broadland Lane, Lake Forest, Illinois.
Q. I apologize. Sorry I didn't realize that Don was not short for Donald.
A. That's all right.
Q. Thank you for the correction.
A. Yes.
Q. Mr. Samuelson, I would like to go over just a few preliminary matters with you before we begin today. First of all, if you don't understand a question that I ask, will you let



me know?
A. Yes.
Q. And if you need a break at any time today, will you let me know that as well?
A. Yes.
Q. Okay. And that's fine. The only thing I ask is that if I have asked a question and it's pending, that you please answer the question before we take a break. Is that all right, sir?
A. Yes.
Q. Thank you. If you need to talk to your attorney at any time during today's deposition, please just let me know. Again, the only thing I ask is that if a question is pending at that time, that you respond to that question. Do you understand, sir?
A. Yes, sir.
Q. Thank you. If at any point today you realize that an answer that you have given before is incorrect, will you let me know that as well so we can correct the record?
A. Yes.
Q. Thank you. And, Mr. Samuelson, are

Page 6

there any reasons why you believe you may be unable to provide truthful or complete testimony today?
A. No.
Q. Okay. Thank you. Have you ever been deposed before, sir?
A. Yes.
Q. How many times?
A. Two or three.
Q. And in what cases were you deposed previously, sir?
A. There was a lawsuit by DSSA against the ACHT Theta Development Corporation, and there was a lawsuit by DSSA Management against a management company run by Ed Carlson.
Q. And where were those lawsuits filed, sir?
A. In Lake County, Illinois.
Q. And that's true for both of them?
A. Yes.
Q. And did you testify as the plaintiff in those suits at your deposition?
A. Yes, and the third was a lawsuit involving a claim against the CHA in which I was

Page 7

deposed as simply a material witness.
Q. And who brought that suit, sir?
A. A private party -- I don't recall who it was -- against the Chicago Housing Authority.
Q. And the first suit that you mentioned which was, I believe, a lawsuit by DSSA against ACHT Theta Development Corp. --
A. Yes.
Q. -- what time period was that, sir?
A. I think that was 1998 or 1999, in that general vicinity.
Q. And what was the subject matter of that lawsuit?
A. A complaint for failure to provide adequate compensation in the sale of the property.
Q. And those were your allegations, sir, as the plaintiff?
A. Yes.
Q. And what was the outcome of that suit, sir?
A. I think it was mixed. I think there was -- the counterclaim was for damages related to the failure to have a proper proration at the

Page 8

time of the closing. I wasn't at the closing, so I really didn't have any idea what was involved, and I think -- I'm not quite sure how it resolved itself, but it was negligible one way or the other.
Q. There was a judgment entered?
A. Yes.
Q. But you don't recall the specifics?
A. I don't recall what it was.
Q. And for the lawsuit by DSSA against I believe you mentioned it was Ed Carlson Management or an Ed Carlson managed company --
A. An Ed Carlson managed company.
Q. Okay. What was the disposition of that suit?
A. And I think that was involved in the same relationship with ACHT Theta, and that was for breach of contract. And there was ultimately damages awarded to DSSA of something like $270,000.
Q. And do you remember what time period or what year that would have been?
A. That was about the same time period.
Q. 1998, 1999, somewhere in there?

Page 9

A. Yes.
Q. And in the suit in which you testified as a material witness in your claim against CHA --
A. I think that still may be pending. I'm not sure it's resolved. It was a case for -- a tort case against the CHA for some damages related to injuries related to materials on the site.
Q. And were you called by the plaintiff in that case?
A. Yes.
Q. And what year would that have been, sir?
A. 2003.
Q. And did you testify at trial at any of these cases?
A. I testified -- in any of the cases?
Q. Yes, sir.
A. Yes.
Q. Which ones?
A. I believe it was the first two.
Q. The action against the Ed Carlson managed company and the action against ACHT Theta?

Page 10

A. ACHT Theta.
Q. And the third case you mentioned, the action against CHA, is still pending?
A. As far as I know. I haven't heard anything about it.
Q. Okay. Thank you. Mr. Samuelson, did you prepare for your deposition today?
A. Yes.
Q. And how did you prepare for it, sir?
A. By talking to Mr. Baugher and by reading documents.
Q. I don't want you to reveal the contents of any of your discussions with Mr. Baugher. Do you recall what documents you looked at?
A. I looked at the complaint and the exhibits. I looked at the Judge Wolski opinion in August of 2004. I looked at the defendant's answer, and I looked at the motions for production of documents and interrogatories and the plaintiff's answers and the defendant's answers to interrogatories.
Q. Okay. So you reviewed the complaint and the attached exhibits, Judge Wolski's order from August 2004, the defendant's response to the

