difficulties, managed by a church. Ebenezer Primm was the name of the property, and the church had no knowledge of the operations. They needed someone to come in to correct them because they were under a scrutiny by HUD at that point, and so we developed a plan, and I trained -- DSSA Management trained individuals who were working for the church to become the management staff.

And there was a third project called Sunnyside Apartments which was owned by an individual, and that was on the north side of Chicago not too far from Wrigley Field, and it had physical problems, and it needed to again assess its condition, develop a sense of what needs to be done.

That happened to involve the development of a MIO, management improvement and operating plan, that set out the activities to be completed, the cost, the timing, and the financial resources that would be available largely in cooperation with HUD to enable the project to pay its bills.

Q. And what were the -- well, first before



I forget to ask, DSSA Management, what was the structure of that company?

A. That was a subchapter C corporation.

Q. And how many employees did you have at this time?

A. Well, we would have a small office staff and a -- the employees at the various sites would be our employees as well. So there would be anywhere between three and 15 employees per project.

Q. Let me make sure I understand this. So, for example, the church staff, I believe it was at Ebenezer Primm --

A. Yes.

Q. -- they would then become DSSA Management employees?

A. They were at that point, yes. So there was two, and then we had a project supervisor who was a DSSA employee who provided guidance to them as they did that.

Cedar Village might have had -- I think it had three. It had a maintenance man, a janitor, and a manager. And every project had a different organizational structure, depending on



its needs and its economics.

Q. And I guess we'll start with Northwest Tower and work our way through, but what were the results of DSSA Management's work with these properties?

A. Northwest Tower was successfully purchased, which was no small achievement, involving the seller, Bruce Rozet, and a construction plan was developed and completed and a resident services program was created and planned and implemented. An on-site computer learning center was created, and a Class 9 property tax exemption process had been prepared and completed subject to the final activities.

And then I think it was in May of 1999 when the residents concluded that maybe it would be -- since most of the hard work had been done at that point, they could basically create a management company using a former DSSA employee and themselves to become the management agent for Northwest Tower.

So we had completed our consulting work for Northwest Tower. We had completed our construction oversight work, owner's



representative functions, and we had the project which was in a position to be managed on an ongoing basis, even with some foundation grants, at which point it was taken over by the residents.

Q. I see we have been going for a little over an hour. Did you want to take a break and get some water?

A. No.

Q. You're doing okay? Okay. Thank you, Mr. Samuelson.

With Ebenezer Primm what was the result of those efforts?

A. Ebenezer Primm ultimately concluded that it wanted to manage the project itself as well, and it had its own staff, and most of the corrective work had been done and it -- they were interested in a redevelopment program that involved capital improvements at the existing building and a new building that was being financed four or five blocks away.

And they had a lawyer, consultant, Clarence Crooks, who was the architect of all of those activities. So that was something he was





00000000-0000-0000-0000-000000000000

Page 62

already engaged in doing, and while we might have done it, we didn't and he did. So we finished our assignment at Ebenezer Primm, and that was that.

Q. I believe it was Northwest Tower, I forgot to ask you -- you mentioned that having the property sold was an achievement in and of itself, and I forgot to ask you what exactly you meant by that.

A. Well, Bruce Rozet is a very controversial HUD figure. He's owned a lot of HUD properties. He's been the source of lots of newspaper articles and high level debates and discussions within HUD, and he's a very demanding businessman.

So to get him to come along with the time that was necessary to create -- to buy Northwest Tower for the residents was something of an achievement, but as I said to Bruce, unless you have LIHPRHA financing at that point, you're likely not -- that's probably the best economic arrangement you could have at that time. Probably turned out to be wrong. He probably should have not sold it.

Page 63

HUD's procedures enabled LIHPRHA projects to be sold in 2000, 2001, at which point it's a mile and a half from the downtown, on an expressway, probably much more attractive these days as a condominium development than as government-assisted housing.

Q. What were the results of the work at the Sunnyside property?

A. What were the what?

Q. The results of your work at the Sunnyside property.

A. The owner had no experience dealing with HUD. He had thought this was simply a building that you could buy and do with as you wish. He wasn't familiar with all the regulatory procedures. He wasn't familiar with the controls that HUD really had over the project. And he wasn't particularly familiar with keeping records.

And so there it was an organizational structuring and developing of a MIO plan and the completion of a MIO plan. And then his conclusion was, since he had a management company of his own and his desire was to convert

Page 64

this to condominiums, which may or may not have been available given use restrictions, that he would just simply have his management company take over the management of the property after the MIO had been completed.

Q. So was the MIO plan developed for Sunnyside approved by HUD?

A. Yes.

Q. And that MIO plan was then executed?

A. Yes.

Q. And completed?

A. Yes.

Q. And then the owner took over management at that point?

A. Yes.

Q. After the MIO plan had been completed?

A. Yes.

Q. Got it. Thank you. Well, we've covered a lot of ground. At what point in time does that put us where Sunnyside has been completed? What year was that?

A. Probably '98, '99.

Q. And have we overlooked any properties that you were involved with during the time

Page 65

period of the late '90s?

A. Yes. Then I spent time starting -- since I had now worked as a fee owner for the resident group at Northwest Tower, a church group at Ebenezer Primm, and an owner at Sunnyside, we concluded it might be interesting to work for the Chicago Housing Authority.

So they were in the process of privatizing their management at that point. So in 1997 we became the manager of a 450-unit -- DSSA Management, Inc. became the manager of a 450-unit apartment project called Sheridan-Devon Apartments, at which point we went through our standard procedure of the state of the project and helping a plan for its physical improvement and services for residents and financial stability and landscaping and otherwise taking a project and making it attractive.

