A. I think it was. I think there was a certain amount of money that we had spent on things for which we were seeking reimbursement, and they said that the proration was improper. And it was a relatively small amount of money involved, and I had thought under the circumstances since we were giving them a new -- completely planned building for free with three and a half million dollar rehabilitation loan that that would have been something that would have been normally something that we would have expected and received.

But, again, I was not in the country. I was in Sweden at that point, and the question of the nature of the dispute I wasn't familiar with.

Q. Do you recall her ruling that DSSA's claimed expenses were specious?

A. No, I don't -- I think I have to know what the expenses are, but there were no -- I don't think there's any specious expenses we've been involved in that I know of.

Q. Do you dispute that that was her ruling?

A. I don't have the ruling. I think if we



had the ruling, I guess I could determine whether it was or wasn't.

MR. WELLONS: Okay. Mark this as Samuelson Exhibit 2.

(Document marked as Samuelson Deposition Exhibit No. 2 for identification.)

BY MR. WELLONS:

Q. This document is an order dated August 1, 2002, entered by Judge Margaret J. Mullen. Take as much time as you need to review the document, Mr. Samuelson.

A. The whole document?

Q. Take as much time as you need. I will be specifically questioning you about statements appearing on pages 6 and 7.

A. Okay. Okay.

Q. Mr. Samuelson, does this document refresh your recollection that Judge Mullen had determined that you breached your fiduciary duty by paying preclosing statements from post-closing receipts?

A. I don't recall ever seeing this opinion.

Q. Does it refresh your recollection that



Judge Mullen determined that some of the expenses sought to be recovered by DSS were unsubstantiated, inflated, or specious?

A. I see that she wrote that, and I dispute that they were understated or specious. They were typical fees that we had charged to other LIHPRHA clients for performing the same work. And since ACHT Theta had no money to pay for anything, we basically said we will effectively carry this completely through on the assumption that we would continue to manage the property on an ongoing basis.

And ultimately it was -- and we attempted at some point when this dispute occurred -- when I came back from Sweden, I had been told in July or August, something like that, that there was some concern about the payment of rental proceeds -- the property continued to operate with Bogda Kirkiewicz being the manager. Money comes in; money went out. There was no change in any element of the property and -- but there was the position taken that there were payments for gas and electrical costs done subsequent to May 7 out of normal



project revenues.

And I had requested on several occasions to talk to the board of ACHT Theta because this was one of many projects we had done. We had developed a portfolio of projects for ACHT Theta to get into management properties, and it just happens that Father McClenaghan was a very difficult man to work with, and we had a dispute.

And ultimately there was a trial, and I gather Judge Mullen -- Margaret Mullen is her name -- reached these conclusions which are pretty much lifted directly from the plaintiff's brief or the Affordable Community Housing Trust's brief, and I don't know that there was any independent thinking about specious or any of those sorts of topics as she wrote this opinion.

So I would say in answer to that, yes, she wrote this opinion. And it was our position then and it is now that the work that we had done was the typical going rate for a LIHPRHA consulting activity.

We had generated fees of anywhere

Page 122

between $100,000 and $400,000 per LIHPRHA closing. So this was really quite standard in that particular arena. But she thought otherwise, and that happens, I gather, in litigation.

Q. But you were not aware of this prior opinion or were not familiar with the contents --

A. I haven't seen the opinion. I haven't seen the opinion. I obviously have seen the letters that I wrote when there was an effort to resolve matters. I think the real issue was the $30,000 in a security deposit account which we paid $30,000, and that was that.

And I see also that there was some effort in November by Judge Mullen that mediation be considered as a vehicle for doing this, and I think ultimately the mediator, DeSanto, concluded -- Ed Fitzpatrick is the husband of one of my wife's -- one of my friends from high school. And it struck me at that point that, while I disagreed with the opinion, it was more prudent just to pay the $30,000 and get done with it and get on our way.

Page 123

Q. When you say you disagreed with the opinion, do you mean you disagreed with the outcome?

A. Yes.

Q. But you had not read the opinion itself prior to today?

A. Had not read the opinion. Have read it now. Disagree with the outcome but most importantly disagree with the -- these were clearly legitimate, bona fide claims we had. These were not frivolous, and I had asked on several occasions to talk to the entire board of ACHT Theta saying doesn't it make sense, given the fact that I had found for you five properties, your entire portfolio, and all of the people that you bought -- I have staffed them with my people. Bogda Kirkiewicz worked for me. So I was turning over a project, staffed, organized, worked out of trouble, with a LIHPRHA design program.

Now, they paid nothing for any of that. Now, so if you spend time working with an architect, working with a general contractor, going through the entire LIHPRHA process, that's

Page 124

a very time-consuming, laborious process for which we were not compensated at all obviously, and the thought was that -- I think underlying this as you see is the fact that I happened to buy the property at the request of the sellers. And as it turned out, I was able to be the last LIHPRHA project completed which, you know, generated a substantial return of a million dollars in the course of a year and a half or so.

But that was the marketplace value of the rents. You know, it's not like these were artificial rents. If I had decided not to -- if I had decided to eliminate the affordable housing provision and take it to the market, those would be the rents that would have been established, and I think in retrospect, you know, it would have been far better for me to keep the project owned as opposed to selling it essentially for a million dollars.

Q. I just wanted to recap and discuss some of the topics we had talked about at the beginning. I neglected to ask before whether Freddie Batchelor has received any compensation

Page 125

for working with you.

A. No.

Q. And is she working as a consultant in any capacity?

A. I guess in a capacity she has helped us understand the HUD and DEC rules and regulations and processes and basically also confirmed our understanding of what the facts were.

Q. She has not served as a paid consultant?

A. No.

Q. Were you aware when she contacted you that she was a former HUD employee?

A. Yes.

Q. So you did not believe that she was a current HUD employee. You knew that she was formerly employed by HUD?

A. I knew she wasn't a current HUD employee, and I'm not sure I knew the circumstances of when she had finished her work at HUD.

Q. Have you spoken with any other HUD employees regarding -- let me back up. Have you spoken with any current HUD employees regarding the current litigation?





00000000-0000-0000-0000-000000000000

Page 126

A. Well, I suppose I talked to Greg Gustin and Ed Hinsberger and perhaps Maria, a cast of people who have been involved and either -- in 2003 the goal was to see if we can work out an arrangement where we continued the subsidies so the project could flourish and there was no need for litigation.
Q. Since the litigation has been filed, have you spoken with any HUD employees other than Greg Gustin or Maria Baguio?
A. I don't believe so, and the reason I'm saying that is Lionel Nixon is a person I have talked to and I don't know whether he is or was -- I'm sure he was a HUD employee. Whether he is under any relationship, I think he's doing something with respect to the union, but I don't know.
Q. What have you and Mr. Nixon discussed?
A. Well, Lionel Nixon came in as a property manager for the period from July 1 to December 31 or thereabouts 2003.
Bob Sova had -- and Stephanie, whose name escapes me, were the on-site manager. They resigned on about June 31. There was a fire on

Page 127

June 31. There were problems that the local activists had with the Duffy Construction Company, and they were going to shut down the property and the construction process.
And so we had need for a person who was familiar with the local community and with the interests of the activists and HUD, and so he came in as a consultant for about three months until maybe -- during which time we hired Joseph Johnson to act as the property manager.
So what I talked to Lionel Nixon about is just the nature of the lawsuit as I think I indicated in the answer to the interrogatories. He was familiar with the history of the project and construction. He had talked to Duffy Construction about their work and the nature of the lawsuit.
Q. Was he present for any of the discussions that you had with Ms. Batchelor?
A. He was present for one. He introduced me to Ms. Batchelor, and it was really just here is a person who actually knows about the DEC in a much more operational way than I do, and he introduced us, and that was the end of the

Page 128

conversation.
Q. Was that at your first meeting with Ms. Batchelor at your office that you described earlier?
A. I think it might have been in a meeting prior to the first meeting at the office because I think that there was some question at that point of how we were going to figure out how the DEC worked, and I had asked Lionel since he was a former employee, and he had a general sense, but he said he didn't understand the details of it. But he had a person who he thought was knowledgeable and could be helpful in explaining it, and he suggested that Freddie Batchelor call and then the three of us meet, and that might have been December. That might have been the first activity before she provided the documents.
Q. So when Ms. Batchelor called you on the telephone, that was at Mr. Nixon's request?
A. Yes.
Q. I see. And when he suggested that he had someone familiar with HUD's procedures that could speak with you, what did you say to him?

