IN THE
UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| ENGLEWOOD TERRACE LIMITED PARTNERSHIP, a Michigan Limited Partnership,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA, and MEL MARTINEZ, Secretary of the Department of Housing and Urban Development,<br><br>Defendants. | ) | No. 03-2209C<br><br>Judge Victor J. Wolski |

**DECLARATION OF FREDDIE BATCHELOR**

I, Freddie Batchelor, declare as follows:

1. I have personal knowledge of and am competent to testify to the matters set forth in this declaration.

2. I was employed by the Department of Housing and Urban Development in Chicago from 1987 to 2004. Because of my background experience in distressed communities working with public housing, drugs, gangs and troubled projects in difficult neighborhoods, I was selected competitively to join the Departmental Enforcement Center ("DEC") in Chicago in September of 1998 when it began its operations in the summer of 1998.

3. My principal work assignment from the summer of 1998 through the spring of 2000 was South Pointe. Because of my experience with difficult CHA family developments I became the Enforcement Analyst ("EA") for South Pointe during that period. I spent from 1987 through 1997 working in the Office of Public Housing in

the drug elimination and economic development programs and resident initiatives for twenty-eight housing authorities. The EA in the DEC was comparable to the Project Manager in Multifamily Housing ("MFH"). As the EA for South Pointe I reported to Joan Kiening, the Team Leader and to James Zale, the DEC Satellite Office Director ("SOD"). I was the person in the DEC with very nearly the sole responsibility for South Pointe for the 18 months it was in the DEC.

4. I was responsible for gathering and analyzing all of South Pointe's historical records. This function began with copying, coding, imaging, filing, analyzing them and then returning them to Ms. Thomas. The next step was to talk with individuals within MFH and the DEC with direct knowledge of South Pointe, talk with representatives of Englewood and P.M. One, and then to visit the property.

5. In analyzing the documents and visiting the site, it was clear to me that "the" major problem at South Pointe was the combination of drugs and gangs. This was the cause of the poor physical conditions and other difficult overall conditions at the site. Almost all of the residents were young single women with two to six children. Almost none were employed. They seemed to exist on zero or almost zero income, and their large 2BR and 3BR mostly free apartments. South Pointe with its 22 floors of apartments, large families, single unemployed mothers existing on public aid and almost free housing, and drug relationships in the building and neighborhood was very similar to the CHA family high rise buildings with which I had had experience.

6. The physical problems at the building were largely attributable to the connections between residents, gangs and drugs. Entry doors were kicked in by angry boyfriends. Walls and doors were damaged in arguments and through heavy usage by

individuals conducting drug transactions. The gang and drug interests disabled elevators and stairwell lighting. They "marked" the areas they controlled with graffiti. Except for the period when security was providing off-duty police, the security guards were either paid off or threatened by gangs with money and guns, and did not control security at the building. My impressions were confirmed by the May Pinnacle management review.

7. A 3BR or large 2BR apartment represented a $10,000 a year subsidy for a family with little to no income, and few or no housing alternatives. In many instances certification procedures were bypassed in getting and keeping a free apartment.

8. The most significant need at South Pointe was to take control of the building from gang and drug interests, and minimizing criminal activities. Unless the crime and security problems were solved, money spent on physical improvements would be wasted. Entry doors and fire extinguishers at fire hoses would be repaired or replaced. The next day they would be destroyed or gone. Walls would be repaired, and then damaged again. Lights and hallway doors would be installed in the stairwells. The next day they would be broken. As I wrote in my Draft Team Report: "With relentless regular and constant efforts by the owners, management and others the pace of the property destruction is moving faster than attempts to control them. Daily schedules were roller coasted depending on what happens in the evening."

9. Special claims related to tenant damage were being routinely denied by HUD, without little or no explanation. There was need for a real "get tough" policy at South Pointe. I indicated in my DEC reports that an eviction policy had to be funded so that the project could afford to hire off duty police officers as security guards and pay legal counsel to evict such tenants. Plans needed to be developed and funded. I

indicated on many occasions that HUD had a chance to really make a difference at South Pointe because the owner was extremely cooperative in working with me and the DEC.

10. The DEC was created to bring professionalism, and specialty skills to these types of problem properties, in order to prevent demolition and the decrease of the affordable housing stock. HUD developed the program of "Community Builders," specialists in HUD at the same time the DEC was created. They were to provide access to the types of security, social services and city services that were necessary to respond to the "total" needs of these types of buildings.

