IN THE
UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| ENGLEWOOD TERRACE LIMITED PARTNERSHIP, a Michigan Limited Partnership,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA, and MEL MARTINEZ, Secretary of the Department of Housing and Urban Development,<br><br>Defendants. | ) | No. 03-2209C<br><br>Judge Victor J. Wolski |

**DECLARATION OF JOHN HAYES**

I, John Hayes, declare as follows:

1. I have personal knowledge of and am competent to testify to the matters set forth in this declaration.

2. I have been involved in the development, redevelopment, syndication, and financing of affordable housing using various government subsidy and tax programs since 1979. My college degree was in accounting and finance from the University of Detroit. Upon graduation I worked in public accounting for a large Michigan based regional CPA firm. I was an audit manager performing certified audits of corporate clients. After that I was the Controller and Chief Financial Officer (CFO) of two large multifamily developer/general contractor/property management companies specializing in affordable housing financed through HUD and the Michigan State Housing Development Authority for nine years.

3. I joined PM Group, Inc. ("PMG") in 1987 as its CFO and Senior Development officer. My duties included finding multifamily acquisition rehab

147597_1.DOC

opportunities. I would identify those opportunities, enter into purchase agreements, secure construction/permanent financing, and secure equity funding. After eight years in those roles I assumed the position of President.

4. Each multifamily property that PMG purchased was owned by a stand alone limited partnership in which a separate corporate entity was established as the general partner. The separate corporate entity was a subsidiary of PMG.

5. South Pointe Apartments was owned by Englewood Terrace Limited Partnership. The corporate general partner was PM Equities, Inc. (PME). PME was a subsidiary of PMG. I was the President of PME. Because of my ownership interest in PMG, and its ownership of PME, I had approximately a 10% ownership interest in PME. Because of my ownership interest in PMG, and its interest in P.M. One, Ltd. (property management company), I had approximately an 8% interest in P.M. One.

6. The property management agent services for most of the properties in Illinois were provided by PM One, Ltd. PM One was a corporation whose major shareholders were the principals of PMG and the corporate officers of the property management company. PMG was the developer of the real estate transactions and PM One was the property management agent. The daily affairs of PM One were conducted by the corporate officers of PM One.

7. HUD Chicago routinely dealt with the various entities (Englewood Terrace Limited Partnership, PM One, PME and PMG) as if they were one company. HUD Chicago regarded written or verbal notice to employees of any entity as notices and communications to all entities.

8. Until December of 1998, Robert Pendergast, a principal owner of PMG, had general partner responsibility for South Pointe. He was the person who signed the business agreements with HUD, had contact with the HUD office in Chicago and coordinated the construction and property management services that were provided to the property.

9. I replaced Mr. Pendergast in this role in January of 1999, about the time that South Pointe was being referred by HUD Multifamily Housing ("MFH") to HUD Departmental Enforcement Center ("DEC").

10. Several financing sources were involved with South Pointe: HUD, Community Investment Corporation ("CIC") and Chevron USA, Inc ("Chevron"). South Pointe was financed and syndicated with Section 42 Low Income Housing Tax Credits ("LIHTC") allocated by the Illinois Housing Development Authority (IHDA) and the City of Chicago in 1992. IHDA provided the tax credits which were syndicated to Chevron USA, Inc ("Chevron"). Community Investment Corporation ("CIC") of Chicago was the lender with an 11 year amortizing loan. HUD provided the rental subsidy through a Housing Assistance Payment ("HAP") Contract.

11. The financial structure set up in 1992 proved unworkable. CIC's $5 million in loan principal was to be paid back within the terms of an 11 year loan. Too much operating revenue from rental operations was being used to pay back CIC's loan principal due to the accelerated 11 year amortization period. There was insufficient operating revenue to pay for the necessary security, resident services, or the extensive maintenance and janitorial services required by the property. The financial condition became more acute when HUD turned down budget/expense based rent increase requests

beginning in 1998. Operating costs were increasing and the property was not receiving rental increases to meet these operating cost increases. We needed money to spend on strong security and eviction programs.

