IN THE
UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| ENGLEWOOD TERRACE LIMITED PARTNERSHIP, a Michigan Limited Partnership,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA, and MEL MARTINEZ, Secretary of the Department of Housing and Urban Development,<br><br>Defendants. | ) | No. 03-2209C<br><br>Judge Victor J. Wolski |

DECLARATION OF CARL SANDERS

I, Carl Sanders, declare as follows:

1. I have personal knowledge of and am competent to testify to the matters set forth in this declaration.

2. I have been employed in real estate sales and property management in the Chicago area for 32 years in various positions including site manager, property manager, district manager, area supervisor and associate director of property operations. Many of the properties for which I had management responsibilities were in neighborhoods where gang activity and drug crimes were epidemic and migrated into the properties. Security and access control are critical in these situations. Residents have to be held to a legal standard with respect to drug/crime activities, control of their children and guests and the destruction of property. There are particular problems related to boyfriends, fathers and guests.

3. Because of my experience with these types of properties, I was hired by the P.M. One Management Company as an area supervisor beginning in September, 1996. I

assumed responsibility for South Pointe in March, 1998, and continued there through mid-April, 2001.

4. I began my responsibilities at South Pointe by reviewing the files and visiting the property. I observed that site management and HUD oversight had allowed drugs dealers and gangs to control the property. The on site security guards had been either been intimidated or bribed by the drug dealers. There was little control over who had access to the building. Many tenants had relationships of one kind or another with the drug/gang interests. The elevators were routinely vandalized and broken. Gang graffiti was in the stairwells and corridors. Entry and bedroom doors and hardware were being broken as part of domestic conflicts. Kids played with the closet doors. Domestic fights led to damage to drywall.

5. There were too many tenants with zero income, for which the HUD subsidy represented 100% of the rent. They had no investment in their unit. It was free.

6. We had a difficult time evicting our problem tenants with drug/gang relationships. HUD made these evictions more difficult. When we started the eviction process, the tenant would call Ms. Thomas at HUD alleging some problem with management, the unit, etc. Ms. Thomas would call us to talk about the resident's complaint on the assumption that the resident was right and management was wrong. Ms. Thomas always started with the opinion that management was wrong. Residents quickly learned how to "game" the relationship between Ms. Thomas and onsite management. We had many problems of this type. In one instance, Ms. Thomas tried to intimidate me not to evict a tenant whose boyfriend had been arrested for selling drugs in the hallway of the building. After I stood my ground and asked Ms. Thomas to give me her concerns in writing, she had the tenant call HUD in Washington DC.

7. My review of the financial statements for the property revealed that the property was losing money. There wasn't adequate funding for proper security or evictions. In my experience, drug evictions usually lead to jury trials which take time and money that South Pointe did not have.

8. Given the location of the building in Englewood, its size, its tenant make up and the lack of effective physical and operational security systems, South Pointe was an expensive building to operate.

9. More than 85% of the property's income came from HAP payments. Only 15% of the overall rent was paid by the residents. Single mothers with large families were expensive to serve, and tenants who were relying almost exclusively on government rent subsidy often allowed their apartments units to be damaged by their families and guests.

10. In the summer of 1998 South Pointe had been referred by Multifamily Housing ("MFG") to the Departmental Enforcement Center ("DEC"), a HUD department that specialized in difficult properties like South Pointe. HUD's Community Builder program was developed to give troubled projects access to city resources like rodent control, specialized police services (like the Violent Crimes Division), social services and all of the variety of services needed by a building like South Pointe and the families it was serving.

11. South Pointe was one of the few Section 8 high rises in Chicago which had 3BR units and large 2BR units and was under a use restriction that required it to serve only "very low income" families. Under those restrictions it was a particularly expensive building to operate. There were more than 700 children at the building with no place to play, except for corridors, stairwells and the very limited common areas.

12. DEC's Enforcement Analyst at South Pointe was Freddie Batchelor. She

had had experience with buildings like South Pointe. She did a comprehensive evaluation of all aspects of the project. She was serious and committed. We agreed that there was an immediate need to take control of the building, to reach out for the services of the Violent Crime Division of the City and to upgrade the security at South Pointe through the use of off-duty police officers, who were armed and had arrest powers. They were significantly more costly than security guards, but they were essential to our success in getting control of the building. Englewood and P.M. One had a very good working relationship with the DEC.

