IN THE
UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| ENGLEWOOD TERRACE LIMITED PARTNERSHIP, a Michigan Limited Partnership,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA, and MEL MARTINEZ, Secretary of the Department of Housing and Urban Development,<br><br>Defendants. | No. 03-2209C<br><br>Judge Victor J. Wolski |

**DECLARATION OF DON S. SAMUELSON**

I, Don S. Samuelson, declare as follows:

1. I have personal knowledge of and am competent to testify to the matters set forth in this declaration.

2. I am the sole member of DSS New Englewood Terrace LLC, the general partner in the Englewood Terrace Limited Partnership. I assumed the role of general partner on December 13, 2002, taking over from P.M. Equities and John Hayes.

3. Englewood and HUD entered into the HAP contract to provide affordable housing to very low income families in Englewood. While there were a number of HUD and Chicago Housing Authority ("CHA") projects for seniors in Englewood, there was no similarly subsidized housing for families.

4. Subsidized housing for very low income families, like South Pointe, tend to be either community assets, contributing much needed housing resources for low income families and adding to neighborhood stability, or they function as community "liabilities,"

contributing to the problems of the neighborhood as magnets for concentrations of gangs, drugs and crime. Which role they perform is a function of the level of collaboration achieved through the owner/manager, the residents, the neighborhood, HUD oversight, and the police.

5. One major problem I noted at South Pointe during my first tour during the summer of 2001 was the absence of physical equipment – entry controls, locks, buzzers, intercoms, surveillance cameras, etc. – to support the efforts of the guards to control access to the building. There were no entry controls at the back door or at the north service entrance. As a result, gang and drug interests had access to the building and into the stairwells, and then into the elevators, without being required to pass through the security guard controlled front entrance.

6. Without a physical access control system, and the presence of an armed guard inspecting the stairwells, corridors, common areas and grounds 24 hours a day, there was little control of what went on within the building, particularly after hours and on the weekends when management was not present. Security systems cost money to install and operate. Off duty policemen cost $20/hour, or $175,000 for 24 hours, 365 days a year. An unarmed security guard costs $12/hour or $105,000 per year. South Pointe needed to spend an additional $140,000 a year to give it the security service it needed to control gangs, drugs and crime. It simply didn't have the money. Rent increases, special HUD programs related to drugs and high cost areas and buildings, and other forms of financial support should have been used to pay for these extraordinary expenses. HUD used Englewood's alleged default and failure to be in "good standing" as standard explanations for denying Englewood the essential funds to which it was entitled.

7. South Pointe had the need for an aggressive eviction program. A significant number of residents were actively collaborating with drug interests. These

relationships resulted in physical damage to the individual unit (damage to entry and interior doors, door hardware and walls) and security problems in the building. Such an eviction program would have resulted in the removal of problem families, special claims to HUD for tenant damage and unpaid rent/vacancy losses and the availability of housing for low income Englewood families seeking service enriched affordable housing. South Pointe didn't have the operating revenue, or the cooperation from HUD, to implement such a program.

8. When I wrote to Mr. Hinsberger on October 11, 2001, I was very clear that terminating project based Section 8 housing subsidies was both illegal and a major mistake. South Pointe needed sustained predictable revenue to pay for enhanced security, repairs and an aggressive eviction campaign. I thought that vouchers could be the "carrot" for getting bad tenants removed at no cost to Englewood, rather than the "stick" of eviction which would cost money, particularly for the drug and gang related evictions where the tenant would demand a jury trial. I was very much in support of the effort by Mr. Hayes to seek a declaration that the HAP contract should be automatically renewed by its terms and that vouchers could be used to get rid of bad tenants. These two objectives were not mutually exclusive.

