**Englewood v. United States**
**03-2209**
**Joint Appendix**

# JA 035

U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

DEPARTMENTAL ENFORCEMENT CENTER
Chicago Satellite Office
77 W. Jackson Blvd., Suite 2207
Chicago, Illinois 60604-3507

Tel. (312)353-5895 Fax (312)886-1405

INTERNAL DOCUMENT ONLY

# FINAL ACTION PLAN
## South Ppointe Towers - Chicago, Illinois
## REMS #800040489 - PROJECT # 071-55028 Section 8# IL06E000034

EC Analyst: Ms. Freddie C. Batchelor
EC Team Leader: Joan Kiening
EC Attorney: Maria Baguio Cooper
EC Satellite Director: James Zale

Project Manager: Gwendolyn Thomas
MF HUB Director: Ed Hinsberger
________Community Builder: Loraine

Date Action Plan approved:

Action Plan meeting dates: March, 1999 (meeting held with Site Manager in HUD Office)
April 15 - 16, 1999 (site visit completed by analyst, team leader & attorney)
May, 1999 (analyst talked with CB regarding property)
June 11, 1999 (internal meeting held)

## PROBLEM STATEMENT

South Pointe Towers is a 303 unit, non-insured multifamily development, that is currently owned by PM One Equities. Robert Pendagrast is the General Partner. ~~Southpoint Towers is a 303 unit non-insured multifamily development that is currently owned by PM One Equities, Robert Pendagrast is the General Partner.~~ This property's fiscal accounting is budget based. It currently has a HAP contract that expires in 9-30-99. The REAC inspection was completed April 29, 1999. The Chicago Enforcement Center conducted their initial site visit a few days before the REAC inspection. Our site visit concluded that the property should have had a lower score than it actually received. It received a score of 42b*.

The building has an infestation of roaches and rats. There are leaking pipes throughout the building. ~~Throughout the building are leaking pipes.~~ The elevators are all non-operable. Using the elevators are the only way residents enter and exit their apartments. ~~The elevators are all non-operable, this is the only way residents exit out and in the building to get access to their apartments.~~ The common areas of this property were very severe. The mail boxes and fire extinguishers in the building were all damaged and some missing. There are also visible signs of moisture, mold and flaking. ~~There is also visible signs of moisture, mold and flaking.~~ There is graffiti all over the building and no lights in the hallways. This building is also a high drug and crime property.

There have been many people harmed due to guns, gangs and drugs. ~~There has been many persons harmed due to guns, gangs and drugs.~~ The City of Chicago Violent Crimes Division was contacted and this property has been referred to them by our Enforcement Center Office. ~~The City of Chicago Violent Crimes Division was contacted and this property was referred to them by our Enforcement Center Office.~~ They agreed to assign a team to this building. The population in this building is predominantly all African-Americans. Since the Enforcement Center's on-site review and the REAC inspection, our office received a letter from PM 1 (One). This letter indicates that they would like to be pro-active in correcting all deficiencies noted by the EC and REAC. ~~Since the~~

~~Enforcement Center's on-site review and the REAC inspection our office received a letter from PM-1 (One) stating they would like to be pro-active in correcting all deficiencies noted by the EC and REAC.~~ It is the EC's position that if this is what is desired, an escrow account should be set up earmarking the money for all identified repairs necessary and needed. ~~It is the EC's position that if indeed this is what is desired is an escrow account should be set up ear-marking the money for all identified repairs necessary and needed.~~ If this is not adhered to, we will go on with abatement of all Section 8 units. ~~If this is not adhered too then we will proceed with abatement of all section 8 units.~~ The building has deteriorated due to lack of regular and routine maintenance. These are serious Regulatory and HAP violations. ~~There are serious Regulatory and HAP violations.~~ A Comprehensive Needs Assessment (CNA) is needed for this property. ~~A comprehensive needs assessment is also needed for this property.~~ b

After careful review of all the circumstances surrounding this property it is recommended that we proceed with the following actions after the 30 day cure period and upon non-compliance:

a) Abatement of Section 8 units, and ~~abatement of section 8 units, and~~
b) possible sanctions for false claims of section 8 subsidy.

