**Englewood v. United States**
**03-2209**
**Joint Appendix**

# JA 101

for the above captioned project.

I have requested and received a letter from Renzi and Associates explaining the use of market rate comparables in subsidized and rent restricted properties. Also the names and telephone numbers of the individuals contacted at these properties. Attached to the Rent Comparability Study is the letter from the appraiser.

In summary, it appears that Renzi and Associates is in compliance with Hud Notice Hoo-12 and that the Rent Comparability Study is acceptable for the above captioned project.

----- Forwarded by Gregory G. Gustin/DEC/CHI/HUD on 10/11/01 11:58 AM -----

**Edward Hinsberger**
10/11/01 09:21 AM

To: Gregory G. Gustin/DEC/CHI/HUD@HUD
cc:
Subject: Re: South Pointe Towers, Chicago, IL, #071-55028, REMS #800040489, Section 8 #IL06-E000-034, REAC PI #109997 of 03-02-01, Score 31c*.

----- Forwarded by Edward Hinsberger/HSNG/CHI/HUD on 10/11/01 09:27 AM -----

**Veronica Coleman**
10/01/01 03:26 PM

To: Edward Hinsberger/HSNG/CHI/HUD@HUD
cc:
Subject: Re: South Pointe Towers, Chicago, IL, #071-55028, REMS #800040489, Section 8 #IL06-E000-034, REAC PI #109997 of 03-02-01, Score 31c*.

The message below went to HQ when they were requesting information on certain properties to determine if we handled the situation properly according to our new protocols for DEC and REAC.

Richard Pace coordinated this for Ken Hannon.

VC

----- Forwarded by Veronica Coleman/HSNG/CHI/HUD on 10/01/01 03:21 PM -----

**Veronica Coleman**
08/01/01 07:47 AM

To: Richard C. Pace/HSNG/HHQ/HUD@HUD
cc: Gwendolyn X. Thomas/HSNG/CHI/HUD@HUD, Kenneth F. Hannon/HSNG/HHQ/HUD@HUD, Margaret P. Keels/HSNG/HHQ/HUD@HUD, Delon A. Green/HSNG/HHQ/HUD@HUD, Richard C. Pace/HSNG/HHQ/HUD@HUD
Subject: Re: South Pointe Towers, Chicago, IL, #071-55028, REMS #800040489, Section 8 #IL06-E000-034, REAC PI #109997 of

A 1755

03-02-01,
Score 31c*.

Richard,

In short, the owner did not comply and we've taken several administrative actions that include:

Second referral to the DEC (This was an elective referral)
Ordered vouchers
Flagged the owner
Rejected plan
Change of management and
We are requiring them to bring in new ownership, should they resubmit a suitable plan.

This is a non-insured property that needs substantial rehab. The plan to bring it in for mortgage insurance and rehab the property was established while in the DEC as an elective referral. The property was returned to the Hub with a plan instructing the owner to address the rehab of every unit as well as the entire building and he did not. We rejected his application for mortgage insurance due to the scope of work being limited, which would not solve the problems longterm.

Our file is rather large and we will overnight the information to show the above actions. Please let us know just how much information you want on this one because we do have alot of stuff.

VC

Richard C. Pace

Richard C. Pace
07/30/2001 01:06 PM

To: Gwendolyn X. Thomas/HSNG/CHI/HUD@HUD, Veronica Coleman/HSNG/CHI/HUD@HUD
cc: Kenneth F. Hannon/HSNG/HHQ/HUD@HUD, Margaret P. Keels/HSNG/HHQ/HUD@HUD, Delon A. Green/HSNG/HHQ/HUD@HUD, Richard C. Pace/HSNG/HHQ/HUD@HUD
Subject: South Pointe Towers, Chicago, IL, #071-55028, REMS #800040489, Section 8 #IL06-E000-034, REAC PI #109997 of 03-02-01,
Score 31c*.

Gwen,

Please fax us a copy of the Owner's Certification that repairs have been completed, the Survey, MIO Plan or any other
Plan, and any related documentation asap. We look forward to your reply. Thank you.

