**Englewood v. United States**
**03-2209**
**Joint Appendix**

# JA 128

DSSA Management, Inc.

Real Estate Management and Development since 1979

5901 N. Cicero Ave., Suite 300
Chicago, IL 60646
Phone: (773) 205-6410
Fax: (773) 205-5414

May 31, 2002

Mr. Ed Hinsberger
Office of Multifamily Housing
HUD
77 West Jackson Boulevard
Chicago, Illinois 60604

Re: South Pointe Financial Claims – Total $430,429

Dear Ed:

I appreciate that you have taken the position that South Pointe is not eligible for any of the financial claims described below because South Pointe was "not in good standing." However, if these claims are determined to be valid, there were $430,429 in lost revenues at South Pointe during the past year:

Energy Costs:

The PM Group submitted a timely request for the "Rental Adjustments for Escalating Energy Costs" on August 6, 2001. It is attached as Exhibit A. A Rent Comparability Study was also completed and submitted to HUD in August of 2001.

DSSA has developed an updated version of this Rental Adjustment based on the detailed backup information provided by Peoples Energy Services Corporation. The calculations and backup data is contained in Exhibit B. The amount of this amended and updated request for reimbursement is $139,187.

Special Claims:

There are currently 76 vacant units at South Pointe. Two months of vacancy loss for these units amount to $112,230; 80% of that amount is $92,878. The total of Special Claims is $145,991.

| | | |
|---|---|---|
| Vacancy Losses | $112,230 | |
| 80% of Vacancy Losses | | $92,878 |
| Rent Balances at Move Out | | $40,983 |
| Damages to Unit | | $12,130 |
| Total of Special Claims | | 145,991 |

The backup information supporting these Special Claims calculations is contained in Exhibit C. ~~We have not included legal charges in these calculations or the total costs of the repair of the~~ damaged units that have been vacated.

EXHIBIT S

Lost Value of Rental Increase:

A Rent Comparability Study was submitted to HUD in August of 2001 as part of the request for the extension of the HUD HAP Contract that was to expire on September 30, 2001. HUD approved the comparables and rents in September of 2001. Exhibit D contains the amount of rent that should have been received from October, 2001 through June of 2002. These amounts are:

| Month | Amount Billed | New Rent Billing | Difference |
|---|---|---|---|
| October | $194,539 | $212,033 | $17,494 |
| November | $193,293 | $210,589 | $17,296 |
| December | $190,444 | $207,588 | $17,144 |
| January | $188,788 | $205,672 | $16,884 |
| February | $184,430 | $200,521 | $16,091 |
| March | $180,119 | $195,929 | $16,710 |
| April | $171,431 | $186,710 | $15,279 |
| May | $165,734 | $180,430 | $14,696 |
| June | $147,602 | $162,259 | $14,657 |
| Total: | | | $145,251 |

The totals of the claims for which South Pointe is seeking reimbursement from HUD is as follows:

| | |
|---|---|
| Escalating Energy Costs | $139,187 |
| Special Claims | $145,991 |
| Lost Value of Rental Increase | $145,251 |
| Total: | $430,429 |

We have more comprehensive backup materials to support these calculations. However, for the moment, we simply wanted to share totals with you.

Sincerely,

Robert Sova

~~Cc John Hayes~~
Gwen Thomas
Don Samuelson

**Englewood v. United States**
**03-2209**
**Joint Appendix**

# JA 129

Gwendolyn X. Thomas

07/02/2002 07:59 AM

To: Gregory G. Gustin/DEC/CHI/HUD@HUD, Margarita Maisonet/DEC/CHI/HUD@HUD, Veronica Coleman/HSNG/CHI/HUD@HUD, Debbie Gray/HSNG/CHI/HUD@HUD, James L. Pollock/DEC/CHI/HUD@HUD, Edward Hinsberger/HSNG/CHI/HUD@HUD, Maria T. Baguio/DEC/CHI/HUD@HUD

cc: Catherine E. Paul/DEC/CHI/HUD@HUD, Lillye R. Simmons/HSNG/CHI/HUD@HUD, Lucille Ellison/HSNG/CHI/HUD@HUD, Karyn Stamps/HSNG/CHI/HUD@HUD, Deborah E. Monroe/HSNG/CHI/HUD@HUD, Kathy Merritt/HSNG/CHI/HUD@HUD, Teresa DiPietro/HSNG/CHI/HUD@HUD

Subject: South Pointe Tower Visit

On June 28, 2002 at 9:00 a.m. HUD staff went to pass out and post notices regarding the extension of the Section 8 contract at South Pointe Towers, located at 6425 S. Lowe, in Chicago. Staff included:

Gwendolyn Thomas, Project Manager
Cathy Paul, Enforcement Analyst
Kathy Merritt, Troubled Project Manager
Lillye Simmons, Construction Analyst
Karyn Stamps, Project Manager
Lucille Ellison, Project Manager
Deborah Monroe, Project Manager
Teresa DiPietrio, Project Manager

We observed outside of the property, people hanging out of the windows, including children, there were missing screens, lots of exposed wires were loose and hanging from the out side of the building, garbage dumpsters were over flowing, no landscaping and debris and broken glass surrounded the building.

