**Englewood v. United States**
**03-2209**
**Joint Appendix**

# JA 133

TAFT, STETTINIUS & HOLLISTER LLP
425 WALNUT STREET, SUITE 1800
CINCINNATI, OHIO 45202-3957
513-381-2838
FAX: 513-381-0205
www.taftlaw.com

COLUMBUS, OHIO OFFICE
TWELFTH FLOOR
21 EAST STATE STREET
COLUMBUS, OHIO 43215-4221
614-221-2838
FAX: 614-221-2007

NORTHERN KENTUCKY OFFICE
SUITE 340
1717 DIXIE HIGHWAY
COVINGTON, KENTUCKY 41011-4704
859-331-2838
513-381-2838
FAX: 513-381-6613

CLEVELAND, OHIO OFFICE
3500 BP TOWER
200 PUBLIC SQUARE
CLEVELAND, OHIO 44114-2302
216-241-2838
FAX: 216-241-3707

Daniel R. Warncke
(513) 357-9317
warncke@taftlaw.com

February 6, 2003

BY FEDERAL EXPRESS FOR OVERNIGHT DELIVERY

Ms. Phyllis Conrad, Executive Secretary
Multi-Family Participation Review Committee
Department of Housing and Urban Development
HUD Building, Room 9134
451 Seventh and D Street, SW
Washington, D.C. 20410

Re: Reconsideration of HUD-2530 Denial
P.M. One Ltd., Michael McGhie, John Morrissey

Multifamily Participation Review Committee:

This firm represents P.M. One, Ltd. ("P.M. One") in connection with P.M. One's form HUD-2530 application. P.M. One respectfully requests that the Multifamily Participation Review Committee ("MPRC") reconsider and approve P.M. One's 2530 application and also to remove the risk flags placed on P.M. One, Michael McGhie and John Morrissey.

## I. Introduction

The documents tendered in support of this reconsideration show two key facts which the MPRC should consider: (1) P.M. One, Mr. McGhie and Mr. Morrissey have decades of experience and a long history of excellent property management that exemplifies the standards of business integrity and financial responsibility that the Department requires of property managers, and (2) there has been a complete change in the control of P.M. One since the difficulties P.M. One experienced in the management of a limited number of properties owned by P.M. One's former majority shareholder, P.M. Group, Inc. ("PMG"). Mr. McGhie and Mr. Morrissey, who now control P.M. One, never had any ownership interest in PMG. Mr. McGhie and Mr. Morrissey have distanced themselves and P.M. One from PMG by terminating all management contracts between them. In short, P.M. One presently has no business with PMG.[1]

[1] See Exhibit A, Affidavit of M. McGhie.

D 0892

II. **P.M. One Has the Experience and Business Integrity to Manage HUD-Assisted Properties.**

P.M. One maintains four full service management offices and employs over eight hundred people. It is the largest property management firm in the Midwest. It maintains an Accredited Management Organization® designation from the Institute of Real Estate Management, a distinction from the Institute of Real Estate Management given to a very small number of companies. This certification is only given to companies that show exceptional competency, integrity, and strong commitment to upholding the Professional Code of Ethics. Mr. McGhie and Mr. Morrissey also hold a Certified Property Management® designation. This exceptional competency, integrity and dedication to ethics is precisely what HUD requires of property managers. P.M. One also supports and is a member of the National Multi-Housing Council, the National Association of Housing Cooperatives, and the Midwest Affordable Housing Management Association.[2]

In the almost thirty years that Mr. McGhie and Mr. Morrissey have been associated with P.M. One, the company has provided superior management services to over four hundred (400) properties.[3] As shown in the attached documents, P.M. One has won numerous awards including a Secretary's Commendation from the Department for the "Top 1000" high performing multifamily properties. The company has also won six GLASTAR awards from the National Apartment Association and seven awards from the Institute of Real Estate Management ("IREM"). Other awards include the St. Louis High Performer Award in Public Housing and recognition for the Best Resident Retention Program. P.M. One has been ranked fifteenth in the "Best of the Best" rankings by the Midwest Real Estate News as a top property management firm.[4]

P.M. One employs a number of well-trained professionals.[5] These dedicated individuals give P.M. One the experience to perform at the level that HUD seeks in all property managers. All P.M. One property managers and leasing professionals are required to obtain and hold an active real estate

---

[2] A brief description of P.M. One's involvement in these organization is attached as Exhibit B.

