No. 03-2209C
(Judge Horn)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

ENGLEWOOD TERRACE LIMITED PARTNERSHIP,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

# JOINT STIPULATION OF FACTS

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

BRIAN M. SIMKIN
Assistant Director

PETER BAUGHER
Schopf & Weiss LLP
312 West Randolph Street
Suite 300
Chicago, IL 60606-1721

Attorney for plaintiff

PAUL R. WELLONS
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
1100 L Street, N.W.
Attn: Classification Unit
8th Floor
Washington, D.C. 20530
Tel: (202) 616-8253
Fax: (202) 307-0972

Attorneys for Defendant

SEPTEMBER 2, 2005

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| ENGLEWOOD TERRACE LIMITED PARTNERSHIP,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | No. 03-2209C<br>(Judge Horn) |

JOINT STIPULATION OF FACTS

Pursuant to the Court's order dated July 28, 2005, the parties submit the following joint stipulation of facts. The parties' "Stipulated Facts" appear below, followed by "Plaintiff's Proposed Statements of Fact" to which defendant would not stipulate. The numbered statements in each of these three sections contain citations to the accompanying Joint Appendix which is submitted contemporaneously.[1]

[1] In an effort to facilitate agreement on the proposed statements, the parties have reserved any objections to the admission into evidence of documents contained in the Joint Appendix. Accordingly, the parties do not intend for the appearance of documents in the Joint Appendix to constitute a waiver of any objections to the admission of such documents.

## Stipulated Facts

### I. Background Facts and Definitions

1. "Englewood" refers to plaintiff, Englewood Terrace Limited Partnership, a limited partnership organized pursuant to Michigan state law. Englewood owns South Pointe Towers. [Compl. ¶¶ 1, 17.]

2. "South Pointe" refers to South Pointe Towers, a 23-story, 303-unit apartment building located at 6425 South Lowe in Chicago, Illinois. [Compl. ¶¶ 1, 17.]

3. "DSSA" refers to DSSA New Englewood Terrace LLC, a sole proprietorship of Don S. Samuelson. DSSA replaced P.M. Group as Englewood's general partner in October 2002. [DSSA Management Letter dated Aug. 21, 2001 at 1 (JA __) Don Samuelson Deposition Transcript ("Samuelson Tr.") at 68-70 (JA __).]

4. "DSSA Management" refers to a company affiliated with DSSA. DSSA Management replaced P.M. One as South Pointe's managing agent in December 2001. [Samuelson Tr. at 90 (JA __).]

5. "P.M. Group" refers to Englewood's general partner during the period relevant to this dispute until October 2002. [P.M. One Letter dated Sept. 26, 2002 at 1 (JA __).]

6. "P.M. One" refers to a company affiliated with P.M. Group. P.M. One served as the managing agent for South Pointe during the period relevant to this dispute until December 2001. [P.M. One Letter dated Sept. 26, 2002 at 1. (JA __).]

7. "REAC" refers to HUD's Real Estate Assessment Center, which conducted inspections at South Pointe on April 28, 1999 and March 2, 2001. [Inspection Summary Report dated Apr. 28, 1999 at 1 (JA __); Inspection Summary Report dated Mar. 2, 2001 at 1 (JA __).]

II. Agreements Between The Parties

8. In response to the shortage of affordable housing for the low income residents of Chicago's Englewood community, Englewood and the U.S. Department of Housing and Urban Development ("HUD") formed a Housing Assistance Payment contract (the "HAP Contract") pursuant to the United States Housing Act of 1937, 42 U.S.C. § 1437. [HAP Contract at 1 (JA 1).] The HAP Contract stated that its purpose was "to make housing assistance payments on behalf of Families for the Contract Units; to enable the Families to lease decent, safe, and sanitary housing pursuant to Section 8 of the Act." [HAP Contract at 1 (JA 1).]

