46. Mr. Sanders subsequently wrote to HUD to provide "updates to the Management Improvement and Operating (MIO) Plan for the . . . REAC Inspection dated April 28, 1999." [P.M. One Letter dated June 7, 2000 at 1 (JA __).] Mr. Sanders provided updates regarding Englewood's progress on June 7, 2000, July 27, 2000, August 15, 2000, and October 17, 2000. [P.M. One Letter dated June 7, 2000 at 1 (JA __); P.M. One Letter dated July 27, 2000 (JA __); P.M. One Letter dated Aug. 15, 2000 (JA __); P.M. One Letter dated Oct. 17, 2001 (JA __).]

47. On March 13, 2000, Ms. Thomas conducted an on-site review at South Pointe. [Compl. ¶ 22.] Ms. Thomas's Management Review Questionnaire recorded "big problem with drugs and gangs in area and building" and noted that Englewood had hired "off duty police where persons in violation can be arrested on [the] spot." [Management Review Questionnaire dated Mar. 13, 2000 at 3 (JA __).]

48. During her review, Ms. Thomas visited three occupied apartments and five vacant units at which evictions had been made. Ms. Thomas recorded that "stairwells were dirty and smell of urin[e]," and that elevators were not functioning properly. [Management Review Questionnaire dated Mar. 13, 2000 at 2 (JA __)]. She typed her report on May 7, 2000. [Deposition Transcript of Gwendolyn Thomas ("Thomas Tr.") at 172 (JA __).]

49. On June 16, 2000, Ms. Coleman informed Mr. Hayes of the results of HUD's March 14, 2000 on-site review.

Ms. Coleman's letter apologized for the delay in transmitting the results of the on-site review. [Letter dated June 16, 2000 at 1 (JA __).]

50. Ms. Coleman's letter informed Mr. Hayes that South Pointe received a "below average" rating "attributable to," among other items, "serious violations of the project's Housing Assistance Payment Contract (HAP)." [Letter dated June 16, 2000 at 1 (JA __).] Ms. Coleman's letter stated that "the Department does not allow management to continue at this level of performance. Failure to perform the necessary corrections will result in removal of the agent and denial of future participation in HUD's programs." [Letter dated June 16, 2000 at 1 (JA __).]

51. P.M. One submitted a response to this on-site review on July 10, 2000. [P.M. One Letter dated July 10, 2000 at 1 (JA _ ).] Ms. Coleman informed Mr. Sanders that HUD had approved this response in a letter dated October 3, 2000 and cc'd to Ms. Thomas. She informed P.M. One that "[t]his review is now closed" and that, "[o]n the next review, findings will be verified for corrections made. This includes items identified in the REAC physical inspection report." [Letter dated Oct. 3, 2000 at 1 (JA __).]

52. On November 3, 2000, P.M. One's on-site management staff conducted inspections of the units at South Pointe. [Physical Inspection Summary at 1 (JA __).] P.M. One's staff created an inspection report concerning the physical needs of the units as well as a summary of their findings. The report

indicated that all of the cabinets should be refinished, that closet doors should be replaced, and 95% of the units needed to be repainted. [Physical Inspection Report at 1 (JA __).]

53. The Physical Inspection Summary stated that "elevators are always out of order and it's always the same problem." [Physical Inspection Summary at 2 (JA __).] The summary also stated that conditions around garbage chutes were "unsanitary" and "a danger to children." [Physical Inspection Summary at 2 (JA __).] P.M. One's summary recorded an average of six rodent holes in each unit inspected. [Physical Inspection Summary at 2 (JA __).]

B. <u>The 2001 REAC Inspection And Englewood's Response</u>

54. On March 2, 2001, REAC again inspected a sample of 25 units at South Pointe. Frank Caperton, the REAC inspector who inspected South Pointe, left a two page list of Exigent Health and Safety ("EH&S") items with P.M. One's on-site staff. These items included one inoperative smoke detector, five missing or broken outlet covers, three missing breakers, a light fixture missing in the maintenance room, a fire extinguisher without a current tag in the penthouse, a blocked exit in the trash room, and a missing cover on an electrical panel in the penthouse. [Notification of Exigent and Fire Safety Hazards Observed (JA _).]

