100. This notice also stated that the voucher and relocation process "may extend beyond the expiration date of the current HAP Contract Renewal." [Notice dated Nov. 30, 2001 at 1 (JA __).] HUD stated that "[t]o safeguard the residents, and not affecting HUD's determinations as set forth above, HUD will provide Owner with a HAP Contract Renewal with Addendum. Please execute the extension and return it to HUD promptly." [Notice of Abatement and Termination dated Nov. 30, 2001 at 2 (JA __).]

F. The Aftermath of HUD's Notice of Abatement and Termination

101. On December 21, 2001, Englewood's attorneys transmitted its response to HUD's "Notice of Abatement and Termination of Housing Assistance Payment Contract." Englewood's attorneys informed HUD that Englewood objected to HUD's "notice of non-renewal and seeks to exercise its right to cure, as required pursuant to Chapter 13 of MAHRA." [Letter dated Dec. 21, 2001 at 1 (JA __).]

102. Representatives of the parties met at HUD's Chicago office on January 22, 2002. [Compl. ¶ 63.] On February 7, 2002, Greg Gustin, Lead Enforcement Attorney, informed Englewood that HUD's final decision was to uphold its right to "continue to act as it stated in its November 30, 2001 Notice of Abatement and Termination." [Letter dated Feb. 7, 2002 at 1 (JA __).] App. 298.

103. HUD conducted a hearing regarding Englewood's claims in Washington, D.C. on April 16, 2002. [Compl. ¶ 65.] On May 2, 2002, Howard Mayfield, Deputy Director, Office of Asset

Management, informed Englewood that he affirmed HUD's February 7, 2002 final decision. [Notice of Reviewing Official's Appeal Decision at 2 (JA __).]

104. In June 2002, Englewood renewed its lawsuit in Federal district court. That suit was dismissed with prejudice for failure to prosecute in March 2003.

105. Ms. Thomas visited Englewood on June 28, 2002. In an e-mail dated July 2, 2002, she reported that "most of the stairwells were not lit, smelled of urine." [E-mail from Gwendolyn Thomas dated 07/02/2001 (JA __).] She also reported exposed wires, non-functioning elevators, missing fire extinguishers, and garbage on the floors of common areas. [E-mail from Gwendolyn Thomas dated 07/02/2001 (JA __).]

106. CHAC, Inc., the company administering HUD's voucher program, determined that the Englewood community "is not an appropriate location for the use of housing vouchers." [Compl. ¶ 69.]

107. On September 26, 2002, Michael G. McGhie, P.M. One's President, wrote to HUD and acknowledged that "problems did exist in the operation of P.M. One properties in Chicago." [P.M. One Letter dated Sept. 26, 2002 at 1 (JA __).] In recognition of P.M. One's "poor track record," Mr. McGhie offered for P.M. One "to be placed on probation." [P.M. One Letter dated Sept. 26, 2002 at 1 (JA __).]

108. On February 6, 2003, P.M. One's attorneys wrote to HUD and asked that HUD remove "risk flags placed on P.M. One, Michael

McGhie and John Morrissey." [P.M. One Letter dated Feb. 6, 2003 at 1 (JA __).]. P.M. One's lawyers also stated that in 1998 PMG entered into a plan with DEC that called for the "refinancing and rehabilitation of South Pointe. After ample opportunity to do so, PMG failed to execute that aspect of the Plan." [P.M. One Letter dated Feb. 6, 2003 at 5 (JA __).] P.M. One's lawyers stated that HUD's "DEC was correct that South Pointe required financing and rehabilitation that only PMG could provide." [P.M. One Letter dated Feb. 6, 2003 at 5 (JA __).]

109. In June 2003, a fire destroyed records at South Pointe. According to Mr. Samuelson, "drug interests" broke into South Pointe's management office and set this fire: "And I think it became understood by the drug interests that the camera tapes would in fact be stored in the management office . . . . So at 5 o'clock or 4:30 a.m. one night, there was a mysterious fire that was set in the management office which destroyed most of the records in the management office." [Samuelson Tr. at 136 (JA _ ).]

H. Reported Incidents At South Pointe

110. Between January 1, 1999 and December 31, 2001, the Chicago Police responded to a total of 794 incidents reported at South Pointe. [Report of Crimes Occurring at South Pointe at 1-29 (JA __).]

111. These included at least two homicides (Report of Crimes Occurring at South Pointe at 29( JA __)), 39 burglaries (Report of Crimes Occurring at South Pointe at 15-16 (JA __)),

more than 50 assaults (Report of Crimes Occurring at South Pointe at 16-17 (JA __)), and more than 100 batteries. [Report of Crimes Occurring at South Pointe at 19-27 (JA __).]

