[Sanders Decl. at 9 ¶ 37 (JA __); Hayes Decl. at 6 ¶ 26 (JA __).]

Response To Plaintiff's Proposed Fact #6

Agree in part and disagree in part. Ms. Gray signed a letter dated October 3, 2000 that referenced HUD's 2000 Occupancy Review. [Letter dated Oct. 3, 2000 (JA __).] This letter did not "add the REAC inspection addendum" that was incorporated into the 2000 Renewal Contract. [Letter dated Oct. 3, 2000 (JA __).] Nor did this letter indicate that Ms. Gray had approved a multi-year HAP renewal contract, or that everything was "in order" with respect to Englewood's performance. [Letter dated Oct. 3, 2000 (JA __).]

7. Ms. Thomas testified at length in her deposition that the 1999 HAP contract renewal was for three months. It was to be short term. Everyone knew that it was to be short term. She persisted in this testimony for over 10 pages of questioning. [Thomas Tr. at 146-155 (JA __).] After a lunch break, when Ms. Thomas was able to confer with her lawyers, she returned to concede that all of her statements in her previous 20 minutes of testimony were simply wrong. [Thomas Tr. at 160—162 (JA __).]

Response To Plaintiff's Proposed Fact #7

Agree in part and disagree in part. Ms. Thomas testified in error that the HAP Contract between HUD and Englewood expired in 1998 and subsequently was renewed through multiple three-month stages. [Thomas Tr. at 154-55 (JA __).] Ms. Thomas corrected her testimony by stating that the Renewal Contract HUD and Englewood executed in 1999 was for one year. [Thomas. Tr. at 160-62).] This

fact is not material to defendant's motion for summary judgment. Disagree with any implication that Ms. Thomas or her counsel behaved inappropriately.

8. Ms. Thomas does not keep a daily calendar, written notes, or project files. All of the key directions from her superiors appear to be made orally, without written records. [Thomas Tr. at 53 (JA __).]

<u>Response To Plaintiff's Proposed Fact #8</u>

Agree in part and disagree in part. Ms. Thomas testified that she does not retain personal paper notes regarding her performance of her duties at HUD. [Thomas Tr. at 53 (JA __).] Ms. Thomas did not testify that she receives only oral instructions from superiors.

9. Ms. Thomas, however, testified that she saw the HAP contract at a meeting at HUD in October 18, 2000, recognized that there was an "error" in the length of time for the contract (it was to be for three months, not one year with three automatic one year renewals), and it was explained to everyone at the meeting that there was an error in the contract. Everyone understood that there was an error. [Thomas Tr. at 202, 207 (JA __).] She has no recollection of when and by whom the "error" announcement was made. [Thomas Tr. at 204—206 (JA __).] She testified that there was a "discussion" of the error and that it was accepted by everyone. [Thomas Tr. at 207-08 (JA __).]

Response To Plaintiff's Proposed Fact #9

Agree that Ms. Thomas testified at her deposition that HUD's Chicago Multi-Family Housing department lacked the authority to form HAP contracts of longer than one year. Agree that HUD officials informed Englewood representatives, including Ken Horton, at a meeting on October 18, 2000 that Englewood had received a copy of a renewal contract in error. [Thomas Tr. at 204-08 (JA __).] Disagree that these facts are material to defendant's motion for summary judgment.

10. Mr. Sanders recalls clearly that there was no discussion of an error in the HAP contract at the October 18, 2000 meeting. The meeting was limited to a discussion of the proposed rehab work and loan processing. [Sanders Decl. at 10-11 ¶ 39, 40, 42 (JA __).]

Response To Plaintiff's Proposed Fact #10

Disagree with plaintiff's statement regarding what Mr. Sanders recalls for lack of knowledge or information sufficient to form a belief as to its accuracy. Although there is a factual dispute regarding what was discussed at the October 18, 2000 meeting, this dispute is not material to defendant's motion for summary judgment.

11. Despite Mr. Hayes meeting with HUD between October 18, 2000 and December 6, 2000, he was never informed of the "error" until he received the December 6, 2000 letter from Ms. Coleman. [Hayes Decl. at 7 ¶ 31 (JA __).]

Response To Plaintiff's Proposed Fact #11

Disagree with plaintiff's statement regarding what information Mr. Hayes received before December 6, 2000 for lack of knowledge or information sufficient to form a belief as to its accuracy.

12. Ms. Coleman, in her deposition, corroborated the testimony of Ms. Thomas. [Coleman Tr. at 69—80 (JA __).] She added that the contract she saw when the "error" was raised by Ms. Thomas had only been signed by Mr. Hayes, not by HUD. [Coleman Tr. at 74 (JA __).] Although she could not imagine why HUD would sign a contract that was clearly in error, HUD did sign the contract, on the very day – October 18, 2000. [Coleman Tr. at 79 (JA __).]

