**Englewood v. United States**
**03-2209**
**Joint Appendix**

# JA 141

**Schopf & Weiss LLP**
**Business Litigation**

312 West Randolph Street, Suite 300
Chicago, Illinois 60606-1721
tel 312.701.9300
fax 312.701.9335
www.sw.com

Writer's e-mail
baugher@sw.com

Writer's direct dial
312.701.9315

January 4, 2006

**By Email: Paul.Wellons@usdoj.gov**

Mr. Paul R. Wellons
Commercial Litigation Branch, Civil Division
U. S. Department of Justice
Attn: Classification Unit
1100 L. Street, N.W., Room 800
Washington, D.C. 20005

**Re: Englewood v. HUD: 2006 Overview**

Dear Paul:

As we move toward trial, I thought it would be useful to summarize our positions so that we can sharpen our proposed stipulations of issues and facts for Judge Horn. As Judge Horn has stated in our various status conferences, the prospects for a summary judgment that would be granted by her and sustained in the Federal Circuit are remote. Our current assignment to develop stipulations of issues and facts, however, should shorten our preparation for trial and thus has utility beyond its initial purpose.

Englewood has agreed to prepare draft stipulations of issues and law later this week for your review and response. We would like the DOJ/HUD comments by Thursday, January 12, 2006, so that we may incorporate them into these drafts.

**The Central Issue**

The central issue is whether HUD was justified in refusing to honor the three automatic one-year renewals of the October 2000 HAP Renewal Contract. If it was, HUD had no obligations and Englewood has no claim for damages. If it was not, HUD breached and repudiated its contract obligations and is liable for the damages resulting from the breach.

As we understand them, HUD's arguments to support its right to terminate its contract renewal obligations are:

**Schopf & Weiss LLP**
Business Litigation



1. There were errors in the Contract that was executed. It should not have been for one year with three automatic one-year renewals. It should have been for three months with zero automatic renewals.

2. The Contract was amended twice. The first time it was amended to three months with zero automatic renewals. The second time it was amended to 12 months with zero automatic renewals.

3. The Contract was "renewed" in September 2001 for 90 days, functioning as an "accord and satisfaction" of its automatic renewal obligations under the October 2000 HAP Renewal Contract.

4. HUD used the physical condition of the property and Paragraph 20 of the 1998 HAP Contract to determine that Englewood was in default and HUD could terminate its renewal obligations under the Contract.

5. HUD used the Addendum provisions to the October 2000 HAP Renewal Contract to give it the right to terminate its renewal obligations under the Contract as of September 30, 2001 but to continue to provide subsidy payments to tenant while they were exercising their vouchers.

6. HUD's declaration in March 2001 that South Pointe's physical condition was "not decent, safe and sanitary" enabled it to terminate its renewal obligations under the Contract.

Englewood has factual and legal arguments in opposition to each of these HUD positions which are summarized in the pages that follow. They will be set out more precisely in the "plaintiff's positions" in the "Issues" document which we will to you later this week.

**Background**

Englewood filed suit in September 2003 alleging breach of contract and damages related to rejected financial claims and lost rental revenue for years 2 and 3 of a 4 year HAP Contract. In December of 2004, HUD moved to dismiss on the grounds that HAP Contracts involved MAHRA, MAHRA's administrative review was exclusive, there was no right to judicial review and the Court of Federal Claims lacked jurisdiction.

Judge Wolski rejected HUD's arguments in his Opinion of August 10, 2004. HUD filed a motion to reconsider arguing that the contract was made in error, it was amended and it was replaced by the short term renewal contract in September 2001. Judge Wolski rejected these arguments in a second Opinion of August 31, 2004.

HUD filed its Answer in September 2004. Discovery proceeded through May 2005, with continuing disputes over DEC documents and HUD's failure to produce "concurrences" to document what decisions were made, by whom, and when. Testimony in the depositions

**Schopf & Weiss LLP**
Business Litigation



confirmed that "concurrences" were standard operating procedures in HUD's decisions and significant communications. We were surprised by their almost complete absence from HUD's document production.

