**IN THE**
**UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| ENGLEWOOD TERRACE LIMITED PATNERSHIP, | ) | |
| Plaintiff, | ) | No. 03-2209C |
| v. | ) | Judge Marian Blank Horn |
| THE UNITED STATES, | ) | |
| Defendant, | ) | |

**PLAINTIFF'S MOTION TO COMPEL**

Plaintiff Englewood Terrace Limited Partnership ("Englewood"), pursuant to Rule 37 of the Court of Federal Claims, moves to compel HUD to comply with this Court's March 17, 2006 Order. Englewood seeks an order compelling HUD to (a) produce additional concurrences, or a certification by a HUD official that all concurrences have been produced; and (b) explain the "delegated authority" by which HUD approved the decisions at issue in this matter, either through the production of documents or deposition testimony.

**INTRODUCTION**

On March 17, this Court ordered HUD to provide additional information to Englewood regarding the approval of the HUD decisions at the heart of this dispute. Specifically, this Court directed HUD to serve an affidavit of a HUD official regarding HUD's search for "concurrence" documents. This action arises from a contract between Englewood and HUD. Whether HUD had authority to amend, non-renew or terminate the contract are central issues in dispute between the parties. HUD, however, has produced almost no evidence relating to such issues.

**A. The HUD "Concurrence" Process**

HUD uses "concurrences" to track official approval of HUD actions. HUD imposed this system to ensure that federal officials act within the scope of their authority. Englewood has requested concurrence documents for more than a year, first through document requests and then through follow-up correspondence and discovery conferences with HUD's counsel. (*See* Ex. 2, Defendant's Response to Plaintiff's Document Requests, and Ex. 3, April 4, 2006 Letter Baugher to Wellons, attaching prior correspondence.)

At the March 17 status hearing, Englewood explained that HUD produced only one "concurrence" in this litigation – despite deposition testimony that demonstrated that concurrences were necessary for key HUD decisions.[1] (*See, e.g.*, Coleman Dep. at 272, 280, 281, (February 21, 2006 Joint Appendix ("JA") 008, Docket Nos. 83-90), referring to concurrence pages in the context of a December 6, 2000 letter from HUD to Englewood asserting an "error" in the HAP Contract, and HUD's "amendment" of the HAP contract). For example, Margarita Maisonet referred to the concurrence process when describing the process used by HUD in issuing: (a) the April 9, 2001 Notice of Default, (b) the May 16, 2001 Continuing Notice of Default, and (c) the November 30, 2001 Notice of Abatement and Termination; and (d) the May 2, 2002 HUD Final Decision in its review of Englewood's administrative challenge to HUD's decision not to renew the automatic renewal provisions of the 2000 HAP Renewal Contract. (Maisonet Dep. at 99, 105, 149-50, 208, 254 [JA 009]). HUD has failed to produce concurrences related to any of these decisions.

---

[1] A copy of that single concurrence, for the January 26, 2000 Final Team Report on South Pointe Towers, is attached as the tenth page of Exhibit 1.

**B. The March 24, 2006 HUD Declarations**

The Court directed HUD to provide affidavits to certify that HUD had undertaken a careful and thorough search for concurrences, and that no concurrences existed for the documents and decisions for which they were requested. On March 24, 2006, HUD served two Declarations. Neither Declaration resolved the issues raised by Englewood and the Court. The first Declaration skirts the issue of HUD's production of concurrences, and the second raises an entirely new issue – the purported "delegated authority" of the Chicago office of HUD. In short, despite Englewood and this Court's efforts to definitively resolve the parties' dispute regarding concurrences, HUD has instead raised new issues.

**C. HUD's Reliance On Purported "Delegated Authority"**

Indeed, at this late date in the litigation, on the eve of summary judgment briefing, HUD now claims that all decisions at issue in this lawsuit were authorized under "delegated authority" from HUD's central offices. HUD makes no attempt to explain the basis for its allegation – or to clarify the amorphous term "delegated authority." On the contrary, during an April 18, 2006 telephone conference, counsel for HUD referred Englewood to hudclips.org, HUD's website containing thousands upon thousands of official documents, declining to specify any particular document, page or section. This Court should not allow HUD to avoid its obligation to support its allegations with legal authority and evidence, and to comply with Englewood's reasonable (and repeated) requests in interrogatories and depositions for detail concerning HUD's decision making authority and process.

## ARGUMENT

### I. HUD MUST PRODUCE AN AFFIDAVIT EXPLAINING ITS SEARCH FOR CONCURRENCE DOCUMENTS, AND CLEARLY CERTIFYING THAT FURTHER CONCURRENCE DOCUMENTS DO NOT EXIST AND HAVE NOT BEEN DESTROYED.

