# EXHIBIT 1

RECEIVED FEB 3 2000

Bonnie / Ken

# SOUTH POINTE TOWERS
REMS# 800040489 FHA# N/A
FINAL TEAM REPORT - RESOLUTION
January 26, 2000

## 1. Project Description:

| | | | |
|---|---|---|---|
| 1. | Project Address: 6425 South Lowe | 18. | Bldg. Type: High Rise/Elevator |
| 2. | City: Chicago | 19. | Total Units: 303 |
| 3. | State: Illinois | 20. | Total Section 8 Units: 303 |
| 4. | Property Mgt. Company: PM One Ltd. | 21. | Section 8 #: IL06E000-034 End Date: (9-30-2000) |
| 5. | Property Mgt. Phone: 773 - 324-9010 | 22. | Occupancy Rate: 92% |
| 6. | Owner: PM One Equities | 23. | Orig. Mortgage Amount: NA |
| 7. | Owner Phone: 773 - 324-9010 | 24. | Unpaid Balance: N/A |
| 8. | Site Manager: Angela McNair | 25. | Reserve Balance: N/A |
| 9. | Site Phone #: (773) 324 - 9010 | 26. | Net Cash Flow: N/A Date: N/A |
| 10. | Year Built: 1972 | 27. | AFS Current : N/A |
| 11. | Sec. Of Act: N/A | 28. | Date of Contractor Site Visit: 5/19/99 |
| 12. | REAC P I Score:42b* | 29. | Date of DEC Staff Visit: 4/15-16/99 |
| 13. | REAC Inspection Date: 04-28-99 | 30. | Mortgage Type: uninsured |
| 14. | Date REAC to Owner: 05-01-99 | 31. | Date of last Mortgage Payment: N/A |
| 15. | FASS Score: N/A | 32. | Date Mortgage Assigned to HUD: N/A |
| 16. | FASS Report Date: Not Required | | |
| 17. | Rents vs. FMR: Below and Above | | |

**Enforcement Analyst:** Ms. Freddie C. Batchelor **Team Leader:** Mrs. Joan M. Kiening

**MF Project Manager:** Ms. Gwendolyn Thomas **DEC Attorney:** Mr. Gregory Gustin

## 2. Project Summary

South Pointe Towers is located in Chicago, Illinois. It has 303 units all of which have Section 8 assistance. The property is a high rise development with elevators. This is an uninsured property and in need of extensive physical repairs. The REAC Inspection was done on April 28, 1999, and was scored 42*b. The apartments in this property are spacious and in demand. The area surrounding the site is undergoing revitalization and was recently designated an Enterprise Zone. The property has a number of deferred maintenance items, foremost among this were the elevators. The curb appeal of the property has improved. The owner has infused $770,000 in the property and continues to add additional funds in order to correct all physical deficiencies identified in the REAC Inspection.

## 3. Ownership

**Current:** **Legal Structure:** Limited Partnership

| Ownership Entity: | | Percent Ownership |
|---|---|---|
| **General Partner** | | |
| PM One Equities, Brighton, Michigan<br>John J. Hayes, President | 38-2312468 | 1% |
| **Limited Partner**<br>Chevron U. S. A. Incorporated | | 99% |

**Identity of Interest Companies**

1. Advantage Construction
2. Austin Laundry
3. Delcor Construction
4. H & G Renovations
5. PALCO, Inc.
6. Sosco, Inc.
7. Woltan Services

**Owner Contact:**

John J. Hayes, President PM One, Ltd.
Mr. Carl Sanders, Property Manager
1651 E. 55th Street
Chicago, Illinois
773-374-9010

### 4. File Deficiencies

There was an approved MIO in March, 1997, and this could not be located in the project files.

### 5. Financial Condition

This property is uninsured and on a budget based funding accounting system. The owner has not been required to submit financial statements due to the property being uninsured that only receives section 8 assistance.

### 6. Physical Condition

**Current:** The owner submitted a MIO Plan to this office on December 8, 1999. The MIO has been tentatively accepted with two modifications. The HUB office has requested the owner to add on the MIO Plan the source of funding. The owner has already infused capital into the property totaling $770,000. He has committed to completing all the necessary items identified in the REAC inspection report that was conducted on 4/29/99 with the property receiving a score of 42b* with deficiencies such as:

- fix broken light fixtures,
- replace all mailboxes,
- remove all graffiti,
- replace elevators,
- repair foundation cracks,

Building Exterior:

- replace damaged doors,
- replace broken windows,
- replace fire protection equipment,
- repair ceiling,
- complete rehab of laundry facility,
- repair trash chutes,
- monthly extermination increased

Internal Repairs ;

- repair all broken doors,
- repair ceiling
- replace heating
- and plumbing system.

By infusing capital into the property the owner has shown a good faith effort to correct REAC deficiencies identified.

The Property received a site visit by the DEC staff on April 15 and 16, 1999 revealed the following conditions:

- Common areas were filled with garbage, graffiti and urine odor,
- Building infested with rats and roaches
- Pipes were leaking
- Elevators not working
- Mailboxes were damaged
- Fire extinguishers were missing or damaged
- There were visible signs of moisture and mold on exterior walls
- There is graffiti all over the building
- There are no lights in some of the hallways
- There was evidence of drug activity

Another site visit by the DEC staff in August, 1999 revealed the deficiencies identified above and the following REAC items were corrected:

- fixed broken light fixtures,
- replaced all mailboxes,
- removed all graffiti,
- replaced elevators,
- repaired foundation cracks,

Building Exterior:

- replaced damaged doors,
- replaced broken windows,
- replaced fire protection equipment,
- repaired ceiling,
- completed rehab of laundry facility,

- repaired trash chutes,
- monthly extermination increased

Internal Repairs ;

- repaired all broken doors,
- repaired ceiling
- replaced heating
- and plumbing system.

| DATE CONDUCTED | DATE OF REPORT | OVERALL RATING | TYPE REVIEWER | DEFICIENCIES CORRECTED |
|---|---|---|---|---|
| 04/28/99 | 04/29/99 | 42b* | REAC | Some |
| 04/15-16/99 | 04/30/99 | Unsatisfactory | On Site DEC | Some |
| 11/19/97 | 1997 | Satisfactory | HUD Staff | MIO Plan Prepared |
| 12/19/96 | 1996 | Unsatisfactory | Contractor | No |
| 03/10/95 | 1995 | Satisfactory | HUD Contractor | Yes |
| 10/21/94 | 10/21/94 | Unsatisfactory | HUD Contractor | No |

**History:** This project has a history of poor physical maintenance. Drug activity within and around the project has decreased since the owners changed security firms. In 1996, this property received a Special Rent Increase for Crime Prevention Activities in the amount of $200,570.

1) 1994 – Inspections completed by Thomas Hickey & Associates.

   Many of the units did not pass HQS inspection. Items identified in need of major repair work were: a) sign of gang activity (graffiti), b) trashed stairwells, c) roof in need of repair, d) extermination needed, e) bathrooms - plumbing problems, f) windows, g) doors, and h) door locks Rating was unsatisfactory.

2) 1995 - Inspection revealed the property was in need of major repairs. Interior unsatisfactory. Property improvements proposed: a) replace roof curb, b) handrails, c) fire hoses in cabinets, d)replace deadbolts, e)repair trash chutes, f) extermination, and g) repair boiler.

3) 1996 - Unit Inspections conducted by management found that many apartments were left abandoned and tenants moved out without notice or because of dissatisfaction with property upkeep. A No trespassing order was done through the Cook County Court System for individuals who had been evicted.

4) 1997 - Units Re-Inspected by Leroy Fishleigh (HUD staff) Overall rating was Below Average (Physical Condition).

5) 1997 - Maintenance Policies and Practices( Below Average)

a) Floors and hallways were found to be dirty, littered and stairwells were in same condition of disarray. b) air handler needs repair, c) boiler room needed cleaning/maintenance, and d)fire extinguisher cases needed repair and the need to install missing extinguishers.

