No. 03-2209C
(Judge Horn)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

ENGLEWOOD TERRACE LIMITED PARTNERSHIP,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

# DEFENDANT'S MOTION TO DISMISS IN PART AND MOTION FOR PARTIAL SUMMARY JUDGMENT

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

BRIAN M. SIMKIN
Assistant Director

PAUL R. WELLONS
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
1100 L Street, N.W.
Attn: Classification Unit
8th Floor
Washington, D.C. 20530
Tel: (202) 616-8253
Fax: (202) 307-0972

APRIL 28, 2006

Attorneys for Defendant

# TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . iii

DEFENDANT'S MOTION TO DISMISS IN PART AND MOTION FOR PARTIAL SUMMARY JUDGMENT . . . . . . . . . . . . . . . . . . 1

DEFENDANT'S BRIEF . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . 1

I. NATURE OF THE CASE . . . . . . . . . . . . . . . . . . 1

II. ISSUES PRESENTED . . . . . . . . . . . . . . . . . . . 3

III. STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . 4

SUMMARY OF THE ARGUMENT . . . . . . . . . . . . . . . . . . . 11

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

I. THE COURT LACKS JURISDICTION TO CONSIDER ENGLEWOOD’S “SPECIAL CLAIMS” . . . . . . . . . . . . 12

A. The Standard Of Review Pursuant To RCFC 12(b)(1) . . . . . . . . . . . . . . . . . 12

B. The Court Lacks Jurisdiction To Consider Englewood’s Claims Regarding A Rent Increase Request . . . . . . . . . . . . . . . . 14

C. The Court Lacks Jurisdiction To Consider Englewood’s Claims For Energy Costs . . . . . . 18

D. The Court Lacks Jurisdiction To Consider Englewood’s Claims For Unpaid Rent And Tenant-Caused Damage . . . . . . . . . . . . . . 20

E. The Court Lacks Jurisdiction To Consider Claims Related To “Risk Flags” That HUD Recorded Regarding Englewood’s Owners . . . . . 22

II. ENGLEWOOD WAS NOT ENTITLED TO HAP SUBSIDY PAYMENTS AFTER SEPTEMBER 2002 . . . . . . . . . . . . 25

A. The Standard Of Review Pursuant To RCFC 56 . . . . . . . . . . . . . . . . . . . . . 25

B. The Parties' HAP Renewal Contracts Unambiguously Demonstrate That Englewood Was Not Entitled To HAP Subsidies Beyond September 2002 . . . . . . . . . . . . . . . . . 27

C. Englewood Cannot Rescue Its Claims By Pointing To The HAP Renewal Contracts' Negotiation History . . . . . . . . . . . . . . 33

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . 40

## TABLE OF AUTHORITIES

CASES

Adickes v. S.H. Kress & Co.,
398 U.S. 144 (1970) . . . . . . . . . . . . . . . . . . . . 25

Aetna Cas. & Sur. Co. v. United States,
228 Ct. Cl. 146, 655 F.2d 1047 (1981) . . . . . . . . . . . 13

Anderson v. Liberty Lobby, Inc.,
477 U.S. 242 (1986) . . . . . . . . . . . . . . . . . . 25, 26

Aviation Contr. Employee, Inc. v. United States,
945 F.2d 1568 (Fed. Cir. 1991) . . . . . . . . . . . . . . 36

Casa de Cambio Comdiv S.A., de C.V. v. United States,
291 F.3d 1356 (Fed. Cir. 2002) . . . . . . . . . . . . . . 22

Christianson v. Colt Industrs. Operating Corp.,
486 U.S. 800 (1988) . . . . . . . . . . . . . . . . . . . . 13

Creppel v. United States,
41 F.3d 627 (Fed. Cir. 1994) . . . . . . . . . . . . . . . 25

Crocker v. United States,
125 F.3d 1475 (Fed. Cir. 1997) . . . . . . . . . . . . . . 24

De Brousse v. United States,
28 Fed. Cl. 187 (1993) . . . . . . . . . . . . . . . . . . 26

Dynalectron Corp. v. United States,
4 Cl. Ct. 424 (1984) . . . . . . . . . . . . . . . . . . . 13

Eastport S.S. Corp. v. United States,
178 Ct. Cl. 599, 372 F.2d 1002 (1967) . . . . . . . . . . . 13

Englewood Terrace Ltd. Partnership v. United States,
61 Fed. Cl. 583 (2004) . . . . . . . . . . . . . . . . . . 18

Falzarano v. United States,
607 F.2d 506 (1st Cir. 1979) . . . . . . . . . . . . . . . 16

Fid. Constr. Co. v. United States,
700 F.2d 1379 (Fed. Cir. 1983) . . . . . . . . . . . . . . 13

Fortec Constructors v. United States,
760 F.2d 1288 (Fed. Cir. 1985) . . . . . . . . . . . . 28, 32

Frakes v. Pierce,
700 F.2d 501 (9th Cir. 1983) . . . . . . . . . . . . . . . 15

Grace Towers Tenants Assoc. v. Grace House Dev. Fund Co.,
538 F.2d 491 (2d. Cir 1976) . . . . . . . . . . . . . . . . 16

Green Mgmt. Corp. v. United States,
42 Fed. Cl. 411 (1998) . . . . . . . . . . . . . . . . . 25, 26

Hahn v. Gottlieb,
430 F.2d 1243 (1st Cir. 1970) . . . . . . . . . . . . . . . 16

Harlib v. Lynn,
511 F.2d 51 (7th Cir. 1975) . . . . . . . . . . . . . . . . 16

Hol-Gar Mfg. Corp. v. United States,
169 Ct. Cl. 384, 351 F.2d 972 (1965) . . . . . . . . . . 28, 32

Kennedy Heights Apartments, Ltd. I v. United States,
48 Fed. Cl. 574 (2001) . . . . . . . . . . . . . . . . . . 15

Lujan v. Nat'l Wildlife Fed.,
497 U.S. 871 (1990) . . . . . . . . . . . . . . . . . . . 26

McCauley v. United States,
38 Fed. Cl. 250 (1997) . . . . . . . . . . . . . . . . . . 14

Medgar Evers Houses Assocs., L.P. v. United States,
Fed. Cl. No. 96-809 (Nov. 10, 2005) . . . . . . . . . . . . 17

Mients v. United States,
50 Fed. Cl. 665 (2001) . . . . . . . . . . . . . . . . . . 22

Monarch Painting Co. v. United States,
16 Cl. Ct. 280 (1989) . . . . . . . . . . . . . . . . . . 26

Pacificorp Capital, Inc. v. United States,
25 Cl. Ct. 707 (1992) . . . . . . . . . . 27, 28, 32, 33, 38

Peterson-Sharpe Eng’g Corp. v. United States,
6 Cl. Ct. 288 (1984)). . . . . . . . . . . . . . . . . 28, 33

Phaidin v. United States,
28 Fed. Cl. 231 (1993) . . . . . . . . . . . . . . . . . . 12

Reiner v. West Village Assocs.,
768 F.2d 31 (2d Cir. 1985) . . . . . . . . . . . . . . . . 15

Reynolds Assocs. v. United States,
31 Fed. Cl. 335 (1994) . . . . . . . . . . . . 15, 19, 20, 21

Rice v. United States,
31 Fed. Cl. 156 (1994) . . . . . . . . . . . . . . . . . . 14

So. Comfort Builders, Inc. v. United States,
67 Fed. Cl. 124 (2005) . . . . . . . . . . . . . . . . 22, 24

Sohm v. United States,
3 Cl. Ct. 74 (1983) . . . . . . . . . . . . . . . . . . . 26

Sweats Fashions, Inc. v. Pannill Knitting Co., Inc.,
833 F.2d 1560 (Fed. Cir. 1987) . . . . . . . . . . . . . . 25

