U.S. Department of Justice

Civil Division

PDK:PRWellons:
No. 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

Telephone: (202) 616-8532
Datafax: (202) 307-0972

*Washington, D.C. 20530*

May 2, 2005

VIA FED EX

Peter V. Baugher
Shopf & Weiss LLP
312 West Randolph Street
Suite 300
Chicago, IL 60606-1721

Re: Englewood Terrace v. United States

Dear Peter:

This letter is in response to your letters of April 19 and 26, 2005, as well as to additional outstanding discovery issues. We address documents requested in your April 19, 2005 letter below:

1. DEC Files - Your statement that you requested documents from the Department of Housing and Urban Development ("HUD") reflecting the Department of Enforcement's ("DEC") involvement with South Pointe in September 2004 is incorrect. In fact, your initial document requests did not ask for any documents from DEC. However, I have enclosed documents from DEC for 1998.

Further, we previously produced all other discoverable DEC documents in HUD's possession, custody, and control. This includes the contents of all "green" files. It also includes all documents regarding South Pointe that DEC staff imaged. In fact, your continued insistence that you have not received "imaged" documents fails to take into account that DEC's imaged documents are, by definition, indistinguishable from the paper documents from which images were taken.

Your statement that you have not received documents reflecting work undertaken by DEC Analyst Freddie Bachelor is particularly disturbing given Mr. Samuelson's testimony under oath that he has paid at least one former HUD employee who has assisted him in obtaining HUD documents from Ms. Bachelor outside of the scope of the discovery.

In fact, HUD has discovered that many records formerly in Ms. Bachelor's custody are missing and likely were wrongfully removed by her. We ask that Mr. Samuelson immediately return any original documents he obtained from Ms. Bachelor to HUD.

2. May 31, 2001 Privilege Claim - Upon further review, we agree that the referenced document is not privileged. A non-redacted version is enclosed.

3. DEC Processing Protocols - The requested Procedures Manual was produced at Margie Maisonnett's deposition on April 29, 2005. Your reference to "protocols" actually refers to the fact that you questioned Ms. Kiening regarding a hand-written flow chart during her deposition. We have located no copies of this flow chart or any others like it in HUD's possession, custody, or control. We believe that the "protocol" you showed Ms. Kiening during her deposition was wrongfully removed from HUD by Ms. Bachelor.

4. REMS Change - At Ms. Maisonet's deposition on April 29, 2005, we produced documents describing procedures for making REMS entries. After consulting with Gwendolyn Thomas and Veronica Coleman, we have enclosed the instructions we believe Ms. Thomas referenced in her testimony.

Regardless, your client has filed a breach of contract action. Englewood's complaint contains no allegations that HUD's record keeping practices relate to any claimed breach of contract, and HUD's record keeping policies are not at issue in this dispute.

5. Flags - We will produce copies of the requested "flags" after we redact them in compliance with the requirements of the Privacy Act. Alternatively, we are agreeable to your suggestion that the parties file a more comprehensive protective order. A proposed order is attached. We will produce the requested flags once you return a signed copy of this draft order to us.

6. Referrals - The requested dates may be located within the documents corresponding to the following Bates numbers:

D0993
D110
D1128
D1145

7. REMS Instructions - Please refer to our response to request number 4.

8. Concurrence Pages - All concurrence pages regarding South Pointe in HUD's possession, custody, or control have been produced.

9. New DEC and REAC Protocols - Your request misstates Ms. Coleman's testimony. Regardless, please refer to our response to request number 4.

10. Claim of Privilege - As we have previously informed you, Gregory Gustin served as DEC Lead Enforcement Attorney for the Chicago Satellite Office in May 2002. Howard Mayfield served as Deputy Director of HUD's Office of Asset Management at that time. The requested documents are privileged attorney-client communications and are not subject to discovery. If you believe the documents are exempted from the privilege doctrine, please inform us of the basis for that position.

During Ms. Maisonet's deposition, you made oral requests for certain documents. Several of these documents already have been produced to you -- a situation that has occurred repeatedly during discovery. However, please inform us of what documents you wish to receive so that we may evaluate and respond to your requests.

Finally, we enclose four photographs that we believe were inadvertently omitted from prior productions.

Please contact me with any questions or concerns at 202-616-8253.

Sincerely,

Paul R. Wellons
Trial Attorney
Commercial Litigation Branch
Civil Division

**U.S. Department of Justice**

Civil Division

PDK:PRWellons:
No. 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

Telephone: (202) 616-8532
Datafax: (202) 307-0972

*Washington, D.C. 20530*

May 18, 2005

VIA FED EX

Peter V. Baugher
Shopf & Weiss LLP
312 West Randolph Street
Suite 300
Chicago, IL 60606-1721

Re: Englewood Terrace v. United States

Dear Peter:

This letter is in response to your recent document requests. As you know, since becoming counsel for the Government in this case, I have endeavored to cooperate as much as possible in responding to South Pointe's repeated discovery requests. This has included repeatedly supplying you with the Bates numbers of previously produced documents as well as additional copies of documents that plaintiff misplaced. We also have agreed to produce documents not requested in plaintiff's original requests for documents.

We are under no obligation to produce wholly irrelevant documents not even tangentially related to plaintiff's breach of contract claims. However, in order to ensure that this case proceeds to a determination on the merits quickly, we address each of your most recent discovery requests below:

11. **Verification of Interrogatories** - We have obtained the requested verifications and have included them with this letter.

12. **Reengineering Report** - The document that Ms. Maisonet described was a draft report concerning HUD's processing procedures. This draft pre-dates the facts relevant to this dispute. Regardless, I have included a copy of it with this letter.

13. **Document Retention Policy** - HUD's document retention policies are not relevant to this suit, which is a breach of contract action. Nevertheless, document retention policies are reflected in guidelines and handbooks that you may access via the HUD-Clips web site.

Moreover, we repeatedly have provided you with information regarding how HUD personnel maintained documents relevant to this dispute, including sharing instructions HUD employees received regarding the REMS system. Finally, Ms. Kiening, Ms. Thomas, Ms. Coleman, and Ms. Maisonet testified regarding HUD's document retention policies.

14. **Protocol on Contract Defaults** - HUD maintains guidelines and handbooks regarding contract administration that may be accessed via the HUD-Clips web site. I specifically refer you to HUD Handbooks 98-34 and 99-36, which appear related to your inquiry. Of course, the contract between the parties governed their mutual obligations in this case.

The protocol dated November 1, 2002 that you reference does not appear to concern "contract defaults." Further, its date establishes that it was created outside of the period relevant to this case. Nevertheless, I have included a copy of it with this letter, along with other Mutifamily and DEC protocols applicable during the period relevant to this dispute.

15. **Protocol on Amending Contracts** - Please see our response to request number 14.

16. **Maisonet Notes** - I have included the notes Ms. Maisonet took at her home while contemplating her approaching deposition, along with notes she wrote on her copy of the complaint.

I will not produce notes that she took while meeting with me because these notes contain attorney-client communications and reflect my work product. I note that you continue to refuse to produce notes taken by DSSA employees during depositions they attended.

17. **Default Team Report** - Your request misstates Ms. Maisonet's testimony. No "default team report" was created for South Pointe, nor was one required.

18. **Concurrences and Approvals** - Following a searching review of its files, HUD confirms that all discoverable concurrences in its possession, custody, and control have been produced. I have included in this letter one concurrence page that previously was not produced.

19. **Authorship of Default and Related Documents** - The documents themselves identify their signatories. Further, HUD is under no obligation to attempt to recreate the drafting history of these documents. Finally, as we have previously stated, following a searching review of its files, HUD confirms that all discoverable drafts in its possession, custody, and control have been produced.

20. **Headquarters Approval for Defaults** - Please see our response to request number 14. With reference to HUD's procedures, including "fastrack" procedures, we refer you to applicable regulations. See, e.g., 24 C.F.R. § 200.857(i)(4).

