# EXHIBIT A

RECEIVED

Bonnie Kerr

# SOUTH POINTE TOWERS

REMS# 800040489 FHA# N/A

FINAL TEAM REPORT - RESOLUTION

January 26, 2000

## 1. Project Description:

| | | | |
|---|---|---|---|
| 1. | Project Address: 6425 South Lowe | 18. | Bldg. Type: High Rise/Elevator |
| 2. | City: Chicago | 19. | Total Units: 303 |
| 3. | State: Illinois | 20. | Total Section 8 Units: 303 |
| 4. | Property Mgt. Company: PM One Ltd. | 21. | Section 8 #: IL06E000-034 End Date: (9-30-2000) |
| 5. | Property Mgt. Phone: 773 - 324-9010 | 22. | Occupancy Rate: 92% |
| 6. | Owner: PM One Equities | 23. | Orig. Mortgage Amount: NA |
| 7. | Owner Phone: 773 - 324-9010 | 24. | Unpaid Balance: N/A |
| 8. | Site Manager: Angela McNair | 25. | Reserve Balance: N/A |
| 9. | Site Phone #: (773) 324 - 9010 | 26. | Net Cash Flow: N/A Date: N/A |
| 10. | Year Built: 1972 | 27. | AFS Current: N/A |
| 11. | Sec. Of Act: N/A | 28. | Date of Contractor Site Visit: 5/19/99 |
| 12. | REAC P I Score: 42b* | 29. | Date of DEC Staff Visit: 4/15-16/99 |
| 13. | REAC Inspection Date: 04-28-99 | 30. | Mortgage Type: uninsured |
| 14. | Date REAC to Owner: 05-01-99 | 31. | Date of last Mortgage Payment: N/A |
| 15. | FASS Score: N/A | 32. | Date Mortgage Assigned to HUD: N/A |
| 16. | FASS Report Date: Not Required | | |
| 17. | Rents vs. FMR: Below and Above | | |

Enforcement Analyst: Ms. Freddie C. Batchelor    Team Leader: Mrs. Joan M. Kiening

MF Project Manager: Ms. Gwendolyn Thomas    DEC Attorney: Mr. Gregory Gustin

## 2. Project Summary

South Pointe Towers is located in Chicago, Illinois. It has 303 units all of which have Section 8 assistance. The property is a high rise development with elevators. This is an uninsured property and in need of extensive physical repairs. The REAC inspection was done on April 28, 1999, and was scored 42*b. The apartments in this property are spacious and in demand. The area surrounding the site is undergoing revitalization and was recently designated an Enterprise Zone. The property has a number of deferred maintenance items, foremost among this were the elevators. The curb appeal of the property has improved. The owner has infused $770,000 in the property and continues to add additional funds in order to correct all physical deficiencies identified in the REAC inspection.

## 3. Ownership

**Current:** Legal Structure: Limited Partnership

| Ownership Entity: | | Percent Ownership |
|---|---|---|
| General Partner | | |
| PM One Equities, Brighton, Michigan<br>John J. Hayes, President | 38-2312468 | 1% |
| Limited Partner<br>Chevron U. S. A. Incorporated | | 99% |

**Identity of Interest Companies**

1. Advantage Construction
2. Austin Laundry
3. Delcor Construction
4. H & G Renovations
5. PALCO, Inc.
6. Sosco, Inc.
7. Woltan Services

**Owner Contact:**

John J. Hayes, President PM One, Ltd.
Mr. Carl Sanders, Property Manager
1651 E. 55th Street
Chicago, Illinois
773-374-9010

## 4. File Deficiencies

There was an approved MIO in March, 1997, and this could not be located in the project files.

## 5. Financial Condition

This property is uninsured and on a budget based funding accounting system. The owner has not been required to submit financial statements due to the property being uninsured that only receives section 8 assistance.

