# EXHIBIT C

Page 98

A Yes.
Q During your tenure as director of DEC in Chicago, approximately how many notices of default do you suppose were sent out?
A Probably dozens.
Q Thirty? Six?
A No, more -- definitely more than six.
Q No, I said 36.
A Oh, 36. I really don't know.
Q Were you involved in all of those default notices in the sense that you were a signatory on them?
A The ones that when I was there, yes, I would have been the signatory.
Q For all default notices that went out?
A During my tenure.
Q Yes.
A Yes.
Q That's what I meant.
A Yes.
Q Is there anyone else at DEC during the time in which you were the director of the Chicago office

Page 99

that would sign default letters or was that one of your responsibilities to be the signatory on such letters?
A It was my responsibility but if I was out of the office, if I left someone acting, they would have signed on my behalf.
Q But assuming you were there --
A Yes.
Q -- you were the person who would sign such notices?
A That's correct.
Q Now, before you signed a default notice, did you have to get any approvals from anyone else at HUD?
A I would obtain -- we would obtain concurrences on them.
Q From whom?
A And including internal to the enforcement center, the analysts, supervisors, legal counsel, Multifamily director.
Q One of the types of documents that was mentioned at the depositions a couple of weeks ago,

Page 100

Ms. Thomas and Ms. Coleman and I guess Ms. Kiening, too, were concurrences.
A Uh-huh.
Q What do those look like?
A Just a blank page and, generally, the person who would be concurring on it provides a place for them to initial.
Q All right. So for a default notice that you would be signing as director of DEC in Chicago, who are the -- or what are the job positions or the names of individuals for whom you would get concurrences?
A The enforcement analyst or it could be a financial analyst but the team leader.
Q Who else?
A Staff attorney.
MR. SAMUELSON: I'm sorry?
THE WITNESS: Staff attorney. Lead attorney.
BY MR. BAUGHER:
Q Is that different than the staff attorney?
A Sometimes. Sometimes the lead attorney was

Page 101

the staff attorney. Sometimes it was a different staff attorney assigned.
Q So, for example, it might be Ms. Baguio and Mr. Gustin --
A That's right.
Q -- or just Mr. Gustin?
A Yes.
Q Who else?
A Early on in the process, defaults would go to headquarters for approval.
Q Who at headquarters?
A It would be the operations director.
Q Mr. Spearman?
A No, Mr. Spearman works in Multifamily Housing. Operations director, Marilyn Edge was the operations director when I was the satellite office director and then it would go to the DEC director until the satellite office directors were delegated authority directly.
Q When did that happen?
A Well, it was after I came --
Q '02?

Case 1:03-cv-02209-MBH Document 84 Filed 02/21/2006 Page 7 of 21



Page 102

A -- to the enforcement center. I'm thinking probably '01. I'm thinking sometime in 2001.
Q Early in the year? Late in the year?
A Gosh.
Q Middle of the year?
A I don't remember. I know it came up after -- we would have quarterly management meetings and it came up after one of those but I don't remember when that was -- when that was delegated where they would no longer have to go to headquarters for physical defaults.
Q The person at headquarters was, during your tenure at DEC in Chicago, Marilyn Edge?
A Was the director of operations.
Q And just so I can -- I have an image of this physically, it would be a piece of paper with a number of -- of names and titles to be either signed or initialed by the people that you mentioned?
A Yes.
Q Along with, presumably, the notice of default itself or a draft of that notice?
A Yes. I don't recall that headquarters

Page 103

initialed off. They went up there for approval but I don't recall that they signed the concurrence pages.
Q How did you know they approved?
A They would usually e-mail, send an e-mail saying it was acceptable and if a report was required to have been done, it would have been signed in headquarters.
Q Now, when you say, "a report," what would be the report?
A A team report.
Q Would there usually be a team report if there was going to be a default notice?
A Yes.
Q And who would draft the team report?
A Enforcement analyst.
Q And then that team report would have its own set of signatures --
A Yes.
Q -- is that right?
A Yes.
Q Now --
MR. BAUGHER: Excuse me.

Page 104

MR. GUSTIN: It is not me.
(Telephone ringing.)
(Discussion off the record.)
BY MR. BAUGHER:
Q Excuse me for the interruption -- well, I'm not responsible for it. It is probably your phone.
MR. SAMUELSON: It could be. I'm so hard of hearing, it might have been.
MR. BAUGHER: Don, it is your phone.
MR. WELLONS: It may be the phone in the conference room in the corner.
MR. BAUGHER: Okay.
BY MR. BAUGHER:
Q Your recollection, Ms. Maisonet, is that into 2001, when there were default notices to be issued, that there would -- that the first main document in that process would be a team report; is that right?
A Yes.
Q And then the team report, assuming it recommended a default notice, would be followed up by the default notice itself?

Page 105

A Yes.
Q That would then have concurrences by the enforcement analyst, the financial analyst, if applicable, the team leader, the staff attorney, the lead attorney, and Marilyn Edge, the director of operations?
A Yes, and the Multifamily director.
Q And where -- where would the team report and later the draft notice with the concurrences be retained? What files would that be kept in?
A Satellite office files and they would maintain copies, I'm sure, in headquarters.
Q Would those documents be imaged?
A Yes, in the field.
Q "In the field" meaning in the Chicago office?
A Yes.
Q Now, on the Multifamily side -- on the Multifamily side, what reports or concurrences would be used with respect to default notices?
A I don't know what each Multifamily office did.

