**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **ENGLEWOOD TERRACE LIMITED PARTNERSHIP,** | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **No. 03-2209C** |
| | ) | **(Judge Marian Blank Horn)** |
| **THE UNITED STATES,** | ) | |
| **Defendant.** | ) | |

**JOINT STIPULATIONS OF FACT**

Pursuant to the Court's August 23, 2006 order, defendant, the United States, and plaintiff, Englewood Terrace Limited Partnership ("Englewood"), respectfully submit the following stipulations so fact.

## I. DEFINITIONS

1. "Englewood" refers to plaintiff, Englewood Terrace Limited Partnership, a limited partnership organized pursuant to Michigan law and the sole beneficiary of a land trust that owns South Pointe Towers. [Compl. 1, 17 (JE 3, p. 30 at 34).][1]

2. "South Pointe" refers to South Pointe Towers, a 23-story, 303-unit apartment building located at 6425 South Lowe in Chicago, Illinois. [Compl. 1, 17 (JE 3, p. 30 at 34).]

3. "DSSA" refers to DSSA New Englewood Terrace LLC, a sole proprietorship of Don S. Samuelson. DSSA replaced P.M. Group as Englewood's general partner in December 2002. [Samuelson Submission dated August 21, 2001 at 1 (JE 104, p. 1120), Samuelson Deposition Transcript ("Samuelson Tr.") at 68-70 (JE 14, p. 587).]

---

[1] We have included reference to tab and page numbers of the parties joint exhibit list, which will be referred to as "JE __, p. __."

4. "DSSA Management" refers to a company affiliated with DSSA. DSSA Management replaced P.M. One as South Pointe's managing agent in December 2001. [Samuelson Tr. at 93 (JE 14, p. 570 at 593).]

5. "P.M. Group" refers to Englewood's general partner during the period relevant to this dispute and until December 2002. [Samuelson Tr. at 70 (JE 14, p. 570 at 587).]

6. "P.M. One" refers to a company affiliated with P.M. Group. P.M. One served as the managing agent for South Pointe during the period relevant to this dispute until December 2001. [Samuelson Tr. at 93 (JE 14, p. 570 at 593); Taft, Stettinus Letter dated February 6, 2003 at 1, 4 (JE 133, p. 1259 at 1262); P.M. One Letter dated September 26, 2002 at 1 (JE 132, p. 1257).]

7. "1998 HAP Contract" refers to the Housing Assistance Payments Contract executed by HUD and Englewood that covered the period from October 1, 1998 through September 30, 1999. [1998 HAP Contract at 1 (JE 19, p. 677).]

8. "1999 HAP Renewal Contract" refers to the first one-year renewal to the 1998 HAP Contract that covered the period from October 1, 1999 through September 30, 2000. [1999 HAP Renewal Contract (JE 20, p. 691).]

9. "October 2000 HAP Renewal Contract" refers to the second renewal of the 1998 HAP Contract. [2000 HAP Renewal Contract (JE 21, p. 696).] The 2000 HAP Renewal Contract stated that the "Contract shall run an initial 1 Year period" and that, "[a]fter expiration of the initial term, this Contract shall renew automatically for 3 additional one-year terms, subject to the availability of appropriations in any year." [2000 HAP Renewal Contract at 1 (JE 21, p. 696).]

10. "2001 90-Day HAP Renewal Contract" refers to the 90-day renewal contract from October 1, 2001 through December 31, 2001. [2001 90-Day HAP Renewal Contract (JE 24, p. 719).]

11. "180-Day HAP Renewal Contract" refers to the 180-day renewal contract from JEnuary 1, 2002 through June 30, 2002. [180-Day HAP Renewal Contract (JE 25, p. 737).]

12. "2002 90-Day HAP Renewal Contract" refers to the short-term renewal contract from July 1, 2002 through September 30, 2002. [2002 90-Day HAP Renewal Contract (JE 26, p. 746).]

13. "REAC" refers to HUD's Real Estate Assessment Center, which conducted inspections at South Pointe on April 28, 1999 and March 2, 2001. [REAC Report dated April 28, 1999 at 1 (JE 27, p. 760); REAC Report dated March 8, 2001 at 1 (JE 28, p. 767).]

## II. <u>THE HOUSING ASSISTANCE PAYMENT ("HAP") CONTRACTS</u>

### A. <u>The 1998 HAP Contract - October 1, 1998 to September 30, 1999</u>

14. In 1998, in response to the shortage of affordable housing for the low income residents of Chicago's Englewood community, Englewood and the United States Department of Housing and Urban Development ("HUD") executed a Housing Assistance Payment Contract (the "1998 HAP Contract") pursuant to the United States Housing Act of 1937, 4 U.S.C. § 1437. [1998 HAP Contract at 1 (JE 19, p. 677).] The 1998 HAP Contract stated that its purpose was "to make housing assistance payments on behalf of families for the contract units; to enable the families to lease decent, safe, and sanitary housing pursuant to Section 8 of the Act." [1998 HAP Contract at 1 (JE 19, p. 677).]

15. The term of the 1998 HAP Contract was for one year beginning on October 1, 1998 and continuing through September 30, 1999. [1998 HAP Contract at 1 (JE 19, p. 677).]

16. Paragraph 6 of the 1998 HAP Contract stated that Englewood was "to maintain and operate the Contract Units, unassisted units, if any, and related facilities to provide decent, safe, and sanitary housing including the provision of all the services, maintenance and utilities." [1998 HAP Contract at 3 (JE 19, p. 677 at 679).] The 1998 HAP Contract also stated that HUD "shall inspect or cause to be inspected at such times as may be necessary to ensure that the Owner is meeting its obligations to maintain the units in decent, safe, and sanitary condition including the provision of the agreed-upon utilities and other services." [1998 HAP Contract at 4 (JE 19, p. 677 at 680).]

17. Paragraph 20(b)(1)(i) of the 1998 HAP Contract defined an event of default: "A default by the Owner under this Contract shall result if . . . Owner has violated or failed to comply with any provision of, or obligation under, this Contract or of any Lease, including failure to correct any deficiencies identified by HUD in connection with any inspection." [1998 HAP Contract at 11 (JE 19, p. 677 at 687).]

18. Paragraph 20(b)(2) of the 1998 HAP Contract provided: "Upon a determination that an event of default has occurred HUD shall notify Englewood of (i) The nature of the default; (ii) The actions required to be taken and the remedies to be applied on account of the default (including actions by the Owner to cure the default); and (iii) The time within which the Owner shall respond with a showing that all the required actions have been taken." [1998 HAP Contract at 11 (JE 19, p. 677 at 687).]

19. Paragraph 20(b)(2) of the 1998 HAP Contract further provided that if Englewood "fails to respond or take action to the satisfaction of HUD, HUD shall have the right to take corrective action to achieve compliance, in accordance with paragraph [20](b)(3) or to terminate th[e] Contract with HUD approval, in whole or in part, or to take other corrective action to achieve compliance in its discretion, or as directed by HUD." [1998 HAP Contract at 11 (JE 19, p. 677 at 687).]

20. Paragraph 20(b)(3)(iv) of the 1998 HAP Contract provided that HUD could also "[r]educe or suspend housing assistance payments" in response to Englewood's default. [1998 HAP Contract at 11 (JE 19, p. 677 at 687).]

