**IN THE**
**UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **ENGLEWOOD TERRACE LIMITED PATNERSHIP,** | ) | |
| **Plaintiff,** | ) | **No. 03-2209C** |
| **v.** | ) | **Judge Marian Blank Horn** |
| **THE UNITED STATES,** | ) | |
| **Defendant,** | ) | |

**PLAINTIFF ENGLEWOOD'S MOTION IN LIMINE TO LIMIT TESTIMONY AND DOCUMENTS RELATING TO INSPECTIONS OF SOUTH POINTE AND ENGLEWOOD'S REQUEST FOR A HUD REHABILITATION LOAN**

Pursuant to this Court's November 6, 2006 Order and Rule 37 of the Court of Federal Claims, Plaintiff Englewood moves this Court to enter an order precluding HUD from presenting testimony regarding inspections of South Pointe and/or regarding Englewood's requests for a loan from HUD. After insisting that these issues were "irrelevant" during discovery in this action, HUD now apparently intends to introduce documents and testimony regarding them as a centerpiece of its defense. HUD's change in course prejudices Englewood, which was denied information regarding these issues during discovery. HUD's attempt to inject new and "irrelevant" issues will also needlessly prolong and complicate trial.

## PROCEDURAL BACKGROUND

This case is about HUD's breach of its October 2000 Housing Assistance Payment ("HAP") contract with Englewood Terrace Limited Partnership. That contract was to extend for four years (a one year term with three automatic annual extensions), generating project-based subsidy payments to Englewood of over $2.5 million a year. Instead, in April 2001, HUD wrongly declared Englewood to be in default under the contract. HUD's conduct in

2001 was inconsistent with the contract's default and termination procedures, as well as the facts about South Pointe's condition and prospects for improvement. HUD insisted, moreover, on a capital improvement program far beyond than current operational deficiencies identified in its March 2001 REAC inspection. At the same time, HUD also demanded that Englewood find a new owner and new management. By the summer of 2001, less than a year into what was to have been a four-year contract, that contract was dead, with HUD preparing to issue vouchers to all residents who it then encouraged to move to other housing.

**A. HUD Asserted During Discovery That Alleged Deficiencies In The Physical Condition Of South Pointe And Englewood's Request For A Loan Were "Irrelevant."**

Through a series of interrogatories, Englewood directed questions to HUD regarding the reasons for the alleged "default" raised by HUD in its April 9, 2001 Notice of Default and May 16, 2001 Notice of Continuing Default. Copies of these documents are attached to this Motion as Exhibits A and B, and were previously submitted to the Court in the parties' February 21, 2006 Joint Appendix as Exhibits 88 and 94. HUD's Notice of Default referred to 1999 and 2001 "REAC" inspections of South Pointe inspections of South Pointe and HUD's rejection of Englewood's request for HUD funding for its rehabilitation efforts.

Under Section 20 of the HAP Contract, Englewood had the right to cure any alleged deficiencies identified by HUD in its default notice before termination of the contract. Accordingly, during discovery, Englewood asked HUD to identify any alleged deficiencies identified in the 1999 and 2001 REAC inspections, or in any other HUD inspection, that Englewood did not correct. Because the default notice also referred to Englewood's proposal for rehabilitation of South Pointe funded by a HUD loan, Englewood asked HUD to identify differences between the scope of work proposed by Englewood and the scope of work required by HUD.

Rather than provide responses to these interrogatories, HUD asserted that issues relating to HUD's inspections and Englewood's request for a loan were "irrelevant." HUD objected and refused to answer, stating:

> **Defendant objects to this interrogatory as seeking information irrelevant to the issues being litigated in this case and not reasonably calculated to lead to the discovery of admissible evidence. The mere repair of physical deficiencies identified in a REAC inspection would not ensure that the project was in acceptable physical condition. Moreover, HUD's provision of an $11 million insured loan to plaintiff, and the repairs and rehabilitation that loan was intended to finance as a condition to insuring that loan, have no relevance to plaintiff's failure to timely cure its Housing Assistance Contract breach.**

Def's. Resp. to Pl's. Interrogatory No. 11 (emphasis added); *see also* Resp. to Interrogatory Nos. 12-14. A complete copy of HUD's responses to Englewood's Interrogatories is attached as Exhibit C, and was previously submitted with the parties' February 21, 2006 Joint Appendix as Exhibit 5.

