IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| ENGLEWOOD TERRACE LIMITED PARTNERSHIP,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | ) | No. 03-2209C<br>(Judge Wolski) |

DEFENDANT'S OBJECTIONS AND
RESPONSES TO PLAINTIFF'S INTERROGATORIES

Pursuant to Rules 26 and 33 of the Rules of the Court of Federal Claims ("RCFC"), defendant, the United States of America, submits the following objections and responses to plaintiff's first set of interrogatories. Defendant has made a good faith effort to respond fully to those interrogatories to which it has not objected. Discovery is continuing, however, and defendant reserves the right to supplement its responses, including any objections that may be applicable, based upon any additional information and documents that may be discovered subsequent to providing these responses.

Defendant objects and responds to plaintiff's interrogatories as follows:

I. GENERAL OBJECTIONS AND RESPONSES

Defendant asserts and incorporates by reference the following objections to plaintiff's interrogatories as though

they were set forth in full in each response to each interrogatory:

1. Defendant objects to each interrogatory to the extent that it seeks information protected from disclosure by the attorney-client privilege, work product immunity, the deliberative process privilege, the law enforcement privilege, or any other privilege or immunity, including the Privacy Act of 1974, 5 U.S.C. § 552a.

2. Defendant objects to each interrogatory to the extent that it seeks information prepared or developed in anticipation of litigation or for trial when plaintiff has not shown that it has substantial need of such materials in the preparation of its case in that plaintiff is unable, without undue hardship, to obtain the substantial equivalent of such information by other means.

3. Defendant objects to each interrogatory to the extent that it seeks information irrelevant to the issues being litigated in this case and is not reasonably calculated to lead to the discovery of admissible evidence.

4. Defendant objects to those interrogatories that seek to require defendant to extract various types of information (such as names, positions or titles, dates, or the content of communications) from documents that have been produced upon the grounds that such information is as accessible to

plaintiff as to defendant and the burden of extracting the information is the same for plaintiff as defendant.

5. Defendant objects to the interrogatories to the extent that plaintiff seeks to require defendant to reach legal conclusions or conclusions as to the legal significance of certain documents or events that it is not required to make. In addition, defendant objects to the interrogatories to the extent that plaintiff seeks to require defendant to reach legal conclusions or conclusions concerning the legal significance of certain documents or events that must be determined by the Court in this action and upon the grounds that, to respond to them, defendant would be required to conduct an extensive investigation and to research, compile, and evaluate data and records in its possession, which would constitute a harassment, oppression, undue burden, and undue expense to defendant.

6. Defendant objects to any inference that can be drawn from any portion of either the interrogatories or interrogatory responses that the documents as to which identification is requested or events referenced in the requests actually exist or occurred. The failure to object to each such inference in no way constitutes an admission by defendant that such information exists or that such events actually occurred.

7. Defendant objects to each definition, instruction, and request to the extent that it seeks to impose upon defendant any obligations or responsibilities other than those mandated by the Rules of this Court.

8. Defendant objects to each and every interrogatory that is so vague, broad, general, and all inclusive that it does not permit a proper or reasonable response and is, therefore, unduly burdensome and oppressive.

9. Defendant's objections stated above and below are incorporated by reference to each interrogatory, and shall not be repeated as objections to each definition, instruction, and request to which they are applicable. In addition to these general objections, defendant asserts the specific objections set forth below. By stating these specific objections, defendant does not waive any of the objections incorporated herein.

10. Defendant notes that the information supplied in these responses is based upon the knowledge of the parties' agents, representatives and attorneys, unless privileged.

12. Defendant notes that the word usage and sentence structure is that of the attorneys who in fact prepared these responses.

13. Defendant notes that it reserves the right to supplement or amend its responses in the event that additional

information comes to light throughout the discovery process, and shall provide any such information as it becomes available.

II. SPECIFIC RESPONSES AND OBJECTIONS TO INTERROGATORIES

Interrogatory No. 1

With respect to Southpointe Tower ("Southpointe"), describe the respective roles and responsibilities of the Chicago Satellite Office ("CSO") of the Departmental Enforcement Center ("DEC") and the Chicago Office of Multifamily Housing ("MFH") during the following time periods:

a) Before August of 1998;

b) August 1998 through July 1, 1999;

c) July 1, 1999 through the January 26, 2000 Final Team Report-Resolution or January 26, 2000 recommending the Return of Southpointe to MFH;

d) January 26, 2000 through October 23, 2001 when Southpointe was again referred to the CSO DEC;

e) Subsequent to October 23, 2001.

