**No. 03-2209C**
**(Judge Horn)**

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**ENGLEWOOD TERRACE LIMITED PARTNERSHIP,**

**Plaintiff,**

**v.**

**THE UNITED STATES,**

**Defendant.**

# DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTIONS IN LIMINE

**PETER D. KEISLER**
**Assistant Attorney General**

**DAVID M. COHEN**
**Director**

**BRIAN M. SIMKIN**
**Assistant Director**

**DOUGLAS K. MICKLE**
**Trial Attorney**
**Commercial Litigation Branch**
**Civil Division**
**Department of Justice**
**Attn: Classification Unit,**
**8th Floor**
**1100 L Street, N.W.**
**Washington, D.C. 20530**

**Attorneys For Defendant**

**OF COUNSEL:**
**GREGORY G. GUSTIN**
**MARIA T. BAGUIO**
**RUSSELL J. COHEN**
**LORRAINE C. SHOTO**
**THOMAS G. MASSOURAS**
**Office of General Counsel**
**U.S. Department of Housing**
**and Urban Development**

**November 28, 2006**

# TABLE OF CONTENTS

**PAGE(S)**


DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTIONS IN LIMINE .............................. 1

ARGUMENT ........................................................................................................ 2

I. Plaintiff's First Motion In Limine Should Be Rejected ........................................ 2

A. HUD Has Always Maintained That Englewood 's Section 8 HAP Contract Was Terminated Because Numerous Inspections Consistently Showed That Englewood Failed To Maintain South Pointe In A Decent, Safe, And Sanitary Condition ........................................................ 2

B. Englewood Is Correct, Englewood's Attempt To Obtain A HUD Insured Loan Is Not Relevant To The Fact That Englewood Failed To Cure Its Breach Of Its Section 8 HAP Contract .................................................. 13

II. Plaintiff's Second Motion In Limine Should Be Rejected .................................. 15

A. HUD Has Always Placed Englewood On Notice That Alan Cravitz Of Developer's Mortgage Possessed Information That Could Be Relevant To This Matter ........................................................................ 15

CONCLUSION ................................................................................................. 17

# INDEX TO DEFENDANT'S APPENDIX

1998 HAP contract ........ Exhibit 1

1999 HAP contract ........ Exhibit 2

HUD's April 9, 2001 notice of default ........ Exhibit 3

HUD's May 16, 2001 continuing notice of default ........ Exhibit 4

HUD's November 30, 2001 notice of abatement and termination ........ Exhibit 5

Maisonet depo extract ........ Exhibit 6

Samuelson depo extract ........ Exhibit 7

April 5, 2001 letter to Joan Kiening, HUD
re: management Improvement and Operating Plan ........ Exhibit 8

March 8, 2001 REAC Physical Condition Report ........ Exhibit 9

Apr. 8, 2001 Letter From Kelly Brown,
Regional Property Manager, P.M. One,
To Ms. Coleman Re: REAC Inspection ........ Exhibit 10

Notice of Public Nuisance dated July 7, 2001 ........ Exhibit 11

E-mail from Lillye Simmons dated Oct. 22, 2001 ........ Exhibit 12

District court's order ........ Exhibit 13

Government's Initial Disclosures ........ Exhibit 14

March 9, 2001 Letter From Ms. Coleman To
Mr. Hayes Re: REAC EHS Certification ........ Exhibit 15

March 16, 2001 Letter From Mr. Hayes To
Ms. Coleman Re: EHS Certification ........ Exhibit 16

Englewood's Initial Disclosures ........ Exhibit 17

Englewood's Response To Defendant's Request For Production of Documents ........ Exhibit 18

Englewood's Response To Defendant's First Set Of Interrogatories ........ Exhibit 19

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **ENGLEWOOD TERRACE LIMITED PARTNERSHIP,** | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **No. 03-2209C** |
| | ) | **(Judge Marian Blank Horn)** |
| **THE UNITED STATES,** | ) | |
| **Defendant.** | ) | |

**DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTIONS *IN LIMINE***

Defendant, the United States, pursuant to Rule 12 of the Rules of the United States Court of Federal Claims ("RCFC") and the Court's November 6, 2006 Order, respectfully responds to the two motions in limine plaintiff, Englewood Terrace Limited Partnership ("Englewood") filed on November 20, 2006.

