# Exhibit 1

## JE 19 (1998 HAP contract)

U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

Office of Housing, Federal Housing Commissioner

SECTION 405a

HOUSING ASSISTANCE PAYMENTS CONTRACT

HUD as Contract Administrator

This Housing Assistance Payments Contract ("Contract") is entered into between the U.S. Department of Housing and Urban Development ("HUD") and ENGLEWOOD TERRACE LIMITED PARTNERSHIP AN ILLINOIS LIMITED PARTNERSHIP ("Owner") pursuant to the United States Housing Act of 1937, 42 U.S.C. 1437, *et seq.* ("Act") and the Balanced Budget Downpayment Act, I, also known as the Continuing Resolution ("CR") passed by Congress on January 26, 1996, (Pub. Law 104-99. See H.R. 2880, Sec. 405). The purpose of this Contract is to provide housing assistance payments on behalf of Eligible Families ("Families") leasing decent, safe and sanitary units from the Owner.

Project Name SOUTH POINTE TOWER City CHICAGO
Street Address 6425 SOUTH LOWE
SECTION 8 NO: IL06-E000-034 COUNTY: COOK
FHA Project No: State: ILLINOIS

1. Commencement Date, Term, Contract Units, and Contract Rents.

(a) Commencement Date of Contract. The effective date of this Contract OCTOBER 1, 1998.

(b) Term of Contract. The term of this Contract is one year (365 days), beginning on the Commencement Date.

(c) Contract Units, and Contract Rents. This Contract is hereby executed with respect to the units ("Contract Units") described in Exhibit A listed by size and their applicable rents ("Contract Rents").

2. Owner's Warranties.

The Owner warrants that the rental units listed in Exhibit A are in good and tenantable condition and meet HUD's Housing Quality Standards.

3. Families To Be Housed; HUD Assistance.

(a) Families To Be Housed. The Contract Units are to be leased by the Owner to eligible families ("Families") for occupancy by such Families solely as private dwellings and as their principal place of residence.

JUL 25 '03 12:14

EXHIBIT B

(b) HUD Assistance

(1) HUD will be the Contract Administrator.
(2) HUD hereby agrees to make housing assistance payments on behalf of Families for the Contract Units, to enable the Families to lease decent, safe, and sanitary housing pursuant to section 8 of the Act.
(3) If there is a Utility Allowance and if the Allowance exceeds the total Family contribution, the Owner shall pay the Family the amount of the excess. HUD will pay funds to the Owner in trust solely for the purpose of making this payment. Any pledge by the Owner of payments properly payable under this Contract shall not be construed to include payments covered by this paragraph.

4. Maximum Housing Assistance Commitment; Project Account.

(a) Maximum Contract Commitment. The maximum amount of the commitment for housing assistance payments under this Contract is $ 2,313,000 . However, this amount may be reduced commensurately with any reduction in the number of Contract Units or in the Contract Rents or pursuant to any other provisions of this Contract.

5. Housing Assistance Payments To Owners.

(a) Housing Assistance Payments on Behalf of Families.

(1) Housing assistance payments shall be paid to the Owner for units under lease for occupancy by Families in accordance with the Contract. The housing assistance payment will cover the difference between the Contract Rent and that portion of the rent payable by the Family as determined in accordance with the HUD-established schedules and criteria.

(2) The amount of housing assistance payment payable on behalf of a Family and the amount of rent payable by the Family shall be subject to change by reason of changes in Family Income, Family composition, extent of exceptional medical or other unusual expenses or program rules in accordance with the HUD-established schedules and criteria; or by reason of a change in any applicable Utility Allowance approved or required by HUD. Any such change shall be effective as of the date stated in a notification of the change to the Family, which need not be at the end of the Lease term.

(b) Vacancies. If an occupied unit becomes vacant, HUD will pay the Owner 80 percent of the contract rent for up to the lesser of 60 calendar days following the date the unit became vacant or the actual number of days the unit remained vacant. Such payments will be made only in accordance with the following conditions and limitations:

(1) The Owner shall be entitled to vacancy payments under this paragraph (b) if the Owner:

(a) immediately upon learning of the vacancy or prospective vacancy (i) notified the CA of the vacancy and the reasons for the vacancy; and (ii) took and continued to take all feasible actions to fill the vacancy including, but not limited, contacting applicants on the waiting list and advising them of the availability of the unit;
(b) has not rejected any eligible applicant except for good cause acceptable to HUD;
(c) when the vacancy was created by the Owner action, administered the termination of the tenancy, eviction and all related notices in accordance with State and local law, the lease and HUD regulations and administrative procedures.

(2) HUD will pay vacancy payments only for those days on which the unit was in decent, safe, and sanitary condition and available for occupancy.

(3) If the Owner collects other payments towards the rent due for the period HUD pays vacancy payments, the Owner shall pay to the CA, or pay as the CA directs, any amount by which the sum of the HUD vacancy payments exceeds the contract rent. "Other payments" will include rent collected from or on behalf of the former tenant, security deposit applied toward the rent, and payments from any other source.

(c) Prohibition of Double Compensation for Vacancies. The Owner is not entitled to payments for vacant units to the extent it can collect for the vacancy from other sources (such as security deposits, other amounts collected from the Family, and governmental payments under other programs). If the Owner collects any of the Family's share of the rent for a vacancy period in an amount which, when added to the vacancy payment, results in more than the Contract Rent, the excess must be reimbursed as HUD directs.

(d) HUD Not Obligated for Family Rent. HUD has not assumed any obligation for the amount of rent payable by any Family or the satisfaction of any claim by the Owner against any Family. The financial obligation of HUD is limited to making housing assistance payments on behalf of Families in accordance with this Contract.

(e) Owner's Monthly Requests for Payments.

(1) The Owner shall submit monthly requests to HUD or as directed by HUD for housing assistance payments. Each request shall set forth: (i) the name of each Family and the address and/or number of the unit leased by the Family; (ii) the address and/or the number of each unit, if any, not leased to Families for which the Owner is claiming payments; (iii) the Contract Rent as set forth in Exhibit A for each unit for which the Owner is claiming payments; (iv) the amount of rent payable by the Family leasing the unit; and (v) the total amount of housing assistance payments requested by the Owner.

(2) Each of the Owner's monthly requests shall contain a certification by it that to the best of its knowledge and belief (i) the dwelling units are in decent, safe, and sanitary condition, (ii) all the other facts and data on which the request for funds is based are true and correct, (iii) the amount requested has been calculated in accordance with the provisions of this Contract and is payable under the Contract, (iv) none of the amount claimed has been previously claimed or paid under this Contract, and (v) the Owner has not received and will not receive any payments or other consideration from the Family, the PHA, HUD, or any other public or private source for the unit beyond that authorized in this Contract and the lease.

(3) If the Owner has received an excessive payment, HUD in addition to any other rights to recovery, may deduct the amount from any subsequent payment or payments.

