# Exhibit 6

# JE 13 (Maisonet depo extract)

# Transcript of the Testimony of **Margarita Maisonet**

**Date:** April 29, 2005
**Volume:** 1

**Case:** Englewood Terrace Limited Partnership v. The United States

Printed On: May 6, 2005

Ace-Federal Reporters, Inc.
Phone: 202-347-3700
Fax: 202-737-3638
Email: info@acefederal.com
Internet: www.acefederal.com

IN THE UNITED STATES

COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - -x

ENGLEWOOD TERRACE LIMITED :

PARTNERSHIP, :

Plaintiff, : No. 03-2209C

vs. :

THE UNITED STATES :

Defendant. :

- - - - - - - - - - - - - - -x

DEPOSITION OF MARGARITA MAISONET

Washington, DC

Friday, April 29, 2005

REPORTED BY:

VICTORIA L. WILSON

Page 214

Q To the extent that the items referred to in the default notice either had been corrected by May 15th, 2001, or were within a short period of time to be corrected, what impact would that have on the question of default?
MR. WELLONS: Object to the extent it calls for a legal conclusion, asked and answered. Go ahead and answer.
THE WITNESS: Sorry. You said the items identified in the REAC inspection?
BY MR. BAUGHER:
Q Yes.
A If they had -- well, without confirmation of whether or not they had been actually fixed, again, it is not sufficient to submit a plan and say, "This is what I fixed and these are the items that I am going to fix."
Q Well, let's assume that they were actually fixed.
A I believe we still would have had a basis for default or I would not have signed that notice.
Q Well, you would have to -- you would have

Page 215

to have a new basis for a default and maybe there would be one but you would have to find a new basis since the original basis had been taken care of; correct?
MR. WELLONS: Objection; misstates prior testimony, assumes facts not in evidence.
THE WITNESS: If I received a plan from an owner showing that everything has, in fact, been corrected, then we would have done a confirmatory review prior to issuing the notice. If I received it subsequent to issuing the notice, then some type of confirmatory review would have been done prior to actually procuring -- starting to issue vouchers.
BY MR. BAUGHER:
Q After April 9th, 2001, HUD never did a confirmatory review concerning South Pointe; right?
A No, that's not correct.
Q When was a confirmatory review done?
A There was a review done prior to our issuing the notice of abatement in November of 2001.
Q When was that? When was it conducted and by whom?

Page 216

A I know it was -- it was prior to our November notice of termination.
Q There was another inspection?
A There was a confirmatory review done, not a REAC inspection. I don't mean to be technical but that's what we call it.
Q Well, let's be technical.
A Okay.
Q There was no REAC -- there was no further REAC report; correct?
A Between March and November.
Q Ever after March 2001?
A I don't believe so.
Q Okay. As to some other type of confirmatory report, we have asked very broadly for any inspection reports conducted by HUD and none -- this is my testimony but -- or my account -- none has been produced to us in this litigation after April of 2001. Do you know of an inspection report after that date?
MR. WELLONS: I'm going to state on the record I believe counsel's statement is incorrect.

Page 217

But go ahead and answer the question.
THE WITNESS: Yes, it was not in the form of a REAC physical inspection report but -- and I reviewed it again -- well, not the actual report but reference to it that I know that HUD staff went out prior to issuance of the November notice because I specifically asked that question because I know that has not been our practice to go ahead and issue a notice of intent to abate without some type of confirmatory once the owner's cure period has expired.
MR. BAUGHER: Mr. Wellons, is there some inspection report that you know of that -- that I don't that is between April 2001 and November of 2001 that I am just not thinking of right now?
MR. WELLONS: Counsel, I believe it is inappropriate for us both to be testifying in place of the witness answering questions; however, I believe that there are multiple documents that clearly reflect that HUD employees visited the property and found that its default continued. But, again, the purpose of this deposition is for you to

Page 218

ask questions of the witness.
BY MR. BAUGHER:
Q Was there any formal inspection report that you saw in this property after April 2001?
MR. WELLONS: Objection; vague. Go ahead and answer.
THE WITNESS: Not a formal inspection report similar to that done by REAC. A confirmatory site visit report, yes.
BY MR. BAUGHER:
Q And who was the site visit report from?
A I believe it was Lily Simmons and I don't know who else was there.
Q What month do you think that was from?
A If I had to guess, I would say October.
MR. BAUGHER: I would ask that copy of Ms. Simmons's report be produced to us or that if it has been produced and it just isn't obvious what that report was, that we be given the Bates numbers that correspond to that.
MR. WELLONS: We will take that request under advisement. I believe that, as with other

Page 219

documents you requested during depositions, it has been produced to you but we will take that request under advisement.
BY MR. BAUGHER:
Q Let me show you again the defendant's responses to plaintiff's interrogatories.
(Witness reviewed the document.)
BY MR. BAUGHER:
Q Will you look, please, at page 19, interrogatory number 11? The question posed in interrogatory number 11 is to identify the physical deficiencies at South Pointe that were listed on the April 29th, 1999 REAC report that were not corrected by Englewood or that were not to be corrected as part of a new rehabilitation loan request. And when you turn to the response on page 20, looking particularly at the first sentence, do you agree that the answer to that question is irrelevant?
MR. WELLONS: Objection; calls for a legal conclusion. You can respond.
THE WITNESS: Because the notice was based on the most recent physical inspection, yes.

Page 220

BY MR. BAUGHER:
Q And not the 1999 inspection?
A Which was -- correct, which was, again, a sample of the conditions at the property.
Q Okay. Now look at -- now look at interrogatory number 12, which is essentially the same question but directed to the March 8th, 2001 REAC report, and do you see that the response -- this is on page 20 -- is, "We refer plaintiff to our response to interrogatory number 11, which is that the answer to that question is irrelevant or that the question is irrelevant." Do you see that?
A Yes.
Q And do you agree with that?
MR. WELLONS: Objection to the extent it calls for a legal conclusion. Go ahead and respond.
THE WITNESS: The response is consistent with my prior testimony where I have stated that repairing just those things cited in the REAC inspection is not sufficient. We require 100 percent of the property be maintained.
BY MR. BAUGHER:

Page 221

Q But as of March or April of 2001, you didn't know anything about other parts of the property because other parts of the property hadn't been inspected by HUD; correct?
MR. WELLONS: Objection; misstates prior testimony, assumes facts not in evidence. Go ahead and answer.
THE WITNESS: The physical inspection was a sample of the property. Even if the owner submitted a plan for how everything else was going to be fixed doesn't mean that it was fixed at the time that we issued the notice. We issued -- it's a snapshot of the picture -- physical condition at the time that REAC was out there.
BY MR. BAUGHER:
Q Let me show you what has been marked as Maisonet Deposition Exhibit 6. Have you seen this letter, Maisonet Deposition Exhibit 6, before?
A Yes.
Q What is it?
A It is a continuation of default under the HAP contract issued by HUD to the owner of South

# Exhibit 7

## JE 14 (Samuelson depo extract)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| ENGLEWOOD TERRACE LIMITED PARTNERSHIP, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 03-2209C |
| | ) | Judge Wolski |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

The deposition of DON SAMUELSON, taken in the above-entitled case, before Suzanne Thalji, CSR and Notary Public in and for the County of Cook and State of Illinois, at 77 West Jackson Boulevard, 22nd Floor, Chicago, Illinois, on April 28, 2005, at 10:07 a.m.

Page 2

PRESENT:

SCHOPF & WEISS LLP
BY MR. PETER V. BAUGHER
312 West Randolph Street, Suite 300
Chicago, Illinois 60606
(312) 701-9300

appeared on behalf of the Plaintiff;

MR. PAUL R. WELLONS
U.S. Department of Justice
Civil Division
1100 L Street, N.W.
Washington, D.C. 20530
(202) 616-8253

and

MS. MARIA T. BAGUIO
MR. GREGORY G. GUSTIN
U.S. Department of Housing
and Urban Development
77 West Jackson Boulevard
Chicago, Illinois 60604
(312) 353-6236

appeared on behalf of the Defendant.

