# Exhibit 15

# JE 77 (March 9, 2001 Letter From Ms. Coleman To Mr. Hayes Re: REAC EHS Certification)

MAR 09 2001

Mr. John Hayes, President
P.M. Group
1050 Corporate Office Drive
Suite 150
Milford, MI 48381

Subject: REAC EHS Certification and
Notice of Violation
South Pointe Tower Apartments
Contract No. IL06-E000-034

The Real Estate Assessment Center (REAC) conducted a physical of your property on March 2, 2001. At the conclusion of the inspection the inspector issued your representative a ticket citing several Emergency Health and Safety (EHS) issues observed. You were given 72 hours from issuance to repair the items as stated on the ticket. March 6, 2001, we received your certification indicating that all EHS items had been mitigated. Because of the numerous complaints and issues that we have experienced with the management of this property, our staff conducted a confirmatory review of the items that you certified as being corrected. Your onsite assistant manager and maintenance person accompanied HUD staff while they performed the review. Our review confirmed that only a few of the EHS items had been mitigated and not all as you certified. When the confirmatory review concluded, all items found to be inaccurately certified were discussed with your onsite staff.

This letter is to advise that the EHS items cited on your REAC inspection of March 2, 2001, remain open. Also, the fact that your property is not in good repair places you in violation of your Housing Assistance Payment (HAP) Contract (refer to Section 524 (a) Addendum).

As stated above, the EHS findings are open and you are still required to mitigate each one and provide an accurate certification statement. Please keep in mind that false certifications and contract violations are serious infractions that HUD will not tolerate. Should actions like these continue, we will not hesitate to exercise our rights and/or remedies under the HAP contract, including reduction, suspension, abatement or termination of the Section 8 Assistance Payments.

A 2217

Hopefully, this matter will be resolved expeditiously. Should you need assistance, please contact Gwendolyn Thomas, Project Manager on (312) 353-6236, extension 2246.

Sincerely,

Veronica Coleman

Veronica Coleman
Director, Project Management
Chicago Multifamily Hub

CC: Marlene Dau, Vice President
Carl Sanders, Property Supervisor
P.M. One, LTD
1621 East 55th Street
Chicago, Illinois 60615

5AHM:Thomas:dem 3/9/01 doc. Southpointe

Thomas

A 2218

# Exhibit 16

## JE 79 (March 16, 2001 Letter From Mr. Hayes To Ms. Coleman Re: EHS Certification)

PM GROUP

March 16, 2001

Ms. Veronica Coleman
Director, Project Management
US Department of Housing and Urban Development
Office of Housing
Chicago Multifamily Division
77 West Jackson Boulevard
23rd Floor
Chicago, IL 60604

Re: REAC EHS Certification and Notice of Violation
South Pointe Tower Apartments
Contract No. IL 06-E000-034

Dear Ms. Coleman:

I am in receipt of your letter dated March 9, 2001 referencing the Emergency Health and Safety issues observed at South Pointe Tower Apartments on March 2, 2001. Based on your facts of what transpired at the site during the confirmatory review of the items listed on the EHS ticket, I understand your frustration and concern over the management of this property. The General Partner representing the ownership of South Pointe Tower Apartments wishes to ensure total compliance with all HUD regulations and open lines of communication between HUD, property management, and ownership. I believe that over the last year or so this has not been met to HUD's satisfaction. I would like to rectify, remedy and recommit the ownership to cooperation, working diligently with HUD and property management to provide safe, decent and sanitary housing for our residents.

Specifically addressing the reference in your letter of March 9 that "false certifications and contract violations are serious infractions that HUD will not tolerate" is of extreme concern to me. The General Partner representing ownership is located in Michigan and does not have the ability to monitor on a daily basis specific site inspections to validate compliance with required repairs from physical inspections. The General Partner relies solely on the information received from the property management company. It is my belief from investigation with property management that the certification dated March 6, 2001 as a response to the Emergency Health and Safety Issues observed on the March 2, 2001 inspection, was correct. I believe that part of the problem was the use of a site Assistant Manager and maintenance person to accompany the HUD staff on the confirmatory review. Using the site Property Manager would have resulted in what I believe would have been a more favorable report. With that being said, I am enclosing the response from Mr. Carl Sanders, Property Manager for South Pointe Tower Apartments as it relates to the EHS Issues observed on March 2, 2001. This includes photos of those items cited on the March 2, 2001 Inspection.

I am also in receipt of the REAC full inspection report from March 2, 2001. I have sent this report on to the Property Management company and we will begin the process of responding within the thirty (30)

1050 Corporate Office Drive, Suite 150 • Milford, MI 48381
248-529-2000 • Fax 248-529-2001 • www.pmgroupinc.com

day period. As you are also aware the ownership is completing a submission for financing under the HUD Section 221(d)4 program in order to complete substantial rehabilitation of the building.

I look forward to working with you to meet the specific goals and objectives that both ownership and HUD have on the betterment of South Pointe Tower Apartments.

Very Truly Yours,

ENGLEWOOD TERRACE APARTMENTS, L.P.
PM GROUP, INC., GENERAL PARTNER

John J. Hayes
President

cc: Mike McGhie
Marlene Dau
Carl Sanders

# Exhibit 17

# Englewood's Initial Disclosures

Simkin, B
Dinis, C

IN THE
UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| ENGLEWOOD TERRACE LIMITED PARTNERSHIP, a Michigan Limited Partnership,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA, and MEL MARTINEZ, Secretary of the Department of Housing and Urban Development,<br><br>Defendants. | ) | No. 03-2209C<br><br>Judge Victor J. Wolski |

**PLAINTIFF ENGLEWOOD TERRACE LIMITED PARTNERSHIP'S**
**<u>INITIAL DISCLOSURES PURSUANT TO RULE 26(A)(1)</u>**

In accordance with Rule 26(a)(1) of the Rules of the Court of Federal Claims, plaintiff Englewood Terrace Limited Partnership ("Englewood") provides these initial disclosures, based on the information currently available it:

