**IN THE**
**UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| ENGLEWOOD TERRACE LIMITED PARTNERSHIP, | ) | |
| Plaintiff, | ) | No. 03-2209C |
| v. | ) | Judge Marian Blank Horn |
| THE UNITED STATES, | ) | |
| Defendant, | ) | |

## JOINT STATEMENT OF ISSUES OF FACT AND LAW

Pursuant to Appendix A of the Rules of the United States Court of Federal Claims, as modified by this Court's Orders of August 23, 2006 and December 14, 2006, the parties respectfully submit the following joint statement of the issues fact and law to be determined by the Court. Accordingly, to the extent that the issues listed below incorporate statements of fact, the parties reserve the right to dispute those facts.

**The Contract Between Englewood And HUD:**

1. Did the contract executed by the parties on or about October 18, 2000 provide for an initial one year term with three automatic one year renewals[1] (Joint Exhibit "JE" 21)?

   a) Under what circumstances and procedures could HUD be relieved of any obligation to renew the contract automatically for three one-year terms?

   b) Under what circumstances and procedures could HUD be relieved of its other obligations under the contract?

2. Under what circumstances and procedures could HUD terminate the contract?

[1] Englewood contends that in ruling on HUD's Motion to Dismiss For Lack Of Jurisdiction under Rule 12(b)(1), Judge Wolski discussed the term of the parties' agreement. *See* 61 Fed. Cl. 583, 588 (Fed. Cl. 2004).

3. Under what circumstances and procedures could HUD issue Section 8 vouchers to tenants to relocate from South Pointe without responsibility for the tenants' lease obligations?

4. Under what circumstances and procedures could HUD abate the contract?

**Englewood's Good Faith Efforts Regarding Compliance In 1999 And 2000 Leading To The 2000 HAP Contract:**

5. Did Englewood take substantial actions in good faith regarding South Pointe, from at least 1999, by:

a) working with the Department Enforcement Center ("DEC") to identify and correct existing deficiencies in the condition of South Pointe;

b) hosting a delegation from HUD Washington in August 1999 to review Englewood's interim performance with the DEC (*See* JE 40);

c) developing and implementing a Management Improvement and Operating ("MIO") Plan and other plans to correct cited deficiencies through rehabilitation of the building, additional security services, and tenant social services programs;

d) attempting to finalize the MIO Plan throughout 2000;

e) infusing $770,000 in additional capital to pay for repairs, enhanced security and building improvements;

f) applying for a rehabilitation loan to finance other capital repairs;

g) and did HUD recognize and approve Englewood's actions and intentions regarding the South Pointe building: (i) through its acceptance of Englewood's MIO Plan in 1999 and 2000, (ii) the drafting of the "Final Team Report" in January 2000 (JE 47), (iii) the approval of Englewood's prompt response to HUD's 2000 management/occupancy review, and (iv) through the events leading to the execution of the 2000 HAP Contract in October 2000.

**Englewood's Claims That HUD Breached The Contract:**

6. Did the following listed events occur, and, if they occurred, did HUD breach and repudiate its contract obligations and/or covenant of good faith and fair dealing through any of the following actions or events:

a) by refusing to cooperate with Englewood from February through September of 2000 in "finalizing" the MIO Plan, to the extent that HUD was directed to do so by the Final Team Report – Resolution (JE 47)?

b) by failing to process special claims submitted by Englewood in March 2000 until November 2000, and then rejecting them on the grounds that they were not timely submitted?

c) by declaring the 2000 HAP Contract to have been made in error on December 6, 2000 (JE 71)?

d) by attempting to unilaterally alter the duration of the initial and renewal terms of the contract without the approval of Englewood twice through correspondence in December 2000 and/or January 2001 (JE 71, 72)?

e) by declaring that Englewood had not completed its March 2001 Exigent Health & Safety ("EH&S") corrections prior to the time that Englewood was required to complete the corrections?

f) by stating that Englewood had not completed the EH&S corrections, in the event that Englewood had completed those corrections?

g) if HUD had obligations or responsibilities under the March 8, 2001 REAC Report (JA 28), by not complying with those obligations or responsibilities?

h) by issuing a Notice of Default in April 2001 (JE 89) without describing the actions required to be taken and the remedies to be applied as required by Section 20(b)(2) of the 1998 HAP Contract (JE 19)?

i) by issuing a Notice of Default in April 2001 without factual support for the alleged "events of default" (JE 89)?

