**No. 03-2209C**
**Judge Marian Blank Horn**

---

**IN THE UNITED STATES COURT OF THE FEDERAL CLAIMS**

---

**ENGLEWOOD TERRACE LIMITED PARTNERSHIP,**

**Plaintiff,**

**v.**

**THE UNITED STATES OF AMERICA,**

**Defendant.**

---

# DEFENDANT'S POST-TRIAL BRIEF

---

**PETER D. KEISLER**
**Assistant Attorney General**

**JEANNE E. DAVIDSON**
**Director**

**BRIAN M. SIMKIN**
**Assistant Director**

**DOUGLAS K. MICKLE**
**Trial Attorney**
**Commercial Litigation Branch**
**Civil Division**
**Department of Justice**
**Attn: Classification Unit, 8th Floor**
**1100 L Street, N.W.**
**Washington, D.C. 20530**
**Tele: (202) 307-0383**
**Fax: (202) 353-7988**

**Attorneys for Defendant**

**OF COUNSEL:**

**GREGORY G. GUSTIN**
**MARIA T. BAGUIO**
**RUSSELL J. COHEN**
**LORRAINE C. SHOTO**

**Office of General Counsel**
**U.S. Department of Housing and Urban Development**

**April 13, 2007**

## TABLE OF CONTENTS

DEFENDANT'S POST-TRIAL BRIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ISSUES PRESENTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

STATUTORY AND REGULATORY BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

I. The Section 8 Program . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

II. The Regulatory Requirements For Maintaining A Section 8 Program Property In Decent Safe And Sanitary Condition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

STATEMENT OF FACTS ADDUCED AT TRIAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

I. Englewood's Housing Assistance Payment ("HAP") Contracts With HUD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

A. The October 2000 HAP Renewal Contract . . . . . . . . . . . . . . . . . . . . . . . . 9

B. October 2001 HAP Renewal Contract . . . . . . . . . . . . . . . . . . . . . . . . . . 12

C. December 2001 HAP Contract Renewal . . . . . . . . . . . . . . . . . . . . . . . . . 14

D. June 2002 HAP Renewal Contract . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

II. Numerous Agencies Inspected South Pointe From 1999 Until October 2001, And All Found South Point Was Not Being Properly Maintained. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

A. The 1999 Real Estate Assessment Center ("REAC") Report . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

B. 1999 City Of Chicago Department Of Buildings Inspection . . . . . . . . . . 16

C. March 2000 HUD Management And Occupancy Review . . . . . . . . . . . 16

D. November 2000: Englewood's Inspection Of South Pointe . . . . . . . . . . 18

E. February 2001 HUD Management And Occupancy Review . . . . . . . . . 18

F. March 2001 REAC Inspection . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

G. March 2001 Confirmatory Inspection By HUD . . . . . . . . . . . . . . . . . . . 20

H. March 2001 Illinois Housing Development Authority Inspection . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

I. July 2001: Don Samuelson's Visit To South Pointe . . . . . . . . . . . . . . . . 23

J. July 2001: Office of the State's Attorney For Cook County Report . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

K. October 2001 Confirmatory Inspection By HUD . . . . . . . . . . . . . . . . . . 25

L. HUD's June 2002 Site Visit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

M. Englewood's September 2002 Admission That South Pointe Was Poorly Managed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

N. Additional Evidence That Demonstrates That South Pointe Was Not Maintained In Decent, Safe And Sanitary Condition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

III. Englewood's Failure To Submit An Acceptable Management Improvement ("MIO") And Operating Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

IV. HUD's Notice Of Default . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

V. Englewood's Request For Increased Rents . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

VI. 2001 Energy Reimbursement Costs Program . . . . . . . . . . . . . . . . . . . . . . . . . 34

VII. Voucher Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

VIII. Final Notice Of Abatement And Termination . . . . . . . . . . . . . . . . . . . . . . . . . 38

IX. HAP Contract Ends . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

I. Relevant Legal Standards In Non-Contract Disputes Act Breach Of Contract Cases . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

A. Englewood Must Prove The Government Committed A Breach Of A Material Term Of The HAP Contract By A Preponderance Of The Evidence . . . . . . . . . . . . . . 40

B. Even Assuming A Breach By HUD, Englewood's Failure To Maintain South Pointe In Decent, Safe And Sanitary Condition Acts As A Prior Material Breach And Excuses Any Non-Performance By HUD . . . . . . . . . . . . . . 41

C. When Reviewing The Conduct Of HUD Personnel In Administering Englewood's HAP Contract, The Court Presumes HUD Personnel Acted In Good Faith And Performed Their Duties Properly . . . . . . . . . . . . . . . . . . . . . . . . . . 44

II. Englewood Failed To Prove That HUD Committed A Material Breach Of The HAP Contract As It Defaulted Upon The HAP Contract's Primary Obligation By Failing To Maintain South Pointe In Decent, Safe, And Sanitary Condition . . . . . . . . . . . . . . . . . . . . . . . . . 46

A. The Terms "Decent, Safe, And Sanitary" Are Well-Defined Pursuant To HUD's Regulations And The HAP Contract . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

B. HUD's Remedies For Englewood's Failure To Maintain South Pointe In Decent, Safe, And Sanitary Condition . . . . . . . . . . . . . . . 51

C. Englewood Presented No Evidence At Trial That It Was Not In Default Of Its Obligation To Maintain South Pointe In Decent, Safe, And Sanitary Condition At The Time HUD Decided To Terminate The HAP Contract . . . . . . . . . . . . . . . 52

D. Englewood's Expected Defenses Are Without Merit And Do Not Excuse Englewood's Failure To Maintain South Pointe In Decent, Safe And Sanitary Condition . . . . . . . . . . . . . . . 62

III. Englewood Failed In Its Burden To Prove That HUD Breached The HAP Contract Because Englewood Was Not Entitled To HAP Subsidies Beyond September 2002 – The Date Payments Under The HAP Contract Ended . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

A. The Parties' HAP Renewal Contracts Unambiguously Demonstrate That Englewood Was Not Entitled To HAP Subsidies Beyond September 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

B. Englewood Cannot Rescue Its Claims By Pointing To The HAP Renewal Contracts' Negotiation History . . . . . . . . . . . . . . . . . 70

IV. Englewood's Claims For Rental Increases Or Emergency Energy Reimbursements Also Fail . . . . . . . . . . 76

A. The Court Lacks Jurisdiction To Consider Englewood's Claims Regarding A Rent Increase Request . . . . . . . . . . 77

B. The Court Lacks Jurisdiction To Consider Englewood's Claims For Energy Reimbursements . . . . . . . . . . 80

C. Even Assuming Jurisdiction, Englewood's Was Ineligible To Receive Rent Increases Or Reimbursements For Extraordinary Energy Claims In 2001 . . . . . . . . . . 81

CONCLUSION . . . . . . . . . . 84

## TABLE OF AUTHORITIES

**CASES:** **PAGES:**

Admiral Fin. Corp. v. United States,
57 Fed. Cl. 418 (2003),
aff'd on other grounds, 378 F.3d 1345 (Fed.Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Alliant Techsystems, Inc. v. United States,
178 F.3d 1260 (Fed. Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

American General Leasing, Inc. v. United States,
218 Ct. Cl. 367, 587 F.2d 54 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

American Combustion, Inc.,
ASBCA No. 43712, 94-3 BCA ¶ 26,961 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

Appeal of Blanco-Mora Enterprises, Inc.,
HUDBCA No. 94-G-136-C5, 94-3 BCA ¶ 26,974 . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Appeal of Housing Authority of the City of Pagedale,
HUDBCA No. 87-2687-C18, 89-1 BCA ¶ 21302 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Appeal of Mayer,
HUDBCA No. 83-823-C20, 84-2 BCA ¶ 17,494 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Applied Companies v. United States,
144 F.3d 1470 (Fed. Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

Argus Inc. v. Eastman Kodak Co.,
801 F.2d 38 (2nd Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

Aviation Contr. Employee, Inc. v. United States,
945 F.2d 1568 (Fed. Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

Bradley Construction, Inc. v. United States,
30 Fed. Cl. 507 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Bradley v. Chiron Corp.,
136 F.3d 1317 (Fed. Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

Busby School of the Northern Cheyenne Tribe v. United States,
8 Cl. Ct. 596 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Christopher Village , L.P. v. United States,
360 F.3d 1319 (Fed. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

College Point Boat Corp. v. United States,
267 U.S. 12 (1925) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Commerce International Company v. United States,
167 Ct. Cl. 529, 338 F.2d 81 (1964) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Dewakuku v. Martinez,
226 F. Supp. 2d 1199 (D. Ariz. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

Doninger Metal Products, Corp. v. United States,
50 Fed. Cl. 110 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

E. Walters & Co. v. United States,
217 Ct. Cl. 254, 576 F.2d 367 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

Falzarano v. United States,
607 F.2d 506 (1st Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

Farmers Grain Co. of Esmond v. United States,
33 Fed. Cl. 298 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

Fortec Constructors. v. United States,
760 F.2d 1288 (Fed. Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66, 69

Frakes v. Pierce,
700 F.2d 501 (9th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

Fru-Con Construction Corp. v. United States,
43 Fed. Cl. 306, aff'd on recon. in relevant part,
44 Fed. Cl. 298 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

G & H Machinery Company, v. United States,
16 Cl. Ct. 568 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Glasgow Associates v. United States,
495 F.2d 765 (Fed. Cir. 1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Grace Towers Tenants Assoc. v. Grace House Dev. Fund Co.,
538 F.2d 491 (2d. Cir 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

Hahn v. Gottlieb,
430 F.2d 1243 (1st Cir. 1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

Harlib v. Lynn,
511 F.2d 51 (7th Cir. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

Hoel-Steffen Construction Co. v. United States,
231 Ct. Cl. 128, 684 F.2d 843 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

Hoffman v. General Motors Acceptance Corp.,
814 F.2d 1385 (9th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Hol-Gar Mfg. Corp. v. United States,
169 Ct. Cl. 384, 351 F.2d 972 (1965) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66, 70

Hometown Financial, Inc. v. United States,
409 F.3d 1360 (Fed. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42, 43

Kennedy Heights Apartments, Ltd. I v. United States,
48 Fed. Cl. 574 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

Marshall v. Cuomo,
192 F.3d 473 (4th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

Medgar Evers Houses Assocs., L.P. v. United States,
Fed. Cl. No. 96-809 (Nov. 10, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

Mega Construction Co. v. United States,
29 Cl. Ct. 396 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Mobil Oil Exploration & Producing Southeast, Inc. v. United States,
530 U.S. 604 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

Montgomery Coca-Cola Bottling Co. v. United States,
222 Ct. Cl. 356, 615 F.2d 1318 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

National Movers Co. v. United States,
386 F.2d 999 (Fed. Cir. 1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Pacificorp Capital, Inc. v. United States,
25 Cl. Ct. 707 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66, 69, 70, 74

Patushin Aviation Co., Div. Of Swiss Electro Instruments, Inc.,
ASBCA Nos. 21243 & 22960, 82-1 BCA ¶ 15,639 (1982) . . . . . . . . . . . . . . . . . . . . . . . . 74

PBI Electric Corp. v. United States,
17 Cl. Ct. 128, 133 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44, 45

Perry v. Department of the Army,
992 F.2d 1575 (Fed. Cir.1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Peterson-Sharpe Eng'g Corp. v. United States,
6 Cl. Ct. 288 (1984) . . . . . . . . . . 66, 70

Pleasant East Assocs. v. Martinez,
2004 WL 840290, No. 02 Civ. 4144
(LLMM) (S.D.N.Y. April 19, 2004) . . . . . . . . . . 82

Prevado Village Partnership v. United States,
3 Cl. Ct. 219 (1983) . . . . . . . . . . 48

Reiner v. West Village Assocs.,
768 F.2d 31 (2d Cir. 1985) . . . . . . . . . . 78

Reynolds Assocs. v. United States,
31 Fed. Cl. 335 (1994) . . . . . . . . . . 78, 80, 81

Roberts v. United States,
174 Ct. Cl. 940, 357 F.2d 938 (1966) . . . . . . . . . . 44

San Carlos Irrigation and Drainage District v. United States,
877 F.2d 957 (Fed. Cir. 1989) . . . . . . . . . . 41

Sanders v. United States Postal Service,
801 F.2d 1328 (Fed. Cir. 1986) . . . . . . . . . . 46

SEB Engineering, Inc.,
ASBCA No. 39728, 94-2 BCA ¶ 26,810 . . . . . . . . . . 45

Sterling Millwrights, Inc. v. United States,
26 Cl. Ct. 49 (1992) . . . . . . . . . . 74

Stone Forest Indus., Inc. v. United States,
973 F.2d 1548 (Fed. Cir. 1992) . . . . . . . . . . 42, 43

Sylvania Elec. Prods., Inc. v. United States,
198 Ct. Cl. 106, 458 F.2d 994 (1972) . . . . . . . . . . 66

Technical Consultant Servs., Inc. v. Lakewood Pipe of Texas, Inc.,
861 F.2d 1357 (5th Cir. 1988) . . . . . . . . . . 66

Technical Assistance Intern., Inc. v. United States,
150 F.3d 1369 (Fed. Cir. 1998) . . . . . . . . . . 40

Texas v. United States,
210 Ct. Cl. 522, 537 F.2d 466 (1976) . . . . . . . . . . 80, 81

Thomas v. Dep't of Housing & Urban Development,
124 F.3d 1439 (Fed. Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

Torncello v. United States,
231 Ct. Cl. 20, 681 F.2d 756 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

Trauma Service Group v. United States,
104 F.3d 1321 (Fed. Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

United States Fidelity & Guaranty Co. v. United States,
230 Ct. Cl. 355, 676 F.2d 622 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

United States v. Gypsum Co.,
333 U.S. 364 (1947) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

United States v. Mitchell,
445 U.S. 535 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

United States v. Intervest Corp.,
67 F. Supp.2d 637 (S.D. Miss. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

Willems Indus. v. United States,
155 Ct. Cl. 360 (1961) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Whittaker v. Dalton,
124 F.3d 1443 (Fed. Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

Winn-Senter Constr. Co. v. United States,
110 Ct. Cl. 34 (1948) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Wunderlich Contracting Co. v. United States,
173 Ct. Cl. 180, 351 F.2d 956 (1965) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Youngstown Steel Equipment Sales, Inc. v. United States,
20 Cl. Ct. 517, 525-26 (1990),
rev'd on other grounds, 935 F.2d 281 (Fed. Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . 45

## STATUTES

41 U.S.C. § 601 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

41 U.S.C. § 609 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

42 U.S.C. § 1437 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

42 U.S.C. § 1437(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

42 U.S.C. § 1437a(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

42 U.S.C. § 1437f . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

42 U.S.C. § 1437f(c)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

## REGULATIONS

24 C.F.R. § 5.703 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3, 7, 49

24 C.F.R. Part 5, Sub-part G . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

24 C.F.R. § 5.701 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

24 C.F.R. § 5.703(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 49

24 C.F.R. § 5.703(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 49

24 C.F.R. § 5.703(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 50

24 C.F.R. § 5.703(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 50

24 C.F.R. § 5.703(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 50

24 C.F.R. § 5.703(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

24 C.F.R. § 5.703(g) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 51

24 C.F.R. § 5.705 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

24 C.F.R. § 200.853(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

24 C.F.R. § 886.323(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

24 C.F.R. § 982.1(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

48 C.F.R. § 2.101 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **ENGLEWOOD TERRACE LIMITED PARTNERSHIP,** | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **No. 03-2209C** |
| | ) | **(Judge Marian Blank Horn)** |
| **THE UNITED STATES,** | ) | |
| **Defendant.** | ) | |

**DEFENDANT'S POST-TRIAL BRIEF**

Pursuant to Appendix A, ¶ 19 of the Rules of the United States Court of Federal Claims, and this Court's order dated February 28, 2007, defendant, the United States, respectfully submits its post-trial brief in this matter.[1]

**PRELIMINARY STATEMENT**[2]

Plaintiff, Englewood Terrace Limited Partnership ("Englewood"), brought this case in 2003 alleging that the United States Department of Housing and Urban Development ("HUD") breached a Housing Assistance Payments ("HAP") contract between the two parties. Pursuant to the terms of the parties' HAP contract, HUD agreed to make monthly subsidy payments to Englewood, upon behalf of the residents of an Englewood owned property, South Pointe Towers ("South Pointe" or "the project"), and, in return, Englewood agreed, among other things, to maintain the project in decent, safe, and sanitary condition. The HAP contract was clear and

---

[1] Pursuant to the Court's order, the Government's brief focuses solely upon Englewood's liability.

[2] Throughout this brief we will use the following acronyms when referencing to facts adduced at trial: page from the joint exhibit ("JX __, p. __"); paragraph in the complaint ("Compl. ¶ __"); paragraph in the joint stipulation of facts ("Jt. Stip. of Fact ¶ __"); page and line from the record of trial transcript ("Record _ : __").

explicit that, if Englewood failed to maintain South Pointe in decent, safe and sanitary condition, HUD could abate and terminate the HAP contract. That is exactly what the evidence at trial showed occurred.

After more than three and one-half years of litigation and six days of trial, Englewood has utterly failed to show by any evidentiary standard, let alone a preponderance, that HUD breached the HAP contract. Indeed, it is not at all clear which specific actions by HUD are alleged to have constituted any breach. It is clear, however, that Englewood's case consists mainly of an improper attempt to force HUD to defend its conduct as a means of avoiding its own burden of proof. Englewood's tactic here is understandable given the complete lack of evidence that Englewood put forward at trial regarding the condition of South Pointe.

As we demonstrate below, the documentary and testimonial evidence at trial was overwhelming and conclusive in showing that Englewood breached the HAP contract when it failed to maintain South Pointe in decent, safe and sanitary condition. Indeed, Englewood failed to produce any credible evidence that showed that South Pointe met the requirements of the HAP contract and 24 C.F.R. § 5.703 when HUD issued: (1) the first notice of default in April 2001, (2) a continuing notice of contract default in May 2001, (3) a notice of contract abatement and termination in November 2001, or, (4) when, after Englewood's three prior legal actions, HUD finally ended the contract, as the contract clearly allowed, in September 2002. Additionally, the evidence also proved that Englewood was not entitled to a post-default rent increase or reimbursement of discretionary extraordinary energy costs.

Finally, the evidence at trial demonstrated that, even if the Court disagreed with the Government and determined that South Pointe was maintained in decent, safe and sanitary

condition, Englewood was paid all that it was due pursuant to the HAP contract. The final HAP contract that Englewood signed with HUD expired upon its own terms on September 30, 2002. This date coincided with HUD's decision to not further renew the HAP contract, as HUD stated in its notices, and to terminate HUD's relationship with Englewood at South Pointe.

For these reasons, and as described in more detail below, Englewood's claims must be denied.

## ISSUES PRESENTED

The controlling issue in this case is whether Englewood met its burden and proved at trial that it was maintaining South Pointe in decent, safe and sanitary condition as required by the HAP contract and 24 C.F.R. § 5.703. If the Court agrees with the Government that Englewood did not meet its burden of proof upon this pivotal issue, then regardless of whatever other side issues Englewood attempts to raise in its post-trial brief, Englewood's complaint fails. This is because, even assuming a HUD breach of some kind, Englewood's failure to properly maintain and manage South Pointe acts as a prior-material breach that excuses any breach that Englewood might allege that HUD committed. Moreover, a finding that South Pointe was not being properly maintained and managed extinguishes, as a matter of law, Englewood's subordinate claims for an energy reimbursement and rent increase in 2001. This is because an owner is only eligible to receive these discretionary payments if it has complied with all the terms of its HAP contract. Finally, if the Court determines that South Pointe was being maintained in decent, safe and sanitary condition, only then does the Court also need to reach the issue as to what HAP renewal contract was in effect at the time HUD terminated the HAP contract. As Mr. Hinsberger testified at trial, it did not matter if the term of the HAP contract was "50 years," the terms of the

HAP contract allowed HUD to end payments if the property was not maintained appropriately. Record 623: 10-15.

