**No. 03-2209C**
**Judge Marian Blank Horn**

---

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**ENGLEWOOD TERRACE LIMITED PARTNERSHIP, a Michigan Limited Partnership,**

**Plaintiff,**

**v.**

**UNITED STATES OF AMERICA and MEL MARTINEZ, Secretary of the Department of Housing and Urban Development,**

**Defendants.**

---

# PLAINTIFF ENGLEWOOD'S POST-TRIAL BRIEF

---

**Peter V. Baugher**
**William B. Berndt**
**Schopf & Weiss LLP**
**One South Wacker Drive, 28th Floor**
**Chicago, IL 60606**
**312.701.9300**

**April 13, 2007**

# TABLE OF CONTENTS


TABLE OF CONTENTS ........ i

TABLE OF AUTHORITIES ........ vii

INTRODUCTION ........ 1

A. Burdens Of Proof And Evidence Required To Sustain Those Burdens ........ 2

B. HUD Failed to Present Evidence To Meet Its Burden ........ 3

C. Englewood Has Met Its Burden To Prove Breach Of Contract, And HUD Failed To Carry Its Burden To Prove That Its Breach Was Justified ........ 4

STATEMENT OF FACT ........ 5

I. ENGLEWOOD AND THE DEPARTMENTAL ENFORCEMENT CENTER IN 1998-2000 ........ 5

A. THE REFERRAL TO THE DEPARTMENTAL ENFORCEMENT CENTER ........ 5

B. ENGLEWOOD MADE SUBSTANTIAL PROGRESS WORKING WITH THE DEC ........ 5

1. Analysis of the “Root Causes” of the Problems at Englewood ........ 6

2. Englewood Acted to Combat Problems at South Pointe ........ 7

a. Englewood tightened security ........ 7

b. Englewood undertook building repairs ........ 8

c. Englewood invested more than $700,000 into South Pointe while the property was in the DEC ........ 8

d. Englewood developed a Management Improvement and Operating Plan that HUD accepted ........ 8

C. THE VISIT FROM HUD HEADQUARTERS CONFIRMS PROGRESS AT SOUTH POINTE ........ 9

D. THE FINAL TEAM REPORT COMMENDED ENGLEWOOD AND REQUIRED HUD MULTI-FAMILY TO CONTINUE FINALIZATION OF THE MIO PLAN ........ 9

II. HUD FAILED TO RESPOND IN ANY WAY TO ENGLEWOOD'S EFFORTS TO FINALIZE THE MIO PLAN IN 2000 ....................11

A. ENGLEWOOD'S PROGRESS WAS STOPPED WHEN SOUTH POINTE WAS RETURNED FROM THE DEC TO MULTI-FAMILY IN FEBRUARY 2000 ....................11

B. ENGLEWOOD SUBMITS UPDATED MIO PLANS, BUT RECEIVES NO RESPONSE....................11

C. HUD APPROVES ENGLEWOOD'S RESPONSE TO THE 2000 OCCUPANCY REVIEW ....................12

D. HUD MULTI-FAMILY NOT ONLY IGNORED ENGLEWOOD'S EFFORTS, IT ACTIVELY WORKED TO HINDER THEM ....................13

1. HUD Multi-Family Consistently Hindered Englewood's Efforts to Obtain Needed Funding....................13
2. HUD Multi-Family made False Statements about the Status of Englewood in Opposing Englewood's Application for a HUD-Insured Loan ....................15

III. ENGLEWOOD'S APPLICATION FOR THE 2000 HOUSING ASSISTANCE PAYMENTS CONTRACT ....................16

IV. THE PARTIES' EXECUTION OF THE 2000 HOUSING ASSISTANCE PAYMENTS CONTRACT ....................17

A. THE OCTOBER 2000 HOUSING ASSISTANCE PAYMENTS CONTRACT WAS FULLY EXECUTED ....................17

B. THE OCTOBER 2000 HOUSING ASSISTANCE PAYMENTS CONTRACT INCORPORATED PROVISIONS OF THE 1998 HOUSING ASSISTANCE PAYMENTS CONTRACT ....................18

V. HUD ATTEMPTED TO CANCEL THE 2000 HOUSING ASSISTANCE PAYMENTS CONTRACT ....................18

A. HUD ASSERTS "ERROR" ....................18

B. HUD ASSERTS THAT THE CONTRACT WAS AMENDED ....................22

C. THE HOUSING ASSISTANCE PAYMENTS CONTRACT ITSELF REQUIRES ALL AMENDMENTS TO BE MADE IN A WRITING

EXECUTED BY BOTH PARTIES ....23

VI. THE JANUARY 2001 REMS ENTRY SHOWS THAT HUD HAD ALREADY DECIDED TO TERMINATE ENGLEWOOD'S CONTRACT ....23

VII. THE MARCH 2001 REAC INSPECTION AND REPORT ....25

VIII. ENGLEWOOD AND HUD RESPONSES TO THE REAC REPORT ....26

A. THE REQUIREMENTS OF THE REAC REPORT ....26

B. ENGLEWOOD'S RESPONSE ON EH&S ITEMS ....27

C. ENGLEWOOD'S RESPONSE TO THE REAC REPORT ....28

1. The April 5, 2001 MIO Plan ....28
2. Englewood Conducted Two "100% Inspections" of South Pointe...28
3. The BABCO Scope of Work ....29

D. MS. BATCHELOR DETERMINES THAT THE REAC REPORT DOES NOT JUSTIFY TERMINATION OF ENGLEWOOD'S HOUSING ASSISTANCE PAYMENTS CONTRACT ....30

E. HUD RETURNS ENGLEWOOD'S RESPONSE TO THE REAC REPORT ....31

IX. THE APRIL 9, 2001 NOTICE OF DEFAULT ....32

X. HUD'S REPUDIATION OF THE CONTRACT AT THE APRIL 13, 2001 MEETING....33

XI. HUD ORDERS VOUCHERS FOR THE RESIDENTS OF SOUTH POINTE AS A STEP TOWARD THE TERMINATION OF ITS HOUSING ASSISTANCE PAYMENTS CONTRACT WITH ENGLEWOOD ....35

XII. THE SHORT TERM SUBSIDY EXTENSIONS....36

XIII. FINAL REPUDIATION AND TERMINATION OF 2000 HOUSING ASSISTANCE PAYMENTS CONTRACT, THE INJUNCTION SUIT AND EXHAUSTION OF ADMINISTRATIVE REMEDIES ....36

A. THE FINAL BREACH AND REPUDIATION ....36

B. ENGLEWOOD SUES TO RENEW THE HOUSING ASSISTANCE PAYMENTS CONTRACT AND TO STOP VOUCHERS. ....37

C. THE NOTICE OF ABATEMENT AND TERMINATION ........................38

D. THE ADMINISTRATIVE APPEAL PROCESS .......................................38

SUMMARY OF THE ARGUMENT ....................................................................40

ARGUMENT ..................................................................................................42

I. ENGLEWOOD HAS PROVED THAT HUD BREACHED THE OCTOBER 2000 HOUSING ASSISTANCE PAYMENTS CONTRACT.............42

A. Englewood Has Established A Breach Of Contract By HUD ......................43

1. The 2000 Housing Assistance Payments Contract Provided For An Initial One-Year Term, With Three Automatic One-Year Renewals .........................................................43

2. HUD Repudiated And Breached The 2000 Housing Assistance Payments Contract..........................................44

a. HUD Repudiated The Contract...........................................44

b. HUD Shortly Thereafter Terminated The Contract .............46

B. Englewood Was Damaged By HUD's Breach Of Contract ........................47

II. HUD'S DEFENSES TO ENGLEWOOD'S BREACH OF CONTRACT CLAIM FAIL ..................................................................47

A. The October 18, 2000 Housing Assistance Payments Contract Was Not "Made In Error" ...............................................................47

1. The Express Language Of The Parties' Agreement Proves That The Parties Intended A Four-Year Contract .................49

2. The Context Of The Parties' October 2000 Contract Demonstrates That The Parties Intended A Four-Year Agreement..........................................................................50

3. HUD's Testimony Regarding The "Error" Is Fabricated .................51

B. HUD Could Not Unilaterally "Amend" The October 2000 Housing Assistance Payments Contract......................................................52

C. There Was No Factual Basis For HUD's Notice Of Default........................54

1. HUD's Notice Of Default Did Not Comply With HUD's Duty To Provide Englewood With A Specific Description Of Events Of Default And Actions Necessary To Cure The Default ....................56

2. Englewood Properly Responded To The REAC Report....................57

a. Englewood Corrected All Exigent Health & Safety Items Noted During The March 2001 REAC Inspection....................58

b. Englewood Corrected Deficiencies Noted In The REAC Report....................59

c. Englewood Conducted A 100% Inspection To Determine The Physical Needs Of South Pointe With Respect To Units, Common Areas, And Systems ....................59

3. HUD Did Not Review Or Process Englewood's Response To The REAC....................60

D. HUD Has No Basis To Justify Its "Default" Other Than The Findings Of The REAC Report ....................61

E. HUD's Declaration That South Pointe Was Not in "Decent, Safe, And Sanitary" Condition In 2001 Is Unwarranted And Does Not Justify HUD's Breach....................61

1. HUD Ignored Its Obligation Under The Contract To Inform Englewood Of Any Specific Violation Of The "Decent, Safe, And Sanitary" Standard ....................62

2. HUD's Conclusion That Englewood Was Not In "Decent, Safe, And Sanitary" Condition Was Based On Arbitrary, Unreliable And Incorrect Information And Not On The REAC Report....................63

a. HUD's Senior Managers Never Visited South Pointe..........63

b. Mr. Hinsberger's Only Source Of Information Was Ms. Thomas ....................64

c. HUD Ignored The Observations And Analysis Of Freddie Batchelor....................65

d. The "Unofficial Inspections" By Less Experienced HUD Employees Based On Visits Of 60 To 90 Minutes

In February And March 2001 Do Not Provide Support For HUD's Claim That South Pointe Was Not "Decent, Safe, And Sanitary" In March 2001 ....................................66

3. The Findings Of The REAC Report Do Not Support A Conclusion That South Pointe Was Not Decent, Safe, And Sanitary ........................................................................66

4. HUD Has Failed To Describe The Standard Of "Decent, Safe, And Sanitary" With Any Particularity......................67

III. IN ADDITION TO ITS BREACH OF THE EXPRESS TERMS OF THE PARTIES' AGREEMENT, HUD VIOLATED ITS DUTY OF GOOD FAITH AND FAIR DEALING...........................................................68

A. The Law Of Good Faith And Fair Dealing ..................................................69

B. HUD Violated Its Duty Of Good Faith And Fair Dealing In Four Important Situations ........................................................................71

C. HUD Multi-Family's Actions Establish A Pattern Of Violations Of HUD's Duty Of Good Faith And Fair Dealings .....................................72

IV. THE SEPTEMBER 2001 90-DAY SUBSIDY EXTENSION DOES NOT ELIMINATE HUD'S OBLIGATION TO RENEW THE HOUSING ASSISTANCE PAYMENTS CONTRACT ........................................73

A. The Parties Entered The Subsidy Extension To Provide South Pointe's Residents With Housing During The Voucher Process..........................................................................................74

B. Englewood Did Not Release Its Claims To Seek Damages For Breach Of The October 2000 Housing Assistance Payment Contract..........................................................................................75

C. HUD's November 2001 Termination Notice Shows That Englewood's Rights Under the 2000 Housing Assistance Payment Contract Survived the 90-Day Subsidy Extension In September 2001 ..........................................................................................76

CONCLUSION..................................................................................................................77

APPENDIX A - STATEMENT REGARDING CLAIMS THAT HAVE BEEN DISMISSED ..........................................................................................................78

# TABLE OF AUTHORITIES

## Cases

*Albano Cleaners, Inc. v. United States*, 455 F.2d 556 (Ct. Cl. 1972)................................48

*Boston Public Housing Tenant's Policy Council, Inc. v. Lynn*,
388 F. Supp. 493 (D. Mass. 1974)..........................................................................67

*Chase & Rice, Inc. v. U.S.*, 354 F.2d 318 (Ct. Cl. 1965)..................................................74

*Cheyenne-Arapaho Tribes of Indians of Oklahoma v. United States*,
671 F.2d 1305 (Ct. Cl. 1982)..........................................................................48

*Contract Master Servs., Inc. v. United States*,
225 Ct. Cl. 735 (Cl. Ct. 1980)..........................................................................49

*Cuyahoga Metropolitan Housing Authority v. United States*,
57 Fed. Cl. 751 (Fed. Cl. 2003)..........................................................................44

*Dewakuku v. Martinez*, 226 F. Supp. 2d 1199 (D. Ariz. 2002)........................................68

*Englewood v. HUD*, Case No. 01 C 8285 (N.D. Ill. 2001)..............................................76

*Essex Electro Engineers, Inc. v. Danzig*, 224 F.3d 1283 (Fed. Cir. 2000)........................69

*First Annapolis Bancorp, Inc. v. United States*,
75 Fed. Cl. 280 (Fed. Cl. 2007)..........................................................................55

*Franconia Assocs. v. United States*, 536 U.S. 129 (2002)..........................................44, 75

*George A. Fuller Co. v. United States*,
69 F. Supp. 409, 108 Ct. Cl. 70 (Ct. Cl. 1947)..................................................69

*Gill v. United States*, 1997 WL 820963 (Fed. Cl. Oct. 9, 1997)..................................4, 54

*Goode v. St. Stephens United Methodist Church*,
494 S.E. 2d 827 (S.C. Ct. App. 1997)..................................................................67

*H&S Manufacturing, Inc. v. United States*, 66 Fed. Cl. 301 (Fed. Cl. 2005)....................70

*Hometown Financial, Inc. v. United States*, 409 F.3d 1360 (Fed. Cir. 2005)...................55

*Information Intern. Associates, Inc. v. United States*,
74 Fed. Cl. 192 (Fed. Cl. 2006)..........................................................................48

*J.D. Hedin Constr. Co. v. United States*,
187 Ct. Cl. 45, 408 F.2d 424 (Ct. Cl. 1969)..........................................................55

*Lisbon Contractors, Inc. v. United States*, 828 F.2d 759 (Fed. Cir. 1987) ....................2, 55

*Lynch v. United States*, 292 U.S. 571 (1934)........................................................................70

*McClure Elec. Constructors, Inc. v. Dalton*, 132 F.3d 709 (Fed. Cir. 1997) ....................48

*Merchants Nat. Bank of Mobile v. United States*, 7 Cl. Ct. 1 (Cl. Ct. 1984).....................76

*Mobil Oil Exploration & Producing S.E., Inc. v. United States*,
530 U.S. 604 (2000)..........................................................................................................70

*P.R. Burke Corp. v. United States*, 277 F.3d 1346 (Fed. Cir. 2002)............................ 68-69

*Palazzetti Import/Export, Inc. v. Morson*,
2001 WL 1568317 (S.D.N.Y. Dec. 6, 2001) .....................................................................45

*Perry v. Housing Authority of Charleston*,
664 F. 2d. 1210 (4th Cir. 1981) .........................................................................................67

*Precision Pine & Timber, Inc. v. United States*, 50 Fed. Cl. 35 (2001) ............................69

*Rodriguez v. United States*, 69 Fed. Cl. 487 (2006) ..........................................................69

*Roehm v. Horst*, 178 U.S. 1 (1900)...............................................................................44, 45

*San Carlos Irr. and Drainage Dist. v. United States*,
877 F.2d 957 (Fed. Cir. 1989)............................................................................................43

*Statesman II Apartments, Inc. v. United States*,
66 Fed. Cl. 608 (Fed. Cl. 2005) ....................................................................43, 44, 49, 50

*Stockton East Water Dist. v. United States*,
75 Fed. Cl. 321 (Fed. Cl. 2007) .......................................................................................4, 49

*System Fuels Inc. v. United States*, 66 Fed. Cl. 722 (Fed. Cl. 2005) ................................45

*Tecom, Inc. v. United States*, 66 Fed. Cl. 736 (Fed. Cl. 2005) ...................................69, 70

*United States v. Southland Management Corp.*,
326 F.3d 669 (5th Cir. 2003) .........................................................................................67, 68

*United States v. Southland Management Corp., Inc.*,
95 F. Supp. 2d 629 (S.D. Miss. 2000)...............................................................................68

*WRB Corp. v. United States*, 183 Ct. Cl. 409 (Ct. Cl. 1968) ............................................70

**Treatises**

Restatement (Second) of Contracts § 205 (1979) ............................................................69

Restatement (Second) of Contracts § 235(2) ......................................................................44

Restatement (Second) of Contracts § 257...........................................................................45

**Other**

American Heritage Dictionary of the English Language 122 (4th ed. 2000) ....................44

## INTRODUCTION[1]

This case is about HUD's repudiation and breach of its October 18, 2000 Housing Assistance Payments Contract with Englewood.[2] That contract was to continue for four years – an initial one (1) year term with (3) three automatic one year renewals – and to generate project-based subsidy payments to Englewood of over $2.5 million a year. The contract also incorporated terms from the 1998 Housing Assistance Payments Contract between Englewood and HUD. Those provisions limited HUD's ability to amend the agreement, and required HUD to follow prescribed procedures in declaring Englewood in default.

Within two months of the execution of the parties' agreement on October 18, 2000, HUD sought to cancel its obligations under the contract. HUD repudiated the contract on December 6, 2000 by unilaterally amending the agreement to shorten its initial term to *three months* and to eliminate entirely its automatic renewals. HUD unilaterally amended the contract again in January of 2001 when HUD purported to reinstate the term to one year. Five months later, on April 9, 2001, HUD wrongly declared Englewood to be in default. HUD repudiated the October 18, 2000 Contract again only four days later – at a meeting on April 13, 2001 where it demanded that Englewood find a new owner and replace its building management. After repudiating its contract obligations, HUD proceeded as if Englewood had no further contract rights. It ordered vouchers for South Pointe residents, who it then encouraged to move to other housing. On October 1, 2001, HUD further breached the parties' agreement by failing to renew Englewood's Housing Assistance Payments Contract for the first of three automatic, additional

---

[1] Englewood submits a list of claims dismissed by agreement of the parties as Appendix A.

[2] The building in question, South Pointe, was owned by Englewood Terrace Limited Partnership. PM Equities, Inc. was its corporate general partner. Property management agent services were provided by PM One, Ltd. (Tr. 864.) For purposes of this Brief, the building's owner is referred to as "Englewood." Englewood is also the name of the Chicago neighborhood in which South Pointe is located.

one-year terms. On November 30, 2001, HUD issued a Notice of Termination, completing its repudiation and breach of its contractual obligations.

**A. Burdens Of Proof And Evidence Required To Sustain Those Burdens.**

"To recover for breach of contract, a party must allege and establish: (1) a valid contract between the parties, (2) an obligation or duty arising out of the contract, (3) a breach of that duty, and (4) damages caused by the breach." *San Carlos Irr. and Drainage Dist. v. United States*, 877 F.2d 957, 959 (Fed. Cir. 1989). Englewood bears the burden to establish these elements. But HUD bears the burden of proof on any defense. In particular, the government bears the burden of showing that a termination for default was justified. *Lisbon Contractors, Inc. v. United States*, 828 F.2d 759, 765 (Fed. Cir. 1987).

