**No. 03-2209C**
**(Judge Marian Blank Horn)**

---

**ENGLEWOOD TERRACE LIMITED PARTNERSHIP,**

**Plaintiff,**

**v.**

**THE UNITED STATES,**

**Defendant.**

---

# DEFENDANT'S RESPONSE TO PLAINTIFF'S POST-TRIAL BRIEF

---

**PETER D. KEISLER**
**Assistant Attorney General**

**JEANNE E. DAVIDSON**
**Director**

**BRIAN M. SIMKIN**
**Assistant Director**

**OF COUNSEL:**

**GREGORY G. GUSTIN**
**MARIA T. BAGUIO**
**RUSSELL J. COHEN**
**LORRAINE C. SHOTO**
**Office of General Counsel**
**U.S. Department of Housing and Urban Development**
**Chicago, Illinois**

**DOUGLAS K. MICKLE**
**Trial Attorney**
**Commercial Litigation Branch**
**Civil Division**
**Department of Justice**
**Attn: Classification Unit, 8th Floor**
**1100 L Street, N.W.**
**Washington, D.C. 20530**
**Tel: (202) 307-0383**
**Fax: (202) 353-7988**

**Attorneys for Defendant**

**May 2, 2007**

# TABLE OF CONTENTS

**PAGE**

DEFENDANT'S RESPONSE TO PLAINTIFF'S POST-TRIAL BRIEF .................................... 1

PRELIMINARY STATEMENT .......................................................................................... 1

ARGUMENT ...................................................................................................................... 4

I. Englewood Failed To Meet Its Burden And Prove That HUD Committed A Breach Of A Material Term Of The HAP Contract By A Preponderance Of The Evidence ........................................................................................ 4

A. Englewood's Post-Trial Brief Completely Disregards Englewood's Duty To Maintain South Pointe In Decent, Safe And Sanitary Condition As It Was Obligated To Do Pursuant To The HAP Contract ........................................................................................ 5

B. Englewood Failed To Prove That It Was Entitled To Four Years Of HAP Contract Payments .............................................................. 7

1. The Testimony And Documentary Evidence At Trial Shows That Short Term Renewals Of The HAP Contract Were What The Parties Contemplated In October 2000 ......................... 8

C. Englewood Is Wrong When It Asserts That HUD Demanded That Englewood Change Principals And Also Repair South Pointe To An "As New" Condition To Avoid Default Of The HAP Contract ............. 16

D. Englewood Has No Basis For Urging The Court To Draw An Adverse Inference Because Mary Anderson Did Not Provide Cumulative Evidence At Trial Regarding The Duration Of One Of The Parties' HAP Contracts ............................................................ 20

II. Overwhelming Evidence Supports HUD's Decision To Abate And Terminate The HAP Contract ................................................................... 22

III. Englewood Had Been On Notice For More Than Two Years As To What It Needed To Do At South Pointe To Avoid Default – And It Still Failed To Comply ........................................................................................... 30

IV. Englewood Never Properly Responded To The 2001 REAC Inspection ............ 33

A. Englewood Did Not Correct The Exigent Health And Safety Items ....... 33

B. Englewood Never Conducted The Required 100 Percent Survey That Identified South Pointe's Overall Needs ........................................ 35

C. Englewood Not Only Failed To Identify A Funding Source For The Repairs, It Specifically Told HUD That It Was Not Going To Inject Any Of Its Funds Into The Property ...................................................... 36

D. Englewood Never Submitted A MIO Plan That Required A Response From HUD, Nevertheless, HUD Did Respond ....................................... 38

V. Englewood's Claim That HUD Was Not Justified In Finding That South Pointe Was Not In Decent, Safe And Sanitary Condition Has No Legal Or Evidentiary Support ....................................................................... 39

A. Englewood Was Placed Upon Notice On Numerous Occasions As To Its Responsibilities Regarding Maintaining All Of South Pointe In Decent, Safe And Sanitary Condition ................................................ 39

B. HUD Possessed Overwhelming Evidence To Support Its Decision That South Pointe Was Not Being Maintained In Accordance With The Standards Set Forth At 24 C.F.R § 5.703 ........................................ 41

C. Englewood Has No Legal, Contractual, Or Regulatory Bases For Asserting That HUD Could Only Rely Upon Alleged "Official" Inspections Of South Pointe .................................................................. 48

VI. The Term Decent, Safe And Sanitary Is Well–Defined In The Regulation And There Was No Evidence From Englewood Produced At Trial To Justify Any Other Conclusion ............................................................................ 54

VII. Englewood's Argument That HUD Personnel Acted In Bad Faith Is Without Merit ...................................................................................... 54

A. Englewood Misstates The Law Regarding The Presumption That Government Employees Act In Good Faith When Administering The Contract .................................................................. 55

B. HUD Did Not Act In Bad Faith In 1999 And 2001 By Not Approving Englewood's Purported MIO Plan ........................................................ 58

C. HUD Had No Contractual Or Regulatory Duty To Approve Englewood's Alleged Claims For HAP Contract Renewal, A Rent Increase And Energy Reimbursements ........................................... 61

CONCLUSION .................................................................................................... 61

## TABLE OF AUTHORITIES

**CASES** **PAGE(S)**

Am-Pro Protective Agency, Inc. v. United States,
281 F.3d 1234 (Fed. Cir. 2002) ........ 56, 57

Appeal of Blanco-Mora Enterprises, Inc., HUDBCA No. 94-G-136-C5,
94-3 BCA ¶ 26,974 ........ 4

Appeal of Housing Authority of the City of Pagedale, HUDBCA No. 87-2687-C18
89-1 BCA P 21302 ........ 4

Applied Companies v. United States,
144 F.3d 1470 (Fed. Cir. 1998) ........ 9

Argus Inc. v. Eastman Kodak Co.,
801 F.2d 38, 42-43 (2nd Cir. 1986) ........ 9

California Sand and Gravel, Inc. v. United States,
22 Cl. Ct. 19, 25 (1990) ........ 15, 16

Casa de Cambio Comdiv S.A., de C.V. v. United States,
291 F.3d 1356 (Fed. Cir. 2002) ........ 17

CEMS, Inc. v. United States,
65 Fed. Cl. 473 (2005) ........ 42

Christopher Village , L.P. v. United States,
360 F.3d 1319 (Fed. Cir. 2004) ........ 6

College Point Boat Corp. v. United States,
267 U.S. 12 (1925) ........ 6

Colby v. J.C. Penney Cp.,
811 F.2d 1119 (7th Cir. 1987) ........ 56

E. Walters & Co. v. United States,
217 Ct. C 576 F.2d 362 (1978) ........ 16

Fed. Prop. Mgt. Corp. v. Harris,
603 F.2d 1226 (6th Cir. 1979) ........ 17

Fru-Con Construction Corp. v. United States,
43 Fed. Cl. 306, aff'd on recon. in relevant part, 44 Fed. Cl. 298 (1999) ........ 9

Galen Med. Assocs., Inc. v. United States,
369 F.3d 1324 (Fed. Cir. 2004) ........................................ 57, 58

Hoffman v. General Motors Acceptance Corp.,
814 F.2d 1385 (9th Cir. 1986) ........................................ 6

Info. Tech. & Applications Corp. v. United States,
316 F.3d 1312 (Fed. Cir.2003) ........................................ 57

L.P. Consulting Group, Inc. v. United States,
66 Fed. Cl. 238 (2005) ........................................ 57, 58

Lisbon Contractors Inc. v. United States,
828 F2d 759 (Fed. Cir. 1987) ........................................ 4

Long Lane Ltd. Partnership v. Bibb,
No. 05-1036, 2005 WL 3304124,
159 Fed. Appx. 189 (Fed. Cir. Dec. 7, 2005) ........................................ 57

Marcus Garvey Square, Inc. v. Winston Burnett Constr. Company,
595 F.2d 1126 (9th Cir. 1979) ........................................ 17

Marsh v. Oregon Natural Resources Council,
490 U.S. 360 (1988) ........................................ 8

Mients v. United States,
50 Fed. Cl. 665 (2001) ........................................ 17

Montgomery Coca-Cola Bottling Co. v. United States,
222 Ct. Cl. 356, 615 F.2d 1318 (1980) ........................................ 9

Mid-West Construction, Ltd. v. United States,
181 Ct. Cl. 774, 387 F.2d 957 (1967) ........................................ 32

National Movers Co. v. United States,
181 Ct. Cl. 419, 386 F.2d 999 (1967) ........................................ 32

New York Shipbuilding Corp. v. United States,
180 Ct. Cl. 446, 385 F.2d 926 (1968) ........................................ 42

Pacific Architects and Engineers Inc. et. al. v. United States,
203 Ct. Cl. 499, 491 F.2d 734 (1974) ........................................ 42

Penthouse Int'l, Ltd., v. Dominion Fed. Sav. & Loan Assoc.,
855 F.2d 963 (2d Cir. 1988) ........................................ 32

Potter v. United States,
167 Ct. Cl. 28 (1964) .......... 32

San Carlos Irrigation and Drainage District v. United States,
877 F.2d 957 (Fed. Cir. 1989) .......... 4, 6, 7

Schism v. United States,
316 F.3d 1259 (Fed. Cir. 2002) .......... 57

So. Comfort Builders, Inc. v. United States,
67 Fed. Cl. 124 (2005) .......... 17

Sterling Millwrights, Inc. v. United States,
26 Cl. Ct. 49 (1992) .......... 9

Spezzaferro v. Fed. Aviation Admin.,
807 F.2d 169 (Fed. Cir. 1986) .......... 57

Sun Eagle Corp. v. United States,
23 Cl. Ct. 465, 473 (1991) .......... 56

Tecom v. United States,
66 Fed. Cl. 736 (Fed. Cir. 2005) .......... 55, 56

Tyler House Apartments, Ltd. v. United States,
38 Fed. Cl. 1 (1997) .......... 17

United States v. Articles of Drug Consisting of 203 Paper Bags,
818 F.2d 569 (7th Cir. 1987) .......... 56

United States v. Gregory Park, Section II, Inc.,
373 F. Supp. 317 (D.N.J. 1974) .......... 17

United States v. Gypsum Co.,
333 U.S. 364 (1947) .......... 9

United States v. Penn Foundry & Mfg.,
337 U.S. 198, 212 (1949) .......... 32

U.S. PolyCon Corp. v. United States,
43 Fed. Cl. 11 (1999) .......... 56

West Coast Gen. Corp. v. Dalton,
39 F.3d 312 (Fed. Cir. 1994) .......... 56

Whittaker Elect. Systs. v. Dalton Security,
124 F.3d 1443 (Fed. Cir. 1997) ........ 16

## STATUTES AND REGULATIONS

12 U.S.C §1715l ........ 21

18 U.S.C. § 207 ........ 44

41 U.S.C. § 601 et seq ........ 4

5 C.F.R. § 2637.208 ........ 44

24 C.F.R. § 15.301(b) ........ 44

24 C.F.R. § 15.302 (a) ........ 44

24 C.F.R. § 200.857(i)(4) ........ 30, 61

24 C.F.R. § 5.703 ........ passim

48 C.F.R. §2.101 ........ 4

## MISCELLANEOUS

Richard A. Lord, 23 Williston on Contracts § 63:22 (4th ed. 2002) ........ 54

Richard A. Lord, 29 Williston on Contracts § 73.17 (4th ed. 2003) ........ 16

## EXHIBITS TO RESPONSE BRIEF

Chart Setting Forth Record And Government Agency Cites Discussing
South Pointe's Deficiencies ........ A

Englewood Terrace Limited Partnership v. United States, *et. al*,
No. 02C-4033, PACER, Document 11, (N.D. Il. March 11, 2003) ........ B

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **ENGLEWOOD TERRACE LIMITED PARTNERSHIP,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 03-2209C** |
| | ) | **(Judge Marian Blank Horn)** |
| **THE UNITED STATES,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**DEFENDANT'S RESPONSE TO**
**PLAINTIFF'S POST-TRIAL BRIEF**

Pursuant to Appendix A, ¶ 19 of the Rules of the United States Court of Federal Claims, and this Court's order dated February 28, 2007, defendant, the United States, respectfully submits this response to the post-trial brief filed by the plaintiff, Englewood Terrace Limited Partnership ("Englewood").

**PRELIMINARY STATEMENT**[1]

Defendant has addressed below each of the arguments that Englewood has presented in its post-trial brief.[2] All of Englewood's various claims about the conduct of the United States Department of Housing and Urban Development ("HUD"), however, should be considered in light of one fundamental fact: Englewood sets forth no credible evidence that it was maintaining South Pointe in decent, safe and sanitary conditions as it agreed to do pursuant to the Housing

---

[1] Throughout this brief we will use the following acronyms when referencing to facts adduced at trial: page from the joint exhibit ("JX __, p. __"); paragraph in the complaint ("Compl. ¶ __"); paragraph in the joint stipulation of facts ("Jt. Stip. of Fact ¶ __"); page and line from the record of trial transcript ("Record _ : __"), Plaintiff's Post Trial Brief ("Pl. Br. __"); Defendant's Post Trial Brief ("Def. Br. __").

[2] Englewood appears to have abandoned even more claims as its post-trial brief fails to address its claims that it is entitled to an energy reimbursement and rental increase in 2001.

Assistance Payments ("HAP") contract and 24 C.F.R. § 5.703 when HUD issued: (1) the first notice of default to Englewood in April 2001, (2) a continuing notice of contract default in May 2001, (3) a notice of contract abatement and termination in November 2001, or, (4) when, HUD finally ended the contract in September 2002. Englewood's post-trial brief fails to show where even one witness testified that South Pointe was being properly maintained when HUD elected to terminate the contract on November 30, 2001, or even thereafter. This is fatal to all of Englewood's claims because the HAP contract was clear and explicit that, if Englewood failed to maintain South Pointe in decent, safe and sanitary condition, HUD could abate and terminate the HAP contract. That is exactly what the evidence at trial showed occurred. Moreover, and assuming it was otherwise justified, a finding that South Pointe was not being properly maintained extinguishes, as a matter of law, Englewood's subordinate claims for an energy reimbursement and rent increase in 2001. This is because an owner is only eligible to receive these discretionary payments if it has complied with all the terms of its HAP contract.