Page 11

complaint, and the discovery request and responses that the parties exchanged?
A. Yes.
Q. Any other documents that you reviewed?
A. No.
Q. Okay. Thank you. And, Mr. Samuelson, when you reviewed our document request in preparation for this deposition, was that the first time that you had reviewed the defendant's request for production of documents?
A. No.
Q. When had you reviewed that document before, sir?
A. Shortly after it came in.
Q. And did you assist in Englewood's efforts to gather documents in response to that request?
A. Yes.
Q. And what did you do to assist in that process?
A. I went through the -- I think the eight or nine categories with the staff of DSSA Management and discussed the nature of the documents and where they might be and directed

Page 12

people who worked for DSSA to locate the documents.
Q. Do you recall the specific individuals that you met with?
A. Three individuals, Joseph Johnson, Scott Samuelson, and Lena Filkova, F-i-l-k-o-v-a.
Q. So you went through the eight or nine categories of documents with Mr. Johnson, Mr. Samuelson, and Lena Filkova to discuss where they might be located?
A. Yes.
Q. Did you do anything else in gathering documents for the document request?
A. There was also a phone call to Mr. John Hayes, former general partner, asking him if he had any or could produce any documents relevant to the request.
Q. And what did Mr. Hayes tell you?
A. He had some but not many.
Q. And did he share those documents with you?
A. Yes.
Q. And have they been produced to the defendants in this deposition?

Page 13

A. Yes. When all the documents were assembled, I went through them to determine their responsiveness and eliminated duplicates since many of the documents were simply copies of the same materials that had been supplied to us by the government.
Q. And then after the duplicates were removed, were those then the documents that have been produced to us in response to our request?
A. I sent them to Mr. Baugher.
Q. In addition to meeting with the three individuals you identified on your staff and contacting John Hayes, did you do anything else to search for documents in response to our request?
A. I asked Mr. Hayes whether there were any documents at the PM property files, PM Management Company files, and I called the project manager, Mr. Carl Sanders, to see if he had any documents.
Q. And what did Mr. Sanders tell you in response to that inquiry?
A. Mr. Sanders said you're too late. A year ago I had a full set of documents, and I

Page 14

disposed of them about a year ago.
Q. I take it then that you did not receive any documents from Mr. Sanders; is that correct?
A. Yes.
Q. Or anyone else at PM Property Management; is that correct?
A. I didn't receive anything directly from PM Group. It may have gone to John Hayes, then to me, but there were not many documents they had.
Q. Did you receive any documents from any third parties other than Mr. Hayes?
A. I received some documents from Ms. Freddie Batchelor.
Q. And when did you receive those documents from Ms. Batchelor?
A. In January or February of this year.
Q. And was that in response to a request you had made of her?
A. She had called me to meet to talk about explaining how the Department Enforcement Center worked, and as part of those discussions, she had some documents which were explanatory, like the procedures manual.

Page 15

Q. Just to make sure I understand, when you say procedures manual, are you referring to an actual book, such as the one I'm indicating here, or the chart that we reviewed in Joan Keinig's deposition?
A. A three-ring binder, document, that contained maybe 200 or 300, 400 pages, describing in considerable detail the process that the DEC was to proceed with in all of its activities and its relationships to REAC inspections and to multi-family housing.
Q. In addition to meeting with the individuals on your staff, contacting John Hayes and contacting PM Property Management, were there any other steps that you took in order to respond to our document request?
A. None other than simply confirming that those were the -- oh, I'm sorry. We did have one additional activity. We asked whether -- Joseph Johnson asked whether or not there would be documents on the site that would relate to unit work orders or contracts.
Q. And when you say on the site, you're referring to within the South Pointe building

Page 16

itself?
A. At the South Pointe building itself.
Q. And who did he ask that of?
A. A woman who used to work for DSSA Management before she was transferred to Eastlake when they took over named Tamika Nelson.
Q. And do you know what Ms. Nelson told him in response to that question?
A. I recall that there were very few documents, if any, forthcoming, that they had been destroyed in the fire in late June of 2003 and that -- I think the records kept by Eastlake at that point were not available to her or through her to us. So there may be some documents that Eastlake Management has when they took over the management in May of 2004.
Q. So is it correct to say that you did not receive any documents from Eastlake?
A. Yes.
Q. Okay. And in addition to the individuals on your staff that you met with, the calls to PM Property Management, call to John Hayes, and the inquiry that Mr. Johnson made,

Page 17

were there any other steps you took to respond to document requests?
A. No.
Q. You mentioned that Freddie Batchelor had contacted you in 2004, and she wanted to explain DEC procedures to you; is that correct?
A. I think I said in 2005, as we were preparing these documents.
Q. Earlier this year?
A. Yes.
Q. Did she contact you by phone, sir?
A. Yes.
Q. Had you ever spoken with Ms. Batchelor before?
A. No.
Q. Did you know who she was at that time?
A. I think I did because there were references to her in some of the documents that we received by the government in the fourth quarter of 2004, but I wasn't familiar with what her function was or what her role was or what she did.
Q. What did you say to her in response to her offer to show you these documents?