Q. And was that process successful?

A. Yes.

Q. And were there other properties you were working with at this time?

A. In '98 there were two more projects from the CHA, '98 or '99, one of the two. On the

Page 66

south side of Chicago, there were elderly housing developments called Princeton Apartments at 43rd and Princeton and Judge Green Apartments that we managed for the CHA as well.
Then in 2000 the CHA developed an RFP for private management of all of its senior buildings, and DSSA Management responded to the RFP and was awarded three projects on the north side, Sheridan and Devon and Fisher and Pomeroy Apartments, which was about a thousand units total, and Lincoln Perry and Judge Green and Princeton on the south side, another thousand units. So those were two-year contracts that started in 2000 and would be completed in 2002.
And that takes you up to everything in 2000 except for one other project, which was Stateway Gardens, which was part of the State Street corridor, which was a 1600-unit, eight-building project which was as difficult as anything that the CHA had.
Q. What do you mean by difficult?
A. Difficult meaning enormous drug activities, controlled by various gangs and tenants who were living in a dysfunctional

Page 67

environment and coping with it by acting fairly dysfunctionally themselves. So it was a very difficult circumstance.
And when we started, there was eight buildings, and we had to systematically transfer people from one building to the other seven so that the first building could be vacated and demolished, and so eight became seven, at which point some gang lost a lucrative business, and there would be two or three or four days of musical chairs being played with guns, and then you had seven. Then we went from seven to four and four to two.
And so that entire process was one of identifying residents, helping them to move out of the CHA -- they were given vouchers for that period -- or relocating people into CHA properties in the buildings that remained.
Q. And was that process successful?
A. Yes. It's hard to say what success is. The buildings got demolished, and people got relocated, and so we were playing something of a rear guard action at that time.
Q. Did you feel that the residents were

Page 68

served by the approach that was adopted?
A. Yes, yes.
Q. I believe that you said that took us up through 2000; is that correct?
A. The start of the two clusters and the Stateway Gardens began in 2000.
Q. Were there other properties that you had involvement with in 2000 onward?
A. I don't think so.
Q. And that would cover you yourself, DSSA, and DSSA Management, Inc.?
A. Well, yes. DSSA is the sole proprietorship within which I would be working. So it would be DSSA as me and DSSA Management Inc. as the subchapter C corporation.
Q. And that takes us again through 2000. When did you first learn of the Englewood Terrace partnership?
A. In June of 2001.
Q. And was that also the first time you became aware of the South Pointe building?
A. Well, I was aware of it over the years because it's a prominent building in the affordable housing landscape in Chicago, but I

Page 69

had no particular reason to be any more interested in it than just casual until June of 2001.
Q. What happened in June of 2001?
A. I was looking -- since the CHA properties and Stateway were in relatively stable condition at that point -- the corrective plans were being worked -- I was looking for new troubled projects to take over as general partner as I had done in the early '80s.
Q. I'm sorry. Just to clarify, when you refer to troubled project, what do you mean by troubled project?
A. Projects that have need for physical improvements, better marketing, better management, resident services, that can be more effective as places for people to live and become an asset to the community rather than a toxic waste.
Q. Thank you. And again in June 2001 you were actively looking for troubled properties; is that --
A. Yes. There were four or five that we were looking at at that point. One was in the

Page 70

Hyde Park area and there were -- one was in Park Forest, and there was three or four others, and frequently you have to be looking at five or 10 to find one.

But I was looking at that point for projects, and I had found out about Spring Grove and Parkview Apartments -- they were owned by John Hayes -- and was exploring with him the possible assumption of the general partner position or the management function or simple consulting and helping them to work programs out for those two properties.

Q. And John Hayes was with PM Group; is that correct?

A. I think the parent is the PM Group, and PM Equities is, I think, the legal owner, the corporation that became the general partner.

Q. And when you say you were looking for properties to get involved with in that time, that was through DSSA Management, Inc.?

A. No. It was probably through DSSA, myself. It would require me alone to go out, look at the buildings, walk through the buildings, look at the neighborhoods, do much of

Page 71

the same work that I had done with LIHPRHA in the past.

So if you're conceptualizing a theoretical sale to a new owner to justify a value, this was a situation in which we were hypothesizing real redevelopments that would have real values.

Q. And in June 2001 then did John Hayes mention the South Pointe building to you as a --

A. No. It was Carl Sanders who called me and said they had learned that I was looking for properties and that he had understood I was talking to John Hayes about Spring Grove or Parkview and suggested it would be -- it was a higher priority of theirs at that time to have somebody look at South Pointe and develop a corrective plan.

Q. Did he say why South Pointe was a higher priority?

A. He didn't say. He simply said it was a higher priority.

Q. What did you think he meant by higher priority?

A. That that was the first property he

Page 72

wanted to sell and for whatever reasons he wanted to sell that or liquidate his interest in that greater than he had an interest in liquidating his interest in Spring Grove and Parkview.

Q. And what did you say to Mr. Sanders when he called you in June 2001?

A. I said, well, I would be interested in talking to you and seeing the property.

Q. And do you remember anything else that was discussed during that conversation?

A. At that time, no.

Q. Okay. What happened next?

A. I think this was late June of 2001, and I went and visited the property and walked around the property and went up into the building and drove around the neighborhood of Englewood, east Englewood to get familiar with the context in which the building was living.