Page 129

A. I said that would be helpful.
Q. What other discussions do you remember having with Mr. Nixon regarding this lawsuit?
A. Well, I think there were a number, maybe five or 10 telephone calls periodically over the time, at which point the -- since he was familiar with the circumstances that led to the lawsuit, he was familiar with what the complaint entailed, and he was aware of what the answers were, and he was familiar with what the discovery process was. So he was in general providing his sort of thoughts on what the most effective strategies would be for us to pursue.
Q. And has he received any compensation for these services?
A. Well, he's received essentially expense money, so a couple hundred dollars here or a couple hundred dollars there but no sustained amount of money and he's not under any sort of -- he's a consultant at this point, I guess an urban consultant as he says on the phone. So he has a number of people who presumably use his services because of his familiarity with local government issues and HUD and the CHA.





00000000-0000-0000-0000-000000000000

Page 130

Q. What type of expenses has he been reimbursed for?
A. Travel expenses and the ability of using a cell phone, so cell phone costs and costs for, you know, travel, things such as that.
Q. Cell phone, travel, anything else?
A. Well, how he uses the $200, he said occasionally he needed new clothes or something such as that. So there was other elements in that other than simply the cell phone and --
Q. Did he tell you what he needed new clothes for?
A. Yes. He was trying to get his life back together and was looking for a job and couldn't really do that very effectively if he didn't have transportation and didn't have clothes, suitable business clothes.
Q. And where has he traveled to?
A. Around the city.
Q. When Mr. Nixon said he had to get his life back together, what did he mean by that, or what did you understand him to mean?
A. I understood it to mean that he needed to develop some standard, normalized way of

Page 131

living in an address that would be predictable and formal and that would be capable of enabling him to present himself in a way that would be effective when meeting with potential clients or people whose interests he was representing.
Lionel has had a significant background. He was a very -- he had some sustained experience at the CHA and HUD over the years. And I think that if one would have looked at where he was in 1990 or 1992 and projected the continuation of that, it would have been a very different story than how it's ultimately worked out.
Q. How has it worked out for Mr. Nixon?
A. Well, how has it worked out? I think he is in need of sufficiently sustainable income in a work environment so he can behave and perform as he did in the past.
Q. When you gave Mr. Nixon money for clothes, for example, did you consider that payment for services he's rendered in connection with this lawsuit?
A. They were so minimal that I think I regarded it more as a gesture of just helping

Page 132

out someone, which I have done to a variety of people in the past for a variety of reasons.
Q. What are the reasons you're helping Mr. Nixon?
A. One reason I'm helping Mr. Nixon is he has provided insight into the HUD process. That's one. Secondly, I think Lionel has had a strong commitment to affordable housing and the mission of HUD over the years and resident services and community building, and those are things that I think are worth supporting. And I've supported a variety of people in the Englewood area for precisely those reasons.
Q. Mr. Samuelson, you have spoken with what I would characterize as tact and maybe even delicacy in discussing Mr. Nixon's circumstances. Is he experiencing any particular problems at this point that make it necessary for him to require your help?
A. What do you mean by problems?
Q. Well, that's I think what I'm trying to find out.
A. In terms of the delicacy?
Q. You mentioned his need for a stable

Page 133

address, for new clothes and things of that sort. Those are things that an individual usually doesn't look for help with to someone outside their family, for example, and I'm wondering if you could tell us a little bit more about Mr. Nixon's circumstances and why he requires your help.
A. Well, there are probably five individuals that I have helped in very similar situations. Another one was Paul Ramey, who was an activist on the west side doing good things and wasn't -- a close friend of Danny Davis, the Congressman here and was in need of living expenses for a period of time.
And what I would do is advance him some funds for living expenses in the hope that he would get his house and life in order, and unfortunately he developed a coma and died.
And I think Lionel is in a very similar situation. I think he needs -- if I had the time and was not involved in this lawsuit, I would probably spend time helping Lionel, as I did lawyers, figuring out what his skills and background and interest had been and helping to

place him in some employment situation that would be permanent, and that would be the best thing that I could do for Lionel.

That will take a substantial amount of time to do that, and I haven't had the time because I am reading documents.

Q. I understand. Are there reasons why Mr. Nixon is having trouble maintaining a stable employment situation?

A. I don't know. I think he has skills and interests that would be suitable to be -- fit in somewhere. I would have expected that.

Q. Do you have opinions as to why he may be having such difficulties?

A. No.

Q. You haven't speculated about it at all?

MR. BAUGHER: Well, this is not about speculation. We're in a deposition about a lawsuit. You are now asking for speculation on a marginal person's condition for reasons that are beyond me.

BY MR. WELLONS:

Q. Mr. Samuelson --

MR. BAUGHER: Let's get on to



questioning about the issues in this case.

BY MR. WELLONS:

Q. Mr. Samuelson, did you understand the question?

A. Yes.

Q. Will you answer the question, sir?

A. It's very hard to answer, leaving delicacy aside, as to why people with talent and ability and experience somehow come up short in their ability of maintaining themselves. This is not an isolated situation, and it is not particularly abnormal with respect to black males in inner cities.

And why this is I'm not sure, but there are a host of reasons that people get into these situations. And unfortunately there's not enough work opportunities in the inner city to support people who -- I mean, if he had stayed at HUD -- I don't think he left HUD under any sort of requirement; I don't know, but I don't think so -- he could have been sitting like Maria and Greg are, but somehow that didn't happen, and he is not at HUD. And I don't know without a lot more study and thinking about how



one could get him into a position that he would be an effective employee.

Q. Did you pay Mr. Nixon in exchange for his introducing you to Ms. Batchelor?

A. No.

Q. You had mentioned before a fire which to the best of my recollection you mentioned occurred in June 2003 at the property. Is that when the fire that you had mentioned occurred, sir?

A. Yes, late June of 2003.

Q. What were the circumstances of that fire?

A. We had begun to install surveillance equipment under the rehabilitation loan program, and there were cameras in the lobby area and cameras in other areas. And I think it became understood by the drug interests that the camera tapes would in fact be stored in the management office.

So at 5 o'clock or 4:30 a.m. one night, there was a mysterious fire that was set in the management office which destroyed most of the records in the management office.



Unfortunately, the tapes were stored off -- the electronic surveillance materials were stored off site so the perpetrators didn't achieve their objectives, but I think they thought they were going to achieve them by destroying the tapes which would have identified people coming in with unauthorized activity or known gang interests or people who were barred from the building who were still trying to come to the building.