11. In the first quarter of 1999, I convened meetings involving Englewood, P.M. One, the DEC and MFH to develop a consensus on how to proceed. We concluded in our "Draft Team Report" that help was needed from the Violent Crimes Division of the Chicago Police Department and other social service agencies. We also recommended that there be a comprehensive 100% physical needs inspection, a REAC Inspection and a Pinnacle Management Review.

12. My recommendation in late June of 1999 was that South Pointe be accepted into the DEC for further review and possible sanctions if significant improvements were not made in a timely manner. The recommendation received the concurrences from everyone: Joan Kiening, Gregory Gustin, Gwen Thomas and James Zale, HQ DEC Director Ed Kraus, Ed Hinsberger and Veronica Coleman.

13. The REAC inspection occurred on April 28, 1999. The Pinnacle inspection took place on May 19, 1999. The Pinnacle report confirmed the findings in my Draft Team Report and the REAC inspection.

14. I was pleased to see that Englewood's project manager, Carl Sanders, wrote to Joan Kiening on June 14, 1999 asking for a copy of the REAC and Pinnacle reports because he wanted to be pro-active in correcting the findings from the report. They had already started repairs. Mr. Sanders wanted to get moving in a collaborative way. His request for a "prompt response" was a refreshing change of pace. He and the owner seemed genuinely interested in fixing all of the problems at South Pointe, not just the physical repairs. He had assembled an enthusiastic on-site management team, headed by Angela McNair and Kelly Brown and hired a private security firm with off duty policemen headed by a retired police officer.

15. I wrote my Final Action Plan in late June of 1999 at the direction of James Zale. My Final Action Plan was submitted on July 2, 1999 to representatives of the DEC and MFH in Chicago and Washington. It summarized the conditions at the building and the need for a team from the Violent Crimes Division of the City of Chicago. I noted that Mr. Sanders and John Hayes wanted to be pro-active. Nevertheless, I recommended that unless significant progress was made in correcting the physical, security and resident problems at the building I would recommend the abatement of the Section 8 subsidy and other sanctions.

16. I also recommended that a Default Notice be sent out identifying the specific issues of non-compliance, the owner's required actions, responsibilities and time frames. An entire compliance program was set out and, upon non-compliance, a program for sanctions. The first formal review was scheduled for August 30, 1999. Joan Kiening, Maria Baguio, Gregory Gustin, Gwen Thomas, James Zale, Edward Hinsberger and Edward Kraus concurred with this Final Action Plan.

17. South Pointe made substantial progress in July and August of 1999. I had developed a good working relationship with Carl Sanders, Angela McNair and Kelly Brown. They would do repairs, send me invoices and cancelled checks. I was on top of what was being done. Mr. Hayes wrote a letter to Joan Kiening on August 18, 1999 summarizing the progress the owner had already begun. Repairs were being accomplished by site staff, owner advances and some outside contractors. Elevator and mail box repairs were started. The other major repairs however, required a refinancing and rehab loan.

18. On August 30, 1999, Alberta Zinno and Marilyn Edge of the Washington D.C. DEC visited South Pointe along with senior managers from the Chicago DEC and MFH. I was not present. It was reported to me that the group was impressed with the progress that South Pointe had made. Everyone thought it was a perfect example of how the DEC could help its local MFH office in dealing with troubled projects like South Pointe. The recognition from HUD Headquarters was encouraging to us all.

19. Carl Sanders wrote to Joan Kiening on September 2, 1999 requesting confirmation of the rental increase and HAP renewal request indicating that the senior loan officer at the Community Investment Corporation needed some confirmation from HUD that the HAP contract would be renewed. Carl wrote: "It would not be feasible for them to lend funds needed to rehabilitate the building if the contract was not renewed." James Zale asked me to write a response for Ms. Kiening's signature indicating that the group that visited South Pointe on August 30, 1999 was pleased with the obvious progress being made in security, resident services and repairs but that the

issues of the contract renewal, rental increase and special claims were the responsibility of MFH.

20. South Pointe continued to make progress during the remainder of 1999. There were changes in the leases which gave management more control over residents and South Pointe implemented a "one strike" policy leading to evictions of destructive tenants. I met with representatives of MFH to discuss the new resident services initiatives and possible financing sources. The Management Improvement Operating ("MIO") Plan was being developed during the fall of 1999. It was formally submitted by Englewood on December 8, 1999 and approved by the DEC and MFH. The resident services programs was agreed to in December of 1999.