12. HUD's referral of South Pointe to the DEC in 1998 enabled one government entity to consider the property's condition and needs in a comprehensive manner. Given the function of the DEC, there would be a single entity to participate with us in the creation of the redevelopment plan.

13. South Pointe's structural and mechanical systems were sound and reliable. The site had ample outside space. There was plenty of parking. The building was a block from the CTA station in the Englewood district. There was an elementary school across the street. Many public investments were planned for the area.

14. The physical problems at the building were caused largely by HUD's under-funding, gang/drug interests, tenant behavior and size and makeup of the 303 families who were living at South Pointe.

15. In order to have sufficient revenue to meet its operating expenses, South Pointe needed to refinance its CIC loan. The principal balance remaining was relatively small because of the principal repayments already made since 1992. The CIC loan could be refinanced by either HUD or conventional bank loans in ways that could finance the finish of the rehabilitation needs of the building and have operating revenues sufficient to fund necessary operations, security and tenant services.

16. In April, 1999 The Real Estate Assessment Center (REAC) of HUD performed a REAC inspection. This inspection described the rehabilitation needs of the building. The May 1999 Pinnacle Management Review emphasized the need for

security, evictions and tenant control. Ms. Batchelor (HUD DEC) and Mr. Sanders (PM One property management) had a common understanding of the needs of the property.

17. Reports from an August 30, 1999 visit from DEC's Washington D.C. staff confirmed that substantial progress had been made in improving the building.

18. Rent increase requests in the spring and fall of 1999 that were fully documented and which should have been approved were rejected by Ms. Thomas.

19. CIC informed me in August 1999 that an appropriate extension of the HAP contract was needed to support the loan refinancing. The one year renewal was not sufficient to support a meaningful loan.

20. When Carl Sanders wrote to HUD's Joan Kiening requesting confirmation of the rental increase and HAP renewal request he informed HUD that the senior loan officer at the Community Investment Corporation required confirmation from HUD that the HAP contract would be renewed: "It would not be feasible for them to lend us the funds needed to rehabilitate the building if we will not receive a contract."

21. Englewood, CIC, and our mortgage bankers clearly understood the need for a refinancing and rehab loan and that a multi-year HAP contract was needed to provide the security for the loan.

22. Because HUD rejected our 1999 request for a rental increase, the property lost money during the 10/1/99 to 9/30/00 HAP contract year.

23. Repairs, enhanced security and resident services were funded by advances made by the partnership. These partnership advances amounted to more than $770,000, during 1999 and early 2000.

24. On July 27, 2000, I applied for a four year HAP contract and a rental increase. The four year contract was essential to give lenders confidence that the rehab loan/refinancing could be repaid.

25. I expected to receive approximately $6 million from the refinancing proceeds. South Pointe would use $2.5 million to pay off its existing debt to CIC and the balance for repairs and working capital. In four years (2004) Englewood would be able to refinance its $6 million loan ($20,000 per unit) with enough additional financing to complete the final phase of the overall redevelopment program.

26. On October 3, 2000, HUD officially approved our response to their Management Review.

27. In October 2000, Ken Horton brought me a HAP contract renewal from HUD for the period of October 1, 2000 to September 30, 2001 with three automatic one year renewals. I signed the HAP contract on October 16, 2000. Ken Horton took the signed HAP contract to a meeting with HUD (to discuss rehab needs) on October 18, 2000. After the meeting, Ken Horton and Carl Sanders took the contract to Ben Tessler who signed the contract for HUD on October 18, 2000. Ken Horton returned the fully executed contract to me upon his return from Chicago on October 19, 2000. This was a very important milestone. We had a four year HAP contract (one year with three automatic one year renewals) subject only to appropriations.

28. Sometime after the rehab meeting on October 18, 2000 I met with HUD staff (Verónica Coleman, Gwen Thomas and Debbie Grey) at a meeting called by Ms. Thomas to discuss the status of our rehab planning and loan application. Also present at the meeting were Ken Horton and Alan Crevitz of Developer's Mortgage. At

this meeting no mention was made of any changes in the HAP contract including any reduction in its term from four years to three months. I believed we had a four year contract.