13. It was clear to me that South Pointe needed a resident services program, to help residents access needed resources, and to provide recreational and social resources. We hired Kelly Brown, who had developed high quality resident services programs at the CHA Henry Horner development on the west side, and who had experience with the development and delivery of computer learning center services through a HUD Drug Elimination Grant at Northwest Tower, a somewhat smaller version of South Pointe in Chicago.

14. Money was a constant problem from 1998 through 2001. South Pointe needed rent increases and access to supplemental and reimbursement funds to provide essential services, as well as the additional services for security, resident programs, and tenant damage to units. The DEC did not control the money. For all funding resources South Pointe had to apply to the MFH. In our case, that meant Ms. Thomas.

15. In 1998, South Pointe had a cash deficit of $200,000. In March of 1999, and later in May, we requested a rental increase to pay for the increased cost of operations. We even proposed a reduction in the P.M. One management fee to demonstrate that we were interested in doing what we could to help the building financially.

16. Ms. Thomas rejected the March, 1999 rental increase request because it was not the right "time." It was, however, the same time that the budget and rental increase request were made in 1998. Rejections of proper rental increase requests and special claims for losses related to tenant damage and vacancy became standard operating procedure for Ms. Thomas. She knew South Pointe was losing money and that Englewood was making advances to fund repairs and operations. However, for three years she never approved any of our requests for additional funding.

17. The denial of South Point's 1999 rent increase request meant that the project lacked the resources to pay for normal operating expenses as well as the increased security and resident services. The owners were forced to make financial advances to fund operations as well as REAC repairs.

18. When a tenant damaged an apartment and then vacated or was evicted, South Pointe was entitled to the costs of repairing the apartment as well as two months of vacancy rent payments. These are refered to as "special claims." South Pointe made special claims supported by appropriate documentation from 1999 through 2001. None of these claims were approved by Ms. Thomas. For example, our special claims which we prepared and sent to Ms. Thomas in March of 2000 did not get turned over to others at HUD until October, when they were denied for being too late and being incomplete. Clearly, from the time they were prepared in March, 2000, there was plenty of time to add backup materials, if needed, and to process and approve them in a timely manner. I learned that Ms. Thomas had no interest in processing claims.

19. South Pointe properly completed applications for rental increases and submitted them to HUD in 1999 and 2000. All of the applications were denied.

20. Ms. Thomas did not approve one rental increase or one special claim for South Pointe from 1999 through mid-April, 2001, despite the fact she knew the project was losing between $150,000 and $200,000 a year. We made regular requests for rental increases, special claims and the extraordinary gas costs for the winter of 2000/2001. All requests were denied. We were operating on 1998 rents against increased 2001 costs. The major problems at the building – enhanced security and additional maintenance and repair services – cost money the project didn't have.

21. When the REAC and Pinnacle inspections were conducted in April and May of 1999 I requested copies of the reports right away so that we could begin work to remedy any cited deficiencies. I wrote to Joan Kiening at the DEC in mid-June of 1999 asking for the report so that we could be proactive in correcting the problems. We had started on the obvious work immediately. However, we wanted to get the full picture of the work HUD felt needed to be done so that we could develop an overall redevelopment plan that could be financed by our lender, the Community Investment Corporation.

22. The REAC inspector allowed South Pointe to correct alleged EH&S deficiencies on the day of his April, 1999 inspection before noting them on the REAC report. South Pointe had no EH&S deductions from its REAC score in April 1999. South Pointe's REAC score appears to have declined between 1999 and 2001 because the inspector deducted 38 points for easily remedied deficiencies like missing switch plates and breakers from the 2001 score, deficiencies of a sort which were easily reparable and therefore not deducted from South Pointe's 1999 REAC score. If they were treated the same way they were in 1999, the 2001 REAC score would have been a 69.

23. We developed a good working relationship with Ms. Batchelor and the DEC in responding to the 1999 REAC report to develop a correction strategy in June and July of 1999. The entire South Pointe staff had a number of meetings with Ms. Batchelor in the first half of 1999. We made good progress.

24. All of us at South Pointe knew that a failure to implement the corrective actions which we proposed in response to the 1999 REAC Report could result in sanctions including the loss of South Pointe's HAP contract.

25. Although South Pointe accomplished many of the necessary changes through maintenance repairs and work orders and owner advances, a rehab loan was clearly needed to complete the expensive repair work including the mail boxes, the elevator repair, drywall repairs and painting, and the entry and interior door replacement program.