9. In the fall of 2001, I felt that the ideal solution was to use vouchers to get rid of bad tenants who could qualify for vouchers, replace them with good tenants under the reinstated HAP contracts, and to use the rental increase that had been approved to support the costs of evicting bad tenants who could not qualify for vouchers. This was also the view of John Hayes and Englewood. This could have been the position taken by HUD after the District Court held on November 15, 2001 that HUD had not even begun the process of terminating the HAP contract at that time. That was the time when everyone could have taken a fresh, objective and comprehensive look at the available options.

10. On site management tried to collect the unpaid rent and the costs of tenant damages from the tenants who were leaving. Residents were warned that open obligations could jeopardize the availability of voucher payments in the future. The warning was typically ignored by the residents. Neither HUD nor CHAC provided support for the Englewood position. Spending money on lawyers trying to collect unpaid rent or damages from departing residents with zero or almost no income was not a feasible or practical course of action.

11. In the summer of 2002, CHAC did not take the position that South Pointe was an improper location for the use of housing vouchers. In fact, CHAC approved 90 units for the use of housing vouchers at South Pointe during that time period. Englewood managed to market 50 more units to CHAC voucher holders during the second and third quarters of 2003, bringing the total occupancy to 135 as of October of 2003. It was in the summer of 2003 that the CHA and CHAC concluded that they didn't want to support the use of housing vouchers *in Englewood* because of the low income and 100% minority make up of the community. Families with vouchers who were not living in Englewood were encouraged not to use their vouchers in Englewood. Englewood residents did not have vouchers since there were no CHA family housing units being demolished in Englewood which would have been the origin of housing vouchers. Finally, there was no project based Section 8 at South Pointe which would have been the only "market" for low income Englewood families who were the intended constituency when South Pointe was planned in 1992.

12. In July of 2002, there was an emergency related to HUD's failure to process the normal HAP payment in a timely manner. I wrote to Mr. Hinsberger that the monthly HAP payment was needed to make the mortgage payment to CIC. While everyone was assuming that the new loan would be finalized in the summer so that there would be working

capital to pay operating expenses in the fall, there was a delay in the closing that left the project without its normal HAP payment, the declining rent revenues resulting from resident moves, the operating expenses of a fully occupied building and no working capital reserves that would be in the new mortgage when the rehab loan closed.

13. In December of 2003, it was clear that there was no "voucher" market for Englewood, the neighborhood was not sufficiently improved to support "market rate" tenants and there were income limits at South Pointe that limited the market to low income tenants. I had hoped that HUD's self interest in protecting its own insured loan would have resulted in the reinstatement of the HAP contract. Alas, HUD has inexplicable views of its own self interest.

14. In early September of 2001, after I had submitted a comprehensive redevelopment plan and complete rehab loan application to HUD, along with the documentation for a $200,000 rental increase which was approved by HUD, I asked Mr. Hinsberger why that wasn't a sufficient basis for the reinstatement of the HAP contract. The program satisfied all of the HUD program requirements that they had been seeking. Mr. Hinsberger said that when residents had been informed of the availability of vouchers, HUD could not change its position. He thought HUD would be sued by tenant advocacy groups. I told Mr. Hinsberger that I had talked with Rich Wheelock of the Legal Assistance Foundation and was assured that LAF wanted to support project based affordable housing not vouchers. Mr. Hinsberger's position was that once South Pointe residents knew that HUD intended to offer vouchers to South Pointe residents on October 1, 2001, as a practical matter the irrevocable decision had been made that HUD was not going to renew the HAP contract on October 1, 2001.

15. The Englewood losses claimed in this law suit are the revenues lost to Englewood from HUD's refusal to honor its obligations under the October, 2000 HAP contract.

They also include Englewood's loss of the equity and the value of the building and potential re-renewal of the HAP contract, which resulted directly from HUD's failure to fulfill its contract obligations under the October, 2000 HAP contract.

16. My understanding from reading local papers and complaints filed in the District Court is that HUD renewed an expiring HAP contract at the very troubled Lawndale Restoration project for five years in the Fall of 2004, the very time that the October 2000 HAP contract at South Pointe was scheduled to expire.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: June 30, 2005

DON S. SAMUELSON