| | |
|---|---|
| REAC SCORE: | 42b* |
| # UNITS: | 303 |
| SECTION 8 UNITS: | 303 |

## *SECTION I*

| *ACTION ITEM* | *RESPONSIBLE ENTITY* | *TARGET COMPLETION DATE* |
|---|---|---|
| *DEC COMPLIANCE LETTER* | | |
| 1. Issue Notice of Violation of Regulatory Agreement & HAP contract. Letter should identify specific issues of non-compliance. Letter should have what the owner's prescribed actions are, who is responsible for what and specified time frames. (30 day cure) | MF HUB Project Manager (Bonnie Gee) | August 30, 1999 |
| a. Prepare Documents | EC Analyst (Ms. Freddie C. Batchelor) | September 30, 1999 |
| b. EC SOD Signature | EC SOD Dir. (Jim Zale) | |
| c. HUB Director signature | MF HUB Dir. (Preston Pace) | |

*(If owner does not comply, skip Section 2, and go to Section 3)*

## *SECTION 2*

***COMPLIANCE BY OWNER NEXT ACTIONS:***

1. Ensure that the owner provides required
escrows to correct physical problems. ~~escrow's to correct physical problems.~~ EC
Team Leader November 30, 1999
Joan Kiening

2. Monitor owner's progress in completing the necessary corrective actions.

| | | |
|---|---|---|
| b. monitor repairs against timeframes outlined in plan. | PM/EC Analyst | November 30, 1999 |
| c. report on owner's compliance | PM/EC Analyst | November 30, 1999 |
| 3. Owner to provide monthly update reports | Owner | August 30, 1999 |
| 4. Return project to HUB | EC Analyst | October 30, 1999 |
| 5. If owner fails to comply with the agreement by critical dates - property returned to the EC for re-negotiation or sanction. | MF HUB Dir.<br>EC Analyst | November 30, 1999<br>November 30, 1999 |

## *SECTION 3*

***NON-COMPLIANCE BY OWNER OR OWNER'S ALTERNATE PLAN DOESN'T MEET OUR SATISFACTION NEXT STEPS:***

1. Issue Declaration of Default of Regulatory Agreement & HAP contract. ~~(Agreement & HAP contract.~~ (Notice of Default Letter)

| | | |
|---|---|---|
| a. Prepare Documents | EC Analyst | November 30, 1999 |
| b. EC SOD Signature | EC SOD Dir. | November 30, 1999 |
| c. HUB Director signature | MF HUB Dir. | November 30, 1999 |
| 2. Request REAC/Pinnacle to verify whether the deficiencies in the project were corrected during the cure period of the notice of declaration default period" | EC Analyst/GTM/GTR | October 30, 1999 |
| 3. Meeting with Multifamily HUB Director and CB's of forthcoming actions (owner Non-compliance forces enforcement actions, ~~noncompliance forces enforcement actions,~~ possible relocation and pursue foreclosure). | EC Team Leader | September 30, 1999 |

4. Request Headquarters Multifamily Housing to abate Section 8 units. ~~to abatement section 8 units.~~

| | | |
|---|---|---|
| a. Prepare Documents | EC Analyst | October 30, 1999 |

| | | |
|---|---|---|
| b. EC SOD Signature | EC SOD Dir. | October 30, 1999 |
| c. HUB Director signature | MF HUB Dir. | October 30, 1999 |
| 5. Resident meeting, discussion of intention to abate/re-direct/suspend Section 8 assistance and resident's responsibilities. Include discussion of relocation if applicable. | | |
| a. Coordinate & set up meeting (include MF) | CB/HUB Dir. | September 30, 1999 |
| 6. Notify Section 8 Processing Center to abate/redirect/suspend Section 8 assistance. | | |
| a. Prepare Documents | MF HUB | November 30, 1999 |
| b. EC SOD Signature | EC SOD Dir. | November 30, 1999 |
| c. HUB Director signature | MF HUB Dir. | November 30, 1999 |
| 7. EC to determine whether any additional administrative actions are appropriate. 2530's, limited denial of participation and debarment (NOTE: This should be the last step in ALL follow-up actions) | EC Team | October 30, 1999 |

*__Section 4__*

*__Critical Dates for Owners to respond or submit materials to HUD__*

| | |
|---|---|
| 1. 30 day cure period is up | September 30, 1999 |
| 2. Agreement to set-up escrow accounts for all physical repairs | November 30, 1999 |
| 3. <u>Owner</u>~~Owners~~ provides monthly updates beginning | August 30, 1999 |

Concurrence:

______________________________

**Ms. Freddie C. Batchelor, Enforcement Center Analyst, Departmental Enforcement Center Chicago Satellite Office**

______________________________

**Ms. Joan Kiening, Team Leader, Departmental Enforcement Center, Chicago Satellite Office**

______________________________

**Ms. Maria Baguio, Attorney, Departmental Enforcement Center, Chicago Satellite Office**

______________________________ ______________

Mr. Gregory Gustin, Lead Attorney, Departmental Enforcement Center, Chicago Satellite Office

Ms. Gwendolyn Thomas, Project Manager, Cincinnati MF. HUB

~~Ms. Loraine Cooper, Senior Community Builder, Cincinnati Office~~

Approval:

Mr. James P. Zale, Director, Departmental Enforcement Center, Chicago Satellite Office

Mr. Edward Hinsberger, Director Chicago Multifamily HUB

Mr. Edward Kraus, Director Departmental Enforcement Center

**Englewood v. United States**
**03-2209**
**Joint Appendix**

# JA 036

# Initial Report

Prepared for the U.S. Department of Housing and Urban Development
Departmental Enforcement Center

**REMS # 800040489**
**South Pointe Towers**
**Chicago, Illinois**

Date Submitted: August 10, 1999

**Contractor:** Pinnacle Realty Management Company

D 0388

This document is for the proprietary use of the U.S. Department of Housing and Urban Development, and any use, distribution or copying of the material contained herein is strictly prohibited.

# Table of Contents

1 Executive Summary

2 Enforcement Center Questionnaire

3 Case Analysis

4 Site Visit Report

5 REAC Report

6 REMS Updates

7 Financial Review

8 Notice of Exigent Health & Safety

9 File Review Checklist

10 Supporting Documents

D 0389

# Executive Summary

**Basic Property, Owner and Management Information:**

| | |
|---|---|
| **REMS Number:** | 800040489 |
| **FHA Number:** | 071-55028 |
| **Property Name:** | South Pointe Towers |
| Property Address: | 6425 S. Lowe Ave.<br>Chicago, Illinois 60621 |
| Type of Property: | High Rise with Townhomes |
| Number of Units: | 303 |
| Number of Buildings: | 1 |
| Year Built: | 1972 |
| Mortgage Status: | Not FHA Insured, Current as of 12/31/97, Unpaid Principal Balance $5 million as of 12/31/97 (Multiple mortgages and Notes). HUD's only interest is in the HAP Contract. |
| Final Mortgage Endorsement | N/A |
| Original Mortgage Amount: | N/A |
| Section of the Act: | Low Income Housing Tax Credits, Not FHA Insured or HUD-Held. HUD's only interest is in the HAP Contract. |

Subsidy Contract Information:

| Contract Number | Number of Units | Expiration Date |
|---|---|---|
| IL06-E000-034 | 303 | October 21, 1998 |

| | |
|---|---|
| **Owner:** | Englewood Terrace Limited Partnership |
| Owner Contact: | Robert Pendegast |
| Dates of Ownership: | April 1, 1991 to present |
| **Management Agent:** | Property Management One, Ltd. |
| Agent Contact: | Michael G. McGhie, President |
| Identity-of-Interest: | Yes |
| Dates of Service: | April 1, 1991 to present |

**Description of the owner's non-compliance with HUD requirements.**

The following instances of owner non-compliance have been identified in the property file documents provided by the Departmental Enforcement Center. When applicable, contractor observations and analyses are presented.

Below each numbered instance of non-compliance is a concise description of the following:

- Citation of Housing Assistance Payments (HAP) Contract violations
- Magnitude or extent of the problem
- Documents related to the problem and their content
- Status of the problem

D 0390

**The owner is not maintaining and operating the contract units and related facilities to provide decent, safe, and sanitary housing.** This is a violation of paragraph 6(a) of the Section 405(a) HAP Contract.

**Magnitude or extent of the problem:**

HUD REAC Inspection cites a total of seven "severe" findings for the site, and seven "major findings. The contractor's May 19, 1999, site visit revealed that the owner had not corrected the following severe findings. (The contractor performing the site visit was directed by HUD to view exterior findings only. No units were visited to determine outstanding items addressed in the REAC Report).

1. Mailboxes are damaged
2. Graffiti throughout the site
3. Elevators inoperable
4. Missing fire equipment
5. Corridor door damaged

The owner had not corrected the following "major" findings.