Richard
Business Relationships and Special Initiatives Division
FAX #1-(202) 708-1776

A 1756

----- Forwarded by Gregory G. Gustin/DEC/CHI/HUD on 10/11/01 11:58 AM -----

**Englewood v. United States**
**03-2209**
**Joint Appendix**

# JA 102

DSSA

310 NORTH MILWAUKEE AVE.
LAKE VILLA, IL 60046
(847) 356-7800 • FAX (847) 356-8791
E-MAIL: DSSA310@AOL.COM

August 6, 2001

Edward Hinsberger
Housing and Urban Development
77 West Jackson Street
Chicago, Illinois 60601

Re: South Pointe Workout

Dear Ed:

There are four major problem areas at South Pointe. **First**, there are a variety of physical problems: the layout of the first floor, the security and life safety systems, the design and function of the mechanical systems in the penthouse, exterior spalling and tuckpointing, improvements to be made to the individual units, and a general upgrading of the decorating and curb appeal of both the exterior, grounds and common areas. **Second**, there are a number of tenant related costs that need to be brought under control: vacancy, collections, evictions and associated legal costs. **Third**, both the staff and resident populations need to be better managed. The staff is relatively non-productive. Security is not effective. The residents need the discipline of certification, meeting antisocial behavior and housekeeping standards and general compliance with house rules and lease requirements. **Fourth**, the ten year amortization of the CIC first mortgage loan and its current principal payments of greater than $500K a year puts an unreasonable burden on current operations. The property has not had a rental increase since 1998. And it has been running for the past two years at a $134K to $241K annual deficit. Cash deficits, past due bills and deferred maintenance result from the current financing structure.

**Physical Problems.**

Previous discussions between the current owner and HUD have resulted in a situation where the owner has proposed $3,514,568M in improvements and HUD has responded that there are $6,221,800M in needed improvements (Exhibit A).

The current condition of the penthouse is inefficient and dangerous. The space is limited by an abandoned boiler and heat distribution system as well as a second system installed in 1992. There is not sufficient air circulation in the penthouse to enable the mechanical systems to be operated properly, and room to maintain/repair the equipment. Access to both penthouse floors is limited and difficult. One is a wall mounted hand ladder from the garbage chute area on the 22nd floor and the other is an exterior ladder to the upper penthouse area. The egress to the roof is similarly limited.

The first floor needs program/space planning and decorating. The security system is labor intensive, expensive, and without the help of effective locks, intercom and

surveillance support systems. There are excellent opportunities on the first floor for meaningful community spaces for day care, a computer learning center and other resident services. The existing spaces are poorly designed, programmed and decorated. The piping at the corridor at the south end of the first floor needs to be modified to provide an acceptable head clearance.

A comprehensive survey has been conducted of the building to assess the physical condition of paving and walks, brick walls, the condition of the columns and spandrels, corridors and stairwells and the needs of the individual units. While there may be some debate as to the extent of the work needed today in the units, it seems appropriate to make the key replacements of cabinets, appliances and exterior doors, and to fund a replacement reserve to an adequate level to permit a "unit prep" team, under the control of management, to do the kitchen and bath fixture replacement and all of the other almost "punch list" repairs that will be required to prepare the units for reoccupancy.

Exhibit B is a summary of the proposed work program developed by architect Ted Dunaj and Babco Construction in the HUD trade payment breakdown format. Preliminary work plans have been prepared by Ted Dunaj. A narrative summary of the improvements needed at the property has been developed by Babco Construction as Exhibit C.

Financial Problems.

The property is currently faced with significant financial problems. There has been no rental increase since 1998. Deficits have been growing and there is a high level of past due bills. A general summary of the operating economics of the property shows:

| | Actual Year 1999 | Actual Year 2000 | Actual YTD /Forecast Year 2001 |
|---|---|---|---|
| Gross Possible Rent | $2,681,268 | $2,681,268 | $2,681,268 |
| Net Rents | $2,551,499 | $2,615,913 | $2,558,382 |
| Other Income | $ 57,765 | $ 17,414 | $ 31,773 |
| Net Income | $2,609,264 | $2,633,327 | $2,590,156 |
| Expenses | $1,799,931 | $1,873,457 | $1,901,530 |
| NOI | $ 809,333 | $ 759,870 | $ 688,626 |
| Interest | $ 332,028 | $ 275,117 | $ 239,256 |
| Principal | $ 461,389 | $ 556,843 | $ 597,812 |
| Cash Flow | $ 15,916 | $ (72,090) | $ (148,442) |
| Improvements | $ 150,683 | $ 89,151 | $ 92,898 |
| Net Cash Flow | $ (134,767) | $ (161,241) | $ (241,340) |

A detailed summary of the past annual operating economics at South Pointe for 1999, 2000 and 2001 is contained in Exhibit D. There are significant operating deficits that

have resulted in part from the absence of any rental increase since 1998. The operating deficits have been met by the deferral of property management fees and other property obligations as well as the deferral of needed repairs and other maintenance requirements. The needs of the property exceeded the limited means. The actual financial operations for 2000 are contained in **Exhibit E. Exhibit F** contains numbers for 2001 – "actual" operating results for the first half of 2001 and "projections" for the second half of 2001. The property's "past due bills" to third parties (other than the PM Group for accrued but unpaid management fees) as of 6/30/01 is in the range of $400K to $500K.