The common areas and stairwells inside the building were dirty and the floors were sticky. Graffiti was observed in the common areas and stairwells. Most of the stairwells were not lit, smelled of urine, exposed wires and some of the doors were missing door handles. Exit signs were missing and/or broken. The garbage chute room was dirty, smelled, and had garbage on the floors. Some of the units' doors had damaged hardware. One of the elevators was inoperable. The other two elevators were reported to be working, however, while we were at the project, the elevators were extremely slow, we waited approximately 15 mins or more, so, we walked 22 flights of stairs to deliver the notices.

There were no fire hoses or extinguishers, and no ventalation. Also there were lots of cats walking around.

A few of us had been there previously and we saw no improvements.

Gwen

B 5258

**Englewood v. United States**
**03-2209**
**Joint Appendix**

# JA 130



DSSA310@aol.com

07/03/2002 06:31 AM

To: Edward_Hinsberger@hud.gov
cc: jhayes@pmgroupinc.com, RASOVA@email.msn.com, Alcrav@aol.com
Subject: July HAP Payment

Ed:

I got your phone message on my voice mail at 4:50.

It appears that Bob Sova called you Tuesday at 2:30 asking about the status of the July HAP payment which hadn't been received at that time. He said that you indicated that you would get back to him.

You got back to me with a voice mail indicating that while you did receive a fax of the signed HAP contract from John Hayes last week that you didn't receive the original copy and that the payment was being held up for that reason.

I called John immediately upon the receipt of your voice mail. He indicated that he had faxed a signed copy of the HAP extension and then sent the original by overnight mail. Which your office appears not to have received.

After talking with John, I called you back at about 4:55. You were gone. The message was to call Mary Anderson. I called her. She was gone. I called both John Hayes and Alan Cravitz to ask what could be done. Money is needed. As you know, we had to default on the deal with CIC related to the payment of real estate and insurance excrows when there was a delay of 45 days in getting the April HAP payment. That led to the current foreclosure action by CIC.

The possible options: 1. you could "find" the original signed HAP extension in your office - John could help up by following up on his overnight mail records; 2. John could authorize in writing someone - Alan, me, a lawyer - to sign the faxed copy you have with his signature, to make it sufficiently authentic to enable you to approve the release of the July HAP funds; or 3. John could sign a new original on Wednesday and overnight it to HUD Chicago to enable the funds to be released on Friday.

I've asked both John Hayes and Alan Cravitz if they can follow up on this matter by calling Mary Anderson on Wednesday morning. We need to know this information right away so that we can attempt to remain somewhat credible with creditors.

Don

B 5256

**Englewood v. United States**
**03-2209**
**Joint Appendix**

# JA 131

DSSA Management, Inc.

Real Estate Management and Development since 1973

5901 N. Cicero Ave., Suite 306
Chicago, IL 60646
Phone: (773) 205-5415
Fax: (773) 205-5414

July 31, 2002

Mr. Ed Hinsberger
HUD Office of Multifamily Housing
77 West Jackson Boulevard
Chicago, Illinois 60604

Dear Ed:

I received a letter from your office through John Hayes' lawyer, Peter Silverman, asking us to explain the HAP billing at South Pointe from September of 2001 to the present.

Background on HAP Billing:

There is some confusion as to the proper date for the termination of the HAP billing. DSSA has followed the practice of terminating the HAP billing as soon as we learn that the resident has moved and the unit has been vacated. This is not always the same date that the tenant exercises the voucher. In a number of cases, it appears that the voucher has been executed before the tenant moves out, or informs us of the move. We had no way of knowing this information until we developed our recent practice of asking CHAC to give us the date on which the voucher was activated. Until then, we simply assumed the resident moved when the unit was known by us to be vacant.

There is a second problem. In response to delays in our April billing we began theh practice of submitting our HAP request early in the month prior to the month for which the HAP payment was sought. Our practice would be to process the June HAP payment in early May. For residents who moved out of South Pointe after the date of the May billing – in May or in June – there would be a technical, but inadvertent, temporary overbilling for the unit, which would be corrected the following month.