[3] Examples of the properties P.M. One presently manages are listed in Exhibit C. These properties include apartments, single family housing, cooperatives, condominiums, senior housing, non-profit housing, tax credit and manufactured home communities.

[4] An abbreviated list of P.M. One's awards is attached as Exhibit D.

[5] See Exhibit E, which list the key personnel of P.M. One with a brief biography of their accreditations and history in property management.



D 0893

sales license. To encourage employee productivity and longevity, P.M. One supports its employees in their continuing education and training requirements. Under Mr. McGhie and Mr. Morrissey's leadership, P.M. One has an education policy that encourages regional property managers to seek and qualify for a certified property manager designation from the Institute of Real Estate Management. Likewise, P.M. One employs a group of certified credit compliance professionals in order to keep P.M. One and its staff up to date with low-income tax credit rulings and code changes. P.M. One itself maintains a real estate broker's license in every state in which it does business.

Mr. McGhie and Mr. Morrissey themselves also have a proud history in property management. Mr. McGhie joined P.M. One straight out of college in 1978 and has remained there his entire career. Mr. McGhie has climbed to the point now of owning almost a third of the company where he started over twenty-five years ago. Mr. Morrissey's history is similar, as he joined P.M. One in 1974. He has been a maintenance supervisor, a property manager, a regional property manager, and today he is Executive Vice President, owning 19.13% of the company.[6]

The most recent previous participation certification for P.M. One provides the Department's objective assessment of P.M. One's performance and shows P.M. One's superior performance.[7] This form lists one hundred and seventy (170) properties P.M. One has managed. All the properties that do not list a specific Real Estate Assessment Center ("REAC") score show an "Acceptable" rating. Of the fifty eight REAC scores that are shown on the form, the median is 89. There are 2 properties with scores of 99 or above; 25 scores at 90 or above; and 47 at 80 or above. Only one property shown had defaulted, but that default occurred after P.M. One ceased to manage the property.

Of the twenty- nine HUD properties that P.M. One presently manages, all have passing REAC scores.[8] The median remains 89, and the substantial majority, 24 of 28, are over 85. In short, every objective measure of P.M. One's management shows that P.M. One has the capability and dedication that HUD looks for in reviews of HUD-2530 applications.

---

[6] See Exhibit A, Affidavit of M. McGhie.

[7] This form HUD-2530 is attached as Exhibit F.

[8] See Exhibit G, which lists these properties. The Nobel Square project in Chicago, Illinois, has its REAC evaluation deferred until its rehabilitation is complete.

## III. P.M. One's History with PMG and the Chicago Properties.

Many of the difficulties Mr. McGhie and Mr. Morrissey have experienced in this HUD-2530 process appear to stem from a persistent misconception that they own or have some involvement in PMG.[9] For example, HUD recently contacted P.M. One concerning a PMG property that P.M. One did not manage.[10] To the contrary, however, neither Mr. McGhie nor Mr. Morrissey has ever owned any part of PMG. At one time, PMG had a controlling interest in P.M. One, owning eighty percent (80%) of its stock. At that time, Mr. McGhie and Mr. Morrissey were minority shareholders in P.M. One. Today however, there is no relationship between PMG and P.M. One. The two companies no longer do business together.

From 1992 until 1998, Mr. McGhie and Mr. Morrissey together owned only twelve percent (12%) of P.M. One. PMG owned eighty percent (80%) of P.M. One. During this period, in 1996, P.M. Group Management ("PMGM") was formed to manage all PMG-owned properties.[11] P.M. One was to become exclusively a third-party manager. Also during this time, the Chicago properties mentioned in the MPRC's January letter, South Pointe, Monterey, Spring Grove and Park View, began to experience a physical decline. Although PMGM began managing all other PMG properties, PMG did not transfer management of the four troubled Chicago properties to PMGM. Instead, P.M. One continued to manage these properties.

In 1998, PMG entered a plan with the Departmental Enforcement Center ("DEC"), which covered the South Pointe property.[12] That plan called for, among other things, the refinancing and rehabilitation of South Pointe. After ample opportunity to do so, PMG failed to execute that aspect of the Plan. This led to the placement of risk flags in the Active Partner Performance System ("APPS") on PMG and its principals.