9. Paragraph 6 of the HAP Contract stated that Englewood was "to maintain and operate the Contract Units, unassisted units, if any, and related facilities to provide decent, safe, and sanitary housing including the provision of all the services, maintenance and utilities." [HAP Contract at 3 (JA 3).] The HAP Contract also stated that HUD "shall inspect or cause to be inspected at such times as may be necessary to ensure that the Owner is meeting its obligations to maintain the units in decent,

safe, and sanitary condition including the provision of the agreed-upon utilities and other services." [HAP Contract at 4 (JA 4).]

10. The HAP contract also stated that "[a] default by the Owner under this Contract shall result if . . . Owner has violated or failed to comply with any provision of, or obligation under, this Contract or of any Lease, including failure to correct any deficiencies identified by HUD in connection with any inspection." [HAP Contract at 11 (JA 11).]

11. In the event of a default by Englewood, the HAP Contract required HUD to notify Englewood of "(i) The nature of the default; (ii) The actions required to be taken and the remedies to be applied on account of the default (including actions by the Owner to cure the default); and (iii) The time within which the Owner shall respond with a showing that all the required actions have been taken." [HAP Contract at 11 (JA 11).]

12. If Englewood failed "to respond to or take action to the satisfaction of HUD, HUD shall have the right to take corrective action to achieve compliance with paragraph [20](b)(3) or to terminate th[e] Contract with HUD approval, in whole or in part, or to take other corrective action to achieve compliance in its discretion, or as directed by HUD." [HAP Contract at 11 (JA 11).]

13. HUD could also "reduce or suspend housing assistance payments" in response to Englewood's default. [HAP Contract at 11 (JA 11).]

14. The HAP Contract's one year term was scheduled to expire in 1999. [HAP Contract at 1 (JA 1).] The parties subsequently renewed the HAP Contract for one year in September of 1999. [1999 HAP Renewal Contract at 1 (JA __).]

15. On July 27, 2000, John Hayes, President of P.M. Group, requested a "subsequent renewal of my section 8 contract without restructuring . . . ." with a requested duration of four years and a listed comparable rent potential of $2,714,196. [Renewal Worksheet For Option 2 at 1 (JA __).]

16. Mr. Hayes executed a HAP Renewal Contract on October 16, 2000 (the "2000 HAP Renewal Contract"). Ben Tessler signed the 2000 HAP Renewal Contract on behalf of Mary Anderson, HUD Director of Operations, on October 18, 2000. [2000 HAP Renewal Contract at 2 (JA __).]

17. HUD representatives met with Carl Sanders, P.M. One's Property Manager, on October 18, 2001. Mr. Sanders received a signed copy of the 2000 HAP Renewal Contract from HUD on this date. [Declaration of Carl Sanders ("Sanders Decl.") at 11 ¶ 40, 41 (JA __).]

18. The 2000 HAP Renewal Contract executed by Mr. Hayes and Mr. Tessler stated that the "Contract shall run for an initial 1

Year period" and that "after the expiration of the initial term, this Contract shall renew automatically for 3 additional one-year terms, subject to the availability of appropriations in any year." [2000 HAP Renewal Contract at 1 (JA __).]

19. The 2000 HAP Renewal Contract contained an addendum stating:

> Owner agrees as a condition of renewing the Section 8 Contract that, in the event HUD's Real Estate Assessment Center (REAC) issues a physical inspection report to the Owner that has a score which evidences Owner failure to comply with HUD's Uniform Physical Condition Standards and Physical Inspection Requirement, or if the Owner is negotiating a Corrective Plan of Action to repair deficient items on the REAC inspection, or, if the Owner agreed to a Corrective Plan of Action and has endorsed said Plan, HUD may terminate the Contract after the renewal providing the Owner a reasonable period, as determined by HUD, to correct deficiencies or if the Owner fails to perform under an approved Correction Action Plan to Repair. Notwithstanding the foregoing, HUD may, at its option, continue the contract or renew said contract to facilitate the provision of vouchers for such reasonable time (not to exceed 180 days) as may be necessary to relocate eligible residents with Section 8 Vouchers. The Owner agrees to cooperate in the relocation of the residents by providing to HUD such information on income and occupancy as may be necessary to relocate the tenants. Upon relocation of such residents the Contract shall be terminated.