55. Pursuant to applicable regulations, Englewood was required to correct all EH&S items immediately and report its repairs to HUD within three business days: "The owner must

mitigate all EHS items immediately, and the owner must file a written report with the applicable Multifamily Hub Director within 3 business days of the date of the inspection, which is the date the owner was provided with the EHS notice." 24 C.F.R. § 200.857(c)(2).

56. On March 6, 2001, Mr. Hayes provided Ms. Thomas with a "certification" that exigent health and safety items identified in the REAC inspection had been corrected. [P.M. One Letter dated March 6, 2001 (JA ___).]

57. Ms. Thomas visited South Pointe on March 7, 2001. She "toured the property with the assistant manager and a maintenance man, neither of whom understood the importance of this EH&S inspection in the context of [Englewood's] HAP Contract." [Declaration of John Hayes ("Hayes Decl.") at 8 ¶ 36 (JA ___).] Mr. Sanders "assumed the on site staff would show her what we had done." [Declaration of Carl Sanders ("Sanders Decl.") at 13 ¶ 46 (JA ___).]

58. On March 8, 2001, HUD transmitted the overall results of the REAC inspection to P.M. One. Out of a possible total score of 100, South Pointe received a REAC score of 31. [Inspection Summary Report dated Mar. 2, 2001 at 1 (JA ___).] In its transmittal letter, HUD informed Englewood's property manager, P.M. One, that "you have 30 days in which to submit a Proposed Plan of Correction to your local HUD field office." [Letter dated Mar. 8, 2000 at 1 (JA ___).]

59. HUD also directed P.M. One that "[b]efore you can prepare your plan, you are required to conduct a survey of your property to determine if any additional deficiencies exist." [Letter dated Mar. 8, 2001 at 1 (JA __).] HUD instructed P.M. One to "complete your survey and forward your Proposed Plan in Management Improvement Operating Plan (MIO) format, within 30 days of the date of this letter." [Letter dated Mar. 8, 2001 at 1 (JA _).]

60. HUD's transmittal letter stated that "[u]pon receipt of the Plan, the Project Manager will review it to ensure that it has sufficient detail regarding plans and resources for correction, and that the time frames are appropriate. The Project Manager will contact you to discuss any required amendments and the process that will be used to verify completion of the Plan." [Letter dated Mar. 8, 2001 at 2 (JA _).]

61. On March 9, 2001, Ms. Coleman wrote to Mr. Hayes stating that HUD had conducted its "confirmatory review" with P.M. One staff members present. [Letter dated Mar. 9, 2001 at 1 (JA __).] Ms. Coleman's letter stated that "only a few of the EHS items had been mitigated and not all as you certified. When the confirmatory review concluded, all items found to be inaccurately certified were discussed with your staff." [Letter dated Mar. 9, 2001 at 1 (JA __).]

62. Ms. Coleman's letter stated that "the fact that your property is not in good repair places you in violation of your

Housing Assistance Payment (HAP) Contract (refer to Section 542 (a) Addendum)." [Letter dated Mar. 9, 2001 at 1 (JA __).] Ms. Coleman's letter further stated that "false certifications and contract violations are serious infractions that HUD will not tolerate. Should actions like these continue, we will not hesitate to exercise our rights and/or remedies under the HAP contract, including reduction, suspension, abatement, or termination of the Section 8 Assistance Payments." [Letter dated Mar. 9, 2001 at 1 (JA __).]

63. On March 8, 2001, representatives of the Illinois Housing Development Authority inspected South Pointe as part of its annual tax credit review. In addition to finding exposed wires and non-functioning fire alarms, the Illinois Housing Authority documented that smoke detectors were missing or non-functioning and that light fixtures and outlet covers were missing. [IHDA Letter dated Mar. 19, 2001 (JA __).]