IV. Englewood's Claims For Reimbursements

A. Rent Increase Requests

112. HUD Directive H 98-34 required owners requesting rent increases for contracts expiring in 1999 to provide comparability studies to justify requested rents: "In order for an owner of an insured or HUD-held project to claim eligibility under this provision, they must obtain a rent comparability study." [Directive Number 98-34 at 8-9 (JA __).] This directive also stated that rent increases would be established at the time of a contract renewal. [Directive Number 98-34 at 8-9 (JA __).]

113. P.M. One transmitted a rental increase request on behalf of Englewood to Ms. Thomas on March 23, 1999. [P.M. One Letter dated March 23, 1999 at 1 (JA __).] P.M. One's submission requested that HUD grant it a 5 % rent increase retroactive to October 1, 1998. [P.M. One Letter dated Mar. 23, 1999 at 1 (JA __).] It contained no information regarding rents charged at comparable properties. [P.M. One Letter dated Mar. 23, 1999 at 1 (JA __).]

114. On April 9, 1999, Ms. Coleman wrote to P.M. Group's general partner and explained that HUD was "returning your request to you" because "your contract is due to expire in fiscal year 1999 and rent increase requests must be submitted in

accordance with HUD Notice H 98-34." [Letter dated Apr. 9, 1999 at 1 (JA __).]

115. On May 18, 1999, P.M. One forwarded to HUD a re-submission of its 1999 request for a rental increase. [P.M. One Letter dated May 18, 1999 at 1 (JA __).] HUD denied this request for a rental increase because Englewood requested a retroactive rent increase; submitted budget information only showing transactions through 1998; did not submit comparables acceptable to HUD, and did not justify claimed increased expenses to HUD's satisfaction. [Letter dated Oct. 18, 1999 at 1 (JA __)]

116. On August 21, 2001 Mr. Samuelson submitted a new rent increase request on behalf of Englewood. [DSSA Management Letter dated Aug. 21, 2001 at 1 (JA __).]

117. On August 31, 2001, Mr. Samuelson wrote to HUD to "summarize the HAP Extension/Rental Increase and Firm Commitment applications that we have supplied to you with respect to South Pointe." [DSSA Letter dated Aug. 31, 2001 at 1 (JA __).] Mr. Samuelson's letter stated that "[i]t is our understanding that the contract extension and rental increase will be granted contingent upon DSSA's purchase of the partnership interest within a time period satisfactory to HUD." [DSSA Letter dated Aug. 21, 2001 at 2 (JA __).]

118. Mr. Samuelson's letter indicated that "the general feeling is that there was general agreement on the scope of work proposed by HUD and the overall costs of the rehabilitation effort." [DSSA Letter dated Aug. 31, 2001 at 2 (JA __).]

Mr. Samuelson's letter also stated that "on site management has not been effective in recent years." [DSSA Letter dated Aug. 31, 2001 at 3 (JA __).]

119. Mr. Hinsberger notified Mr. Samuelson in an e-mail that a rent comparability study "supports the proposed rents. The submission was made by you. It needs to be signed by the owner or the current manager. There was a spot on your 8/21/2001 letter authorizing you to submit, but Mr. Hayes didn't sign it." [E-mail from Ed Hinsberger dated 09/06/2001 (JA __).] Mr. Hinsberger informed Mr. Samuelson that HUD would "allow the new rents to kick in at the time of closing" of Mr. Samuelson's purchase of South Pointe. [E-mail from Ed Hinsberger dated 09/06/2001 (JA __).] Mr. Hinsberger's e-mail also stated that the "HAP Contract is being extended with a short term renewal for 90 days past the expiration at the end of September 2001." [E-mail from Ed Hinsberger dated 09/06/2001 (JA __).]

B. South Pointe's Special Claims and Requests For Reimbursement

120. The HAP Contract contains no provisions entitling Englewood to reimbursement for unpaid rent or tenant-caused damage. However, as a matter of policy, HUD will reimburse owners who file "special claims" for tenant-caused damages.

121. HUD requires owners to certify that they "took all reasonable steps to collect the debt" and retain authenticating documentation. [Section 8 Special Claims for Unpaid Rent/Damages at 1 (JA __).] In order to receive these reimbursements, HUD

requires owners to submit a signed and completed claim form HUD-52671-B; a list of all units leased and available for lease; evidence of marketing efforts, including advertisements and a copy of the waiting list; and documentation explaining the outcome of applicant contacts including copies of letters to rejected applicants. [HUD Directive Number 4350.3 ¶ 9-14 (JA __).]

122. On or around March 31, 2000, Englewood representatives submitted special claims for unpaid rent and tenant caused damages. [Section 8 Special Claims for Unpaid Rent/Damages at 1. (JA __).]