Response To Plaintiff's Proposed Fact #12

Agree in part and disagree in part. Ms. Coleman's testimony corroborated Ms. Thomas's statements that a copy of the contract executed in October 2000 contained an error in its terms. [Coleman Tr. at 69-75 (JA __).] Ms. Coleman testified that the copy of the contract she saw had been executed by Mr. Hayes and not by HUD. [Coleman Tr. at 74 (JA __).]

13. There was a second meeting in the fall of 2000 to discuss the status of the rehab loan application. This meeting involved Mr. Hayes. The purpose of the meeting was to discuss the need for completing the rehab loan application. There was no discussion of the HAP contract "error" at that meeting. [Hayes Decl. at 6-7 ¶ 28 (JA __).] At no time has HUD produced any

contemporaneous documentation showing that the October 2000 contract was in error.

Response To Plaintiff's Proposed Fact #13

Agree in part and disagree in part. Defendant disagrees with plaintiff's statement that the "Hap contract error" was not discussed at "a second meeting in the fall of 2000" for lack of knowledge or information sufficient to form a belief as to its accuracy. Agree that defendant has not produced documents dated October 18, 2000 that demonstrate that a copy of the Renewal Contract executed on that day contained an error regarding the agreement's duration. However, defendant has produced documents demonstrating that Englewood representatives agreed to amend the HAP Contract. [See, e.g., E-mail from Ken Horton dated Jan. 22, 2001 at 2 (JA __); 2001 HAP Renewal Contract at 6 (JA __).]

14. Neither Ms. Thomas nor Ms. Coleman knew the HUD process for executing amendments to HAP contracts. They knew that they did not have the power to amend HAP contracts. They believed, however, that Mr. Hinsberger had the authority to make such amendments, that their authority to amend the contracts was given by Mr. Hinsberger. [Coleman Tr. at 272-274 (JA __); Thomas Tr. at 229-231 (JA __).]

Response To Plaintiff's Proposed Fact #14

Disagree. Ms. Thomas and Ms. Coleman testified that they possessed no individual authority to amend HAP contracts. [Coleman Tr. at 272-274 (JA __); Thomas Tr. at 229-231 (JA __).] Ms. Coleman and Ms. Thomas testified that Ms. Thomas made

notations recording the amendment of the HAP Renewal Contract under the supervision of Ed Hinsberger, Director of HUD's Multifamily Housing Division, and HUD's Funding Department. [Coleman Tr. at 272-82 (JA __); Thomas Tr. at 229-231 (JA __).]

15. Ms. Thomas testified that Mr. Hinsberger had told her in October 2000 that he did not intend to renew the HAP contract for a term longer than 3 months, that the contract that was signed was an error, that it needed to be corrected or amended, that he wanted Ms. Thomas to change the contract and then inform Englewood of the change. [Thomas Tr. at 229–231, 242–44 (JA _ ).]

Response To Plaintiff's Proposed Fact #15

Disagree. Ms. Thomas testified that she made notations recording the amendment of the HAP Renewal Contract after obtaining authorization from HUD's Funding Department. [Thomas Tr. at 231, 242 (JA __).] Agree that Ms. Thomas discussed this fact with Mr. Hinsberger, who decided to renew the contract until September 30, 2001 to protect South Pointe's residents and to give Englewood time to submit a corrective plan. [Thomas Tr. at 243-44 (JA __).]

16. Ms. Coleman testified that Ms. Thomas was the one who drafted the December 6, 2000 letter which she merely signed and that Ms. Thomas was the one who made the changes in the body of the contract. [Coleman Tr. at 277–84 (JA __).]

Response To Plaintiff's Proposed Fact #16

Disagree. Ms. Coleman testified that, although she signed the December 6, 2000 letter, she was unsure who drafted it. [Coleman Tr. at 280 (JA ___).]

17. Mr. Hayes knew that both of these purported contract "amendments" were not valid since the only valid way to change a HAP contract was in a written document signed by both HUD and Englewood. [Hayes Decl. at 7 ¶ 31 (JA ___).]

Response To Plaintiff's Proposed Fact #17

Disagree with plaintiff's statement regarding what Mr. Hayes knew for lack of knowledge or information sufficient to form a belief as to its accuracy. Regardless of what Mr. Hayes thought at the time, he never informed HUD that he considered the amendments invalid. In fact, he executed subsequent "documents signed by HUD and Englewood" further renewing and amending the HAP Contract. For example, on September 26, 2001, Mr. Hayes executed a Renewal Contract that stated that the parties previously "had entered into a HAP Contract ('expiring contract') to make Section 8 housing assistance payments," that the terms of the expiring contract would expire before October 1, 2001 and that its terms were being renewed for "0.3 years." [2001 HAP Renewal Contract at 2, 3 (JA ___).]