HUD filed a summary judgment motion. But that motion was a non-starter with Judge Horn and has apparently been superseded by a new motion, which we believe HUD will never be permitted to file. In the first motion, HUD argued: (1) that the physical conditions at South Pointe were "not decent, safe and sanitary," and HUD was justified in determining Englewood to be in default and in terminating Englewood's rights and its own obligations; (2) that the three years of automatic renewals in the October 2000 HAP Renewal Contract were made in error, were amended away, or were replaced by the terms of the September 2001, 90 Day Renewal Contract; and (3) that HUD did not improperly deny Englewood's requests for rental increases or other special claims. In the second "conversational" motion for summary judgment, HUD has limited its basis for summary judgment to the second and third arguments from its first motion.

**Two Open Issues: Absence of Concurrences; Charges Against Chicago HUD**

There are two open issues we should discuss by phone this week. The first is resolution of our repeated request for "concurrences" to document the HUD decision making process and your response that the documents don't exist in either hard copy or "imaged" versions, or REMS. The second concerns our responsibilities, if any, for the Nixon letter to Secretary Jackson to which you referred in our recent status report, and his recent letter to us where he explains his intentions in writing the letter and, in effect, accuses the Chicago HUD staff of improper and illegal behavior.

**Other Issues For Elaboration Later This Week**

The major issues in this case are:

1. Was Englewood in compliance with its HUD business arrangements in October of 2000 when it had an approved MIO Plan, the Final Team Report – Resolution returning South Pointe from the DEC to HUD MF, and HUD's acceptance of its response to HUD's 2000 Occupancy Review?

2. Was the October 2000 HAP Renewal Contract, which provided for three years of automatic one-year renewals (subject to appropriations and provisions for termination), the operative contract between the parties?

3. Was this contract made in error? Was it intended to be a three-month contract with no provisions for automatic renewals?

4. Was this contract amended twice to initial terms of three months and 12 months, with no provisions for automatic renewals?

5. Did HUD properly determine Englewood to be in default under the provisions of Paragraph 20 of the 1998 HAP Contract?

6. Was HUD justified in terminating Englewood's rights, and its obligations, based on its determination that the physical conditions at South Pointe were "not decent, safe and sanitary" based on the REAC inspection of March 2, 2001 and Report of March 8, 2001?

6. Was HUD justified in terminating the 2000 HAP Renewal Contract on October 1, 2001 based on Englewood's failure to respond fully to the requirements of the March 8, 2001 REAC Report?

7. Did HUD breach the 2000 HAP Renewal Contract by unilaterally eliminating the automatic renewal provisions, by failing to respond to Englewood's Proposed Plan of Correction, by refusing to consider Englewood's reimbursement claims and by issuing vouchers to residents?

8. Did HUD repudiate its obligations under the 2000 HAP Renewal Contract by indicating it would no longer deal with Englewood and demanding that Englewood replace itself with a new owner and management agent?

9. Did the 90 Day HAP Renewal Contract signed by HUD on September 25, 2001 and Englewood on September 26, 2001 replace the 2000 HAP Renewal Contract under the legal theory of "accord and satisfaction"?

10. Did HUD breach the 2000 HAP Renewal Contract by refusing to automatically renew it for another year on October 1, 2001?

11. What are the categories and amounts of damages that resulted from HUD's breach of contract?

12. Did HUD violate the implied covenant of good faith and fair dealing, and if so, what consequences result from these violations?

**Decisions Made by Judge Wolski**

Judge Wolski in his Opinions of August 10, 2004 and August 31, 2004 ruled that: (1) the October 2000 HAP Renewal Contract was a valid contract between the parties; (2) Englewood alleged a proper cause of action under a breach of contract theory ; (3) the dispute is subject to judicial review; (4) there is jurisdiction in the Court of Federal Claims to resolve the claims of Plaintiff; and (5) arguments concerning contract errors, amendments and subsequent contracts raise fact questions that are not properly resolved by dispositive motions.