Despite the Court's directive, HUD has failed to account for its failure to produce concurrences. Greg Gustin, an attorney staffed to HUD's Chicago office (the "Chicago HUB"), stated on information and belief that "HUD and its counsel have engaged all reasonable diligence and effort to ensure that all written concurrences on actions taken by HUD were delivered to DOJ." (Gustin Decl. ¶ 12, Ex. C to April 4, 2006 Letter from Baugher to Wellons, attached as Exhibit 3.) Mr. Gustin's Declaration did not definitively state that concurrences (a) did not exist in HUD's files; (b) had never existed; or (c) that a full and complete search of both paper and electronic files had failed to reveal additional concurrences. Indeed, Gustin stated merely that "to the best of [his] knowledge, belief and efforts" responsive documents were not being "improperly withheld and/or destroyed." Gustin, who surreptitiously ghost-authored the supposedly independent review decision of HUD Washington in May 2002, does not even state that he checked his own files. Accordingly, neither Englewood nor the Court can be sure that HUD has produced all concurrences.

Under Rule 37 of the Rules of the Court of Federal Claims, this Court may issue an order to compel the government to comply with discovery requests. *Morris v. U.S.*, 37 Fed. Cl. 207, 211 (Fed. Cl. 1997). Moreover, this Court "possesses the inherent authority to impose sanctions for abuses of the discovery process." *Precision Pine & Timber, Inc. v. U.S.*, 2001 WL 1819224 (Fed. Cl. 2001). This Court should not allow HUD to avoid its obligation to produce concurrences (or to provide a coherent explanation for their apparent nonexistence). Because HUD has failed to comply with Englewood's discovery requests, and has now failed to comply

with this Court's March 17, 2006 Order, this Court should compel HUD to produce all the concurrences in its possession, and explain the absence of additional concurrences.

## II. HUD MUST PRODUCE INFORMATION REGARDING THE "DELEGATED AUTHORITY" OF THE CHICAGO HUB.

In an effort to mask its failure to effectively respond to the Court's direction, HUD submitted the Declaration of Edward Hinsberger, the director the Chicago HUB. (Ex. B to April 4, 2006 Letter from Baugher to Wellons, attached as Exhibit 3 ("Hinsberger Decl.").) Hinsberger states that all of the HUD decisions at the heart of this dispute were authorized under "delegated authority" of the Chicago office of HUD (the "Chicago HUB"). In sweeping, non-specific statements, Hinsberger declares that "the proper HUD authority signed the HAP Contract, and made elections to non-renew, renew, modify, amend or terminate the South Pointe HAP Contract." (Hinsberger Decl. ¶ 7.) Hinsberger also states that "[w]ith respect to elections to non-renew, renew, modify, amend, or terminate the South Pointe HAP Contract, the decisions and actions taken concerning those matters were within my delegated authority as said [Chicago HUB] Director, and were taken for HUD by me, or by staff that I authorized to do so, and pursuant to my delegated authority." (Hinsberger Decl. ¶ 8.) HUD fails to provide any additional explanation for these broad assertions or how these decisions were subdelegated to others or reviewed as to their consistency with HUD contracts and regulations. Notably, HUD fails to cite a single statute, regulation or HUD policy that supports or explains Hinsberger's statements, either in the Declaration or in any of the written or telephone exchanges with its attorney during the past month.

Englewood has been working to learn since the inception of this litigation how the authority was vested at HUD Chicago to make the following decisions, and whether the person

made the decision in a proper manner. The description and integrity of the elements of the HUD decision making process that Englewood challenges include:

1. Englewood's performance while in the DEC (1999-2000);
2. The basic validity of the 2000 HAP Renewal Contract (Oct. 17, 2000);
3. The claim of "error" in the Contract in late 2000;
4. The alleged "amendment" to the Contract in December 2000:
5. The factual basis for the alleged "events of default" in early 2001;
6. The completion of the decision making process leading to the Notice of Default before HUD's receipt of Englewood's response in April 2001;
7. The decision to return Englewood's response to the March 8, 2001 REAC report without serious discussion or review in May 2001;
8. HUD's decision not to "automatically renew" the 2000 HAP Contract on October 1, 2001;
9. The purpose and process for entering into the 90-Day Renewal Contract in September 2001; and
10. HUD's administrative review and Gustin's drafting of HUD's "final administrative decision" by Mayfield on May 2, 2002.

(*See* Ex. 3.) It is essential that HUD produce information relating to the authority for the decisions listed above.