## 7. Management Analysis

**Current:** PM One Ltd. is currently the management agent for South Pointe Towers. There are seven identity of interest companies as follows:

- Advantage Construction - Provides unit renovation services - painting, drywall, roofing, siding, paint. Provide services to properties on a bid basis.
- Austin Laundry - Provides coin-operated laundry machine services. Provides services to properties on a bid basis.
- Delcor Construction - Provides contracted maintenance services - painting carpeting, fire damage rehab, roofing, siding. Provides services to properties on a bid basis.
- H & G Renovations - Provides unit renovation services - painting, drywall, roofing, siding, paint. Provides services on a bid basis.
- PALCO, Inc. - Provides contracted unit renovation services - painting, drywall.
- Sosco - Provides unit renovation services
- Woltan Services - Provides contracted maintenance services

**Management Agent:** PM One 38-2312468 - Independent Fee Agent

Note: Social Security Numbers and Names under Ownership Section

**Contact:** Michael G. McGhie, President
33045 Hamilton Court, #100, Farmington Hills, Michigan 48334

**Management Reviews:**

| DATE CONDUCTED | OVERALL RATING | MAINTE. & SECURITY | FINANCIAL MGMT. | LEASING & OCCUPANCY | TENANAT MGMT. RELATIONS | GENERAL MGMT |
|---|---|---|---|---|---|---|
| 06-19-99 Pinnacle | Unsatisfactory | Poor | Poor | Good | Fair | Fair |
| 04-15/16-99 DEC Staff | Unsatisfactory | Poor | Fair | Good | Fair | Fair |
| 11-19-97 HUD Staff | Unsatisfactory | Poor | Fair | Good | Fair | Fair |
| 12-19-98 HUD Staff | Unsatisfactory | Poor | Fair | Good | Fair | Poor |

The property has been managed by PM One since April 1, 1991 - present. Prior to PM One, the property was managed by Englewood Terrace Limited Partnership. The property has a history of poor property management and tenant relations. The management agent is an identity of interest agent. The file contains a management certification submitted by the owner and the agent. The term was from 01-1-96 through 12-31-97. The management submitted a management profile and certification June 21, 1999. The certification was approved by the HUD Office.

## 8. Site Visit Report

On April 15 and 16, 1999, DEC staff conducted an on-site visit of the property. The overall rating of the property was unsatisfactory. The property was in very poor physical condition and had heavy drug related activity. After the DEC visit, the DEC reported the activity to the City of Chicago Violent Crimes Division. They agreed to investigate and send a team to the property. Since then, the property has new security. Since this visit the owners told the DEC they are committed to correcting all deficiencies at South Pointe Towers, however, they have failed to set aside the necessary funds to correct the deficiencies immediately. The property owners have also attempted to address the social issues of the property by putting in place new house rules and adding a social service program to be made available to the residents of South Pointe Towers.

Pinnacle conducted a limited management review of the property on May 19, 1999. The review revealed the owner had not corrected conditions outlined in the REAC. These conditions were reported in the REAC Inspection Report, DEC on-site visit, and the physical inspection reports.

PL.APP-068

**9. Subsidy Status**

The current HAP contract expires 9-30-2000.

**CURENT RENTS:**

| UNIT TYPE | CONTRACT RENT | UTILITY ALLOWANCE | GROSS RENTS | FMR 1999 | OVER/UNDER FMR |
|---|---|---|---|---|---|
| 1BR | $648 | $25 | $673 | $640 | $8.00 OVER |
| 2BR | $799 | $36 | $835 | $762 | $37.00 OVER |
| 3BR | $866 | $52 | $918 | $953 | $(87.00) UNDER |
| 3BR | $800 | $43 | $843 | $953 | $(153) UNDER |

**RENT INCREASE HISTORY:**

| SUBMISSION DATE | HUD RESPONSE | DATE OF RESPONSE | EFFECTIVE DATE |
|---|---|---|---|
| 02/96 | Approved Special Rent Adjustment | 02/96 | 03/01/96 |
| 08/95 | Approved Increase | 09/95 | 09/22/95 |
| 07/94 | Approved Increase | 07/94 | August 18, 1994 |

**History:** In 1996, the project received a Special Rent Increase Adjustment for the purpose of securing tax consulting services. In 1993, the project received a Drug

Elimination grant to assist them in decreasing the amount of criminal activity, gang and drug traffic in and around the property.

**10. Occupancy**

There are a total of 303 units in this project. 60 - 1 bedroom, 140 2- bedroom, 23 - town house units, and 80 - 3 bedroom. Currently the property is 92% occupied. The number of occupants is constantly decreasing due to increased drug evictions and other lease violations.

**11. Neighborhood/Residency**

The property is a physically distressed development in a high crime and blighted neighborhood. The property has a reputation of having been drug infested and controlled by gangs. Off -duty Chicago and Cook County police provide security for the property. The agent has hired a new security firm which has caused the number of drug and gang crimes to decrease. The area surrounding the site is in similar conditions. The area is severely distressed and economically depressed with no signs of investment. Much of the area is filled with vacant lots. There is an elementary school across the street in front of the property.

**12. Problem Statement**

The property is in poor physical condition; however the owner has corrected some of the identified repairs revealed by the REAC Inspection Report. They are in the process of entering into contracts to correct the remainder of the items cited by REAC and the DEC. The owners have started repairs, and are showing good faith by starting some repairs with their own funds. In addition, they are attempting to secure a loan to offset the cost of the remaining work.

**13. Legal Analysis**

All known legal issues needed to support the business decision recommended are adequately addressed herein.

**14. Next Steps/Recommendations**

- Substantial progress has now been made on the findings outlined in the REAC report, therefore the DEC should return the case to the Chicago Multifamily HUB Office for servicing.
- The Chicago HUB Office should continue the finalization of the MIO received on December 8, 1999.

APPROVALS

James P. Zale 1/27/00
Date
Satellite Office Director

Edward Hinsberger 2/1/00
Date
MF HUB Director, Chicago

Marilyn M. Edge 2/14/00
Marilyn Edge Date
Acting Director of Operations
DEC

SMS 2-2-00

Edward Kraus 2-16-00
Edward Kraus Date
Director, DEC

Frank Malone Date
MF Office of Portfolio
Management

PL.APP-071

(separate page - stays in our office)

5vs5:Enf/Batchelor

CONCURRENCES:

| EC Analyst | Team Leader | Attorney | Lead Attorney |
|---|---|---|---|
| Ms. Freddie C. Batchelor | Joan Kening | Maria Baguio | Gregory Guthrie |
| Initials: | Initials: | Initials: | Initials: |
| Date: 1-27-00 | Date: 1/27/00 | Date: 1/28/00 | Date: 1/28/00 |

cc: MF HUB

Program Center (only if appropriate)
Green File
EC Analyst
Imaging File - Enforcement Folder



PL.APP-072

# EXHIBIT 2

ORIGINAL

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

ENGLEWOOD TERRACE LIMITED PARTNERSHIP,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

No. 03-2209C
Judge Wolski

DEFENDANT'S RESPONSES TO PLAINTIFF'S FIRST REQUEST FOR PRODUCTION OF DOCUMENTS

Pursuant to Rule 34 of the Rules of the United States Court of Federal Claims ("RCFC"), defendant objects and responds to Plaintiff's First Request for Production of Documents in Fed. Cl. No. 03-2209C, as follows:

Introductory Statements And General Objections

1. Defendant has not yet completed its investigation of the facts pertaining to this action, review of its own documents, discovery, or preparation for trial. Defendant reserves its right to rely upon any facts, documents, or other evidence that may will produce those documents and records for plaintiff's review.

2. Neither defendant's agreement to produce, nor its objection to the production of, any information or documents or any category of information or documents is to be construed as an admission or acknowledgment that any information or documents exist within such category or categories.

3. Defendant's agreement to produce a document or documents in partial response to any of the requests shall not be deemed a waiver of the right to object to the production of other documents.

4. Defendant's objections set forth are based upon information now known to defendant and its attorneys, and are made without prejudice to defendant's right to assert additional objections should defendant discover additional ground for objections.

5. Defendant objects to any request which may elicit matters subject to attorney-client privilege, attorney work product doctrine, Government privileges, other applicable privileges, or protected by Rule 26(b). By accepting production, plaintiff agrees that, to the extent that there is any inadvertent disclosure of privileged information, it shall not constitute any waiver of the privileges and all such material will be returned. Defendant reserves the right to object to the introduction into evidence before the Court at any time before or at trial of information that is privileged under law and that has been revealed or produced inadvertently. Defendant does not by these answers waive any claim of privilege or attorney work product.

6. Defendant objects to any request to the extent that it requires disclosure of information banned from disclosure by law, including but not limited to the Privacy Act, 5 U.S.C. § 552(a).

7. Defendant objects to requests which call for the identification or production of "any," "all," or "related to" with respect to persons or documents, as being vague, overly broad and unduly burdensome to the extent they request irrelevant information or routine information of no materiality to the litigation or are not reasonably calculated to lead to the discovery of admissible evidence.