Sylvania Elec. Prods., Inc. v. United States,
198 Ct. Cl. 106, 458 F.2d 994 (1972) . . . . . . . . . . . 28

Technical Consultant Servs., Inc. v. Lakewood Pipe of Texas, Inc.,
861 F.2d 1357 (5th Cir. 1988) . . . . . . . . . . . . . . 28

Texas v. United States,
210 Ct. Cl. 522, 537 F.2d 466 (1976) . . . . . . . 19, 20, 21

UNR Industrs., Inc. v. United States,
962 F.2d 1013 (Fed. Cir. 1992) . . . . . . . . . . . . . . 13

United States v. Connolly,
716 F.2d 882 (Fed. Cir. 1983) . . . . . . . . . . . . . . . 14

United States v. King,
395 U.S. 1 (1969) . . . . . . . . . . . . . . . . . . . . . 13

United States v. Mitchell,
445 U.S. 535 (1980) . . . . . . . . . . . . . . . . 13, 14, 19

United States v. Sherwood,
312 U.S. 584 (1941) . . . . . . . . . . . . . . . . . . . . 13

United States v. Testan,
424 U.S. 392 (1976) . . . . . . . . . . . . . . . . . . 13, 14

STATUTES AND REGULATIONS

28 U.S.C. § 1491 . . . . . . . . . . . . . . . . . . . . . . 13, 24

42 U.S.C. § 1437f . . . . . . . . . . . . . . . . . . . . . . 14

24 C.F.R. § 200.210 et seq. . . . . . . . . . . . . . . . . 23, 24

IN THE UNITED STATE COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| ENGLEWOOD TERRACE LIMITED PARTNERSHIP, | ) | |
| Plaintiff, | ) | No. 03-2209C (Judge Horn) |
| v. | ) | |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

DEFENDANT'S MOTION TO DISMISS IN PART
AND MOTION FOR PARTIAL SUMMARY JUDGMENT

Defendant, the United States, pursuant to Rules 12(b)(1) and 56 of the Rules of the United States Court of Federal Claims ("RCFC"), respectfully requests that the Court grant the Government's motion to dismiss in part and motion for partial summary judgment.

In support of this motion, we rely upon the following brief, the complaint, the parties' joint stipulations of fact filed February 16, 2006, and the appendix attached to the parties' joint stipulations of fact.

DEFENDANT'S BRIEF

STATEMENT OF THE CASE

I. NATURE OF THE CASE

Plaintiff, Englewood Terrace Limited Partnership ("Englewood"), bases its complaint upon (1) an alleged "breach of contract for illegal termination" (Compl. at 20); and (2) an

alleged breach of contract "for failure to make payments." Compl. at 23. Plaintiff seeks damages in the amount of "at least $3 million." Compl. at 24.

Englewood's claims arise from a Housing Assistance Payment ("HAP") contract between it and the United States Department of Housing and Urban Development ("HUD"). Pursuant to the HAP contract, HUD provided subsidies to Englewood in exchange for Englewood's commitment to provide decent, safe, and sanitary housing for the residents of South Pointe Towers ("South Pointe"), an Englewood-owned apartment building located on the south side of Chicago.

In its "illegal termination" claim, Englewood seeks damages for HUD's failure to pay subsidies to which Englewood claims it was entitled from October 2002 through September 2004. Compl. at 24. Pursuant to RCFC 56, the Government seeks a ruling that Englewood is not entitled to any damages for subsidy payments not paid after September 2002.

Englewood's additional claims allege that HUD (a) failed to process a request for an energy cost reimbursement; (b) failed to grant an August 2001 rental increase request; (c) failed to reimburse Englewood for vacant apartments; and (d) failed to reimburse Englewood for uncollected rents and damages caused by South Pointe residents. Compl. ¶ 94.

Pursuant to RCFC 12(b)(1), the Government seeks dismissal of those claims identified as items (a), (b), and (d) in paragraph 94 of Englewood's complaint. If the Government succeeds in this motion, the Court will still have pending before it Englewood's claim for HUD's alleged failure to reimburse Englewood for vacant units as described in item (c) of paragraph 94 of the complaint. However, as detailed in our motion for summary judgment filed June 2, 2005, the Government has demonstrated that Englewood also is not entitled to damages for this claim.

Englewood has indicated that it may seek damages at trial pertaining to the placement of "risk flags" in HUD's files regarding Englewood. These risk flags record violations of HUD requirements. Assuming Englewood's claims regarding risk flags--which Englewood did not raise in its complaint--are properly before the Court, we also seek dismissal of these claims pursuant to RCFC 12(b)(1).

II. Issues Presented

1. Whether any contract or money mandating provision of law confers jurisdiction upon the Court to consider Englewood's claims that HUD improperly exercised its discretion by not granting a requested rent increase.

2. Whether any contract or money mandating provision of law confers jurisdiction upon the Court to consider Englewood's claims that HUD improperly exercised its discretion by denying Englewood's requests for reimbursement for energy costs.

3. Whether any contract or money mandating provision of law confers jurisdiction upon the Court to consider Englewood's claims that HUD improperly exercised its discretion by denying Englewood's requests for reimbursement for rent Englewood failed to collect from tenants and alleged tenant-caused damage to units.

4. Assuming Englewood seeks damages in this case for collateral business opportunities allegedly lost as a result of HUD's issuance of program participant "flags" documenting Englewood's failure to comply with HUD requirements, whether any contract or money mandating provision of law confers jurisdiction upon the Court to consider Englewood's claims

5. Whether the HAP renewal contracts executed by the parties in 2001 and 2002 preclude Englewood's claims that HUD failed to make subsidy payments to which Englewood allegedly was entitled from October 2002 through September 2004.

## III. Statement Of Facts

In 1998, in response to the shortage of affordable housing for the low income residents of Chicago's Englewood community, Englewood and HUD executed a Housing Assistance Payment Contract (the "1998 HAP Contract") pursuant to the United States Housing Act of 1937, 4 U.S.C. § 1437. Joint Stip. Fact No. 14; 1998 HAP Contract at 1 (JA 19, p. 677). As noted, pursuant to the 1998 HAP Contract, HUD provide rental subsidy payments to Englewood.

The subsidies covered the difference between the rent levels set in the contract and what South Pointe's low-income tenants could afford to pay. Englewood was required to use the subsidies "to enable the families [at South Pointe] to lease decent, safe, and sanitary housing pursuant to Section 8 of the Act." Joint Stip. Fact No. 14; 1998 HAP Contract at 1 (JA 19, p. 677).

The 1998 HAP Contract was for a one-year term, due to expire in September 1999. Joint Stip. Fact No. 7; 1998 HAP Contract at 1 (JA 19, p. 677). In 1999, the parties executed a HAP renewal contract (the "1999 HAP Renewal Contract") extending the 1998 HAP Contract's terms for one year. Joint Stip. Fact No. 22; 1999 HAP Renewal Contract at 1 (JA 20, p. 691).

South Pointe suffered from serious deficiencies at this time. For example, a physical inspection in 1999 recorded numerous problems "that adversely affect the provision of decent, safe, and sanitary housing as required by the HAP contract." Joint Fact Stip. No. 38; Pinnacle Initial Report dated Aug. 10, 1999 (JA 36, p. 802 at 805). Similarly, on October 15, 1999, the City of Chicago Department of Buildings notified Englewood that an inspection conducted on September 23, 1999 disclosed multiple City Municipal Code violations, including roach and rodent infestations, missing fire extinguishers, "garbage chutes with garbage everywhere," and "raw standing sewage" caused by an obstruction. Notice of Violations and Summons dated Oct. 15, 1999 at 2-5 (JA 41, p. 820 at 821-824).