21. **Lilly Simmons Inspection Report** - We have produced copies of this report as well as many other documents reflecting visits to South Pointe by HUD employees and third-parties confirming that your client failed to maintain the property in decent, safe, and sanitary condition. You may find documents reflecting a visit Ms. Simmons took to South Pointe by reviewing the pages corresponding to Bates numbers A 2378 - 2412.

In the future, we ask that you take the time to review the documents we have produced to you rather than asking us to identify documents for you.

22. **Gustin Draft** - The documents you request contain attorney-client communications and, thus, are not discoverable.

23. **Southpointe Responses to 2001 REAC** - Following a searching review of its files, HUD confirms that it has produced complete copies of the documents it received from Southpointe in response to the 1999 and 2001 REAC reports.

Your statements to me and the compilations of otherwise unrelated documents you have introduced during depositions reflect Englewood's position that it submitted documents to HUD that are no longer in either parties' possession. HUD disputes that it received these documents, assuming they ever existed.

As you are aware, your client submitted certifications to HUD that claimed repairs had been completed when, in fact, no such repairs had occurred. Regardless, even if HUD had received documents purporting to demonstrate that these repairs occurred, we are under no obligation to produce to you documents that you claim your own client created.

As a final matter, we have included redacted printouts reflecting "flags" HUD used to document problems at South Pointe. As we discussed, we have redacted information regarding flags applied to other properties or managers in order to prevent the disclosure of irrelevant information that would be competitively sensitive or embarrassing to non-parties.

Sincerely,

Paul R. Wellons
Trial Attorney
Commercial Litigation Branch
Civil Division

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| ENGLEWOOD TERRACE LIMITED PARTNERSHIP, | ) | |
| Plaintiff, | ) | No. 03-2209C |
| v. | ) | (Judge Wolski) |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

DEFENDANT'S OBJECTIONS AND
RESPONSES TO PLAINTIFF'S INTERROGATORIES

Pursuant to Rules 26 and 33 of the Rules of the Court of Federal Claims ("RCFC"), defendant, the United States of America, submits the following objections and responses to plaintiff's first set of interrogatories. Defendant has made a good faith effort to respond fully to those interrogatories to which it has not objected. Discovery is continuing, however, and defendant reserves the right to supplement its responses, including any objections that may be applicable, based upon any additional information and documents that may be discovered subsequent to providing these responses.

Defendant objects and responds to plaintiff's interrogatories as follows:

I. GENERAL OBJECTIONS AND RESPONSES

Defendant asserts and incorporates by reference the following objections to plaintiff's interrogatories as though

information comes to light throughout the discovery process, and shall provide any such information as it becomes available.

II. SPECIFIC RESPONSES AND OBJECTIONS TO INTERROGATORIES

Interrogatory No. 1

With respect to Southpointe Tower ("Southpointe"), describe the respective roles and responsibilities of the Chicago Satellite Office ("CSO") of the Departmental Enforcement Center ("DEC") and the Chicago Office of Multifamily Housing ("MFH") during the following time periods:

a) Before August of 1998;

b) August 1998 through July 1, 1999;

c) July 1, 1999 through the January 26, 2000 Final Team Report-Resolution or January 26, 2000 recommending the Return of Southpointe to MFH;

d) January 26, 2000 through October 23, 2001 when Southpointe was again referred to the CSO DEC;

e) Subsequent to October 23, 2001.

RESPONSE: With respect to the project at issue in this dispute, MFH generally provided all oversight of operations and compliance with Department of Housing and Urban Development ("HUD") business agreements. MFH referred instances of non-compliance with business agreements to the DEC.

All delegated authority for actions taken in relation to the project's business agreements for the periods at issue in

this dispute rested with MFH, although the DEC possessed authority to propose, recommend, and support enforcement actions. The DEC also possessed authority to provide ongoing support of MFH after a matter was closed by the DEC.

After Spring 2003, DEC Satellite Office Directors were temporarily delegated limited enforcement authority as published in the Federal Register.

Interrogatory No. 2

Stating dates applicable, identify the job titles, job descriptions, responsibilities, authority, duties, immediate supervisors and reporting relationships of the following individuals who were assigned to the CSO DEC:

a) James Zale;

b) Joan Kiening;

c) Freddie Batchelor;

d) Cathy Paul;

e) Sandra Suit[e]r;

f) Patrice Harris;

g) Maria Baguio;

h) Greg Gustin;

i) Margarita Maisonet

RESPONSE: As relevant to the issues in this dispute, matters of delegated authority are addressed in defendant's response to Interrogatory No 1. Additional responses to this Interrogatory are below.

U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

DEPARTMENTAL ENFORCEMENT CENTER
Chicago Satellite Office
77 W. Jackson Blvd., Suite 2207
Chicago, Illinois 60604-3507

Tel. (312)353-5895 Fax (312)886-1405

**CERTIFIED MAIL - RETURN RECEIPT REQUESTED**
**AND FIRST CLASS MAIL, POSTAGE PREPAID, OVERNIGHT MAIL**

APR 09 2001

Englewood Terrace Limited Partnership
P.M. Group, Inc. G.P.
Attention: Mr. John Hayes, President
1050 Corporate Office Drive, Suite 150
Milford, MI 48381

Dear Mr. Hayes:

SUBJECT: Notice of Default of Housing Assistance Payments (HAP) Contract
South Pointe Towers Apartments, Chicago, IL
Contract Number: IL06-E000-034

This letter constitutes formal notice by the Secretary of the U.S. Department of Housing and Urban Development (HUD) to Englewood Terrace Limited Partnership (Owner), owner of South Pointe Towers Apartments (Project), that the Owner is in default of its obligations under the HAP Contract entered into between HUD and the Owner.

The Project was inspected on March 2, 2001 by HUD's Real Estate Assessment Center (REAC) and, out of a possible 100 points, scored a 31c*. Some of the outstanding deficiencies noted in the inspection include: holes and cracks in hallway and unit walls; broken windows; inoperable stoves and faucets; cockroaches in the units; and ponding on the roof.

On March 9, 2001, the Chicago Multifamily Hub sent the Owner a letter addressing the Exigent Health and Safety (EHS) items cited in the REAC inspection. The letter advised the Owner that few of the EHS items had been mitigated at the time. The letter also addressed that the Project was not in good repair, placing the Owner in violation of the Housing Assistance Payment (HAP) contract.

The Chicago Multifamily Hub received the Owner's letter dated March 16, 2001, in which the Owner claimed that the EHS items were corrected. The letter further stated that General Partner relies "solely on information received from the property management company," and that "we will begin the process of responding to [the REAC inspection report from March 2, 2001] within the thirty day period."

On April 3, 2001, the Chicago Multifamily Hub rejected the Owner's application for a firm commitment of funding pursuant to Section 221 (d)(4). In rejecting the application, HUD noted that "the repairs outlined in your application are inadequate when compared to the needs of the property." The letter notes that HUD has allowed 23 months from the date of the April 28, 1999 REAC inspection for this Owner to bring this property into compliance.

Pursuant to Paragraph 6(a) of the HAP Contract, you have agreed to maintain the Project's units and related facilities in decent, safe and sanitary condition. All of the Project, its units, systems, common areas and building(s) must satisfy HUD's Physical Condition Standards, 24 CFR Part 5, Subpart G. The REAC inspection confirms that the Project suffers from ongoing serious neglect, disrepair, and unsafe and unsanitary conditions throughout the units, common areas, and the building. The failure to keep and maintain the Project in a decent, safe, and sanitary condition is a default of the HAP Contract.

Pursuant to Paragraph 20 of the HAP Contract, the Owner is hereby notified that if the foregoing events of default are not corrected to the satisfaction of HUD within 30 days from the date of this Notice, HUD may seek any and all available remedies; including, without limitation, suspending or abating the HAP Contract.

If you have any questions concerning this matter, please contact Margarita Maisonet, Director, Chicago Satellite Office, Departmental Enforcement Center at (312) 353-5895 ext. 2007.