## 6. Physical Condition

**Current:** The owner submitted a MIO Plan to this office on December 8, 1999. The MIO has been tentatively accepted with two modifications. The HUB office has requested the owner to add on the MIO Plan the source of funding. The owner has already infused capital into the property totaling $770,000. He has committed to completing all the necessary items identified in the REAC inspection report that was conducted on 4/29/99 with the property receiving a score of 42b* with deficiencies such as:

- fix broken light fixtures,
- replace all mailboxes,
- remove all graffiti,
- replace elevators,
- repair foundation cracks,

Building Exterior:

- replace damaged doors,
- replace broken windows,
- replace fire protection equipment,
- repair ceiling,
- complete rehab of laundry facility,
- repair trash chutes,
- monthly extermination increased

Internal Repairs :

- repair all broken doors,
- repair ceiling
- replace heating
- and plumbing system.

By infusing capital into the property the owner has shown a good faith effort to correct REAC deficiencies identified.

The Property received a site visit by the DEC staff on April 15 and 16, 1999 revealed the following conditions:

- Common areas were filled with garbage, graffiti and urine odor,
- Building infested with rats and roaches
- Pipes were leaking
- Elevators not working
- Mailboxes were damaged
- Fire extinguishers were missing or damaged
- There were visible signs of moisture and mold on exterior walls
- There is graffiti all over the building
- There are no lights in some of the hallways
- There was evidence of drug activity

Another site visit by the DEC staff in August, 1999 revealed the deficiencies identified above and the following REAC items were corrected:

- fixed broken light fixtures,
- replaced all mailboxes,
- removed all graffiti,
- replaced elevators,
- repaired foundation cracks,

Building Exterior:

- replaced damaged doors,
- replaced broken windows,
- replaced fire protection equipment,
- repaired ceiling,
- completed rehab of laundry facility,

- repaired trash chutes,
- monthly extermination increased

Internal Repairs ;

- repaired all broken doors,
- repaired ceiling
- replaced heating
- and plumbing system.

| DATE CONDUCTED | DATE OF REPORT | OVERALL RATING | TYPE REVIEWER | DEFICIENCIES CORRECTED |
|---|---|---|---|---|
| 04/28/99 | 04/29/99 | 42b* | REAC | Some |
| 04/15-16/99 | 04/30/99 | Unsatisfactory | On Site DEC | Some |
| 11/19/97 | 1997 | Satisfactory | HUD Staff | MIO Plan Prepared |
| 12/19/96 | 1996 | Unsatisfactory | Contractor | No |
| 03/10/95 | 1995 | Satisfactory | HUD Contractor | Yes |
| 10/21/94 | 10/21/94 | Unsatisfactory | HUD Contractor | No |

History: This project has a history of poor physical maintenance. Drug activity within and around the project has decreased since the owners changed security firms. In 1996, this property received a Special Rent Increase for Crime Prevention Activities in the amount of $200,570.

1) 1994 - Inspections completed by Thomas Hickey & Associates.

   Many of the units did not pass HQS inspection. Items identified in need of major repair work were: a) sign of gang activity (graffiti), b) trashed stairwells, c) roof in need of repair, d) extermination needed, e) bathrooms - plumbing problems, f) windows, g) doors, and h) door locks Rating was unsatisfactory.

2) 1995 - Inspection revealed the property was in need of major repairs. Interior unsatisfactory. Property improvements proposed: a) replace roof curb, b) handrails, c) fire hoses in cabinets, d)replace deadbolts, e)repair trash chutes, f) extermination, and g) repair boiler.

3) 1996 - Unit Inspections conducted by management found that many apartments were left abandoned and tenants moved out without notice or because of dissatisfaction with property upkeep. A No trespassing order was done through the Cook County Court System for individuals who had been evicted.

4) 1997 - Units Re-Inspected by Leroy Fishleigh (HUD staff) Overall rating was Below Average (Physical Condition).

5) 1997 - Maintenance Policies and Practices( Below Average)

a) Floors and hallways were found to be dirty, littered and stairwells were in same condition of disarray. b) air handler needs repair, c) boiler room needed cleaning/maintenance, and d)fire extinguisher cases needed repair and the need to install missing extinguishers.