Page 110

DEC first. The recommendation is made by an enforcement analyst at DEC?
A Yes.
Q Who does that recommendation get made to?
A Recommendation is made in the team report and it is made to Multifamily Housing.
Q So they -- is the format, if it comes from DEC, this suggestion that there should be a flag, is the format in which it comes a team report?
A It could be and it could be in the team report, it could also be via e-mail.
Q Okay. And then that goes to whom within DEC for review or approval or concurrence?
A If it is an e-mail, it could be just through the team leader making a recommendation, it could be to the satellite office director.
Q At least one of those two?
A Yes.
Q Do you -- when you were the satellite office director, 2000 to 2002, did you to -- were you asked to sign off or concur in any proposed flags?
A I would sign the team reports if it was

Page 111

incorporated in the team report.
Q Were you other -- if it was in an e-mail that was less formal than a team report, would you be asked to sign off on that?
A Well, I might send the e-mail myself or be asked, yes.
Q And if you -- assuming you weren't the sender in the first place but you were approving or concurring, how would you show that approval or concurrence?
A We might have -- you know, it might even be a discussion with the team leader and have them tell me, "I'm going to recommend a flag for these reasons," and I may have orally concurred and said, "That's fine," and they would send the e-mail or, again, if it is in the team report, I would have denoted my approval by signing it.
Q Okay. And in Multifamily, what was the process there?
A Well, they would have their own, I'm sure, process for whether or not they agreed with it in terms of their chain of command, who it would go to,

Page 112

and then I can only speak for Chicago Multifamily. I know mechanically placing the flag in the system is done by the production side of the house, not the asset management side of the house.
Q Well, all my questions, at least at this point, have to do with Chicago.
A Yes.
Q So in Chicago Multifamily, what would be the chain of command that a recommendation for a flag would go through?
A Well, depends who the recommendation went to. If it went to the project manager, they would route it through their supervisor, whatever -- the chain of command is the supervisor and then the director of project management.
Q And then over to operations.
A Yes.
Q And what was operations supposed to do? Were they supposed to concur on this, as well?
A I don't believe concurrence is required. I believe they would enter it into the system.
Q Before they would enter it into the system,

Page 113

though, they would expect to see approvals or concurrences from project manager, the supervisor, or who -- what was the other person that you mentioned, other title you mentioned? The director --
A Director of project management.
Q So the operations person would expect to see those approvals or concurrences?
A When I was in Multifamily, a memo would go from the director of project management to the director of operations requesting that the flag be placed.
Q And with respect to flags, was there any notification to anyone in Washington, D.C. or at the headquarters office?
A Not to place a flag, no, not to my knowledge, not to place a flag, no.
Q What is the -- what was the process, 2000 to 2002, in the Chicago office for requests for new financing or refinancing that HUD was going to be involved in?
A Do you mean, like, a request for an application?

Page 146

discussion and analysis. I don't remember a new team report being done at the time or -- or some type of memorandum.

BY MR. BAUGHER:

Q Well, you understand I wasn't necessarily -- I didn't mean to limit that to something that formally says, "team report." If there was some other kind of memorandum or even an exchange of e-mails in which the pros and cons of a particular course of action were discussed, you don't recall any of that?

A Probably e-mails. I don't remember any formal memorandums.

Q Do you recall some e-mails in which there were issues that were discussed and perhaps debated in those e-mails or you don't recall those?

A I recall e-mails around the time that we were issued the notice. I don't recall specifically what was in them.

Q Were there any e-mails on that subject that you found when you did your search for documents that you -- e-mails that you sent to Mr. Gustin earlier

Page 147

this year?

A I believe my e-mails were later in the year.

Q You didn't have any e-mails from April 2001?

A No.

Q Had you deleted all your e-mails from April 2001?

A No. I -- when I was in Chicago, I would archive them. Once I went to Washington D.C., I didn't have access to these e-mails anymore.

Q Who drafted the notice of default?

A The notice was drafted with counsel.

Q Well, did you participate in -- did you do any drafting yourself? Did you write any words, word process any portion of a letter?

A I gave input on it. I don't remember if I physically sat down and either on electronically or on a hard copy made comments.

Q So who -- who did the draft of the notice?

A It was drafted by counsel.

Q Drafted by counsel and then sent to you and

Page 148

who else?

A And to Mr. Hinsberger and probably Mrs. Coleman.

Q Anyone else?

A I don't -- I don't know. It may have gone to Mrs. Thomas. I'm not sure. I know definitely it went to Mr. Hinsberger.

Q And then there were revisions made to the document or not?

A I don't remember. May have been. I know I gave input. There may have been revisions requested by Multifamily.

Q The counsel or the attorney who drafted this was Mr. Gustin?

A I -- Mr. Gustin or Mrs. Baguio --

Q Well, which?

A -- I think. One of the two. I want to say Mrs. Baguio.

Q What makes you think that?

A Because she was a primary staff attorney.

Q Okay. Do you recall there being revisions and drafts?

Page 149

A Vaguely.

Q And what was the approval process for the notice of default?

A Concurrence chain?

Q Yes.