21. Paragraph 21 of the 1998 HAP Renewal Contract provided: "This Contract, including the exhibit(s), is the entire agreement between HUD and the Owner. No changes in this Contract may be made except in writing signed by both the Owner and HUD." [1998 HAP Contract at 12 (JE 19, p. 677 at 688).]

**B. <u>The 1999 HAP Renewal Contract - October 1, 1999 to September 30, 2000</u>**

22. The 1998 HAP Contract was scheduled to expire in 1999. [1998 HAP Contract at 1 (JE 19, p. 677).] It was renewed for one year in September of 1999. [1999 HAP Renewal Contract at 1 (JE 20, p. 691).] Paragraph 2 of the 1999 HAP Renewal Contract provided that "All terms of the Expiring Contact are renewed except for those provisions relating to contract rents and rent adjustments." [1999 HAP Renewal Contract at 1 (JE 20, p. 691).]

The October 2000 HAP Renewal Contract - October 1, 2000 to September 30, 2004

23. The October 2000 HAP Renewal Contract stated that the "Contract shall run for an initial 1 Year period" and that "after the expiration of the initial term, this Contract shall

renew automatically for 3 additional one-year terms, subject to the availability of appropriations in any year." [2000 HAP Renewal Contract at 1 (JE 21, p. 696).]

24. Paragraph 4 of the 2000 Renewal Contract provided that: "All terms of the Expiring Contact are renewed except for those provisions relating to Contract Rents and rent adjustments." [2000 HAP Renewal Contract at 1 (JE 21, p. 696).]

25. The 2000 HAP Renewal Contract contained an addendum stating:

Owner agrees as a condition of renewing the Section 8 Contract that, in the event HUD's Real Estate Assessment Center (REAC) issues a physical inspection report to the Owner that has a score which evidences Owner failure to comply with HUD's Uniform Physical Condition Standards and Physical Inspection Requirement, or if the Owner is negotiating a Corrective Plan of Action to repair deficient items on the REAC inspection, or, if the Owner agreed to a Corrective Plan of Action and has endorsed said Plan, HUD may terminate the Contract after the renewal providing the Owner a reasonable period, as determined by HUD, to correct deficiencies or if the Owner fails to perform under an approved Correction Action Plan to Repair. Notwithstanding the foregoing, HUD may, at its option, continue the contract or renew said contract to facilitate the provision of vouchers for such reasonable time (not to exceed 180 days) as may be necessary to relocate eligible residents with Section 8 Vouchers. The Owner agrees to cooperate in the relocation of the residents by providing to HUD such information on income and occupancy as may be necessary to relocate the tenants. Upon relocation of such residents the Contract shall be terminated.

[2000 HAP Renewal Contract at 4 (JE 21, p. 696 at 699).]

**C. <u>2001 90-Day HAP Renewal Contract - October 1, 2001 to December 31, 2001</u>**

26. The 2001 90-Day HAP Renewal Contract stated at Section 4(c) that, "Previously, the Contract Administrator and the Owner entered into a HAP Contract ('expiring contract') to make Section 8 assistance payments to the Owner for eligible families living in the Project. The term of the expiring contract will expire prior to the beginning of the term of the Renewal Contract." [2001 90-Day HAP Renewal Contract at 6 (JE 24, p. 719 at 724).]

27. At Section 4(d)(i) the 2001 90-Day HAP Renewal Contract stated: "The purpose of the Renewal Contract is to renew the expiring contract for an additional term." [2001 90-Day HAP Renewal Contract at 6 (JE 24, p. 719 at 724).] At Section 5(a) the 2001 90-Day Renewal Contract stated: "Except as specifically modified by the Renewal Contract, all provisions of the Expiring Contract are renewed (to the extent such provisions are consistent with statutory requirements in effect at the beginning of the Renewal Contract term)" and except for specific provisions "not renewed" as described in 5B i-iv. The 2001 90-Day Renewal Contract also stated: "The term of the Renewal Contract begins on 10/01/2001 and shall run for a period of .3 years." [2001 90-Day HAP Renewal Contract at 4 (JE 24, p. 719 at 724, 722).]

**D. <u>The 180-Day Renewal Contract - JEnuary 1, 2002 to June 30, 2002</u>**

28. The 180-Day HAP Renewal Contract stated: "Previously, the Contract Administrator and the Owner entered into a [Housing Assistance Payments] Contract ('expiring contract') to make Section 8 assistance payments to the Owner for eligible families living in the Project. The term of the expiring contract will expire prior to the beginning of the term of the Renewal Contract." [180-Day HAP Renewal Contract at 4 (JE 25, p. 737 at 740).]

29. The 180-Day HAP Renewal Contract stated: "The purpose of the Renewal Contract is to renew the expiring contract for an additional term." [180-Day HAP Renewal Contract at 4 (JE 25, p. 737 at 740).] The 180-Day HAP Renewal Contract also stated: "Except as specifically modified by the Renewal Contract, all provisions of the Expiring Contract are renewed (to the extent such provisions are consistent with statutory requirements in effect at the beginning of the Renewal Contract term)" and except for those specific provisions "not renewed" as described in 5B i-iv. [180-Day HAP Renewal Contract at 4 (JE 25, p. 737 at 740).] The 180-Day Renewal Contract also stated: "The term of the Renewal Contract begins on 01/01/2002 and shall run for a period of .5 years, beginning on the first day of the term." [180-Day HAP Renewal Contract at 2 (JE 25, p. 737 at 738).]

**E. <u>2002 90-Day HAP Renewal Contract - July 1, 2002 to September 30, 2002</u>**

30. The 2002 90-Day HAP Renewal Contract stated: "Previously, the Contractor Administrator and the Owner entered into a [Housing Assistance Payments] Contract ('expiring contract') to make Section 8 assistance payments to the Owner for eligible families living in the Project. The term of the expiring contract will expire prior to the beginning of the term of the Renewal Contract." [2002 90-Day HAP Renewal Contract at 8 (JE 26, p. 746 at 753).]

31. The 2002 90-Day Renewal Contract stated: "The purpose of the Renewal Contract is to renew the expiring contract for an additional term." [2002 90-Day HAP Renewal Contract at 8 (JE 26, p. 746 at 753).] The 2002 90-Day HAP Renewal Contract also stated: "Except as specifically modified by the Renewal Contract, all provisions of the Expiring Contract are renewed (to the extent such provisions are consistent with statutory requirements in effect at the beginning of the Renewal Contract term)" and except for those specific provisions "not

renewed" as described in 5B i-iv. [2002 90-Day HAP Renewal Contract at 8 (JE 26, p. 753).] The 2002 90-Day Renewal Contract also stated that "[t]he term of the Renewal Contract begins on 07/01/2002 and shall run for a period of .3 years." [2002 90-Day HAP Renewal Contract at 6 (JE 26, p. 746 at 751).]

## III. REFERRAL FROM HUD MULTI-FAMILY HOUSING ("MFH") TO THE HUD DEPARTMENTAL ENFORCEMENT CENTER ("DEC")

32. Edward Hinsberger, Director of HUD's Chicago Multifamily Housing Division ("MFH"), referred South Pointe from MFH to the Departmental Enforcement Center ("DEC") in September of 1998. [Property Referral dated September 13, 1998 (JE 29, p. 779).]