### B. HUD Now Intends To Introduce Evidence Regarding HUD's Inspections Of The Physical Condition Of South Pointe And HUD's Rejection Of Englewood's Request For A HUD Loan.

Reversing course 18 months after the close of discovery, HUD now apparently seeks to focus its defense on the physical condition of South Pointe and Englewood's inability to obtain a loan from HUD in early 2001. In fact, evidence regarding HUD inspections and deficiencies in Englewood's loan application comprise the majority of the evidence HUD lists in its proposed witness testimony and trial exhibits. The following examples illustrate HUD's new focus on issues it formerly deemed "irrelevant" and thus declined to answer interrogatories:

- *Evidence regarding a purported "inspection" of South Pointe in the fall of 2001 by HUD employee Lillye Simmons*. Until discovery in this action, HUD had never informed Englewood of the results of this "inspection," summarized only in an

internal HUD email. HUD has also never explained whether or how this inspection influenced HUD's decision to terminate the HAP Contract. Indeed, the inspection occurred months after HUD issued its Notice of Continuing Default in May 2001. Nevertheless, HUD intends to present Ms. Simmons' testimony and documents relating to the fall 2001 inspection at trial.

- *Evidence regarding a "review" of South Pointe in February 2001 by HUD employee Gwendolyn Thomas*. During a February 2001 visit to South Pointe, Ms. Thomas visited only nine units of the 303 units in the South Pointe complex. HUD failed to forward any notice of the results of Ms. Thomas' "review" to Englewood until more than a month later, on March 28, 2001. Ms. Thomas' review is not mentioned in the Notice of Default sent little more than a week later, on April 9, 2001, or in the May 16, 2001 Notice of Continuing Default. *See* Exs. A and B, Joint Appendix Exs. 88 and 94. Again, HUD never explained during discovery whether or how Ms. Thomas' visit to South Pointe influenced HUD's decision to terminate the HAP Contract.
- *Evidence regarding observations of South Pointe by Kathy Merritt and Teresa Di Pietro*. Neither Ms. Merritt nor Ms. Di Pietro authored any written reports of any findings made during their observations of South Pointe. Indeed, there is no evidence that Ms. Merritt or Ms. Di Pietro played any role in HUD's decision to issue a default or terminate the HAP Contract.
- *Evidence regarding trips to South Pointe by Carlos Castillo and Jennifer O'Neil in late 2001, 2002 or even 2003*. Yet again, there is no evidence that Mr. Castillo or Ms. O'Neil's observations of South Pointe were ever considered by HUD in the context of their decision to terminate the HAP Contract.

- *Evidence regarding inspections of South Pointe by entities other than HUD, including the City of Chicago*. HUD intends to introduce evidence regarding alleged city code violations at South Pointe or reports from the property by Chicago fire and police officials. Those alleged violations and reports are not referred to in HUD's Notice of Default or Notice of Termination, and HUD has never explained whether and how it utilized inspection reports by other agencies or entities in deciding to terminate the HAP Contract. Indeed, HUD seeks to introduce evidence regarding reports from other agencies that were written either years before or years after HUD issued its Notice of Default.
- *Testimony by third party Alan Cravitz, HUD employee Mary Anderson, and others regarding HUD's request for a HUD-insured mortgage loan to fund rehabilitation of South Pointe*. Contrary to HUD's response to Englewood's Interrogatory Nos. 11 and 14 that such evidence was "irrelevant," HUD intends to present numerous witnesses to testify regarding Englewood's request for a rehabilitation loan.