RESPONSE: With respect to the project at issue in this dispute, MFH generally provided all oversight of operations and compliance with Department of Housing and Urban Development ("HUD") business agreements. MFH referred instances of non-compliance with business agreements to the DEC.

All delegated authority for actions taken in relation to the project's business agreements for the periods at issue in

this dispute rested with MFH; although the DEC possessed authority to propose, recommend, and support enforcement actions. The DEC also possessed authority to provide ongoing support of MFH after a matter was closed by the DEC.

After Spring 2003, DEC Satellite Office Directors were temporarily delegated limited enforcement authority as published in the Federal Register.

Interrogatory No. 2

Stating dates applicable, identify the job titles, job descriptions, responsibilities, authority, duties, immediate supervisors and reporting relationships of the following individuals who were assigned to the CSO DEC:

a) James Zale;

b) Joan Kiening;

c) Freddie Batchelor;

d) Cathy Paul;

e) Sandra Suit[e]r;

f) Patrice Harris;

g) Maria Baguio;

h) Greg Gustin;

i) Margarita Maisonet

RESPONSE: As relevant to the issues in this dispute, matters of delegated authority are addressed in defendant's response to Interrogatory No 1. Additional responses to this Interrogatory are below.

a) James Zale: CSO DEC Satellite Office Director ("SOD") for the period from October 1998 through April 2000; immediate supervisor: Alberta Zinno, DEC Director, Washington. All CSO DEC staff that are not attorneys or paralegals report to the SOD or a Team Leader that reports to the SOD.

b) Joan Kiening: CSO DEC Satellite Office Team Leader for the period from October 1998 through March 2000; immediate supervisor: James Zale. Ms. Kiening was Freddie Batchelor's team leader while she was assigned to the project.

c) Freddie Batchelor: CSO DEC Enforcement Analyst. Ms. Batchelor was assigned to the project from October 1998 until it was closed and returned to MFH in January 2000. Immediate supervisor: Joan Kiening. Ms. Batchelor retired from HUD in April 2004.

d) Cathy Paul: CSO DEC Enforcement Analyst. Ms. Paul was assigned to the project from approximately March 2001 until she retired from HUD in 2002; immediate supervisor: Team Leader Sandra Suiter and James Pollock (for a short time prior to Ms. Suiter's retirement.

e) Sandra Suiter: CSO DEC Satellite Office Team Leader from September 2000 through March 2002.

Immediate supervisor: Margarita Maisonet. Ms. Suiter was Freddie Batchelor's Team Leader for a portion of the time Ms. Batchelor was assigned to the project, and Ms. Suiter was Ms. Paul's Team Leader while Ms. Paul was assigned to the project. Ms. Suiter served on a headquarters review team that examined CSO DEC cases, including the project's 2000 Final Team Report. Ms. Suiter was reassigned as an Enforcement Analyst in March 2002, and her immediate supervisor was James Pollock, CSO DEC SOD as of December 2004, and currently is Bradley Adams, Acting Team Leader. Ms. Suiter has periodically assisted CSO DEC legal staff with the project since 2000.

f) Patrice Harris: CSO DEC Enforcement Attorney from 1998 through 2000; immediate supervisor: Gregory Gustin. Ms. Harris left HUD to accept a position in private practice in 2000.

g) Maria Baguio: CSO DEC Enforcement Attorney, from 1998 to-date; immediate supervisor: Gregory Gustin.

h) Greg Gustin: CSO DEC Lead Enforcement Attorney from January 1999 through May 2004, Associate Regional Counsel for Program Enforcement from May 2004 to-date; immediate supervisor from January 1999 to November 2003: Associate General Counsel

(Enforcement) John Herold; immediate supervisor from November 2003 to-date: Regional Counsel Courtney B. Minor. Mr. Gustin periodically served as Acting SOD during the SOD's absences (such as for the periods from January 2003 through October 2004), but his duties in this capacity did not concern issues relevant to this dispute.

i) Margarita Maisonet: CSO DEC SOD from April 2000 through November 2004; immediate supervisors: Ed Krause, former DEC Director, Washington and Jon Gant, former DEC Director Washington. Ms. Maisonet was assigned various details during her tenure as SOD, including as Acting DEC Director, Washington. In her absences, Attorney Gregory Gustin and Team Leaders Walter Mozdzierz and Jim Pollock served as Acting SOD. Ms. Maisonet was appointed DEC Director, Washington in November 2004, and her immediate supervisor is General Deputy General Counsel George Weidenfeller.