Englewood's first motion in limine seeks to "limit testimony and documents relating to inspections of South Pointe and Englewood's request for a HUD rehabilitation loan." Docket Entry 115. Englewood's second motion in limine seeks to "exclude testimony of Alan Cravitz and documents produced by Developers Mortgage Corporation."[1] Docket Entry 116.

As we demonstrate below, neither motion has merit. In support of this response, the United States relies upon the Complaint ("Compl."), the accompanying appendix ("DA"),[2] and the following brief.

---

[1] Mr. Cravitz is the owner of Developers Mortgage Corporation.

[2] Defendant's appendix includes documents we cite for support in this motion.

## ARGUMENT

### I. Plaintiff's First Motion *In Limine* Should Be Rejected

#### A. HUD Has Always Maintained That Englewood 's Section 8 HAP Contract Was Terminated Because Numerous Inspections Consistently Showed That Englewood Failed To Maintain South Pointe In A Decent, Safe, And Sanitary Condition

It is not surprising that Englewood is trying to keep evidence regarding HUD's inspections of South Pointe from being presented at trial. The evidence is highly damaging, and HUD shows that the residents of South Pointe were forced to live in such appalling conditions that HUD terminated Englewood's Section 8 HAP contract. What is surprising is Englewood's insistence now that it was not aware that these inspections played a role in Edward Hinsberger's decision to terminate the contract. Indeed, our responses to interrogatory number 10 details the purpose of these inspections.

Englewood urges this Court to conclude that the Government has somehow caused some "change in course [that] prejudices Englewood" and claims it was "denied information regarding these issues during discovery." Docket Entry 115 at 1. To the contrary, neither the Government nor Englewood has changed their course. The Government properly understands Englewood's HAP contract obligations, and Englewood does not. No prejudice was caused and no information was denied by the Government's fundamental and correct reading of Englewood's obligations pursuant to Englewood's HAP contract.

Englewood's first motion in limine apparently forgets what this case is all about. This is a breach of contract case for Englewood's failure to keep and maintain all of South Pointe Towers in decent, safe and sanitary condition as required by Englewood's contract with the

Government, and applicable law and regulations. The Government could not have been clearer throughout the course of this litigation and all its related proceedings.

For example, the 1998 HAP contract states the following:

> Owner's Warranties. The Owner warrants that the rental units . . . are in good and tenantable condition and meet HUD's Housing Quality Standards;

DA Exhibit 1 [JE 19 (1998 HAP contract) at Section 2].

Section 6(a) of the 1998 HAP contract states:

> Maintenance, Operation and Inspection. The Owner agrees to maintain and operate the Contract units, unassisted units, if any, and related facilities to provide decent, safe, and sanitary housing including the provision of all services, maintenance and utilities . . . [and] if HUD determines that the Owner is not meeting one or more of these obligations, HUD shall have the right to take action under Section 20 [for the default].

DA Exhibit 1 [JE 19 (1998 HAP contract) at Section 6(a)].

Additionally, Section 6(b) states:

> Inspection. Prior to the occupancy of any Contract Unit by a family . . . the Owner shall inspect the unit . . . and . . . certify on forms prescribed by HUD, that [it has] inspected the unit and . . . determined it to be decent, safe, and sanitary . . . [and] the Owner shall keep copies of these reports on file for at least three years.

DA Exhibit 1 [JE 19 (1998 HAP contract) at Section 6(b)].[3]

---

[3] It is instructive that the owner has never produced any such reports certifying it performed its own contractually required inspections of all units, and thus Englewood's objections that the Government's inspections should be precluded from providing evidence of Englewood's breach is factually anomalous.