(4) The Owner's monthly requests for housing assistance payments are subject to penalty under 18 U.S.C. 1001, which provides, among other things, that whoever knowingly and willfully makes or uses a document or writing containing any false, fictitious, or fraudulent statement or entry, in any matter within the jurisdiction of any department or agency of the United States, shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

6. Maintenance, Operation and Inspection.

(a) Maintenance and Operation. The Owner agrees to maintain and operate the Contract Units, unassisted units, if any, and related facilities to provide decent, safe, and sanitary housing including the provision of all the services, maintenance and utilities. The Owner also agrees to comply with the lead-based paint regulations at 24 CFR Part 35. If HUD determines that the Owner is not meeting one or more of these obligations, HUD shall have the right to take action under section 20.

(b) Inspection.—

(1) Prior to occupancy of any Contract Unit by a Family or to receipt of payments hereunder, the Owner and the Family shall inspect the unit and both shall certify, on forms prescribed or approved by HUD, that they have inspected the unit and have determined it to be decent, safe, and sanitary in accordance with the criteria provided in the forms. The Owner shall keep copies of these reports on file for at least three years.

(2) HUD shall inspect or cause to be inspected at such times as may be necessary to ensure that the Owner is meeting its obligation to maintain the units in decent, safe, and sanitary condition including the provision of the agreed-upon utilities and other services. HUD shall take into account complaints by occupants and any other information coming to its attention in scheduling inspections and shall notify the Owner and the Family of its determination.

(c) Units Not Decent, Safe, and Sanitary. If HUD notifies the Owner that it has failed to maintain a dwelling unit in decent, safe, and sanitary condition and the Owner fails to take corrective action within the time prescribed in the notice, HUD may exercise any of its rights or remedies under the Contract, including reduction or suspension of housing assistance payments, even if the Family continues to occupy the unit. If, however, the Family wishes to be rehoused in another dwelling unit with section 8 assistance and HUD does not have other section 8 funds for such purposes, HUD may use the abated housing assistance payments for the purpose of rehousing the Family in another dwelling unit. If the Family continues to occupy the unit, it will do so in accordance with the terms of its lease, including the termination date and amount of rent payable by the Family.

(d) Notification of Abatement. Any reduction or suspension of housing assistance payments shall be effective as provided in written notification to the Owner. The Owner shall promptly notify the Family of any such abatement.

(e) Overcrowded and Underoccupied Units. The Owner agrees to rent units to eligible tenants in accordance with HUD occupancy guidelines, instructions, regulations, and requirements in effect at the time of the determination.

7. Submission of Financial and Operating Statements. The Owner must submit to HUD:

(a) Within 60 days after the end of the project's fiscal year, financial statements for the project audited by an Independent Public Accountant in the form required by HUD, and

(b) Other statements as to project operation, financial conditions and occupancy as HUD may require pertinent to administration of the Contract and monitoring of project operations.

8. Rent Adjustments.

(a) Initial Rents. In accordance with HUD Notice H 96-74, entitled Project-Based Section 8 Contracts Expiring in Fiscal Year 1997 (Notice), issued by HUD on August 28, 1996, the initial rents shall be set forth in Exhibit A.

(b) Adjustments. The Owner may request a budget-based rental increase during the term of this Contract of 5% of the initial rents set forth in Exhibit A. The Owner must demonstrate to HUD sufficient need for this rental adjustment according to the instructions set forth in the Notice. The Owner shall submit to HUD supporting data, financial statements and certifications which clearly support the increase.

(c) Limitation. In no case shall the adjusted rent exceed 120% of the HUD published Fair Market Rent for the area on the Effective Date of this contract.

(d) Incorporation of Rent Adjustment. Any adjustment in Contract Rents shall be incorporated into Exhibit A by a dated addendum to the exhibit establishing the effective date of the adjustment.

9. Marketing and Leasing of Units.

(a) Compliance with Equal Opportunity Requirements. Marketing of units and selection of Families by the Owner shall be in accordance with the Owner's HUD-approved Affirmative Fair Housing Marketing Plan (if required), shown as an exhibit, and with all regulations and procedures relating to fair housing advertising. Projects shall be managed and operated without regard to race, color, religion, creed, sex, handicap, familial status or national origin and in the case of previously HUD-owned projects in accordance with approved tenant selection factors.

(b) Security Deposits. The Owner agrees to comply with applicable section 8 regulations, instructions, procedures, and other requirements, as revised from time to time, regarding security deposits and to comply with all State and local law.

(c) Eligibility, Selection and Admission of Families.

(1) The Owner shall be responsible for determination of eligibility of applicants, selection of Families from among those determined to be eligible, computation of the amount of housing assistance payments on behalf of each selected Family and of total Family contributions and recordkeeping in accordance with applicable HUD regulations and requirements.

(2) The Owner shall not charge any applicant or assisted Family any amount in excess of the total Family contribution except as authorized by HUD.

(3) In renting of the Contract Units, the Owner must lease them to Very Low-Income Families (determined in accordance with HUD established schedule and criteria). Exceptions may be made and the units leased to Low Income Families under such circumstances as where the project viability is being endangered by the lack of sufficient number of potential applicants who are Very Low-Income Families, but only after the prior approval of HUD.

(4) The Lease entered into between the Owner and each selected Family shall be on the form of Lease approved by HUD.

(5) (i) The Owner shall make a reexamination of Family income, composition, and the extent of medical or other unusual expenses incurred by the Family at least as often as required by HUD regulations or other requirements, and appropriate redeterminations shall be made by the Owner of the amount of Family contribution and the amount of housing assistance payment, all in accordance with applicable HUD regulations and requirements.

(ii) If a Family reports a change in income or other circumstances that would result in a decrease of total Family contribution between regularly scheduled reexaminations, the Owner, upon receipt of verification of the change, must promptly make appropriate adjustments in the total Family contribution. The Owner may require in its lease that Families report increases in income or other changes between scheduled reexaminations.

(iii) A Family's eligibility for housing assistance payments continues until its total Family contribution equals the total housing expense for the unit it occupies. The termination of eligibility at this point will not affect the Family's other rights under the lease nor preclude resumption of payments as a result of later changes in income or other circumstances during the term of this Contract.

(6) The Owner shall maintain as confidential all information relating to section 8 applicants and assisted Families, the disclosure of which would constitute an unwarranted invasion of personal privacy.

(d) Processing of Applications and Complaints. The Owner shall process applications for admission, notifications to applicants, and complaints by applicants in accordance with applicable HUD and PHA regulations and requirements and shall maintain records and furnish such copies or other information as may be required by HUD or the PHA.

(e) Review: Incorrect Payments. In making housing assistance payments to Owners, the PHA or HUD will review the Owner's determinations under this section. If as a result of this review, or other reviews, audits or information received by the PHA or HUD at any time, it is determined that the Owner has received improper or excessive housing assistance payments, the PHA or HUD shall have the right to deduct the amount of such overpayments from any amounts otherwise due the Owner, or otherwise effect recovery.

10. Termination of Tenancy or Section 8 Assistance by the Owner; Tenant Notice.

(a) The Owner agrees not to terminate any tenancy of or assistance on behalf of an assisted Family except in accordance with all HUD regulations and other requirements, in effect at the time of the termination, and any Federal, State and local law.