ALSO PRESENT:
MS. JADRANKA M. BERKEC

Page 3

INDEX

WITNESS
DON SAMUELSON

| EXAMINED BY | PAGE |
|---|---|
| MR. WELLONS | 4 |

EXHIBITS

| SAMUELSON DEPOSITION EXHIBITS | PAGE |
|---|---|
| No. 1 | 115 |
| No. 2 | 119 |

Page 4

MR. WELLONS: This is the deposition of Donald Samuelson, taken pursuant to the rules of the United States Court of Federal Claims in the matter of Englewood Terrace Limited Partnership versus United States.

DON SAMUELSON,

having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. WELLONS:

Q. Mr. Samuelson, could you please state your address for the record, sir?

A. My name is Don Samuelson, not Donald. My address is 1745 Broadland Lane, Lake Forest, Illinois.

Q. I apologize. Sorry I didn't realize that Don was not short for Donald.

A. That's all right.

Q. Thank you for the correction.

A. Yes.

Q. Mr. Samuelson, I would like to go over just a few preliminary matters with you before we begin today. First of all, if you don't understand a question that I ask, will you let

Page 5

me know?

A. Yes.

Q. And if you need a break at any time today, will you let me know that as well?

A. Yes.

Q. Okay. And that's fine. The only thing I ask is that if I have asked a question and it's pending, that you please answer the question before we take a break. Is that all right, sir?

A. Yes.

Q. Thank you. If you need to talk to your attorney at any time during today's deposition, please just let me know. Again, the only thing I ask is that if a question is pending at that time, that you respond to that question. Do you understand, sir?

A. Yes, sir.

Q. Thank you. If at any point today you realize that an answer that you have given before is incorrect, will you let me know that as well so we can correct the record?

A. Yes.

Q. Thank you. And, Mr. Samuelson, are





00000000-0000-0000-0000-000000000000

Page 90

All of that was written down in a comprehensive memo in early August that perhaps had 16 detailed exhibits as well, indicating the details of the capital and operating plans and the resident services programs.

In addition to that, there was a request for a rental increase, and the rental increase required the development of a comprehensive market survey, which was done by Neal Renzi, to substantiate the fact that a $200,000 increase in rents would be appropriate.

Q. What additional discussions did you have with Mr. Hayes regarding the purchase of PM's interest in the property?

A. That effectively I was acting as an unpaid consultant to him for that period of time. I didn't charge him anything, and he didn't ask for anything, but this is something that is normally done -- I have normally done to understand a project well enough to decide what needs to be done thereafter. Then it was agreed that I would start -- DSSA Management would start managing the property on December 1, 2001.

Q. When you say you were working as an

Page 91

unpaid consultant, that was something that you and Mr. Hayes had discussed, that you were fulfilling that role?

A. Yes. I was helping as a buyer to put together a program that I thought would be financeable by HUD and successful in the marketplace and convert what was a very crime-ridden, drug-laden project into an attractive addition to the Englewood community.

Q. When you say consultant, you're referring to all the areas that we had discussed before?

A. Yes.

Q. Physical needs, financial needs --

A. Yes.

Q. -- legal needs and whatever other needs the property had?

A. I think the memo I wrote in August sort of describes that.

Q. And again you have reviewed that document recently?

A. I reviewed that document as we were responding to the motion to produce, not prior to today.

Page 92

Q. But you still feel that the conclusions you reached in that document were accurate?

A. Yes, I do.

Q. Okay. And the agreement that you mentioned by which DSSA would become the manager in December 2001, who discussed that specific agreement?

I'm sorry. Were those also discussions between you and Mr. Hayes?

A. Yes.

Q. And that was with the agreement the two of you reached?

A. Yes.

Q. What happened next in the process by which DSSA purchased PM's interest?

A. There was about nine months of interlude between October 1st of 2001 and June 30th of 2002, which largely related to the injunction suit by Mr. Hayes before Judge Castillo in the U.S. District Court here in Chicago, seeking to enjoin the issuance of vouchers to residents and to sustain the continuation of the HAP contract.

And then the process evolved into an administrative review involving from December

Page 93

through perhaps May of 2002 and then after the review in -- or after the exhaustion of the administrative remedy on May 2, 2002, Mr. Hayes then having exhausted the administrative remedies, filed another injunction suit seeking essentially the same relief that he had the first time.

And so not much happened with respect to the loan processing -- not much happened. It still continued, but there was a -- it was a major distraction. So we continued just to manage -- started to manage the property and to look at all of the residents and to do an assessment of the residents by unit, by family, by circumstance, by problem, by need, and to determine whether or not we felt that those residents would be appropriate in the new building as redesigned.

Q. Did you begin that management in December of 2001?

A. Yes, December of 2001.

Q. Okay. When I say you, that's referring to DSSA Management?

A. Yes.





00000000-0000-0000-0000-000000000000

Page 138

a — we had — the management office, which was downstairs, but the leasing and marketing activity which is taking place in terms of leasing the building to shack residents was taking place at a different location. So most of the marketing-related tenant files of the 80 people who had decided to use their vouchers to live at Englewood or the by then 30 or so more residents who applied and all of the people who were in the waiting — or who were in the process of getting processed were upstairs and not lost. Those I would call sort of the marketing and tenant files.

Q. And what other damage occurred to the building in this fire?

A. Well, there was damage to the ceiling, damage to the walls, damage to the furniture, you know. The whole thing was quite a mess. And it was very disruptive because at that point we had the management office, which would normally be next to the entry area which is where a normal management office would be and where we would expect it to be, couldn't be occupied until essentially almost a year later.

Page 139

And what we had at that point was the management functions that were occurring in the leasing office. It would have been more normal to have the leasing functions occur in the management office.

Q. Was anyone ever apprehended and charged with starting this fire?

A. I don't believe so.

Q. When we had discussed the damages claims that you had submitted to HUD, one of the things we talked about were damages that Englewood was seeking because of unpaid rent —

A. Yes.

Q. — from tenants.

And I think you had mentioned that there were some tenants who were undesirable and that you may have even helped facilitate their leaving?

A. Yes.

Q. And what did you do to facilitate getting the undesirable tenants out of the building?

A. We went through the process of evaluating really in December of 2001 all of the

Page 140

300 units, by tenant, by children, by employment, by work. We developed a spread sheet, and ultimately at the end of the spread sheet was were these desirable tenants that we wanted to keep or were these undesirable tenants that we clearly didn't want to keep or were they someplace in the middle that we didn't know.

What we did — we did two things. We helped them to negotiate the process of getting shack vouchers, all of them. Some of them would be using the shack vouchers to remain at Englewood, and there were 80 during the course of that period of time who used the vouchers to locate permanently at Englewood. There were 220 who left.

We had a person named Charles Woods who was specifically hired to do nothing more than tend to tenant needs and interests and help them relocate. He happened to be a big basketball star, a player from a local high school, grew up in the building, was something of a role model for young African-American males and others.

And he was there to help the residents get their vouchers; if they couldn't get their

Page 141

vouchers, to help them develop whatever remedial things they needed to have to get their files in order so that their vouchers would be issued and then actually took a considerable interest in helping them to identify employment opportunities, service opportunities, and using their vouchers effectively to leave.

So he was essentially doing that for all individuals, but, you know, we were particularly interested in having some of the tenants leave because we had had experience with difficulty — records of difficulty with them and there had been efforts of trying to evict them in the past that hadn't been successful.

Q. And did you ascertain that some of these tenants owed back rent before or after they had left the property?

A. Probably before. We were doing — we would have a monthly rent roll where there were accounts receivable, and one of the indicators of a tenant's undesirability is their failure to pay rent, and another would be the problems with their apartments or problems related to, you know, security incidents or other sorts of

36 (Pages 138 to 141)

things. This was a property that was not for the faint-hearted.

Q. And what time was that process going through of trying to get the undesirable tenants out of the building?

A. Well, we were doing the assessment really from January through March of 2002 and developed a resident services program, developed a computer center, developed a bunch of things there that were an outgrowth of what the prior management company had done in 1999 and 2000.

We just did it in a more sustained, more aggressive, more comprehensive way. And there had been almost nobody leaving the property in the end of March, and I think we were still 90 percent occupied or thereabouts.