**<u>INITIAL DISCLOSURES</u>**

## I. INDIVIDUALS WHO MAY HAVE DISCOVERABLE INFORMATION

**<u>HUD Multifamily Housing - Chicago</u>**

Ed Hinsberger
Mary Anderson,
Gwen Thomas
Veronica Coleman
Marlese Adams
Kathy Merritt
Randy Kramer
Lorraine Cooper
Beverly Bishop

**<u>HUD Departmental Enforcement Center - Chicago</u>**

Margarita Maisonet
Greg Gustin
Maria Baguiou



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
CB

Joan Kiening
Freddie Batchelor
Catherine Paul
Franks Swaba
Laura Arnold

**HUD Multifamily Housing - Washington, D.C.**

Beverly Miller
Howard Mayfield
Ken Hannon
Margaret Keck
Richard Pace
Eileen Davis

**HUD Departmental Enforcement Center - Washington, D.C.**

Ken Massman
Sandra Suiter
Bonnie Harris
Herbert Goldblatt
Francine Jones
Nancy Christopher

**HUD Public Housing - Chicago**

Linford Coleman
Elmore Richardson
Coral Duplessis

**Non-HUD Witnesses**

Alan Cravitz
Developer's Mortgage
221 North LaSalle Street, Chicago

Elzie Higginbottom
East Lake Management and Development
2900 South Michigan Avenue, Chicago

Eileen Rhodes
East Lake Management and Development
2900 South Michigan Avenue, Chicago

Howard Richards
Katten, Muchin, Zavis Rosenman
525 West Monroe Street, Chicago

Don Samuelson
DSSA Management
5901 North Cicero, Chicago

Joseph Johnson
DSSA Management
5901 North Cicero, Chicago

John Hayes
3906 Hemingway
Okemof, MI 48864

## II. DESCRIPTION OF ENGLEWOOD DOCUMENTS BY CATEGORY

1. Exhibits to the Complaint
2. Materials Relating to the Injunction Suits in 2001 and 2002
3. Closing Documents and Related Correspondence on HUD-Insured Mortgage
4. Letters and Reports Submitted to HUD
5. Financial Statements and Reports Related to New Englewood Terrace
6. Staff Communications: Management, Marketing/Leasing and Construction
7. Marketing and Leasing Efforts
8. Communications and Reports Related to Relocation
9. Email Communications between NET and DSSA Management
10. Materials Relating to Foreclosure Litigation in 2003 and 20004

## III. DAMAGE ESTIMATES BY CATEGORY

1. HAP claims not paid from 10/1/00 through 9/30/01: $165,000
(the amounts of claims made for energy reimbursement)
2. Rental increase not paid from 10/1/00 through 9/30/01: $75,000
(the value of the rental increase for the year)
3. Lost HAP payments from 10/1/01 through 9/30/02: $300,000
(the value of the HAP payments not made during this period)
4. HAP claims not paid from 10/1/01 through 9/30/02: $400,000
(the amounts of special claims and other owner claims during this period)

5. Rental increase not paid from 10/1/01 through 9/30/02: $180,000
(the value of the rental increase requested for the year)

6. Lost HAP payments from 10/1/02 through 9/30/03: $1.8 million
(the value of the HAP payments not made during this period)

7. Rental increase not paid from 10/1/02 through 9/30/03: $90,000
(the value of the annual rental increase that would have been made)

8. Lost HAP payments from 10/1/03 through 9/30/04: $1.8 million
(the value of the HAP payments not made during this period)

9. Rental increase not paid from 10/1/03 through 9/30/04: $90,000
(the value of the annual rental increase that would have been made)

10. Loss of prior equity investments in partnership: $1.25 million
(partnership equity investments made from 2000 through 2004)

11. Costs related to foreclosure: $100,000
(various transactional and legal costs related to foreclosure process)

12. Loss of future income, tax benefits, management fees and residual value
(the lost present value of $300,000 after tax income for 40 year life of mortgage)

13. The tax consequences of depreciation recapture stemming from foreclosure
(recapture costs resulting from the foreclosure of the mortgage)

## IV. INSURANCE AGREEMENTS

Not applicable

Dated: November 12, 2004

Peter V. Baugher

One of the Attorneys for Plaintiff
Englewood Terrace Limited Partnership

Peter V. Baugher
Schopf & Weiss LLP
312 West Randolph Street
Suite 300
Chicago, IL 60606
312-701-9300

**CERTIFICATE OF SERVICE**

I, Peter V. Baugher, one of the attorneys for Plaintiff Englewood Terrace Limited Partnership, certify that on November 12, 2004, I caused the foregoing **Plaintiff Englewood Terrace Limited Partnership's Initial Disclosures Pursuant to Rule 26(a)(1)** to be served on the counsel listed below by facsimile transmission and first class, postage pre-paid U.S. Mail:

Ms. Lisa B. Donis
Commercial Litigation Branch
Civil Division, United States Department of Justice
11 L Street, N.W., Room 10130
Washington, DC 20005
Facsimile: 202.514.8640

Peter V. Baugher

# Exhibit 18

# Englewood's Response To Defendant's Request For Production of Documents

IN THE
UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| ENGLEWOOD TERRACE LIMITED PARTNERSHIP, a Michigan Limited Partnership, | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 03-2209C |
| UNITED STATES OF AMERICA, and MEL MARTINEZ, Secretary of the Department of Housing and Urban Development, | ) | Judge Victor J. Wolski |
| Defendants. | ) | |

**PLAINTIFF ENGLEWOOD'S RESPONSE TO**
**DEFENDANT'S REQUEST FOR PRODUCTION OF DOCUMENTS**

Plaintiff Englewood Terrace Limited Partnership ("Englewood"), by and through its attorneys, hereby answers and objects to Defendant's Request for Production of Documents as follows:

**GENERAL OBJECTIONS**

In addition to any specific objections separately set forth in response to certain requests, Englewood generally objects to Defendant's Request for Production (hereinafter "Requests") as follows:

1. Englewood objects to each Request to the extent it seeks information that is protected by the attorney-client privilege, that was prepared in anticipation of litigation or for trial, and/or that is otherwise protected by the work product doctrine or other applicable privilege or doctrine.