j) by declaring that South Pointe was not in "decent, safe and sanitary" condition[1] without a proper factual basis and without

---

[2] Englewood contends that the term "decent, safe and sanitary," is neither precise nor measurable. *See United States v. Southland Management Corp.*, 326 F.3d 669, 675 (5th Cir. 2003).

informing Englewood of the actions required to be taken and the remedies to be applied as required by Section 20(b)(2) of the 1998 HAP Contract (JE 19) and/or 24 CFR Part V, Subpart G?

k) by completing the drafting of the Notice of Default (JE 89) on a fast track basis on April 6, 2001, prior to the date on which Englewood was to have submitted its response to the March 8, 2001 REAC Report (JE 28)?

l) by refusing to review and discuss with Englewood the Englewood responses to the March 8, 2001 REAC Report (JE 28) through correspondence from representatives of Englewood in March and April 2001, including but not limited to the following documents in the parties' joint exhibits: 76, 79, 80, 85, 86, 87, 88?

m) by refusing to discuss with Englewood the ways in which Englewood's rehab proposal did or did not satisfy the corrections required by the March 8, 2001 REAC Report (JE 28)?

n) by refusing to discuss Englewood's alleged failure to comply with the correction of EH&S or other deficiencies identified in the March 8, 2001 REAC Report (JE 28)?

o) by refusing to discuss the factual basis for any of the alleged "events of default" set forth in HUD's April 2001 Notice of Default (JE 89)?

p) by refusing to discuss or negotiate with Englewood as owner or management agent under the HAP contract in April 2001 and requiring that Englewood replace itself as owner and manager through the transfer of its property and contract interests as owner and management agent, thereby repudiating the HAP contract?

q) by refusing to discuss or negotiate with Englewood regarding its request for a HUD-insured mortgage loan in April 2001 and requiring that Englewood replace itself as owner and manager through the transfer of its property and contract interests as owner and management agent, thereby repudiating the HAP contract?

r) by refusing to review Englewood's response to the March 2001 REAC inspection and, instead, returning Englewood's responses without processing and reaffirming its direction that Englewood replace itself as owner and manager?

s) by declaring its intention to abate the 2000 HAP Contract in June 2001?

t) by misstating the status of Englewood and South Pointe (e.g., Form 2530 flags) in communications between HUD Chicago and HUD headquarters regarding the issuance of vouchers and the process by which Englewood was declared to be in default?

u) by notifying residents that they would be receiving vouchers and relieved of the residents' lease obligations prior to terminating its contract obligations to Englewood?

v) by repudiating the written terms of the 2000 HAP Contract (JE 21) by failing to "automatically" renew the contract for an additional term[3]?

w) by refusing to follow the procedures relating to renewal of HAP agreements set forth in Chapter 13 of the HUD Section 8 Renewal Guide, including informing Englewood of the rationale for the non-renewal (JE 146)?

x) by abating the 2000 HAP Contract without following applicable contractual and regulatory procedures?

y) by issuing a Notice of Abatement and Termination on November 30, 2001 (JE 117) without updating from April 2001 and making current the nature of the alleged defaults and noting the actions to be taken and remedies to be applied to the extent required by Section 20(b)(2) of the 1998 HAP Contract (JE 19)?

z) by failing to accept and process energy reimbursements requested by Englewood for costs incurred during the winter of 2000-2001?

aa) by approving, but failing to implement a rent increase as of October 2001?

bb) by placing Form 2530 "flags" on Englewood, DSSA Management, Inc., PM Group, Don Samuelson and John Hayes based on a Notice of Default that had been made in error and incorrect statements of fact transmitted from HUD Chicago to HUD Washington in 2001?

cc) by failing to reimburse Englewood for tenant-caused damages to South Pointe in 2002?

dd) by failing to reimburse Englewood for vacancies at South Pointe in 2002?

---

[3] Englewood contends that Judge Wolski discusses HUD's waiver of any discretionary right not to "renew" Englewood's contract for additional terms in his decision denying HUD's Motion to Dismiss. 61 Fed. Cl. at 590-92.

ee) through its actions in the administrative appeal process, participated in by Chicago HUD counsel Greg Gustin[4]?

ff) by other actions inconsistent with its contractual obligations and duty to act in accordance with its duty of good faith and fair dealing, including failing to cooperate with Englewood and hindering Englewood's fulfillment of its contractual responsibilities?