In sum, only if the Court finds that Englewood proved at trial that it had maintained all of South Pointe in decent, safe and sanitary condition, will it then even need to consider Englewood's other claims. However, in the event the Court makes this finding, we also show that, as a matter of law, Englewood's claims still fail.

## STATUTORY AND REGULATORY BACKGROUND

### I. The Section 8 Program

Section 8 of the United States Housing Act of 1937 provides for financial assistance to "aid[] low-income families in obtaining a decent place to live . . . ." 42 U.S.C. § 1437f(a). Under the Section 8 program, HUD pays subsidies to private landlords upon behalf of their low-income tenants. Tenants pay 30 percent of their monthly income toward a pre-determined fair market rent, and HUD pays the remainder. Id. §§ 1437f(c)(3) and 1437a(a)(1). In return, the owner agrees in a Housing Assistance Payment Contract to, inter alia, provide "decent, safe, and sanitary" housing for the tenants. JX 019, p. 677 at 678; Jt. Stip. Of Fact ¶ 16. HUD makes rental assistance payments to the owner in reliance upon the owner's monthly certification that the project and its dwelling units are "in decent, safe, and sanitary condition." JX 019, p. 677 at 679 (¶ 5(e)(2)).

## II. The Regulatory Requirements For Maintaining A Section 8 Program Property In Decent Safe And Sanitary Condition

The project's "decent, safe and sanitary" requirements, as that term was used in the HAP contract, are defined in the Code of Federal Regulations at 24 C.F.R. Part 5, Sub-Part G, which is found at 24 C.F.R. § 5.701 et seq.

Specifically, the regulation requires owners to maintain the property site's components. 24 C.F.R. § 5.703(a).

> The site components, such as fencing and retaining walls, grounds, lighting, mailboxes/project signs, parking lots/driveways, play areas and equipment, refuse disposal, roads, storm drainage and walkways must be free of health and safety hazards and be in good repair. The site must not be subject to material adverse conditions, such as abandoned vehicles, dangerous walks or steps, poor drainage, septic tank back-ups, sewer hazards, excess accumulations of trash, vermin or rodent infestation or fire hazards.

Id.

The owners are also required to maintain the building exterior. 24 C.F.R. § 5.703(b).

> Each building on the site must be structurally sound, secure, habitable, and in good repair. Each building's doors, fire escapes, foundations, lighting, roofs, walls, and windows, where applicable, must be free of health and safety hazards, operable, and in good repair.

Id.

The owners are also required to maintain the property's building systems. 24 C.F.R. § 5.703(c).

> Each building's domestic water, electrical system, elevators, emergency power, fire protection, HVAC, and sanitary system must be free of health and safety hazards, functionally adequate, operable, and in good repair.

Id.

The owners must also maintain the property's dwelling units. 24 C.F.R. § 5.703(d).

> (1) Each dwelling unit within a building must be structurally sound, habitable, and in good repair. All areas and aspects of the dwelling unit (for example, the unit's bathroom, call-for-aid (if applicable), ceiling, doors, electrical systems, floors, hot water heater, HVAC (where individual units are provided), kitchen, lighting, outlets/switches, patio/porch/balcony, smoke detectors, stairs, walls, and windows) must be free of health and safety hazards, functionally adequate, operable, and in good repair.
>
> (2) Where applicable, the dwelling unit must have hot and cold running water, including an adequate source of potable water (note for example that single room occupancy units need not contain water facilities).
>
> (3) If the dwelling unit includes its own sanitary facility, it must be in proper operating condition, usable in privacy, and adequate for personal hygiene and the disposal of human waste.
>
> (4) The dwelling unit must include at least one battery-operated or hard-wired smoke detector, in proper working condition, on each level of the unit.

Id.

The owners are also required to maintain the property's common areas. 24 C.F.R. § 5.703(e).

> The common areas must be structurally sound, secure, and functionally adequate for the purposes intended. The basement/garage/carport, restrooms, closets, utility, mechanical, community rooms, day care, halls/corridors, stairs, kitchens, laundry rooms, office, porch, patio, balcony, and trash collection areas, if applicable, must be free of health and safety hazards, operable, and in good repair. All common area ceilings, doors, floors, HVAC, lighting, outlets/switches, smoke detectors, stairs, walls, and windows, to the extent applicable, must be free of health and safety hazards, operable, and in good repair. These standards for common areas apply, to a varying extent, to all HUD housing, but will be particularly relevant to congregate housing, independent group homes/residences, and single room occupancy

> units, in which the individual dwelling units (sleeping areas) do not contain kitchen and/or bathroom facilities.

Id.

Additionally, the owners are also required to ensure that all areas and components of the housing must be free of health and safety hazards. 24 C.F.R. § 5.703(f).

> These areas include, but are not limited to, air quality, electrical hazards, elevators, emergency/fire exits, flammable materials, garbage and debris, handrail hazards, infestation, and lead-based paint. For example, the buildings must have fire exits that are not blocked and have hand rails that are undamaged and have no other observable deficiencies. The housing must have no evidence of infestation by rats, mice, or other vermin, or of garbage and debris. The housing must have no evidence of electrical hazards, natural hazards, or fire hazards. The dwelling units and common areas must have proper ventilation and be free of mold, odor (e.g., propane, natural gas, methane gas), or other observable deficiencies. The housing must comply with all requirements related to the evaluation and reduction of lead-based paint hazards and have available proper certifications of such (see 24 CFR part 35).

Id.

Finally, the owners must ensure that the property is in compliance with all State and local codes. 24 C.F.R. § 5.703(g). The regulation specifically informs owners that:

> The physical condition standards in [24 C.F.R. § 5.703] do not supersede or preempt State and local codes for building and maintenance with which HUD housing must comply. HUD housing must continue to adhere to these codes.

Id.

HUD monitors the owner's compliance with the above standards through routine inspections. 24 C.F.R. § 5.705. If an owner fails to maintain all of the project in proper condition, HUD may exercise its contractual rights for default, including abatement of further

Section 8 payments to the owner and termination of the contract. See 24 C.F.R. § 886.323(e); JX 019, p. 677 at 687; Jt. Stip. Of Fact ¶¶ 19, 20.

## STATEMENT OF FACTS ADDUCED AT TRIAL

The following material facts were adduced at trial by either direct testimony, the parties' stipulation of fact, or from documents that were contained in the joint appendix.

### I. Englewood's Housing Assistance Payment ("HAP") Contracts With HUD

1. In response to a housing shortage in Chicago's Englewood community, Englewood and HUD executed a HAP contract pursuant to United States Housing Act of 1937, 42 U.S.C. § 1437. Compl. ¶ 2; JX 019, p. 677 at 677-690; Jt. Stip of Fact ¶ 14. In accordance with this contract, HUD agreed "to make housing assistance payments on behalf of Families for the Contract Units; to enable the Families to lease decent, safe, and sanitary housing pursuant to Section 8 of the Act." JX 019, p. 677 at 678.

2. Paragraph 6(a) of the HAP contract required Englewood "to maintain and operate the **Contract Units, unassisted units, if any, and related facilities** to provide decent, safe, and sanitary housing including the provision of all the services, maintenance and utilities." JX 019, p. 677 at 679; Jt. Stip. of Fact ¶ 16,(emphasis added). Pursuant to paragraph 6(b) of the HAP contract, HUD possessed the right to "inspect or cause to be inspected at such times as may be necessary to ensure that the Owner is meeting its obligations to maintain the units in decent, safe, and sanitary condition including the provision of the agreed-upon utilities and other services." JX 019, p. 677 at 679; Jt. Stip. of Fact ¶ 16.

3. The HAP contract stated at paragraph 20(b)(1)(i) that "[a] default by the Owner under this Contract shall result if . . . [the] Owner has violated or failed to comply with any provision

of, or obligation under, this Contract or of any Lease, including failure to correct any deficiencies identified by HUD in connection with any inspection." JX 019, p. 677 at 687; Jt. Stip. of Fact ¶ 17.

4. Paragraph 20(b)(2) of the HAP contract provided that in the event of a default by Englewood, HUD was required to notify Englewood of "(i) The nature of the default; (ii) The actions required to be taken and the remedies to be applied on account of the default (including actions by the Owner to cure the default); and (iii) The time within which the Owner shall respond with a showing that all the required actions have been taken." JX 019, p. 677 at 687; Jt. Stip. of Fact ¶ 18 .

5. Furthermore, pursuant to paragraph 20(b)(2), Englewood agreed that if it failed "to respond to or take action to the satisfaction of HUD" to cure a default, HUD possessed the right to terminate the HAP Contact. JX 019, p. 677 at 687. Specifically, Englewood agreed in the HAP contract that HUD could "take corrective action to achieve compliance, in accordance with paragraph [20](b)(3) or to terminate th[e] Contract . . . in whole or in part, or to take other corrective action to achieve compliance in its discretion . . . ." JX 019, p. 677 at 687; Jt. Stip. of Fact ¶ 19.

6. Paragraph 20(b)(3)(iv) of the HAP contract also stated that HUD could "reduce or suspend housing assistance payments" in response to Englewood's default. JX 019, p. 677 at 687; Jt. Stip. of Fact ¶ 20.

**A. <u>The October 2000 HAP Renewal Contract</u>**

7. On October 16, 2000, Englewood executed a new HAP Renewal Contract ("2000 Renewal Contract") by which Englewood agreed that "[a]ll items of the Expiring [HAP]

Contract are renewed except for those provisions relating to Contract Rents and rent adjustments." JX 021, p. 696 at 696-697; Jt. Stip. of Fact ¶ 24.

8. As a "condition of renewing the Section 8 Contract," Englewood agreed to an addendum stating that, in the event HUD's Real Estate Assessment Center ("REAC") issued a physical inspection report evidencing Englewood's failure to "comply with HUD's Uniform Physical Condition Standards and Physical Inspection Requirement,"HUD "may terminate the Contract after the renewal providing the Owner a reasonable period, as determined by HUD, to correct deficiencies or if the Owner fails to perform under an Approved Correction Action Plan to Repair." JX 021, p. 696 at 699; Jt. Stip. of Fact ¶ 25.

9. HUD executed the 2000 Renewal Contract on October 18, 2000. JX 021, p. 696 at 697; Jt. Stip of Fact ¶ 64. The 2000 Renewal Contract contained an error indicating that it "shall run for an initial 1 Year period" and would "renew automatically for 3 additional one year terms, subject to the availability of appropriations in any year." JX 021, p.696; Record 680: 3-11.

10. HUD officials informed Englewood representatives of this error during a meeting on October 18, 2000. JX 071, p. 1014; Record 210:10-18, 803:15-23, 811:3-15.

11. On December 6, 2000, Veronica Coleman, Director of Project Management for the Chicago HUD Office of Multifamily Housing, wrote a letter that transmitted a corrected copy of the 2000 Renewal Contract to John Hayes. JX 071, p. 1014; Record 220: 4-9, 802: 7-18, 803: 3-9. Mr. Hayes was an officer of PM Group, Inc., the corporate General Partner of Englewood, as well as an officer of South Pointe's affiliated management company, PM One. Jt. Stip. of Facts ¶¶ 5, 6, 43. The corrected copy of the 2000 HAP Renewal accurately stated that it was a "(three) 3 month short term renewal with zero (0) renewal terms." JX 022, p.705 at 705.

Ms. Coleman's letter further stated that, as the owner's representatives were told in the October 18, 2000 meeting, the HAP contract was renewed for a shorter period “due to the physical conditions of the subject property.” JX 071, p. 1014; Record 803: 15-20.

12. Mr. Hayes received the letter but did not respond to HUD. Record 886: 23-25; 887: 4-7, 888: 1-2.

13. Instead of complaining about the terms of the corrected contract or how the correction was processed, on January 22, 2001, Ken Horton, Asset Manager of P.M. Group, and the primary representative for Englewood upon these matters, simply acknowledged the correction in an e-mail to Ms. Coleman, stating:

> On a separate note, pursuant to my conversation with Ms. Thomas [a HUD Project Manager] last week, she informed me that the HAP contract would be further amended to reflect the original expiration date of September 30, 2001. Please forward the amended, amended HAP contract to my attention at the following address.

JX 072, p. 1015 at 1016; Jt. Stip. of Fact ¶ 70. Mr. Hayes also received a copy of this e-mail. JX 072, p. 1015 at 1016; Record 892:1-3; 1013:12-14.

14. Ms. Coleman responded to Mr. Horton by encouraging him to expedite Englewood’s efforts to obtain a new mortgage to “substantially repair the property.” JX 072, p. 1015; Record 804: 14-17, 815: 10-22, 833: 20-24, 835: 21 - 836: 2, 837: 25 - 838: 8. Ms. Coleman warned Mr. Horton that HUD was only continuing to subsidize the property “to protect the tenants” and that HUD would be prepared to issue vouchers that tenants could spend on rent at other properties "should the need arise." JX 072, p. 1015; Record 815: 2-7, 829: 20 - 8:30: 1.

15. Following this exchange, Mr. Hayes responded to Ms. Coleman's e-mail and informed her that Mr. Horton would no longer be responsible for the loan application efforts. JX

073, p.1018; Record 1013:15-18. It is noteworthy that at no time did Mr. Hayes express any objection to the corrected HAP Contract or its expiration date of September 2001. JX 073, p. 1018; Record 1013:19-21.

16. It was well-known by the parties that the duration set forth in the 2000 HAP Renewal Contract, as originally executed, was incorrect, and that the parties' intent was the agreed upon short-term extensions reflected in the corrected HAP Renewal Contracts. Record 804:22-24.

**B. October 2001 HAP Renewal Contract**

17. In August 2001, Don Samuelson, President of DSSA Management and DSSA Inc., purporting to act upon behalf of Englewood, requested a renewal of the corrected 2000 Renewal Contract that was scheduled to expire on September 30, 2001. Compl. ¶ 50; JX 104, p. 1120 at 1120; Record 976: 5-17. As with everyone else associated with Englewood during this time frame, when discussing the 2000 HAP Renewal Contract with HUD, Mr. Samuelson never contended that the 2000 HAP Renewal Contract was amended in error, or that there was no need to execute a new HAP renewal contract because the contract was not expiring; he simply requested a renewal of Englewood's existing HAP contract. Record 680:12-25, 681: 1-5. Mr. Samuelson's August 2001 letter also requested a rent increase upon behalf of Englewood, as more fully discussed below in Section V of this brief. JX 104, p. 1120 at 1120-1121.

18. In August 2001, when Mr. Samuelson requested the renewal of the HAP contract for another year, Mr. Samuelson had neither replaced PM One as Englewood's management agent nor replaced the owner's general partner. Jt. Stip. of Fact ¶ 3, 4; Record 975: 2-18. In fact, the letter of August 2001 recites that the General Partner "intends to enter into an agreement to convey its partnership interest [in South Pointe] to DSSA, Inc. ("DSSA"). DSSA Management,

Inc. ("DSSA Management") would also replace PM as the Managing Agent for the Property." JX 104, p. 1120.

19. As the corrected 2000 HAP Renewal contract was expiring on September 30, 2001, to keep funds flowing to the project, Englewood and HUD executed a new short-term HAP renewal contract ("2001 90-day HAP Renewal Contract") renewing the terms of the HAP contract "for a period of .3 years." Compl. ¶ 52; Jt. Stip. of Fact ¶ 27; JX 024, p. 719 at 722; Record 981:12-16.

20. In the 2001 90-day HAP Renewal Contract, the parties acknowledged in the agreement that they "had entered into a HAP Contract ("expiring contract") to make Section 8 housing assistance payments to the Owner for eligible families living in the Project. The term of the expiring contract will expire prior to the beginning of the term of the Renewal Contract." Jt. Stip. of Fact ¶ 26; JX 024, p. 719 at 724. HUD and Englewood further agreed that the purpose of the 2001 90-day HAP renewal Contract was "to renew the expiring contract for an additional term." Jt. Stip. of Fact ¶ 27; JX 024, p. 719 at 724.

21. Englewood also agreed at paragraph 4(d)(ii) of the 2001 90-day HAP Renewal Contract that, if HUD abated housing assistance payments because South Pointe was not in "decent, safe, and sanitary condition," HUD could "use amounts otherwise payable to the Owner pursuant to the Renewal Contract for the purpose[] of relocating or rehousing assisted residents in other housing." JX 024, p. 719 at 724.

22. Finally, in the 2001 90-day HAP Renewal Contract, Englewood agreed that the agreed-upon contract rents specified the "applicable contract rents" Englewood would charge the tenants at South Pointe. In agreeing to the "applicable contract rents," Englewood was

acknowledging that the parties agreed that a rental increase had not been approved at the time of contract execution. JX 024, p. 719 at 724-725; Compl. ¶ 52.

**C. <u>December 2001 HAP Contract Renewal</u>**

23. On December 21, 2001, Englewood willingly agreed to another HAP renewal contract ("2001 180-day HAP Renewal Contract"); this time, the parties agreed to renew the terms of the HAP Contract for six additional months. JX 025, p. 737 at 737-738; Compl. ¶ 61. There was no evidence presented at trial that, when Englewood agreed to the 2001 180-day HAP Renewal Contract, anyone associated with Englewood contended that: (1) this HAP Renewal Contract was executed in error, or, (2) that there was no need to execute a new HAP renewal contract because the terms of the previous contract, or any other contact, had not expired.

24. Furthermore, during this HAP contract renewal period, Don Samuelson, by then, Englewood's new management agent, understood that HUD was issuing vouchers and that the HAP Contract had been extended and not illegally terminated:

> So we needed to get people moved because there had been uses of HAP extensions for periods of time . . . By the end of December, nobody moved. And then there was an extension for six months from January 1 to July 30. So at the end of three months, you know, my conclusion was there is going to be no more Section 8 as far as I can tell. People ought to be prepared to leave and move out.

JX 014, p. 570 at 606.

**D. <u>June 2002 HAP Renewal Contract</u>**

25. The parties executed a final HAP renewal contract on June 24, 2002 ("June 2002 HAP Renewal Contract"). JX 026 p. 746 at 746. This renewal contract provided for an expiration date of September 30, 2002. JX 026, p. 746; Jt. Stip. of Fact ¶ 12.

26. As before, no one associated with Englewood argued at the time of the time the June 2002 HAP Renewal Contract was agreed upon, that the 2002 HAP Renewal Contract was in error, or that there was no need to execute the June 2002 HAP Renewal Contract because the previous contract, or any other contract, was not expiring, or had expired.

## II. Numerous Agencies Inspected South Pointe From 1999 Until October 2001, And All Found South Pointe Was Not Being Properly Maintained

### A. The 1999 Real Estate Assessment Center ("REAC") Report

27. On April 28, 1999, HUD's Real Estate Assessment Center ("REAC") performed a physical inspection of 25 randomly selected units at South Pointe. A report was prepared ("REAC Report"), and out of a possible numeric score of 100, Englewood received an overall score of 42. HUD's REAC Report also noted exigent health and safety items at South Pointe. JX 027, p. 760 at 760; Jt. Stip. of Fact ¶ 36. Exigent health and safety items are considered life-threatening and require corrective action within 72 hours. See, Record: 939: 10-16.

28. On May 19, 1999, HUD's contractor, Pinnacle Realty Management Company ("Pinnacle"), visited South Pointe to evaluate the property and found that Englewood had not corrected "severe findings" from the REAC Report. JX 036, p. 802 at 805; Jt. Stip. of Fact ¶ 38.