Under these standards, Englewood must prove the existence of a valid contract, that the contract imposed obligations on HUD, that HUD breached those obligations, and that Englewood suffered damages as a result of HUD's breach. Englewood must establish those elements by a "preponderance of the evidence." Englewood also claims that HUD breached its duty of good faith and fair dealing under its contract with Englewood. Englewood bears the burden of presenting a *prima facie* case that HUD violated that duty by a preponderance of the evidence.

HUD has the burden of proof with respect to all of its defenses. HUD claims that: (a) the parties' written contract was made in error; (b) the parties' contract was amended; (c) HUD properly terminated the parties' contract for a purported default by Englewood; and (d) HUD's obligations under the parties' contract were superseded by subsequent limited short term subsidiary extensions. With one exception, HUD must prove all of the elements of each of these

defenses by a preponderance of the evidence. In order to prevail on its assertion that the parties' written agreement contained an error, HUD must prove the elements of that defense by clear and convincing evidence. Whether or not the 2000 Housing Assistance Payments Contract was made in error is a critical issue in this litigation. (Am. Jt. Stmt. Of Issues of Fact and Law, Docket No. 136 ¶ 15) ("Jt. Stmt. Issues"[3].)

**B. HUD Failed To Present Evidence To Meet Its Burden.**

At the close of trial, the Court noted that HUD had elected not to call witnesses had relevant knowledge about the facts in dispute, or had elicited very narrow direct examination from its own witnesses and objected to cross-examination regarding other areas on which its witnesses' were acknowledgeable. (Tr. 1473-74.) In particular, HUD refused to allow Mary Anderson, HUD's Director of Operations for the Chicago Multifamily Hub, to testify regarding "the interactions, meetings, and other communications with her staff, including Ben Tessler and John Schneider, regarding Englewood's Housing Assistance Payments (Housing Assistance Payment) Contract." (Am. Jt. Witness List, Docket No. 127, at 13 ("Jt. Witness List".)) HUD similarly narrowly circumscribed the testimony of John Schneider, a senior appraiser at HUD who had authored memos on the value of South Pointe and its need for a subsidy contract, but was asked only to authenticate photographs he took of the building. (Jt. Witness List at 17.) HUD also failed to call Margarita Maisonet, another witness listed by HUD and a signatory of HUD's April 9, 2001 Notice of Default, to explain the basis for HUD's decision to terminate its agreement with Englewood. (Jt. Witness List at 14-15.)

[3] Throughout this Brief, Englewood refers to the Amended Joint Statement of Issues of Fact and Law, Docket No. 136, as "Jt. St. Issues." Englewood refers to the Amended Joint Witness List, Docket No. 127, as "Jt. Witness List." Englewood refers to the parties' Joint Stipulations of Fact, Docket No. 111, as "Jt. Stip. Fact." Englewood refers to the parties' Joint Exhibits as "JX," and the Trial Transcript as "Tr."

This Court has stated that "[t]he non-appearance of a litigant at the trial or his failure to testify as to facts material to his case and as to which he has especially full knowledge creates an inference that he refrained from appearing or testifying because the truth, if made to appear, would not aid his contention." *Gill v. United States*, 1997 WL 820963, at *50 (Fed. Cl. Oct. 9, 1997) (quotations omitted). The Court of Federal Claims has affirmed this principle. *See Stockton East Water Dist. v. United States,* 75 Fed. Cl. 321, 368 (Fed. Cl. 2007) *quoting Contract Master Servs., Inc. v. United States,* 225 Ct. Cl. 735, 737 (Cl. Ct. 1980) ("[I]f a party knows of the existence of an available witness on a material issue and such witness is within the party's control and is not called by that party, the finder of fact *may* draw an inference that the testimony of the witness would have been unfavorable to such party.") (emphasis in original).

**C. Englewood Has Met Its Burden To Prove Breach Of Contract, And HUD Failed To Carry Its Burden To Prove That Its Breach Was Justified.**

At trial, Englewood proved that HUD breached its obligations under the parties' contract. Because HUD abated and terminated Englewood's October 18, 2000 Housing Assistance Payments Contract, Englewood did not receive all of the revenues it was due under the three years of automatic renewals under that agreement, and ultimately lost ownership of South Pointe due to HUD's termination of the contract. Englewood established that it suffered more than $8 million in damages.

HUD failed to meet its burden to justify its breach. HUD's various defenses – error, amendment, prior material breach and/or accord and satisfaction were simply not supported by the evidence presented by HUD. In particular, testimony of HUD's witnesses at trial revealed that the Notice of Default was merely an attempt by HUD to provide an after-the-fact rationalization for the decision that HUD had already made to end Englewood's Housing Assistance Payments Contract. HUD is liable to Englewood for its breach of contract.

## STATEMENT OF FACTS

### I. ENGLEWOOD AND THE DEPARTMENTAL ENFORCEMENT CENTER IN 1998-2000.

#### A. The Referral To The Departmental Enforcement Center.

Edward Hinsberger, Director of HUD's Chicago Multi-Family Housing Division, referred South Pointe from Multi-Family Housing to the Departmental Enforcement Center in September 1998. (JX 29 at 779.) HUD's Departmental Enforcement Center was intended to centralize HUD supervision and management of troubled properties. (Tr. 75.) Freddie Batchelor was the enforcement analyst assigned to South Pointe in the DEC from 1998 through February 2000. (Tr. 81, 129.)

At the time she was assigned to South Pointe, Ms. Batchelor was an experienced HUD professional. Ms. Batchelor had managed social programs, community policing, building management and financial analysis for various departments within HUD. (Tr. 72-78.) She held certifications as a manager of housing, maintenance manager, occupancy specialist and public trust officer. (Tr. 78.) Consequently, Ms. Batchelor was well suited to identifying and addressing the social, environmental and physical needs of South Pointe in 1998-2000.

#### B. Englewood Made Substantial Progress Working With The DEC.

Englewood made substantial progress in the Department Enforcement Center. (Tr. 125.) Ms. Batchelor and Carl Sanders – the two individuals principally involved in the relationship between HUD and Englewood from 1998 through February 2000 – worked together to develop plans to turn the property around. (Tr. 102.) Mr. Sanders was the property supervisor assigned to Englewood from 1998 through the Spring of 2001. (Tr. 387-88, 495.) At trial, Ms. Batchelor and Mr. Sanders explained that Englewood moved forward by identifying the key

issues that were impeding maintenance of the property. (Tr. 85-87, 389-91.) Englewood then worked to correct those problems. (Tr. 125-26.)

**1. Analysis of the "Root Causes" of the Problems at Englewood.**

Both Ms. Batchelor and Mr. Sanders agreed that a few persistent problems afflicted Englewood in 1999 – and set about finding ways to fix those problems. They testified that Englewood suffered from drugs and crime that in turn led to recurring maintenance problems. For example, vandalism (often associated with criminal activity) led to non-functioning elevators, missing fire extinguishers, and graffiti. (Tr. 86-87, 391.)

Ms. Batchelor, Mr. Sanders and John Hayes, owner of the general partner interest in Englewood, all agreed that the structure of Englewood's financing in 1999 and 2000 severely limited Englewood's efforts to solve these problems. (Tr. 87, 389-90, 869-70.) Englewood's 11-year $5 million loan required it to pay nearly $600,000 per year in principal payments out of the limited revenue it received under its Housing Assistance Payments contract with HUD. (Tr. 869-70.) Accordingly, only approximately seventy-five percent of Englewood's gross revenue was available to pay for all regular operations, enhanced security, tenant management and evictions, normal maintenance and needed repairs. (Tr. 870.)

Ms. Batchelor and Mr. Sanders both worked to devise solutions to Englewood's problems. Ms. Batchelor explained that she conducted an extensive analysis of Englewood, including relevant reports and financial information regarding the property. (Tr. 83-84.) Ms. Batchelor visited the site often – several times per week while she was evaluating the property. (Tr. 88.) During those visits, she examined the entire building, inspecting the building structure and individual units, as well as the common and maintenance areas. (Tr. 83, 88.) She also familiarized herself with the community surrounding Englewood. (Tr. 83, 85.)

Finally, Ms. Batchelor directed HUD's Real Estate Assessment Center ("REAC") to perform a physical inspection of Englewood in April 1999. (Tr. 89, 93.) Ms. Batchelor explained the "REAC" process as a review conducted by a team of trained inspectors would visit a property that was under contract with HUD which would serve as the framework for efforts to improve the property. (Tr. 89-90.)

Ms. Batchelor testified that Englewood showed substantial "good faith" in collaborating with HUD. (Tr. 102, 105.) Englewood allowed Ms. Batchelor access to the entire property (Tr. 88), and Englewood responded promptly to Ms. Batchelor's suggestions for enhanced security, repairs, social programs and other improvements to the building. (Tr. 100-04.)

Mr. Sanders similarly performed his own analysis of the building. He identified security concerns, persistent maintenance problems caused by vandalism, and the need to restructure Englewood's financing to redirect money spent on principal payments to operations priorities, as major issues for South Pointe. (Tr. 389-92.)

**2. Englewood Acted to Combat Problems at South Pointe.**

Once Ms. Batchelor and Mr. Sanders had identified the root causes of the problems at South Pointe, Englewood moved to institute corrections. Englewood tightened security, renovated the building, and injected cash into the property.

**a. Englewood tightened security.**

Beginning in 1999, Englewood took steps to strengthen security at South Pointe. Englewood began by investigating the source of gang and drug activity in the building. (Tr. 392.) Englewood, through Mr. Sanders, even administered drug tests to its own staff – and then terminated employees who failed or refused to take the test. (Tr. 392-93.) Englewood replaced

the existing security staff with off-duty police with arrest powers and the authority to carry firearms. (Tr. 397.) These steps limited criminal activity (and the resulting vandalism and maintenance problems) was substantially reduced during 1999 and 2000. (Tr. 98-99.)

**b. Englewood undertook building repairs.**

In response to Ms. Batchelor and Mr. Sanders' recommendations, as well as the findings of the April 1999 REAC report, Englewood began to make building repairs. Englewood showed it intended to proactively respond to the needs of the property identified in the 1999 REAC Report through a June 14, 1999 letter from Mr. Sanders to Joan Kiening, the head of the Departmental Enforcement Center. (JX 34 at 796.) Mr. Sanders requested a copy of the April 1999 REAC report, and explained at trial that Englewood hoped to begin working immediately to respond to the concerns of the REAC inspectors. (Tr. 401-02.) Englewood was taking matters seriously.

**c. Englewood invested more than $700,000 into South Pointe while the property was in the DEC.**

Ms. Batchelor and Mr. Hayes both noted that Englewood invested more than $700,000 in cash into the property while it was in the DEC. (Tr. 104, 878.) Those funds were used to pay for repairs and upgrades to security at the property.

**d. Englewood developed a Management Improvement and Operating Plan that HUD accepted.**

Englewood's efforts during the summer and fall were developed into a Management Improvement and Operating ("MIO") Plan. On December 8, 1999, Mr. Sanders submitted to Ms. Joan Kiening the MIO Plan that had been developed in response to the April 1999 REAC Report. (JX 45 at 840.) The MIO Plan included information regarding a "status update and work in progress," describing corrective work on the problems identified in the 1999

REAC inspection. The MIO Plan listed repairs that had been made, and listed a schedule for the completion of future repairs. (JX 45 at 840-52, Tr. 416-23.) Ms. Batchelor, Ms. Thomas and Ms. Gray were copied on the letter. (JX 45 at 840-41.)

The December 1999 MIO Plan was "accepted" by HUD. (Tr. 786.) Ms. Coleman explained: "[a] Management Improvement and Operating Plan, in order to be accepted . . . it has to be comprehensive." (Tr. 785.) Ms. Coleman acknowledged that HUD's records reflect that HUD accepted Englewood's MIO Plan. (Tr. 786; JX 50 at 872; Kiening Dep. at 199, JX 10 at 215.)

**C. The Visit From HUD Headquarters Confirms Progress At South Pointe.**

Senior DEC representatives from Washington visited South Pointe on August 30, 1999. (Tr. 107-08.) They were impressed with the progress that had been made during the summer in security, resident services and repairs. (*Id.*)

Ms. Batchelor testified that after the visit, Chicago DEC Director Ed Zale prepared a letter for Ms. Kiening's signature. (Tr. 107.) Through the letter, HUD thanked Englewood for the "courtesies extended to our Washington visitor and the rest of our staff during our trip on August 30, 1999" and stated that "[w]e were pleased to see the obvious benefits of your increased security program, the potential your social programs hold, and the progress of the ongoing rehabilitation work." (JX 40 at 818-19; Tr. 108.)

**D. The Final Team Report Commended Englewood And Required HUD Multi-Family To Continue Finalization Of The MIO Plan.**

A Final Team Report - Resolution ("Final Team Report") was signed on January 26, 2000 by Ms. Batchelor as the final report on the DEC referral. Its conclusions received "concurrences" from her DEC colleagues: Ms. Kiening (Team Leader), Ms. Baguio (Attorney) and Mr. Gustin (Lead Attorney). (JX 47 at 869.) It also received "approvals" from: Mr. Zale

(Satellite Office Director); Mr. Hinsberger (Multi-Family Housing HUB Director, Chicago); Ms. Edge (Acting Director of Operations, DEC HQ); and Mr. Kraus (National Director, DEC). (*Id.* at 868.)

The Final Team Report directed that South Pointe be returned from the DEC to Multi-Family Housing for servicing and the finalization of the MIO: "Substantial progress has now been made on the findings outlined in the REAC Report, therefore the DEC should return the case to the multifamily HUB for servicing." The Report acknowledged that Englewood had infused $770,000 into South Pointe (*Id.* at 860-61), and noted that Englewood had shown a "good faith effort" to correct items noted in the April 1999 REAC Inspection. (*Id.* at 862.) The Report directed further that:

> The Chicago HUB office should continue the finalization of the MIO Plan received on December 8, 1999.

(*Id.* at 867.) At trial, Mr. Hinsberger agreed that HUD was obligated to work with Englewood to finalize the plan. (Tr. 645.)

The Final Team Report was sent to Multi-Family Housing for its concurrence with the DEC recommendation on January 27, 2000 and Multi-Family Housing reported its concurrence with the Final Team Report through an entry in HUD's Real Estate Management System on February 1, 2000. (JX 49 at 871.) Ms. Thomas also noted in HUD's Real Estate Management System that the "MIO Plan [was] accepted by enforcement." (JX 50 at 872.) Ms. Kiening closed out the referral to the DEC in early February and returned South Pointe to HUD's Multi-Family division. (JX 51 at 873.)

## II. HUD FAILED TO RESPOND IN ANY WAY TO ENGLEWOOD'S EFFORTS TO FINALIZE THE MIO PLAN IN 2000.

### A. Englewood's Progress Was Stopped When South Pointe Was Returned From The DEC To Multi-Family in February 2000.

Englewood fully expected that HUD Multi-Family would work with it to finalize the MIO Plan as the Final Team Report directed. HUD made no effort whatsoever. In fact, HUD's witnesses explained that not only did they not follow the directions of the Final Team Report – *they did not even read the Report.* (Tr. 246-47, 778.) Gwen Thomas, the HUD employee assigned to South Pointe upon the return of the building from the DEC, offered no real explanation for her failure to read the Report. (Tr. 246-47.) Rather, she said that she was very busy, and had other properties under her supervision. (Tr. 247.) Similarly, Ms. Thomas's superior, Veronica Coleman, testified that she never read the Final Team Report (Tr. 778), and in fact did not recall reading the MIO Plan (Tr. 783), or the response to the Occupancy Review (Tr. 787-88) before 2001. (Tr. 780.) Mr. Hinsberger testified that he would have been "surprised" to learn that Ms. Thomas had not read the Report. (Tr. 646.) But it was Ms. Thomas on whom he relied significantly for information on South Pointe.

Ms. Thomas and Ms. Coleman's actions contrast sharply with those of Ms. Batchelor. Ms. Batchelor, Ms. Coleman, and Ms. Thomas were all HUD employees. During her involvement with South Pointe, Ms. Batchelor actively worked to improve conditions of South Pointe through frequent visits to the property and communications with staff. (Tr. 400-01.) HUD Multi-Family did the opposite.

### B. Englewood Submits Updated MIO Plans, But Receives No Response.

After the return to Multi-Family, Englewood continued to renovate the building, and documented those renovations in a series of updated MIO plans sent to various individuals

within HUD Multi-Family asking for comments and questions. Carl Sanders explained that he actively sought feedback on the MIO plans – but received no response whatsoever. (Tr. 405, 423, 426.) Mr. Sanders wrote first to Ms. Thomas on June 7, 2000. (JX 54 at 908-20.) He then wrote to Luella Kirkman on July 27, 2000. (JX 59 at 941-46.) Another letter was sent from Ken Horton to Luella Kirkman on August 15, 2000. (JX 61 at 956.) On October 17, 2000, Mr. Sanders sent another updated MIO Plan to Ms. Thomas. (JX 66 at 964-69.) Mr. Sanders testified that HUD never responded to any of these communications. (Tr. 405, 423, 426.)

In fact, Ms. Thomas and Ms. Coleman admitted that not only had they failed to respond to Englewood's Plans – *they had failed to read them.* (Tr. 254, 783.) HUD did nothing to fulfill its obligation under the Final Team Report to help finalize the MIO Plan. (JX 47 at 867.)

### C. HUD Approves Englewood's Response To The 2000 Occupancy Review.

Ms. Thomas's sole involvement with Englewood between October 1998 and October 2000 was an Occupancy Review in March 2000. During a brief visit to the property on March 13, 2000, Ms. Thomas visited three occupied units and five vacant units. (JX 52 at 875.) Ms. Thomas waited more than three months to issue her report, which was finally sent to Englewood by Ms. Coleman on June 16. (JX 55 at 921.) In a letter to Englewood summarizing Ms. Thomas' observations, Ms. Coleman apologized for the delay in transmitting the results of the on-site review. (JX 55 at 921.)

Englewood promptly responded to the review through a July 10, 2000 letter from Mr. Sanders to Ms. Coleman, which set out Englewood's actions concerning the March 2000 Occupancy Review. (JX 57 at 932-39.) The reply by Mr. Sanders was an 8-page document that

replied to each of the "findings" and the specific "actions to be taken" in the letter of June 16, 2000. (JX 57 at 932.) Englewood received no answer until October 2000. (JX 64 at 961.)

The only written communication from HUD Multi-Family in reply to Englewood's numerous communications in 2000 to explain its efforts to renovate South Pointe is HUD Multi-Family's approval of Englewood's response to the Occupancy Review. (JX 64 at 961.) Debbie Gray, Ms. Thomas's superior, wrote to Englewood that its response had been accepted. (JX 64 at 961.) This was the final written communication from HUD to Englewood before execution of the October 2000 Housing Assistance Payments contract. (JX 21 at 696.)