Instead of addressing the pivotal issue of the case, i.e., in what condition was Englewood maintaining South Pointe, Englewood spends a large part of its brief arguing over the duration of the HAP contract. In doing so, Englewood loses focus over this central issue because, as Mr. Hinsberger testified at trial, it did not matter if the term of the HAP contract was for "50 years," the terms of the HAP contract allowed HUD to end payments if the property was not maintained appropriately. Record 623: 10-15. Furthermore, Englewood spends several pages arguing that HUD employees were acting in bad faith when administering the contract; however, in making this argument, Englewood fails to show any evidence that HUD employees attempted to injure Englewood, let alone possessed the specific intent to do so as is required by the law. Moreover,

Englewood completely ignores the fact that, if HUD intended to injure Englewood, why would HUD then agree to a non-recourse $11.6 million dollar HUD-insured mortgage with Englewood for it to repair South Pointe after the HAP contract was abated and terminated.

The paucity of evidence in the record that supports any of Englewood's arguments is glaring. As a result, Englewood's arguments are based upon incomplete quotations of testimony and unfocused citations to documents. This tactic is understandable, however, given the lack of testimony or documentary evidence in support of its claims. Nevertheless, the overwhelming evidence regarding the deplorable condition of South Pointe cannot be ignored. The unequivocal and consistent testimony of experienced HUD employees who visited the property and who fielded the daily complaints of the tenants was never rebutted by Englewood. Nor were the numerous damning reports from city and state agencies that visited the property over several years only to see, consistent with both HUD's and even Englewood's evidence, conditions worsen. Moreover, Englewood failed to address the phone calls Ed Hinsberger received from desperate tenants seeking assistance. Nor did Englewood rebut the evidence that elected officials were constantly calling HUD officials to complain about the conditions of South Pointe. In sum, there was no evidence at trial that showed that Englewood was maintaining South Pointe in decent, safe or sanitary condition for years, and we respectfully submit that the Court should not endorse the conditions there as being anything but indecent, unsafe, and unsanitary. Accordingly, the Court should deny all of Englewood's claims and dismiss its complaint.

## ARGUMENT

### I. Englewood Failed To Meet Its Burden And Prove That HUD Committed A Breach Of A Material Term Of The HAP Contract By A Preponderance Of The Evidence

Englewood's post-trial brief correctly states that it bears the burden of proof in this breach of contract case by a preponderance of the evidence. See Pl. Br. p. 2. Furthermore, Englewood correctly states the standards that it must establish in order to prevail: "(1) a valid contract between the parties, (2) an obligation or duty arising out of the contract, (3) a breach of that duty, and (4) damages caused by the breach." Id., citing San Carlos Irrigation and Drainage District v. United States, 877 F.2d 957, 959 (Fed. Cir. 1989). Englewood is wrong, however, when it states that this case involves a termination for default in which HUD bears the burden. Id., citing Lisbon Contractors Inc. v. United States, 828 F.2d 759, 765 (Fed. Cir. 1987). As we demonstrated in our opening brief, a HAP contract is not for goods or services, and thus the jurisprudence concerning terminations for default issued pursuant to the Contracts Disputes Act ("CDA"), 41 U.S.C. § 601 et seq, such as Lisbon, supra, do not apply.[3] See Appeal of Blanco-Mora Enterprises, Inc., HUDBCA No. 94-G-136-C5, 94-3 BCA ¶ 26,974; Appeal of Housing Authority of the City of Pagedale, HUDBCA No. 87-2687-C18, 89-1 BCA P 21302; 48 C.F.R. §

---

[3] The Government agrees that it bears the burden in a termination for default case because that decision involves a Government claim. Indeed, the Federal Circuit stated as much in Lisbon when it held: "[w]e conclude that the government bears the burden of proof on the issue of default by the contractor **in this type of proceeding**." Lisbon, 828 F.2d at 763. Here, HUD is not making any affirmative claim against Englewood pursuant to the CDA's default clause. HUD is not seeking repayment of progress payments, as it would in a CDA termination for default scenario. Instead, HUD simply chose to abate and terminate the HAP contract because Englewood breached its agreement to maintain South Pointe in decent safe and sanitary condition. However, if the Court disagrees with our position upon this point, as we demonstrated in our post-trial brief and below, the evidence adduced at trial proved beyond any doubt that Englewood failed to maintain South Pointe in accordance with the standards set forth at 24 C.F.R. § 5.703.

2.101 (Federal Acquisition Regulations ("FAR"), definitions of "contract" and "contracting"). Thus, analysis of Englewood's complaint using the disputes or termination clauses of the FAR is inapplicable here.

Furthermore, given its burden of proof, as we show below, Englewood's post-trial brief: (1) completely disregards Englewood's duty to maintain South Pointe in decent, safe and sanitary condition as it was obligated to do pursuant to the HAP contract; (2) fails to establish, as it alleges, that it had a four-year HAP contract with HUD; and, (3) ignores the plain language of the contract that allows HUD to abate and terminate the HAP contract if Englewood fails to maintain South Pointe in proper condition.[4]

### A. Englewood's Post-Trial Brief Completely Disregards Englewood's Duty To Maintain South Pointe In Decent, Safe And Sanitary Condition As It Was Obligated To Do Pursuant To The HAP Contract

In arguing that HUD allegedly breached the HAP contract for the predicate failing to make four-years of HAP payments, Pl. Br. p. 44-47, Englewood completely ignores its contractual obligation that, before Englewood becomes entitled to any subsidy payment pursuant to the HAP contract, Englewood must first demonstrate that it was maintaining the property in decent, safe and sanitary condition.[5] Thus, Englewood has failed to meet its burden that HUD

[4] As we showed in our opening brief, if the Court determines that South Pointe was not being maintained in decent, safe and sanitary condition, it will not need to reach the issue as to what HAP renewal contract was in effect at the time HUD terminated the HAP contract. Each HAP contract agreed upon by the parties, regardless of their length of term, allowed HUD to end payments if the property was not maintained appropriately. Accordingly, we will first address the central issue regarding Englewood's maintenance of South Pointe, then show why Englewood did not possess a four-year HAP contract with HUD.

[5] As we demonstrated in our opening brief, even if the Court disagreed with HUD and determined that Englewood could meet its initial burden, HUD cannot be held liable for breach of contract for ending its contractual relationship with Englewood because Englewood violated

breached "an obligation or duty arising out of the contract." San Carlos Irrigation and Drainage District v. United States, 877 F.2d at 959.

Englewood has not disputed that it agreed in the HAP contract to provide "decent, safe, and sanitary" housing for the tenants. JX 019, p. 677 at 678; Jt. Stip. Of Fact ¶ 16. Furthermore, although Englewood now feigns ignorance as to the meaning of that term, see Pl. Br. pp. 67-68, Englewood had no difficulty with understanding the term or that HUD's obligation to make rental assistance payments to the owner only vested after HUD received Englewood's truthful monthly certification that South Pointe and its dwelling units were "in decent, safe, and sanitary condition." See JX 019, p. 677 at 679 (¶ 5(e)(2)). Not surprisingly, given the lack of supporting evidence at trial, Englewood's post-trial brief fails to mention this contractual prerequisite to it receiving HAP contract subsidies. Thus, Englewood has failed to meet its burden and show that HUD breached any obligation under the HAP contract because HUD had no duty to pay Englewood anything unless the property was being properly maintained.

---

the terms of the HAP contract by failing to maintain South Pointe in decent, safe and sanitary condition. Christopher Village , L.P. v. United States, 360 F.3d 1319, 1334 (Fed. Cir. 2004) ("When 'a party to a contract . . . is sued for its breach [it] may ordinarily defend on the ground that there existed, at the time [of the breach], a legal excuse for nonperformance.'") (quoting College Point Boat Corp. v. United States, 267 U.S. 12, 15 (1925)); see Restatement (Second) of Contracts § 237, Comment (a) (1979) (in general, "[a] material failure of performance by one party has the effect of preventing performance of the other party's duties"); Hoffman v. General Motors Acceptance Corp., 814 F.2d 1385, 1387 (9th Cir. 1986) (citing Restatement (Second) of Contracts § 237 (1969) for proposition that "if a condition precedent to the promisor's duty to perform has not occurred, he is under no duty to perform, whether or not he knows the condition has not occurred").

### B. Englewood Failed To Prove That It Was Entitled To Four Years Of HAP Contract Payments

Englewood also is required to establish that it possessed "a valid contract between the parties" that was breached before it is entitled to relief. See San Carlos Irrigation and Drainage District v. United States, 877 F.2d at 959. Englewood failed to meet this requirement at trial. While Englewood is correct that we do not dispute that a HAP contract renewal was executed in October of 2000, Englewood is wrong when it states that the parties intended any HAP contract to effectively last for four years.[6] Indeed, the testimony at trial by Director of Project Management Veronica Coleman, Project Manager Gwendolyn Thomas and Hub Director Edward Hinsberger was that the contract terms were not supposed to run for one year with three automatic renewals. Moreover, contemporaneous documents written at the time this contract was executed support the testimony of the HUD witnesses. Finally, Englewood waived any right it may have possessed to argue an alleged breach upon the part of HUD when it executed numerous follow-on HAP renewal contracts that specifically reference the predecessor contract's expiration.

---

[6] Englewood cites to page 625 of the transcript for support of its assertion that "[t]he parties agree that HUD did not "automatically" renew Englewood's contract for an additional term in October 2001, and did not provide four years of payments to Englewood under the contract." Pl. Br. p. 44. Nowhere on page 625, or in any of the surrounding pages to page 625, is there any statement by a witness that supports Englewood's allegation here. Englewood's assertion is just another of the many misquotes of the record Englewood makes throughout its opening post-trial brief. Moreover, Englewood's assertion here implies that HUD agrees that it was obligated, automatically or otherwise, to "provide four years of payments to Englewood," apparently despite Englewood's default, which of course, we dispute.

**1. The Testimony And Documentary Evidence At Trial Shows That Short Term Renewals Of The HAP Contract Were What The Parties Contemplated In October 2000**

Englewood argues that there "is no credible evidence that the October 18, 2000 Housing Assistance Payments Contract was in error as to the duration of the contract or the existence of three automatic one-year renewals." Pl. Br. pp. 47-48. This statement is wrong, as Englewood admits when it contradicts itself by arguing that the HUD witnesses who testified to the contrary were essentially lying. Pl. Br. pp. 51-52. However, no one from Englewood testified that the HUD employees were "fabricating" this testimony. Indeed, as we demonstrated in our post-trial brief and below, the evidence at trial supports the HUD witnesses' testimony on this point.

Furthermore, Englewood's argument here is based upon its assumption that there was a four-year contract between the parties. Englewood's argument ignores the testimony and documentary evidence adduced at trial that showed that the parties never intended to enter into a HAP contract for such a duration. To the contrary, the parties' conduct in October 2000, and subsequent to that date, show that the parties willingly agreed to numerous short term extensions of the HAP contract.

Three HUD officials testified that the October 2000 HAP renewal contract mistakenly contained a term of duration of one year plus three automatic renewals.[7] Record 212: 9-24, 680:

[7] Ms. Coleman and Ms. Thomas have been consistent in their testimony regarding this point. Both testified at their depositions that the terms of the contract sent to the owner were in error. JX 011, p. 251 at 302 (Thomas deposition transcript at 202: 2-3); JX 012, p. 365 at 383 (Coleman deposition transcript at 71: 10-12). These prior-consistent statements, again made under oath, also serve to rebut Englewood's unsupported allegations that Ms. Thomas and Ms. Coleman were fabricating evidence. More importantly, to the extent there was any inconsistency between the opinions of Englewood's employees and HUD's employees as to the conditions of South Pointe, HUD was certainly entitled to rely upon the findings of its own personnel. See Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 378 (1988) ("When specialists

3-11, 806:19-22. However, putting aside this direct testimony, Englewood's post-trial brief also fails to address the numerous documents that, contemporaneous with the October 2000 HAP renewal contract, clearly support the testimony of the HUD witnesses.[8] Moreover, as we set forth below, these documents demonstrated that Englewood knew that the HAP contract with the base term of one year with three automatic renewals was in error.

On October 16, 2000, Englewood executed a new HAP Renewal Contract ("2000 Renewal Contract") by which Englewood agreed that "[a]ll items of the Expiring [HAP] Contract are renewed except for those provisions relating to Contract Rents and rent adjustments." JX 021, p. 696 at 696-697; Jt. Stip. of Fact ¶ 24. HUD executed the 2000 Renewal Contract on October 18, 2000. JX 021, p. 696 at 697; Jt. Stip of Fact ¶ 64. However, the 2000 Renewal Contract contained an error indicating that it "shall run for an initial 1 Year period" and would "renew automatically for 3 additional one year terms, subject to the availability of appropriations in any year." JX 021, p.696; Record 680: 3-11. HUD's own

---

express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts . . . .").

[8] As we showed in our opening brief, it is well-established that contemporaneous documents have far greater probative value than post-hoc, self-serving testimony. This includes situations where the testimony is directly contradicted by the contemporaneous documents, e.g., Applied Companies v. United States, 144 F.3d 1470, 1474-75 (Fed. Cir. 1998) (affirming summary judgment); Montgomery Coca-Cola Bottling Co. v. United States, 222 Ct. Cl. 356, 369-75, 615 F.2d 1318 (1980) (citing United States v. Gypsum Co., 333 U.S. 364, 396 (1947)); Sterling Millwrights, Inc. v. United States, 26 Cl. Ct. 49, 90 (1992), and situations where an allegedly significant event is not reflected in the contemporaneous documents. E.g., Argus Inc. v. Eastman Kodak Co., 801 F.2d 38, 42-43 (2nd Cir. 1986); Fru-Con Construction Corp. v. United States, 43 Fed. Cl. 306, 335-37 (citing cases), aff'd on recon. in relevant part, 44 Fed. Cl. 298, 307, 314-15 (1999). Even if the overwhelming direct testimony from the numerous HUD witnesses that was consistent with the contemporaneous documents could be ignored, the Court should rely upon these contemporaneous documents, and reject any inconsistent, self-serving testimony offered by Englewood's witnesses at trial.

internal computer system reflected that the 2000 HAP Contract was renewed for a short-term period of three months. JX 068, p. 972 at 972 (showing "Short-term Renewal Effective Date" of 10/1/2000 and "Short-term Renewal Expiration Date" of 12/31/2000, and Last Modified: October 9, 2000).