Page 18

A. Well, the question was I didn't understand the organizational structure of the DEC or its processing or its staffing or the filing system used or the entire decision-making process.
We had asked for that information, I think, in our motions to produce documents, had not received any, and it was helpful at that point for us to talk to somebody who actually knew in general how the process worked and more specifically some of the specific steps that were taken at South Pointe itself.
Q. So when she made this offer to you, what specifically did you say to her?
MR. BAUGHER: Excuse me. What offer are you referring to?
MR. WELLONS: I believe Mr. Samuelson testified that she had offered to show him documents in this conversation, and I was asking Mr. Samuelson what his response to that offer was.
MR. BAUGHER: Well, I don't think that's a precise account of what Mr. Samuelson said, but if you're asking him what was said in the

Page 19

conversation, obviously, he should say that.
BY MR. WELLONS:
Q. Mr. Samuelson, did you understand the question, sir?
A. She basically explained the process through the use of the documents, and at that point we had received some REMS, Real Estate Management System documents, that were extraordinarily hard for me to understand, and she was helpful in explaining the overview of the DEC structure system, filing system, decision-making system, and the electronic filing of documents within the DEC.
Q. Now, did she explain these matters during this initial telephone conversation or --
A. No. We met in person.
Q. Okay. And where did you meet, sir?
A. We met at my office at 5901 North Cicero in Chicago.
Q. And do you remember the date of that meeting, sir?
A. I don't recall.
Q. And did she bring the documents with her?

Page 20

A. Yes.
Q. And what happened at this meeting?
A. She went through the documents and explained the system, and I took notes and listened and -- I'm not sure I took notes, but I listened. And at the end of the discussion, I had a much better feel for how the DEC process worked than I had before.
Q. So you may have taken notes during this meeting. You may have not?
A. I probably didn't because I had the documents.
Q. Have you made a search of your files to see if you have notes from that meeting?
A. I don't think I do.
Q. But you haven't taken a specific search to look for those notes?
A. I don't know where I would have kept them. I mean it's not a practice necessarily to keep notes in those sorts of meetings when there are documents you're talking about.
Q. I believe that you had described the contents of your discussion as the policies and the structure of DEC. Is that a fair

Page 21

characterization, sir?
MR. BAUGHER: I didn't hear the word policy mentioned.
MR. WELLONS: Sir, please answer the question.
A. It was really more oriented to the process of decision making and the steps that the DEC would take after a property had been referred to it by multi-family housing to determine whether it should be given sanctions or returned to multi-family housing.
Q. Were there any other topics that you discussed at this meeting?
A. We talked about the filing system, what type of documents would normally have been produced within the system, and how they would have been kept and stored.
Q. And did you talk about anything else?
A. That was essentially it.
Q. Did you discuss the current litigation between the government and Englewood?
A. I think she knew that there was litigation between the government and Englewood, but we didn't discuss it in any specifics at

Page 22

that time.
Q. Do you remember anything that was said in general?
A. In general, my sense was that she felt that the procedures of the DEC and multi-family housing were not really being followed in this particular case.
Q. And did you and she have any specific discussions at any other time regarding the litigation?
A. We met to discuss the responses we had received from the government in terms of the motion to produce documents and asked whether or not those were the complete documents that she was aware of at the time that she was working within the DEC.
Q. And do you recall when that meeting was, sir?
A. That might have been perhaps within a month after that. If the first meeting was January, that might have been February, or it could have been December and January but in that vicinity.
Q. And do you remember anything

Page 23

specifically that was said during that meeting?
A. Yes, I do. She said that there was a rather foolproof method of documenting decisions, activities, meetings, that were to be kept in administrative green files, and many of them were then imaged electronically as I think Joan Keinig testified when she was in her deposition to keep an electronic record of all of the materials. And then the explanation that there would be events recorded in the REM system. And so I was surprised at the comprehensiveness of the record-keeping system that has been designed in DEC for matters such as ours.
Q. Do you recall any other specific statements from that meeting?
A. No.
Q. And did you have any other discussions with Ms. Batchelor about the litigation?
A. We had a discussion concerning the responses to the interrogatories that the government made as to whether they were as complete as they could have been.
Q. Was that at the same meeting or on a

Page 24

different occasion?
A. Probably a separate meeting. I think all in all there might have been four or five meetings.
Q. Do you recall any specific statements regarding the interrogatories and their responses?
A. I think she said that the documents that you have been asking for do exist, but they have not been produced.
MR. BAUGHER: Point of clarification, who is the you that your answer referred to?
A. Perhaps I should let her read back the question and my answer again.
BY MR. WELLONS:
Q. I believe you were reporting a statement that she said to you; is that correct?
A. Yes.
MR. BAUGHER: So the "you" is referring to Englewood, correct?
THE WITNESS: Referring to me as I suppose the general partner in Englewood Terrace Limited Partnership.
BY MR. WELLONS:

Page 25

Q. And did she identify specifically which documents she was referring to?
A. No. She said that she had a rather complete file. I recall her saying that it was several shelves full of documents that she recalls having been produced during the period at which time she was working at the DEC.
Q. I believe you mentioned there may have been other meetings with Ms. Batchelor. Do you remember when those might have occurred?
A. They would -- one occurred with Carl Sanders when I had gathered together materials for the production of documents as we discussed earlier and also began to develop notes on the answers to interrogatories.
Since I wasn't present at those meetings for much of the -- relating to much of the subject matter we're discussing, I was depending upon Ms. Batchelor and Carl Sanders to confirm the information that was being assembled, and that would have been prior to the time that we submitted our answers to interrogatories.
Q. Do you recall the date of that meeting?
A. No, but it would have been within a week

Page 26

of the time that Mr. Baugher assembled materials and drafted the response to the interrogatories.
Q. Did Ms. Batchelor review your draft responses?
A. No. She was really providing -- I had kind of a bullet point of the basic question -- or answers and she was amplifying some of the information that I didn't have available myself.
Q. And do you recall any specific statements that either of you made during this meeting?
A. Nothing specific.
Q. Do you remember any specific statements that Mr. Sanders made during this meeting?
A. Mr. Sanders expressed considerable disappointment that the efforts that were made to correct the problems identified in the REAC report of April of 1999 and the repairs that were done and the changes to the security system and personnel and the resident services programs weren't referred to or considered in any of the types of responses that he was seeing.
So he had invested a substantial portion of his work life for two years in trying to take

Page 27

a problemed project and turn it around, and so there was a series of comments that he made about his disappointment with the way that this has ultimately turned out.
Q. When you refer to the way this has ultimately turned out, were you referring to the condition of the property or the specific documents you were looking at or something else?
A. He was referring to basically the general condition of the property and the efforts made to improve it during 1999 and 2000.
Q. Do you remember anything else in general that was said at this meeting?
A. No.
Q. And do you recall any other meetings with Ms. Batchelor?
A. I think I've suggested there were about five, and that's about it, and with Carl Sanders there were two meetings.
Q. So there were two meetings between yourself, Carl Sanders, and Ms. Batchelor?
A. One meeting with myself, Ms. Batchelor, and Carl Sanders and another separate meeting with myself and Carl Sanders.

Page 28

Q. I see. So you don't recall any other meetings with --
A. No.
Q. -- Ms. Batchelor?
And there were no other meetings with Ms. Batchelor and you?
A. No. I think we described them in terms of five. They were about one a month at the time of the key documents being produced in discovery.
Q. And have the documents that Ms. Batchelor gave to you been produced to the government in this case?
A. I submitted them to Mr. Baugher.
Q. Did Ms. Batchelor ever tell you whether or not she had removed documents from HUD?
A. No.
Q. She never said one way or the other?
A. No.
Q. Did she ever --
A. They were simply documents in her personal files, and that's all there was to it.
Q. Did she tell you they were documents in her personal files?

Page 29

A. Well, she said they were documents in her files that she had kept.
Q. Did she indicate whether those were her personal files or possibly some other type of files?
A. Well, I don't think it came up specifically. They were just called her files.
Q. You took that to mean her personal files?
A. Her personal files, yes.
Q. Okay. Mr. Samuelson, I would like to go back a little bit and just ask you a little bit about your background, if I could.
A. Yes.
Q. I would like to start with your education, if you could, I guess, start with college, and we can work our way forward chronologically.
A. I went to Dartmouth College. I graduated in 1962. I was in the Peace Corps for two years in Nigeria, from '62 to '64. I returned, as Peace Corps volunteers do, with little money. So I sold Fuller brushes for six months to generate enough money to with

Page 30

scholarship go to the University of Chicago Law School. So I went to University of Chicago Law School from '64 to '67.

Q. And did you pursue any other education after graduating from University of Chicago Law School?

A. I have attended a lot of conferences and have been involved in classes leading to a real estate brokerage certificate but no formal degrees other than the periodic seminars, workshops on training programs, some of which I attended, some of which I spoke at.

Q. And have you obtained a real estate brokerage certificate?

A. Yes.

Q. When did you obtain that, sir?

A. 1993 or 4, fourth quarter of '93 or the first quarter of '94.

Q. And what courses did you have to take in order to obtain that?

A. In Illinois they have a provision that lawyers can simply take a test. So I acquired from the groups that provided training the course materials in a book and CD, and then I

Page 31

studied independently and went in and took the test and passed the test and got a broker's license.

Q. I thought you had mentioned there were some seminars that you attended; is that correct?

A. Over the years I have attended a wide variety of seminars in the real estate industry.

Q. What were some of the topics of those seminars?

A. Property management.

Q. And when did you attend that, sir?

A. This is a long time. Between 1970, when I began in the real estate industry, to today, I have attended a wide variety of seminars related to property management, HUD processing, community development activities, the use of technology in buildings and in communities, all of which relate to the general topic of creating spaces within buildings where people can improve themselves moving towards self-sufficiency.