Q. And that was in late June 2001?

A. I think it was late June or early July, about that time. My sense is the last two weeks in June is when it was.

Q. What did you do next?

Page 73

A. Well, I visited the property.

Q. Did you take a tour of the property?

A. Yes.

Q. And who went with you on the tour?

A. I think the first tour I took of the building, I was with the Babco Construction Company and perhaps the architect Ted Dunaj, D-u-n-a-j, and perhaps Carl Sanders, but I'm not sure.

Q. And who from Babco Construction was with you?

A. Jerry Levin, L-e-v-i-n. I think that's his name. And John Angelovich, A-n-g-e-l-o-v-i-c-h.

Q. And do you remember if anyone else came with you on the tour?

A. Yes. There was a very heavyset maintenance supervisor named, I think, Bob, a very heavyset maintenance manager.

Q. Understood. When you conducted this tour, was this in July 2001?

A. In late June or early July, and I didn't really conduct a tour. I was toured by the individuals who were explaining to me what they

Page 74

felt the project circumstances were.
Q. Is this similar to the process you would have undergone at other properties to identify the items that you wished to correct?
A. Yes.
Q. For example, had you worked with Babco Construction on other --
A. No.
Q. -- properties?
Who selected Babco Construction to tour the property with you?
A. Well, Babco Construction had been working for some time to -- and Ted Dunaj had been working for some time to develop a rehabilitation program for the property. And they began working on that perhaps -- for some time.
I later learned through documents it may have been as early as 2000, but I don't know that directly. And Ted Dunaj, I learned later through documents that he had been working on the property for the same period of time. So my guess was that they had been working with some energy to develop a rehabilitation plan for the

Page 75

property during the second half of 2000, and they were familiar with the physical needs of the building at least.
Q. But you hadn't requested that they come along? That was the request made by someone else?
A. Yes. I hadn't known of them at that point. So the first time I met Babco and Ted Dunaj was the time I took the tour, and I think it was arranged by Carl Sanders or John Hayes, and the tour effectively was led by the very heavyset maintenance man Bob.
Q. Do you know Bob's last name?
A. No, I don't.
Q. Well, at least we have a physical description to go by.
A. Well, it was interesting how I would think of that because his ability of maneuvering in the penthouse over pipes and under pipes and around boilers was -- he was quite nimble. And to get up there you had to go into the garbage chute on the 22nd floor, garbage chute room, and then take a hand captain's ladder up to the top, push back -- unlock and push back a trapdoor and

Page 76

step up into the penthouse at that point, so-called penthouse where they had a lot of mechanical equipment in somewhat random locations.
Q. Do you remember what was discussed during the tour between yourself and Mr. Dunaj and Mr. Levin and Mr. Angelovich and Bob?
A. One thing that was particularly highlighted by them was the problem of security. They indicated that there really was little physical security at the building because of locks on various entries and exits that had been broken or compromised and the relative freedom that gangs and gang-related and drug interests had in moving off the street, into the building, up into the units and around the building.
So their largest concern was to say that security and the drug and gang interests have to be eliminated or anything you do at this building is a waste of time.
Q. Did you observe anything that appeared to you to be gang related while you were conducting this tour?
A. There were certain insignia in the

Page 77

stairwells that indicated gang presence or turf claiming. There were a number of young men on the outside of the building along Lowe Street who appeared to have no reason for being there other than selling drugs.
Q. What else was discussed during the tour?
A. I think the -- I didn't take notes. This is a long time ago, although I think I wrote up a memo within a week or two weeks which summarized my general sense of the situation. But there was a substantial concern for security and security-related physical improvements. There was also concern for the elevator conditions.
Q. Were the elevators operating during your tour?
A. Yes.
Q. What were the concerns that were expressed?
A. The other concerns?
Q. Specifically, the concerns about the elevators.
A. Well, the elevators had -- it had a long tradition of having difficulties, and in an

Page 78

environment like that, elevators become important parts of the drug business so that there's lots of -- we had seen that in very direct fashion at Stateway Gardens, where we were operating buildings which were to some extent -- in which there was a thriving business going on related to drug sales, about two blocks away from the superintendent of police window where he could actually see them going on.

So the elevators had been vandalized, stopped, doors put off, lots of things that would keep them not operational so that there was relative greater capacity for people to roam the building stairwells than the elevator system.

Q. What other concerns about the building were identified during the tour?

A. There was need for a careful assessment of the roof. There had been some water damage that occurred on the 22nd floor, which appeared to be roof related. There was the need for a better hot water boiler and water circulation system. It was working, but it would periodically not work. There was the need for

Page 79

creating a different look to the building. That was recoloring so it lost its penitentiary-like coloring and atmosphere and the need for the substantial upgrading of the lobby, entry area, management office, and common areas.

Other than that, my sense was all of the problems in the units were largely functions of repairs and maintenance.

Q. And did you discuss the quality of the management in place at the building at that time?

A. Not with that group.

Q. Did you form any opinions about the quality of the management in place?

A. Well, not really. In a building like that or like some of the CHA buildings, it's very difficult to manage buildings if you don't have the security. If you don't have control over the building and the ability of eliminating gangs, drugs, and criminal activities, you are very hard-pressed. Everything else follows from that.

Q. In your assessment the first priority would be -- let me start over.

Page 80

In your assessment the first priority to address a troubled building would be to address the security and gang concerns?

A. And the eviction of residents who are allied with them.

Q. I see. Because if you don't take care of those problems first, you're hindered in your ability to address the other problems?