Q. Do you know specifically which records or which types of records were destroyed by the fire?

A. Normally, the -- my understanding is that it was all of the normal operating records that are kept at the site which relate to the unit, activities related to tenancy, tenant records, unit inspection records, and the contracts that were at the site itself, not many of them at that point related to management activities, but there were some.

Q. Any other records that you're aware of that were destroyed?

A. No, I don't think so, because we had





00000000-0000-0000-0000-000000000000

Page 138

a -- we had -- the management office, which was downstairs, but the leasing and marketing activity which is taking place in terms of leasing the building to shack residents was taking place at a different location. So most of the marketing-related tenant files of the 80 people who had decided to use their vouchers to live at Englewood or the by then 30 or so more residents who applied and all of the people who were in the waiting -- or who were in the process of getting processed were upstairs and not lost. Those I would call sort of the marketing and tenant files.

Q. And what other damage occurred to the building in this fire?

A. Well, there was damage to the ceiling, damage to the walls, damage to the furniture, you know. The whole thing was quite a mess. And it was very disruptive because at that point we had the management office, which would normally be next to the entry area which is where a normal management office would be and where we would expect it to be, couldn't be occupied until essentially almost a year later.

Page 139

And what we had at that point was the management functions that were occurring in the leasing office. It would have been more normal to have the leasing functions occur in the management office.

Q. Was anyone ever apprehended and charged with starting this fire?

A. I don't believe so.

Q. When we had discussed the damages claims that you had submitted to HUD, one of the things we talked about were damages that Englewood was seeking because of unpaid rent --

A. Yes.

Q. -- from tenants.

And I think you had mentioned that there were some tenants who were undesirable and that you may have even helped facilitate their leaving?

A. Yes.

Q. And what did you do to facilitate getting the undesirable tenants out of the building?

A. We went through the process of evaluating really in December of 2001 all of the

Page 140

300 units, by tenant, by children, by employment, by work. We developed a spread sheet, and ultimately at the end of the spread sheet was were these desirable tenants that we wanted to keep or were these undesirable tenants that we clearly didn't want to keep or were they someplace in the middle that we didn't know.

What we did -- we did two things. We helped them to negotiate the process of getting shack vouchers, all of them. Some of them would be using the shack vouchers to remain at Englewood, and there were 80 during the course of that period of time who used the vouchers to locate permanently at Englewood. There were 220 who left.

We had a person named Charles Woods who was specifically hired to do nothing more than tend to tenant needs and interests and help them relocate. He happened to be a big basketball star, a player from a local high school, grew up in the building, was something of a role model for young African-American males and others.

And he was there to help the residents get their vouchers; if they couldn't get their

Page 141

vouchers, to help them develop whatever remedial things they needed to have to get their files in order so that their vouchers would be issued and then actually took a considerable interest in helping them to identify employment opportunities, service opportunities, and using their vouchers effectively to leave.

So he was essentially doing that for all individuals, but, you know, we were particularly interested in having some of the tenants leave because we had had experience with difficulty -- records of difficulty with them and there had been efforts of trying to evict them in the past that hadn't been successful.

Q. And did you ascertain that some of these tenants owed back rent before or after they had left the property?

A. Probably before. We were doing -- we would have a monthly rent roll where there were accounts receivable, and one of the indicators of a tenant's undesirability is their failure to pay rent, and another would be the problems with their apartments or problems related to, you know, security incidents or other sorts of

Page 142

things. This was a property that was not for the faint-hearted.

Q. And what time was that process going through of trying to get the undesirable tenants out of the building?

A. Well, we were doing the assessment really from January through March of 2002 and developed a resident services program, developed a computer center, developed a bunch of things there that were an outgrowth of what the prior management company had done in 1999 and 2000.

We just did it in a more sustained, more aggressive, more comprehensive way. And there had been almost nobody leaving the property in the end of March, and I think we were still 90 percent occupied or thereabouts.

So we needed to get people moved because there had been uses of HAP extensions for periods of time. At that point in time all we -- originally there was a three-month HAP extension from October 1, 2001, to December 31, as the lawsuit was going on before Judge Castillo.

By the end of December, nobody moved.

Page 143

And then there was an extension for six months from January 1 to July 30. So at the end of three months, you know, my conclusion was there is going to be no more Section 8 as far as I can tell. People ought to be prepared to leave and move out.

And so it was April, May, and June which were times of the year that were easier to move than January, February, and March in Chicago. So there was a very aggressive effort during those three months to move people out or help people move.

Then there was the renewed lawsuit in I think it was May or June of 2002, the second go-around with the injunction, and that led to an extension for three more months. And at that point it was clear to -- HUD had communicated to the residents, we had communicated to the residents that there would be no more extensions, that this was it, this was final, and the remainder of the people were moved out by the end of September.

Q. What, if any, collection efforts did you pursue to obtain unpaid rent from these tenants?

Page 144

A. I think there was a -- we went through an assessment of the residents by unit, and residents who had no income, who were paying zero rent, while they may have owed some money in the past, it struck me that it would be just a waste of money to retain a lawyer and to try to collect rents.

I think we probably stated that they owed rent and explained to them that they did and that that could be an impact on their voucher, but that's about all we could have done at that point practically and economically. This is not a situation where they were likely to be capable of paying whatever judgment we ever recovered.

Q. You had mentioned before that this property was not for the faint-hearted. Were you referring to the fact this property was not for the faint-hearted tenant?

A. Well, it wasn't for the faint-hearted anyone. In '97, 8, 9, 2000, the schoolteachers across the street wouldn't walk into the building. There was some hesitation of police going into the building. Residents were

Page 145

concerned about their fellow residents, and what you had is people going in and going into their units, closing the door and being there.

And there was a certain element of crime and gang activities that was prevalent throughout the building, not particularly unlike our experience in Stateway Gardens, except at Stateway it was much more ruly, you know. They were business interests. In Englewood there was a lot more just craziness going on, where there would be altercations and fights and stuff like that.

Q. I just wanted to clarify. I think we went over this earlier, but I may not have asked the questions very artfully. I just want to confirm, DSSA is the only entity that has any -- well, let me strike that.

Englewood Partnership is the only entity that has any ownership interest in the property; is that correct?

A. Yes.

MR. WELLONS: Okay. I think if we can go off the record for two minutes, we're probably going to be done questioning

37 (Pages 142 to 145)

KRUSE & ASSOCIATES, LTD.
312-345-1500

00000000-0000-0000-0000-000000000000

Page 146

Mr. Samuelson.

MR. BAUGHER: Good.

(Recess taken.)

MR. WELLONS: Okay, Mr. Samuelson. That concludes the questions I have for you today. I want to thank you for your time.

THE WITNESS: Thank you very much.

MR. BAUGHER: Okay.

MR. WELLONS: We are adjourned.

(WITNESS EXCUSED.)

Page 147

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

ENGLEWOOD TERRACE LIMITED )
PARTNERSHIP, )
)
Plaintiff, )
)
vs. ) No. 03-2209C
) Judge Wolski
THE UNITED STATES, )
)
Defendant. )

I, DON SAMUELSON, being first duly sworn, on oath say that I am the deponent in the aforesaid deposition taken on April 28, 2005; that I have read the foregoing transcript of my deposition, consisting of pages 1 through 148 inclusive, and affix my signature to same.