21. I had been very impressed with the efforts being made by Englewood and P.M. One to work with me and the DEC to develop and to start implementing the overall correction plan involving physical repairs, security and services. MFH had responsibility for monitoring the remaining work to be done on the MIO. The DEC had limited involvement after that.

22. A complete summary of our 1998 and 1999 DEC efforts was developed in the Final Team Report – Resolution. It described in considerable detail the condition of South Pointe prior to the referral to the DEC, the improvements made prior to the high level visit on August 30, 1999, and the other improvements made during the remainder of 1999. The owners advanced $770,000 to South Pointe for operations and improvements. They were cooperating. There were good faith efforts by Englewood to get South Pointe back on the right track. The retention of off-duty police to provide security rather than simply guards contributed significantly to the improvement. There

was effective security at the front door, in the building and on the grounds. It was expensive but necessary. The property was returned to MFH so that they could monitor the MIO and work on the rental increases, HAP renewals and rehab loans that would be necessary to fund increased security, resident services and an increased maintenance program to keep the elevators operating, increased exterminating in place and the rehab loan for the capital expenditures needed to complete the MIO. Everyone, the DEC in Washington, the DEC in Chicago, MFH in Chicago concurred in the Final Team Report – Resolution.

23. MFH did not understand its role in monitoring the MIO. It appeared that neither Ms. Thomas nor Ms. Coleman had read the MIO, the Final Team Report – Resolution or had any sense of what was needed to continue the types of efforts which had been initiated within the DEC. MFH regarded South Pointe as just another project. I sensed there would be a problem.

24. After the DEC withdrew from active involvement, there was no one at HUD either interested or willing to assist Englewood in implementing the MIO and redevelopment plan that everyone had officially agreed to on the Final Team Report—Resolution. Both Ms. Thomas and Ms. Coleman were hostile to the Englewood and P.M. One staff and their efforts.

25. I hadn't realized that Gwen Thomas had recommended against the rental increase and rehab loan requests in 1999. These funds were necessary to fund special operating costs – security and resident services and the completion of the MIO. South Pointe clearly needed some help from within HUD. It wasn't getting any.

26. There was no explanation to Englewood of the support services or appeal processes available to Englewood within HUD for challenges to REAC scores or the rejection of rent increases or special claims. Both Ms. Thomas and Ms. Coleman seemed preoccupied with making every attempt to "flag" "suspend" or "abate/terminate" the HAP contract. There were numerous occasions when they could have been helpful in shaping HUD programs to assist efforts at South Pointe. They did not do so.

27. I mentioned this to senior DEC officials in Washington. I expressed concern that the gains we had made at South Pointe during 1999 would be lost. It was a tough neighborhood. Hard won gains could be quickly lost.

28. I knew how bad things were in 1998 when South Pointe was referred from MFH to the DEC. I knew what it took to get operations back on track. I regularly expressed the opinion within HUD that South Pointe was on the right track and needed the continued collaboration between HUD and the owner. Ms. Thomas consistently rejected all rental increases and other claims for financial assistance.

29. In early fall of 2000 the Englewood HAP renewal request was in the HUD office for processing. When I was asked my opinion I said clearly that the HAP contract should be renewed on a multi-year basis. South Pointe had been regarded by the DEC in Washington as a "model," there was remarkable improvement during 1999, the owner was cooperative, the partnership had made more than $770,000 in advances, and the problems of drugs, gangs and crime had been significantly reduced with the off-duty police security system. It needed the multi-year HAP contract to support a refinancing to cover operations and to complete the MIO.

30. When the strategy was developed by the DEC/MFH to terminate the HAP contract in March of 2001, I expressed strong disagreement. I indicated there was no basis for it. Ms. Maisonet talked to me again about my experience at South Pointe during the DEC referral period. I told her that a lot of good work was done. She didn't appear to want to hear that or to read the parts of the file that corroborated my statements. I thought that the goal of defaulting Englewood and terminating the HAP contract was unfair and inconsistent with the HUD policy of working with owners who were cooperative. Other owners were given third and fourth chances to correct deficiencies using REAC and informal challenges and grievance procedures. It was normal for HUD to explain to owners their rights to challenge and appeal REAC scores. The 42 REAC score was much too high in 1999. There were no EHS deductions. If the trivial EHS findings in 2001 were eliminated, the 2001 REAC score would have been a 69. HUD did not explain any of this to Englewood. It seemed to me the goal was simply to get rid of Englewood and P.M. One and to transfer the property to preferred customers of HUD Chicago.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct. Executed on June, 30, 2005.

Freddie Batchelor