29. With the four year HAP contract in place we could have gone to various commercial lending sources. But HUD encouraged us to work with them on an application to HUD under its 221(d)(4) loan program.

30. At this meeting, Ms. Coleman emphasized the need for speed in getting our rehab loan package submitted. She did not mention any changes in the HAP contract including any reduction in its term from four years to three months.

31. In early December I was surprised to receive a letter from Ms. Coleman stating that the multi-year HAP contract was for 3 months and she was amending the contract. It was inconsistent with all of our understandings at that time. Furthermore, I knew that an amendment required my signature and I had not signed anything reducing the term of the HAP contract from four years to three months. I never agreed to any proposed amendments.

32. In January, 2001, I was again surprised to see in an email from Ms. Coleman to Ken Horton that HUD had made a second amendment extending the contract from 3 months to a year, which was the first term of the four year renewal contract we signed in October of 2000. This was all very informal, just a reference by Ms. Coleman in an email message to Ken Horton.

33. My primary concern was getting our loan application completed for the March 19, 2001 deadline we had been given.

34. South Pointe did not have enough funds to cover its operating expenses because the requested rental increase from 1999-2000 was denied and because the cost of natural gas in the winter of 2000/2001 was dramatically higher than previous years.

35. South Pointe repaired all of the claimed exigent health and safety (EH&S) violations listed in the March 2001 REAC report on or before March 6, 2001.

36. I learned from the March 9, 2001 letter from Ms. Coleman that Ms. Thomas had visited South Pointe on March 7, 2001 when neither Mr. Sanders nor the on-site manager were present, and toured the property with the assistant manager and maintenance man, neither of whom understood the importance of this EH&S inspection in the context of our HAP contract.

37. Because of my concern with the seriousness of the charge of "false certification" in the letter, I asked Carl Sanders to reinspect the property immediately and document that the work has been done. He did this right away. He took photographs. He wrote a report covering the status of all of the EH&S deficiencies. I sent these materials on to HUD as evidence of our earlier position that the work had been done.

38. That work was the basis for my letter to HUD on March 16, 2001 that I was satisfied that the work had been done as originally reported in my first letter of March 6, 2001.

39. I returned my attention to the rehab loan application and wanted to make sure that it addressed all of the findings in the March, 2000 REAC Report. Ted Dunaj (consult and architect) sent the drawings he had developed from his several months of 100% unit inspections to BABCO Construction (general contractors). They

referred to them in their proposed scope of work. Together they developed a comprehensive redevelopment program based on a licensed architect's review of 100% of the units, common areas and mechanical and structural systems.

40. I was satisfied that we had a comprehensive program addressing all of the elements set out in the March 8, 2001 REAC notice that met all the deficiencies identified in the REAC report and our own sense of additional needs resulting from our complete review of the building. The entire package of materials required of Englewood by the REAC Report was submitted to HUD on April 8, 2001. The materials were sent from Chicago. I received a copy of the entire submission package.

41. When I received the loan rejection notice from HUD after April 3, 2001, along with the Etzkorn report outlining HUD's proposed scope of repairs, I compared South Pointe's proposed scope of work with HUD's. I could see immediately that there were glaring differences. There was no need to replace the penthouse for $650,000. The kitchen cabinets needed refinishing and some modest repairs, not replacement. HUD wanted to completely replace the kitchens and baths. South Pointe wanted to repair them. HUD wanted to add air-conditioning to the units, along with electrical distribution and service upgrades. Hud wanted to add individual heating controls to the units. These were fundamental changes to the building, not repairs.

42. I wanted to meet with HUD immediately to go over the issues. The most immediate concern I had was with the differences in the rehab program and the impact that had on the loan application. The REAC deficiencies could be remedied for $750,000. We proposed a $3 million rehab program. Etzkorn estimated his program to cost $6.2 million (actually $6 million when his $200,000 of addition mistakes were

corrected). PM One wanted to talk about their REAC response sent to Joan Kiening. Doug Sher of Developer's Mortgage, had determined that the rehab loan for construction could be as much as $5.5 million. There was clearly the need to talk about scope of work, costs and the key business terms in the rehab loan.