26. John Hayes wrote to HUD at my request in August, 1999 explaining our need for the confirmation of the 1999 HAP contract renewal and rental increase so that we could get additional financing from the Community Investment Corporation, our lender. If we could defer principal payments for one year, making a 10 year loan an 11 year loan, we could have access to $500,000 in what would otherwise be principal payments, which, with our renewed HAP contract, could finance the completion of the work needed to correct deficiencies identified on the 1999 REAC Report.

27. On August 30, 1999 a high level Washington delegation came to South Pointe to assess our progress. They were impressed with our accomplishments. I thought it was a good time to write another letter to HUD asking for a confirmation of our 1999/2000 HAP contract renewal and a rental increase to cover our increased expenses.

28. In response to this visit, South Pointe received a letter from the DEC complimenting us for the good work we had done, the significant progress we had made and the favorable impression we made on the Washington visitors. The DEC could not renew the HAP contract or provide for a rental increase. The letter said that we would have to work with MFH, Ms Coleman and Ms. Thomas on the HAP renewal and rental increase.

29. In October, 1999 we learned that the HAP contract was renewed for one year but that our request for the rental increase was rejected. The one year contract wasn't sufficient security for a private sector loan. The rejection of the rental increase simply meant South Pointe would continue to lose money for another year.

30. South Pointe had to rely on advances from Englewood to fund both operating costs and the improvement program being developed in response to the 1999 REAC Report and Management Improvement Operations Plan ("MIO").

31. On December 8, 1999, I drafted a MIO status report documenting and updating our progress in responding to the 1999 REAC Report. I followed the format that HUD had accepted for all of the other P.M. One properties in Chicago. It was a format that was accepted by everyone. The MIO update indicated that many repairs had been made, the mail boxes had been replaced, elevator work had begun, but that the elevators still needed to be repaired, and that we needed the rehab loan for the drywall and painting repairs, and the door replacement program.

32. I learned from Freddie Batchelor in December, 1999 that the referral to the DEC was a success, that a Final Team Report Resolution had been approved, and that South Pointe would soon be transferred from the DEC back to MFH.

33. I was surprised that no one at MFH seemed to understand that they were supposed to be monitoring the MIO that had been approved in December, 1999. We were operating without clear connections to HUD. Ms. Batchelor at the DEC had largely completed their work. Ms. Thomas was not around. I would send in MIO updates. I would get no response.

34. Ms. Thomas had very little to do with South Pointe for the first nine months of 2000. She visited the site briefly for a Management review in March, 2000. We didn't get the results of her report until mid-June, at which time she was already on a four month maternity leave. I responded fully and promptly to the Management Review on July 10, 2000. We didn't learn until October 3, 2000 that my response had been formally approved in what appeared to be part of the HAP contract renewal process.

35. Louella Kirkman replaced Ms. Thomas as the Project Manager during the summer of 2000. We started mailing letters and reports to her, on the assumption that they would get routed to the proper parties in MFH or the DEC.

36. I helped Mr. Hayes prepare and submit HAP contract renewal request and request for rental increase to HUD on July 27, 2000. We knew from conversations with CIC in the summer of 1999 that a multi-year HAP contract would be essential to the approval of the loan. A one year contract wasn't enough to give a lender adequate security for the repayment of a rehab loan. A lender wanted a multi-year contract in which there was guaranteed subsidy income from HUD. Our July 27, 2000 application was for a four year HAP contract.

37. On October 3, 2000, Deb Gray and Ms. Thomas accepted our response to the 2000 Management review with specific language noting that there would be a future REAC review that would need to be satisfied.

38. I didn't regard the REAC addendum to the 2000 HAP contract as a particular problem. There was still work to do on the existing MIO. The owner had advanced more than $770,000 to South Pointe in 1999 and 2000 in response to the 1999 REAC Report and DEC referral. We needed a refinancing. We needed to develop a 100% unit review and to update the needs of the building as part of our new rehab loan. We were developing a rehab plan that would complete all of the old MIO work as well as any new work uncovered by our comprehensive building review. The four year HAP contract would support a loan for all of the required repairs, and eliminate the $500,000 a year in principal payments that made up more than 20% of our operating budget. I clearly saw the multi-year HAP contract and rehab loan as the solution to all of our financial, physical and operational problems at South Pointe. The minimization of principal payments would give us the operating revenue needed to provide enhanced security, maintenance, repairs and resident programs. The refinancing would serve a number of important objectives.