1. Damaged fencing at rear of property
2. Broken lighting fixtures
3. Parking lot cracks
4. Exterior doors are damaged
5. Hallway ceilings damaged
6. Hallway floors damaged
7. Hallway walls damaged

**Documents related to the problem and their content:**

- HUD REAC Inspection
- Contractor's Site Visit conducted May 19, 1999.
- December 19, 1996, HUD physical inspection (form HUD-9822 in file)

**Status of the problem:**
The owner has not corrected conditions that adversely affect the provision of decent, safe, and sanitary housing as required by the HAP Contract. These conditions were reported in HUD's REAC Inspection Report and December 19, 1996, physical inspection report.

D 0391

## Property Description

| | |
|---|---|
| REMS Number | 800040489 |
| FHA Number: | 071-55028 |
| Property Name: | South Pointe Towers |
| Property Address: | 6425 S. Lowe<br>Chicago, Illinois 60621 |

### Neighborhood Description

This property is a physically distressed development in a very dangerous neighborhood. The property has a deserved reputation of having been drug infested and controlled by gangs, who control the drug trade. The contractor's site visitor was greeted at the site visit by an off-duty Chicago Police who provided security at the site.

The building is currently in a state of transition. The agent has "locked down" the building with a new security service, and is actively pursuing evictions for cause, as well as non-payment. This has removed twenty plus undesirables from the building with another half dozen in process, waiting to be served. This has also brought death threats to the agent's staff, and led to the change in site security to off-duty Chicago Police officers as of Mid-April. The officers are armed, have powers of arrest, and are actively involved in gaining control of the site.

The evictions have added to a territorial dispute for the dealers. Since the demand for drugs is unabated, other dealers have replaced the dealers who have been ousted.

The security service is currently very active in responding to complaints, and in controlling the traffic into the building. The dealers had previously been able to pay off the security service or threatened the service into inactivity.

The area surrounding the site is in similar poor condition. The area is severely economically depressed with no signs of investment in the immediate neighborhood in years. Immediately across the street from the development is a grade school, which appears to be in good condition and is separated from the neighborhood by a substantial fence. Other significant structures in the area would be a Chicago Housing Authority High Rise for seniors, a largely vacant shopping district, and a CTA elevated train stop. Much of the area is vacant lots, and unimproved older housing stock. There is no chain presence for shopping, fast food, or services for the area, and very little in the way of independent stores in the area.

The area is not anticipated to change from its present position for the foreseeable future.

### Ownership and Management History

| Name of Owner | Dates of Ownership |
|---|---|
| Edgewood Terrace Limited Partnership<br>8137 W. Grand River<br>Brighton, Michigan 48116-9392<br>Contact Person: Robert J. Pendergast | April 1, 1991 to present |

| Name of Management Agent | Dates of Ownership |
|---|---|
| Property Management One, Ltd.<br>Contact Person: Michael G. McGhie, President<br>5215 Jolly-Cedar Court<br>Lansing, Michigan 48911 | April 1, 1991 to present |

Previous Management Agents:
None

Description of ownership

According to the 1997 audited annual financial statement, the partnership was formed as a limited partnership under the laws of the State of Michigan on September 1, 1989, for the purposes of acquiring an interest in real property located in Chicago, Illinois and operating an apartment complex under Section 8 of the National Housing Act. Business activity of the project began on April 1, 1990. The general partner is The P.M. Group, Inc. The general partner, as of December 31, 1997, was owed $1.45 million for development fees and nearly $300,000 for cash advances made to the property. The P.M. Group, Inc, also pledged $1.2 million in certificates of deposit as collateral for bank loans to the property.

The limited partner, Chevron U.S.A., Inc., was obligated to contribute $5 million to the project for its 99% interest. Chevron's annual capital contributions are scheduled to end June 2000. In connection with the acquisition and rehabilitation of the project, the partnership was eligible for low income housing tax credits totaling $872,693. The credit period is ten years and began in 1993.

Description of management

The management agent, P.M. One, is an identity-of-interest entity. The file contains a management certification submitted by the owner and agent. The term was from January 1, 1996 through December 31, 1997.

On September 5, 1995, the management agent submitted a Management Entity Profile to HUD. At 12/31/97, the project owed management fees of $366,519.