**The Need for a Rental Increase.**

A successful workout at South Pointe will require a rental increase of approximately $50 pu/pm. It is justified on several grounds. First, South Pointe is operating in 2001 on a 1998 rent schedule schedule. There have been three years without a rental increase. Second, project operations have resulted in deficits of between $100K and $250K a year in 1999, 2000 and estimated 2001. Third, rent comparables in the neighborhood – in particular the property immediately to the south would support a rental increase at South Pointe of approximately $50 per unit per month. Such an increase would increase income potential by $180K per year, enough to offset the operating deficits that have been experienced in past years. The analysis of comparable units supporting this rental increase is summarized in Exhibit G.

**Application for an FHA Insured Loan and a Rental Increase.**

**Exhibit H** is an application prepared by Developer's Mortgage for an FHA insured loan of $10M. It assumes a construction rehabilitation program of $6.5M, made up of immediate improvements and the full funding of Replacement Reserves for completion of individual unit improvements and cycle replacements, similar to the Mark to Market format. It assumes the refinancing of the current CIC and Michigan loans of $2.5M. And it assumes $1M for transactional costs, fees, construction interest and the funding of past due bills an redevelopment period operating losses.

**Projection of Income and Expenses for 2002**

The projection of income and expenses for the redevelopment period during 2002 is contained in **Exhibit I.** A rental increase of $50 per unit per month is projected for 1/1/02. A 5% vacancy level has been assumed for the end of the development period, when unit upgrades have been completed and resident services program have been installed. Security costs are gradually reduced starting in 2002 as a result of investments made in the physical security system. The personnel costs will remain constant throughout the year, although some of the personnel costs will be reallocated to resident services and the management of the on-site computer learning center. The debt service for the redevelopment period will be substantially reduced. There will be interest costs related to the refinancing of the existing debt. The interest costs associated with the redevelopment program will be capitalized in the FHA loan. The additional net cashflow

from the combination of the rental increase and the capitalization of construction interest costs during the redevelopment period will create cash flow that can be used to pay off the current high level of unpaid past due bills.

**Stabilized Operations – 2003 and Subsequent Years.**

**Exhibit J** is the projection of stabilized operations in 2003. The basic rent potential – after the rental increase of $50 pu/pm will be $2,907,600. After making adjustments for vacancy and collection losses and "other income," Total Income will be $2,768,748. If we build in a contingency to our 2003 expense projections of $90K and assume 2003 expenses to be $1,850,048 – similar to the existing level despite efficiencies to be gained in security, tenant related costs and maintenance functions related to improvements – we will have stabilized NOI of $918K.

Ninety percent (90%) of the NOI of $918K is $826,200. If $826,200 is divided by the 7% interest rate, 40 year amortization constant of .0789, the mortgage which can be supported is $10,471,482. If a more conservative interest rate of 7 ½% is assumed – a constant of .0839 will support a mortgage of $9,847,437.

While neither the construction nor income/expense numbers are "hard" at this time, they are reasonable, they have been developed by experienced people, and they can be converted into very firm numbers, contracts and plans to support a full and formal FHA insurance application in a short amount of time.

**Resident Relations and Services.**

DSSA's approach to housing is more comprehensive than just looking at the structural requirements of the building. We are serious about developing "human capital" in the HUD and public housing properties that we own and manage by creating service programs, staffing the program with a concierge or Service Connector, and connecting the residents to community resources. The concepts underlying the HUD Neighborhood Networks programs are sound. We believe in them. Our approach to service enriched, and service and neighborhood "connected" housing is described in **Exhibit K.**

In applying this approach to South Pointe, there is an excellent opportunity to use the first floor space to provide resident service. For a property such as South Pointe a day care center and Neighborhood Networks computer learning center would be appropriate. Additionally, to assist residents to be on the right side of the "Digital Divide" and to have full access to technology for employment and social purposes, DSSA would propose to make South Pointe a "smart building" with a switch and broadband access to the individual units to support computers and other broadband applications in the individual units. There is also the opportunity to demolish the existing garage at the south end of the property, and to create outside recreational and green space, that could complement general landscaping and decorating improvements at the lobby and entry area and throughout the property.

Additionally, DSSA would conduct a serious recertification and lease compliance initiative, similar to the program designed by the CHA in its Plan for Transformation, which we have been implementing successfully at Stateway Gardens. DSSA's use of a concierge service to support, assist and motive residents to take charge of their lives and organize them into a market for existing services, help them to develop personal growth plans, and then to connect them to the appropriate community resources, education and training centers and jobs is described more fully in **Exhibit L**.