Response to Your Letter:

In response to your letter, we went back into the records to document, for every unit, the following information:

1. the unit number
2. the name of the leaseholder
3. the date of the last HAP payment for the unit
4. the date when DSSA learned that the unit was vacant
5. the date then the CHAC voucher was activated
6. the amount of the HAP payment for periods after the voucher was activated

The HUD letter is Exhibit A. The analysis described above is contained in Exhibit B.

Claims to HUD by South Pointe:

Exhibit B also contains for every unit the vacancy loss provided for by the HAP contract, as well as rent delinquencies and tenant damages at the time of the move out. In addition, there is a column that "nets" the HUD claims for excess HAP payments made in good faith by South Pointe on the basis of information available.

Exhibit C is the claim request made for South Pointe on May 31, 2002 It requested payment in specific amounts for the following categories of claims:

| | |
|---|---|
| Extraordinary Energy Costs | $139,187 |
| Special Claims Related to Units | $145,991 |
| Lost Value of the September Rent Increase | $145,251 |
| Total Claims: | $430,429 |

Exhibit D represents the timely submission of the original PM request on August 6, 2001 for the "Rental Adjustments for Escalating Energy Costs." Exhibit E is the updated version of the request based on the detailed backup information provided by Peoples Energy Services Corporation.

Exhibit F represents the estimated claims which will arise from the vacancies which will take place in August relating to the expected departure of 50 more residents at South Pointe. In late July there were 150 vacancies. We expect there will be 50 more which will take place in August. This will leave a balance of 100 South Pointe families who will be using their CHAC vouchers for housing at New Englewood Terrace (NET). Exhibit G is the lost value of the September, 2001 approved rental increase through June.

Our current claims to HUD under the original and renewed HAP contracts are as follows:

| | |
|---|---|
| Extraordinary Energy Costs | $139,187 |
| "Net" Special Claims to South Pointe | $208,911 |
| Estimated Future Claims Prior to 9/30 | $ 64,000 |
| Lost Value of the September Rent Increase | $145,251 |
| Total of Claims: | $557,349 |

We have tried to set a meeting to discuss these matters earlier. Vacations intervened. However, we would like to meet with you to resolve these matters as quickly as possible.

Sincerely,

Don S. Samuelson

Cc Veronica Coleman, Debbie Gray, Gwen Thomas, John Hayes, Alan Cravitz

**Englewood v. United States**
**03-2209**
**Joint Appendix**

# JA 132

P.M. 1 ONE

FIRST IN PROPERTY MANAGEMENT

September 26, 2002

Ms. Phyllis Conrad
Department of Housing and Urban Development
HUD Building, Room 9134
451 Seventh and D Street S.W.
Washington, D.C. 20410

RE: HUD-2530 Flag

Dear Ms. Conrad:

Per our conversation on Tuesday, you have received my correspondence of September 6, 2002 that provides a detailed breakdown of the individual ownership of P.M. One, Ltd. and those entities that own stock in P.M. One. If there are any further questions regarding the individual ownership, please contact me and I will supply any additional information needed.

As I have stated in earlier correspondence, problems did exist in the operation of P.M. Group properties in Chicago. John Morrissey and I recognized that these problems existed and have taken the steps necessary to correct those problems as they reflect and impact on P.M. One. These steps included the reorganization of the company's ownership (detailed in my September 6 correspondence) and the reorganization of our executive and management staff, specifically in our Chicago operations. In recognition that our prior staff had a poor track record with the Chicago HUD office, Mr. Morrissey and I have replaced almost all of the prior executive and management personnel. In addition, Mr. Morrissey and I are personally and directly involved in our Chicago operation and will remain so.

John Morrissey and I, are the majority shareholders in P.M. One, Ltd. and are the sole executive officers of the corporation. We further certify that no other entities or individuals, whether current or past shareholders, have any ability or authority to direct the actions or decisions of P.M. One, Ltd.

We certify and commit that we will take all steps necessary to insure that the problems that existed in the past do not recur in the future and that we will operate and maintain each of the properties managed by P.M. One in a decent, safe and sanitary condition according to HUD policies and requirements. As a sign of our commitment and a show of good faith, we are willing to be placed on probation regarding the new property. D 0875

5215 JOLLY-CEDAR COURT • LANSING, MICHIGAN 48911
OFFICE (517) 887-0040 • FAX (517) 887-6700 • www.pmone.com

Ms. Phyllis Conrad
September 26, 2002
Page 2

We sincerely hope that HUD will look at our appeal in a positive light, and I know that given the opportunity, we will regain the confidence that HUD has had in our company for these past 29 years and once again will prove that we can manage additional HUD properties to the satisfaction of any HUD regional office.

Respectfully,

Michael G. McGhie, CPM®
President

MGM:mel

cc: John Morrissey

D 0876