Inexplicably, risk flags were also placed on P.M. One, Mr. McGhie and Mr. Morrissey. However, P.M. One was merely the *manager*, not the owner of South Pointe. P.M. One was not in

---

[9] See Exhibit A, Affidavit of M. McGhie, which explains the ownership of P.M. One and its relationship to PMG.

[10] See Exhibit H, Letter of December 11, 2002.

[11] See Exhibit A, Affidavit of M. McGhie.

[12] Also in 1998, Mr. McGhie purchased additional stock and became a ten percent (10%) shareholder of P.M. One while Mr. Morrissey increased his ownership from four percent (4%) to six percent (6%). See Exhibit A, Affidavit of M. McGhie.



D 0895

a position to refinance and rehabilitate the properties.[13] Indeed, P.M. One, Mr. McGhie and Mr. Morrissey were so insignificant to the failure at South Pointe that HUD did not even bother to send notices of the risk flags to P.M. One, Mr. McGhie or Mr. Morrissey. HUD addressed them to PMG only.

Obviously, the inadequate condition of the property noted by the MPRC was not due to P.M. One's management. In fact, P.M. One waived over $600,000 in management fees to increase cash flow at South Pointe.[14] P.M. One also obtained a $1.5 million grant to partially rehabilitate the properties. Ultimately, however, the DEC was correct that South Pointe required refinancing and rehabilitation which only PMG could provide.

As for the other three troubled Chicago properties, P.M. One did not manage those properties when the risk flags were placed. The Monterey property was sold by PMG in June 2001 and P.M. One only did bookkeeping for the new owner until the end of the year. Park View and Spring Grove had new management starting in July 2001.

While PMG's activities in Chicago were problematic, any objective measure of P.M. One's activities in Chicago shows that P.M. One was doing an excellent job as a property manager. The Chicago Public Housing report card in the second quarter of 2001 for P.M. One shows that P.M. One was very effective. There were no past due recertifications, 100% of emergency work requests were completed within 24 hours, on average only three (3) work requests were pending per property, and P.M. One collected 98% of potential rents. Also, P.M. One tried to foster a positive relationship with the local HUD Field Office by accommodating the Field Office in its request that P.M. One extend its management of South Pointe.[15]

In March, 2001, when control of P.M. One changed hands, Mr. McGhie and Mr. Morrissey immediately took steps to correct the operational deficiencies experienced under PMG's domination and control. They eliminated PMG's ownership interest in P.M. One. P.M. One no longer manages any PMG properties. P.M. One is now exclusively a third-party management company under the control of Mr. McGhie and Mr. Morrissey. Mr. McGhie and Mr. Morrissey are the sole directors of P.M. One.

---

[13] Again, at the time, Mr. McGhie and Mr. Morrissey together held only sixteen percent (16%) of the ownership of P.M. One.

[14] See Exhibit I, a letter from Mr. McGhie to PMG dated August 30, 1993.

[15] See Exhibit J, Letter of September 24, 2001.

## IV. Management While P.M. One's HUD-2530 Application Was Pending.

The MPRC has noted that P.M. One managed certain properties while its HUD-2530 application was still pending. The MPRC failed to note that it was P.M. One who honestly and openly brought this to the MPRC's attention.[16] Various communications with HUD officials gave P.M. One the understanding that HUD would not give "advisory" opinions and that P.M. One could not have the risk flags removed from APPS until it had a pending contract.[17] The management contracts P.M. One entered did not call for P.M. One to immediately begin management. Instead, the contracts gave what P.M. One believed to be adequate time, based on P.M. One's decades of experience, for the HUD-2530 application process to be completed. P.M. One, Mr. McGhie and Mr. Morrissey had never had a HUD-2530 Application denied and never intended to manage the properties without prior approval. Upon realizing its mistake, P.M. One notified the MPRC as well as the owner of those projects. As it is hard to imagine a time when it would be less in P.M. One's interest to disclose this information, this act demonstrates that P.M. One has the honesty and business integrity that HUD expects of property managers.

## V. Conclusion

By every objective measure, P.M. One provides effective and efficient property management with honesty and integrity. The deficient performance in Chicago and the failure to execute the DEC Plan are not fairly attributable to P.M. One, Mr. McGhie or Mr. Morrissey. These individuals, who have dedicated their careers to P.M. One, have amply demonstrated their responsibility to the Department and to the management of HUD-assisted properties.