[Addendum To 2000 HAP Renewal Contract (JA __).]

20. On December 6, 2000, Veronica Coleman, Director of Project Management for HUD's Chicago Multifamily Hub, transmitted a letter to Mr. Hayes that stated, "[t]his letter is to inform you that we have amended your Section 8 HAP Contract from (one) 1 year to a (three) 3 month short term renewal with zero (0)

renewal terms." [Letter dated Dec. 6, 2000 at 1 (JA __).] The letter further stated, "[a]s we stated in our meeting on October 18, 2000, the contract will be renewed under a three (3) month short term contract, due to the physical conditions of the subject property." [Letter dated Dec. 6, 2000 at 1 (JA __).]

21. Gwendolyn Thomas, a Project Manager with HUD's Chicago Multifamily Hub, made notations on a copy of the signed 2000 HAP Renewal Contract to reflect these amendments. [Thomas Tr. at 243 (JA __).] Ms. Thomas made a second change to the 2000 HAP Renewal Contract on January 10, 2001, crossing out the reference to 3 months on the document and replacing it with 1 year, but maintaining the earlier amendment provision that there were no automatic renewals in the contract. [Thomas Tr. at 243 (JA __).]

22. On January 22, 2001, Ken Horton, Vice President of P.M. Group, transmitted to Ms. Coleman an e-mail that stated: "On a <u>separate note, pursuant to my conversation with Ms. Thomas last</u> week, she informed me that the HAP contract would be further amended to reflect the original expiration date of September 30, 2001. Please forward the amended, amended HAP contract to my attention at the following address." [E-mail from Ken Horton dated Jan. 22, 2001 at 2 (JA ).] Mr. Horton cc'd Mr. Hayes on this e-mail. [E-mail from Ken Horton dated Jan. 22, 2001 at 2 (JA ).]

23. Ms. Coleman responded to Mr. Horton with an e-mail. Following this exchange, Mr. Hayes informed Ms. Coleman that Mr. Horton would no longer be responsible for Englewood's loan application efforts. [E-mail from John Hayes dated 01/23/2001 (JA __).]

24. On August 21, 2001, HUD received a request for a renewal of the HAP Contract, along with a rent adjustment, with a supporting Rent Comparability Analysis, under the provisions of Section 8 of the HAP Contract." [Compl. ¶ 50.]

25. On September 26, 2001, Mr. Hayes executed another HAP Renewal Contract (the "2001 HAP Renewal Contract"). The 2001 HAP Renewal Contract stated that "[p]reviously, HUD and the Owner entered into a Housing Assistance Payments Contract ('Expiring Contract') to provide Section 8 assistance payments to the Owner for eligible families living in the Project. The term of the expiring contract will expire prior to the beginning of the term of the Renewal Contract." [2001 HAP Renewal Contract at 6 (JA _).] The purpose of the 2001 HAP Renewal Contract was "to renew the expiring contract for an additional term." [HAP Renewal Contract at 6 (JA __).]

26. The 2001 HAP Renewal Contract also stated that "[t]he term of the Renewal Contract begins on 10/01/2001." [2001 HAP Renewal Contract at 4 (JA __).] The 2001 HAP Renewal Contract indicated that "the Renewal Contract shall run for a period of .3

years, beginning on the first day of the term." [2001 HAP Renewal Contract at 4 (JA __).]

27. On December 21, 2001, Daniel Armistead executed another HAP Renewal Contract on behalf of Englewood. This HAP Renewal Contract stated that "the term of the Renewal Contract begins on 01/01/2002" and "shall run for a period of 0.5 years, beginning on the first day of the term." [Second 2001 HAP Renewal Contract at 2 (JA __).]