64. On March 16, 2001, Mr. Hayes submitted a written response to Ms. Coleman's letter. His response stated that the property manager wished to "ensure total compliance with all HUD regulations" and "open lines of communications" but acknowledged that "over the last year or so this has not been met to HUD's satisfaction." [P.M. Group Letter dated Mar. 16, 2001 at 1 (JA _).] Mr. Hayes's letter explained that he "relies solely on the information received from the property management company." [P.M. Group Letter dated Mar. 16, 2001 at 1 (JA __).] Mr. Hayes's letter further stated his "belief upon investigation with

property management" that the previous certification was correct. [P.M. Group Letter dated Mar. 16, 2001 at 1 (JA __).]

65. As part of Englewood's interest in obtaining a HUD-insured rehabilitation loan, BABCO Construction provided P.M. Group with a scope of work dated March 19, 2001. This scope of work states that it was "loosely based on the plans prepared by Ted Dunaj." [BABCO Scope of Work dated Mar. 19, 2001 at 1 (JA _ ).]

66. On March 19, 2001, HUD received a mortgage insurance application from P.M. Group in which P.M. Group outlined repairs it intended to make at South Pointe. [Letter dated Apr. 3, 2001 at 1-2 (JA __).]

67. On March 22 and 23, 2001, HUD, through inspector Ray Etzkorn, conducted an inspection of South Pointe. Mr. Etzkorn prepared a report that recorded the "physical condition," "needed maintenance," and the "estimated cost" of repairs of "items inspected" at South Pointe. [Report Prepared By HUD at 1 (JA _ ).] This report also recorded Mr. Etzkorn's additional comments. [Report Prepared by HUD at 2 (JA __).]

68. Mr. Etzkorn's report listed estimated costs of $650,000 for the replacement of the penthouse, $666,000 for the replacement of all kitchen cabinets, $151,000 for the replacement of countertops, $242,000 for the replacement of appliances, $240,000 for electrical service and distribution upgrades, $437,000 for bathrooms upgrades, $303,000 for the installation of

air conditioning, $150,000 for the replacement of an emergency generator, and $257,000 for individual heating controls. [Report Prepared by HUD at 1-5 (JA __).]

69. On April 3, 2001, Mr. Hinsberger informed Mr. Hayes that HUD was rejecting Englewood's application for mortgage insurance because "the repairs outlined in your application are inadequate when compared to the needs of the property." [Letter dated Apr. 3, 2001 at 2 (JA __).] Mr. Hinsberger's letter further stated that HUD rejected Englewood's application because the appraisal value was overstated and because HUD "would not process this refinancing with P.M. One remaining in the position of management agent due to their poor past performance." [Letter dated Apr. 3, 2001 at 2 (JA __).] Finally, Mr. Hinsberger's letter listed 15 required documents that Englewood's loan application was missing or that were incomplete. [Letter dated Apr. 3, 2001 at 2-3 (JA __).]

70. Mr. Hinsberger's letter also stated that "HUD has allowed you 23 months from the date of the initial Real Estate Assessment Center (REAC) Inspection conducted on April 28, 1999, and your Management Improvement Operating (MIO) Plan submitted to our Enforcement Center on December 8, 1999, to bring the property into compliance." [Letter dated Apr. 3, 2001 at 1 (JA __).]

71. On April 5, 2001, P.M. One sent HUD a document titled as a MIO plan that reported "the status update [of] work in progress" performed in response to the March 2, 2001 REAC inspection. [Letter dated Apr. 5, 2001 (JA __).]

72. On April 8, 2001, Kelly Brown, Regional Property Manager for P.M. One, sent Ms. Coleman a letter with attachments identified as a "Management Improvement and Operating Plan (MIO) and the Emergency Health and Safety (EH&S) Certification from the owner." [Letter dated Apr. 8, 2001 at 1 (JA __).] Ms. Brown did not submit a MIO Plan on form HUD-9835, which requires owners to submit a complete survey of needed improvements, a plan of correction, and sources of funding. [Form HUD-9835 at 1 (JA __).]