123. On November 17, 2000, HUD informed Mr. Sanders that "we are unable to approve your claims due to the following reasons: Claims were received late (received 10/3/00, should have received no later than 9/7/00) and missing documentation. Listed below are the required documents that were not included in your claims." [Letter dated Nov. 17, 2000 at 1 (JA __).] Among the documents listed were "HUD-52670A, Part 2 (Schedule of Section 8 Special Claims" . . . Copy of Owner's notice to HUD of vacancy . . . Copy of waiting list . . . Tenant Payment History." [Letter dated Nov. 17, 2000 at 1 (JA __).]

124. In 2001, HUD initiated a program through which property owners could request reimbursement for high energy costs. "In order for owners to take advantage of the opportunity for a utility lump sum adjustment," properties had to be acceptably managed and "in good standing with all Business

Agreements signed with the Department." [Guidelines for Processing Renewal Adjustment for Escalating Energy Costs at 3 (JA ___).]

125. Englewood submitted a request for a lump sum reimbursement of $55,230.99 for its energy costs on August 6, 2001. [Energy Lump Sum Adjustment Supplement To HAP Contract at 4 (JA ___).] HUD denied this energy lump sum adjustment because it had declared Englewood to be in default of the HAP Contract.

126. On May 31, 2002 and July 31, 2002, Mr. Samuelson submitted letters to Mr. Hinsberger in which he claimed that Englewood was entitled to a total of $557,349 in lost revenues. [DSSA Management Letter dated May 31, 2002 at 1-2 (JA ___); DSSA Management Letter dated July 31, 2002 at 2 (JA ___).] These claims included a request for $139,187 in "Rental Adjustments for Escalating Energy Costs," as well as additional amounts for lost revenues for vacant apartments, unpaid rent, and tenant-caused damage to apartments. [DSSA Management Letter dated July 31, 2002 at 2 (JA ___).]

127. Mr. Samuelson wrote to Mr. Hinsberger that "I understand that you have taken the position that South Pointe is not eligible for any of the financial claims described below because South Pointe was 'not in good standing.' However, if these claims are determined to be valid, there were $430,299 in lost revenues at South Pointe during the past year." [DSSA Management Letter dated May 31, 2002 at 1-2 (JA ___).]

Plaintiff's Proposed Statement of Facts

1. The DEC worked closely with Englewood to ensure that additional investments were made in South Pointe by Englewood and to provide for a rehab loan that could complete the additional work that needed to be done. [Kiening Tr. at 189-90 (JA __); Batchelor Decl. at 6, 7 ¶¶ 17, 21 (JA __).] Meanwhile, Ms. Thomas falsely stated in the loan review process that a "flag" was being issued against Englewood. [E-mail from Gwendolyn Thomas dated 11/30/99 (JA __); Thomas Tr. at 124–126 (JA __).] Ms. Thomas knew and intended that others at HUD would rely upon her recommendation in their decision. [Thomas Tr. at 127–132 (JA __).]

Response To Plaintiff's Proposed Fact #13

Disagree. Ms. Kiening testified that HUD would "assist or cooperate with an owner in obtaining additional financing, in general." [Kiening Tr. at 190 (JA __).] Ms. Thomas had no authority over HUD's decision whether to insure a new loan for Englewood, and nothing in the HAP Contract obligated HUD to insure such a loan. [HAP Contract at 1-14 (JA 1-14).] However, HUD insured an $11.5 million repair and rehabilitation loan to Englewood. [Compl. ¶ 16.]

Moreover, Ms. Thomas did not falsely state that a flag was being issued against Englewood. Englewood and Mr. Samuelson have received multiple "flags" from HUD's Office of Multifamily Housing. Ms. Thomas recommended against providing mortgage insurance for a loan for Englewood for several reasons, including

that South Pointe had received a score of 42 from the April 28, 2999 REAC inspection and had dozens of open city code violations. [E-mail from Gwendolyn Thomas dated 11/30/99 (JA __).]

2. Ms. Coleman and Housing Management appear to have taken no responsibility for receiving, reading, reviewing or implementing the MIO as set out in the Final Team Report. Ms. Coleman has never once visited South Pointe from 1998 through today. [Coleman Tr. at 127-128 (JA __).] She did not read or review the Final Team Report or the MIO. [Coleman Tr. at 113-115 (JA __)]. She regarded her responsibilities and those of Housing Management as simply normal loan servicing. [Coleman Tr. at 135 (JA __).]