18. HUD has produced no concurrence or approval documents that show how these letters went from the idea to the executed document. Ms. Thomas and Ms. Coleman have testified that

Mr. Hinsberger gave them oral instructions to amend the contracts, that Ms. Thomas drafted the letter for Ms. Coleman to sign, that Ms. Thomas made the alterations in the contract documents, and that Ms. Coleman signed the letter. [Coleman Tr. at 277-84 (JA __).] HUD has produced no documentation to support this sworn testimony.

Response To Plaintiff's Proposed Fact #18

Agree that HUD has produced no concurrence or approval documents regarding the referenced letters. Disagree that Ms. Coleman and Ms. Thomas testified that Mr. Hinsberger gave them oral instructions to amend the HAP Contract. In fact, Ms. Coleman and Ms. Thomas testified that Ms. Thomas made notations recording the amendment of the HAP Renewal Contract under the supervision of Ed Hinsberger, Director of HUD's Multifamily Housing Division, and HUD's Funding Department. [Coleman Tr. at 272-74; Thomas Tr. at 229-31 (JA __).]

Disagree that HUD has produced no documents consistent with this testimony. In fact, HUD has produced multiple documents consistent with Ms. Thomas's and Ms. Coleman's recollections, including documents generated and executed by plaintiff's representatives. [E-mail from Ken Horton dated Jan. 22, 2001 at 2 (JA __); 2001 HAP Renewal Contract at 6 (JA __).]

19. Englewood never agreed to HUD's proposed amendments to the HAP contract. [Hayes Decl. at 7 ¶ 31 (JA __).]

Response To Plaintiff's Proposed Fact #19

Disagree. As noted, on January 22, 2001, Ken Horton, an Englewood representative, wrote to Ms. Coleman and Mr. Hayes via e-mail that Englewood agreed to amending the contract to reflect a September 31, 2001 expiration date. Mr. Horton requested a copy of the "amended, amended HAP contract." [E-mail from Ken Horton dated Jan. 22, 2001 at 2 (JA __).] Subsequently, Englewood's representatives agreed to amend the duration of the HAP Contract's terms through multiple renewal contracts. [See, e.g., 2001 HAP Renewal Contract at 6 (JA __).]

20. Ms. Thomas came up with a new way to terminate the HAP contract when she simply drafted a letter for Mr. Hinsberger's signature on March 15, 2001. The letter stated that HUD's previous letter of December 6, 2000 and email of January 23, 2001 had declared Englewood in default, and, as a result, HUD was suspending and abating Section 8 payments and was directing the Field Accounting Division to suspend HAP payments immediately. [Draft Letter to John Hayes at 1 (JA __).]

Response To Plaintiff's Proposed Fact #20

Disagree. Ms. Thomas did not "c[o]me up with a new way to terminate the HAP contract." In fact, Ms. Thomas testified that she did not recall creating the referenced draft. [Thomas Tr. at 292 (JA __).] Regardless, the draft contains a handwritten notice indicating that it was not mailed and is not material to

defendant's motion for summary judgment. [Draft Letter to John Hayes at 1 (JA __).]

21. Ms. Thomas did not remember at whose direction the letter was prepared or why the letter was drafted, and didn't remember what happened to it after she created the initial draft. [Thomas Tr. at 289—293 (JA __).]

Response To Plaintiff's Proposed Fact #21

Agree that Ms. Thomas did not recall the circumstances of the draft's creation. Disagree with plaintiff's implying that Ms. Thomas testified that she wrote the draft. [Thomas Tr. at 289-93 (JA __).]

22. HUD's next effort was to use the Exigent Health and Safety Hazards ("EH&S") report to justify finding Englewood in default of the HAP contract. These EH&S "findings" resulted in the loss of 38 points in the overall REAC score. [Inspection Summary Report dated Mar. 2, 2001 at 1 (JA __).] Without these deductions, South Pointe would have received a "69." Because of these 13 minor/trivial problems, South Pointe received a "31." [Inspection Summary Report dated Mar. 2, 2001 at 1 (JA __).]

Response To Plaintiff's Proposed Fact #22

Disagree. HUD was not making a "next effort" to find Englewood in default of the HAP Contract. Moreover, defendant disagrees with plaintiff's characterization of health and safety findings as "minor/trivial."

South Pointe would not have received a score of 69 in the absence of the exigent health and safety items. South Pointe's

REAC score reflected an overall "health and safety" score of 38.5. This included more than just the exigent items that required immediate correction. [Inspection Summary Report dated Mar. 2, 2001 at 1, 8 (JA __).]