**The South Pointe Chronology/Issues**

1. Referral to the DEC

South Pointe was a dangerous and troubled building from the mid-90s into the fall of 1998. It was caused by combination of gangs, drugs, the lack of effective security and physical problems at the building. It was referred by HUD MF to the Departmental Enforcement Center in September of 1998 so that it could receive specialized attention.

2. Condition of the Building in the First Half of 1999

Freddie Batchelor was the DEC Enforcement Analyst responsible for South Pointe. She concluded there were crime and security problems, as well as the need for resident services and a significant repair program. The REAC Report of April 29, 1999 and the Pinnacle Management Review of May 19, 1999 came to the same conclusions. The Final Action Plan developed by Ms. Batchelor, and agreed to by MF Housing and the DEC, required that a comprehensive program of resident services, security and meaningful repairs needed to be developed by Englewood or the HAP Contract would be terminated.

3. Englewood Response – the Final Action Plan to the Final Team Report

Englewood staff began to address maintenance repairs immediately. Englewood advanced funds for improvements for the elevators and mail boxes. A security program with armed guards was installed. A serious resident services program was implemented. A delegation of senior HUD MF and DEC staff – from Chicago and Washington – visited South Pointe on August 30, 1999 and found significant improvement.

Englewood made requests for rental increases and a HUD insured loan during this time period. The requests were rejected by HUD.

4. MIO and Final Team Report – Resolution and the Return of South Pointe to HUD Multifamily

On December 8, 1999 a MIO Plan for physical improvements was submitted to HUD and approved. The Final Team Report – Resolution was approved on January 30, 2000. In February of 2000, South Pointe was returned to HUD MF for the finalization of the MIO.

5. 2000 HUD Occupancy Review, MIO Updates from Englewood and the Submission and Acceptance of Four Year HAP Contract

HUD conducted an Occupancy Review on March 13, 2000 which it sent to Englewood in June. Englewood responded fully in July. HUD accepted the Englewood response on October 3, 2000.

During 2000, Englewood submitted five "updates" on the progress of its MIO Plan. The reports were acknowledged by HUD. HUD provided no commentary on the reports.

In order to complete the painting/decorating and other capital expenditures in its MIO Plan, it was clear to Englewood through conversations with lenders that it needed a multiyear HAP subsidy contract as the funding source to repay the rehabilitation loan.

Englewood applied for a four year HAP Contract on June 27, 2000. The request proceeded through HUD reviews and processing. It was approved as a one-year contract with three automatic one-year renewals, subject to appropriations. It also contained a special provision giving HUD the right to terminate the contract in connection with REAC inspections. The October 2000 HAP Renewal Contract was signed by Englewood on October 16, 2000 and by HUD on October 18, 2000.

6. Was the October 2000 HAP Renewal Contract Made in Error, That the Parties Did Not Intend to Include Provisions for Automatic Renewal?

HUD's position is that the 2000 HAP Renewal Contract was made in error, that it was intended to be a three (3) month contract and that the parties knew of this fact at the time of the meeting on October 18, 2000.

The next issue therefore is whether Englewood and HUD agreed in October 2000 to a HAP Contract Renewal for one (1) year with three (3) automatic one-year renewals (subject to appropriations and the contract termination provisions set out in Paragraph 20 of the 1998 HAP Contract and the special termination provisions set out in the REAC Addendum to the October 2000 HAP Renewal Contract) or whether it was a three-month contract with zero provisions for renewals of any type?

If HUD's position is correct, everyone knew that the 2000 HAP Renewal Contract signed by HUD on October 18, 2000 was intended to expire on December 31, 2000 and there were no provisions for renewal.

7. Was the October 2000 HAP Renewal Contract Properly Amended by the Parties to Eliminate the Automatic Renewal Provisions?

HUD's position is that the 2000 HAP Renewal Contract was amended in December 2000 to a three month contract with zero provisions for renewal, and then again in January to a 12 month contract with provisions for renewal.