During phone conferences on April 18 and 27, 2006 regarding the Declarations pursuant to Rule 37 of the Court of Federal Claims, counsel for HUD was unwilling to provide any documents to plaintiff or to supplement any of its interrogatory answers. Instead, he only generally referred Englewood to a HUD website – hudclips.org. That website serves as a repository for some subset of federal regulations, statutes applicable to HUD, as well as a group of other HUD documents. The documents are segregated into dozens of databases. It takes an expert in HUD organizational structure, correspondence protocols, rules, regulations, directives

and the navigation of the complex web site itself to find the answers to the simple questions that Englewood has been asking, if in fact they can be found at all.[2]

Indeed, Federal courts around the country have held that a litigant cannot satisfy its obligation to produce relevant documents by forcing its opponent to find needles in a haystack of nonresponsive and irrelevant documents. *In re Sulfuric Acid Antitrust Lit.*, 231 F.R.D. 351, 363 (N.D. Ill. 2005) (A party may not "dump massive amounts of documents, which . . . have 'no logical order to them,' on their adversaries and demand that they try to find what they are looking for."). Throughout this litigation, HUD has ignored its obligation to produce documents regarding the authority of the Chicago HUB and the specifics of its actions. It is not reasonable now for HUD to demand that Englewood review thousands of web files for information that should be readily available to the HUD officials who purportedly relied on the "delegated authority" and the HUD decision making – and concurrence and approval processes – to take the actions at issue in this suit.

This Court should require HUD to produce either (a) documents showing HUD's basis for its claim of delegated authority; or (b) an official with knowledge regarding the

[2] Through hours of searching "hudclips," Englewood has discovered evidence that shows that HUD *did not* follow proper procedures in renewing, not-renewing, and terminating the HAP contract. For example, HUD did not follow its own procedures in deciding to "not renew" the HAP Contract that it was obligated to "automatically" renew in September of 2001. At the time, Englewood expressed concerns regarding HUD's decision and decision-making process. (*See* Jt. Stmt. Facts (Docket No. 82) at ¶¶ 112-14.) Englewood's concerns were justified. HUD circulars in both 1999 and 2000 describe the detailed process HUD is to follow when deciding "not to renew" a HAP contract, even one that it is not "automatically" obligated to renew as in our case. (*See* Ex. 4, HUD Circular 99-36 at Sections XIX-XX.) HUD Circular 99-36 is a 136-page document that Englewood happened upon in the "hudclips" database. Englewood has attached the pertinent portions to this Motion. The Circular states that HUD must follow proscribed standards in making a decision to terminate a HAP contract (XIX(c), XX(a)), and must inform HUD headquarters if it anticipates a contract termination (XIX(e)). Notably, prior to and when a decision is made to terminate a HAP contract, Chicago HUB was required to notify Frank Malone, Director in the Office of Portfolio Management at HUD headquarters. (XX(c).) There is no record in the documents produced by HUD that any of these steps were taken.

"delegated authority" of the Chicago HUB for a deposition. It may be that the most efficient course of action is for Englewood to depose Mr. Hinsberger at his office in Chicago so that he can explain under oath the source of all of the authority exercised by himself and his staff, the procedures for renewing and "not renewing" HAP contracts, the process for amending HAP contracts, the circumstances of drafting Notices of Default before receiving the response of Englewood upon which the Default Notice would need to be based, and the timing and nature of the concurrences required of MFH and DEC program and legal staff, and the Office of the General Counsel and HUD Washington with respect to all of the key decisions. At the very least, this Court should compel HUD to produce the documents that it claims vested the Chicago HUB with authority to take the actions at the heart of this lawsuit.

## CONCLUSION

This Court directed HUD to provide affidavits to finally resolve the parties' disputes regarding concurrences and HUD's authority to take the actions at issue in this lawsuit. The Gustin and Hinsberger Declarations do not resolve those issues, but rather raise new issues. This Court should Order HUD to provide additional information put these issues to rest.

WHEREFORE, Plaintiff respectfully requests this Court to grant Plaintiff's Motion to Compel, and to enter an order directing HUD to:

a) Produce all "concurrence" documents relating to the South Pointe project; and produce an affidavit that definitively states that no additional such concurrences now exist or have ever existed;

b) Produce (i) documents showing HUD's basis for its claim that its actions were taken pursuant to appropriate delegated authority; and (ii) Declarant Edward Hinsberger, or an official with knowledge regarding the "delegated authority" of the Chicago HUB, for a deposition.

Dated: April 27, 2006

/s/Peter V. Baugher_________________
One of the Attorneys for Plaintiff
Englewood Terrace Limited Partnership

Peter V. Baugher
Schopf & Weiss LLP
312 West Randolph Street
Suite 300
Chicago, IL 60606
312.701.9300