8. Defendant objects to the requests to the extent that they are vague and ambiguous, such that defendant is unable to discern the meaning of a particular request or phrases or words used in them. Where possible, defendant will respond based upon its understanding of the request.

9. Defendant objects to the requests to the extent that they seek routine information of no materiality to the litigation or information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

10. Defendant makes these answers subject to the reservation of its right to object to the introduction into evidence in this or any other action of any of the information or material contained in the answers, or produced pursuant to these

requests for production of documents on any ground, including but not limited to, relevancy, materiality, competency and hearsay.

11. Defendant objects to each and every request to the extent that it seeks information from documents that are not in defendant's possession, custody or control.

12. Defendant objects to each and every request to the extent that it seeks information in the possession, custody or control of plaintiffs.

13. The information supplied in these responses is not based solely upon the knowledge of the executing party, but includes the knowledge of the Government's agents, representatives, and attorneys, unless privileged. The word usage and sentence structure is that of the attorneys who prepared these responses, and does not purport to be the exact language of the executing party.

14. Defendant objects to the "Definitions" and "Instructions" contained in plaintiff's request for production of documents to the extent that they seek to impose upon defendant any requirement beyond those established by the Rules of the United States Court of Federal Claims.

REQUEST NO. 1:

All documents concerning agreements between the parties, including the 2000 HAP Contract for South Pointe and any amendments to that contract.

RESPONSE:

All responsive, non-privileged documents are being provided. See attached documents.

REQUEST No. 2:

All documents concerning the Real Estate Assessment Center' s March 2001 inspection and report on South Pointe, Englewood's April 2001 responses, HUD's May 2001 rejection of Englewood's responses, and any subsequent inspections or reports on the physical condition of South Pointe, including those pertaining to Exhibits F, G, H, and L to the Complaint.

RESPONSE:

All responsive, non-privileged documents are being provided. See attached documents.

REQUEST NO. 3:

All documents concerning Englewood's asserted default under the parties' 2000 HAP Contract, including those pertaining to HUD's May 2001 default notice, Exhibit I to the Complaint.

RESPONSE:

All responsive, non-privileged documents are being provided. See attached documents.

REQUEST NO. 4:

All documents concerning HUD's abatement or termination of the parties' 2000 HAP Contract, including its November 2001 termination letter, Exhibit P to the Complaint.

RESPONSE:

All responsive, non-privileged documents are being provided. See attached documents.

REQUEST NO. 5:

All documents concerning HUD's efforts to relocate South Pointe residents, and to replace Section 8 project based housing, assistance with vouchers at South Pointe.

RESPONSE:

All responsive, non-privileged documents are being provided. See attached documents.

REQUEST NO. 6:

All documents concerning HUD's plans in Chicago or nationally to reduce or replace Section 8 project based housing assistance with vouchers.

RESPONSE:

Defendant objects to this request because it is overbroad, oppressive, and unduly burdensome, and also because it encompasses documents which are irrelevant and not reasonably calculated to lead to the discovery of relevant evidence.

REQUEST NO. 7:

All documents concerning proposed or consummated capital improvement rehabilitation loans for South Pointe.

RESPONSE:

All responsive, non-privileged documents are being provided. See attached documents.

REQUEST NO. 8:

All documents concerning rent increases, energy cost reimbursements, vacancy claims, or damages caused by residents of South Pointe, including the requests for payments pertaining to those subjects in Exhibit S to the Complaint.

RESPONSE:

All responsive, non-privileged documents are being provided. See attached documents.

REQUEST NO. 9:

All documents concerning Englewood's asserted damages, or lack thereof.

RESPONSE:

Defendant objects to this request as it seeks documents that are in the possession, custody or control of plaintiffs.

REQUEST NO 10:

All documents included in or concerning HUD's "concurrence file" pertaining to South Pointe, including all documents on South Pointe entailing review, comment and approval inside HUD.

RESPONSE:

Defendant objects to this request because it is vague and ambiguous, and we are unable to discern the meaning of the phrase "concurrence file."

REQUEST NO. 11:

All emails or other electronic communications concerning South Pointe.

RESPONSE:

All responsive, non-privileged documents are being provided. See attached documents.

REQUEST NO. 12:

All documents concerning communications with East Lake Management and Development Company, Elzie Higginbottom, Ann Harrison, or Eileen Rhodes pertaining to South Pointe.

RESPONSE:

Defendant objects to this request because it is overbroad, oppressive, and unduly burdensome, and also because it encompasses documents which are irrelevant and not reasonably calculated to lead to the discovery of relevant evidence.

REQUEST NO. 13:

All documents concerning HUD's collateral estoppel or accord and satisfaction affirmative defenses (Answer 98-99).

RESPONSE:

All responsive, non-privileged documents are being provided. See attached documents.

REQUEST NO. 14:

All other documents, not described in the preceding requests, pertaining to South Pointe.

RESPONSE:

Defendant objects to this request because it is overbroad, oppressive, and unduly burdensome, and also because it encompasses documents which are irrelevant and not reasonably calculated to lead to the discovery of relevant evidence.

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

Brian M. Simkin / by HD Foster

BRIAN M. SIMKIN
Assistant Director

OF COUNSEL:

GREGORY G. GUSTIN
MARIA BAGUIO
Department of Housing
and Urban Development
Departmental Enforcement
Center
Chicago, IL

LISA B. DONIS
Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor, 1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 307-6288
Attorneys for Defendant

OCTOBER 19, 2004

**CERTIFICATE OF SERVICE**

I certify under penalty of perjury that on this 19th day of October 2004, I caused to be sent, via FedEx, copies of "DEFENDANT'S RESPONSES TO PLAINTIFF'S FIRST REQUEST FOR PRODUCTION OF DOCUMENTS" addressed as follows:

PETER V. BAUGHER
Schopf & Weiss, LLP
312 West Randolph Street
Suite 300
Chicago, IL 60606

J Bennett ____________________

# EXHIBIT 3

**Schopf & Weiss LLP**
**Business Litigation**

312 West Randolph Street, Suite 300
Chicago, Illinois 60606-1721
tel 312.701.9300
fax 312.701.9335
www.sw.com

Writer's e-mail
baugher@sw.com

Writer's direct dial
312.701.9315

April 4, 2006

**By Facsimile: 202.307.0972**
**and Email:** paul.wellons@usdoj.gov

Mr. Paul R. Wellons
Commercial Litigation Branch
U.S. Department of Justice
1100 L Street, N.W., Room 800
Washington, DC 20005

**Re: *Englewood v. HUD*, No. 03-2209C**

Dear Paul:

Much of our status report with Judge Horn on March 17, 2006, was devoted to the issue of "concurrences." You were directed to produce an affidavit evidencing that some HUD official with standing, authority and independence had (1) reviewed the documents and decisions for which we are seeking evidence of concurrences and approvals, (2) understood the HUD decision making protocols related to them, (3) made sure the appropriate files were searched thoroughly, and (4) could testify that the requested documents did not exist, and that HUD files had not been improperly destroyed.

Because there were interruptions in the conference call, and to help assure that we would get a meaningful declaration, I wrote to you on Monday, March 20, enclosing a draft affidavit for Janet Golrick, the senior HUD official that had been designated to oversee the settlement negotiations last fall (**Exhibit A**). Unlike Ms. Miller, Mr. Mayfield, Mr. Gustin and Mr. Hinsberger, Ms. Golrick was independent of the specific HUD actions that are being challenged in this litigation.

You did not acknowledge or otherwise respond to our draft, or to my follow-up emails until Thursday, March 23, the day before HUD's certification was due. At that point, you asserted that the Government would file an appropriate certification and declined to discuss the matter further.

Instead, on Friday, March 24, you filed affidavits from Mr. Hinsberger and Mr. Gustin (**Exhibits B and C**). While I appreciate that you might have wanted to discuss and change some of the exact language we proposed for Ms. Golrick's affidavit, I was disappointed not to hear back from you and surprised by the non-responsiveness of the Hinsberger and Gustin declarations.