On October 18, 2000, representatives of HUD and Englewood met to execute a new HAP renewal contract (the "2000 HAP Renewal Contract"). Joint Stip. Fact No. 65. At the parties' meeting, they discussed HUD's intention to form only a three month-contract because of South Pointe's continuing problems. Joint Stip. Fact No. 66; Coleman Tr. at 73-76 (JA 12, p. 365 at 383-84). Contrary to HUD's intention, the copy of the 2000 HAP Renewal Contract the parties executed on this day contained a provision stating that its duration was for a one year term. It also stated that it was subject to three "automatic" one-year renewals–-through September 2004. Joint Stip. Fact No. 23; 2000 HAP Renewal Contract at 1 (JA 21, p. 696).

In December 2000, Veronica Coleman, HUD's director of project management, wrote a letter to John Hayes, President of Englewood's general partner, explaining that the inclusion of a one year-term with automatic renewal provisions in the 2000 HAP Renewal Contract "was an error." Joint Stip. Fact No. 67; Letter dated Dec. 6, 2000 (JA 71, p. 1014). Ms. Coleman's letter explained that the 2000 HAP Renewal Contract would be for a three-month period and would expire at the end of December 2000. Joint Stip. Fact No. 67; Letter dated Dec. 6, 2000 (JA 71, p. 1014).

Significantly, at no time did any Englewood representative object to the letter's contents or express disagreement with HUD's position that Englewood was not entitled to automatic renewals. In fact, on January 23, 2001, Ken Horton, vice-president of Englewood's general partner, emailed Ms. Coleman regarding recent discussions he had held with Gwendolyn Thomas, HUD's project manager assigned to South Pointe. Mr. Horton stated that, pursuant to these discussions, the 2000 HAP Contract had been extended "to reflect the original expiration date of September 30, 2001." Joint Stip. Fact No. 70; Email Message dated Jan. 23, 2001 between Coleman and Horton at 2 (JA 72, p. 1015 at 1016). Mr. Horton requested that a copy of the "amended, amended HAP contract" be sent "to my attention at the following address."

Mr. Hayes received these emails and responded to them. Email from John Hayes dated Jan. 23, 2001 (JA 73, p. 1018). Neither Mr. Hayes, Mr. Horton, nor any other Englewood representative informed HUD that Englewood believed it still was entitled to three automatic one-year renewals of the 2000 HAP Renewal Contract, or that Englewood was entitled to receive HAP subsidies through 2004.

On March 2, 2001, HUD's Real Estate Assessment Center ("REAC") conducted an inspection of the site, building exterior, building systems, common areas and 25 sample units at South

Pointe. Joint Stip. Fact No. 71; REAC Report dated March 8, 2001 at 3 (JA 28, p. 767 at 769, 776) Out of a possible total score of 100, South Pointe received a REAC score of 31. Joint Stip. Fact No. 74; REAC Report dated March 8, 2001 at 3 (JA 28, p. 767 at 769) Because of Englewood's continuing failure to maintain South Pointe in decent, safe, and sanitary condition, HUD issued a notice of HAP Contract default on April 9, 2001. Joint Stip. Fact No. 88; Notice of Default dated April 9, 2001 at 1 (JA 89, p. 1090). HUD issued a notice of continuing default on May 16, 2001. Joint Stip. Fact No. 101; Notice of Continuing Default dated May 16, 2001 at 2 (JA 94, p. 1099 at 1100).

However, conditions at Englewood did not improve. For example, on July 2, 2001, the Office of the State’s Attorney for Cook County, Illinois declared that a public nuisance existed at South Pointe. Joint Stip. Fact No. 57; Notice of Public Nuisance dated July 7, 2001 at 1 (JA 99, p. 1105). On October 22, 2001, HUD representative Lilye Simmons visited South Pointe. In an internal email, she reported the “smell of urine throughout the building,” “exposed wires,” and “roaches in the hallways and on the walls.” Joint Stip. Fact No. 58; E-mail from Lilye Simmons dated Oct. 22, 2001 at 1 (JA 115, p. 1166). Englewood acknowledged that it needed a rehabilitation loan to fix South Pointe. Joint Stip. Fact No. 81; Letter dated Apr. 5, 2001 at 1; JA 84, p. 1076. However, Englewood failed to submit a complete

loan application. Joint Stip. Fact No. 86; Letter dated Apr. 3, 2001 at 2-3 (JA 82, p. 1071 at 1072-73).

In September 2001, the parties executed a short-term HAP renewal contract renewing the terms of the 1998 HAP Contract from October 2001 through December 2001 (the “2001 90-Day HAP Renewal Contract”). Joint Stip. Fact No. 26, 27; 2001 90-Day HAP Renewal Contract at 6 (JA 24, p. 719 at 724). As a result of Englewood’s continuing default due to poor conditions, HUD determined that it would abate and terminate the 1998 HAP Contract, as renewed, and proceed to issue portable section 8 vouchers for Englewood’s tenants to use at acceptable housing. Joint Stip. Fact No. 101; Notice of Continuing Default dated May 16, 2001 at 2 (JA 94, p.1099 at 1100). Tenants could use these vouchers at South Pointe if the Housing Authority overseeing the vouchers found the South Pointe unit eligible (that is, in decent, safe, and sanitary condition). But Englewood’s low-income tenants also could use the vouchers to rent units at other housing projects at a subsidized rent.

In October 2001, Englewood filed suit in Federal district court, alleging that HUD had terminated the parties’ 1998 HAP Contract. The court disagreed, and held that “HUD never formally terminated Englewood’s HAP Contract.” Joint Stip. Fact No. 116; Order dated Nov. 15, 2001 at 3 (JA 7, p. 146 at 148). On November 30, 2001, HUD issued a notice of abatement and termination stating its decision to terminate the parties’ 1998

HAP Contract. Joint Stip. No. 118; Notice of Abatement and Termination dated Nov. 30, 2001 at 2 (JA 117, p. 1176 at 1177).

The notice explained that the termination would occur after the completion of the voucher and relocation process for eligible residents, which would take time to implement. Joint Stip. Fact No. 118; Notice of Abatement and Termination dated Nov. 30, 2001 at 2 (JA 117, p. 1176 at 1177). HUD was concerned about residents who would be stranded without rental assistance at Englewood if HUD ceased funding HAP subsidies before residents received vouchers. As a result, HUD stated that it would agree to additional short-term HAP renewal contracts after the 2001 90-Day HAP Renewal Contract. HUD’s express purpose for agreeing to renew the 1998 HAP Contract’s terms at this time was solely to protect South Pointe’s residents, and was wholly consistent with HUD’s decision to end its relationship with Englewood: “To safeguard the residents, and not affecting HUD’s determinations as set forth above, HUD will provide Owner with a HAP Contract Renewal with Addendum.” Joint Stip. Fact No. 118; Notice of Abatement and Termination dated Nov. 30, 2001 at 2 (JA 117, p. 1176 at 1177).

Accordingly, the parties executed additional short-term HAP renewal contracts. The last of these short-term HAP renewal contracts covered the period from July 2002 through September 2002. Joint Stip. Fact No. 31; 2002 90-Day HAP Renewal Contract

at 6 (JA 26, p. 745 at 751). After this date, the parties executed no additional HAP renewal contracts, Englewood received no additional subsidies, and the 1998 HAP Contract was terminated.

For additional facts, we respectfully refer the Court to the parties' joint stipulations of fact filed February 16, 2006.

## SUMMARY OF THE ARGUMENT

In its complaint, Englewood seeks money that it claims HUD was obligated to pay it. These funds include (1) the proceeds from a post-default August 2001 request for an increase in the rent Englewood could charge its tenants; (2) reimbursement for alleged high energy costs; and (3) reimbursement for uncollected rent and alleged tenant-caused damage to apartments. Compl. ¶¶ 93, 94. In the parties' joint stipulations of fact filed February 16, 2006, Englewood also suggested that it will seek damages at trial for alleged lost business opportunities resulting from program participant "flags" that HUD used to record instances in which Englewood violated HUD requirements. Pl.'s Proposed Fact No. 136.