Sincerely,

Edward Hinsberger, Director
Chicago Multifamily Hub

Margarita Maisonet, Director
Chicago Satellite Office
Departmental Enforcement Center

U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

DEPARTMENTAL ENFORCEMENT CENTER
Chicago Satellite Office
77 W. Jackson Blvd., Suite 2207
Chicago, Illinois 60604-3507

Tel. (312)353-5895 Fax (312)886-1405

May 16, 2001

**CERTIFIED MAIL - RETURN RECEIPT REQUESTED
AND FIRST CLASS MAIL, POSTAGE PREPAID**

Englewood Terrace Limited Partnership
P.M. Group, Inc., General Partner
Attention: Mr. John Hayes, President
1050 Corporate Office Drive, Suite 150
Milford, MI 48381

Dear Mr. Hayes:

SUBJECT: Continuing Default of Housing Assistance Payments (HAP) Contract
South Pointe Towers Apartments, Chicago, IL
Contract Number: IL06-E000-034

In response to HUD's April 9, 2001, notice of HAP Contract default, your May 2, 2001, letter to Ed Hinsberger, Multifamily Hub Director, described the status of your efforts. You listed three possible acquirers and felt that a satisfactory acquisition agreement might be reached among the Owner and the acquirer within the next 30-days. Your letter did not indicate that any efforts had been taken to contain the declining physical condition of the property or to address ongoing site management deficiencies.

While HUD may appreciate that the due diligence process you reference in your letter could delay implementing a resolution preferred by the Owner, HUD must emphasize its ongoing concern for Owner and manager delays that affect, among others, the tenants. Your letter describes yet another event of delay in complying with your business agreements with HUD:

- The Project was last inspected by HUD's Real Estate Assessment Center (REAC) on March 2, 2001. Of a possible 100 points, the Project scored a 31c*.
- A notice of the EHS deficiencies was left by REAC with the Owner's agent during the inspection. REAC mailed a copy of the inspection to the Owner by a cover letter, which emphasized that an acceptable plan to return the Project to decent, safe, and sanitary condition should be delivered to HUD within the 30-days.
- In response to the Owner's March 6, 2001, certification that all EHS deficiencies were corrected, HUD staff visited the Project. On March 9, 2001, the Chicago Multifamily Hub sent the Owner a letter expressing HUD's grave concern that, despite its certification, HUD confirmed that many of the EHS items remained outstanding. Those items were to have been repaired within 72-hours of REAC's inspection. The letter again advised the Owner that since the Project remained in unacceptable physical condition, the Owner remained in violation of the Owner's HAP Contract.
- The Chicago Housing Office received the Owner's response letter dated March 16, 2001. In addition to claiming, it seems, that the EHS items were corrected, the letter further stated that with respect to any outstanding EHS and other concerns in HUD's last letter, the Owner's General Partner "does not have the ability to monitor on a daily basis specific site inspections to validate compliance with required repairs from physical inspectors." Continuing, the letter stated that the General Partner relies "solely on information received from the property management company." Last, with respect to the most recent REAC inspection, the letter provided that the Owner "will begin the process of responding

A 2359

to [the March 2, 2001, REAC inspection report] within the thirty day period."

- HUD did not receive an acceptable plan addressing all the physical deficiencies from either the Owner or the Owner's identity-of-interest Project managing agent. Instead, on April 3, 2001, the Chicago Multifamily Hub rejected the Owner's application for a firm commitment of funding pursuant to Section 221(d)(4).
- In rejecting the application, HUD noted that "the repairs outlined in your application are inadequate when compared to the needs of the property." The letter emphasized that HUD has allowed 23 months from the date of an April 28, 1999, REAC inspection for the Owner to bring the Project into compliance with its HUD business agreements. In 1999, the Project scored a 42b*. Over that 23-month period, the Project's physical condition declined to a score of 31c*.
- HUD issued its notice of HAP Contract default on April 9, 2001.
- HUD met with you and amplified your need for immediate action; including the need to change Project ownership and management.
- You have responded to the notice of default and the subjects of the meeting on May 2, 2001, stating you may have an acquirer in 30-days.

The Owner's default of the HAP Contract is uncured and continues. HUD urges you to provide adequate, timely information describing the immediate efforts that the Owner is making to address the HAP default and the sale of the Project and proposed assumption of the HAP Contract. In the interim, HUD intends to contact the potential acquirers you have listed to determine their interest and ability to succeed the current Owner and management for the Project. Because of HUD's ongoing concerns for your delays and for the tenants, HUD is proceeding with its process to secure vouchers for relocation of eligible tenants.

If you have further information or concerns in these regards, please contact us immediately.

Sincerely,

Edward Hinsberger, Director
Chicago Multifamily Hub

Margarita Maisonet, Director
Chicago Satellite Office
Departmental Enforcement Center

A 2360

U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

DEPARTMENTAL ENFORCEMENT CENTER
Chicago Satellite Office
77 W. Jackson Blvd., Suite 2207
Chicago, Illinois 60604-3507

Tel. (312) 353-3895 Fax (312) 886-1405

November 30, 2001

Englewood Terrace Limited Partnership
P.M. Group, Inc., General Partner
John Hayes, President
1050 Corporate Office Drive, Suite 150
Milford, MI 48381
Via Facsimile and Certified and Regular Mail

Re: Notice of Abatement and Termination of
Housing Assistance Payments Contract
South Pointe Towers Apartments, Chicago, IL
Contract No. IL06-E000-034

Dear Mr. Hayes:

On April 9, 2001, HUD gave Englewood Terrace Limited Partnership (Owner), owner of South Pointe Towers Apartments (Project), formal notice that it was in default of its Housing Assistance Payments (HAP) Contract for failure to maintain the Project's units and related facilities in decent, safe and sanitary condition, as defined by Owner's HAP Contract and HUD's Physical Condition Standards, 24 C.F.R. Part 5 Subpart G. The notice provided 30 days from its date for Owner to correct all the stated events of default. During that time, Owner instead attempted to obtain an acquirer and new management for the Project but failed to correct the events of default complained of in the notice.

On May 16, 2001, HUD advised Owner in writing that its efforts to obtain an acquirer and new management for the Project did not cure Owner's default of the HAP Contract. HUD again emphasized its ongoing concern for the condition of the Project and the risks to its residents. HUD urged Owner to provide timely information describing the immediate efforts made to address the HAP default. HUD reminded Owner that its default of the HAP Contract was uncured and continued, and that HUD intended to proceed with its process to secure vouchers for relocation of eligible residents.

To date, Owner has not cured the conditions complained of in the notice of default issued on April 9, 2001 and as more fully described in HUD's May 16, 2001 writing. Owner has failed to maintain the property according to the physical conditions standards acceptable to HUD despite Owner's receipt of the notice of default and a reasonable opportunity (almost 240 days since the notice of default) to cure. Accordingly, pursuant to paragraph 20(b)(3) of the HAP Contract, this is Owner's notice that HUD intends to abate the HAP Contract.

Further, pursuant to Section 516(a) and (b) of the Multifamily Assisted Housing Reform and Affordability Act of 1997 ("MAHRA") HUD will terminate the HAP Contract upon HUD's determination that the relocation process of eligible residents at the Project is concluded.

Pursuant to MAHRA, this is Owner's notice to provide, within 30 days from receipt of this notice, written objection to this notice of termination of HAP or to cure the underlying basis for the default. If the Owner does not submit a written objection or cure the underlying basis for the default to the satisfaction of HUD during this 30-day period, HUD's decision to terminate the HAP Contract will become a final determination under Section 516(c) of MAHRA and is not subject to judicial review.

As Owner has been previously notified, HUD will abate the HAP subsidy for the Project's units as eligible residents receive their vouchers and timely opt to use those vouchers at the Project, if possible, or elsewhere. HUD also intends to abate the subsidy for ineligible residents, if any, and other residents that do not timely act with respect to their vouchers, at the time that HUD terminates the HAP Contract. **As units are abated from the HAP Contract, the owner may not again lease those units to project-based Section 8 residents.**

The HAP Contract will be terminated when HUD has, in concert with CHAC, completed its voucher and relocation process for all eligible residents at the Project. The foregoing description of HUD's intended method of abatement provides the course that HUD has determined best serves the interests of the residents as of the date of this notice. HUD does not intend that this notice limit the actions that HUD may otherwise properly take in protection of the residents. For example, if Owner fails to continue to provide basic necessary services for the residents, HUD may elect to redirect HAP Contract payments for particular uses in protection of the residents.