## 7. Management Analysis

Current: PM One Ltd. is currently the management agent for South Pointe Towers. There are seven identity of interest companies as follows:

- Advantage Construction - Provides unit renovation services - painting, drywall, roofing, siding, paint. Provide services to properties on a bid basis.
- Austin Laundry - Provides coin-operated laundry machine services. Provides services to properties on a bid basis.
- Delcor Construction - Provides contracted maintenance services - painting carpeting, fire damage rehab, roofing, siding. Provides services to properties on a bid basis.
- H & G Renovations - Provides unit renovation services - painting, drywall, roofing, siding, paint. Provides services on a bid basis.
- PALCO, Inc. - Provides contracted unit renovation services - painting, drywall.
- Sosco - Provides unit renovation services
- Woltan Services - Provides contracted maintenance services

Management Agent: PM One 38-2312468 - Independent Fee Agent

Note: Social Security Numbers and Names under Ownership Section

Contact: Michael G. McGhie, President
33045 Hamilton Court, #100, Farmington Hills, Michigan 48334

Management Reviews:

| DATE CONDUCTED | OVERALL RATING | MAINTE & SECURITY | FINANCIAL MGMT | LEASING & OCCUPANCY | TENANAT MGMT RELATIONS | GENERAL MGMT |
|---|---|---|---|---|---|---|
| 06-19-99 Pinnacle | Unsatisfactory | Poor | Poor | Good | Fair | Fair |
| 04-15/16-99 DEC Staff | Unsatisfactory | Poor | Fair | Good | Fair | Fair |
| 11-19-97 HUD Staff | Unsatisfactory | Poor | Fair | Good | Fair | Fair |
| 12-19-98 HUD Staff | Unsatisfactory | Poor | Fair | Good | Fair | Poor |

The property has been managed by PM One since April 1, 1991 - present. Prior to PM One, the property was managed by Englewood Terrace Limited Partnership. The property has a history of poor property management and tenant relations. The management agent is an identity of interest agent. The file contains a management certification submitted by the owner and the agent. The term was from 01-1-96 through 12-31-97. The management submitted a management profile and certification June 21, 1999. The certification was approved by the HUD Office.

8. Site Visit Report

On April 15 and 16, 1999, DEC staff conducted an on-site visit of the property. The overall rating of the property was unsatisfactory. The property was in very poor physical condition and had heavy drug related activity. After the DEC visit, the DEC reported the activity to the City of Chicago Violent Crimes Division. They agreed to investigate and send a team to the property. Since then, the property has new security. Since this visit the owners told the DEC they are committed to correcting all deficiencies at South Pointe Towers, however, they have failed to set aside the necessary funds to correct the deficiencies immediately. The property owners have also attempted to address the social issues of the property by putting in place new house rules and adding a social service program to be made available to the residents of South Pointe Towers.

Pinnacle conducted a limited management review of the property on May 19, 1999. The review revealed the owner had not corrected conditions outlined in the REAC. These conditions were reported in the REAC Inspection Report, DEC on-site visit, and the physical inspection reports.

9. **Subsidy Status**

The current HAP contract expires 9-30-2000.

**CURENT RENTS:**

| UNIT TYPE | CONTRACT RENT | UTILITY ALLOWANCE | GROSS RENTS | FMR 1999 | OVER/UNDER FMR |
|---|---|---|---|---|---|
| 1BR | $648 | $25 | $673 | $640 | $8.00 OVER |
| 2BR | $799 | $56 | $835 | $762 | $37.00 OVER |
| 3BR | $866 | $52 | $918 | $953 | $(87.00) UNDER |
| 3BR | $800 | $43 | $843 | $953 | $(153) UNDER |

**RENT INCREASE HISTORY:**

| SUBMISSION DATE | HUD RESPONSE | DATE OF RESPONSE | EFFECTIVE DATE |
|---|---|---|---|
| 02/96 | Approved Special Rent Adjustment | 02/96 | 03/01/96 |
| 08/95 | Approved Increase | 09/95 | 09/22/95 |
| 07/94 | Approved Increase | 07/94 | August 18, 1994 |

**History:** In 1996, the project received a Special Rent Increase Adjustment for the purpose of securing tax consulting services. In 1993, the project received a Drug

Elimination grant to assist them in decreasing the amount of criminal activity, gang and drug traffic in and around the property.