A It would have been staff attorney, lead attorney, myself and the hub director.

Q What about Marilyn Edge?

A At this point I believe those notices had been delegated totally to the field and we didn't have to send them to headquarter anymore.

Q What about the general counsel's office in Washington?

A No.

Q There were no Washington approvals sought or obtained for this notice of default?

A I don't believe any were needed.

Q What manuals or references do you have that would tell us when it was that approvals from Washington, Marilyn Edge or the legal counsel's office were no longer required for notices of default?

Page 150

A I know we discussed it in a management meeting and there may have been a follow-up e-mail.

MR. BAUGHER: I would like to see that e-mail or whatever the statement is from Washington that approvals or concurrences were no longer needed from Marilyn Edge or others at DEC or from the general counsel's office in Washington.

MR. WELLONS: To clarify the record, the witness testified that such an e-mail may exist. We will certainly take the request under advisement.

MR. BAUGHER: I would also like to see the concurrence pages for the various people mentioned. We have no such concurrence documents in any of the records produced to us to date for this or many other points but including the default notice.

MR. SAMUELSON: Did I miss an answer? Did you say something?

MR. WELLONS: We will take it under advisement certainly and we would appreciate a written request, if we could have a formal request to identify the requested documents.

BY MR. BAUGHER:

Page 151

Q Do you know if there were any draft default notices that were prepared before April of 2001?

A I don't know.

Q Did you see any drafts before -- that were dated before April 2001?

A I don't recall seeing any for this property, no.

Q Do you know if Ms. Thomas drafted a default notice?

A I don't know.

Q Let me show you what is marked as Thomas Deposition Exhibit 18 and ask you if you have seen that document before.

(Witness reviewed the document.)

BY MR. BAUGHER:

Q Have you seen this before?

A I don't remember seeing it.

Q Does it look at all familiar?

A No.

Q Do you see that at the bottom of the second page of Thomas Deposition Exhibit 2 it says, "Draft GT 3/15/01"; do you see that?

Page 152

A Yes.

Q Does that tell us who was the author of this document?

A It looks like it was Gwen Thomas.

Q Did you have -- you see at the top it says, "Wasn't mailed," at the top on page 1?

A Yes.

Q Do you know whose handwriting that is?

A No.

Q Did Mr. Hinsberger or Ms. Coleman or others tell you that -- that they had already started to work on a default notice?

A They may have. I just don't remember.

Q Do you know if the inspection report that you referred to, the HUD inspection report, REAC report, had been conducted and delivered to HUD by March 15th, 2001?

A I believe the inspection date was around March 8th. I don't know when it was delivered.

Q That's why I was asking you about the delivery. Do you know if Ms. Thomas or others had received that inspection report by March 15th?

Page 153

A They may have.

Q As of March 15th, do you know if the owner had responded to any inspection report?

A To the March 2001 inspection report?

Q Yes.

A I thought they had certified to exigent health and safety items being repaired around that time frame or maybe just before.

Q Now, had you seen -- well, at the time in which you were considering whether or not a notice of default should be issued to or for South Pointe, had you seen correspondence concerning exigent health and safety conditions?

A Yes.

Q What had you seen?

A The -- I don't remember who exactly it was from but certifying that the repair -- the exigent health and safety items had been corrected.

Q All right. Did you see anything else on exigent health and safety items?

A Prior to the notice being issued?

Q Yes.

Page 206

work, that if the property were being maintained, I sincerely doubt it would have been as extensive as what you just showed me so I know from all of that that the property, in addition to the March 2001 inspection, that the property was not being maintained.

BY MR. BAUGHER:

Q Was there subsequently, subsequent to this default notice, a meeting with Hayes and various other people that you referred to before?

A Yes.

Q And what was said at that meeting?

A HUD was very concerned with the condition of the property, the tenants, the -- the lack of progress in getting in a complete loan application.

Q Was anything stated about the condition of the property other than items mentioned in your default notice, Thomas Deposition Exhibit 19?

A I don't remember.

Q What else was said at that meeting, anything?

A Discussion about vouchers being secured,

Page 207

possibly being secured, for the residents and that -- that if the units later passed inspection, that the residents could use vouchers there.

Q What else?

A I recall that Multifamily Housing, because of the length of time, probably, I think, it was close to two years in getting an acceptable loan application, that in order to -- to ensure a new loan, that Multifamily wanted a new owner and agent or at least a general partner.

Q Well, in fact, wasn't that the thrust of the meeting, that no matter what the current owner pays and the PM Group did, it wasn't going to be sufficient, that HUD wanted a new owner on the property?

A Well, definitely a new management agent is a condition for the loan and I know that we talked about a new owner, as well, but I don't recall if -- if the loan hinged directly on both of those entities being replaced.

Q Now, I -- I showed you the letter, default letter, as it actually went out to the South Pointe

Page 208

owner. There isn't attached to any copy that we have of this letter any concurrence pages or anything else that shows approvals, whether internally at HUD in Chicago or in Washington. Do you know if any approvals with written concurrence pages, in fact, were obtained?

A I would have to guess that it would have gone through the staff attorney, the lead attorney, prior to Mr. Hinsberger and myself signing the notice.

Q Was this fast-tracked because you were especially anxious to get this out?

A Well, we were very concerned with the condition of the property. Since 1999 it had continued to decline.