33. Freddie Batchelor was the Enforcement Analyst assigned to South Pointe for the time that it was in the DEC from the summer of 1998 through the spring of 2000. [Batchelor Decl. at 1 3, 4 (JE 15, p. 630 at 631).] Ms. Batchelor prepared in early 1999 a "Draft Team Report" recommending that South Pointe be accepted for further review and possible sanctions. [Batchelor Decl. at 4 11 (JE 15, p. 630 at 633); Draft Team Report at 7 (JE 30, p. 780 at 786).]

34. On March 23, 1999, P.M. One wrote to HUD requesting a rental increase for FY 1999. [Letter from Harth to Thomas dated March 23, 1999 (JE 31, p. 787).]

35. On April 9, 1999, Veronica Coleman, Director of Project Management for HUD's Chicago Multifamily Hub, responded that HUD was unable to process the request because "your contract is due to expire in fiscal year 1999." [Letter from Coleman to Prendergast dated April 9, 1999 (JE 32, p. 788).]

36. On April 28, 1999, REAC performed a physical inspection of 25 units at South Pointe, as well as the site, building exterior, building systems and common areas. Out of a

possible numeric score of 100, Englewood received an overall score of 42. [REAC Report dated April 28, 1999 at 1 (JE 27, p. 760).]

37. On May 18, 1999, Englewood renewed its request for a rent increase of 5% stating it was supported by a market comparability study it prepared to offset the costs of utilities, vandalism, security and the physical repairs needed to correct the physical deficiencies identified in the REAC Report of April 28, 1999. [Letter from Sanders to Thomas dated May 18, 1999 at 1 (JE 33, p. 790).]

38. On May 19, 1999, representatives of Pinnacle Realty Management Company, a HUD contractor, conducted a comprehensive management review. Pinnacle's written report, which was completed on August 10, 1999, stated that Englewood had not corrected "severe findings" from the REAC inspection "that adversely affect the provision of decent, safe, and sanitary housing as required by the HAP contract." [Pinnacle Initial Report dated August 10, 1999 at 4 (JE 36, p. 802 at 805).]

39. The Pinnacle Property Description also stated that the "property is a physically distressed development in a very dangerous neighborhood" and that it is "drug infested and controlled by gangs." The Report continued: "The building is currently in a state of transition. The agent has 'locked down' the building with a new security service. . . .This has removed 20 plus undesirables from the building with another half dozen in process waiting to be served. This has also brought death threats to the agent's staff, and led to the change in site security of off-duty Chicago Police officers as of mid-April. The officers are armed, have powers of arrest and are actively involved in gaining control of the site." [Pinnacle Initial Report dated August 10, 1999 at 5 (JE 36, p. 802 at 806).] "Units are in hard shape judging from the current vacancies.

Extensive repairs, cleaning, and painting are needed for most turnovers. This results in higher cost time, materials and effort. . . .The agent is trying to lock out the drug dealers through evictions. The evictions and number of turnovers are blowing out the budget." [Pinnacle Initial Report dated August 10, 1999 at 5 (JE 36, p. 802 at 812).]

40. Carl Sanders, Property Manager, wrote to HUD on June 14, 1999 asking for a copy of the April REAC Report so that he could be "pro-active in correcting the findings from the above inspection." [Letter from Sanders to Kiening dated June 14, 1999 (JE 34, p. 796).]

41. On June 30, 1999, Ms. Batchelor prepared a draft "Final Action Plan." [Batchelor Decl. at 5 15 (JE 15, p. 630 at 634).] This document stated that "[t]he building has an infestation of roaches and rats. There are leaking pipes throughout the building. The elevators are all non-operable." [Draft Final Action Plan at 1 (JE 35, p. 797).] Ms. Batchelor's draft noted that South Pointe should have received a score lower than 42 in the April 1999 REAC Report, that there had been many people harmed due to guns, gangs and drugs, the property had been referred to the City of Chicago Violent Crimes Division, and that the management company wrote of their desire to be "proactive" in developing solutions to problems. [Draft Final Action Plan at 1 (JE 35, p. 797 at 798).]

42. Ms. Batchelor's draft final action plan stated that unless various improvements were agreed to and funded by Englewood, and if there was non-compliance by the owner, the Section 8 units would be abated. [Draft Final Action Plan at 2 (JE 35, p. 797 at 798).]

43. On August 18, 1999, John Hayes, then President of Englewood's general partner, wrote to Ms. Kiening regarding the status of discussions with the Community Investment

Corporation ("CIC") with respect to a rehab loan to complete planned repairs. [Letter from Hayes to Kiening dated August 18, 1999 at 1 (JE 37, p. 813).]

44. On August 20, 1999, Mr. Hayes wrote to Mr. Hinsberger and stated that "[a]ll Health and Safety items such as non working Smoke Detectors, GFIs, etc. listed in the above referenced report have been corrected." [Letter from Hayes to Hinsberger dated August 20, 1999 (JE 38, p. 815).]

45. On September 2, 1999, Mr. Sanders wrote to Joan Kiening, HUD Supervisory Enforcement Analyst, and indicated that Englewood's owner and management agent were completing a rehabilitation loan application with their lender, the Community Investment Corporation ("CIC") and that they needed assurance that the 1998 HAP Contract was going to be renewed. [Sanders letter to Kiening dated September 2, 1999 at 1 (JE 39, p. 816).] Mr. Sanders described the need for a HAP Contract renewal to respond to lender concerns with the assurance of rent revenue. [Sanders letter to Kiening dated September 2, 1999 at 1 (JE 39, p. 816).] Mr. Sanders reported that Englewood was applying for a loan "to not only assist in bringing the building into compliance with HUD regulations, but to implement a minor rehabilitation to the units in the building and replace the major systems (see attachment)." [Sanders letter to Kiening dated September 2, 1999 at 1 (JE 39, p. 816).]

46. The 1998 HAP Contract was renewed for one year by the 1999 HAP Renewal Contract, which was signed by Englewood and HUD on September 28, 1999. [1999 HAP Renewal Contract (JE 20, p. 691).]

47. On October 18, 1999, Ms. Gray wrote to Englewood informing them that their request for a rental increase to accompany the 1999 HAP Renewal Contract was denied. [Gray letter dated October 18, 1999 (JE 42, p. 830).]

48. On November 11, 1999, Alan Cravitz, President of Developers Mortgage Corporation, submitted to HUD a loan application on behalf of Englewood for a construction amount of $2,450,880 to complete a rehab program. [Request for Pre-Application Conference dated November 11, 1999 (JE 43, p. 832 at 835).]

49. On December 8, 1999, Mr. Sanders submitted to Ms. Kiening a document titled "Management Improvement and Operating (MIO) Plan," developed in response to the REAC Report dated April 28, 1999. [MIO Plan dated December 8, 1999 at 1 (JE 45, p. 840).] This document included information regarding a "status update and work in progress," responding to problems identified in the April 28, 1999 REAC inspection. Ms. Batchelor, Ms. Thomas and Ms. Gray were copied on the letter. [MIO Plan dated December 8, 1999 at 1 (JE 45, p. 840, 841).]