Unfortunately, the lengthy list of HUD's proposed evidence above is only a subset of the evidence HUD intends to present regarding the physical condition of South Pointe and Englewood's request for a HUD-insured loan. Clearly, HUD's attempt to introduce such evidence – which it earlier branded "irrelevant" – will prolong and complicate the trial and unfairly prejudices Englewood coming as it does after HUD refused to answer interrogatories on these issues.

**ARGUMENT**

Rule 37(c) of the Court of Federal Claims mandates that "[a] party that without substantial justification fails to disclose information required by RCFC 26(a) or 26(e)(1), or to amend a prior response to discovery as required by RCFC 26(e)(2), is not, unless such failure is harmless, permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed." HUD willfully refused to answer Englewood's interrogatories regarding unresolved issues relating to the physical condition of South Pointe and deficiencies in the scope of repairs proposed by Englewood in its request for a HUD-insured loan. HUD's failure to describe the basis for its defenses in this action has deprived Englewood (and this Court) of a pre-trial explanation of the nature of HUD's claim that the physical condition of South Pointe was unacceptable or that Englewood's loan application was unsatisfactory.

Englewood has been prejudiced by HUD's failure to respond to interrogatories, and later about-face regarding these issues at trial. If Englewood had known that HUD intended to argue that any observation of South Pointe by HUD employees (or even other agencies and entities) was relevant to HUD's decision to terminate the HAP Contract, Englewood would have taken a different approach to discovery. At a minimum, Englewood would have deposed HUD employees who now state that they observed the condition of the property, and issued further discovery regarding HUD's decision-making procedures.

It is far too late in the day for HUD to change its theory of the case and its defenses to Englewood's claims in this action. Indeed, HUD's change of position violates longstanding contract principles. *Harbor Ins. Co. v. Continental Bank Corp.*, 922 F.2d 357, 363 (7th Cir. 1990). In *Harbor Ins. Co.*, the Seventh Circuit explained that the hornbook law of contracts has always prohibited parties from changing its position regarding the nature of the breach of contract by its opponent. The Court explained this rule as a "a corollary of the duty of

good faith that the law … imposes on the parties to contracts." *Id.* The Court noted that "[a] party who hokes up a phony defense to the performance of his contractual duties and then when that defense fails (at some expense to the other party) tries on another defense for size can properly be said to be acting in bad faith." *Id.; see also* Farnsworth § 7.17 n. 23 (2004 ed.) (quoting *Harbor Ins. Co.*).

HUD's Notice of Default identified its 1999 and 2001 REAC inspections, and Englewood's request for a HUD-insured loan as bases for the default. But during discovery, HUD asserted that these inspections (and any others) were irrelevant to the issues in this case, as were issues relating to the HUD-insured loan. HUD should not be allowed now to contradict itself, changing its position by offering evidence on matters as to which it had previously blocked Englewood interrogatories.

**CONCLUSION**

For the foregoing reasons, this Court should enter an order precluding HUD from introducing testimony or documents regarding the physical condition of South Pointe or any alleged deficiency in Englewood's applications for rehabilitation loans from HUD.

Dated: November 20, 2006

s/Peter V. Baugher
One of the Attorneys for Plaintiff
Englewood Terrace Limited Partnership

Peter V. Baugher
Schopf & Weiss LLP
312 West Randolph Street
Suite 300
Chicago, IL 60606
312.701.9300

**CERTIFICATE OF SERVICE**

I, Peter V. Baugher, an attorney, certify that on this 20th day of November, 2006, the foregoing **Plaintiff Englewood's Motion in Limine to Limit Testimony and Documents Relating to Inspections of South Pointe and Englewood's Requests for a HUD Rehabilitation Loan** was filed electronically with the Clerk of the Court using the CM/ECF system, which will automatically send email notifications of such filing to the following:

DOUGLAS K. MICKLE
Trial Attorney
Commercial Litigation Branch
Civil Division
United States Department of Justice
1100 L Street, NW
Washington, D.C. 20530

s/ Peter V. Baugher