Interrogatory No.3

For each of the individuals listed in Interrogatory 2, state what entries or files they were required by HUD regulations, rules or practice to produce and keep for Southpointe with respect to (a) REMS; (b) the "imaging" files; (c) the hard copy, administrative or "green files"; and (d)

any other reports, analyses, studies, correspondence or email communications with respect to the processing or review of any meaningful decision or action taken with respect to the CSO DEC's supervision of Southpointe.

RESPONSE: Defendant objects to this Interrogatory seeking to require defendant to extract various types of information (such as names, positions or titles, dates, or the content of communications) from documents that have been produced upon the grounds that such information is as accessible to plaintiff as to defendant and the burden of extracting the information is the same for plaintiff as defendant. Defendant also objects to this Interrogatory to the extent that plaintiff seeks to require defendant to reach legal conclusions or conclusions as to the legal significance of certain documents or events that it is not required to make. Defendant refers plaintiff to HUD regulations pertaining to this matter, including Title 24, Code of Federal Regulations and those contained on HUD's Internet site at www.hudclips.org.

Interrogatory No. 4

State what roles and responsibilities (1) MFH had with respect to Southpointe during time periods (b), (c) and (c) listed in Interrogatory 1, when Southpointe was referred to the CSO DEC, and (2) the CSO DCE had with respect to Southpointe during time

periods (a) and (d) listed in Interrogatory 1, when Southpointe was the responsibility of MFH.

RESPONSE: Please see our response to Interrogatory No. 1.

Interrogatory No. 5

Identify the Chicago Office MFH Project Manager with direct oversight responsibility for Southpointe for the following time periods, and to whom that person (or those persons) reported:

a) 1992 through August 1998;

b) August 1998 through June 30, 1999;

c) July 1, 1999 through January 26, 2000;

d) January 26, 2000 through October 18, 2000;

e) October 18, 2000 through May 16, 2001;

f) May 16, 2001 through October 1, 2001;

g) October 2, 2001 through December 31, 2001;

h) 2002;

i) 2003;

j) 2004.

RESPONSE: During the periods referenced, the organizational structure of MFH changed from one in which two MFH staff members were assigned to project oversight (a "Loan Servicer" if a project had a HUD-insured or HUD-held mortgage, and an "Occupancy Specialist" that managed Housing Assistance Payments Contract matters) to a structure in which one MFH staff member served as a project manager combining these responsibilities.

With respect to the project, prior to 1996, available records indicate that Cheryl Martin-Merhl was the MFH Loan Servicer until the project's mortgage was prepaid in 1992. Ms. Martin-Merhl's supervisors were Debbie Gray and Veronica Coleman. With respect to the project, prior to 1996, available project records indicate Gwen Thomas served as the Occupancy Specialist, and her supervisors were Denise Johnson, Joan Kiening, Margarita Maisonet, Mary Anderson, and Veronica Coleman.

With respect to the project, 1996 and after, available records indicate that the following MFH staff were the Project Managers: Gwen Thomas was the Project Manager until September 1996, and her supervisors were Margarita Maisonet and Walter Mozdzierz. Kathy Merritt was the Project Manager from September 1996 until sometime in 1998, and her supervisors were Debbie Gray and Veronica Coleman. In 1998, Gwen Thomas succeeded Kathy Merritt as Project Manager and she has remained the Project Manager to-date. Her supervisors were Walter Mozdzierz and Kathy McMahon. Her current supervisors are Debbie Gray and Veronica Coleman. Ms. Thomas coordinates with Ms. Coleman when addressing troubled projects, including the one at issue in this dispute.

Interrogatory No. 6

State what roles and responsibilities the individuals listed in Interrogatory 2 had with respect to the procedures that were followed in the initial preparation, distribution, review, comment preparation, approvals, signed concurrences and the final approval of the following documents prepared by the CSO DEC with respect to:

a) Draft Team Report on Southpointe prepared in May/June 1999;

b) MIO Plan prepared for Southpointe in May/June/July 1999;

c) Final Action Plan prepared before July 2, 1999;

d) MIO Plan update submitted on December 6, 1999;

e) Final Action Plan - Resolution prepared on January 6, 2000.