Finally, Section 6( c) states that:

> HUD shall inspect or cause to be inspected at such times as may be necessary to ensure that the Owner is meeting its obligations to maintain the units in decent, safe and sanitary condition . . .

DA Exhibit 1 [JE 19 (1998 HAP contract) at Section 6(c)].[4]

Each of the renewals of the 1998 HAP contract that Englewood signed, including those that Englewood asks this Court to ignore, provide that these 1998 HAP contract terms are renewed. See, e.g., DA Exhibit 2 [JE 20 (1999 HAP contract at Section 2 "All terms of the Expiring Contract are renewed except for those provisions relating to contract rents and rent adjustments.")].

Consistently, HUD's April 9, 2001 notice of default, May 16, 2001 continuing notice of default, and November 20, 2001 notice of abatement and termination, clearly state that HUD's actions for Englewood's default are grounded upon Englewood's failure to keep and maintain all of South Pointe in acceptable physical condition as required by Englewood's HAP contract. See DA Exhibit 3 [JE 89 (HUD's April 9, 2001 notice of default,"The failure to keep and maintain the Project in decent, safe, and sanitary condition is a default of the HAP Contract.")], DA Exhibit 4 [JE 94 (May 16, 2001 continuing notice of default,"HUD did not receive an acceptable plan addressing all the physical deficiencies from either the Owner or the Owner's

---

[4] There is no limitation upon how many times HUD may inspect to confirm Englewood's compliance, or non-compliance; and the owner or its agents are present at each such inspection so any feigned surprise that inspections occurred is erroneous. Admittedly, as HUD argued in its motions in limine, HUD inspections occurred at times when Englewood's principal partners were different; i.e. Mr. Hayes and Mr. Samuelson. A feigned perception that Mr. Hayes did not know of visits that Mr. Samuelson knew of, and vice versa, does not extinguish the fact that each, as a representative of Englewood, directly or through their agents, knew or should have known of the inspections.

identity-of-interest Project managing agent.")], and DA Exhibit 5 [JE 117 (November 30, 2001 notice of abatement and termination, "Owner has failed to maintain the property according to the physical conditions standards acceptable to HUD despite Owner's receipt of the notice of default and a reasonable opportunity (almost 240 days since the notice of default) to cure.")], Yet, despite all of these notices, Englewood now urges that the very basis of its default was somehow secreted from Englewood.

Not surprisingly, and as this matter apparently must be determined at trial, for HUD to conclude that Englewood failed to cure its default must, necessarily, be based upon: 1) inspections; 2) Englewood's failure to timely provide an acceptable (as to time and funding) plan to cure all of South Pointe's physical deficiencies; and, 3) Englewood's failure to timely implement such a plan (even assuming Englewood actually ever submitted one) and cure the default. Only if Englewood cured the default, so that the residents lived in decent, safe, and sanitary housing, would it be entitled to ongoing Government Section 8 payments.

As Department Enforcement Director Margie Maisonet testified at her deposition, it is common for HUD to confirm that a project's physical condition remains in unacceptable physical condition, in breach of a HAP contract, prior to HUD electing to abate and terminate a HAP contract. See DA Exhibit 6 [JE 13 (Maisonet depo at 217)]. Such was the case here. As Englewood itself admitted, the project suffered ongoing managerial neglect, physical and safety infirmities, and gangs and drug activity. DA Exhibit 7 [JE 14 (Samuelson depo at 142: "[South Pointe was] not for the feint of heart;" and generally Samuelson depo pp. 142-145 regarding security at the property and gang activity in the building)]. The burden in this case is for Englewood to prove the project was in decent, safe and sanitary condition, and that no default

remained uncured within the time allowed by the Government. To the contrary, Englewood now seeks the Court's permission, in the guise of a motion in limine, to impose the reverse.