(b) The Owner agrees, that as a project owner participating in the Section 8 Program, the Owner is required under Section 8(c)(9) of the U.S. Housing Act of 1937 to provide, at minimum, a one year notice to HUD and the affected tenants about the termination or expiration of this Contract. The term "termination" means the expiration of the assistance contract or an owner's refusal to renew the assistance contract. The Owner acknowledges that if the Owner does not give proper notice under 8(c)(9) of the Act, the Owner must permit the tenants to remain in their unit for the one year notice period without an increase in the tenants' portion of the rent they were paying under the expiring contract.

11. Reduction of Number of Units for Failure to Lease to Eligible Families.

(a) Limitation on Leasing to Ineligible Families. The Owner may not at any time during the term of this Contract lease more than 10 percent of the assisted units in the project to families which are ineligible under section 8 requirements at initial occupancy without the prior approval of HUD. Failure on the part of the Owner to comply with this prohibition is a violation of the Contract and grounds for all available legal remedies, including specific performance of the Contract, suspension or debarment from HUD programs and reduction of the number of units under the Contract, as set forth in paragraph (b) of this section. (See also section 20.)

(b) Reduction for Failure to Lease to Eligible Families—New and Rehab Projects. If, at any time beginning sixty days after the effective date of the Contract, the Owner fails for a continuous period of sixty days to have at least 90 percent of the assisted units leased or available for leasing by Families eligible under section 8 requirements at initial occupancy, HUD (or the PHA at the direction of HUD, as appropriate) may, on at least 30 days' notice, reduce the number of units covered by the Contract. HUD or the PHA may reduce the number of units to the number of units actually leased or available for leasing plus 10 percent (rounded up). This reduction, however, will not be made if the failure to lease units to eligible Families is permitted in writing by HUD under paragraph (a) of this section.

(c) Reduction—Previously HUD-Owned Projects. If, at any time beginning sixty days after the effective date of the Contract, the Owner fails for a continuous period of sixty days to have all of the assisted units leased or available for leasing by Families eligible under section 8 requirements at initial occupancy, HUD may, on 30 calendar days' notice, reduce the number of Contract units to not less than the number of Contract units under lease, plus 10 percent of such number if the number is 10 or more, rounded up. Failure by the Owner to make a reasonable effort to lease the units to eligible Families shall be a violation of the Contract and grounds for all legal remedies including those specified in paragraph (a) and section 20.

(d) Restoration. HUD will agree to an amendment of the ACC or the Contract as appropriate, to provide for subsequent restoration of any reduction made pursuant to paragraph (b) or (c) of this section if:

(1) HUD determines that the restoration is justified by demand,
(2) The Owner otherwise has a record of compliance with its obligations under the Contract, and
(3) Contract authority is available. HUD will take such steps authorized by section 8(c)(6) of the Act as may be necessary to carry out its agreement.

12. Nondiscrimination.

(a) General. The Owner shall not in the selection of Families, in the provision of services, or in any other manner, discriminate against any person on the grounds of race, color, creed, religion, sex, handicap, familial status, or national origin.

(b) Members of Certain Classes. The Owner shall not automatically exclude anyone from participation in, or deny anyone the benefits of, the Housing Assistance Payments Program because of membership in a class, such as unmarried mothers, recipients of public assistance, and handicapped persons.

(c) The Fair Housing Act. The Owner shall comply with all requirements imposed by the Fair Housing Act, which prohibits discrimination in the sale, rental, financing and advertising of housing on the basis of race, color, religion, sex, handicap, familial status, or national origin, and any related rules and regulations.

(d) Title VI of the Civil Rights Act of 1964 and Executive Order 11063. The Owner shall comply with all requirements imposed by Title VI of the Civil Rights Act of 1964, 42 U.S.C. 2000d. et seq.; the HUD Regulations issued thereunder, 24 CFR, Subtitle A, Part 1; the HUD requirements pursuant to these regulations; and Executive Order 11063 and any regulations and requirements issued thereunder, to the end that, in accordance with that Act, Executive Order 11063, and the regulations and requirements of HUD, no person in the United States shall, on the grounds of race, color, creed, or national origin, be excluded from participation in, or be denied the benefits of, the Housing Assistance Payments Program, or be otherwise subjected to discrimination. This provision is included pursuant to the regulations of HUD, 24 CFR, Subtitle A, Part 1 issued under Title VI of the Civil Rights Act of 1964, HUD regulations issued pursuant to Executive Order 11063 and the HUD requirements pursuant to the regulations. The obligation of the Owner to comply therewith inures to the benefit of the United States of America and HUD any of which shall be entitled to invoke any remedies available by law to redress any breach or to compel compliance by the Owner.

(e) Section 504 of the Rehabilitation Act of 1973. The Owner shall comply with all the requirements imposed by section 504 of the Rehabilitation Act of 1973, as amended, and any related rules and regulations. Section 504 provides that no qualified handicapped person shall, on the basis of handicap, be excluded from participation in, be denied the benefits of, or otherwise be subjected to discrimination under any program or activity which receives or benefits from Federal financial assistance. Accordingly, the Owner (1) shall not discriminate against any qualified handicapped person on the basis of handicap and (2) shall cause to be incorporated into all contracts executed in connection with this project a provision requiring compliance with rules and regulations issued pursuant to section 504. See also paragraph (f)(3) through (8) concerning Section 504 protections to employees with handicaps.

(f) Employees of Owner.

(1) In carrying out the obligations under this Contract, the Owner will not discriminate against any employee or applicant for employment because of race, color, creed, religion, sex, handicap, familial status, or national origin. The Owner will take affirmative action to ensure that applicants are employed, and that employees are treated during employment, without regard to race, color, creed, religion, sex, handicap, familial status, or national origin. Such action shall include, but not be limited to, the following: employment, upgrading, demotion, or transfer; recruitment or recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and selection for training, including apprenticeship.

(2) The Owner agrees to post in conspicuous places, available to employees and applicants for employment, notices to be provided by HUD setting forth the provisions of this nondiscrimination clause. The Owner will in all solicitations or advertisements for employees placed by or on behalf of the Owner state that all qualified applicants will receive consideration for employment without regard to race, color, creed, religion, sex, handicap, familial status, or national origin. The Owner will incorporate the foregoing requirements of this paragraph in all of its contracts for project work, except contracts for standard commercial supplies or raw materials, and will require all of its contractors for such work to incorporate such requirements in all subcontracts for project work.

(3) The Owner agrees not to limit, segregate, or classify applicants or employees in any way that adversely affects their opportunities or status because of handicap.

(4) The Owner agrees not to participate in a contractual or other relationship that has the effect of subjecting qualified applicants with handicaps or employees with handicaps to discrimination.

(5) The Owner agrees to make reasonable accommodation to the known physical or mental limitations of an otherwise qualified applicant with handicaps or employee with handicaps, unless the Owner can demonstrate that the accommodation would impose an undue hardship on the operation of its program.