So we needed to get people moved because there had been uses of HAP extensions for periods of time. At that point in time all we -- originally there was a three-month HAP extension from October 1, 2001, to December 31, as the lawsuit was going on before Judge Castillo.

By the end of December, nobody moved.



And then there was an extension for six months from January 1 to July 30. So at the end of three months, you know, my conclusion was there is going to be no more Section 8 as far as I can tell. People ought to be prepared to leave and move out.

And so it was April, May, and June which were times of the year that were easier to move than January, February, and March in Chicago. So there was a very aggressive effort during those three months to move people out or help people move.

Then there was the renewed lawsuit in I think it was May or June of 2002, the second go-around with the injunction, and that led to an extension for three more months. And at that point it was clear to -- HUD had communicated to the residents, we had communicated to the residents that there would be no more extensions, that this was it, this was final, and the remainder of the people were moved out by the end of September.

Q. What, if any, collection efforts did you pursue to obtain unpaid rent from these tenants?



A. I think there was a -- we went through an assessment of the residents by unit, and residents who had no income, who were paying zero rent, while they may have owed some money in the past, it struck me that it would be just a waste of money to retain a lawyer and to try to collect rents.

I think we probably stated that they owed rent and explained to them that they did and that that could be an impact on their voucher, but that's about all we could have done at that point practically and economically. This is not a situation where they were likely to be capable of paying whatever judgment we ever recovered.

Q. You had mentioned before that this property was not for the faint-hearted. Were you referring to the fact this property was not for the faint-hearted tenant?

A. Well, it wasn't for the faint-hearted anyone. In '97, 8, 9, 2000, the schoolteachers across the street wouldn't walk into the building. There was some hesitation of police going into the building. Residents were



concerned about their fellow residents, and what you had is people going in and going into their units, closing the door and being there.

And there was a certain element of crime and gang activities that was prevalent throughout the building, not particularly unlike our experience in Stateway Gardens, except at Stateway it was much more ruly, you know. They were business interests. In Englewood there was a lot more just craziness going on, where there would be altercations and fights and stuff like that.

Q. I just wanted to clarify. I think we went over this earlier, but I may not have asked the questions very artfully. I just want to confirm, DSSA is the only entity that has any -- well, let me strike that.

Englewood Partnership is the only entity that has any ownership interest in the property; is that correct?

A. Yes.

MR. WELLONS: Okay. I think if we can go off the record for two minutes, we're probably going to be done questioning





00000000-0000-0000-0000-000000000000

# Exhibit 8

## JE 84 (April 5, 2001 letter to Joan Kiening, HUD re: management Improvement and Operating Plan)

April 5, 2001

Ms. Joan Kiening
Supervisor
Enforcement Analyst
U.S. Department of Housing and Urban Development
Ralph H. Metcalfe Building
77 West Jackson Boulevard, Room 2207
Chicago, Illinois 60604-3507

Re: Management Improvement & Operating (MIO) Plan
REAC Inspection Dated 3/8/01
Southpointe Tower Apartments
FHA Project No: 071-55028

Dear Ms. Kiening:

Following is the Management Improvement and Operating (MIO) Plan for the above referenced REAC Inspection dated March 28,2001.

The status update work in progress is as follows:

| Site | Observation | Status |
|---|---|---|
| **Certificates** | | |
| Boilers | Not Available | Attached Copy<br>Proposal Attached |
| Fire Alarm<br>Sprinkler System | Not Available<br>Not Available | Certification<br>For building<br>Systems will be<br>Completed as of 5/15/01. |
| **Building 1 – Building Exterior** | | |
| Window Screens | Missing/Damaged | In progress: Screens<br>Fabricated& installed<br>Completed by 5/15/01. |
| Fencing/Gates | Damaged/Leaning | Completed as of 5/31/01. |
| Roof | Ponding | " " " |
| **Building 1 – Building Systems** | | |
| Electrical | Missing Covers<br>Exhaust Fans penthouse | COMPLETED/w<br>Tenant Signature |

#1

EXHIBIT
G

Page 2
MIO

| Site | Observation | Status |
| --- | --- | --- |
| Electrical | Comments: Cover missing on elec. Box (2) | Completed |
| Fire Protection | Missing/Damage Exhaust Fans penthouse Extinguisher tag expired -dated 1997(2). 1999 missing or no tags. | COMPLETED |

**Building 1 – Common Areas**

| | | |
| --- | --- | --- |
| Halls/Corridors/Stairs | Walls –Damaged Location: 13th Floor & Ground Crack greater than 1/8 x 11 long on 2 walls | COMPLETED |
| | Graffiti | TO BE COMPLETED 5/31/01 |
| Laundry Room | Doors-Damaged Hardware/Locks Trash Collection Area Damaged chutes | COMPLETED Completed complete 5/31/01 |
| Other Community Spaces | Electrical – Missing Covers Maintenance room; outlet Cover missing on 2 outlets | COMPLETED |
| Restrooms | Electrical-Missing Covers | COMPLETED |
| Trash Collection Areas | Chutes-Damaged/Missing | TO BE COMPLETED 5/31/01 |

**Building 1 – Common Areas – Health & Safety**

| | | |
| --- | --- | --- |
| Electrical Hazards | Exposed Wires/Open Panels (LT)Custodian room; bare wires exposed due to missing missing light fixture | COMPLETED |
| Emergency/Fire Exits | Emergency/Fire Exits Blocked/ Unusable (LT). Trash room; Exit door inoperable | COMPLETED |
| | Sharp Edges (NLT)-hallway at End of bl; walls damaged Exposing pointed ends of nails | COMPLETED |
| | Missing Exit Signs | COMPLETED 5/31/01 |

Page 3
MIO

Building 1 – Unit 1007

| | | |
|---|---|---|
| Doors | Missing | COMPLETED/w Tenant Signature |
| Electrical System | GFI – Inoperable (NLT) Kitchen; gfi inoperable | COMPLETED/w Tenant Signature |
| | Missing Breakers/Fuses (LT) | COMPLETED |

Building 1- Unit 1013

| | | |
|---|---|---|
| Bathroom | Plumbing-Leaking Faucet/Pipes | COMPLETED/w Tenant Signature |

Building 1 – Unit 1109

| | | |
|---|---|---|
| Doors | Damaged Surface | COMPLETION DATE: 4/15/01 |
| Electrical Systems | Locked Access to Breaker Panel | COMPLETED w/ Tenant Signature |
| Bathroom | Plumbing-Leaking Faucet/Pipes | COMPLETED w/ Tenant Signature |
| Kitchen | Stove-Damaged/Inoperable | COMPLETED/w Tenant Signature |
| Walls | Damaged | TO BE COMPLETED: 4/25/01 |

Building 1 – Unit 1111

| | | |
|---|---|---|
| Doors | Missing Door | COMPLETED |
| Bathroom | Plumbing-Leaking Faucet/Pipes | COMPLETED w/ Tenant Signature |
| Outlets/Switches | Missing/Broken Cover Plates | COMPLETED/w Tenant Signature |

Building 1 – Unit 1112

| | | |
|---|---|---|
| Kitchen | Range/Stove-Missing/ Damaged | COMPLETED/w Tenant Signature |

Building 1 – Unit 1201

| | | |
|---|---|---|
| Bathroom | Lavatory Sink-Damaged/Missing | COMPLETED/w Tenant Signature |