142985_1.DOC

2. Englewood objects to each Request to the extent it purports to impose an obligation upon Englewood other than that which is required by the rules of the U.S. Court of Federal Claims.

3. Englewood's objections and answers to each Request are based upon information presently known to it. Discovery and investigation in this matter may yield further information affecting these responses. Englewood reserves their right to amend and/or supplement their responses.

4. Englewood will produce documents in response to any Request only where expressly so stated. Any statement that Englewood will produce responsive documents in response to any Request should not be taken as an indication that such documents exist, but only that Englewood will produce such documents or information where the documents are located or at the offices of Schopf & Weiss LLP at a time and place to be agreed upon if the documents exist in their possession, custody, or control, and are not privileged or otherwise exempt from production under any applicable law.

5. No answer provided herein shall be deemed to constitute any agreement or concession that the subject matter thereof is relevant to this action, and all answers are provided without waiving or intending to waive any objection as to relevance, privilege, or admissibility.

6. Englewood objects to these Requests to the extent that they seek documents or any other information from Englewood which are already in the possession, custody or control of the Government. Most recently, in the spring of 2004, HUD employees spent two full days at the corporate offices of DSSA Management, Inc., reviewing and copying all the files it requested related to the financial affairs and operations of Southpointe. HUD also has access to the inspection and other reports prepared by the Building Department, the Police

Department and the Fire Department of the City of Chicago, the CHAC, and the Illinois Housing Development Authority. Southpointe's records maintained at the site, including project work order information in its onsite computer systems, and resident and unit files, are under control of HUD. HUD also has access to all the papers filed in the federal court cases. Other Southpointe and Englewood records have previously been produced to HUD over the course of the last six years.

7. Englewood objects to producing documents created or coming into its possession after the filing of this lawsuit in September 2003.

The foregoing General Objections are incorporated into and apply to each of the following responses to specific requests. Each response to a specific request is made subject to and without waiving these General Objections, whether or not specifically reiterated in the response.

## RESPONSES TO REQUEST FOR PRODUCTION

**Request No. 1:**

All correspondence, internal memoranda, telephone call records, electronic mail, diaries, reports, files, or records relating to the claims by Plaintiff described by the complaint in this action.

**RESPONSE:**

Englewood believes that HUD already has these documents, including particularly the exhibits to the complaint. To the extent that other such documents exist and have not already been produced to HUD, Englewood will produce these documents.

**Request No. 2:**

All documents upon which the plaintiff intends to rely to establish proof of its assertions and defenses in this action.

**RESPONSE:**

See the exhibits to the complaint and answer to Request 1. Englewood otherwise objects to this Request as being overbroad and seeking information whose confidentiality is protected by the work product doctrine and attorney-client privilege.

**Request No. 3:**

All documents required to be identified in Defendant's First Set of Interrogatories.

**RESPONSE:**

Englewood will produce the documents identified, except to the extent they have already been produced to the Government or are equally available to HUD.

**Request No. 4:**

All documents relied upon or consulted in order to respond to Defendant's First Set of Interrogatories.

**RESPONSE:**

Englewood objects to Request 4 on grounds that the confidentiality of the information sought is protected by the attorney work product doctrine and attorney-client privilege.

**Request No. 5:**

All contracts and subcontracts where applicable for repairs, replacements, and other work items for the property since 1999.

**RESPONSE:**

Englewood believes that the records referred to are at Southpointe under HUD's control.

**Request No. 6:**

All other relevant documentation including but not limited to, all maintenance records for the properties.

**RESPONSE:**

Englewood believes that the maintenance records referred to are at Southpointe under HUD's control. Englewood objects to the request for "all other relevant documentation" as being vague and overbroad.

**Request No. 7:**

In regards to plaintiff's contention that HUD improperly denied its special claims and other compensation, submit any and all documents in support of this contention.

**RESPONSE:**

Englewood will produce documents in response to Request 7, except to the extent it has already done so.

**Request No. 8:**

Identify any other documents not previously identified that plaintiff contend substantiates their responses to the foregoing subparagraphs.

**RESPONSE:**

Englewood objects to Request 8 as being vague and ambiguous.

Dated: February 28, 2005

By: Peter V. Baugher
One of the Attorneys for Plaintiff
Englewood Terrace Limited Partnership

Peter V. Baugher
Schopf & Weiss LLP
312 West Randolph Street
Suite 300
Chicago, Illinois 60606
(312) 701-9300

CERTIFICATE OF SERVICE

I, Peter V. Baugher, an attorney, certify that on March 1, 2005, I caused a copy of the foregoing **PLAINTIFF ENGLEWOOD'S RESPONSE TO DEFENDANT'S REQUEST FOR PRODUCTION** to be served on the counsel listed below by facsimile transmission and first class, postage pre-paid U.S. Mail:

Mr. Paul R. Wellons
Commercial Litigation Branch
Civil Division, United States Department of Justice
Attention: Classification Unit
1100 L Street, N.W., Room 800
Washington, DC 20005
Facsimile: 202.307.0972

Peter V. Baugher

# Exhibit 19

# Englewood's Response To Defendant's First Set Of Interrogatories

IN THE
UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| ENGLEWOOD TERRACE LIMITED PARTNERSHIP, a Michigan Limited Partnership,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA, and MEL MARTINEZ, Secretary of the Department of Housing and Urban Development,<br><br>Defendants. | ) | No. 03-2209C<br><br>Judge Victor J. Wolski |