**Englewood's Damage Claims:**

7. The following issues relate to Englewood's claim for damages[5]:

a) Whether Englewood may recover damages for lost revenues and increased costs during the four years of subsidies that the Englewood alleges were due and owing under the 2000 HAP Contract, including the difference between the subsidy and rental revenues that Englewood would have received under the full four years of the HAP Contract (more than $7 million that HUD saved by terminating the contract) and the amount of revenues actually received by Englewood through its effort to mitigate damages, and the amount of such damages;

b) Whether Englewood may recover damages for increased costs caused by HUD's decision to terminate the parties' contract and issue vouchers to the tenants of South Pointe, and the amount of such damages;

c) Whether Englewood may recover damages for the loss of equity in South Pointe resulting from the foreclosure action filed against it in the summer of 2002, its efforts to mitigate this loss by entering into the HUD loan in December of 2002, and the subsequent default and foreclosure actions against Englewood in 2004 because of HUD's repudiation and breach of its obligations under the 2000 HAP Contract, and the amount of such damages;

d) Whether Englewood may recover damages for HUD's failure to implement an approved rent increase that was to go into effect in October 2001, in the event that HUD approved such a rental increase, and the amount of such damages;

e) Whether Englewood may recover damages for HUD's failure to reimburse Englewood for extraordinary energy costs in 2000-01,

[4] Defendant does not agree with this issue.
[5] The parties propose that the issue of the availability and amount of attorneys' fees to be awarded in this action be resolved after the Court rules on Englewood's other claims.

tenant-caused damage, and/or tenant vacancies, and the amount of such damages;

f) Whether Englewood may recover damages for the loss of business to Englewood, DSSA Management, Inc., PM Group, Don Samuelson and John Hayes, resulting from HUD's improper imposition of Form 2530 HUD program participation restrictions, and the amount of such damages.

**Issues Relating To HUD's Defenses To Englewood's Claims:**

8. Has HUD waived its right to assert any affirmative defenses at trial other than "estoppel," "accord and satisfaction," and "prior material breach," as those defenses are the only affirmative defenses asserted by HUD with its December 30, 2005 Answer and Affirmative Defenses?

9. If HUD contends that the contract was amended through unilateral actions of HUD, did the parties' contract require that any amendment to the contract be in writing and signed by both parties?

10. To the extent that HUD contends that subsequent HAP renewal contracts preclude Englewood's claims:

a) Did Englewood receive any consideration through the subsequent HAP renewal contracts that it would not otherwise have been entitled to under the October 2000 HAP Contract?

b) Did Englewood intend to relinquish its rights under the October 2000 HAP Contract through the execution of the subsequent HAP renewal contracts?

c) Did Englewood enter the subsequent renewal contracts in an attempt to mitigate its damages?

d) Did the subsequent renewal contracts act as renewals of the parties' prior contracts, or did they replace only a portion of Englewood's rights under the prior contracts?

11. May Englewood assert claims for unpaid rent and tenant-caused damage to units, excessive energy costs, and HUD's failure to implement rent increases under this Courts' right to exercise ancillary jurisdiction over such claims?

12. May Englewood assert claims for lost business opportunities caused by HUD's imposition of Form 2530 "flags" under this Courts' right to exercise ancillary jurisdiction over such claims?

13. To the extent that HUD contends that damages are not available to Englewood for the loss of its equity interest in South Pointe: If Englewood had not obtained a HUD-insured loan, would it have lost its equity interest in South Pointe?

**<u>Issues Relating To Whether Plaintiff Breached The 1998 HAP Contract</u>**:

14. Was Englewood in material breach of paragraphs 6 and 20 of the 1998 HAP Contract, as renewed and amended, in the event that it failed to maintain South Pointe in decent, safe and sanitary condition? JE 19, p. 679, 686-87.

15. Was Englewood in material breach of paragraph 20 of the 1998 HAP Contract, as renewed and amended, in the event that it failed to take corrective action "to the satisfaction of HUD?" JE 19, p. 687.

**<u>Issues Relating To Defense That The Terms Of The October 1, 2000 HAP Renewal Contract Were Not In Effect When Plaintiff's HAP Contract Was Terminated</u>**

16. Did the HAP renewal contract dated October 1, 2000 contain a "mistake" as to its term, and rather than a one year term with three automatic one year renewals, was the contract to have been for a 3 month term with no automatic renewals?

17. Was the October 1, 2000 HAP renewal contract amended on or about January 10, 2001 to provide for an initial one year term with zero one year renewals? JE 23.