29. Pinnacle's written report further stated that “[t]he owner has not corrected conditions that adversely affect the provision of decent, safe, and sanitary housing as required by the HAP contract.” JX 036, p. 802 at 805.

30. On August 20, 1999, Mr. Hayes wrote to Ed Hinsberger, Director of HUD's Office of Multifamily Housing in Chicago. Mr. Hayes's letter stated that "[a]ll Health and Safety items such as non working Smoke Detectors, GFIs, etc. listed in the above referenced report have been corrected." JX 038, p. 815; Jt. Stip. of Fact ¶ 44.

**B. <u>1999 City Of Chicago Department Of Buildings Inspection</u>**

31. On October 15, 1999, the City of Chicago Department of Buildings notified Englewood that an inspection of South Pointe conducted on September 23, 1999 - a little over one month after Mr. Hayes' letter stating that exigent health and safety items were corrected - found multiple City Municipal Code violations, including missing fire extinguishers. JX 041, p. 820 at 821. In addition, the report found roach and rodent infestations, "garbage chutes with garbage everywhere" and "raw standing sewage." JX 041, p. 820 at 821-824.

32. The findings made by the City of Chicago Department of Buildings during its September 1999 inspection mirrored many findings identified by the April 1999 REAC inspection, including: roaches, broken light fixtures, damaged doors, and broken, missing or cracked window panes. <u>Compare</u> JX 027, p. 761-766 with JX 041, p. 820 at 821-824; Record 1005: 25, 1006: 1-25, 1007: 1-13.

33. In its self-described Management Improvement and Operating ("MIO") Plan submitted to HUD in December 1999, Englewood represented to HUD that similar problems revealed by REAC were repaired between May and September of 1999. Record 1007: 14-17.

**C. <u>March 2000 HUD Management And Occupancy Review</u>**

34. On March 14, 2000, HUD project manager Gwendolyn Thomas went to South Pointe and conducted an on-site management and occupancy review. Jt. Stip. of Fact ¶ 58; Record 312:25 - 313:3. The report generated from this review stated that there was a "big problem with drugs and gangs," and that "stairwells were dirty and smell[ed] of urin[e]," and that elevators were not functioning properly. JX 052 p. 874 at 875-876; Jt. Stip. of Fact ¶¶ 58-59; Record 314:1-4; 315: 1-3; 316:9-10.

35. Ms. Thomas visited a particular unit because of complaints she had received from the tenant: " . . .[t]he tenant called me and said that there was a mouse in the bed of her newborn baby, because she had a big hole in the wall . . . And when I went in her unit, she had peeling paint, she had holes at the bottom of the baseboards where you could see the roach. She had roaches in her kitchen, and her bathroom, her shower was, it was just rusted real bad where the drywall and everything like water damage was awful . . ." Record 317: 13-22. Unfortunately, she found the same conditions in the other units that she visited. Record 318: 6-8. Ms. Thomas took representational photographs of the units and conditions she found. JX 196, p. 1848 at 1848-1850G.

36. Englewood submitted a response to this on-site review, stating that the physical conditions issues identified in the Management and Occupancy Review were addressed. JX 057, p. 932 at 932-933. HUD deemed this response acceptable upon its face and informed Englewood that "[t]his review is now closed." JX 064, p. 961; Record 791: 16-22. However, HUD also informed Englewood that "[o]n the next review, findings will be verified for corrections made. This includes items identified in the REAC physical inspection report." JX 064, p. 961; Record 352: 15-17, 791: 18-22.

**D. November 2000: Englewood's Inspection Of South Pointe**

37. On November 3, 2000, Englewood conducted a review of South Pointe to "determine the physical status" of the project. JX 069, p. 975 at 975. In their summary report, Englewood's own inspectors noted that South Pointe's "elevators are always out of order and it's always the same problem." JX 069, p. 975 at 976; Record 510: 5-8. They determined that conditions around garbage chutes were "unsanitary" and "a danger to children," and that many of the units had water damage. JX 069, p. 975 at 976; Record 507:23-25, 508: 1-2. Englewood's inspectors also stated that they discovered an average of six rodent holes in each unit inspected. JX 069, p. 975 at 975; Record 504: 5-10.

**E. February 2001 HUD Management And Occupancy Review**

38. On February 19, 2001, Project Manager Gwendolyn Thomas, accompanied by other HUD staff members, including Teresa DiPietro, conducted another management and occupancy review of South Pointe. JX 150; Record 323: 2-15.

39. The visit revealed that the property had not improved since the last management review of March 2000. In fact, Ms. Thomas found that the elevators were not working properly, the stairwells had no lighting and smelled of urine, graffiti was "everywhere", and there was peeling paint in the hallways. Record 324-325. There was "a lot" of police in the building because of a drug related incident. Record 324: 6-13.

40. Ms. Thomas returned to the same unit she had visited in March 2000. Record 326: 3-6. She found the damaged showerhead "with the water damaged wood, the still rusted tub, the peeling paint in the units." Record 326: 8-13. Ms. Thomas found that the project had not changed since her last visit. Record 326: 19.

41. Teresa DiPietro, who was at South Pointe for training purposes as a new project manager, saw a building with boarded windows and missing screens. Record 1247: 18-19. She walked into a dimly lit hallway with dirty floors and missing tiles; residents were waiting for elevators that were an ongoing problem because "at no point in time are all the elevators working." Record 1249: 1-6. Units had broken windows, holes in walls, and roaches in the kitchen. Record 1249: 24-25, 1250: 2-6. Stairwells were dimly lit and smelled of urine; the floors and the handrails were sticky; fire hoses were missing, and exit signs were broken out. Record 1251: 15-24.

42. Photographs taken of representative units showed holes and water damage on walls, peeling paint, and overflowing garbage. JX 196, p. 1548 at 1851-1886; Record 327-338.

**F. <u>March 2001 REAC Inspection</u>**

43. Less than one month later, on March 2, 2001, REAC again inspected a sample of 25 units at South Pointe. This time, out of a possible total score of 100, and notwithstanding Englewood's repeated representations that repairs were being made, South Pointe received an even lower score of 31. Jt. Stip of Fact ¶ 74; JX 028, p.767 at 769; Record 948: 13-18. The cover letter transmitting the REAC report to Englewood informed Englewood that "you have 30 days in which to submit a Proposed Plan of Correction to your local HUD field office." JX 028, p.767 at 767; Record 949: 4-9.

44. The REAC letter also stated that "[b]efore you can prepare your plan, you are required to conduct a survey of your property to determine if any additional deficiencies exist." JX 028, p.767at 767; Record 957: 20-22. The letter directed that the owner "should use the

findings of the REAC inspection and the random sample of unit inspections as the basis for the survey." JX 028, p. 767 at 767.

45. REAC further instructed Englewood to “complete your survey and forward your Proposed Plan in Management Improvement Operating Plan (MIO) format, within 30 days of the date of this letter.” JX 028, p. 767 at 767; Record 957: 6-10.

46. Finally, the REAC letter directed Englewood to correct “exigent health and safety deficiencies” identified in the 2001 REAC Report “within 72 hours of receipt of the report.” Jt. Stip. of Fact ¶ 77; JX 074, p. 1019 at 1020; Record 939: 10-16.

47. On March 6, 2001, Mr. Hayes, upon behalf of Englewood, submitted to HUD a "certification" that exigent health and safety items identified in the REAC report had been corrected. Jt. Stip. of Fact ¶ 78; JX 076, p. 1054 at 1054; Record 939:17-20.

48. Mr. Hayes's certification was inaccurate. Jt. Stip. of Fact ¶ 79; JX 077, p. 1055 at 1055; Record 464: 15-20.

**G. <u>March 2001 Confirmatory Inspection By HUD</u>**

49. Shortly after receiving Mr. Hayes' certification, HUD personnel, including Ms. Thomas and HUD construction analyst Lillye Simmons, conducted a confirmatory review of Englewood's exigent health and safety certification. Ms. Simmons was an experienced construction analyst who has been with HUD for 20 years. Record 1221: 12-18.

50. Although she was sent specifically to verify the veracity of Englewood's exigent health and safety certification, Ms. Simmons couldn't help but notice the condition of her surroundings when she went to South Pointe. She testified that she noticed the trash at the front of the property, broken windows and missing window screens. Record 1223: 22-24. She

recalled the poorly lit lobby and the smell of urine; she saw the graffiti, the improperly working elevators, the trash, and the sticky stairwells. Record 1224: 5-25. She also noticed that with respect to the exigent health and safety items, only "some" had been mitigated. Record 1226: 21-22.

51. On March 9, 2001, Ms. Coleman wrote to Mr. Hayes and told him that HUD had conducted a "confirmatory review" with Englewood staff members present. Jt. Stip. of Fact ¶ 79; JX 77, p. 1055 at 1055; Record 464:15-20. Ms. Coleman further stated that this review confirmed that "only a few of the EHS [exigent health and safety] items had been mitigated and not all as you certified. When the confirmatory review concluded, all items found to be inaccurately certified were discussed with your staff." JX 077, p. 1055; Record 819: 7-23, 820: 4-11, 14-21.

52. Ms. Coleman warned Englewood that HUD could not continue to ignore Englewood's failure to provide decent, safe, and sanitary housing to its residents: "Also, the fact that your property is not in good repair places you in violation of your Housing Assistance Payment (HAP) Contract (refer to Section 542 (a) Addendum)." JX 077, p. 1055 at 1055.

53. Ms. Coleman warned Mr. Hayes that HUD would not tolerate further "false certifications and contract violations." JX 077, p.1055 at 1055. She explained that, "[s]hould actions like these continue, we will not hesitate to exercise our rights and/or remedies under the HAP contract, including reduction, suspension, abatement, or termination of the Section 8 Assistance Payments." JX 077, p. 1055.

54. Mr. Hayes responded to Ms. Coleman's letter by conceding that the General Partner "does not have the ability to monitor on a daily basis specific site inspections to validate

compliance with required repairs from physical inspections. The General Partner relies solely on the information received from the property management company." Jt. Stip. of Fact ¶ 80; JX 79, p. 1059. Mr. Hayes blamed HUD's findings upon the "use of a site Assistant Manager and maintenance person to accompany the HUD staff on the confirmatory review." JX 79, p. 1059 at 1059.

55. Englewood subsequently submitted another purported MIO plan that addressed the REAC deficiencies and included unit repair items that were purportedly corrected with the tenant's signature of acknowledgment. JX 084; Record 276: 19-22. However, HUD had further reason to doubt the veracity of this submission: Ms. Thomas noted in court that one of the items allegedly signed by a tenant was for repairs to the penthouse, which was where building systems were located and was therefore unoccupied. JX 084, p. 1076 at 1076; Record 276: 24-25, 277: 1-5.

**H. <u>March 2001 Illinois Housing Development Authority Inspection</u>**

56. HUD was not the only party to discover that serious health and safety problems existed at South Pointe in early 2001. On March 8, 2001, representatives of the Illinois Housing Development Authority inspected South Pointe. JX 151; Record 1015:3-12. In addition to finding conditions similar to those cited in the 1999 and 2001 REAC reports, including water-damaged bathroom ceilings and walls, leaking kitchen faucets, and stove knobs missing, the Illinois Housing Development Authority also documented exposed wires and non-functioning fire alarms, and missing or non-functioning smoke detectors. JX 151, p. 1547 at 1547-1550; Record 1015: 23-24. These findings are very troubling because these were the same

types of items that Mr. Hayes had certified to HUD were corrected just two day before. Compare, JX 076, p. 1054 and JX 151, p. 1547; Record 1016:10-13.

## I. July 2001: Don Samuelson's Visit To South Pointe

57. Prior to replacing Englewood's corporate general partner, Mr. Samuelson visited South Pointe in the summer of 2001, as he did whenever he was considering purchasing and managing "troubled" projects. JX 014, p. 570 at 588; Record 72: 14-23, 1026: 19-25. Mr. Samuelson defines as "troubled" those projects "that have need for physical improvements, better marketing, better management, resident services, that can be more effective as places for people to live and become an asset to the community rather than a toxic waste." JX 014, p. 570 at 587; Record 69: 14-19.

58. Mr. Samuelson discovered a lack of physical security "because of locks on various entries and exits that had been broken or compromised and the relative freedom that gangs and gang-related and drug interests had in moving off the street, into the building, up into the units and around the building." JX 014, p. 570 at 589.

59. According to Mr. Samuelson's assessment, South Pointe's physical deficiencies could only be resolved after its management corrected its security problems. As Mr. Samuelson stated,

> In a building like that or like some of the CHA [Chicago Housing Authority] buildings, its very difficult to manage buildings if you don't have the security. If you don't have control over the building and the ability of eliminating gangs, drugs, and criminal activities, you are very hard-pressed. Everything else follows from that.

JX 014, p. 570 at 590.

60. In short, Mr. Samuelson found that South Pointe was not an appropriate living space for “faint-hearted” tenants. In fact, South Pointe, according to Mr. Samuelson, “wasn't for the faint-hearted anyone.” JX 014, p. 570 at 606; Record 1365: 12-15.

61. Mr. Samuelson prepared written findings following his visit to South Pointe and submitted these to HUD along with a proposed plan of action. Mr. Samuelson reported that Englewood’s on-site staff “is relatively non-productive. Security is not effective” and that “the current condition of [South Pointe's] penthouse is inefficient and dangerous.” JX 102, p. 1110 at 1110. Mr. Samuelson confirmed the accuracy of these statements during his deposition and at trial. JX 014 p. 570 at 590; Record 1368: 17-25, 1369: 1-8.

62. It was at this time that Mr. Samuelson began working as an "unpaid consultant" to Englewood in hopes of “convert[ing] what was a very crime-ridden, drug-laden project into an attractive addition to the Englewood community.” JX 014, p. 570 at 593, Record at 90: 24 - 91: 9.

**J. <u>July 2001: Office of the State's Attorney For Cook County Report</u>**

63. Mr. Samuelson's impression of the building's lack of security was confirmed in July 2001 when the Office of the State's Attorney for Cook County, Illinois declared South Pointe a public nuisance because “narcotics are being bought and sold in and around this property. In addition, the Chicago Police Department has expressed concern that this property is being used for illegal drug activity.” JX 099, p. 1105 at 1105.

**K. October 2001 Confirmatory Inspection By HUD**

64. On October 19, 2001, HUD staff was sent to South Pointe again to assess its physical condition, and, as before, HUD staff reported that the property still was not in decent, safe, and sanitary condition. JX 115, p. 1166; Record 1227: 14-17; 1228: 2-25; 1229: 1-6. Specifically, they noted the smell of urine in common areas, exposed wires, and roaches in hallways and on walls. JX 115, p. 1166 at 1166; Record 1205: 19-20; 1228: 6-8.

65. Lillye Simmons returned to the project and found that conditions had not improved. She saw broken windows, missing window screens, and trash outside the building. Record 1228: 2-3. The inside of the building was dark and smelled of urine. Record 1228: 6-8. Stairwells were in the same, if not worse, condition than when she was last at the project in March 2001. Record 1228: 17-21. Ms. Simmons documented her findings in an e-mail that she sent to her supervisor, Veronica Coleman. JX 115, p. 1166; Record 1229: 9-10, 1230: 2-5.

66. Accompanying Ms. Simmons was HUD appraiser John Schneider. JX 115, p. 1166 at 1167; Record 1227:18-21. Mr. Schneider testified that his first impression of the building was that it was "in extreme disrepair as evidenced by boarded up windows on the outside [and], areas of the lawn that were bare." Record 1205: 7-10. He noted that units had "water marked ceilings, paint peeling off the ceilings, paint peeling off the walls, damages walls, holes in the walls, areas where walls had been repaired but unpainted, missing floor tiles, outlets and switches with protruding wiring . . . We saw, in the bathrooms mildew in shower areas, missing tiles from the walls, cracked tiles, missing plumbing fixtures." Record 1205: 18-25, 1205: 1. Mr. Schneider saw rodent droppings and noted that he took the stairwells to go down the 22nd floor because "there was only one functioning elevator and it was very slow." Record 1205: 3-8.

Stairwells were dimly lit and smelled of urine; fire doors were permanently open, there were missing push bars on fire doors, and fire hoses were missing. Record 1205: 11-20. Mr. Schneider took representative photos of his findings. JX 196, p. 1848 at 1887-1906; Record 1206: 10-12.

67. Mr. Schneider, a HUD appraiser for 12 years, testified that of the estimated 200 properties that he had visited in his official capacity, he had "seen properties that are in worse disrepair [and] in worse condition but none of them were occupied." Record 1207: 5-8.

**L. <u>HUD's June 2002 Site Visit</u>**

68. Project manager Gwendolyn Thomas visited Englewood one more time on June 28, 2002 to distribute notices to residents regarding the use of their Section 8 tenant-based vouchers.[3] JX 129, p. 1253; Record 340:9-18. On that visit, Ms. Thomas found that the smell of urine still filled common areas. JX 129, p. 1253; Record 342:5-9. She also noted broken windows, garbage everywhere, and no security. JX 129, p. 1253; Record 341: 3-8

69. Accompanying Ms. Thomas were several other HUD staff, including, again, Lillye Simmons and Teresa DiPietro. Record 340:19-21; 1230: 6-13; 1254:11-19.

70. Ms. Simmons, returning for the third time, testified that as compared to her two previous visits in March and October of 2001, the project was in "much worse" condition than it was when she previously visited the property. Record 1230:20-23. In her 20 years working at HUD, Ms. Simmons testified that South Pointe was "one of the worst" properties that she has seen. Record 1231: 2-5.

---

[3] Section 8 tenant-based vouchers are subsidies paid upon behalf of tenants for housing they select and is not tied to a specific housing development, such as South Pointe, or unit. 24 C.F.R. § 982.1(b).

71. Ms. DiPietro testified that when she returned to South Pointe in June 2002, it appeared as if no repairs had been done since her last visit of February 2001. Record 1255:10-12. Specifically, Ms. DiPietro noted the smell in the stairwell was "worse than the first time [HUD was] there because now there was human waste laying on the stairs. The smell was even stronger . . ." Record 1255: 15-17.

### M. Englewood's September 2002 Admission That South Pointe Was Poorly Managed

72. On September 26, 2002, Michael G. McGhie, P.M. One's new President, wrote to HUD and acknowledged that "problems did exist in the operation of P.M. One properties in Chicago." JX 132, p. 1257 at 1257. In recognition of P.M. One's "poor track record," Mr. McGhie offered for P.M. One "to be placed on probation." JX 132, p. 1257 at 1257.

### N. Additional Evidence That Demonstrates That South Pointe Was Not Maintained In Decent, Safe And Sanitary Condition

73. Between January 1, 1999 and December 31, 2001, the Chicago Police responded to a total of 794 incidents at South Pointe. JX 195, p. 1819 at 1847.

74. The incidents that the Chicago Police recorded as occurring at South Pointe included at least two homicides, 39 burglaries, more than 50 assaults, and more than 100 batteries. JX 195, p. 1819-1847.

## III. Englewood's Failure To Submit An Acceptable Management Improvement And Operating Plan ("MIO")

75. As a result of its failing REAC inspection score of 31 in March of 2001, the letter that transmitted the inspection results to Englewood required it to submit a proposed plan of correction in the form of a Management Improvement and Operating Plan to HUD within thirty days. Jt. Stip. of Fact ¶¶ 72,74; JX 028, p. 767 at 769. Prior to submitting its MIO plan,

Englewood was responsible for conducting a 100 percent survey of South Pointe to determine if the problems identified by the REAC were systemic. JX 028, p. 767 at 767. REAC's transmittal letter also informed Englewood that the plan, in a "Management Improvement Operating Plan (MIO) format" should include "additional deficiencies identified by your survey; deficiencies already corrected; available resources; completion time frames (scheduled) by quarter." JX 028, p. 767 at 767.