### D. HUD Multi-Family Not Only Ignored Englewood's Efforts, It Actively Worked To Hinder Them.

HUD Multi-Family employees not only ignored Englewood's efforts to work with HUD, they were actively hostile to those efforts. Ms. Batchelor and Mr. Sanders testified that Veronica Coleman and Gwen Thomas were hostile and unresponsive to Englewood. (Tr. 132-38; Tr. 405, 423, 426.) Ms. Batchelor recounted several occasions on which Ms. Thomas refused to even meet with South Pointe staff working on resident service programs. And she testified that both Ms. Coleman and Ms. Thomas were actively unfriendly and unresponsive to Englewood in meetings she attended. (Tr. 132-38.) Neither Ms. Coleman nor Ms. Thomas, nor any other Government witness, attempted to challenge this testimony.

#### 1. HUD Multi-Family Consistently Hindered Englewood's Efforts to Obtain Needed Funding.

From 1998 through 2001, HUD consistently denied Englewood's requests for increases or special claims. HUD's refusal to grant (or even process) these requests prevented Englewood from obtaining funding needed for repairs. For example on March 23, 1999, P.M. One wrote to HUD requesting a rent increase for FY 1999. (JX 210 at 1982.) On April 9, 1999,

Veronica Coleman rejected the Englewood request for a rent increase. (JX 32 at 788.) On May 18, 1999, Englewood renewed its request. (JX 211 at 2004.) Englewood's request was supported by a market comparability study it prepared to justify a rent increase that would have helped offset the costs of utilities, vandalism, security and the physical repairs needed to correct the physical deficiencies identified in the 1999 REAC Report. (*Id.*) Mr. Sanders wrote to HUD on September 2, 1999, inquiring about the status of the rehab loan and rent increase. (JX 39 at 816.) Mr. Sanders explained that Englewood's lender "needs some indication from HUD as to what their position is with regard to the HAP contract for the property." (JX 39 at 816.)

HUD delayed six months, until October 18, 1999, to inform Englewood that its request for a rent increase to accompany the 1999 Housing Assistance Payments Contract was denied. (JX 42 at 830.) While apologizing for the "delay" in processing the rental increase request, the reasons given by HUD for rejecting the request could have been corrected by Englewood had HUD communicated in a timely manner. Instead, HUD waited until the 1999 Housing Assistance Payments Contract had been executed, effectively eliminating the opportunity for the rent increase. (Tr. 412-13.) As a result, Englewood lost the opportunity to have additional income to fund repairs and other operational expenses at South Pointe. (*Id.*)

Ms. Thomas's delay in processing Englewood's submissions also adversely affected Englewood's request for reimbursement of claims for tenant damage and vacancies. Englewood submitted such clams for reimbursement on March 31, 2000. (JX 70 at 986; Tr. 413-14.) Ms. Sanders followed up with Ms. Thomas after Englewood submitted its request for those claims, and he explained Englewood's need for funds to continue its work at South Pointe. (Tr. at 414-15.) Ms. Thomas stated that she did not like to process special claims and ignored the request. (Tr. 414-15.) Mr. Sanders followed up with Debbie Gray, Ms. Batchelor's superior,

who ultimately denied the claims *in November 2000*, purportedly because Englewood's request was late and lacked back-up documentation. (JX 70 at 986; Tr. 414-15.)

HUD also denied Englewood's claim for reimbursement of extraordinary energy costs during the winter of 2000-01. (JX 103 at 1116-19.) HUD submitted its request for reimbursement in August 2001. (JX 103 at 1119; Tr. 984.) HUD again waited months to deny the request, then said the request was "late." (Tr. 985.) Englewood resubmitted its claim in 2002. (JX 273 at 4195-205.)

**2. HUD Multi-Family Made False Statements About the Status of Englewood In Opposing Englewood's Application For A HUD-Insured Loan.**

From 1999 on, Englewood pursued a refinancing of its existing loan. On September 2, 1999, Mr. Sanders wrote to Joan Kiening, HUD Supervisory Enforcement Analyst, stating that Englewood's owner and management agent were completing a rehabilitation loan application with their lender, the Community Investment Corporation ("CIC"). (JX 39 at 816.) Mr. Sanders described the need for a Housing Assistance Payments Contract renewal to respond to lender concerns regarding the assurance of rent revenue. (JX 39 at 816.) Mr. Sanders wrote that Englewood was applying for a loan "to not only assist in bringing the building into compliance with HUD regulations, but to implement a minor rehabilitation to the units in the building and replace the major systems." (JX 39 at 816.)

On November 11, 1999, Alan Cravitz of Developers Mortgage Corporation, submitted a loan application to HUD on behalf of Englewood. (JX 43 at 835.) HUD employees acted to block this request. On November 30, 1999, Ms. Thomas wrote an internal email to HUD staff recommending that HUD not accept Englewood's application for a rehab loan. (JX 44 at 838.) Ms. Thomas *falsely* stated the owner was being "flagged" (JX 44 at 838), and that

there was a flag on the owners and managers at South Pointe in November 1999 (Tr. 236-38.) Ms. Thomas intended that her statements as a Project Manager would be used by other HUD staff in making their decision on whether to accept the Englewood rehab loan application. (*Id.*)

## III. ENGLEWOOD'S APPLICATION FOR THE 2000 HOUSING ASSISTANCE PAYMENTS CONTRACT.

In the fall of 2000, Englewood was in compliance with all of its contract obligations with HUD. A MIO Plan had been approved. (JX 50 at 872.) The referral to the DEC had been completed and South Pointe had been returned to Multi-Family Housing for the finalization of the MIO Plan. (JX 47 at 867.) All of the senior HUD officials in the DEC and Multi-Family Housing in both Chicago and Washington, D.C. concurred with the decision of the Final Team Report – Resolution, that "substantial progress had been made" and that South Pointe could be returned to Multi-Family Housing for the finalization of the MIO Plan. (JX 47 at 867.) Englewood's response to the March 2000 Occupancy Review was accepted and that review was closed. (JX 64 at 961.)

As early as August 18, 1999, Mr. Hayes wrote to HUD describing the need for the Housing Assistance Payments Contract renewal to respond to the lenders need for assurance of rent revenue. (Tr. 871; JX 37 at 813.) A month later, in September 1999, Mr. Sanders reported that Englewood was applying for a loan "to not only assist in bringing the building into compliance with HUD regulations, but to implement a minor rehabilitation to the units in the building and replace the major systems." (JX 39 at 816.) The loan was to be a rehab loan to complete MIO Plan repair work related to the mailboxes, elevator repairs, drywall and painting and an entry and interior door replacement program. (Tr. 872-75.) Unfortunately, there was no multi-year Housing Assistance Payments Contract in 1999, and Englewood had to advance over

$700,000 of its own funds to respond to the April 1999 REAC Report and the MIO Plan it was developing at that time. (Tr. 877-78.)

At Mr. Hayes' instruction, in July 2000, Mr. Sanders prepared a request for a four-year renewal of Englewood's existing Housing Assistance Payments Contract. (JX 60 at 949.) Mr. Hayes reviewed and signed the request – seeking a rent increase for a total of approximately $2.7 million in annual subsidy funding. (JX 60 at 952.) Mr. Sanders stated that Englewood needed a multi-year contract to complete ongoing renovation of South Pointe. (Tr. 451.) Mr. Sanders and Mr. Hayes also explained that Englewood needed a multi-year contract for another crucial reason – to refinance its existing loan, which required large principal payments that were crippling Englewood's ability to operate and upgrade the property. (Tr. 451, 881.) Ms. Batchelor agreed with Englewood's assessment of those needs, and testified that it was widely known that a multi-year contract was (a) requested by Englewood, and (b) necessary to continue the progress made at South Pointe. (Tr. 138-39.)

## IV. THE PARTIES' EXECUTION OF THE 2000 HOUSING ASSISTANCE PAYMENTS CONTRACT

### A. The October 2000 Housing Assistance Payments Contract Was Fully Executed.

In October 2000, the parties entered the contract at the center of this dispute -- the 2000 Housing Assistance Payments contract between HUD and Englewood for an initial term from October 1, 2000 to September 30, 2001, with three automatic one-year renewals. (Jt. Stip. Fact ¶ 64, JX 21.) HUD processed and drafted the contract to provide that:

> "[a]fter expiration of the initial term, this Contract *shall renew automatically* for *3* additional one-year terms, subject to the availability of appropriations in any year."

(Jt. Stip. Fact ¶ 23; JX 21 at 696 (italics added).) HUD forwarded the contract to Englewood for signature, and Mr. Hayes signed the contract for Englewood on October 16, 2000. (Jt. Stip. Fact ¶ 64; Tr. 451-52; JX 21 at 697.) Benjamin Tessler signed the contract for HUD on October 18, 2000. (Jt. Stip. Fact ¶ 64; JX 21 at 697; Tr. 452.)

### B. The October 2000 Housing Assistance Payments Contract Incorporated Provisions Of The 1998 Housing Assistance Payments Contract.

Paragraph 4 of the October 2000 Housing Assistance Payments Contract provided that: "All terms of the Expiring Contact are renewed except for those provisions relating to Contract Rents and rent adjustments." (JX 21 at 696.) Two incorporated provisions are particularly relevant. Paragraph 20(b)(2) of the 1998 Housing Assistance Payments Contract provided:

> Upon a determination that an event of default has occurred HUD shall notify Englewood of (i) The nature of the default; (ii) The actions required to be taken and the remedies to be applied on account of the default (including actions by the Owner to cure the default); and (iii) The time within which the Owner shall respond with a showing that all the required actions have been taken.

(JX 19 at 687.) The 1998 Housing Assistance Payments Contract also stated the procedures for amending contracts – Paragraph 21 Contract provides that: "No changes in this Contract may be made except in writing signed by both the Owner and HUD." (JX 19 at 688.)

## V. HUD ATTEMPTS TO CANCEL THE 2000 HOUSING ASSISTANCE PAYMENTS CONTRACT.

### A. HUD Asserts "Error."

At trial, HUD insisted that the October 2000 Contract was executed "in error," and was later "amended" through unilateral HUD action. HUD witnesses Ms. Thomas, Ms. Coleman, and Mr. Hinsberger claimed that the term of the agreement should not have been one year with three automatic one-year extensions – but rather should have been *for only three*

*months.* (Tr. 211, 801, 618.) HUD clung to its version of events, despite admitting all of the following points at trial:

- HUD never determined who made the "error" that led to the execution of a contract that contained a purportedly dramatic error in its term (Tr. 801-02);
- Ms. Thomas was in the room with Mr. Tessler at the time that the supposedly-erroneous contract was signed (Tr. 209-10);
- Ms. Thomas did not suggest to Mr. Tessler that he was signing multiple copies of a contract in error (Tr. 210-11);
- There was no written evidence of any sort within HUD – memos, notes to file, email, etc. that an error had been made, despite allegedly being "discovered" by Ms. Thomas on October 18, 2000 (Tr. 218);
- Ms. Thomas did not mention of the error in her meeting notes on October 18, 2000 when the fact of the error was supposed to have been discussed by everyone at the meeting (Tr. 218);
- The first physical "evidence" of the error was the letter sent by Ms. Coleman to Mr. Hayes on December 6, 2000 (JX at 71 at 1014);
- No one at HUD made any writing discussing the "error" until more than seven weeks later – no letters, memos or even notes exist that explain when and how HUD found the "error." (Tr. 720-21);
- HUD never asked Englewood to countersign an amendment to the October 2000 HAP Contract, and thus failed to comply with the terms of the Contract itself requiring that all amendments be agreed to in writing by both parties. (Tr. 888-89.)

Seven weeks after the execution of the 2000 Housing Assistance Payments Contract, on December 6, 2000, Ms. Coleman wrote to Englewood declaring that the four-year Housing Assistance Payments contract was "in error," and would be "amended . . . from (one) 1 year to a three (3) month short term renewal with zero (0) renewal terms. [sic]" (Jt. Stip. Fact ¶

67; JX 71 at 1014; JX 22 at 705.) This would have resulted in the termination of the Contract only three weeks after the drafting of the letter – on December 31, 2000.

The evidence demonstrates that HUD's claim that the four-year agreement should have been executed for a *three month* term is fabricated. HUD signed the contract it drafted on October 18, 2000, without amendment. (Jt. Stip. Fact ¶ 64; JX 21 at 697.)

HUD has never explained how the purported "error" was made. Ms. Coleman testified that at least two employees in her department (usually Ms. Thomas and Ms. Gray) reviewed every request for a Housing Assistance Payments Contract, and reviewed the information in the system to ensure that it complied with HUD's decisions. (Tr. 796-97.) Indeed, a request for a full year of funding for the contract was entered in HUD's Real Estate Management System on September 27, 2000. (JX 62 at 958.) HUD personnel entered into REMS a contract amount of $2,513,000 for Englewood, approximately $200,000 less than had been requested by Englewood. (JX 62 at 958.)

Ms. Coleman admitted that she (and HUD) had no idea how the "error" in the Englewood contract occurred. (Tr. 801-802.) Mr. Hinsberger also provided no explanation. (Tr. 720.) Ms. Coleman refused to testify whether HUD determined who made the error (Tr. 799-801), but conceded that, other than her letter and the "amended" contract itself, there are no other documents reflecting the "error." (Tr. 802.) Mr. Hinsberger also admitted that he never wrote an email, memo or even a note regarding the "error." (Tr. 720-21.)

Ms. Thomas and Ms. Coleman contend that this virtual nullification of the contract was discussed at an October 18, 2000 meeting with Mr. Sanders and Ken Horton of Englewood. (Jt. Stip. Fact ¶ 66; Tr. 210, 803.) Mr. Sanders flatly denied HUD's version of events, testifying that no such discussion took place. (Tr. 453.)

All documentary evidence support Englewood's version of events. At trial, Thomas claimed that she was *present* at the execution of the October 2000 Contract by Ben Tessler. (Tr. 208.) She claims that she noticed the error in the agreement, *but did not discuss the error with Mr. Tessler*. Rather, she took the agreement to Ms. Coleman, who then met with Mr. Hinsberger. (Tr. 620-21.) Ms. Coleman claims that the Contract was amended "that same day." (Tr. 811.) Thomas was not sure whether the Contract was amended "later" (Tr. 219), or on October 18. (Tr. 220-21.) If HUD had already delivered an amended contract to Englewood on October 18, however, there would have been no need to transmit the same document to Englewood seven weeks later – when only three weeks remained in the contract's purported term. (JX 71 at 1014.) HUD's funding request for Englewood remained the amount for the first full year agreed to in October 2000. (Tr. 812-13.)

HUD offers no documentary evidence, and no testimony other than Thomas' and Coleman's contradicted and illogical story, to substantiate its claim that a discussion regarding the "error" ever occurred with Englewood on October 18. None of HUD's contemporaneous records reflect <u>any</u> discussion of the just-executed contract. For example, Ms. Thomas's notes from the October 18 meeting make no mention of a shortening or any other change in Englewood's contract terms, but indicate that HUD discussed long-term rehabilitation of South Pointe, as testified by Mr. Sanders. (Tr. 216-18, 452-53; JX 67 at 971.) Finally, no HUD official has been able to provide any details to substantiate this after-the-fact concoction. Though pressed at their depositions, neither Ms. Thomas nor Ms. Coleman could remember who supposedly spoke on that subject during the October meeting. (Coleman Dep. at 71-78, JX 12 at 383-84; Thomas Dep. at 188-90, 202-04, JX 11 at 298-99, 302.). Mr. Hinsberger had no information to fill out or corroborate the Thomas – Coleman story. (Tr. 618-21.) And HUD

blocked questioning of Mary Anderson on this topic (Tr. 1188-89), did not call Ben Tessler as a witness, and asked no questions of Coleman on any subject, seeking to get her off the witness stand as quickly as possible. (Tr. 840-42.)

**B. HUD ASSERTS THAT THE CONTRACT WAS AMENDED.**

On December 6, 2001, HUD attempted to amend the October 2000 contract by crossing out and replacing key provisions and sending an "amended" contract with a 3 month term and no renewals. (JX 71 at 1014; JX 22 at 705.) During their depositions, Ms. Thomas and Ms Coleman testified that they possessed no individual authority to amend Housing Assistance Payments contracts. (Jt. Stip. Fact ¶ 68.)

One month later, in January 2001, Ms. Coleman made a second attempt at unilateral amendment of Englewood's contract. On January 10, 2001, without explanation, HUD asserted that it had "amended" the contract again by restating the full 12 months of the first term of the four-year contract. (Jt. Stip. Fact ¶ 70; JX 23 at 712.) Again, HUD fails to provide any credible evidence to substantiate Ms. Coleman's claim that the 2000 Housing Assistance Payments Contract was amended in January 2001. At trial, HUD repeatedly referred to an email from Ken Horton, an employee of Englewood, requesting a copy of the "amended, amended contract" on January 23, 2001. (JX 72 at 1016.) As Ms. Coleman admitted, however, the email itself does not reflect any "agreement" by Englewood to an amendment of the Contract. (Tr. 813.)

Contrary to the HUD employees' testimony, no such changes in the term of the 2000 Housing Assistance Payments Contract were ever made. (Tr. 888-91.) No discussion regarding an "error" in the term of the Contract occurred at the October 18, 2000 meeting. (Tr. 453.) Nor was any "amended" contract signed in 2000 or 2001. (Tr. 888-91.)

Mr. Sanders and Mr. Hayes unequivocally stated that they did not agree to any "amendment" of the October 2000 Housing Assistance Payments Contract. (Tr. 453, 891.) Indeed, HUD made the proposed amendments with no involvement from Englewood. (Tr. 888-91.) Englewood did not accept or sign the HUD proposed amendment to the Contract made on December 6, 2000, or the additional amendment made by HUD on January 10, 2001. (Tr. 888, 890-91.) Mr. Hayes expressed disbelief at HUD's attempts at amendments: "they can't effectively do an amended contract without my signature. I don't know how they can do it unilaterally." (Tr. 888.)

### C. THE HOUSING ASSISTANCE PAYMENTS CONTRACT ITSELF REQUIRES ALL AMENDMENTS TO BE MADE IN A WRITING EXECUTED BY BOTH PARTIES.

HUD claims to have "amended" the Contract on two occasions by unilaterally crossing out the term of the agreement and inserting "3 months" for the term of the agreement, with "0 renewals." (JX 22 at 705.) Gwen Thomas explained that she had made the handwritten edits to the fully executed October 2000 Contract. (Tr. 222.) She professed not to know whether her actions complied with the requirements for amending the contract. (Tr. 226-29.) Section 21 of the Housing Assistance Payments Contract prescribes that all amendments must be agreed to in writing. (JX 19 at 688.) In fact, Ms. Coleman conceded that no Englewood employee ever "agreed" to the amendments to the contract in writing. (Tr. 813.)