HUD officials informed Englewood representatives of this error during a meeting on October 18, 2000. JX 071, p. 1014 at 1014; Record 210:10-18, 803:15-23, 811:3-15. Furthermore, on December 6, 2000, Veronica Coleman wrote a letter that transmitted a corrected copy of the 2000 Renewal Contract to John Hayes. JX 071, p. 1014 at 1014; Record 220: 4-9, 802: 7-18, 803: 3-9. The corrected copy of the 2000 HAP Renewal accurately stated that it was a "(three) 3 month short term renewal with zero (0) renewal terms." JX 022, p.705 at 705. Ms. Coleman's letter further stated that, as the owner's representatives were told in the October 18, 2000 meeting, the HAP contract was renewed for a shorter period "due to the physical conditions of the subject property." JX 071, p. 1014; Record 803: 15-20. Mr. Hayes received this letter but did not respond to HUD. Record 886: 23 - 887: 1; 887: 4-7, 888: 1-2.

Instead of complaining about the terms of the corrected contract or how the correction was processed, on January 22, 2001, Ken Horton, Asset Manager of P.M. Group, and the primary representative for Englewood upon these matters, simply acknowledged the correction in an e-mail to Ms. Coleman, stating:

> On a separate note, pursuant to my conversation with Ms. Thomas [a HUD Project Manager] last week, she informed me that the HAP contract would be <u>further</u> amended to reflect the original expiration date of September 30, 2001. Please forward the amended, amended HAP contract to my attention at the following address.

JX 072, p. 1015 at 1016; Jt. Stip. of Fact ¶ 70, emphasis added. Mr. Hayes also received a copy of this e-mail. JX 072, p. 1015 at 1016; Record 1013:12-14. Again, Mr. Hayes was silent. He never objected. Indeed, he never questioned the change. And why not? Because as Ms. Coleman testified, it was well-known by the parties that the duration set forth in the 2000 HAP Renewal Contract, as originally executed, was incorrect, and that the parties' intent was the agreed upon short-term extensions reflected in the corrected HAP Renewal Contracts. Record 804:22-24.

Additionally, following this exchange, Mr. Hayes responded to Ms. Coleman's e-mail and informed her that Mr. Horton would no longer be responsible for the loan application efforts. JX 073, p.1018; Record 1013:15-18. Again, it is noteworthy that at no time did Mr. Hayes express any objection to the corrected HAP contract or its expiration date of September 2001. JX 073, p. 1018; Record 1014: 12-17.

Furthermore, in August 2001, Don Samuelson, President of DSSA Management and DSSA Inc., purporting to act upon behalf of Englewood, requested a renewal of the corrected 2000 Renewal Contract that was scheduled to expire on September 30, 2001. Compl. ¶ 50; JX 104, p. 1120 at 1120; Record 976: 5-17. As with everyone else associated with Englewood during this time frame, when discussing the 2000 HAP Renewal Contract with HUD, Mr. Samuelson never contended that the 2000 HAP Renewal Contract was amended in error, or that there was no need to execute a new HAP renewal contract because the contract was not expiring; he simply requested a renewal of Englewood's existing HAP contract. JX 104, p. 1120. He did not argue that the renewal was automatic and no request was needed, as argued in Englewood's post-trial brief.

Moreover, as the corrected 2000 HAP Renewal contract was expiring on September 30, 2001, Englewood and HUD executed a new short-term HAP renewal contract ("2001 90-day HAP Renewal Contract") renewing the terms of the HAP contract “for a period of .3 years.” Compl. ¶ 52; Jt. Stip. of Fact ¶ 27; JX 024, p. 719 at 722; Record 981:12-16. In the 2001 90-day HAP Renewal Contract, the parties acknowledged in the agreement that they “had entered into a HAP Contract (“expiring contract”) to make Section 8 housing assistance payments to the Owner for eligible families living in the Project. The term of the expiring contract will expire prior to the beginning of the term of the Renewal Contract.” Jt. Stip. of Fact ¶ 26; JX 024, p. 719 at 724. HUD and Englewood further agreed that the purpose of the 2001 90-day HAP renewal Contract was “to renew the expiring contract for an additional term.” Jt. Stip. of Fact ¶ 27; JX 024, p. 719 at 724. Indeed, if Englewood believed it had a four-year, automatically renewing agreement with HUD, why would it agree to such written, signed, contract terms? Again, the answer is clear: The parties’ intent in October 2000 was to enter into short-term extensions.

Similarly, on December 21, 2001, Englewood willingly agreed to another HAP renewal contract ("2001 180-day HAP Renewal Contract"); this time, the parties agreed to renew the terms of the HAP Contract for six additional months. JX 025, p. 737 at 737-738; Compl. ¶ 61. As before, there was no evidence presented at trial that, when Englewood agreed to the 2001 180-day HAP Renewal Contract, anyone associated with Englewood contended that: (1) this HAP Renewal Contract was executed in error, or, (2) that there was no need to execute a new HAP renewal contract because the terms of the previous contract, or any other contact, had not expired or that it was automatically renewed. Furthermore, during this HAP contract renewal period, Don Samuelson, by then, Englewood's new management agent, understood that HUD

was issuing vouchers and that the HAP Contract had been extended and not wrongfully terminated:

> So we needed to get people moved because there had been uses of HAP extensions for periods of time . . . By the end of December, nobody moved. And then there was an extension for six months from January 1 to July 30. So at the end of three months, you know, my conclusion was there is going to be no more Section 8 as far as I can tell. People ought to be prepared to leave and move out.

JX 014, p. 570 at 606 (Samuelson deposition tr. 142: 17-24, 143: 1-6). Mr. Samuelson is an attorney who has had contracts with HUD for over 25 years. Record 1027: 19-23. If he had thought there was a problem with this HAP renewal contract he assuredly would have objected at the time. He did not. Why? Because the parties' intent was that only short-term extensions would be issued.

Finally, the parties executed a final HAP renewal contract on June 24, 2002 ("June 2002 HAP Renewal Contract"). JX 026 p. 746 at 746. This renewal contract provided for an expiration date of September 30, 2002. JX 026, p. 746 at 746; Jt. Stip. of Fact ¶ 12. As before, no one associated with Englewood argued at the time the June 2002 HAP Renewal Contract was agreed upon, that the 2002 HAP Renewal Contract was in error, or that there was no need to execute the June 2002 HAP Renewal Contract because the previous contract, or any other contract, was not expiring, or had expired, or that it was automatically renewed.

Englewood's post-trial brief ignores the plain language of the HAP Contract and subsequent written, signed renewal contracts.[9] This is unsurprising, because the plain terms of

[9] Englewood argued at trial that there were no written, signed changes to the alleged "4-year" HAP contract that it argues solely controls. Each written, signed subsequent bi-lateral HAP renewal contract belies this assertion.

these agreements demonstrate that HUD did not wrongfully terminate the HAP Contract and that Englewood never thought it was entitled to four years of uninterrupted subsidies, particularly when it was in default.

Instead, Englewood tries to confuse this issue by arguing that the self-inflicted financial constraints it was facing at the time the HAP renewal contract was executed demonstrates that the parties intended a four-year contract. Pl. Br. at 50-51. This contention is without merit because it would only be relevant, if at all, if Englewood demonstrated that it was diligently pursuing private mortgage financing and Englewood proved a prospective private mortgagee required a long-term agreement. However, this argument ignores Englewood's utter lack of evidence in this regard, that HUD had no obligation to enter into multi-year agreements to accommodate Englewood or any lender, that the likely refinance motivation was to extinguish Mr. Hayes's personal guarantee on the original South Pointe mortgage,[10] and the fact that Englewood's plan was to get a HUD-insured mortgage – and a HUD-backed agreement was not controlled by the term of the HAP renewal contract.[11]

Furthermore, Englewood's argument that it did not "release" or "waive" its alleged breach claim when it bi-laterally agreed to several follow-on HAP renewal contracts, Pl. Br. pp. 75-76, fails because the parole evidence rule estops Englewood "from varying integrated

---

[10] Mr. Hayes testified that he was personally and individually liable for the $5 million dollar note that the mortgagee, Community Investment Corporation ("CIC"), had initiated foreclosure proceedings on. That note was paid off, thus extinguishing Mr. Hayes' personal liability, by the $11.6 million HUD-insured mortgage. Record 1016: 14 - 1017: 17; see also 1069: 12-18.

[11] This point was made clear when HUD insured an $11.6 million loan **after** the HAP contract was terminated. Record 1195: 18-22, 1196: 23-25.

agreements by introducing evidence of inconsistent prior or contemporaneous terms." California Sand and Gravel, Inc. v. United States, 22 Cl. Ct. 19, 25 (1990). Englewood offers no such evidence, and the plain terms of the parties' agreements demonstrate that Englewood had no valid "illegal termination" claim to waive. This is because, as set forth above, the plain language of the parties' written, signed agreements reflected their understanding that the HAP contract's terms were renewed in stages through September 2002, ultimately for the purpose of issuing vouchers to South Pointe residents so they could elect to move to housing that was physically acceptable pursuant to HUD's November 30, 2001 notice. JX 024, p. 719; JX 025, p. 737, pp. 284; JX 026, p. 746, JX 117 p 1176.

In sum, regardless of how Englewood now conceptualizes the HAP renewal contracts, the agreement the parties executed in September 2001 stated clearly that the parties previously "had entered into a HAP Contract ('expiring contract') to make Section 8 housing assistance payments to the Owner for eligible families living in the Project." JX 024, p. 719 at 724. The HAP renewal contract stated that its purpose was "to renew the expiring contract for an additional term" and defined the length of that term as "0.3" years." JX 024, p. 719 at 722. Subsequent renewal contracts render it clear that the HAP contract's terms (and thus Englewood's entitlement to subsidies) were renewed for short periods and that HUD did not wrongfully terminate a four-year HAP contract. JX 025, p. 737; JX 026, p. 746. These agreements were written and signed by both parties without objection and comply with the contract requirements despite Englewood's belated protestations to the contrary.

Englewood may not rely upon undisclosed interpretations contrary to the agreements' plain terms to avoid dismissal. Englewood's attempt to avoid dismissal by merely asserting

"waiver" does not enable Englewood to avoid the well-established principle that a party that affixes its signature to a contract cannot later object to the terms of the agreement. Whittaker Elect. Systs. v. Dalton Security, 124 F.3d 1443, 1446 (Fed. Cir. 1997). Neither can a party challenge the terms of a contract "where it fails to raise the problem prior to execution, or even prior to litigation, on which it later bases its challenge." Id. See also E. Walters & Co. v. United States, 217 Ct. Cl. 254, 576 F.2d 362, 367-68 (1978).

In this case, it is beyond dispute that Englewood signed repeated renewal contracts that indicated that the terms of the HAP contract would be extended for short term periods until September 2002. The parties executed these renewal contracts consistent with HUD's November 30, 2001 notice, and Englewood's willingness to sign these agreements in order to collect more HUD subsidy cannot change the agreements' basic terms.[12] JX 117, p. 1176.

**C. Englewood Is Wrong When It Asserts That HUD Demanded That Englewood Change Principals And Also Repair South Pointe To An "As New" Condition To Avoid Default Of The HAP Contract**

Putting aside that Englewood failed to meet its burden regarding its maintenance of South Pointe, or that it was entitled to four-years of HAP subsidies, Englewood also misstates several facts when it argues for the first time that HUD also repudiated the HAP contract when it "directed Mr. Hayes to transfer the Englewood general partner interest to a new owner." Pl. Br. P. 45. Initially, this claim must be rejected because this is the first time that Englewood asserted

---

[12] The undisputed fact that the parties agreed to numerous subsequent bilateral HAP renewal contracts also defeats Englewood's allegation that HUD improperly unilaterally amended these contracts. Pl. Br. pp. 52-54. Even assuming HUD did improperly amend an earlier version of the HAP renewal contract, parties may modify any contract through subsequent agreements. California Sand and Gravel. v. United States, 22 Cl. Ct. at 25.; see also, 29 Williston on Contracts § 73.17 (4th ed. 2003). The signed, written subsequent contracts fulfill the HAP contract amendment requirements, which Englewood improperly argues were not.

such a claim. It is settled law that "a plaintiff's failure to raise a claim or argument in its complaint may be deemed as a waiver of that argument by the plaintiff." So. Comfort Builders, Inc. v. United States, 67 Fed. Cl. 124, 153 (2005) (citing Casa de Cambio Comdiv S.A., de C.V. v. United States, 291 F.3d 1356, 1366 (Fed. Cir. 2002); Mients v. United States, 50 Fed. Cl. 665, 671 (2001)). Furthermore, Englewood fails to state what provision of the HAP contract was allegedly repudiated by HUD's actions. However, even if this claim was properly, specifically, pled, it still fails because the evidence at trial showed that HUD's demand for a new general partner only was relevant to HUD agreeing to insure the $11.6 million dollar mortgage. As Mr. Hinsberger testified directly:

> Q: And you said to [Hayes], in unequivocal terms, that he was out as the owner, and the PM Management Company was out as the manager. Correct?
>
> A: If they wanted to proceed with mortgage insurance. Yes.

Record 537: 20-24.

Moreover, HUD had no obligation pursuant to the HAP contract to insure a new repair and rehabilitation loan for Englewood.[13] Thus, HUD's refusal to risk taxpayer money by insuring a new loan for Englewood unless certain conditions were made could never constitute a breach of the HAP contract. Similarly, HUD's prudent decision that it would insure a new loan

---

[13] Contrary to Englewood's apparent position, it is well-established that it is not HUD's responsibility to ensure the financial success of a HUD-subsidized project. Fed. Prop. Mgt. Corp. v. Harris, 603 F.2d 1226 (6th Cir. 1979); Marcus Garvey Square, Inc. v. Winston Burnett Constr. Company, 595 F.2d 1126 (9th Cir. 1979); Tyler House Apartments, Ltd. v. United States, 38 Fed.Cl. 1 (1997); United States v. Gregory Park, Section II, Inc., 373 F.Supp. 317 (D.N.J. 1974).

only if South Pointe received new management could not constitute a breach of the HAP contract.

In fact, contrary to Englewood's position in its complaint, it is Englewood and not HUD that has confused the HAP contract with Englewood's desire for a new HUD-insured loan. Compl. ¶ 44. Although HUD mentioned Englewood's failure to submit an acceptable scope of work in its notices of default to Englewood, HUD always clearly stated that the event of default was Englewood's uncured failure to maintain South Pointe in acceptable (that is, decent, safe, and sanitary) condition. JX 089, p. 1090; JX 094, p. 1099; JX 117, p. 1176.

Additionally, Englewood's claim here fails because Englewood was not replaced as the owner. Indeed, Englewood's latest general partner, Mr. Samuelson, recognized the need for restructuring of the ownership interest and was, in fact, actively pursued by Mr. Hayes to replace his interests. JX 014, p. 570 at 591 (Samuelson deposition at 83: 3-5, 16-22).