MR. WELLONS: Could you read back the topics that he mentioned? I just want to make sure that I've got them all.

Page 32

(Answer read.)

BY MR. WELLONS:

Q. Do you have any idea how many seminars in total you have attended on these topics?

A. Probably 20.

Q. And over how long a period of time would that be?

A. From 1970 to 2004.

Q. I think we're touching on a little bit here. If I could have you go through your work history for me and I guess we'll just start again with the Peace Corps and then move forward chronologically.

A. Well, I tend to put the Peace Corps as an educational experience more than a work experience, but if it is the first of the work experiences, I had a wide variety of jobs prior to college and in college and in law school.

When I graduated from University of Chicago, I went to Kirkland & Ellis, a law firm in Chicago.

Q. And again what year was that, sir?

A. 1967 through 1969.

Q. And what type of practice did you have

Page 33

at Kirkland & Ellis?

A. I was involved in several very large lawsuits, one involving an antitrust case that went before the Supreme Court, U.S. versus General Dynamics, and a variety of smaller matters.

Q. And I believe you said that you departed Kirkland & Ellis in 1969; is that correct?

A. Yes.

Q. And where did you go next, sir?

A. I went back to the law school at the University of Chicago as the assistant dean.

Q. And what were your responsibilities there, sir?

A. Helping the dean in all areas other than student recruitment and financial aid.

Q. And when you say helping the dean, what were your specific duties there?

A. I was responsible for a capital campaign that raised a substantial amount of money for the building improvements, for the development of class and regional alumni associations, similar to the programs that Dartmouth College had developed; conferences and special events,

Page 34

including the annual University of Chicago Tax Conference; publications, which were the Law School Record and other publications that came out of conferences and special events.
Q. So you headed the capital campaign; is that correct?
A. Yes.
Q. And you were also in charge of developing various programs at the law school; is that correct?
A. Working with the faculty in development of them.
Q. And you were also involved in planning conferences and other special events?
A. Yes. My general role at the law school was intended to be an interim one, where the dean wanted me to develop, as I had done at Kirkland & Ellis, black books and other systems describing processes whereby these regular activities could be done.
Prior to that time, they were relatively informal and not terribly structured and he thought -- this was Dean Phil Neal -- if I were to come down to basically work with all of these

Page 35

activities and reduce them into manuals and flow charts and systems and procedures and prototype documents and were to lead the law school, I would have basically converted a whole series of random experiences into systematic activities which the law school uses till this day.
Q. So you were brought in specifically for what I'll call the standardization process that was going on?
A. Yes, and systemization.
Q. And did that systemization include the topics you had identified before, such as the capital campaign, developing programs, conferences, and special events?
A. Yes.
Q. And also publications?
A. Yes.
Q. You had mentioned that originally it was -- I believe you had mentioned it was meant to be an interim role. Does that mean that it became a more permanent role?
A. No. I saw the need for the problems to be solved, and the dean simply wanted a commitment of time from me to complete the work

Page 36

so that they would be capable of being taken over by other individuals.
So I finished the standardization, systemization and then recruited two people to come in to take my place, one in the law placement function, which is another area that I had responsibility for at that point, and the second in the areas of fund-raising. So with the systems in place and with the successors found, that was the end of my responsibilities at the law school.
Q. And what year was that?
A. 1969 to 1970.
Q. So you were there about a year?
A. About two years. What happened is that when I left Kirkland, I was working at Kirkland for about four to six months to transition other people into the work since I was the one that was completely familiar with the facts. So I was working four to six months at Kirkland in the evenings while working during the days at the law school.
Q. Sounds like some long days.
A. They were long days.

Page 37

Q. Sure.
A. But I was trying to be convenient or helping both the -- both employers out.
Q. So you departed the law school somewhere in 1970 then?
A. Yes.
Q. And where did you go next, sir?
A. To the Illinois Housing Development Authority.
Q. And what was your position there?
A. Assistant director.
Q. And what were your duties as assistant director?
A. To essentially assemble, standardize, routinize, put all the procedures together that IHDA needed to do to run its mortgage lending program, not too dissimilar from the roles at the law school, and it was a law school graduate and a governor, Ogilvie, who had known what I had done at the law school and saw it needed to be done in state government. So I was recruited to leave the law school and join IHDA, I-H-D-A.
Q. Thank you. This was specifically focused on their mortgage program; is that

Page 38

correct?
A. Well, it was really everything. This goes back to the questions of public policy and what was IHDA to do and developing its standard mortgage lending program and its senior housing program and its management functions and its nonprofit grant allocations and then to produce the documents that were necessary to get tax-exempt bond financing approval from the rating agencies and working with the legislature.
So I had responsibilities for virtually everything that went on at IHDA as the assistant director directly working for the director and the board of IHDA.
Q. And how long did you serve as the assistant director at IHDA?
A. This is another situation where I started in 1970 and continued working at the law school for about six months until that could be transitioned. So I had about four years of work in a three-year period.
Wholly working on IHDA matters was two years, from 1970 and '71. In 1972 the governor