A. Well, you just do them and you -- I think many of the reports I read later from the REAC report in '99 and the Pinnacle report in '99 indicated that the criminal activities and the gang and drugs and allied resident relationships just had you on a constant treadmill of fixing and then breaking and then fixing and breaking, and all of that kind of goes with the territory of drugs and gangs.

Q. You mentioned that you didn't at that time have discussions regarding the quality of the management in place. Did you have such discussions at another time?

A. I don't think I had discussions on the quality of management necessarily. I think I wrote that management had to be improved, but

Page 81

that was part of an overall process of security and resident services.

Q. Would that have been a letter written to someone at HUD?

A. I think it was either -- I think it was to HUD. I think it was -- as I recall going through documents in response to the motion to produce, I recall that there was three or four memos that I wrote in July, August, September of 2001 which were quite comprehensive, describing my impressions, understandings, need for correction, so forth.

Q. And after reviewing those documents, do you believe that your conclusions in those documents were accurate?

A. I do.

Q. And you stand by the statements that you made in those documents?

A. Yes.

Q. What other concerns were noted during the tour of the facility that took place in July of 2001?

A. I don't think there were any other concerns. We were looking at -- thinking about





00000000-0000-0000-0000-000000000000

Page 82

this and systematically there are concerns about the structural quality of the building, which relates to the roof. I think there was some concern about the quality of the exterior concrete because there seemed to be some infiltration of water at the windowsills and at the spandrels or at the spandrel joint connections.

So there were concerns about the structural elements, and there were discussions of the mechanical systems. There were discussions of the elevators, need for elevator improvements. There were substantial concerns with making the building look more normal from the exterior and curb appeal standpoint and then developing a program to improve the units.

Q. What happened next following this tour?

A. What happened what?

Q. What happened following the tour? I guess if I can narrow that a little bit, I mean in terms of the progress towards a transaction by which DSSA would purchase PM's interest.

A. I indicated to John that this struck me as being very similar to a transaction that I

Page 83

had structured with New Kensington, where we needed to have a -- there needed to be an improvement loan. There needed to be a rehabilitation program, and there needed to be a restructuring of the partnership interest.

And I think I submitted those as I recall in a comprehensive memo to Ed Hinsberger in July or August of 2001.

MR. WELLONS: Could you just read that answer back. I just want to make sure I got everything that he said down.

(Answer read.)

BY MR. WELLONS:

Q. When did you communicate this to John, if you recall?

A. Probably within the week following the visit, and it was at that point that John indicated that this was his priority. He didn't want to really talk about the other two projects at this point, that he wanted to focus on developing a relationship to get South Pointe under new ownership and management.

Q. Had you identified what you thought the rehabilitation program should consist of at that

Page 84

point?

A. At that point meaning July and/or August, I think within that 45 days, yes. My perspective was sort of different than John's, that I was looking to own and operate a building for the next 40 years. So I had concerns and interest in the rehabilitation loan that may not have been the same that John had in terms of his interest in rehabilitating the building.

Q. What did you understand John's interest to be?

A. Well, this is something I learned later, I think, through the review of the documents, but I think John's interest was to primarily develop an improvement program that would respond to the deficiencies listed in all of the REAC inspections and the Pinnacle inspections and the MIO and the final team report resolution. There was a whole series of things that he had obligations to do under his Section 8 contract, which were different than what one would do if HUD made an insured loan for the long-term future of the project.

Q. And at this point you had decided that

Page 85

it would be appropriate to pursue an improvement loan for the property?

A. Yes.

Q. As well as to restructure the partnership interest?

A. As well as to ask for rental increase. The project -- just by examining the financial statements, the project for the prior three years had lost about $150,000 to $200,000 a year in cash, meaning that the money it received was $200,000 less than the expenses it incurred.

And that was to some extent a function of the financing that it had with the Community Investment Corporation, which had a 10-year loan which was amortized over the 10-year period. So the $5 million loan had the property paying back $500,000 to $550,000 in principal repayments, which was about 20 percent of the operating budget.

Now, if you put a new 40-year loan on the project, you might be paying $50,000 in principal in the early years as opposed to 500,000.

So it struck me that the fact that it

Page 86

was losing money was a function of the constant repair needs that it had, the need for very upgraded security, and those could be accommodated if you could eliminate the onerous principal obligations that were part of the CIC loan.

Q. What did you see as being necessary as part of the rehabilitation program?

MR. BAUGHER: What is the rehabilitation program you are talking about?

MR. WELLONS: I'm sorry.

Q. I believe you had identified the need for a rehabilitation program, and I believe that you mentioned that what you thought would be appropriate differed from Mr. Hayes. I am hoping you could explain what you thought would be appropriate in a rehabilitation program.

A. Well, there were three views of rehabilitation that had occurred, and this is something I learned later. The first rehabilitation program was that which was necessary to simply satisfy the REAC concerns, which were unit repairs and elevator repairs and things such as -- and painting and decorating.

Page 87

Those were really what had come out of the various inspections that had been done by outside parties.

Babco expanded that to include some elements of what I would call long-term capital improvements that were not discussed in any of the prior inspections involving concrete repairs or involving mechanical system changes or the redoing of many of the elements of the units themselves.

So their thought was that there would be perhaps some structural and mechanical and common area repairs of perhaps a million and a half dollars, including the million dollars of corrective activities, and then generally they thought that 25 percent of the units had to be repaired in terms of cabinets or tile or appliances or one thing or another, plumbing related, and that brought them to a $3.5 million proposed program.