Corrections have been submitted
No corrections have been submitted

DON SAMUELSON, Deponent

Subscribed and sworn to before me this day of , 20__

Notary Public

Page 148

STATE OF ILLINOIS)
) SS.
COUNTY OF C O O K)

I, SUZANNE THALJI, CSR and Notary Public in and for the County of Cook and State of Illinois, do hereby certify that on April 28, 2005, at 10:07 a.m., at 77 West Jackson Boulevard, 22nd Floor, Chicago, Illinois, the deponent DON SAMUELSON personally appeared before me.

I further certify that the said DON SAMUELSON was by me first duly sworn to testify and that the foregoing is a true record of the testimony given by the witness.

I further certify that the deposition terminated at 1:55 p.m.

I further certify that I am not counsel for nor related to any of the parties herein, nor am I interested in the outcome hereof.

In witness whereof, I have hereunto set my hand and seal of office this 4th day of May, 2005.

Notary Public

CSR 084-002337 - Expiration Date: May 31, 2007

A

**aberrational** 99:13
**ability** 75:18 79:19 80:8 89:23 130:3 135:9,10
**able** 46:5 55:18 124:6
**abnormal** 135:12
**above-entitled** 1:12
**access** 89:22 108:17
**accommodated** 86:4
**account** 18:23 111:6 122:13
**accounts** 141:20
**accuracy** 100:13 109:9 116:19
**accurate** 81:15 92:2
**achieve** 55:21 94:22 137:3,5
**achievement** 60:7 62:7,19
**ACHT** 6:13 7:7 8:17 9:23 10:1 54:1,7,8 116:15 116:17 120:8 121:3,5 123:13
**acquired** 30:22 40:18
**acquisition** 44:23
**act** 48:15 49:18 127:10
**acting** 67:1 90:15
**action** 9:22,23 10:3 67:23
**actively** 69:21
**activist** 133:11
**activists** 127:2,7
**activities** 15:10 23:4 31:17 34:20 35:1,5 39:17 40:17 46:10 58:19 60:14 61:24 66:23 79:20 80:12 87:15 88:13 137:17,21 145:5
**activity** 15:19 57:14 105:19 121:23 128:17 137:7 138:3
**actual** 15:3 103:19
**addition** 13:11 15:12 16:21 90:6 91:9
**additional** 15:19 90:12
**address** 4:12,14 80:2,2,8 131:1 133:1
**adequate** 7:15
**adequately** 39:1
**adjourned** 146:9
**adjustment** 99:15 100:1
**adjustments** 99:8
**administrative** 23:5 92:24 93:3,4
**admissions** 104:18
**adopted** 68:1
**advance** 47:19 133:15
**advanced** 96:13
**advantage** 89:20
**affiliate** 95:21
**affix** 147:14
**affordable** 68:24 116:8 121:14 124:14 132:8
**aforesaid** 147:11
**African-American** 140:22
**agencies** 38:10 39:11
**agency** 39:14 42:2
**agent** 60:20
**aggressive** 142:13 143:10
**ago** 13:24 14:1 77:8
**agreed** 90:21 94:20 95:2,3,5,7,13
**agreement** 92:4,7 92:11 94:10,11 95:24 96:22
**aid** 33:16
**air** 88:2
**allegations** 7:17
**allied** 80:5,13
**allocations** 38:7
**altercations** 145:11
**alumni** 33:22
**amended** 51:11 94:9
**amortized** 85:15
**amount** 33:20 98:16,18,24 99:10 99:15 102:4 107:17 111:12,15 117:4 118:2,5 129:19 134:4
**amounts** 102:8 103:19 105:14 106:24
**amplifying** 26:7
**analysis** 41:6
**analyzed** 112:23
**and/or** 84:2
**Angelovich** 73:13 76:7
**annual** 34:1 46:9 112:18
**answer** 5:8,20 10:18 21:4 24:12 24:14 32:1 83:10 83:12 121:19 127:13 135:6,7
**answers** 10:20,21 25:15,22 26:7 129:9
**Antioch** 43:8
**antitrust** 33:3
**apartment** 65:12 103:4 110:8 115:18
**apartments** 45:1 58:11 65:13 66:2 66:3,10 70:7 102:11,19 141:23
**apologize** 4:16
**apparent** 41:2
**appeal** 82:15
**appeared** 2:5,16 76:21 77:4 78:20 87:21 148:8
**appearing** 119:16
**appliances** 87:18
**application** 98:6,9 98:11 100:23,24
**applications** 99:7
**applied** 138:9
**applying** 111:20
**appraisal** 54:23 111:22 112:22
**appraisals** 54:24
**appraiser** 54:22
**apprehended** 139:6
**approach** 68:1
**appropriate** 85:1 86:15,17 88:15 90:11 93:17 112:1
**appropriateness** 104:24 105:9
**approval** 38:9 113:3,4
**approved** 53:11 64:7 111:21,21 112:15,16,20 113:1,6
**April** 1:16 26:18 99:5 143:7 147:11 148:5
**architect** 61:23 73:7 123:23
**architectural** 57:12
**area** 36:6 42:9 70:1 79:4 87:13 132:13 136:16 138:21
**areas** 33:15 36:8 79:5 91:11 136:17
**arena** 122:3
**arose** 54:10,13
**arranged** 75:10
**arrangement** 62:22 126:5
**arrangements** 56:6
**arson** 105:19
**artfully** 145:15
**article** 115:16
**articles** 62:13
**artificial** 124:13
**ascertain** 141:15
**aside** 135:8
**asked** 5:7 13:16 15:19,20 18:6 22:13 39:2 51:6 53:5 99:17 123:11 128:9 145:14
**asking** 12:15 18:19 18:24 24:9 134:19
**aspects** 42:13
**assemble** 37:14
**assembled** 13:2 25:20 26:1
**assess** 52:6 55:19 58:15
**assessed** 52:16
**assessment** 78:18 79:23 80:1 93:14 142:6 144:2
**asset** 69:18
**assigned** 107:6
**assignment** 41:22 62:3
**assignments** 41:20
**assist** 11:15,19
**Assistance** 48:14
**assistant** 33:12 37:11,12 38:13,17 39:3 40:12,15 41:13,16
**Associates** 43:13 47:13 48:3,6
**Association** 57:8
**associations** 33:22
**assumed** 89:3

assumption 70:9 120:10
atmosphere 79:3
attached 10:23
attempted 120:14
attend 31:12 110:19
attended 30:7,12 31:5,7,15 32:4
attention 41:4
attorney 5:13
attractive 63:4 65:18 91:9
attributable 105:20
August 10:17,24 81:9 83:8 84:3 89:7,10 90:2 91:18 98:2,12 119:10 120:16
Authority 7:4 37:9 39:12 65:7
available 16:14 26:8 58:21 64:2 97:6 106:15 107:24 108:4,6
awarded 8:19 66:8
aware 22:15 68:21 68:22 122:6 125:11 129:9 137:22
A-C-H-T 54:1
A-n-g-e-l-o-v-i-c-h 73:14
A-n-t-i-o-c-h 43:8
a.m 1:16 136:21 148:6