43. When I received the April 9, 2001 Notice of Default, I had fundamental questions about the factual accuracy of each and every "event of default" they referred to. I was shocked that the minor EH&S correction had become a very major issue. There was no reference to the major accomplishments made at South Pointe when it was in the DEC in 1999 and 2000. There was no reference to our REAC response which we had just submitted, as I indicated we would in my letter of March 16, 2001. I didn't agree that any of the listed "events of default" referred to in the Notice -- the failure to correct the EH&S deficiencies, the alleged inadequacy of our proposed scope of work, the failure to create an approved work plan over the past 23 months -- were factually supportable. We had been working on an approved MIO. We did all that we could without a rehab loan. We had been working for six months to develop a comprehensive rehab plan developed out of a unit-by-unit inspection of the building. Our Proposed Plan of Correction was responsive to every type of repair need mentioned in the March 8, 2001 REAC Report and our own independent building survey.

44. There had been no mention that South Pointe was not decent, safe and sanitary and no mention of a "default" while major repairs were being made in 1999 while South Pointe was the DEC. There was a MIO plan that everyone agreed to which set out the repairs to be made. We simply needed a rehab loan to complete the repairs. A multi-year HAP contract was needed to support the rehab loan. While I thought that the

kitchen and bath replacement program, and the air-conditioning, and many of the other items on the Etzkorn report were completely unnecessary as responses to the REAC Report or any reasonable interpretation of "decent, safe and sanitary," as long as they could be supported by a construction budget of $5.5M in the new mortgage, which our consultant Doug Sher said that it could, I would just as soon have done the HUD repair program (with the exception of the penthouse replacement which was completely unnecessary and impractical – a waste of $650,000). The HAP payments would be used to cover any increased costs. I was in favor of whatever reasonable improvements could be financed out of the HUD insured loan.

45. A meeting was arranged with HUD Chicago for April 13, 2001. I wanted to talk about the scope of work for our rehab loan, the REAC Report and our REAC Response. I was prepared to talk about all of the "events of default" that HUD referred to in their Notice. I assumed the meeting was to discuss an updating of the earlier MIO, amending it to reflect the recent REAC Report and our Response, and to work toward an agreed upon scope of work and rehab loan refinancing so that all of the physical and operational needs of South Pointe could be addressed in a comprehensive manner.

46. Mr. Hinsberger, HUD Chicago director, refused to discuss any of these points when we met on April 13, 2001. When I started my presentation, Mr. Hinsberger cut me off and said he didn't want to discuss those matters. He refused to discuss any of the efforts that had been taken or were planned to improve the physical condition of the property or to address any operational or financial needs. He was very

clear in his decision that Englewood and P.M. One had to be replaced by a new owner and management agent. Englewood was being kicked out.

47. Because HUD's clear and unequivocal position at the meeting on April 13, 2001 was that HUD had no future role for Englewood in the HAP contract or rehab loan, but that our only role was to find a new owner there was really nothing to be done with respect to completing the remainder of the MIO or developing any additional response to the March, 2001 REAC Report.

48. I started to use my network to find potential buyers. I provided Mr. Hinsberger with a status report on May 2, 2001. It soon became apparent I had nothing to sell. Without the four year HAP contract, and proper subsidy levels, my task was to find someone who would pay me something for an operation that HUD had regulated into losing money. Whatever HAP contract reinstatement that could be done or rehab loan to be approved would come from HUD's agreements with the new buyer. Englewood had nothing to sell. We were limited to giving the property away to some buyer approved by HUD.

49. On May 15, 2001, HUD formally rejected Englewood's response to the REAC Report of March 8, 2001. Ms. Coleman wrote that the very fact of an application for a 40-year rehabilitation loan was an acknowledgement by Englewood of the substantial physical deficiencies at the project justifying the termination of the HAP Contract. There was no reference to Englewood's REAC response. Our proposed plan was returned.