39. My understanding in early October 2000 was that the multi-year HAP contract had been approved. There was a meeting scheduled on October 18, 2000 to discuss the requirements of processing the rehab loan so that we were all on the same page. An architect had been retained. Ken Horton was hired by the PM Group to process the loan application. The purpose of the morning meeting that day was to discuss the HUD loan requirements. Ms. Thomas functioned as chair of the meeting. The rehab loan was the only topic discussed. Mr. Horton mentioned in passing that he had copies of the HAP contract signed by Englewood that needed to be signed by HUD. They were to be signed by Ben Tessler after the meeting. There was no discussion by Ms. Thomas, Ms. Coleman or anyone at HUD that there was any question about the multi-year HAP

contract. At the end of the meeting, Mr. Horton and I went to meet with Ben Tessler so that he could sign the contracts which Mr. Horton could take back with him to Michigan.

40. At the meeting on October 18, 2000 there was absolutely no discussion of an "error" in the HAP contract. Ms. Thomas never mentioned it. Neither did Ms. Coleman. It was simply not discussed. We finished the meeting. Ken Horton and I met with Ben Tessler to have the HAP contract signed for HUD. We left with a signed contract. I was comfortable that we would get a rehab loan, complete the MIO, reduce our principal payments, or get them deferred for a year, so that we could pay for the security and utility costs and pay for repairs out of the rehab loan. HUD's idea that there was an "error" in the contract must have occurred at some later point in time. There was absolutely no discussion of it at the meeting on October 18, 2000, or at any time after the meeting. Neither Ken Horton nor I learned about it until the Veronica Coleman letter of December 6, 2000.

41. I left the meeting on October 18, 2000, pleased that the rehab meeting went well and we had a signed HAP contract for four years which we could use to refinance the improvements we needed to finish off the work we were to do on the December 8, 1999 MIO, finance whatever new needs would result from our 100% unit inspections which were being done by both Ted Dunaj and on site management, and still have adequate revenue for security, resident services and the massive increase in heating costs projected for the winter of 2000/2001.

42. If there had been any indication on October 18, 2000 that the HAP contract was to be for 3 months, or anything other than the contract that Mr. Hayes had signed, I would have immediately contacted Mr. Hayes. The rehab loan was essential to the completion of the MIO and our pressing accounts payable. The multi-year HAP contract was critical to the rehab loan. This was "the" issue we were concerned about South Pointe.

43. As we discussed at the meeting on October 18th, I organized a 100% unit survey of the building the last days of October and the first days of November, 2000. The report resulting from this comprehensive inspection program indicated that physical conditions were significantly better than HUD's description of the property in the October 18th meeting. The units were not "deplorable." Some units had been badly abused by residents. That should have led to evictions, and damage and vacancy claims. But we didn't have the money to pay lawyers until we completed our refinancing. The units needed painting, the replacement of closet doors and various repairs. We felt all of the kitchen cabinets should be refinished. There were some repairs needed for toilets, tubs, floors, entry and interior doors and walls. Most units needed nothing other than normal work order requests. The repair needs of each unit were set out in a detailed spread sheet. The report indicated that 90% of the repairs were a result of tenant damage. The damages were concentrated in a limited number of units.

44. There was a REAC inspection on March 2, 2001. The 13 EH&S items cited in the March 2, 2001 report were very minor, almost trivial: missing/broken outlet and switch covers, assumption about missing breakers, one situation where there were exposed nails in the drywall, a missing fire extinguisher inspection tag, etc. They could have been fixed while the inspector was on the site. That is what happened in 1999, and we received no EH&S deductions. If we had been allowed use 2-3 hours to correct the EH&S deficiencies on March 2, 2001, the day of the inspection, as we had been allowed to do in April of 1999, the South Pointe REAC score would have been a 69 and not a 31.

45. I reviewed the EH&S list with the REAC inspector at the end of his visit on Friday, March 2, 2001. We talked about the other identified areas needing correction which could be found through work orders, that we could begin right away. We started to repair the

EH&S items immediately after the inspector left. We finished them on the morning of Saturday March 3, 2001. John Hayes was informed that the work was done on Monday, March 5, 2001. He wrote his letter to that effect on Tuesday, March 6, 2001.