Financial Condition

The financial viability of the property based on current Section 8 rental assistance for 100% of the units cannot be evaluated. Since the property is not FHA insured, there is no reserve fund for replacements. The debt structure is complex and repayment depends substantially upon the limited partner's capital contributions. No major problems related to tenant accounts receivable or accounts payable (nearly 60% owed to the management agent) were identified. The 1997 statement is missing the asset side of the balance sheet making it necessary to rely on data provided in notes under funds in financial institutions--nearly $300,000, an amount adequate to pay trade payables.

The auditor reported that Tenant Security Deposits were being used as collateral for a short-term note (repeated finding).

Using the calculation of financial viability for 1998-2002, as detailed below, and based on the continuation of 1997's levels of net operating income, this analysis suggests that, after all capital contributions are received from Chevron, the project covers its 1st mortgage at only 1.10 and cannot make the full required payments on the Michigan National Bank notes (toward which the General Partner has pledged over $1 million in CD's.)

Estimate of project financial viability 1998-2002, assuming continuation of 1997 levels of NOI.

| Amounts ($000 omitted) | 1998 | 1999 | 2000 | 2001 | 2002 |
|---|---|---|---|---|---|
| | | | | | |
| Net Operating Income (1997 level) | 768 | 768 | 768 | 768 | 768 |
| Plus Chevron Capital Contribution | 625 | 625 | 625 | 0 | 0 |
| Note payable Capital Natl. Bank | -35 | 0 | 0 | 0 | 0 |
| 1st Mortg (Community Inv. Corp) | -693 | -693 | -693 | -693 | -693 |
| Note A (Michigan Natl. Bank) | -60 | -60 | -60 | -60 | -60 |
| Note A interest (assumes 7%) | -70 | -66 | -62 | -58 | -54 |
| Note B (Michigan Natl.' Bank) | -250 | -250 | 0 | 0 | 0 |
| Note B interest (assumes 7%) | -30 | -12 | 0 | 0 | 0 |
| Note C (CMP Trust) | -16 | -15 | 0 | 0 | 0 |
| Note D (CMPP Trust) | -14 | -14 | -13 | 0 | 0 |
| | | | | | |
| Operating Cash Flow | 225 | 283 | 565 | -43 | -39 |

## Physical Condition

On May 19, 1999, the contractor conducted a site visit. The development had a number of deferred maintenance items. Foremost among these was the current elevator system. The three elevators were at the end of their useful lives. At the time of the site visit one elevator was working, one completely down, and one operable only by maintenance with a key. The agent had plans for the rebuilding of one elevator--the others would remain in their original condition.

The building has tiled floors throughout, cinder block walls, and exposed supply lines along an unfinished ceiling. The hallways and stairwells were recently painted, however every stairwell had been vandalized with graffiti and incidental damage to lights and fire equipment. The cost of repainting the graffiti and repairing the lights daily was an added expense. There was a problem with bug infestation, despite ongoing extermination by a contractor. The laundry area was dirty and damaged.

The exterior of the building was in adequate condition. The reinforced concrete walls had some settlement cracks, but showed no visible signs of spalling or deteriorating rebar. The roof was a non-ballasted, composite material that was mechanically fastened at the coping, and without apparent seam problems. The southeast ceiling of the top floor showed water penetration problems.

The REAC inspection showed a total score of 42 points out of a possible 100. Five points were given for the "site" out of a possible 13.6. The findings for mailbox damage, graffiti, damaged fencing, and broken lights all still exist. The inspection also gave 9.8 of 16.8 possible points for the" Building Exterior". The only major finding was for damaged doors, which still exist. The building received 0 out of a possible 22.1 points for "Building Systems". No points were given for two severe findings, 1) Missing fire extinguishers 2) Inoperable elevators. These conditions still existed although the extinguishers had all been collected for recharging and replacement. One elevator was slated for overhaul this summer. The common areas collected 3.1 of a possible 10.9 points. Three severe and three major findings were found. The severe issue that remained open is door damage on the 22nd floor. Open "major' findings included damaged hallway floors, damaged hallway ceilings, and damaged hallway walls. The apartment units garnered 24.2 out of a possible 36.7 points.

The site was in a condition similar to that indicated on the REAC inspection. Work was in progress to address the most serious issues of the fire extinguishers, and the elevator, though the condition at the site visit was unimproved. An inspection by the Chicago Fire Marshall was going on concurrently with the site visit. They verbally cleared the property of violations.

In summary, there were a total of seven "severe" findings for the site, and seven "major findings. The owner had not corrected the following severe findings.