A combination of appropriately tailored resident services is particularly important to the residents at South Pointe, where there are large numbers of single parent families and unemployed residents.

**Potential Positive Impact on the Community.**

The Antioch Church has upgraded 63rd Street from the Dan Ryan to the elevated through its various townhouse and apartment programs. The Kennedy King Community College is planned to be relocated to 63rd and Halsted. The City has committed some significant resources to the areas surrounding 63rd and Halsted. Were South Pointe to be successfully rehabilitated as planned, and its efforts connected to the primary school across the street and the adult education programs at Englewood High School and Kennedy King College, it could act as a powerful community development engine that could help the efforts of the apartment development to its south and the CHA senior building to the southwest of the property. The HUD Neighborhood Networks program would be designed to connect residents of South Pointe to all of the educational, training and health support systems available in the area between the Dan Ryan and Halsted Streets, between 59th and 67th Streets.

As you recall, DSSA was responsible for the development of the West Town Learning Network as part of its work at Northwest Tower during 1996 into 1999. A DOE Technology Challenge Grant was obtained by CPS as a result of this effort. While the program as implemented was less effective as the program as designed, there is the opportunity at South Pointe to build on this prior experience and to create in fact the type of Neighborhood Learning, Employment, Business Incubation and Public Safety Network that was planned by DSSA at various times for West Town and Bronzeville **(Exhibit M)**. Having an ownership interest in a property – rather than a contract relationship with a resident group as consultant and management agent – is an important difference in the circumstances of the two situations.

**Substitution of General Partner – Restated and Amended Partnership Agreement.**

South Pointe represents some of the same programming and structural issues which DSSA experienced at New Kensington in Schaumburg (1991 through the sale in 1999), and at Niles Terrace in Waukegan (1994 purchase, 1997 LIHPRHA sale) and at Northwest Tower in West Town (1996 through June of 1999). The plan is to have an affiliate of DSSA replace the PM Group as the General Partner in the ownership partnership and to restate and amend the current partnership agreement to give DSSA the

combination of risks and incentives that will insure the successful implementation of the planned redevelopment program. A description of the New Kensington deal structure at Schaumburg which we plan to adapt to South Pointe is contained in **Exhibit** N. The DSSA purchase of the PM Group General Partner interest would be conditioned upon the agreement of both the PM Group and Chevron (the current Limited Partner) to such a structure. DSSA has been involved in a number of substitution of GP positions in both HUD and IHDA troubled projects in Illinois and other Midwestern states. All of these troubled project workouts have been successful. In all of the cases we have developed investor communications and amended partnership agreements similar to the structure developed at New Kensington.

Because of the fifty year use restriction imposed on South Pointe as a result of the 1992 refinancing there is no prospect of residual value. Since management fees have costs and only "net" profits, it is important that this deal be structured so that there are "values" to DSSA in this transaction related to meaningful tax losses and cash flow that can be generated through operating efficiencies. The negotiation of the allocation of future tax losses with Chevron will require DSSA to provide Chevron with some guarantees for the remaining five years of the Tax Credit compliance period. There will be real economic incentives for DSSA to operate South Pointe in an efficient and professional manner through its indefinite future.

If you regard the combination of a rental increase and FHA insurance as feasible, we will go ahead and finalize the purchase of the GP interest from the PM Group, proceed into an accelerated due diligence process, seek the consents from Chevron for the replacement of the GP interest and the amended and restated partnership agreement, and prepare for a closing in early October. I would be happy to meet with you and others at HUD at your earliest convenience to go over your questions, suggestions, etc. I gather it is important to everyone concerned that we move quickly on this matter, and that everyone understand the official HUD position with respect to the conditions under which HUD will agree to renew the current HAP contract.

If you would get back to me promptly with your response to this "plan," I would be happy to convert it – on an accelerated time schedule – to the formal applications, contracts, schedules and plans that will be required to converted this plan into a series of operational programs.

Sincerely,

Don S. Samuelson

**Englewood v. United States**
**03-2209**
**Joint Appendix**

# JA 103

Attachment 2

U.S. Department of Housing and Urban Development

Office of Housing

Project-based Section 8

FEDERAL FISCAL YEAR 2001

ENERGY LUMP SUM ADJUSTMENT

SUPPLEMENT TO HAP CONTRACT

1 CONTRACT INFORMATION

PROJECT

Section 8 Project Number IL06E00034

FHA Project Number (if applicable) 07155028

Project Name SOUTH POINTE TOWER

Project Description

303 SUBSIDIZED MULTI-FAMILY UNITS

TYPE OF UNITS

☐ Check this box for a restructured project subject to a HAP contract renewed under Option 3 of the HUD Renewal Guidebook.