---

16/ See Exhibit K, Letter of December 10, 2002 from P.M. One to the MPRC.

17/ See Exhibits L, M, N, and O. Respectively, these Exhibit are: a voicemail transcript from E. Hinsberger (HUD) dated June 7, 2002; e-mail from G.Gustin (HUD) dated June 14, 2002; e-mail from B. Miller (HUD) dated May 29, 2002; and e-mail from G. Gustin (HUD) dated February 20, 2002.

On behalf of P.M. One, Mr. McGhie and Mr. Morrissey, we respectfully request that you reconsider your previous position and grant their pending HUD-2530 application and remove the risk flags in the APPS.

Sincerely,

Daniel R. Warncke

cc: Michael McGhie

D 0898

**Englewood v. United States**
**03-2209**
**Joint Appendix**

# JA 134

**Schopf & Weiss LLP**
**Business Litigation**

312 West Randolph Street, Suite 300
Chicago, Illinois 60606-1721
tel 312.701.9300
fax 312.701.9335
www.sw.com

Writer's e-mail
baugher@sw.com

Writer's direct dial
312.701.9315

April 1, 2004

The Honorable Victor J. Wolski
United States Court of Federal Claims
717 Madison Place, N.W.
Washington, DC 20005

Re: Englewood Terrace Limited Partnership v. United States of America, et al., No. 03-2209C

Dear Judge Wolski:

I have reviewed the Government's March 25 submission. Two comments:

First, the HAP renewal contracts submitted last week are fundamentally inconsistent with the premise of the Government's motion to dismiss--that HUD's (constructive) election *not to renew* Englewood's request for renewal of the 2000 HAP contract in October 2001 was an exercise of discretion by HUD not subject to judicial review. As is apparent from the documents tendered, *the contract was renewed.*

Second, it is also clear from these documents that Englewood's HAP contract was renewed with the express incorporation of all the provisions related to this lawsuit--breach, notice, default, remedies. Paragraph 4 of the 2001-2 renewal contracts (Attachments 5-7) states: "All terms of the Expiring Contract are renewed except for those provisions related to Contract Rents and rent adjustments."

Whether HUD breached the HAP contract and is liable for damages, or Englewood's conduct excused HUD's actions, are questions for another day (hopefully very soon, given the project's exigent circumstances). But the renewals submitted by the Government as attachments to its motion further demonstrate that this Court has jurisdiction over the parties' dispute.

Sincerely yours,

s/Peter V. Baugher

PVB:mml

**Englewood v. United States**
**03-2209**
**Joint Appendix**

# JA 135

# NEW ENGLEWOOD TERRACE – "NET"

## A HUD DEMONSTRATION PROJECT

**Don S. Samuelson**
**August 15, 2005**

New Englewood Terrace ("NET") was intended to be, and can still be, a demonstration project to illustrate how a project based Section 8 development can be a positive force in a redeveloping neighborhood, building human capital among residents, connecting low income families to community resources, and facilitating the acquisition of education, training and self sufficiency. The goal is use existing resources to facilitate home ownership for low income families in the Englewood community where private sector housing is as "affordable" as any neighborhood in Chicago.

NET is located in the center of East Englewood, at 6425 South Lowe, across from the Kershaw School and the new Kennedy-King Community College. **Exhibit 1** is a collection of photos which illustrate the direction of the redevelopment program, the general location of the building, and some of the new construction and rehabilitation that is taking place in East Englewood around NET.

Both the Clinton and Bush Administrations saw the enormous potential of the rebuilding of the Englewood community. Englewood was chosen as a "New Markets" initiative in the Clinton Administratiŏn. There were plans for the development of a new campus for Kenned-King College, a new library, senior center and police station. There were plans for a host of "New Homes for Chicago" around the St. Bernard Hospital. The two CHA senior developments were going to be rehabilitated under the CHA's Plan for Transformation.

Englewood was chosen as a HUD "Renewal Community" in the Bush Administration. There are three high schools, three grammar schools, parochial schools, the regional office of DCCA and a host of service providers and institutional churches. The "L" has stops at Halsted, Racine, Damen and Western. There are five interchanges off of the Dan Ryan serving Englewood. The foundations for redevelopment are in place.