28. On June 26, 2002, Mr. Hayes executed another HAP Renewal Contract (the "2002 HAP Renewal Contract"). HUD executed the 2002 HAP Renewal Contract on July 3, 2002. [2002 HAP Renewal Contract at 14 (JA __).] The 2002 HAP Renewal Contract stated that "[t]he term of the Renewal Contract begins on 07/01/2002." [2002 HAP Renewal Contract at 4 (JA __).] The 2002 HAP Renewal Contract also stated that "the Renewal Contract shall run for a period of 0.3 years, beginning on the first day of the term." [2002 HAP Renewal Contract at 4 (JA __).]

## III. Facts Pertaining To South Pointe's Physical Condition

### A. Physical Inspections At South Pointe During 1999 and 2000

29. The purpose of HUD's Departmental Enforcement Center (the "DEC") was to centralize HUD supervision and management of troubled properties and to restore public trust in HUD's ability to employ subsidies to assist owners in providing decent, safe,

and sanitary housing. [Declaration of Freddie Batchelor ("Batchelor Decl.") at 1 ¶ 10 (JA ___).]

30. Edward Hinsberger, Director of HUD's Multifamily Housing Division ("MFH"), referred South Pointe from MFH to the DEC in September of 1998. [Property Referral dated Sept. 13, 1999 at 1 (JA ___).]

31. Freddie Batchelor was the Enforcement Analyst responsible for South Pointe for the time that it was in the DEC from the summer of 1998 through the spring of 2000. [Batchelor Decl. at 1 ¶¶ 3, 4 (JA ___).]

32. On April 28, 1999, REAC performed a physical inspection of 25 units at South Pointe. Out of a possible numeric score of 100, Englewood received an overall score of 42. [Inspection Summary Report dated Apr. 28, 2001 at 1 (JA ___).]

33. On May 19, 1999, representatives of Pinnacle Realty Management Company conducted a more comprehensive management review. Pinnacle's written report stated that Englewood had not corrected "severe findings" from the REAC inspection and that "[t]he owner has not corrected conditions that adversely affect the provision of decent, safe, and sanitary housing as required by the HAP contract." [Initial Report dated Aug. 10, 1999 at 4 (JA ___).]

34. Ms. Batchelor was responsible for preparing a "Draft Team Report" recommending that South Pointe be accepted for further review and possible sanctions. [Batchelor Decl. at 4 ¶ 11 (JA ___).] Ms. Batchelor also was responsible for preparing a draft "Final Action Plan." [Batchelor Decl. at 5 ¶ 15 (JA ___).] This document stated that "[t]his building has an infestation of roaches and rats. There are leaking pipes throughout the building. The elevators are all non-operable." [Draft Final Action Plan at 1 (JA ___).] Ms. Batchelor's draft noted that South Pointe should have received a score lower than 42 in the April 1999 REAC Report and recommended that HUD "go on with abatement of all Section 8 units" if funds were not earmarked "for all identified repairs necessary and needed." [Draft Final Action Plan at 2 (JA ___).]

35. On August 20, 1999, Mr. Hayes wrote to Mr. Hinsberger and stated that "[a]ll Health and Safety items such as non working Smoke Detectors, GFIs, etc. listed in the above referenced report have been corrected." [P.M. One Letter dated Aug. 20, 1999 at 1 (JA ___).]

36. DEC representatives visited South Pointe on August 30, 1999. [Deposition Transcript of Joan Kiening ("Kiening Tr.") at 174-75 (JA ___).]

37. On September 2, 1999, Mr. Hayes wrote to Joan Kiening, HUD Supervisory Enforcement Analyst, and indicated that Englewood's owner and management agent were completing a rehabilitation loan application with their lender, the Community Investment Corporation ("CIC"). [P.M. Group Letter dated Sept. 2, 1999 at 1 (JA __).]