C. HUD Issues Notice Of Default

73. On April 9, 2001, HUD issued a notice of contract default to Englewood. [Notice of Default dated Apr. 9, 2001 at 1 (JA __).] This notice, executed by Mr. Hinsberger and Margarita Maisonnet, the Director of the CSO of HUD's Departmental Enforcement Center, stated that "[a]ll of the Project, its units, systems, common areas and building(s) must satisfy HUD's Physical Condition Standards, 24 C.F.R., Part 5, Subpart C." [Notice of Default dated Apr. 9, 2001 at 2 (JA __).]

74. The notice also stated that the "failure to keep and maintain the Project in a decent, safe, and sanitary condition is a default of the HAP contract." [Notice of Default dated Apr. 9, 2001 at 2 (JA __).] HUD informed Englewood that failure to correct the events of default "to the satisfaction of HUD within 30 days from the date of this Notice" could cause HUD to "seek any and all available remedies including, without limitation,

suspending or abating the HAP contract." [Notice of Default dated Apr. 9, 2001 at 2 (JA __).]

75. On April 13, 2001, Mr. Hayes met with HUD representatives. Mr. Hayes wished to discuss "the various approaches to the improvement program" needed at South Pointe. [Compl. ¶ 38.]

76. On May 15, 2001, Ms. Coleman returned P.M. One's April 8, 2001 response to the March 8, 2001 REAC Report. Ms. Coleman's cover letter stated that HUD would not accept Ms. Brown's response "due to impending negotiations with HUD . . . concerning your proposed refinance and substantial rehabilitation of the property." [Letter dated May 15, 2001 (JA __).] Ms. Coleman's letter also stated that "[a]lthough the letter from REAC directs you to prepare a Management Improvement and Operating (MIO) Plan subject to our approval, the condition of this property is beyond that point as acknowledged by your application to refinance that we rejected due to major deficiencies." [Letter dated May 15, 2001 (JA __).]

77. On May 16, 2001, Mr. Hinsberger and Ms. Maisonnet sent P.M. One a notice of continuing default. This notice requested that P.M. One "provide adequate, timely information describing the immediate efforts that the Owner is making to address the HAP default and the sale of the Project and proposed assumption of the HAP contract." [Notice of Continuing Default dated May 16, 2001 at 1 (JA __).] This notice also advised P.M. One that HUD was "proceeding with its process to secure vouchers for

relocation of eligible tenants." [Notice of Continuing Default dated May 16, 2001 at 1 (JA __).]

78. In July 2001, the Office of the State's Attorney for Cook County, Illinois declared South Pointe a public nuisance because "narcotics are being bought and sold in and around this property. In addition, the Chicago Police Department has expressed concern that this property is being used for illegal drug activity." [Notice of Public Nuisance dated Jul. 7, 2001 at 1 (JA __).]

D. Don Samuelson's Tour Of South Pointe

79. A potential buyer of South Pointe was Don Samuelson, plaintiff's current representative. Mr. Samuelson previously had purchased and managed "troubled" projects. [Samuelson Tr. at 69 (JA __).] At his deposition, Mr. Samuelson defined as "troubled" those projects "that have need for physical improvements, better marketing, better management, resident services, that can be more effective as places for people to live and become an asset to the community rather than a toxic waste." [Samuelson Tr. at 69 (JA _ ).]

80. Mr. Samuelson toured South Pointe in the summer of 2001 and discovered a lack of physical security "because of locks on various entries and exits that had been broken or compromised and the relative freedom that gangs and gang-related and drug interests had in moving off the street, into the building, up into the units and around the building." [Samuelson Tr. at 76 (JA __).]

81. Mr. Samuelson also found that gangs and drug dealers repeatedly sabotaged the elevators at South Pointe: "So the elevators had been vandalized, stopped, doors put off, lots of things that would keep them not operational so that there was relative greater capacity for people to roam the building stairwells than the elevator system." [Samuelson Tr. at 78 (JA _ ).]