<u>Response To Plaintiff's Proposed Fact #2</u>

Disagree. Ms. Coleman, as Director of Project Management for HUD's Chicago Multifamily Hub, was not responsible for managing Englewood's own plan for correcting South Pointe's deficiencies. Further, Ms. Coleman's duties as director did not require her to tour South Pointe. Ms. Coleman did not regard her responsibilities simply as loan servicing and did not testify that she viewed her duties simply as loan servicing. [Coleman Tr. at 134-36, 187-88 (JA __).]

3. Similarly, Ms. Thomas, though the Project Manager for South Pointe, does not seem to have taken responsibility for monitoring the MIO as approved in the Final Team Report. She did not read or review the Final Team Report or the MIO. [Thomas Tr. at 86-89 (JA __).] She regarded her responsibilities and those

of Housing Management as simply being normal loan servicing. [Thomas Tr. at 142-143 (JA __)].

Response To Plaintiff's Proposed Fact #3

Disagree. Ms. Thomas was not responsible for managing Englewood's own plan for correcting South Pointe's deficiencies. Moreover, Ms. Thomas did not regard her responsibilities as simply loan servicing. In fact, she testified that her duties included "occupancy reviews . . . site visits . . . inspections, deal with tenant complaints, [and] normal project processing." [Thomas Tr. at 143 (JA __).]

4. Ms. Thomas had only two conversations with Ms. Batchelor during the entire time that her South Pointe project was in the DEC from 1998 through February of 2000. One was at the time the files were gathered by Ms. Batchelor in the fall of 1998. The second time was during a discussion of the lease amendments and proposed resident services program in the fall of 1999. [Thomas Tr. at 81-82 (JA __).] Ms. Thomas says that she keeps no notes. [Thomas Tr. at 53 (JA __).] Yet Ms. Thomas made numerous entries in REMS in 2001 related to events which were alleged to have happened two years before in the summer and fall of 1999. [Thomas Tr. at 68—70 (JA __).]

Response To Plaintiff's Proposed Fact #4

Agree in part and disagree in part. At her deposition, Ms. Thomas recalled having conversations with Ms. Batchelor "at the outside of referral as [Ms. Batchelor] was gathering information from Multi-Family Housing to start her work". [Thomas

Tr. at 81 (JA __).] Ms. Thomas did not testify that these necessarily were the only conversations she had with Ms. Batchelor between 1998 and February 2000. [Thomas Tr. at 81 (JA __).]

Ms. Thomas testified at her deposition that she does not retain personal paper records regarding her performance of her duties at HUD but that she made notes regarding South Pointe in HUD's Real Estate Management System ("REMS"). [Thomas Tr. at 53 (JA __).] Agree that Ms. Thomas made entries regarding South Pointe in REMS in 2001. [Thomas Tr. at 68-70 (JA __).]

5. The HAP contract renewal request proceeded through the normal HUD review process in 2000. It was reviewed and approved by the Project Manager, reviewed and approved by Debbie Gray as Supervisor, transferred to Operations for the reservation of funds and the preparation of contracts, forwarded to Hayes for his signature and final execution by HUD. [Coleman Tr. at 37-52 (JA __).] A construction program was being developed by individuals experienced with HUD construction requirements. [Developers Mortgage Corp. Letter dated July 20, 2000 (JA __).] On September 27, 2000, Victor Taylor directed "Randy" to request a full year of HAP payments for $2,513,000. [Owner's Checklist at 1 (JA __).] Finally, the MFH accepted Englewood's response to the 2000 Management/Occupancy review and closed the file. [Letter dated Oct. 3, 2000 (JA __).]

Response To Plaintiff's Proposed Fact #5

Agree in part and disagree in part. In her testimony, Ms. Coleman described the Chicago HUD Multifamily Housing Office's standard practices for processing HAP Contract renewal requests. She testified that she had no first-hand knowledge regarding how HUD processed Englewood's July 27, 2000 request for a renewal of the HAP Contract. [Coleman Tr. at 37-52, 69-70 (JA _ ).]

Agree that Mr. Cravitz, President of Developers Mortgage, wrote to Ms. Coleman on July 20, 2000 and reported that a construction plan was being developed. [Developers Mortgage Corp. Letter dated July 20, 2000 (JA __).] Agree that a handwritten note on the Owner's checklist indicates that Mr. Taylor may have directed a person named "Randy" to "please request 2,513,800 in REMS." [Owner's Checklist at 1 (JA __).]

Finally, HUD accepted Englewood's response to the Occupancy Review subject to further review in which "findings will be verified for corrections made. This includes items identified in the REAC physical inspection report." [Letter dated Oct. 3, 2000 at 1 (JA __).]

6. Since Ms. Gray approved Englewood's HAP renewal request and signed the Management/Occupancy letter which added the REAC inspection addendum to the Renewal Contract, everything was in order with respect to Englewood' s performance and the availability of a multi-year HAP contract on October 3, 2000.