23. Mr. Sanders had all of these minor problems fixed at the end of the day on Friday, March 2nd and on the morning of Saturday, March 3rd. [Sanders Decl. at 12-13 ¶ 45 (JA __).]

Response To Plaintiff's Proposed Fact #23

Disagree. Although there is a factual dispute regarding whether plaintiff timely corrected exigent health and safety items in the 25 inspected units, doing so would not relieve plaintiff of its obligation to maintain the entire property in decent, safe, and sanitary condition.

24. Had problems remained, Ms. Thomas could easily have called them to the attention of the South Pointe maintenance staff during her visit on March 7, 2001 so that the corrections could have been made that day. She chose not to do so. [Sanders Decl. at 13 ¶ 46 (JA ).]

Response To Plaintiff's Proposed Fact #24

Disagree. Ms. Thomas discussed the REAC findings with members of South Pointe's maintenance staff. According to Englewood's witnesses, these staff members did not understand "the importance of the EH&S inspection" (Hayes Decl. at 8 ¶ 36 (JA __)) and failed to show Ms. Thomas that repairs had been made. [Sanders Decl. at 13 ¶ 46 (JA __).]

25. After hearing of the March 9, 2001 letter, Mr. Sanders

revisited South Pointe over the weekend and confirmed with Marlene Dau and John Hayes that the work that was certified as having been done in fact was done. He took photographs of the work and included them in his report on Monday, March 12, 2001. [Mem. from Carl Sanders dated Mar. 12, 2001 at 1-2 (JA __).] This list represented the work that was done:

- A missing outlet cover in the maintenance room (CS Pix ¶¶ 1 and 3)
- A light fixture missing in the maintenance area (CS Pix ¶¶ 2 and 4)
- A blocked exit in the trash room (CS Pix ¶ 5 – HUD did not verify at the time of the visit)
- A missing breaker in unit ¶ 1007 (CS Pix ¶ 13 –closed hole)
- An inoperative smoke detector in ¶ 2208
- A fire extinguisher tag missing in the penthouse (CS Pix ¶ 9 – HUD did not verify at the time of the visit)
- An outlet cover missing in ¶ 1201 (CS Pix ¶ 11 is GFI cover)
- A missing breaker in ¶ 1305 (CS Pix ¶ 10–closed hole)
- An outlet cover missing in ¶ 2208 (CS Pix ¶ $6)
- An outlet cover missing in ¶ 405 (CS Pix ¶ 15 is outlet cover in kitchen)
- A missing breaker in ¶ 910 (CS ¶ 14 is in ¶ 905 – closed hole)
- A missing cover on the electrical panel in the penthouse (CS Pix ¶¶ 7 and 8 – HUD did not verify at the time of the visit)

[Mem. from Carl Sanders dated Mar. 12, 2001 at 1-2 (JA __); Sanders Decl. at 12 ¶ 44 (JA __).]

Response To Plaintiff's Proposed Fact #25

Defendant disagrees with plaintiff's statement that Mr. Sanders took photographs purporting to document that Englewood corrected the listed problems for lack of knowledge or information sufficient to form a belief as to its accuracy. Regardless, defendant is unaware of any occasion upon which plaintiff produced these photographs to HUD or the Court.

26. On Friday, March 16, 2001, John Hayes wrote to Ms. Coleman that he had investigated the March 6, 2001 certification with the management staff and confirmed that the representations were correct. He enclosed the Carl Sanders letter of March 12, 2001 with the photos that accompanied the narrative. [P.M. Group Letter dated March 16, 2001 (JA __); Hayes Decl. at 8 ¶ 37 (JA __).]

Response To Plaintiff's Proposed Fact #26

Agree in part and disagree in part. Agree that Mr. Hayes wrote the referenced letter addressed to Ms. Coleman on March 16, 2001. Defendant disagrees with plaintiff's statement that Mr. Hayes included the "Carl Sanders letter of March 12, 2001" or any photographs with this letter. However, this dispute is not material to defendant's motion for summary judgment.

27. During October and November of 2000, and January and February of 2001, architect Ted Dunaj carefully inspected each of the 303 units at South Pointe. He converted his field notes into 25 pages of architectural drawings that were completed on March 4, 2001, the weekend after the HUD inspection.

Response To Plaintiff's Proposed Fact #27

Disagree with plaintiff's statements for lack of knowledge or information sufficient to form a belief as to their accuracy.

28. BABCO used the Dunaj drawings to prepare the scope of work that Englewood proposed in its March 19, 2001 rehab loan application to HUD. This proposal was included as part of the REAC Response submitted to HUD on April 8, 2001. [P.M. One