If HUD's position is correct there were no renewal provisions in the 2000 HAP Renewal Contract to be honored by the parties.

8. Was HUD Entitled to Terminate Englewood's Rights in the October 2000 HAP Renewal Contract Through its Proper Use of the Termination Provisions in Paragraph 20 of the 1998 HAP Contract?

HUD's position is that the various "events of default" which it attributed to Englewood on April 9, 2001 terminated Englewood's rights under the 2000 HAP Renewal Contract and relieved it of its own contract responsibility to honor Englewood claim requests and then automatic renewal provisions of the contract.

Englewood's position is that there were no factual predicates for any of the "events of default" cited by HUD and it maintained its rights under the contract and HUD was not relieved of its contract responsibilities.

9. Was HUD Entitled to Terminate the October 2000 HAP Renewal Contract Through the Proper Use of the REAC Addendum Which Gave HUD the Right to Terminate the Contact as of the Next Renewal Date of October 1, 2001?

HUD's position is that Englewood's failure to correct the deficiencies cited in the March 8, 2001 REAC Report gave it the right to terminate the 2000 HAP Renewal Contract as of October 1, 2001.

Englewood's position is that its April 8, 2001 response to the March 8, 2001 REAC Report was a full and comprehensive reply to the responsibilities described in the March 8, 2001 REAC Report and therefore HUD had no legal basis for terminating the Contract on October 1, 2001 and electing to replace its responsibility for a one-year automatic renewal with a three (3) month subsidy program which would be abated and reduced every time a resident used their housing voucher to move to alternative housing.

10. Events from April 9, 2001 and May 16, 2001

On April 9, 2001, HUD issued its Notice of Default. Englewood immediately requested a meeting to discuss an agenda of issues. A meeting was set for April 13, 2001. At the meeting, HUD indicated it would not discuss: a. the legitimacy of the events of default; b. Englewood's April 8, 2001 response to the March 8, 2001 REAC Report; or c. the HUD and Englewood differences in the scope of work needed by the rehab loan to respond to the physical problems described in the March 8, 2001 REAC Report. HUD indicated it would only discuss Englewood's responsibility to replace itself with a new management agent and owner.

On May 15, 2001, HUD returned Englewood's April 8, 2001 response to the March 8, 2001 REAC Report because it did not address sufficiently the physical needs of South pointe. On May 16, 2001, HUD issued a Notice of Continued Deficiency, repeating the "events of default" set out in the April 9, 2001 Notice of Default, summarizing Englewood's efforts to find a new owner, and indicating that it would continue its efforts to process vouchers for South Pointe

residents. At this point, Englewood had no rights under the 2000 HAP Renewal Contract and HUD had no obligations or responsibilities.

11. Events from May 16, 2001 and October 1, 2001

Because Englewood had not corrected HUD's determination of Default within 30 days of the Notice of Default on April 9, 2001, HUD arranged with HUD Washington and the Chicago Housing Authority for vouchers to be obtained for residents and the subsidy payments to be abated and rejected Englewood's request for a special one-time energy reimbursement to be made to Englewood relating to the extraordinary gas costs incurred by Englewood during the winter of 2000/2001.

In August of 2001, DSSA and Englewood submitted a comprehensive redevelopment plan for South Pointe, an application for a rehab loan to cover the physical improvements desired by HUD rather those required by the March 8, 2001 REAC Report, a request for the first automatic renewal of the 2000 HAP Renewal Contract and a fully documented request for a rental increase based on losses resulting from operating costs and comparable rents in the marketplace.

12. Execution of the 90 Day Renewal Contract

On September 25, 2001, HUD asked Englewood to sign a 90 day HAP Contract Renewal in order to continue subsidy payments for the benefit of residents. On September 26, 2001, HUD signed the renewal contract that had been returned to it by Englewood. There was no indication that the short term renewal was anything other than a response to the need to obtain subsidy for the residents to pay their rent from October through December while they used their housing vouchers to apply for continued living at South Pointe or to obtain alternative housing. There was no indication that either HUD or Englewood was giving up contract rights under the 2000 HAP Renewal Contract. In fact, the possibility of short term renewals "for up to 180 days" were specifically contemplated in the REAC Addendum to the 2000 HAP Renewal Contract.