Mr. Hinsberger's Declaration states that all decisions regarding South Pointe were made by him, or his staff, under his "delegated authority" as HUB Director (¶ 8). **Please produce any documents that constitute or discuss Mr. Hinsberger's "delegated authority" with respect to the transactions at issue concerning South Pointe. Please also supplement HUD's March 2005 answers to Plaintiff's Interrogatories, many of which discuss authority but none of which mention Mr. Hinsberger or any authorizations by him to other HUD personnel pertaining to South Pointe.**

Mr. Gustin is silent on his involvement with South Pointe from February 2000 through October 26, 2001, and limits his Declaration to the period "since May 2004," when he has been Associate Regional Counsel in HUD Chicago. In that capacity, he explains his actions only with numerous qualifications. He was involved in the gathering of documents and electronic media that "were reasonably known or suspected to (be).....responsive," engaged in "reasonable diligence," and delivered documents "to the best of my information, belief and knowledge," and delivered to DOJ "all responsive" media. With respect to the specific concurrences requested by Englewood, which was the central question, Gustin offers just the broad assertion: "HUD and its counsel have engaged all reasonable diligence and efforts to ensure that all written concurrences on actions taken by HUD were delivered to DOJ."

Paul, as you know, we have asking about HUD "concurrences" on key decisions and documents since the beginning of discovery in the fall of 2004. Initially, your argument was that they were privileged. On May 27, 2005, you wrote that HUD was "not seeking to withhold any concurrences as privileged" but that the documents we were seeking "are irrelevant" (**Exhibit D**). In that same letter, you stated that: "Jadranka Burkec...has *accessed* HUD's imaging records and *verified* that we have produced paper copies of all (relevant) imaged documents." (Italics added.) HUD's entire concurrences search has apparently been based on the efforts of Greg Gustin's paralegal, Jadranka Burkec. There is no reference to any participation or supervision by the Department of Justice.

When I wrote you again in detail on the subject of concurrences on September 2, 2005 (**Exhibit E),** you confirmed again that no concurrences were being withheld for reasons of privilege, said that no concurrences were needed for default notices, and contended that a Motion to Compel was inappropriate because discovery was closed in May 2005 (**Exhibit F**).

These appear to be your positions at present:

First, all of the questioned documents and decisions were made properly by appropriate HUD staff under the "delegated authority" that HUD Washington had conferred on Ed Hinsberger as HUB Director. This would seem to include the "amendment" of HAP contracts without following the specific contract provisions. Second, there are no documents which would evidence the grant or limits of the delegated authority to Hinsberger or Hinsberger's transfer of his delegated authority to others. Gwen Thomas could amend a HAP contract unilaterally because Hinsberger told her to amend the contract. Third, there is no HUD requirement that there be written concurrences or approvals for HUD actions or that there be any permanent record of the decision making process beyond "delegated authority" and the document or action. Fourth, the person responsible for "actually doing" the search for the requested documents was Greg Gustin's paralegal, Jadranka Burkec and it is her "verification" that the search was comprehensive and that all of the requested documents have been produced. You have not provided any information about her instructions, or what access, clearances, passwords or authority she was given.

Paul, I am sure you appreciate how important a clear documentation of the HUD decision making process in this matter has become: delegated authority to Hinsberger, Hinsberger's redelegation of authority to others, concurrences and approvals. Englewood believes that HUD Chicago was a rogue operation, acting outside of the rules with no prospect of judicial review, without any meaningful supervision by HUD Washington.

The description and integrity of the elements of the HUD decision making process that Englewood challenges include:

1. Englewood's performance while in the DEC;
2. The basic validity of the 2000 HAP Renewal Contract;
3. The claim of "error" in the Contract;
4. The "amendment" to the Contract:
5. The factual basis for the alleged "events of default";
6. The completion of the decision making process leading to the Notice of Default before HUD's receipt of Englewood's response;
7. The decision to return Englewood's response to the March 8, 2001 REAC report without serious discussion or review;
8. HUD's decision not to "automatically renew" the 2000 HAP Contract on October 1, 2001;
9. The purpose and process for entering into the 90-Day Renewal Contract in September 2001; and
10. HUD's administrative review and Gustin's drafting of HUD's "final administrative decision" by Mayfield on May 2, 2002.

Under the circumstances there is no value in having Messrs. Hinsberger and Gustin make non-responsive and highly qualified statements concerning the propriety of their actions. They are among the key managers whose actions are at issue in this litigation.

**Schopf & Weiss LLP**
**Business Litigation**



There are two ways we can proceed: First, someone senior to Ms. Miller at HUD Washington (Ms. Golrick or equivalent) can testify that the actions of HUD Chicago were authorized and proper, and that the required documentation of those actions has been produced or does not exist. Second, we can take the depositions of Messrs. Hinsberger and/or Gustin with a waiver of any claim of privilege concerning the circumstances of the requested documents. I would appreciate your prompt response.

Sincerely yours,

Peter V. Baugher

Peter V. Baugher

PVB:mt

Enclosures

cc: Ms. Beverly J. Miller (Beverly_J._Miller@hud.gov)
Ms. Nancy Christopher (Nancy_D._Christopher@hud.gov)
Ms. Janet Golrick (Janet_M._Golrick@hud.gov)
Mr. Brian Simkin (Brian.Simkin@usdoj.gov)

# EXHIBIT A

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| ENGLEWOOD TERRACE LIMITED PATNERSHIP,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant, | ) | No. – 03-2209C<br>(Judge Horn) |

AFFIDAVIT OF JUDITH GOLRICK

I, Judith Golrick, having been duly sworn on oath state that, if called as a witness in the above captioned matter, I could testify as follows of my own personal knowledge and under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. I am the Assistant Deputy Assistant for Multifamily Housing at the Department of Housing and Urban Development.

2. I have knowledge of and access to all of the HUD and DEC Multifamily project files in the field and in Washington, D.C. whether they are hard copy files, files in the Real Estate Management System ("REMS") or "imaged" in the central files saved in Washington.

3. I am thoroughly familiar with HUD protocols and procedures with respect to the requirements for "concurrences" from various HUD and DEC personnel on key HUD decisions or written communications from HUD to project

owners with respect to projects supervised by the HUD Office of Multifamily Housing.

4. I have reviewed the specific requests made for "concurrences" by personnel at HUD or the DEC in the letter from Peter Baugher to Paul Wellons dated xxxxxxxxx related to various decisions and communications made with respect to South Pointe Tower (HUD No. xxxxxxxxxxxx).

5. I have reviewed the documents referred to in the request for concurrences so that I am familiar with the circumstances under which the documents were produced and with the positions of the individuals who would be responsible for drafting, concurring in or executing the documents.

6. I have instructed staff at HUD with no connection with this matter the authority to review the hard copy and electronic imaged files in both Chicago and Washington for HUD and the DEC to make sure that all of the concurrences that would be appropriate for these decisions and documents and which were requested by Englewood have been produced and delivered to Englewood.

7. I certify under oath that all of the concurrence documents requested by Englewood in the Baugher letter of xxxxxxxxxxx have been produced and that the requested documents do not exist anywhere at HUD.

8. I further certify under oath that the requested documents have not been purged or otherwise destroyed from the date the litigation was filed in September of 2003 to the present date.

# EXHIBIT B

**IN THE**
**UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| ENGLEWOOD TERRACE LIMITED PARTNERSHIP,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | ) | No. 03-2209C<br>(Judge Marian Blank Horn) |

**DECLARATION OF EDWARD J. HINSBERGER**

I, EDWARD J. HINSBERGER, in my official capacity for the United States Department of Housing and Urban Development (HUD), on oath and under penalty of perjury pursuant to 28 U.S.C. § 1746, state as follows:

1. I am the Director of the Chicago, Illinois, Region 5, HUD Office of Multifamily Housing (Chicago Hub).

2. As Director, among other matters, I am responsible for the oversight, development, and general operation of multifamily properties within the jurisdiction of the Chicago Hub insofar as those properties desire to be, or are, subject to HUD program requirements.

3. I have been employed by HUD since 1978, and I have served as Director of the Chicago Hub since 1997.

Case 1:03-cv-02209-MBH Document 94 Filed 03/24/2006 Page 2 of 2

4. This Declaration is made in my official capacity as Chicago Hub Director, and only for the matters at issue in the above styled litigation.

5. I am familiar with the project located at 6425 S. Lowe and commonly known as South Pointe Towers Apartments (South Pointe). South Pointe received rental subsidies through a project-based Housing Assistance Payments (HAP) Contract with HUD; as that HAP Contract was renewed from time-to-time until its termination in 2002.

6. The authority for actions taken by HUD with respect to the South Pointe HAP Contract resided with HUD's Office of Multifamily Housing, and myself as Director of the Chicago Hub.