The Court possesses no jurisdiction to entertain these claims. Although Englewood labels these claims as arising under a breach of contract theory, these claims are not based upon any agreement between Englewood and HUD that could confer jurisdiction upon the Court. Compl. at 23. Neither are these

claims based upon any money mandating provision of law conferring jurisdiction.

Englewood also alleges that HUD illegally terminated the parties' 1998 HAP Contract. Compl. at 20. Ignoring the other subsequent renewals, Englewood asserts that the parties' 2000 HAP Renewal Contract obligated HUD to pay Englewood subsidies through September 2004, and that HUD breached this obligation. Englewood seeks the subsidies it claims HUD was obligated to pay through September 2004. Comp. ¶ 93.

The Government is entitled to partial summary judgment in the form of a ruling that Englewood was not entitled to HAP subsidies beyond September 2002. Contrary to Englewood's assertions otherwise, HUD had no obligation to pay Englewood subsidies beyond September 2002. Pursuant to the HAP renewal contracts executed in 2001 and 2002, any right of Englewood to subsidies ended in September 2002, and the Court should rule that Englewood was not entitled to HAP subsidy payments beyond September 2002 as a matter of law.

## ARGUMENT

### I. THE COURT LACKS JURISDICTION TO CONSIDER ENGLEWOOD'S "SPECIAL CLAIMS"

#### A. The Standard Of Review Pursuant To RCFC 12(b)(1)

This Court, like its predecessors, is a court of limited jurisdiction. Phaidin v. United States, 28 Fed. Cl. 231, 233

(1993); Dynalectron Corp. v. United States, 4 Cl. Ct. 424, 428, (1984). Absent congressional consent to entertain a claim against the United States, the Court lacks authority to grant relief. United States v. Testan, 424 U.S. 392, 399 (1976); United States v. Sherwood, 312 U.S. 584, 586 (1941).

Congressional consent to suit in this Court, which thereby waives sovereign immunity, must be explicit and is strictly construed. United States v. Mitchell, 445 U.S. 535, 538 (1980); Fid. Constr. Co. v. United States, 700 F.2d 1379, 1383 (Fed. Cir. 1983). A waiver of sovereign immunity cannot be implied, but must be expressed unequivocally. Testan, 424 U.S. at 399; United States v. King, 395 U.S. 1, 4 (1969). Moreover, "a court may not in any case, even in the interest of justice, extend its jurisdiction where none exists." Christianson v. Colt Industrs. Operating Corp., 486 U.S. 800, 818 (1988); accord UNR Industrs., Inc. v. United States, 962 F.2d 1013, 1022-23, 1025 (Fed. Cir. 1992).

The central provision granting consent to suit in this Court is the Tucker Act, 28 U.S.C. § 1491. Testan, 424 U.S. at 397; Aetna Cas. & Sur. Co. v. United States, 228 Ct. Cl. 146, 151, 655 F.2d 1047, 1051 (1981). This provision, however, does not create any substantive right of recovery against the United States for money damages. Testan, 424 U.S. at 398; Eastport S.S. Corp. v. United States, 178 Ct. Cl. 599, 605-07, 372 F.2d 1002, 1007-09

(1967). Rather, it merely confers jurisdiction upon the Court whenever the substantive right exists. Testan, 424 U.S. at 398; United States v. Connolly, 716 F.2d 882, 885 (Fed. Cir. 1983). Thus, in order to state a claim within the jurisdiction of this Court, a claimant must look beyond this jurisdictional statute and establish some substantive provision of law, regulation, or the Constitution, which fairly can be construed as mandating compensation. Mitchell, 445 U.S. at 538; Connolly, 716 F.2d at 885.

Although the factual allegations, as pled, must be presumed true and viewed in the light most favorable to the plaintiff, the burden of establishing the Court's jurisdiction falls squarely upon the plaintiff. McCauley v. United States, 38 Fed. Cl. 250, 262-63 (1997); Rice v. United States, 31 Fed. Cl. 156, 161 (1994).

Application of these principles to this case demonstrate that the Court lacks jurisdiction to consider several of Englewood’s claims.

### B. The Court Lacks Jurisdiction To Consider Englewood’s Claims Regarding A Rent Increase Request

It is well-established that HUD has the authority to regulate the rents charged by owners receiving HUD-funded HAP subsidies. 42 U.S.C.A. § 1437f. Thus, unless HUD agrees to a rent increase, an owner cannot exceed the rent levels agreed upon in the parties’ HAP contract. In this case, Englewood alleges

that it submitted a post-default rent increase request to HUD in August 2001 and that HUD "fail[ed] to implement the rental increase it acknowledged was proper in August 2001." Compl. ¶ 94.

In order to invoke the jurisdiction of this Court, Englewood would have to assert either that (1) HUD violated some contract provision requiring it to approve Englewood's rent increase request in August 2001; or (2) HUD violated some statute or regulation that was compensation mandating, that is, mandated the payment of money for its violation. See Kennedy Heights Apartments, Ltd. I v. United States, 48 Fed. Cl. 574, 577-79 (2001). Englewood can satisfy neither requirement.

First, Englewood cannot demonstrate that HUD violated any money mandating provision of law conferring jurisdiction upon this Court by denying it a rent increase. After all, HUD's decisions regarding whether to grant a rent increase request are not subject to judicial review and, thus, cannot confer jurisdiction upon the Court. See Reynolds Assocs. v. United States, 31 Fed. Cl. 335, 340 (1994) (holding that HUD handbook provisions regarding processing rent increase requests did not confer jurisdiction upon the Court); Reiner v. West Village Assocs., 768 F.2d 31, 33 (2d Cir. 1985) ("The courts that have addressed the issue agree that the Secretary's decision to approve a rent increase is unreviewable . . ."); Frakes v. Pierce, 700 F.2d 501, 505 (9th Cir. 1983) ("Similarly, we think

HUD's rental determinations in the instant appeal are the kind of decisions which are within agency discretion."); Falzarano v. United States, 607 F.2d 506, 513 (1st Cir. 1979) ("The Secretary's decision regarding the rents and charges at the two projects is not properly a subject for mandamus jurisdiction in the posture presented to us."); Grace Towers Tenants Assoc. v. Grace House Dev. Fund Co., 538 F.2d 491, 495 (2d. Cir 1976) (holding plaintiffs did not have due process right to challenge HUD decision regarding rental increase); Harlib v. Lynn, 511 F.2d 51, 55 (7th Cir. 1975) (rejecting claim that tenants had due process right to a hearing regarding rent increase decision); Hahn v. Gottlieb, 430 F.2d 1243, 1250-51 (1st Cir. 1970) (holding that plainitffs had no right to judicial review of decisions regarding rent increases). This rule is sensible. After all, "courts are ill-equipped to superintend economic managerial decisions of the kind involved" when HUD must decide whether to grant a rent increase request. Hahn, 430 F.2d at 1249.

Second, even if, as Englewood alleges, a HUD official suggested that a rent increase might be "proper" under certain circumstances, Englewood cannot identify any contract provision that HUD violated by failing to approve Englewood's request for a rent increase. As noted, it is "well-settled that HUD's decision to grant or deny rent increase requests are committed to agency discretion as a matter of law, and are thus not subject to

judicial review . . . . In such circumstances a failure to approve rent increases cannot give rise to a breach of contract." Medgar Evers Houses Assocs., L.P. v. United States, Fed. Cl. No. 96-809 (Nov. 10, 2005), slip op. 19 (unpublished).