Please also be advised that the voucher and relocation process may extend beyond the expiration date of the current HAP Contract Renewal. To safeguard the residents, and not affecting HUD's determinations as set forth above, HUD will provide Owner with a HAP Contract Renewal with Addendum. Please execute the extension and return it to HUD promptly.

Owner may submit its objection or notification of cure to Edward Hinsberger, Director of the Chicago Multifamily Hub.

Sincerely,

Edward Hinsberger, Director
Chicago Multifamily Hub

Margarita Maisonet, Director
Chicago Satellite Office
Departmental Enforcement Center

cc: Peter Silverman

IN THE
UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| ENGLEWOOD TERRACE LIMITED PARTNERSHIP, a Michigan Limited Partnership, | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 03-2209C |
| UNITED STATES OF AMERICA, and MEL MARTINEZ, Secretary of the Department of Housing and Urban Development, | ) | Judge Victor J. Wolski |
| Defendants. | ) | |

**PLAINTIFF ENGLEWOOD'S ANSWERS TO**
**DEFENDANT'S FIRST SET OF INTERROGATORIES**

Plaintiff Englewood Terrace Limited Partnership ("Englewood"), by and through its attorneys, hereby answers and objects to Defendant's First Set of Interrogatories as follows:

**GENERAL OBJECTIONS**

In addition to specific objections separately set forth in response to certain interrogatories, Englewood generally objects to Defendant's Interrogatories as follows:

1. Englewood objects to each interrogatory to the extent it seeks information that is protected by the attorney-client privilege, the work product doctrine, or other applicable privilege or doctrine. If any such privileged information is disclosed, except pursuant to a specific written agreement covering such information, the disclosure shall be deemed inadvertent and will not be intended to waive or prejudice any applicable privilege or immunity from disclosure.

Interrogatory No. 6:

Has the project ever received any citations or notices of code violation from any entity other than HUD with respect to the physical condition of the property? If so, identify:

(a) The reason for the citation or notice, the entity responsible for issuing such citation or notice, and the date of issuance of the citation or notice.

ANSWER:

The Building Department of the City of Chicago made inspections of Southpointe at various times during the period from summer 1998 through May 2004. The inspections related to violation of the City Building Code. Most involved the elevators and plumbing. A list of these code violations and their resolution can be obtained from the City of Chicago Building Department.

In addition, there were periodic inspections of Southpointe conducted by the State's Attorney's Office and the Chicago Police Department related to the presence of crime, drugs and gangs which were operating out of Southpointe.

Interrogatory No. 7:

With regard to Count II of the Complaint, which alleges HUD breached its contract with plaintiff by: Failing to provide rental assistance for its alleged "full" four-year term; Failing to process an energy cost reimbursement; failing to implement rental increases; Failing to honor vacancy claims; and Failing to pay special claims related to rent payments and damages caused by residents at the property:

(a) Describe, date, and identify all steps taken and documents submitted by plaintiff to HUD to obtain the reimbursements, special claims, and other payments alleged [sic] owed to Plaintiff;

(b) Identify any HUD personnel with whom plaintiff had any contact regarding each of the submissions described above;

(c) Explain and provide documentation for plaintiff's contention that HUD allegedly wrongfully refused each claim, and that such alleged refusal was arbitrary and without reason.

Def App 019

ANSWER:

With respect to HUD's failures set out in the introduction to Interrogatory 7:

HUD's Failure to Provide Four Years of Rental Assistance

Rental assistance was provided to Englewood under the HAP Contract from 10/1/00 through 9/30/01, although in an amount $200,000 less than requested. HUD refused to honor Englewood's HAP Contract renewal and rental increase request made in August 2001 to be effective October 1, 2001. Instead, it approved but did not implement the rental increase, extended HAP payments through a series of forced short term renewals until residents relocated, prohibited Englewood from marketing or leasing units after October 1, 2001, and refused to honor its responsibilities under the basic terms of the HAP Contract. Englewood sought an injunction in October 2001 to force HUD to continue payments under the HAP Contract. The injunction request was denied by U.S. District Judge Ruben Castillo in an Order entered on November 15, 2001. Judge Castillo ruled that the action was not "ripe" and that there were adequate remedies at law available to Englewood, including relief for damages in the Court of Federal Claims. HUD, through Ed Hinsberger, continued to reject Englewood's request for the reinstatement of the HAP Contract on numerous occasions from September 2001 through September 2003, when Englewood filed this suit.

HUD's Failure to Implement Rent Increases

On July 27, 2000, John Hayes submitted a request to Gwen Thomas at HUD for the renewal of the HAP Contract in the amount of $2,714,196. This included a request for a rent increase. The request appears to have been rejected, without explanation or acknowledgement. The HAP Contract renewal was for $2,513,000, entered on September 27, 2000. In August 2001, another request for a rent increase was made by DSSA Management on behalf of Englewood as part of the request for the renewal of the HAP Contract. It contained all of the

market research documentation required for the proposed increase. HUD's market research group confirmed the rent comparables contained in the request. Ed Hinsberger wrote that the requested rent increase was supported by the documentation. But the approved increase was not implemented. While the comparables supported the need for the increase as of October 1, 2001, Ed Hinsberger stated that the increase would not be effective until the completion of a full rehabilitation loan application – unrelated to the operating needs of the property. Hinsberger later construed the application to be the HUD closing of the rehabilitation loan in December 2002, rather than the submission of the full plan that occurred in September 2001.

HUD's Failure to Process Englewood's Energy Cost Reimbursement

During the fourth quarter of 2000 and the first quarter of 2001, natural gas costs more than doubled. This caused very serious problems for the HUD multifamily portfolio around the country. A special lump sum reimbursement was arranged to be made available to developments like Southpointe. Southpointe made a request for this lump sum reimbursement in the summer of 2001. HUD claimed that it never received the request and would not honor it. An account payable was generated of more than $125,000 by reason of these extraordinary costs, an amount that Southpointe was never able to pay fully, and that resulted in interest costs, penalties and service terminations. When this claim was made again by DSSA Management in fall 2001, HUD took the position that the program was over, that it was too late, and that nothing could be done. HUD had funds available to it to provide financial support to Southpointe. The money was needed to stay current with vendors, in particular the People's Gas Company. HUD refused to fulfill its duties.

HUD's Failure to Honor Vacancy and Special Claims

Requests were made for vacancy and special claims in March 2000. HUD rejected these claims in November 2000 because (supposedly) they were not submitted on time. Money was needed to complete work on the MIO during this period. The very heavy costs of natural gas in the 4th quarter of 2000 put a great strain on operating finances. Englewood's claims were valid. They were filed in a timely manner. They were simply ignored for eight months, and then rejected.

In May and July 2002, there were renewed claims made by DSSA Management to Ed Hinsberger of HUD on behalf of Englewood requesting more than $500,000 in rent increases, vacancy losses, special claims, lump sum energy cost reimbursements and other claims that should have been available under the terms of the renewed HAP Contract. Margarita Maisonet of the CSO DEC rejected these claims on the ground that no claims of these sorts could be made by Englewood on behalf of Southpointe because the project was "not in good standing."

Interrogatory No. 8:

> Describe in detail any other actions undertaken by plaintiff in response to HUD's Notice of HAP Default and Notice of Continuing Default.