**10. Occupancy**

There are a total of 303 units in this project. 60 - 1 bedroom, 140 2- bedroom, 23 - town house units, and 80 - 3 bedroom. Currently the property is 92% occupied. The number of occupants is constantly decreasing due to increased drug evictions and other lease violations.

**11. Neighborhood/Residency**

The property is a physically distressed development in a high crime and blighted neighborhood. The property has a reputation of having been drug infested and controlled by gangs. Off -duty Chicago and Cook County police provide security for the property. The agent has hired a new security firm which has caused the number of drug and gang crimes to decrease. The area surrounding the site is in similar conditions. The area is severely distressed and economically depressed with no signs of investment. Much of the area is filled with vacant lots. There is an elementary school across the street in front of the property.

**12. Problem Statement**

The property is in poor physical condition; however the owner has corrected some of the identified repairs revealed by the REAC Inspection Report. They are in the process of entering into contracts to correct the remainder of the items cited by REAC and the DEC. The owners have started repairs, and are showing good faith by starting some repairs with their own funds. In addition, they are attempting to secure a loan to offset the cost of the remaining work.

**13. Legal Analysis**

All known legal issues needed to support the business decision recommended are adequately addressed herein.

**14. Next Steps/Recommendations**

- Substantial progress has now been made on the findings outlined in the REAC report, therefore the DEC should return the case to the Chicago Multifamily HUB Office for servicing.
- The Chicago HUB Office should continue the finalization of the MIO received on December 8, 1999.

APPROVALS

James P. Zale 1/21/00
Date
Satellite Office Director

Edward Hinsberger 2/1/200
Date
MF HUB Director, Chicago

Marilyn X. Edge 2/14/00
Marilyn Edge
Date
Acting Director of Operations
DEC

Edward Kraus 2-16-00
Edward Kraus
Date
Director, DEC

Frank Malone
Date
MF Office of Portfolio Management

(separate page - stays in our office)

5vs5:Enf/Batchelor

CONCURRENCES:

| EC Analyst | Team Leader | Attorney | Lead Attorney |
|---|---|---|---|
| Ms. Freddie C. Batchelor | Joan Deming | Maria Baguio | Gregory Gustin |
| Initials: | Initials: | Initials: | Initials: |
| Date: 1-27-00 | Date: 1/27/00 | Date: 1/28/00 | Date: 1/28/00 |

cc: MF HUB

Program Center (only if appropriate)
Green File
EC Analyst
Imaging File - Enforcement Folder

# EXHIBIT B

# IN THE MATTER OF:

# ENGLEWOOD VS THE UNITED STATES

# THE DEPOSITION OF VERONICA COLEMAN

APRIL 13, 2005

PREPARED BY JUDITH T. LEPORE, CSR

KRUSE & ASSOCIATES, INC.

(312) 345-1500

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| ENGLEWOOD TERRACE LIMITED PARTNERSHIP, | ) | |
| Plaintiff, | ) | |
| -vs- | ) | No. 03-2209C Judge Wolski |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

The deposition of VERONICA COLEMAN, called by the Plaintiff for examination, pursuant to subpoena and pursuant to the Federal Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before Judith T. Lepore, Certified Shorthand Reporter and Notary Public within and for the County of Cook and State of Illinois, at 312 West Randolph Street, 4th Floor, Chicago, Illinois, commencing at the hour of 9:30 a.m., on the 13th day of April, A.D., 2005.





A P P E A R A N C E S:

SCHOPF & WEISS LLP, By
MR. PETER BAUGHER
312 West Randolph Street, Suite 300
Chicago, Illinois 60606-1721
(312) 701-9300

On behalf of the Plaintiff;

U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION, By
MR. PAUL R. WELLONS
1100 L Street, N.W.
Washington, DC 20530
(202) 616-8253

and

U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, By
MR. GREGORY G. GUSTIN
MS. MARIA T. BAGUIO
77 West Jackson Boulevard, Room 2202
Chicago, Illinois 60604
(312) 353-6236

On behalf of the Defendant.