MR. WELLONS: Ms. Maisonet, I believe the question was was this fast-tracked.

THE WITNESS: Yes, from the time that, yes, we met.

BY MR. BAUGHER:

Q The meeting that you were describing took place in approximately April 13th?

Page 209

A Roughly.

Q Let me show you what was marked as Coleman Deposition Exhibit 13. Have you seen Ms. Coleman's letter to John Hayes dated May 15th before?

A Yes.

Q When did you first see it?

A I don't recall if I saw it in 2001. I did see it this week.

Q Do you think you saw it for the first time this week?

A I don't recall if I saw it in '01. I may have -- I may have seen it back in 2001. I'm just not positive.

Q Well, was Ms. Coleman authorized to send out a letter of this sort, Coleman Deposition Exhibit 13?

MR. WELLONS: Objection; vague. Go ahead and answer.

THE WITNESS: I have no reason to believe she wasn't.

BY MR. BAUGHER:

Q She says -- well, did she send a copy of

Page 254

answer that question.
BY MR. BAUGHER:
Q Do you know who asked Mr. Gustin to draft it?
A I think I know.
Q Do you know if the draft that Mr. Gustin prepared was also sent to counsel for South Pointe?
A I don't know.
Q Would the concurrence sheets on the original default letter, April 2001, continuing default, May 2001, and abatement and termination letter of November 2001 show who the drafter of those letters was, whether it was Mr. Gustin or other attorneys in his office?
A Typically, the originator is the first person in line for the concurrence -- in the concurrence chain.
MR. BAUGHER: Well, I have asked for concurrences with respect to a number of letters and I want to make sure that we get copies of whatever concurrences exist with respect to the three, default, continuing default and abatement and

Page 255

termination letters, please.
MR. WELLONS: That request is taken under advisement.
BY MR. BAUGHER:
Q Have you since -- since coming to DEC in 2000, been part of any of the review process on requests for rental increases or special energy reimbursement or other costs for properties?
A I would not review those at all. Those are considered servicing type functions.
Q That are over in Multifamily?
A That's correct.
Q And, in fact, in the operations side of Multifamily?
A Project management side of Multifamily.
Q Okay. So you didn't have anything to do with any of the South Pointe requests for rental increases or other reimbursements; is that right?
A That's correct.
Q And you don't have any special knowledge of that process and how those decisions are made?
MR. WELLONS: Objection; vague. Go ahead

Page 256

and answer.
THE WITNESS: Okay. I understand the process for submitting a rent increase request and review process and approval chains, yes.
BY MR. BAUGHER:
Q What do you know about the special reimbursement program there was for the spike in energy costs in the Chicago Area in, I think it was late '02, early '03?
MR. SAMUELSON: No, '00, '01.
BY MR. BAUGHER:
Q Well, or late 2000 and early 2001?
A That one I'm even least familiar with. I'm more familiar with routine special claims. That special claims for the spike in utility increases happened when I was already in the enforcement center. The only thing I recall about that was that there was a very short window for submitting a claim.
Q How are routine special claims taken care of?
A Submitted to the Multifamily project manager along with supporting documentation and

Page 257

that's reviewed to make sure that the submission is complete and that adequate documentation is submitted. If it is, then the special claim could be approved. What I am not clear on is in terms of the communication then, whether it comes from project management or operations to HUD's -- the accounting center that -- that handles the actual payments. So, you know, if an owner is approved for an additional amount of money exceeding a threshold, and I don't know what the threshold was, that the system doesn't automatically flag it.
Q As of the new Bush Administration coming into office in March of 2001, was there a policy shift at HUD moving away from project based subsidies to market support of low income tenants through voucher programs?
MR. WELLONS: Objection; vague. Go ahead and answer.
THE WITNESS: I don't recall any specific push to move from -- from project based to tenant based.
BY MR. BAUGHER:

# EXHIBIT D

H

# DRAFT TEAM REPORT

| | |
|---|---|
| PROJECT NAME: | South Pointe Towers a.k.a., Englewood Terrace Apts. |
| LOCATION: | Chicago, Illinois |
| REMS Number: | 800040489 |
| FHA Number: | N/A |
| HAP Contract Number: | IL06-E000-034 |

## Ownership/Management History:

South Pointe Towers a.k.a. Englewood Apartments, is an uninsured property located at 6425 S. Lowe Avenue in the City of Chicago, State of Illinois 60621. The partnership for this property was formed as a limited partnership under the laws of the State of Michigan on September 01, 1989 for the purpose of acquiring an interest in real property located in Chicago, Illinois and operating as apartment complex under the Section 8 of the National Housing Act. Business activity of the project began ion 04/01/90. The project consists of 303 units and currently operates under its new name South Pointe Towers. When PM One purchased the property in 1990 it was a distressed property, with numerous building code violations and apparently ridden with gang, drug and criminal activity. Knowing the needs of the building PM One worked with management and owners to complete a moderate rehabilitation of the property and improve the resident profile. The cost for the partnership to rehabilitate the property in April 1990 was $8,303,937. The rehab work was finished in May 1993 all 303 units had been remodeled and all building code violations cured and was finally 100% occupied. $5,000,000 of the funds for the rehabilitation cost were obtained through an adjustable rate mortgage loan from the Community Investment Corporation of Chicago. Another $5,000,000 was received from contribution of capital from Chevron USA Inc. They are 99% limited partners. This will be done in eight installments of $625,000. As of June 1999 seven installments will have been made totaling $4,375,000 The last installment will be given in June 2000.