50. On December 15, 1999, Kelly Brown, Executive Administrator for Englewood's property manager, wrote to Ms. Thomas, enclosing a Resident Support Service collaborative where four social service agencies had agreed to provide services to the families at South Pointe. [P.M. One letter dated December 15, 1999 at 1 (JE 46, p. 853).]

51. A Final Team Report - Resolution ("Final Team Report") was signed on JEnuary 26, 2000 by Ms. Batchelor as the final report on the DEC referral. Its conclusions received "concurrences" from her DEC colleagues: Ms. Kiening (Team Leader), Ms. Baguio (Attorney) and Mr. Gustin (Lead Attorney) [Final Team Report - Resolution at 10 (JE 47, p. 860 at 869).] It

also received "approvals" from: Mr. Zale (Satellite Office Director); Mr. Hinsberger (MFH HUB Director, Chicago); Ms. Edge (Acting Director of Operations, DEC HQ); and Mr. Kraus (National Director, DEC). [Final Team Report - Resolution at 9 (JE 47, p. 860 at 868).]

52. The Final Team Report referred to the April 28, 1999 REAC Report [Final Team Report at 1 (JE 47, p. 860)]; Englewood's submission of a MIO Plan on December 8, 1999 [Final Team Report at 2 (JE 47, p. 860 at 861)]; its tentative approval for finalization subject to identifying sources of funding beyond the $770,000, which the report stated had been advanced in 1999 by Englewood; a DEC site visit on April 14-15, 1999 and the REAC inspection on April 8, 1999; the owner's commitment to complete the 1999 REAC Repairs [Final Team Report at 2 (JE 47, p. 861)]; and noted in a DEC Headquarters visit to the property on August 30, 1999 [Final Team Report at 3-4 (JE 47, p. 862-63)].

53. The Final Team Report stated: a) the "property is in poor physical condition; however the owner has corrected some of the identified repairs revealed by the REAC Inspection Report" [Final Team Report-Resolution at 8 (JE 47, p. 867)]; b) "substantial progress has now been made on the findings outlined in the REAC report, therefore the DEC should return the case to the Multifamily HUB Office for servicing" [Final Team Report at 8 (JE 47, p. 867)]; and c) "the Chicago HUB office should continue the finalization of the MIO Plan received on December 8, 1999." [Final Team Report at 8 (JE 47, p. 867)].

54. The Final Team Report was sent to MFH for its concurrence with the DEC recommendation on JEnuary 27, 2000 and MFH indicated its concurrence with the Final Team Report [REMS entry dated February 1, 2000 (JE 49, p. 871)]; Ms. Thomas noted in HUD's Real Estate Management System ("REMS") that the "MIO Plan [was] accepted by enforcement."

[REMS entry dated February 2, 2000 (JE 50, p. 872)]; and Ms. Kiening closed out the referral to the DEC in early February and returned South Pointe to MFH. [REMS entry dated February 6, 2000 (JE 51, p.873).]

55. On June 7, 2000, Mr. Sanders wrote to Ms. Thomas to provide an update on the MIO Plan. "This is the update to the Management Improvement and Operating (MIO) Plan for the above referenced REAC Inspection dated April 28, 1999 as of May 31, 2000." [Letter dated June 7, 2000 at 1 (JE 54, p. 908).] On June 20, 2000, HUD received the update from Englewood. [REMS entry on June 20, 2000 (JE 56, p. 931).]

56. On July 20, 2000, Mr. Cravitz wrote to Ms. Coleman indicating that Englewood would meet with Henry Chiano, HUD's former Director of Construction, to develop the rehab work program and budget and to confirm that a rehab loan application would be submitted by Mr. Cravitz on behalf of Englewood "which should allow work to commence within approximately four months." [Letter from Cravitz on July 20, 2000 at 1 (JE 58, p. 940).]

57. Mr. Sanders provided HUD with additional updates on the progress of the MIO Plan on July 27, 2000 [Sanders letter and HUD confirmation of receipt (JE 59, p. 941, 947); August 15, 2000 Horton letter and HUD confirmation of receipt (JE 62, p. 956, 957); October 17, 2000 Sanders letter and HUD confirmation of receipt (JE 66, p. 964, 970); and December 8, 2000 [Sanders letter (JE 147, p. 1505)]. In each letter, Englewood asked HUD to respond if there were any questions. Each of the five letters was acknowledged as being received by HUD.

## IV. HUD'S YEAR 2000 MANAGEMENT/OCCUPANCY REVIEW AND REPORT

58. On March 14, 2000, Ms. Thomas conducted a review of South Pointe. [Compl. 22 (JE 3, p. 30 at 35).] Ms. Thomas's Management Review Questionnaire recorded a "big

problem with drugs and gangs in area and building" and noted that Englewood had hired "off duty police where persons in violation can be arrested on [the] spot." [Management Review Questionnaire dated March 13, 2000 at 3 (JE 52, p. 874 at 876).]

59. During her review, Ms. Thomas visited three occupied apartments and five vacant units at which evictions had recently been made. Ms. Thomas recorded that "stairwells were dirty and smell of urin[e]," and that elevators were not functioning properly. [Management Review Questionnaire dated March 13, 2000 at 2 (JE 52, p. 874 at 875).] The final version of the letter was sent sometime after May 7, 2000. [Deposition Transcript of Gwendolyn Thomas ("Thomas Tr.") at 172 (JE 11, p. 521 at 294-95).]

60. On June 16, 2000, Ms. Coleman wrote to Mr. Sanders informing him of the results of HUD's March 14, 2000 on-site review and the specific actions that were to be taken by Englewood in response to HUD's "Schedule of Findings," which described the specific problems which needed correction and the corrective action to be taken. Ms. Coleman's letter apologized for the delay in transmitting the results of the on-site review. [Letter from Coleman to Sanders dated June 16, 2000 at 1 (JE 55, p. 921).]

61. Mr. Sanders wrote Ms. Coleman a response to her letter of June 16, 2000 on July 10, 2000. The reply by Mr. Sanders was an 8-page document that replied to each of the "findings" and the specific "actions to be taken" set out in the letter of June 16, 2000. [Letter from Sanders to Coleman dated July 10, 2000 (JE 57, p. 932.]

## V. THE 2000 HAP RENEWAL CONTRACT

62. On July 27, 2000, Mr. Hayes requested a "subsequent renewal of my section 8 contract without restructuring . . . with a requested duration of four years and a listed comparable rent potential of $2,714,196." [Renewal Worksheet for Option 2 at 1 (JE 60, p. 948 at 952).]

63. On September 27, 2000, HUD personnel entered into REMS the request for a contract amount of $2,513,000 for Englewood, approximately $200,000 less than had been requested by Englewood. [Note dated September 27, 2000 (JE 62, p. 958).]

64. Mr. Hayes signed the HAP Renewal Contract on October 16, 2000. [2000 HAP Renewal Contract at 2 (JE 21, p. 696 at 697).] Ben Tessler signed the 2000 HAP Renewal Contract on behalf of Mary Anderson, OMF Chicago HUB Director of Operations, on October 18, 2000. [2000 HAP Renewal Contract at 2 (JE 21, p. 696 at 697).]

65. HUD representatives met with Carl Sanders, P.M. One's Property Manager, on October 18, 2000. John Hayes had already signed the contract on behalf of Englewood on October 16, 2000. Mr. Sanders received a signed copy of the 2000 HAP Renewal Contract from HUD following his October 18 meeting at HUD in Chicago.