RESPONSE: Defendant objects to this Interrogatory seeking to require defendant to extract various types of information (such as names, positions or titles, dates, or the content of communications) from documents that have been produced upon the grounds that such information is as accessible to plaintiff as to defendant and the burden of extracting the information is the same for plaintiff as defendant. Defendant refers plaintiff to its response to Interrogatory No. 2 and to documents B8263, D1602-1611, and A2594-96.

Interrogatory No. 7

With respect to the following actions and decisions on Southpointe, state (1) which of them may be made entirely by the Project Manager without the approval of anyone else within MFH, (2) which require the review or approval of the Project Manager's Supervisor, other senior staff at the Chicago Office MFH, HUD Headquarters ("HQS) or the Director, Team Leader, Enforcement Analyst, or attorney at the CSO DEC. If the answers vary by date, state the applicable time periods:

a) Processing HAP/Contract renewal applications;

b) Processing owner requests for rental increases:

c) Processing owner requests for "special claims," emergency relief or other requests for financial assistance;

d) Scheduling, performing and documenting physical inspections;

e) Processing owner requests for physical improvement loans;

f) Approving a Management Improvement and Operations ("MIO") Plan;

g) Approving work done in response to the MIO;

h) Reviewing and approving the marketing and leasing activities of owner.

i) Reviewing and approving the annual financial reports and budget requests made by the owner in compliance with HUD rules and regulations;

j) Approving construction improvements and costs which are in the nature of capital improvements;

k) Making the determination that the owner is in Default of the HAP Contract;

l) Informing the owner of the specific corrections which the owner must make to correct the factors which led to the determination of Default and the time period in which the corrections must be made;

m) Imposing sanctions on the owner as set out in Paragraph 20 of the HAP Contract;

n) Reviewing the REAC reports which were made in April 1999 and March 2001 and in working with the owner to develop appropriate corrective strategies;

o) Making the determination that the owner and/or management agent Should receive a 2530 "flag" that would limit or prohibit the ability of the owner or management agent to participate in HUD subsidy, financing or insurance programs;

p) Suspending HAP Contract payments;

q) Abating HAP Contract payments;

r) Terminating HAP Contract payments;

s) Writing letters on behalf of HUD to the owner or management agent.

RESPONSE: To the extent that the Interrogatory purports to describe "actions" or "decisions" that could affect the project, with the exception of sending letters confirming site visits as agreed with a project agent, there are no "actions" or "decisions" that could be taken by a project manager without the approval of a supervisor employed by MFH.

Interrogatory No. 8

With respect to each of the actions or decisions listed in Interrogatory 6 that require the review, approval or concurrence

of other and senior staff within the Chicago Office MFH, CSO DEC or HUD HQS, (a) identify the rules, regulations and procedures that describe the processes by which final decisions are made by HUD with respect to these actions or decisions and communicated to the owner and management agent, and the owners and management agents are advised of their rights to question, appeal or challenge the assumed facts, or proposed actions or decisions made by HUD, and (b) state what rules, regulations and handbook provisions define, describe and illustrate the various decision making processes.

RESPONSE: Defendant objects to this Interrogatory to the extent that plaintiff seeks to require defendant to reach legal conclusions or conclusions as to the legal significance of certain documents or events that it is not required to make. Defendant refers plaintiff to HUD rules, regulations, and procedures pertaining to the issues in this dispute, including Title 24, Code of Federal Regulations, HUD Program statutes, and those contained on HUD's Internet site at www.hudclips.org. Defendant also refers plaintiff to the project business agreements at issue in this dispute and the "HAP Renewal Guide," which plaintiff has cited in prior litigation.

Interrogatory No. 9

With respect to the specific decisions made with respect to Southpointe on each of the decision points or actions listed in Interrogatory 6, and the official process for arriving at these decisions made in Interrogatory 7, identify who were the specific individuals in the Chicago Office MFH, the CSO DEC, or HUD HQS responsible for participating in, reviewing proposed decisions or actions, approving or concurring in the specific decisions made with respect to Southpointe decisions or actions listed in Interrogatory 6 from August 1998 to the final administrative decision made by Howard Mayfield of HUD HQS on May 2, 2002. For each of the foregoing, state what decision, concurrence or approval was made by the individual, and upon what legal or regulatory standard, criteria or assumption with respect to facts the decision was made.