As Englewood cannot satisfy its burden, it concocts a claimed ignorance that it did not know what the Government's contract standard was by urging, upon the one hand that, the Government claimed physical conditions were irrelevant to the actions taken (an accusation belied by every notice HUD provided, every decision HUD communicated, every inspection HUD and others conducted, every pleading and motion filed in this action, and every aspect of discovery), and on the other hand, never pleads that the project actually met the physical condition contract standards. In doing so, Englewood ignores the literal waste that the South Pointe residents lived in, while now claiming Englewood had a plan to cure deficiencies had it had enough time and access to the Government's perceived-to-be endless financial resources.

Perhaps most disingenuous, in a necessary effort to preclude evidence of Englewood's failures, Englewood asks this Court to preclude the very evidence that proves Englewood's breach by suggesting, as it has disingenuously done throughout this and related matters, that the Court should only consider what Englewood planned upon fixing if the Government pointed out each and every deficiency. A careful reading of the pleadings and the evidence reveals that Englewood wanted to repair only those items the Government identified as deficiencies. There was no proactive effort by Englewood to come into compliance, for the entire property, as required by contract (the evidence indicates Englewood's so-called curative, or MIO plan, only addressed what the Government identified, nothing else. <u>See</u>, DA Exhibit 8 [JE 84 (April 5, 2001 letter to Joan Kiening, HUD re: management Improvement and Operating Plan)].
And, only after Englewood refused to inject its own needed repair funds to pay for its "MIO

Plan" did Englewood seek more money from the Government, in the form of a now defaulted mortgage loan. Incredulously, Englewood claims that the Government made it obtain the loan to cure a HAP contract default that Englewood simultaneously urges never existed.

Englewood's motion, and in fact its entire case, is based upon the illogic and contractual fallacy that unless the Government identified each and every physical infirmity at South Pointe, there could be no basis for declaring a breach or for abating and terminating the HAP Contract. Englewood asks this Court to shift its contractual burden to the Government. Englewood claims it had no duty under its contract, rather the Government somehow had a duty to manage and direct each and every instance of Englewood's need to keep and maintain the entire project in decent, safe and sanitary condition. Incredibly, after squandering an $11.6 million mortgage to repair and rehabilitate the project, Englewood filed this action and now urges there was never a default to begin with.

This position is without merit. The Government enters into contracts with the public for the contracting party to provide agreed contracted services for the Government, not for the Government to provide the services itself; otherwise, the Government would own and operate projects with no need for contract parties like Englewood, and there would be no need for contract parties to receive compensation for their efforts.

By focusing upon the first sentence of one of our interrogatory responses, without regard for the balance of the answer to the interrogatory, Englewood alleges some "change in course [that] prejudices Englewood." Englewood claims it was also "denied information regarding these issues during discovery." To the contrary, the Government was quite clear in its position.

Englewood correctly quotes the Government's answer in its motion:

> Defendant objects to this interrogatory as seeking information irrelevant to the issues being litigated in this case and not reasonably calculated to lead to the discovery of admissible evidence. **The mere physical repair of physical deficiencies identified in a REAC inspection would not ensure that the project was in acceptable physical condition. Moreover, HUD's provision of an $11 million insured loan to plaintiff, and the repairs and rehabilitation that loan was intended to finance as a condition to insuring that loan, have no relevance to plaintiff's failure to timely cure its Housing Assistance Contract breach**.

Docket Entry 115 at p. 3 (emphasis added).

With respect to the project's physical conditions and Englewood's contract requirements, the Government could not have been clearer that the REAC inspection findings alone were not conclusive of the totality of the basis for the default HUD declared. The physical conditions of the entire project, as HUD repeatedly stated in its notices,[5] is the contract requirement Englewood must prove, not the Government. Englewood's position, ripe with admissions of actual fact, that it fixed (or more correctly stated, planned to fix) only those physical deficiencies that the Government thrust to its attention is contrary to what Englewood agreed to pursuant to the HAP contract with the Government. Englewood was required to be proactive, without Government insistence, in keeping and maintaining all of the project in acceptable physical condition as it contracted. Englewood may not avoid this burden by a belated effort to bar the Government's evidence of Englewood's clear HAP contract breach.