(6) The Owner agrees not to use any employment test or other selection criterion that screens out or tends to screen out individuals with handicaps unless:

(i) The Owner demonstrates that the test score or other selection criterion, as used by the Owner, is job-related for the position in question; and

(ii) The appropriate HUD official demonstrates that alternative job-related tests or criteria that tend to screen out fewer individuals with handicaps are unavailable.

(7) The Owner agrees to comply with 24 CFR 8.12 and related HUD instructions when selecting and administering tests to avoid discrimination against individuals with handicaps.

(8) The Owner agrees to comply with 24 CFR 8.13 an any related HUD instructions concerning preemployment inquiries.

(g) Age Discrimination Act of 1975. The Owner shall comply with any rules and regulations issued or adopted by HUD under the Age Discrimination Act of 1975, as amended, 42 U.S.C. 6101 et seq., which prohibits discrimination on the basis of age in programs and activities receiving Federal financial assistance.

13. Cooperation in Equal Opportunity Compliance Reviews.

The Owner agrees to cooperate with HUD in the conducting of compliance reviews and complaint investigations pursuant to or permitted by all applicable civil rights statutes, Executive Orders, and rules and regulations.

14. Flood Insurance.

The Owner agrees that the project will be covered, during its anticipated economic or useful life, by flood insurance in an amount at least equal to its development or project cost (less estimated land cost) or to the maximum limit of coverage made available with respect to the particular type of property under the National Flood Insurance Act of 1968, whichever is less.

15. Clean Air Act and Federal Water Pollution Control Act.

(a) Definition. "Facility" means any building, plant, installation, structure, mine, vessel, or other floating craft, location, or site of operations, owned, leased, or supervised by the Owner or any subcontractor, used in the performance of the contract or any subcontract. When a location or site of operations includes more than one building, plant, installation, or structure, the entire location or site shall be deemed a facility except when the Administrator, or a designee, of the Environmental Protection Agency (EPA) determines that independent facilities are collocated in one geographical area.

(b) In compliance with regulations issued by the United States Environmental Protection Agency (EPA), 40 CFR Part 15, pursuant to the Clean Air Act, as amended ("Air Act"), 42 U.S.C. 7401, et seq., the Federal Water Pollution Control Act, as amended ("Water Act"), 33 U.S.C. 1251, et seq., and Executive Order 11738, the Owner agrees to:

(1) Not utilize any facility in the performance of this contract or any subcontract which is listed on the EPA List of Violating Facilities pursuant to Part 15 of the regulations for the duration of time that the facility remains on the list;

(2) Promptly notify HUD if a facility the Owner intends to use in the performance of this contract is on the EPA List of Violating Facilities or the Owner knows that it has been recommended to be placed on the List;

(3) Comply with all requirements of the Air Act and the Water Act, including the requirements of Section 114 of the Air Act and Section 308 of the Water Act, and all applicable clean air and clean water standards; and

(4) Include or cause to be included the provisions of this clause in every subcontract, and take such action as HUD may direct as a means of enforcing such provisions.

16. Reports and Access to Premises and Records.

(a) The Owner shall furnish any information and reports pertinent to this Contract as reasonably may be required from time to time by HUD.

(b) The Owner shall permit HUD or any of their duly authorized representatives to have access to the premises and, for the purpose of audit and examination, to have access to any books, documents, papers and records of the Owner that are pertinent to compliance with this Contract, including the verification of information pertinent to the housing assistance payments.

17. Interest of Local Public Officials and Employees when PHA has an Interest in the Contract.

If a PHA is a party to or has an interest in this contract, no member, officer, or employee of the PHA; no member of the governing body of the locality (city or county) in which the project is situated or in which the PHA was activated; and no other public official of such locality or localities who exercises any functions or responsibilities with respect to the project, shall have any interest, direct or indirect, in this Contract or in any proceeds or benefits arising from it during his/her tenure or for one year thereafter. This provision may be waived by HUD for good cause.

18. Interest of Member of or Delegate to Congress.

No member of or delegate to the Congress of the United States of America or resident commissioner shall be admitted to any share or part of this Contract or to any benefits which may arise from it.

19. Assignment, Sale or Foreclosure.

(a) The Owner agrees that it has not made and will not make any sale, assignment, or conveyance or transfer in any fashion, of this Contract, the Agreement, the ACC (if applicable), or the project or any part of them or any of its interest in them, without the prior written consent of HUD. However, in the case of an assignment as security for the purpose of obtaining financing of the project, HUD shall consent in writing if HUD has approved the terms of the financing.

(b) The Owner agrees to notify HUD promptly of any proposed action covered by paragraph (a) of this section. The Owner further agrees to request the prior written consent of HUD.

(c) (1) For purposes of this section, a sale, assignment, conveyance, or transfer includes but is not limited to one or more of the following:

- (i) A transfer by the Owner, in whole or in part,
- (ii) A transfer by a party having a substantial interest in the Owner,
- (iii) Transfers by more than one party of interests aggregating a substantial interest in the Owner,
- (iv) Any other similarly significant change in the ownership of interests in the Owner, or in the relative distribution of interests by any other method or means, and
- (v) Any refinancing by the Owner of the project.

(2) An assignment by the Owner to a limited partnership, in which no limited partner has a 25 percent or more interest and of which the Owner is the sole general partner, shall not be considered an assignment, conveyance, or transfer. An assignment by one or more general or limited partners of a limited partnership interest to a limited partner, who will have no more than a 25 percent interest, shall not be considered an assignment, conveyance, or transfer.

(3) The term "substantial interest" means the interest of any general partner, any limited partner having a 25 percent or more interest in the organization, any corporate officer or director, and any stockholder having a 10 percent or more interest in the organization.

(d) The Owner and the party signing this Contract on behalf of the Owner represent that they have the authority of all of the parties having ownership interests in the Owner to agree to this provision on their behalf and to bind them with respect to it.

(e) Except where otherwise approved by HUD, this Contract, the Agreement, and the ACC (if applicable) shall continue in effect and housing assistance payments will continue in accordance with the terms of the Contract in the event:

(1) Of assignment, sale, or other disposition of the project or this Contract, the Agreement, or the ACC.
(2) Of foreclosure, including foreclosure by HUD,
(3) Of assignment of the mortgage or deed in lieu of foreclosure,
(4) The PHA or HUD takes over possession, operation or ownership,
(5) The Owner prepays the mortgage.

20. Defaults by PHA and/or Owner.

(a) Rights of Owner if PHA Defaults under Contract (for Private-Owner/PHA Projects).

(1) Events of Default. The occurrence of any of the following events, if the Owner is not in default, is defined as a default under the ACC:

(i) If the PHA fails to perform or observe any term or condition of this Contract;
(ii) If the Contract is held to be void, voidable, or ultra vires;
(iii) If the power or right of the PHA to enter into the Contract is drawn into question in any legal proceeding; or
(iv) If the PHA asserts or claims that the Contract is not binding upon the PHA for any such reason.

(2) Owner Request for HUD Determination of Default. If the Owner believes that an event as specified in paragraph (a)(1) has occurred, and the Owner is not in default, the Owner may, within 30 days of the initial occurrence of the event:

(i) Notify HUD of the occurrence of the event;
(ii) Provide supporting evidence of the default and of the fact that the Owner is not in default; and
(iii) Request HUD to determine whether there has been a default.