Page 4
MIO

| Site | Observation | Status |
|---|---|---|
| Doors | Damaged Hardware/Locks | COMPLETED/w Tenant Signature |
| Kitchen | Range/Stove – Missing/Damaged Inoperable | COMPLETED/w Tenant Signature |
| | Refrigerator-Missing/Damaged/ Inoperable | COMPLETED/w Tenant Signature |
| Outlets/Switches | Missing/Broken Cover Plates | COMPLETED/w Tenant Signature |
| Walls | Damaged | COMPLETED/w Tenant Signature |
| **Building 1 – Unit 1205** | | |
| Bathroom | Plumbing-Leaking Faucet/Pipes | COMPLETED/w Tenant Signature |
| Ceiling | Peeling/Needs Paint | COMPLETED/w Tenant Signature |
| Electrical System | GFI-Inoperable | COMPLETED/w Tenant Signature |
| **Building 1 – Unit 1210** | | |
| Bathroom | Plumbing-Leaking Faucet/Pipes | COMPLETED/w Tenant Signature |
| Infestation | Insects | COMPLETED/w Tenant Signature |
| **Building 1 – Unit 1305** | | |
| Bathroom | Lavatory Sink-Damaged/Missing | COMPLETED Tenant Signature |
| Doors | Damaged Hardware/Locks | COMPLETED |
| Electrical System | Missing Breakers/Fuses | COMPLETED |
| Kitchen | Stove Inoperable | COMPLETED |
| **Building 1 – Unit 1413** | | |
| Doors | Missing Door | COMPLETED |
| | Damaged Surface-Holes/ Paint/Rusting/Glass | TO BE COMPLETED 5/31/01 |
| Walls | Damaged | TO BE COMPLETED 5/31/01 |

| Site | Observation | Status |
|---|---|---|
| Building 1 – Unit 1502 | | |
| Doors | Damaged Hardware/Locks | COMPLETED |
| Refrigerator | Inoperable | COMPLETED |
| Building 1- Unit 1509 | | |
| Bathroom | Plumbing-Leaking Faucet/Pipes | COMPLETED |
| | Shower/Tub-Damaged/Missing | COMPLETED |
| Electrical System | GFI-Inoperable | COMPLETED |
| Windows | Cracked/Broken/Missing Panes | COMPLETED |
| Building 1 – Unit 1509 – Health & Safety | | |
| Hazards | Sharp Edges-Bedroom Caused by Broken Window | COMPLETED |
| Building 1 – Unit 1701 | | |
| Doors | Damaged Hardware/Locks | TO BE COMPLETED 5/31/01 |
| | Damaged Surface-Holes/ Paint/Rusting/Glass | TO BE COMPLETED 5/31/01 |
| Kitchen | Damaged Cabinets | TO BE COMPLETED 4/12/01 |
| Building 1 – Unit 1907 | | |
| Doors | Damages Surface-Holes/ Paint/Rusting/Glass | COMPLETED |
| Kitchen | Range/Stove-Missing/ Damaged/Inoperable | COMPLETED |
| Building 1 – Unit 1914 | | |
| Bathroom | Lavatory Sink Damaged | COMPLETED |
| | Shower/Tub-Damaged/Missing | TO BE COMPLETED 5/31/01 |
| Doors | Damaged-Bedroom | COMPLETED |
| | Missing Door | TO BE COMPLETED 5/31/01 |

| Site | Observation | Status |
|---|---|---|
| Kitchen | Damaged Cabinets | TO BE COMPLETED 4/13/01 |
| **Building 1 – Unit 2009** | | |
| Bathroom | Plumbing-Leaking Faucet/ Pipes | COMPLETED |
| Kitchen | Plumbing-Clogged Drains | COMPLETED |
| **Building 1 – Unit 2202** | | |
| Doors | Damaged Hardware/Locks | COMPLETED |
| | Missing Door | TO BE COMPLETED 5/31/01 |
| Kitchen | Plumbing-Leaking Faucet | COMPLETED |
| Windows | Inoperable/Not Lockable | COMPLETED |
| **Building 1 – Unit 2208** | | |
| Doors | Damaged Hardware/Locks | COMPLETED |
| | Damaged Surface-Holes/ Paint/Rusting/Glass | COMPLETED |
| Electrical System | GFI – Inoperable | COMPLETED |
| Outlets/Switches | Missing/Broken Cover Plates | COMPLETED |
| Smoke Detector | Missing/Inoperable | TO BE COMPLETED 5/31/01 |
| **Building 1 – Unit 402** | | |
| Bathroom | Bathroom Cabinets-Damaged /Missing | COMPLETED |
| | Lavatory Sink-Damaged/Missing | COMPLETED |
| | Shower/Tub-Damaged/Missing | COMPLETED |
| Electrical Systems | GFI Inoperable | COMPLETED |
| Kitchen | Plumbing-Leaking Faucet/ Pipes | TO BE COMPLETED 5/31/01 |
| | Range/Stove-Missing/ Inoperable | TO BE COMPLETED 5/31/01 |

Page 7
MIO

| Site | Observation | Status |
| --- | --- | --- |
| Walls | Damaged | COMPLETED |
| | Peeling/Needs Paint | COMPLETED |
| Doors | Damaged Hardware/Locks | COMPLETED |
| **Building 1 – Unit 402 – Health & Safety** | | |
| Infestation | Insects | COMPLETED |
| **Building 1 – Unit 405** | | |
| Bathroom | Water Closet/Toilet Damaged/Clogged/Missing | COMPLETED |
| Kitchen | Plumbing-Leaking Faucet/Pipes | COMPLETED |
| Outlets/Switches | Missing/Broken Cover Plates | COMPLETED |
| Walls/Ceiling | Damaged/Peeling Paint | ORDER OF POSSESSION ISSUED 3/23/01 |
| Doors | Missing Door | ORDER OF POSSESSION ISSUED 3/23/01 |
| **Building 1 – Unit 405 – Health & Safety** | | |
| Infestation | Insects | COMPLETED |
| Hazards | | ORDER OF POSSESSION ISSUED 3/23/01 |
| **Building 1 – Unit 407** | | |
| Bathroom | Plumbing-Leaking Faucets/Pipes | COMPLETED |
| Kitchen | Range/Stove-Missing/Damaged/ Inoperable | COMPLETED |
| | Plumbing-Leaking Faucets/ Pipes | TO BE COMPLETED 5/31/01 |
| Doors | Missing | COMPLETED |

Page 8
MIO

| Site | Observation | Status |
| --- | --- | --- |
| **Building 1 – Unit 811** | | |
| Bathroom | Lavatory Sink-Damaged/Missing | COMPLETED |
| | Plumbing-Leaking Faucet/Pipes | COMPLETED |
| Doors | Damaged Hardware/Locks | COMPLETED |
| | Missing Door | TO BE COMPLETED 5/31/01 |
| Walls | Damaged | COMPLETED |
| Kitchen | Refrigerator-Missing/ Damaged | TO BE COMPLETED 5/31/01 |
| **Building 1 – Unit 906** | | |
| Bathroom | Plumbing-Leaking Faucet/Pipes | COMPLETED |
| | Shower/Tub-Damaged/Missing | COMPLETED |
| Kitchen | Plumbing-Leaking Faucet/Pipes | COMPLETED |
| | Range/Stove-Missing/Damaged Missing | COMPLETED |
| Doors | Damaged Hardware/Locks | COMPLETED |
| **Building 1 – Unit 908** | | |
| Bathroom | Plumbing-Leaking Faucet/ Pipes | COMPLETED |
| Doors | Damaged Hardware/Locks | COMPLETED |
| | Damaged Surface-Holes/Paint Rusting/Glass | TO BE COMPLETED 5/31/01 |
| Kitchen | Plumbing-Leaking Faucet/Pipes | COMPLETED |
| **Building 1 – Unit 910** | | |
| Electrical System | GFI – Inoperable | COMPLETED |
| | Missing Breakers/Fuses | COMPLETED |

Page 9
MIO

| Site | Observation | Status |
| --- | --- | --- |

REPAIRS TO COMMON AREAS ARE PROJECTED TO BE COMPLETED BY APRIL 25, 2001; IF NOT DEFINED BY THE BABCO REHAB PLAN (Enclosed). – SHAWN MINTZ-

# Exhibit 9

# JE 28 (March 8, 2001 REAC Physical Condition Report)

U.S. Department of Housing and Urban Development
Washington, DC 20410-0100

REAL ESTATE ASSESSMENT CENTER

March 08 ,2001

109997 / 800040489
P.M. One, Ltd.
1050 Cooperate Office Drive
Suite 150
Milford, MI 43831

Dear Owner:

Enclosed with this letter is an important document, a physical inspection report for your property.

In order to provide uniform, consistent and standardized information regarding the physical condition of multifamily properties with HUD involvement, the Department issued a new rule on September 1, 1998. The primary purpose of the rule, entitled *Uniform Physical Condition Standards and Physical Inspection Requirements For Certain HUD Properties (24 CFR Part 5)*, is to establish uniform requirements for the maintenance of properties to ensure that they are decent, safe, sanitary and in good repair.