**PLAINTIFF ENGLEWOOD'S ANSWERS TO**
**DEFENDANT'S FIRST SET OF INTERROGATORIES**

Plaintiff Englewood Terrace Limited Partnership ("Englewood"), by and through its attorneys, hereby answers and objects to Defendant's First Set of Interrogatories as follows:

**GENERAL OBJECTIONS**

In addition to specific objections separately set forth in response to certain interrogatories, Englewood generally objects to Defendant's Interrogatories as follows:

1. Englewood objects to each interrogatory to the extent it seeks information that is protected by the attorney-client privilege, the work product doctrine, or other applicable privilege or doctrine. If any such privileged information is disclosed, except pursuant to a specific written agreement covering such information, the disclosure shall be deemed inadvertent and will not be intended to waive or prejudice any applicable privilege or immunity from disclosure.

144084_1.DOC

2. Englewood objects to each interrogatory to the extent it purports to impose any obligations upon Englewood other than that which is required by the rules of the U.S. Court of Federal Claims and the Court's orders.

3. Englewood's objections and answers to each interrogatory are based upon information presently known to Englewood. Discovery and investigation in this matter may yield further information affecting these responses. Englewood reserves its right to amend and/or supplement its responses.

4. No answer provided herein shall be deemed to constitute any agreement or concession that the subject matter thereof is relevant to this action, and all answers are provided without waiving or intending to waive any objection as to relevance, privilege, or admissibility.

The foregoing General Objections are incorporated into and apply to each of the following answers to specific interrogatories. Each answer to a specific interrogatory is made subject to and without waiving these General Objections, whether or not specifically reiterated in the answers.

ANSWERS TO FIRST SET OF INTERROGATORIES

**Interrogatory No. 1:**

> Identify all individual(s) employed or affiliated with plaintiff with knowledge of the claims filed against the United States in this action. For each individual so identified, state with specificity, the basis for that person's knowledge.

**ANSWER:**

Carl Sanders – PM One Property Manager from spring 1998 through June 2001. Mr. Sanders was involved generally in the events that took place at Southpointe from the summer of 1998 through June 2001.

John Hayes – Managing Partner of the Englewood Terrace Limited Partnership ("Englewood") from summer 1999 through early December 2002. Mr. Hayes represented the

ownership of Englewood throughout the period from summer 1999 to the end of 2002, when DSSA New Englewood Terrace LLC replaced PM Equities.

Lionel Nixon – Site Manager and Consultant at Southpointe from July 2003 through December 2003. Mr. Nixon took over the site management responsibilities at Southpointe in June 2003. In addition to responsibility for site management, he was involved in security oversight, and the reconstruction of the site files and their integration with the files that were kept in the DSSA Management, Inc. corporate office after a fire in June 2003. During this time, he became familiar with historic operations, current operations, and the construction program being conducted by Joseph J. Duffy.

Joseph J. Johnson – Site Manager at Southpointe from September 2003 through June 2004. Joseph Johnson has worked for DSSA Management, Inc. from 1997 through 2005. He was responsible for site management responsibilities at Southpointe from September 2003 through June 2004. His duties included site management, the reconstruction of the management office and files, financial operations, and the oversight of construction and review of the project history from the beginning of DSSA management in December 2001 through May 2004.

Don S. Samuelson – Successor to John Hayes as the General Partner in Englewood. Mr. Samuelson prepared the rehabilitation loan package for Englewood in the summer of 2001, consulted on the injunction suit brought by Englewood against HUD in October 2001, retained DSSA Management, Inc. to perform management services for Englewood from December 2001 through May 2004, became the replacement General Partner in Englewood in December 2002, and continues to function as General Partner in Englewood to this date.

**Interrogatory No. 2:**

With regard to the property:

(a) Identify each person and each business entity that plaintiff used, whether employed by plaintiff and/or by a contractor a subcontractor [sic], that repaired, maintained, or otherwise provided service(s) for the property from 1999 until present, and;

(b) For each person or entity identified, describe in detail the nature and purpose of the work, including the start and completion dates for each repair project or service, and the cost for the work or the service provided.

(c) If work was not completed, state with specificity the reason why work was not completed.

**ANSWER:**

There were three time periods during which repair and maintenance work was done at Southpointe. The first time period was the time between the date the first REAC inspection was conducted on April 29, 1999 through the response on April 8, 2001 to the second REAC Report on March 8, 2001. The second time period was the time between the Notice of Default on April 9, 2001 through the closing of the HUD rehab loan on December 13, 2002 when DSSA New Englewood Terrace LLC replaced the PM Group as the General Partner in Englewood. The third time period began on December 13, 2002 and ended when HUD terminated the Englewood contract with Joseph J. Duffy Construction on May 24, 2004, and replaced DSSA Management with East Lake Management and Development.

April 29, 1999 through April 8, 2001

During this time period, all of the repairs and improvements conducted in response to the April 29, 1999 REAC Report and subsequent MIO repairs were submitted by Englewood and PM One to the CSO DEC and MFH in the form of invoices and cancelled checks. All of this work was identified fully and documented, and all of the proposed charges and payments were approved by the CSO DEC. These materials should be in the hard copy files of the CSO DEC, or in files which were "imaged," or in entries in REMS related to actions taken by various DEC and MFH personnel assigned to Southpointe. The repairs conducted during this

period by Southpointe maintenance staff were documented as work orders, entered in the computer and kept in files maintained at the property. The work that was not completed under the approved MIO during this period, to be completed by June 2001, related to the finishing of some wall and ceiling repairs, and unit decoration, work that was to be funded under a HUD rehabilitation loan. HUD rejected the loan application. As a result this work was not done.