18. Was Englewood's failure to object to HUD's changing of the terms of the October 2000 HAP renewal contract evidence of a unilateral mistake, and that the corrected October 2000 HAP renewal contract was the parties' actual agreement?

19. Did the parties execute HAP renewal contracts that renewed the 1998 HAP contract on September 26, 2001, December 21, 2001 and June 26, 2002? JE 24, JE 25, JE 26.

20. Did the parties, by execution of each of these three renewal contracts, acknowledge that each of the preceding contracts was expired?

**<u>Issues Relating To The Defense Of Waiver And/Or Estoppel</u>**:

21. Did Englewood waive its ability to challenge the enforceability of the terms of the corrected October 2000 HAP renewal contract by not objecting prior to the the parties' execution of subsequent HAP renewal contracts, and then subsequently performing upon these HAP renewal contracts?

22. Did Englewood waive its ability to claim that HUD improperly failed to implement any rent increase when it subsequently entered into HAP renewal contracts which contained provisions setting forth the parties' agreement as to the rents Englewood may charge residents at South Pointe?

**<u>Issues Relating To Defendant's Jurisdictional Defenses</u>**:

23. Whether any contract or money mandating provision of law confers jurisdiction upon this Court to entertain Englewood's "special claims" pertaining to unpaid rent and tenant-caused damage to units; Englewood's claims pertaining to excessive energy costs, and; Englewood's claims that HUD failed to implement any rent increase?

24. Whether any contract, regulation or other money mandating provision of law confers jurisdiction upon this Court to entertain claims by Englewood's former or current general partners or owners for business opportunities allegedly lost as a result of HUD's issuance of internal program participant "flags?"

**<u>Issues Relating To Defendant's Defenses To Plaintiff's Claims For Damages</u>**:

25. If the court determines that South Pointe was maintained in decent, safe and sanitary condition at the time that the applicable HAP contract was terminated, can Englewood claim damages for improper termination of the HAP contract if the date of the termination coincided with the end date of the applicable HAP contract?

26. Whether Englewood may seek damages in this case by claiming that HUD repudiated any HAP contract by making a cardinal change to its terms, to the extent that Englewood raised this claim for the first time in response to the Government's first motion for summary judgment?

27. Can Englewood maintain a claim for damages based upon a theory of loss of equity in South Pointe due to its default of a HUD-insured mortgage, to the extent that Englewood agreed to the $11.6 million dollar HUD-insured loan knowing that the HAP contract had been terminated and that Englewood would not be receiving HAP payments for South Pointe?

28. Can Englewood maintain a claim for damages in this case for its alleged inability to make payments towards a HUD-insured mortgage, to the extent that Englewood failed to plead such damages in its complaint?

29. Can Englewood maintain a claim for damages in this case for its alleged inability to make payments towards a HUD-insured mortgage, to the extent that Englewood obtained its mortgage in an undertaking entered into after the parties' HAP contract was terminated and all renewals/extensions had ended?

30. Can Englewood maintain a claim for damages in this case for its alleged inability to make payments towards a HUD-insured mortgage, to the extent that Englewood's application for a mortgage indicated that Englewood would rely upon no HAP contract payments with which to repay the mortgage?

31. Can Englewood's former or current general partners or owners maintain a claim for damages in this case for business opportunities allegedly lost as a result of HUD's issuance of internal program participant "flags," to the extent that Englewood failed to plead a claim for such damages in its complaint?

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

BRIAN M. SIMKIN
Assistant Director

_/s/Peter V. Baugher____________
PETER V. BAUGHER
Schopf & Weiss LLP
One South Wacker Drive, 28th Floor
Chicago, IL 60606
(312) 701-9300

Attorneys for Plaintiff

_/s/Douglas K. Mickle_____________
DOUGLAS K. MICKLE
Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor, 1100 L Street, N.W.
Washington, D.C. 20530
(202) 307-0383

Attorneys for Defendant

## CERTIFICATE OF SERVICE

I, Peter V. Baugher, an attorney, certify that on this 27th day of December, 2006, the foregoing **JOINT STATEMENT OF ISSUES OF FACT AND LAW** was filed electronically with the Clerk of the Court using the CM/ECF system, which will automatically send email notifications of such filing to the following:

DOUGLAS K. MICKLE
Trial Attorney
Commercial Litigation Branch
Civil Division
United States Department of Justice
1100 L Street, NW
Washington, D.C. 20530

s/ Peter V. Baugher