76. By letter dated April 5, 2001, P.M. One sent HUD a document it identified as a MIO plan that purported to show the status of work performed in response to the March 2, 2001 REAC inspection. Jt. Stip. of Fact ¶ 81; JX 084, p. 1076; Record 826:11-19. However, this document contained no MIO form, it did not contain a 100 percent survey identifying South Pointe's overall needs, and most importantly, it did not identify sources of funding with which to correct problems. JX 084, p. 1076; Record 784: 11-22; 829:5-19. As Ms. Coleman testified at trial:

> A Management Improvement and Operating Plan is a comprehensive plan. It provides a full scope, full details of all repairs that's needed at a property, a 100 percent unit inspection survey, sources and uses of funding.

Record 784: 16-19.

77. By letter dated April 8, 2001, Kelly Brown, Regional Property Manager for Englewood, sent Ms. Coleman a letter also purporting to contain a "Management Improvement and Operating Plan (MIO) and the Emergency Health and Safety (EH&S) Certification from the owner." Jt. Stip. of Fact ¶ 82; JX 086, p. 1086; Record 826:11-19. However, this document was not only mailed by Englewood one day beyond the 30-day deadline established by HUD in its March 8, 2001 transmittal of the REAC Report, but the MIO plan, purportedly submitted with

this document, also failed to meet the requirements of a HUD-approved MIO plan. Record 829: 5-19, 830: 7-21, 836: 12-13. Specifically, it did not contain a sources and uses of funds and only dealt with REAC findings. JX 093, p. 1098; Record 754: 7-10.

78. There is no evidence that Englewood ever conducted a 100 percent survey of South Pointe in response to HUD's 2001 REAC Report. The survey relied upon by Englewood at trial, and purportedly submitted with the April 8, 2001 letter from Kelly Brown, was, in fact, conducted in October or November 2000 and completed in December 2000, three months prior to the 2001 REAC inspection. Record 852:18-21. The completed survey specifications were then incorporated into a scope of work proposal that was dated March 4, 2001. JX 243, p. 3774; Record 852: 18-22. Thus, this survey was not responsive to the REAC Report. It was impossible for this survey to take into consideration the subsequent REAC findings and other accruing physical deficiencies.

79. More importantly, even if the breadth of the survey had been sufficient for MIO plan purposes, it still failed to include the sources and uses of funds Englewood planned to effect repairs. Englewood's contractor, BABCO, incorporated the survey into its scope of work. As Mr. Hinsberger testified at trial, however:

> If you use the BABCO Inspection, if that's what you're referring to as the 100 percent inspection that was done, 100 percent review, and if, if the owner had submitted the MIO indicating that they did 100 percent review and here are the inspection, and here are the repairs that need to be made and this is how we're going to fund it, we would have considered it. But that's not what happened . . . [W]e don't know if 100 percent of the units were inspected. But assuming that they were, **<u>there is still no funding mechanism</u>** . . .

Record 753: 19-25, 754: 7-10, (emphasis added). In fact, the only funding ever discussed by the Owner to effect repairs to South Pointe - the only funding apparently contemplated by

Englewood in order to resolve financial problems caused by an unfavorable mortgage - was through a HUD insured-loan. Record 689: 11-13, 715:23-25, 829: 12-14, 834: 10-14, 872: 5-10.

**IV. <u>HUD's Notice Of Default</u>**

80. On April 9, 2001, Mr. Edward Hinsberger, Director of HUD's Chicago Regional Office, issued a notice of contract default to Englewood. Jt. Stip. of Fact ¶ 88; JX 089, p. 1090; Record 540:2-5. This notice, referred Englewood to HUD's Physical Condition Standards, which are set forth in 24 C.F.R. Part 5, Subpart G. Jt. Stip. of Fact 94; JX 089, p.1090 at 1091. The notice of default further identified South Pointe's physical condition as grounds for default under the HAP contract:

> The failure to keep and maintain the Project in a decent, safe, and sanitary condition is a default of the HAP contract.

Jt. Stip. of Fact ¶ 94; JX 089, p. 1090 at 1091.

81. Mr. Hinsberger also notified Englewood that failure to correct the events of default "to the satisfaction of HUD within 30 days from the date of this Notice" could cause HUD to "seek any and all available remedies including, without limitation, suspending or abating the HAP contract." Jt. Stip. of Fact 89; JX 089, p. 1090 at 1091.

82. The notice of default tracked the terms of the HAP Renewal Contract and the rights afforded HUD if Englewood was in breach of the HAP contract. JX 019, p. 679 at 687 at 20(b)(2), 20(b)(3)(iv).

83. On April 13, 2001, after issuance of the notice of default, HUD met with Englewood's representatives, including Mr. Hayes. Record 688: 3-7. At that meeting, Mr. Hayes stated that he was unwilling to put any funds into the project. Record 689: 11-13, 829: 11-14, 836: 4-7. This admission by Englewood made it impossible for Englewood to ever be

able to submit a proper MIO plan since the MIO plan required Englewood to identify the sources and uses of funding to effect repairs. Record 669: 16-19. Furthermore, HUD representatives reiterated to Mr. Hayes that if he was not going to invest any of Englewood's funds into South Pointe, HUD could only assume the obligation of insuring a new mortgage if Englewood replaced PM One as the managing agent of South Pointe. Compl. ¶ 38; Jt. Stip. of Fact ¶ 98.

84. After this meeting, on May 15, 2001, Ms. Coleman returned Englewood's late and defective response to the March 8, 2001 REAC Report. Jt. Stip. of Fact ¶ 100; JX 093, p. 1098; Record 840: 3-7, 826: 16-19. Ms. Coleman's transmittal letter stated that HUD would not accept Ms. Brown's response “due to impending negotiations with HUD . . . concerning your proposed refinance and substantial rehabilitation of the property.” Compl. ¶ 40; Jt. Stip. of Fact ¶ 100; JX 093, p. 1098; Record 834: 6-14, 837: 25 - 838: 8. Ms. Coleman further noted that, although Englewood submitted what it purported to be a MIO plan in response to problems identified in the 25 units covered in the 2001 REAC Report, “the condition of this property is beyond that point as acknowledged by your application to refinance that we rejected due to major deficiencies.” Compl. ¶ 40; Jt. Stip. of Fact ¶ 100; JX 093, p. 1098.

85. By May 16, 2001, HUD had received no communication from Englewood indicating that “any efforts had been taken to contain the declining physical condition of the property or to address ongoing site management deficiencies.” JX 094, p. 1099; Record 840:8-9. Instead, Mr. Hayes had written to HUD indicating that “a satisfactory acquisition agreement might be reached among the Owner and [an] acquirer within the next 30-days.” Jt. Stip. of Fact ¶ 99; JX 091, p. 1096.

86. Thus, on May 16, 2001, more than 30 days after HUD issued its Notice of Default, HUD sent Englewood a notice of continuing default. Jt. Stip. of Fact ¶ 101; JX 094, p. 1099 at 1100; Record 840:8-19. In this second Notice of Default, HUD urged Englewood "to provide adequate, timely information describing the immediate efforts that the Owner is making to address the HAP default and the sale of the Project and proposed assumption of the HAP contract." Jt. Stip. of Fact ¶ 101; JX 094, p. 1100. HUD also advised Englewood that HUD was "proceeding with its process to secure vouchers for relocation of eligible tenants." Jt. Stip. of Fact ¶ 101; JX 094, p. 1099 at 1100.

87. Beginning the voucher process once a notice of default is issued is normal operating procedures for HUD because the issuance of vouchers is a lengthy process. Record 692: 1-12. Initiation of the voucher process did not mean that the notice of default would automatically result in a termination of the HAP contract. To the contrary, Mr. Hinsberger testified that if Englewood had repaired South Pointe, Englewood could have continued the HAP contract with PM Group as owner and manager of the project. Record 538: 3-6. The voucher process merely ensured that HUD had all options available to it to protect the residents of the troubled property. Record 690: 15 - 691:8.

## V. Englewood's Request For Increased Rents

88. Shortly after Englewood received its notice of default and continuing notice of default, Mr. Samuelson requested that HUD increase the rent Englewood could charge its residents. Compl. ¶ 50; JX 104, p. 1120. As previously discussed, in his letter dated August 21, 2001, Mr. Samuelson requested a renewal of Englewood's expiring HAP contract and further requested an increase of the HAP contract rents. See, Section I (B), supra. This request included

a place for Mr. Hayes to affix his signature in order to “acknowledge[] and agree[] to” Mr. Samuelson's request for a rent increase. JX 104, p. 1120 at 1121-22; Record 704: 1-3. In support of the rent increase request, Mr. Samuelson included a rent comparability study that was prepared for Englewood's loan application. Record 632: 20 - 633: 3, 702: 11-18.

89. However, the rent increase request was incomplete because data identifying the years and items for the budget comparisons was not in the request form. JX 104, p. 1120 at 1123-1124; Record 632: 1-15. More importantly, the relationship between Mr. Samuelson and Englewood was unclear at this time: HUD never received a document that was signed by Mr. Hayes. JX 104, p. 1120 at 1121-1122, 1131; Record 630: 10-11. Additionally, during this time, HUD received complaints from South Pointe’s on-site management staff regarding the presence of Mr. Samuelson at the property. Record 629: 20-630:3. Accordingly, the rent increase request was deficient because it was neither signed by the owner or the current management company, nor was it complete. Record 632: 1-6.

90. Mr. Hinsberger notified Mr. Samuelson that while the rent comparability study "supports the proposed rents," because the submission was not signed by the current management company or owner, rent increases could not be approved. JX 107, p. 1144; Record 703: 24-25, 704: 1. Mr. Hinsberger informed Mr. Samuelson that if a rent increase was properly submitted, HUD would allow the rent increases "to kick in at the time of closing" of Mr. Samuelson's purchase of South Pointe. JX 107, p. 1144. Mr. Hinsberger also noted that the rent comparability study “supports the proposed rents,” but this was with respect to the loan application. JX 107, p. 1144; Record 632: 25, 633: 1-3.

91. As Mr. Hinsberger explained during his testimony

> . . . [T]here were two, two activities going on at this time. There was the loan application that we needed in order to determine the rents at the loan, for the loan, if the Section 8 contract were to continue, we needed to assure that the, that the rents that we used in the underwriting weren't greater than the market rents. So, that market comp study that was submitted actually was something that we could, could use to show that the market comp rents, what the market comp rents were and that would be an indication on how we would process the loan.

Record 631: 13-24.

92. There is no contractual or regulatory requirement that HUD must approve such a request for rental increases, particularly when an owner of a project has been declared in default of its HAP contract. Record 704: 18-23.

93. Furthermore, HUD never formally executed a contract with Englewood in which HUD agreed to pay Englewood rental increases in 2001 or 2002. Indeed, the subsequent HAP Renewal Contract that was executed on September 26, 2001 specified the "applicable contract rents" and contained no rental increase at the time of execution. See JX 025, p. 737 at 740-741; Record 703: 22 - 704: 11; Compl. ¶ 52.

**VI. 2001 Energy Reimbursement Costs Program**

94. In 2001, HUD initiated a program through which property owners could request reimbursement for high energy costs. JX 208, p. 1961; Record 705: 2-11. "In order for owners to take advantage of the opportunity for a utility lump sum adjustment," properties had to be acceptably managed and "in good standing with all Business Agreements signed with the Department." JX 208, p. 1961 at 1965; Record 705: 19-25.

95. Guidance for submitting a claim for energy reimbursements was set forth in a memorandum issued by HUD's Deputy Assistant Secretary on April 20, 2001. JX 208, p. 1961.

The memorandum was transmitted to local property owners of HUD-insured and/or subsidized properties with a cover memorandum signed by the Chicago Hub Director, Edward Hinsberger. JX 218, p. 2298. Any request for energy reimbursement had to be submitted no later than September 30, 2001. JX 218, p. 2298; Record 705: 14-19. A request for Emergency Energy Reimbursement must have also included any copies of paid utility bills. JX 208, p. 1961 at 1973. The terms of the 2001 energy reimbursement program were not contained in any provision of the parties' 1998 HAP Contract, or any subsequent HAP renewal contract, and there was no contractual obligation that HUD provide Englewood with reimbursement for energy costs. See JX 019 - JX 026, p. 677-759.

96. Englewood maintains that it submitted via facsimile a request for a lump sum reimbursement of $55,230.99 for its energy costs on August 6, 2001. JX 103, p. 1116 at 1119; Record 984: 14-21. However, HUD never received a request for energy reimbursement from Englewood prior to the September 30, 2001 deadline. Record 706:1-4. Further, Mr. Hayes testified at trial that he believed a request for energy reimbursement was submitted by his regional property manager, Carl Sanders. Record 984: 20-25 - 985:5. However, Mr. Sanders testified that he did not submit the request. Record 519: 15-17. Indeed, the request form Englewood argues was sent to HUD had a facsimile transmission banner date of "Sept. 02 2000," seven months before the April 2001 guidance issued, and did not indicate the facsimile number that it was sent to or from. JX103, p. 1116.

97. Furthermore, even if the August 6, 2001 facsimile was received by HUD on that date, HUD would have declined this request because of Englewood's ongoing default of its HAP contract, which prevented it from being considered "in good standing." JX 089, p. 1090; JX 094,

p. 1099; Record 705: 19-25. Additionally, the August 6, 2001 facsimile would have been deficient because it did not include any copies of paid utility bills, as required by the guidance. See JX 218, p. 2298 at 2302 (requirements for utility bills to be submitted) and JX 103, p. 1116 (no utility bills attached).

98. Nearly a year later, on May 31, 2002 and July 31, 2002, Mr. Samuelson submitted letters to Mr. Hinsberger in which he claimed that Englewood was entitled to $430,429 in lost revenues for a variety of reasons. JX 128, p. 1251; JX 131, p. 1255; Record 1118: 16-21. The reasons included claims that Englewood dismissed during trial, but, one of these claims included a request for $139,187 in "Rental Adjustments for Escalating Energy Costs." JX 128, 1251; JX 131, p. 1255 at 1256; Record 1118: 22 - 1119: 2. HUD denied all of these claims because, as Mr. Samuelson understood, Englewood was not in good standing. Record 1118: 17-19.

## VII. Voucher Process

99. On October 1, 2001, Mr. Hinsberger notified Mr. Hayes via e-mail that the Chicago Housing Authority "will begin issuing vouchers for the residents at South Pointe today." Jt. Stip. of Fact ¶ 111; JX 111, p. 1106 at 1161. Despite HUD's frequent communications regarding its intention to issue vouchers - and Englewood's subsequent agreement to a HAP renewal contract acknowledging HUD's right to issue vouchers - Mr. Hayes informed Mr. Hinsberger in an e-mail that he considered HUD's actions "unfair." Jt. Stip. of Fact ¶ 112; JX 112, p. 1162.

100. Mr. Hinsberger responded by forwarding previous correspondence between the parties reflecting Mr. Hayes' prior notice of HUD's rights and stated that, "to accommodate you, and the prospective purchaser, we are willing to continue to process the mortgage insurance

application once a complete application is received that addresses the deficiencies." JX 111, p. 1160 at 1161.

101. On October 11, 2001, Mr. Samuelson sent an e-mail to Mr. Hinsberger and Mr. Hayes confirming that, although he was "surprised at the rigidity of [HUD's] position," he conceded "of course that there was the possibility of the use of vouchers" when the parties had discussed the HAP Renewal Contract in August and September 2001. Jt. Stip. of Fact ¶ 114; JX 114, p. 1165.

102. Indeed, by October of 2001, Mr. Samuelson regarded HUD's issuance of vouchers as potentially advantageous. Mr. Samuelson stated that he believed that part of the ideal solution in the fall of 2001 ". . . was to use vouchers to get rid of bad tenants who could qualify for vouchers . . . " JX 18 p. 671 at 673. Mr. Samuelson noted that he had successfully pursued this strategy at other properties he managed. Id.

103. By their actions, Englewood's then-current owners appear to have disagreed. On October 29, 2001, Englewood filed a complaint in the Federal District Court for the Northern District of Illinois seeking to enjoin HUD from issuing vouchers to tenants at South Pointe. Compl. ¶ 55; Jt. Stip. of Fact ¶ 115; JX 001; Record 987: 2-14. The court denied Englewood's request for an injunction against the issuance of vouchers. Jt. Stip. of Fact ¶ 116; JX 007, p. 146; Record 987: 22 - 988: 3. The court also concluded that HUD had not terminated the HAP contract: "Rather, HUD provided Englewood with notice that it was in continuing default under the HAP contract and that HUD would begin the process of providing vouchers for relocation of eligible tenants." Jt. Stip. of Fact ¶ 116; JX 007, p. 146 at 148.

**VIII. Final Notice Of Abatement And Termination**

104. On November 30, 2001, HUD issued a "Notice of Abatement and Termination." This document stated that Englewood had failed to demonstrate that it had maintained the units at South Pointe in decent, safe, and sanitary condition as defined by 24 C.F.R. Part 5, Subpart G within 30 days of HUD's April 9, 2001 formal notice of default. Jt. Stip. of Fact ¶ 117; JX 117, p. 1176. HUD further stated that Englewood "has not cured the conditions complained of in the notice" and that, if Englewood did not provide a written objection or cure the underlying basis of default within 30 days, HUD's decision to terminate the contract would become final. Jt. Stip. of Fact ¶ 117; JX 117, p. 1176. HUD informed Englewood that it intended to terminate the contract after completing “its voucher and relocation process for all eligible residents in the Project.” Jt. Stip. of Fact ¶ 117; JX 117, p. 1176 at 1177.

105. HUD's notice also informed Englewood that the voucher and relocation process “may extend beyond the expiration date of the current HAP Contract Renewal.” Jt. Stip. of Fact 118; JX 117, p. 1176 at 1177. The notice provided that to “safeguard the residents, and not affecting HUD's determinations . . . HUD will provide [Englewood] with a HAP Contract Renewal with Addendum.” Jt. Stip. of Fact ¶ 118; JX 117, p. 1176 at 1177.

106. On December 21, 2001, Englewood willingly agreed to another HAP renewal contract, which extended the terms of the HAP Contract for six additional months. Compl. ¶ 61; JX 025, p. 737.

107. During this period, Englewood's representative, Don Samuelson understood that HUD was issuing vouchers and that the HAP Contract had been extended and not wrongfully terminated. Indeed, Mr. Samuelson acknowledged that “we needed to get people moved because

there had been uses of HAP extensions for periods of time . . . By the end of December, nobody moved. And then there was an extension for six months from January 1 to July 30. So at the end of three months, you know, my conclusion was there is going to be no more Section 8 as far as I can tell. People ought to be prepared to leave and move out." JX 014, p. 570 at 606.

108. Mr. Samuelson, who assumed management duties at South Pointe on December 1, 2001, favored vouchers as a means of removing undesirable tenants: "so there was a very aggressive effort during those three months to move people out or to help move people out." JX 014, p. 606. Mr. Samuelson claimed that he even hired an employee to facilitate removing tenants who received vouchers: "We had a person named Charles Woods who was specifically hired to do nothing more than tend to tenant needs and interests and help them relocate . . . we were particularly interested in having some of the tenants leave because we had had experience with difficulty - records of difficulty with them and there had been efforts of trying to evict them in the past that hadn't been successful." JX 014, p. 605.

## IX. <u>HAP Contract Ends On September 30, 2002</u>

109. On September 30, 2002, the HAP contract ended. JX 26, p. 746.

110. On December 13, 2002, Don Samuelson assumed control of Englewood and also agreed to a HUD-insured mortgage of $11.6 million dollars. Record 1179: 25 - 1180: 1.