## VI. THE JANUARY 2001 REMS ENTRY SHOWS THAT HUD HAD ALREADY DECIDED TO TERMINATE ENGLEWOOD'S CONTRACT.

At trial, Gwen Thomas admitted that she made an entry in HUD's Real Estate Management System on January 10, 2001 reflecting an "enforcement action" by HUD against Englewood. (JX 108 at 1149.) She also explained that the Englewood contract was being "extended" only until vouchers could be obtained. (Tr. 196.) Ms. Thomas claimed that she did

not make the decision to take an "enforcement action" – that decision was made by Ed Hinsberger, and was communicated by Mr. Hinsberger to Ms. Thomas sometime between October 2000 and January 2001. (Tr. 199, 201). Mr. Hinsberger conceded he began ordering vouchers in January in anticipation of ending the Housing Assistance Program subsidy. (Tr. 588.)

HUD's decision to take an "enforcement action" in early January 2001 did not arise from any inspection of South Pointe. (Tr. 202.) Ms. Thomas admitted that she was unaware of any inspection of South Pointe in the months prior to January 2001. (Tr. 202.) In fact, the most recent inspection of South Pointe was the March 2000 Occupancy Review *that had been closed out favorably only three months before in October.* (JX 64 at 961.) Mr. Hinsberger himself had not been to South Pointe *since 1989*, (Tr. 539), and Ms. Coleman had never been to the property. (Tr. 775.) Accordingly, there was no factual basis to conclude that an "enforcement action" against Englewood was called for – and there was certainly no need to begin the process of obtaining vouchers in January 2001.

Ms. Thomas continued her efforts to end Englewood's Housing Assistance Payments contract in the next few months. For example, on March 15, 2001, Ms. Thomas prepared a draft letter proposing to terminate the subsidy payments immediately. (JX 78 at 1057-58; Tr. 241-44.) Other employees similarly sought to cut shore Englewood's substantive interactions with HUD. Mary Anderson e-mailed her staff on March 21, 2001, saying she had talked with "Ed and Veronica" about "how to handle" Englewood's just-submitted rehab application. Among instructions on which Englewood would like to have questioned her at trial, she told Virginia, "do not deposit their exam fee," and deployed other aides to find fault with the application so it could be rejected. (JX 270 at 4188).

## VII. THE MARCH 2001 REAC INSPECTION AND REPORT

On March 2, 2001, REAC conducted an inspection of the site, building exterior, building systems, common areas and 25 units at South Pointe. (*See* JX 74 at 1019; JX 212 at 2132.) The "Inspection Summary" of March 2, 2001, resulted in the preparation of a "Report" dated March 8, 2001. (JX 28 at 776.)

The March 8, 2001 REAC Report found a few items that it listed as Exigent, Health and Safety ("EH&S") issues. (JX 28 at 769.) The EH&S deficiencies found in the REAC inspection were minor and easily corrected. (Tr. 462-63.) The only deficiencies in the units were the five outlets or light switch covers, a missing light fixture, an exhaust fan cover, and three electrical breakers that had to be replaced. (JX 74 at 1019-20; JX 216 at 2266-67.) If those items had not been recorded by the REAC inspectors, the building would have scored a 69. (Tr. at 469, 725.) The REAC Inspection identified no deficiencies found with respect to the structural and mechanical systems – on those issues, South Pointe received a perfect score. (JX 28 at 769.) Like the EH&S items, all of the remaining physical deficiencies cited by the REAC inspectors could be corrected through normal work order repairs. (Tr. 951-52.)

The Report made no findings of overflowing garbage containers, no garbage in the halls, no rats, no mice, and no urine in the stairwells. (JX 28 at 769-75.) All of the entry doors had working locks. (*Id.*) The windows kept out the elements. (*Id.*) All of the units had private bathroom doors. (*Id.*) There was hot and cold running water in all of the units. (*Id.*) The appliances were operational. (*Id.*) Toilets worked. (*Id.*) Sinks drained. (*Id.*) The floors, ceilings and walls were structurally sound. (*Id.*) There were no findings of peeling or lead based paint. (*Id.*) The elevators worked. (*Id.*) There was heat in the units. (*Id.*) Later that month, on March 19, 2001, the Illinois Housing Development Authority conducted an inspection of 61

units that likewise found only minor maintenance items needing correction. (JX 251 at 1547-50.)

In effect, in spring of 2001 the units in South Pointe were "decent, safe and sanitary." Ms. Batchelor testified that they were. (Tr. 187.) Mr. Sanders also testified that they were. (Tr. 486.) Mr. Sanders said that the problems he observed in the units related to maintenance work that needed to be brought to the attention of management by the residents, who sometimes hesitated to do so because they were charged for damage they caused. (Tr. 457-58.)

## VIII. ENGLEWOOD AND HUD RESPONSES TO THE REAC REPORT.

### A. The Requirements Of The REAC Report.

The REAC Report directed Englewood to: (a) correct the identified exigent health and safety ("EH&S") deficiencies; (b) describe the work to be done to correct other "identified deficiencies"; (c) conduct a survey of the building to identify other deficiencies; (d) determine the needs in all of the units for the types of physical problems identified in the "findings" from the 25 sample units inspected; and (e) submit to HUD a Proposed Plan of Correction. (JX 28 at 767.)

The REAC "Report" also described HUD responsibilities: "Upon receipt of the Plan, the Project Manager will review it to ensure that it has sufficient detail regarding plans and resources for correction, and that the time frames are appropriate. The Project Manager will contact you to discuss any required amendments and the process that will be used to verify completion of the Plan." (JX 28 at 768.)

**B. Englewood's Response To EH&S Items.**

At the end of the March 2, 2001 REAC inspection, a REAC inspector gave Mr. Sanders a list of 13 "exigent health and safety" deficiencies. (JX 74 at 1019-20; Tr. 462.) Englewood was to correct all EH&S within 72 hours. (JX 74 at 1019.) Mr. Sanders stated that all of the items were corrected within the 24 hours following the inspection (Tr. 464.) On March 6, 2001, based on information supplied to him by Mr. Sanders, Mr. Hayes provided Ms. Thomas with a "certification" that exigent health and safety items identified in the REAC inspection had been corrected. (JX 76 at 1054.)

On March 9, 2001, Ms. Coleman wrote to Mr. Hayes stating that HUD had conducted a "confirmatory review" with Englewood maintenance staff members present. (JX 77 at 1055.) Ms. Coleman's letter stated, "only a few of the EHS items had been mitigated and not all as you certified." (JX 77 at 1055.) At trial, no HUD witness could state which items had not been mitigated. In fact, Coleman admitted that no notes exist that detail which items remained outstanding. (Tr. 820.) Ms. Thomas and Ms. Simmons, who accompanied Ms. Thomas on the visit to South Pointe on March 7, 2001, did not recall whether they even took notes regarding which items were corrected and which were not. (Tr. 1233-34; Tr. 265-66.) Ms. Thomas claimed that she took pictures of items that had not been corrected, but testified that she had no idea where those pictures might be. (Tr. 265-66.)

Mr. Hayes responded to Ms. Coleman by letter, and attached a memo prepared by Mr. Sanders that detailed corrections of each item noted in the EH&S report. (JX 79 at 1059-60; JX 216 at 2266-67.) Mr. Hayes enclosed "photos of those items cited on the March 2, 2001 inspection," and enclosed a copy of the reinspection report prepared by Mr. Sanders – with

photos taken on the day he received the letter to confirm that the work had in fact been done as certified. (JX 79 at 1059; Tr. 465-68.)

### C. Englewood's Response To The REAC Report.

On April 8, 2001, Kelly Brown on behalf of Englewood sent Ms. Coleman a letter which was the "30 day response" to the March 8, 2001 Letter, which Englewood was required to submit to HUD. (JX 28 at 767.) The March 8, 2001 REAC Report requested Englewood to provide a Proposed Plan of Correction in MIO format without any reference to any specific HUD form. (JX 28 at 767.) Englewood's April 8, 2001 letter attached (a) Englewood's March 12, 2001 EH&S certifications (JX 79 at 1059); (b) the April 5, 2001 MIO Plan for the correction of the existing deficiencies (JX 84 at 1076), as well as the BABCO scope of work. (JX 80 at 1061.) Englewood had previously submitted a loan request to HUD on March 19, 2001, detailed plans for rehabilitation of South Pointe. (JX 241 at 3248 – 676.)

#### 1. The April 5, 2001 MIO Plan.

On April 5, 2001, Englewood sent HUD a MIO Plan that described the status of work that had been done to correct "other identified deficiencies" in the REAC Inspection Summary. (JX 84 at 1076.) Nearly all of the repairs were reported as having already been made. (JX 84 at 1076-84; Tr. 951-52.) The MIO submission on April 5, 2001 was in the same format that HUD approved when it accepted Englewood's December 8, 1999 MIO Plan. (*See* JX 45 at 840-52; JX 50 at 872.) Mr. Hayes explained that maintenance staff had completed or would soon complete all required repairs. (Tr. 951-52.)

#### 2. Englewood Conducted Two "100% Inspections" Of South Pointe.

In November 2000, Englewood spent four days conducting inspections of 100% of the units at South Pointe. The purpose was to determine the physical needs of the property

that were to be addressed as part of the rehabilitation loan that was being discussed by Englewood and HUD. (JX 69 at 975; Tr. 455-61.) Englewood created an inspection "Log" and "Physical Inspection Summary" concerning the physical needs of each of the units as well as an overall narrative summary of the findings. (JX 69 at 978-83; Tr. 456-61.)

In March 2001, an architect retained by Englewood, Ted Dunaj, completed his detailed inspection of the building, which included one hundred percent review of the units at South Pointe. (Tr. 843-44.) Mr. Dunaj was engaged in his inspection for four weeks and converted his field notes into 33 pages of architectural drawings that described the repair needs of each apartment. (JX 75 at 1021-53; Tr. 843-44.) He also prepared detailed specifications for the contemplated building-wide, unit-by-unit rehabilitation plan. (JX 243 at 3774.) Mr. Dunaj also created a book of specifications for exterior and interior repairs at South Pointe. (JX 243 at 3774–891.)

**3. The BABCO Scope Of Work.**

BABCO's proposed scope of work was based on the repairs prescribed in Mr. Dunaj's drawings and specifications. (JX 80 at 1061.) Accordingly, the BABCO Scope of Work reflected Englewood's analysis of the current needs of the entire building. (JX 75 at 1021-53; JX 243 at 3774–891; JX 80 at 1061; Tr. 911-13.) Their proposed work assumed that one hundred percent of the closet drawers needed to be replaced along with the repainting of all of the units and common areas. It reflected repairs to the spandrels, the replacement of the roof, and the replacement of boiler controls. (*Id.*) Mr. Dunaj concluded that virtually all of the work to be undertaken in the units could be performed by maintenance staff. (Tr. 858.)

### D. Ms. Batchelor Determines That The REAC Report Does Not Justify Termination Of Englewood's Housing Assistance Payments Contract.

The only HUD analysis of the 2001 REAC Report was the assignment undertaken by Freddie Batchelor. In the spring of 2001, Ms. Batchelor prepared an analysis comparing the 2001 REAC findings with Englewood's Management Improvement and Operations plans. (Tr. 142-43.) Margarita Maisonet, the head of the Departmental Enforcement Center who signed the Default Notice along with Mr. Hinsberger, asked Ms. Batchelor her opinion regarding whether the Housing Assistance Payments Contract should be terminated. (Tr. 145, 180, 186.) Ms. Batchelor testified: "I still recommended and agreed as I did early on that the Housing Assistance Payments contract stay in force." (Tr. 145.) Ms. Batchelor reported to Ms. Maisonet that South Pointe was "on track with their corrections of the problems . . . that they were still moving forward with correcting identified problems." (Tr. 144-45, 186-87.) Ms. Batchelor was the HUD employee who had the most experience with South Pointe, which is why DEC director Maisonet (who never visited South Pointe) (Maisonet Dep. at 45, JX 13 at 486), gave Ms. Batchelor this assignment.

Ms. Batchelor testified that she created a spreadsheet that compared items identified in the 1999 and 2001 REAC inspections, and that approximately 92% had been corrected or completed. (Tr. 145-46.) HUD did not challenge Ms. Batchelor's testimony. Mr. Mickle asked her on cross-examination whether if Ms. Maisonet testified differently, Ms. Maisonet would be wrong. (Tr. 180.) Ms. Batchelor said YES, Ms. Maisonet would be wrong. (Tr. 180.) The Government, which listed Ms. Maisonet as one of its witnesses, elected not to call her. (Jt. Stmt. Witnesses at 14-15.) Ms. Batchelor concluded that, as of April 2001, Englewood was decent, safe and sanitary, and Englewood's contract should not be terminated. (Tr. 186-87.)

**E. HUD Returns Englewood's Response To The REAC Report.**

On May 15, 2001, Ms. Coleman returned P.M. One's April 8, 2001 response to the March 8, 2001 REAC Report. (JX 93 at 1098.) Ms. Coleman's cover letter stated that HUD would not accept Ms. Brown's response "due to impending negotiations with HUD . . . concerning your proposed refinance and substantial rehabilitation of the property." (JX 93 at 1098.) Ms. Coleman's letter also stated that "[a]lthough the letter from REAC directs you to prepare a Management Improvement and Operating (MIO) Plan subject to our approval, the condition of this property is beyond that point as acknowledged by your application to refinance that we rejected due to major deficiencies." (JX 93 at 1098.)

Neither Ms. Coleman nor Ms. Thomas followed the instructions to HUD in the March 8, 2001 REAC Report. (JX 28 at 767; Tr. 243-44; 824-27; 833-37.) Neither contacted Englewood to discuss any required amendments, including the format of the MIO or the reference to Englewood's loan application or other plans to fund the repairs. (*Id.*) Mr. Hinsberger testified that Englewood's rehab loan application referred to by Ms. Coleman was rejected because it would not result in a "like new" building. (Tr. 576-78.)

Trial revealed that HUD made no effort whatsoever to evaluate the scope of work proposed by Englewood. Mr. Hinsberger and Ms. Coleman acknowledged that HUD never even processed the BABCO scope of work to determine whether it would correct the deficiencies identified in the REAC. (Tr. 598-99, 830-36.) Mr. Hinsberger wanted a "like new" building, but acknowledged that a complete renovation of the building was not necessary to satisfy the issues noted by the REAC Report. (Tr. 577, 591, 716, 751.)

## IX. THE APRIL 9, 2001 NOTICE OF DEFAULT

HUD completed a Notice of Default on Friday, April 6, 2001, the week *before* Englewood's response to the March 2001 REAC Report was due. (JX 89 at 1090.) In developing this Notice of Default, HUD did not follow its normal procedures in generating a Team Report with concurrences. (Maisonet Dep. at 104-05, JX 13 at 501.) Ms. Maisonet said these procedures were not followed because the decision and notice were being "fast tracked." (Maisonet Dep. 208, JX 13 at 527.) Because the process was "fast tracked," the Notice of Default was completed on April 6, 2001, two days prior to HUD's receipt of Englewood's April 8, 2001 REAC response. (Jt. Stip. Fact ¶ 87.)

On April 9, 2001, HUD issued a notice of default to Englewood. (JX 89 at 1090.) This notice, signed by Mr. Hinsberger and Ms. Maisonet stated: "This letter constitutes formal notice by the Secretary of the U.S. Department of Housing and Urban Development (HUD) to Englewood Terrace Limited Partnership (Owner), owner of South Pointe Towers Apartments (Project), that the Owner is in default of its obligations under the HAP Contract entered into between HUD and the Owner." (JX 89 at 1090.) ***Mr. Hinsberger conceded at trial that the Notice of Default was based on a single event – the March 8, 2001 REAC Report. (Tr. 544.)*** He acknowledged that the REAC and related EH&S deficiencies were the "totality" of the specific physical problems identified in the Notice. (Tr. 556.)

HUD's notice of default also referred to HUD's April 3, 2001 letter, which stated that the rehab program proposed by Englewood in its loan application was "inadequate when compared to the needs of the property." (JX 89 at 1090.) Mr. Hinsberger, however, conceded that HUD's rejection of Englewood's request for a HUD-insured loan did *not* constitute an independent event of default. (Tr. 568-69, 578.)

HUD's notice of default generally asserted that Englewood had failed to maintain South Pointe in "decent, safe and sanitary" condition with respect to HUD's Physical Condition Standards. (JX 89 at 1091.) It stated that the "failure to keep and maintain the Project in a decent, safe, and sanitary condition is a default of the HAP contract." (JX 89 at 1091.) However, there was no description of any alleged violations concerning the physical condition of South Pointe, other than the REAC Report. The notice, likewise, did not prescribe what corrective actions HUD believed Englewood should take. (JX 89 at 1091.)

Paragraph 20(b)(2) of the Housing Assistance Payments Contract provides that upon a determination that an event of default has occurred:

> HUD shall notify the Owner of (i) The nature of the default; (ii) The actions required to be taken and the remedies to be applied on account of the default (including actions by the Owner to cure the default); and (iii) The time within which the Owner shall respond with a showing that all the required actions have been taken.

(JX 19 at 687.) HUD gave no such notice to Englewood. While HUD stated in its Notice of Default that Englewood was being notified of the foregoing events of default "pursuant to Paragraph 20 of the HAP Contract," there was no notification of any of the "actions required to be taken and the remedies to be applied on account of the default, including actions by the owner to cure the default." (JX 89 at 1090-91.)

## X. HUD'S REPUDIATION OF THE CONTRACT AT THE APRIL 13, 2001 MEETING.

Englewood scheduled a meeting with HUD on April 13, 2001. Mr. Hayes understood that the purpose of the meeting would be to discuss reconciling the BABCO construction numbers with HUD's suggested loan for the property and to discuss Englewood's response to the REAC Report of March 8, 2001. (Tr. 935, 965-66.) On April 4, 2001, Mr. Hinsberger confirmed Englewood's requested agenda in an email to his staff saying that

Englewood wanted to meet to discuss the Occupancy Review and REAC Inspection. (JX 83 at 1075.)

On April 9, 2001, Mr. Sher, one of the mortgage brokers working on South Pointe's rehabilitation financing, emailed Mr. Hinsberger asking to speak with him regarding HUD's April 3, 2001 letter rejecting Englewood's rehab loan application. (JX 167 at 1608; JX 82 at 1071.) Mr. Hinsberger replied to Mr. Sher:

> I am always happy to talk to you, however, this has more to do with PM and their lack of interest or commitment to this project (and several others) than anything you or I can do. I've spoken with them, with former HUD folks who are now consultants and working for them, with the Enforcement Center and HQ staff. ***I've had enough of PM, we are going to proceed to abate the Sec. 8***.

(*Id.*, emphasis added.)