Finally, Englewood also presents the false position throughout its brief that HUD was requiring Englewood to maintain South Pointe at a higher standard than that established at 24 C.F.R. § 5.703. See e.g. Pl. Br. p. 31. In doing so, Englewood argues, wrongly, that HUD required Englewood to repair the property to "as new" condition to cure its HAP contract breach. The evidence adduced at trial does not support this erroneous contention. To the contrary, how Englewood **elected** to cure its deficiencies under the HAP was completely distinct from HUD's underwriting requirements to insure a 40-year rehabilitation loan unless, as here, HUD's loan **was** Englewood's plan. Moreover, it cannot be disputed that Mr. Hinsberger and Ms. Coleman repeatedly, and consistently, testified at trial that it was not HUD's, but Englewood's plan to obtain the HUD-insured loan as its funding source to cure its breach. See Record: 670: 12 - 672:

19; 715: 23 - 716: 18; 785: 13-18; 829: 11 - 830: 1; 835: 24 - 836: 10. Englewood was never required to obtain a HUD-insured loan to cure South Pointe's many problems. Furthermore, Mr. Hinsberger testified that if indeed Englewood was going to use HUD to insure its loan, then, and only then, would a more robust repair be required because the loan Englewood sought, a Section 221(d)(4) loan, required a "substantial rehabilitation" of the property. Record 670: 12 - 671: 22; 716: 7-18. In sum, no one testified that the decent, safe and sanitary requirements could only be met if Englewood repaired South Pointe to "as new" condition. Indeed, Mr. Hinsberger made it clear that standard would only be required if Englewood opted to fund any repairs at South Pointe using HUD's mortgage program:

> A: . . . [W]e're also talking about a substantial rehabilitation [loan], which brings it up to a like new condition.
>
> Q: So there's no requirement or conclusion that could be properly drawn that in order for Englewood to come up with a repair plan that would put the building in . . . Decent, Safe and Sanitary [condition] is not what was required, right?
>
> A: Correct, it was for the loan.

Record 576: 24-577: 1021. See consistently, 568: 13-25; 569: 1-19; 570: 1-8; 574: 3-12; 583: 11-25. The fact that Englewood's chosen plan was to pursue a rehabilitation loan from HUD as its hoped-for method to cure the HAP contract default that it claimed it could not fund, or would not fund, was Englewood's election, not HUD's requirement. As every HUD witness testified at trial was the case. Englewood's contention to the contrary is simply unsupportable.

At bottom, there is simply no factual or legal support for Englewood's allegations here, and they must be rejected.

### D. Englewood Has No Basis For Urging The Court To Draw An Adverse Inference Because Mary Anderson Did Not Provide Cumulative Evidence At Trial Regarding The Duration Of One Of The Parties' HAP Contracts

Finally, Englewood's argument that the failure of Mary Anderson to testify, as apparently Englewood now belatedly wishes, should be held against HUD is without merit. Pl. Br. p. 54.

Englewood's purported claim for HUD calling Ms. Anderson was so that she could explain the "means of amending a contract," is not only factually incorrect, as we explain below, it is also unwarranted given that this is a legal issue that the Court is well-equipped to decide. Furthermore, Ms. Anderson's testimony upon this matter would have been cumulative or inferior to that of Ms. Coleman, Ms. Thomas, and Mr. Hinsberger, because Ms. Anderson was not present at the time the October 2000 HAP Contract was entered into. As explained above, the parties entered into numerous bilateral agreements subsequent to the HAP renewal contract in question. Ms. Anderson's testimony upon this point would not only have been cumulative, it would have been irrelevant.

Most importantly, however, Englewood's assertion here is based entirely upon speculation. It has no factual basis for asserting that "Ms. Anderson's testimony would not have been "cumulative or inferior" to the testimony of other HUD witnesses."[14] Pl. Br. p. 54. Indeed, once again, lacking any record evidence, Englewood resorts to misstating what is in the record in an attempt to make its point here. Englewood boldly states, without any support, that "Ms.

---

[14] Englewood's tactic here is reminiscent to one it tried during discovery, when Englewood falsely accused Beverly Miller and Edward Hinsberger of possessing information that they did not have. As Englewood did for Ms. Miller and Mr. Hinsberger, Englewood failed to depose Ms. Anderson where it could have obtained this information first hand. Instead, Englewood also failed to designate Ms. Anderson upon its witness list and now wants the Court to draw an adverse inference against HUD for Englewood's tactical misjudgment regarding its discovery plan and trial strategy.

Anderson was the HUD witness with the most knowledge on these topics," and then points to language in the joint witness list for support. However, that sentence, even when taken out of context, as Englewood does, in no way supports Englewood's argument upon this point. A review of the joint witness list clearly shows that Mary Anderson was HUD's primary witness at trial regarding the loan process. HUD always intended to call Ms. Anderson so she could explain Englewood's application for, and subsequent default upon, a HUD-insured Section 221(d)(4) $11.6 million loan.[15] Englewood simply has no basis to make any assertions upon

---

[15] Specifically, Ms. Anderson's **potential** testimony was listed as follows:

> Ms. Anderson is the Director of Operations for the Chicago Multifamily Hub. Ms. Anderson has been with HUD since 1979 and has served as the Director of Operations for eight years. As Director of Operations, Ms. Anderson has **oversight of loan production**, among other responsibilities, for the Chicago regional office of HUD, and supervises the Operations staff. Ms. Anderson reports to Hub Director Edward Hinsberger. If called, Ms. Anderson is expected to testify as to the policies and practices of HUD's subsidy and insurance programs; her delegated authority; the efforts made by HUD to maintain affordable housing at South Pointe Towers Apartments; the interactions, meetings, and other communications with Englewood regarding Englewood's application for a HUD-insured loan pursuant to Section 221(d)(4) of the National Housing Act, 12 U.S.C §1715l; the interactions, meetings, and other communications with her staff, including Ben Tessler and John Schneider, regarding Englewood's Housing Assistance Payments (HAP) Contract and application for a HUD-insured Section 221(d)(4) loan; the processing of Englewood's Section 221(d)(4) mortgage insurance; the general expectations of participants in HUD's insurance programs; and the nature of HUD's actions relative to Englewood's Section 221(d)(4) loan. Estimated time for examination is 2.5 hours.

what Ms. Anderson would, or would not, testify to at trial. Absent any evidence to the contrary, Englewood's unsubstantiated argument should be denied.[16]

## II. Overwhelming Evidence Supports HUD's Decision To Abate And Terminate The HAP Contract

We agree with Englewood that the "evidence is not evenly balanced" when it comes to whether Englewood was in default of the HAP contract. See Pl. Br. p. 55. Clearly the evidentiary scales were tipped completely in HUD's favor at trial as Englewood failed to present one witness that testified that South Pointe was being maintained in decent, safe and sanitary condition during the critical time frame from when the initial notice of default was sent to Englewood, in April 2001; or the continuing notice of default sent in May 2001; or when the official Notice of Abatement and Termination issued in November 2001; or finally, even in September 2002, when the HAP contract subsidies finally ended.[17]

---

[16] In their insistence that the Court should draw a negative inference because the testimonies of Ms. Anderson and Mr. Schneider were more limited than Englewood may now have wished, Englewood glaringly omits a more critical witness for itself: Asset Manager Ken Horton. Mr. Horton was not only alleged to be present at the debated October 18, 2000 meeting between HUD and Englewood, but Mr. Horton also was the owner contact that Ms. Coleman repeatedly cited to when discussing the parties' prior understanding that the October 2000 multi-year contract was executed in error. Record 809: 19-23. If any negative inference is to be drawn, it should be in the marked absence of Mr. Horton.

[17] Englewood presented four witnesses at trial who discussed the condition of the property, none of whom provided first-hand testimony of the conditions of the property between May 2001 to October 2002. Ms. Batchelor and Mr. Sanders were not involved with South Pointe after the middle of April, 2001. Record 143: 1-9; 494: 9-15. Mr. Hayes was an absentee owner, who was not directly involved in the day-to-day operations of the property. Record 866: 9-21. Mr. Samuelson provided testimony that supported HUD's finding regarding South Pointe's conditions. Finally, Englewood understandably fails to mention that on September 26, 2002, Michael G. McGhie, P.M. One's President who succeeded Mr. Hayes, wrote to HUD and acknowledged that "problems did exist in the operation of P.M. One properties in Chicago." JX 132, p. 1257 at 1257. In recognition of P.M. One's "poor track record," Mr. McGhie offered for P.M. One "to be placed on probation." JX 132, p. 1257 at 1257. This admission clearly does not

In addition to the summary of the evidence chart attached to this brief as an exhibit, here is what evidence **was** adduced at trial regarding the conditions of South Pointe during the critical periods:

On February 19, 2001, Project Manager Gwendolyn Thomas, accompanied by other HUD staff members, including Teresa DiPietro, conducted another management and occupancy review of South Pointe. JX 150 at 1539; Record 323: 2-15. The visit revealed that South Pointe had not improved since HUD's last management review of March 2000. In fact, Ms. Thomas found that the elevators were not working properly, the stairwells had no lighting and smelled of urine, graffiti was "everywhere", and there was peeling paint in the hallways. Record 324-325. There was "a lot" of police in the building because of a drug related incident. Record 324: 6-13. In sum, Ms. Thomas found that the project had not changed since her last visit. Record 326: 3-19.

Teresa DiPietro was also on this visit and saw a building with boarded windows and missing screens. Record 1247: 18-19. She walked into a dimly lit hallway with dirty floors and missing tiles; residents were waiting for elevators that were an ongoing problem because "at no point in time are all the elevators working." Record 1249: 1-6. Ms. DiPietro noted that units had broken windows, holes in walls, and roaches in the kitchen. Record 1249: 24-25, 1250: 2-6. She also saw that the stairwells were dimly lit and smelled of urine; the floors and the handrails were sticky; fire hoses were missing, and exit signs were broken out. Record 1251: 15-24.

---

endorse Englewood's management of South Pointe or rebut the several agencies' findings that South Point was not in decent, safe and sanitary condition.

Moreover, photographic evidence that was obtained during this visit was also not rebutted at trial. See JX 196, p. 1848 at 1851-1886.

Englewood produced no one at trial to testify differently about these findings. These uncontroverted findings clearly are evidence that South Pointe was not in decent, safe and sanitary condition at this time.

Less than one month later, on March 2, 2001, HUD's Real Estate Assessment Center ("REAC") inspected a sample of 25 units at South Pointe. This time, out of a possible total score of 100, and notwithstanding Englewood's repeated representations that repairs were being made, South Pointe received a score of 31.[18] Jt. Stip of Fact ¶ 74; JX 028, p.767 at 769; Record 948: 13-18.

Shortly thereafter, HUD personnel, including Ms. Thomas and HUD construction analyst Lillye Simmons, visited South Pointe and conducted a confirmatory review of Englewood's exigent health and safety problems. Ms. Simmons was an experienced construction analyst who has been with HUD for 20 years. Record 1221: 12-18. Although she was sent specifically to confirm the veracity of Englewood's previous certification that the exigent health and safety items found by the REAC's sampling were corrected, Ms. Simmons could not help but notice the condition of her surroundings when she went to South Pointe. She testified that she noticed the trash at the front of the property, broken windows and missing window screens. Record 1223: 22-24. Ms. Simmons recalled the poorly lit lobby and the smell of urine; she saw the graffiti, the improperly working elevators, the trash, and the sticky stairwells. Record 1224: 5-25. She also

---

[18] A decline from the 42 REAC score South Pointe received in 1999.

noticed that with respect to the exigent health and safety items, only "some" had been mitigated. Record 1226: 21-22.

HUD was not the only party to discover that serious health and safety problems existed at South Pointe in early 2001. On March 8, 2001, representatives of the Illinois Housing Development Authority inspected South Pointe. JX 151 at 1547; Record 1015:3-12. In addition to finding conditions similar to those cited in the 1999 and 2001 REAC reports, including water-damaged bathroom ceilings and walls, leaking kitchen faucets, and stove knobs missing, the Illinois Housing Development Authority also documented exposed wires and non-functioning fire alarms, and missing or non-functioning smoke detectors. JX 151, p. 1547 at 1547-1550. These findings were the same types of items that Mr. Hayes had certified to HUD were corrected just two days before, and that Ms. Thomas had noted were not in fact fixed. Compare, JX 076, p. 1054 and JX 151, p. 1547; Record 1016:10-13. As before, Englewood produced no one at trial to testify differently about these findings. These uncontroverted findings clearly are evidence that South Pointe was not in decent, safe and sanitary condition at that time. Thus, the "evidence is not evenly balanced" and shows Englewood was in default of the HAP contract at that time, too.

The evidence at trial also showed that in July 2001 Mr. Samuelson visited South Pointe and discovered a lack of physical security "because of locks on various entries and exits that had been broken or compromised and the relative freedom that gangs and gang-related and drug interests had in moving off the street, into the building, up into the units and around the building." JX 014, p. 570 at 589 (Samuelson Deposition Tr. 76: 11-16). According to Mr.

Samuelson's assessment, South Pointe’s physical deficiencies could only be resolved after its management corrected its security problems. As Mr. Samuelson stated,

> In a building like that or like some of the CHA [Chicago Housing Authority] buildings, its very difficult to manage buildings if you don't have the security. If you don't have control over the building and the ability of eliminating gangs, drugs, and criminal activities, you are very hard-pressed. Everything else follows from that.

JX 014, p. 570 at 590 (Samuelson Deposition Tr. 76: 15-22). In short, Mr. Samuelson found that South Pointe was not an appropriate living space for “faint-hearted” tenants. In fact, South Pointe, according to Mr. Samuelson, “wasn't for the faint-hearted anyone.” JX 014, p. 570 at 606 (Samuelson Deposition Tr. 144: 20-21); Record 1365: 12-15.

Allowing gang and drug related activity at South Pointe was a safety issue. Record: 171: 7-12. It also showed a failing by Englewood because as owner, Englewood was responsible for making sure the building was safe. Record 172: 18-21. Again, Englewood produced no one at trial to testify to the contrary about these findings. These uncontroverted findings are clearly evidence that South Pointe was not in a safe and secure condition at this time. Thus, once again, the “evidence is not evenly balanced” and shows Englewood was in default of the HAP contract at this time, too.