Page 39

thought we were adequately staffed at the executive level at IHDA, and I was asked to work as a special project assistant in the Bureau of the Budget in the Office of Planning for the state. So I was working half time for the Bureau of the Budget and half time for IHDA.
Q. And what were your duties at the Bureau of the Budget?
A. To help develop a planning process and program for them and to begin to integrate a variety of agencies so that -- the Illinois Housing Development Authority was putting housing in places that the Environmental Protection Agency was providing upgrading and sewer treatments.
Prior to that there had been a lot of independent activities where IHDA would put in a housing development and there was no plan for sewage, or there were sewage treatment plants going in but no planning for housing and other things. So it was largely a function of that.
And, secondly, the thought was that in the housing programs there needed to be more involvement in the resident services and

Page 40

connecting low-income individuals to services and financial supports.
Q. And how long were you at IHDA?
A. Four years.
Q. So that would take us to '76, thereabouts?
A. '73.
Q. '73.
A. '70, '71, '72, and '73.
Q. Where did you go after that?
A. I went to the Inland Steel Company as a special assistant to the president of the Inland Steel Development Company.
Q. And what were your duties as a special assistant to the president?
A. Initially they were the same type of planning, systemization activities. They had acquired two real estate development companies, Jewel Builders and Public Facilities, and they wanted to have a standardized process of conceptualizing, planning, and implementing subsidized housing developments.
And, secondly, toward the next two years -- that was about two years of doing that,

Page 41

but by the second year I was there, it was fairly apparent they had some troubled projects around the country that were in need of specialized attention. So I spent the better part of three years doing troubled project review, analysis, and restructuring involving mortgage loan increases with HUD insured -- not HUD insured, actually HUD subsidized Section 236 projects in Illinois, Wisconsin, Michigan, and New York.
Q. When you got involved working with these troubled projects and Section 236 restructuring, was your title still special assistant, or did you have a different title at that time?
A. I think it might have just been assistant to the president, something such as that. It was not -- I don't recall that we spent a lot of time thinking about titles at that point, but that's the function it was. It was special assignments to solve troubled projects for the president.
Q. And under the special assignment what were your specific duties?
A. To work with their general contracting

Page 42

company, the management company, the partnership, and the funding agency to develop workout plans that would take the problemed project and turn it into a stabilized operation.
Q. And do you remember specifically any of the projects that you worked with?
A. Yes. One was Benedale Green in Lisle, Illinois. Another was what became the Cedars of Chili, a suburban area in Rochester, New York, and a third was the Pines of Perinton, which was again a suburb of Rochester, New York.
Those are ones in which I had direct responsibility for all aspects of the projects. On a host of other projects I was doing more trouble-shooting and consultative work.
Q. And during all of this time, you were employed by Inland Steel Company; is that correct?
A. Inland Steel Development Corporation.
Q. Okay. I see. Which was part of Inland Steel?
A. A subsidiary of Inland Steel.
Q. I see. And how long did you work with them, sir?

Page 43

A. Four years.
Q. And where did you go next?
A. I set up my own business at that point with some of the executives of Inland Steel to create a single-family development in Gurnee, Illinois called Prairie Oaks and the development of four IHDA-financed developments in Lake Villa, Illinois, Antioch, A-n-t-i-o-c-h, Grayslake, and Lake in the Hills.
Q. What was the name of your business?
A. It was at that point called DSSA.
Q. And does that stand for something?
A. Well, Don Searle Samuelson Associates.
Q. And what year did you form DSSA?
A. 1997.
MR. BAUGHER: '97?
A. I'm sorry. 1977. Thank you.
BY MR. WELLONS:
Q. '77. And I believe you mentioned that that was formed between yourself and executives who had been at Inland Development; is that correct?
A. One of the projects was. Well, actually several -- all four of those projects that I

Page 44

talked -- or five of the projects I talked about were in conjunction with David and Jim Carley, who were the founders with Vince Lombardi, the football coach, of Public Facilities, which was sold to the Inland Steel Company and which then began to operate as a subsidiary of Inland Steel.
Q. What was the structure of DSSA at this time?
A. DSSA was a sole proprietorship, and the various projects were created as limited partnerships.
Q. Between yourself and the other partners?
A. And limited partner investors.
Q. And have you been running DSSA since that time, since '77?
A. Yes.
Q. I guess moving forward from that time, what were other projects that DSSA undertook?
A. The first period of DSSA was 1977 to 1984. That involved the Gurnee single-family project, the limited partnerships in Lake County, like Lake Villa, and the acquisition of a troubled project in Milwaukee, Wisconsin