HUD appeared to conclude that it was not 25 percent of the units that needed to be repaired but 100 percent of the units that needed to be repaired and that there were a

Page 88

number of other things that they wanted to have, like air conditioning and individual heating units, some of which were incapable of being done physically, but that's what brought them to a $6 million total.

And as I looked at things, if we were going to talk about owning the property for the next 40 years, I think we needed to go back and look at a comprehensive program that would involve the repairs that ultimately got made, which were the repair -- the comprehensive repairs to the kitchens and baths and other sorts of more complete activities.

Q. So you believed a more comprehensive rehabilitation program was appropriate?

A. For somebody going to be owning the project for the next 40 years, yes.

Q. And that takes us, I think, to the other issue you identified, which was a change in the ownership, structure of the ownership incentives. What did you view as necessary in terms of changing the ownership structure?

A. Well, it was a replacement of PM Equities as the general partner with I think it

Page 89

was DSSA, New Englewood Terrace, LLC. So we had a change in the general partner function, which was what I assumed HUD was looking for when it looked for a change in ownership.

Q. What happened next after these discussions you had with Mr. Hayes in July or August 2001?

A. I developed a comprehensive plan, I think it was on July -- late July or early August, describing in detail what I thought needed to be done and developing an improvement program and improvement budget and an improvement timetable and projections of income and expense that would be derived from that, as well as the resident services program and Computer Learning Center Smart Building Program that would help residents -- help the right kind of residents who were interested in self-sufficiency come to the building, take advantage of the services through the building, learn how to use computers in the building and have broadband access in their individual units so they would have the ability of becoming self-sufficient through the process.





00000000-0000-0000-0000-000000000000

Page 90

All of that was written down in a comprehensive memo in early August that perhaps had 16 detailed exhibits as well, indicating the details of the capital and operating plans and the resident services programs.

In addition to that, there was a request for a rental increase, and the rental increase required the development of a comprehensive market survey, which was done by Neal Renzi, to substantiate the fact that a $200,000 increase in rents would be appropriate.

Q. What additional discussions did you have with Mr. Hayes regarding the purchase of PM's interest in the property?

A. That effectively I was acting as an unpaid consultant to him for that period of time. I didn't charge him anything, and he didn't ask for anything, but this is something that is normally done -- I have normally done to understand a project well enough to decide what needs to be done thereafter. Then it was agreed that I would start -- DSSA Management would start managing the property on December 1, 2001.

Q. When you say you were working as an

Page 91

unpaid consultant, that was something that you and Mr. Hayes had discussed, that you were fulfilling that role?

A. Yes. I was helping as a buyer to put together a program that I thought would be financeable by HUD and successful in the marketplace and convert what was a very crime-ridden, drug-laden project into an attractive addition to the Englewood community.

Q. When you say consultant, you're referring to all the areas that we had discussed before?

A. Yes.

Q. Physical needs, financial needs --

A. Yes.

Q. -- legal needs and whatever other needs the property had?

A. I think the memo I wrote in August sort of describes that.

Q. And again you have reviewed that document recently?

A. I reviewed that document as we were responding to the motion to produce, not prior to today.

Page 92

Q. But you still feel that the conclusions you reached in that document were accurate?

A. Yes, I do.

Q. Okay. And the agreement that you mentioned by which DSSA would become the manager in December 2001, who discussed that specific agreement?

I'm sorry. Were those also discussions between you and Mr. Hayes?

A. Yes.

Q. And that was with the agreement the two of you reached?

A. Yes.

Q. What happened next in the process by which DSSA purchased PM's interest?

A. There was about nine months of interlude between October 1st of 2001 and June 30th of 2002, which largely related to the injunction suit by Mr. Hayes before Judge Castillo in the U.S. District Court here in Chicago, seeking to enjoin the issuance of vouchers to residents and to sustain the continuation of the HAP contract.

And then the process evolved into an administrative review involving from December

Page 93

through perhaps May of 2002 and then after the review in -- or after the exhaustion of the administrative remedy on May 2, 2002, Mr. Hayes then having exhausted the administrative remedies, filed another injunction suit seeking essentially the same relief that he had the first time.

And so not much happened with respect to the loan processing -- not much happened. It still continued, but there was a -- it was a major distraction. So we continued just to manage -- started to manage the property and to look at all of the residents and to do an assessment of the residents by unit, by family, by circumstance, by problem, by need, and to determine whether or not we felt that those residents would be appropriate in the new building as redesigned.

Q. Did you begin that management in December of 2001?

A. Yes, December of 2001.

Q. Okay. When I say you, that's referring to DSSA Management?

A. Yes.





00000000-0000-0000-0000-000000000000

Page 94

Q. Was it October 2002 when PM's interest actually was purchased?
A. No. It was December 13, 2002.
Q. December 13, 2002, thank you. How was that transaction structured?
A. Pretty much similar to the structure that had been worked out in New Kensington, when we took over from the LaSalle Partners in which there was an amended and restructured partnership agreement. There was a mortgage loan agreement with HUD, and there was a construction contract with Duffy Construction and then a revised management contract with DSSA Management, Inc., and that's what took place December 13.
Q. How much did DSSA purchase PM's interest for?
A. We didn't purchase it for anything. It struck me that it had prospective value. What I agreed to do with John Hayes is to pay him for a three-year period 25 percent of the management fee that DSSA Management would achieve and that while that's not necessary, it was something for John, and as it turned out, it turned out to be