B

Babco 73:6,10 74:6 74:10,12 75:8 87:4 114:14
back 24:13 29:12 31:22 33:11 38:3 75:24,24 83:10 85:16 88:8 99:16 104:20 116:15 120:15 125:22 130:13,21 141:16
background 29:13 131:6 133:24
backing 103:17
backup 109:11
Baguio 2:12 126:10
balance 103:7 107:16
balances 107:19
barred 137:8
basic 26:6 111:20
basically 19:5 27:9 34:24 35:4 60:18 111:11 120:9 125:7
basis 46:8 56:3,13 61:3 110:6 120:12
basketball 140:19
Batchelor 14:14,16 17:4,13 23:19 25:9,19 26:3 27:16,21,22 28:4 28:6,12,15 124:24 127:19,21 128:3 128:14,19 136:4
baths 88:12
Baugher 2:3 10:10 10:13 13:10 18:15 18:22 21:2 24:11 24:19 26:1 28:14 43:16 46:15,18 86:9 106:5 134:17 134:24 146:2,8
becoming 89:23
began 25:14 31:14 44:6 48:16 68:6 74:16
beginning 49:12 111:6 112:9 124:23
begun 136:14
behalf 2:5,16 45:17 54:4 57:7
behave 131:17
believe 6:1 7:6 8:11 9:21 18:17 20:22 24:16 25:8 33:7 35:19 43:19 45:21 59:12 62:5 68:3 81:14 86:12,13 97:18 98:20 99:22 101:21 102:1,4 103:6 109:2 111:14 113:2 115:23,24 116:7 125:14 126:11 139:8
believed 88:14 97:22
Benedale 42:7
benefit 101:4
BERKEC 2:19
best 62:21 134:2 136:7
better 20:7 41:4 69:15,15 78:22 124:18
beyond 56:4 134:21
big 140:19
billing 100:16
bills 58:23 117:5
binder 15:6
bit 29:12,12 32:9 82:20 97:9 133:5
black 34:18 135:12
blocks 61:21 78:7
board 38:15 121:3 123:12
Bob 73:18 75:12 76:7 104:7 110:15 126:22
Bob's 75:13
Bogda 120:19 123:17
boiler 78:22
boilers 75:20
bona 123:10
bond 38:9
book 15:3 30:24
books 34:18
bottom 115:12
bought 123:16
Boulevard 1:15 2:14 148:7
breach 8:18
breached 119:20
break 5:3,9 61:7 97:13 113:20
breaking 80:15,16
bricks 56:4
brief 121:14,15
briefly 109:10,16
bring 19:23
bringing 49:7
broadband 89:22
Broadland 4:14
broken 76:13
brokerage 30:9,14
broker's 31:2
brought 7:2 35:7 87:19 88:4 106:21
Bruce 57:7 60:8 62:10,19
brushes 29:23
budget 39:4,6,8 85:19 89:12
budgeting 46:9
Builders 40:19
building 15:24 16:2 33:21 61:20,20 63:13 67:6,7 68:21,23 71:9 72:17,19 73:6 75:3 76:11,15,16 76:20 77:3 78:14 78:16 79:1,10,15 79:19 80:2 82:2 82:14 84:5,9 89:16,19,20,21 93:18 105:20 114:2 115:18 118:8 132:10 137:9,10 138:4,15 139:22 140:21 142:5 144:23,24 145:6
buildings 31:18,20 66:7 67:5,18,21 70:23,24 78:5 79:16,17
bullet 26:6
bunch 142:9
Bureau 39:3,6,7
business 43:3,10 47:13,21 48:2 50:13 67:9 78:2,6 105:2,6 130:17 145:9
businessman 62:15
buy 53:6 54:3 62:17 63:14 124:5
buyer 91:4 117:2 117:16
B5083 115:11

C

C 59:3 68:15 148:2
cabinets 87:17
calculate 98:24
calculated 98:15 102:8 103:20,22 107:17 110:4,5 112:7,8
calculating 105:14
calculation 100:2 111:19
calculations 100:10 100:12 104:6,13 106:1 107:22 109:3,6,8,12,14 110:13,22 111:3 112:8,14
call 12:14 16:23 35:8 55:9 87:5 128:14 138:12
called 9:10 13:18 14:20 29:7 43:6 43:11 45:1,2

47:13 48:2,12 49:16 50:5,11,18 53:2,24 57:4,22 58:10 65:12 66:2 71:10 72:7 107:6 128:19
**calls** 16:23 129:5
**CAM** 106:18 107:2 108:4
**camera** 105:21 136:18
**cameras** 136:16,17
**campaign** 33:19 34:5 35:13
**CAMS** 107:9,12,13 107:23 108:5,12 108:14,19,22 111:4
**canceled** 111:9,11
**capable** 36:1 131:2 144:14
**capacity** 78:13 125:4,5
**capital** 33:19 34:5 35:13 61:19 87:5 90:4
**captain's** 75:23
**care** 80:6 116:23
**career** 47:20
**careful** 78:18
**Carl** 13:19 25:11 25:19 27:18,21,23 27:24 71:10 73:8 75:10
**Carley** 44:2
**Carlson** 6:15 8:11 8:12,13 9:22
**Carmen** 50:5 53:13 57:8
**carry** 120:10
**case** 1:12 9:6,7,11 10:2 22:7 28:13 33:3 116:12 117:9 135:1
**cases** 6:10 9:16,17 110:15
**cash** 85:10
**cast** 126:2
**Castillo** 92:19 142:23
**casual** 69:2
**categories** 11:22 12:8 96:7 101:22 110:1
**category** 103:6
**CD** 30:24
**Cedar** 59:21
**Cedars** 42:8
**ceiling** 138:16
**cell** 130:4,4,6,10
**center** 14:21 60:12 89:16 142:9
**certain** 76:24 118:2 145:4
**certificate** 30:9,14
**certify** 148:5,10,14 148:16
**CHA** 6:24 9:4,7 10:3 65:24 66:4,5 66:20 67:16,17 69:5 79:16 129:24 131:8
**chairs** 67:11
**change** 88:19 89:2 89:4 120:21
**changes** 26:19 87:8
**changing** 88:22
**characterization** 21:1
**characterize** 132:15
**charge** 34:8 90:17
**charged** 105:1 112:18 120:6 139:6
**charges** 105:9
**Charles** 140:16
**chart** 15:4
**charts** 35:2
**Chicago** 1:15 2:4 2:15 7:4 19:19 30:1,2,5 32:20,21 33:12 34:1 50:5 58:13 65:7 66:1 68:24 92:20 143:9 148:7
**child** 114:9
**children** 140:1
**Chili** 42:9
**chronologically** 29:18 32:13
**church** 58:1,3,8 59:12 65:4
**chute** 75:22,22
**CIC** 86:5
**Cicero** 19:18
**circulation** 78:22
**circumstance** 67:3 93:15
**circumstances** 48:19,23 49:3 74:1 109:19 118:7 125:19 129:7 132:17 133:6 136:12
**cities** 135:13
**city** 130:19 135:17
**Civil** 2:8
**claim** 6:24 9:3 99:15 102:24 116:16
**claimed** 110:4 111:15 118:18
**claiming** 77:2 97:10
**claims** 1:1 4:3 102:2 103:17 109:14,21 110:2 123:10 139:9 147:1
**Clarence** 61:23
**clarification** 24:11
**clarify** 69:11 109:20 145:13
**class** 33:22 60:12
**classes** 30:8
**Claudia** 100:17
**clear** 95:11 99:10 143:17
**clearly** 123:10 140:6
**clients** 120:7 131:4
**clip** 116:3
**close** 133:12
**closed** 106:23
**closing** 8:1,1 112:3 113:8 116:19,22 116:24 117:1,7,17 117:19 122:2 145:3
**clothes** 130:8,12,16 130:17 131:20 133:1
**clusters** 68:5
**coach** 44:4
**collect** 144:7
**collection** 143:23
**college** 29:17,19 32:18,18 33:23
**coloring** 79:3
**coma** 133:18
**combination** 104:7
**come** 34:24 36:5 51:6 55:3 58:4 62:16 75:4 87:1 89:19 104:5 135:9 137:9
**comes** 120:20
**coming** 49:11 137:6
**comments** 27:2
**commitment** 35:24 132:8
**common** 79:5 87:13
**communicate** 83:14
**communicated** 143:17,18
**communities** 31:18
**community** 31:17 69:18 85:13 91:9 116:8 121:14 127:6 132:10
**companies** 40:18
**company** 6:15 8:12 8:13 9:23 13:18 40:11,13 42:1,1 42:17 44:5 59:2 60:19 63:24 64:3 73:7 99:17,23 100:3,16 127:3 142:11
**comparables** 112:23
**compare** 99:11
**compensate** 102:22
**compensated** 110:10 124:2
**compensation** 7:15 110:10 124:24 129:14
**complaint** 7:14 10:15,22 11:1 129:8
**complete** 6:2 22:14 23:23 25:4 35:24 88:13
**completed** 58:20 60:9,14,22,23 64:5,11,16,20 66:14 124:7
**completely** 36:19 118:8 120:10
**completion** 63:22
**comprehensive** 55:10 81:10 83:7 88:9,11,14 89:8 90:2,8 142:13
**comprehensiven...** 23:12
**compromised** 76:13
**computer** 60:11 89:16 106:21 108:14 142:9