50. The very next day, May 16, 2001, HUD wrote to us what was a Notice of Continuing Default. It repeated the same "events of default" referred to in the

April 9, 2001 Notice of Default. The new emphasis concerned what Englewood should be doing to find a new owner. This effort was referred to in a number of parts of the letter.

51. Englewood was clearly a lame duck. HUD was aggressive and publicly pursuing its voucher program. We were doing everything we could, within our resources, to keep the building operational and safe. Englewood continued to lose money in daily operations. The building was becoming increasingly costly to operate. The unexpectedly high gas bill from the prior winter created an account payable of $150,000 that we didn't have the money to pay. Englewood was denied the benefit of HUD's program of reimbursement of gas heating costs. First HUD said they lost our August application. Later, HUD said that it was not complete. HUD offered no help or guidance in helping us to complete the application. South Pointe clearly needed the money. I gather their current position is that we were not in good standing.

52. The rental increase request that I asked Mr. Samuelson to make on behalf of the partnership in August of 2001 was proper, but not implemented. At that time both Mr. Samuelson and Mr. Cravitz were preparing materials for HUD on behalf of Englewood. Operations continued to lose money through the fall of 2001. From April 13, 2001 on, HUD demanded that we continue to provide services to our residents and to make repairs with money that we did not have. On their part, however, they acted as if they had no responsibilities under the contract except to pay monthly rental subsidies based on 1998 rents.

53. HUD continued to deny us program and HAP resources and benefits based upon their unilateral declarations that we were in default and not in good

standing. We had tried to discuss these questions with them in April, 2001. They refused. We continued to operate South Pointe as best we could without the resources we requested of HUD and to which we were entitled.

54. On September 25, 2001 Mr. Hinsberger sent me what was HUD's election to extend the subsidy, for the benefit of the residents, and asked me to sign it. I signed the agreement thinking it was a practical alternative to having a building of tenants who couldn't pay rent, would become "squatters," and would have to be evicted.

55. However, it was clear on October 1, 2001, that the October 1, 2000 multi-year HAP contract had "died," "stopped," been cancelled, or was suspended, abated or terminated. HUD's repudiation of its HAP obligations were finalized.

56. I filed suit seeking an injunction action against HUD in October, 2001 to reinstate the multi-year HAP contract and to terminate the issuing of vouchers. HUD responded to my utter amazement that the HAP contract had not been terminated, that the termination process had not even begun despite the fact that HUD had been threatening for 9 months to abate or terminate the contract which it did on October 1, 2001. It seemed to me that HUD terminated the contract on October 1, 2001 when Mr. Hinsberger made clear that the HAP contract had not been automatically renewed and HUD indicated once again that it would not be.

57. HUD took the position in open court that South Pointe was dangerous and residents needed to be able to leave immediately. However, residents had known of the availability of vouchers since June, 2001 and none had moved at the time of Judge Castillo's decision on November 15, 2001. More than 80% of the residents were still living at South Pointe in the spring of 2002. It was not until May of 2002 that large

numbers of South Pointe residents left, in large part with the assistance of the staff of DSSA Management.

58. Judge Castillo agreed with HUD's legal argument and concluded that the contract had not been terminated nor had the termination process begun.

59. We started the HUD administrative appeal process under MAHRA. There was really no substantive analysis or review of Englewood's position that the April 9, 2001 Notice of Default was improper. The ultimate irony is that the very person who wrote all of HUD's Notices in April, May and November of 2001 is the person who appears to have written the opinion for what was to have been an independent reviewing officer who was to have had no prior involvement in the case.

60. After exhausting this process, Englewood filed another injunction suit in June of 2002. It shortly became clear that our only remedy was in the Court of Federal Claims, a point made by the government in the second injunction suit. I, therefore, decided not to pursue the case in federal court in Chicago, and that the only relief would come in the Court of Federal Claims.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct. Executed on June, 30, 2005.

John J. Hayes