46. I learned on my normal weekly visit to Ft. Wayne on Wednesday, March 7th, that Ms. Thomas came out to South Pointe that day. Since we had completed the EH&S repairs on Saturday, I assumed the on site staff would show her what we had done. She was escorted by an assistant manager and a maintenance man. If I had been there, I would have gone down the EH&S list one-by-one to show her that all of the corrections had been made. I would have pointed out that the breakers Ms. Thomas later referred to were not operational, she was looking at a light fixture in the wrong maintenance room that was off limits to residents, and I would have made sure that Ms. Thomas went up into the penthouse to see the corrections there (something Ms. Thomas would not likely be able to do) and to make sure she saw the access to the exit in the trash room (something that Ms. Thomas declined to do). If there were any corrections that had to be made they could have been made right then within the 72 business hour REAC deadline.

47. When I learned that Ms. Coleman had stated in her letter of March 9, 2001 that "some" set "not all" of the supposed EH&S items were corrected I went to the site, photographed the completed repair work, explained each deficiency in a memo, and sent it to my boss, Marlene Dau, so that John Hayes could have the documentary evidence to rebut these charges.

48. During late March of 2001, since I had been with the REAC inspector during his visit on March 2, 2001, I helped John Hayes compare the scope of the work developed by Ray Etzkorn for HUD on March 27, 2001of Ted Dunaj and BABCO, and the management

survey which I supervised in early November 2000. The EH&S work noted by Etzkorn was done in a matter of hours. All of the references to ranges and refrigerators, leaky faucets, clogged drains and repairs to bath and kitchen fixtures would be handled as normal maintenance work orders. The damage to entry and interior doors, closet doors and walls were results of tenant misbehavior. Under normal conditions they should have resulted in evictions and special claims. The Englewood proposal was to repair them through the rehab loan and then reestablish the security and resident services program that had worked well in 1999 and the first half of 2000.

49. The Etzkorn proposal had some extremely impractical suggestions. Most obvious was its recommendation to replace the concrete penthouse. First, the removal of the concrete walls running two thirds the length of the building would have been almost an impossibility. Second, it would be a waste of money to spend $700,000 on it. Third, although the equipment in the penthouse needed to be moved and, in some cases, removed, it was unnecessary to demolish the structure to accomplish that.

50. The Etzkorn proposal required the 100% replacement of cabinets, countertops, sinks, appliances, baths and kitchens. This was unnecessary. The March 2, 2001 REAC Report made no mention of countertops in any of the 25 inspected units. It called for the repair of one cabinet set. A few refrigerators needed new handles or gaskets. Some burners and ovens weren't working. Etzkorn recommended the complete replacement of existing features and upgrades like individual heating units, air conditioning and electrical upgrades. The recommendations were unrelated to the "findings" of the March 8, 2001 REAC Report.

51. Almost all of the items listed in the March 8, 2001 REAC Report could

have been handled by work orders and two additional maintenance men, and special claims that should have been made against residents for the damages they caused to their units.

52. I thought that the REAC Response consisting of the EH&S corrections, the list of corrections already made and the BABCO work proposal was a thorough response to the REAC Report. There needed to be selective drywall repairs in some units. All of the units needed to be repainted, along with the corridors and stairwells. Some toilets and tubs had to be replaced or reglazed. It was a good idea to refinish all of the cabinets and to replace bottoms or shelves where necessary. The Dunaj/BABCO work program was entirely consistent with the results of our four day unit inspection program in early November of 2000.

53. The real problem at South Pointe was the need for money to pay for a first rate off-duty police security program to "take back" the building from the gang and drug interests, to design and implement a "get tough" eviction program so that the bad tenants who had damaged their units at South Pointe could be evicted, to pay for the extraordinary gas bills that materialized in the winter of 2000- 2001 (more than double those of past years), and to complete the updated 2001 MIO program that had been developed by Englewood and P.M. One in response to the March 2, 2001 REAC report.

54. There was a solid core of good tenants at South Ponte. There was also a very large population of good tenants living in Englewood that were very interested in getting Section 8 housing in a secure building with resident services. It would be simple to maintain 100% occupancy level for the building essentially by serving the needs of low income families in Englewood, the target market for which the building had originally been intended. All of the plans were in place to redevelop a financially solid South Pointe with tenants who would take advantage of the resident services programs that were offered, and who would work with

Englewood and HUD to make the building the asset to the community, and the resource for affordable housing for Englewood residents that it was meant to be.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: June 30, 2005

CARL SANDERS