1. Mailboxes are damaged
2. Graffiti throughout the site
3. Elevators inoperable
4. Missing fire equipment
5. Corridor door damaged

The owner had not corrected the following "major" findings.

1. Damaged Fencing at rear of property
2. Broken Lighting Fixtures
3. Parking lot cracks
4. Exterior doors are damaged
5. Hallway ceilings damaged
6. Hallway floors damaged
7. Hallway walls damaged

Many of the findings will represent ongoing repairs throughout the life of the property. Unless the vandalism is curtailed there will always be a lot of damage repair that is ongoing in perpetuity.

On March 26, 1998, HUD informed the owner of the results of its November 19, 1997, site visit. HUD stated that "The review revealed that management has resolved the items listed in our report dated December 19, 1996."

On March 20, 1998, P.M. One, management agent, wrote HUD requesting written correspondence stating that all physical conditions were met based on HUD's November 19, 1997, re-inspection.

On November 19, 1997, HUD conducted a site visit to re-inspect items on the December 19, 1996, physical inspection report. The file contains a Trip Report that states "The items listed in this report appear to have been resolved since that inspection. The stairwells (walls and stairs) in particular have been painted 'in spots' to cover up the re-occurring graffiti. This re-inspection did not include any of the units or common areas mentioned in the December 19, 1996, report."

On December 19, 1996, HUD conducted a physical inspection of the property (form HUD-9822 in file). The overall rating was below average. The file does not contain a letter transmitting the report to the owner. The most significant problems were as follows:

1. Fire extinguishers missing and cases damaged
2. Magnetic fire doors propped open by tenants using wedges
3. Hallways and stairwells dirty and littered
4. Stairwells need paint
5. Air handler needs repair
6. Compactor room dirty
7. Boiler room dirty and not properly maintained
8. Laundry room exhaust tubing and drain covers require repairs

On March 10, 1995, HUD informed the owner of the results of its October 21, 1994, physical inspection. The overall rating was satisfactory. The most significant problems were as follows:

1. No fire hoses in any cabinets
2. Elevator rehab (two elevators planned)

On May 15, 1995, P.M. One, management agent, responded to HUD's March 10, 1995, physical inspection correspondence by submitting a MIO plan to correct the deficiencies cited in the October 21, 1994 report. The MIO plan did not address the missing fire hoses or budget for the planned elevator rehab.

Management and Operations

On May 19, 1999, the contractor conducted a site visit. The site manager has been on site for three months, and with the support of the area supervisor has implemented over twenty evictions for cause. The cause has generally been for violation of the drug addendum to the lease, though some squatters have also been turned out. The agent has taken a tough stand, in tenant selection, security, and in lease enforcement; that was obviously not the case in the past. Tenant selection now includes criminal background checks, and home visits to improve selection.

The receivable process is standardized. The rents are due on the first, late on the sixth, with a late fee added on the sixth. The collections are very strong; there is less than $1500 in receivable for the month, on gross rents of approximately $214,000. No cash is accepted, and deposits are made daily for checks and money orders.

The site manager makes payables from a central management office, with the requisite approval. Account reconciliation is conducted by the home office and checked by the area supervisor and site manager. The system has adequate checks and balances.

Occupancy at the time of the site visit was 94%. There are currently 20 vacant apartments of which 3 are off-line because of heating problems. The vacancies are the result of the recent evictions, and are not the norm for the site. The agent believes that the apartments can be market-ready and filled within a month.

The apartments are fairly spacious, with adequate demand in the marketplace. There is a ready pool of Section 8 applicants in the area.

The curb appeal of the development is minimal, and would not be attractive to a market renter with other options. The overall first impression of the site is one of a penal institution, very stark. Vandals have destroyed any plantings made by the agent. Vandals destroyed the railings that protected the plants.

The file does not contain any HUD management or occupancy reviews.

Rent Subsidy

Section 8 Contract Number: IL06-E000-034, between HUD and Englewood Terrace Partnership, an Illinois Limited Partnership. Effective date September 22, 1982.