FROM : FAX NO. : Sep. 02 2000 01:08PM P4

☐ Check this box for Mark Up to Market units covered by a HAP contract renewed under Option 1 of the HUD Renewal Guidebook.

PARTIES TO HAP CONTRACT

Name of Contract Administrator

______________________________

Address of Contract Administrator

______________________________

______________________________

______________________________

Name of Owner

P.M. GROUP/P.I.C.A.

Address of Owner

1050 CORPORATE OFFICE DRIVE
SUITE 150
MILFORD, MI 48381

# ENERGY LUMP SUM COST WORKSHEET
## Attachment 1

Project Name: SOUTH POINTE TOWER

Project Owner: P.M. GROUP FHA Project #: 07155028

Section 8 #: IL06E000034 No. of Units 303

Total Number of Unassisted Units in Property: 0

Date of Last Rent Adjustment 10/01/98 [x] OCAF or [ ] Budget Based

Check One: [ ] OPTION 1 [x] OPTION 2 [ ] OPTION 3 [ ] OPTION 4 [ ] OR [ ] OPTION 5

INDICATE WHICH UTILITY IS TENANT PAID, IF APPLICABLE Electric
Gas/Oil/Electric

IF TENANT PAID, INDICATE DATE UTILITY ALLOWANCES LAST UPDATED 10/01/98

A. Total Utility Increase Amount

1. Total of invoices from September 1999 - March 2000 $ 122,642.65
2. Total of invoices from September 2000 - March 2001 $ 177,872.94
3. Amount of increase (Line 2. minus Line 1.) $ 55,230.29

(Attach September 1999 - March 2000 invoices and September 2000 - March 2001 invoices to support increased amounts. If invoices straddle months, do not prorate, however, be consistent for each month instead)

B. Prorated Utility Increase

If partially assisted, prorate the total increase based on the Section 8 rent potential percentage.

1. Total Rent Potential for all units in the property $ 223,439
2. Total Rent Potential for all Section 8 units $ 223,439
3. Percentage of rent potential that is Section 8 (Line 2. divided by Line 1.) 100%

Amount of Increase (Line A. 3 above) X Section 8 rental percentage (Line B. 3 above)

TOTAL PRORATED ENERGY INCREASE = $ 55,230.29

2

FROM : FAX NO. : Sep. 02 2000 01:07PM P1

NET 00181

## ENERGY LUMP SUM AMOUNT CALCULATION

LINE 1 CURRENT ANNUAL SECTION 8 RENT POTENTIAL: $ 223,439

LINE 2 TOTAL PRORATED ENERGY INCREASE: $ 55,230.29
(FROM CALCULATION ON PREVIOUS PAGE)
(EXCLUDE TENANT PORTION, IF APPLICABLE)

LINE 3 CURRENT ANNUAL SECTION 8 RENT POTENTIAL + LUMP SUM ENERGY AMOUNT= $ 278,669.29
(LINE 1 + LINE 2)

**The following must be completed if rents are subject to comparability:**

LINE 4 TOTAL COMPARABLE RENT POTENTIAL
(Based on Last RCS, adjusted annually by OCAF, or Attached Updated RCS): $ 223,439

LINE 5 TOTAL NEW SECTION 8 RENT POTENTIAL RESULTING FROM ADDED LUMP SUM
(enter results from line 3 above) $ 278,669.29

IMPORTANT: Compare Line 5 with Line 4. Total new Section 8 rent potential must be no higher than Line 4.)

LINE 6 ADJUSTED LUMP SUM AMOUNT $ 278,669.29
(If Line 5 exceeds Line 4 reduce lump sum amount excess so that total does not exceed Line 4)

LINE 7 TOTAL ESTIMATED LUMP SUM AMOUNT TO BE VOUCHERED FOR:
(From either Line 2 above or Line 6, if subject to comparability) $ 55,230.29

I (We) certify that prior to requesting this energy lump sum adjustment, all other sources of funding have been exhausted. Under the penalties and provisions of Title 18, United States Code, Chapter 47, Section 1001, the statements contained in this request have been examined by me (us) and to the best of our knowledge and belief are true, correct and complete.

[signature] 8/6/01

(OWNER OR OWNER'S REPRESENTATIVE SIGNATURE) DATE

(HUD PROJECT MANAGER OR CONTRACT ADMINISTRATOR SIGNATURE) DATE