### A Short History of New Englewood Terrace:

New Englewood Terrace is a 303 unit 22 story building serving low income families with Section 8 subsidies. From 1980 through 2000, the property followed a downward spiral, paralleling the fortunes of the neighborhood. Working families moved out. They were replaced by single parent families, headed by a young female, with little education, work experience, or hope for a better life. Gradually, gangs and drugs migrated from the neighborhood into the building. This led to turf battles, graffiti, marginalized security, damage to the elevators and common areas and drug money "hustle" becoming a significant source of outside income for $0 income families.

The property was purchased out of HUD property disposition by a Limited Partnership headquartered in Michigan. It was structured as a tax shelter with LIHTC coming from Chevron, a 10 year amortized loan from the Community Investment Corporation and a HAP Contract for 100% of the units from HUD. There was little investor/lender involvement in the project. The HAP contracts provided the subsidy.

The property was transferred from MFH to the DEC in September of 1998, to develop a corrective plan or to terminate the HAP contract and put the property into foreclosure. There wasn't enough money in the operating budget to pay for the 10 year loan payback, the armed guard program necessary to provide effective security and the resident services that were needed by the kids in the building and the heads of household. It was clear there was the need for a multiyear HAP contract and a rehab loan, so that the physical repairs could be funded by a rehab loan and the operating income could be directed to operations, security and resident services.

Unfortunately, HUD terminated the four year HAP contract signed by the parties in October of 2000, the revenue stream that would have eliminated the immense principal payments, provided the funds for the REAC improvement program, and "freed up" operating income for security, resident services and operations.

There was an operational upgrade plan developed as part of the DEC referral in 1998. It dealt with resident services, security and repairs. It worked as long as there was money to pay for security and resident services. HUD didn't feel the rehab loan requested by Englewood was comprehensive enough to meet "the needs of the property." It didn't want to deal with the Owner or the management agent. It wanted a new owner.

DSSA developed a new "plan" in the summer of 2001. It ultimately was funded by HUD in December of 2002, for the amount desired by HUD and for the types of improvements that HUD wanted. The status of the implementation of the redevelopment plan at the end of September, 2003 is described in **Exhibit 2.** The marketing program that was developed in April of 2004 is contained in **Exhibit 3.** This is the program that needs to be redesigned and updated at this time.

**The Vision of "New Englewood Terrace" as Public Trust Housing:**

DSSA had been involved with a number of HUD troubled developments from 1996 through 2002 that dealt with low income families and troubled neighborhoods. There was attention given to understanding the families, their capacities and their needs. On-site pre-school programs were developed. Residents were connected to neighborhood services. There were on-site computer learning centers which were oriented to job skills and placement ("Success in the Workplace") and school support programs. DSSA was very much oriented to community asset inventorying and neighborhood planning. Collaborations were developed with neighborhood institutions and groups to create "neighborhood learning and employment networks."

Don Samuelson thought that the conversion of the "troubled" South Pointe Tower on the even more troubled "Lowe Street" could become "New Englewood Terrace," a catalyst for the redevelopment of Lowe Street and the East Englewood community. The pieces were in place. There was a grade school – Kershaw – across the street that served the families and NET. The new campus of the Kennedy-King Community College was to begin on Lowe Street and run north and west past 63rd and Halsted.

In addition to on-site workforce development and pre-school/after-school programs, the computer learning center would prepare NET families for affordable "broadband" to their units through vertical wiring and horizontal wifi distribution using Cisco and Motorola Canopy equipment. The Motorola Canopy system could redistribute wireless broadband throughout Englewood to give connectivity to senior housing, churches, service providers and small businesses. The objective was to redevelop an inner city neighborhood where the Internet could be used effectively by NET and neighborhood residents, local service providers and the small business community. The goal was to create wealth in Englewood for Englewood residents and businesses, and to facilitate the recycling of money within the community.

The principles to be applied were based on HUD's "Neighborhood Networks" and "Community Builder" programs, and the import substitution and export strategies of Jane Jacobs in "Cities and the Wealth of Nations." At a slightly more abstract level, the goal was to illustrate economic efficiencies that could be achieved through investments in human capital, information and social capital. There were significant values to be achieved by investing the resources of existing HUD and housing support programs in ways in which longer term and more diverse interests could be achieved.