38. Mr. Hayes stated that the purpose of his letter was to "to update you on our efforts to bring Southpointe Tower in compliance with HUD regulations." [P.M. Group Letter dated Sept. 2, 1999 at 1 (JA __).] Mr. Hayes reported that Englewood was applying for a loan "not only to assist in bringing the building into compliance with HUD regulations, but to implement a minor rehabilitation to the units in the building and replace the major systems (see attachment)." [P.M. Group Letter dated Sept. 2, 1999 at 1 (JA __).] He also indicated that Englewood's lender "needs some information from HUD as to what their position is with regard to the HAP contract for the property" and that Englewood would not obtain a loan "if we will not receive a contract." [P.M. Group Letter dated Aug. 8, 1999 at 1 (JA __).]

39. A handwritten draft letter was prepared by Ms. Batchelor for Ms. Kiening's signature. The draft letter thanked Englewood for the "courtesies extended to our Washington visitor and the rest of our staff during our trip on August 30, 1999" and stated that "[w]e were pleased to see the obvious

benefits of your increased security program, the potential your social programs hold, and the progress of the ongoing rehabilitation work." [Handwritten Draft Letter at 2 (JA __).]

40. On October 15, 1999, the City of Chicago Department of Buildings notified P.M. One that an inspection conducted on September 23, 1999 disclosed multiple City Municipal Code violations, including roach and rodent infestations, missing fire extinguishers, "garbage chutes with garbage everywhere," and "raw standing sewage" caused by an obstruction. [Notice of Violations and Summons dated Oct. 15, 1999 at 2-5 (JA _ ).] Englewood was notified of the inspection results so that it could respond to the alleged violations at a subsequent hearing on November 1, 1999. [Notice of Violations and Summons dated Oct. 15, 1999 at 1 (JA __).]

41. On December 8, 1999, Mr. Sanders submitted to Ms. Kiening a document titled "Management Improvement & Operating (MIO) Plan," developed in response to the REAC Inspection dated April 28, 1999. [P.M. One Letter dated Dec. 8, 1999 at 1 (JA __).] This document included information regarding a "status update and work in progress" responding to problems identified in the April 28, 1999 REAC inspection. [P.M. One Letter dated Dec. 8, 1999 at 1 (JA __).]

42. A Final Team Report—Resolution ("FTR") was prepared on January 26, 2000 by Ms. Batchelor. The FTR stated that the "property is in poor physical condition; however the owner has

corrected some of the identified repairs revealed by the REAC Inspection Report." [Final Team Report-Resolution at 8 (JA __).]

43. The FTR also stated that HUD had "tentatively accepted" the owner-submitted MIO plan, that the owner had "infused capital into the property totaling $770,000" and that the owner had committed "to completing all the necessary items identified in the REAC Inspection report that was conducted on 4/2[8]/1999." [Final Team Report-Resolution at 2 (JA __).] The FTR stated that the owners were "showing good faith by starting some repairs with their own funds" and were attempting to obtain a loan to offset the cost of remaining work. [Final Team Report-Resolution at 8 (JA __).]

44. The FTR concluded that "substantial progress" had been made "on the findings outlined in the REAC report, therefore the DEC should return the case to the Chicago Multifamily HUB Office for servicing." [Final Team Report-Resolution at 8 (JA __).] The FTR also recommended that HUD "continue the finalization of the MIO received on December 8, 1999." [South Pointe Towers Final Team Report-Resolution at 8 (JA __).]

45. The findings set out in the FTR were approved and concurred with by Ms. Edge and Mr. Krause from the DEC in Washington, Mr. Zale from the DEC in Chicago, Mr. Hinsberger from MFH, and Ms. Kiening, Ms. Batchelor, Ms. Baguio and Mr. Gustin from the DEC staff in Chicago. [Final Team Report-Resolution at 9 (JA __).]