82. "One major problem" Mr. Samuelson observed "was the absence of physical equipment-entry controls, locks, buzzers, intercoms, surveillance cameras, etc.-to support the efforts of the guards to control access to the building." [Declaration of Don Samuelson ("Samuelson Decl.") at 2 ¶ 5 (JA __).] "Without a physical access control system, and the presence of an armed guard inspecting the stairwells, corridors, common areas and grounds 24 hours a day, there was little control of what went on within the building, particularly after hours and on the weekends when management was not present." [Samuelson Decl. at 2 ¶ 6 (JA _ ).]

83. According to Mr. Samuelson's assessment, South Pointe's physical deficiencies could only be resolved after its management corrected its security problems: "In a building like that or like some of the CHA buildings, its very difficult to manage buildings if you don't have the security. If you don't have control over the building and the ability of eliminating gangs, drugs, and criminal activities, you are very hard-pressed. Everything else follows from that." [Samuelson Tr. at 79 (JA __).]

84. When asked whether South Pointe was not for faint hearted tenants, Mr. Samuelson stated that South Pointe "wasn't for the faint-hearted anyone." [Samuelson Tr. at 144 (JA __).]

85. Mr. Samuelson prepared a six-page "workout" report on April 6, 2001. The report addressed improvement programs considered in the past, a proposed work program, a review of the project's past financial performance, a request for a rental increase, a loan application, financial projections for 2002 and 2003, a description of a proposed resident services program including workforce training and job placement, and a proposal to replace P.M. Group as Englewood's general partner with DSSA. [DSSA Letter dated Aug. 6, 2001 at 1-5 (JA __).]

86. Mr. Samuelson's report stated that P.M. One's on-site staff "is relatively non-productive. Security is not effective" and that "the current condition of [South Pointe's] penthouse is inefficient and dangerous." [DSSA Letter dated Aug. 6, 2001 at 1 (JA __).] Mr. Samuelson confirmed the accuracy of these statements during his deposition. [Samuelson Tr. at 81 (JA __).]

87. At this time, Mr. Samuelson began working as an "unpaid consultant" to P.M. One: "I was helping as a buyer to put together a program that I thought would be financeable by HUD and successful in the marketplace and convert what was a very crime-ridden, drug-laden project into an attractive addition to the Englewood community." [Samuelson Tr. at 91 (JA __).]

E. HUD Funds Vouchers

88. On October 1, 2001, Mr. Hinsberger notified Mr. Hayes and Mr. Samuelson via e-mail that the Chicago Housing Authority "will begin issuing vouchers for the residents at South Pointe today." [E-mail from Ed Hinsberger dated October 1, 2001 (JA _ ).] Mr. Hinsberger's e-mail stated that "the Sec. 8 contract will be terminated once all of the residents receive their vouchers. The residents can remain in the project if their individual units pass the CHAC inspection. If they care to move, the voucher is portable and they will be able to do that too." [E-mail from Ed Hinsberger dated October 1, 2001 (JA __).]

89. Mr. Hayes responded to Mr. Hinsberger's e-mail by writing that this seemed "unconscionable and unfair." [E-mail from John Hayes dated 10/01/2001 (JA __).]

90. Mr. Hinsberger forwarded a portion of an e-mail from Ms. Coleman dated January 23, 2001 "addressing the same issue." [E-mail from Ed Hinsberger dated 10/01/2001 (JA _).] Mr. Hinsberger stated that "to accommodate you, and the prospective purchaser, we are willing to continue to process the mortgage insurance application once a complete application is received that addresses the deficiencies." [E-mail from Ed Hinsberger dated 10/1/2001 (JA __).]

91. On October 2, 2001 Mr. Samuelson responded to this e-mail by writing that "I presume that the termination of the Section 8 contract - rather your decision not to extend the 90 day extension - follows a set of delineated due process

procedures." [E-mail from Don Samuelson dated 10/2/2001 (JA _ ).]