13. The 90-Day Renewal Contract Supersedes the 2000 HAP Renewal Contract by Reason of Accord and Satisfaction?

HUD's position is that either the arguments for "error" or "amendment," or "accord and satisfaction," eliminated its responsibilities for the automatic renewal of the terms of the 2000 HAP Renewal Contract.

Englewood's position is that: a. there was no "error" with respect to the length of the contract; b. there was no agreement by the parties to "amend" the length of the contract; and c. there was no "intention" by the parties to replace the three "years" remaining on the 2000 HAP Renewal Contract with one for three "months," and there was no "consideration" for the enormous economic loss which would be suffered by Englewood as well as its inability to finance the rehabilitation loan needed to complete the MIO Plan.

14. Was HUD's Refusal to Automatically Renew the 2000 HAP Renewal Contract a Confirmation of its Earlier Repudiation?

On October 1, 2001, HUD refused to honor the automatic renewal provision of the 2000 HAP Renewal Contract. Instead, it indicated that it was abating the subsidy payments when residents received their vouchers.

15. Englewood's 2001 Suit for a Declaratory Judgment

HUD's notice to Englewood on October 1, 2001 stated that: a) it was not renewing the HAP Contract; b) that it was abating the contract and continuing to issue vouchers; and c) that it was extending the provision of subsidy under the contract for 90 days for the benefit of the residents. There was no indication that the 90-Day HAP Renewal Contract representation an accord and satisfaction concerning the 2000 HAP Renewal Contract.

16. What Is the Legal Significance of Judge Castillo's Injunction Decision on Englewood's Current Contract Claims in the Court of Federal Claims?

Judge Castillo's decision that Englewood had not met the extraordinary burden required for entry of an injunction has no relevance to Englewood's contract claims in the Court of Federal Claims, particularly when the Defendant used the availability of contract relief in the Court of Federal Claims to support its claims that there was an adequate remedy at law (the claim in the Court of Federal Claims) and therefore no irreparable injury.

17. Did the HUD Administrative Review Provide Englewood with Due Process?

HUD denied Englewood due process in the administrative review process in four ways. First, it refused to consider the arguments made by Englewood in its appeal on December 21, 2001 when Englewood challenged the factual predicates that were used by HUD in making its determination of default. Second, it indicated that the substantive arguments made by Englewood had been considered by Judge Castillo in the injunction suit and resolved against Englewood. Third, Gregory Gustin, the lawyer for HUD Chicago throughout the proceedings wrote the opinion for Howard Mayfield in HUD Washington, an individual who was supposed to be independent and was not to have been involved in any of the HUD's prior actions or decisions. Fourth, throughout these proceedings from August 2001 until Judge Wolski's issued his opinion on August 10, 2004, Greg Gustin continued to argue HUD's position that none of its decisions in these matters were subject to judicial review.

18. Did HUD Honor its Implied Covenant of Good Faith and Fair Dealing?

HUD denied each and every request for financial assistance from HUD programs made by Englewood from March 1999 through July 2002. It did this despite the fact that Englewood had

not had a rental increase since 1998 while confronting increasing costs and $200K of operating losses per year.

HUD staff made material misrepresentations concerning the status of "flags" against the PM Group from 1999 through 2001 to justify its refusals to make rental increases, cost reimbursements and rehabilitation loans. HUD prepared sanctions against Englewood prior to the times when Englewood was supposed to provide responses to be reviewed by HUD. HUD staff made reference to the existence of #2530 flags as justifications for actions when the #2530 flags did not exist.

In discovery, HUD refused to produce documentation prepared by Ms. Batchelor while she was the DEC Enforcement Analyst responsible for South Pointe. HUD denied that "concurrence" documents existed either in the hard copy files, the "imaged" files or in the Real Estate Management System ("REMS"). There is reason to believe that HUD staff in Chicago destroyed files that were requested in discovery and gave false statements during depositions to support their theories of "error" and "amendment."