7. Thus, the proper HUD authority signed the HAP Contract, and made elections to non-renew, renew, modify, amend, or terminate the South Pointe HAP Contract.

8. With respect to elections to non-renew, renew, modify, amend, or terminate the South Pointe HAP Contract, the decisions and actions taken concerning those matters were within my delegated authority as said Hub Director, and were taken for HUD by me, or by staff that I authorized to do so, and pursuant to my delegated authority.

9. Further Declarant sayeth naught.

Executed and affirmed this 22nd day of March 2006.

/s/ Edward J. Hinsberger
Edward J. Hinsberger
Director
U.S. Department of Housing and Urban Development
Office of Multifamily Housing, Chicago Hub

# EXHIBIT C

**IN THE**
**UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| ENGLEWOOD TERRACE LIMITED PARTNERSHIP,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | ) | No. 03-2209C<br>(Judge Marian Blank Horn) |

**DECLARATION OF GREGORY G. GUSTIN**

I, GREGORY G. GUSTIN, in my official capacity for the United States Department of Housing and Urban Development (HUD), on oath and under penalty of perjury pursuant to 28 U.S.C. § 1746, state as follows:

1. Since May 2004, I have been the Associate Regional Counsel for Program Enforcement, U.S. Department of Housing and Urban Development (HUD), Office of Regional Counsel, Region 5, Chicago, Illinois (Associate Regional Counsel).

2. This Declaration is made in my official capacity as Associate Regional Counsel, and only for the matters at issue in the above styled litigation.

3. As Associate Regional Counsel, among other matters, I am responsible for the oversight and conduct of litigation matters assigned to the Office of Regional Counsel legal section that I supervise; and I am responsible for the supervision of the section's attorney and paralegal staff in those regards.

4. The above-styled litigation is one such matter assigned to the Office of Regional Counsel legal section that I supervise; and I am thus familiar with the above-styled litigation surrounding a project located at 6425 S. Lowe and commonly known as South Pointe Towers Apartments, including the Plaintiff's original and amended requests for document production submitted during the course of that litigation.

5. Directly, and through staff, I supervised the gathering of all records, including all documents and electronic media, from all departments within HUD that were reasonably known or suspected to have media that was responsive to Plaintiff's discovery requests.

6. Throughout the course of the above-styled litigation Plaintiff has asserted that additional media that is responsive to Plaintiff's discovery requests exists.

7. To ensure all reasonable diligence has been engaged by HUD, I and my staff issued multiple requests to all departments within HUD that were reasonably known or suspected to have media that was responsive to Plaintiff's discovery requests.

8. To the best of my information, belief, and knowledge all media located in response to those multiple requests, after diligent search, was delivered to my legal section's staff; and either I, and/or members of the legal section I supervise, reviewed all such media.

9. With the exception of media created by Plaintiff, all media that was located in response to Plaintiff's discovery requests was delivered to counsel for the Department of Justice (DOJ) for review and production to Plaintiff.

10. HUD and its counsel have engaged all reasonable diligence and efforts to locate and deliver, to DOJ, all responsive media.

11. HUD and its counsel have engaged all reasonable diligence and efforts to ensure that all HUD electronic databases, such as HUD's Real Estate Management System and the Departmental Enforcement Center's Imaging system, that did contain or may have contained responsive media, were reviewed, printed, and delivered to DOJ.

12. HUD and its counsel have engaged all reasonable diligence and efforts to ensure that all written concurrences on actions taken by HUD were delivered to DOJ.

13. Plaintiff's statements or inferences that responsive media has been improperly withheld and/or destroyed is, to the best of my knowledge, belief, and efforts, false.

14. Further Declarant sayeth naught.

Executed and affirmed this 22nd day of March 2006.

/s/ Gregory G. Gustin
Gregory G. Gustin
Associate Regional Counsel, Program Enforcement
U.S. Department of Housing and Urban Development
Office of Regional Counsel, Region 5

# EXHIBIT D

**U.S. Department of Justice**

Civil Division

PDK:PRWellons:
No. 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

Telephone: (202) 616-8532
Datafax: (202) 307-0972

*Washington, D.C. 20530*

May 27, 2005

VIA FIRST CLASS MAIL

Peter V. Baugher
Schopf & Weiss LLP
312 West Randolph Street
Suite 300
Chicago, IL 60606-1721

Re: Englewood Terrace v. United States

Dear Peter:

This letter is in response to your letter dated May 23, 2005. You have inquired again regarding documents that personnel working for the U.S. Department of Housing and Urban Development ("HUD") may have imaged. Jadranka Burkec, a legal assistant with HUD's Chicago Departmental Enforcement Center, has accessed HUD's imaging records and verified that we have produced paper copies of all imaged documents regarding South Pointe during the period relevant to this dispute.

Specifically, I note that your letter refers to "documents up to the point of referral in September 1998." We have produced copies of all imaged documents regarding South Pointe from 1998 onward, but have not produced copies of imaged documents dated from 1997 and before. This is because you have not asked for these documents as well as because they pre-date the facts of this dispute and are completely irrelevant.

You also ask whether anyone has accessed REMS screens to verify that our production is complete. As Joan Kiening testified at her deposition, she accessed REMS on a screen-by-screen basis to verify the completeness of our document production. Further, as I noted above, Ms. Burkec has verified that we have produced all imaged documents relevant to this case.

With regard to concurrences, your client has filed a breach of contract action, and its complaint contains no allegations that any action taken by HUD was not approved by the appropriate deciding official. Thus, these documents are irrelevant. However, as I have previously stated, HUD has disclosed all concurrences it has located for the documents you reference. We are not seeking to withhold any concurrences as privileged.

Finally, Englewood's complaint contains no allegations that HUD improperly placed "flags" regarding Englewood in its records. Thus, we do not understand the relevance of the documents you request. However, we have produced the documents we have located regarding HUD's decision to flag South Pointe. In particular, I refer you to the documents enclosed in my last letter, which will identify the dates on which HUD flagged South Pointe and the reasons for the flags.

Peter, I trust that this will resolve your questions regarding our document production.

Sincerely,

Paul R. Wellons
Trial Attorney
Commercial Litigation Branch
Civil Division

# EXHIBIT E

**Schopf & Weiss LLP**
**Business Litigation**

312 West Randolph Street, Suite 300
Chicago, Illinois 60606-1721
tel 312.701.9300
fax 312.701.9335
www.sw.com

Writer's e-mail
baugher@sw.com

Writer's direct dial
312.701.9315

September 2, 2005

**By Facsimile: 202.307.0972**

Mr. Paul R. Wellons
Commercial Litigation Branch
Civil Division, United States Department of Justice
Attention: Classification Unit
1100 L Street, N.W., Room 800
Washington, DC 20005

**Re: *Englewood v. HUD*--Concurrences**

Dear Paul:

One of the major issues not resolved during discovery was the surprising dearth of "concurrences" produced by HUD. As you know, we have been asking about getting copies of concurrences related to the major decisions made on South Pointe since September of last year. At the close of discovery we exchanged letters on this topic on April 19, May 2, May 4, May 23 (comprehensive list), and May 27. And as recently as last week, you wrote (to be confirmed by letter) that "all concurrences have been produced."

We first learned about the concurrence process from the 2000 Final Team Report-Resolution, which stands virtually alone as a document with actual concurring signatures/initials and dates. We understand that concurrences were standard operating procedure in both Multifamily Housing and the DEC. From the materials produced by HUD, we saw places for concurrences in various Multifamily Housing documents.

We learned in the depositions that the bottom left space was the location for the initial author of any draft document, and that the individuals who agreed with or "concurred" with the document and/or decision would place their initials in spaces to the right. The person intended to sign the document would appear in the signature block. When it was signed the individual's signature would appear. Ms. Kiening stated that it was standard practice for important documents to be filed as hard copy, "imaged" in a Washington server location, and also referred to in REMS entries. The concurrence files should be in the hard copy files, the "image" system in Washington and REMS.

There were numerous references to concurrences by the HUD deposition witnesses as the source of information on the sequence of approvals for key decisions and documents. Witnesses in the depositions referred to concurrences related to HUD's position on the "error" in the HAP 2000 Renewal Contract and the two contract amendments, as well as the authorship and approval of the letters of December 6, 2000, March 9, 2001, and May 15, 2001.