Further, Englewood's claim that HUD failed to approve a August 2001 rent increase request also is precluded by the agreements the parties executed. As noted, in September 2001, the parties executed the 2001 90-Day HAP Renewal Contract. In this agreement, the parties agreed upon the rents Englewood would charge its residents. 2001 90-Day HAP Renewal Contract at 12 (JA 24, p. 719 at 730). By signing this agreement, Englewood accepted that it would not charge its tenants any amount higher than that agreed upon. 2001 90-Day HAP Renewal Contract at 12 (JA 24, p. 719 at 730). If Englewood believed it was entitled to higher rents based upon a request filed in August 2001, it could have declined to sign a renewal contract in September 2001 mandating agreed-upon rents.

In addition, and perhaps more importantly, the Court already has noted that HUD's denial of the August 2001 rent increase request could not have violated any contract terms in effect at the time Englewood submitted its request. In its decision dated August 10, 2004, the Court correctly observed that Englewood based its August 2001 rent increase request upon a provision of the parties' 1998 HAP Contract that no longer was in effect.

Englewood Terrace Ltd. Partnership v. United States, 61 Fed. Cl. 583, 584 (2004).

Specifically, Englewood based its request upon section 8 of the 1998 HAP Contract. However, the parties' 2000 HAP Renewal Contract eliminated section 8 of the 1998 HAP Contract: "All terms of the Expiring Contract are renewed except for those provisions relating to contract rents and rent adjustments." Joint Stip. Fact No. 24; 2000 HAP Renewal Contract at 1 (JA 21, p. 696). As the Court observed, the 2000 HAP Renewal Contract established new procedures for requesting rent increases. Thus, when Englewood submitted its August 2001 rent increase request, it "requested a rent adjustment, apparently invoking a paragraph from its 1998-99 HAP contract that no longer applied." Id. at 584.

HUD's decisions regarding rent increase requests are not subject to judicial review. Further, Englewood's claims regarding an alleged failure to approve a rent increase request are not based upon any contract terms in effect between the parties or any money mandating provision of law. For these reasons, Englewood's claims should be dismissed.

### C. The Court Lacks Jurisdiction To Consider Englewood's Claims For Energy Costs

Englewood alleges that HUD failed to provide certain reimbursements to which Englewood claims it was entitled. This includes "an energy cost reimbursement for extraordinary energy

costs for the 4th quarter of 2000 and the 1st quarter of 2001." Compl. ¶ 94. However, no provision of the parties' 1998 HAP Contract or any subsequent HAP renewal contract between the parties obligates HUD to provide Englewood with reimbursement for energy costs. Neither does any money mandating statute entitle Englewood to such payments. For these reasons, the Court lacks jurisdiction to consider this claim.

In order to state a claim within the jurisdiction of this Court, a claimant must look beyond the Court's jurisdictional statute and establish some substantive provision of law, regulation, or the Constitution, which fairly can be construed as mandating compensation. Mitchell, 445 U.S. at 538. It is well settled that HUD handbooks and guidelines, which are not codified in the Code of Federal Regulations, do not qualify as money mandating provisions of law: "Although plaintiff does not so contend, the HUD Handbook, on its own fails to rise to the level of an executive regulation sufficient to establish independent jurisdiction under the Tucker Act." Reynolds Assocs., 31 Fed. Cl. at 340. See also Texas v. United States, 210 Ct. Cl. 522, 537 F.2d 466, 470-71 (1976) (finding that Office of Emergency Planning circulars were not money mandating where they were "neither promulgated by the agency as regulations, identified in the parties' Agreement nor even attached to the Agreement.").

Englewood is correct that, in 2001, HUD issued guidelines pursuant to which property owners could request reimbursement for

high energy costs. Guidelines for Processing Renewal Adjustment for Escalating Energy Costs at 3 (JA 90, p. 1092 at 1094); Memo To Owners Re: Energy Reimbursement Guidelines dated May 10, 2001 (JA 92, p. 1097). These guidelines are not incorporated into, or even mentioned, in any of the parties' agreements. Neither were these guidelines substantive provisions of law mandating compensation to Englewood. In fact, the decision whether to reimburse an owner for energy costs remained solely at HUD's discretion. And even if these guidelines could be construed to require HUD to compensate Englewood for energy costs under certain circumstances, Englewood has not alleged that HUD violated any portion of these guidelines.

HUD's guidelines for approving energy cost reimbursements are not embodied in any contract between the parties, and are not money mandating provisions of law. As a result, Englewood's claims for reimbursement for energy costs should be dismissed. Reynolds Assocs., 31 Fed. Cl. at 340; Texas, 210 Ct. Cl. 522, 537 F.2d at 470-71.

### D. The Court Lacks Jurisdiction To Consider Englewood's Claims For Unpaid Rent And Tenant-Caused Damage

Englewood also claims that HUD owes it money for "special claims related to rent payments and damages caused by South Pointe residents subsidized by the Hap Contract." Compl. ¶ 94. However, no provision of the parties' 1998 HAP Contract or any of

the parties' subsequent HAP renewal contracts obligates HUD to reimburse Englewood for tenant-caused damage. To the contrary, the 1998 HAP Contract specifically states that HUD "has not assumed any obligation for the amount of rent payable by any Family or the satisfaction of any claim by the Owner against any family." 1998 HAP Contract at 3 (JA 19, p. 677 at 679).

Englewood is correct that, under certain circumstances, HUD may reimburse owners for uncollected rent or tenant-caused damage to property. This willingness, which is at HUD's sole discretion, is expressed in an agency handbook: Occupancy Requirements of Subsidized Multifamily Housing Programs Handbook Number 4350.3 ("HUD Directive Number 4350.3").

This handbook is not incorporated into any of the parties' agreements. Neither is it a substantive provision of law that mandated payment to Englewood. HUD Directive Number 4350.3 at 7-8 ¶ 6-15 (JA 136, p. 1273 at 1279-80); Reynolds Assocs., 31 Fed. Cl. at 340; Texas, 210 Ct. Cl. 522, 537 F.2d at 470-71.

Finally, even if HUD's handbook imposed a legal obligation upon HUD to reimburse Englewood under certain circumstances, Englewood has not alleged that HUD violated any portion of the handbook in denying Englewood's requests for reimbursement for uncollected rent or tenant-caused damage.

HUD's handbook regarding reimbursements for unpaid rent and tenant-caused damage is not incorporated into any contract between the parties, and is not a money mandating provision of

law. For these reasons, Englewood's claims for reimbursement for unpaid rent and tenant-caused damage should be dismissed.

### E. The Court Lacks Jurisdiction To Consider Claims Related To "Risk Flags" That HUD Recorded Regarding Englewood's Owners

In its proposed findings of fact, Englewood indicates that it may seek damages at trial for HUD's "imposition of #2530 flags which prohibited Englewood from doing business with HUD programs thereby denying to [Englewood's former owners] their long standing businesses involving HUD insurance and subsidies." Pl.'s Proposed Fact No. 136.

The Court lacks jurisdiction to consider these claims, which are not based upon any contract obligation or money mandating provision of law. Even if the Court possessed jurisdiction to entertain these claims, Englewood waived them by failing to assert them in its complaint.

It is settled law that "a plaintiff's failure to raise a claim or argument in its complaint may be deemed as a waiver of that argument by the plaintiff." So. Comfort Builders, Inc. v. United States, 67 Fed. Cl. 124, 153 (2005) (citing Casa de Cambio Comdiv S.A., de C.V. v. United States, 291 F.3d 1356, 1366 (Fed. Cir. 2002); Mients v. United States, 50 Fed. Cl. 665, 671 (2001)). This is true even when a plaintiff lists a waived claim in its statement of proposed facts filed before trial. So. Comfort Builders, Inc., 67 Fed. Cl. at 124.