ANSWER:

Englewood fully complied with the REAC Report of April 29, 1999, which compliance was approved by HUD, and responded fully to the REAC Report of March 8, 2001. Unfortunately, those April 5 and 8, 2001 responses were neither accepted nor reviewed by HUD. HUD's April 6, 2001 Notice of Default and the April 9, 2001 Default letter ignored the two Englewood responses. Prior to the HUD Notice of Continuing Default of May 15, 2001, HUD had informed Englewood on April 13, 2001 that there was nothing that Englewood could do to reach agreement on the rehabilitation loan. HUD simply wanted Englewood to transfer its

DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

Office of the Assistant Secretary for
Housing-Federal Housing Commissioner

[Docket No. ____________; FR ____________]

Revocation and Redelegation of Authority

AGENCY: Office of the Assistant Secretary for Housing-Federal Housing Commissioner, HUD

ACTION: Revocation and Redelegation of Authority

SUMMARY: This notice pertains to reforms in the field concerning the management of Multifamily Housing and Hospital Mortgage Insurance programs. In this notice, the Assistant Secretary for Housing-Federal Housing Commissioner revokes those portions of several redelegations of authority relating to Multifamily Housing and/or Hospital Mortgage Insurance programs, as noted herein. The Assistant Secretary then redelegates power and authority with respect to the Multifamily Housing and Hospital Mortgage Insurance programs to the Multifamily Hub Directors and to other Office of Housing officials, as noted herein.

EFFECTIVE DATE: February 15, 1998

FOR FURTHER INFORMATION CONTACT: Charles E. Patterson, Chief, Program Analysis Branch, Management Services Division, Department of Housing and Urban Development, 451 Seventh Street, S.W., Room 9116, Washington, D.C. 20410-0400, Telephone No. (202) 708-0826. Persons with hearing or speech impairments may also utilize HUD's TTY No. (202) 708-1455 or the Federal Information Relay Service's TTY No. at (800) 877-8339. Aside from the "800" number, the telephone and TTY numbers listed are not toll-free.

SUPPLEMENTARY INFORMATION: This revocation and redelegation of authority pertains to authority in the field over Multifamily Housing and Hospital Mortgage Insurance programs. Prior to the changes being implemented in this document, Multifamily Housing was managed by 51 Multifamily Housing Directors, with staff stationed in 57 offices. Under the new field structure, as part of the HUD 2020 Management Reform Plan, the Secretary has authorized the establishment of 18 Multifamily Hubs, each of which will be headed by a Multifamily Hub Director. Multifamily Hub staff will operate out of the Multifamily Hub sites or be outstationed in the 33 Program Centers. The 18 Multifamily Hubs and 33 Program Centers are listed below, by their respective cities, in the chart in Section B., I., a., (i.). It is

anticipated that the implementation of the Multifamily field structure will enable the Department to more expeditiously provide increasingly efficient services with respect to both Multifamily Housing and Hospital Mortgage Insurance programs to HUD clients.

The 51 cities in which Multifamily Housing will operate include 50 of the 57 cities in which Multifamily Housing had offices prior to the implementation of this redelegation, and one city (Coral Gables, Florida) in which Multifamily Housing did not previously have an office. Multifamily is discontinuing services in the seven offices listed on the left below. Multifamily business previously handled by these offices will now be performed by the Multifamily Hub or Program Center listed on the right below.

| *Multifamily functions previously performed by these offices ...* | *...will now be be performed by these Hubs or Program Centers.* |
|---|---|
| Cincinnati, OH | Columbus |
| Dallas, TX | Fort Worth |
| Grand Rapids, MI | Detroit |
| Sacramento, CA | San Francisco |
| San Diego, CA | Los Angeles |
| Shreveport, LA | New Orleans |
| Tulsa, OK | Oklahoma City |

In this revocation and redelegation of authority, the Assistant Secretary for Housing-Federal Housing Commissioner revokes those portions of several redelegations of authority relating to Multifamily Housing and/or Hospital Mortgage Insurance programs, and then redelegates power and authority to carry out the Multifamily Housing and Hospital Mortgage Insurance programs identified within this notice, to the Directors of the Multifamily Hubs and to other Office of Housing officials, as provided herein. Each Multifamily Hub Director is redelegated authority for all Multifamily Housing and Hospital Mortgage Insurance program functions, except the functions listed below, which are redelegated only to the Multifamily Hubs noted below:

- Property Disposition: Handled only by Fort Worth, Texas and Atlanta, Georgia Multifamily Hubs.
- Authorizing payment of monthly subsidy billings submitted to the voucher processing center: Processed by the Kansas City, Kansas Multifamily Hub.
- All transactions involving coinsured loans: Handled only by the Greensboro, North Carolina Multifamily Hub.

Accordingly, the Assistant Secretary for Housing-Federal Housing Commissioner revokes and redelegates authority as follows:

Section A. Authority Revoked

This notice revokes those portions of the following documents which redelegated power and authority with respect to Multifamily Housing and/or Hospital Mortgage Insurance programs: 60 FR 29862, published on June 6, 1995; 60 FR 36301, published on July 14, 1995; 62 FR 24969, published on May 7, 1997; 59 FR 62739, published on December 12, 1994, as amended by 61 FR 33130, published on June 26, 1996; 62 FR 5029, published on February 3, 1997; 62 FR 23477, published on April 30, 1997; 62 FR 44132, published on August 19, 1997; and 62 FR 48106, published on September 12, 1997.

Section B. Authority Redelegated

I. To Whom Authority Redelegated

a. Multifamily Hub Directors

(i.) The Assistant Secretary for Housing-Federal Housing Commissioner redelegates to the Deputy Assistant Secretary for

Multifamily Housing programs, who retains and further redelegates to the Multifamily Hub Directors, the power and authority to carry out the program functions listed below in Part III, for both the Multifamily Housing and Hospital Mortgage Insurance programs listed below in Part II, within the geographic region of their respective Multifamily Hubs. The 18 Multifamily Hubs are listed in the chart below.

*Multifamily HUB Structure*

| HUB | *Program Centers* | *Geographic Area Serviced* |
|---|---|---|
| Atlanta | *Caribbean, Knoxville, Louisville, Nashville* | *Georgia, Kentucky, Puerto Rico, Tennessee, Virgin Islands* |
| Baltimore | *Richmond, Washington, DC* | *Maryland, Virginia, Washington D.C.* |
| Boston | *Hartford, Manchester, Providence* | *Connecticut, Maine, Massachusetts, New Hampshire, Rhode Island, Vermont* |
| Buffalo | | *NY state, except for NYC Metro Area.* |
| Chicago | *Indianapolis* | *Illinois, Indiana* |
| Columbus | *Cleveland* | *Ohio* |
| Denver | *Las Vegas* | *Colorado, Montana, Nevada, North Dakota, South Dakota, Utah, Wyoming* |
| Detroit | | *Michigan* |
| Fort Worth | *Albuquerque, Houston, Little Rock, New Orleans, San Antonio* | *Arkansas, Louisiana, New Mexico, Texas* |
| Greensboro | *Columbia* | *North Carolina, South Carolina* |
| Jacksonville | *Birmingham, Coral Gables, Jackson* | *Florida, Alabama Mississippi* |
| Kansas City | *Des Moines, Oklahoma City, Omaha St. Louis* | *Iowa, Kansas, Missouri, Nebraska, Oklahoma* |
| Los Angeles | | *Southern California* |
| Minneapolis | *Milwaukee* | *Minnesota, Wisconsin* |
| New York City | | *New York City Metro Area.* |
| Philadelphia | *Charleston, Newark, Pittsburgh* | *Delaware, New Jersey, Pennsylvania, West Virginia* |
| San Francisco | *Honolulu, Phoenix* | *Arizona, Northern California, Hawaii.* |
| Seattle | *Anchorage, Portland* | *Alaska, Idaho, Oregon, Washington* |

(ii.) The authority redelegated to the Multifamily Hub Directors, above, may be further redelegated in writing by individual Multifamily Hub Directors to Team Coordinators within the Director's Multifamily Hub or outstationed in Program Centers within the jurisdiction of the Director's Multifamily Hub, or to Supervisory Project Managers that report to the redelegating Multifamily Hub Director, but are outstationed in Program Centers that do not have Team Coordinators. Additionally, the authority redelegated to the Multifamily Hub Directors, above, may be further redelegated in writing to appropriate field office staff to maximize efficiency.

b. <u>Specific Multifamily Hub Directors Redelegated Nationwide Authority</u>

Along with the authority redelegated from the Assistant Secretary for Housing-Federal Housing Commissioner to the Multifamily Hub Directors for their respective geographic areas, the Assistant Secretary for Housing-Federal Housing Commissioner redelegates nationwide authority to certain Multifamily Hub Directors with respect to certain functions, as specified below:

(i.) Multifamily Hub Director, Atlanta, Georgia and Fort Worth, Texas

(A.) The Assistant Secretary for Housing-Federal Housing Commissioner redelegates to the Deputy Assistant Secretary for Multifamily Housing programs, who retains and further redelegates to the Multifamily Hub Director in the Atlanta, Georgia and Fort Worth, Texas Multifamily Hubs, the power and authority to perform, on a nationwide basis, those Multifamily Property Disposition and Hospital Property Disposition functions listed below, related to the Multifamily Housing and Hospital Mortgage Insurance programs listed below in Part II.