Also Present:

Don Samuelson
Scott Samuelson

* * *





I N D E X


| WITNESS | DX | CX | RDX | RCX |
|---|---|---|---|---|
| VERONICA COLEMAN | | | | |
| By Mr. Baugher | 4 | | | |


E X H I B I T S


| COLEMAN DEPOSITION EXHIBIT | MARKED FOR ID |
|---|---|
| No. 1 | 140 |
| No. 2 | 142 |
| No. 3 | 146 |
| No. 4 | 147 |
| No. 5 | 153 |
| No. 6 | 164 |
| No. 7 | 175 |
| No. 8 | 184 |
| No. 9 | 191 |
| No. 10 | 195 |
| No. 11 | 217 |
| No. 12 | 219 |
| No. 13 | 231 |
| No. 14 | 252 |
| Nos. 15 & 16 | 268 |


(Exhibits were retained by counsel.)





MR. BAUGHER: Let the record show that this is the deposition of Veronica Coleman taken under the rules of the Court of Federal Claims and pursuant to notice and agreement.

Swear the witness, please.

(Witness duly sworn.)

VERONICA COLEMAN,

called as a witness herein, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. BAUGHER:

Q. What is your full name, please.

A. Veronica Coleman.

Q. Where do you live, Ms. Coleman?

A. In Chicago, Illinois.

Q. Where?

A. I'm not going to provide my place of residence. My business address is 77 West Jackson Boulevard, Chicago, Illinois, 60604, 23rd Floor.

MR. WELLONS: Mr. Baugher, we will accept service of process for Ms. Coleman in the future if you have a concern about contacting her. But she is not here to provide testimony regarding personal

submitted to Edward Hinsberger from Mr. Samuelson, and that's all I can say.
BY MR. BAUGHER:
Q. And certainly, as of the time that you were communicating with Mr. Pace about a month and a half later -- excuse me. Strike that.
Did you send a copy of this plan to Mr. Pace?
A. I communicated with Mr. Pace on 8/1/01. Mr. Samuelson submitted this document 8/6/01.
Q. That's not what my question was. Did you send a copy of this plan to Mr. Pace? I understand that it came in shortly after your e-mail response to Mr. Pace. But did you send him a copy of this plan?
A. This plan was submitted to Mr. Hinsberger after Mr. Pace's request.
Q. Did you participate in any discussion of this plan, Coleman Deposition Exhibit 15?
A. I don't recall being in any discussions.
Q. One of the things that the letter refers to or has a page on or an exhibit on is the need for a rental increase. Do you see page three of the document that discusses the need for a rental increase?





A. I see the statement.
Q. Were you involved in evaluating whether or not the rents for South Pointe should be increased in 2001?
A. No.
Q. Were you ever involved in determining or participating -- did you ever participate in determining whether rents for South Pointe should be increased?
A. At the point of this submission, this issue was handled by Mr. Hinsberger and Ms. Anderson.
Q. Had you ever been involved in passing on or reviewing requests for rent increases at South Pointe?
A. I don't recall. But at the point in time of this August 6, 2001, memo from DSSA, Exhibit Number 15 for Coleman, I was not involved.
Q. And you don't have any recollection of any prior involvement with respect to rent increases for South Pointe either; is that right?
MR. WELLONS: Objection, asked and answered. Go ahead.
THE WITNESS: I do not recall.
BY MR. BAUGHER:





Q. Look please at Coleman Deposition Exhibit 16, which is a letter dated August 20, 2001, from Eric Cooper and Neil Renzi to Scott Samuelson, which is a market rental analysis about the South Pointe property.
Have you ever seen that before?
A. No, I have not.
Q. Are you aware that Samuelson and DSSA submitted a market rental analysis of the real property along with its plan in August of 2001?
A. No, I am not.
Q. Do you have any information about the disposition of the request for rent increase that was made in the summer of 2001 for South Pointe?
A. As I previously indicated, the refinancing -- the whole determination of the rents for the refinancing was handled by Mary Anderson and her staff in the operations division.
Q. And you had no involvement in that that you can remember for South Pointe?
A. No.
MR. WELLONS: Objection. Asked and answered.
THE WITNESS: I do not recall.