The property is eligible for low income credits totaling $872,693 per year under Section 42 of the Internal Revenue Code. The credit period is ten years that began in 1993 and ends in 2003. Income and loss of income are allocated between the general partner and the limited partner (1% to the general partner and 99% to the limited partners). AFS is not required for this property because it is non-insured. Building types consist of townhouse and high-rise/elevator.

General Partner owns maintenance and management company that provides services for the property. General Partner is PM One, Ltd. President Robert Pendergast. He is also one of the limited partners. Chevron USA is the other limited partner. There is a total of 303 units.

1 bedrooms - 60

2 bedrooms - 157

3 bedrooms - 86

The initial original contract term of the Section 8 HAP was 09/22/82 originally it was for a 15 year term, which expired 10/21/97. It was renewed three times in increments of one year. Maximum Annual Contract Commitment is $2,394,000..

This project was previously foreclosed on in 1981. In 1982 Englewood Terrace Apartments a limited partnership secured this property under a purchase money mortgage in a property disposition sale. The effective date of their contract was September 22, 1982, as of this date the contract authority was $1,244,448.00 and budget authority was $18,666,720.00. At this time, purchase, use, and contract management plans, were put in place at the time of purchase by Englewood Terrace Apartments.

Owner and management agent signed a Certification as to the Purchasing Practices and Reasonableness of Expenses but in reviewing high cost items recorded for maintenance and administrative expense per unit month cost is escalated. The certification was signed January 16, 1996. In recent years there were several tenant complaints as to the management agent secured for this project. The building is a 100% Section 8 assisted property. The building also received Special Rent increase for purchase of crime prevention items and services. Special claims were submitted to HUD for payment. Several of the claims were rejected by the HUB Project manager for not being legitimate claims. With relentless efforts by the owners, management and others the pace of the property destruction is moving faster than our attempts to control and improve them. . Daily schedules are roller coasted depending on what happens in the evening. In October 1993 this project was awarded a Drug Elimination Grant from HUD for Drug Elimination, Prevention and Education. This area still has a prevalent problem with vandalism, crime and drugs. Move outs occur on a regular basis. There is also a very serious problem with rodents (rats) in the areas that get into the building because the property is in need of serious external major repairs.

**Physical Maintenance:**

The physical conditions of South Pointe Towers a.k.a. Englewood Terrace Apartments are in unsatisfactory condition. Between 1994 and the present time many inspections were completed. The results are cited as:

1) 1994 - Inspections completed by Thomas Hickey & Associates.

Many of the units did not pass HQS inspection. Items identified as in need of major repair work were: a) sign of gang activity (graffiti), b) trashed stairwells, c) roof in need of repair, d) extermination needed, e) bathrooms - plumbing problems, f) windows, g) doors, h) door locks.. Rating unsatisfactory

1) 1995 - Inspection revealed the property was in need of major repairs. Exterior areas were not inspected. Interior - Unsatisfactory

Property Improvements proposed: a) replace roof curb, b) handrails, c) fire hoses in cabinets, d)replace deadbolts, e)repair trash chutes, f) extermination, and g) repair boiler.

2) 1996 - Unit Inspections conducted by management many apartments left abandoned and tenants moved out without notice or because of dissatisfaction of property up keep. A No trespassing order was done through the Cook County Court System.

3) 1997 - Units Re-Inspected by Leroy Fishleigh (HUD staff) Overall ratinn Below Average (Physical Condition)

Maintenance Policies and Practices - Below Average a) Floors and hallways were found to be dirty, littered and stairwells were in same condition of disarray. b) air handler needs repair, c) boiler room needs cleaning/maintenance d) repair fire extinguisher cases and install missing extinguishers.

The owner/management agent prepared a MIO Plan 3/97.

The property is in need of an 100% comprehensive HQS inspection and environmental review. In addition a revised complete MIO Plan should be completed after inspection addressing all deficiencies/repairs needed.

## Financial Management

The financial condition of South Pointe Towers is poor. The limited partner does not have the money needed for all the necessary major repairs. It is possible that the general partners do, along with one of the limited partners Chevron USA. In 1994 the project received a Special Rent Increase Adjustment for the purpose of securing tax consulting services. In 1993 project received a Drug Elimination grant for the purpose of Drug Elimination, Prevention and Education, and to assist them in decreasing the amount of criminal activity, and gang and drug traffic in and around the property. Special Claims also submitted for 76 tenants. Nine out of 76 of the claims were denied. These claims were substantiated by the owner.

In 1995 the property's budget reflected that the expenses did not exceed the income. Most of the income received was paid out and reported as property expenses. The budget also reflects that reserve funds are low. A new security system was installed. The owner/management agent asked HUD for a Special rent increase in subsidy to cover this cost. The amount received was $52.00 per unit 303 x $52.00 = $15,756

The building in this year was 97% occupied and the security cost for the building increased.

In 1996 the property's expenses exceeded its income, at the end of the year the project had a deficit. Total of non-operating expenses for this year =$54,759.00 This is money that was disbursed for other reasons than property maintenance and administration.