## VI. ALLEGED ERRORS AND AMENDMENTS

66. HUD alleges that the 2000 HAP Renewal Contract contained an error and that the intended term of the contract was not one 1 year with three automatic one-year renewals but three months with zero renewals. During depositions, both Ms. Thomas and Ms. Coleman testified to this "error" and stated that it was discussed at a meeting at HUD on October 18, 2000 and was understood by Mr. Sanders and other Englewood representatives. [Coleman Tr. at 73-76 (JE 12, p. 365 at 383-84); Thomas Tr. at 202-11 (JE 11, p. 251 at 302-04).] Ms. Thomas's meeting notes

do not mention the contract or an error, and Mr. Sanders denies there was any discussion of this topic. [Thomas notes (JE 67, p. 971); Sanders Decl. at 10 39 (JE 17, p. 655 at 664).]

67. On December 6, 2000, Veronica Coleman, Director of Project Management for HUD's Chicago Multifamily Hub, transmitted a letter to Mr. Hayes that stated: "This letter is to inform you that we have amended your Section 8 HAP Contract from (one) 1 year to a (three) 3 month short term renewal with zero renewal terms." [Letter dated December 6, 2000 (JE 71, p. 1014).] The letter further stated: "As we stated in our meeting on October 18, 2000, the contract will be renewed under a three month short term contract, due to the physical conditions of the subject property." [Letter dated December 6, 2000 (JE 71, p. 1014).]

68. During depositions, Ms. Thomas and Ms. Coleman testified that they possessed no individual authority to amend HAP contracts. [Coleman Tr. at 281-84 (JE 12, p. 365 at 435-36); Thomas Tr. at 229-32 (JE 11, p. 251 at 308-09).] Ms. Coleman and Ms. Thomas testified that Ms. Thomas made notations recording the amendment of the 2000 HAP Renewal under the direction of Ed Hinsberger, Director of HUD's Chicago Multifamily Housing Division, and HUD's Funding Department. [Coleman Tr. at 272-82 (JE 12, p. 365 at 433-36); Thomas Tr. at 229-31 (JE 11, p. 251 at 308-09).]

69. Ms. Thomas testified that she made notations recording the amendment of the 2000 Renewal Contract after obtaining direction from Mr. Hinsberger and HUD's Funding Department. [Thomas Tr. at 231, 242 (JE 11, p. 251 at 309, 312); Undated Edits to 2000 HAP Renewal Contract at 1 (JE 22, p. 705); Edits to 2000 HAP Renewal Contract dated JEnuary 10, 2001 at 1 (JE 23, p. 712).]

70. There were references to "amendments" in an email from Ken Horton, Vice President of P.M. Group, to Ms. Coleman dealing with the status of the rehab loan application. Mr. Horton noted that in a conversation with Ms. Thomas she informed him that "the HAP contract would be further amended to reflect the original expiration date of September 30, 2001." [Email message dated JEnuary 23, 2001 between Coleman and Horton at 2 (JE 72, p. 1015 at 1016).] He requested that a copy of the "amended, amended HAP contract" be sent "to my attention at the following address." [Email message dated JEnuary 23, 2001 between Coleman and. Horton at 2 (JE 72, p. 1015 at 1016).]

## VII. THE MARCH 2, 2001 REAC INSPECTION AND MARCH 8, 2001 REAC LETTER

71. On March 2, 2001, REAC conducted an inspection of the site, building exterior, building systems, common areas and 25 sample units at South Pointe. The "Inspection Summary" of March 2, 2001, resulted in the preparation of a "Report" dated March 8, 2001. [REAC Report dated March 8, 2001 (JE 28, p. 767 at 769, 776).]

72. The "Inspection Summary" identified deficiencies observed during the inspection and directed Englewood to: (a) correct the identified exigent health and safety ("EH&S") deficiencies; (b) describe the work to be done to correct other "identified deficiencies"; (c) conduct a survey of the building to identify other deficiencies; (d) determine the needs in all of the units for the types of physical problems identified in the "findings" from the 25 sample units inspected; and submit to HUD a Proposed Plan of Correction. [REAC Report dated March 8, 2001 at 1 (JE 28, p. 767).]

73. The REAC "Letter" also described HUD responsibilities. "Upon receipt of the Plan, the Project Manager will review it to ensure that it has sufficient detail regarding plans and resources for correction, and that the time frames are appropriate. The Project Manager will contact you to discuss any required amendments and the process that will be used to verify completion of the Plan." [REAC Report dated March 8, 2001 at 2 (JE 28, p. 767 at 768).]

74. Out of a possible total score of 100, South Pointe received a REAC score of 31. [REAC Report dated March 8, 2001 at 3 (JE 28, p. 767 at 769.]

75. Englewood's score recorded a 38.5 point reduction for "health and safety" deficiencies which consisted of an expired fire extinguisher tag and missing cover on an electrical panel in the rooftop mechanical space, the parking gate not working, five missing outlet covers, three missing breakers, a broken window, a cable TV line on the floor in a doorway, three instances of roaches in kitchen cabinets, exposed nails, bare wires, and an inoperable exit door. [REAC Report dated March 8, 2001 at 4-9 (JE 28, p. 767 at 770-75).]

76. Additional problems identified with respect to the site, building exterior, building systems and the common areas included: repairing window screens, correcting the ponding of water on the roof, repairing damaged corridor walls on the 1st and 13th floors, repairing the locks in the laundry room, replacing the garbage chute doors and replacing the exit signs. [REAC Report dated March 8, 2001 at 4-9 (JE 26, p. 767 at 770-75771-75).] The repairs identified in the REAC Report were planned to be corrected as part of the proposed plan of corrections and rehab loan. [BABCO Rehab Program (JE 80, p. 1061); Hayes Decl. at 8-10 39-43 (JE 16, p. 640 at 647-49); Sanders Decl. 4 14-15 (JE 17, p. 655 at 658).]

## VIII. ENGLEWOOD AND HUD RESPONSES TO THE MARCH 8, 2001 REAC REPORT

77. At the end of the March 2, 2001 inspection, the inspector Frank Caperton gave Mr. Sanders a list of 13 "exigent health and safety" deficiencies. Englewood was required to correct all EH&S items immediately and report its repairs to HUD within 72 hours. These items included one inoperative smoke detector, five missing or broken outlet covers, three missing breakers, a light fixture missing in the maintenance room, a fire extinguisher without a current tag in the penthouse, a blocked exit in the trash room, and a missing cover on an electrical panel in the penthouse. [Notification of Exigent and Fire Safety Hazards Observed at 1-2 (JE 74, p. 1019-20).]

78. Mr. Sanders stated that all of the items were corrected within the 24 hours following the inspection. [Sanders Decl. 12-13 45 (JE 17, p. 655 at 666-67).] On March 6, 2001, based on information supplied to him by Mr. Sanders, Mr. Hayes provided Ms. Thomas with a "certification" that exigent health and safety items identified in the REAC inspection had been corrected. [Letter by Hayes dated March 6, 2001 (JE 76, p. 1054).]