RESPONSE: Defendant objects to this Interrogatory as seeking information irrelevant to the issues being litigated in this case and not reasonably calculated to lead to the discovery of admissible evidence. Defendant also objects to this Interrogatory seeking to require defendant to extract various types of information (such as names, positions or titles, dates, or the content of communications) from documents that have been produced upon the grounds that such information is as accessible to plaintiff as to defendant and the burden of

extracting the information is the same for plaintiff as defendant. Defendant further objects to this Interrogatory to the extent that plaintiff seeks to require defendant to reach legal conclusions or conclusions as to the legal significance of certain documents or events that it is not required to make. Defendant refers plaintiff to its responses to Interrogatories No. 6 and 7.

Interrogatory No. 10

State on what specific dates from August 1998 through May 16, 2001, official physical inspections were made of Southpointe by the CSO DEC, by REAC, by Pinnacle, or by the Chicago Office MFH. For each inspection, state the purpose of that inspection, identify the names and titles of the persons responsible for the inspections, and describe the results of these inspections in terms of reports, tests, photographs and other documentary evidence. Identify any documents reporting on or otherwise pertaining to these inspections.

RESPONSE: Defendant objects to this Interrogatory as seeking to require defendant to extract various types of information (such as names, positions or titles, dates, or the content of communications) from documents that have been produced upon the grounds that such information is as accessible to plaintiff as to defendant and the burden of extracting the information is the same for plaintiff as defendant.

Whenever HUD, through its agents, employees, contractors, or other authorized personnel, visits a project to conduct an inspection, a site visit, a management review, an occupancy review, or other review, it invariably occurs to determine if the project is in compliance with its HUD business agreements. The project experienced various such visits during the period referenced. Typically, resulting reports are reduced to writing and the author is identified.

Written reports associated with the project are no different, and all written reports (and any photos and other documents) the plaintiff requested have been produced except to the extent they contain any privileged material. Accordingly, plaintiff is directed to the documents produced to it, and specifically those numbered D1612-50; D0388-783; D0836-842; B8220-1; A2224-42; A2203-2218; B8209-19; B8276-77; A2267-85; A2203-16; A2259; A2162-66; A2167-88; A2288-96; A2243-46; A2329-32; and A2297-99.

<u>Interrogatory No. 11</u>

Identify the physical deficiencies at Southpointe that were listed on the April 29, 1999 REAC Report that were <u>not</u> corrected by Englewood or that were <u>not</u> to be corrected as part of a new rehabilitation loan request. Identify any documents reporting on or otherwise pertaining to these deficiencies.

RESPONSE: Defendant objects to this interrogatory as seeking information irrelevant to the issues being litigated in this case and not reasonably calculated to lead to the discovery of admissible evidence. The mere repair of physical deficiencies identified in a REAC inspection would not ensure that the project was in acceptable physical condition. Moreover, HUD's provision of an $11 million insured loan to plaintiff, and the repairs and rehabilitation that loan was intended to finance as a condition to insuring that loan, have no relevance to plaintiff's failure to timely cure its Housing Assistance Contract breach.

Interrogatory No. 12

Identify the physical deficiencies at Southpointe that were listed on the March 8, 2001 REAC Report that were not corrected by Englewood between March 8, 2001 and April 8, 2001, or that were not planned to be corrected by the Englewood rehabilitation plan submitted to HUD on March 19, 2001, and again on April 8, 2001. Identify any documents reporting on or otherwise pertaining to these deficiencies.

RESPONSE: We refer plaintiff to our response to Interrogatory No. 11.

Interrogatory No. 13

Identify any physical deficiencies listed on an official HUD inspection Report that were not corrected by Englewood or

that were not planned to be corrected as part of a rehabilitation loan application submitted by Englewood. Identify any documents reporting on or otherwise pertaining to these deficiencies.

RESPONSE: We refer plaintiff to our response to Interrogatory No. 11.

Interrogatory No. 14

Describe the differences in the scope of work proposed by Englewood and by HUD in their discussions of a rehabilitation loan in March 2001, identifying any additional work requested by HUD listed on the REAC Report of 2001, and stating whether Englewood said it would not do the additional work requested by HUD.