---

[5] As further supported by the volume of discovery the Government produced to Englewood (adopted in the Government's answers as additional objections to Englewood's interrogatories). In contrast, Englewood produced a virtual dearth of documents evidencing its HAP Contract compliance, because it could not.

Englewood wants to make this case about repairing only items listed in a REAC report, but the report is indicia of a default, not the entirety of the evidence, and not the contract requirement to which Englewood agreed. As Englewood produced nothing in discovery evidencing it actually complied with its contract requirements, Englewood now insists that HUD must prove Englewood did not fix what was contained in one report. It is not surprising, then, that Englewood asks this Court to preclude the Government's evidence. Englewood has no evidence of its own compliance.

Englewood's motion is based entirely upon Englewood's continued failure to comprehend that the items listed upon the 2001 REAC report[6] were simply a partial snapshot of the problems Englewood had with maintaining the property in decent safe and sanitary condition. Allegedly correcting the deficiencies identified in the 25 units examined during the REAC inspection could not cure Englewood's failure to maintain the entire building in decent, safe, and sanitary condition. It is for this reason that HUD instructed Englewood to conduct a complete survey of the property and to forward a proposed plan for correcting all deficiencies in an official "Management Improvement Operating Plan (MIO) format, within 30 days of the date of this letter." DA Exhibit 9 [JE 28 (March 8, 2001 REAC Physical Inspection Report )]. HUD

---

[6] On March 2, 2001, HUD's Real Estate Assessment Center ("REAC") conducted an inspection of the site, building exterior, building systems, common areas and 25 sample units at South Pointe. Joint Stip. Fact No. 71; DA Exhibit 9 [JE 28, p. 767 at 769, 776 (REAC Report dated March 8, 2001 at 3). Out of a possible total score of 100, South Pointe received a REAC score of 31. Joint Stip. Fact No. 74; Id. (REAC Report dated March 8, 2001 at 3). Because of Englewood's continuing failure to maintain South Pointe in decent, safe, and sanitary condition, HUD issued a notice of HAP Contract default on April 9, 2001. Joint Stip. Fact No. 88; DA Exhibit 3 [JE 89, p. 1090 (Notice of Default dated April 9, 2001 at 1). HUD issued a notice of continuing default on May 16, 2001. Joint Stip. Fact No. 101; DA Exhibit 4 [JE 94, p. 1099 at 1100 (Notice of Continuing Default dated May 16, 2001).

also instructed P.M. One (the managing agent for South Pointe) to correct “exigent health and safety deficiencies” identified by the REAC inspection “within 72 hours of receipt of the [exigent health and safety deficiencies] report.” DA Exhibit 9 [JE 28 (March 8, 2001 REAC Physical Condition Report)]. Instead, Englewood provided a late response to the REAC exigent health and safety report and never submitted the required comprehensive MIO plan, including its funding source for the necessary repairs. DA Exhibit 8 [JE 84 (Apr. 5, 2001 Letter To Ms. Kiening Re: Management Improvement & Operating Plan (MIO))]; DA Exhibit 10 [JE 86 (Apr. 8, 2001 Letter From Kelly Brown, Regional Property Manager, P.M. One, To Ms. Coleman Re: REAC Inspection)].

Regardless, and perhaps more importantly, Englewood's failure to maintain South Pointe in decent, safe, and sanitary condition extended far beyond the physical problems identified in the REAC report. This failure included, for example, the safety problems that caused Englewood’s own witness, Donald Samuelson, to describe South Pointe as a “a very crime-ridden, drug-laden project.” DA Exhibit 7 [JE 14 (Excerpts From Mr. Samuelson’s Deposition, Tr. 91)].

Furthermore, HUD provided examples of what required fixing at South Pointe, and HUD did afford Englewood an opportunity to cure its default in the April 9, 2001, notice of default, which referred Englewood to the detailed physical standards contained at 24 C.F. R. Part 5, Subpart G. DA Exhibit 3 [JE 89 (Apr. 9, 2001 Letter From Mr. Hinsberger And Margarita Maisonet, Director, Chicago Satellite Office To Mr. Hayes Re: Notice Of Default Of HAP Contract App)].