(3) HUD Determination of Default and Curing of Default. HUD, after notice to the PHA giving it a reasonable opportunity to take corrective action, or to demonstrate that it is not in default, shall make a determination whether the PHA is in default and whether the Owner is not in default. If HUD determines that the PHA is in default and that the Owner is not, HUD shall take appropriate action to require the PHA to cure the default. If necessary for the prompt continuation of the project, HUD shall assume the PHA's rights and obligations under the Contract, including any funds. HUD shall continue to pay annual contributions with respect to the units covered by this Contract in accordance with the ACC and this Contract until reassigned to the PHA. All rights and obligations of the PHA assumed by HUD will be returned as constituted at the time of the return:

(i) When HUD is satisfied that all defaults have been cured and that the project will thereafter be administered in accordance with all applicable requirements, or
(ii) When the Contract is at an end, whichever occurs sooner.

(4) Enforcement by Owner. The provisions of this paragraph (a) are made for the benefit of the Owner, the lender, the PHA where it is the lender and then only in its capacity as lender, and the Owner's other assignees, if any, who have been specifically approved by HUD prior to the assignment. These provisions shall be enforceable by these parties against HUD by suit at law or in equity.

(b) Rights of PHA and HUD if Owner Defaults under Contract.

(1) Events of Default. A default by the Owner under this Contract shall result if:

(i) The Owner has violated or failed to comply with any provision of, or obligation under, this Contract or of any Lease, including failure to correct any deficiencies identified by HUD in connection with any inspection; or

(ii) The Owner has asserted or demonstrated an intention not to perform some or all of its obligations under this Contract or under any Lease; or

(iii) For projects with mortgages insured by HUD or loans made by HUD, the Owner has violated or failed to comply with the regulations for the applicable insurance or loan program, with the insured mortgage, or with the regulatory agreement; or the Owner has filed any false statement or misrepresentation with HUD in connection with the mortgage insurance or loan.

(2) HUD Determination of Default. Upon a determination by HUD that a default has occurred, HUD shall notify the Owner of

(i) The nature of the default,

(ii) The actions required to be taken and the remedies to be applied on account of the default (including actions by the Owner to cure the default), and

(iii) The time within which the Owner shall respond with a showing that all the required actions have been taken.

If the Owner fails to respond or take action to the satisfaction of HUD, HUD shall have the right to take corrective action to achieve compliance, in accordance with paragraph (b)(3) or to terminate this Contract with HUD approval, in whole or in part or to take other corrective action to achieve compliance in its discretion, or as directed by HUD.

(3) Corrective Actions. Pursuant to paragraph (b)(2) of this section, HUD may take the following corrective actions:

(i) Take possession of the project, bring any action necessary to enforce any rights of the Owner growing out of the project operation, and operate the project in accordance with the terms of this Contract until such time as HUD determines that the Owner is again in a position to operate the project in accordance with this Contract. If HUD takes possession, housing assistance payments shall continue in accordance with the Contract.

(ii) Collect all rents and charges in connection with the operation of the project and use these funds to pay the necessary expenses of preserving the property and operating the project and to pay the Owner's obligations under the note and mortgage or other loan documents.

(iii) Apply to any court, State or Federal, for specific performance of this Contract, for an injunction against any violation of the Contract, for the appointment of a receiver to take over and operate the project in accordance with the Contract, or for such other relief as may be appropriate. These remedies are appropriate since the injury to the PHA and/or HUD arising from a default under any of the terms of this Contract could be irreparable and the amount of damage would be difficult to ascertain.

(iv) Reduce or suspend housing assistance payments.

(v) Recover any overpayments.

(c) Remedies Not Exclusive and Non-Waiver of Remedies. The availability of any remedy under this Contract or the ACC, where applicable, shall not preclude the exercise of any other remedy under this Contract or the ACC or under any provisions of law, nor shall any action taken in the exercise of any remedy be considered a waiver of any other rights or remedies. Failure to exercise any right or remedy shall not constitute a waiver of the right to exercise that or any other right or remedy at any time.

21. Entire Agreement.

This Contract, including the exhibit(s), is the entire agreement between HUD and the Owner. No changes in this Contract may be made except in writing signed by both the Owner and HUD. The Agreement and Contract must be interpreted and implemented in accordance with HUD requirements.

Warnings:

There are fines and imprisonment -- $10,000/5 years -- for anyone who makes false, fictitious, or fraudulent statements or entries in any matter within the jurisdiction of the Federal Government (18 U.S.C. 1001).

There are fines and imprisonment --$250,000/5 years -- for anyone who misuses rents and proceeds in violation of HUD regulations relative to this project. This applies when the mortgage note is in default or when the project is in a nonsurplus cash position (12 U.S.C. 1715z-9).

HUD may seek a "double damages" civil remedy for the use of assets or income in violation of any Regulatory Agreement or any applicable HUD regulations (12 U.S.C. 1715z-4a).

HUD may seek additional civil money penalties to be paid by the mortgagor through personal funds for:

(1) Violation of an agreement with HUD to use nonproject funds for certain specified purposes as a condition of receiving transfers of physical assets, flexible subsidy loan, capital improvement loan, modification of mortgage terms or workout. The penalties could be as much as the HUD Secretary's loss at foreclosure sale or sale after foreclosure.

(2) Certain specific violations of the Regulatory Agreement, the penalties could be as much as $25,000 per occurrence (12 U.S.C. 1735f-15).

This Contract is hereby executed with respect to the Contract Units described in Exhibit A.

United States of America
Secretary of Housing and
Urban Development

By: ______________________

(Official Title)

Date: ______________________

OWNER

By: Robert J. [signature]

Owner

(Official Title)

Date: 10/1/98

Warning: 18 U.S.C. 1001 provides, among other things, that whoever knowingly and willfully makes or uses a document or writing containing any false, fictitious, or fraudulent statement or entry, in any matter within the jurisdiction of any department or agency of the United States, must be fined not more than $10,000 or imprisoned for not more than five years, or both.

EXHIBIT A

SCHEDULE OF UNITS, RENTS, EQUIPMENT, UTILITIES AND SERVICES

Project Name: South Pointe Towers
Number:
Sect. 8 No: IL06-E000-034

Sect. 8 Unit: (303)

HAP Contract FY End: 12/31

| Unit Size | | No. of Sect. 8 Units | Contract Rent | Util. Allow. | Gross Rent |
|---|---|---|---|---|---|
| Bdrm | 0 | | | | |
| Bdrm | 1 | 60 | 648.00 | 25.00 | 673.00 |
| Bdrm | 2 | 140 | 727.00 | 31.00 | 758.00 |
| Bdrm | 2 | 17th | 799.00 | 36.00 | 835.00 |
| Bdrm | 3 | 80 | 800.00 | 43.00 | 843.00 |
| Bdrm | 3 | 6th | 825.00 | 52.00 | 877.00 |

EFFECTIVE DATE: October 1, 1998

Equipment, Utilities And Services Included In Rent

| EQUIPMENT | UTILITIES | SERVICES |
|---|---|---|
| [X] Range | [X] Heat | [X] Parking |
| [X] Refrigerator | [X] Cooking | [X] Laundry Facilities |
| [ ] Air Conditioner | [X] Hot Water | |
| [X] Kitchen Exhaust Fan | [ ] Air Conditioning | |
| [ ] Disposal | [ ] Lights, etc. | |
| [ ] Dishwasher | [ ] Dishwasher | |
| [ ] Carpet | [ ] Other (Specify) | |
| [ ] Drapes | | |
| [ ] Other (Specify) | | |

The Owner hereby acknowledges receipt of this schedule and agrees that the above will supersede all previous schedules.