As an integral part of the implementation of the new physical inspection requirement, HUD established the Real Estate Assessment Center (REAC) and developed and tested new software that captures information electronically in accordance with the rule. REAC's web site, *http://www.hud.gov/reac*, is currently accessible by you. This site provides a great deal of information about REAC, its mission and, in particular, the physical inspection process. From this web site you can download a free copy of the inspection software and view deficiency definitions and the text of the rule.

A HUD contractor recently inspected your property. The report on the physical condition of your property prepared as a result of that inspection is enclosed. The Inspection Summary Report includes property and ownership profile information and shows each deficiency observed during the inspection. Also enclosed is a short description of the report so that you may better understand it. In the future, we anticipate making physical inspection reports available to owners via the Internet.

Your property received a score of 45 or less. Therefore, the Office of Housing has asked me to inform you that you have 30 days in which to submit a Proposed Plan of Correction to your local HUD field office. DO NOT submit your plan to the REAC. Before you can prepare your Plan you are required to conduct a survey of your property to determine if any additional deficiencies exist. You should use the findings of the REAC inspection and the random sample unit inspections as the basis for the survey.

You must complete your survey and forward your Proposed Plan in Management Improvement Operating Plan (MIO) format, within 30 days of the date of this letter. This Proposed Plan should include:

- Additional deficiencies identified by your survey
- Deficiencies already corrected
- Available resources
- Completion time frames (schedule) by quarter

EXHIBIT 8

EXHIBIT F

Upon receipt of the Plan, the Project Manager will review it to ensure that it has sufficient detail regarding plans and resources for correction, and that the time frames are appropriate. The Project Manager will contact you to discuss any required amendments and the process that will be used to verify completion of the Plan.

If, at the time of the inspection, the inspector noted any exigent health and safety deficiencies, you should have received a report listing those deficiencies. You were required to correct those items within 72 hours of receipt of the report.

If you have not already done so, please provide the local HUD field office having jurisdiction over your property with a confirmation on your letterhead that these items, if any, have been corrected.

Thank you for your cooperation.

Sincerely,

Donald J. LaVoy
Acting Director
Real Estate Assessment Center

Enclosures

# Inspection Summary Report - 109997

Case 1:03-cv-02209-VJW Document 46 Filed 06

Inspection No: 109997
Property: (800040489) South Pointe Towers
6425 S Lowe Ave.
Chicago, IL 60621

Inspection Date: 3/02/2001
Phone: (773) 874-1122
Fax: (773) 874-9820
E-Mail Address:
ACC#:
CA#:

Scattered Site?: No

Comments:

## Building Unit Count

| | #Total | #Inspecte |
|---|---|---|
| Buildings | 1 | 1 |
| Units | 303 | 25 |

## Scores

| | Possible Points | Area Points | H & S Deduction |
|---|---|---|---|
| Site | 16.1 | 14.2 | 4.8 |
| Bldg Ext | 16.1 | 7.7 | 0.0 |
| Bldg Sys | 21.1 | 21.1 | 21.1 |
| CA | 12.1 | 3.3 | 3.3 |
| Units | 34.6 | 23.0 | 9.3 |
| Overall | 100.0 | 69.3 | 38.5 |
| Final Score = Area Points - H & S Deduction | | | 31 c* |

## Health and Safety Counts

Non-Life Threatening

| | Site | Bldg | Unit | Total |
|---|---|---|---|---|
| Actual | 1 | 2 | 17 | 20 |
| %Inspected | — | 100% | 8% | — |
| Projected | 1 | 2 | 206 | 209 |

Life Threatening

| | Site | Bldg | Unit | Total |
|---|---|---|---|---|
| Actual | 0 | 6 | 7 | 13 |
| %Inspected | — | 100% | 8% | — |
| Projected | 0 | 6 | 85 | 91 |

Smoke Detectors

| | Site | Bldg | Unit | Total |
|---|---|---|---|---|
| Actual | 0 | 0 | 1 | 1 |
| %Inspected | — | 100% | 8% | — |
| Projected | 0 | 0 | 12 | 12 |

## Systemic Deficiencies:

| | Area | Item | Defect | # with Defect | # Total | % of Bldgs / Units with Defect |
|---|---|---|---|---|---|---|
| Capital* | DU | Kitchen | Range/Stove - Missing/Damaged/Inoperable** | 9 | 25 | 36% |
| Ordinary** | DU | Bathroom | Plumbing - Leaking Faucet/Pipes | 11 | 25 | 44% |
| | | Doors | Damaged Hardware/Locks** | 10 | 25 | 40% |
| | | | Missing Door | 9 | 25 | 36% |

* Capital items are repairs that generally require large cash outlays. ( Items such as new roofs and new appliances ).
** Ordinary items are repairs that require smaller cash outlays. ( Items such as light fixtures, fire extinguishers, and smoke detecto

## Participants:

| | | | | |
|---|---|---|---|---|
| Management Agent<br>P.M. One, Ltd | Sanders, Carl | Phone:<br>Fax:<br>E-Mail Address: | (773) 324-9010 Ext. 204<br>(773) 324-9820<br>ces@pmchgo.com | 1621 E. 55th Street<br>Chicago, IL 60659 |
| Owner/PHA<br>P.M. One, Ltd. | Hayes, John | Phone:<br>Fax:<br>E-Mail Address: | (248) 529-2000<br>(248) 529-2001<br>pmgroupinc.com | 1050 Cooperate Office Drive<br>Suite 150<br>Milford, MI 43831 |

## Buildings/Units:

| No | Name/Type/Reason Uninspectable | | Year built | # Units | Address |
|---|---|---|---|---|---|
| | SOUTH POINT TOWER<br>Mid/High Rise Apartments | | 1972 | 303 | 6425 S Lowe<br>Chicago IL 60621 |
| | 1007 | 2 Bedroom | Occupied | | |
| | 1013 | 3 Bedroom | Occupied | | |
| | 1109 | 1 Bedroom | Occupied | | |
| | 1111 | 2 Bedroom | Occupied | | |

# Inspection Summary Report 100997

| | | | |
|---|---|---|---|
| 1112 | 2 Bedroom | Occupied | |
| 1201 | 3 Bedroom | Occupied | |
| 1205 | 2 Bedroom | Occupied | — |
| 1210 | 1 Bedroom | Occupied | |
| 1305 | 2 Bedroom | Occupied | |
| 1401 | 3 Bedroom | Not Occupied | *Vacant* |
| 1413 | 3 Bedroom | Occupied | |
| 1502 | 3 Bedroom | Occupied | |
| 1505 | 2 Bedroom | Not Occupied | *Vacant* |
| 1509 | 3 Bedroom | Occupied | |
| 1701 | 3 Bedroom | Occupied | |
| 1907 | 2 Bedroom | Occupied | |
| 1914 | 3 Bedroom | Occupied | |
| 2009 | 1 Bedroom | Occupied | |
| 2202 | 3 Bedroom | Occupied | |
| 2208 | 2 Bedroom | Occupied | |
| 402 | 3 Bedroom | Occupied | |
| 405 | 2 Bedroom | Occupied | |
| 407 | 2 Bedroom | Occupied | |
| 811 | 1 Bedroom | Occupied | |
| 906 | 1 Bedroom | Occupied | |
| 908 | 2 Bedroom | Occupied | |
| 910 | 1 Bedroom | Occupied | |

Inspectable Items:

| Inspected Item | NO/OD | Observation | Severity | Location/Comments | Ded. |
|---|---|---|---|---|---|
| **Certificates** | | | | | |
| Boilers | NO | | | | |
| Fire Alarm | NO | | | | |
| Sprinkler System | NO | | | | |
| **Site** | | | | Possible Points: | 16.1 |
| Fencing and Gates** | OD | Damaged/Falling/Leaning** (NLT) | Level 3 | Location: end of bldg. at gara; Comments: gate no longer functions/missing | 4.8 |
| Market Appeal | OD | Litter** | Level 2 | | 1.9 |
| **Building 1 - Building Exterior** | | | | Possible Points: | 16.1 |
| Roofs | OD | Ponding** | Level 3 | Location: exhaust fans penthou; Comments: standing water on roof | 7.7 |
| Windows | OD | Damaged/Missing Screens** | Level 1 | | 0.7 |
| **Building 1 - Building Systems** | | | | Possible Points: | 21.1 |