April 9, 2001 through December 13, 2002

During this time period, the repair work done at Southpointe related to "work orders" performed by on-site staff. Almost all of the work required by the April 29, 1999 and March 8, 2001 REAC Reports had been done. There were loan proposals made to HUD for painting and decorating and for additional rehab work beyond the scope of work set out in the REAC Reports. HUD rejected these loan applications. The repairs and maintenance work done during this period related to the completion of work orders and the preparation of individual units for CHAC occupancy reviews so that existing Southpointe residents could use their CHAC housing vouchers to continue to live at Southpointe. The date, time, and scope of work related to the individual work orders was kept in the Southpointe work order files and computer system. The work was done. The file was then closed out. Many of the hard copy files documenting this work were destroyed in the first floor fire in the management office in June 2003.

December 14, 2002 through May 24, 2004

Englewood entered into a construction contract with Joseph J. Duffy Construction ("Duffy") on December 13, 2002. It set out in plans and specifications a comprehensive rehabilitation program that took place between December 13, 2002 and May 24, 2004. Information related to the performance of Duffy and subcontractors under the Duffy contract is contained in files kept by Duffy. These files contain the scope of work to be performed by Duffy

and its subcontractors, construction contracts, progress reports, requests for monthly payments, sworn statements and all of the other documentation describing the work to be performed, and performed, under these various contracts. The work to be performed by Duffy and its subcontractors under the Duffy contract was not completed consistently with the requirements of the contract documents. HUD simply wanted the construction program finished and did not appear to care whether or not it was completed in a way that comported with the contract.

**Interrogatory No. 3:**

With respect to plaintiff's allegation in Count I of its complaint, that it had cured the events of default under its HAP default:

(a) Identify with specificity what physical conditions it alleges were cured in response to the "Notice of HAP Default," including the individual or entity that completed the repair or replacement of the item(s), the date(s) of completion, and whether the item repaired or replaced was identified as "exigent health and safety;"

(b) Identify with specificity the basis for plaintiff's belief that HUD used "the needs of a long-term rehabilitation program…to define the standards by which to judge the adequacy of an annual repair and maintenance program," (Complaint ¶ 82), and the basis for plaintiff's belief that this was also HUD's allegedly improper basis for default under the HAP contract.

**ANSWER:**

The Notice of Default under the HAP contract that was sent to Englewood on April 9, 2001 asserted several reasons for the Default Notice: (1) the alleged failure of Englewood to complete the required repairs from the REAC inspection and April 29, 1999 Report; (2) the alleged failure of Englewood to respond to the March 2, 2001 REAC Inspection and March 8, 2001 Report; and (3) the alleged failure of Englewood to respond to the EH&S deficiencies that were listed in a HUD letter to Englewood dated March 9, 2001.

March 8, 2001 REAC Report – Exigent Health and Safety Issues

The supposed "exigent health and safety" conditions that were identified in the REAC Report of March 8, 2001, included:

- A cover missing on the electric box in the penthouse;
- An expired fire extinguisher tag in the penthouse;
- Two outlet covers missing in the maintenance room;
- Exposed wires from a broken light fixture in the maintenance room;
- A blocked door exit in the trash compactor room;
- Three missing breakers in breaker boxes in units;
- Three missing outlet covers in units;
- One broken window in a unit; and
- Two instances of roaches in units.

These were the EH&S issues that resulted in the reduction of the REAC score from a "69" to a "31." All of these EH&S issues either related to building locations to which residents had no access (the penthouse, the maintenance/compactor rooms), or were minor and quickly correctable (breakers, outlet covers, a broken window, two roaches). However, it was these EH&S items that resulted in Englewood receiving a low score. Most of these items were corrected immediately. All were corrected by March 12, 2001.

March 8, 2001 REAC Report – The Englewood Response

On April 5, 2001, Englewood provided HUD with a written response to all of the issues listed on the March 8, 2001 REAC Report. More than 90% of the items listed on the Report were corrected as explained in that April 5 letter to Joan Kiening of HUD. The remaining items were scheduled to be completed by May 31, 2001. In addition to the specific problems

listed with respect to the units inspected on March 2, 2001. Englewood completed a detailed unit-by-unit inspection during March in order to develop a program for correction in all Southpointe units of the types of problems identified in the March 8, 2001 REAC Report. There was a March 19, 2001 rehab work proposal that covered all of the types of corrective work that had been identified as being needed in the April 1999 REAC Report, the March 2001 REAC Report, and the inspection by the Illinois Housing Development Authority of 37 units on March 19, 2001. All of these responses were included in a comprehensive letter by Englewood (Kelly Brown) to HUD (Veronica Coleman) on April 8, 2001. The Notice of Default letter to Englewood failed to acknowledge that Englewood had already completed its response to the HUD April 9, 2001 Notice of Default, even before the April 9, 2001 letter was sent.

HAP Contract vs. New Loan Underwriting

HUD apparently relied on a report written by Ray Etzkorn of HUD on March 27, 2001 in deciding that Southpointe was in violation of its HAP Contract. It is clear from simply comparing the types of maintenance and repair work identified on the March 8, 2001 REAC Report, the April 28, 1999 REAC Report, and the IHDA inspection report of March 19, 2001, with the comprehensive capital improvement program set out by Etzkorn in his March 27, 2001 report, that there were dramatic differences in the scopes of work contemplated by all of the previous HUD inspections and the work required by Etzkorn in his report. The REAC Report noted almost no significant capital expenditures related to structural or mechanical systems, or to significant improvements to the common areas. It concerned the needs for repair, maintenance and decorating work in the individual units. The Etzkorn Report, on the other hand, proposed the replacement of major systems, the complete reconstruction of kitchens and baths, the replacement of the penthouse, the replacement of the roof, a new call station, an electronic

security system, air conditioning and window reconfiguration, the replacement of all appliances, new heating controls in the units, new electrical services, a new emergency generator, and a host of other improvements that would make sense in the underwriting of a new 40-year loan, but were completely unrelated to the types of repairs required by the previous REAC Reports or IHDA inspections. The Etzkorn Report eventually became the core scope of work for the new comprehensive rehabilitation loan made by HUD on December 13, 2004. Its findings, however, do not justify HUD's determination that Englewood was in default of its HAP Contract.