## ARGUMENT

### I. Relevant Legal Standards In Non-Contract Disputes Act Breach Of Contract Cases[4]

#### A. Englewood Must Prove The Government Committed A Breach Of A Material Term Of The HAP Contract By A Preponderance Of The Evidence

In this breach of contract case, like any civil action, the plaintiff bears the burden by a preponderance of the evidence to prove the allegations in its complaint. See National Movers Co. v. United States, 386 F.2d 999, 1002 (Fed. Cir. 1967); Glasgow Associates v. United States, 495 F.2d 765, 768 (Fed. Cir. 1974); Perry v. Department of the Army, 992 F.2d 1575, 1577 (Fed. Cir.1993); Technical Assistance Intern., Inc. v. United States, 150 F.3d 1369, 1373 (Fed. Cir. 1998). This court has long held that where a plaintiff has alleged a breach of contract, the plaintiff carries the burden of "establishing the fundamental facts of liability, causation and resultant injury." Wunderlich Contracting Co. v. United States, 173 Ct. Cl. 180, 199, 351 F.2d 956, 968 (1965). As the predecessor to this Court explained, the burden of proof requires the plaintiff to establish three separate elements. First, it must establish the nature and extent of the Government's breach of contract. Second, it must prove that it suffered damages. Any damages

---

[4] Englewood's complaint states as a basis for this Court's jurisdiction 41 U.S.C. § 609 of the Contracts Disputes Act ("CDA"), 41 U.S.C. § 601 et seq.. Compl. ¶ 19. However, it is well-settled that the CDA does not apply to this type of contract. Appeal of Blanco-Mora Enterprises, Inc., HUDBCA No. 94-G-136-C5, 94-3 BCA ¶ 26,974 (board does not possess jurisdiction under CDA of disputes involving HAP contracts; HAP contracts are not contracts for the procurement of property or services); Appeal of Housing Authority of the City of Pagedale, HUDBCA No. 87-2687-C18, 89-1 BCA P 21302 (no CDA jurisdiction because the contracts were assistance instruments rather than procurement contracts, citing, Busby School of the Northern Cheyenne Tribe v. United States, 8 Cl. Ct. 596, 600 (1985)); Appeal of Mayer, HUDBCA No. 83-823-C20, 84-2 BCA ¶ 17,494 (same). Similarly, the Federal Acquisition Regulations ("FAR") do not apply to HAP contracts, which are not contracts for the procurement of supplies or services. 48 C.F.R. § 2.101 (FAR definitions of "contract" and "contracting"). Thus analysis of Englewood's complaint using the disputes or termination clauses of the FAR is inapplicable here.

must be proved with sufficient certainty so that the determination of the amount of damage would not be pure speculation. Willems Indus. v. United States, 155 Ct. Cl. 360, 376 (1961). Finally, even where damages have been verified, plaintiff is required to demonstrate that there is a causal link between the damages and defendant's breach. G & H Machinery Company, v. United States, 16 Cl. Ct. 568, 571 (1989); Doninger Metal Products, Corp. v. United States, 50 Fed. Cl. 110, 126 (2001) (the contractor bears a "basic and essential burden of establishing the fundamental facts of liability, causation, and resultant injury"); Winn-Senter Constr. Co. v. United States, 110 Ct. Cl. 34 (1948) ("These being suits for breach of contract, the plaintiffs had the burden not only of proving that there were breaches, but that they were harmed by the breaches, and the extent of the harm, within measurable limits.").

In sum, to recover for breach of contract, Englewood "must allege **and establish**: (1) a valid contract between the parties, (2) an obligation or duty arising out of the contract, (3) a breach of that duty, and (4) damages caused by the breach." San Carlos Irrigation and Drainage District v. United States, 877 F.2d 957, 959 (Fed. Cir. 1989)(emphasis added). As we demonstrate in section II of this brief, the evidence shows that Englewood did not establish that HUD breached any term of the HAP Contract when HUD terminated the contract on September 30, 2002.

### B. Even Assuming A Breach By HUD, Englewood's Failure To Maintain South Pointe In Decent, Safe And Sanitary Condition Acts As A Prior Material Breach And Excuses Any Non- Performance By HUD

Even if the Court disagreed with HUD and determined that Englewood could meet its initial burden, HUD cannot be held liable for breach of contract for ending its contractual relationship with Englewood because Englewood violated the terms of the HAP contract by

failing to maintain South Pointe in decent, safe and sanitary condition. Christopher Village , L.P. v. United States, 360 F.3d 1319, 1334 (Fed. Cir. 2004) ("When 'a party to a contract . . . is sued for its breach [it] may ordinarily defend on the ground that there existed, at the time [of the breach], a legal excuse for nonperformance.'") (quoting College Point Boat Corp. v. United States, 267 U.S. 12, 15 (1925)); see Restatement (Second) of Contracts § 237, Comment (a) (1979) (in general, "[a] material failure of performance by one party has the effect of preventing performance of the other party's duties"); Hoffman v. General Motors Acceptance Corp., 814 F.2d 1385, 1387 (9th Cir. 1986) (citing Restatement (Second) of Contracts § 237 (1969) for proposition that "if a condition precedent to the promisor's duty to perform has not occurred, he is under no duty to perform, whether or not he knows the condition has not occurred").

In general, a material breach by one party to a contract permits the non-breaching party to discontinue performance under the contract. Alliant Techsystems, Inc. v. United States, 178 F.3d 1260, 1276 (Fed. Cir. 1999); Stone Forest Indus., Inc. v. United States, 973 F.2d 1548, 1550 (Fed. Cir. 1992). Therefore, where a plaintiff materially breaches a contract to which it is a party, the defendant is excused from liability for any subsequent breach it may have committed. College Point Boat Corp., 267 U.S. at 15; Hometown Financial, Inc. v. United States, 409 F.3d 1360, 1370 (Fed. Cir. 2005); Christopher Vill., L.P., 360 F.3d at 1334 (citing Restatement (Second) of Contracts § 237, cmt. b (1981); E. Allan Farnsworth, Contracts § 8.15 at 439 (2d ed. 1990)), cert. denied, 543 U.S. 1146 (2005); Admiral Fin. Corp. v. United States, 57 Fed. Cl. 418, 432 (2003), aff'd on other grounds, 378 F.3d 1336, 1345 (Fed. Cir. 2004).

Whether a party to a contract committed a prior material breach is a mixed question of law and fact. Hometown Financial, Inc., 409 F.3d at 1369. "The legal aspect of the question

flows from the proper interpretation of the contract, while the factual aspects of the question flow from the parties' conduct – what they did, or did not, do." Id.

To determine whether a prior breach is "material," the Court must consider "the nature and effect of the violation in light of how the particular contract was viewed, bargained for, entered into, and performed by the parties." Stone Forest, 973 F.2d at 1551; see also Farmers Grain Co. of Esmond v. United States, 33 Fed. Cl. 298, 300 (1995). In other words, the Court determines whether a breach is material "in light of the totality of events and circumstances." Stone Forest, 973 F.2d at 1552 (citing Restatement (Second) of Contracts §241, cmt. a (1981)).

"A breach is material when it relates to a matter of vital importance or goes to the essence of the contract." Hometown Financial, Inc., 409 F.3d at 1370; Thomas v. Dep't of Housing & Urban Development, 124 F.3d 1439, 1442 (Fed. Cir. 1997) (citing 5 Arthur Linton Corbin, Corbin on Contracts § 1104 (1964)). The "materiality" of a breach does not depend upon whether the breach results in a financial loss to the non-breaching party. Mobil Oil Exploration & Producing Southeast, Inc. v. United States, 530 U.S. 604, 620-21 (2000). Rather, the question is whether the breach substantially deprived the non-breaching party of the benefit of the bargain it struck. Id. at 621 (citing Restatement (Second) of Contracts § 243 (1981)). For this same reason, materiality cannot simply be equated to the proportion of performance completed by a party. Stone Forest, 973 F.2d at 1552 (holding party materially breached contract by denying access to 15.89 percent of lumber originally bargained for after other party had completed 50 percent of its performance) (citing Restatement (First) of Contracts § 275, cmt. a (1932) (regarding materiality, it is "impossible to lay down a rule that can be applied with mathematical exactness")). Thus, any argument by Englewood that it could easily repair items

that fixed Englewood's breach, i.e., exposed wires in units, broken or missing smoke detectors, missing fire extinguishers and emergency fire hoses, etc., is without merit.

### C. When Reviewing The Conduct Of HUD Personnel In Administering Englewood's HAP Contract, The Court Presumes HUD Personnel Acted In Good Faith And Performed Their Duties Properly

In addition to alleging HUD wrongfully terminated the HAP Renewal Contract, we believe Englewood will also argue that HUD violated the contract in other ways and that these errors, taken together, add up to a material breach. See Jt. Stmt. of Issues of Fact and Law, Docket # 136, ¶ 6. In sum, this alternate argument by Englewood is that HUD breached its implied duty of cooperation and acted in bad faith.[5] Englewood's allegation regarding HUD's implied duty of cooperation fails however because Englewood has not, and can not, identify a specific contract provision that HUD supposedly violated. This is fatal to Englewood's argument because the Federal Circuit has ruled that "implied covenants of good faith and fair dealing are limited to assuring compliance with the express terms of the contract and cannot be extended to create new obligations not contemplated in the contract." Bradley v. Chiron Corp., 136 F.3d 1317, 1326 (Fed. Cir. 1999).

[5] We do not disagree that as a general matter of law, the United States is obliged to cooperate with, and may not impede, its contractor's performance. See Roberts v. United States, 174 Ct. Cl. 940, 357 F.2d 938 (1966). However, in determining whether the United States has breached its duty of cooperation and non-interference, the Court must examine whether the conduct of the United States was reasonable under the unique circumstances of the case before it. See Commerce International Company v. United States, 167 Ct. Cl. 529, 338 F.2d 81, 86 (1964); Bradley Construction, Inc. v. United States, 30 Fed. Cl. 507, 511 (1994); Mega Construction Co. v. United States, 29 Cl. Ct. 396, 420 (1993); PBI Electric Corp. v. United States, 17 Cl. Ct. 128, 133 (1989)(Government acted reasonably in not providing contractor additional information it requested, even though requested information would have made contractor's performance easier, and accordingly, Government did not breach duty to cooperate).

Furthermore, in order to establish that HUD breached the duty of cooperation, Englewood must establish that HUD personnel acted unreasonably.[6] E.g., PBI Electric Corp. v. United States, 17 Cl. Ct. 128, 133, 135 (1989); Cibinic & Nash, Administration of Government Contracts, supra, at 300, 303 (3d ed. 1995). Thus, when Englewood argues that HUD breached its duty of cooperation and that these actions constituted – or contributed toward – a material breach, Englewood must first establish that HUD acted unreasonably with regard to the specific contract performance matters at issue. If Englewood meets that high standard, only then can HUD's actions be considered by the Court as part of its material breach analysis.

Moreover, in those certain instances where the HAP contract conferred discretion upon HUD with regard to Englewood's claims raised here, Englewood must establish that HUD personnel exercised that discretion in an arbitrary and capricious manner. Hoel-Steffen Construction Co. v. United States, 231 Ct. Cl. 128, 135, 684 F.2d 843 (1982); United States Fidelity & Guaranty Co. v. United States, 230 Ct. Cl. 355, 366-70, 676 F.2d 622 (1982). Thus, in order to prevail upon such a claim, Englewood must show "that there was no reasonable basis for the [HUD official's] decision." Youngstown Steel Equipment Sales, Inc. v. United States, 20 Cl. Ct. 517, 525-26 (1990), rev'd on other grounds, 935 F.2d 281 (Fed. Cir. 1991) (table); accord Hoel-Steffen Construction Co. v. United States, 231 Ct. Cl. at 135 (noting that this standard involves a "high burden of proof" and that this burden "is the plaintiff's to carry"); United States Fidelity & Guaranty Co. v. United States, 230 Ct. Cl. at 369.

---

[6] The duty of cooperation does "not require the Government to do whatever a contractor demands," American Combustion, Inc., ASBCA No. 43712, 94-3 BCA ¶ 26,961 at 134,245 (1994), nor does it require the Government to "mak[e] the contractor's work easier." SEB Engineering, Inc., ASBCA No. 39728, 94-2 BCA ¶ 26,810 at 133,352 (1994)(citations omitted).

Finally, to also succeed upon its bad faith argument, Englewood must overcome the well-settled presumption that HUD employees are presumed to act in good faith and to perform their duties properly, and that it requires "'well-nigh irrefragable proof'" to overcome this presumption. E.g., Sanders v. United States Postal Service, 801 F.2d 1328, 1331 (Fed. Cir. 1986). Thus, in order to establish bad faith, Englewood would have to show that HUD personnel specifically intended to injure Englewood. E.g., Torncello v. United States, 231 Ct. Cl. 20, 45, 681 F.2d 756 (1982). There is no evidence in the record that suggests such an intent. Indeed, the record contains ample evidence that HUD personnel acted reasonably, and fully discharged their duty of cooperation.

## II. Englewood Failed To Prove That HUD Committed A Material Breach Of The HAP Contract As It Defaulted Upon The HAP Contract's Primary Obligation By Failing To Maintain South Pointe In Decent, Safe, And Sanitary Condition

Englewood has not shown that HUD breached any term of the HAP contract. Specifically, Englewood failed to prove that HUD wrongfully terminated – or improperly purported to terminate – the parties' HAP contract. Further, Englewood cannot demonstrate that the Government breached the HAP contract by withholding any payments to which plaintiff was entitled. Instead, the overwhelming evidence at trial demonstrated that Englewood defaulted upon the HAP contract by failing to maintain South Pointe in decent, safe, and sanitary condition. Thus, HUD was simply asserting its rights pursuant to the terms of the contract when it terminated the HAP contract.

Englewood's complaint alleges that its breach of contract action is based upon "HUD's improper termination of a four year Housing Assistance Payment ("HAP") contract between HUD and Englewood." Compl. ¶ 1. According to Englewood, HUD informed Englewood that it

was in default of the HAP Contract "ignoring the fact that Englewood had just demonstrated that the problems HUD identified [at South Pointe] had already been corrected." Compl. ¶ 7. Englewood further alleges that HUD notified Englewood that the HAP contract was terminated in October 2001 and that the only basis for this alleged termination was "stalled rehabilitation loan negotiations." Compl. ¶ 53, 54. The evidence at trial was overwhelming and conclusive upon this point, and clearly demonstrated that Englewood is wrong.

Indeed, there was not one witness who testified that at the time HUD terminated the HAP contract on September 30, 2002 (or at the time of any of the prior notices and inspections) that South Pointe was being maintained in decent safe and sanitary condition. Three experienced HUD employees who were on Mr. Hinsberger's staff testified that the conditions of the property were abysmal. However, the Court need not rely upon the testimony of HUD's employees on this point. In fact, the testimony of Mr. Samuelson, inspections performed by HUD as well as local housing authorities and agents hired by Englewood, and documents authored by Englewood's representatives demonstrate that there can be no dispute as to the fact that South Pointe was not in decent, safe, and sanitary condition.

In sum, at the time the HAP contract was terminated (and at the time of all prior notices and inspections), South Pointe was overrun with gangs and drug dealers, and had numerous other safety and security failures, including: holes in the walls, broken and unreliable elevators, broken windows, broken lights, missing fire hoses, expired fire extinguishers, broken doors, broken locks, and smoke detectors that didn't work. Clearly the common areas and units at South Pointe were not "decent," "safe," or "sanitary" either. The uncontroverted evidence showed that units had damaged or missing stoves, leaky faucets, trash overflowing the broken

garbage chutes, sticky floors and hallways that smelled of urine, mold, grimy paint, damaged plumbing, leaky faucets, and rats, mice and cockroaches galore. The consistency in every witness's testimony as to these conditions, coupled with the complaints HUD received from the City, from the residents, from the Mayor's Office, Chicago city aldermen, Congressmen, and the Police Department that mimic these conditions is glaring. The squalor the tenants at South Pointe were forced to endure by Englewood's poor management was anything but decent, safe, and sanitary. It is no wonder Mr. Samuelson remarked that South Pointe "wasn't for the faint-hearted anyone." Record 1365: 12-15.

### A. The Terms "Decent, Safe, And Sanitary" Are Well-Defined Pursuant To HUD's Regulations And The HAP Contract

Pursuant to the HAP contract, Englewood was obligated to maintain South Pointe in "decent, safe, and sanitary condition."[7] JX 019, p. 677 at 679; Jt. Stip. of Fact ¶ 16. Several courts have interpreted this language and upheld HUD's default determination where an owner defaults upon its contractual obligation to maintain housing in decent, safe, and sanitary condition. See Dewakuku v. Martinez, 226 F. Supp. 2d 1199, 1205 (D. Ariz. 2002) (holding as a matter of law that home was not decent, safe, and sanitary "under any possible interpretation of the phrase"); Marshall v. Cuomo, 192 F.3d 473, 482 (4th Cir. 1999) (upholding debarment of

---

[7] If Englewood had any doubt what this term meant, and we don't think it did, it had a duty to inquire before entering into the HAP contract. Parties contracting with the government are charged with having knowledge of the law and regulations governing the formation of such contracts. American General Leasing, Inc. v. United States, 218 Ct. Cl. 367, 372, 587 F.2d 54, 58 (1978); Prevado Village Partnership v. United States, 3 Cl. Ct. 219, 224 n.2 & 3 (1983). At the very latest, Englewood should have resolved this issue when it agreed to an addendum stating that, in the event HUD's Real Estate Assessment Center ("REAC") issued a physical inspection report evidencing Englewood's failure to "comply with **HUD's Uniform Physical Condition Standards and Physical Inspection Requirement**," HUD "may terminate the Contract . . . " JX 021, p. 696 at 699 (emphasis added); Jt. Stip. of Fact ¶ 25.

section 8 owner and rejecting owner's attempt to create a factual dispute by blaming tenants where "there appears to be no genuine dispute that substandard conditions did exist.") United States v. Intervest Corp., 67 F. Supp.2d 637, 647 (S.D. Miss. 1999) (finding that "there is no genuine issue of material fact as to whether the condition of the property was 'decent safe, or sanitary' under the general meanings of those terms. It was not.").

In addition to this judicial guidance, numerous other explicit standards applied to Englewood because it benefitted from project-based assistance 'pursuant to section 8 of the Act.[8] JX 019, p. 677 at 678. Paragraph eight of the 2000 HAP Renewal contract provides that the "Owner warrants that the units to be leased under the contract are in decent, safe, and sanitary condition as defined by HUD." JX 021 p. 697 (emphasis added). Furthermore, the March 2001 Real Estate Assessment Center inspection report plainly advised Englewood that HUD has defined the term "decent, safe, and sanitary" at 24 C.F.R. Part 5. JX 028 p. 767. Pursuant to these standards, the HAP contract required Englewood to maintain the property site's components such as: refuse disposal receptacles, walkways must be free of health and safety hazards, excess accumulations of trash, vermin or rodent infestation or fire hazards. 24 C.F.R. § 5.703(a). Englewood failed each of these standards.

Furthermore, Englewood was also required to maintain the building exterior. 24 C.F.R. § 5.703(b). Pursuant to this requirement, South Pointe was to be structurally sound, secure,

---

[8] It is stated at 24 CFR § 5.703 that HUD housing must be decent, safe and sanitary. The regulations at 24 CFR part 5, subpart G, which includes 24 CFR § 5.703, are made applicable to section 8 project-based housing projects like South Pointe pursuant to 24 CFR § 5.701(a). This subsection states that standards articulated in 24 CFR part 5, subpart G apply to housing assisted under the HUD programs listed in 24 CFR § 200.853(a). The regulation at 24 CFR § 200.853(a) lists as a covered property, "[a]ll Section 8 project-based assistance."

habitable, and in good repair, which meant that South Pointe's doors, fire escapes, walls, and windows were free of health and safety hazards, operable, and in good repair. Id. Englewood also failed each of these standards.