At the meeting on April 13, 2001, HUD informed Mr. Hayes that it would not insure a rehab loan unless a new property manager replaced P.M. One. (Tr. 966.) HUD refused to discuss any issues listed in the Notice of Default, refused to discuss the Occupancy Review or REAC Inspection, and refused to discuss the scope of work in the proposed rehab loan application. (Tr. 966-67.) Instead, Mr. Hinsberger demanded that Englewood transfer its Housing Assistance Payments Contract rights and responsibilities to a new owner. (*Id.*)

Englewood understood from the April 13 meeting that HUD would not deal any further with Englewood on the 2000 Housing Assistance Payments contract renewal or the rehab loan. (*Id.*) Englewood's only remaining role was to find a new owner. (Tr. 967.) There was nothing to be done with respect to completing the remainder of the existing MIO or developing any additional response to the March 8, 2001 REAC Report. (Tr. 966-67.) Mr. Hayes began the process of finding a new owner and reported his progress to Mr. Hinsberger in a letter dated May 2, 2001. (Tr. 967, 970-71; JX 91 at 1096.)

## XI. HUD ORDERS VOUCHERS FOR THE RESIDENTS OF SOUTH POINTE AS A STEP TOWARD THE TERMINATION OF ITS HOUSING ASSISTANCE PAYMENTS CONTRACT WITH ENGLEWOOD.

As early as January 2001, HUD stated internally that it intended to issue vouchers to the residents of South Pointe. (JX 72 at 1015.) In May 2001, HUD advised Englewood that it was "proceeding with its process to secure vouchers for relocation of eligible tenants." (Jt. Stip. Fact ¶ 101; JX 94 at 1100.) On June 1, 2001, at the direction of the Chicago Hub Director Hinsberger, HUD began the process of ordering vouchers for South Pointe. (Jt. Stip. Fact ¶ 103; JX 97 at 1103.) Less than two weeks later, on June 11, 2001, Ms. Anderson wrote that the Housing Assistance Payments Contract *would be abated* as of September 30, 2001, and that the Chicago Housing Authority would be administering the process:

> Monique and Eileen – we are abating the Sec. 8 contract for this development on 9/30/01. The vouchers need to be in place by 10/1/01. The Chicago Housing Authority will administer the contract.

(Jt. Stip. Fact ¶ 104; JX 98 at 1104.)[4] HUD's actions were a repudiation of the Housing Assistance Payments Contract and its automatic renewal, four-year subsidy program.

Later, on July 30, 2001, Richard Pace of HUD Washington wrote to Ms. Coleman to inquire about the procedures HUD Chicago had used with respect to its Englewood default notice and Housing Assistance Payments contract termination. (JX 100 at 1107.) Ms. Coleman falsely replied that: (1) Englewood had not responded with a plan of correction; (2) that this was the second time that Englewood had been referred to the DEC; and (3) that Englewood, in general, had not been cooperative. (JX 223 at 2454.)

[4] Contrary to Mr. Hinsberger's testimony at trial, there was nothing "coincidental" about the issuance of vouchers on October 1 (instead of a one year contract renewal). (Tr. 635.) Hinsberger and his deputy Mary Anderson ordered vouchers for that date in June. (JX 98 at 1104.)

## XII. THE SHORT TERM SUBSIDY EXTENSIONS.

After declaring Englewood in default, demanding that it replace its ownership and management, and implementing a voucher plan intended to induce all South Pointe's tenants to move from the building, HUD sent a signed short-term subsidy extension contract to Englewood on September 25, 2001. (Jt. Stip. Fact ¶ 109; JX 24 at 729.) Mr. Hayes signed the extension the next day. (Jt. Stip. Fact ¶ 110.) There was no discussion or negotiation about the subsidy extension contract. The alternative was an immediate termination of tenant subsidies that would have resulted in no October rent, a shut down of the building, and 300 likely homeless families. (Tr. 627-28.)

Nothing suggests that the parties intended to eliminate the automatic renewal provisions, or to replace the basic terms and conditions of the 2000 Housing Assistance Payments Contract, or to limit any rights or obligations either party had under the 2000 Housing Assistance Payments Contract. Rather, HUD extended limited ongoing subsidy benefits in order to minimize the impact on Englewood's tenants of HUD's closeout of the 2000 Contract project subsidy funding (which it unilaterally replaced with vouchers). (Tr. 625-28.) Mr. Hinsberger said that he believed HUD had a right to insist on the short-term subsidy extensions under the REAC addendum to the October 2000 Housing Assistance Payments contract that permitted HUD to extend for period of up to 180 days. (Tr. 627-28; JX 21 at 698.)

## XIII. FINAL REPUDIATION AND TERMINATION OF 2000 HOUSING ASSISTANCE PAYMENTS CONTRACT, THE INJUNCTION SUIT AND EXHAUSTION OF ADMINISTRATIVE REMEDIES

### A. The Final Breach and Repudiation.

On October 1, 2001, despite Englewood having met all of the conditions that HUD had set in order to renew the 2000 Housing Assistance Payments Renewal Contract, HUD

did not "automatically renew" the contract as it was required to do. (JX 111 at 1160.) Likewise, to the extent it believed it had discretion to decide whether to renew, it did not follow any of the procedures in the HUD Renewal Handbook. (JX 146 at 1502.) Instead, Mr. Hinsberger emailed to Englewood on October 1, confirming HUD's intention to complete the voucher process, and to terminate the 2000 Housing Assistance Payments Contract at the end of the process. (Jt. Stip. Fact ¶ 111.) Mr. Hinsberger also informed Englewood that the CHAC office had begun the process of issuing vouchers that very day, and reminded Englewood that it had explained for some time that when vouchers were issued the Housing Assistance Payments contract would end. (JX 111 at 1160-61.)

### B. Englewood Sues To Renew The Housing Assistance Payments Contract And To Stop Vouchers.

After three weeks of discussions aimed at persuading HUD that it was making a legal and practical mistake by not renewing the Housing Assistance Payments contract, Englewood filed an injunction suit in the U.S. District Court for the Northern District of Illinois, seeking (1) a declaratory judgment that HUD wrongly failed to renew the contract, issued vouchers to tenants before properly terminating the contract, and improperly refused to implement an approved rent increase for Englewood, and (2) injunctive relief to compel defendants to comply with the legal requirements of the Multifamily Assisted Housing Reform and Affordability Act ("MAHRA") before terminating the Housing Assistance Payments contract. (Compl. dated October 29, 2001, JX 1 at 13.)

In its response, HUD argued misleadingly that it had not terminated the Housing Assistance Payments contract, and that it had not even "begun the contract termination process." (JX 224 at 2463.) On November 15, 2001, the District Court denied Englewood's motion for an

Order requiring continuing project subsidies, noting that Englewood could sue for damages if its contract had been breached. (JX 7 at 148-49.)

### C. The Notice Of Abatement And Termination.

Immediately thereafter, HUD sent Englewood a "Notice of Abatement and Termination of Housing Assistance Payments Contract." (Jt. Stip. Fact ¶ 117; JX 117 at 1176-77.) HUD's November 30, 2001 letter claimed that Englewood had failed to cure the deficiencies identified in the April 9, 2001 default notice and "failed to maintain the property according to the physical conditions standards acceptable to HUD." (*Id.*) Mr. Hinsberger agreed that neither this termination letter, nor the May 16, 2001 Notice of Continuing Default (JX 94 at 1099) added any new grounds for default to those listed in the initial April default notice. (Tr. 642.) All of HUD's facts supporting its termination decision related to the physical condition of South Pointe as of March 2001 and the findings of the March 8, 2001 REAC Report. (JX 117 at 1176-77.)

### D. The Administrative Appeal Process.

On December 21, 2001, Englewood answered HUD's 2000 Housing Assistance Payments Contract termination letter of November 30. (Jt. Stip. Fact ¶ 122; JX 121 at 1182-85.) The letter stated that all of the deficiencies described in the REAC Report of March 8, 2001 and the first HUD termination letter of April 9, 2001 "have been addressed and complied with, leaving no cause for termination of the Housing Assistance Payments Contract for Englewood." (*Id.*) HUD offered no substantive response.

Englewood pursued an administrative appeal from the November contract termination to HUD in Washington. (Jt. Stip. Fact ¶ 124.) But this supposedly independent review was denied in May 2002 – in an opinion drafted for the reviewer by HUD's Chicago

attorney, Greg Gustin ("Gustin"), who had also served as counsel in preparing its 2001 default and termination letters. (Maisonet Dep. 252-54, JX 13 at 538-39.) Mr. Gustin's involvement violated HUD's requirement (in Chapter 13 of its own "Handbook") that an official reviewing an appeal have no prior involvement with the challenged decision. (JX 146 at 1504, HUD Handbook, Chapter 13, at 3.) After a short-lived return to the district court, this action followed in September 2003.

**SUMMARY OF THE ARGUMENT**

Englewood proved the elements of its claims. HUD did not meaningfully contest: (1) that the parties executed a written contract in October 2000; (2) that HUD breached its obligations under that contract; and (3) that Englewood did not receive all the funds it was owed under the parties' agreement and was damaged. HUD hoped to cancel that contract through various defenses – error, amendment, prior material breach, or the effect of a subsidy extension after HUD had repudiated the agreement. HUD did not meet its burden on any of its defenses.

The evidence shows that HUD believed that its promises in its written contract with Englewood were discretionary. When HUD wanted to nullify the term of the agreement – and sought to shorten the contract from four years to three months — HUD simply made handwritten changes to the executed contract. HUD did not follow the requirements of the parties' contract for the amendment. Mr. Hinsberger and Ms. Thomas, the HUD decision-maker and the staff person who actually "amended" the document, did not even know the proper method for amending the contract, and did nothing to check.

At trial, HUD persisted in arguing that HUD amended the contract to correct a three and three-quarter year "error" in its duration. HUD's evidence regarding the "error" was inconsistent and incredible – especially in light of the context of the contract. In October 2000, Englewood had been working toward a multi-year subsidy contract for two years. HUD knew that the multi-year contract was needed to secure a refinancing to pay for maintenance and renovation of South Pointe. A three month agreement was pointless. HUD's "error" and "amendment" defenses fail for lack of credible evidence.

Englewood's defense of "prior material breach" also fails. In the first three months after the execution of the October 2000 contract, HUD made the decision to not only

unilaterally alter Englewood's contract, but to terminate it. HUD apparently made this decision between October 2000 and January 10, 2001 – the date Ms. Thomas noted in HUD's official record-keeping system that HUD was proceeding to "enforcement" at South Pointe, and that the contract would be terminated once vouchers were issued. Ms. Thomas testified that Mr. Hinsberger had made the decision to terminate Englewood's contract before her January 10, 2001 computer entry.

Over the next four months HUD attempted to justify the decision it had already made to terminate Englewood's contract, and to reject Englewood's efforts to engage in any dialog regarding HUD's concerns. HUD issued a Notice of Default based entirely on the March 2001 REAC Report, then refused to consider Englewood's response and plan of correction. HUD repudiated the contract just days later – informing Englewood that the property had to be transferred to a new owner, and refusing to discuss Englewood's response to the REAC inspection. And in June 2001, HUD ordered vouchers set to issue on October, 1, 2001, ending the contract on the date it was supposed to be automatically renewed. HUD failed to establish a justification for its default notice and successive repudiations of the contract.

HUD's actions demonstrate a consistent disregard for Englewood's contract rights. HUD acted to hinder and delay Englewood's performance under the contract, a violation of HUD's duty of good faith and fair dealing that represents an independent ground for liability for HUD. Former HUD employee Freddie Batchelor confirmed the testimony of Englewood witnesses that HUD staff not only failed to cooperate with Englewood, but was openly hostile. HUD's actions rendered Englewood's performance impossible, and wrongly stripped Englewood of its contractual rights.

HUD ultimately refused to renew Englewood's contract for the first additional one-year renewal, and proceeded to terminate what was to have been a four-year agreement. HUD may argue, through a so-far amorphous legal theory, that a subsidy extension signed by the parties in September 2001 affects Englewood's claims. Mr. Hinsberger and Mr. Hayes agreed that the purpose of the subsidy extension was to safeguard the residents of South Pointe by assuring that they could continue to live there during the voucher/contract termination process. The subsidy extension did not (and was not intended to) alter Englewood's rights to damages for HUD's breach of the October 2000 agreement, a dispute over which Englewood almost immediately sought injunctive relief in federal court.

On October 1, 2001, HUD refused to renew the parties' contract for an additional term, despite the fact that the parties' agreement called for three "automatic" one-year renewals. HUD instead terminated the contract. Englewood has been damaged by HUD's actions through the loss of rent revenue, the loss of equity in South Pointe, and the loss of energy reimbursement claims. The Court should hold HUD liable for those damages.

## ARGUMENT

### I. ENGLEWOOD HAS PROVED THAT HUD BREACHED THE OCTOBER 2000 HOUSING ASSISTANCE PAYMENTS CONTRACT.

Englewood and HUD agree that they entered a Housing Assistance Payments Contract in October of 2000. (Joint Stipulations of Fact, Docket No. 111 ¶ 64 ("Jt. Stip. Facts".)) The parties also agree that a written agreement that provided for an initial term of one year with three automatic one year renewals was executed by authorized representatives of both HUD and Englewood. (Jt. Stip. Facts ¶ 9, JX 21 at 696.) Englewood seeks to enforce that contract. HUD seeks to avoid it.

## A. Englewood Has Established A Breach Of Contract By HUD.

"To recover for breach of contract, a party must allege and establish: (1) a valid contract between the parties, (2) an obligation or duty arising out of the contract, (3) a breach of that duty, and (4) damages caused by the breach." *San Carlos Irr. and Drainage Dist. v. United States*, 877 F.2d 957, 959 (Fed. Cir. 1989). Englewood proved these elements by a preponderance of the evidence. Englewood proved that Englewood and HUD entered a written contract that provided for four years of subsidy payments. (*See* JX 21 at 696.) HUD breached its obligation to renew that agreement for the first additional one-year term on October 1, 2001, and thereafter terminated the contract, failing to pay Englewood the years of continuing subsidies it was entitled to under the parties' agreement. Englewood was damaged through the loss of contract revenues and the loss of its equity in South Pointe. Accordingly, Englewood has established a breach of contract by HUD.

### 1. The 2000 Housing Assistance Payments Contract Provided For An Initial One-Year Term, With Three Automatic One-Year Renewals.

The parties agree that on October 18, 2000, Ben Tessler, an authorized representative of HUD, signed a Housing Assistance Payments Contract prepared by HUD that had already been signed by John Hayes. (Jt. Stip. Fact ¶ 64.) That contract obligated HUD to provide Englewood with annual subsidy payments of $2,513,000, beginning in October 2000. (JX 21 at 703.) By its terms, the contract provided for an initial one-year term, with three *automatic* one year renewals – effectively a four-year agreement. (Jt. Stip. Fact ¶ 9, JX 21 at 696.)

The term "automatic" obligated the government to renew Englewood's agreement in October 2001 without further action by Englewood or discretionary review by HUD. *Statesman II Apartments, Inc. v. United States*, 66 Fed. Cl. 608, 616-17 (Fed. Cl. 2005); *see also*

*Cuyahoga Metropolitan Housing Authority v. United States*, 57 Fed. Cl. 751, 759 (Fed. Cl. 2003) ("[t]he 'automatic' references in these provisions, as well as the annual periodicity established therein, plainly reveal an intent that the adjustments would occur without [the owner] having to take any significant action" *citing American Heritage Dictionary of the English Language* 122 (4th ed. 2000) (defining "automatic" as "[a]cting or operating in a manner essentially independent of external influence or control")).

**2. HUD Repudiated And Breached The 2000 Housing Assistance Payments Contract.**

The parties agree that HUD did not "automatically" renew Englewood's contract for an additional term in October 2001, and did not provide four years of payments to Englewood under the contract. (Tr. 625.) It is axiomatic that "[w]hen performance of a duty under a contract is due, any non-performance is a breach." *Statesman II Apartments, Inc. v. United States*, 66 Fed. Cl. 608, 620 (Fed. Cl. 2005), *quoting Franconia Assocs. v. United States*, 536 U.S. 129, 142-43 (2002), *citing* RESTATEMENT (SECOND) OF CONTRACTS §235(2)). Because HUD did not provide Englewood the promised subsidy funds for the three final years under the October 18, 2000 contract, Englewood breached the contract, and Englewood suffered damages.

**a. HUD Repudiated the Contract.**

Prior to failing to renew the contract for the first of three additional one-year terms on October 1, 2001, HUD repudiated the contract. HUD first repudiated its obligations under the contract on December 6, 2000 – the date Veronica Coleman's wrote to Englewood claiming that the parties' four year agreement was only a three-month agreement with *no* automatic renewals. (JX 71 at 1014.) Under the law of anticipatory repudiation, when one party repudiates a contract, the other may wait until the time for performance is due to take any action. *Franconia Assoc. v. United States*, 536 U.S. 129, 143 (2002), *citing Roehm v. Horst*, 178 U.S. 1,

13 (1900) (repudiation "give[s] the promisee the right of electing either to . . . wait till the time for [the promisor's] performance has arrived, or to act upon [the renunciation] and treat it as a final assertion by the promisor that he is no longer bound by the contract").

Accordingly, Englewood had the right to wait for HUD to cure its repudiation. Section 257 of the RESTATEMENT (SECOND) OF CONTRACTS provides that an "injured party does not change the effect of a repudiation by urging the repudiator to perform in spite of his repudiation or to retract his repudiation." *See also System Fuels, Inc. v. United States*, 66 Fed. Cl. 722, 733-34 (Fed. Cl. 2005).

HUD repudiated the contract again on April 13, 2001, during a meeting between representatives of Englewood and HUD in Chicago. (Tr. 966-67.) Four days prior, on April 9, 2001, Ed Hinsberger had written that he had "had enough" of Englewood. (JX 167 at 1608.) On April 13, 2001, Mr. Hinsberger delivered that message to John Hayes and directed Mr. Hayes to transfer the Englewood general partner interest to a new owner. At trial, both Mr. Hayes and Mr. Hinsberger explained that HUD informed Englewood that HUD would not lift its "default" and continue to perform its obligations under the contract unless: (a) Englewood replaced its management company; and (b) John Hayes transferred PM Group's limited partnership interest in Englewood to another entity. (Tr. 966-67; Tr. 582.) HUD's demand was a repudiation of the parties' agreement, as HUD sought to impose obligations on Englewood that went beyond those obligations set forth in the parties' written agreement. *See, e.g.*, *Palazzetti Import/Export, Inc. v. Morson*, 2001 WL 1568317, at *9 (S.D.N.Y. Dec. 6, 2001) (repudiation "can consist of an attempt to advance an unwarranted interpretation of the contract or an indication that the renouncing party will perform only if certain 'extracontractual' conditions are satisfied").

After the April 13, 2001 meeting, HUD implemented the voucher process that would end the October 2000 contract. HUD's actions to obtain vouchers, apparently decided by January 2001, evidence HUD's belief that it had cancelled its contract renewal obligations through its unilateral amendments to the parties' agreement. (JX 108 at 1149; Tr. 196.) By ordering vouchers for residents, and informing residents of this action, HUD effected its expressed intention not to renew the 2000 Housing Assistance Payments Contract for future annual terms. (Tr. 635-36.)