Mr. Samuelson's impression of the building's lack of security was confirmed in July 2001 when the Office of the State's Attorney for Cook County, Illinois declared South Pointe a public nuisance because “narcotics are being bought and sold in and around this property. In addition,

the Chicago Police Department has expressed concern that this property is being used for illegal drug activity."[19] JX 099, p. 1105 at 1105.

On October 19, 2001, HUD staff was again sent to South Pointe to assess its physical condition, and, as before, HUD staff reported that the property was not in decent, safe, and sanitary condition. JX 115, p. 1166; Record 1227: 11-17; 1228: 2-25; 1229: 1-6. Specifically, they noted the smell of urine in common areas, exposed wires, and roaches in hallways and on walls. JX 115, p. 1166 at 1166; Record 1205: 19-20; 1228: 6-8. On this visit, Lillye Simmons returned to the project and found that conditions had not improved. She saw broken windows, missing window screens, and trash outside the building. Record 1228: 2-3. The inside of the building was dark and smelled of urine. Record 1228: 6-8. Stairwells were in the same, if not worse, condition than when she was last at the project in March 2001. Record 1228: 17-21; see also JX 115, p. 1166; Record 1229: 9-10, 1230: 2-5.

Accompanying Ms. Simmons was an experienced HUD appraiser, John Schneider. JX 115, p. 1166 at 1167; Record 1227:18-21. Mr. Schneider testified that his first impression of the building was that it was "in extreme disrepair as evidenced by boarded up windows on the outside [and], areas of the lawn that were bare." Record 1204: 7-10. He noted that units had "water marked ceilings, paint peeling off the ceilings, paint peeling off the walls, damaged walls, holes in the walls, areas where walls had been repaired but unpainted, missing floor tiles, outlets and switches with protruding wiring . . . We saw, in the bathrooms mildew in shower areas,

---

[19] Between January 1, 1999 and December 31, 2001, the Chicago Police responded to a total of 794 incidents at South Pointe. JX 195, p. 1819 at 1847. The incidents that the Chicago Police recorded as occurring at South Pointe included at least two homicides, 39 burglaries, more than 50 assaults, and more than 100 batteries. JX 195, p. 1819-1847.

missing tiles from the walls, cracked tiles, missing plumbing fixtures." Record 1204: 18-25, 1205: 1. Mr. Schneider saw rodent droppings and noted that he took the stairwells to go down the 22nd floor because "there was only one functioning elevator and it was very slow." Record 1205: 3-8. Stairwells were dimly lit and smelled of urine; fire doors were permanently open, there were missing push bars on fire doors, and fire hoses were missing. Record 1205: 11-20. Mr. Schneider took representative photos of his findings. JX 196, p. 1848 at 1887-1906; Record 1206: 10-12. Mr. Schneider, a HUD appraiser for 12 years, testified that of the estimated 200 properties that he had visited in his official capacity, he had "seen properties that are in worse disrepair [and] in worse condition but none of them were occupied." Record 1207: 5-8.

As before, Englewood produced no one at trial to testify differently about these findings. The uncontroverted evidence clearly shows that South Pointe was not in decent, safe and sanitary condition at this time, and thus, Englewood was in default of the HAP contract.

Finally, just before HAP contract subsidies ended, Ms. Thomas visited Englewood one more time, on June 28, 2002, to distribute notices to residents regarding the use of their Section 8 tenant- based vouchers. JX 129, p. 1253 at 1253; Record 340:9-18. On that visit, Ms. Thomas again found that the smell of urine still filled common areas. JX 129, p. 1253 at 1253; Record 342:5-9. She also noted broken windows, garbage everywhere, and no security. JX 129, p. 1253 at 1253; Record 341: 3-8.

Accompanying Ms. Thomas were several other HUD staff, including, again, Lillye Simmons and Teresa DiPietro. Record 340:19-21; 1230: 6-13; 1254:11-19. Ms. Simmons, returning for the third time, testified that as compared to her two previous visits in March and October of 2001, the project was in "much worse" condition than it was when she previously

visited the property. Record 1230:20-23. In her 20 years working at HUD, Ms. Simmons testified that South Pointe was "one of the worst" properties that she has seen. Record 1231: 2-5.

Ms. DiPietro testified that when she returned to South Pointe in June 2002, it appeared as if no repairs had been done since her last visit of February 2001. Record 1255:10-12. Specifically, Ms. DiPietro noted the smell in the stairwell was "worse than the first time [HUD was] there because now there was human waste laying on the stairs. The smell was even stronger . . ." Record 1255: 15-17.

It is incredible that Englewood would argue that the record does not support HUD's findings upon this point. The documentary and testimonial evidence at trial was overwhelming and conclusive in showing that Englewood breached the HAP contract when it failed to maintain South Pointe in decent, safe and sanitary condition. Indeed, Englewood failed to produce any credible evidence that showed that South Pointe met the requirements of the HAP contract and 24 C.F.R. § 5.703 when HUD issued: (1) the first notice of default in April 2001, (2) a continuing notice of contract default in May 2001, (3) a notice of contract abatement and termination in November 2001, or, (4) even when, after Englewood's three prior legal actions, HUD finally ended the contract, as the contract clearly allowed, in September 2002.[20]

[20] We have attached as an exhibit to this brief a chart that sets forth the 24 C.F.R. 5.703 physical standards and the corresponding citations to testimonial and documentary evidence adduced at trial showing that these conditions were not being maintained at South Pointe.

## III. Englewood Had Been On Notice For More Than Two Years As To What It Needed To Do At South Pointe To Avoid Default – And It Still Failed To Comply

Englewood also argues that HUD failed to provide Englewood proper notice of default. Pl. Br. 56-57. This argument is odd given that HUD spent over two years working with Englewood in an attempt to get Englewood to fix the conditions at South Pointe. As Edward Hinsberger testified:

> I mean we had been attempting to get the property repaired really since 1999 when the first Real Estate Assessment Center inspection was done. So, I mean, it had been, this was a culmination of a couple years now.

Record: 585: 16-21.

Englewood cites Departmental Enforcement Center ("DEC") Director Margarita Maisonet's deposition testimony regarding the "fast track" issuance of HUD's initial HAP contract notice of default to imply that Englewood somehow was summarily, and improperly, pre-determined for default. Pl. Br. p. 32. This argument ignores the plethora of evidence showing HUD's multi-year efforts to work with Englewood to acceptably resolve its default. Additionally, Englewood's inference here, that HUD's initial notice of default was somehow issued unusually and in bad faith, is not only mere speculation upon Englewood's part, Englewood is also wrong factually and legally. Ms. Maisonet's deposition reference to the matter being "fast tracked" was simply an indication that the abhorrent physical conditions at South Pointe had lingered, unremedied, for so long that HUD's immediate action was required. JX 013, p. 474 at 527 (Maisonet Deposition Tr. 208 1-15). Moreover, the "fast track" of such matters is exclusively within HUD's discretion and is specifically authorized by HUD Regulation. 24 C.F.R. § 200.857(i)(4).

There is also no support for Englewood’s bare allegation that “HUD’s default notice did not comply with Section 20" of the 1998 HAP contract because it did not set forth the “nature of default” or specify the actions Englewood was required to take. Pl. Br. p. 56. To the contrary, when Edward Hinsberger, Director of HUD's Chicago Regional Office, issued the first notice of contract default to Englewood on April 9, 2001, Englewood was clearly placed upon notice of what was required from Englewood. Jt. Stip. of Fact ¶ 88; JX 089, p. 1090; Record 540:2-5. Indeed, Englewood’s first notice of default referred Englewood to HUD's Physical Condition Standards, which are set forth in 24 C.F.R. Part 5, Subpart G. Jt. Stip. of Fact ¶ 94; JX 089, p.1090 at 1091. This reference provided Englewood with specific details as to Englewood’s requirements to maintain South Pointe. The notice of default further told Englewood that the nature of the default was South Pointe’s dismal physical condition:

> The failure to keep and maintain the Project in a decent, safe, and sanitary condition is a default of the HAP contract.

Jt. Stip. of Fact ¶ 94; JX 089, p. 1090 at 1091. Mr. Hinsberger also notified Englewood that failure to correct the events of default “to the satisfaction of HUD within 30 days from the date of this Notice” could cause HUD to “seek any and all available remedies including, without limitation, suspending or abating the HAP contract.” Jt. Stip. of Fact ¶ 89; JX 089, p. 1090 at 1091. The notice of default tracked the terms of the HAP Renewal Contract and the rights afforded HUD if Englewood remained in breach of the HAP contract. See JX 019, p. 677 at 687 (¶ 20(b)(2), 20(b)(3)(iv)).

Furthermore, Englewood’s argument here ignores the fact that HUD sent it a second notice of default. On April 13, 2001, after HUD issued Englewood its first notice of default, HUD met with Englewood's representatives, including Mr. Hayes, to provide Englewood with

additional information as to Englewood's default. Record 688: 3-7. At that meeting, Mr. Hayes stated that he was unwilling to put any funds into the project.[21] Record 689: 11-13, 829: 11-14, 836: 4-7. Furthermore, HUD representatives reiterated to Mr. Hayes that if he was not going to invest any of Englewood's funds into South Pointe, HUD could only assume the obligation of insuring a new mortgage if Englewood replaced PM One as the managing agent and owner of South Pointe. Compl. ¶ 38; Jt. Stip. of Fact ¶ 98.

By May 16, 2001, HUD had received no communication from Englewood indicating that "any efforts had been taken to contain the declining physical condition of the property or to address ongoing site management deficiencies." JX 094, p. 1099 at 1099. Instead, Mr. Hayes had written to HUD indicating that "a satisfactory acquisition agreement might be reached among the Owner and [an] acquirer within the next 30-days." Jt. Stip. of Fact ¶ 99; JX 091, p. 1096 at 1096. Thus, on May 16, 2001, more than 30 days after HUD issued its first notice of

---

[21] This is a fatal admission by Englewood, because by making it, Englewood affirms that it would be impossible for Englewood to ever be able to submit a proper Management Improvement and Operating ("MIO") plan since the MIO plan required Englewood to identify the sources and uses of funding to effect repairs. Record 669: 16-19. It is well-established that to recover for breach of contract, Englewood must demonstrate that it was ready, willing, and able to perform when its performance was due. See Penthouse Int'l, Ltd., v. Dominion Fed. Sav. & Loan Assoc., 855 F.2d 963, 979 (2d Cir. 1988); United States v. Penn Foundry & Mfg., 337 U.S. 198, 212 (1949) (plaintiff had the burden of proving that it was ready and able to deliver the items required under the contract in the quantities and at the times specified); Mid-West Construction, Ltd. v. United States, 181 Ct. Cl. 774, 387 F.2d 957, 966 (1967) (same); National Movers Co. v. United States, 181 Ct. Cl. 419, 386 F.2d 999, 1002 (1967) (same); Potter v. United States, 167 Ct. Cl. 28, 31 (1964) (same). Englewood's admission that it was not going to use any of its funds to repair South Pointe, when coupled with its admitted failure to timely obtain outside funds for the needed repairs, is clear evidence that Englewood was not ready, willing or able to perform upon the HAP contract because Englewood was admitting that it did not have, and would not use, the needed resources to ensure South Pointe was maintained in decent, safe and sanitary condition. This fact provides an additional basis for dismissing Englewood's breach of contract claim.

default, HUD sent Englewood a notice of continuing default. Jt. Stip. of Fact ¶ 101; JX 094, p. 1099; Record 840:8-19. In this second notice of default, HUD urged Englewood "to provide adequate, timely information describing the immediate efforts that the Owner is making to address the HAP default and the sale of the Project and proposed assumption of the HAP contract." Jt. Stip. of Fact ¶ 101; JX 094, p. 1099 at 1100.

These two notices clearly placed Englewood on notice as to the standards Englewood needed to maintain South Pointe. Englewood's argument to the contrary should be rejected.

## IV. <u>Englewood Never Properly Responded To The 2001 REAC Inspection</u>

Englewood also is wrong when it argues that it properly responded to the REAC inspection. Pl. Br. pp. 57-60. As with Englewood's other arguments, Englewood's position here is based upon its selective reading of the record, and again fails to address the fact that no one from HUD ever testified at trial that Englewood ever properly responded to the March 2001 REAC. Indeed, the consistent testimony at trial shows that, as a result of Englewood's failing REAC inspection score of 31 in March of 2001, the letter that transmitted the inspection results to Englewood required it to submit a proposed plan of correction in the form of a Management Improvement and Operating ("MIO") Plan to HUD within thirty days. Jt. Stip. of Fact ¶¶ 72,74; JX 028, p. 767 at 767. Prior to submitting its MIO plan, Englewood was specifically told that it was responsible for conducting a 100 percent survey of South Pointe to determine if the problems identified by the REAC were systemic. JX 028, p. 767 at 767. REAC's transmittal letter also informed Englewood that the plan, in a "Management Improvement and Operating Plan (MIO) format" should include "additional deficiencies identified by your survey;

deficiencies already corrected; available resources; completion time frames (scheduled) by quarter." Id.

The evidence at trial was consistent in showing that Englewood never properly responded to the REAC inspection because it did not: (1) fix all the exigent health and safety items noted by the REAC as certified, or, (2) conduct the required 100 percent survey that identified South Pointe's overall needs; or, most importantly, (3) identify the sources of funding with which to correct the numerous problems it identified.

**A. Englewood Did Not Correct The Exigent Health And Safety Items**

While Englewood claims it corrected the exigent health and safety items noted by the March 2001 REAC inspection, Pl. Br. p. 58-59, the evidence at trial does not support this contention. Exigent health and safety items are those items that are considered life-threatening and require corrective action within 72 hours. See, Record: 939: 10-16. These items are so serious that Englewood was required to fix all of the noted items in 72 hours.[22] HUD personnel went to South Pointe to confirm Englewood's certification that these repairs were actually completed. However, the HUD staff found that only "some" of the exigent health and safety items had been mitigated. Record 1226: 21-22. Moreover, representatives of the Illinois Housing Development Authority that inspected South Pointe shortly after Englewood "certified"

---

[22] Englewood sets forth a brief argument on pages 66-67 of its post-trial brief that the REAC report did not show that South Pointe was not in decent safe and sanitary condition because Ms. Batchelor opined to the contrary after reading the report. Of course, Englewood's argument ignores the fact that Ms. Batchelor's opinion was formed without discussing the matter with anyone who had visited the property. Moreover, Englewood's argument discounts the seriousness of the exigent health and safety violations. In sum, Englewood's argument here is basically that, but for the fire and electrical hazards, exposed wires, inoperable fire doors, missing breakers, etc., South Pointe was a fine place to live. Clearly, Englewood's argument upon this point is without merit.

it had corrected these serious safety violations, found similar violations. JX 151, p. 1547; Record 1015:3-12. In fact, the Illinois Housing Development Authority found conditions similar to those cited in both the 1999 and 2001 REAC reports, including water-damaged bathroom ceilings and walls, leaking kitchen faucets, and stove knobs missing, and also documented exposed wires and non-functioning fire alarms, and missing or non-functioning smoke detectors. JX 151, p. 1547 at 1547-1550; Record 1015: 23-24. These findings are consistent with what HUD personnel found and show that Mr. Hayes's previous certification was false. Compare, JX 076, p. 1054 and JX 151, p. 1547; Record 1016:10-13.