Page 45

called Sunrise Apartments, and a conventional troubled project in Saline, Michigan, called River Oaks.
Q. I'm sorry. Did you say conventionally troubled?
A. It was a troubled project, but it was conventionally financed.
Q. So DSSA fulfilled a different role with different projects, and some projects DSSA was the owner and other projects DSSA was not the owner; is that correct?
A. No. All of these projects DSSA was -- well, DSSA was an individual. The limited partnership might have been the owner, but I was the general partner of the limited partnership. So for all practical purposes I was functioning as the owner on behalf of the partnership.
Q. And that's true for all of the projects that you've identified?
A. Yes.
Q. I believe you mentioned that this was the first stage of DSSA which ran to 1984. What happened in '84?
A. Well, all the projects were zoned,

planned, constructed, occupied. The troubled projects were planned, and their corrections were implemented.

And I had a partner named Michael Flood and a group of four managers who were able to operate those projects themselves for the next seven years. So I had very little involvement on a day-to-day basis except for monthly reviews of financial statements and annual budgeting activities.

Q. Is it fair to say that your goal was to move into these properties and turn them around or to correct problems?

A. Yes.

MR. BAUGHER: The properties being Sunrise and River Oaks?

THE WITNESS: Yes.

MR. BAUGHER: Because the others were new.

BY MR. WELLONS:

Q. The other two were properties that were newly --

A. The other four, five actually were all new.



Q. But with the preexisting troubled properties, your goal with those was to move in, correct the problems with those properties?

A. Yes. It was the highest value function I could perform.

Q. What opportunities did DSSA pursue starting in 1984?

A. 1984? DSSA with Mike Flood and the managers didn't do anything more than just continue to operate the projects that I had started and at which time I took off probably 80 percent, 80 to 90 percent of my time to create and run a business called Samuelson Associates, which was a consulting firm for lawyers, law firms, and corporate law departments.

Q. And what type of consulting services did you provide to those entities?

A. Retainer recruiting, so I would be paid in advance to go out and find lawyers who would fit needs of firms, career planning for the firms and the individual lawyers, and business plan and marketing consulting for both the individuals, small practice groups, and the firms themselves.



Q. And just to make sure my notes are correct, that business was called Samuelson Associates?

A. Yes.

Q. And how long did you run Samuelson Associates?

A. For seven years.

Q. And what did you do after that?

A. This is the return to real estate, and in 1991 or 2 I got involved in consulting with owners of properties, HUD properties around the country in a program called LIHPRHA, L-I-H-P-R-H-A, which was I think the Low Income Housing Preservation Redevelopment Assistance Act or something such as that.

Q. So you began providing consulting services?

A. Yes. Some of the projects that I owned had similar circumstances related to LIHPRHA and others -- learning from those experiences, I decided to consult with other owners primarily in the Midwest but also in Florida.

Q. What were the similar circumstances that you identified?



A. What were the what?

Q. You said that some of the properties that you owned had similar circumstances to other properties.

A. Well, the Section 236 contracts that were entered into in as early as 1968, '69, '70, '71, had prohibitions against bringing them into a free market position for 20 years. So in 1987 or 8, some of the earliest generations of these 20-year Section 236 or 221(d)(3) projects were coming up for the exhaustion of their use restrictions, and owners were beginning to convert them to higher value rental properties or condominiums.

And that led to consternation in Congress to create a program called ELIHPA, which is the Emergency -- E-L-I-H-P-A, Emergency Low Income Housing Preservation Act, that was in place for about three years until LIHPRHA was enacted as the formal structure for dealing with these types of properties.

Q. And did you form a new entity with which to provide these consulting services?

A. No. I still did them within DSSA.





00000c00-0000-0000-0000-000000000000

Page 50

Q. And how long did you provide consulting services at this time?
A. For the length of the program. The first LIHPRHA project in the country was here in Chicago called Carmen Marine and that I think was in 1994, January, and then LIHPRHA continued on for about three years or four years.
And gradually the thought in Congress was that it was simply too expensive a program, so they stopped it and actually replaced it with something called MAHRA, which you referred to earlier in these discussions.
Q. And were you pursuing any other business opportunities?
A. There were several projects that came along which were troubled projects during that time period. One was an IHDA 236 project in Schaumburg called New Kensington or Kensington, 300 units or thereabouts, and that was a problem where the project was in poor financial shape, poor physical shape, and was managed by the Inland -- I'm sorry, the LaSalle Partners who were not very familiar with low-income housing or government-assisted housing.