Page 95

nothing because DSSA Management never got paid.
Q. And when you say you agreed to pay Mr. Hayes, are you referring to PM you agreed to pay?
A. No. We agreed to pay the seller, which was the PM Equities.
Q. So it was PM Equities you agreed to pay three years management fees --
A. Twenty-five percent of three years of management fees.
Q. Let me just get that clear for the record because I think we were talking over each other. DSSA agreed to pay PM Equities 25 percent of three years worth of management fees; is that correct?
A. Yes.
Q. Thank you. Did PM 1 maintain any ownership interest in the property after this transaction?
A. No.
Q. Did any other affiliate of PM 1 maintain any ownership interest?
A. No.
Q. And is there any agreement in place

Page 96

between Englewood and any other party to share the proceeds of any settlement or damages from this suit?
A. There may be a payment to John Hayes related to the lost equity. He after all was the general partner of Englewood Terrace, and as you know, one of the damage categories we have is lost equity. It's not been determined what the percentage would be, but as you know, he put in $770,000 in the property in 1999. He put in another $400,000 to pay creditors, $450,000, in 2002, and if not he, the PM Equities also advanced money to the project for -- perhaps $500,000 for the three years between 1998, '99, and 2000 to cover financial losses at the property.
So those were equity contributions made by Hayes which have been lost through the foreclosure process. So there is some desire to work out something that seems fair, and we don't know what that is yet.
Q. So there's no agreement in place currently --
A. No.

Page 97

Q. -- to distribute the proceeds of this lawsuit --
A. No.
Q. Okay. But it would be your desire to work something out with Mr. Hayes by which some proceeds were made available to him?
A. Yes.
Q. Mr. Samuelson, I would like to talk with you a little bit about the damages that Englewood is claiming in this suit, if we could.
A. Yes.
Q. And are you doing okay, or would you like a break?
A. I'm fine.
Q. Okay. Thank you.
A. I'm particularly concerned about getting a seven o'clock flight to Washington tonight.
Q. I understand. I don't believe that will be a problem today.
A. Okay.
Q. You submitted on May 31, 2002, a letter to HUD describing the damages that you believed Englewood was entitled to; is that correct?
A. Yes.





00000000-0000-0000-0000-000000000000

Page 98

Q. And Mr. Hayes had submitted a letter on August 6, 2001, seeking reimbursement for energy-related costs?
A. Yes.
Q. Had you reviewed or have you reviewed his application for the reimbursement for those energy costs?
A. I have only seen a portion of the application, I think six or eight pages out of what might have been 12 or 14.
Q. The application that he submitted in August of 2001 requested $55,230.99; is that correct?
A. Yes.
Q. Do you know how he calculated that amount?
A. No, but I don't think it's a correct amount.
Q. And in the submission that you made on May 31, 2002, you requested, I believe, $139,187.35 --
A. Yes.
Q. -- for energy costs?
How did you calculate that amount, sir?

Page 99

A. The general concept was that because of the extraordinary gas price increases in the fourth quarter of 2000 and the first -- fourth quarter of 2000 and the first quarter of 2001 which are unprecedented, that HUD in April or thereabouts concluded that owners should be given the opportunity of making applications for lump sum adjustments.
And the instructions were not terribly clear, but after spending a fair amount of time, the general concept was that you were to compare normal seasonal costs from a prior year to the seasonal costs in the aberrational year, and the difference between those costs would be the amount that you could claim some adjustment.
So we went back to the Peoples Gas Company and asked them to construct a schedule of gas costs for the fourth quarter of '98, first quarter of '99, fourth quarter of '99, first quarter of 2000, and the fourth quarter of 2000 and the first quarter of 2001, which I believe was -- I didn't do this myself. It was done by the management company. But my sense is that that process led to the conclusion that the

Page 100

unusual adjustment would be $139,000.
Q. When you say the calculation was done by the management company, are you referring to DSSA Management?
A. Yes, yes.
Q. So it would have been someone in DSSA's staff?
A. Yes.
Q. Do you know who performed those calculations?
A. Yes, Robert Sova, S-o-v-a.
Q. And have you reviewed those calculations to determine their accuracy?
A. Not recently, but at the time I did, yes. I had direct conversations with the billing department of Peoples Gas Company and a woman named Claudia.
Q. And you had made reference to HUD's procedures for seeking this reimbursement. What do you remember about those procedures and what they required?
A. I think it was like most HUD procedures. It just required that there be the application and the application that would be reviewed by

Page 101

the project manager, and if there were deficiencies, usually the project manager would point them out and seek to get them corrected so that the project could receive the benefit of money, and that was the purpose of this whole thing.
And given the fact that there had been very substantial costs -- I think the typical monthly costs for the month of January and February in normal years might have been $30,000. The years in question they were $55,000, so a $25,000 per month increase during that period of time.
And given the fact that the project was losing $200,000 in funds and needed to spend money on security and repairs, it struck me that that was something that would have been in everyone's interest to get that money out of the federal government and into the project where it can do some good.
Q. I believe that the May 31, 2002 document you submitted also discussed other categories of damages that Englewood sought; is that correct?
A. Yes.