computers 89:21
concept 99:1,11
conceptualizing 40:21 71:3
concern 76:17 77:11,13 82:4 120:17
concerned 97:16 145:1
concerning 23:20
concerns 77:18,20 77:21 78:16 80:3 81:20,24 82:1,9 82:13 84:6 86:22
conclude 87:21
concluded 60:16 61:14 65:6 99:6 122:19
concludes 146:5
conclusion 63:23 99:24 143:3
conclusions 81:14 92:1 121:12
concrete 82:5 87:7
condition 27:7,10 53:21 55:20 58:15 69:7 102:19 103:23 134:20
conditioning 88:2
conditions 77:14
condominium 63:5
condominiums 49:14 64:1
conduct 73:23
conducted 73:20
conducting 76:23
Conference 34:2
conferences 30:7 33:24 34:4,14 35:14
confirm 25:19 109:12 145:16
confirmed 125:7
confirming 15:17
Congress 49:16 50:8
Congressman 133:13
conjunction 44:2
connecting 40:1
connection 131:21
connections 82:8
consider 131:20
considerable 15:8 26:15 141:4
considered 26:21 122:17
consist 83:24
consisting 147:13
constant 80:14 86:1
consternation 49:15
construct 99:17
constructed 46:1
construction 55:21 60:9,24 73:6,10 74:7,10,12 94:12 94:12 127:2,4,15 127:16
consult 48:21
consultant 61:22 90:16 91:1,10 125:3,9 127:8 129:20,21
consultation 53:4
consultative 42:15
consulting 47:14,16 47:22 48:10,16 49:23 50:1 54:5 54:19 56:22,24 60:22 70:11 121:23
contact 17:11
contacted 17:5 125:11
contacting 13:13 15:13,14
contained 15:7
contents 10:12 20:23 122:8
context 72:19
continuation 92:22 131:11
continue 47:10 120:11
continued 38:19 50:6 93:10,11 120:19 126:5
continuing 102:21
contract 8:18 84:21 92:22 94:12,13 102:21
contracting 41:24
contractor 57:13 123:23
contracts 15:22 49:5 66:13 137:19
contributions 96:17
control 79:18
controlled 66:23
controls 63:17
controversial 62:11
convenient 37:2
conventional 45:1
conventionally 45:4,7
conversation 18:19 19:1,15 72:11 128:1
conversations 100:15
convert 49:13 63:24 91:7
converted 35:4 51:23
Cook 1:14 148:4
cooperation 58:22
coordinated 54:24
copies 13:4 105:12 113:16
coping 67:1
Corp 7:7
corporate 47:15
corporation 6:13 42:19 59:3 68:15 70:17 85:14
Corps 29:20,22 32:12,14
correct 5:22 14:3,6 16:18 17:6 24:17 24:20 26:17 31:6 33:8 34:6,10 38:1 42:18 43:22 45:11 46:13 47:3 48:2 54:12 58:4 68:4 70:14 74:4 95:15 97:23 98:13,17 101:23 102:7 103:8 106:8,9,22 109:13 112:4,11 112:13,24 113:5 115:19 116:9 145:20
corrected 52:17,18 101:3 106:23 107:7
correction 4:19 81:12
corrections 46:2 147:16,17
corrective 61:17 69:7 71:17 87:15 110:18
corridor 66:18
cost 58:20 103:23 110:2
costs 98:3,7,23 99:12,13,14,18 101:8,9 102:9 104:24 120:24 130:4,4
counsel 105:11 148:16
counterclaim 7:23
country 41:3 48:12 50:4 118:13
County 1:14 6:18 44:23 148:2,4
couple 53:14 113:19 129:17,18
course 30:24 107:8 124:9 140:12
courses 30:19
Court 1:1 4:3 33:4 92:20 147:1
cover 68:10 96:15
covered 64:18
craziness 145:10
create 43:5 47:12 49:16 60:18 62:17
created 44:11 51:5 60:10,12 106:20
creating 31:19 79:1
creation 51:11
creditors 96:11
crime 145:4
crime-ridden 91:8
criminal 79:20 80:12
criteria 107:1
Crooks 61:23
CSR 1:13 148:3,24
curb 82:15
current 21:20 125:15,17,23,24
currently 96:23

D

D 3:1
damage 78:19 96:7 138:14,16,17,17
damages 7:23 8:19 9:7 96:2 97:9,22 101:23 102:23 103:3 109:22 110:1 139:9,11
Danny 133:12
Dartmouth 29:19 33:23
date 19:20 25:23 148:24
dated 115:1 119:9
David 44:2
Davis 133:12