On November 1, 1997, HUD and the owner executed a Section 405a Housing Assistance Payments Contract. Unit types and rents were as follows:

- 60 units, 1-bedroom: $648 contract rent, $25 utility allowance, $673 gross rent
- 140 units, 2-bedroom: $727 contract rent, $31 utility allowance, $758 gross rent
- 17 townhouse units, 2-bedroom: $799 contract rent, $36 utility allowance, $835 gross rent
- 80 units, 3-bedroom: $800 contract rent, $43 utility allowance, $843 gross rent
- 6 townhouse units, 3-bedroom: $866 contract rent, $52 utility allowance, $918 gross rent

Effective March 1, 1996, HUD approved a special rent adjustment for non-drug related crime prevention/security measures. Unit types and rents were as follows:

- 60 units, 1-bedroom: $651 contract rent, $32 utility allowance, $683 gross rent
- 140 units, 2-bedroom: $730 contract rent, $36 utility allowance, $766 gross rent
- 17 townhouse units, 2-bedroom: $820 contract rent, $53 utility allowance, $873 gross rent
- 80 units, 3-bedroom: $804 contract rent, $48 utility allowance, $852 gross rent
- 6 townhouse units, 3-bedroom: $870 contract rent, $75 utility allowance, $945 gross rent

Effective September 22, 1995, HUD approved a rent increase. HUD stated that "any future rent increase will not be processed without a utility analysis." Unit types and rents were as follows:

- 60 units, 1-bedroom: $603 contract rent, $32 utility allowance, $635 gross rent
- 140 units, 2-bedroom: $676 contract rent, $36 utility allowance, $712 gross rent
- 17 townhouse units, 2-bedroom: $743 contract rent, $53 utility allowance, $796 gross rent
- 80 units, 3-bedroom: $744 contract rent, $48 utility allowance, $792 gross rent
- 6 townhouse units, 3-bedroom: $806 contract rent, $75 utility allowance, $881 gross rent

On August 18, 1994, HUD approved a rent increase "reflecting the special adjustment for tax consulting services previously granted on July 7, 1994."

<u>Tenant Relations</u>

On May 19, 1999, the contractor visited with several residents during its site visit:

> Ms. Landry of 2211 is a two-year resident with two children. She thinks that the property is getting better with the new manager. The manager has been able to remove some of the bad element, although there are still problem tenants. She said you have to remove the weeds for the garden to be able to grow. She wishes there was a playground at the site and that they would fix the elevators.
>
> Tanya McGee, a long-term resident, occupies a townhouse unit with a separate entrance. She thinks that the building is improving of recent, with better security, and safety. Several times in the winter there was no domestic hot water on the weekend. She is troubled by residents who throw garbage out their windows and into her entry area. The garbage has included TV's, animals, and diapers.
>
> Ms. Minnie Johnson of 702 is a sixteen year resident of the development. She has two children and wishes that there were a play area for the children. She said that there is ample heat at the site, things were repaired when you called, but that several calls were sometimes needed. She is aware of the local gang problems although they do not bother her.
>
> Ms. Bryson lives at 6447, a townhouse unit. She is an active tenant in relaying information on suspicious activities to security and management.
>
> An unnamed resident approached the contractor's site visitor while in the entryway and volunteered that the elevators were always broken and needed to be fixed for good.

The file does not contain documents related to tenant relations.

| Item No. | For each "M" and "I" item checked, Describe findings and give recommendation for correction. Explain any "Below Average" or "Unsatisfactory" rating. Use photocopies of page 3 as continuation sheets, if necessary. | Date Completion Verified |
|---|---|---|
| A1 | The physical condition of the property is prison-like. There are armed guards at the entry that review all traffic. The hallways are cleaned with bleach and very institutional in lighting, cinder block walls, and unfinished ceilings. There is much graffiti throughout. | |
| A5 | Units are in hard shape judging from the current vacancies. Extensive repairs, cleaning, and paint are needed for most turnovers. This results in higher cost in time, materials and effort. | |
| A8 | Armed Chicago Police guard the main entry 24 hours a day. The building has the reputation of having an active drug trade. Because of the demand for drugs there are dealer problems as the gangs maneuver for selling rights. | |
| B11 | The agent is trying to lock out the drug dealers through evictions. The evictions and number of turnovers are blowing out the budget. | |
| C20 | Current tenant selection is more stringent, criminal background checks, credit checks, landlord verification, and home visits. | |
| E35 | There is no physical evidence of drug sales. Conversations with staff and residents indicate that the building has active drug use, dealer in-fighting for territory, and great danger in possible retaliation to any who interfere.<br>Past security had been coerced to inactivity through bribes and threats. The Chicago Police Officers have been on-site since mid-April and have tightened up security. | |