The concept of "Public Trust" housing was intended to achieve shorter term residencies. If the average stay in Section 8 housing could be shorted from 16 years to 8 years, twice as many families could be served. Form 8 years to 4 years there could be twice as many served. Families would be coming into the program intending to use the NET services intensively over a 2 to 3 year period, save money they would otherwise be spending on rent, develop work skills and a job/career, and a strategy for buying a single family home in the Englewood community. NET would be the point of entry into Englewood for purposes of recruiting and training a community of working families and homeowners to support local institutions and businesses, and to rebuild the sort of social fabric which characterized Englewood and the 63rd and Halsted commercial center from 1900 through 1960.

**Bringing It All Together – New Englewood Terrace**

New Englewood Terrace seemed to me an ideal situation in which we could bring all of the pieces together and develop a "demonstration" project on how these initiatives could be integrated and implemented. The advantage was that there was a single owner who could make decisions quickly and with minimal political interference. The disadvantage proved to be that there was the local HUD office did not buy in to or support the vision. There was the opportunity for the connection between the vision of

Neighborhood Networks and the "silo crossing" function of the Community Builder. Unfortunately, both of these programs were being phased out. There was no involvement in the planning or implementation processes from HUD Washington interested in policy and program connections. None of the ideas in the exhibits interested HUD Chicago.

**Planning in Englewood.** An overview of the goals of NET are contained in "About New Englewood Terrace" **(Exhibit 4).** A summary of the prior planning efforts in Englewood were summarized in a draft speech written by Don Samuelson for the Alderman for purposes of an Englewood economic summit in 2003. **(Exhibit 5).**

**Economic Development Strategies.** There were a series of essays written by Don Samuelson in the summer of 2003 related to: a. a systematic approach to the potential use of Kennedy-King jobs for businesses and residents of Englewood – "Jobs, Contracts and Programs in Englewood," **(Exhibit 6)**; b. an overall strategy on wealth building as the objective of community planning – "CTCs, Community Networks and Community Development, **(Exhibit 7);** and c. some strategies for identifying and solving problems on Lowe Street, the street serving NET, the Kershaw School and the new campus of Kennedy-King College, **(Exhibit 8).**

**Computers and the Internet at NET and East Englewood.** There were other short essays describing the ways in which the computer learning center could promote the effective use of broadband for residents of NET and for residents, service providers and small businesses in East Englewood. The first is a short essay and concept paper related to: "Tackling the 'Digital Divide' in Englewood. **(Exhibit 9).** The second relates to the creation of "DOC Englewood – the Digital Opportunity Coalition of Englewood." **(Exhibit 10).** The third is the start of a business plan support the development of broadband from NET to serve the Englewood community. **(Exhibit 11).** There is a short summary of "The Technology Objectives at NET," **(Exhibit 12).**

**Marketing Generally and Through the NET Web Site.** Finally, the general descriptions of marketing strategies to tell the NET story effectively to the target markets is contained in "Updating the Marketing/Leasing Plan a NET" when the building was within a month or two of completion and the use of the NET web site to both promote NET and the use of broadband in Englewood, but a "Members Only" section for the same types of services that had been developed earlier at Northwest Tower. **(Exhibit 13).**

**Some Background on DSSA Housing and Neighborhood Redevelopment Strategies:**

Over the years, DSSA has done extensive writing about its plans and initiatives to develop projects like NET and to place them within the asset inventorying and neighborhood planning structures. An overview of the journey from LIHPRHA work in the early 90s through the planning of NET in 2001 are contained in "Creating Neighborhood Learning and Employment Networks." **(Exhibit 14).**

**Niles Terrace.** The basic ideas in the DSSA approach were first developed at Niles Terrace in Waukegan, Illinois in 1998. An overall summary of the resident/neighborhood planning programs was described in "Housing, Computer Learning Centers and Welfare Reform." **(Exhibit 15).** There was the need for a new kind of resident services coordinator. We called the position, a "concierge." The function of the affordable housing concierge, understanding resident interests and needs, and connecting them to community resources, was summarized in "Defining the Function of the Concierge." **(Exhibit 16).**

**Northwest Tower.** The principles of Niles Terrace were extended in Northwest Tower, a 150 unit tower 1 mile from the Loop of Chicago that DSSA purchased and rehabbed through LIHPRHA for the Northwest Tower Resident Association. The general principles of the process were described in "The Big Picture." **(Exhibit 17).** The process for generalizing the process of understanding resident needs and community resources was described more fully in "Developing Instructional Programs in Buildings and Neighborhoods." **(Exhibit 18).** The process of implementing these ideas was set out in the "The DSSA Lifelong Learning and Development Center."