92. On October 11, 2001, Mr. Samuelson sent an e-mail to Mr. Hinsberger and Mr. Hayes stating that, "I'm surprised at the rigidity of your position which is completely at odds with the Section 8 renewal assumptions we were all making in August and September. Conceding of course that there was the possibility of the use of vouchers." [E-mail from Don Samuelson dated 10/11/2001 (JA __).]

93. On October 22, 2001, HUD representative Lily Simmons visited South Pointe. In an e-mail, she reported the "smell of urine throughout the building," "exposed wires," and "roaches in the hallways and on the walls." [E-mail from Lilly Simmons dated 10/22/2001 (JA __).]

94. By October 2001, Mr. Samuelson regarded vouchers as a potentially advantageous way to induce problem tenants to move voluntarily rather than incurring the delay and expense associated with evictions: "There is clearly a bad element at South Pointe. Intimidators. Have to be identified and moved. Perhaps vouchers could serve a useful purpose in this regard." [E-mail from Don Samuelson dated 10/11/2001 (JA __).] Mr. Samuelson had pursued this strategy at other properties he managed. [Samuelson Tr. at 66-67. (JA __).]

95. According to Mr. Samuelson, "there was a very aggressive effort during those three months to move people out or help move people out." [Samuelson Tr. at 143 (JA __).]

Mr. Samuelson hired an employee to facilitate removing tenants who received vouchers. "We had a person named Charles Woods who was specifically hired to do nothing more than tend to tenant needs and interests and help them relocate . . . . we were particularly interested in having some of the tenants leave because we had had experience with difficulty -- records of difficulty with them and there had been efforts of trying to evict them in the past that hadn't been successful." [Samuelson Tr. at 141 (JA ___).]

96. As these tenants left, Englewood explained that non-payment could jeopardize tenant's entitlement to vouchers but did not seek reimbursement from them for unpaid rent or damage the tenants had caused to apartments. At his deposition, Mr. Samuelson explained that "it struck me that it would be just a waste of money to retain a lawyer and to try to collect rents" [Samuelson Tr. at 144 (JA ___).]

97. On October 29, 2001, Englewood filed a complaint in the Federal District Court for the Northern District of Illinois seeking a declaratory judgment that HUD "(1) failed to renew the Housing Assistance Payment contract ("HAP contract"); and (2) issued Section 8 vouchers to tenants in violation of the Multifamily Assisted Housing Reform and Affordability Act (MAHRA)." [Order dated Nov. 15, 2001 at 1-2 (JA ___).]

98. The court denied Englewood's request for an injunction against the issuance of vouchers. The court concluded that "HUD never formally terminated Englewood's HAP contract. Rather, HUD

provided Englewood with notice that it was in continuing default under the HAP contract and that HUD would begin the process of providing vouchers for relocation of eligible tenants." [Order dated Nov. 15, 2001 at 3 (JA __).] The court also held that "(t)he harm that Englewood asserts is not irreparable because it is a loss of project-based revenue provided by the HAP contract which, should Englewood prevail, may be compensated at the conclusion of this litigation." [Order dated Nov. 15, 2001 at 3 (JA __).]

99. On November 30, 2001, HUD issued a "Notice of Abatement and Termination." This document stated that Englewood had failed to demonstrate that it had maintained the units at Englewood in decent, safe, and sanitary condition as defined by 24 C.F.R. Part 5, Subpart G within 30 days of HUD's April 9, 2001 formal notice of default. [Notice of Abatement and Termination dated Nov. 30, 2001 at 1 (JA __).] This notice further stated that Englewood "has not cured the conditions complained of in the notice" and that, if Englewood did not provide a written objection or cure the underlying basis of default within 30 days, HUD's decision to terminate the contract would become final. [Notice of Abatement and Termination dated Nov. 30, 2001 at 1 (JA __).] HUD informed Englewood that it intended to terminate the contract after completing "its voucher and relocation process for all eligible residents in the Project." [Notice of Abatement and Termination dated Nov. 30, 2001 at 1 (JA __).]