**Englewood's Damage Claims**

The first claim is that HUD improperly denied Englewood's claim for a rental increase and energy reimbursement requests from October 1, 2000 through September 30, 2001 on the ground that Englewood was in default and not in good standing.

The second claim is that HUD improperly denied Englewood's claims for an approved rental increase, vacancy loss and tenant damage for the period from October 1, 2001 through September 30, 2002 on the ground that Englewood was in default and not in good standing.

The third claim is that HUD improperly denied the automatic 2000 HAP Contract Renewals on the grounds that the contract between the parties did not provide for any automatic renewals or that the termination provisions of Paragraph 20 of the 1998 HAP Contract or the REAC Addendum to the 2000 HAP Contract gave HUD the right to reject the automatic renewal provisions.

The fourth claim is that HUD's failure to honor its automatic renewal obligations prevented Englewood from obtaining and paying for debt service that would have allowed Englewood to complete its MIO repairs, to refinance the property in 2004 and to avoid the loss of the building through foreclosure.

The fifth claim is that the improper imposition of "flags" against both the PM Group (in August 2001) and DSSA (in June 2004) resulted in the loss of business opportunities in areas where both groups had a track record of success.

**Conclusion**

Englewood's goal is to work collaboratively with you and your colleagues at HUD to prepare the materials required by Judge Horn. In our view, this will end consideration of any possible summary judgment, aid in our respective trial preparation, and may even lead to a more candid and complete discussion of our respective positions resulting in a resolution before trial. I look forward to your prompt response.

Sincerely yours,

Peter V. Baugher

PVB:cmf

cc: Mr. Brian Simkin (Brian.Simkin@usdoj.gov)
Ms. Beverly J. Miller (Beverly_J._Miller@hud.gov)
Ms. Nancy D. Christopher (Nancy_D._Christopher@hud.gov)
Ms. Janet M. Golrick (Janet_M._Golrick@hud.gov)

**Englewood v. United States**
**03-2209**
**Joint Appendix**

# JA 142

U.S. Department of Justice

Civil Division

PDK:PRWellons:
No. 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

Telephone: (202) 616-8532
Datafax: (202) 307-0972

*Washington, D.C. 20530*

January 20, 2006

VIA FIRST CLASS MAIL

Peter V. Baugher
Schopf & Weiss LLP
312 West Randolph Street
Suite 300
Chicago, IL 60606-1721

Re: Englewood Terrace v. United States
Fed. Cl. No. 03-2209C

Dear Peter:

This letter is in response to your e-mail and attached letter dated January 18, 2006. I attempted to call you regarding these issues yesterday but received your voice mail. Regardless, this letter should address your stated concerns.

We have produced all "concurrences" regarding South Pointe going back as far as 1998. Although we consider concurrences to be immaterial to this case, we withheld no concurrences regarding any letter, contract, or any other document pertaining to South Pointe from 1998 onward. Moreover, your contention that concurrences are important to this breach of contract case is incorrect. Englewood has not alleged that any HUD officials acted beyond the scope of their duties or that any "institutional decisions" were not properly authorized.

You suggest that we discuss whether we have "other responsibilities" regarding Lionel Nixon's December 8, 2005 letter to your client representative, Don Samuelson. During his deposition testimony, Mr. Samuelson testified that he employs Mr. Nixon as a consultant in this litigation. I do not believe it is appropriate for me to comment or act upon your client's internal correspondence with its litigation consultant.

However, Mr. Nixon's letter contains vague and unsubstantiated allegations of improper conduct by HUD employees. If your client or Mr. Nixon wish to forward to me any information substantiating allegations of improprieties relevant to this case, I will of course consider that information.

Sincerely,

Paul R. Wellons

Paul R. Wellons
Trial Attorney
Commercial Litigation Branch
Civil Division