Below are the specific documents and/or decisions for which we requested "concurrence" and "approval" information on May 23. They contrast, for example, with the January 26, 2000 Final Team Report-Resolution (with concurrence pages):

| No. | DOCUMENT | REFERENCE |
|---|---|---|
| 1. | 1999 DEC Draft Team Report | Pl. App. 39-44 |
| 2. | June 30, 1999 DEC Final Action Plan | Pl. App. 45-49 |
| 3. | July 1, 1999 Acceptance of South Pointe's Referral to the DEC | Attached |
| 4. | September 1999 Approval of 1999 Renewal Contract | Pl. App. 58-60 |
| 5. | November 30, 1999 Rejection of the Rehab Loan | Pl. App. 61-62 |
| 6. | December 8, 1999 Management Improvement & Operating (MIO) Plan | Kiening Dep. Ex. 3, D994 |
| 7. | September 29, 2000 Draft #2530 Flag | Pl. App. 139-43 |
| 8. | October 3, 2000 Close Out of 2000 Management Review | App. 107 |
| 9. | October 12, 2000 Draft #2530 Flag | Pl. App. 144-45 |
| 10. | September/October 2000 Approval of 2000 Renewal Contract | Thomas Dep. Ex. 10 |
| 11. | December 6, 2000 Letter Amending the 2000 Renewal Contract | App. 155 |
| 12. | March 8, 2001 REAC Inspection Summary | App. 160-71 |
| 13. | March 9, 2001 HUD Letter Challenging Completion of EH&S items | App. 171.1-171.2 |
| 14. | March 15, 2001 Draft Letter - Suspension of HAP Payments | Pl. App. 183-84 |
| 15. | April 3, 2001 HUD Rejection of Rehab Loan Application | App. 172-75 |
| 16. | April 9, 2001 Notice of Default | App. 192-93 |
| 17. | May 15, 2001 HUD Rejection of Englewood REAC Response | App. 199 |
| 18. | May 16, 2001 HUD Notice | App. 200-01 |
| 19. | August 21, 2001 #2530 Flag Against Englewood and P.M.One | B4654-6 (attached) |
| 20. | September 26, 2001 90 Day Renewal Contract | App. 217-34 |
| 21. | November 30, 2001 Notice of Abatement and Termination | App. 283-84 |

**Schopf & Weiss LLP**
Business Litigation



| No. | DOCUMENT | REFERENCE |
|---|---|---|
| 22. | May 2, 2002 HUD Final Decision in Administrative Process | App. 302-03 |
| 23. | June 1, 2004 #2530 Flag Against Don Samuelson and DSSA | None |

HUD's first position was that this information was privileged. During the last several months you have said that you have inquired about this information from HUD officials in Multifamily Housing and the DEC in Chicago and the information we are seeking does not exist. It would be helpful if "HUD officials" had names, so that it is clear that everyone understands that a thorough and truthful response is important.

At present, our discussion of this issue appears in depositions, letters, status conferences before Judge Wolski, and notes from phone conversations. I think it is in our common interest to have HUD's position on concurrences made "official." Please consider this letter an informal Rule 36 request for admissions that there were no concurrences or approvals for the documents listed above.

I am also writing to reiterate the substance of the email I sent to you yesterday. The motion for summary judgment will not succeed, though it has interrupted our progress toward trial. Nonetheless, this does present an opportunity. We should use this unfortunate delay to our clients' mutual advantage by engaging in serious, Washington-based settlement negotiations. We are willing to adjust our schedules to participate in such discussions. Let's talk on Tuesday to determine how best to proceed.

Sincerely yours,

Peter V. Baugher

Peter V. Baugher

PVB:ddj

Attachments

# EXHIBIT F

**U.S. Department of Justice**

Civil Division

PDK:PRWellons:
No. 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

Telephone: (202) 616-8253
Datafax: (202) 307-0972

*Washington, D.C. 20530*

September 2, 2005

VIA FIRST-CLASS Mail

Peter V. Baugher
Schopf & Weiss LLP
312 West Randolph Street
Suite 300
Chicago, IL 60606-1721

Re: Englewood Terrace v. United States,
Fed. Claims No. 03-2209

Dear Peter:

This letter is in response to your e-mail dated August 23, 2005. I have enclosed a letter previously sent to you that explains that we have produced all concurrences in our possession and are not seeking to withhold any concurrences upon the basis of attorney-client privilege. We have located no concurrences for the default notices you reference. In fact, no concurrences were needed for these notices, which were executed by the appropriate officials.

Even if this were not so, a motion to compel at this time would be inappropriate. Discovery in this case closed in May 2005. On July 26, 2005, both parties represented to the Court that all discovery was complete.

RECEIVED
SEP 0 6 2005
PVB

You also ask whether anyone has accessed REMS screens to verify that our production is complete. As Joan Kiening testified at her deposition, she accessed REMS on a screen-by-screen basis to verify the completeness of our document production. Further, as I noted above, Ms. Burkec has verified that we have produced all imaged documents relevant to this case.

With regard to concurrences, your client has filed a breach of contract action, and its complaint contains no allegations that any action taken by HUD was not approved by the appropriate deciding official. Thus, these documents are irrelevant. However, as I have previously stated, HUD has disclosed all concurrences it has located for the documents you reference. We are not seeking to withhold any concurrences as privileged.

Finally, Englewood's complaint contains no allegations that HUD improperly placed "flags" regarding Englewood in its records. Thus, we do not understand the relevance of the documents you request. However, we have produced the documents we have located regarding HUD's decision to flag South Pointe. In particular, I refer you to the documents enclosed in my last letter, which will identify the dates on which HUD flagged South Pointe and the reasons for the flags.

Peter, I trust that this will resolve your questions regarding our document production.

Sincerely,

Paul R. Wellons
Trial Attorney
Commercial Litigation Branch
Civil Division

# EXHIBIT 4

## *Project-based Section 8 Contracts Expiring in Fiscal Year 2000*

---

*Directive Number:* **99-36**

---

Click Here or type Alt-x for a Self Extracting File which contains Notice and all at

Click Here or type Alt-k for MS Word version of Notice

**U.S. Department of Housing and Urban Development**
**Office of Housing**

**Special Attention of:** **Notice H 99-36 (HUD)**
All Community Builders
All Multifamily Hub Directors Issued: December 29, 1999
All Multifamily Program Center Directors Expires: December 12, 2000
All Project Managers
All Secretary's Representatives
Contract Administrators, Owners and Managers
of Projects with Expiring Section 8 Contracts

**Subject:** Project-based Section 8 Contracts Expiring in Fiscal Year 2000

TABLE OF CONTENTS


| SECTION | | PAGE |
|---|---|---|
| I. | BACKGROUND | 4 |
| II. | PURPOSE | 6 |
| III. | FY 2000 POLICY CHANGES | 6 |
| IV. | APPLICABILTY | 10 |
| V. | Initial and Subsequent RENEWALS | 11 |
| VI. | CONTRACT TERMS AND EFFECTIVE DATES | 12 |
| VII. | OWNER'S OPTIONS AT CONTRACT EXPIRATION | 16 |
| VIII. | RENT COMPARABILITY STUDY (RCS) | 18 |
| IX. | OPTION 1: Request Renewal Under MARK-UP-TO-MARKET PROCEDURE | 20 |
| X. | OPTION 2: REQUEST RENEWAL OF OTHER CONTRACTS WITH CURRENT RENTS AT OR BELOW COMPARABLE MARKET RENTS | 22 |
| XI. | OPTION 3: REQUEST REFERRAL TO OMHAR FOR RESTRUCTURING | 24 |
| XII. | OPTION 4: REQUEST RENEWALS FOR PROJECTS EXEMPTED FROM | |