The damages Englewood seeks pertain to HUD's policy that persons and organizations applying to do business with HUD's multifamily insured and subsidized housing programs be responsible and comply with their legal, financial, and contractual obligations. 24 C.F.R. § 200.210. To assure that this policy is carried out, HUD requires that an owner, management agent, or other party seeking to conduct new business in the relevant programs must submit a previous participation certificate (HUD form 2530) disclosing all prior participation in those programs. 24 C.F.R. §§ 200.213, 218, and 219. In addition, HUD records "flags" against current program participants when they violate HUD requirements. When applicants for new HUD business are found to have flags against them, the application is subject to additional scrutiny. However, applicants with flags against them may not be disapproved unless the Multifamily Participation Review Committee finds that one of the criteria contained in 24 CFR § 200.230 has been met.

As noted, in its proposed findings of fact, Englewood claims that HUD flags "prohibited Englewood from doing business with HUD programs." Pl.'s Proposed Fact No. 136. However, Englewood has not identified any new business that it has been denied because of any "2530 flag," let alone explained how any money mandating provision of law gave Englewood an entitlement to new business.[1]

[1] In fact, Englewood has not been denied the opportunity to (continued...)

Because Englewood failed in its complaint to allege that it had suffered damages by the denial of any new business opportunities, Englewood has waived any such claims. So. Comfort Builders, Inc., 67 Fed. Cl. at 124.

In addition, and perhaps more importantly, the Court would lack jurisdiction to consider claims for allegedly lost new business opportunities, even if Englewood had included them in its complaint. Nothing in any agreement between the parties prohibited HUD from recording Englewood's violation of HUD requirements. This process is based entirely upon applicable regulations and is not embodied in any contract between the parties.

Even if the Committee had denied Englewood the opportunity to conduct new business with HUD, Englewood has not, and indeed cannot, allege that it exhausted its administrative remedies for redressing such a denial. See 24 C.F.R. § 200.241. Moreover, the Court could not entertain a claim for a wrongful denial of new business. 28 U.S.C. § 1491(b)(1); Crocker, 125 F.3d 1475, 1476 (Fed. Cir. 1997) (holding that the Court lacks general Federal question jurisdiction).

---

[1](...continued)
conduct new business with HUD. In December 2002, HUD insured an $11.6 million rehabilitation loan to Englewood. Compl. at 4 ¶ 16 (JA 3, p. 30 at 33). Englewood subsequently defaulted on this loan.

Englewood failed to plead in its complaint any damages allegedly resulting from the denial of new business opportunities with HUD. Moreover, the Court would lack jurisdiction to entertain such claims. Thus, to the extent the Court determines such claims to be pending in this case, those claims should be dismissed.

## II. ENGLEWOOD WAS NOT ENTITLED TO HAP SUBSIDY PAYMENTS BEYOND SEPTEMBER 2002

### A. The Legal Standard Pursuant To RCFC 56.

Summary disposition is appropriate where “there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.” Green Mgmt. Corp. v. United States, 42 Fed. Cl. 411, 427 (1998) (granting summary judgment to defendant after concluding there was no genuine issue of material fact). See also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-52 (1986); Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Creppel v. United States, 41 F.3d 627, 630-31 (Fed. Cir. 1994); RCFC 56(c). In responding to a motion for summary judgment, “the burden on the moving party may be discharged by ‘showing’--that is, pointing out to the [Court of Federal Claims]--that there is an absence of evidence to support the non-moving party's case.” Sweats Fashions, Inc. v. Pannill Knitting Co., Inc., 833 F.2d 1560, 1563 (Fed. Cir. 1987) (emphasis in original) (citation omitted).

Merely disagreeing with a movant's contentions is not enough to avoid summary judgment. A "material" fact is one "that might affect the outcome of the suit under the governing law." Anderson, 477 U.S. at 248. See also Green Mgt. Corp., 42 Fed. Cl. at 427 ("Disputes over facts which are not outcome determinative under the governing law will not preclude the entry of summary judgment.").

For this reason, "judicial admissions are of the highest possible probative value inasmuch as they are beyond the power of evidence to controvert them." De Brousse v. United States, 28 Fed. Cl. 187, 188-89 (1993). Similarly, a "party cannot defeat summary judgment by instigating controversy with its own position on the facts." Monarch Painting Co. v. United States, 16 Cl. Ct. 280, 289 (1989) (rejecting plaintiff's attempt to preclude summary judgment by avoiding its admissions in deposition testimony); Sohm v. United States, 3 Cl. Ct. 74, 77-78 (1983).

Finally, it is well-established that, "Rule 56 does not require the moving party to negate the elements of the nonmoving party's case." Lujan v. Nat'l Wildlife Fed., 497 U.S. 871, 885 (1990) (reversing court of appeals because the trial court correctly determined that plaintiff's affidavits were too conclusory to establish a genuine dispute of material fact) (emphasis in original). Thus, although the nonmoving party may present affidavits by knowledgeable persons, such affidavits must

present more than vague or conclusory allegations. After all, "the object of Rule 56(e) is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit." Id. at 888.

Application of these principles to this case demonstrates that the Court should grant defendant's partial motion for summary judgment.

### B. The Parties' HAP Renewal Contracts Unambiguously Demonstrate That Englewood Was Not Entitled To HAP Subsidies Beyond September 2002

According to Englewood's complaint, the 2000 HAP Renewal Contract entitled Englewood to continued HAP subsidy payments through September 2004, and HUD breached this contract by terminating it for default and failing to make subsidy payments through this date. Compl. ¶ 93. However, the parties signed multiple HAP renewal contracts in 2001 and 2002. These HAP renewal contracts renewed and amended the parties' earlier agreements, and demonstrate that Englewood's entitlement to HAP subsidy payments could not have extended beyond September 2002.[2]

It is well-established that the interpretation of Government contracts is a matter of law. Pacificorp Capital, Inc., 25 Cl.

---

[2] Of course, even if Englewood had been entitled to four years of HAP subsidies pursuant to any automatic renewal provisions, HUD would still possess the right to terminate the 1998 HAP Contract's terms for Englewood's default. If necessary, the Government will demonstrate at trial that Englewood's default entitled HUD to exercise this option.

Ct. 707, 715 (1992) (citing Fortec Constructors. v. United States, 760 F.2d 1288, 1291 (Fed. Cir. 1985); Hol-Gar Mfg. Corp. v. United States, 169 Ct. Cl. 384, 386, 351 F.2d 972, 973 (1965)). For this reason, the Court will only consider factors outside the four corners of a contract after determining that the contract is ambiguous. Pacificorp Capital, Inc., 25 Cl. Ct. at 715 (citing Sylvania Elec. Prods., Inc. v. United States, 198 Ct. Cl. 106, 126, 458 F.2d 994, 1005 (1972). "When the terms of a contract are clear and unambiguous, there is no need to resort to extraneous circumstances, such as prior negotiations or custom of the trade for its interpretation." Pacificorp Capital, Inc. 25 Cl. Ct. at 716 (quoting Peterson-Sharpe Eng'g Corp. v. United States, 6 Cl. Ct. 288, 295 (1984)).

A contract is only ambiguous if reasonably susceptible to more than one interpretation. Pacificorp Capital, Inc. 25 Cl. Ct. at 716 (citing Technical Consultant Servs., Inc. v. Lakewood Pipe of Texas, Inc., 861 F.2d 1357, 1362 (5th Cir. 1988)). Pursuant to the parol evidence rule, interpretation of an unambiguous contract may not be affected by the contentions of either party that it meant something else. Pacificorp Capital, Inc., 25 Cl. Ct. at 716.

As noted, the parties have stipulated that HUD provided Englewood with HAP subsidies pursuant to the 1998 HAP Contract. Joint Stip. Fact No. 14; 1998 HAP Contract at 1 (JA 19, p. 677).

The parties further have stipulated that the 1998 HAP Contract was for a one-year term, and that a one-year extension renewed its terms in 1999. Joint Stip. Fact No. 8; 1999 HAP Renewal Contract (JA 20, p. 691).