(a.) Multifamily Property Disposition Functions

1. Authorizing foreclosure of HUD-held mortgages. (Includes notifying mortgagor of HUD's decision to foreclose and deciding owner's appeals of the initial foreclosure decision.)

2. Determining terms of foreclosure sale.

3. Directing Office of General Counsel to commence foreclosure.

4. Determining services (statement of work) to be included in Project Managers' contracts.

5. Establishing maximum rents and charges Project Managers may levy.

6. Approving budgets for rehabilitation work and operating costs, including personnel and salaries.

7. Authorizing project managers to spend amounts or to subcontract for goods or services not authorized in budgets.

8. Authorizing rehabilitation work.

9. Authorizing advertisements of properties for sale.

10. Approving disposition plans.

11. Approving purchasers, in conjunction with foreclosures or sales, of HUD-owned properties.

12. Approving sales documents.

13. Executing Annual Housing Assistance Program (AHAP) and Housing Assistance Program (HAP) contracts.

14. Making final decisions on subsidy layering reviews required in conjunction with foreclosure sales or sales of HUD-owned projects or authorizing HFAs to make these decisions.

(b.) <u>Hospital Property Disposition Functions</u>

1. Determining terms of foreclosure sale.

2. Directing Office of General Counsel to commence foreclosure.

3. Determining services (statement of work) to be included in Project Managers' contracts.

4. Approving budgets for rehabilitation work and operating costs, including personnel and salaries.

5. Authorizing project managers to spend amounts or to subcontract for goods or services not authorized in budgets.

6. Authorizing rehabilitation work.

7. Authorizing advertisements of properties for sale.

8. Approving purchasers of HUD-owned properties.

9. Approving sales documents.

(B.) The authority redelegated to the Multifamily Hub Directors in the Atlanta, Georgia and Fort Worth, Texas Multifamily Hubs, above, may be further redelegated in writing to the Property Disposition Center Director located in either the Atlanta, Georgia or Fort Worth, Texas Multifamily Hub, or to other appropriate field staff to maximize efficiency.

(ii.) Multifamily Hub Director, Greensboro, North Carolina

(A.) The Assistant Secretary for Housing-Federal Housing Commissioner redelegates to the Deputy Assistant Secretary for Multifamily Housing programs, who retains and further redelegates to the Multifamily Hub Director in the Greensboro, North Carolina field office, the power and authority to perform, on a nationwide

basis, all program functions with respect to the Multifamily Coinsurance Program (Section 244 of the National Housing Act, 12 U.S.C. § 1715z-9). In addition, with regard to the function listed in Section B. at III., a., (iii.), (a.), 24., the Multifamily Hub Director is herein redelegated the authority to execute second mortgage documents without first obtaining Headquarters approval of partial payment of claims. Also, the Multifamily Hub Director, Greensboro, North Carolina is herein specifically redelegated the authority to perform the function of endorsing requests for conversion from coinsurance to full insurance, as per the coinsurance regulations at 24 CFR 251.3, 252.3, and 255.3.

(B.) The authority redelegated to the Multifamily Hub Director in the Greensboro, North Carolina Multifamily Hub, above, may be further redelegated in writing to appropriate field office staff to maximize efficiency.

(iii.) <u>Multifamily Hub Director, Kansas City, Kansas</u>

(A.) The Assistant Secretary for Housing-Federal Housing Commissioner redelegates to the Deputy Assistant Secretary for Multifamily Housing programs, who further redelegates to the Multifamily Hub Director in the Kansas City, Kansas field office, on a nationwide basis, the power and authority to authorize

payment of project monthly subsidy billings submitted to the Kansas City Voucher Processing Center.

(B.) The authority redelegated to the Multifamily Hub Director in the Kansas City, Kansas Multifamily Hub, above, may be further redelegated in writing to the Director of the Kansas City Voucher Processing Center, or to any appropriate field office staff to maximize efficiency.

II. Programs Under Which Authority is Redelegated

a. Multifamily Housing Programs

1. Multifamily Rental Housing for Moderate Income and Displaced Families Mortgage Insurance Program (Section 221(d)(3) and (4), National Housing Act (12 U.S.C. 1715l(d)(3) and (4)).

2. Multifamily Rental Housing Mortgage Insurance Program (Section 207 of the National Housing Act (12 U.S.C. 1713)).

3. Existing Multifamily Housing Mortgage Insurance Program (Section 223(f) of the National Housing Act (12 U.S.C. 1715n(f)).

4. Refinancing of Existing Insured Mortgages (Section 223(a)(7) of the National Housing Act (12 U.S.C. 1715n(a)(7)).

U.S.C. 1715k)).

11. Supplemental Loans for Multifamily Projects Mortgage Insurance Program (Section 241 of the National Housing Act (12 U.S.C. 1715z-6)).

12. Operating Loss Loans (Section 223(d) of the National Housing Act (12 U.S.C. 1715n(d)).

13. Nursing Homes, Intermediate Care Facilities, and Board and Care Homes Mortgage Insurance Program (Section 232 of the National Housing Act (12 U.S.C. 1715w)).

14. Assisted Living Facilities Mortgage Insurance Program (Section 232 of the National Housing Act (12 U.S.C. 1715w, pursuant to authority in Section 511 of the Housing and Community Development Act of 1992)).

15. Mortgage Insurance for Group Practice and Medical Practice Facilities (Title XI, National Housing Act (12 U.S.C. 1749aaa et seq.)).

16. Housing for the Elderly Mortgage Insurance Program (Section 231 of the National Housing Act (12 U.S.C. 1715v)).

17. HOPE 2: Homeownership of Multifamily Units (Subtitle B of Title IV of the National Affordable Housing Act of 1990 (42 U.S.C. 12871 et seq.)).

18. Direct Loans for Housing for the Elderly or Handicapped (Section 202 of the Housing Act of 1959 (12 U.S.C. 1701q)).

19. Supportive Housing for the Elderly (Section 202 of the Housing Act of 1959 (12 U.S.C. 1701q, as amended by Section 801 of the National Affordable Housing Act)).

20. Supportive Housing for Persons with Disabilities (Section 811 of the National Affordable Housing Act (42 U.S.C. 8013)).

21. Congregate Housing Services (Title IV of the Housing and Community Development Amendments of 1978).

23. Section 802 of the National Affordable Housing Act (42 U.S.C. 8011 et seq.)), as amended by Section 604 of the Housing and Community Development Act of 1992.

23. Service Coordinators for Assisted Housing (Subtitle E of Title VI of the Housing and Community Development Act of 1992; Section 805 of the National Affordable Housing Act, as amended by Section 677 of the Housing and Community Development Act of 1992).

24. Housing Development Grants (Section 17 of the U.S. Housing Act of 1937 (42 U.S. C. 1437o).

25. Special Purpose Grants (Public Laws 101-507, 102-139, 102-389 and 103-327).

26. Section 8 New Construction and Substantial Rehabilitation (Section 8 of the U.S. Housing Act of 1937 (42 U.S.C. 1437f note)).

27. Section 8 Loan Management Set Aside Program (Section 8 of the U.S. Housing Act of 1937, as amended by Section 101 of the Multifamily Housing Property Disposition Reform Act of 1994 (42 U.S.C. 1437f)).

28. Rent Supplement Program (Section 101 of the Housing and Urban Development Act of 1965 (12 U.S.C. 1701s)).

29. Section 236 Rental Housing Interest Reduction and Rental Assistance Program (Section 236 of the National Housing Act (12 U.S.C. 1715z-1)).