MR. BAUGHER: Give me just a minute. I think I'm finished or at least looking for the last exhibit.
BY MR. BAUGHER:
Q. Ms. Coleman, let me show you what was marked yesterday as Thomas Deposition Exhibit 12, the top page of which is a letter from you to John Hays dated December 6, 2000, and it's a letter that we've discussed earlier in the day concerning your amendments to the 2000 housing assistance payment contract.
You're seen that letter before?
A. Yes, I have.
Q. Did you write that letter?
A. I do not see a concurrence page. And I do not know for sure if I wrote the letter or if Ms. Thomas drafted it but I signed it.
Q. Did you read it before you signed it?
A. Yes.
Q. Did Ms. Thomas need to concur with you sending the letter, which is Thomas Deposition Exhibit 12?
A. As previously stated, this occurred quite sometime ago, I cannot say if Gwen actually --

A. Yes.
Q. And did you do that cross out?
A. No.
Q. And then three months is written. Do you see that?
A. Yes.
Q. And the three months that is written there for a renewal is consistent with the December 6 letter that we've just been talking about, correct?
A. I did not annotate this contract.
Q. I didn't ask if you did.
A. Let me finish my statement. Let me finish my statement.
I did not annotate this contract. The project manager, Gwendolyn Thomas, did.
Q. So first she crossed out one year on renewal and wrote three months, right?
MR. WELLONS: Objection, asked and answered, calls for speculation.
THE WITNESS: I cannot speculate on what Ms. Thomas did.
BY MR. BAUGHER:
Q. Well, based on your letter, the way the contract should have been amended would be to cross





out one year and put in three months, right?
MR. WELLONS: Same objection. Also assumes facts not in evidence. Go ahead and answer.
THE WITNESS: I can only speculate. I did not cross this out.
BY MR. BAUGHER:
Q. So you don't know if this was correct or incorrect?
MR. WELLONS: Objection, misstates prior testimony.
THE WITNESS: I cannot speculate.
BY MR. BAUGHER:
Q. And then looking at that same page please, three months is crossed out. Do you see that?
A. Yes, I do.
Q. And that's Ms. Thomas' handwriting?
A. I see the initials GT there.
Q. For Gwen Thomas?
A. Yes, I do.
Q. And you see a date?
A. It's a --
Q. January?
A. 1/10.
Q. '01?





A. Yeah.
MR. WELLONS: Counsel, will allow the witness to finish her answer.
THE WITNESS: The one and the '01 almost look like it could be something else, so I was trying to see.
BY MR. BAUGHER:
Q. And then what is written in is one year; is that right?
A. Yes, that's what's there.
Q. With Ms. Thomas' initials and a date?
A. Yes.
Q. So there was a second amendment then in January of 2001 changing the three months to one year, correct?
MR. WELLONS: Objection, calls for speculation, calls for a legal conclusion. Go ahead and answer.
THE WITNESS: I can only speculate that that's what occurred. Those are not my initials. I did not sign the contract, nor did I cross out that information on the contract.
BY MR. BAUGHER:
Q. But if the contract renewal was amended to





three months and then reamended to one year, then the letter that you sent to Mr. Hays on December 6, 2000, isn't an accurate statement as to how the contract had been amended, correct?
MR. WELLONS: Objection, mischaracterizes prior testimony, assumes facts not in evidence, calls for a legal conclusion. Go ahead and answer.
I also want to point out on the record that the document he's referring to, the letter, is dated December 6, 2000; the annotation counsel is referring to has a date in 2001 next to it.
Go ahead and answer.
THE WITNESS: As I indicated earlier, I did not see the concurrence page for this letter. Therefore, I do not know who prepared the letter. I did sign it. There are amendments annotated on the contract with the initials of GT that I assume to be Gwen Thomas, the project manager. For the record, this contract was amended and amended and amended going forward until approximately December of 2002.
BY MR. BAUGHER:
Q. When you wrote your letter, first page of Thomas Deposition Exhibit 12, did you have a copy of the amended contract with it that you were looking