In this year the property received yet another special rent increase for Crime Prevention Activities in the amount of $200,570.

Payment plans were made with delinquent tenants but the plans were not reasonable, because they were over 50% of their income.

The property has 4 (four) outstanding mortgage and/or collateral loans.

1st Mortgage $59,116 x 12 = $709,392

2nd Mortgage $4500 x 12 = $54,000

Old Kent bank check collateral $750,000

Note Due PM One due 1/1/96 $1,437,900

**Page 782**

Loan made to replace elevators CNP Trust $16,380.

Collateral came from partnerships of individuals who put up money for various loans..

The property had accumulated some CD's. They had to be cashed in, to pay for non-payment of loans to MI National Bank. The CD's were worth $190,773 and $28,287. Only the CD for $190,773 is secured by the project.

In 1997 collection service activity was made active on a number of tenants' accounts. They were deemed as not collectible. Individuals moved leaving no forwarding address or notifying the management.

An increase in tenant transfers has occured almost every month, this contributed to the large turn over of tenants moving in and out which effected the income of the property.

The property was given a rent adjustment for non-drug related crime activity. Again special claims were submitted to HUD for payment and were denied by HUD Representative Thelma Delarosa on 08/20/97.

In June 1998, the property received a rent increase of 5%, this amount totaled $2,681,268. In reviewing the budget for this project the financial position of the property is not good. Partners within the company continue to lend the project money to repair critical items. The expenses exceeded income in this year, the property was left in a deficit position.

A short term loan is payable to Capitol National Bank that is due, December 30, 1998, with interest at 7.3%. A Capital Bank CD is pledged as collateral. Face value is $33,000. Note balance is $33,000. Also a long term debt is owed to Community Investment Corporation, the monthly payments are $57,785 (principal + interest) based upon 132 (11) years that began in 1993 - 2003. The property is pledged as collateral. The mortgage note balance is $3,466,667.

A promissory note is payable to Michigan National Bank in the amount of $5,000 with the note balance being $1,010,324. The note payable by the partnership in the amount of $119,000 was paid to the P.M. Group, Inc. (the general Partner), on June 10, 1997. During 1997, the partnership incurred $9,206 in interest on this and other notes that were paid off during 1997. Notes are also payable by the Partnership to CMP Trust (a Michigan trust) owned by the spouse of a significant shareholder of the PM Group Inc., in the amount of $63,348. In addition the partnership owes the PM Group, Inc. $295,035 in cash advances also paid Palco, Inc., for paint and painting services and $5,290 to PM One LTD for credit applications and other fees. The stockholders of the PM Group have direct and indirect stockholder interests in Palco, Inc. and PM One Ltd. Also the partnership owes the PM One Group Ltd., (the general Partner), a development fee totaling $1,454,000 for its services in supervising the project in 1993 while under moderate rehab..

Compensation of Partners Audits from 94,95, and 96 reveal that there is no compensation of partners. This is not true because they have some identity of interest companies conducting work for South Pointe Towers. The general partner is acting as a loan agent for the limited partner. Chevron USA is a major gas/oil company.

A large amount of the property's fiscal funds are going to PM One Group (General Partner). The project's security deposits are being used as collateral for a short term loan. Since 1994. Management regularly states every year that it intends to change the collateralization of security deposits as soon as acceptable alternate collateral is available.

## Environmental

The only cited problem here in this section is the continuation of the problem with rats entering the building. There is rodent infestation throughout the building and community area. 09/11/98 the HUB Office reported to us that a resident in apt 1212 (reported that rats were crawling over children) building infested with rats. She also received other calls.

## Management

The general partners for South Pointe Towers are:

- David Halasz, PM Equities, Inc.
- Robert Pendergast of PM Equities, Inc.
- Limited partners are Kellie Seman, Financial Manager PM One LTD,
- Daniel D. Armistead - Stockholder 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
- Michael G. McGhie - Officer/Stockholder 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, PM One Ltd. , Manager

Page 783

## Project File Deficiencies

The project should have a 100% comprehensive inspection. An Environmental Review for the rodent manifestation problems should be completed. (What can be done to secure safety for residents. Were residents were interviewed about this problem? Was Management staff interviewed?

Still awaiting a REAC inspection and visit from Pinnacle (contractor).

Work with community builders and public housing closely on this case.

In case of relocation issues!

Full scale fiscal audit.

## Visitation Reports

. Enforcement Center visited the site in April 1999. We found that the property was in very bad and severe physical conditions. We are going to recommend abatement of Section Units. There were serious health hazards present. A recent REAC inspection was performed that confirmed the conditions, but we feel the score should have been lower than what it was scored by REAC.

## Project Photos

Project photos were taken on the site visit in April 1999.

Part of the administrative file. The pictures affirm the severe physical condition complaints made by residents. This is also a very high crime and drug area and building.