79. Ms. Thomas visited South Pointe on March 7, 2001. On March 9, 2001, based on the report given her by Ms. Thomas, Ms. Coleman wrote to Mr. Hayes stating that HUD had conducted its "confirmatory review" with P.M. One staff members present. [Letter dated March 9, 2001 at 1 (JE 77, p. 1055).] Ms. Coleman's letter stated that "only a few of the EHS items had been mitigated and not all as you certified." [Letter dated March 9, 2001 at 1 (JE 77, p. 1055).]

80. On March 16, 2001, Mr. Hayes submitted a written response to

Ms. Coleman's letter confirming his "belief from investigation with property management" that the previous certification "was correct." [Hayes letter dated March 16, 2001 at 1 (JE 79, p. 1059).] Mr. Hayes stated that the "General Partner relies solely on the information received from the property management company." [Hayes letter dated March 16, 2001 at 1 (JE 79, p. 1059).] Mr. Hayes wrote that he had enclosed "photos of those items cited on the March 2, 2001 inspection." [Hayes letter dated March 16, 2001 at 1 (JE 79, p. 1059).]

Correcting the Other Identified Deficiencies

81. On April 5, 2001, Englewood sent HUD a document it identified as a MIO Plan that described the status of work that had been done to correct the "other identified deficiencies" in the REAC Inspection Summary. [Letter dated April 5, 2001 at 1 (JE 84, p. 1076).] All of the repairs were reported as made except those requiring the replacement of doors and door hardware, plumbing, smoke detector replacement, and the decorating and drywall repairs which Englewood intended to take care of as part of a rehab loan. [Letter dated April 5, 2001 at 1 (JE 84, p. 1076).]

82. On April 8, 2001, Kelly Brown on behalf of Englewood sent Ms. Coleman a letter intended to be the (30 day) "response" to the March 8, 2001 letter, which Englewood was required to submit to HUD. [Letter from Brown dated April 8, 2001 at 1 (JE 86, p. 1086).]

Englewood's Proposed Rehabilitation Program

83. On March 19, 2001, Englewood submitted the application for the rehab loan. Englewood intended the centerpiece in the loan application to be the BABCO rehab work program. This program related to doors, bath and kitchen appliances and fixtures, and painting and drywall repairs, it proposed $700,000 in concrete repairs to the exterior spandrels, a new roof

and rehabilitation of the hot water system. [Rehab program proposed by BABCO (JE 80, p. 1061).]

HUD's Proposed Rehabilitation Program

84. On March 22 and 23, 2001, HUD's inspector Ray Etzkorn conducted an inspection of South Pointe. Mr. Etzkorn prepared a report that recorded the "physical condition," "needed maintenance," and the "estimated cost" of repairs of "items inspected" at South Pointe. [Rehab Report Prepared by HUD at 1 (JE 81, p. 1066).] This report also recorded Mr. Etzkorn's additional comments. [Rehab Report Prepared by HUD at 2 (JE 81, p. 1066 at 1067).]

85. Etzkorn's report listed additional estimated costs of $650,000 for the replacement of the penthouse, $666,000 for the replacement of all kitchen cabinets, $151,000 for the replacement of countertops, $242,000 for the replacement of appliances, $240,000 for electrical service and distribution upgrades, $437,000 for bathrooms upgrades, $303,000 for the installation of air conditioning, $150,000 for the replacement of an emergency generator, and $257,000 for individual heating controls. [Rehab Report Prepared by HUD (JE 81, p. 1070).]

HUD's Rejection of Englewood's Rehab Loan Application

86. On April 3, 2001, Mr. Hinsberger informed Mr. Hayes that HUD was rejecting Englewood's application for mortgage insurance because "the repairs outlined in your application are inadequate when compared to the needs of the property." [Letter dated April 3, 2001 at 2 (JE 82, p. 1071 at 1072).] Mr. Hinsberger's letter further stated that HUD rejected Englewood's application because the appraisal value was overstated and because HUD "would not process this refinancing with P.M. One remaining in the position of management agent due to their poor past performance." [Letter dated April 3, 2001 at 2 (JE 82, p. 1071 at 1072).] Finally, Mr.

Hinsberger's letter listed required documents that he identified as missing or that were incomplete. [Letter dated April 3, 2001 at 2-3 (JE 82, p. 1071 at 1072-73).]

## IX. HUD'S APRIL 9, 2001 NOTICE OF HAP CONTRACT DEFAULT

87. HUD completed a Notice of Default on Friday, April 6, 2001. [Email from Maisonet on April 6, 2001 (JE 85, p. 1085).]

88. On April 9, 2001, HUD issued a notice of HAP Contract default to Englewood [Notice of Default dated April 9, 2001 at 1 (JE 89, p. 1090).] This notice, signed by Mr. Hinsberger and Margarita Maisonet, Director, Chicago Satellite Office, Departmental Enforcement Center, stated: "This letter constitutes formal notice by the Secretary of the U.S. Department of Housing and Urban Development (HUD) to Englewood Terrace Limited Partnership (Owner), owner of South Pointe Towers Apartments (Project), that the Owner is in default of its obligations under the HAP Contract entered into between HUD and the Owner." [Notice of Default dated April 9, 2001 at 1 (JE 89, p. 1090).]

89. The Notice also stated: "Pursuant to Paragraph 20 of the HAP Contract, the Owner is hereby notified that if the foregoing events of default are not corrected to the satisfaction of HUD within 30 days from the date of this Notice, HUD may seek any and all available remedies, including, without limitation, suspending or abating the HAP Contract." [Notice of Default dated April 9, 2001 at 2 (JE 89, p. 1090 at 1091).]

90. HUD's notice of default stated: "The Project was inspected on March 2, 2001 by HUD's Real Estate Assessment Center (REAC) and, out of a possible 100 points, scored a 31c. Some of the outstanding deficiencies noted in the inspection include: holes and cracks in

hallway and unit walls; broken windows; inoperable stoves and faucets; cockroaches in the units; and ponding on the roof." [Notice of Default dated April 9, 2001 at 1 (JE 89, p. 1090).]

91. HUD's notice of default cited HUD's March 9, 2001 letter regarding EH&S deficiencies and stated that "few of the EHS items had been mitigated at that time," and "the Project was not in good repair, placing the Owner in violation of the Housing Assistance Payment (HAP) contract." [Notice of Default dated April 9, 2001 at 1 (JE 89, p. 1090).]

92. HUD's notice of default referred to HUD's April 3, 2001 letter that had stated that the rehab program proposed by Englewood in its loan application was "inadequate when compared to the needs of the property." [Notice of Default dated April 9, 2001 at 1 (JE 89, p. 1090).]

93. HUD's notice of default stated that Englewood had not brought the property "into compliance" during the 23 months since the April 28, 1999 REAC inspection. [Notice of Default dated April 9, 2001 at 1 (JE 89, p. 1090).]

94. HUD's notice of default stated that Englewood had failed to maintain South Pointe in "decent, safe and sanitary" condition with respect to HUD's Physical Condition Standards. "All of the Project, its units, systems, common areas and building(s) must satisfy HUD's Physical Condition Standards, 24 C.F.R., Part 5, Subpart G." [Notice of Default dated April 9, 2001 at 2 (JE 89, p. 1091).] The notice also stated that the "failure to keep and maintain the Project in a decent, safe, and sanitary condition is a default of the HAP contract." [Notice of Default dated April 9, 2001 at 1 (JE 89, p. 1090 at 1091).]