RESPONSE: We refer plaintiff to our response to Interrogatory No. 11.

Interrogatory No. 15

State in what capacities as a lawyer, lead lawyer or acting director of the DEC Greg Gustin, participated in the decisions or actions listed in Interrogatories 6 and 7 regarding Southpointe:

a) For each month from August 1998 through June 30, 1999;

b) For each month from July 1, 1999 through January 26, 2000;

c) For each month from January 26, 2000 through October 23, 2001;

d) For each month subsequent to October 23, 2001.

RESPONSE: With respect to the subjects of the referenced Interrogatories, Mr. Gustin's "particip[ation]" was only as HUD counsel in his capacities as Lead Enforcement Attorney and, as of May 2004, Associate Regional Counsel for Program Enforcement.

Interrogatory No. 16

State in what capacities in HUD MFH Chicago, DEC Chicago or DEC Headquarters Margarita Maisonet participated in decisions or actions listed in Interrogatories 6 and 7 regarding Southpointe;

a) For each month from August 1998 through June 30, 1999;

b) For each month from July 1, 1999 through January 26, 2000;

c) For each month from January 26, 2000 through October 23, 2001;

d) For each month subsequent to October 23, 2001.

RESPONSE: Prior to joining the CSO DEC, Ms. Maisonet was a Project Manager, a MFH Supervisor, and then the Troubled Project Manager for MFH. Ms. Maisonet served as CSO DEC SOD from April 2000 through November 2004. Ms. Maisonet was appointed as DEC Director, Washington in November 2004. With respect to the project, any "participation" by Ms. Maisonet was in these capacities.

Interrogatory No. 17

Identify the individuals from the DEC HHQ, and CSO of the DEC and Chicago MFH who visited Southpointe on or about August 30, 1999, and who participated in the meeting on or about that same date at the Chicago HUD offices. State the purpose for this site visit and subsequent conversation in the HUD offices, describe the results of the site visit and subsequent conversation, and identify what entries were made in REMS related to this visit, by whom, and when.

RESPONSE: Defendant objects to this Interrogatory as seeking to require defendant to extract various types of information (such as names, positions or titles, dates, or the content of communications) from documents that have been produced upon the grounds that such information is as accessible to plaintiff as to defendant and the burden of extracting the information is the same for plaintiff as defendant. To the extent they are identified, the names of the individuals are set forth in the documents associated with the events plaintiff references. Defendant refers plaintiff to the following documents: D1602-11 and B4269. Based upon the dates recited in the Interrogatory, defendant believes that one or more the following HUD staff were likely to have participated in the site visit and immediately subsequent meetings: Alberta Zinno, DEC Director, Washington; Marilyn Edge, DEC Operations

Director, Washington; James Zale CSO DEC SOD; Joan Kiening, CSO DEC Team Leader; Freddie C. Batchelor, CSO DEC Enforcement Analyst; Patrice Harris, CSO DEC Enforcement Attorney; Gwen Thomas, MFH Project Manager; and, Kathy Merritt, MFH Project Manager.

Interrogatory No. 18

State when and by whom the scope of work proposed in the MIO by Englewood in response to the referral of Southpointe to the CSO DEC in June/July 1999 was approved by the DEC in Chicago and Washington and by Chicago MFH, and identify any work identified in the REAC inspection of April 29, 1999, that was not completed by the time of the Final Team Report - Resolution, or for which there was not a plan for its completion within the framework of the MIO.

RESPONSE: Defendant objects to this interrogatory as seeking information irrelevant to the issues being litigated in this case and not reasonably calculated to lead to the discovery of admissible evidence. Defendant further objects to this Interrogatory as seeking to require defendant to extract various types of information (such as names, positions or titles, dates, or the content of communications) from documents that have been produced upon the grounds that such information is as accessible to plaintiff as to defendant and the burden of extracting the information is the same for

plaintiff as defendant. Regardless, no MIO was ever approved by HUD for the periods relevant to this dispute. The HUD staff that would have considered the plaintiff's submissions for the periods referenced are identified in defendant's responses to the proceeding Interrogatories as well as in the actual documents which have been produced to plaintiff. For example, defendant refers plaintiff to document D1602-

Interrogatory No. 19

Describe any written response provided to Englewood by Chicago MFH or the DEC related to the MIO updates presented by Englewood on July 7, 2000, July 20, 2000, July 27, 2000, and August 15, 2000.