Additionally, we produced documents during discovery that showed conditions at South Pointe did not improve long after the REAC report was issued. For example, on July 2, 2001, the Office of the State's Attorney for Cook County, Illinois declared that a public nuisance existed at South Pointe. Joint Stip. Fact No. 57; DA Exhibit 11 [JE 99, p. 1105 (Notice of Public Nuisance dated July 7, 2001 at 1)]. Then on October 22, 2001, HUD representative Lillye Simmons visited South Pointe. In an internal email, Ms. Simmons reported the "smell of urine throughout the building," "exposed wires," and "roaches in the hallways and on the walls." Joint Stip. Fact No. 58; DA Exhibit 12 [JE 115, p. 1166 (E-mail from Lillye Simmons dated Oct. 22, 2001 at 1)]. It is beyond reason that Englewood would now argue that it was not placed upon notice that inspections like the ones detailed above would be considered by Mr. Hinsberger when he decided to terminate Englewood's Section 8 HAP contract in November 2001.

Furthermore, as the Court is aware, defendant raised Englewood's prior material breach in its June 2, 2005 motion for summary judgment. See Docket Entry 46-1 (Def.'s Mot. Summ. J. at 16-20). Englewood responded to these arguments in its July 1, 2005 opposition to defendant's motion. See Docket Entry 51-1 (Pl.'s Opp. Def.'s Mot. Summ. J. at 10-22). This reasoning was also the basis for the United States to move to amend its answer on December 30, 2005, to which Englewood also responded. Thus, Englewood cannot now claim that it was unaware that this is the position of the United States.[7]

[7] As the Court is aware, HUD's termination of Englewood's HAP contract was challenged twice in Federal district court, during which HUD defended its decision by specifically citing the findings that the property was not in decent, safe and sanitary condition. See DA Exhibit 13 [JE 7 (District court's order noting that "without issuing any findings of fact [the court] believes that, given the dispute between the parties over whether South Pointe is in suitable condition and in compliance with the HAP contract, the balance of the equities does not favor Englewood.")].

Finally, Englewood's allegation that is has been taken by surprise by the witnesses the Government listed on its witness list who would provide testimony regarding the condition of the South Pointe property is clearly without merit. Indeed, Englewood was provided the names of these witnesses at the outset of this case. See DA Exhibit 14 (Government's Initial Disclosures). All Englewood had to do was simply depose these witnesses to learn: 1) what they saw when they visited South Pointe, 2) who they told about the deplorable conditions they witnessed, and, 3) what, if any part of this information, Mr. Hinsberger relied upon when he made his decision to terminate Englewood's Section 8 HAP contract. Instead, for apparently strategic reasons, Englewood simply chose not to depose these witnesses, including Mr. Hinsberger.

At bottom, HUD has been unwavering in its position that Englewood failed to maintain the South Pointe property in its entirety in a decent safe and sanitary condition. It has never been HUD's position that Englewood would meet this standard by simply making band-aid fixes to the property. Englewood continues to misconstrue the Government's objection set forth in its response to Interrogatory 11. This is apparent from Englewood's characterization of the Government's response. In it, HUD states that the question of which REAC items had not been corrected is irrelevant to whether or not the entire property was in decent physical condition. Englewood erroneously characterizes this as a broad statement that any issues relating to physical inspections are irrelevant. Englewood also states that HUD's objection prejudiced it with respect to HUD's basis for declaring the project to be in poor physical condition. It asserts, essentially, that, because HUD objected to the interrogatory, Englewood had no notice that HUD would offer evidence and testimony from HUD employees and others concerning the physical condition of the project. This assertion is also flawed in that it greatly overstates the breadth of

the interrogatory and the objection. A reasonable reading of the objection does not lead to the conclusion that HUD believes that the physical condition is irrelevant or that HUD will not provide evidence concerning the physical condition. The evidence regarding HUD employees visits to South Pointe should be allowed, because it is this evidence that formed the basis of Mr. Hinsberger's decision.[8]