Robert J. Pendergast — Owner — 10/1/98

(Owner's Signature) (Title) (Date)

CERTIFICATION FOR CONTRACTS, GRANTS, LOANS, AND COOPERATIVE AGREEMENTS, PER SECTION 1352, TITLE 31, U.S.C.

The undersigned person certifies, to the best of his or her knowledge or belief that:

(1) No Federal appropriated funds have been paid, or will be paid, by or on behalf of the undersigned, to any person for influencing or attempting to influence an officer or employee of an agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with the awarding of any Federal contract, the making of any Federal grant, the making of any Federal loan, the entering into of a cooperative agreement, and the extension, continuation, renewal, AMENDMENT or modification of any Federal contract, grant, loan, or cooperative agreement.

(2) If any funds other than Federal appropriated funds have been paid or will be paid to any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with this Federal contract, grant, loan, or cooperative agreement, the undersigned person shall complete and submit Standard Form-LLL, "Disclosure Form to Report Lobbying", in accordance with its instructions.

(3) The undersigned person shall require that the language of this certification be included in the award documents for all subawards at all tiers (including subcontracts, subgrants, and contracts under grants, loans, and cooperative agreements) and that all subrecipients shall certify and disclose accordingly.

This certification is a material representation of fact upon which reliance was placed when this transaction was made or entered into. Submission of this certification is a prerequisite for making or entering into this transaction imposed by Section 1352, Title 31, U.S. Code. Any person who fails to file the required certification shall be subject to a civil penalty of not less than $10,000 and not more than $100,000 for each such failure.

**MUST BE SIGNED & DATED**

Executed this 1st day of OCTOBER, 1998

Byrd Amendment Certification: By Robert J. Pedersen
(Signature)

ROBERT J. PEDERSEN
(Typed or Printed name)

Owner
(Title, Organization)

Covered Action: ______________________
(type and identity of program, project or activity)

# Exhibit 2

# JE 20 (1999 HAP contract at Section 2)

3

07/23/2003 16:17 2485292091 APG SERVICES INC PAGE 02/05

U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT
Office of Housing, Federal Housing Commissioner

HOUSING ASSISTANCE PAYMENTS
RENEWAL CONTRACT

524(a)(1)

HUD as Contract Administrator

SECTION 8 PROJECT NUMBER: IL06-E000-034

FHA PROJECT NUMBER: (if applicable) 071-55028

This HOUSING ASSISTANCE PAYMENTS CONTRACT ("Contract") is entered into between the U.S. Department of Housing and Urban Development ("HUD") and Robert J. Pendergast ("Owner"). Pursuant to the United States Housing Act of 1937, 42 U.S.C. 1437 et seq. and section 524(a)(1) of the Departments of Veterans Affairs and Housing and Urban Development, and Independent Agencies Appropriations Act, 1998, Pub. L. 105-65, 111 Stat. 1344, approved 10/27/97. The purpose of this Contract is to provide housing assistance payments on behalf of Eligible Families ("Families") leasing decent, safe and sanitary units from the Owner.

Previously, HUD and the Owner entered into a Housing Assistance Payments Contract ("Expiring Contract") to provide section 8 assistance to the Owner for eligible families living in South Pointe Towers A.K.A. Englewood Terrace ("Project").

This Expiring Contract expired on September 30, 1999.

HUD and the Owner desire to renew for the term specified below the Expiring Contract EXCEPT for the Contract Rent and Rent Adjustment Provisions.

THEREFORE, HUD and the Owner hereby agree as follows:

1. This Contract provides Housing Assistance Payments to the Owner for the term specified (see #3 & #4 below) at the contract rent levels listed in Exhibit A.

2. All terms of the Expiring Contract are renewed except for those provisions relating to contract rents and rent adjustments.

A 0961

EXHIBIT C

3. The effective date of this Contract is October 01, 1999.

4. This Contract expires on September 30, 2000

5.

5. Rent Adjustments will be determined in accordance with HUD regulations at 24 CFR 402.4 and other HUD requirements, including any amendments or changes in HUD regulations or requirements.

6. The maximum amount of the commitment for housing assistance payments under this Contract is $ 2,627,000

7. The Owner warrants that it has the legal right to execute this Contract and to lease dwelling units covered by this Contract.

8. The Owner warrants that the rental units to be leased under the terms of this Contract are in decent, safe and sanitary condition, as defined by HUD.

9. In accordance with section 8(c)(9) of the United States Housing Act of 1937, the owner shall provide, at a minimum, a one year written notice to HUD and each assisted family about the termination of this Contract. The term "termination" means the expiration of the Contract or an owner's refusal to renew the Contract. The notice shall comply with HUD regulations and other requirements, including any amendments or changes in the law or HUD requirements.

If the owner fails to provide this notice in accordance with HUD requirements, HUD may require that the owner permit each assisted family to remain in its unit for the full notice period without increasing the tenant portion of the rent under the expiring Contract.

A 0962

This Contract is hereby executed with respect to the contract units described in Exhibit A.

United States of America
Secretary of Housing and
Urban Development

OWNER Englewood Terrace L.P.
PM Group, Inc. G.P.

By: [signature]
Mary E. Anderson, Director
Office of Operations

Date: 9/28/99

By: [signature]
(Official Title)
John J. Hayes, Pres.

Date: 9-24-99

A 0963

3. The effective date of this Contract is October 01, 1999.

4. This Contract expires on September 30, 2000.

5. Rent Adjustments will be determined in accordance with HUD regulations at 24 CFR 402.4 and other HUD requirements, including any amendments or changes in HUD regulations or requirements.

6. The maximum amount of the commitment for housing assistance payments under this Contract is $ 2,627,000.

7. The Owner warrants that it has the legal right to execute this Contract and to lease dwelling units covered by this Contract.

8. The Owner warrants that the rental units to be leased under the terms of this Contract are in decent, safe and sanitary condition, as defined by HUD.

9. In accordance with section 8(c)(9) of the United States Housing Act of 1937, the owner shall provide, at a minimum, a one year written notice to HUD and each assisted family about the termination of this Contract. The term "termination" means the expiration of the Contract or an owner's refusal to renew the Contract. The notice shall comply with HUD regulations and other requirements, including any amendments or changes in the law or HUD requirements.

If the owner fails to provide this notice in accordance with HUD requirements, HUD may require that the owner permit each assisted family to remain in its unit for the full notice period without increasing the tenant portion of the rent under the expiring Contract.