Case 1:03-

# Inspection Summary Report - T09997

| | | | | | |
|---|---|---|---|---|---|
| **Building 1 - Building Systems** | | | | Possible Points: | 21.1 |
| Electrical System | OD | Missing Covers (LT) | Level 3 | Location: exhaust fans pentho; Comments: cover missing on elec. box (2) | 16.7 |
| Fire Protection | OD | Missing/Damaged/Expired Extinguishers** (LT) | Level 3 | Location: exhaust fans penthou; Comments: extinguisher tag expired - dated 1997(2).1999, missing or no tags | 16.7 |
| **Building 1 - Common Areas** | | | | Possible Points: | 12.1 |
| Halls/Corridors/Stairs | OD | Graffiti** | Level 2 | | 2.4 |
| | | Walls - Damaged** | Level 3 | Location: 13th floor & ground; Comments: crack greater than 1/8""x11"" long on two walls | 3.6 |
| Laundry Room | OD | Doors - Damaged Hardware/Locks** | Level 1 | | 0.9 |
| Other Community Spaces | OD | Electrical - Missing Covers (LT) | Level 3 | Location: maintenance room; Comments: outlet covers missing on 2 outlets | 4.0 |
| Restrooms/Pool Structures | OD | Electrical - Missing Covers (LT) | Level 3 | Location: custodian room; Comments: outlet cover missing in toilet area | 4.0 |
| Trash Collection Areas | OD | Chutes - Damaged/Missing Components** | Level 3 | Location: trash rooms on all f; Comments: chute door does not close | 1.8 |
| **Building 1 - Common Areas - Health & Safety** | | | | | |
| Electrical Hazards | OD | Exposed Wires/Open Panels** (LT) | Level 3 | Location: maintenance area; Comments: bare wires exposed due to missing light fixture | 8.1 |
| Emergency/Fire Exits | OD | Emergency/Fire Exits Blocked/Unusable (LT) | Level 3 | Location: trash room, also at; Comments: exit door inoperable | 16.7 |
| | | Missing Exit Signs (NLT) | Level 3 | Location: hallways on all floo; Comments: exit signs missing or broken | 7.5 |
| Hazards | OD | Sharp Edges (NLT) | Level 3 | Location: hallway at end of bl; Comments: walls damaged exposing pointed ends of nails | 3.6 |
| **Building 1 - Unit 1007** | | | | Possible Points: | 1.4 |
| Doors | OD | Missing Door | Level 1 | | 0.1 |
| Electrical System | OD | GFI - Inoperable (NLT) | Level 3 | Location: kitchen; Comments: gfi inoperable | 0.8 |
| | | Missing Breakers/Fuses (LT) | Level 3 | Location: kitchen; Comments: breaker missing from breaker box | 0.8 |
| **Building 1 - Unit 1013** | | | | Possible Points: | 1.4 |
| Bathroom | OD | Plumbing - Leaking Faucet/Pipes | Level 1 | | 0.2 |
| **Building 1 - Unit 1109** | | | | Possible Points: | 1.4 |
| Bathroom | OD | Plumbing - Leaking Faucet/Pipes | Level 1 | | 0.2 |
| Doors | OD | Damaged Surface - Holes/Paint/Rusting/Glass** | Level 3 | Location: bedroom; Comments: hole larger than 1"" | 0.2 |
| | | Missing Door | Level 1 | | 0.1 |
| Electrical System | OD | Blocked Access to Electrical Panel** (NLT) | Level 3 | Location: kitchen; Comments: microwave blocks access | 0.3 |
| Kitchen | OD | Range/Stove - Missing/Damaged/Inoperable** | Level 2 | | 0.3 |
| Walls | OD | Damaged** | Level 1 | | <0.05 |
| **Building 1 - Unit 1111** | | | | Possible Points: | 1.4 |
| Bathroom | OD | Plumbing - Leaking Faucet/Pipes (NLT) | Level 3 | Location: bath; Comments: faucet can not be used | 0.7 |

# Inspection Summary Report - 109997

| | | | | | |
|---|---|---|---|---|---|
| **Building 1 - Unit 1111** | | | | Possible Points: | 1.4 |
| Doors | OD | Missing Door | Level 1 | | 0.1 |
| Outlets/Switches | OD | Missing/Broken Cover Plates (LT) | Level 3 | Location: brdeoom; Comments: broken switch cover | 0.1 |
| **Building 1 - Unit 1112** | | | | Possible Points: | 1.4 |
| Kitchen | OD | Range/Stove - Missing/Damaged/Inoperable** | Level 2 | | 0.3 |
| **Building 1 - Unit 1201** | | | | Possible Points: | 1.4 |
| Bathroom | OD | Lavatory Sink - Damaged/Missing** | Level 1 | | 0.1 |
| Doors | OD | Damaged Hardware/Locks** | Level 2 | | 0.1 |
| Kitchen | OD | Range/Stove - Missing/Damaged/Inoperable** | Level 3 | Location: kitchen; Comments: oven can not be turned on | 0.5 |
| | | Refrigerator - Missing/Damaged/Inoperable | Level 1 | | 0.1 |
| Outlets/Switches | OD | Missing/Broken Cover Plates (LT) | Level 3 | Location: kitchen; Comments: outlet cover missing | 0.1 |
| Walls | OD | Damaged** | Level 3 | Location: bedroom and bath; Comments: two walls have holes larger than 8-1/2"x11" | 0.1 |
| **Building 1 - Unit 1205** | | | | Possible Points: | 1.4 |
| Bathroom | OD | Plumbing - Leaking Faucet/Pipes | Level 1 | | 0.2 |
| Ceiling | OD | Peeling/Needs Paint** | Level 2 | | <0.05 |
| Electrical System | OD | GFI - Inoperable (NLT) | Level 3 | Location: kitchen; Comments: gfi inoperable | 0.8 |
| **Building 1 - Unit 1210** | | | | Possible Points: | 1.4 |
| Bathroom | OD | Plumbing - Leaking Faucet/Pipes | Level 1 | | 0.2 |
| **Building 1 - Unit 1210 - Health & Safety** | | | | | |
| Infestation | OD | Insects (NLT) | Level 3 | Location: kitchen sink cabinet; Comments: roaches | 0.5 |
| **Building 1 - Unit 1305** | | | | Possible Points: | 1.4 |
| Bathroom | OD | Lavatory Sink - Damaged/Missing** | Level 1 | | 0.1 |
| Doors | OD | Damaged Hardware/Locks** | Level 3 | Location: bathroom; Comments: door knob and latch missing | 0.2 |
| Electrical System | OD | Missing Breakers/Fuses (LT) | Level 3 | Location: kitchen breaker box; Comments: breaker missing | 0.8 |
| Kitchen | OD | Range/Stove - Missing/Damaged/Inoperable** | Level 2 | | 0.3 |
| **Building 1 - Unit 1413** | | | | Possible Points: | 1.4 |
| Doors | OD | Damaged Surface - Holes/Paint/Rusting/Glass** | Level 3 | Location: both bedrooms; Comments: holes larger than 1" | 0.2 |
| | | Missing Door | Level 1 | | 0.1 |
| Walls | OD | Damaged** | Level 1 | | <0.05 |
| **Building 1 - Unit 1502** | | | | Possible Points: | 1.4 |
| Doors | OD | Damaged Hardware/Locks** | Level 2 | | 0.1 |
| Kitchen | OD | Refrigerator - Missing/Damaged/Inoperable | Level 1 | | 0.1 |
| **Building 1 - Unit 1509** | | | | Possible Points: | 1.4 |
| Bathroom | OD | Plumbing - Leaking Faucet/Pipes | Level 1 | | 0.2 |
| | | Shower/Tub - Damaged/Missing** | Level 1 | | 0.2 |
| Electrical System | OD | GFI - Inoperable (NLT) | Level 3 | Location: kitchen; Comments: gfi inoperable | 0.8 |