<u>Coleman Letter to Hayes</u>

Veronica Coleman wrote a letter to John Hayes on May 15, 2001, the day before HUD issued its "Notice of Continuing Default" on May 16, 2001. Her letter states that HUD would not accept the Englewood responses of April 5, 2001 and April 8, 2001 because of the "impending negotiations with HUD concerning your proposed refinance and substantial rehabilitation of the property," and claims that the condition of the property is beyond the scope of the MIO, "as acknowledged by your application to refinance."

**Interrogatory No. 4:**

With regard to the physical condition of project [sic]:

(a) Identify any person or entity, other than HUD or a representative of plaintiff, that has ever inspected the property. For each person or entity identified, state with specificity the purpose of the inspection, the date it occurred and whether a report, photographs, or other documentation was generated as a result of the inspection;

(b) For each inspection identified in (a) above, state the results of the inspection and plaintiff's response(s), if any.

**ANSWER:**

There were various physical inspections at Southpointe during the period from August 1999 through December 2002. Representatives of the CSO DEC inspected Southpointe

on April 15-16, 1999. The purpose of the inspection was to determine whether additional inspections were needed in order for the CSO DEC to decide how to proceed with its referral from MFH. There were inspection notes, narrative reports taken as part of this inspection. As a result of the CSO DEC inspection there were additional inspections scheduled for REAC on April 29, 1999 and Pinnacle on May 19, 1999. There may have been other inspections by REAC and Pinnacle at Southpointe later in 1999 to confirm that the MIO work had been done and to support the recommended transfer of Southpointe back to MFH in January 2000. There may also have been CSO DEC, REAC or Pinnacle inspections in the summer of 2000 to confirm that the MIO had been substantially completed and in connection with approval of Englewood's request for a four year extension of the HAP Contract. During these inspections, it is likely that inspection reports were created, "before" and "after" photographs were taken, and there were entries and narratives recorded in REMS, along with the creation of "images" of the documents and their filing in hard copy files. Englewood's response to the CSO DEC, REAC and Pinnacle inspections in the first half of 1999 was the creation of a MIO along with a work program and schedule, and a funding mechanism to complete the work outlined in the MIO.

There was another REAC Inspection performed on March 2, 2001, which led to an Inspection Report dated March 8, 2001. It is not clear why this REAC Report was scheduled at this time since there was an existing MIO in place that was to be completed in June 2001. Englewood's response to the REAC Report was a detailed summary of the actions taken in response to the EH&S findings, all of the individual defects that were found in the building systems, common areas and units, as well as a comprehensive program to correct the types of problems found in the 25 inspected units for all of the 303 residential units in the building.

There was an inspection conducted by the Illinois Housing Development Authority on March 19, 2001.

Hank Chiano (former Construction Manager at HUD) and Brad Mathes (of Mathes Construction) inspected Southpointe in the summer of 2000, in conjunction with the architect Ted Dunaj, to review the physical condition of Southpointe subsequent to the pending completion of the MIO in order to create a scope of work for the rehabilitation loan request Englewood was preparing for HUD.

There were additional inspections of Southpointe conducted by Ted Dunaj during the first quarter of 2001. These led to the preparation of detailed unit-by-unit descriptions of the work he felt should be part of a new rehabilitation loan. Frank McCann of Industrial Piping, Inc and Jerold Levin of BABCO Construction Company inspected the property in preparing their March 2001 reports on work they considered appropriate to be undertaken.

During the period from November 2001 through December 13, 2002, representatives of CHAC inspected a number of individual units at Southpointe. These inspections were conducted to assure that the units were of sufficient quality to have Southpointe residents use their vouchers at the building. During the period, CHAC accepted the applications of approximately 100 residents at Southpointe to use their vouchers at the building. The CHAC inspections continued throughout the period from December 13, 2002 through 2003, when it was necessary to move residents from the upper floors to the lower floors to accommodate the rehabilitation program, and then to relocate residents from the middle and lower floors to the completed upper floors to "vacate" the middle and lower floors for rehabilitation.

Finally, there have been City Building Department inspections at Southpointe. Elevators were a problem, as were leaking pipes until the entire system of horizontal pipe

replacement and the clearing of the risers was accomplished in January 2004. During December 2003, there were some serious problems with burst pipes that flooded and damaged all of the elevator electronics, shutting down the elevators for more than two days. This led to a massive City inspection program during this period leading to 38 code violations. Most of these code violations were corrected quickly. Two of the three elevators had been restored to working order at the time that Englewood and DSSA Management were replaced by East Lake Management on May 24, 2004, leaving one elevator to be repaired in June 2004. There were no other City code violations outstanding at that time. The City has a complete file on Building Code violations resulting from City inspections from 1992 through 2004.

**Interrogatory No. 5:**

> Identify all facts, documents or other evidence that plaintiff fulfilled all its maintenance obligations with respect to the property.

**ANSWER:**

As stated earlier in the answers to Interrogatories 2 and 3, Englewood responded promptly and comprehensively to all of the physical problems noted in the REAC Reports of April 29, 1999 and March 8, 2001. The work done in response to the REAC Report of April 29, 1999 was accepted by HUD. The Englewood comprehensive and timely response of Englewood to the March 8, 2001 REAC Report was simply ignored by HUD. All work orders that were submitted to the management office at Southpointe were responded to and closed in a timely manner. There were 135 CHAC unit inspections that resulted in the acceptance of units. In addition, there were 135 units that were rented to residents with housing vouchers, before completion of construction at Southpointe. These housing vouchers, which could be used anywhere in the City, were used to lease apartments for $1025 (3BR TH), $900 (3BR Apt), $775 (2BR Apt) and $625 (1BR Apt) at Southpointe.