The regulation further required that Englewood maintain the property's building systems. 24 C.F.R. § 5.703(c). This section of the regulation required South Pointe's electrical system, elevators, fire protection, and sanitary system must be operable and in good repair. Id. Englewood failed each of these standards as well.

The HAP contract also established standards for Englewood regarding its obligation to maintain South Pointe's dwelling units. 24 C.F.R. § 5.703(d). Pursuant to this guidance, each dwelling unit must be structurally sound, habitable, and in good repair. Specifically, "[a]ll areas and aspects of the dwelling unit (for example, the unit's bathroom, . . . doors, electrical systems, floors, hot water heater, . . . kitchen, lighting, outlets/switches, . . . smoke detectors, . . . walls, and windows) must be free of health and safety hazards, functionally adequate, operable, and in good repair." Id. Furthermore, each unit must have hot and cold running water and include at least one battery-operated or hard-wired smoke detector, in proper working condition, on each level of the unit. Id. Again, the evidence at trial showed that Englewood failed each of these standards.

The owners are also required to maintain the property's common areas. 24 C.F.R. § 5.703(e). The HAP Contract prohibited items such as "excess accumulation of trash, vermin or rodent infestation or fire hazards." 24 C.F.R. § 5.703(f). These standards further required that "areas and components of the housing must be free of health and safety hazards. These areas include, but are not limited to, air quality, electrical hazards, elevators, emergency/fire exits,

flammable materials, garbage and debris, handrail hazards, infestation, and lead-based paint." 24 C.F.R. § 5.703(f). Englewood also failed each of these standards.

Unsurprisingly, the regulations applicable to the HAP Contract also required Englewood to ensure that South Pointe had "no evidence of infestation by rats, mice, or other vermin, or of garbage and debris." 24 C.F.R. § 5.703(f). Englewood also failed these standards. Indeed, it was Englewood's own inspectors that noted that **each** unit had an average of **six** mouse holes. Record 504: 5-16; JX 069, p. 975. Clearly, by Englewood's own admission, it failed to achieve these standards.

Finally, Englewood was required to ensure "[c]ompliance with State and local Codes" 24 C.F.R. § 5.703(g). Not surprising, Englewood failed each of these standards too.

### B. HUD's Remedies For Englewood's Failure To Maintain South Pointe In Decent, Safe, And Sanitary Condition

The HAP Contract provided HUD with powerful remedies to ensure that South Pointe's residents received decent, safe, and sanitary housing. Once HUD notified Englewood of the nature of a default and provided a time to cure, HUD possessed the right to "take corrective action to achieve compliance, in accordance with paragraph [20](b)(3) **or** to terminate th[e] Contract . . . , in whole or in part, or to take other corrective action to achieve compliance in its discretion . . . ." JX 019, p. 677 at 687. HUD also could "reduce or suspend housing assistance payments" in response to Englewood's default. Id. These are the remedies HUD elected to use.

In October 2000, the parties executed a Renewal Contract that incorporated an addendum stating that, if HUD's Real Estate Assessment Center ("REAC") issued a physical inspection report indicating that the property was in sub-standard condition, HUD could "terminate the Contract after the renewal providing the Owner a reasonable period, as determined by HUD, to

correct deficiencies." JX 021, 696 at 699; Jt. Stip. of Fact ¶ 25. This was the remedy HUD elected.

The documentary evidence and undisputed testimony by HUD's employees at trial demonstrate that Englewood triggered HUD's right to exercise these remedies by defaulting upon the HAP contract and failing to cure this default, despite multiple opportunities to do so.

### C. Englewood Presented No Evidence At Trial That It Was Not In Default Of Its Obligation To Maintain South Pointe In Decent, Safe, And Sanitary Condition At The Time HUD Decided To Terminate The HAP Contract

The overwhelming and undisputed evidence at trial demonstrated that Englewood failed to maintain South Pointe in decent, safe, and sanitary condition. For example, Chicago Police responded to 794 incidents reported at South Pointe during the period relevant to this dispute. JX 195, p. 1819 at 1847. This was just one example, from a disinterested party, establishing Englewood's failure to secure the property for its residents. Unfortunately, this example was not an isolated one when it came to the numerous deficiencies at South Pointe. Englewood continually failed to satisfy its obligations pursuant to 24 C.F.R. part 5, subpart G. Examples of ongoing violations included standing garbage (JX 150, p. 1539 at 1542), the smell of urine in common areas (JX 052, p. 874 at 874 ), city code violations (JX 150, p. 1539 at 1542.), and the presence of drug dealers and gangs. JX 052, p. 874 at 876.

Indeed, since 1999, when the Real Estate Assessment Center reported its dreadful findings from a physical inspection of 25 units at South Pointe, the evidence at trial was consistent that South Pointe was in a constant state of disrepair, managed by owners who were doing nothing more than reacting to outside forces, such as HUD, Chicago Department of

Buildings, the Illinois State's Attorney, and the Illinois Housing Authority, who were trying to get Englewood to comply with the terms of the HAP contract or local ordinances and law.[9]

Less than a month later, on May 19, 1999, representatives of HUD's contractor, Pinnacle Realty Management Company, visited Englewood and found that Englewood had not corrected "severe findings" from the REAC inspection. JX 036, p. p. 802 at 805; Jt. Stip. of Fact ¶ 38. Pinnacle's written report also found that "[t]he owner has not corrected conditions that adversely affect the provision of decent, safe, and sanitary housing as required by the HAP contract." JX 036, p. p. 802 at 805.

John Hayes, who was also President of Englewood's management agency at that time, P.M. One, wrote to HUD on August 20, 1999 and stated that "[a]ll Health and Safety items such as non working Smoke Detectors, GFIs, etc. listed in the above referenced report have been corrected." JX 038, p. 815 at 715; Jt. Stip. of Fact ¶ 44. However, on October 15, 1999, the City of Chicago Department of Buildings notified P.M. One that an inspection conducted on September 23, 1999 disclosed multiple City Municipal Code violations, including roach and rodent infestations, missing fire extinguishers, "garbage chutes with garbage everywhere," and "raw standing sewage." JX 41, p. 820 at 821-824. Indeed, the findings made by the City of Chicago Department of Buildings during its September 1999 inspection mirrored many findings identified by the April 1999 REAC inspection, including: roaches, broken light fixtures, damaged doors, and broken, missing or cracked window panes. Compare JX 027, p. 760 at 761-766 with JX 041, p. 820 at 821-824; Record 1005: 25 - 1007: 12.

---

[9] Out of a possible score of 100, Englewood received an overall score of 42 on the 1999 REAC inspection. JX 027, p. 760.

Similarly, when HUD personnel returned to South Pointe on March 14, 2000, they found once again that there was a "big problem with drugs and gangs," that "stairwells were dirty and smell of urin[e]," and that elevators were not functioning properly. JX 52, p. 874 at 875-876; Jt. Stip. of Fact ¶¶ 58-59; Record 314: 1-4; 315: 1-3; 316: 9-10.

Ms. Thomas visited one unit because of complaints she had received from the tenant. As she testified at trial, "[t]he tenant called me and said that there was a mouse in the bed of her newborn baby, because she had a big hole in the wall . . . And when I went in her unit, she had peeling paint, she had holes at the bottom of the baseboards where you could see the roach. She had roaches in her kitchen, and her bathroom, he shower was, it was just rusted real bad where the drywall and everything like water damage was awful . . ." Record 317: 13-22. Unfortunately, Ms. Thomas found these same conditions in the other units that she visited. Record 318: 6-8.

The deplorable conditions at South Pointe were again found to exist eight months later, when on November 3, 2000, Englewood's managing agent, P.M. One, had a physical inspection summary prepared regarding the conditions at South Pointe. P.M. One's own inspectors determined that South Pointe's "elevators are always out of order and it's always the same problem." JX 069, p. 975 at 976; Record 510: 5-8. These inspectors also determined that conditions around garbage chutes were "unsanitary" and "a danger to children" and that many units had water damage. JX 069, p. 975 at 976; Record 507: 23 - 508: 2. Englewood's inspectors also discovered an average of six rodent holes in each unit inspected. JX 069, 975; Record 504: 5-10.

However, despite being placed upon notice of these conditions by these prior inspections, Englewood still did nothing to correct the problems. In fact, the same problems still existed four months later, when on February 19, 2001, Gwendolyn Thomas, accompanied by other HUD staff members, including Teresa DiPietro, conducted another management and occupancy review of South Pointe. JX 150, p. 1539; Record 323: 2-15.

This visit by HUD personnel revealed that the property had not improved since the last management review of March 2000. In fact, Ms. Thomas found that the elevators were not working properly, the stairwells had no lighting and smelled of urine, graffiti was "everywhere", and there was peeling paint in the hallways. Record 324: 14 - 325: 23. There were “a lot” of police in the building because of a drug related incident. Record 324: 6-13.

Of special note was that Ms. Thomas returned to the same unit she had visited in March 2000. Record 326: 3-6. Ms. Thomas found the same damaged showerhead “with the water damaged wood, the still rusted tub, the peeling paint in the units.” Record 326: 8-13.
Ms. Thomas found that the project had not changed since her last visit. Record 326: 18-20.

Teresa DiPietro, who was at South Pointe for training purposes as a new project manager, saw a building with boarded windows and missing screens. Record 1247: 18-19. Ms. DiPietro testified that she walked into a dimly lit hallway with dirty floors and missing tiles; residents were waiting for elevators that were an ongoing problem because "at no point in time are all the elevators working." Record 1249: 1-6. Ms. DiPietro also noticed that dwelling units had broken windows, holes in their walls, and roaches in the kitchen. Record 1249: 24-25, 1250: 2-6.
Finally, Ms. DiPietro noticed that the stairwells were dimly lit and smelled of urine; the floors and the handrails were sticky; fire hoses were missing, and exit signs were broken out. Record

1251: 15-24; see also JX 196, p. 1851-1886 (photographs taken of representative units showing holes and water damage on walls, peeling paint, and over-flowing garbage); Record 327: 15-338: 10, 1225: 8 - 1234: 7.

On March 2, 2001, REAC again inspected a sample of 25 units at South Pointe. This time, out of a possible total score of 100, South Pointe received a score of 31. Jt. Stip. of Fact ¶ 74; JX 028, p.767 at 769; Record 948: 18. On March 6, 2001, Mr. Hayes provided Gwen Thomas of HUD's Chicago Multifamily Housing Hub with a "certification" that exigent health and safety items identified in the 2001 REAC inspection had been corrected. Jt. Stip. of Fact ¶ 78; JX 076, p. 1054; Record 939:17-20.

Mr. Hayes's certification was inaccurate. Jt. Stip. of Fact ¶ 79; JX 077, p. 1055; Record 464: 15-20. Shortly after receiving Mr. Hayes's certification, HUD personnel, including Ms. Thomas and HUD construction analyst Lillye Simmons, conducted a confirmatory review of Mr. Hayes's exigent health and safety certification. Ms. Simmons was an experienced construction analyst who has been with HUD for 20 years. Record 1221: 12-18.

Although she was sent specifically to verify the veracity of Englewood's exigent health and safety certification, Ms. Simmons couldn't help but notice the condition of her surroundings when she went to South Pointe. Ms. Simmons testified that she noticed the trash at the front of the property, broken windows and missing window screens. Record 1223: 22-24. Ms. Simmons also recalled the poorly lit lobby and the smell of urine; she saw the graffiti, the improperly working elevators, the trash, and the sticky stairwells. Record 1224: 5-25. Ms. Simmons also noticed that with respect to the exigent health and safety items, only "some" had been mitigated. Record 1226: 21-22.

Armed with this report from her experienced staff, on March 9, 2001, Ms. Coleman wrote to Mr. Hayes stating that HUD had conducted a "confirmatory review" with P.M. One staff members present. Jt. Stip. of Fact ¶ 79; JX 77, p. 1055; Record 464:15-20, Record 819:20-23. This review confirmed that "only a few of the EHS items had been mitigated and not all as you certified." JX 077, p. 1055; Record 819:7-23, 820:4-11, 14-21.

Mr. Hayes responded to Ms. Coleman's letter by conceding that the General Partner "does not have the ability to monitor on a daily basis specific site inspections to validate compliance with required repairs from physical inspections. The General Partner relies solely on the information received from the property management company." Jt. Stip. of Fact ¶ 80; JX 079, p. 1059 at 1059. Mr. Hayes then blamed HUD's findings upon the "use of a site Assistant Manager and maintenance person to accompany the HUD staff on the confirmatory review." JX 79, p. 1059; Record 941: 25 - 942: 6.

HUD was not the only party to discover that serious health and safety problems existed at South Pointe in early 2001. On March 8, 2001, representatives of the Illinois Housing Development Authority inspected South Pointe. JX 151, p.1547; Record 1015: 3-12. In addition to finding conditions similar to those cited in the 1999 and 2001 REAC reports, including water-damaged bathroom ceilings and walls, leaking kitchen faucets, and stove knobs missing, the Illinois Housing Development Authority also documented exposed wires and non-functioning fire alarms, and missing or non-functioning smoke detectors. JX 151, p. 1547-1550; Record 1015: 16 - 1016: 9. These findings were especially troubling because they were similar to items that Mr. Hayes had certified to HUD were corrected just two day before.

Compare, JX 076, p. 1054 and JX 151, p. 1547; Record 1016:10-13. Again, this report was consistent with the previous inspections of South Pointe – the place was a dump.

However, the Court need not rely upon these private and Government entities to find that Englewood had failed to maintain South Pointe in decent, safe and sanitary condition. This is because the true extent of problems at South Pointe was also revealed when Mr. Samuelson first visited the property in the summer of 2001. Mr. Samuelson's description of South Pointe at the conclusion of his visit there renders his use of the term "toxic waste" understandable.

In his deposition, which he confirmed at trial, Mr. Samuelson testified that the building was not secure because he found a building overrun with gangs and drug dealers. Mr. Samuelson described the "relative freedom that gangs and gang-related and drug interests had in moving off the street, into the building, up into the units and around the building." JX 14, p. 570 at 590. According to Mr. Samuelson's assessment, South Pointe's physical deficiencies could only be solved after its management corrected security problems:

> In a building like that or like some of the CHA buildings, its very difficult to manage buildings if you don't have the security. If you don't have control over the building and the ability of eliminating gangs, drugs, and criminal activities, you are very hard-pressed. Everything else follows from that.

JX 14, p. 590. This admission by Mr. Samuelson is blatant proof that South Pointe was anything but "safe" and "secure" or "decent."

In short, Mr. Samuelson found that South Pointe was not an appropriate living space for "faint-hearted" tenants. In fact, it "wasn't for the faint-hearted anyone." JX 014, p. 570-606, Record 1356: 12-15. Indeed, in a written report Mr. Samuelson transmitted to HUD on August 6,

2001, Mr. Samuelson confirmed his impression that South Pointe's on-site staff and security were "ineffective" and that dangerous conditions existed at South Pointe. JX 102, p. 1110.

In fact, Mr. Samuelson's assessment of the building's lack of security and dangerous conditions was confirmed in July 2001 when the Office of the State's Attorney for Cook County, Illinois declared South Pointe a public nuisance because "narcotics are being bought and sold in and around this property. In addition, the Chicago Police Department has expressed concern that this property is being used for illegal drug activity." JX 099, p. 1105.

Finally, on October 19, 2001, Mr. Hinsberger sent experienced members of his staff, to include HUD construction analyst Lillye Simmons and HUD appraiser John Schneider, to South Pointe to confirm the conditions of the property. Record 675: 11-18, 1227: 13-16. As before, the HUD staff confirmed that South Pointe's physical problems still were not corrected. JX 115, pp. 1166-1167; Record 1206: 24 - 1207-1208; 1228: 2 - 1229: 6. Among others, the HUD team noted the smell of urine in common areas, the dim lighting, and sticky floors. JX 115, p. 1166; Record 1205: 15-20; 1228: 6-8.

Lillye Simmons, who was at the project several months earlier, found that conditions had not improved. Ms. Simmons saw broken windows, missing window screens, and trash outside the building. Record 1228: 2-3. Ms. Simmons also testified that the inside of the building was dark and smelled of urine, Record 1228: 6-8, and that the stairwells were in the same, if not worse, condition than when she was last at the project in March 2001. Record 1228: 17-21. Ms. Simmons documented her findings in an e-mail that she sent to her supervisor, Veronica Coleman. JX 115, p. 1166 at 1167; Record 1229: 9-10, 1230: 2-5.

Accompanying Ms. Simmons upon this confirmatory visit was HUD appraiser John Schneider. JX 115, p. 1166 at 1167; Record 1227: 18-21. Mr. Schneider testified that his first impression of the building was that it was "in extreme disrepair as evidenced by boarded up windows on the outside [and], areas of the lawn that were bare." Record 1204: 7-10. He noted that units had "water marked ceilings, paint peeling off the ceilings, paint peeling off the walls, damages walls, holes in the walls, areas where walls had been repaired but unpainted, missing floor tiles, outlets and switches with protruding wiring . . . We saw, in the bathrooms mildew in shower areas, missing tiles from the walls, cracked tiles, missing plumbing fixtures." Record 1204: 18 - 1205: 1. Mr. Schneider saw rodent droppings and noted that he took the stairwells to go down to the 22nd floor because "there was only one functioning elevator and it was very slow." Record 1205: 4-7. Stairwells were dimly lit and smelled of urine; fire doors were permanently open, there were missing push bars on fire doors, and fire hoses were missing. Record 1205: 11-20. Mr. Schneider took representative photos of his findings which support his and Ms. Simmons testimony. See JX 196, p. 1887-1906; Record 1206: 10-12.

Englewood cannot reasonably dispute that it was failing to maintain South Pointe in decent, safe, and sanitary condition. Even if the Court discounts the reports of HUD employees and city and state inspectors who found standing garbage and sewage as well as gangs and drug dealers at South Pointe, Englewood's own representatives confirmed that South Pointe was not decent, safe, and sanitary. This includes Mr. Samuelson's testimony at his deposition and trial, his written findings, and Mr. Hayes's written acknowledgment that HUD's requirements were not met. Of course, the most damaging testimony at trial upon this point was given by Englewood's on-site manager, Carl Sanders. Mr. Sanders admitted upon cross-examination that

Englewood's problems were consistently recurring. Record 514: 20 - 516: 8. Clearly, Englewood was not managing South Pointe but reacting to other entities' findings.

Consistently, in September 2002, P.M. One's new president, Michael McGhie, wrote to HUD acknowledging that "problems did exist in the operation of P.M. One properties in Chicago." JX 132, p. 1257. Indeed, Mr. McGhie promised to operate properties in "decent, safe, and sanitary condition" in the future and even offered for P.M. One "to be placed on probation." Id.

Nevertheless, despite this promise, Englewood still attempts to avoid its contractual duties and even claimed at trial that problems at South Pointe were just "minor" and "easy to correct." Englewood's position fails here, however, because nowhere in the HAP contract does a provision require the owner to only maintain the "serious" or "difficult to repair" items. To the contrary, Englewood was required to maintain all of the building in decent, safe and sanitary condition. There were no contractual limitations upon this responsibility when it came to scope of damage. Of course, this argument also ignores the fact that Englewood's admitted failure to maintain South Pointe's alleged "minor" problems goes directly to its ability to manage the property. Or, as HUD witness Theresa DiPietro testified at trial, if after repeated inspections the noted problems were so minor and easily correctable, "why didn't maintenance or management and owners do that?" Record 1262: 6-8. Englewood has never answered that question.