**b. HUD Shortly Thereafter Terminated The Contract.**

Once HUD repudiated, Englewood had the right to wait for HUD to retract its repudiation. Englewood proceeded in good faith through the summer of 2001 to find a new owner and obtain a rehabilitation loan for South Pointe. Until HUD refused to renew the contract for an additional year, Englewood hoped that HUD would reconsider and extend the Contract in accordance with the terms signed by the parties in October 2000. That hope ended on October 1, 2001. HUD stated that it would terminate the Housing Assistance Payments Contract, writing on October 1, 2001: "[w]e are doing what we told you many times we would do. We are abating the Section 8 Contract." (JX 111 at 1161.) When HUD stated that it would not renew the 2000 Housing Assistance Payments Contract for another year and Englewood could not persuade HUD to reconsider, not only did Englewood *not* waive HUD's breach of contract, Englewood filed for an injunction. (Jt. Stip. Facts ¶ 111; JX 1 at 1.) As soon as the injunction was denied, HUD issued a Notice of Abatement and Termination on November 30, 2001, reiterating and confirming its decision to terminate Englewood's contract. (Jt. Stip. Facts ¶ 111; JX 117 at 1176.)

### B. Englewood Was Damaged By HUD's Breach Of Contract.

At trial, Englewood established that HUD's breach caused more than $8 million in damages. Those damages fall in three categories: (1) $4,368,907 million dollars of lost revenue under the parties' agreement; (2) $4 million of lost equity in South Pointe; and (3) $139,187.35 in energy reimbursements that HUD failed to grant Englewood. (PX 2A at 4247A; Tr. 1346, 1349-50.) HUD made little effort to counter Englewood's damage evidence at trial. Assuming the Court finds HUD liable, Englewood's damages will be the subject of a second round of post-trial briefs.

## II. HUD'S DEFENSES TO ENGLEWOOD'S BREACH OF CONTRACT CLAIM FAIL.

HUD has not disputed the execution of the Housing Assistance Payments Contract or its refusal to renew the agreement on October 1, 2001. HUD has thus conceded the major elements of Englewood's burden of proof. HUD, however, relies on various affirmative defenses – on which it bears the burden of proof – to support its contention that HUD's breach of the October 2000 contract was justified or that HUD can avoid liability for its breach. HUD claims: (a) the October 2000 Contract was made in error; (b) the October 2000 Contract was amended; (c) HUD properly terminated the October 2000 Contract for default; and (d) the October 2000 Contract was extinguished through an "accord and satisfaction." (*See* Am. Ans. to Compl., Docket No. 70, at ¶¶ 27, 99, 100.) HUD failed to sustain its burden of proof at trial on any of these defenses.

### A. The October 18, 2000 Housing Assistance Payments Contract Was Not "Made In Error."

There is no credible evidence that the October 18, 2000 Housing Assistance Payments Contract was in error as to the duration of the contract or the existence of three

automatic one-year renewals. Nevertheless, HUD persists in its argument that the October 2000 Contract was a "mistake." (Tr. 210-211.) HUD claims that the term of the October 18, 2000 Contract, which was essential to the refinancing of South Pointe, should have been "3 months." (*Id.*) HUD has no evidence to support this imagined history.

The Court of Federal Claims holds the government to its written promises, noting that "[a] unilateral mistake . . . does not serve to relieve a party of his contractual obligations." *Albano Cleaners, Inc. v. United States*, 455 F.2d 556, 560 (Ct. Cl. 1972); *see also Cheyenne-Arapaho Tribes of Indians of Oklahoma v. United States*, 671 F.2d 1305, 1311 (Ct. Cl. 1982). "Any other rule would throw chaos into all contract arrangements because a party could avoid responsibility hereunder at his convenience simply by saying that he had signed the contract without reading it." *Id.* (holding the government to have accepted a qualification submitted in a written bid). In this case, the evidence presented at trial makes clear that Chicago HUD decided that it did not want to perform the multi-year contract and sought to cancel its obligations.

A party asserting unilateral mistake in this Court must prove the existence of the mistake by "clear and convincing evidence." *Information Intern. Associates, Inc. v. United States*, 74 Fed. Cl. 192, 207 (Fed. Cl. 2006). In the context of government contracting, a contractor seeking to prove its own mistake as a basis for cancelling is contract obligations, must show that:

> (1) a mistake in fact occurred prior to contract award; (2) the mistake was a clear-cut, clerical or mathematical error or a misreading of the specifications and not a judgmental error; (3) prior to award the Government knew, or should have know, that a mistake had been made and, therefore, should have requested bid verification; (4) the Government did not request bid verification or its request for bid verification was inadequate; and (5) proof of the intended bid is established.

*McClure Elec. Constructors, Inc. v. Dalton*, 132 F.3d 709, 711 (Fed. Cir. 1997).

Following these principles, in order to prove "mistake" in the term of the October 2000 Housing Assistance Payments Contract, HUD must prove by clear and convincing evidence that (a) a mistake occurred; (b) the mistake was a clear-cut, clerical or mathematical error . . . and not a judgment error; (c) prior to the execution of the contract, Englewood knew of the mistake; (d) the intended term of the contract was 90 days with no automatic renewals.

Not only did HUD fail to meet any of these proof requirements at trial, HUD's witness Ms. Coleman contended abstractly that "the error was made and a correction was made to the error," without any reference to the nature of the mistake or by whom and how the mistake was made (or could have been made). (Tr. 801.) Significantly, Ms. Anderson, the Director of Multi-Family Operations, failed to testify on this point. HUD also declined to call Mr. Tessler, Ms. Anderson's representative and the HUD senior manager who actually signed the contract. The Court is permitted to draw the inference from these failures to testify that neither Anderson nor Tessler could say anything to support the government' position. *Stockton East Water Dist. v. United States,* 75 Fed. Cl. 321, 368 (Fed. Cl. 2007), *quoting Contract Master Servs., Inc. v. United States,* 225 Ct. Cl. 735, 737 (Cl. Ct. 1980) ("[I]f a party knows of the existence of an available witness on a material issue and such witness is within the party's control and is not called by that party, the finder of fact *may* draw an inference that the testimony of the witness would have been unfavorable to such party.")

**1. The Express Language Of The Parties' Agreement Proves That The Parties Intended A Four-Year Contract.**

If the language of an agreement "is explicit and unambiguous, the court must effectuate its plain meaning and may not rely on extrinsic evidence." *Statesman II*, 66 Fed. Cl. at 616. There is no question that the October 2000 Housing Assistance Payments Contract has an "explicit and unambiguous" term – one year with three automatic one-year renewals. (JX 21 at

696.) "In addition, the instrument must be read as a whole and interpreted so as to harmonize and give a reasonable meaning to all of its parts." *Statesman II*, 66 Fed. Cl. at 616. The exhibits to the contract confirm testimony by Englewood witnesses that the contract was to extend for an initial one-year term (with three automatic renewals). (JX 21, Ex. B at 702.)

The exhibits to the contract are a part of the contract. (JX 21 at 697, ¶ 10.) Exhibit B refers to an initial one-year term, and provides for a full year of funding -- $2,513,000.00. (JX 21 at 702.) Accordingly, both the plain language of the "term" of the October 2000 Housing Assistance Payments Contract and the contract as a whole confirm the term of the agreement was one year – not three months – with three automatic one-year renewals.

**2. The Context Of The Parties' October 2000 Contract Demonstrates That The Parties Intended A Four-Year Agreement.**

Although it is not necessary to review extrinsic evidence to determine the term of the October 2000 Housing Assistance Payments Contract, such a review shows that the circumstances required and the parties intended a four-year agreement. Englewood worked diligently for two years – from 1998 through October 2000 – to develop a MIO Plan, and to make repairs and rehabilitate the property. Throughout this process, it was widely known that Englewood wanted to refinance its existing loan, and that Englewood needed a multi-year contract to obtain new financing. (Tr. 871.) The financing package required to accomplish these much-discussed objectives was a new long-term loan, which in turn required a multi-year Housing Assistance Payments Contract. Mr. Hayes testified that he requested a four year contract. (Tr. 880; JX 60 at 949.) All of the Englewood witnesses at trial – including HUD's own key South Pointe representative, Ms. Batchelor – emphasized the critical importance of the multi-year loan refinancing. (Tr. 138-39.) Obviously, a three month contract was essentially no

contract at all. There was no practical reason for such an agreement – and there was no such agreement.

**3. HUD's Testimony Regarding The "Error" Is Fabricated.**

At trial, Ms. Coleman and Ms. Thomas's testimony regarding the purported error contradicted HUD's stipulations and the testimony of Mr. Hinsberger. Ms. Thomas testified that Mr. Sanders and Ms. Thomas went to Ben Tessler's office on October 18, 2000 with a copy of the contract that had already been signed by Mr. Hayes. (Tr. 209-10.) She stated that she noticed the "mistake" only after the contract had been fully executed by Mr. Tessler, and a copy had been handed to Mr. Sanders. (Tr. 209-11; 218-19.) At trial, Ms. Thomas testified that she did not discuss the error with Mr. Tessler, but instead sought out Ms. Coleman, who in turn sought out Mr. Hinsberger, a part of the story that neither Ms. Thomas nor Ms. Coleman mentioned in their extended deposition testimony. (*Compare* Tr. 218-19 and Coleman Dep. 71-76, JX 12 at 383-84, Thomas Dep. 188-90, 202-04, JX 11 at 298-99, 302.) Ms. Coleman and Ms. Thomas testified that after all of these discussions of the "error" among Ms. Thomas, Ms. Coleman and Mr. Hinsberger, they then attended a meeting with Mr. Sanders where they claim to have discussed the "error." (Tr. 209-10.) Ms. Coleman stated that corrections to the contract were made "the same day." (Tr. 811.)

Contrary to Ms. Coleman's testimony, Mr. Hinsberger stated that HUD could not have issued a new contract on the same day it discovered the mistake. (Tr. 681.) Rather, Mr. Hinsberger suggested that such a sudden change in contract terms would cause a "computer" and "funding" issue for HUD. (*Id.*) Contrary to both Ms. Thomas and Ms. Coleman's testimony, HUD stipulated that "Mr. Sanders received a signed copy of the 2000 Housing Assistance Payment Renewal Contract from HUD *following* his October 18 meeting at HUD in Chicago."

(Jt. Stip. Facts ¶ 65.) Mr. Hinsberger's testimony and the parties' Joint Stipulations of Fact is consistent with the testimony of Mr. Sanders, who had explained that he and Ms. Thomas did not meet with Mr. Tessler until *after* the October 18, 2000 meeting. (Tr. 453.) HUD's muddled and inconsistent testimony "under oath" regarding the mistake is incredible and cannot be believed.

**B. HUD Could Not Unilaterally "Amend" The October 2000 Housing Assistance Payments Contract.**

Section 21 of the 1998 Housing Assistance Payments Contract, which was incorporated into the 2000 Housing Assistance Payments Contract, provided that: "No changes in this Contract may be made except in writing signed by both the Owner and HUD." (JX 19 at 688). Accordingly, the terms of the 2000 Housing Assistance Payments Contract could only be amended by a writing signed by both parties. No such amendments took place. Contrary to the facts and the law, HUD persisted at trial in the theory that the contract was "amended."

HUD claims to have "amended" the October 2000 Housing Assistance Payments Contract twice. First, in December 2000, HUD simply declared that it was "amending" the length of the agreement from what amounted to a four-year agreement to a *three-month* agreement. (Tr. 800-01; Tr. 210-11.) Second, on January 10, 2001, HUD claims to have "amended" the contract yet again, reestablishing the initial full one year term to the agreement, so that it expired on September 30, 2001. (Tr. 214.) There was no mention in the re-marked document of any further change concerning automatic renewal. (JX 72 at 1016.)

Englewood's representative, Mr. Horton, later asked that a copy of the "amended, amended" contract be sent to his attention. (JX 72 at 1016.) There is no evidence that one was ever sent. Mr. Hayes testified that he did not agree to the first proposed amended contract and that he never received the second one. (Tr. 887-91.) He further testified that he did not sign or agree to either of them. (Tr. 888-90.)

Through Ms. Coleman's and Ms. Thomas's trial testimony, HUD asserted the novel theory that Mr. Hayes' failure to object to the proposed amendments proves that these amendments were "accepted" by Englewood. (Tr. 813-14; Tr. 222-23.) No written amendment to the contract signed by Englewood ever existed, and Section 21 of the 1998 contract did not permit HUD to amend (and virtually negate) the contract unilaterally. (JX 19, ¶ 21 at 688.)

HUD produced no evidence at trial of a writing signed by Englewood that constitutes agreement to any amendment to the October 2000 Housing Assistance Payments Contract. On the contrary, HUD's witnesses acknowledged at trial that the January 23, 2001 email that HUD has repeatedly relied upon as evidence that Englewood "agreed" to the amendment does not represent an agreement at all. (Tr. 809, 813-14; JX 72 at 1016.) Rather, the email simply represents Englewood's request for a copy of HUD's January 2001 attempt to amend the contract – a request that HUD never fulfilled. (Tr. 890-91.)

Indeed, HUD's insistence that it held the right to unilaterally "amend" its contract with Englewood by handwriting changes on the parties' agreement demonstrates HUD's disregard for the legal constraints of contract. HUD never asked Englewood to sign an amendment to the October 2000 Housing Assistance Payments Contract. (Tr. 888-90.) It simply declared on its own that the 2000 contract had been "amended." HUD representatives apparently believed that by simply altering the terms of their copy to the contract that they had created a valid amendment, or could bully Englewood into acquiescing. This belief was all the more surprising considering that HUD's witnesses testified they did not even read the contract to determine the proper method for "amending" the agreement – and professed not to know the proper procedure for amending a Housing Assistance Payments Contract as of the 2007 trial. (Tr. 228-29; Tr. 622.)

HUD chose not to question Mary Anderson, the head of the Chicago Multi-Family Operations Department, regarding the means of amending a contract. This Court has held that if a party that fails to call an available witness to testify about a particular topic, and that witnesses' testimony would not be "cumulative or inferior to the evidence already presented," an adverse inference should be drawn. *Gill v. United States*, 1997 WL 820963, at *50 (Fed. Cl. Oct. 9, 1997). Specifically, the "[t]he non-appearance of a litigant at the trial or his failure to testify as to facts material to his case and as to which he has especially full knowledge creates an inference that he restrained from appearing or testifying because the truth, if made to appear, would not aid his contention." *Id.* (quotations omitted).

Ms. Anderson's testimony would not have been "cumulative or inferior" to the testimony of other HUD witnesses. Mr. Hinsberger, Ms. Thomas and Ms. Coleman failed to explain (a) how such a significant "error" found its way into the parties' written agreement; or (b) the mechanism for *properly* amending a Housing Assistance Payments agreement. Ms. Anderson was the HUD witness with the most knowledge on these topics. *See* Jt. Witness List at 13 (stating that Ms. Anderson may testify regarding "the interactions, meetings, and other communications with her staff, including Ben Tessler and John Schneider, regarding Englewood's Housing Assistance Payments (HAP) Contract." In light of the fact that HUD bears the burden of proving its defenses, an adverse inference should be drawn against HUD by its failure to have Ms. Anderson testify on this important point.

### C. There Was No Factual Basis For HUD's Notice Of Default.

HUD claims to have terminated Englewood's 2000 Housing Assistance Payments Contract for "default." It concluded that its declaration of Default cancelled its future obligations under the 2000 Housing Assistance Payments Contract. "[D]efault termination is a

drastic sanction which should be imposed (or sustained) only for good grounds and on solid evidence." *J.D. Hedin Constr. Co. v. United States*, 187 Ct. Cl. 45, 408 F.2d 424, 431 (Ct. Cl. 1969). For this reason, HUD bears the burden of establishing that a default termination was justified. *Lisbon Contractors, Inc. v. United States*, 828 F.2d 759, 765 (Fed. Cir. 1987). HUD's burden does not "shift" to Englewood upon a showing of a technical violation of the parties' agreement. *Id.* (burden does not shift upon showing that contractor was behind schedule). Rather, HUD must prove, based on the "entirety of the evidence," that its default termination was justified. *Id.* Even if the evidence is "evenly balanced," HUD loses. *Id.*

HUD asserts an affirmative defense – that Englewood was in "prior material breach" of the parties' agreement. (*See* Aff. Defenses, Am. Ans. to Compl., Docket No. 70, at ¶ 100.) Although a "party sued for breach of contract may defend on a theory that its nonperformance is excused because the other contracting party committed the first material breach," that party must show that the prior breach relates "to a matter of vital importance, or goes to the essence of the contract." *Hometown Financial, Inc. v. United States,* 409 F.3d 1360, 1370 (Fed. Cir. 2005) (rejecting government defense of prior material breach). The defense may be waived by the government if the government "chooses to continue acting under the contract and the obligations of both parties remain in force." *First Annapolis Bancorp, Inc. v. United States*, 75 Fed. Cl. 280, 289 (Fed. Cl. 2007) (finding government waived defense of prior material breach).

The evidence is not evenly balanced here. Rather, the evidence at trial showed that HUD did not have a proper basis to find Englewood in default under the October 2000 Housing Assistance Payments Contract. On the contrary, the evidence showed that Englewood

was not in default. Moreover, HUD failed to fulfill its obligations to follow contract procedures in declaring a "default" under the Housing Assistance Payments Contract.

**1. HUD's Notice Of Default Did Not Comply With HUD's Duty To Provide Englewood With A Specific Description Of Events Of Default And Actions Necessary To Cure The Default.**

At trial, Mr. Hinsberger, the HUD Chicago Director and who made the decision to find Englewood in default, testified that the sole basis for finding Englewood in "default" was the March 8, 2001 REAC Report. (Tr. 544-46.) The REAC Report itself sets forth the requirements for Englewood's response to the Report. (JX 28 at 767; Tr. 243-44.)

Additionally, HUD's right to terminate the 2000 Housing Assistance Payments Contract for default is expressly limited by the 1998 Housing Assistance Payments Contract, whose provisions are incorporated into the October 18, 2000 agreement. Paragraph 20(b)(2) of the 1998 contract provides:

> Upon a determination that an event of default has occurred HUD shall notify Englewood of:
>
> (i) The nature of the default;
>
> (ii) The actions required to be taken and the remedies to be applied on account of the default (including actions by the Owner to cure the default); and
>
> (iii) The time within which the Owner shall respond with a showing that all the required actions have been taken."

(JX 19 at 687.) HUD's default notice did not comply with Section 20. HUD's Notice merely refers to the findings of the REAC Report, and provides no further details regarding the "nature of the default." (JX 89 at 1090-91.) The Notice does not specify "[t]he actions required to be taken" by Englewood. (*Id.*) Accordingly, HUD's Notice of Default is procedurally defective, and HUD may not justify its breach of the 2000 Housing Assistance Payments Contract by claiming that Englewood was in default.