### B. Englewood Never Conducted the Required 100 Percent Survey That Identified South Pointe's Overall Needs

Englewood correctly states that senior HUD officials were unaware that Englewood had ever conducted a 100 percent survey of the property. Pl. Br. p. 59. This is unremarkable, however, given that Englewood never did accomplish a 100 percent survey of the property in response to the REAC inspection, as it was required to do.

There is no evidence that Englewood ever conducted a 100 percent survey of South Pointe in response to HUD's 2001 REAC Report. The survey relied upon by Englewood at trial, and in Englewood's post-trial brief, was the BABCO survey that was purportedly submitted with the April 8, 2001 letter from Kelly Brown. However, the BABCO survey was based upon an architect's visit that was, in fact, conducted in October or November 2000 and completed in December 2000, three months prior to the 2001 REAC inspection. Record 852: 18-21. The architect's survey was then incorporated into a scope of work proposal by BABCO that was dated March 4, 2001. JX 243, p. 3774; Record 852: 18-21. Thus, this survey, as discussed in the next section, was quite apparently part of Englewood's efforts to obtain a new HUD-insured

loan. Further, it was not prepared in the context of the HAP contract **<u>without</u>** a new HUD-insured loan. Finally, it was not responsive to the REAC report because it was impossible for this survey to take into consideration the subsequent REAC findings and other accruing physical deficiencies.

Despite these shortcomings, Englewood states in its brief that it was responsive to the REAC report. However, nowhere does Englewood show that the items specifically mentioned in the 2001 REAC report were addressed for every unit of the property.

### C. Englewood Not Only Failed To Identify A Funding Source For The Repairs, It Specifically Told HUD That It Was Not Going To Inject Any Of Its Funds Into The Property

Englewood also states that "it had recently submitted a rehab <u>loan application</u> that set forth a proposal for substantial rehabilitation of the entire building." Pl. Br. p. 60 (emphasis added). Assuming this is Englewood's alleged funding source, it is clear why HUD rejected Englewood's response here. A loan application is just that – an application. It is not a source of funding until the application is approved. Thus, even if the Court agrees that the breadth of the survey could somehow have been sufficient for MIO plan purposes, insofar as repairs of physical conditions were concerned, Englewood still failed to include the sources and uses of funds Englewood planned to effect repairs. As Mr. Hinsberger testified at trial, however:

> If you use the BABCO Inspection, if that's what you're referring to as the 100 percent inspection that was done, 100 percent review, and if, if the owner had submitted the MIO indicating that they did 100 percent review and here are the inspection, and here are the repairs that need to be made and this is how we're going to fund it, we would have considered it. But that's not what happened . . . [W]e don't know if 100 percent of the units were inspected. But assuming that they were, **<u>there is still no funding mechanism</u>** . . .

Record 753: 19-25, 754: 7-10, (emphasis added). In fact, the only funding ever discussed by Englewood to effect repairs to South Pointe - the only funding apparently contemplated by Englewood in order to resolve financial problems caused by an unfavorable mortgage that it agreed to - was through a new HUD-insured loan. Record 689: 11-13, 715:23-25, 829: 12-14, 834: 10-14, 872: 5-10.

However, no one testified at trial that Englewood ever secured such a loan for a MIO plan. Certainly no HUD employee testified that Englewood received or obtained a funding source to make the necessary repairs to bring the property to decent, safe and sanitary condition as the HAP contract required.[23] Indeed, Freddie Batchelor testified that she was unaware that Englewood ever secured the necessary funding source for its MIO plan. Record 176: 1-4. Similarly, Carl Sanders testified that Englewood never obtained a funding source for a MIO plan while he was with Englewood. Record 511: 23-25. Nor did Mr. Hayes nor Mr. Samuelson. This is because Englewood never secured the necessary financial backing its claims it so desperately needed.

In sum, Englewood's failure to meet any of the requirements of the 2001 REAC inspection merits the rejection of Englewood's argument upon this point.

---

[23] In fact, Mr. Hinsberger testified that HUD had been waiting upon Englewood to come up with a source of funding for over two years to make the necessary repairs when he issued his first notice of default. Record 585: 16-21.

**D. Englewood Never Submitted A MIO Plan That Required A Response From HUD, Nevertheless. HUD Did Respond**

Englewood next argues that HUD failed to respond to its Management Improvement Operating ("MIO") plan. Pl. Br. pp. 60-61. Englewood is mistaken, because Englewood assumes that it actually submitted a plan that mandated a response. Record 827: 19 –828: 6. As we showed above, Englewood's purportedly submitted plan failed to meet several prerequisites of a suitable MIO plan. Thus, HUD could not assist Englewood in carrying out a plan.

Englewood's argument here is similar to its argument regarding a funding source for the necessary repairs. Just as HUD could not validate an unapproved loan application as a funding source for needed repairs (because there were no funds to validate), HUD could not assist Englewood to effectuate a comprehensive plan that was never submitted. Nevertheless, it is equally clear that Englewood is wrong when it states that HUD never responded to its alleged plan. HUD sent numerous letters and had many discussions with Englewood as to what was required of a MIO plan. For Englewood to argue otherwise is without merit.

Veronica Coleman, Director of Project Management, testified that, after it was determined that Englewood's submission did not include a complete scope of work or a sources and uses of funds, Englewood's April 2001 submission was found deficient and returned to Mr. Hayes. Record 826:16-19, 837: 16-24. But Englewood now argues that this communication with the Director of Project Management, and other communications Englewood had with HUD, including additional communications it had with the Hub Director, Mr. Hinsberger, regarding the notices, were not adequate or sufficient because the review was required of their subordinate, the project manager, Ms. Thomas, who had no delegated authority.

In sum, Englewood urges the Court to disregard these communications with senior HUD officials because it did not receive feedback from their subordinate. There is no merit to this contention, and this argument should be rejected.

**V. Englewood's Claim That HUD Was Not Justified In Finding That South Pointe Was Not In Decent, Safe And Sanitary Condition Has No Legal Or Evidentiary Support**

Englewood argues there are several reasons why HUD was wrong in finding that South Pointe was not in decent, safe and sanitary condition. Pl. Br. p. 61-68. As we demonstrate below, each of Englewood's reasons are wrong.

**A. Englewood Was Placed Upon Notice On Numerous Occasions As To Its Responsibilities Regarding Maintaining All Of South Pointe In Decent, Safe And Sanitary Condition**

Contrary to Englewood's argument, Pl. Br. pp. 62-63, as we demonstrated in our opening brief, Def. Br. pp. 30-32 and throughout this response, Englewood was clearly placed upon notice as to the deficiencies of the property, and that all of the property must be in decent, safe and sanitary condition.

In sum, on April 9, 2001, Mr. Edward Hinsberger, Director of HUD's Chicago Regional Office, issued a notice of contract default to Englewood. Jt. Stip. of Fact ¶ 88; JX 089, p. 1090; Record 540:2-5. This notice, referred Englewood to HUD's Physical Condition Standards, which are set forth in 24 C.F.R. Part 5, Subpart G. Jt. Stip. of Fact ¶ 94; JX 089, p.1090 at 1091. The notice of default further identified South Pointe's physical condition as grounds for default under the HAP contract. Jt. Stip. of Fact ¶ 94; JX 089, p. 1090 at 1091.

After 30 days expired without hearing from Englewood regarding the initial default notice, on May 16, 2001, HUD sent Englewood a notice of continuing default. Jt. Stip. of Fact ¶ 101; JX 094, p. 1099; Record 840:8-19. In this second Notice of Default, HUD urged

Englewood “to provide adequate, timely information describing the immediate efforts that the Owner is making to address the HAP default and the sale of the Project and proposed assumption of the HAP contract.” Jt. Stip. of Fact ¶ 101; JX 094, p. 1099 at 1100.

Finally, after Englewood failed to demonstrate that it had secured a funding source to make the necessary repairs to South Pointe and failed to show that all identified repairs had been made to the property to cure the default, on November 30, 2001, HUD issued a “Notice of Abatement and Termination.” This document clearly stated that Englewood had failed to demonstrate that it had maintained the units at South Pointe in decent, safe, and sanitary condition as defined by 24 C.F.R. Part 5, Subpart G within 30 days of HUD's April 9, 2001 formal notice of default. Jt. Stip. of Fact ¶ 117; JX 117, p. 1176.

Clearly, Englewood was placed on formal notice on at least three separate occasions, and in each instance failed to do anything to remedy the deficiencies at South Pointe. Englewood’s argument to the contrary is without support and should be rejected.

### B. HUD Possessed Overwhelming Evidence To Support Its Decision That South Pointe Was Not Being Maintained In Accordance With The Standards Set Forth At 24 C.F.R. § 5.703

Englewood next argues that there "was no factual basis for HUD's finding" that Englewood was in default. Pl. Br. pp. 63-66. We disagree. The standards established at 24 C.F.R. § 5.703 and cited in HUD's April 2001 Notice of Default are quite detailed. Englewood was placed upon notice by HUD, and other agencies, that these standards were not being met. If Englewood was confused, all it needed to do was to compare its HAP contract and the standards in the Code of Federal Regulation with the numerous inspections its received. However, it did not. Englewood apparently believed that it only needed to respond to those specific deficiencies that HUD and various state agencies identified in their reports, and look no further than those cited problem areas. Record 516: 13-15. Englewood's management philosophy, or lack thereof, should not be condoned.

Englewood argues, without citing to any regulatory or contractual basis, that only "official" inspections could be the basis for finding South Pointe was not in decent safe and sanitary condition. Pl. Br. p. 63. That is not the case. The HAP contract provides that HUD, not exclusively REAC, will "inspect" the property. JX 019, p. 677 at 680 (¶ 6(b)(2): HUD shall inspect or cause to be inspected at such times **as may be necessary** to ensure that the Owner is meeting its obligation to maintain the units in decent, safe and sanitary condition . . .). Englewood cannot cite any authority that HUD is precluded from taking any action under the contract merely because there were, or were not, repeated REAC inspections.[24]

---

[24] Notwithstanding, HUD's REAC inspected the property in 1999 and 2001 and recorded dismal findings each time.

Englewood also implies that, because Mr. Hinsberger never personally visited South Pointe, he could not find that South Pointe was in default. Pl. Br. pp. 63-64. Again, Englewood fails to point to any legal or factual basis for its position here. Moreover, Englewood is wrong. The law is clear that senior officials may reasonably rely upon information supplied by subordinates, as long as the deciding official "put his own mind to the problems and render[s] his own decisions," New York Shipbuilding Corp. v. United States, 180 Ct. Cl. 446, 460, 385 F.2d 427, 435 (1968); Pacific Architects and Engineers Inc. et. al. v. United States, 203 Ct. Cl. 499, 518, 491 F.2d 734, 744 (1974)(citation omitted)(there is nothing improper with the contracting officer "first obtaining or even agreeing with the views of others).

Englewood has again failed to point to any evidence that shows Mr. Hinsberger did not put "his own mind to the problems and render his own decision" regarding abating and terminating the HAP contract. At trial, it was clear that Mr. Hinsberger was fully engaged in the decision-making process, and repeatedly tried to get Englewood to act upon South Pointe. Mr. Hinsberger was not an official who was "remarkably detached from the decision-making process" and who failed to review data or relied only upon Government sources when making his decision. See CEMS, Inc. v. United States, 65 Fed. Cl. 473, 479-80 (2005). To the contrary, Mr. Hinsberger held meetings with Englewood, Record 683: 1-10, 688: 3-7; sent senior HUD employees to do confirmatory reviews and met with them after the reviews to discuss their outcome, Record 675: 21 - 676: 3, 694: 6 - 698: 18; and considered input from many outside agencies and individuals. Record 672: 19 - 674: 11.

Furthermore, Mr. Hinsberger testified that there are two thousand properties in his region alone, which covers the states of Indiana and Illinois. Record 663: 1-6. If HUD were

constrained from action upon a breach of contract until its regional director personally conducted a site visit to assess the physical condition of the property, as Englewood suggests, thousands of residents (not to mention the taxpayer's money) would be at risk.

Furthermore, Englewood is wrong when it asserts that Mr. Hinsberger and Ms. Coleman only relied upon Ms. Thomas when they made their decisions. Clearly the record does not support this assertion. In addition to other agency reports and complaints they received, there were visits from REAC and other HUD personnel who had little or no additional involvement with the project. Record 1203: 13-16, 1206: 21-23, 1222: 1-5, 1245: 25-1246:9.

Englewood's next argument that HUD erred by not relying upon Ms. Batchelor is also without merit. See Pl. Br. pp. 65-66. First, Englewood failed to mention that Ms. Batchelor had nothing to do with South Pointe after April 2001. Ms. Batchelor testified that the Chicago Multi-Family Housing Office, and specifically Ms. Thomas, Ms. Coleman, and Mr. Hinsberger had primary responsibility for South Pointe after January 26, 2001. Record 150: 9 - 151: 8.
Ms. Batchelor also admitted that she never conducted any inspections of the property in 2001 or participated in any of the decisions regarding South Pointe. Record: 151: 20-25, 152: 1-25, 153: 1-22. She only testified that she compared the 1999 REAC inspection with Englewood's purported MIO plan and prepared an alleged spreadsheet of purported corrected items.[25] Record

---

[25] In making its argument, we are unsure what point Englewood is attempting to make when it asserts that "HUD failed to produce [Ms. Batchelor's spreadsheet analyzing the property] during discovery." Pl. Br. p. 65. As we have repeatedly stated, we have turned over everything that was in South Pointe's files. HUD simply did not have in its files Ms. Batchelor's spreadsheet. Moreover, as we have also mentioned many times before, and as Mr. Samuelson testified to at his deposition, Ms. Batchelor produced numerous documents to Englewood from her "personal file" on South Pointe, including a "procedures binder" of approximately "200 or 300, 400 pages." JX 014, p. 570 at 574, 577 (Samuelson deposition at 14: 20 - 15: 11 and 20: 21 - 29:2). Ms. Batchelor took many documents from HUD prior to leaving the Government's

144: 1-12. Thus, assuming this former employee is testifying truthfully, her testimony is irrelevant to the pivotal time frames of April 2001, when HUD issued its initial notice of default; or in May 2001 when the continuing notice of default was issued; or again in November 2001 when the HAP contract was abated and terminated; and finally, in October 2002, when the last HAP renewal contract expired.