Page 51

So IHDA was about to foreclose on that particular project with its investor group, and since the investor group that was involved in Kensington was related to some of the investor groups that I had already created in the early '80s, they asked if I would come in to restructure the Kensington project and to turn it around, which I did.
Q. When you say restructure the Kensington project, what specifically did that entail?
A. The creation of an amended and restated limited partnership, which was a redesignation of the responsibilities and rights of the old general partner and the limited partners and the new general partner.
Q. And did you or DSSA become the new general partner in that property?
A. Yes.
Q. And what was the result of your experience of New Kensington?
A. It was successfully done and sold to a -- about five years later or six years later to a large developer from Michigan who converted it to a higher income property. All of these

Page 52

projects worked out per plan.
Q. And when you refer to the plan successfully done, what specifically are you referring to?
A. Well, the first thing you have to do is to assess all of the factors that give rise to its problems to begin with, which involve financial and physical and organizational and marketing and resident services and legal. So you have a sense of this is where we are, and then you start projecting this is where we would like to be when the redevelopments occurred, one, two, or three years into the future.
And then you just start developing milestones along the way so that if something was 12/31/94 when you assessed its problems, you would like to see it corrected by 12/31/97, defining what it would mean to be as corrected and then doing the same thing for 12/31/96 and 12/31/95.
Q. And as the general partner, you managed that process?
A. Yes.
Q. You mentioned New Kensington. What were

Page 53

some of the other properties that --
A. There is another project called Niles Terrace in Waukegan, which is a project that was originally intended to be a consultation, and the Northern Trust that owned the property asked if I would simply make an offer to buy the property and take the risk that it would be financed under LIHPRHA rather than them taking the risk.
So I did and worked out a LIHPRHA refinancing plan, got it approved, and that happened to be I think the last project under LIHPRHA. Carmen Marine was the first project out of -- I don't know -- a couple thousand perhaps that had been refinanced under LIHPRHA over a four-year period and Niles Terrace was the last.
Q. And what was the end result of your efforts at Niles Terrace?
A. Well, it received the LIHPRHA valuation. The condition was it had to be sold to a nonprofit organization, so I couldn't keep it or the rehabilitation or refinancing wouldn't have been permissible. So I found a group called





00000000-0000-0000-0000-000000000000

Page 54

ACHT, A-C-H-T, that was headed by Father Mack, an Episcopal priest, who indicated that they would like to buy projects under LIHPRHA.
And I had sold on behalf of owners three or four projects to them when I was consulting with LIHPRHA in '95 and '96, and ultimately I sold ACHT Theta to -- or sold Niles Terrace to ACHT Theta rather.
Q. And the previous experience you had had with deposition testimony arose out of that transaction?
A. Yes, correct.
Q. Or the lawsuit arose out of that transaction.
Were there any other properties that you were involved with at this time?
A. Well, there was probably 20 or 30 projects involving LIHPRHA where I was consulting, which meant that I had to do the evaluation, estimate the future value of the property, if it were improved and unregulated, retain an appraiser to support the theory, review the HUD's appraisal and work out a coordinated resolution of the dual appraisals to

Page 55

the satisfaction of HUD and the owner, at which point then HUD would make them a grant or loan to -- for a new owner to come in to redevelop the project as planned.
So there were probably during '73, 4, 5 and -- I'm sorry, '93, 4, 5, and 6, 30 or 40 projects of that type that I did throughout the Midwest and Florida.
Q. You had described before what I'll call the comprehensive process of looking at a troubled property, looking at the legal problems, physical property problems, financial problems. Were you looking at all of those elements for these 30 or 40 projects that you were involved with under LIHPRHA, or was the process different?
A. It was similar. The reason is that for -- to be able to determine its value unregulated and improved, you had to assess its physical condition and determine what would need to be done to achieve the level of construction for which you would presume a value.
You would also have to develop kind of a marketing plan and a resident services plan --

Page 56

didn't have to, but I did them, because my sense is that to have a sustained project on a permanent basis, you should have something beyond just bricks and mortar.
And then obviously the legal and financial arrangements going forward had to be done for purposes of selling it to the nonprofit, who frequently wouldn't have much skill at doing that.
They would be a nonprofit would be the owner, but they would be largely dependent upon the reconstruction and management plans that I had developed which were the basis for the valuation.
Q. And were there other properties for which you served as the general partner at this time as well?
A. No. I think that was it. With New Kensington all the other projects were still owned by me. We picked up Niles Terrace. We picked up New Kensington. There was a lot of LIHPRHA consulting, and then I started doing -- DSSA became DSSA Management, Inc., and it started doing both consulting and fee-based

Page 57

management.
And there were three significant properties where that was done early in '97, '98. One was a project called Northwest Tower, at 1170 East Erie Street, where it happened to be a LIHPRHA project that was purchased from Bruce Rozet on behalf of the Northwest Tower Resident Association. So it was like Carmen Marine where the residents were the owner, but they needed someone to develop the LIHPRHA processing so it could be financed by LIHPRHA, develop the architectural drawings and retain the general contractor and supervise the activity.
So that was essentially everything that I would have done as a general partner/owner, done for in that private group.
There was a second project -- and at this point I was looking to work with a variety of types. That happened to be a resident-based group that was a LIHPRHA owner.
Another one was called -- I can't remember the name of the -- it was an elderly housing project in Evanston, which was having