Q. I believe it discussed something that you termed special claims?
A. Yes.
Q. And I believe those were in the amount of $92,878? Do you recall --
A. Yes.
Q. -- if that's correct?
How are those amounts calculated, sir?
A. I think those were the costs of the repairs that were necessary to fix the apartments that people had vacated. On October 1, 2001, there were 300 occupied units. On December 31, 2001, there was about 300 occupied units. Nobody had left. By the end of March, there was about 250 or so occupied units, but then we started getting people to move out rather -- after winter was over. They started moving out. We helped them. And they left their apartments in not very good condition.
So in the normal situation, with a continuing HAP contract, there is an opportunity for the owner to receive money to compensate for tenant damages during the tenancy period, and that's what was developed to support the claim



for the $92,000.
Q. And just to make sure I understand, these were damages that were identified after the residents had left the apartment?
A. Yes.
Q. I believe that you had another category, which was rent balance at move-out. Does that sound correct, sir?
A. Yes, and that may have been tenants who decided since they were moving, they didn't have to pay rent. So while they were only paying a portion of the rent, 10, 20, 30 percent, they thought that this was as they moved out a kind of rental holiday. So there was rent obligations that were still present at the time that they moved.
Q. And backing up to the special claims, we discussed in general how those figures were determined. How were the actual amounts calculated?
A. I don't know, but I think the way they would have been calculated is to determine the cost of repairing the items to a condition that would have been normal at the time that a person



left the property. So if we had a toilet that was trashed or holes in the walls or defaced doors, those would be looked at, quantified, and put into a total, and that would have been the way that they would come up with that figure.
Q. And who prepared those calculations?
A. I think it was a combination of Bob Sova, who is the property manager, and perhaps Tracy Nightengale, who was the property maintenance supervisor.
Q. And do you know what records they would have relied upon in performing those calculations?
A. They would have gone through and made physical inspections of the units and then put the physical inspections in the unit files, so that the typical file would have tenant-related information in the front, related to admissions, lease terms, rent payments, things such as that. In the back of the file there was normally a section dealing with work orders and other improvements related to the unit itself.
Q. How would they have determined the appropriateness of the costs that were to be



charged?
A. Both of them had been in the business for many years and had been involved in managing other properties at DSSA and had experiences in doing MIOs and making repairs, and they had had substantial experience in the business.
Q. Do you know of any records or documents they relied upon in determining the appropriateness of the charges?
A. I don't know.
MR. WELLONS: Counsel, we would like to make an informal request that we obtain copies of any documents relied upon or reviewed in the process of calculating those amounts. I will get a letter to you about that in writing.
A. I think those probably were destroyed in the fire of June of 2003. That's my understanding, that all the unit files were down there and there was an arson activity at the building attributable to drug interests because we had a security camera and I think -- my sense is that those records were destroyed at that time.
Q. So the records that they would have





00000000-0000-0000-0000-000000000000

relied upon in performing those calculations --
A. Yes.
Q. -- were likely destroyed in that fire?
A. Yes.
MR. BAUGHER: Well, there are no records that exist that you have that are responsive to Mr. Wellons's request; is that right?
THE WITNESS: That's correct. That's correct.
BY MR. WELLONS:
Q. Do you know of anywhere else those records might be located?
A. I didn't hear you well.
Q. Do you know of anywhere else that those records might be available or located?
A. They might have been recorded as work orders. That would have been entered into the CAM system, which was the property management and maintenance system, so that when needs are determined, the work orders are created. They're brought down to the computer. They are given to the maintenance staff to correct. They are then corrected. Then they are closed out, and it may have been that the amounts and other



criteria used were in that particular report.
Now, unfortunately, the CAM system only keeps records for one year. So they're primarily interested in making sure that you have detailed reports on the work orders that have been called in or assigned and that they are corrected and it just has a -- those are done in the normal course of events so you don't necessarily -- CAMS hasn't saved them for year after year after year. That's usually done in the unit files themselves which happened to be destroyed. But there may be something in CAMS, and I don't know enough about how CAMS keeps itself.
Q. Okay. And for the $40,983 that was requested for rent balance at move-out, are you familiar with how that amount was calculated?
A. Yes. That would have been done by just the balances that were owed by the tenant at the time of the move-out.
Q. And what documents would have been relied upon in performing those calculations?
A. That would have been CAMS reports again. All of those reports would have been available



at that time in 2002, and so that was not, you know -- if anyone had sought to question or verify a document, they would have been available through the CAM system right then.
Q. But your understanding is those CAMS documents are no longer available today?
A. No. I understand at some point in time, and I think they had one year that they kept, they kept one year, and at the end of the following year they would destroy all the other documents.
Q. And where physically were the CAMS records located?
A. CAMS is a computer system that entries are made locally, and where they're stored, I'm not sure. It's an electronic process.
Q. Where would I go if I wanted to access a record?
A. In CAMS?
Q. Yes.
A. You would go to the site, and I think they're still operating the CAMS system down there at the site, and you would go to the site and you would ask for information on individual



units.
Q. And do you believe that's the process that was followed when these calculations were made?
A. Yes, I do.
Q. And who prepared those calculations?
A. Robert Sova.
Q. And did you review those calculations to determine their accuracy?
A. I probably reviewed them briefly to see that there was backup, but I didn't go through the calculations to confirm the numbers.
Q. And is that also correct for the special claims calculations?
A. Yes.
Q. So you may have reviewed them briefly but you didn't --
A. They seemed to be reasonable, you know, given the circumstances. So --
Q. Just to clarify, Mr. Samuelson, the term special claims, was that used to refer to damages done by a tenant or was it used to refer to vacancy losses?
A. I think both vacancy loss and tenant

Page 110

damages and perhaps one or two other categories of cost are included in special claims.
Q. Do you recall how the vacancy losses that Englewood claimed were calculated?
A. I think they would have been calculated on the basis of -- I think you were given vacancy losses for two months after a tenant has left an apartment, and so I think there's a period of time in which vacancies are supposed to be compensated, provide compensation by HUD. That's the way it would have been done.
Q. But you did not perform the vacancy loss calculations that are referred to in this letter?
A. No. In all cases it was the -- Bob Sova who was responsible. He was responsible for managing the property, for designing the corrective strategy that was to be done at the property during 2002, and to attend to the financial matters of the property.
Q. And did you review the vacancy loss calculations?
A. Probably in the same way I did the others.