**day** 35:6 115:23 116:4 147:22 148:20
**days** 36:21,23,24 63:5 67:10 84:3
**day-to-day** 46:8
**dealing** 49:20 63:12 104:21
**dean** 33:12,15,17 34:17,23 35:23
**debates** 62:13
**DEC** 15:9 17:6 18:3 19:11,13 20:7,24 21:8 22:5 22:16 23:13 25:7 125:6 127:22 128:9
**December** 22:22 90:23 92:6,24 93:20,21 94:3,4 94:15 102:13 126:21 128:16 139:24 142:21,24
**decide** 90:20
**decided** 48:21 84:24 103:10 124:13,14 138:7
**decision** 21:7
**decisions** 23:4
**decision-making** 18:4 19:12
**decorating** 86:24
**defaced** 104:2
**Defendant** 1:7 2:16 147:6
**defendants** 12:24
**defendant's** 10:17 10:20,24 11:9
**deficiencies** 84:16 101:2
**defining** 52:18
**degrees** 30:10
**delicacy** 132:16,23 135:8
**demanding** 62:15
**demolished** 67:8,21
**departed** 33:7 37:4
**department** 2:7,13 14:21 100:16 111:22 112:22
**departments** 47:15
**dependent** 56:11
**depending** 25:18 59:24
**deponent** 147:10 147:20 148:8
**deposed** 6:6,10 7:1
**deposit** 122:13
**deposition** 1:11 3:11 4:1 5:13 6:22 10:7 11:8 12:24 15:5 23:8 54:10 115:7 119:6 134:18 147:11,13 148:14
**derived** 89:14
**DeSanto** 122:19
**described** 20:22 28:7 55:9 128:3
**describes** 91:19
**describing** 15:8 34:19 81:10 89:10 97:22
**description** 75:16
**design** 123:20
**designed** 23:13
**designing** 110:17
**desirable** 140:4
**desire** 63:24 96:19 97:4
**destroy** 108:10
**destroyed** 16:12 105:16,22 106:3 107:12 136:23 137:12,23
**destroying** 137:5
**detail** 15:8 89:10
**detailed** 90:3 107:5
**details** 90:4 128:11
**determine** 13:2
21:10 55:18,20 93:16 100:13 103:22 109:9 119:1
**determined** 96:8 103:19 104:23 106:20 111:12 119:20 120:1
**determining** 105:8
**develop** 25:14 34:17 39:9 42:2 55:23 57:10,12 58:15 71:16 74:14 74:24 84:15 130:24 141:1
**developed** 33:24 56:13 58:6 60:9 64:6 66:5 89:8 102:24 121:5 133:18 140:2 142:8,8,9
**developer** 51:23
**developing** 34:9 35:13 38:4 52:14 63:21 82:16 83:21 89:11
**development** 2:14 6:13 7:7 31:17 33:21 34:11 37:8 39:12,18 40:13,18 42:19 43:5,6,21 58:17 63:5 90:8
**developments** 40:22 43:7 66:2
**Devon** 66:9
**died** 133:18
**differed** 86:15
**difference** 99:14 112:19
**different** 24:1 41:14 45:8,9 55:16 59:24 79:1 84:4,21 131:12 138:5
**difficult** 66:19,21
66:22 67:3 79:17 121:8
**difficulties** 58:1 77:24 134:14
**difficulty** 141:11 141:12
**direct** 4:9 42:12 78:4 100:15
**directed** 11:24
**directly** 14:7 38:14 74:20 121:13
**director** 37:11,13 38:14,14,17
**disagree** 123:8,9
**disagreed** 122:22 123:1,2
**disappointment** 26:16 27:3
**discovery** 11:1 28:10 129:11
**discuss** 12:9 21:20 21:24 22:11 79:9 124:21
**discussed** 11:23 21:13 25:13 72:11 76:5 77:6 87:6 91:2,11 92:6 101:22 102:1 103:18 126:18 139:9
**discussing** 25:18 132:16
**discussion** 20:6,23 23:20
**discussions** 10:13 14:22 22:9 23:18 50:12 62:14 80:19 80:21,22 82:10,12 89:6 90:12 92:8 127:19 129:2
**disposed** 14:1
**disposition** 8:14
**dispute** 117:3,12 118:15,23 120:4 120:14 121:9
**disruptive** 138:19
**dissimilar** 37:17
**distraction** 93:11
**distribute** 97:1
**District** 92:20
**Division** 2:8
**document** 11:7,12 12:13 15:6,16 17:2 91:21,22 92:2 101:21 108:3 112:6 115:1,6,10 119:5,9,12,13,18
**documenting** 23:3
**documents** 10:11 10:14,19 11:4,10 11:16,24 12:2,8 12:13,16,20 13:1 13:4,8,14,17,20 13:24 14:3,9,11 14:13,15,23 15:21 16:11,16,19 17:8 17:18,24 18:7,19 19:6,8,13,23 20:3 20:12,21 21:15 22:13,14 24:8 25:2,5,13 27:8 28:9,11,16,21,23 29:1 35:3 38:8 74:18,21 81:7,13 81:15,18 84:13 105:7,13 107:21 108:6,11 112:13 113:17 128:18 134:6
**doing** 40:24 41:5 42:14 52:19 56:9 56:22,24 61:10 62:1 97:12 105:5 122:17 126:15 133:11 141:8,18 142:6
**dollar** 118:9
**dollars** 87:14,14 124:9,20 129:17 129:18

**Don** 1:11 3:4 4:6,13 4:17 43:13 147:9 147:20 148:8,10
**Donald** 4:2,13,17
**door** 145:3
**doors** 78:11 104:3
**downstairs** 138:2
**downtown** 63:3
**draft** 26:3
**drafted** 26:2
**drawings** 57:12
**drove** 72:17
**drug** 66:22 76:14 76:18 78:2,7 105:20 136:18
**drugs** 77:5 79:20 80:13,17
**drug-laden** 91:8
**DSS** 120:2
**DSSA** 6:12,14 7:6 8:10,19 11:22 12:1 16:4 43:11 43:14 44:8,10,15 44:19,20 45:8,9 45:10,12,13,22 47:6,8 49:24 51:16 56:23,23 58:7 59:1,15,19 60:4,19 65:11 66:7 68:10,11,12 68:14,14 70:20,21 82:22 89:1 90:22 92:5,15 93:23 94:13,16,22 95:1 95:13 100:4 105:4 116:14,17 117:20 145:16
**DSSA's** 100:6 118:17
**dual** 54:24
**Duffy** 94:12 127:2 127:15
**duly** 4:7 147:9 148:11
**Dunaj** 73:7 74:13 74:20 75:9 76:6
**duplicates** 13:3,7
**duties** 33:18 37:12 39:7 40:14 41:23
**duty** 117:10 119:20
**Dynamics** 33:5
**dysfunctional** 66:24
**dysfunctionally** 67:2
**D-u-n-a-j** 73:8
**D.C** 2:9