**Neighborhood Learning and Employment Networks ("L&EN").** There was a companion program that DSSA was involved in creating. It related to the creation of a community network of community technology centers, similar to the one developed at Northwest Tower. This led to the creation of the "Chicago Neighborhood Learning Network" funded by the DOE Technology Innovation Challenge Grant program. **(Exhibit 19).** Some corrective strategies were developed by DSSA. The integration of service enriched affordable housing and neighborhood computer learning centers was developed into a TOP application, "Neighborhood Learning Networks." **(Exhibit 20).** A somewhat different L&EN was developed for Fuller Park/New City in response to a Chicago Empowerment Zone RFP. The emphasis was on technology training, career planning and jobs. **(Exhibit 21).**

**The CHA and the Plan for Transformation.** DSSA was responsible for the management of Stateway Gardens for 30 months from 2000 through 2002, the period during which eight buildings were consolidated into two and all of the residents at Stateway had to go through an eligibility certification and housing choice plan. DSSA proposed the adaptation of its earlier work in response to the CHA "Service Connector RFP." **(Exhibit 22).** It also commented extensively on the overall CHA Relocation Program . Finally, DSSA wrote an application for a local service provider serving Stateway, the Elliot Donnelley Center, a Power Up grant application for an on-site computer learning center that was funded.

**Some Concluding Thoughts:**

**The Value of a Demonstration.** It's not too late to use NET and East Englewood for the inner city redevelopment demonstration it was intended to be.

**Housing in the Context of Neighborhood Asset Based Mapping/Planning.** Jody Kretzmann and John McKnight of the Northwestern Asset Based Community Development Institute have developed asset mapping strategies to discover community resources that can be built upon. They have developed case studies of troubled neighborhood redevelopment projects using ABCD principles in "Community Transformation: Turning Threats into Opportunities." A more application-oriented description of these principles can be found in the neighborhood redevelopment process that was developed by ABCD in Savannah, Georgia and is described in "Leading by Stepping Back: A Guide for City Officials on Building Neighborhood Capacity."

Technology support for these asset mapping initiatives. There were two Department of Commerce Technology Opportunity Program ("TOP") awards that were won by Chicago area institutions (Northeastern Illinois Planning Commission – NIPC, and the Center for Neighborhood Technologies – CNT) to illustrate the use of computers and the Internet for the visualization of community mapping and for local wireless mesh networks. **(Exhibits 23 and 24).**

**The Value of a Carefully Constructed RFP.** It would be possible for HUD to do a careful review of the physical condition and needs of the property at this time, update the services and technology potential of the building and promote responses to an RFP that would advance the "demonstration" potential of the project. If the RFP were managed as a Headquarters "demonstration," and the RFP was widely marketed and promoted, there could be responses from creative and competent development groups from all over the country. Quite apart from the serious competition that would develop for the efficient disposition of NET, there would be proposals created that would make up a collection of creative approaches for inner city redevelopment involving non-profit/for profit joint ventures, housing and service collaborations, residents services, technology and inner city economic development planning that could provide some modern principles for the uses of mixed income subsidized housing that could be applied widely, and differently, around the country.

**Publicity and Transparency in the Process of Selecting a Winner.** The publicity and transparency of the decision making process in selecting a winner could have important values as well. One of the problems with the current decision making process involving HUD and public housing authorities has been the relatively secretive ways in which discretion is exercised and decisions made. The goal of this competition would be to promote the opportunity widely, publicizing the submissions, and publicly announcing the winner and the reasoning for the decision. I appreciate that it will be challenging to provide structure to the RFP: a. describing the objectives of the redevelopment effort; b. deciding on HUD resources to allocate to the project; c. creating the terms and weight of the selection criteria; and d. developing a process for using the Internet to explain the opportunity and decision making process and the requirements of the competition for reporting on the planning and implementation process, and helping to support the adaptation and replication of the experience.