OMHAR 25

XIII. OPTION 5: Request renewal for portfolio reengineering or preservation contract 27

XIV. Option 6: Notification of intention to opt out of the section 8 contract 29

XV. PROTECTING SECTION 8 FAMILIES 29

XVI. OWNER'S NOTIFICATION REQUIREMENTS 31

XVII. LEASE ADDENDUM 34

XVIII. RESIDUAL RECEIPTS 35

XIX. PHYSICAL CONDITION OF THE PROPERTY 36

XX. HUD's REFUSAL TO RENEW A SECTION 8 CONTRACT 41

XXI. RURAL HOUSING SERVICE 515/8 PROJECTS 44

XXII. BUDGET-BASED RENT INCREASES FOR CAPITAL REPAIRS 46

XXIII. OTHER RENT INCREASES 48

XXIV. REMS REPORTING 49

XXV. FOR FURTHER INFORMATION 49

ATTACHMENTS

1. Acronyms Used in this Notice
2. Glossary of Terms
3A. Sample One Year Notification Reminder Letter from HUD to Owners for Projects in Good Standing
3B. Sample One Year Notification Reminder Letter from HUD to Owners for Projects Not in Good Standing
3C. Sample One Year Notification Letter When Owner Does Not Intend To Renew
3D. Sample One Year Notification when Owner Intends to Renew
3E. Sample 150-Day Notification Letter to Tenants When Owner Pre-Pays a Preservation Eligible Project
4. Owner's Option Checklist and Worksheet
4A. Processing Instructions for Attachment 4.
4B. Processing Instructions for Initial Renewal Under Option 1
4C. Worksheets for Mark-Up-To-Market
5. Addendum to Lease
6. Instructions for Completing the RCS
7. Overview of Conversion Procedure
8. Additional Guidance for Budget Submission (to be used with Chapter 7 of HUD Handbook 4350.1)
9. FY 2000 OCAF's
10. Section 8 Renewal Help Desk Contacts
11A. Section 524(a) Contract - HUD as Contract Administrator
11B. Section 524(a) Contract - PHA as Contract Administrator
11C. Addendum to Section 524(a) Contract
12A. Section 524(b)(1) Contract - HUD as Contract Administrator
12B. Section 524(b)(1) Contract - PHA as Contract Administrator
12C. Addendum to Section 524(b)(1) Contract

applicable Residual Receipts account must be returned to HUD.

2. The Hub or Program Center Director should send a memorandum to the Comptroller, Fort Worth Accounting Center, informing the Comptroller of the termination of the Section 8 HAP Contract(s) and any impending deposit of remaining funds in a Residual Receipts Account by a depository.

a. Include documentation to evidence the termination of the HAP Contract with the memorandum.

b. Simultaneously, send a letter of instructions to the Depository advising them of the disposition of the Residual Receipts Account.

3. The Depository must forward all remaining or prorated funds held in the Residual Receipts Account to a Lockbox administered by NationsBank of Georgia, P. O. Box 277303, Atlanta, GA 30384-7303. It is critical that the Section 8 contract number(s) be disclosed on the front of the check so that the funds can be returned to the proper HAP Contract or else the Lockbox will not know where to place the funds.

4. Once the Fort Worth Accounting Center receives confirmation of the termination of the HAP contract(s), all of the funds remaining in the Lockbox will ultimately be sent to the Budget Office in HUD Headquarters for recapture.

XIX. PHYSICAL CONDITION OF THE PROPERTY

A. The physical condition of a property is an important component in deciding whether or not to renew a Section 8 contract. The Real Estate Assessment Center (REAC) will complete a physical inspection that will assist field staff in making this important decision. Based on the results of the inspection, HUD can either renew, terminate or simply let a contract expire. The vast majority of properties will not show serious problems and will have their contract renewed. However, some properties will be shown to be in material violation of their agreements with HUD. The course of action that the field staff will take will depend on the score the property receives on the report and whether the Owner corrects the deficiencies in an acceptable and timely manner.

In cases where there are multiple contracts or stages on one property, there will only be one inspection each year. The PM should refer back to the results of the earlier inspection and the Owner's response. If the Owner submitted a Plan to complete the repairs, as described below, the PM should assess compliance with that Plan when making a recommendation on renewing the contract. If in the Owner's plan, it is not determined

that the repairs have or will be made, or if the Owner is not in compliance with the approved plan, the contract should not be renewed. (If a contract is not renewed or terminated, See Section XIX D.)

B. An Exigent Health and Safety (EHS) Deficiency Notice or a Full Physical Inspection Report from REAC may affect renewals of Section 8 HAP contracts.

1. EHS Deficiency Notice

Field staff should not take action to terminate the contract or refuse to renew the contract based solely upon receipt of the EHS Notice. However, if the condition is not promptly corrected or mitigated, the Section 8 subsidy should be abated on individual units depending on the severity of the deficiency. Abatement on units identified on the Deficiency Notice should occur only if the units are clearly identified, the deficiency is deemed exigent and the Owner cannot or will not repair or mitigate the problem. However, if EHS deficiencies are numerous and are not quickly corrected (within 72 hours) the Field Office should give careful consideration to not renewing the contract in addition to abating the Section 8 on individual units and or the field should consider requesting an expeditious special inspection from Headquarters to quickly determine the extent of the EHS problem throughout the project. A special inspection can be ordered within 30 days.

2. Full Physical Inspection Report (REAC)

Upon receipt of a full inspection report the Field Office has a complete picture of the condition of the property; and, subject to the Owner's response to the inspection, is prepared to assess how to handle renewal of the Contract.

a. For inspections where the score is 60 or above:

1) Renew the contract if all EHS deficiencies were corrected or mitigated; and

2) If the Owner does not correct EHS, follow the procedures listed in (D) below.

b. For inspections where the score is 59 or below:

1) And if all EHS deficiencies and repair items have been corrected or mitigated or the Owner submits an acceptable repair Plan within the prescribed time, renew the contract. If the repair Plan

continues into the term of the new contract, the Owner must agree to execute the new HAP Addendum (See Attachment 18) regarding physical conditions in addition to the Plan.

2) Whenever the Owner fails to complete the EHS repairs or provide an acceptable Plan for other repairs, and either the Owner indicates that it cannot or will not bring the property into compliance or the PM is certain that based on what the Owner has submitted as a Plan that the Owner cannot bring the property into compliance, generally, do not renew the contract.

However, the decision to not renew the Contract will depend on whether there is sufficient time to obtain vouchers to protect the residents.

C. Any decision not to renew a Contract or terminate must be made by the Program Center Director or a Supervisor in the Hubs. Generally, the decision should be to not renew if serious physical problems exist at the property that threaten the health and safety of the families, unless the Owner has a viable plan underway and is current under that plan. The Hub Director must be informed before any termination in order to advise Headquarters of the potential termination. Every effort should be made to obtain compliance from the Owner. The PM should continue to actively service the asset to correct the physical problems of the property up until the time the vouchers are about to be issued. The PM should utilize all resources that are available to restore full compliance, including the proposed sale of the property to a new Owner (Transfer of Physical Assets). A supplemental site visit is advisable as well as involvement of the Community Builder to address local issues. Appeals regarding any decision should go to the Hub Director.

D. The process to obtain vouchers to assist residents is expected to take no more than 180 days.

1. If more than 180 days remain on the contract:

a. Notify the Owner that because the EHS repairs were not corrected or the Owner did not submit an acceptable Plan, HUD intends to not renew the Contract.

b. Follow Attachment 7, to immediately begin processing vouchers; however, allow up to 180 days.

c. Monitor the processing of the vouchers with the Owner, PIH and the assigned Public Housing Agency (PHA).

2. If less than 180 days remain on the contract.

a. Notify the Owner that because the physical condition of the property remains uncorrected, HUD intends to end the project-based subsidy. However, to protect families in the interim, HUD is renewing the contract on a short-term basis (not to exceed 180 days) in order for HUD to process vouchers for residents. The Owner must also sign the new HAP Addendum.

b. Do not sign the contract renewal with the Owner immediately.

1) Make all necessary preparations to get funding for housing vouchers in place.

2) Do not sign the renewal Contract with the Owner until very near the expiration of the existing contract.

c. Enter into a short-term renewal of the contract utilizing either of the appropriate generic contracts, at current rents, not to exceed 120 percent of Fair Market Rent (FMR).

d. Follow Attachment 7, in order to obtain the vouchers, allowing up to 180 days, if necessary.

e. Terminate the contract after vouchers have been issued to eligible families and sufficient search-time has been provided to locate eligible housing units with the tenant-based assistance.

3. HUD's decision not to renew:

a. If the Contract is about to expire and the Owner appeals the decision to not renew the contract under this notice, the PM should renew the contract for one year with the new HAP Addendum, pending the appeal.

b. If the Owner subsequently becomes compliant or prevails with the appeal and the Field Office changes its decision, leave the contract in place.

c. If the Owner does not prevail in the appeal, request vouchers to protect the families and coordinate with PIH. Terminate the Contract after vouchers have been issued to the eligible families and sufficient search time has been provided to locate eligible housing units with the family-based assistance.

d. Should an Owner want to appeal the physical

Inspection upon which certain decisions were made, see the Instructions for the Field for REAC Inspections.