The parties also have stipulated that, in October 2000, they executed the 2000 HAP Renewal Contract, which again renewed the terms of the 1998 HAP Contract, but amended the procedures Englewood was to follow in requesting rent increases. Joint Stip. Fact No. 24; 2000 HAP Renewal Contract at 4 (JA 21, p. 696).

Englewood alleges that the 2000 HAP Renewal Contract was for a one-year term expiring in September 2001, to be followed by three "one-year automatic renewals, subject to the availability of appropriations." Compl. ¶ 27. As explained more fully in the next section of this brief, the incontrovertible evidence demonstrates that the provision of the 2000 HAP Renewal Contract apparently entitling Englewood to HAP subsidies through September 2004 was an error. The parties corrected this error by agreeing that the 2000 HAP Renewal Contract would expire at the end of December 2000, and then by agreeing that it would expire in September 2001. Joint Stip. Fact Nos. 67, 70; Letter dated Dec. 6, 2000 (JA 71, p. 1014); Email Message dated Jan. 23, 2001 between Coleman and Horton at 2 (JA 72, p. 1015 at 1016).

However, the Court does not need to consider any evidence beyond the plain terms of the parties' HAP renewal contracts themselves in order to rule that Englewood was entitled to no HAP subsidies beyond September 2002.

The parties have stipulated that they executed HAP renewal contracts in 2001 and 2002 that covered the period from September 2001 through September 2002--much of the same period that Englewood claims was covered by the 2000 HAP Renewal Contract. Joint Stip. Fact No. 26; 2001 90-Day HAP Renewal Contract at 6 (JA 24, p. 719 at 724). If Englewood were correct that it was entitled to HAP subsidy payments through 2004, Englewood's representatives would have had no reason to sign these additional HAP renewal contracts in 2001 and 2002.

For example, in September 2001, the parties executed the 2001 90-Day HAP Renewal Contract. This agreement plainly states that the terms of the parties' prior agreement would expire before the beginning of the 2001 90-Day HAP Renewal Contract's term on October 1, 2001. Joint Stip. Fact No. 26; 2001 90-Day HAP Renewal Contract at 4, 6 (JA 24, p. 719 at 722, 724). Thus, the parties agreed in writing that the 1998 HAP Contract's terms were due to expire in September 2001–-not September 2004. Joint Stip. Fact No. 26; 2001 90-Day HAP Renewal Contract at 4, 6 (JA 24, p. 719 at 722, 724).

The parties also have stipulated that the plain terms of the 2001 90-Day HAP Renewal Contract stated that the parties' contractual obligations were only renewed through December 2001: "The term of the Renewal Contract begins on 10/01/2001 and shall run for a period of .3 years." Joint Stip. Fact No. 27; 2001 90-Day HAP Renewal Contract at 4 (JA 24, p. 719 at 724, 722).

In accordance with these plain terms, if the parties had not executed additional HAP renewal contracts, Englewood's entitlement to HAP subsidy payments would have ended in December 2001. In fact, HUD issued a notice of termination and default in November 2001 informing Englewood of HUD's intention to fund vouchers, and to terminate the parties' relationship. Joint Stip. No. 118; Notice of Abatement and Termination dated Nov. 30, 2001 at 2 (JA 117, p. 1176 at 1177).

However, the parties stipulate that they entered into two additional HAP renewal contracts containing terms substantially similar to the 2001 90-Day HAP Renewal Contract. Consistent with its decision to end its relationship with Englewood, HUD executed these additional HAP renewal contracts in order to protect South Pointe's residents until they received vouchers.

The first of these additional HAP renewal contracts was for six months and was executed in December 2001 (the "180-Day HAP Renewal Contract"). Joint Stip. Fact No. 28; 180-Day HAP Renewal Contract at 4 (JA 25, p. 737 at 740). The parties have

stipulated that the 180-Day Renewal Contract extended the terms of the parties' 1998 HAP Contract for six additional months: "The term of the [180-Day HAP] Renewal Contract begins on 01/01/2002 and shall run for a period of .5 years, beginning on the first day of the term." Joint Fact Stip. No. 29; 180-Day HAP Renewal Contract at 2 (JA 25, p. 737 at 738).

Finally, the parties have stipulated that, in June 2002, they entered into one final HAP renewal contract (the "2002 90-Day HAP Renewal Contract"). The 2002 90-Day HAP Renewal Contract extended the 1998 HAP Contract's terms from July 2002 through September 2002: "[t]he term of the Renewal Contract begins on 07/01/2002 and shall run for a period of .3 years." Joint Fact Stip. No. 31; 2002 90-Day HAP Renewal Contract at 6 (JA 26, p. 746 at 751).

Englewood cannot escape the plain terms of the HAP renewal contracts it signed. By these plain terms, Englewood agreed that the provisions of the parties' 1998 HAP Contract–-and Englewood's entitlement to HAP subsidies–-did not extend beyond September 2002. Englewood may not ask the Court to rewrite these HAP renewal contracts or to pretend that they state anything other than what their plain terms require. Pacificorp Capital, Inc., 25 Cl. Ct. at 715 (citing Fortec Constructors, 760 F.2d at 1291; Hol-Gar Mfg. Corp., 169 Ct.Cl. at 386, 351 F.2d at 973.

For these reasons, the Government is entitled to a ruling that Englewood was not entitled to HAP subsidy payments beyond September 2002.

C. Englewood Cannot Rescue Its Claims By Pointing To The HAP Renewal Contracts' Negotiation History

As noted, "when the terms of a contract are clear and unambiguous, there is no need to resort to extraneous circumstances, such as prior negotiations or custom of the trade for its interpretation." Pacificorp Capital, Inc., 25 Cl. Ct. at 716 (quoting Peterson-Sharpe Eng'g Corp. v. United States, 6 Cl. Ct. 288, 295 (1984)). It is also well established that interpretation of an unambiguous contract may not be affected by the contentions of either party that it meant something else. Pacificorp Capital, Inc., 25 Cl. Ct. at 716.

Despite these clear principles, we anticipate that Englewood will resort to allegations regarding the negotiation history of the parties' HAP renewal contracts in an attempt to resuscitate its position that it is entitled to HAP subsidies through September 2004. To the extent the Court concludes that the HAP renewal contracts could be ambiguous, the stipulated facts in this case demonstrate that Englewood's entitlement to HAP subsidies could not have extended beyond September 2002.

Based upon its proposed findings of uncontroverted fact, we anticipate that Englewood will argue that the 2001 and 2002 HAP

renewal contracts represented nothing more than HUD’s unilateral extension of subsidies to protect tenants. According to this view, Englewood may argue that HUD simply “exercised its option to extend the HAP contract for the benefit of the residents . . . as contemplated by the Addendum to the October 2000 HAP Renewal Contract” Pl.’s Proposed Fact No. 88.

Although there is no question that HUD’s motivation for agreeing to each HAP renewal contract was so that Englewood’s tenants would be protected, this in no way implies that Englewood is not bound by the plain terms of the the HAP renewal contracts the parties executed in 2001 and 2002. The “Addendum” Englewood references obligated it “to cooperate in the relocation of the residents by providing to HUD such information on income and occupancy as may be necessary to relocate the tenants.” Joint Stip. Fact No. 25; 2000 HAP Renewal Contract at 4 (JA 21, p. 696 at 699). It did not, however, state or imply that Englewood is not bound by the plain terms of the HAP renewal contracts Englewood executed.

Moreover, Englewood has stipulated that the purpose of each HAP renewal contract was “to renew the expiring [HAP] contract for an additional term.” Joint Fact Stip. No. 27; 2001 90-Day HAP Renewal Contract at 6 (JA 24, p. 719 at 724). Englewood cannot now assert that either party executed the HAP renewal contracts for any other purpose.