30. Below Market Interest Rate Rental Housing Program (Sections 221(d)(3) and 221(d)(5) of the National Housing Act (12 U.S.C. 1715l(d)(3) and (5)).

31. Flexible Subsidy Operating Assistance Program (Section 201 of the Housing and Community Development Amendments of 1978, as amended by Section 103 of the Multifamily Housing Property Disposition Reform Act of 1994 (12 U.S.C. 1715z-1a)).

32. Flexible Subsidy Capital Improvement Loan Program (Section 201 of the Housing and Community Development Amendments of 1978, as amended by Section 103 of the Multifamily Housing Property Disposition Reform Act of 1994 (12 U.S.C. 1715z-1a)).

33. Federally-Assisted Drug Elimination Grants (Title V of the Anti-Drug Abuse Act of 1988 (42 U.S.C. 11901), as amended by Section 581 of the National Affordable Housing Act of 1990 and Section 161 of the Housing and Community Development Act of 1992 (42 U.S.C. 11901)).

34. Housing in Military Impacted Areas (Section 238(c) of the National Housing Act (12 U.S.C. 1715z-3(c)).

35. Section 8 Assistance for Property Disposition Resales (Section 8 of the U.S. Housing Act of 1937, as amended (42 U.S.C. 1437f)).

36. Management and Disposition of HUD-Owned Multifamily Housing Projects (Section 203 of the Housing and Community Development Amendments of 1978, as amended by Section 101 of the Multifamily Property Disposition Reform Act of 1994 (12 U.S.C. 1701z-11)).

37. Emergency Low-Income Housing Preservation Program (Title II of the Housing and Community Development Act

of 1987 (12 U.S.C. 1715l note)).

38. Low-Income Housing Preservation and Resident Homeownership Program (Subtitle A of Title VI of the National Affordable Housing Act of 1990 (12 U.S.C. 4101 et seq.)).

39. Portfolio Reengineering Demonstration Program. (This program was originally authorized in 1996 under Section 210 of the Departments of Veteran Affairs and Housing and Urban Development, and Independent Agencies Appropriations Act, 1996 (110 Stat. 1321). This program was reauthorized in 1997 under Sections 211 and 212 of the Departments of Veterans Affairs and Housing and Urban Development, and Independent Agencies Appropriations Act, 1997 (110 Stat. 2874), and continues to be authorized in 1998 under Title V of the Departments of Veteran Affairs and Housing and Urban Development, and Independent Agencies Appropriations Act, 1998 (111 Stat. 1344)).

b. Hospital Mortgage Insurance Programs

1. Mortgage Insurance for Hospitals Program (Section 242 of the National Housing Act (12 U.S.C. 1715z-7)).

2. Supplemental Loans for Hospitals Mortgage Insurance Program (Section 241 of the National Housing Act (12 U.S.C. 1715z-6)).

3. Refinancing of Existing Insured Hospital Mortgages (Section 223(a)(7) of the National Housing Act (12 U.S.C. 1715n(a)(7)).

4. Operating Loss Loans (Section 223 (d) of the National Housing Act (12 U.S.C. 17155n(d)).

III. Program Functions for Which Authority is Redelegated

a. Multifamily Housing Programs

Powers and authorities redelegated under the Multifamily Housing Programs, listed above, include:

(i.) General Multifamily Housing Functions

1. Issuing waivers of Department directives not mandated by statute or regulation.

2. Signing documents as necessary to carry out enumerated functions.

(ii.) Multifamily Production

1. Approving fee/contract appraisers and inspectors.

2. Determining acceptability of project sites.

3. Issuing Site Appraisal and Market Analysis (SAMA) approvals.

4. Issuing conditional or firm commitments for FHA mortgage insurance or capital advances.

5. Issuing initial or final endorsements for FHA mortgage insurance or capital advances.

6. Issuing firm approval letters and mortgage insurance endorsements for Risk-Sharing program.

7. Executing cost certifications and determining maximum insurable mortgages or maximum capital advances.

8. Executing Regulatory Agreements.

9. Issuing construction inspection reports and requiring corrective actions and escrows as needed.

10. Approving construction advances and change orders.

11. Approving per unit mortgage limits in excess of base amounts, up to statutory maximums.

12. Making final decisions on subsidy layering reviews for projects in development or authorizing Housing Finance Agencies (HFAs) to make these decisions.

(iii.) Multifamily Asset Management and Funding

(a.) Cross-cutting Servicing and Compliance

1. Approving/Disapproving owner's choice of management agent or owner's decision to self-manage.

2. Establishing management agent fee ranges and add-on fees.

3. Approving/disapproving management fees that owners and agents negotiate.

4. Approving changes in project ownership (Transfer of Physical Assets (TPAs)).

5. Signing 9 and 12-month guarantee inspections and approving releases from escrows.

6. Processing and deciding all forms of rent increases, including special additional adjustments of Annual Adjustment Factors (AAF) projects.

7. Deciding owner appeals of decisions on rent increase requests.

8. Authorizing project owners to bill for Section 8 special claims and authorizing payment of monthly subsidy billings not yet transferred to the Kansas City Voucher Processing Center.

9. Authorizing offsets to monthly subsidy billings.

10. Executing repayment agreements for collection of overpaid rental subsidies or delinquent excess income.

11. Authorizing releases from the residual receipts accounts, including using residual receipts to fund service coordination.

12. Authorizing releases from the replacement reserve accounts.

13. Executing partial releases of security.

14. Determining acceptability of monthly or annual financial statements and requiring corrective action related to those statements.

15. Reviewing performance of project management and assigning performance ratings on project management reviews and physical inspections.

16. Reviewing and rating subsidy contract administrator's performance.

17. Determining which principals should be flagged in 2530 system.

18. Ordering and approving Limited Denials of Participation.

19. Approving exceptions, authorizing admission of low-income families under "post-81" Section 8 contracts that are subject to the very low-income rule.

20. Determining which projects will receive Loan Management Set-Asides (LMSA), Flexible Subsidy Operating Assistance, or Flexible Subsidy Capital Improvement Loans.

21. Executing Section 8 Housing Assistance Payments contracts, Project Rental Assistance contracts, and Section

8 Annual Contributions contracts.

22. Executing Flexible Subsidy contracts and authorizing disbursements under such contracts.

23. Acknowledging receipt of Default and Election to Assign Notices.

24. Executing second mortgage documents following Headquarters' approvals of partial payment of claims.

25. Making final decisions on subsidy layering reviews for projects in management or authorizing HFAs to make these decisions.

26. Approving current bond refunders.

27. Determining terms of workout on insured or HUD-held mortgages when workout does not involve a Financial Adjustment Factor (FAF) refunder.

28. Executing workouts on insured or HUD-held mortgages.

29. Approving Title II Plans-of-Action and executing Title II Use Agreements.

30. Granting preliminary and final approval of Title VI Plans-of-Action and executing Title VI Use Agreements.

31. Signing hazard insurance loss drafts.

32. Determining Housing's proposal for resolving audit findings.

33. Closing audit finding on field office matters.

(b.) <u>Multifamily Housing for Elderly Persons or Persons with Disabilities</u>

1. Reviewing and rating Section 202 and Section 811 applications.

2. Exercising regulatory option to approve Section 811 application for more than number of units handbook allows.

3. Authorizing Section 811 sponsor to serve only one type of disability.

4. Authorizing change in disability group to be served by group home/independent living facility under Sections 202, 162, 811 programs.

5. Selecting Sections 202 and 811 applications to be funded.

6. Approving extensions of Sections 202 and 811 fund reservations to dates no more than 36 months beyond initial reservation date.