at?
A. As I previously stated, I did not know who prepared this letter. I signed it. I do not have the concurrence page indicating who the originator of the letter is. I did sign the letter.
Q. My question --
A. The contract was amended by Gwen Thomas.
Q. Did you have the contract in front of you with the proposed amendments or amendment at the time you signed that letter?
A. I do not recall.
Q. Do you recall seeing the contract around the time you were writing this letter?
A. As previously stated, Gwen Thomas detected the error in this contract that was issued. I did not correct, amend the contract, or sign the contract. I did sign the letter.
Q. At the time you signed the letter, did you have in front of you or had you recently seen the 2000 South Pointe HAP contract with its amendments?
MR. WELLONS: Objection, asked and answered. Go ahead and answer the question.
THE WITNESS: As I previously stated, I signed the letter.





BY MR. BAUGHER:
Q. And that's all you had in front of you at the time?
A. I signed this letter. The originator of the letter, I do not recall. Gwen Thomas, the project manager, she found errors in the HAP contract and did the cross out with her initials there. And I'm sure that whatever she put on this particular contract, she consulted Mary Anderson and Ed Hinsberger.
Q. Did she tell you that?
A. Did who tell me that?
Q. Did Gwen Thomas tell you that she consulted either Mary Anderson or Ed Hinsberger about what is attached to your letter?
MR. WELLONS: Objection, asked and answered. We exhausted this topic this morning. Go ahead and answer the question again.
THE WITNESS: Ms. Thomas would not have made that decision on her own.
BY MR. BAUGHER:
Q. Looking at the pages attached to your cover letter, do you know if those pages comprise an accurate and complete copy of the amended or second amended contract for South Pointe on its 2000





renewal?
A. I don't recall. And for the record, I don't recall if, in fact, when I signed the letter, the contract was attached. I don't recall the -- Exhibit 12 dated December 6, 2000, Exhibit 12 of Ms. Thomas dated December 6, 2000, I did sign the letter. I made no amendments to the contract.
BY MR. BAUGHER:
Q. And you can't vouch for the accuracy or the integrity of the pages that follow your letter in Thomas Deposition Exhibit 12; is that right?
MR. WELLONS: Objection, argumentative, asked and answered.
THE WITNESS: I have already responded to your question.
MR. BAUGHER: Read the question back, please.
(Whereupon, the record was read as follows:
Q. And you can't vouch for the accuracy or the integrity of the pages that follow your letter in Thomas Deposition Exhibit 12; is that right?)





MR. WELLONS: Also object to the extent the question calls for a legal conclusion. Go ahead and answer.
THE WITNESS: As previously stated, I signed the letter, Thomas Exhibit 12. I did not sign the contract attached, nor did I annotate the contract with any X-outs and initials.
BY MR. BAUGHER:
Q. You don't know whether the contract that's attached to your letter is actually the final amended correct version of the contract between South Pointe and HUD; is that right?
MR. WELLONS: Objection, calls for a legal conclusion, asked and answered.
THE WITNESS: I don't execute contracts. The contract was annotated by Ms. Thomas. I signed the letter, Thomas Exhibit 12. I did not annotate anything on the contract.
BY MR. BAUGHER:
Q. All right. I'm going to try this one more time.
MR. WELLONS: Objection, argumentative.
BY MR. BAUGHER:
Q. You read and signed and meant to send out

deposition transcript within 30 days or make other arrangements for reading and signing thereof, this deposition transcript may be used as fully as though signed, and the instant certificate will then evidence such failure to read and sign this deposition transcript as the reason for signature being waived.

The undersigned is not interested in the within case, nor of kin or counsel to any of the parties.

Witness my official signature and seal as Notary Public, in and for Cook County, Illinois, on this 25th day of April, A.D., 2005.

Judith T. Lepore, CSR
Notary Public

License No. 084-004040