## Additional Contractor Services Needed

Environmental Review needed

Safety Assessment and Analysis

Complete fiscal audit

Structural Analysis

## Problem Statement - Incl. Add HUD Resources Needed



STATEMENT OF PROBLEM

*Physical condition: The owners, general partners, and/or limited partners have not maintained the property in good repair and condition as required by the Section 8 HAP contract. Additionally, for 4 years straight in all inspections the property has received a rating of below average, and unsatisfactory for not passing*

*housing quality standards inspections. This trend has continued despite tremendous rent increases, special claims and special rent increases given for major repairs and/or reasons of safety for residents.*

*Additionally, the project is a safety and sanitary hazard because of the problem the tenants are having with rat infestation.*

*Books and Records The owners have repeatedly used project finances to pay second, third etc.., mortgages on property as well as pay unreasonable expenses on budget line items such as: maintenance, administrative and other personnel services for employees employed by the general partners.*

*Additional HUD resources would be to conduct a full management review including inspections besides REAC.*

It is recommended to the Director of the Satellite Chicago Enforcement Center that this property/project be accepted in the Enforcement Center for further review and possible sanctions.

---

PREPARED BY:

Freddie Batchelor, Enforcement Analyst:______________________________ Date: ________

---

NCURRENCES:

Joan M. Kiening, Team Leader:______________________________ Date: ________

Gregory Gustin, Satellite Attorney:______________________________ Date: ________

Gwen Thomas, Chicago MF Project Managerr:______________________________ Date: ________

---

APPROVALS:

James P. Zale, Satellite Office Director:______________________________ Date: ________

---

# EXHIBIT E

U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

DEPARTMENTAL ENFORCEMENT CENTER
Chicago Satellite Office
77 W. Jackson Blvd., Suite 2207
Chicago, Illinois 60604-3507

Tel. (312)353-5895 Fax (312)886-1405

INTERNAL DOCUMENT ONLY

# FINAL ACTION PLAN

## South Ppointe Towers - Chicago, Illinois

## REMS #800040489 - PROJECT # 071-55028 Section 8# IL06E000034

EC Analyst: Ms. Freddie C. Batchelor
EC Team Leader: Joan Kiening
EC Attorney: Maria Baguio
Cooper
EC Satellite Director: James Zale

Project Manager: Gwendolyn Thomas
MF HUB Director: Ed Hinsberger
________Community Builder: Loraine

Date Action Plan approved:

Action Plan meeting dates: ~~March,~~ 1999 (meeting held with Site Manager in HUD Office)
April 15 - 16, 1999 (site visit completed by analyst, team leader & attorney)
May, 1999 (analyst talked with CB regarding property)
June 11, 1999 (internal meeting held)

PROBLEM STATEMENT

South Pointe Towers is a 303 unit, non-insured multifamily development, that is currently owned by PM One Equities. Robert Pendagrast is the General Partner. ~~Southpoint Towers is a 303 - unit non-insured multifamily development that is currently owned by PM One Equities, Robert Pendagrast is the General Partner.~~ This property's fiscal accounting is budget based. It currently has a HAP contract that expires in 9-30-99. The REAC inspection was completed April 29, 1999. The Chicago Enforcement Center conducted their initial site visit a few days before the REAC inspection. Our site visit concluded that the property should have had a lower score than it actually received. It received a score of 42b*.

The building has an infestation of roaches and rats. There are leaking pipes throughout the building. ~~Throughout the building are leaking pipes.~~ The elevators are all non-operable. Using the elevators are the only way residents enter and exit their apartments. ~~The elevators are all non-operable, this is the only way residents exit out and in the building to get access to their apartments.~~ The common areas of this property were very severe. The mail boxes and fire extinguishers in the building were all damaged and some missing. There are also visible signs of moisture, mold and flaking. ~~There is also visible signs of moisture, mold and flaking.~~ There is graffiti all over the building and no lights in the hallways. This building is also a high drug and crime property.

There have been many people harmed due to guns, gangs and drugs. ~~There has been many persons harmed due to guns, gangs and drugs.~~ The City of Chicago Violent Crimes Division was contacted and this property has been referred to them by our Enforcement Center Office. ~~The City of Chicago Violent Crimes Division was contacted and this property was referred to them by our Enforcement Center Office.~~ They agreed to assign a team to this building. The population in this building is predominantly all African-Americans. Since the Enforcement Center's on-site review and the REAC inspection, our office received a letter from PM 1 (One). This letter indicates that they would like to be pro-active in correcting all deficiencies noted by the EC and REAC. ~~Since the~~

~~Enforcement Center's on-site review and the REAC inspection our office received a letter from PM-1 (One) stating they would like to be pro-active in correcting all deficiencies noted by the EC and REAC.~~ It is the EC's position that if this is what is desired, an escrow account should be set up earmarking the money for all identified repairs necessary and needed.~~It is the EC's position that if indeed this is what is desired is an escrow account should be set up ear marking the money for all identified repairs necessary and needed.~~ If this is not adhered to, we will go on with abatement of all Section 8 units.~~If this is not adhered too then we will proceed with abatement of all section 8 units.~~ The building has deteriorated due to lack of regular and routine maintenance. These are serious Regulatory and HAP violations.~~There are serious Regulatory and HAP violations.~~ A Comprehensive Needs Assessment (CNA) is needed for this property.~~A comprehensive needs assessment is also needed for this property.~~ b

After careful review of all the circumstances surrounding this property it is recommended that we proceed with the following actions after the 30 day cure period and upon non-compliance:

a) Abatement of Section 8 units, and~~abatement of section 8 units, and~~
b) possible sanctions for false claims of section 8 subsidy.