## X. ENGLEWOOD MEETING WITH HUD ON APRIL 13, 2001

95. Englewood scheduled a meeting with HUD on Friday, April 13, 2001. According to Mr. Hayes, the purpose of the meeting was to discuss the need for updating the earlier MIO, amending it to reflect the REAC Report of March 8, 2001 and Englewood's response, and to work toward an agreed upon scope of work and rehab loan financing so that all of the physical and operational needs of South Pointe could be addressed in a comprehensive manner. [Hayes Decl. at 11 45 (JE 16, p. 640 at 650).]

96. On April 4, 2001, Mr. Hinsberger sent an email to his staff indicating that Englewood wanted to meet to discuss the Occupancy Review and REAC Inspection. [Hinsberger Email of April 4, 2001 (JE 83, p. 1075).]

97. On April 9, 2001, Mr. Sher, one of the mortgage brokers working on rehabilitation financing for South Pointe, sent an email to Mr. Hinsberger indicating that he believed that a loan of $5.5 million could be financed by HUD programs, and Englewood wanted to meet to discuss the scope of work and structure for the rehab loan. [Sher email of April 9, 2001 (JE 88, p. 1089).]

98. At the meeting on April 13, 2001, HUD informed Mr. Hayes that it would not insure a rehab loan unless a new property manager replaced P.M. One. [Maisonet Tr. at 207 (JE 13, p. 474 at 527).]

99. Mr. Hayes reported his progress regarding finding a new owner to Mr. Hinsberger in a letter dated May 2, 2001. [Hayes Decl. at 12 48 (JE 16, p. 640 at651); Letter dated May 2, 2001 (JE 91, p. 1096).]

100. On May 15, 2001, Ms. Coleman returned P.M. One's April 8, 2001 response to the March 8, 2001 REAC Report. Ms. Coleman's cover letter stated that HUD would not accept Ms. Brown's response "due to impending negotiations with HUD . . . concerning your proposed refinance and substantial rehabilitation of the property." [Letter dated May 15, 2001 (JE 93, p. 1098).] Ms. Coleman's letter also stated that "[a]lthough the letter from REAC directs you to prepare a Management Improvement and Operating (MIO) Plan subject to our approval, the condition of this property is beyond that point as acknowledged by your application to refinance that we rejected due to major deficiencies." [Letter dated May 15, 2001 (JE 93, p. 1098).]

101. On May 16, 2001, Mr. Hinsberger and Ms. Maisonet sent P.M. One a Notice of Continuing Default. This notice responded to the May 2, 2001 letter from Mr. Hayes and requested that P.M. One "provide adequate, timely information describing the immediate efforts that the Owner is making to address the HAP default and the sale of the Project and proposed assumption of the HAP contract." [Notice of Continuing Default dated May 16, 2001 at 2 (JE 94, p. 1099 at 1100).] This notice also advised P.M. One that HUD was "proceeding with its process to secure vouchers for relocation of eligible tenants." [Notice of Continuing Default dated May 16, 2001 at 2 (JE 94, p. 1099 at 1100).]

102. On May 16, 2001, Mr. Hinsberger sent an email to his staff indicating that he had "received a couple of calls from" a potential buyer of South Pointe. [May 16, 2001 email at 1 (JE 95, p. 1101).]

103. On June 1, 2001, Ms. Thomas requested that Ms. Anderson order vouchers for South Pointe at the request of Mr. Hinsberger. [June 1, 2001 email at 1 (JE 97, p. 1103).]

104. On June 11, 2001, Ms. Anderson wrote that the HAP Contract would be abated as of September 30, 2001, and that the Chicago Housing Authority would be administering the contract. [June 11, 2001 email (JE 98, p. 1104).]

105. On August 6, 2001, Englewood submitted a request for reimbursement of $55,230.29 for extraordinary gas costs during the winter of 2000-2001. [Energy Reimbursement Request dated August 6, 2001 (JE 103, p. 1116 at 1119).] The amount of the excess cost reimbursement requested was eventually determined by Englewood to be $139,187 in Rental Adjustments for Escalating Energy Costs. [May 31, 2002 South Pointe Financial Claims at 2 (JE 128, p. 1251 at 1252).]

107. On September 4, 2001, a revised rehabilitation loan request was submitted to HUD by Alan Cravitz on behalf of Englewood. [Cravitz Letter of September 4, 2001 at 1 (JE 105, p. 1135).] On September 5, 2001, Paul Seliga reported to Mr. Hinsberger that the market study which accompanied the loan application supported the proposed rents. [Seliga email dated September 5, 2001 at 1 (JE 106, p. 1140).] On September 6, 2001, Mr. Hinsberger sent an email to Mr. Samuelson stating that the "rent comp study supports the proposed rents. The submission was made by you. It needs to be signed by the owner or the current managing agent. There was a spot on your 8/21/2001 letter authorizing you to submit, but Mr. Hayes didn't sign it." [Hinsberger email of September 6, 2001 (JE 107, p. 1144).]

108. On September 25, 2001, Mr. Hinsberger responded to Mr. Cravitz detailing the additional information that "must be submitted in order to process the application." [Hinsberger Letter to Cravitz of September 25, 2001 (JE 109, p. 1150).] On September 28, 2001, Mr. Cravitz responded to Mr. Hinsberger stating that the eight issues raised by Mr. Hinsberger had been or

were being addressed, including that a "total scope of work" would be submitted "by Friday, October 5." [Cravitz Letter to Hinsberger of September 28, 2001 at 1 (JE 110, p. 1151).]

## XI. THE THREE MONTH RENEWAL CONTRACT BEGINNING OCTOBER 2001

109. On September 25, 2001, Mr. Hinsberger sent Mr. Hayes a signed short-term renewal contract. [2001 90-Day HAP Renewal Contract at 11 (JE 24, p. 719 at 729).]

110. Mr. Hayes signed the 90-Day HAP Renewal Contract the next day, September 26, 2001. [2001 90-Day HAP Renewal Contract at 11 (JE 24, p. 719 at 729).]

111. On October 1, 2001, Mr. Hinsberger notified Mr. Hayes and Mr. Samuelson via email that the Chicago Housing Authority "will begin issuing vouchers for the residents at South Pointe today." [Email from Ed Hinsberger dated October 1, 2001 at 2 (JE 111, p. 1160 at 1161).] Mr. Hinsberger's email stated that "the Sec. 8 contract will be terminated once all of the residents receive their vouchers." [Email from Ed Hinsberger dated October 1, 2001 at 2 (JE 111, p. 1160 at 1161).]

112. Mr. Hayes responded to Mr. Hinsberger's email by writing that this seemed "unconscionable and unfair." [Email from John Hayes dated October 1, 2001 (JE 112, p. 1162).] Mr. Hinsberger forwarded a portion of an email from Ms. Coleman dated JEnuary 23, 2001 "addressing the same issue." [Email from Ed Hinsberger dated October 1, 2001 at 1 (JE 111, p. 1160).]

113. On October 2, 2001, Mr. Samuelson sent an email to Mr. Hinsberger: "I presume that the termination of the Section 8 contract - rather your decision not to extend the 90-day extension - follows a set of delineated due process procedures." [Email from Don Samuelson dated October 2, 2001 at 1 (JE 113, p. 1163).]