RESPONSE: Defendant objects to this Interrogatory as seeking information irrelevant to the issues being litigated in this case and not reasonably calculated to lead to the discovery of admissible evidence. Defendant also objects to this Interrogatory as seeking to require defendant to extract various types of information (such as names, positions or titles, dates, or the content of communications) from documents that have been produced upon the grounds that such information is as accessible to plaintiff as to defendant and the burden of extracting the information is the same for plaintiff as defendant. Regardless, the documents plaintiff identifies as "MIO updates" actually include occupancy

reviews. Further, the document plaintiff references as being dated July 7, 2000 appears to be a document dated June 7, 2000. HUD refers plaintiff to its written response to this document dated October 3, 2000 (produced to plaintiff as document number A2190). HUD may supplement its answer to this Interrogatory if additional responsive documents are found among those already produced to plaintiff.

Interrogatory No. 20

During the period from April 1, 2000 through September 30, 2000, describe any official inspections of the work done by Englewood to complete the MIO that challenged the extent, nature or quality of the work done. Identify any documents pertaining to such inspections.

RESPONSE: We refer plaintiff to our response to Interrogatory No. 18.

Interrogatory No. 21

State the purpose(s) of delaying the transmission to Englewood until June 16, 2000, of the results of Gwen Thomas' Management Review of March 14, 2000. Identify any documents pertaining to said purpose or delay.

RESPONSE: Defendant objects to this interrogatory as seeking information irrelevant to the issues being litigated in this case and not reasonably calculated to lead to the discovery of admissible evidence. Defendant denies "delaying" transmission of the referenced document.

Interrogatory No. 22

Identify any written response provided to Englewood by Chicago MFH Or the DEC related to the Englewood's full response to the Management/Occupancy Review on July 10, 2000.

RESPONSE: Plaintiff is directed to the document produced as A2190 as evidencing its reply to Englewood's response to the July 10, 2000 Management/Occupancy Review.

Interrogatory No. 23

Identify any written response by Chicago MFH or the DEC to the Englewood submission to HUD of Englewood's review and assessment of the physical condition of the units at Southpointe on November 3, 2000.

RESPONSE: Defendant states that the document plaintiff appears to reference is an internal document plaintiff's staff prepared and submitted informally to HUD for informational purposes. To date, defendant has located no document written in response to this document. HUD may supplement its answer to this Interrogatory if additional responsive documents are found among those already produced to plaintiff.

Interrogatory No. 24

Describe the official procedure that HUD MFH is to follow in proposing that an owner or management agent be "flagged" for poor performance; that standard by which the decision is to be made; how the decision is communicated to the owner or management agent; whether the owner or management

agent have the opportunity to challenge the proposed action; whether the owner or management agent have the opportunity to appeal the decision; and what are the practical consequences of the "flag". If the answers vary by date, please state the time period applicable.

RESPONSE: Defendant objects to this Interrogatory as seeking information irrelevant to the issues being litigated in this case and not reasonably calculated to lead to the discovery of admissible evidence. Defendant also objects to this Interrogatory as seeking to require defendant to reach legal conclusions or conclusions as to the legal significance of certain documents or events that it is not required to make. Regardless, defendant refers plaintiff to HUD's Handbooks, policy statements, and other guidance that may be found at www.hudclips.org. Defendant further refers plaintiff to 24 CFR Part 200, Subpart H (Participation and Compliance Requirements), Sections 200.210 et seq.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

BRIAN M. SIMKIN
Assistant Director

PAUL R. WELLONS
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, DC 20530
Tel: (202) 616-8253
Fax: (202) 307-0972

March 30, 2005

Attorneys for Defendant

Case 1:03-cv-02209-MBH Document 184 Filed 02/21/2008 Page 30 of 30

CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on this __ day of March 2005, I cause to be served by U.S. mail (first class, postage prepaid) and facsimile a true and correct copy of "DEFENDANT'S OBJECTIONS AND RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES" upon counsel of record for plaintiffs at the following address:

Peter V. Baugher
Shopf & Weiss LLP
312 West Randolph Street
Suite 300
Chicago, IL 60606-1721

______________________________