### B. Englewood Is Correct, Englewood's Attempt To Obtain A HUD Insured Loan Is Not Relevant To The Fact That Englewood Failed To Cure Its Breach Of Its Section 8 HAP Contract

As we explained above, Englewood's Section 8 HAP contract was terminated because it failed to maintain the South Pointe property in decent, safe and sanitary condition. Englewood's 24 month attempt to obtain a HUD insured mortgage is not relevant to the decision to terminate. However, the United States has listed witnesses who possess first hand knowledge regarding Englewood's loan application simply because Englewood has indicated that it will present evidence regarding its loan application as part of its theory that HUD's handling of the loan application contributed to the breach and as part of its theory regarding damages. We have listed these witnesses simply to put Englewood upon notice that, if Englewood does introduce

[8] This evidence will also show that despite Englewood's claim, it never even fixed the problems noted in the REAC. As we explained in our initial motion for summary judgment in June 2005, Mr. Hayes's certification that the "exigent" problems noted in the REAC report were corrected was inaccurate. On March 9, 2001, Veronica Coleman, Director of Project Management for HUD's Chicago Multifamily Hub, wrote to Mr. Hayes stating that HUD had conducted a "confirmatory review" with P.M. One staff members present. DA Exhibit 15 [JE 77 (March 9, 2001 Letter From Ms. Coleman To Mr. Hayes Re: REAC EHS Certification)]. This review confirmed that "only a few of the EHS items had been mitigated and not all as you certified." Id. Mr. Hayes responded to Ms. Coleman's letter by admitting that HUD's requirements had not been complied with in the past and that he had submitted his certification without direct knowledge of the conditions at South Pointe: "The General Partner relies solely on the information received from the property management company." DA Exhibit 16 [JE 79 (March 16, 2001 Letter From Mr. Hayes To Ms. Coleman Re: EHS Certification)].

testimony on this point, we will have witnesses who would be in the position to provide rebuttal testimony.

We have always maintained that Englewood was not required to obtain an insured loan from HUD to cure its HAP Contract default. To the contrary, Englewood could have used its own funds to achieve compliance. Englewood preferred using the Government's money and refused to use its own funds. In fact, without the Government's money, Englewood could not cure its HAP contract default. Englewood seeks to place the cart before the horse, and the Court should decline the invitation.

But for Englewood's failure to make repairs and pay for them (and HUD's desire to preserve decent, safe and sanitary housing for the otherwise trapped South Pointe residents), no loan would ever have been contemplated by HUD. The loan became Englewood's curative plan because Englewood did not, could not, and would not fulfill its contract obligations to keep and maintain the entire project in decent, safe, and sanitary condition without yet more Government funds.

While the South Pointe residents were trapped, Englewood took some 24 months to complete its loan application, and to begin the process of actually repairing the project. Because Englewood was so lax in its efforts, HUD had to protect the residents while it waited for Englewood to properly seek more Government money. Thus, HUD gave eligible residents vouchers to move to decent, safe and sanitary housing (or elect to stay at South Pointe, if units were found eligible, and many were not), while Englewood slowly made the repairs that, after it defaulted upon its HUD-insured mortgage, Englewood claims were never needed in the first place.

HUD should not be prevented from introducing evidence concerning the loan to rebut whatever testimony Englewood presents regarding the loan. While it is true that HUD believes that the scope of the loan, and the HAP default, are distinct issues, it does not follow that HUD should be prevented from introducing evidence upon the topic. Indeed, Englewood claims in its complaint that HUD wrongfully required a higher level of repair through the loan application process than was required under the contract. See Compl. ¶¶ 80, 82. In sum, although HUD believes that the loan is irrelevant to the HAP default, it should not be prohibited from refuting Englewood's arguments.