A 0962

This Contract is hereby executed with respect to the contract units described in Exhibit A.

United States of America
Secretary of Housing and
Urban Development

OWNER Englewood Terrace, L.P.
PM Group, Inc. G.P.

By: [signature] Mary B. Anderson, Director
Office of Operations

By: [signature]
(Official Title)
John J. Akyes, Pres.

Date: 9/28/99

Date: 9-24-99

A 0963

# Exhibit 3

## JE 89 (HUD's April 9, 2001 notice of default)

05/29/2003 15:30 2485292091 APG SERVICES INC PAGE 03/06

FROM US DEPT OF HUD DEPARTMENTAL ENFORCEMENT (WED)10.10'01 16:44/ST.16:44/NO.4860805095 P 3

U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

DEPARTMENTAL ENFORCEMENT CENTER
Chicago Satellite Office
77 W. Jackson Blvd., Suite 2207
Chicago, Illinois 60604-3507

CERTIFIED MAIL - RETURN RECEIPT REQUESTED
AND FIRST CLASS MAIL, POSTAGE PREPAID, OVERNIGHT MAIL

APR 09 2001

Englewood Terrace Limited Partnership
P.M. Group, Inc. G.P.
Attention: Mr. John Hayes, President
1050 Corporate Office Drive, Suite 150
Milford, MI 48381

Dear Mr. Hayes:

SUBJECT: Notice of Default of Housing Assistance Payments (HAP) Contract
South Pointe Towers Apartments, Chicago, IL
Contract Number: IL06-E000-034

This letter constitutes formal notice by the Secretary of the U.S. Department of Housing and Urban Development (HUD) to Englewood Terrace Limited Partnership (Owner), owner of South Pointe Towers Apartments (Project), that the Owner is in default of its obligations under the HAP Contract entered into between HUD and the Owner.

The Project was inspected on March 2, 2001 by HUD's Real Estate Assessment Center (REAC) and, out of a possible 100 points, scored a 31c*. Some of the outstanding deficiencies noted in the inspection include: holes and cracks in hallway and unit walls; broken windows; inoperable stoves and faucets; cockroaches in the units; and ponding on the roof.

On March 9, 2001, the Chicago Multifamily Hub sent the Owner a letter addressing the Exigent Health and Safety (EHS) items cited in the REAC inspection. The letter advised the Owner that few of the EHS items had been mitigated at the time. The letter also addressed that the Project was not in good repair, placing the Owner in violation of the Housing Assistance Payment (HAP) contract.

The Chicago Multifamily Hub received the Owner's letter dated March 16, 2001, in which the Owner claimed that the EHS items were corrected. The letter further stated that General Partner relies "solely on information received from the property management company," and that "we will begin the process of responding to [the REAC inspection report from March 2, 2001] within the thirty day period."

On April 3, 2001, the Chicago Multifamily Hub rejected the Owner's application for a firm commitment of funding pursuant to Section 221 (d)(4). In rejecting the application, HUD noted that "the repairs outlined in your application are inadequate when compared to the needs of the property." The letter notes that HUD has allowed 23 months from the date of the April 28, 1999 REAC inspection for this Owner to bring this property into compliance.

10/11/01 THU 10:34 (TX/RX NO

EXHIBIT I

Pursuant to Paragraph 6(a) of the HAP Contract, you have agreed to maintain the Project's units and related facilities in decent, safe and sanitary condition. All of the Project, its units, systems, common areas and building(s) must satisfy HUD's Physical Condition Standards, 24 CFR Part 5, Subpart G. The REAC inspection confirms that the Project suffers from ongoing serious neglect, disrepair, and unsafe and unsanitary conditions throughout the units, common areas, and the building. The failure to keep and maintain the Project in a decent, safe, and sanitary condition is a default of the HAP Contract.

Pursuant to Paragraph 20 of the HAP Contract, the Owner is hereby notified that if the foregoing events of default are not corrected to the satisfaction of HUD within 30 days from the date of this Notice, HUD may seek any and all available remedies, including, without limitation, suspending or abating the HAP Contract.

If you have any questions concerning this matter, please contact Margarita Maisonet, Director, Chicago Satellite Office, Departmental Enforcement Center at (312) 353-5895 ext. 2007.

Sincerely,

Edward Hinsberger, Director
Chicago Multifamily Hub

Margarita Maisonet, Director
Chicago Satellite Office
Departmental Enforcement Center

# Exhibit 4

## JE 94 (HUD's May 16, 2001 continuing notice of default)

05/29/2003 15:30 2485292891 APG SERVICES INC PAGE 05/06

FROM US DEPT OF HUD DEPARTMENTAL ENFORCEMENT (WED) 10. 10' 01 16:45/ST. 16:44/NO. 4860805095 P 5

U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

DEPARTMENTAL ENFORCEMENT CENTER
Chicago Satellite Office
77 W. Jackson Blvd., Suite 2207
Chicago, Illinois 60604-3507

May 16, 2001

CERTIFIED MAIL - RETURN RECEIPT REQUESTED
AND FIRST CLASS MAIL, POSTAGE PREPAID

Englewood Terrace Limited Partnership
P.M. Group, Inc., General Partner
Attention: Mr. John Hayes, President
1050 Corporate Office Drive, Suite 150
Milford, MI 48381

Dear Mr. Hayes:

SUBJECT: Continuing Default of Housing Assistance Payments (HAP) Contract
South Pointe Towers Apartments, Chicago, IL
Contract Number: IL06-H000-034

In response to HUD's April 9, 2001, notice of HAP Contract default, your May 2, 2001, letter to Ed Hinsberger, Multifamily Hub Director, described the status of your efforts. You listed three possible acquirers and felt that a satisfactory acquisition agreement might be reached as long the Owner and the acquirer within the next 30-days. Your letter did not indicate that any efforts had been taken to contain the declining physical condition of the property or to address ongoing site management deficiencies.

While HUD may appreciate that the due diligence process you reference in your letter could delay implementing a resolution preferred by the Owner, HUD must emphasize its ongoing concern for Owner and manager delays that affect, among others, the tenants. Your letter describes yet another event of delay in complying with your business agreements with HUD:

- The Project was last inspected by HUD's Real Estate Assessment Center (REAC) on March 2, 2001. Of a possible 100 points, the Project scored a 31c*.
- A notice of the EHS deficiencies was left by REAC with the Owner's agent during the inspection. REAC mailed a copy of the inspection to the Owner by a cover letter, which emphasized that an acceptable plan to return the Project to decent, safe, and sanitary condition should be delivered to HUD within the 30-days.
- In response to the Owner's March 6, 2001, certification that all EHS deficiencies were corrected, HUD staff visited the Project. On March 9, 2001, the Chicago Multifamily Hub sent the Owner a letter expressing HUD's grave concern that, despite its certification, HUD confirmed that many of the EHS items remained outstanding. Those items were to have been repaired within 72-hours of REAC's inspection. The letter again advised the Owner that since the Project remained in unacceptable physical condition, the Owner remained in violation of the Owner's HAP Contract.
- The Chicago Housing Office received the Owner's response letter dated March 16, 2001. In addition to claiming, it seems, that the EHS items were corrected, the letter further stated that with respect to any outstanding EHS and other concerns in HUD's last letter, the Owner's General Partner "does not have the ability to monitor on a daily basis specific site inspections to validate compliance with required repairs from physical inspectors." Continuing, the letter stated that the General Partner relies "solely on information received from the property management company." Last, with respect to the most recent REAC inspection, the letter provided that the Owner "will begin the process of responding

10/11/01 THU 10:34 [TX/RX NO 80

EXHIBIT

05/29/2003 15:30 2485292891 APG SERVICES INC PAGE 06/06

007/007

FROM US DEPT OF HUD DEPARTMENTAL ENFORCEMENT (WED)10. 10' 01 16:45/ST. 16:44/NO. 4860305095 P 6

to [the March 2, 2001, REAC inspection report] within the thirty day period."