# Inspection Summary Report - 109997

| | | | | | |
|---|---|---|---|---|---|
| **Building 1 - Unit 1509** | | | | Possible Points: | 1.4 |
| Windows | OD | Cracked/Broken/Missing Panes (NLT) | Level 3 | Location: bedroom; Comments: broken window | 0.2 |
| **Building 1 - Unit 1509 - Health & Safety** | | | | | |
| Hazards | OD | Sharp Edges (NLT) | Level 3 | Location: bedroom; Comments: caused by broken window | 0.5 |
| **Building 1 - Unit 1701** | | | | Possible Points: | 1.4 |
| Doors | OD | Damaged Hardware/Locks** | Level 3 | Location: bathroom; Comments: door does not latch | 0.2 |
| | | Damaged Surface - Holes/Paint/Rusting/Glass** | Level 3 | Location: hallway; Comments: door delaminating - hole larger than 1" | 0.2 |
| Kitchen | OD | Cabinets - Missing/Damaged** | Level 2 | | 0.1 |
| **Building 1 - Unit 1907** | | | | Possible Points: | 1.4 |
| Doors | OD | Damaged Surface - Holes/Paint/Rusting/Glass** | Level 3 | Location: bathroom; Comments: hole larger than 1" | 0.2 |
| Kitchen | OD | Range/Stove - Missing/Damaged/Inoperable** | Level 3 | Location: kitchen; Comments: 2 burners do not function | 0.5 |
| **Building 1 - Unit 1914** | | | | Possible Points: | 1.4 |
| Bathroom | OD | Lavatory Sink - Damaged/Missing** | Level 1 | | 0.1 |
| | | Shower/Tub - Damaged/Missing** | Level 1 | | 0.2 |
| Doors | OD | Damaged Hardware/Locks** | Level 3 | Location: bedroom; Comments: all hardware (knob and latch) missing | 0.2 |
| | | Missing Door | Level 1 | | 0.1 |
| Kitchen | OD | Cabinets - Missing/Damaged** | Level 2 | | 0.1 |
| **Building 1 - Unit 2009** | | | | Possible Points: | 1.4 |
| Bathroom | OD | Plumbing - Leaking Faucet/Pipes (NLT) | Level 3 | Location: bathroom; Comments: tub faucet can not be used | 0.7 |
| Kitchen | OD | Plumbing - Clogged Drains | Level 1 | | 0.2 |
| **Building 1 - Unit 2202** | | | | Possible Points: | 1.4 |
| Doors | OD | Damaged Hardware/Locks** | Level 2 | | 0.1 |
| | | Missing Door | Level 1 | | 0.1 |
| Kitchen | OD | Plumbing - Leaking Faucet/Pipes | Level 1 | | 0.1 |
| Windows | OD | Inoperable/Not Lockable** (NLT) | Level 3 | Location: living room; Comments: lock missing on window | 0.2 |
| **Building 1 - Unit 2208** | | | | Possible Points: | 1.4 |
| Doors | OD | Damaged Hardware/Locks** | Level 2 | | 0.1 |
| | | Damaged Surface - Holes/Paint/Rusting/Glass** | Level 2 | | 0.1 |
| Electrical System | OD | GFI - Inoperable (NLT) | Level 3 | Location: kitchen; Comments: gfi inoperable | 0.8 |
| Outlets/Switches | OD | Missing/Broken Cover Plates (LT) | Level 3 | Location: living room; Comments: outlet cover missing | 0.1 |
| Smoke Detector | OD | Missing/Inoperable** (SD) | Level 3 | Location: hallway; Comments: s.d. inoperable | |
| **Building 1 - Unit 402** | | | | Possible Points: | 1.4 |
| Bathroom | OD | Bathroom Cabinets - Damaged/Missing** | Level 1 | | 0.1 |
| | | Lavatory Sink - Damaged/Missing** | Level 1 | | 0.1 |
| | | Shower/Tub - Damaged/Missing** | Level 1 | | 0.2 |
| Doors | OD | Damaged Hardware/Locks** | Level 2 | | 0.1 |

# Inspection Summary Report - 109997

| | | | | | |
|---|---|---|---|---|---|
| **Building 1 - Unit 402** | | | | Possible Points: | 1.4 |
| Electrical System | OD | GFI - Inoperable (NLT) | Level 3 | Location: kitchen; Comments: gfi inoperable | 0.8 |
| Kitchen | OD | Plumbing - Leaking Faucet/Pipes | Level 1 | | 0.1 |
| | | Range/Stove - Missing/Damaged/Inoperable** | Level 3 | Location: kitchen; Comments: 3 burners do not light | 0.5 |
| | | Refrigerator - Missing/Damaged/Inoperable | Level 1 | | 0.1 |
| Walls | OD | Damaged** | Level 2 | | 0.1 |
| | | Peeling/Needs Paint** | Level 1 | | <0.05 |
| **Building 1 - Unit 402 - Health & Safety** | | | | | |
| Infestation | OD | Insects (NLT) | Level 3 | Location: kitchen; Comments: roaches | 0.5 |
| **Building 1 - Unit 405** | | | | Possible Points: | 1.4 |
| Bathroom | OD | Water Closet/Toilet - Damaged/Clogged/Missing (NLT) | Level 3 | Location: bathroom; Comments: toilet will not flush | 1.1 |
| Ceiling | OD | Peeling/Needs Paint** | Level 2 | | <0.05 |
| Doors | OD | Missing Door | Level 1 | | 0.1 |
| Kitchen | OD | Plumbing - Leaking Faucet/Pipes | Level 1 | | 0.1 |
| | | Range/Stove - Missing/Damaged/Inoperable** | Level 3 | Location: kitchen; Comments: oven inoperable | 0.5 |
| | | Refrigerator - Missing/Damaged/Inoperable | Level 1 | | 0.1 |
| Outlets/Switches | OD | Missing/Broken Cover Plates (LT) | Level 3 | Location: kitchen; Comments: outlet cover missing | 0.1 |
| Walls | OD | Damaged** | Level 2 | | 0.1 |
| **Building 1 - Unit 405 - Health & Safety** | | | | | |
| Hazards | OD | Tripping (NLT) | Level 3 | Location: hallway; Comments: tv cable across doorway | 0.0 |
| Infestation | OD | Insects (NLT) | Level 3 | Location: kitchen; Comments: roaches | 0.5 |
| **Building 1 - Unit 407** | | | | Possible Points: | 1.4 |
| Bathroom | OD | Plumbing - Leaking Faucet/Pipes | Level 1 | | 0.2 |
| Doors | OD | Missing Door | Level 1 | | 0.1 |
| Kitchen | OD | Plumbing - Leaking Faucet/Pipes | Level 1 | | 0.1 |
| | | Range/Stove - Missing/Damaged/Inoperable** | Level 3 | Location: kitvhen; Comments: 2 burners will not light | 0.5 |
| **Building 1 - Unit 811** | | | | Possible Points: | 1.4 |
| Bathroom | OD | Lavatory Sink - Damaged/Missing** | Level 1 | | 0.1 |
| | | Plumbing - Leaking Faucet/Pipes | Level 1 | | 0.2 |
| Doors | OD | Damaged Hardware/Locks** | Level 2 | | 0.1 |
| | | Missing Door | Level 1 | | 0.1 |
| Kitchen | OD | Refrigerator - Missing/Damaged/Inoperable | Level 1 | | 0.1 |
| Walls | OD | Damaged** | Level 2 | | 0.1 |
| **Building 1 - Unit 906** | | | | Possible Points: | 1.4 |
| Bathroom | OD | Plumbing - Leaking Faucet/Pipes | Level 1 | | 0.2 |
| | | Shower/Tub - Damaged/Missing** | Level 1 | | 0.2 |
| Doors | OD | Damaged Surface - Holes/Paint/Rusting/Glass** | Level 2 | | 0.1 |