**Interrogatory No. 6:**

Has the project ever received any citations or notices of code violation from any entity other than HUD with respect to the physical condition of the property? If so, identify:

(a) The reason for the citation or notice, the entity responsible for issuing such citation or notice, and the date of issuance of the citation or notice.

**ANSWER:**

The Building Department of the City of Chicago made inspections of Southpointe at various times during the period from summer 1998 through May 2004. The inspections related to violation of the City Building Code. Most involved the elevators and plumbing. A list of these code violations and their resolution can be obtained from the City of Chicago Building Department.

In addition, there were periodic inspections of Southpointe conducted by the State's Attorney's Office and the Chicago Police Department related to the presence of crime, drugs and gangs which were operating out of Southpointe.

**Interrogatory No. 7:**

With regard to Count II of the Complaint, which alleges HUD breached its contract with plaintiff by: Failing to provide rental assistance for its alleged "full" four-year term; Failing to process an energy cost reimbursement; failing to implement rental increases; Failing to honor vacancy claims; and Failing to pay special claims related to rent payments and damages caused by residents at the property:

(a) Describe, date, and identify all steps taken and documents submitted by plaintiff to HUD to obtain the reimbursements, special claims, and other payments alleged [sic] owed to Plaintiff;

(b) Identify any HUD personnel with whom plaintiff had any contact regarding each of the submissions described above;

(c) Explain and provide documentation for plaintiff's contention that HUD allegedly wrongfully refused each claim, and that such alleged refusal was arbitrary and without reason.

ANSWER:

With respect to HUD's failures set out in the introduction to Interrogatory 7:

HUD's Failure to Provide Four Years of Rental Assistance

Rental assistance was provided to Englewood under the HAP Contract from 10/1/00 through 9/30/01, although in an amount $200,000 less than requested. HUD refused to honor Englewood's HAP Contract renewal and rental increase request made in August 2001 to be effective October 1, 2001. Instead, it approved but did not implement the rental increase, extended HAP payments through a series of forced short term renewals until residents relocated, prohibited Englewood from marketing or leasing units after October 1, 2001, and refused to honor its responsibilities under the basic terms of the HAP Contract. Englewood sought an injunction in October 2001 to force HUD to continue payments under the HAP Contract. The injunction request was denied by U.S. District Judge Ruben Castillo in an Order entered on November 15, 2001. Judge Castillo ruled that the action was not "ripe" and that there were adequate remedies at law available to Englewood, including relief for damages in the Court of Federal Claims. HUD, through Ed Hinsberger, continued to reject Englewood's request for the reinstatement of the HAP Contract on numerous occasions from September 2001 through September 2003, when Englewood filed this suit.

HUD's Failure to Implement Rent Increases

On July 27, 2000, John Hayes submitted a request to Gwen Thomas at HUD for the renewal of the HAP Contract in the amount of $2,714,196. This included a request for a rent increase. The request appears to have been rejected, without explanation or acknowledgement. The HAP Contract renewal was for $2,513,000, entered on September 27, 2000. In August 2001, another request for a rent increase was made by DSSA Management on behalf of Englewood as part of the request for the renewal of the HAP Contract. It contained all of the

market research documentation required for the proposed increase. HUD's market research group confirmed the rent comparables contained in the request. Ed Hinsberger wrote that the requested rent increase was supported by the documentation. But the approved increase was not implemented. While the comparables supported the need for the increase as of October 1, 2001, Ed Hinsberger stated that the increase would not be effective until the completion of a full rehabilitation loan application – unrelated to the operating needs of the property. Hinsberger later construed the application to be the HUD closing of the rehabilitation loan in December 2002, rather than the submission of the full plan that occurred in September 2001.

<u>HUD's Failure to Process Englewood's Energy Cost Reimbursement</u>

During the fourth quarter of 2000 and the first quarter of 2001, natural gas costs more than doubled. This caused very serious problems for the HUD multifamily portfolio around the country. A special lump sum reimbursement was arranged to be made available to developments like Southpointe. Southpointe made a request for this lump sum reimbursement in the summer of 2001. HUD claimed that it never received the request and would not honor it. An account payable was generated of more than $125,000 by reason of these extraordinary costs, an amount that Southpointe was never able to pay fully, and that resulted in interest costs, penalties and service terminations. When this claim was made again by DSSA Management in fall 2001, HUD took the position that the program was over, that it was too late, and that nothing could be done. HUD had funds available to it to provide financial support to Southpointe. The money was needed to stay current with vendors, in particular the People's Gas Company. HUD refused to fulfill its duties.

HUD's Failure to Honor Vacancy and Special Claims

Requests were made for vacancy and special claims in March 2000. HUD rejected these claims in November 2000 because (supposedly) they were not submitted on time. Money was needed to complete work on the MIO during this period. The very heavy costs of natural gas in the 4th quarter of 2000 put a great strain on operating finances. Englewood's claims were valid. They were filed in a timely manner. They were simply ignored for eight months, and then rejected.

In May and July 2002, there were renewed claims made by DSSA Management to Ed Hinsberger of HUD on behalf of Englewood requesting more than $500,000 in rent increases, vacancy losses, special claims, lump sum energy cost reimbursements and other claims that should have been available under the terms of the renewed HAP Contract. Margarita Maisonet of the CSO DEC rejected these claims on the ground that no claims of these sorts could be made by Englewood on behalf of Southpointe because the project was "not in good standing."

**Interrogatory No. 8:**

> Describe in detail any other actions undertaken by plaintiff in response to HUD's Notice of HAP Default and Notice of Continuing Default.