Englewood's default entitled HUD to exercise its remedies pursuant to the HAP Contract. HUD did so by providing Englewood a notice of its default on April 9, 2001 (Jt. Stip. of Fact ¶ 88; JX 89, p. 1090; Record 540: 2-5) and by issuing a subsequent notice of Englewood's continuing default in May 2001 (JX 94, p. 1099; Record 840: 8-19), and finally, in

November 2001, a notice of abatement and termination. Jt. Stip. of Fact ¶ 117; JX 117, p. 1176, Record 641: 16. Although HUD never wrongfully terminated the HAP Contract – which also expired pursuant to multiple Renewal Contracts executed by the parties – HUD acted properly when it exercised its remedy of funding vouchers for use by South Pointe's tenants. Thus, the Court should rule Englewood failed to meet its burden that HUD illegally terminated the HAP Contract.

### D. Englewood's Expected Defenses Are Without Merit And Do Not Excuse Englewood's Failure To Maintain South Pointe In Decent, Safe And Sanitary Condition

As they have throughout the history of this case, Englewood will make several arguments to deflect the Court's attention from the pivotal issue in this matter: Did Englewood maintain South Pointe in decent, safe and sanitary condition. In its attempt to shirk this responsibility, we expect Englewood will argue in its post-trial brief that HUD terminated the HAP Contract because of "stalled loan negotiations" (See also Compl. ¶ 54) and that the 2001 REAC Report "[h]ad to be the basis for the [d]efault." Compl. ¶ 10.

To the contrary, the April 9, 2001 "notice of contract default" HUD sent to Englewood referred Englewood to the Physical Condition Standards contained at 24 C.F. R. Part 5, Subpart G. See Jt. Stip. of Fact ¶ 94; JX 089, p. 1090 at 1091. It further stated that, "[t]he failure to keep and maintain the Project in a decent, safe, and sanitary condition is a default of the HAP contract." Id. HUD could not have been more explicit regarding the grounds of Englewood's default, and HUD reminded Englewood of these grounds in its May and November 2001 notices regarding Englewood's failure to cure its default. JX 094, p. 1099; JX 117 p. 1176.

Englewood also may argue that it "corrected the deficiencies listed in the Report during the month of March and informed HUD of this in detailed letters of April 5 and April 9, 2001." Compl. ¶ 6. In fact, plaintiff did not correct the referenced deficiencies, and its attempt to limit its default to the 2001 REAC Report is a red herring.

As noted, correcting the deficiencies identified in the 25 units examined during the REAC inspection could not cure Englewood's failure to maintain the entire building in decent, safe, and sanitary condition. For this reason, HUD instructed Englewood to conduct a complete survey of the property and to forward a proposed plan for correcting all deficiencies in an official "Management Improvement Operating Plan (MIO) format, within 30 days of the date of this letter." JX 28, p. 767; Record 957: 6-8. HUD also instructed Englewood to correct "exigent health and safety deficiencies" identified in the REAC Report "within 72 hours of receipt of the report." Jt. Stip. of Fact ¶ 77; JX 74, p. 1019; Record 939: 10-16. Instead, Englewood provided a false certification, a late response to the REAC report, and never submitted an acceptable MIO plan that contained a funding source or a 100 percent inspection of the property that was based upon the REAC inspection. Record 732: 3-17.

Regardless, and amplifying the need for a 100 percent survey of the property that was based upon the REAC report, Englewood's failure to maintain South Pointe in decent, safe, and sanitary condition extended far beyond the problems identified in the REAC report. This failure included, for example, the safety and security problems that caused Mr. Samuelson to describe South Pointe as a "a very crime-ridden, drug-laden project" JX 014, p. 570 at 593. Moreover, Mr. Samuelson stated, the physical deficiencies of the property "follows from that." JX 014, p.

570 at 590. It also included problems raised by tenants, state and local government employees, political figures. See Record 672: 19 - 675: 18.

We also anticipate Englewood to argue that HUD failed to provide sufficient notice of what required fixing at South Pointe and did not afford Englewood an opportunity to cure its default. However, as noted, the April 9, 2001, notice of default referred Englewood to the detailed physical standards contained at 24 C.F. R. § 5.703. Jt. Stip. of Fact ¶ 94; JX 89, p. 1090 at 1091.

Further, the undisputed facts demonstrate that, from 1999 through 2001, HUD gave Englewood every possible opportunity to cure its default. In fact, HUD even insured a new mortgage for South Pointe to retain the affordable housing and provide the owner funds to effect repairs – something HUD had no obligation to do under the HAP Contract. Compl. ¶ 38. Still, Englewood never complied with HUD's requirements that it present a timely and acceptable plan to correct deficiencies, much less timely implementing such a plan.[10]

There can be no dispute that the Government is entitled to judgment as to Englewood's entire complaint. Englewood's breach entitled HUD to exercise its remedies under the HAP Contract, including abating payments to Englewood and funding vouchers for use by South Pointe's tenants. Accordingly, because the evidence clearly showed HUD's actions were contemplated by the contract, and because of Englewood's undisputed, continuing default in maintaining South Pointe, the Court should deny Englewood's claims.

---

[10] In fact the substantial rehabilitation loan **was** Englewood's plan to correct the deficiencies. Record 715: 23 - 716: 6; 833: 20-24. However, HUD, having exhausted its internal procedures to protect the residents ended the HAP contract because Englewood's proposed HUD-insured loan was never achieved until months after the HAP contract was terminated.

## III. Englewood Failed In Its Burden To Prove That HUD Breached The HAP Contract Because Englewood Was Not Entitled To HAP Subsidies Beyond September 2002 – The Date Payments Under The HAP Contract Ended

Notwithstanding Englewood's failure to prove that HUD breached any term of the HAP contract, Englewood also failed in its burden to prove that it was entitled to HAP subsidies beyond September 2002 – the date HUD terminated the HAP contract.[11] The evidence at trial proved that HUD had no obligation to pay Englewood subsidies beyond September 2002. Pursuant to the HAP renewal contracts executed in 2001 and 2002, any right of Englewood to subsidies ended in September 2002, and thus, Englewood was not entitled to HAP subsidy payments beyond September 2002 as a matter of law.

### A. The Parties' HAP Renewal Contracts Unambiguously Demonstrate That Englewood Was Not Entitled To HAP Subsidies Beyond September 2002

According to Englewood's complaint, the 2000 HAP Renewal Contract entitled Englewood to continued HAP subsidy payments through September 2004, and HUD breached this contract by terminating it for default and failing to make subsidy payments through this date. Compl. ¶ 93. However, the parties signed multiple HAP renewal contracts in 2001 and 2002. These HAP renewal contracts renewed and amended the parties' earlier agreements, and prove

[11] Thus, even if the Court disagreed with us and determined that South Pointe was being properly maintained, Englewood's complaint still fails because the HAP contract expired upon its own terms. In order for there be a breach of contract, there must be a duty owed at the time of the allegedly improper conduct. Trauma Service Group v. United States, 104 F.3d 1321, 1325 (Fed. Cir. 1997) ("a breach of contract is failure to perform a contractual duty when it is due.") (emphasis added).

that Englewood's entitlement to HAP subsidy payments could not have extended beyond September 2002.[12]

It is well-established that the interpretation of Government contracts is a matter of law. Pacificorp Capital, Inc. v. United States, 25 Cl. Ct. 707, 715 (1992)(citing Fortec Constructors. v. United States, 760 F.2d 1288, 1291 (Fed. Cir. 1985); Hol-Gar Mfg. Corp. v. United States, 169 Ct. Cl. 384, 386, 351 F.2d 972, 973 (1965)). For this reason, the Court will only consider factors outside the four corners of a contract after determining that the contract is ambiguous. Pacificorp Capital, Inc., 25 Cl. Ct. at 715 (citing Sylvania Elec. Prods., Inc. v. United States, 198 Ct. Cl. 106, 126, 458 F.2d 994, 1005 (1972). "When the terms of a contract are clear and unambiguous, there is no need to resort to extraneous circumstances, such as prior negotiations or custom of the trade for its interpretation." Pacificorp Capital, Inc. 25 Cl. Ct. at 716 (quoting Peterson-Sharpe Eng'g Corp. v. United States, 6 Cl. Ct. 288, 295 (1984)).

A contract is only ambiguous if reasonably susceptible to more than one interpretation. Pacificorp Capital, Inc. 25 Cl. Ct. at 716 (citing Technical Consultant Servs., Inc. v. Lakewood Pipe of Texas, Inc., 861 F.2d 1357, 1362 (5th Cir. 1988)). Pursuant to the parol evidence rule, interpretation of an unambiguous contract may not be affected by the contentions of either party that it meant something else. Pacificorp Capital, Inc., 25 Cl. Ct. at 716.

The parties have stipulated that HUD provided Englewood with HAP subsidies pursuant to the 1998 HAP Contract. Joint Stip. Fact ¶ 14; JX 19, p. 677. The parties further have

---

[12] As we demonstrated in Section II above, even if Englewood had been entitled to four years of HAP subsidies pursuant to any automatic renewal provisions, or even a 50-year contract, HUD would still possess the right to terminate the HAP contract for Englewood's default.

stipulated that the 1998 HAP Contract was for a one-year term, and that a one-year extension renewed its terms in 1999. Joint Stip. Fact ¶ 8; JX 20, p. 691 at 692.

The parties also have stipulated that, in October 2000, they executed the 2000 HAP Renewal Contract, which again renewed the terms of the 1998 HAP Contract, but amended the procedures Englewood was to follow in requesting rent increases. Joint Stip. Fact ¶ 24; JX 21, p. 696.

Englewood alleges that the 2000 HAP Renewal Contract was for a one-year term expiring in September 2001, to be followed by three "one-year automatic renewals, subject to the availability of appropriations." Compl. ¶ 27. As explained more fully in the next section of this brief, the incontrovertible documentary and testimonial evidence demonstrates that the provision of the 2000 HAP Renewal Contract Englewood argues entitled it to HAP subsidies through September 2004 was an error. The parties corrected this error by agreeing that the 2000 HAP Renewal Contract would expire at the end of December 2000, and then by agreeing that it would expire in September 2001. Joint Stip. Fact ¶¶ 67, 70; JX 71, p. 1014); JX 72, p. 1015 at 1016.

However, the Court does not need to consider any evidence beyond the plain terms of the parties' HAP renewal contracts themselves in order to rule that Englewood was entitled to no HAP subsidies beyond September 2002.

The parties have also stipulated that they executed HAP renewal contracts in 2001 and 2002 that covered the period from September 2001 through September 2002 – much of the same period that Englewood claims was covered by the 2000 HAP Renewal Contract. Joint Stip. of Fact ¶¶ 26, 28, 30; JX 24, p. 719 at 722. If Englewood were correct that it was entitled to HAP

subsidy payments through 2004, Englewood's representatives would have had no reason to sign these additional HAP renewal contracts in 2001 and 2002.

For example, in September 2001, the parties executed the 2001 90-Day HAP Renewal Contract. This agreement plainly states that the terms of the parties' prior agreement would expire before the beginning of the 2001 90-Day HAP Renewal Contract's term on October 1, 2001. Joint Stip. Fact ¶ 26; JX 24, p. 722, 724. Thus, the parties agreed in writing that the 1998 HAP Contract's terms were due to expire in September 2001 – not September 2004. Id.

The parties also have stipulated that the plain terms of the 2001 90-Day HAP Renewal Contract stated that the parties' contractual obligations were only renewed through December 2001: "The term of the Renewal Contract begins on 10/01/2001 and shall run for a period of .3 years." Joint Stip. Fact ¶ 27; JX 24, p. 722.

In accordance with these plain terms, if the parties had not executed additional HAP renewal contracts, Englewood's entitlement to HAP subsidy payments would have ended in December 2001. In fact, HUD issued a notice of abatement and termination in November 2001 informing Englewood of HUD's intention to fund vouchers, and to terminate the parties' relationship. Joint Stip. of Fact ¶¶ 117-118; JX 117, p. 1177.

However, the parties stipulate that they entered into two additional HAP renewal contracts containing terms substantially similar to the 2001 90-Day HAP Renewal Contract. Consistent with its decision to end its relationship with Englewood, HUD executed these additional HAP renewal contracts in order to protect South Pointe's residents until they received vouchers.

The first of these additional HAP renewal contracts was for six months and was executed in December 2001 (the "180-Day HAP Renewal Contract"). Joint Stip. Fact ¶ 28; JX 025, p. 737. The parties have stipulated that the 180-Day Renewal Contract extended the terms of the parties' 1998 HAP Contract for six additional months: "The term of the [180-Day HAP] Renewal Contract begins on 01/01/2002 and shall run for a period of .5 years, beginning on the first day of the term." Joint Fact Stip. ¶ 29; JX 025, p. 737 at 738.

Finally, the parties have stipulated that, in June 2002, they entered into one final HAP renewal contract (the "2002 90-Day HAP Renewal Contract"). The 2002 90-Day HAP Renewal Contract extended the 1998 HAP Contract's terms from July 2002 through September 2002: "[t]he term of the Renewal Contract begins on 07/01/2002 and shall run for a period of .3 years." Joint Fact Stip. ¶ 31; JX 026, p. 746 At 751.

Englewood cannot escape the plain terms of the HAP renewal contracts it signed. By these plain terms, Englewood agreed that the provisions of the parties' 1998 HAP Contract – and Englewood's entitlement to HAP subsidies – did not extend beyond September 2002. Englewood may not ask the Court to rewrite these HAP renewal contracts or to pretend that they state anything other than what their plain terms require. Pacificorp Capital, Inc., 25 Cl. Ct. at 715 (citing Fortec Constructors, 760 F.2d at 1291; Hol-Gar Mfg. Corp., 169 Ct.Cl. at 386, 351 F.2d at 973.

For these reasons, the Government is entitled to a ruling that Englewood was not entitled to HAP subsidy payments beyond September 2002, and Englewood received all that it was owed.

## B. Englewood Cannot Rescue Its Claims By Pointing To The HAP Renewal Contracts' Negotiation History

As noted, "when the terms of a contract are clear and unambiguous, there is no need to resort to extraneous circumstances, such as prior negotiations or custom of the trade for its interpretation." Pacificorp Capital, Inc., 25 Cl. Ct. at 716 (quoting Peterson-Sharpe Eng'g Corp. v. United States, 6 Cl. Ct. 288, 295 (1984)). It is also well established that interpretation of an unambiguous contract may not be affected by the contentions of either party that it meant something else. Pacificorp Capital, Inc., 25 Cl. Ct. at 716.

Despite these clear principles, we anticipate that Englewood will argue in its post-trial brief that the negotiation history of the parties' HAP renewal contracts resuscitate its position that it is entitled to HAP subsidies through September 2004. To the extent the Court concludes that the HAP renewal contracts could be ambiguous, the stipulated facts in this case demonstrate that Englewood's entitlement to HAP subsidies could not have extended beyond September 2002.

We further anticipate that Englewood will argue that the 2001 and 2002 HAP renewal contracts represented nothing more than HUD's unilateral extension of subsidies to protect tenants. According to this view, Englewood may argue that HUD simply exercised its option to extend the HAP contract for the benefit of the residents.

Although there is no question that HUD's motivation for agreeing to each HAP renewal contract was so that Englewood's tenants would be protected, this in no way implies that Englewood is not bound by the plain terms of the the HAP renewal contracts the parties executed in 2001 and 2002. The "Addendum" Englewood references obligated it "to cooperate in the relocation of the residents by providing to HUD such information on income and occupancy as

may be necessary to relocate the tenants." Joint Stip. Fact ¶ 25; JX 021, p. 696 at 699. It did not, however, state or imply that Englewood is not bound by the plain terms of the HAP renewal contracts Englewood executed.

Moreover, Englewood has stipulated that the purpose of each HAP renewal contract was "to renew the expiring [HAP] contract for an additional term." Joint Fact Stip. ¶ 27; see, e.g. JX 024, p. 719 at 724. Englewood cannot now assert that either party executed the HAP renewal contracts for any other purpose.

We also anticipate that Englewood may argue that the HAP renewal contracts executed in 2001 and 2002 are not enforceable for lack of consideration. According to this view, Englewood was entitled to four years of HAP subsidy payments after the parties executed the 2000 HAP Renewal Contract, notwithstanding its default. We anticipate that Englewood will claim that, when it executed the 2001 and 2002 HAP renewal contracts, it received nothing in return for surrendering its right to HAP contract payments through September 2004, without regard for its default.

The parties' joint stipulations also foreclose Englewood's argument here. The parties have stipulated that HUD informed Englewood in November 2001 that HUD would terminate the parties' 1998 HAP Contract. Joint Stip. Fact ¶¶ 117, 118; JX 117, p. 1176. However, Englewood also has stipulated that the parties signed HAP renewal contracts extending the 1998 HAP Contract's terms beyond December 2001 so that HUD could protect South Pointe's residents by continuing to fund HAP subsidies while issuing vouchers to eligible tenants. Joint Stip. Fact ¶ 117-118; JX 117, p. 1177. In contrast, HUD was under no legal obligation to not then abate one hundred percent of the subsidy. Record 690: 2-12.

Through these HAP renewal contracts, Englewood received the consideration of continued HAP subsidies. Englewood continued to receive this consideration until the parties' final HAP renewal contract ended in September 2002. Joint Stip. Fact ¶¶ 30, 31; JX 26, p. 746. After this, the parties executed no additional HAP renewal contracts, and the terms of the 1998 HAP Contract had been terminated.

Moreover, the rule that contract amendments are unenforceable without "fresh" or "new" consideration has no application to cases in which parties amend the terms of a contract to correct an error or alter the language of an agreement whose terms are in dispute. Aviation Contr. Employee, Inc. v. United States, 945 F.2d 1568, 1574 (Fed. Cir. 1991); Williston on Contracts § 7:36, 4th ed., 585.

That is the situation in this case, where the parties have stipulated that the terms of the 2000 HAP Renewal Contract were in question, and that the parties resolved this question by executing HAP renewal contracts in 2001 and 2002. The parties have stipulated that, in December 2000, Veronica Coleman, HUD's Director of Project Management, informed the President of Englewood's owner that the 2000 HAP Renewal Contract's reference to a one-year term with automatic one-year renewals "was an error." Joint Stip. Fact ¶ 67; JX 71, p. 1014. Instead, the 2000 HAP Renewal Contract was to expire at the end of December 2000, without any automatic renewal provisions. Joint Stip. Fact ¶ 67; JX 71, p. 1014. Ms. Coleman's letter stated that the parties had discussed this during a meeting on October 18, 2000 – the day the 2000 HAP Renewal Contract was executed. Joint Stip. Fact ¶ 67; JX 71, p. 1014.

Englewood argued at trial that its representatives did not assert any objection to HUD's position. However, to the contrary, on January 23, 2001, Ken Horton wrote to Ms. Coleman and

stated that Ms. Thomas informed him that the 2000 HAP Contract had been amended "to reflect the original expiration date of September 30, 2001." Joint Stip. Fact ¶ 70; JX 72, p. 1015 at 1016. Mr. Horton did not protest or challenge HUD's actions. He merely requested that a copy of the "amended, amended HAP contract" be sent "to my attention at the following address." Joint Stip. Fact ¶ 70; JX 72, p. 1015 at 1016. Moreover, as Carl Sanders testified, Mr. Horton was the type of manager who would object if he thought something was wrong. Record 518: 3-7. However, the record is void of any testimony that anyone at Englewood ever objected throughout the course of its dealing with HUD about any term of the HAP renewal contracts. Indeed, Mr. Sanders, Englewood's on-site manager during the time these contracts were being negotiated and agreed upon, testified that he was not aware of anyone from Englewood contacting HUD about any aspect of the provisions in the HAP renewal contracts. Record 517: 12-15.