Nonetheless, Englewood responded to the March 2001 REAC Report and HUD's Notice of Default. HUD's witnesses claimed, however, that Englewood's responses were not sufficient. HUD's witnesses were wrong. HUD did not review or discuss Englewood's response as the REAC procedures prescribed. HUD's witnesses were unsure as to whether HUD even kept a copy of the response in their files. (Tr. 826.) Without waiting for Englewood's response, HUD simply went ahead with its "fast track" Notice of Default on April 9, 2001, a Notice which was drafted on April 6, 2001, three days before Englewood's response was even due. (Jt. Stip. Facts ¶ 87; JX 89 at 1090-91.)

**2. Englewood Properly Responded To The REAC Report.**

At trial, HUD attempted to bootstrap Englewood's obligation to respond to the March 8, 2001 REAC Report into a rationale for HUD's Notice of Default. HUD's argument is specious. HUD began drafting its Notice of Default in March 2001 – weeks before Englewood's response to the REAC Report was due. (Tr. 242-43.) And months prior to the REAC inspection, in the late 2000 and early 2001, Mr. Hinsberger, Ms. Thomas and others discussed their intention to take "enforcement" actions against Englewood that would lead to the ordering of vouchers, which would terminate Englewood's Housing Assistance Payments Contract. (JX 68 at 972; Tr. 199.)

Englewood satisfied each of the requirements of the REAC Report. The REAC Report directed Englewood to: (a) correct the identified exigent health and safety ("EH&S") deficiencies; (b) describe the work to be done to correct other "identified deficiencies"; (c) conduct a survey of the building to identify other deficiencies; (d) determine the needs in all of the units for the types of physical problems identified in the "findings" from the 25 units

inspected; and (e) submit to HUD a Proposed Plan of Correction. (JX 28 at 767.) Englewood complied with all these requirements.

**a. Englewood Corrected All Exigent Health & Safety Items Noted During The March 2001 REAC Inspection.**

At trial, Englewood showed that Englewood properly responded to the Exigent Health & Safety items noted by REAC inspectors during their March 2, 2001 visit to South Pointe. The EH&S deficiencies found in the REAC inspection were minor and easily corrected. (Tr. 462-63.) The only deficiencies in the units were the five outlet or light switch covers, an exhaust fan cover, and three electrical breakers that had to be replaced and one broken window. (JX 74 at 1019-20; JX 216 at 2266-67.) A light fixture had to be installed in a maintenance room. (*Id.*) An electrical panel had to be reattached and a fire extinguisher replaced in the penthouse and there needed to be a path to one of the exits in the trash room. (*Id.*) Mr. Sanders, Englewood's representative during the REAC inspection, stated that all EH&S items noted during the March 2, 2001 inspection were corrected within 48 hours following the inspection. (Tr. 463-64.) Given the minor nature of the repairs, Mr. Sanders should be believed.

HUD contends that only "some" but "not all" of the EH&S items were corrected. But at trial, no HUD witness could say which items had not been corrected. Neither Ms. Thomas nor Ms. Simmons, who accompanied Ms. Thomas on the visit to the "confirmatory" review of South Pointe on March 7, 2001, could recall whether they even took notes regarding items were corrected and which were not. (Tr. 1233-34; Tr. 265-66.) Ms. Thomas claimed that she photographed items that had not been corrected, but testified that she had no idea where those pictures might be. (Tr. 265-66.)

Within days, Mr. Hayes responded to Ms. Coleman by letter, and attached a memo prepared by Mr. Sanders that detailed corrections of each item noted in the EH&S report.

(JX 79 at 1059; Tr. 465-66.) Mr. Hayes enclosed "photos of those items cited on the March 2, 2001 inspection," and enclosed a copy of the re-inspection report prepared by Mr. Sanders – who took photos to confirm that the work had in fact been done as certified. (JX 79 at 1059; Tr. 465-66.) HUD has clearly failed to prove Englewood did not fulfill its obligations regarding the EH&S items noted during the REAC inspection. At trial, Mr. Hinsberger admitted that he had no knowledge contradicting the memo prepared by Mr. Sanders. (Tr. 550-51.)

**b. Englewood Corrected Deficiencies Noted In The REAC Report.**

The vast majority of the deficiencies noted in the 25 units inspected were corrected between March 8, 2001 and April 5, 2001. (JX 84 at 1076-84; Tr. 952.) On April 5, 2001, Englewood submitted a report on its corrective work in the sample units, indicating that 95% of the problems found by the REAC inspectors had been corrected by South Pointe maintenance personnel. (*Id.*) Englewood listed estimated completion dates for all remaining work. (*Id.*) All of the corrections were in the nature of work order repairs. (Tr. 951-52.)

**c. Englewood Conducted A 100% Inspection To Determine The Physical Needs Of South Pointe With Respect to Units, Common Areas, And Systems.**

At trial, the most senior HUD witnesses, Mr. Hinsberger and Ms. Coleman, claimed they were unaware of whether Englewood had ever conducted a "100% Inspection" of South Pointe. (Tr. 598-599, 830-831.) Both Mr. Hinsberger and Ms. Coleman stated that Englewood's failure to conduct such an inspection justified HUD's default and eventual termination of the parties' agreement. (Tr. 731-32.) At trial, it was clear that Mr. Hinsberger and Ms. Coleman were wrong.

Immediately after Mr. Hinsberger's testimony, Mr. Ted Dunaj, a licensed architect with decades of experience in high-rise multi-family housing rehabilitation, including

experience with HUD, testified that he had indeed conducted a 100% inspection at South Pointe of all of the units, common areas and systems. (Tr. 842-46.) Mr. Dunaj concluded his review with the production of detailed plans (33 pages of architectural drawings) and specifications in March 2001. (JX 75 at 1021-53.; JX 243 at 3774-3891.) Mr. Dunaj then collaborated with BABCO Construction ("BABCO") to produce a scope of work that represented a full and total response of the physical needs of the building. (JX 80 at 1061-65.)

Using the materials prepared by Mr. Dunaj and BABCO, Englewood submitted its overall plan of correction to HUD on April 8, 2001. That plan consisted of (1) Englewood's EH&S certifications by Mr. Hayes and Mr. Sanders; (2) Englewood's April 5, 2001 status report on the correction of the issues noted in the March 2001 REAC Report; (3) the BABCO scope of work (which was completely responsive to all of the deficiencies noted in the REAC Report as well as the additional work recommended by Mr. Dunaj to make the building fully operational). (JX 86 at 1086-87, referring to attachments JX 80, at 1061-65, JX 84 at 1076-84, JX 79 at 1059-60.) In addition, Englewood had recently submitted a rehab loan application that set forth a proposal for a substantial rehabilitation of the entire building. (JX 241 at 3248-3676.)

**3. HUD Did Not Review or Process Englewood's Response To The REAC Report.**

Although the REAC Report obligated HUD to review Englewood's response to the REAC and work with Englewood to develop an acceptable plan, HUD did nothing to process Englewood's response. The REAC Report described HUD's responsibilities:

> Upon receipt of the Plan, the Project Manager will review it to ensure that it has sufficient detail regarding plans and resources for correction, and that the time frames are appropriate. The Project Manager will contact you to discuss any required amendments and the process that will be used to verify completion of the Plan.

(JX 28 at 768.)

Ms. Thomas did not meet with Englewood to discuss her findings. (Tr. 969.) She never contacted Englewood to describe the "required amendments" to Englewood's plan. (*Id.*)

**D. HUD Has No Basis To Justify Its "Default" Other Than The Findings Of The REAC Report.**

Through Mr. Hinsberger's testimony at trial, HUD conceded that it had no reason for the termination of Englewood's contract except for the conditions described in the March 2001 REAC Report. (Tr. 544.) Mr. Hinsberger testified that the REAC Report is "the basis for [the] default notice." (*Id.*) HUD's April 9, 2001 Notice of Default also refers to Englewood's alleged failure to "comply" with HUD directives for the prior 23 months, the rejection of Englewood's request for a HUD-insured loan in March 2001, and Englewood's purported failure to correct exigent health and safety items noted during the March 2, 2001 REAC inspection. (JX 89 at 1090.) In fact, Englewood was in compliance with HUD directives since the REAC Report in April of 1999. Englewood's rehab loan was rejected because it did not propose a "like new" building, not because it was insufficient to meet the requirements of the REAC Report. Finally, Englewood had corrected the EH&S deficiencies in a timely manner. But Mr. Hinsberger acknowledged at trial that none of these issues constituted a basis for HUD's default notice. (Tr. 544-46.)

**E. HUD's Declaration That South Pointe Was Not In "Decent, Safe, And Sanitary" Condition In 2001 Is Unwarranted And Does Not Justify HUD's Breach.**

At trial, HUD's witnesses repeated a refrain – that South Pointe was not in "decent, safe and sanitary" condition, and therefore HUD had the right to terminate Englewood's contract. (Tr. 323.) For four reasons, HUD's declaration that South Pointe was not "decent, safe and sanitary" does not justify HUD's breach of its contract with Englewood: (1) HUD failed to follow its obligations under its contract with Englewood to specify the nature of Englewood's

default and the requirements to cure any deficiency noted by HUD; (2) HUD followed a completely arbitrary and unreliable process in determining South Pointe was not "decent, safe and sanitary"; (3) *even at trial*, HUD's witnesses failed to articulate the standard of "decent, safe and sanitary" and the repairs necessary to bring South Pointe within that standard; and (4) the evidence presented at trial demonstrates that South Pointe was "decent, safe and sanitary" in March 2001.

**1. HUD Ignored Its Obligations Under The Contract To Inform Englewood Of Any Specific Violation Of The "Decent, Safe, And Sanitary" Standard.**

Section 6 of the 1998 Housing Assistance Payments Contract, which was incorporated into the parties October 2000 agreement, addresses the procedures to be followed in the event that HUD determined that South Pointe was not in "decent, safe and sanitary" condition. Section 6(a) provides that "[i]f HUD determines that [South Pointe] is not "decent, safe and sanitary," HUD shall have the right to take action under section 20." (JX 19 at 679.) Section 20 of the 1998 Housing Assistance Payments contract, incorporated by reference into the October 2000 agreement, obligates HUD to provide Englewood with a specific description of any deficiency that might constitute a default and the actions to be taken to correct or remedy the situation. (JX 19 at 687.) This protects the due process interests of an owner so that HUD can not simply "declare" conditions to be "not decent, safe and sanitary" and then impose sanctions against an owner including the termination of a Housing Assistance Payments Contract. Mr. Hinsberger acknowledged that HUD was required to follow the procedures of Section 20 to issue a default. (Tr. 760-61.)

It is HUD's burden to show that it followed its contractual obligations in issuing a default. There is no evidence that HUD *ever* explained to Englewood in any communication (a)

the conditions at South Pointe that violated "decent, safe and sanitary" standards; or (b) the corrections necessary to bring South Pointe within that standard. Accordingly, HUD cannot satisfy its burden to prove that its termination of the Housing Assistance Payments Contract was justified.

**2. HUD's Conclusion That Englewood Was Not In "Decent, Safe, And Sanitary" Condition Was Based On Arbitrary, Unreliable And Incorrect Information And Not On The REAC Report.**

Trial revealed that there was no factual basis for HUD's finding that Englewood was not "decent, safe and sanitary." Chicago HUD Director, Ed Hinsberger made the decision to terminate Englewood's Housing Assistance Payments Contract. Mr. Hinsberger acknowledged at trial that the sole basis for that decision was the REAC Report. (Tr. 544.) But HUD has consistently attempted to confuse the issue by relying on other evidence outside of conditions described in that report. HUD argues that a series of "unofficial" inspections, unrelated to the REAC inspection in time and purpose, justified the finding that the project was not in "decent, safe and sanitary" condition. These were not "official" inspections by HUD professionals trained to do physical inspections. They were the short and anecdotal visits of HUD staff that didn't know how to replace outlet covers or breakers or the process or cost of doing repairs for peeling paint or a mismatched tile, and whose purpose was to collect evidence against Englewood. The results of many of these "inspections" were never shared with Englewood, and were often reduced to writing only in the form of internal HUD emails. By contrast, the Illinois Housing Development Authority inspected 61 South Pointe units just a few weeks after the REAC Inspection, and noted a need for only minor repairs. (Tr. at 1021-22.; JX 151 at 1547-50.)

**a. HUD's Senior Managers Never Visited South Pointe.**

Ed Hinsberger, the HUD official who decided to terminate Englewood's contract, testified that he last visited South Pointe in 1989, and had not been to the property between then and 2003. (Tr. 539.) He was not at South Pointe during 1999 and 2000 when the 2000 Housing Assistance Payments Contract was signed and when the events leading to the Notice of Default occurred. Ms. Maisonet, the other signatory on the Notice of Default, never visited South Pointe at any time. (Maisonet Dep. 45, JX 13 at 486.) Neither Mr. Hinsberger nor Ms. Maisonet had any first-hand knowledge of the condition of South Pointe at any point between 1989 and 2001.

**b. Mr. Hinsberger's Only Source Of Information Was Ms. Thomas.**

Because he had not visited South Pointe for more than a decade, Mr. Hinsberger's conclusions about South Pointe's condition depended on verbal reports from his staff, particularly Ms. Thomas and Ms. Coleman. Ms. Thomas verbally informed Mr. Hinsberger, as well as Ms. Coleman, of her impressions of South Pointe following her March 2000 Occupancy Review. (Tr. 338, 677.) That review, however, was the only time Ms. Thomas visited South Pointe from the fall of 1998 through her February 2001 Occupancy Review. (Tr. 346-47.) Accordingly, Ms. Thomas had little knowledge from which to conclude that the property was not in decent, safe and sanitary condition.

Ms. Thomas, Ms. Coleman and Mr. Hinsberger discussed the condition of South Pointe in the late fall of 2000 and early winter of 2001. (Tr. 198-99.) Their conversations led to Ms. Thomas's annotation in the "REMS" system on January 10, 2001 that "enforcement" was being taken against Englewood due to the "condition" of the property. (*Id.*, JX 108 at 1149.) The REMS entry demonstrated (and Ms. Thomas conceded) Mr. Hinsberger decided in late 2000 or early 2001 would terminate Englewood's multi-year contract once vouchers had been

obtained months before the REAC Report or other site visits recounted by HUD's witnesses. (Tr. 196-97.)

Trial revealed, furthermore, that Ms. Coleman had *no* first-hand knowledge of South Pointe. Ms. Coleman admitted she had never visited the property (Tr. 775-76), had not read any of Englewood's MIO Plan updates in 2000 (Tr. 784), and had not even read the Final Team Report for the property in February 2000. (Tr. 780-81.) Like Mr. Hinsberger, Ms. Coleman's information about the condition of South Pointe came from Ms. Thomas. (Tr. 782-83.) Ms. Batchelor, who testified she at times visited South Point weekly (Tr. 88), was the only HUD employee with consistent, direct experience. Her opinion was that South Pointe *was* decent, safe and sanitary, and Englewood's contract should not be terminated. (Tr. 186-87.) Her views were ignored.

**c. HUD Ignored The Observations And Analysis Of Freddie Batchelor.**

Freddie Batchelor, an experienced HUD specialist who had often visited South Pointe in 1999 and early 2000, testified unequivocally that South Pointe *was* in decent, safe and sanitary condition in 2001. (Tr. 187.) Ms. Batchelor based her opinion on her experience with the building – but also on a detailed analysis of the 1999 and 2001 REAC Reports. (Tr. 142-44.) Ms. Batchelor testified that Ms. Maisonet asked her to prepare an analysis in March 2001 comparing the REAC Reports to determine whether conditions had improved at South Pointe. (Tr. 142-44.) Her analysis (which HUD failed to produce in discovery) showed that Englewood's efforts over the past two years had led to substantial progress at South Pointe, and that the building was decent, safe and sanitary. (Tr. 186-87.) Notably, HUD failed to counter Ms. Batchelor's testimony with any testimony by Ms. Maisonet. Ms. Batchelor's testimony

should be given significant weight since she was HUD's own employee, and the HUD person with the greatest experience with troubled properties in general and South Pointe in particular.

**d. The "Unofficial Inspections" By HUD Staff Do Not Provide Support For HUD's Claim That South Pointe Was Not "Decent, Safe, And Sanitary" In March 2001.**

In the months after January 2001, HUD attempted to justify its pending "enforcement" action and its April 9, 2001 Notice of Default through a series of "unofficial" inspections by Ms. Thomas and a small group of HUD staff. Ms. Thomas, Lily Simmons, and Teresa Di Pietro all testified about their visits to South Pointe in 2001. The witnesses shared a lack of experience and knowledge of maintenance and construction issues. Ms. Simmons could not explain the method for fixing a missing outlet cover. (Tr. 1234-35.) Ms. Thomas and Ms. could not determine the process of correcting, cost of correcting or severity of almost any of their observed "findings." (Tr. 261-63; 1232-36.) They could not explain the time or cost required to fix basic maintenance problems such as a missing cover for an electrical outlet, a leaking faucet, a missing battery in a smoke detector, or a cracked floor tile. (Tr. 1212-16, 1234-35, 1261-62.) Ms. Di Pietro conceded that she visited the property as part of her "training" (by Ms. Thomas) as a new project manager. (Tr. 1248.) Because Ms. Thomas, Ms. Simmons and Ms. Di Pietro could not answer basic questions about maintenance issues and simple repairs, they are not qualified to determine whether South Pointe was in "decent, safe and sanitary" condition.

**3. The Findings Of The REAC Report Do Not Support A Conclusion That South Pointe Was Not Decent, Safe And Sanitary.**

The findings of the REAC Report did not show that South Pointe was not in "decent, safe, and sanitary" condition. Ms. Batchelor, an experienced HUD employee charged with analyzing the findings of the April 1999 and March 2001 REAC inspections, testified that her analysis revealed that South Pointe was in good repair. In fact, when asked directly whether

she believed the property to be "decent, safe and sanitary" in early 2001, she stated that it was. (Tr. at 187.)

Ms. Batchelor's analysis is supported by the findings of the REAC Report itself. Before deductions for "EH&S" items, the REAC inspected granted South Pointe a perfect score for the South Pointe building systems – which, by definition, include the building elevators, fire protection, heating/ventilation/air conditioning and sanitary system. (JX 28 at 769, 777.) Accordingly, not only did the REAC inspection *not* prove that Englewood was not "decent, safe and sanitary," the inspection directly refuted the *ad hoc* observations of Ms. Thomas, Ms. Simmons, and Ms. Di Pietro, who complained of elevator problems and fire protection issues.

**4. HUD Has Failed To Describe The Standard Of "Decent, Safe, And Sanitary" With Any Particularity.**

HUD never explained at trial in any comprehensible way what exactly it meant by "decent, safe and sanitary." This is not surprising given the ambiguity of the phrase. But the burden is on HUD to be precise if it seeks to justify contract termination on that basis. This task is a difficult one, which HUD's witnesses did not attempt.

A number of courts have held that the standard of "decent, safe and sanitary" is so vague that is essentially meaningless – and thus defaults for failure to maintain a property in "decent, safe and sanitary" condition are unjustified. Those courts have found that the term "'decent, safe and sanitary' housing is a subjective term at best." *Goode v. St. Stephens United Methodist Church*, 494 S.E. 2d 827, 834 (S.C. Ct. App. 1997), quoting *Perry v. Housing Authority of Charleston*, 664 F. 2d. 1210, 1216 n 13 (4th Cir. 1981), in turn *quoting Boston Public Housing Tenant's Policy Council, Inc. v. Lynn*, 388 F. Supp. 493, 497 (D. Mass. 1974).