Moreover, Ms. Batchelor's testimony actually supports Mr. Hinsberger's decision. Her testimony shows that Englewood had a consistent history of failing to maintain South Pointe, even as far back as 1995, and that these failures demonstrated that South Pointe was not in decent, safe or sanitary condition; even during Ms. Batchelor's authorized tenure for the project when it was in HUD's Departmental Enforcement Center for the periods 1998-2000.

Ms. Batchelor agreed upon questioning at trial that "the building had an infestation of roaches and rodents in 1999." Record 154: 1-3. She also testified that the elevators were broken. Record 154: 4-6. Ms. Batchelor further agreed that "there was visible signs of mold and flaking" at the property. Record 154: 7-11. She also testified that there was extensive graffiti and a significant amount of drug related violent crime there. Record 154: 12-15. Ms. Batchelor also agreed with the premise that if Englewood failed to rectify these conditions, HUD would be justified in abating the HAP contract. Record 154: 16-19. Finally, Ms. Batchelor also noted that

---

employ and this could have been one of these documents she took. Nevertheless, as we mentioned above, Ms. Batchelor's opinions in late 1999 and early 2000 are irrelevant to what Englewood was doing in the Fall of 2001 and in 2002 when the decisions concerning whether HUD should abate and terminate the HAP contract were being debated. Last, we point out that Ms. Batchelor was not authorized by HUD to give opinion/expert testimony, which, until Englewood's brief, we did not believe was being provided as "expert" opinion. See 5 C.F.R. § 2637.208 and 18 U.S.C. § 207, see also 24 C.F.R. § 15.302 (a) and 24 C.F.R. § 15.301(b)(defining the term "employee" to include a former employee).

in 1999 South Pointe had a large number of rats that were entering the building because the project needed major external repairs, Record 154: 24-155: 2, and that when HUD went to the property to review the condition of the property, the common areas were filled with garbage and there was graffiti on the walls, and the common areas smelled of urine. Record 155: 8-12; JX 047, p. 860 at 862. Ms. Batchelor's findings are remarkable in that they are consistent with all of the other witnesses' testimonies and documentary evidence regarding the conditions of South Pointe and Englewood's lack of evidence that they were ever repaired.

Furthermore, Ms. Batchelor testified that these problems were noted as far back as 1994. Record 157: 3-9; JX 047, p. 860 at 863. Of note, too, is that these listed problems would have justified a finding that South Pointe was not in decent, safe and sanitary condition. Record 157: 12-14. Moreover, these problems were not corrected. JX 047 p. 860 at 863.

Similarly, Ms. Batchelor testified that in 1995 another inspection was conducted and it revealed that more repairs were needed. Record 158: 9-11. Ms. Batchelor noted that in 1995 South Pointe needed to replace the roof, handrails, fire hoses, cabinets, deadbolts, and repair trash chutes and the boiler. Record 158: 13-18. Once again, Ms. Batchelor testified that these deficiencies made South Pointe unsafe, not decent and unsanitary. Record 158:19-21.

Moreover, when questioned upon these inspections, Ms. Batchelor admitted that Englewood had a pattern of failing to make repairs of similar items:

> Q. And would you agree with me that the report says that the common areas were filled with garbage and that there was a smell of urine and that the building . . . was infested with rats and roaches?
>
> A. Yes, that's correct.

Q. All right. So you could see that there was a pattern there, correct?

A True, there definitely was.

Record 159: 8-15.

Finally, when asked about certain conditions and if they were found at a property, what finding would be reasonable to make, Ms. Batchelor was equally clear:

Q. . . . if any hallway in any building smells of urine you would say that's not a sanitary condition in that hallway?

A. Yes, we would.

Q. And similarly I assume that if a stairwell smelled of urine that's unsanitary as well?

A. Yes, we would.

Q. And if a building's garbage shoots are broken and garbage is strewn all over the place that would be an unsanitary building?

A. It would be a health hazard, yes it would.

Q. And what about . . . exposed wires. I think you'd agree that also --

A. – also would be a health hazard, yes.

Q. And say if a stairwell on the 18th floor of a high rise is missing fire hoses that would make the building unsafe as well, would you agree?

A. Yes. And create other problems also, yes.

Q. And, you know, if a building is infested with rats that would be unsanitary and unsafe would you agree?

A. That's correct too.

Q. And if a unit contains missing or broken smoke detectors that's an unsafe unit isn't that true?

> A. True, yes it is.
>
> Q. And if a unit is infested with roaches that's an unsafe and unsanitary unit as well?
>
> A. Right, that's true.

Record 177: 21 - 178: 22.

> Q And I assume though you'd also agree with me that if an elevator isn't operable and a resident is forced to climb 22 stairs to get to their unit I don't know if that's unsafe and I don't know if it's unsanitary and I don't know if indecent but that's problem?
>
> A. Yes. That's why it was cited as one of the major problems.

Record 179: 10-16.

Clearly, Ms. Batchelor's testimony shows that: (1) South Pointe had shown a disturbing pattern of recurring physical condition problems; (2) that these problems were not fixed; (3) these recurring deficiencies made South Pointe not decent, not safe; and certainly not sanitary, as mandated by 24 C.F.R. § 5.703; and 4) the conditions Ms. Batchelor said were not decent, safe and sanitary, are the same conditions Lillye Simmons, John Schneider, Gwendolyn Thomas, Teresa DiPietro, the Illinois Housing Development Authority, and numerous others found to exist when they visited South Pointe in 2001 and 2002.

Accordingly, when senior HUD personnel found virtually the same, and more problems in 2001 and 2002, and that Englewood was neglecting to make repairs, Mr. Hinsberger was certainly more than justified in abating and terminating the HAP contract.

**C. Englewood Has No Legal, Contractual, Or Regulatory Bases For Asserting That HUD Could Only Rely Upon Alleged "Official" Inspections Of South Pointe**

Englewood's attempt to attack HUD's decision to abate and terminate the HAP contract by impugning the findings of experienced HUD personnel (Ms. Thomas, Ms. Simmons and Mr. Schneider) is completely without merit. See Pl. Br. p. 66. These employees have years of experience: Project Manager Gwendolyn Thomas began with HUD in 1989 and conducted over a hundred site visits. Record 308: 15-18, 312: 22-24. Construction analyst Lillye Simmons visited hundreds of buildings in the course of her 20-year career with HUD. Record 1230: 24-1231:1. John Schneider, an appraiser with HUD since 1994, had been to approximately 200 properties in the course of his career. Record 1202: 18- 1203: 1. Given their experience, there is simply no basis for Englewood to denigrate the findings of these dedicated Federal servants.

Despite the HUD witnesses' years of experience, Englewood still argues, again without citing any regulatory or statutory basis, that "[b]ecause Ms. Thomas, Ms. Simmons and Ms. DiPietro could not answer basic questions about maintenance issues and simple repairs, they are not qualified to determine whether South Pointe was in 'decent, safe and sanitary' condition." Pl. Br. 66. Englewood's opinion is not only irrelevant, it is wrong. The deficiencies that the HUD witnesses identified are so obvious that it does not take any specialized training or knowledge to realize a serious problem existed at South Pointe. Contrary to Englewood's position, it does not take an experienced maintenance person to know that urine and feces in the common area, dim lighting in the hallways, and sticky floors throughout the building, are unsanitary and indecent conditions. See JX 115, p. 1166; Record 1205: 11-20; 1228: 6-8. Similarly, it does not take any special construction and repair skill to realize that a building with

broken windows, missing window screens, and trash about the building, also is not decent, safe or sanitary. See Record 1228: 2-3. This was particularly evident in Teresa DiPietro's testimony: As a new project manager, she was taken to South Pointe for her first inspection, and came away extremely disturbed:

> And then as we got into the units, I became very upset with the fact that people were living in these kinds of, in the kinds of conditions along with the fact that they [were] actually – being paid for people and that this was what we were having them live in and basically somebody was telling them that this is a unit that is liveable when there was so much disrepair about the building.

Record 1253: 25 – 1256: 7.

Nevertheless, even assuming that Englewood's position here has a scintilla of merit, John Schneider, an experienced appraiser, reviewed South Pointe's property conditions and testified that his first impression of the building was that it was "in extreme disrepair as evidenced by boarded up windows on the outside [and], areas of the lawn that were bare." Record 1204: 7-10. Mr. Schneider also noted that units had "water marked ceilings, paint peeling off the ceilings, paint peeling off the walls, damages walls, holes in the walls, areas where walls had been repaired but unpainted, missing floor tiles, outlets and switches with protruding wiring . . . We saw, in the bathrooms mildew in shower areas, missing tiles from the walls, cracked tiles, missing plumbing fixtures." Record 1204: 18 - 1205: 1. Mr. Schneider saw rodent droppings and noted that he took the stairwells to go down to the 22nd floor because "there was only one functioning elevator and it was very slow." Record 1205: 4-7. Consistent with the testimony of the other HUD witnesses, stairwells were dimly lit and smelled of urine; fire doors were permanently open, there were missing push bars on fire doors, and fire hoses were missing. Record 1205: 11-20.

Furthermore, the HUD witnesses' conclusions regarding the recurring conditions they saw were the same as Englewood's on-site manager, Carl Sanders. Like the HUD witnesses, Mr. Sander's testimony showed that Englewood never solved major problems at South Pointe. For example, accumulation of trash or problems with trash removal are specifically listed as unsafe, indecent, and unsanitary conditions that must be controlled. Specifically, the regulation requires owners to maintain the property site's components. See 24 C.F.R. § 5.703(a)("The site components, such as . . . refuse disposal . . . must be free of health and safety hazards and be in good repair. The site must not be subject to material adverse conditions, such as . . . excess accumulations of trash . . ., vermin or rodent infestation).

On this point, Mr. Sanders testified:

> Q. And once again your hundred percent review noted that the trash chutes are also problematic.
>
> A. Yes.
>
> Q. Which is another restatement of the April 1999 REAC report. Correct?
>
> A. Restatement, been repaired, and re-damaged --
>
> Q. And the City of Chicago report, didn't that also find problems with trash?
>
> A. Sure.
>
> Q. So let me get this straight. In April 1999, you were put on notice that you had problems with trash.
>
> A. Um-hmm.
>
> Q. In October 1999, the City of Chicago put you on notice you had problems with trash.
>
> A. Yes, sir.

> Q. And your own inspection said that you had problems be it the trash chutes, or some other item of refuse removal. Correct?
>
> A. Yes, sir.

Record 508: 3-21; see also, Record 514: 20 - 515: 6. Clearly, Englewood's own witness understood that South Pointe's trash problems violated the standards established at 24 C.F.R. § 5.703(a). It is difficult to understand how Englewood believes that problems with trash accumulation identified in 1999 by Englewood's site-manager, are somehow of less consequence in 2001 and 2002, when they were identified by senior HUD employees.

In addition to trash problems at South Pointe, Carl Sanders echoed the HUD officials' findings regarding missing and broken fire safety equipment, broken elevators and infestation of roaches. These items also are specifically addressed in the governing regulation. See 24 C.F.R. § 5.703(c)("Each building's . . . elevators . . .[and] fire protection . . . must be free of health and safety hazards, functionally adequate, operable, and in good repair . . .); 24 C.F.R. § 5.703(f) (setting forth general health and safety hazards as "infestation" and stating that "[t]he housing must have no evidence of infestation by rats, mice, or other vermin, or of garbage and debris.").

> Q. In 2001, a report was in issue regarding an inspection --
>
> A. That is correct.
>
> Q. -- of a few number of units in the property.
>
> A. Yes.
>
> Q. And you would agree that there's a, that in 1998 there was problems with trash chutes, and trash.
>
> A. Um-hmm.
>
> Q. In 1999 there were problems with trash chutes and trash.

A. That is correct.

Q. In 2000 there were problems with trash chutes and trash.

A. That is correct.

Q. In 2001 there were problems with trash chutes and trash.

A. That is correct.

Q. In 1998 there were problems with fire protection and fire hoses missing and things like that. Correct?

A. That's, that's correct.

Q. In 1999 same problem.

A. That is correct.

Q. 2000, once again, smoke detectors missing, smoke detectors inoperable, fire hoses missing, you know, fire hazards to the building. Correct?

A. Right.

Q. In 2001, same thing.

A. Right.

Q. 1998, elevators broken.
A. Right.

Q. 1999, problems with the elevators.

A. That is correct

.

Q. 2000, problem with the elevators.

A. That is correct.

Q. 2001, more problems with the elevators.

A. Correct.

Q. 1998, again, infestation of roaches.

A. That is correct.

Q. 1999, roaches again.

A. Right.

Q. 2000, more roaches.

A. Yes.

Q. 2001, more roaches.

A. Yes.

Q. And all these times you were certifying that those same problems had been fixed or repaired. Correct?

A. I was certifying that the problem on the report was fixed and repaired.

Q. So you were reacting to a report.

A. That's, what I was certifying was to that report, and what we were required to do.

See Record 514: 15 - 516: 15.

Thus, the uncontroverted evidence at trial shows that regardless of one's experience or background in the area of maintenance and repairs, or whether a witness was one for the plaintiff or one called by HUD, the conclusions reached were the same. The same deficiencies that violated 24 C.F.R. § 5.703's standards were chronic at South Pointe. More importantly, the repetitive nature of these violations provided Mr. Hinsberger with more than enough evidence to find that the conditions at South Pointe were deplorable, and that it was clear the building was not in decent, safe and sanitary condition.