Page 111

Q. Sure. And what records would he have referred to when performing the vacancy loss calculations?
A. The same CAMS records. They have all of the -- when a tenant -- every month there is an account receivable generated at the beginning of the month for the tenant's payment and for the HUD subsidy payment, and when the payment from HUD is received, that's canceled out. When the payment from the tenant is received, that's canceled out. And he would have basically just determined the past amount owed at the point in time -- it may have been May 31.
Q. And finally I believe that there was an amount claimed for lost value of rental increase?
A. Yes.
Q. Are you familiar with how that calculation was performed?
A. That would have been basic -- applying the Renzi approved rents which were approved by the appraisal department within HUD, which was then relayed to me by Ed Hinsberger, but HUD took the position that the rental increase,

Page 112

while appropriate, was not going to be made effective until there was a rehabilitation loan closing. That just happened to be their position. I don't think it's correct, but that's what they said.
Q. And the May 31, 2002 document, you calculated the rental increase -- or whoever performed the calculations calculated the rental increase beginning in October 2001?
A. Yes.
Q. Do you recall if that's correct?
A. Yes.
Q. That is correct. What documents did they rely upon in performing those calculations?
A. They relied upon the Renzi approved rents or the HUD approved Renzi rents and substituted those for the rents that were actually charged, and as I recall, the annual difference would have been about $210,000.
Q. And when you refer to HUD approved, you're referring to the fact that Mr. Hinsberger informed you that the appraisal department had analyzed the comparables that you had submitted; is that correct?

Page 113

A. Yes, and approved them.
Q. I believe you also testified that HUD had informed you that no rent approval would be made until the loan approval occurred; is that correct?
A. Not quite. They had approved the rents, but they were not going to implement the rent increase until the closing of the loan.
Q. And do you recall when you were informed of that?
A. September of 2001.
Q. And who informed you of that?
A. Ed Hinsberger.
Q. And how did he notify you of that?
A. By e-mail. I think I received eight copies of that in the government's motion to produce documents.
MR. WELLONS: Okay. I am going to have to go off the record for just a couple minutes myself and take a break.
(Recess taken.)
BY MR. WELLONS:
Q. Mr. Samuelson, I want to ask you about one specific incident that occurred at South

29 (Pages 110 to 113)

Pointe in November 2001. Do you recall a woman being thrown from a window of the building at that time?
A. Not in 2001. There was no woman thrown from a window.
Q. Do you remember an incident like that at another time?
A. I had heard that there had been a woman thrown out of a window or a child or a young teenager in either 1999 or 2000.
Q. What specifically do you remember hearing about that incident?
A. I remember when we were at our inspection -- this is the one with Babco -- they had talked about residents throwing stuff out of the window as sort of standard operating procedure, and then they said in a semi-joking way, and one time it was actually a woman that was thrown out of the window. So that's about all I remember about it.
Q. Do you remember sending an e-mail to Ed Hinsberger about that incident?
A. No.
MR. WELLONS: I am going to show you a



document dated November 20, 2001, see if you recognize it or if it refreshes your recollection.
Would you mark this as Samuelson Exhibit 1, please.
(Document marked as Samuelson Deposition Exhibit No. 1 for identification.)
BY MR. WELLONS:
Q. And this document has been prelabeled as B5083, and it looks to be an e-mail from Ed Hinsberger to you, and at the bottom of the page it looks to be an e-mail from you to him.
A. Yes.
Q. And in the fourth paragraph of your e-mail to him, it references a Sun-Times article indicating a woman being thrown out of the ninth floor window of an apartment building at South Lowe; is that correct?
A. Yes, but I don't know what the -- I don't think it was in 2001. I think there had been -- something like that had occurred, but I don't believe it was that day.
Q. So you believe that this likely refers



to the earlier incident you had mentioned?
A. Yes. I couldn't figure out when the Sun-Times clip was, but I think it was a prior day.
Q. Okay. Thank you. You had mentioned before the litigation in Waukegan, Illinois, and I believe that was again between yourself and Affordable Community Housing Trust-Theta; is that correct, sir?
A. Yes.
Q. Do you remember any specific rulings that came out in that case?
A. I don't remember on that one. I think it was one that DSSA may have had to pay something back to ACHT Theta. I think there was a claim for -- I think there was a -- I'm not sure whether the suit was by DSSA against ACHT Theta or the reverse. But at the time of the closing, it related to the accuracy of the prorations, and as I recall, there were -- I think our position was at the time of the closing that all the prorations had been taken care of and that obligations that emerged after the closing for periods that may have occurred



before the closing were the obligations of the buyer as opposed to the seller.
And there was some dispute, but it was not a large amount of money, and it really related to things like utility bills or things like that that hadn't been -- we hadn't received them at the time of the closing.
Q. Do you remember Judge Margaret Mullen in that case ruling that you had violated your fiduciary duty?
A. I don't remember that, no.
Q. Do you dispute that she had ruled that?
A. Well, I guess I'm not sure whether she has or hasn't, but I don't know that a seller has any fiduciary responsibility necessarily to a buyer. And I was in Sweden during that entire period, so I wasn't even at the closing, and I was relying on lawyers and other people like that to have handled the closing process.
Q. Was DSSA seeking expenses in that lawsuit?
A. Expenses for legal fees?
Q. Or reimbursement for funds that you had expended.