**E**

**E** 3:1
**earlier** 17:9 25:14 50:12 116:1 128:4 145:14
**earliest** 49:9
**early** 49:6 51:5 57:3 69:10 72:21 73:22 74:19 85:22 89:9 90:2
**easier** 143:8
**east** 57:5 72:18
**Eastlake** 16:6,13 16:16,19
**Ebenezer** 58:1 59:13 61:12,14 62:3 65:5
**economic** 62:22
**economically** 144:12
**economics** 60:1
**Ed** 6:15 8:11,12,13 9:22 83:7 111:23 113:13 114:21 115:11 122:19 126:2
**education** 29:16 30:4
**educational** 32:15
**effective** 69:17 112:2 129:13 131:4 136:2
**effectively** 75:11 90:15 120:9 130:15 141:7
**effort** 122:11,16 143:10
**efforts** 11:16 26:16 27:11 53:19 61:13 141:13 143:23
**eight** 11:21 12:7 67:4,8 98:9 113:15
**eight-building** 66:19
**either** 26:10 81:5 114:10 126:3
**elderly** 57:23 66:1
**electrical** 120:23
**electronic** 19:12 23:8 108:16 137:2
**electronically** 23:6
**element** 120:21 145:4
**elements** 55:14 82:10 87:5,9 130:9
**elevator** 77:13 78:14 82:12 86:23
**elevators** 77:15,22 77:23 78:1,10 82:12
**ELIHPA** 49:16
**eliminate** 86:4 124:14
**eliminated** 13:3 76:19
**eliminating** 79:19
**Ellis** 32:20 33:1,8 34:18
**emerged** 116:23
**Emergency** 49:17 49:17
**employed** 42:17 125:16
**employee** 59:19 60:19 125:12,15 125:18 126:14 128:10 136:2
**employees** 59:4,7,8 59:9,16 125:22,23 126:9
**employers** 37:3
**employment** 134:1 134:9 140:2 141:5
**enable** 58:22
**enabled** 63:1
**enabling** 131:2
**enacted** 49:20
**energy** 74:24 98:7 98:23
**energy-related** 98:3
**Enforcement** 14:21
**engaged** 62:1
**Englewood** 1:3 4:4 21:21,23 24:20,22 68:17 72:18,18 89:1 91:9 96:1,6 97:10,23 101:23 110:4 132:13 138:8 139:11 140:12,14 145:9 145:18 147:2
**Englewood's** 11:15
**enjoin** 92:21
**enormous** 66:22
**entail** 51:10
**entailed** 129:9
**entered** 8:6 49:6 106:17 119:10
**entire** 18:4 67:14 117:16 123:12,15 123:24
**entities** 47:17
**entitled** 97:23
**entity** 49:22 145:16 145:18
**entries** 76:12 108:14
**entry** 79:4 138:21
**environment** 67:1 78:1 131:17
**Environmental** 39:13
**Episcopal** 54:2
**equipment** 76:3 136:15
**Equities** 70:16 88:24 95:6,7,13 96:12
**equity** 96:5,8,17
**Erie** 57:5
**escapes** 126:23
**essentially** 21:19 37:14 57:15 93:6 124:20 129:16 138:24 141:8
**established** 124:17
**estate** 19:7 30:9,13 31:8,14 40:18 48:9
**estimate** 54:20
**evaluating** 139:24
**evaluation** 54:20
**Evanston** 57:24
**evenings** 36:21
**events** 23:10 33:24 34:4,14 35:14 107:8
**everyone's** 101:18
**evict** 141:13
**eviction** 80:4
**evolved** 92:23
**exactly** 62:8
**EXAMINATION** 4:9
**examined** 3:5 4:7
**examining** 85:7
**example** 59:12 74:6 131:20 133:4
**exchange** 136:3
**exchanged** 11:2
**Excuse** 18:15
**EXCUSED** 146:11
**executed** 64:9
**executive** 39:2

**executives** 43:4,20
**exemption** 60:13
**exhausted** 93:4
**exhaustion** 49:11 93:2
**Exhibit** 115:4,7 119:4,6
**exhibits** 3:9,11 10:16,23 90:3
**exist** 24:9 106:6
**existing** 61:19
**exits** 76:12
**expanded** 87:4
**expect** 138:23
**expected** 118:12 134:12
**expended** 117:24
**expense** 89:14 129:16
**expenses** 85:11 117:20,22 118:18 118:20,21 120:2 130:1,3 133:14,16
**expensive** 50:9
**experience** 32:15 32:16 51:20 54:9 63:12 105:6 131:8 135:9 141:11 145:7
**experiences** 32:17 35:5 48:20 105:4
**experiencing** 132:17
**Expiration** 148:24
**explain** 17:5 19:14 86:16
**explained** 19:5 20:4 144:9
**explaining** 14:21 19:10 73:24 128:13
**explanation** 23:9
**explanatory** 14:23
**exploring** 70:8
**expressed** 26:15 77:19
**expressway** 63:4
**extension** 142:21 143:1,16
**extensions** 142:18 143:20
**extent** 78:6 85:12
**exterior** 82:4,15
**extraordinarily** 19:9
**extraordinary** 99:2
**E-L-I-H-P-A** 49:17
**e-mail** 113:15 114:21 115:11,13 115:16

F

**facilitate** 139:17,20
**Facilities** 40:19 44:4
**facility** 81:21
**fact** 85:24 90:10 101:7,14 112:21 123:14 124:4 136:19 144:18
**factors** 52:6
**facts** 36:19 125:8
**faculty** 34:11
**failure** 7:14,24 141:21
**faint-hearted** 142:2 144:17,19,20
**fair** 20:24 46:11 96:20 99:10
**fairly** 41:2 67:1
**familiar** 17:20 36:19 50:23 63:15 63:16,18 72:18 75:2 107:17 111:18 118:15 122:7 127:6,14 128:23 129:7,8,10
**familiarity** 129:23
**family** 93:14 133:4
**far** 10:4 58:13 124:18 143:4
**fashion** 78:4
**Father** 54:1 121:7
**February** 14:17 22:21 101:10 143:9
**federal** 1:1 4:3 101:19 147:1
**fee** 65:3 94:22
**feel** 20:7 67:24 92:1
**fees** 95:8,10,14 117:22 120:6 121:24
**fee-based** 56:24
**fellow** 145:1
**felt** 22:4 74:1 93:16
**fide** 123:10
**fiduciary** 117:10,15 119:20
**Field** 58:13
**fights** 145:11
**figure** 62:11 104:5 116:2 128:8
**figures** 103:18
**figuring** 133:23
**file** 25:4 104:17,20
**filed** 6:16 93:5 126:8
**files** 13:17,18 20:13 23:5 28:22,24 29:2,4,5,7,9,10 104:16 105:18 107:11 138:6,13 141:2
**filing** 18:4 19:11,13 21:14
**Filkova** 12:6,9
**final** 60:14 84:18 143:20
**finally** 111:14
**financeable** 91:6
**financed** 45:7 53:8 57:11 61:21
**financial** 33:16 40:2 46:9 50:20 52:8 55:12 56:6 58:21 65:16 85:7 91:14 96:15 110:20
**financing** 38:9 62:20 85:13
**find** 47:19 70:4 132:22
**fine** 5:6 97:14
**finished** 36:3 62:3 125:19
**fire** 16:12 105:17 106:3 126:24 136:6,9,13,22 137:13 138:15 139:7
**firm** 32:20 47:14
**firms** 47:15,20,21 47:24
**first** 4:7,23 7:5 9:21 11:9 22:20 30:18 32:16 44:20 45:22 50:4 52:5 53:13 58:24 67:7 68:17 68:20 71:24 73:5 75:8 79:23 80:1,7 86:20 93:7 99:3,4 99:19,20,21 128:2 128:6,17 147:9 148:11
**Fisher** 66:9
**fit** 47:20 134:11
**Fitzpatrick** 122:19
**five** 24:3 27:18 28:8 44:1 46:23 51:22 61:21 69:23 70:3 123:14 129:5 133:8
**fix** 102:10
**fixing** 80:15,16
**flight** 97:17
**Flood** 46:4 47:8
**floor** 1:15 75:22 78:20 115:18 148:7
**Florida** 48:22 55:8
**flourish** 126:6
**flow** 35:1
**focus** 83:20
**focused** 37:24
**followed** 22:6 109:3
**following** 82:17,19 83:16 108:10
**follows** 4:8 79:21
**foolproof** 23:3
**football** 44:4
**foreclose** 51:1
**foreclosure** 96:19
**foregoing** 147:12 148:12
**Forest** 4:14 70:2
**forget** 59:1
**forgot** 62:6,8
**form** 43:14 49:22 79:13
**formal** 30:9 49:20 131:2
**formed** 43:20
**former** 12:15 60:19 125:12 128:10
**formerly** 125:16
**forth** 81:12
**forthcoming** 16:11
**forward** 29:17 32:12 44:18 56:6
**found** 36:10 53:24 70:6 123:14
**foundation** 61:3
**founders** 44:3
**four** 24:3 36:17,20 38:21 40:4 43:1,7 43:24 46:5,23 50:7 54:5 61:21 67:10,12,13 69:23 70:2 81:8
**fourth** 17:19 30:17 99:3,3,18,19,20 115:15
**four-year** 53:16