E. REMS and Reporting Requirements

1. All activities related to bringing a property into Regulatory an Contractual compliance because of a REAC physical inspection must be entered in the Project Action Screen of REMS.

a. It is important to Owners for HUD to document compliance since that is part of the asset management record which may influence future decisions; and it is important to HUD to have an accurate administrative record should HUD proceed with enforcement.

b. Track in REMS all close-out activity regarding Physical Inspections.

2. The Hub Director must submit Attachment 19, Anticipated Abatement or Termination of Full Section 8 HAP Contracts on a monthly basis to Frank Malone, Director of Portfolio Management, Headquarters.

a. The report will be used to track the number of anticipated abatements or termination of full Section 8 Contracts, as well as to identify Owners and the properties within a particular Hub or Program Center which may have abatements of Section 8 subsidy.

b. The Hub Director must contact Frank Malone before the actual termination of any full contract.

XX. HUD's REFUSAL TO RENEW A SECTION 8 CONTRACT

A. Under Sections 516 of and 524(a)(2) of MAHRA:

1. HUD may refuse to renew a contract if it is determined that:

a. The Owner or Purchaser of the project has engaged in material adverse financial or managerial actions or omissions with regard to such project; or

b. The Owner or Purchaser of the project has engaged in material adverse financial or managerial actions or omissions with regard to other projects of such Owner or purchaser that are federally assisted or financed with a loan from, or mortgage insured or guaranteed by, an agency of the Federal Government;

c. The project does not meet the physical

condition standards for HUD housing that is decent, safe, sanitary, and in good repair, unless HUD determines the project will meet the standards within a reasonable time after renewal.

2. Material adverse financial or managerial actions or omissions include:

a. Materially violating any Federal, State, or local law or regulation with regard to this project or any other federally assisted project, after receipt of notice and an opportunity to cure;

b. Materially breaching a contract for assistance under Section 8 of the United States Housing Act of 1937, after receipt of notice and an opportunity to cure;

c. Materially violating any applicable regulatory or other agreement with the Secretary or a participating administrative entity, after receipt of notice and an opportunity to cure;

d. Repeatedly and materially violating any Federal, State, or local law or regulation with regard to the project or any other federally assisted project;

e. Repeatedly and materially breaching a contract for assistance under Section 8 of the United States Housing Act of 1937;

f. Repeatedly and materially violating any applicable regulatory or other agreement with the Secretary or a participating administrative entity;

g. Repeatedly failing to make mortgage payments at times when project income was sufficient to maintain and operate the property;

h. Materially failing to maintain the property according to housing quality standards after receipt of notice and a reasonable opportunity to cure; or

i. Committing any actions or omissions that would warrant suspension or debarment by the Secretary.

3. The Owner or Purchaser of the property materially failed to follow the procedures and requirements of MAHRA, after receipt of notice and an opportunity to cure.

B. Owner's Dispute and Appeal of Rejection.

If HUD refuses to renew an Owner's request for contract renewal, the following appeal process should be followed. However, HUD staff should take all steps necessary to protect the families. If this means executing a short-term contract to complete the appeal process and issue vouchers if necessary, that is what should be done.

1. HUD will provide a notice to the Owner giving the reason(s) for rejection.

2. The Owner has 30 calendar days from receipt of this notice to provide written objections or cure the problems identified. If the Owner does not submit written objections or cure the problems identified during that period, the decision will become a final determination under Section 516(c) of MAHRA and is not subject to judicial review.

3. If the Owner submits written objections or asserts that the problems identified have been cured, HUD will consider the matter, review the Owner's action, if any, and send the Owner a final decision affirming, modifying, or reversing the rejection and setting forth the rationale for the final decision.

4. Within 10 days of receiving the final decision, the Owner may submit a written appeal to HUD contesting the decision and requesting a conference to discuss the issues with the Hub that has jurisdiction over the project.

5. A representative of the Hub will meet with the Owner at a mutually agreeable time, but no later than 10 calendar days after request by Owner for meeting.

6. If the Owner wants to provide additional information, establish a mutually agreeable deadline for submission of the material.

7. Within 20 days after the conference, or 20 days after any agreed-upon extension of time for submission of additional materials, the Hub will advise the Owner in writing of the decision to either terminate, modify or affirm the original decision.

8. HUD will designate an official to review any appeal, conduct the conference, and issue the written decision. The official designated will be one who was not directly involved in making the decision being appealed.

The reviewing official's decision is a final determination and is not subject to judicial review.

C. The Hub Director must contact Frank Malone, Director,

Office of Portfolio Management in Headquarters before the actual termination of any contract.

XXI. RURAL HOUSING SERVICE (RHS) 515/8 PROJECTS

A. Owners of Section 515/8 projects who are requesting a contract renewal under Option 4 pursuant to 524(b) of MAHRA must submit their project budget approved by the Rural Housing Service. HUD staff are not required to review and approve these budgets. As long as the budget has been approved by RHS, the budget-based rent should be accepted by HUD. Their budget-based rent is the "basic" rent.

B. During our negotiations with RHS staff on this process, we agreed to accept RHS-approved budgets reflecting the appropriate 8 percent allowable Owner's distribution on equity or any higher level as approved by RHS as an incentive to the Owner to prevent prepayment. (This is explained in RHS's administrative notice dated April 12, 1999)

C. An Owner of a Section 515/8 project may receive a short-term renewal in order to align the project's accounting cycle with the anniversary date of the Section 8 HAP contract. The Owner should contact the local HUD office. The PM will issue a short-term contract covering the months between the end of the current HAP contract and the end of the current accounting cycle (December 31). Upon expiration of the short-term contract, the Owner will be eligible for renewal under the provisions of MAHRA, as described above.

The short-term contract is the Initial renewal under both 524(a) and 524(b) of MAHRA. After the short-term contract expires, the first full subsequent renewal contract will be based on current rents adjusted by an OCAF or RHS-approved budget as described in Section XII of this Notice.

Note: RHS projects are exempted from OMHAR under 524(b)(1). Like all other 524(b)(1) projects, at initial renewal, they are subject to the "lesser of" OCAF or budget-based test.

D. An Owner who has executed a HAP contract expiring on December 31st is requested to submit its request for renewal to HUD annually by September 1. The Owner may submit a non-approved budget at this time. The Owner should submit the RHS-approved budget to the local HUD Hub or Program Center no later than November 15.

The process of issuing short-term contracts in order to align the accounting cycle with the anniversary date of the HAP contract may begin during FY 2000, with the first full renewals under this process being in January 2001.

E. After the loan with RHS has been paid in full, the

Owner will submit its budget and request for contract renewal directly to HUD. The contract will be handled in accordance with HUD procedures for non-insured projects with Section 8 contracts. The budget should be completed in accordance with the instructions in HUD Handbook 4350.1. After the contract receives an initial renewal under either Sections 524(a) or 524(b) of the MAHRA, the Owner will receive OCAF adjustments in subsequent years, without submitting an annual budget, unless the Owner requests and the Secretary approves a budget-based increase. Owners who renew under Section 524(a) are required to submit a comparability study at the time of initial renewal and at the end of five years. HUD may also request that the Owner submit one additional comparability study within the five year period.

XXII. BUDGET-BASED RENT INCREASES FOR CAPITAL REPAIRS

A. One of HUD's primary concerns is the long-term preservation of affordable housing. The Mark-Up-To-Market renewal option will accomplish this goal for many properties. Due to budgetary constraints, however, nonprofit Owners are generally prohibited from Mark-Up-To-Market because they are less likely to opt out of their Section 8 contracts. Yet many nonprofit-owned projects are in need of recapitalization to perform repairs that will preserve them for the long-term as affordable housing.

1. To address the physical condition of nonprofit projects, the Department will approve a Section 8 budget-based rent increase, not exceeding comparable market rents, for nonprofit projects to perform capital repairs that will maintain the financial and long-term physical viability of the project when current rents are not sufficient. This is the first time that a budget-based increase will recognize increased debt service to address the physical needs of the project.

2. This new option is an addition to existing policy on budget-based rent increases and does not replace any existing options for Owners. Both for-profit and nonprofit Owners continue to be eligible for budget-based increases for standard operating expenses under existing guidance.

3. If there are unassisted units in the project, the burden of the rent increase will be calculated on the Section 8 rents similar to the Mark-Up-To-Market procedure.

B. To be eligible, a project must meet the following criteria:

1. The new Section 8 contract rents will not exceed comparable market rents based on the Owner's RCS.

2. The project must have a REAC score of greater than