We also anticipate that Englewood may argue that the HAP renewal contracts executed in 2001 and 2002 are not enforceable for lack of consideration. According to this view, Englewood was entitled to four years of HAP subsidy payments after the parties executed the 2000 HAP Renewal Contract. We anticipate that Englewood will claim that, when it executed the 2001 and 2002 HAP renewal contracts, it received nothing in return for surrendering its right to HAP contract payments through September 2004. Although the general rule is that parties may not amend or renew a contract without consideration, this rule does not prohibit summary judgment in this case.

The parties' joint stipulations foreclose Englewood's argument. The parties have stipulated that HUD informed Englewood in November 2001 that HUD would terminate the parties' 1998 HAP Contract. Joint Stip. Fact No. 118; Notice of Abatement and Termination dated Nov. 30, 2001 (JA 117, p. 1176 at 1777). However, Englewood also has stipulated that the parties signed HAP renewal contracts extending the 1998 HAP Contract's terms beyond December 2001 so that HUD could protect South Pointe's residents by continuing to fund HAP subsidies and issuing vouchers to eligible tenants. Joint Stip. Fact No. 118; Notice of Abatement and Termination dated Nov. 30, 2001 at 2 (JA 117, p. 1176 at 1177).

Through these HAP renewal contracts, Englewood received the consideration of continued HAP subsidies. Englewood continued to

receive this consideration until the parties' final HAP renewal contract ended in September 2002. Joint Stip. Fact Nos. 30, 31; 2002 90-Day HAP Renewal Contract (JA 26, p. 746 at 753). After this, the parties executed no additional HAP renewal contracts, and the terms of the 1998 HAP Contract had been terminated.

Moreover, the rule that contract amendments are unenforceable without "fresh" or "new" consideration has no application to cases in which parties amend the terms of a contract to correct an error or alter the language of an agreement whose terms are in dispute. Aviation Contr. Employee, Inc. v. United States, 945 F.2d 1568, 1574 (Fed. Cir. 1991); Williston on Contracts § 7:36, 4th ed., 585.

That is the situation in this case, where the parties have stipulated that the terms of the 2000 HAP Renewal Contract were in question, and that the parties resolved this question by executing HAP renewal contracts in 2001 and 2002. The parties have stipulated that, in December 2000, Veronica Coleman, HUD's director of project management, informed the President of Englewood's owner that the 2000 HAP Renewal Contract's reference to a one-year term with automatic one-year renewals "was an error." Joint Stip. Fact No. 67; Letter dated Dec. 6, 2000 (JA 71, p. 1014). Instead, the 2000 HAP Renewal Contract was to expire at the end of December 2000, without any automatic renewal provisions. Joint Stip. Fact No. 67; Letter dated Dec. 6, 2000

(JA 71, p. 1014). Ms. Coleman's letter stated that the parties had discussed this during a meeting on October 18, 2000–-the day the 2000 HAP Renewal Contract was executed. Joint Stip. Fact No. 67; Letter dated Dec. 6, 2000 (JA 71, p. 1014).

Englewood stipulates that its representatives did not assert any objection to HUD's position. To the contrary, on January 23, 2001, Ken Horton, the vice-president of Englewood's owner wrote to Ms. Coleman and stated that the parties had extended the 2000 HAP Contract "to reflect the original expiration date of September 30, 2001." Joint Stip. Fact No. 70; Email Message dated Jan. 23, 2001 between Coleman and Horton at 2 (JA 72, p. 1015 at 1016). Mr. Horton requested that a copy of the "amended, amended HAP contract" be sent "to my attention at the following address." Joint Stip. Fact No. 70; Email Message dated Jan. 23, 2001 between Coleman and Horton at 2 (JA 72, p. 1015 at 1016).

Mr. Hayes received and responded to these emails. Email from John Hayes dated Jan. 23, 2001 (JA 73, p. 1018). However, prior to this suit, neither Mr. Hayes, Mr. Horton, nor any other Englewood representative informed HUD that Englewood believed it was entitled to three automatic one-year renewals of the 1998 HAP Contract. Joint Stip. Fact Nos. 67-70.

Englewood clearly has concocted a <u>post hoc</u> rationalization with which to argue that it was entitled to four years of HAP subsidies based upon the original, uncorrected terms of the 2000

HAP Renewal Contract. However, the parties' subsequent HAP renewal contracts preclude this "gotcha" argument.

At most, Englewood can assert that between December 2000 and January 2001 there existed a dispute regarding whether Englewood was entitled to HAP subsidies through September 2004, and that this dispute was resolved when the parties executed additional HAP renewal contracts in 2001 and 2002. These HAP renewal contracts unambiguously demonstrate Englewood's agreement that the parties' relationship, and thus Englewood's entitlement to HAP subsidies, did not extend beyond September 2002. Joint Fact Stip. No. 32; 2002 90-Day HAP Renewal Contract at 6 (JA 26, p. 746 at 751). Englewood may not now rely upon any claims that its representatives had a secret, undisclosed interpretation contrary to the HAP renewal contracts' plain terms. Pacificorp Capital, Inc., 25 Cl. Ct. at 716.

Finally, we anticipate that Englewood will argue that the parties' 2001 and 2002 HAP renewal contracts could not alter the duration of the parties' 1998 HAP Contract because the 1998 HAP Contract was an integrated agreement. Specifically, paragraph 21 of the 1998 HAP Contract provides: "This Contract, including the exhibit(s), is the entire agreement between HUD and the Owner. No changes in this Contract may be made except in writing signed by both the Owner and HUD." Joint Stip. Fact No. 21; 1998 HAP Contract at 12 (JA 19, p. 677 at 688). This argument fails for several reasons.

It is well-established that parties may amend or alter even an integrated contract with subsequent written agreements. See Williston on Contracts § 73:17 (4th ed. 2003). In this case, the parties have stipulated that the written HAP renewal contracts executed in 2001 and 2002 referred to and incorporated the terms of the parties' 1998 HAP Contract except where specifically amended: "Except as specifically modified by the Renewal Contract, all provisions of the Expiring Contract are renewed (to the extent such provisions are consistent with statutory requirements in effect at the beginning of the Renewal Contract term)." Joint Stip. Fact No. 31; 2002 90-Day HAP Renewal Contract at 8 (JA 26, p. 753).

Englewood has stipulated that, as early as December 2000, the parties discussed that, at most, there was a question regarding when Englewood's entitlement to HAP subsidies would end by agreement. Joint Stip. Fact Nos. 67, 70; Letter dated Dec. 6, 2000 (JA 71, p. 1014), Email Message dated Jan. 23, 2001 between Coleman and Horton at 2 (JA 72, p. 1015 at 1016). Englewood also has stipulated that it willingly executed short-term HAP renewal contracts until the parties' relationship ended in September 2002. Joint Stip. Fact No. 31; 2002 90-Day HAP Renewal Contract at 6 (JA 26, p. 746 at 751).

Englewood may regret its decision to execute the short-term HAP renewal contracts now. However, it cannot ask this Court to

rewrite the parties' agreements. Under these circumstances, the Government is entitled to a ruling that Englewood had no enforceable right to HAP subsidy payments beyond September 2002.

CONCLUSION

For these reasons, we respectfully request that our partial motion to dismiss and motion for partial summary judgment be granted, and that plaintiff's complaint be dismissed.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/ BRIAN M. SIMKIN
BRIAN M. SIMKIN
Assistant Director

s/ PAUL R. WELLONS
PAUL R. WELLONS
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor,
1100 L Street, N.W.
Washington, D.C. 20530
Tel: (202) 616-8253
Fax: (202) 307-0972

OF COUNSEL:

GREGORY GUSTIN
MARIA BAGUIO

Office of General Counsel
U.S. Department of Housing
and Urban Development

April 28, 2006

Attorneys for Defendant

CERTIFICATE OF FILING

I hereby certify that on April 28, 2006, a copy of the foregoing "DEFENDANT'S MOTION TO DISMISS IN PART AND MOTION FOR PARTIAL SUMMARY JUDGMENT" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/PAUL R. WELLONS