7. Executing Section 202 regulatory agreements and development and funding documents.

8. Approving/disapproving mortgagors' requests to prepay Section 202 mortgages when note contains a prepayment right.

9. Executing new Congregate Housing Services Program (CHSP) grants.

10. Executing extensions, amendments, close-outs, or terminations of existing CHSP grants.

11. Executing Section 8 contracts for service coordinators.

12. Approving use of residual receipts for service coordinators.

(c.) Multifamily Grants

1. Rating and, where specified in program regulations, ranking of applications for competitive grant programs.

2. Processing applications in noncompetitive grant programs.

3. Executing and amending grant agreements.

4. Approving Line of Credit Control System (LOCCS) drawdowns.

5. Monitoring compliance with grant agreements and terminating agreements for non-performance.

6. Executing close-out/settlements of grants.

(iv.) Portfolio Reengineering Functions

1. Executing restructuring commitment letters.

2. Executing closing documents, agreements and contracts needed to implement terms of restructuring commitment letters, including executing second mortgage documents without first obtaining Headquarters approval.

b. Hospital Mortgage Insurance Program Functions

Powers and authorities redelegated under the hospital mortgage insurance programs, listed above, include:

(i.) General Hospital Mortgage Insurance Functions

1. Issuing waivers of Departmental directives not mandated by statute or regulation.

2. Signing documents as necessary to carry out enumerated functions.

(ii.) Hospital Mortgage Insurance Development

1. Issuing conditional or firm commitments for FHA mortgage insurance, pursuant to HHS recommendation and instructions from Headquarters.

2. Issuing initial or final endorsements for FHA mortgage insurance.

3. Determining maximum insurable mortgages, upon receipt of approved cost certification from HHS.

4. Executing Regulatory Agreements.

5. Approving construction advances and change orders, pursuant to recommendation from HHS.

(iii.) Hospital Mortgage Insurance Servicing and Compliance Activities

1. Approving changes in project ownership (Transfer of Physical Assets (TPAs)), pursuant to recommendation from HHS.

2. Executing partial releases of security, pursuant to recommendations from HHS and approval from Headquarters, when appropriate.

3. Reviewing performance of project management and assigning performance ratings on project management reviews and physical inspections.

4. Acknowledging receipt of Default and Election to Assign Notices and Mortgage Assignment.

5. Executing workouts on insured or HUD-held mortgages, pursuant to recommendations from HHS and approval from Headquarters.

6. Authorizing foreclosure of HUD-held mortgages, pursuant to recommendations from HHS and approval from Headquarters. (Includes notifying mortgagor of HUD's decision to foreclose and deciding owners' appeals of the initial foreclosure decisions.)

7. Determining Housing's proposal for resolving audit findings on Field Office matters, in consultation with Headquarters.

8. Closing audit findings on field office matters, in consultation with Headquarters.

Section C. Authority Excepted

The authority redelegated in Section B, above, does not include the authority to issue or waive regulations. In addition, it does not include the authority to sue or be sued.

Authority: Section 7(d), Department of Housing and Urban Development Act, 42 U.S.C. § 3535(d).

Dated: 2/5/95

Nicolas P. Retsinas
Assistant Secretary for Housing-
Federal Housing Commissioner

**IN THE**
**UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| ENGLEWOOD TERRACE LIMITED PARTNERSHIP,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | ) | No. 03-2209C<br>(Judge Marian Blank Horn) |

**DECLARATION OF GREGORY G. GUSTIN**

I, GREGORY G. GUSTIN, in my official capacity for the United States Department of Housing and Urban Development (HUD), on oath and under penalty of perjury pursuant to 28 U.S.C. § 1746, state as follows:

1. Since May 2004, I have been the Associate Regional Counsel for Program Enforcement, U.S. Department of Housing and Urban Development (HUD), Office of Regional Counsel, Region 5, Chicago, Illinois (Associate Regional Counsel).

2. This Declaration is made in my official capacity as Associate Regional Counsel, and only for the matters at issue in the above styled litigation.

3. As Associate Regional Counsel, among other matters, I am responsible for the oversight and conduct of litigation matters assigned to the Office of Regional Counsel legal section that I supervise; and I am responsible for the supervision of the section's attorney and paralegal staff in those regards.

4. The above-styled litigation is one such matter assigned to the Office of Regional Counsel legal section that I supervise; and I am thus familiar with the above-styled litigation surrounding a project located at 6425 S. Lowe and commonly known as South Pointe Towers Apartments, including the Plaintiff's original and amended requests for document production submitted during the course of that litigation.

5. Directly, and through staff, I supervised the gathering of all records, including all documents and electronic media, from all departments within HUD that were reasonably known or suspected to have media that was responsive to Plaintiff's discovery requests.

6. Throughout the course of the above-styled litigation Plaintiff has asserted that additional media that is responsive to Plaintiff's discovery requests exists.

7. To ensure all reasonable diligence has been engaged by HUD, I and my staff issued multiple requests to all departments within HUD that were reasonably known or suspected to have media that was responsive to Plaintiff's discovery requests.

8. To the best of my information, belief, and knowledge all media located in response to those multiple requests, after diligent search, was delivered to my legal section's staff; and either I, and/or members of the legal section I supervise, reviewed all such media.

9. With the exception of media created by Plaintiff, all media that was located in response to Plaintiff's discovery requests was delivered to counsel for the Department of Justice (DOJ) for review and production to Plaintiff.

10. HUD and its counsel have engaged all reasonable diligence and efforts to locate and deliver, to DOJ, all responsive media.

11. HUD and its counsel have engaged all reasonable diligence and efforts to ensure that all HUD electronic databases, such as HUD's Real Estate Management System and the Departmental Enforcement Center's Imaging system, that did contain or may have contained responsive media, were reviewed, printed, and delivered to DOJ.

12. HUD and its counsel have engaged all reasonable diligence and efforts to ensure that all written concurrences on actions taken by HUD were delivered to DOJ.

13. Plaintiff's statements or inferences that responsive media has been improperly withheld and/or destroyed is, to the best of my knowledge, belief, and efforts, false.

14. Further Declarant sayeth naught.

Executed and affirmed this 22nd day of March 2006.

/s/ Gregory G. Gustin
Gregory G. Gustin
Associate Regional Counsel, Program Enforcement
U.S. Department of Housing and Urban Development
Office of Regional Counsel, Region 5

**IN THE**
**UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| ENGLEWOOD TERRACE LIMITED PARTNERSHIP,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | ) | No. 03-2209C<br>(Judge Marian Blank Horn) |

**DECLARATION OF EDWARD J. HINSBERGER**

I, EDWARD J. HINSBERGER, in my official capacity for the United States Department of Housing and Urban Development (HUD), on oath and under penalty of perjury pursuant to 28 U.S.C. § 1746, state as follows:

1. I am the Director of the Chicago, Illinois, Region 5, HUD Office of Multifamily Housing (Chicago Hub).

2. As Director, among other matters, I am responsible for the oversight, development, and general operation of multifamily properties within the jurisdiction of the Chicago Hub insofar as those properties desire to be, or are, subject to HUD program requirements.

3. I have been employed by HUD since 1978, and I have served as Director of the Chicago Hub since 1997.

4. This Declaration is made in my official capacity as Chicago Hub Director, and only for the matters at issue in the above styled litigation.

5. I am familiar with the project located at 6425 S. Lowe and commonly known as South Pointe Towers Apartments (South Pointe). South Pointe received rental subsidies through a project-based Housing Assistance Payments (HAP) Contract with HUD; as that HAP Contract was renewed from time-to-time until its termination in 2002.

6. The authority for actions taken by HUD with respect to the South Pointe HAP Contract resided with HUD's Office of Multifamily Housing, and myself as Director of the Chicago Hub.

7. Thus, the proper HUD authority signed the HAP Contract, and made elections to non-renew, renew, modify, amend, or terminate the South Pointe HAP Contract.

8. With respect to elections to non-renew, renew, modify, amend, or terminate the South Pointe HAP Contract, the decisions and actions taken concerning those matters were within my delegated authority as said Hub Director, and were taken for HUD by me, or by staff that I authorized to do so, and pursuant to my delegated authority.

9. Further Declarant sayeth naught.

Executed and affirmed this 22nd day of March 2006.

/s/ Edward J. Hinsberger
Edward J. Hinsberger
Director
U.S. Department of Housing and Urban Development
Office of Multifamily Housing, Chicago Hub