REAC SCORE: 42b*
\# UNITS: 303
SECTION 8 UNITS: 303

*SECTION I*

| *ACTION ITEM* | *RESPONSIBLE ENTITY* | *TARGET COMPLETION DATE* |
|---|---|---|
| *DEC COMPLIANCE LETTER* | | |
| 1. Issue Notice of Violation of Regulatory Agreement & HAP contract. Letter should identify specific issues of non-compliance. Letter should have what the owner's prescribed actions are, who is responsible for what and specified time frames. (30 day cure) | MF HUB Project Manager (Bonnie Gee) | August 30, 1999 |
| a. Prepare Documents | EC Analyst (Ms. Freddie C. Batchelor) | September 30, 1999 |
| b. EC SOD Signature | EC SOD Dir. (Jim Zale) | |
| c. HUB Director signature | MF HUB Dir. (Preston Pace) | |

*(If owner does not comply, skip Section 2, and go to Section 3)*

## *SECTION 2*

***COMPLIANCE BY OWNER NEXT ACTIONS:***

1. Ensure that the owner provides required escrows to correct physical problems. ~~escrow's to correct physical problems.~~ EC Team Leader November 30, 1999

Joan Kiening

2. Monitor owner's progress in completing the necessary corrective actions.

| | | |
|---|---|---|
| b. monitor repairs against timeframes outlined in plan. | PM/EC Analyst | November 30, 1999 |
| c. report on owner's compliance | PM/EC Analyst | November 30, 1999 |
| 3. Owner to provide monthly update reports | Owner | August 30, 1999 |
| 4. Return project to HUB | EC Analyst | October 30, 1999 |
| 5. If owner fails to comply with the agreement by critical dates - property returned to the EC for re-negotiation or sanction. | MF HUB Dir.<br>EC Analyst | November 30, 1999<br>November 30, 1999 |

## *SECTION 3*

***NON-COMPLIANCE BY OWNER OR OWNER'S ALTERNATE PLAN DOESN'T MEET OUR SATISFACTION NEXT STEPS:***

1. Issue Declaration of Default of Regulatory Agreement & HAP contract. ~~(Agreement & HAP contract.~~ (Notice of Default Letter)

| | | |
|---|---|---|
| a. Prepare Documents | EC Analyst | November 30, 1999 |
| b. EC SOD Signature | EC SOD Dir. | November 30, 1999 |
| c. HUB Director signature | MF HUB Dir. | November 30, 1999 |
| 2. Request REAC/Pinnacle to verify whether the deficiencies in the project were corrected during the cure period of the notice of declaration default period" | EC Analyst/GTM/GTR | October 30, 1999 |
| 3. Meeting with Multifamily HUB Director and CB's of forthcoming actions (owner Non-compliance forces enforcement actions. ~~noncompliance forces enforcement actions,~~ possible relocation and pursue foreclosure). | EC Team Leader | September 30, 1999 |

4. Request Headquarters Multifamily Housing to abate Section 8 units. ~~to abatement section 8 units.~~

| | | |
|---|---|---|
| a. Prepare Documents | EC Analyst | October 30, 1999 |

| | | |
|---|---|---|
| b. EC SOD Signature | EC SOD Dir. | October 30, 1999 |
| c. HUB Director signature | MF HUB Dir. | October 30, 1999 |
| 5. Resident meeting, discussion of intention to abate/re-direct/suspend Section 8 assistance and resident's responsibilities. Include discussion of relocation if applicable. | | |
| a. Coordinate & set up meeting (include MF) | CB/HUB Dir. | September 30, 1999 |
| 6. Notify Section 8 Processing Center to abate/ redirect/suspend Section 8 assistance. | | |
| a. Prepare Documents | MF HUB | November 30, 1999 |
| b. EC SOD Signature | EC SOD Dir. | November 30, 1999 |
| c. HUB Director signature | MF HUB Dir. | November 30, 1999 |
| 7. EC to determine whether any additional administrative actions are appropriate. 2530's, limited denial of participation and debarment (NOTE: This should be the last step in ALL follow-up actions) | EC Team | October 30, 1999 |

*Section 4*

*Critical Dates for Owners to respond or submit materials to HUD*

1. 30 day cure period is up — September 30, 1999
2. Agreement to set-up escrow accounts for all physical repairs — November 30, 1999
3. Owner~~Owners~~ provides monthly updates beginning — August 30, 1999

Concurrence:

________________________________

**Ms. Freddie C. Batchelor, Enforcement Center Analyst, Departmental Enforcement Center Chicago Satellite Office**

________________________________

**Ms. Joan Kiening, Team Leader, Departmental Enforcement Center, Chicago Satellite Office**

________________________________

**Ms. Maria Baguio, Attorney, Departmental Enforcement Center, Chicago Satellite Office**

Mr. Gregory Gustin, Lead Attorney, Departmental Enforcement Center, Chicago Satellite Office

Ms. Gwendolyn Thomas, Project Manager, Cincinnati MF. HUB

~~Ms. Loraine Cooper, Senior Community Builder, Cincinnati Office~~

Approval:

Mr. James P. Zale, Director, Departmental Enforcement Center, Chicago Satellite Office

Mr. Edward Hinsberger, Director Chicago Multifamily HUB

Mr. Edward Kraus, Director Departmental Enforcement Center