114. On October 11, 2001, Mr. Samuelson sent an email to Mr. Hinsberger and Mr. Hayes stating that, "I'm surprised with the rigidity of your position. It is completely at odds with the Section 8 renewal assumptions we were all making in August and September. Conceding, of course, that there was the possibility of the use of vouchers." [Email from Don Samuelson dated October 11, 2001 (JE 114, p. 1165).]

## XII. THE INJUNCTION SUIT IN THE FEDERAL DISTRICT COURT

115. On October 29, 2001, Englewood filed a complaint in the Federal District Court for the Northern District of Illinois seeking a declaratory judgment that HUD: "1) failed to renew the Housing Assistance Payment contract ('HAP contract'); and (2) issued Section 8 vouchers to tenants in violation of the Multifamily Assisted Housing Reform and Affordability Act (MAHRA)." [Declaratory Judgment/Injunction Complaint filed in the District Court for the Northern District of Illinois dated October 29, 2001 (JE 1, p. 1).]

116. The Court denied Englewood's request for an injunction against the issuance of vouchers. Judge Castillo concluded that "HUD never formally terminated Englewood's HAP contract. Rather, HUD provided Englewood with notice that it was in continuing default under the HAP contract and that HUD would begin the process of providing vouchers for relocation of eligible tenants." [Order dated November 15, 2001 at 3 (JE 7, p. 146 at 148).] The Court also held that "the harm that Englewood asserts is not irreparable because it is a loss of project-based revenue provided by the HAP contract which, should Englewood prevail, may be compensated at the conclusion of this litigation." [Order dated November 15, 2001 at 3 (JE 7, p. 146 at 148).]

## XIII. HUD'S NOTICE OF ABATEMENT AND TERMINATION

117. Following the issuance of Judge Castillo's decision, on November 30, 2001, HUD issued a "Notice of Abatement and Termination." This document stated that Englewood had failed to demonstrate that it had maintained the units in decent, safe and sanitary condition as defined by 24 C.F.R. Part 5, Subpart G within 30 days of HUD's formal notice of default. [Notice of Abatement and Termination dated November 30, 2001 at 1 (JE 117, p. 1176).] This notice further stated that Englewood "has not cured the conditions complained of in the notice" and that, if Englewood did not provide a written objection or cure the underlying default within 30 days, HUD's decision to terminate the contract would become final. [Notice of Abatement and Termination dated November 30, 2001 at 1 (JE 117, p. 1176).] HUD informed Englewood that it intended to terminate the contract after completing "its voucher and relocation process for all eligible residents in the Project." [Notice of Abatement and Termination dated November 30, 2001 at 1 (JE 117, p. 1176).]

118. This notice also stated that the voucher and relocation process "may extend beyond the expiration date of the current HAP Contract Renewal." [Notice of Abatement and Termination dated November 30, 2001 at 2 (JE 117, p. 1176 at 1177).] HUD stated that "[t]o safeguard the residents, and not affecting HUD's determinations as set forth above, HUD will provide Owner with a HAP Contract Renewal with Addendum. Please execute the extension and return it to HUD promptly." [Notice of Abatement and Termination dated November 30, 2001 at 2 (JE 117, p. 1176 at 1177).]

119. On December 6, 2001, Mr. Hinsberger sent an email to Mary Anderson, Veronica Coleman, Gwen Thomas, Maria Baguio and Greg Gustin: "You need to extend the HAP at

Southpointe for another 90 days. It expires 12/31/01. The vouchers will not be in place by then so extend the contract again." [Email from Ed Hinsberger dated December 6, 2001 (JE 118, p. 1178).]

120. Greg Gustin wrote to Englewood's then-attorney on December 7, 2001: "As we discussed, and as HUD's November 30th letter references, HUD expects that the HAP Contract will need to be extended to accommodate HUD's actions in protection of the residents. HUD will act in that regard in due course." [Letter dated December 7, 2001 at 1 (JE 119, p. 1179).]

121. On December 19, 2001, Mr. Hinsberger sent another email to HUD employees, including Margarita Maisonet and Victor Taylor: "Please extend the contract for 180 days.... I took a look at the Sec 8 guidebook. Greg pointed out that the guidebook indicated that extensions should be for 120 days to cover the time to get the vouchers issued. Out of the 303 units at the project, CHAC still hasn't completed the process for even a third of the tenants. So I am making the decision to go the six-month extension, June 30, 2002. Gwen will be putting the info into REMS and getting whatever the paperwork is together for Victor." [Email from Hinsberger dated December 19, 2001 (JE 120, p. 1181).]

## XIV. ENGLEWOOD'S ADMINISTRATIVE CHALLENGE TO THE NOTICE OF ABATEMENT AND TERMINATION

122. On December 21, 2001, Englewood's attorneys transmitted its response to HUD's "Notice of Abatement and Termination of Housing Assistance Payment Contract." Englewood's attorneys informed HUD that Englewood was appealing HUD's "notice of non-renewal" and was

exercising its right to appeal the HUD decision "pursuant to Chapter 13 of MAHRA." [Letter dated December 21, 2001 at 1 (JE 121, p. 1182).]

123. Representatives of the parties met at HUD's Chicago office on JEnuary 22, 2002. On February 7, 2002, Greg Gustin, Lead Enforcement Attorney, informed Englewood's attorney that HUD's final decision was to uphold its right to "continue to act as it stated in its November 30, 2001, Notice of Abatement and Termination." [Letter dated February 7, 2002 at 1 (JE 123, p. 1215).] Mr. Gustin further explained that HUD "affirms its original final decision" and that the issues had already been decided against Englewood by Judge Castillo in his Order on the injunction suit. [Letter dated February 7, 2002 at 1 (JE 123, p. 1215).]

124. HUD conducted a hearing regarding Englewood's claims in Washington, D.C. on April 16, 2002. [Compl. at 17 65 (JE 3, p. 30 at 46).] On May 2, 2002, Howard Mayfield, Deputy Director, Office of Asset Management, informed Englewood that he affirmed HUD's February 7, 2002 final decision. [Notice of Reviewing Official's Appeal Decision at 2 (JE 126, p. 1223 at 1224).]

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/Peter V. Baugher
PETER V. BAUGHER
Schopf & Weiss LLP
312 West Randolph Street, Suite 300
Chicago, IL 60606-1720
Tel: (312) 701-9300
fax: (312) 701-9335

WILL BERNDT
Schopf & Weiss LLP

s/ Brian M. Simkin
BRIAN M. SIMKIN
Assistant Director

s/ Douglas K. Mickle
DOUGLAS MICKLE
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit, 8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tel: (202) 307-0383
Fax: (202) 307-0972

OF COUNSEL:
GREGORY G. GUSTIN
MARIA T. BAGUIO
RUSSELL J. COHEN
LORRAINE C. SHOTO
THOMAS G. MASSOURAS
Office of General Counsel
U.S. Department of Housing
and Urban Development

November 3, 2006

**CERTIFICATE OF FILING**

I hereby certify that on November 3, 2006, a copy of the foregoing "**Stipulations Of Fact**" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Peter V. Baugher
Peter V. Baugher