In sum, Englewood's intentions here are clear and flatly disingenuous. The Court should decline Englewood's invitation to preclude the Government's evidence that proves Englewood did not cure its HAP contract default, and that Englewood’s (defaulted) mortgage loan was a wholly collateral matter.

## II. Plaintiff’s Second Motion *In Limine* Should Be Rejected

### A. HUD Has Always Placed Englewood On Notice That Alan Cravitz Of Developer’s Mortgage Possessed Information That Could Be Relevant To This Matter

Englewood’s second motion in limine seeks to exclude the testimony of Alan Cravitz, owner of Developer’s Mortgage corporation, and documentary evidence the Government received from Developer’s Mortgage Corporation and then turned over to Englewood’s counsel. Englewood’s motion to exclude the testimony of Mr. Cravitz is odd, given that the Government has always listed Mr. Cravitz as a person who possesses relevant information regarding this matter. Indeed, Mr. Cravitz was not only listed upon our initial disclosure list, but upon Englewood’s as well. See DA Exhibit 14 (Government’s RCFC 26 disclosures); DA Exhibit 17

(Englewood's RCFC 26 disclosures). Thus, it is difficult to see how Englewood is prejudiced now by the Government listing Mr. Cravitz as a witness. As with the other witnesses Englewood now pleads surprise with, Englewood's prejudice here is self-inflicted. Again, for apparent strategic reasons, Englewood simply chose not to depose Mr. Cravitz. Englewood's failure to depose this witness, like the others noted above, is hard to explain given that these witnesses are all located in Chicago. The Government's case should not be prejudiced by Englewood's litigation strategy.

Englewood also argues that it was not formally served with a subpoena the Government allegedly issued to Developer's Mortgage Corporation, and thus, the documents we turned over to Englewood should not be admitted. Englewood is correct that the Government apparently did not serve it with the subpoena issued to Developer's Mortgage. Nevertheless, it is difficult to see how Englewood was prejudiced by this, especially given the fact that many of the documents that were produced by Developer's Mortgage Corporation are documents that Englewood should have turned over to the Government in discovery and failed to do so. After all, Developer's Mortgage Corporation was **Englewood's** mortgage developer and **Englewood's** agent – not HUD's. Certainly Englewood cannot dispute that the documents the Government listed in its exhibit list are ones that should have been turned over to the Government during discovery, if not before, as part of Englewood's initial disclosures. See generally DA Exhibits 18, 19.

In sum, Englewood now is seeking the Court's protection for the Government's alleged technical violation of RCFC 45, when Englewood has committed a substantive violation of RCFC 26 by failing to turn over documents that the Government had requested in discovery.

Englewood's second motion in limine should be denied, Alan Cravitz allowed to testify, and the documents obtained from Developer's Mortgage Corporation allowed at trial.[9]

## CONCLUSION

For the reasons set forth herein, Englewood's motions in limine should be denied.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/ Brian M. Simkin
BRIAN M. SIMKIN
Assistant Director

s/ Douglas K. Mickle
DOUGLAS MICKLE
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit, 8th Floor
Washington, D.C. 20530
1100 L Street, N.W.
Tel: (202) 307-0383
Fax: (202) 307-0972

Attorneys for Defendant

OF COUNSEL:

GREGORY G. GUSTIN
MARIA T. BAGUIO
RUSSELL J. COHEN
LORRAINE C. SHOTO
THOMAS G. MASSOURAS

Office of General Counsel
U.S. Department of Housing
and Urban Development

November 28, 2006

[9] If the Court disagrees and determines that the documents from Developer's Mortgage Corporation cannot be used, we respectfully suggest that the remedy is to simply exclude the documents, and not the testimony of Mr. Cravitz. See RCFC 37(c).

**CERTIFICATE OF FILING**

I hereby certify that on November 28, 2006, a copy of the foregoing "**DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTIONS *IN LIMINE*"** with its accompanying appendix was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Douglas K. Mickle
Douglas K. Mickle