- HUD did not receive an acceptable plan addressing all the physical deficiencies from either the Owner or the Owner's Identity-of-Interest Project managing agent. Instead, on April 3, 2001, the Chicago Multifamily Hub rejected the Owner's application for a firm commitment of funding pursuant to Section 221(d)(4).
- In rejecting the application, HUD noted that "the repairs outlined in your application are inadequate when compared to the needs of the property." The letter emphasized that HUD has allowed 23 months from the date of an April 28, 1999, REAC inspection for the Owner to bring the Project into compliance with its HUD business agreements. In 1999, the Project scored a 43c*. Over that 23-month period, the Project's physical condition declined to a score of 31c*.
- HUD issued its notice of HAP Contract default on April 9, 2001.
- HUD met with you and amplified your need for immediate action; including the need to change Project ownership and management.
- You have responded to the notice of default and the subjects of the meeting on May 2, 2001, stating you may have an acquirer in 30-days.

The Owner's default of the HAP Contract is uncured and continues. HUD urges you to provide adequate, timely information describing the immediate efforts that the Owner is making to address the HAP default and the sale of the Project and proposed assumption of the HAP Contract. In the interim, HUD intends to contact the potential acquirers you have listed to determine their interest and ability to succeed the current Owner and management for the Project. Because of HUD's ongoing concerns for your delays and for the tenants, HUD is proceeding with its process to secure vouchers for relocation of eligible tenants.

If you have further information or concerns in these regards, please contact us immediately.

Sincerely,

Edward Hinsberger, Director
Chicago Multifamily Hub

Margarita Maisonet, Director
Chicago Satellite Office
Departmental Enforcement Center

10/11/01 THU 10:34 [TX/RX NO 8093]

# Exhibit 5

## JE 117 (HUD's November 30, 2001 notice of abatement and termination)

U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

DEPARTMENTAL ENFORCEMENT CENTER
Chicago Satellite Office
77 W. Jackson Blvd., Suite 2207
Chicago, Illinois 60604-3507

November 30, 2001

Englewood Terrace Limited Partnership
P.M. Group, Inc., General Partner
John Hayes, President
1050 Corporate Office Drive, Suite 150
Milford, MI 48381
Via Facsimile and Certified and Regular Mail

Re: Notice of Abatement and Termination of
Housing Assistance Payments Contract
South Pointe Towers Apartments, Chicago, IL
Contract No. IL06-E000-034

Dear Mr. Hayes:

On April 9, 2001, HUD gave Englewood Terrace Limited Partnership (Owner), owner of South Pointe Towers Apartments (Project), formal notice that it was in default of its Housing Assistance Payments (HAP) Contract for failure to maintain the Project's units and related facilities in decent, safe and sanitary condition, as defined by Owner's HAP Contract and HUD's Physical Condition Standards, 24 C.F.R. Part 5 Subpart G. The notice provided 30 days from its date for Owner to correct all the stated events of default. During that time, Owner instead attempted to obtain an acquirer and new management for the Project but failed to correct the events of default complained of in the notice.

On May 16, 2001, HUD advised Owner in writing that its efforts to obtain an acquirer and new management for the Project did not cure Owner's default of the HAP Contract. HUD again emphasized its ongoing concern for the condition of the Project and the risks to its residents. HUD urged Owner to provide timely information describing the immediate efforts made to address the HAP default. HUD reminded Owner that its default of the HAP Contract was uncured and continued, and that HUD intended to proceed with its process to secure vouchers for relocation of eligible residents.

To date, Owner has not cured the conditions complained of in the notice of default issued on April 9, 2001 and as more fully described in HUD's May 16, 2001 writing. Owner has failed to maintain the property according to the physical conditions standards acceptable to HUD despite Owner's receipt of the notice of default and a reasonable opportunity (almost 240 days since the notice of default) to cure. Accordingly, pursuant to paragraph 20(b)(3) of the HAP Contract, this is Owner's notice that HUD intends to abate the HAP Contract.

Further, pursuant to Section 516(a) and (b) of the Multifamily Assisted Housing Reform and Affordability Act of 1997 ("MAHRA") HUD will terminate the HAP Contract upon HUD's determination that the relocation process of eligible residents at the Project is concluded.

Pursuant to MAHRA, this is Owner's notice to provide, within 30 days from receipt of this notice, written objection to this notice of termination of HAP or to cure the underlying basis for the default. If the Owner does not submit a written objection or cure the underlying basis for the default to the satisfaction of HUD during this 30-day period, HUD's decision to terminate the HAP Contract will become a final determination under Section 516(c) of MAHRA and is not subject to judicial review.

EXHIBIT

EXHIBIT P

As Owner has been previously notified, HUD will abate the HAP subsidy for the Project's units as eligible residents receive their vouchers and timely opt to use those vouchers at the Project, if possible, or elsewhere. HUD also intends to abate the subsidy for ineligible residents, if any, and other residents that do not timely act with respect to their vouchers, at the time that HUD terminates the HAP Contract. As units are abated from the HAP Contract, the owner may not again lease those units to project-based Section 8 residents.

The HAP Contract will be terminated when HUD has, in concert with CHAC, completed its voucher and relocation process for all eligible residents at the Project. The foregoing description of HUD's intended method of abatement provides the course that HUD has determined best serves the interests of the residents as of the date of this notice. HUD does not intend that this notice limit the actions that HUD may otherwise properly take in protection of the residents. For example, if Owner fails to continue to provide basic necessary services for the residents, HUD may elect to redirect HAP Contract payments for particular uses in protection of the residents.

Please also be advised that the voucher and relocation process may extend beyond the expiration date of the current HAP Contract Renewal. To safeguard the residents, and not affecting HUD's determinations as set forth above, HUD will provide Owner with a HAP Contract Renewal with Addendum. Please execute the extension and return it to HUD promptly.

Owner may submit its objection or notification of cure to Edward Hinsberger, Director of the Chicago Multifamily Hub.

Sincerely,

Edward Hinsberger, Director
Chicago Multifamily Hub

Margarita Maisonet, Director
Chicago Satellite Office
Departmental Enforcement Center

cc: Peter Silverman