# Inspection Summary Report - 109997

| | | | | | |
|---|---|---|---|---|---|
| **Building 1 - Unit 906** | | | | Possible Points: | 1.4 |
| Kitchen | OD | Plumbing - Leaking Faucet/Pipes | Level 1 | | 0.1 |
| | | Range/Stove - Missing/Damaged/Inoperable** | Level 3 | Location: kitchen; Comments: 2 burners will not light | 0.5 |
| **Building 1 - Unit 908** | | | | Possible Points: | 1.4 |
| Bathroom | OD | Plumbing - Leaking Faucet/Pipes | Level 1 | | 0.2 |
| Doors | OD | Damaged Hardware/Locks** | Level 2 | | 0.1 |
| | | Damaged Surface - Holes/Paint/Rusting/Glass** | Level 2 | | 0.1 |
| Kitchen | OD | Plumbing - Leaking Faucet/Pipes | Level 1 | | 0.1 |
| Walls | OD | Damaged** | Level 2 | | 0.1 |
| **Building 1 - Unit 910** | | | | Possible Points: | 1.4 |
| Electrical System | OD | GFI - Inoperable (NLT) | Level 3 | Location: kitchen; Comments: gfi inoperable | 0.8 |
| | | Missing Breakers/Fuses (LT) | Level 3 | Location: kitchen; Comments: 2 breakers missing from breaker box | 0.8 |

NOTE: Score for any given building or unit can not be negative (if deductions are greater than possible points, the score is set to zero)

## PHYSICAL INSPECTION SUMMARY REPORT

The Inspection Summary Report is designed to achieve two objectives:

1. Provide the Public Housing Agency or owner and/or owner agent (POA) with the background information, *i.e. addresses, phone numbers, building names, etc.*, collected during the property inspection.

2. Provide the POA the results of the REAC physical inspection of a specific property.

The items below describe the information provided in the Inspection Summary Report.

Inspection Number: The inspection number is unique for each property inspection conducted by REAC. Each time a property is inspected by REAC, a new inspection number is used. These unique numbers may be used to communicate with REAC on any matter concerning a particular inspection.

Property Information: Information related to a property is provided:

- property identification number (in parentheses) - a unique number in HUD databases
- property name
- status as a scattered site (Yes/No)
- relevant addresses, phone numbers, fax numbers, and e-mail addresses for the property

Each of these should be checked carefully for accuracy. *All discrepancies should be reported to the REAC Physical Inspection Operations Center at 1-877-406-9220.*

Building Unit Count: The total number of buildings and units on the property are given, along with the number of buildings and units actually inspected by REAC

Scores: An overall numerical score is given as a value from zero to 100. Separate numerical scores are also given for each of five areas:

- site
- building exterior
- building systems
- common areas
- units

The five area scores range from zero to the maximum number of points possible for each area. The possible points for a given area are determined for a specific property based on the inspectable items actually present in each area. The sum of the area points identifies what the overall score would be if there were no health & safety (H&S) deficiencies. The overall numerical score is then calculated by subtracting the sum of deductions for H&S deficiencies from the sum of the individual "area points.".

Examples of overall scores are: 95c; 67b*; 84a*; 100b; 78a; and 43c*. The asterisk indicates that H&S deficiencies were found with respect to smoke detectors. The lower-case letter indicates whether or not other kinds of H&S deficiencies were observed, as follows:

- The letter "a" is given if no health and safety deficiencies were observed other than for smoke detectors.

- The lower-case letter "b" is given if one or more non-life threatening H&S deficiencies, but no exigent/fire safety H&S deficiencies were observed other than for smoke detectors.
- The lower-case letter "c" is given if one or more exigent/fire safety (calling for immediate attention or remedy) H&S deficiencies were observed.

Although all H&S deficiencies, except for smoke detector problems and "other" hazards, affect the scores with appropriate deductions, the letter grades are added to highlight the serious nature of H&S deficiencies, all of which need to be addressed by the POA.

Health and Safety Counts: In addition to the counts of actual H&S deficiencies observed in the inspected buildings and units, the *estimated* number of H&S deficiencies that would have been found had all buildings and units been inspected is also given. This projected count gives a sense of the total H&S problem for the inspected property. The projection is calculated by dividing the counts actually observed in buildings or units by the proportion of buildings or units inspected. The percent of buildings and units inspected is additionally given to show the basis for the calculations.

Systemic Deficiencies: Defects observed in at least half of the inspected units or buildings are listed by whether or not they are repairs generally requiring large cash outlays ("Capital" items) or generally requiring smaller cash outlays ("Ordinary" items).

Participants & Buildings/Units: Information provided includes:

- relevant addresses, phone numbers, fax numbers, and e-mail addresses for participants
- name, year built, number of units and address for each building on the property. Note: All buildings on the property should be listed.

*As before, each of these should be checked carefully for accuracy and any discrepancies should be reported to the REAC Physical Inspection Operations Center at 1-877-406-9220.*

Inspectable Items: This portion of the report details all deficiencies found in the inspection. The main headings in the first column refer to the inspectable area--site, building exterior, building systems, common areas, unit, or health & safety, where the deficiency was observed. The entries are "inspectable items" within which the deficiencies were found. Some items may not be present for a given property. In such cases, appropriate adjustments are made in the points for each area. Items present, but with no deficiencies found, are not listed. Inspectable items are:

Site: fencing & gates, grounds, mail boxes/project signs, market appeal, parking lots/driveways/roads, play areas & equipment, refuse disposal, retaining walls, storm drainage, and walkways/stairs.

Building Exterior: doors, fire escapes, foundations, lighting, roofs, walls, and windows.

Building Systems: domestic water, electrical system, elevators, emergency power, exhaust system, fire protection, heating/ventilation/air conditioning, and sanitary system.

Common Areas: basement/garage/carport, closet/utility/mechanical, community room, day care, halls/corridors/stairs, kitchen, laundry room, lobby, office, other community spaces, patio/porch/balcony, pools & related structures, restrooms/pool structures, storage, and trash collection areas.

Unit: bathroom, call-for-aid, ceiling, doors, electrical system, floors, heating/ventilation/air conditioning, hot water heater, kitchen, laundry area (room), lighting, outlets/switches, patio/porch/balcony, smoke detectors, stairs, walls, and windows.

Health & Safety: air quality, electrical hazards, elevator, emergency/fire exits, flammable materials, garbage and debris, hazards, infestation.

Column labeled NO/OD:

NO: The inspection protocol requires the inspector to check for the existence of certificates ~~for~~ certain items such as lead-based paint, elevators, etc. If the inspector verifies all of the required certificates, the report will not include any certificate information. If a certificate is not present, the first inspectable item listed will be "certificates" and the designation "NO" will be listed for each unavailable certificate.

OD: If the inspector records a deficiency, then an OD in this column refers to the "observed-deficiency" for the given item.

Column labeled Observation: The column lists each specific deficiency observed within a given inspectable item. Each deficiency has a definition, which specifies what must be observed for that deficiency to be recorded. Also noted in this column are observations about Health & Safety items. These are:

- (LT) - Exigent/Fire Safety (calling for immediate attention or remedy)
- (NLT) - Not Life Threatening
- (SD) - Smoke Detector

Definitions for all deficiencies are given in the physical inspection section at REAC's web site on the Internet (www.hud.gov/reac/). Click on "Products," then "Physical Inspection," and then "Physical Inspection Definitions."

Column labeled Severity: Deficiencies differ by "severity." The definitions specify what must be recorded for a given deficiency under one of three possible severity levels-level 1, level 2 and level 3. The severity level is given on the report to indicate which part of the definition actually applies for the specific deficiency observed. Severity levels are defined within a given deficiency and do not necessarily indicate which deficiencies are the worst. For more serious deficiencies, a level 2 severity may be more of a problem and may reduce the overall score more than less serious deficiencies with a severity of level 3.

Location/Comments: Comments are required for all severity level 3 deficiencies.

Column labeled Ded.: This column gives the points deducted from the overall property score for the observed deficiencies. In the shaded heading the possible points are given for that area and building or unit. Although the listed points deducted may sum to more than the possible points, the total deducted from the overall property score for that area and building or unit does not exceed its possible points. The listing of points deducted is rounded to the nearest tenth of a point, so "<0.05" is listed when the points deducted is a very small fraction, but greater than zero. Where there is a blank or zero, such as for lack of a certificate or observed smoke detector problems, it means no points are deducted from the property score.

(Version 2.3)