**ANSWER:**

Englewood fully complied with the REAC Report of April 29, 1999, which compliance was approved by HUD, and responded fully to the REAC Report of March 8, 2001. Unfortunately, those April 5 and 8, 2001 responses were neither accepted nor reviewed by HUD. HUD's April 6, 2001 Notice of Default and the April 9, 2001 Default letter ignored the two Englewood responses. Prior to the HUD Notice of Continuing Default of May 15, 2001, HUD had informed Englewood on April 13, 2001 that there was nothing that Englewood could do to reach agreement on the rehabilitation loan. HUD simply wanted Englewood to transfer its

interests to a new owner and management agent satisfactory to HUD, stating that it would likely continue the HAP Contract if such a new ownership entity could be found. In HUD's view there was apparently nothing for Englewood to do but to liquidate its interests.

Englewood continued to press its case that the issuance of vouchers (begun in June 2001) and the abatement of the HAP Contract (again directed by HUD in June 2001) were improper, and that Englewood had made appropriate and timely responses to the REAC Report of March 8, 2001. It regularly requested meetings to resolve open issues that could reinstate the HAP Contract. It believed that the new rehabilitation "plan" prepared by DSSA in August 2001 would satisfy HUD's demands so that the HAP Contract could be reinstated. HUD rejected these requests.

Englewood then sought an injunction in the U.S. District Court. HUD took the position that it had not "terminated" the contract, that the injunction claim was premature, and that there were adequate remedies at law: administrative relief through HUD under MAHRA, and a claim for damages in the Court of Federal Claims. Judge Castillo sustained the Government's position.

Englewood then worked through all of the steps in the internal HUD review process: a request for reconsideration, an appeal of the MFH decision, an appeal to the Hub, and a final appeal to what was to be an independent party in HUD HQS:

> "HUD will designate an official to review any appeal, conduct the conference, and issue the written decision. The official designated will be one who was not directly involved in making the decision being appealed."

HUD Section 8 Renewal Policy Handbook, Chapter 13, page 3, point #8. In the case of Southpointe, it appears that Greg Gustin was consulting on, and may have written, the Final Decision for Howard Maybury on May 2, 2002, the last internal HUD appeal available to Englewood.

Finally, Englewood contacted the HUD Secretary's Regional Representative, HUD official in Washington, the local Congressman, Bobby Rush, and the two Illinois Senators (Senators Durbin and Fitzgerald) to see if a reconciliation could be accomplished short of litigation in the Court of Federal Claims. HUD resisted all of these efforts. Englewood had no alternative but to sue for damages in the Court of Federal Claims in September 2003.

**Interrogatory No. 9:**

> Describe with specificity the factors that plaintiff will rely upon in determining and calculating the amount of damages that Plaintiff allege HUD owes.

**ANSWER:**

Englewood's calculation of damages includes the following factors:

- The money that was withheld from Englewood during the first year of the contract (10/01/00 through 9/30/01), consisting of the failure to provide the requested rental increase, and claims related to unusual energy costs and the special claims related to individual units.

- Claims related to the failure to implement the rental increase for the first automatic renewal period (10/01/01 through 9/30/02), and the lost revenue related to vacancy and additional special claims.

- Claims related to the lost revenue for the second automatic renewal period (10/01/02 through 9/30/03), and the loss of management fees related to reduced occupancy.

- Claims related to the lost revenue for the third automatic renewal period (10/1/03 through 9/30/04), and the loss of management fees related to reduced occupancy.

- The loss of Englewood's investment and equity in the project resulting from the foreclosure brought by Reilly Mortgage Group on behalf of HUD that was directly

caused by the shortfall in rental revenue that resulted from HUD's failure to honor the HAP Contract.

- The value of developer fees and syndication proceeds Southpointe lost through foreclosure. This denied Englewood access to the tax exempt bond 4% LIHTC financing that the Illinois Finance Authority was prepared to extend on Southpointe, through the reservation of a bond cap allocation that was to be available to Southpointe. This deal structure and financing availability was known to HUD.

- The lost ongoing economic value of a project that had been rehabilitated, was next door to a new multi-million dollar community college to be constructed in Englewood, in a community that was the only HUD urban "Renewal Community" in Illinois, for which a wide variety of tax and program incentives were available to Southpointe and Englewood.

- The lost opportunities for the two General Partners in Englewood to do business with HUD through the issuance by HUD of 2530 "flags" against PM Equities (August 2001) and Samuelson/DSSA Management (June 2004).

- Costs, attorney fees, statutory interest and other appropriate damages.

Dated: February 28, 2005

By: Peter V. Baugher
One of the Attorneys for Plaintiff
Englewood Terrace Limited Partnership

Peter V. Baugher
Schopf & Weiss LLP
312 West Randolph Street
Suite 300
Chicago, Illinois 60606
(312) 701-9300

**VERIFICATION**

Pursuant to 28 U.S.C. § 1746, I, Don S. Samuelson, verify under penalty of perjury under the laws of the United States of America that the foregoing information provided in these responses to interrogatories is true and correct to the best of my knowledge and belief, except as to matters stated therein to be on information and belief and as to such matters I certify that I believe the same to be true.

Don S. Samuelson

CERTIFICATE OF SERVICE

I, Peter V. Baugher, an attorney, certify that on March 1, 2005, I caused a copy of the foregoing **PLAINTIFF ENGLEWOOD'S ANSWERS TO DEFENDANT'S FIRST SET OF INTERROGATORIES** to be served on the counsel listed below by facsimile transmission and first class, postage pre-paid U.S. Mail:

Mr. Paul R. Wellons
Commercial Litigation Branch
Civil Division, United States Department of Justice
Attention: Classification Unit
1100 L Street, N.W., Room 800
Washington, DC 20005
Facsimile: 202.307.0972

Peter V. Baugher