In addition to Mr. Horton's silence upon receipt of an alleged new contract, Mr. Hayes received and responded to these emails explaining the error in the HAP contract. JX 73; p. 1018. But, like Mr. Horton, Mr. Hayes, remained silent to the notice regarding the change in the contract's term. Consistently, there is no evidence of any Englewood representative informing HUD that Englewood believed it was entitled to three automatic one-year renewals of the 1998 HAP Contract. Joint Stip. of Fact ¶¶ 67-70. At trial, Mr. Hayes never stated that he, or anyone associated with Englewood, objected at any time to the terms of these contracts. Indeed, all Mr.

Hayes could utter at trial was that he was aware that the HAP contract had been amended.[13] Record 1011: 6 - 1014: 17.

Englewood clearly has concocted a post hoc rationalization with which to argue that it was entitled to four years of HAP subsidies based upon the original, uncorrected terms of the 2000 HAP Renewal Contract. However, the parties' subsequent HAP renewal contracts preclude this "gotcha" argument.

At most, Englewood can assert that between December 2000 and January 2001 there existed a dispute regarding whether Englewood was entitled to HAP subsidies through September 2004, and that this dispute was resolved when the parties executed additional HAP renewal contracts in 2001 and 2002. These HAP renewal contracts unambiguously demonstrate Englewood's agreement that the parties' relationship, and thus Englewood's entitlement to HAP subsidies, did not extend beyond September 2002. Joint Fact Stip. ¶ 31; JX 26, p. 746. Englewood may not now rely upon any claims that its representatives had a secret, undisclosed interpretation contrary to the HAP renewal contracts' plain terms. Pacificorp Capital, Inc., 25 Cl. Ct. at 716.

---

[13] Furthermore, it is well-established that contemporaneous documents have far greater probative value than post-hoc, self-serving testimony. This includes situations where the testimony is directly contradicted by the contemporaneous documents, e.g., Applied Companies v. United States, 144 F.3d 1470, 1474-75 (Fed. Cir. 1998) (affirming summary judgment); Montgomery Coca-Cola Bottling Co. v. United States, 222 Ct. Cl. 356, 369-75, 615 F.2d 1318 (1980) (citing United States v. Gypsum Co., 333 U.S. 364, 396 (1947)); Sterling Millwrights, Inc. v. United States, 26 Cl. Ct. 49, 90 (1992), and situations where an allegedly significant event is not reflected in the contemporaneous documents. E.g., Argus Inc. v. Eastman Kodak Co., 801 F.2d 38, 42-43 (2nd Cir. 1986); Fru-Con Construction Corp. v. United States, 43 Fed. Cl. 306, 335-37 (citing cases), aff'd on recon. in relevant part, 44 Fed. Cl. 298, 307, 314-15 (1999); Patushin Aviation Co., Div. Of Swiss Electro Instruments, Inc., ASBCA Nos. 21243 & 22960, 82-1 BCA ¶ 15,639 at 77,256 (1982).

Finally, we anticipate that Englewood will argue that the parties' 2001 and 2002 HAP renewal contracts could not alter the duration of the parties' 1998 HAP Contract because the 1998 HAP Contract was an integrated agreement. Specifically, paragraph 21 of the 1998 HAP Contract provides: "This Contract, including the exhibit(s), is the entire agreement between HUD and the Owner. No changes in this Contract may be made except in writing signed by both the Owner and HUD." Joint Stip. Fact ¶ 21; JX 19, p. 677 at 688. This argument fails for several reasons.

First, it is well-established that parties may amend or alter even an integrated contract with subsequent written agreements. See Williston on Contracts § 73:17 (4th ed. 2003). In this case, the parties have stipulated that the written HAP renewal contracts executed in 2001 and 2002 referred to and incorporated the terms of the parties' 1998 HAP Contract except where specifically amended: "Except as specifically modified by the Renewal Contract, all provisions of the Expiring Contract are renewed (to the extent such provisions are consistent with statutory requirements in effect at the beginning of the Renewal Contract term)." Joint Stip. Fact ¶ 31; JX 026, p. 746 at 753.

Englewood has stipulated that, as early as December 2000, the parties discussed that, at most, there was a question regarding when Englewood's entitlement to HAP subsidies would end by agreement. Joint Stip. Fact ¶¶ 67, 70; JX 71, p. 1014; JX 072, p. 1015 at 1016. Englewood also has stipulated that it knowingly executed short-term HAP renewal contracts until the parties' relationship ended in September 2002. Joint Stip. of Fact ¶ 31; JX 026, p. 746.

In sum, clearly Englewood now regrets its decision to execute the short-term HAP renewal contracts. However, it cannot ask this Court to rewrite the parties' agreements. Under

these circumstances, the Government is entitled to a ruling that Englewood had no enforceable right to HAP subsidy payments beyond September 2002. Accordingly, Englewood did not prove that the Government breached any provision of the HAP contract.

## IV. Englewood's Claims For Rental Increases Or Energy Reimbursements Also Fail

In its complaint, Englewood also seeks money that it claims HUD was obligated to pay it. These funds include: (1) the proceeds from a post-default August 2001 request for an increase in the rent Englewood could charge its tenants and (2) discretionary reimbursement for alleged high energy costs.[14]

The Court possesses no jurisdiction to entertain these claims. Although Englewood labels these claims as arising under a breach of contract theory, these claims are not based upon any agreement between Englewood and HUD that could confer jurisdiction upon the Court. Compl. ¶ 23. Neither are these claims based upon any money mandating provision of law conferring jurisdiction.

Furthermore, even if the Court possessed jurisdiction to entertain these discretionary payments, the evidence at trial demonstrated that Englewood was not entitled to receive these payments for several reasons. First, as we have already demonstrated, Englewood was failing to meet its duty under the HAP contract to properly maintain South Pointe, and thus Englewood was ineligible to receive these payments because it was not in good standing. Second, Englewood's requests for these payments were untimely and incomplete.

---

[14] At the close of its case at trial, Englewood dismissed its other claims, to include: (1) reimbursement for uncollected rent and alleged tenant-caused damage to apartments. Compl. ¶¶ 93, 94, and, (2) its unplead claim for alleged lost business opportunities resulting from program participant "flags" that HUD used to record instances in which Englewood violated HUD requirements. Record: 1169: 7-8, 1170: 16-18, 1171: 21-24, 1172: 8-13, 1173: 11-20.

### A. The Court Lacks Jurisdiction To Consider Englewood's Claims Regarding A Rent Increase Request

It is well-established that HUD has the authority to regulate the rents charged by owners receiving HUD-funded HAP contract subsidies. 42 U.S.C.A. § 1437f. Thus, unless HUD agrees to a rent increase, an owner cannot exceed the rent levels agreed upon in the parties' HAP contract. In this case, Englewood alleges that it submitted a post-default rent increase request to HUD in August 2001 and that HUD "fail[ed] to implement the rental increase it acknowledged was proper in August 2001."[15] Compl. ¶ 94.

In order to invoke the jurisdiction of this Court, Englewood would have to assert either that (1) HUD violated some statute or regulation that was compensation mandating, that is, mandated the payment of money for its violation, or, (2) HUD violated some contract provision requiring it to approve Englewood's rent increase request in August 2001. See Kennedy Heights Apartments, Ltd. I v. United States, 48 Fed. Cl. 574, 577-79 (2001). Englewood can satisfy neither requirement.

---

[15] Englewood bases its assertion here upon a misreading of an e-mail from Ed Hinsberger, in which he stated that he would permit rents to "kick in" at the time of closing. JX 107, p. 1144. However, as demonstrated by the facts set forth in paragraphs 89 through 91 of the Statement of Facts supra, even assuming jurisdiction, Englewood's position upon this issue is without merit for a number of reasons: (1) the rent increase request was incomplete because data identifying the years and items for the budget comparisons was not in the request form, JX 104, p. 1120 at 1123-1124; Record 632: 1-15; (2) the relationship between Mr. Samuelson and Englewood was unclear at this time and HUD never received a document that Mr. Hayes signed, JX 104, p. 1120 at 1121; Record 630: 10-11; (3) HUD told Englewood that **if** a rent increase was properly submitted, HUD would allow the rent increases "to kick in at the time of closing" of Mr. Samuelson's purchase of South Pointe, which occurred after the HAP contract ended, JX 107, p. 1144; and, finally, (4) the rent comparability study which "support[ed] the proposed rents," was with respect to the HUD-insured loan application. JX 107, p. 1144; Record 632: 25, 633: 1-3.

First, Englewood cannot demonstrate that HUD violated any money mandating provision of law conferring jurisdiction upon this Court by denying it a rent increase. After all, HUD's decisions regarding whether to grant a rent increase request are not subject to judicial review and, thus, cannot confer jurisdiction upon the Court. See Reynolds Assocs. v. United States, 31 Fed. Cl. 335, 340 (1994) (holding that HUD handbook provisions regarding processing rent increase requests did not confer jurisdiction upon the Court); Reiner v. West Village Assocs., 768 F.2d 31, 33 (2d Cir. 1985) ("The courts that have addressed the issue agree that the Secretary's decision to approve a rent increase is unreviewable . . ."); Frakes v. Pierce, 700 F.2d 501, 505 (9th Cir. 1983) ("Similarly, we think HUD's rental determinations in the instant appeal are the kind of decisions which are within agency discretion."); Falzarano v. United States, 607 F.2d 506, 513 (1st Cir. 1979) ("The Secretary's decision regarding the rents and charges at the two projects is not properly a subject for mandamus jurisdiction in the posture presented to us."); Grace Towers Tenants Assoc. v. Grace House Dev. Fund Co., 538 F.2d 491, 495 (2d. Cir 1976) (holding plaintiffs did not have due process right to challenge HUD decision regarding rental increase); Harlib v. Lynn, 511 F.2d 51, 55 (7th Cir. 1975) (rejecting claim that tenants had due process right to a hearing regarding rent increase decision); Hahn v. Gottlieb, 430 F.2d 1243, 1250-51 (1st Cir. 1970) (holding that plainitffs had no right to judicial review of decisions regarding rent increases). This rule is sensible. After all, "courts are ill-equipped to superintend economic managerial decisions of the kind involved" when HUD must decide whether to grant a rent increase request. Hahn, 430 F.2d at 1249.

Second, even if, as Englewood alleges, a HUD official suggested that a rent increase might be "proper" under certain circumstances, Englewood cannot identify any contract

provision that HUD violated by failing to approve Englewood's request for a rent increase. As noted, it is "well-settled that HUD's decision to grant or deny rent increase requests are committed to agency discretion as a matter of law, and are thus not subject to judicial review . . . In such circumstances a failure to approve rent increases cannot give rise to a breach of contract." Medgar Evers Houses Assocs., L.P. v. United States, Fed. Cl. No. 96-809 (Nov. 10, 2005), slip op. 19 (unpublished).

Further, Englewood's claim that HUD failed to approve an August 2001 rent increase request also is precluded by the contracts the parties executed. As noted, in September 2001, the parties executed the 2001 90-Day HAP Renewal Contract. In this contract, the parties agreed upon the rents Englewood would charge its residents. JX 24, p. 719 at 730. By signing this contract, Englewood accepted that it would not charge its tenants any amount higher than that agreed upon. Id. If Englewood believed it was entitled to higher rents based upon a request filed in August 2001, it could have declined to sign a renewal contract in September 2001 mandating agreed-upon rents. The same holds true for each subsequent HAP contract renewal.

In addition, and perhaps more importantly, HUD's denial of the August 2001 rent increase request could not have violated any contract terms in effect at the time Englewood submitted its request. This is because Englewood based its August 2001 rent increase request upon a provision of the parties' 1998 HAP Contract that was no longer in effect.

Specifically, Englewood based its request upon section 8 of the 1998 HAP Contract. However, the parties' 2000 HAP Renewal Contract eliminated section 8 of the 1998 HAP Contract: "All terms of the Expiring Contract are renewed except for those provisions relating to contract rents and rent adjustments." Joint Stip. Fact ¶ 24; JX 21, p. 696. The 2000 HAP

Renewal Contract established new procedures for requesting rent increases. Thus, when Englewood submitted its August 2001 rent increase request, it was requesting a rent adjustment by invoking a paragraph from its 1998-99 HAP contract that no longer applied.

HUD's decisions regarding rent increase requests are not subject to judicial review. Further, Englewood's claims regarding an alleged failure to approve a rent increase request are not based upon any contract terms in effect between the parties or any money mandating provision of law. For these reasons, Englewood's claims should be dismissed.

**B. The Court Lacks Jurisdiction To Consider Englewood's Claims For Energy Reimbursements**

Englewood also alleges that HUD failed to provide it "an energy cost reimbursement for extraordinary energy costs for the 4th quarter of 2000 and the 1st quarter of 2001." Compl. ¶ 94. However, no provision of the parties' 1998 HAP Contract or any subsequent HAP renewal contract between the parties obligates HUD to provide Englewood with reimbursement for energy costs. Neither does any money mandating statute entitle Englewood to such payments. For these reasons, the Court lacks jurisdiction to consider this claim.

In order to state a claim within the jurisdiction of this Court, a claimant must look beyond the Court's jurisdictional statute and establish some substantive provision of law, regulation, or the Constitution, which fairly can be construed as mandating compensation. United States v. Mitchell, 445 U.S. 535, 538 (1980). It is well settled that HUD handbooks and guidelines, which are not codified in the Code of Federal Regulations, do not qualify as money mandating provisions of law: "Although plaintiff does not so contend, the HUD Handbook, on its own fails to rise to the level of an executive regulation sufficient to establish independent jurisdiction under the Tucker Act." Reynolds Assocs., 31 Fed. Cl. at 340. See also Texas v. United States,

210 Ct. Cl. 522, 537 F.2d 466, 470-71 (1976) (finding that Office of Emergency Planning circulars were not money mandating where they were "neither promulgated by the agency as regulations, identified in the parties' Agreement nor even attached to the Agreement.").

HUD issued guidelines pursuant to which property owners could request reimbursement for high energy costs. JX 208, 1961; Record 705: 2-11.; JX 208, p. 1961. These guidelines are not incorporated into, or even mentioned in, any of the parties' agreements. Neither were these guidelines substantive provisions of law mandating compensation to Englewood. In fact, the decision whether to reimburse an owner for energy costs remained solely at HUD's discretion. And even if these guidelines could be construed to require HUD to compensate Englewood for energy costs under certain circumstances, Englewood has not alleged that HUD violated any portion of these guidelines.

HUD's guidelines for approving energy cost reimbursements are not embodied in any contract between the parties, and are not money mandating provisions of law. As a result, Englewood's claims for reimbursement for energy costs should be dismissed. Reynolds Assocs., 31 Fed. Cl. at 340; Texas, 210 Ct. Cl. 522, 537 F.2d at 470-71.

**C. Even Assuming Jurisdiction, Englewood Was Ineligible To Receive Rent Increases Or Reimbursements For Energy Claims In 2001**

Even if Englewood could point to a contractual or money mandating provision for these claims, HUD did not breach the HAP contract by failing to implement a rent increase after August 2001. As demonstrated at trial, Englewood alleges it submitted a request for a renewal of the HAP Contract in August 2001. JX 104, p. 1120. At this time, Mr. Samuelson wrote to Mr. Hinsberger and requested a rental increase on behalf of Englewood. Id. Mr. Hinsberger informed Mr. Samuelson that, although he had provided some information supporting a rent

increase, HUD could not grant Englewood a rent increase based upon information he submitted because the form was incomplete and Mr. Samuelson was neither South Pointe's owner nor the property manager. JX 107, p. 1144; Record 632: 1-15, 703:24-25, 704:1. Mr. Hinsberger further informed Mr. Samuelson that HUD would only implement a rent increase if it was properly submitted after Mr. Samuelson completed his purchase. JX 107, p. 1144. This condition precedent was never met, as Mr. Samuelson did not become the owner of Englewood until December 2002, almost two months after Englewood's HAP contract was terminated.

Thus, it cannot reasonably be disputed that HUD was under no obligation to grant Englewood's request for a rent increase because Englewood was in default on the HAP Contract and had not submitted the required documentation. See Pleasant East Assocs. v. Martinez, 2004 WL 840290, No. 02 Civ. 4144(LLMM) (S.D.N.Y. April 19, 2004) (upholding HUD's decision to deny rent increases when property was not maintained in decent, safe, and sanitary condition and rental increase applications were incomplete).

Regardless, Englewood agreed to a HAP renewal contract subsequent to Mr. Samuelson's letter that contained no rent increase and that contained agreed upon rental rates. JX 25; Compl. ¶ 52. Thus, Englewood waived any right to object to HUD's refusal to provide a rent increase in August 2001. Whittaker Elect. Systs. v. Dalton, 124 F.3d 1443, 1446 (Fed. Cir. 1997); E. Walters & Co. v. United States, 217 Ct. Cl. 254, 576 F.2d 367, 367-68 (1978).

For these reasons, the Government did not breach the HAP contract by not implementing a rent increase in 2001.

Englewood also alleges that HUD breached the HAP Contract by failing to process a request for energy costs reimbursements. Englewood is wrong.

In 2001, HUD initiated a program through which properties could request reimbursement for unusually high energy costs. JX 208, p. 1961. However, that program specifically precluded Englewood from participating because Englewood was in default under the HAP contract. The program guidance stated that “[i]n order for owners to take advantage of the opportunity for a utility lump sum adjustment,” properties had to be acceptably managed and “in good standing with all Business Agreements signed with the Department.” JX 208, p. 1965; Record 705: 19-25. Englewood alleges it filed a request seeking $55,230.29 in energy costs in August 2001; however, no one testified at trial that one was ever sent or that one was received. Even if it was actually sent by this date, HUD had already determined that Englewood was not in good standing and thus, Englewood was not eligible for this discretionary payment. Furthermore, Englewood’s alleged August 2001 request did not contain the required documentation. Indeed, there was never any record evidence produced by Englewood that demonstrated its requests for Energy Reimbursement also included the requisite copies of paid utility bills. This is an additional reason that would mandate rejection of Englewood’s request, regardless of Englewood’s status and whether the request was submitted in a timely manner.

Finally, Mr. Samuelson testified during his deposition that the request Englewood allegedly filed in August 2001 was inaccurate. JX 014, p. 570 at 595. Indeed, the subsequent application Mr. Samuelson submitted, he recalculated Englewood’s request claim amount and asked for more than $139,000 in energy reimbursements in May 2002. JX 128, p. 1251; JX 131, p. 1256. Putting aside that this application was late, HUD properly declined Mr. Samuelson’s request because of Englewood’s previous default.

For these reasons, Englewood’s claim for energy reimbursement fails.

**CONCLUSION**

For these reasons, the United States respectfully requests the Court to dismiss Englewood's complaint.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/ Brian M. Simkin
BRIAN M. SIMKIN
Assistant Director

s/ Douglas K. Mickle
DOUGLAS K. MICKLE
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit, 8th Floor
Washington, D.C. 20530
1100 L Street, N.W.
Tel: (202) 307-0383
Fax: (202) 307-0972

Attorneys for Defendant

OF COUNSEL:

GREGORY G. GUSTIN
MARIA T. BAGUIO
RUSSELL J. COHEN
LORRAINE C. SHOTO

Office of General Counsel
U.S. Department of Housing
and Urban Development

April 13, 2007

**CERTIFICATE OF FILING**

I hereby certify that on April 13, 2007, a copy of the foregoing "DEFENDANT'S POST-TRIAL BRIEF" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Douglas K. Mickle
Douglas K. Mickle