As the court held in *United States v. Southland Management Corp.*, 326 F.3d 669, 675 (5th Cir. 2003), the meaning of "decent, safe, and sanitary" is neither precise nor

measurable. Thus, "[t]here will be wide difference of opinion of what is, and what is not, decent, safe, or sanitary." *Id.* In *Southland*, where the issue was whether building owners' certifications that the building was decent safe and sanitary were false claims, the district court granted the owners' motion for summary judgment. *United States v. Southland Management Corp, Inc.*, 95 F. Supp. 2d 629 (S.D. Miss. 2000). The Fifth Circuit *en banc* affirmed the trial court. *United States v. Southland Management Corp., Inc.*, 326 F. 3d 669 (5th Cir. 2003). In her concurring opinion (in which she was joined by Judges Smith, Barksdale, DeMoss and Clement) Judge Jones noted that:

> No regulatory or contractual definition of that standard exists. The content of the standard is far from self evident . . . At oral argument to the en banc court, the government's attorney repeatedly failed to offer any coherent, non-tautological definition of the standard.

*Id*. at 684. *See also Dewakuku v. Martinez*, 226 F. Supp. 2d 1199, 1201 (D. Ariz. 2002) (although parties agreed that the building in question was not "decent safe and sanitary," court acknowledged the potentially subjective nature of the determination - "an assessment as to whether property qualifies as decent, safe, and sanitary *obviously involves a certain degree of subjective judgment*").

Because of the vague and subjective nature of HUD's "decent, safe and sanitary" standard, HUD cannot rely on a simple declaration that South Pointe was not in "decent, safe and sanitary" condition as justification for a default finding. It offered nothing beyond that.

## III. IN ADDITION TO ITS BREACH OF THE EXPRESS TERMS OF THE PARTIES' AGREEMENT, HUD VIOLATED ITS DUTY OF GOOD FAITH AND FAIR DEALING.

"Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." *P.R. Burke Corp. v. United States*, 277 F.3d 1346, 1360

(Fed. Cir. 2002), *quoting* RESTATEMENT (SECOND) OF CONTRACTS § 205 (1979). Proof of a breach of a party's duty of good faith and fair dealing must be considered in the same manner as any other breach of contract. *Tecom, Inc. v. United States,* 66 Fed. Cl. 736, 771 (Fed. Cl. 2005) ("[C]laims of a breach of the implied covenant of good faith and fair dealing--including claims that the duties to cooperate and not hinder performance of a contract have been breached--are to be treated like any other claim for breach of contract.") HUD violated that duty in its dealings with Englewood.

**A. The Law Of Good Faith And Fair Dealing.**

Courts have described government conduct that violates this duty in a variety of ways. Most cases involve "actions that unreasonably cause delay or hindrance to contract performance." *George A. Fuller Co. v. United States*, 69 F. Supp. 409, 411, 108 Ct. Cl. 70, 94 (Ct. Cl. 1947) ("implied provision of every contract, whether it be one between individuals or between an individual and the government, that neither party to the contract will do anything to prevent performance thereof by the other party or that will hinder or delay him in its performance."); *Precision Pine & Timber, Inc. v. United States*, 50 Fed. Cl. 35, 59 n. 31 (Fed. Cl. 2001) ("the implied duties to cooperate and not to hinder are two separate, albeit related, implied duties"); *Essex Electro Engineers, Inc. v. Danzig*, 224 F.3d 1283, 1291 (Fed. Cir. 2000) ("Every contract, as an aspect of the duty of good faith and fair dealing, imposes an implied obligation that neither party will do anything that will hinder or delay the other party in performance of the contract.") (internal quotation marks and citations omitted).

For example, the government's failure to follow its own policies breaches the duty of good faith and fair dealing. *Rodriguez v. United States*, 69 Fed. Cl. 487, 498-99 (Fed. Cl. 2006). Similarly, the government breaches the duty of good faith and fair dealing when it makes

up its inspection standards as it goes along. *H&S Manufacturing, Inc. v. United States*, 66 Fed. Cl. 301, 311 (Fed. Cl. 2005), *citing WRB Corp. v. United States*, 183 Ct. Cl. 409, 509 (Ct. Cl. 1968) ("[I]nconsistent inspections 'amounted to an unreasonable interference with the plaintiff in its attempt to perform the contract.'

The *Tecom* court stated that the presumption of good faith and "well nigh irrefragable" burden of proof are not germane to ordinary breach of contract claims: "[W]hen the government actions that are alleged are not formal, discretionary decisions, but instead the actions that might be taken by any party to a contract, the presumption of good faith has no application." *Id.* at 769. Accordingly, "[t]he Government's long touted desideratum that "irrefragable proof" is needed to demonstrate the absence of good faith in the administration of government contracts has been given its last rites." *H & S Mfg., Inc. v. United States,* 66 Fed. Cl. 301, 310-11 (Fed. Cl. 2005).

The current state of the law, in which the government is treated as an ordinary contractor, returns the Court of Claims to the longstanding rule that "[w]hen the United States enters into contract relations, its rights and duties therein are generally governed by the law applicable to contracts between private individuals." *Lynch v. United States,* 292 U.S. 571, 579, (1934); *Mobil Oil Exploration & Producing S.E., Inc. v. United States,* 530 U.S. 604, 607-08 (2000) ("When the United States enters into contract relations, its rights and duties therein are governed generally by the law applicable to contracts between private individuals." In summary, when the government is acting as a party to a contract, it is subject to the same standards of law, presumptions and burdens of proof as any other contracting party.

**B. HUD Violated Its Duty Of Good Faith And Fair Dealing In Four Important Instances.**

HUD violated its duty of Good Faith and Fair Dealing in four important situations where its actions prevented Englewood from completing its contract obligations.

First, HUD refused to follow the directive of the Final Team Report to "continue the finalization" Englewood's MIO Plan over the eight month period from February through October of 2000. (*See* JX 47 at 867; Tr. 405, 423, 426.) HUD's failure to process the MIO Plan reflects HUD Multi-Family's persistent refusal to work with Englewood on its efforts to repair and renovate South Pointe. Englewood repeatedly sought out feedback from HUD on the ongoing renovations at South Pointe. (Tr. 405, 423, 426.) Ms. Thomas not only failed to respond, *she failed to read the MIO Plans submitted by Englewood.* (Tr. 252.) Had HUD engaged in a dialog with Englewood prior to reaching its decision to take an "enforcement" action and ultimately default Englewood, the present dispute and Englewood's damages could have been avoided.

Second, HUD returned Englewood's April 5, 2001 MIO Plan and April 8, 2001 Response to the REAC Report to Englewood. HUD's response stated that the circumstances were now "beyond that point at which communication would be useful." (JX 93 at 1098.) Again, HUD violated a written directive *from HUD* – on this occasion, an instruction in the REAC Report to the project manager, Ms. Thomas. (*Id.*) Under the REAC Report, Ms. Thomas was required to contact Englewood "to discuss any required amendments" to Englewood's response. (JX 28 at 768.) Had HUD engaged Englewood in negotiations and lifted its spurious default notice, Englewood could have executed on its planned refinancing (with HUD or a private party) using the four year HAP contract as the revenue base for a rehabilitation loan.

Third, HUD refused to grant or process Englewood's request for a HAP contract renewal and rent increase. (JX 104 at 1120-34.) HUD never provided Englewood with a written explanation for its failure to process the rent increase or renewal. Had HUD believed that it had the right to reject the renewal of its agreement with Englewood, HUD's own Manual required HUD to inform the owner, describe the reasons for the rejection and give the owner the opportunity to challenge or cure the reasons for the rejection. (JX 146 at 1502-04, HUD Handbook, Chapter 13.)

Fourth, HUD refused to grant Englewood's energy reimbursement claims for specious reasons. HUD claimed that all such requests must have been submitted by September 1, 2001, and that Englewood's claims were late. (Tr. at 704-06.) Mr. Hinsberger, in particular, testified that HUD never received a request by Englewood for energy reimbursements prior to September 1, 2001. (Tr. 706.) *Mr. Hinsberger's testimony directly contradicts one of the parties' Joint Stipulations of Fact.* (Jt. Stip. Facts ¶ 105: "On August 6, 2001, Englewood submitted a request for reimbursement of $55,230.29 for extraordinary gas costs during the winter of 2000-2001.")

### C. HUD Multi-Family's Actions Establish A Pattern Of Violations Of HUD's Duty Of Good Faith And Fair Dealing.

Trial established that HUD repeatedly violated its duty of good faith and fair dealing on other occasions. HUD delayed its responses to Englewood's requests for rent increases and special claims needed for the renovation of South Pointe. (Tr. 166, 410, 414-15.) HUD repeatedly repudiated its obligations under the parties' agreement by purporting to issue unilateral "amendments" in December 2000 and January 2001. (JX 22 at 705; JX 23 at 712.) HUD sought to force Englewood to replace its ownership and management company during a meeting on April 13, 2001. (Tr. 966-67.)

HUD's actions reveal a pattern of active hostility to Englewood – not only the absence of good faith, but bad faith. Indeed, *a former HUD employee*, Ms. Batchelor, stated that Ms. Thomas and Ms. Coleman *were* actively hostile to Englewood. (Tr. 132-38.) Ms. Batchelor and Mr. Sanders testified that Ms. Thomas was hostile in meetings with Englewood and an obstacle – not a help – in working with Englewood and the DEC in developing and implementing the MIO Plan. (*Id.*) Indeed, Ms. Thomas made false statements about Englewood to other HUD staff members. (Tr. 236-38.) Ms. Thomas and Ms. Coleman were directly involved in discussions that led to Mr. Hinsberger's decision prior to January 10, 2001 to terminate Englewood's contract. (Tr. 199.) Accordingly, Ms. Thomas and Ms. Coleman's bad faith actions led directly to the termination of Englewood's contract with HUD and resulting damages.

## IV. THE SEPTEMBER 2001 90-DAY SUBSIDY EXTENSION DID NOT ELIMINATE HUD'S OBLIGATION TO RENEW THE HAP CONTRACT.

HUD may claim in its post-trial brief that a 90-day subsidy extension signed by Mr. Hayes and Mr. Hinsberger allows HUD to avoid the effect of its breach of the parties' agreement. (*See* JX 24 at 719-36.) HUD has never clearly articulated a legal theory supporting such a claim. In its affirmative defenses to Englewood's Complaint, HUD alludes to an "accord and satisfaction" that it contends limits Englewood's rights under its contract with HUD. (*See* Aff. Defenses, Am. Ans. to Compl., Docket No. 70, at ¶ 99.) HUD did not elect to include any issues regarding that defense in the parties' Joint Statement of Issues of Fact and Law. (Docket No. 136.) Rather, HUD refers generally to the effect of a short term subsidy extension in September 2001 that HUD agrees was entered to allow residents to remain at South Pointe

during the voucher/contract termination process.[5] (Jt. Stmt. Issues ¶¶ 18, 19; Tr. 625-26.) HUD failed, however, to introduce any evidence regarding the purpose behind that extension or the effect of the extension. Indeed, the only evidence on the subject at trial was elicited by Englewood, and confirms that the short term subsidy extension had no effect on Englewood's claims in this action.

**A. The Parties Entered The Subsidy Extension To Provide South Pointe's Residents With Housing During The Voucher Process.**

"This Court has held that the interpretation of a contract by the parties to it before the contract becomes the subject of controversy is deemed to be of great, if not controlling weight." *Chase & Rice, Inc. v. United States*, 354 F.2d 318, 321-322 (Ct. Cl. 1965). If the parties intend a contract to have a certain meaning, this Court "will not allow their proven intention to be thwarted by a technicality" or ambiguity presented by the terms used by the parties. *Id.*

At trial, HUD presented no evidence regarding the limited subsidy extension in September 2001. Englewood elicited the only testimony regarding the agreements – from Mr. Hinsberger and Mr. Hayes. Both witnesses concurred that they intended the subsidy extension to minimize the impact on Englewood's tenants of HUD's closeout of the 2000 Contract project subsidy funding (which HUD unilaterally replaced with vouchers). (Tr. 625-26; 981-82.) There was no negotiation for the extensions. (Tr. 981-82.) HUD simply extended the subsidy, as and to the extent it considered necessary, in order to bridge the period during which the contract was being abated and vouchers were being issued to South Pointe's tenants. (Jt. Stip. Facts ¶¶ 119-21; see also, Maisonet Dep. 60-2, JX 13 at 490-1.)

[5] HUD plead just three affirmative defenses: estoppel, accord and satisfaction, and prior material breach. (Aff. Defenses, Am. Ans. to Compl., Docket No. 70, at ¶¶ 98-100.) Englewood asserts that HUD

Moreover, the evidence clearly showed that HUD directed Englewood to enter the subsidy extension *through the use of a provision of the parties October 18, 2000 Agreement.* Mr. Hinsberger expressed his belief that HUD had the right to insist that Englewood enter the extensions under the REAC addendum to the October 2000 Housing Assistance Payments contract. (Tr. 627.) He further testified that he exercised that authority in September 2001 by sending Englewood only a short term extension. (*Id.*) Accordingly, the subsidy extension was not a waiver of Englewood's rights under its agreement with HUD – but rather an election by HUD to (wrongfully) pursue termination of the October 18, 2000 Housing Assistance Payments contract.

**B. Englewood Did Not Release Its Claims To Seek Damages For Breach Of The October 2000 Housing Assistance Payments Contract.**

Englewood did not release or waive its rights to seek redress for HUD's breach of the 2000 Housing Assistance Payments Contract by executing the subsidy extension. At the time of the September 2001 extension, HUD had already repudiated the 2000 Housing Assistance Payments Contract on April 13, 2001 when it would no longer deal with Englewood, required that Hayes find a new owner, and asked CHAC to prepare vouchers to South Pointe residents for issuance on October 1, 2001. Mr. Hinsberger has acknowledged that when vouchers were issued, Englewood's contract was doomed. (Tr. 635-36.) As discussed above, HUD's repudiation allowed Englewood to wait for HUD to reconsider and perform under the parties' agreement. *Franconia Assocs.*, 536 U.S. at 143. HUD had repudiated the contract well before the 90-day subsidy extension, which was itself part of the abatement and termination process, leaving Englewood with its right to sue for breach or take steps to mitigate its damages.

---

has waived any other affirmative defenses. (Jt. Stmt. Issues ¶ 8.)

Indeed, when asked about the effect of the subsidy extensions at oral argument on HUD's motion to dismiss, HUD's counsel told the court: "*I don't think they waived their rights*." (August 31, 2004 Op. at 2, Docket No. 31, JX 9 at 164.) In a similar case, the court noted testimony of a government witness who stated the parties to a substituted contract did not intend to "cut off" existing claims by the parties, and rejected the government's argument that the subsequent contract acted as a release of the bank's rights. *Merchants Nat. Bank of Mobile v. United States,* 7 Cl. Ct. 1, 11 (Cl. Ct. 1984)

### C. HUD's November 2001 Termination Notice Shows That Englewood's Rights Under The 2000 Housing Assistance Payments Contract Survived The 90-Day Subsidy Extension In September 2001.

HUD served its "Notice of Abatement and Termination" purporting to terminate Englewood's rights under the 2000 Housing Assistance Payments Contract in November 2001, two months after the short-term subsidy extension that it obviously did not view (at the time) as having ended the 2000 contract. (JX 117 at 1176-77.) The November 2001 Termination Notice expressly refers to the 2000 Housing Assistance Payments Contract, and HUD's declaration of default in April 2001. (*Id.*) It makes no reference to the subsidy extension or any supposed event earlier concluding the 2000 contract.

At HUD's urging, in fact, Judge Castillo of the Northern District of Illinois ruled that HUD had not terminated the 2000 HAP contract, and had not even started the termination proceedings in October 2001. (JX 224 at 2463, HUD's Response to Motion for Preliminary Injunction at 8, filed November 8, 2001 in *Englewood v. HUD*, Case No. 01 C 8285 (N.D. Ill.)) (emphasis added). HUD told Judge Castillo in November 2001 that it had not yet "commence[d] suspension of abatement of the contract." (*Id.*) Accordingly, HUD's argument in 2007 that Englewood had no rights under the October 2000 Housing Assistance Payments Contract after

the execution of the subsidy extension contradicts arguments made successfully by HUD in November 2001. HUD's arguments led Judge Castillo to deny Englewood's motion for a preliminary injunction to halt vouchers and contract termination, and it cannot now reverse its position. (Jt. Stip. Facts ¶ 116.)

## CONCLUSION

For the foregoing reasons, Englewood respectfully requests this Court to find HUD liable to Englewood for breach of contract. Englewood has clearly met its burden to prove that HUD breached a valid agreement between the parties – the October 18, 2000 Housing Assistance Payments contract. HUD has fallen far short of meeting its burden on any of its defenses to Englewood's claims. Judgment should be entered for Englewood.

Dated: April 13, 2007

s/Peter V. Baugher
One of the Attorneys for Plaintiff
Englewood Terrace Limited Partnership

Peter V. Baugher
William B. Berndt
Schopf & Weiss LLP
One South Wacker Drive
28th Floor
Chicago, IL 60606
312.701.9300

# APPENDIX A

## STATEMENT REGARDING CLAIMS THAT HAVE BEEN DISMISSED

Pursuant to the Court's February 28, 2007 Order, the parties conferred and, on March 14, 2007, submitted a list of claims asserted in the Complaint of Plaintiff Englewood Terrace Limited Partnership ("Englewood") that Englewood withdrew or agreed to dismiss during the trial (Docket No. 135):

1. Claims for damages arising from alleged vacancies at South Pointe (*i.e.* "vacancy claims"). *See* Complaint ¶ 94 (c).

2. Claims for damages arising from special claims for unpaid tenant rents and damage to units caused by tenants of South Pointe. *See* Complaint ¶ 94 (d).

Additionally, as discussed in Englewood's February 26, 2007 Motion to Voluntarily Dismiss Certain Claims (filed February 27, 2007 as Docket No. 132), and this Court's Order of February 28, 2007, Englewood has withdrawn certain claims relating to alleged Form 2530 program participation claims against Englewood. As stipulated by the parties at trial (Record p. 1169), Englewood also dismissed its claim for damages caused by HUD's failure to award Englewood an alleged rent increase in 1999.

**CERTIFICATE OF SERVICE**

I, Peter V. Baugher, one of the attorneys for Plaintiff Englewood Terrace Limited Partnership, state that on April 13, 2007, I caused a copy of **Plaintiff Englewood's Post-Trial Brief,** to be served electronically on:

Mr. Douglas K. Mickle
Commercial Litigation Branch
Civil Division, United States Department of Justice
11 L Street, N.W.
Room 10130
Washington, DC 20005

s/Peter V. Baugher
Peter V. Baugher