**VI. The Term Decent, Safe And Sanitary Is Well-Defined In The Regulation And There Was No Evidence From Englewood Produced At Trial To Justify Any Other Conclusion**

As we predicted in our opening brief, Def. Br. p.48, Englewood still maintains that the term "decent, safe and sanitary" is ambiguous and that HUD failed to define it. Pl. Br. pp. 67-68. In making this argument, Englewood cites to several cases that found, under different scenarios, that the term was "subjective." Id. Englewood's reliance upon these cases is misplaced because the salient facts of these cases predated HUD's enactment of the standardized definition of the term "decent, safe and sanitary" at issue here that is set forth at 24 C.F.R. § 5.703, and that **were** operative when official action was taken by HUD for **this** property. It is difficult to see how the standards that Englewood were required to meet, as now set forth at 24 C.F.R. §5.703, are vague. Englewood's alleged "key" witnesses at trial did not find the standard vague or subjective. Indeed, Ms. Batchelor agreed with the Government that several consistently recurring findings, such as problems with garbage and the trash chutes, rodent and cockroach infestation, and urine smells in the common area, were not decent, safe or sanitary. Record 157:3-159:20.

**VII. Englewood's Argument That HUD Personnel Acted In Bad Faith Is Without Merit**

As expected, Englewood also argues that HUD employees essentially acted in bad faith[26] by hindering Englewood's ability to perform upon the HAP contract. Pl. Br. 68-72. The overwhelming evidence at trial proved otherwise. Indeed, the reason why Englewood did not

[26] Englewood argues that HUD violated the duty to act in good faith; however, "[i]t is axiomatic that before a court will consider a claim that the implied duty of good faith has been violated, there must be some factual basis for . . . bad faith on the part of defendant." Richard A. Lord, 23 Williston on Contracts § 63:22 (4th ed. 2002).

make repairs at South Pointe and thus maintain the property in decent, safe and sanitary condition was because Englewood either lacked funds or refused to spend them for the needed repairs. Englewood's fiscal crisis was self-imposed, and was not due to anything HUD did, or should have done.[27] Record 496: 16-25; 689: 11-13; 862: 15-17; 870: 9-17. As we demonstrate below, the instances that Englewood now cites for support upon this point are without merit.[28]

### A. Englewood Misstates The Law Regarding The Presumption That Government Employees Act In Good Faith When Administering The Contract

In arguing that HUD employees acted in bad faith, Englewood misstates the law regarding what standard applies. Pl. Br. p. 70. Englewood's argument is based upon language in Tecom v. United States, 66 Fed. Cl. 736 (Fed. Cir. 2005). Pl. Br. p. 69-70. However,

---

[27] We are also surprised that Englewood would make this argument given that Englewood agreed to dismiss at trial the causes of action it now asserts are some of the bases for this claim: vacancy claims, tenant damage, and an alleged pre-default 1999 rent increase request.

[28] Englewood also raised at trial, and briefly in its post-trial brief, that other alleged indicia of HUD's bad faith were in proceedings before the United States District Court for the Northern District of Illinois. See Pl. Br. p. 37, 76-77. Englewood claims that the district court was misled when HUD indicated, in October of 2001, that HUD had not yet begun its voucher and termination process. Pl. Br. p. 37. Englewood again misstates what the evidence at trial showed. HUD's assertion was accurate because its official notice to abate and terminate the HAP Contract issued only after the initial district court matter was dismissed, as Englewood correctly observes. Pl. Br. p. 38; JX 117, p. 1176. However, once again demonstrating its selective use of the actual facts, even if the Court were to assume that the district court was somehow misled by the United States in Englewood's first district court action, Englewood neglects to point out that the district court most certainly was not misled when it dismissed Englewood's largely duplicate second complaint, with prejudice, in 2002, well after the November 2001 notice of abatement and termination. See JX 002, p. 15; Englewood Terrace Limited Partnership v. United States, *et. al*, No. 02C-4033, PACER, Document 11, (N.D. Il. March 11, 2003) (a copy of the document is attached to this brief as Exhibit B).

Tecom's analysis is inconsistent with Federal Circuit precedent, and thus, because the Tecom holding is not binding upon this Court, it should not be followed.[29]

This Court's decision in Tecom, Inc. v. United States, did not change, and could not have changed, the "well-nigh irrefragable" or "clear and convincing" standard applicable to bad faith claims. Tecom's rejection of the higher burden "clear and convincing evidence" standard as discussed in Am-Pro Protective Agency, Inc. v. United States, 281 F.3d 1234, 1239-40 (Fed. Cir. 2002), is based upon a reading of Am-Pro that limits the application of the "clear and convincing evidence" standard to "'fraud or in some other quasi-criminal wrongdoing.'" Tecom, 66 Fed. Cl. at 769 (citing Am-Pro, 281 F.3d at 1239). However, Am-Pro itself did not involve allegations of "fraud or [] quasi-criminal wrongdoing." 281 F.3d at 1239. The plaintiff in Am-Pro alleged duress, and there was no finding that duress was the equivalent of "fraud or . . . some other quasi-criminal wrongdoing." Id. In addition, this Federal Circuit has never limited the requirement to show "clear and convincing evidence" – or "well-nigh irrefragable proof" – to situations demonstrating "fraud or . . . some other quasi-criminal wrongdoing," either before or after Am-Pro – instead readily applying the standard to bad faith.

Indeed, recent opinions show that the Federal Circuit uses both the "clear and convincing evidence" and "well-nigh irrefragable proof" standards when discussing a plaintiff's burden to

---

[29] Court of Federal Claims decisions, while persuasive, do not set binding precedent for separate and distinct cases in that court." West Coast Gen. Corp. v. Dalton, 39 F.3d 312, 315 (Fed. Cir. 1994) (citing Sun Eagle Corp. v. United States, 23 Cl. Ct. 465, 473 (1991)); U.S. PolyCon Corp. v. United States, 43 Fed. Cl. 11, 13 (1999) ("Two of the cases cited by defendant were decided by other judges of this court and thus do not constitute binding precedent.") (footnote omitted); cf. United States v. Articles of Drug Consisting of 203 Paper Bags, 818 F.2d 569, 572 (7th Cir. 1987) (single district court decision does not bind other district judges in the same district); Colby v. J.C. Penney Cp., 811 F.2d 1119, 1123 (7th Cir. 1987)).

establish bad faith upon the Government employee. See Galen Med. Assocs., Inc. v. United States, 369 F.3d 1324, 1330 (Fed. Cir. 2004)(". . . we assume that the government acts in good faith while contracting and a protester needs 'well-nigh irrefragable proof' that the government had an intent to injure it to overcome this presumption."); Info. Tech. & Applications Corp. v. United States, 316 F.3d 1312, 1323 n. 2 (Fed. Cir.2003)(When a contractor alleges bad faith, in order "to overcome the presumption of good faith [on behalf of the government], the proof must be almost irrefragable."); Schism v. United States, 316 F.3d 1259, 1302 (Fed. Cir. 2002) (en banc)("well-nigh irrefragable proof" required to rebut the "valid and binding" presumption that Government officials perform their duties in good faith); Am-Pro Protective Agency, Inc. v. United States, 281 F.3d at 1239-40 ("well nigh irrefragable proof" has been described as "clear and convincing evidence."); see also Long Lane Ltd. Partnership v. Bibb, No. 05-1036, 2005 WL 3304124, 159 Fed. Appx. 189, 192 (Fed. Cir. Dec. 7, 2005)(Government is always presumed to act in good faith, and "it requires 'well-nigh irrefragable proof' to induce the court to abandon the presumption of good faith dealing").

In sum, when reviewing the actions of Mr. Hinsberger and other senior HUD employees, contrary to Englewood's argued position, the Court must presume that these Government officials acted conscientiously and in good faith in the discharge of their duties. L.P. Consulting Group, Inc. v. United States, 66 Fed. Cl. 238, 243 (2005) (citing Spezzaferro v. Fed. Aviation Admin., 807 F.2d 169, 173 (Fed. Cir. 1986)). Proving that the Government acted in bad faith is intended to be very difficult. See Am-Pro Protective Agency, Inc. v. United States, 281 F.3d at 1240. In order to overcome the presumption that Government officials acted in bad faith, Englewood must allege and prove, by clear and strong evidence, specific acts of bad faith upon

the part of the Government. L.P. Consulting, 66 Fed. Cl. at 243 (citing Galen Med. Assocs., Inc. v. United States, 369 F.3d 1324, 1330 (Fed. Cir. 2004)). The level of proof to overcome this presumption is high, and has been equated with evidence of some specific intent to injure the plaintiff. Id. (citing Galen).

Englewood has failed to meet this high burden. Nevertheless, even if the Court were to apply the Tecom standard, Englewood's claims here fail because even if the allegations Englewood alleges are true, they did not impact upon Englewood's ability to perform upon the contract.

**B. HUD Did Not Act In Bad Faith In 1999 And 2001 By Not Approving Englewood's Purported MIO Plan**

Englewood first argues that HUD violated the duty of good faith and fair dealing when "HUD refused to follow the directive of the Final Team Report to 'continue the finalization' [of] Englewood's MIO Plan over the eight month period from February through October of 2000." Pl. Br. p. 71. This argument fails for several reasons. First, as with many of Englewood's arguments, there is no evidence that the Chicago Multi-Family Housing Office was "directed" to do anything with Englewood's MIO plan. It was Englewood's duty to finalize, submit and implement, a valid MIO plan, and Englewood never did. See JX 047, p. 860 at 861 (at ¶ 6: "The MIO has been **tentatively accepted** with two modifications: The HUB office has requested the **owner** to add on the MIO plan the source of funding . . .")(emphasis added). Critical to the plan was a source of funding because, as Edward Hinsberger testified,

> If there's no finding source and . . . the repairs can't be made because there's no money to make repairs then the Operating Plan is actually useless.

Record 669: 21-24.

Similarly, there is no support for Englewood's claim that HUD's Multi-Family Housing Office refused to "work with Englewood on its efforts to repair and renovate South Pointe." Pl. Br. p. 71. Again, Englewood fails to identify any regulatory or contractual requirement upon HUD's part that HUD actually was required to assist Englewood in renovating and repairing the property. Indeed, HUD was paying Englewood a potential of over $2 million dollars a year under the HAP contract to provide decent, safe and sanitary housing. This allegation also ignores the feedback HUD provided to Englewood from HUD's numerous site visits and inspections. JX 027, p. 760; JX 028, p. 767; JX 055, p. 921; JX 150, p. 1539. It also ignores the letters HUD sent to Englewood imploring it to do its job and maintain South Pointe in the appropriate condition.

Furthermore, Englewood's claim that its "damages could have been avoided" if only had "HUD engaged in a dialog with Englewood" is completely without support. Englewood is correct that it did not have a dialogue with HUD. This is because HUD was having a **<u>monologue</u>** with Englewood upon its need to get a funding source. Record: 715: 23 - 716: 3. The evidence shows that HUD pleaded with Englewood for several years to get a funding source – whether for a MIO plan or a loan – so it could make the much needed repairs to South Pointe. Record 605: 22 - 606: 1. It is beyond dispute that Englewood did not obtain a source of funds prior to the HAP contract's date of termination or expiration.

Finally, it is hard to see how any alleged lack of dialogue caused Englewood's damages because after the HAP contract ended, HUD insured Englewood's $11.6 million dollar loan to pay off its unfavorable mortgage and to make the necessary repairs to South Pointe. Record 1179: 25 - 1180:1. The $11.6 million dollar insured loan was substantially more than the amount

of money Englewood was seeking a year earlier. Moreover, this loan contained funding to keep Englewood operational while the construction was ongoing. Record 1181: 12-14. It is difficult to understand how HUD acted in bad faith when, despite knowing that Englewood had miserably failed to maintain South Pointe in decent safe and sanitary condition, HUD still voluntarily agreed to insure such a large loan for Englewood.

Englewood also argues that HUD violated a duty of good faith and fair dealing by returning Englewood's April 5, 2001 Management Improvement Operating ("MIO") plan and its April 8, 2001 response to the March 8, 2001 REAC letter. Incredibly, Englewood appears to argue that, because the project manager – who had no delegated authority – did not review the MIO plan, and notwithstanding the fact that the Director of Project management did review the MIO, HUD somehow failed to give due consideration to Englewood. Pl. Br. p. 71. This argument clearly fails because it assumes that Englewood's purported MIO plan dated April 5, 2001, and its April 8, 2001 response to the REAC inspection were, in fact, responsive to begin with. That was not the case. As Veronica Coleman testified:

> The package was returned. It was deficient. It did not have a source of funding to repair anything. It did not have the entire scope of work. The plan that was submitted by [Englewood] was not submitted in accordance with the [REAC] letter dated March 8, 2001. This letter states, additional deficiencies identified by your survey, deficiencies already corrected, available resources, completion time frame schedules by quarter. None of this was done.

Record 837: 16-24.[30]

---

[30] Indeed, Englewood's argument that the Chicago Hub "refused to follow the directive of the Final Team Report to continue the finalization [of] Englewood's MIO Plan . . ." is equally without merit. Even assuming the Chicago Departmental Enforcement Center ("DEC") could "direct" the Chicago Hub to take certain actions, and not withstanding the DEC process, HUD

### C. HUD Had No Contractual Or Regulatory Duty To Approve Englewood's Alleged Claims For HAP Contract Renewal, A Rent Increase And Energy Reimbursements

Englewood also argues, again without pointing to any legal duty upon HUD's part, that HUD acted in bad faith when it "refused to grant or process Englewood's request for a HAP contract renewal and rent increase" and "energy reimbursement claims." Pl. Br. p. 72-73. In doing so, Englewood ignores the fact that there was no evidence adduced at trial that shows that these requests were: (1) ever properly submitted, (2) submitted on time, or (3) complete. See also Def. Br., Docket # 138, pp. 76-83.

## CONCLUSION

For these reasons, and those stated in our post-trial brief, the United States respectfully requests the Court to dismiss Englewood's complaint.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/ Brian M. Simkin
BRIAN M. SIMKIN
Assistant Director

can always take whatever actions are necessary to protect the residents and HUD's interests. 24 C.F.R. § 200.857(i)(4).

s/ Douglas K. Mickle
DOUGLAS K. MICKLE
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit, 8th Floor
Washington, D.C. 20530
1100 L Street, N.W.
Tel: (202) 307-0383
Fax: (202) 353-7988

Attorneys for Defendant

OF COUNSEL:

GREGORY G. GUSTIN
MARIA T. BAGUIO
RUSSELL J. COHEN
LORRAINE C. SHOTO

Office of General Counsel
U.S. Department of Housing
and Urban Development
Chicago, Illinois

May 2, 2007

## CERTIFICATE OF FILING

I hereby certify that on May 2, 2007, a copy of the foregoing "**DEFENDANT'S RESPONSE TO PLAINTIFF'S POST-TRIAL BRIEF**" with its exhibits were filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Douglas K. Mickle
Douglas K. Mickle