**No. 03-2209C**
**Judge Marian Blank Horn**

---

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**ENGLEWOOD TERRACE LIMITED PARTNERSHIP, a Michigan Limited Partnership,**

**Plaintiff,**

**v.**

**UNITED STATES OF AMERICA and MEL MARTINEZ, Secretary of the Department of Housing and Urban Development,**

**Defendants.**

---

# ENGLEWOOD'S REPLY TO HUD'S POST-TRIAL BRIEF

---

**Peter V. Baugher**
**William B. Berndt**
**Schopf & Weiss LLP**
**One South Wacker Drive, 28th Floor**
**Chicago, IL 60606**
**312.701.9300**

**May 2, 2007**

# TABLE OF CONTENTS

TABLE OF CONTENTS ..... i

INTRODUCTION ..... 1

ARGUMENT ..... 3

I. HUD FAILED TO MEET ITS BURDEN OF PROOF TO SHOW THAT SOUTH POINTE WAS NOT IN "DECENT, SAFE AND SANITARY" CONDITION. ..... 3

A. Established Law Holds That HUD Bears The Burden Of Establishing Its Affirmative Defense Of Prior Material Breach. ..... 4

1. Prior Material Breach Is An Affirmative Defense. ..... 4

2. HUD Bears The Burden To Prove Its Affirmative Defense Of Prior Material Breach, And Thus Bears The Burden To Show That Its Default Notice Was Justified. ..... 5

B. The Parties' Written Contract Restricts The Manner In Which HUD May Properly Declare Englewood In Default. ..... 6

II. HUD FAILS TO PROVE THAT ANY OF THE EVENTS OF DEFAULT LISTED IN ITS APRIL 2001 NOTICE OF DEFAULT WERE A PROPER BASIS TO TERMINATE ENGLEWOOD'S HAP CONTRACT. ..... 8

A. HUD Has Acknowledged That The Only Basis For Termination Of Englewood's Housing Assistance Payments Contract Is The Findings Of The March 2001 REAC Report. ..... 9

B. The Findings Of The REAC Report Do Not Support HUD's Conclusion That Englewood Was Not Decent, Safe And Sanitary. ..... 9

1. The EH&S Items Do Not Demonstrate That South Pointe Was Not Decent, Safe and Sanitary. ..... 10

2. Englewood Submitted A Complete Response To The March 2001 REAC Inspection. ..... 12

3. HUD Did Not Fulfill Its Obligation To Respond Englewood's Response To The REAC Report. ..... 13

4. HUD's After-The-Fact Rationalization For The Rejection Of Englewood's Response To The MIO Plan Relies On A Misstatement Of The Evidence At Trial. ..... 14

C. Other Evidence Of South Pointe's Condition Is Both Legally Irrelevant And Factually Insufficient To Justify Termination Of Englewood's Contract. .......... 15

1. HUD Cannot Rely On 1999 And March 2000 Inspections Of Englewood In Light Of Its Own Conclusions That Englewood Had Satisfied Its Obligations Under Those Inspections. .......... 16

2. The *Ad Hoc* Observations Of HUD Staff Do Not Provide A Coherent Picture Of Englewood. .......... 18

3. All Of Englewood's Witnesses Presented Testimony Supporting Their Conclusion That South Pointe's Condition Was Decent, Safe And Sanitary. .......... 20

D. HUD's Own Conduct – In Offering Housing At South Pointe To CHAC Voucher Holders – Establishes That South Pointe Was In Decent, Safe And Sanitary Condition. .......... 22

E. HUD Fails To Provide Any Authority Supporting HUD's Assertion That Courts Routinely Affirm HUD Default Determinations For Failure To Maintain A Property In Decent, Safe And Sanitary Condition. .......... 23

III. HUD FAILS TO MEET ITS BURDEN TO PROVE ERROR AND AMENDMENT. .......... 25

IV. HUD DOES NOT MEANINGFULLY DISPUTE THAT THE PARTIES ENTERED A BINDING CONTRACT IN OCTOBER 2000 PROVIDING FOR A ONE-YEAR TERM WITH THREE AUTOMATIC ONE-YEAR RENEWALS. .......... 26

V. HUD VIOLATED ITS DUTY OF GOOD FAITH AND FAIR DEALING .......... 27

A. HUD Misstates The Law Of Good Faith And Fair Dealing. .......... 28

B. HUD Is Not Entitled To Any Presumption Of Good Faith. .......... 28

C. HUD Breached Its Contract Obligation Of Good Faith And Fair Dealing .......... 30

1. HUD Violated Its Duty Of Good Faith And Fair Dealing By Failing To Respond To Englewood's MIO Plan Updates In 2000. .......... 30

2. HUD Breached Its Obligation to Respond to Englewood's REAC Response As It Was Directed By The REAC Report. .......... 30

3. HUD Violated Its Duty Of Good Faith And Fair Dealing By Repudiating The Contract On April 13, 2001. .......... 31

4. HUD Breached Its Duty Of Good Faith By Failing To Fully Process Englewood's Request For A Renewal And Rent Increase. .......... 32

5. HUD's Actions Reveal A Pattern Of Violations Of HUD's Duty Of Good Faith And Fair Dealing. .......... 32

VI. THE SHORT-TERM SUBSIDY EXTENSIONS DID NOT EXTINGUISH ENGLEWOOD'S RIGHTS. .......... 33

A. The Short Term Subsidy Extensions Were Contemplated In The Parties' October 2000 Housing Assistance Payments Contract. .......... 34

B. Englewood Entered The Short Term Renewals After HUD Had Already Repudiated The Parties' Agreement. .......... 35

C. Englewood Entered The Short Term Subsidy Extensions To Mitigate Its Damages. .......... 36

D. HUD Never Plead Any Conceivably Relevant Defense Other Than Accord And Satisfaction, And Cannot Prove That Defense. .......... 37

E. HUD'S Interpretation Of The Renewals Is Inconsistent With The Intent Of The Parties. .......... 38

VII. THIS COURT HAS JURISDICTION OVER ENGLEWOOD'S CLAIMS FOR A RENT INCREASE AND ENERGY REIMBURSEMENT. .......... 40

A. This Court Has Jurisdiction Over Englewood's Claim For The Implementation Of An Approved Rent Increase. .......... 40

1. HUD Approved A Rent Increase for Englewood, But Failed to Implement The Increase. .......... 40

2. Federal Courts May Hear Claims Arising From HUD's Failure To Implement An Approved Rent Increase. .......... 41

3. The Rent Increase Denied In October 2001 Caused Damages Arising From HUD's Wrongful Notice of Default. .......... 42

4. Englewood Did Not Waive Its Rights To A Rent Increase By Accepting Subsidy Extension Payments After HUD Repudiated The October 2000 Housing Assistance Payments Contract. .......... 42

B. This Court Has Jurisdiction Over Englewood's Claim For Energy Reimbursements. .......... 43

CONCLUSION .......... 45

## TABLE OF AUTHORITIES

**Cases**

*A Olympic Forwarder, Inc. v. United States*, 33 Fed. Cl. 514 (1995) ........................42, 43

*Am-Pro Detective Agency, Inc. v. United States*, 281 F.3d 1234 (Fed. Cir. 2002)...........29

*Beck-Wilson v. Principi*, 441 F.3d 353 (6th Cir. 2006) ....................................................5

*Ben Kozloff, Inc. v. H & G Distributions, Inc.*,
1989 WL 152280 (N.D. Ill. Dec. 11, 1989).........................................................................4

*Bradley v. Chiron*, 136 F.3d 1317 (Fed. Cir. 1999).........................................................28

*Brady v. United States*, 397 U.S. 742, 90 S. Ct. 1463 (1970)..........................................43

*Brighton Vill. Assocs. v. United States*, 52 F.3d 1056 (Fed. Cir. 1995) ...........................41

*C. Sanchez and Son, Inc. v. United States*, 6 F.3d 1539 (Fed. Cir. 1993) ........................28

*Centex Corp. v. U.S.*, 395 F.3d 1283 (Fed. Cir. 2005).....................................................44

*Chase & Rice, Inc. v. U.S.*, 354 F.2d 318 (Ct. Cl. 1965) .................................................39

*Christopher Village, L.P. v. United States*, 360 F.3d 1319 (Fed. Cir. 2004)....................41

*Crest A Apartments v. United States*, 52 Fed. Cl. 607 (Fed. Cl. 2002).......................41, 44

*Cuyahoga Metropolitan Housing Authority v. United States*,
57 Fed. Cl. 751 (Fed. Cl. 2003) ....................................................................26, 41

*Dewakuku v. Martinez*, 226 F. Supp. 2d 1199 (D. Ariz. 2002) .................................23, 24

*Engle Investors v. United States*, 21 Cl. Ct. 543 (Cl. Ct. 1989).......................................36

*First Annapolis Bancorp, Inc. v. United States*, 75 Fed. Cl. 280 (Fed. Cl. 2007) ..............4

*Franconia Assoc. v. United States*, 536 U.S. 129 (2002) ................................................35

*Green Management Corp. v. United States*, 42 Fed. Cl. 411 (Fed. Cl. 1998)..................37

*H&S Manufacturing, Inc. v. United States*, 66 Fed. Cl. 301 (Fed. Cl. 2005)...................29

*Heidtman Steel Products v. Compuware Corp.*,
178 F. Supp. 2d 862 (N.D. Ohio 2001)...............................................................................6

*Helix Electric, Inc. v. United States*, 68 Fed. Cl. 571 (Fed. Cl. 2005).............................29

*Hope v. G&S Foods, Inc.*, 2004 WL 1380178 (N.D. Tex. Jun. 18, 2004)...........................5

*Kehm Corp. v. United States*, 119 Ct. Cl. 454, 93 F. Supp. 620 (Ct. Cl. 1950)................28

*Krzeminski v. United States*, 13 Cl. Ct. 430 (Cl. Ct. 1987)..............................................43

*Lewis v. Nicholson, Inc. v. United States*, 550 F.2d 26, 21 (Ct. Cl. 1977) .......................28

*Lisbon Contractors, Inc. v. United States*, 828 F.2d 759 (Fed. Cir. 1987) ..........................5

*Malone v. United States*, 849 F. 2d 1441 (Fed. Cir. 1998) ...............................................28

*Marshall v. Cuomo*, 192 F.3d 473 (4th Cir. 1999) ....................................................23, 24

*New Valley Corporation v. United States*, 119 F. 3d 1576 (Fed. Cir. 1997) .....................35

*Northern Helex Co. v. United States*, 455 F.2d 546 (Ct. Cl. 1972) ..................................43

*Renda Marine v. United States*, 71 Fed. Cl. 378 (Fed. Cl. 2006) .....................................29

*Rodriguez v. United States*, 69 Fed. Cl. 487 (Fed. Cl. 2006)...........................................29

*Roehm v. Horst*, 178 U.S. 1 (1900)....................................................................................35

*Roxco, Ltd. v. United States*, 60 Fed. Cl. 39 (2004).........................................................43

*Safeco Ins. Co. of America v. City of Whitehouse, Tennessee*,
191 F.3d 675 (6th Cir. 1999) ..............................................................................................5

*San Carlos Irr. and Drainage Dist. v. United States*,
877 F.2d 957 (Fed. Cir. 1989)............................................................................................26

*San Carlos Irrigation & Drainage Dist. v. United States*,
111 F.3d 1557 (Fed. Cir. 1997)....................................................................................43, 44

*Schaffer ex rel. Schaffer v. Weast*, 126 S. Ct. 528 (2005)....................................................5

*Spearman Industries, Inc. v. St. Paul Fire and Marine Ins. Co.*,
138 F. Supp. 2d 1088 (N.D. Ill. 2001) ................................................................................19

*Spraying Systems Co. v. Delavan, Inc.*, 975 F.2d 387 (7th Cir. 1992) .............................20

*Statesman II Apartments, Inc. v. United States*, 66 Fed. Cl. 608 (Fed. Cl. 2005) .............26

*Stoner-Caroga Corp., Inc. v. United States*, 3 Cl. Ct. 92 (Cl. Ct. 1983) ..............6, 7, 8, 16

*Sun Cal, Inc. v. United States*, 25 Cl. Ct. 426 (Cl. Ct. 1992).....................................36, 43

*Tecom, Inc. v. United States*, 66 Fed. Cl. 736 (Fed. Cl. 2005) ...................................29, 30

*United Enterprise & Associates v. United States*, 70 Fed. Cl. 1 (Fed. Cl. 2006) ................5

*United States v. Intervest Corp.*, 67 F. Supp. 2d 637 (S.D. Miss. 1999) ....................23, 24

*United States v. Olano*, 507 U.S. 725 (1993)..........................................................42

*White v. Atlantic Richfield Co.*, 945 F.2d 1130 (9th Cir. 1991).......................................36

*Youngdale & Sons Construction Co. v. United States*,
22 Cl. Ct. 345 (Cl. Ct. 1991)............................................................................43

**Statutes and Rules**

28 U.S.C. § 1491 (a)(1)...............................................................................44

Fed. R. Civ. P. 8(c) .....................................................................................4

Rules of Court of Federal Claims 8(c).......................................................................4

**Treatises**

Restatement (Second) of Contracts § 350 (1981)...........................................................36

Williston on Contracts § 601 ........................................................................38

Williston on Contracts § 63:14 .......................................................................5

Williston on Contracts § 73:17 .......................................................................38

## INTRODUCTION

HUD's Brief is wrong on what HUD states is the "controlling issue in this case," whether Englewood met what HUD contends is *Englewood's* burden and proved that South Pointe was decent, safe and sanitary. (HUD Br.[1] at 3.) HUD fails to cite any authority for the central premise of its brief – that Englewood, rather than HUD, has the burden on this issue, and that if *Englewood* does not meet this asserted burden, it loses. In so arguing, HUD turns the settled law of this Court on its head.

This Court has consistently held that the government bears the burden on any of its affirmative defenses, including the defense of prior material breach. The Court's decisions are consistent with long-standing principles of contract law, holding that prior material breach is an affirmative defense, which the defendant must prove.

HUD had the obligation to automatically renew the October 2000 Housing Assistance Payments contract for the first of three additional one-year terms on October 1, 2001. HUD's arguments on "error" and "amendment" are unconvincing, bordering on the unbelievable. HUD's automatic renewal obligation was still in force when the contract's second one-year term was to have begun in October 2001.

HUD's various alleged "events of default" in its April 9, 2001 Notice of Default do not justify HUD's failure to renew and subsequent termination of the parties' agreement. Ed Hinsberger, the Director the Chicago HUB Office of HUD, testified at trial that the Notice of Default was based on the March 8, 2001 Report prepared by HUD's Real Estate Assessment

---

[1] Throughout this Brief, Englewood refers to the Defendant's Post-Trial Brief, Docket No. 138, as "HUD Br." Englewood refers to Plaintiff Englewood's Post-Trial Brief, Docket No. 139, as "Englewood Br." Englewood refers to the Amended Joint Statement of Issues of Fact and Law, Docket No. 136, as "Jt. St. Issues." Englewood refers to the Amended Joint Witness List, Docket No. 127, as "Jt. Witness List." Englewood refers to the parties' Joint Stipulations of Fact, Docket No. 111, as "Jt. Stip. Fact." Englewood refers to the parties' Joint Exhibits as "JX," and the Trial Transcript as "Tr."

Center ("REAC"). But Englewood fully complied with its obligations under the REAC Report — including the correction of the relatively minor Exigent Health and Safety ("EH&S") and "Health and Safety" findings in the Report, the only issues noted that HUD could possibly have characterized as "decent, safe and sanitary" deficiencies. There was thus no proper basis for the Notice of Default that HUD used to reject and terminate Englewood's right to three years of additional subsidies under the parties' October 2000 contract.

HUD's failure to comply with its duty to act in good faith and fair dealing provides an independent basis for HUD's liability. HUD's Brief attempts to sharply delimit the government's obligation to perform under a contract in good faith. But HUD's summary of the law of this Court regarding good faith and fair dealing is incorrect and incomplete. HUD's delays, hindrance of Englewood's performance, and outright hostility toward Englewood constitute breaches of duty by HUD for which it should be held liable.

HUD's remaining arguments are without merit. There was no "error" in the term of the October 2000 Housing Assistance Payments contract, and HUD had no right to unilaterally amend the contract in 2000 and 2001 to eliminate Englewood's rights to future annual renewals. Short term subsidy extensions beginning in October 2001, entered to aid residents and without discussion of any satisfaction of Englewood's rights under the October 2000 contract, did not extinguish Englewood's claims in this lawsuit. Finally, HUD's questions about jurisdiction over Englewood's claims to the approved 2001 rental increase and energy cost reimbursement also fail, since these matters arise out of the contract and are within the Court's ancillary jurisdiction.

Importantly, HUD's Brief fails to counter Englewood's affirmative case for breach of contract. HUD does not contest the fact that the parties executed a written agreement

in October 2000 calling for one year of subsidies with three automatic annual renewals. HUD does not contest the fact that HUD refused to renew the agreement for additional terms – citing at the time Englewood's supposed failure to maintain the condition of the property. Because HUD did not meet *its* burden to prove that defense, the Court should find HUD liable to Englewood for breach of contract.[2]

## ARGUMENT

### I. HUD FAILED TO MEET ITS BURDEN OF PROOF TO SHOW THAT SOUTH POINTE WAS NOT IN "DECENT, SAFE AND SANITARY" CONDITION.

Englewood has proved that HUD breached the terms of the parties' October 2000 Housing Assistance Payments Contract by failing to renew the agreement for three additional one-year terms. After its breach, HUD halted the payments due to Englewood under the parties' contract (saving more than $6 million in subsidy payments to the detriment of Englewood). HUD attempts to avoid the terms of the parties' contract or justify its termination of the agreement by asserting the defense of prior material breach. HUD's principal defense at trial and in its Brief is its assertion that Englewood failed to maintain South Pointe in decent, safe and sanitary condition.

HUD's Brief fundamentally misstates the burdens of proof applicable to Englewood's claims for breach of contract and HUD's affirmative defenses. HUD asserts that Englewood must prove the condition of the building, and that HUD has no obligation to defend its own declaration of default. In its Brief, HUD says that the "controlling issue" in this case is whether Englewood has met "its burden" to show that South Pointe was maintained in decent, safe and sanitary condition. (HUD Br. at 3.) HUD claims that Englewood bears the burden of proof on HUD's own *affirmative defense* – prior material breach. (*Id.*) In its 84-page Brief,

[2] The parties and the Court agreed to defer briefing regarding Englewood's damages until after the Court rules on HUD's liability to Englewood.

HUD fails to cite a single case supporting its position that plaintiff has the burden of *disproving* an affirmative defense, despite this Court's specific request to discuss this issue. (Tr. 1473: "[Y]ou need to address the burdens of proof here.").

HUD fails to cite any authority because there is no authority for its assertion that Englewood holds the burden of refuting HUD's affirmative defense of prior material breach. (Aff. Defenses, Am. Ans. to Compl., Docket No. 70, at ¶ 100.) Rather, long-standing principles of law as discussed by this Court, the Federal Circuit Court of Appeals, and federal courts around the country establish that the burden to justify its termination of Englewood's contract rests on HUD. HUD failed to meet that burden.

### A. Established Law Holds That HUD Bears The Burden Of Establishing Its Affirmative Defense Of Prior Material Breach.

#### 1. Prior Material Breach Is An Affirmative Defense.

HUD's defense to Englewood's breach of contract claim is based on its argument that the termination of Englewood's contract was justified by the grounds stated in HUD's Notice of Default, a defense of "prior material breach." (HUD Br. at 41-44.) The defense of "prior material breach," and thus any argument that a termination for default was justified, is an *affirmative defense*. *Ben Kozloff, Inc. v. H & G Distributors, Inc.*, 1989 WL 152280, at *1 (N.D. Ill. Dec. 11, 1989) (defendant required to plead prior breach as an affirmative defense under Fed. R. Civ. P. 8(c).) The Rules of the Court of Federal Claims require that defenses such as prior material breach be plead as affirmative defenses. *See* RCFC 8(c) (requiring defendant to specifically plead any matter constituting an "avoidance" of an affirmative claim); *First Annapolis Bancorp, Inc. v. United States*, 75 Fed. Cl. 280, 290 (Fed. Cl. 2007) (construing RCFC 8(c), noting requirement to plead prior breach as affirmative defense, but finding that defense had been substantively rather than procedurally waived).

HUD acknowledges that its principal defense is an affirmative defense. HUD specifically sought leave from this Court to plead "prior material breach" as an affirmative defense with its Amended Answer in 2006. (*See* Aff. Defenses, Am. Ans. to Compl., Docket No. 70, at ¶ 100.)

**2. HUD Bears The Burden To Prove Its Affirmative Defense Of Prior Material Breach, And Thus Bears The Burden To Show That Its Default Notice Was Justified.**

It is axiomatic that the burden to prove the elements of an affirmative defense rests with the defendant. *Schaffer ex rel. Schaffer v. Weast*, 126 S. Ct. 528, 534 (2005) ("[T]he burden of persuasion as to certain elements of a plaintiff's claim may be shifted to defendants, when such elements can fairly be characterized as affirmative defenses or exemptions"); *see also* WILLISTON ON CONTRACTS § 63:14 ("Once the facts of breach are established, the defendant has the burden of pleading and proving any affirmative defense that legally excuses performance."); *Beck-Wilson v. Principi*, 441 F.3d 353, 360 (6th Cir. 2006) ("Because these are affirmative defenses, the defendant bears the burden of proof.").

This Court has affirmed the same rule. *United Enterprise & Associates v. United States*, 70 Fed. Cl. 1, 21 (Fed. Cl. 2006) (burden of proof is on the party that raises the affirmative defense). Accordingly, a party asserting the defense of prior material breach assumes the burden of proof on that defense. *Hope v. G&S Foods, Inc.*, 2004 WL 1380178, at *3 (N.D. Tex. June 18, 2004) (applying Texas law).

The Federal Circuit Court of Appeals and other federal courts have specifically held that a party asserting the defense of prior material breach to justify a default termination bears the burden of proof on that issue. *Lisbon Contractors, Inc. v. United States*, 828 F.2d 759, 765 (Fed. Cir. 1987); *Safeco Ins. Co. of America v. City of Whitehouse, Tennessee*, 191 F.3d 675, 682 (6th Cir. 1999) (under Tennessee law, "the defendant may assert the affirmative defense that

the *plaintiff* failed to comply with a condition precedent to the *defendant's* duty to perform; if the defendant asserts this defense, he bears the burden of proof") (emphasis in original); *Heidtman Steel Products v. Compuware Corp.*, 178 F. Supp. 2d 862, 866 (N.D. Ohio 2001) (applying Michigan law) ("[D]efendant's claim that the plaintiff was in default is an affirmative defense, as to which the defendant has the burden of proof.") In *Lisbon Contractors*, the Federal Circuit noted that the issuance of a default by the government is a "drastic sanction," and the government bears the burden to justify the default. 828 F.2d at 765. The government bears the burden to show the default was justified by the weight of all of the evidence. *Id.*

The *Heidtman Steel* court explained the rationale for placing the burden on defendant to justify its notice of default, reasoning, "[a]s a general rule, a party asserting that another is in breach has the burden of proving the breach." 178 F. Supp. 2d at 866. On reconsideration, the *Heidtman Steel* court further explained that a defendant who opposes a breach of contract claim on the basis of a "negative averment" must bear the burden of proof on its defense. *Id.* at 868. In that case, the defendant argued that shirts sold by the plaintiff were defective. *Id.* Similarly, in this case, where HUD argues that the condition of South Pointe was deficient, it bears the burden of proving that its position is supported by the evidence.

**B. The Parties' Written Contract Restricts The Manner In Which HUD May Properly Declare Englewood In Default.**

In order to sustain its burden of proving that termination of Englewood's contract was justified, HUD must prove that it followed procedures set forth in the parties' contract before terminating the contract for a purported default. *Stoner-Caroga Corp., Inc. v. United States*, 3 Cl. Ct. 92, 95 (Cl. Ct. 1983) (government did not have "discretion" as to whether to follow default termination provision). In *Stoner-Caroga*, the United States Claims Court found that a provision requiring the government to give written notice to a contractor was breached

when the government merely called the contractor regarding the termination. *Id.* at 95. The court found that the government has no discretion as to whether to follow agreed procedures for default. *Id.* If the government fails to follow such procedures, it breaches the contract. *Id.* at 94-95. Similarly, in this action, the parties' written agreement created a binding obligation on HUD to follow the contract's termination provisions.

The parties' Housing Assistance Payments contract specified a procedure for HUD to follow in issuing a default – including a default for purported failure to maintain the property in decent, safe and sanitary condition. Section 6(a) of the 1998 Housing Assistance Payments contract (incorporated by the parties in the October 2000 Housing Assistance Payments contract) required Englewood to operate South Pointe in decent, safe and sanitary condition under 24 C.F.R. Part 35. (JX 19 at 679.) Section 6(a) then directs HUD to follow the procedures in Section 20 of the parties' contract if HUD found that South Pointe was not "decent, safe, and sanitary." (JX 19 at 679; "If HUD determines that Owner is not meeting one or more of these obligations, HUD shall have the right to take action under Section 20.") Hinsberger conceded this point at trial. (Tr. 760-61.)

Section 20(b)(2) states the procedure that HUD must follow in declaring a default:

> Upon a determination by HUD that a default [whether in connection with the contract or an inspection] has occurred, HUD shall notify the Owner of:
>
> (i) The nature of the default,
> (ii) The actions required to be taken and the remedies to be applied on account of the default (including actions by the Owner to correct the default), and
> (iii) The time with which the Owner shall respond with a showing that all the required actions have been taken.

(JX 19 at 687.) The parties have agreed that Section 6 and 20 of the 1998 Housing Assistance Payments contract were incorporated into the parties' October 2000 agreement. (HUD Br. at 8-10.) HUD's April 9, 2001 Notice of Default referred to these provisions, stating: "The [March 2,

2001] REAC inspection confirms that the Project suffers from ongoing serious neglect, disrepair, and unsafe and unsanitary conditions throughout the units, common areas and the building.[3]" (JX 89 at 1091.)

The Notice of Default, however, provided no detail about any particular conditions at South Pointe that HUD found to violate the standard for decent, safe and sanitary housing. HUD simply declared that "[t]he failure to keep and maintain the Project in a decent, safe and sanitary condition is a default of the HAP contract." (*Id.*) HUD concluded its default notice by noting its obligation to comply with Section 20 of the parties' agreement. (*Id.*) ("Pursuant to Paragraph 20 of the HAP Contract, the Owner is hereby notified that if the foregoing 'events of default' are not corrected to the satisfaction of HUD within 30 days....HUD may seek any all available remedies, including…suspending or abating the HAP Contract.") (*Id.*)

Of course, HUD never *specified* any "events of default" in its Notice in a way that complied with Section 20. HUD did not (and never has) explained Englewood's default beyond general reference to the March 2001 REAC inspection and the "decent, safe and sanitary" standard. It, likewise, never explained the "actions" that would have cured the default. In short, HUD paid lip service only to Section 20 prior to terminating the parties' agreement. That does not suffice. *See Stoner-Caroga Corp.,* 3 Cl. Ct. at 95.

## II. HUD FAILS TO PROVE THAT ANY OF THE EVENTS OF DEFAULT LISTED IN ITS APRIL 2001 NOTICE OF DEFAULT WERE A PROPER BASIS TO TERMINATE ENGLEWOOD'S HAP CONTRACT.

Even if HUD had followed the requirements of Section 20, its termination of Englewood's contract still could not be sustained. HUD not only neglected to follow the

[3] The REAC Report did not announce any conclusions regarding the condition of the property, but rather merely listed individual issues noted by the inspectors and summarized those issues by type. (JX 28 at 767-78.)

procedure for default – it was wrong on the facts. None of the "events of default" listed in HUD's Notice justified a default termination. Accordingly, HUD did not meet its burden to prove its defense of prior material breach.

### A. HUD Has Acknowledged That The Only Basis For Termination Of Englewood's Housing Assistance Payments Contract Is The Findings Of The March 2001 REAC Report.

HUD issued a two-page Notice of Default on April 9, 2001. (JX 89 at 1090-91.) Although the Notice refers generally to Englewood's obligation to operate South Pointe in "decent, safe and sanitary condition," and lists several other issues,[4] HUD Chicago HUB Director Ed Hinsberger conceded that the sole reason for HUD's Notice of Default was the findings of the March 2001 REAC Report. (Tr. 544-46.)

HUD's failure to justify the "events of default" listed in the April 2001 Notice is consistent with the testimony at trial. In particular, as described below, the March 2001 REAC Report did not (and does not) provide a proper basis for HUD to meet its burden to prove that South Pointe was not decent, safe and sanitary.

### B. The Findings Of The REAC Report Do Not Support HUD's Conclusion That Englewood Was Not Decent, Safe And Sanitary.

The conclusions of the March 2, 2001 REAC Inspection are set forth in two documents – the March 2, 2001 listing of Exigent Health and Safety ("EH&S") items and the

[4] The Notice of Default refers to Englewood's alleged failure to "comply" with HUD directives for the prior 23 months, the rejection of Englewood's request for a HUD-insured loan in March 2001, and Englewood's purported failure to correct exigent health and safety items noted during the March 2, 2001 REAC inspection. (JX 89 at 1090-91.) In fact, Englewood was in compliance with HUD directives since the REAC Report in April of 1999. (*See* Englewood Post-Trial Br. at 16.) Englewood's rehab loan was rejected because it did not propose a "like new" building, not because it was insufficient to meet the requirements of the REAC Report. (*Id.* at 31, 61.) And Englewood corrected the EH&S deficiencies in a timely manner. (*Id.* at 27.) Mr. Hinsberger acknowledged at trial that none of these issues constituted a basis for HUD's default notice. (Tr. 544-46.) Furthermore, HUD says nothing about these portions of the April 9, 2001 Default Notice in its Brief. (HUD Br. at 30.)

March 8, 2001 REAC Report. Neither document shows that South Pointe was not decent, safe and sanitary.

**1. The EH&S Items Do Not Demonstrate That South Pointe Was Not Decent, Safe and Sanitary.**

At trial, Englewood established that all of the "EH&S" items noted by the REAC inspectors were minor maintenance items that were easily corrected. (JX 28 at 769-75; Tr. 462-63.) The deficiencies were five missing outlet or light switch covers, a missing light fixture, an exhaust fan cover, and three missing breakers that had to be replaced, a fire extinguisher that needed to be replaced from stock and one exit from the trash room that needed to be cleared. (JX 74 at 1019-20; JX 216 at 2266-67.) If those items had not been recorded by the REAC inspectors, the building would have scored a 69. (Tr. at 469, 725.) The problems were to be corrected in 72 business hours. (JX 74 at 1019.) Englewood corrected them within 24 hours. (Tr. 462-63.)

Likewise, the March 8, 2001 REAC Report does not establish that South Pointe was not in decent, safe and sanitary condition. Its Health and Safety "findings" related to one broken window, one TV cable across a doorway, and three instances of roaches in kitchen cabinets. (JX 28 at 769-75.) The broken window and cable realignment were easily repaired. The roaches required regular exterminating services and better tenant housekeeping. The REAC Inspection found no deficiencies with respect to the structural and mechanical systems. On those categories, South Pointe received a perfect score. (JX 28 at 769.)

The Report made no findings of overflowing garbage containers, garbage in the halls, rats, mice, or urine in the stairwells. (JX 28 at 769-75.) All entry doors had working locks. (*Id.*) The REAC Report did not mention the absence of hot and cold running water in any

of the units. (*Id.*) The vast majority of the appliances inspected were operational.[5] (*Id.*) Other than one clogged toilet, the toilets worked. (*Id.*) Sinks drained. (*Id.*) The floors, ceilings and walls were structurally sound. (*Id.*) There were no findings of lead based paint. (*Id.*) The Report found no problems with the operation of the elevators. (*Id.*) The Report does not list any problem with heating and cooling of the units or the building generally. (*Id.*) The only repair problems that occurred in more than 25 percent of the units related to stove burners and ovens, faucets and drains, closet doors, and the need for replacement hardware on doors. (*Id.* at 769.) Like the EH&S items noted by the inspectors, the items listed on the REAC Report were generally minor items that could be corrected through routine maintenance work orders. (Tr. 951.)

In what was intended to be a "gotcha" moment at the trial, Ms. DePietro challenged that if the problems in the units were so minor and easily correctable, why weren't they corrected by maintenance or management? (Tr. 1262.) In its Brief, HUD declares "Englewood has never answered that question." (HUD Br. at 61.) In fact, Mr. Sanders provided the answer when he said that management was only able to go into tenants' apartments at the time of the annual inspection or when the tenant called in a work order. (Tr. 486.) Otherwise management would not know that a unit had a broken outlet/switch cover, detached closet doors, broken hardware on doors, or some stove burners that were not operating. Tenants were slow to call in work orders to fix problems they or their family or guests caused, because they were charged for these repairs. (Tr. 457-58, 485-86.)

[5] Englewood corrects an omission in its initial Brief, which stated "appliances were operational." (Englewood Br. at 25.) In fact, a single oven was found to be inoperable. (JX 28 at 770.) Additionally, the Report noted three units which required paint – two walls and a ceiling, among the 25 inspected units. (JX 28 at 772, 774.)

In short, the items listed in the March 2001 REAC inspection do not demonstrate that South Pointe was not decent, safe and sanitary. Because HUD relied on that inspection in its Notice of Default – *and no other evidence whatsoever*, HUD cannot meet its burden of justifying its termination of Englewood's Housing Assistance Payments Contract.

**2. Englewood Submitted A Complete Response To The March 2001 REAC Inspection.**

Even if the REAC Report had shown that South Pointe was not in decent, safe and sanitary condition, and HUD had complied more than superficially with Section 20, HUD's Notice of Default would not be warranted. (Englewood Br. at 28-29.) Englewood properly responded to the REAC Report and corrected the issues which the Report noted. The REAC Report directed Englewood to: (a) correct the identified exigent health and safety ("EH&S") deficiencies; (b) describe the work to be done to correct other "identified deficiencies"; (c) conduct a survey of the building to identify other deficiencies; (d) determine each unit's needs for the types of physical problems identified in the "findings" of the 25 units inspected; and (e) submit to HUD a Proposed Plan of Correction. (JX 28 at 767.)

As Englewood demonstrated in its Post-Trial Brief (at 27), Englewood corrected the EH&S deficiencies noted by the REAC inspectors. Mr. Sanders prepared a memorandum that detailed corrections of each item listed in the EH&S report. (JX 79 at 1059-60; JX 216 at 2266-67.) Mr. Hayes enclosed "photos of those items cited on the March 2, 2001 inspection," and a copy of the memorandum prepared by Mr. Sanders – with photos to confirm that Englewood had in fact repaired the EH&S items. (JX 79 at 1059-60; Tr. 465-68.) HUD never presented any evidence of any specific items that Englewood failed to correct. (*See* Englewood Br. at 27-28.)

On April 8, 2001, Kelly Brown on behalf of Englewood sent Ms. Coleman a letter which was the "30 day response" to the March 8, 2001 REAC Report, which detailed how Englewood had complied with all of the other requirements set forth in the REAC Report. Contrary to HUD's misleading summary of its contents, the response was complete and included all of the items that the REAC Report directed Englewood to provide. Englewood's April 8, 2001 letter attached (a) Englewood's March 12, 2001 EH&S certifications (JX 79 at 1059-60); (b) an April 5, 2001 Management Improvement and Operating Plan for the correction of the deficiencies noted in the REAC Report (JX 84 at 1076); and (c) a scope of work prepared by BABCO Construction, Inc. ("BABCO") that set forth Englewood's plan to correct items noted through Englewood's own "100%" inspection of South Pointe (JX 80 at 1061-65).

**3. HUD Did Not Fulfill Its Obligation To Respond Englewood's Response To The REAC Report.**

HUD returned Englewood's April 5, 2001 MIO Plan and April 8, 2001 Response to the REAC Report. (*See* Englewood Br. at 31.) HUD's response stated that the circumstances were now "beyond that point at which communication would be useful." (JX 93 at 1098.) Again, HUD violated a written directive *from HUD* – on this occasion, an instruction in the REAC Report to the project manager, Ms. Thomas. Under the REAC Report, Ms. Thomas was supposed to review Englewood's submissions and contact Englewood "to discuss any required amendments" to Englewood's response. (JX 28 at 768.) Had HUD engaged Englewood in negotiations and lifted its spurious default notice, Englewood could have executed its planned refinancing (with HUD or a private party), using the four year HAP contract as the revenue base for a loan with principal payment and interest terms that would have freed up cash flow for building maintenance and rehabilitation.

### 4. HUD's After-The-Fact Rationalization For The Rejection Of Englewood's Response To The MIO Plan Relies On A Misstatement Of The Evidence At Trial.

In its Brief, HUD challenges Englewood's Response to the REAC in three ways – it claims that Englewood's Response failed to identify a funding source for the repairs at South Pointe, that the MIO plan submitted by Englewood was not in "MIO form," and that Englewood had not completed a 100% inspection of South Pointe since the fall of 2000. (HUD Br. at 27-29.) HUD is wrong on all points. HUD knew that Englewood had sought a HUD-insured rehabilitation loan through a comprehensive loan application of more than 300 pages only weeks before, which HUD rejected less than a week before Englewood submitted its response. (JX 240 at 2938-47.) In addition to this rejection, HUD effectively thwarted Englewood's efforts to obtain refinancing from other sources through the default notice that precluded approaching private lenders (though Mr. Hinsberger claimed he was not sure Englewood would have to disclose that fact). (Tr. 757.) Additionally, as John Hayes testified, the repairs listed in Englewood's MIO Plan were largely maintenance items that did not require another funding source. (Tr. 951-52.) Mr. Hinsberger did not dispute Englewood's ability to fund the MIO Plan through operations – he testified that he did not know whether any additional financing would be necessary to fund the repair of the types of items noted in the REAC Report. (Tr. 714-15, 737.)

HUD's complaint regarding the "form" of the MIO Plan is precisely the type of "amendment" that the REAC report stated should have been corrected through a dialogue between HUD and Englewood. HUD, however, refused to participate in any such conversation with Englewood. By April, HUD demanded that Mr. Hayes find a new manager and new owner. (Tr. 966-67.) In fact, HUD had accepted MIO plans in the form submitted by Englewood on April 5, 2001 and Englewood's December 1999 MIO Plan and updates in response to the April 1999 REAC Report. (JX 45 at 840-52; JX 50 at 872.)

Finally, HUD's Post-Trial Brief claims that Englewood only conducted a single "100%" inspection, in November and December 2000. (HUD Br. at 29.) HUD claims the results of the fall 2000 inspection were incorporated in the "BABCO" scope of work submitted Englewood's April 8, 2001 Response. (HUD Br. at 29.) HUD's argument is contrary to the facts at trial. Ted Dunaj, a licensed architect engaged by Englewood, explained that he personally performed a 100% inspection of Englewood that culminated in the preparation of drawings and specifications for the rehabilitation of South Pointe. Mr. Dunaj conducted his inspection over four weeks and converted his field notes into 33 pages of architectural drawings that prescribed the repair needs of each apartment. (JX 75 at 1021-53; Tr. 843-45.) Mr. Dunaj completed his work on *March 4, 2001* – two days after the REAC Inspection. (JX 243 at 3774–891.) HUD ignores Mr. Dunaj's work – and the fact that the BABCO scope of work was based on Mr. Dunaj's "100%" survey of South Pointe. (JX 80 at 1061.) The BABCO Scope of Work thus reflected Englewood's analysis of the current needs of the entire building as of March 19, 2001, after the issuance of the March 8, 2001 REAC Report. (JX 75 at 1021-53; JX 243 at 3774–891; JX 80 at 1061; Tr. 911-14.) Englewood did what REAC asked it to do.

### C. Other Evidence Of South Pointe's Condition Is Both Legally Irrelevant And Factually Insufficient To Justify Termination Of Englewood's Contract.

At trial, HUD attempted to patch together evidence to support its declaration that South Pointe was not in decent, safe and sanitary condition. With the exception of the March 2001 REAC inspection, none of HUD's evidence on the subject was considered by HUD in issuing its Notice of Default in April 2001. HUD's evidence truly constitutes an after-the-fact rationalization for a decision HUD made more than six years ago. In relying on such evidence, HUD ignores its obligation under its agreement with Englewood to specifically describe the nature of any "default" by Englewood, and the steps necessary to correct the offending items.

Accordingly, evidence of South Pointe's condition that is not set forth in the REAC is legally irrelevant. *See Stoner-Caroga Corp.,* 3 Cl. Ct. at 95.

Even if HUD had complied fully with Section 20, HUD's *ad hoc* collection of other evidence of South Pointe's condition would not justify the termination of Englewood's Housing Assistance Payments Contract. Other than the REAC Report, HUD's evidence falls in three categories: (1) records of HUD inspections from 1999-2000; (2) observations of HUD staff in February 2001, March 2001, October 2001 and June 2002; and (3) supposed admissions by Englewood witnesses regarding the condition of the building that HUD has taken out of context.

**1. HUD Cannot Rely On 1999 And March 2000 Inspections Of Englewood In Light Of Its Own Conclusions That Englewood Had Satisfied Its Obligations Under Those Inspections.**

HUD's Brief refers to the findings of the April 1999 REAC inspection, a May 1999 Pinnacle Inspection, a September 1999 Chicago Building Inspection, and a March 2000 Occupancy Review. (HUD Br. at 15-16.) HUD thus attempts to create a rationale that the Chicago HUB Director, Ed Hinsberger, testified was <u>not</u> a basis for HUD's April 2001 Notice of Default. (Tr. 544-46.) In addition to this obvious contradiction between HUD's trial testimony and its Brief, any argument that records from 1999 and 2000 show that Englewood was not decent, safe and sanitary is belied by HUD's own documents, including the Final Team Report and HUD's acceptance of Englewood's response to the 2000 Occupancy Review.

As Englewood explained in its initial Post-Trial Brief, Englewood proactively responded to the April 1999 REAC Inspection. (*See* Englewood Br. at 8, 11-12.) For example, Mr. Sanders requested a copy of the REAC Report in June 1999,[6] and explained at trial that he hoped to begin working immediately to respond to the concerns of the REAC inspectors. (JX 34 at 796; Tr. 401-02.) Englewood's actions were recognized by the Chicago HUD Office (including Ed Hinsberger) through the approval of a Final Team Report regarding South Pointe on February 2, 2000. (JX 47 at 868.) That Report explained that Englewood had shown good faith and directed HUD Multi-Family to continue working with Englewood to finalize a Management Improvement and Operating Plan submitted in December 1999. (JX 47 at 862, 867.) HUD accepted Englewood's Management Improvement and Operating Plan at the same time. (JX 50 at 872.) As the Final Team Report post-dates both the April 1999 REAC Report and September 1999 Chicago Building inspection, that Report shows that Englewood was effectively responding to existing conditions at South Pointe and making significant progress.

HUD's Brief also relies on a March 2000 Occupancy Review of South Pointe. Trial testimony of Carl Sanders – which was unrebutted by HUD witnesses – established that Mr. Sanders consistently attempted to open a dialogue with HUD during 2000 regarding the finalization of Englewood's Management Improvement and Operating Plan and Englewood's response to the Occupancy Review. (*See* Englewood Br. at 11-12.) Neither Gwen Thomas nor her superior, Veronica Coleman, even read Englewood's submissions. (*Id.*) The only contemporaneous evidence of HUD's reactions to Englewood's efforts is HUD's *acceptance* of Englewood's Response to the Occupancy Review. (JX 64 at 961.) HUD has no ground to argue

[6] HUD's Brief complains that a report by Pinnacle Realty Management Company based on a May 19, 1999 inspection suggests that Englewood had not corrected the findings of the REAC Report within a month of the April 1999 inspection. (HUD Br. at 15, 53.) As demonstrated by Mr. Sanders letter in June 1999, Englewood had not even received a copy of the report associated with the April 1999 Inspection at the time of the Pinnacle review. (JX 34 at 796.)

– now seven years later – that Englewood's response to the Occupancy Review was somehow deficient.

### 2. The *Ad Hoc* Observations Of HUD Staff Do Not Provide A Coherent Picture Of Englewood.

HUD also attempts to justify its April 9, 2001 Notice of Default through a series of observations of the condition of Englewood by Ms. Thomas and a small group of HUD staff. (HUD Br. at 18-21, 25-27.) Ms. Thomas, Lily Simmons, Teresa Di Pietro and John Schneider all testified about their visits to South Pointe in 2001 and 2002. The witnesses shared a lack of experience and knowledge of maintenance and construction issues. Ms. Simmons could not explain the method for fixing a missing outlet cover. (Tr. 1234-35.) Ms. Thomas and Ms. Simmons could not determine the process of correcting, cost of correcting, or severity of almost any of their observed "findings." (Tr. 261-63; 1232-36.) They could not explain the time or cost required to fix basic maintenance problems such as a missing cover for an electrical outlet, a leaking faucet, a missing battery in a smoke detector, or a cracked floor tile. (Tr. 1212-16, 1234-36, 1261-62.) Ms. Di Pietro conceded that she visited the property as part of her "training" (by Ms. Thomas) as a new project manager. (Tr. 1248.) Ms. Thomas, Ms. Simmons and Ms. Di Pietro could not (or would not) answer basic questions about maintenance issues and simple repairs; they were not qualified to determine whether South Pointe was in "decent, safe and sanitary" condition, and were never asked to do so in connection with HUD's Notice of Default.

Because HUD chose to rely on a smattering of *ad hoc* observations[7] of the condition of South Pointe at trial, rather than using the results of HUD's REAC inspection, it did

---

[7] HUD also cites documents prepared by third parties who did not even testify at trial. For example, HUD relies on police reports relating to South Pointe, but provides no context for the report. Numerous witnesses testified that security in the building had significantly improved due to the efforts of Englewood staff. (Tr. 98-99.) HUD also relies on an inspection from the Illinois Housing Development Authority ("IHDA") from March 2001. As John Hayes testified, and is obvious from review of the items listed by IHDA, virtually all of these items were minor and easily corrected. (Tr. 1020-22.)

meet its burden of establishing its only plausible defense. HUD claims that South Pointe was not "decent, safe, and sanitary" – but failed to: (a) present an expert witness to explain how South Pointe purportedly fell short of the standard set forth in 24 CFR Part 5, Subpart G; (b) call an inspector from the Real Estate Assessment Center to explain the condition of South Pointe or the "REAC" process; (c) explain why CHAC inspectors approved the condition of 80 units at South Pointe in 2002; or (d) counter the testimony of Freddie Batchelor, the sole HUD employee who prepared an analysis of the condition of South Pointe based on the REAC inspection. Instead, HUD relied on the observations of non-expert HUD employees, whose jobs were not to make formal evaluations of the physical conditions of buildings. *Compare Spearman Industries, Inc. v. St. Paul Fire and Marine Ins. Co.*, 138 F. Supp. 2d 1088, 1097 (N.D. Ill. 2001) (admitting opinion regarding roof damage based on witness' extensive experience "installing and repairing roofs, distributing roofing materials, and working as a roofing contractor").

Beyond their lack of experience, Ms. Thomas, Ms. Simmons and Ms. Di Pietro's testimony exhibited bias against Englewood. Ms. Thomas, in particular, was openly hostile to Englewood and its managers. Both Mr. Sanders and Ms. Batchelor testified that Ms. Thomas had failed to respond to Englewood's requests for information, and had been rude and hostile during face-to-face meetings. (Tr. 133-38, 174, 405, 423, 426.) Ms. Thomas had attempted to "flag" Englewood as early as 1999, and had falsely informed her colleagues that Englewood was then in the process of being flagged. (Tr. 236-38.) On January 10, 2001, Ms. Thomas also noted in HUD's Real Estate Management System that HUD planned to take "enforcement action" against Englewood, *prior* to any of HUD's informal inspections. (JX 108 at 1149.) Ms. Thomas prepared a draft termination letter based on the March 2001 REAC inspection only a week after the Report was issued, and more than three weeks before Englewood's response was even due to

be submitted. (JX 78 at 1057-58; Tr. 241-44.) Ms. Thomas' visits to Englewood were designed to create a colorable basis for a decision that had already been made.

Ms. Thomas' bias infected the visits of Ms. Simmons, Ms. Di Pietro and even Mr. Schneider. Ms. Simmons was directed to attend a confirmatory review to assist in documenting a "false certification" by Englewood of correction of exigent health and safety items noted in the March 2001 inspection. Ms. Coleman and Ms. Thomas had no reason at the time to assume that Englewood's certification was false, but suggested as much to Ms. Simmons. (Tr. 1223.) Ms. Di Pietro visited South Pointe as part of her training – purportedly to show Ms. Di Pietro what a "bad" building looked like. (Tr. 323, 1248.) As courts have long recognized, bias in the presentation of survey questions can render the results unreliable. *Spraying Systems Co. v. Delavan, Inc.*, 975 F.2d 387, 394 (7th Cir. 1992) (suggestive questions rendered survey evidence unreliable and inadmissible). Similarly, Ms. Di Pietro's evaluation of the building, which she was *trained* to view as in very poor condition, is not an independent or unbiased opinion of South Pointe's condition. Finally, Mr. Schneider, an appraiser who testified as a "photographer," was also directed to help document what HUD had already concluded was a substandard building. These observations of non-expert HUD staff are not sufficient for HUD to sustain its burden to prove that Englewood was not decent, safe and sanitary.

**3. All Of Englewood's Witnesses Presented Testimony Supporting Their Conclusion That South Pointe's Condition Was Decent, Safe And Sanitary.**

HUD's Brief ignores the only coherent evidence regarding the condition of South Pointe that was presented at trial. The only HUD analysis of the 2001 REAC Report was the assignment undertaken by Freddie Batchelor. In the spring of 2001, Ms. Batchelor prepared an analysis comparing the 2001 REAC findings with Englewood's Management Improvement and Operations plans. (Tr. 142-44.) Margarita Maisonet, the head of the Departmental Enforcement

Center who signed the Default Notice along with Mr. Hinsberger, asked Ms. Batchelor her opinion on whether the Housing Assistance Payments Contract should be terminated. (Tr. 145, 180, 186-87.) Ms. Batchelor reported to Ms. Maisonet that South Pointe was "on track with their corrections of the problems . . . that they were still moving forward with correcting identified problems." (Tr. 144-45, 186-87.) Ms. Batchelor testified that she created a spreadsheet that compared items identified in the 1999 and 2001 REAC inspections, and that approximately 92% had been corrected or completed. (Tr. 144-46.)

HUD did not challenge Ms. Batchelor's testimony, either at trial or in its Brief. Ms. Batchelor concluded that, as of April 2001, Englewood was decent, safe and sanitary, and Englewood's contract should not be terminated. (Tr. 186-87.) Ms. Batchelor's testimony disproves HUD's assertion that "there was not one witness who testified … that South Pointe was being maintained in decent safe and sanitary condition." (HUD Br. at 47.)

Mr. Sanders also testified that Englewood was decent, safe and sanitary. (Tr. 486.) Mr. Sanders said that the problems he observed in the units related to maintenance work that needed to be brought to the attention of management by the residents, who sometimes hesitated to do so because they were charged for damage they caused. (Tr. 457-58.) Although HUD contends that Mr. Sanders testified that problems were "constantly recurring" (HUD Br. at 61), Mr. Sanders explained that such problems were "much minimized" between 1998 and 2001. (Tr. 420-21, 529.) Mr. Sanders further explained that Englewood had established a protocol for review of South Pointe for vandalism or tenant damage (which led to issues with graffiti and garbage) on a daily basis. (Tr. 420-21, 529.) If the inspection found vandalism, South Pointe maintenance staff would correct the problem. (Tr. 420-21, 529.)

HUD's Brief also mischaracterizes the testimony of Mr. Samuelson regarding the condition of Englewood. Mr. Samuelson's testimony was consistent with that of Mr. Hayes, who described a building in generally good working order, but with repair needs that could be fulfilled for the most part by South Pointe's maintenance staff. (Tr. 951-52.) Mr. Samuelson was asked directly about his assessment of the building, and responded that the building was in generally good condition and that the REAC Inspection noted "largely things that would have been corrected through normal work order operations." (Tr. 1149-50.)

### D. HUD's Own Conduct – In Offering Housing At South Pointe To CHAC Voucher Holders – Establishes That South Pointe Was In Decent, Safe And Sanitary Condition.

Although HUD issued vouchers in an attempt to encourage South Pointe tenants to relocate because of the purported poor condition of the building, many tenants elected to stay in the building after all HUD subsidy payments ended in 2002. The fact that CHAC allowed these tenants to remain at South Pointe demonstrates that CHAC determined that the tenant's units were in decent, safe and sanitary condition. Mr. Hinsberger explained the intended use of the CHAC vouchers at trial:

> The tenants have a choice, I mean they're choice vouchers. The tenant can move, if that's what they elect, or they can stay if that's what they want to do *provided that the unit is in acceptable condition*.

(Tr. 609) (emphasis added). Over the first half of 2002, 80 South Pointe families elected to utilize their newly acquired vouchers at South Pointe. (Tr. 1065.) The fact that these 80 tenants used their vouchers at South Pointe shows that *those 80 units passed CHAC housing inspections*, attesting to the fact that they were in "acceptable condition" – decent, safe and sanitary condition. (Tr. 609, 1064.) HUD, moreover, never considered closing the building. To the contrary, it extended its subsidy payments expressly so that Englewood would continue to operate.

**E. HUD Fails To Provide Any Authority Supporting HUD's Assertion That Courts Routinely Affirm HUD Default Determinations For Failure To Maintain A Property In Decent, Safe And Sanitary Condition.**

Through a series of erroneous citations, HUD contends that courts routinely determine whether a particular building is "decent, safe and sanitary" as a matter of law. HUD cites three cases for the proposition that "courts have interpreted [the language "decent, safe and sanitary condition"] and upheld HUD's default determination when an owner defaults upon its contractual determination to maintain housing in decent, safe and sanitary condition." (HUD Br. at 48-49.) None of the cases cited by HUD stand for this proposition, and thus HUD fails to identify *a single case* in which a Court has upheld a default termination for failure to maintain a property in decent, safe and sanitary condition.

The first case miscited for that proposition, *Dewakuku v. Martinez*, 226 F. Supp. 2d 1199, 1205 (D. Ariz. 2002), involved a dispute regarding a house that all parties to the litigation agreed was substandard. *Id.* at 1201 ("Both parties concede that the home is substandard.") In the course of its decision, the court agreed with the parties regarding the condition of the building, but also noted that "an assessment as to whether property qualifies as decent, safe, and sanitary *obviously involves a certain degree of subjective judgment*." *Id.* HUD did not make any "default determination" in the dispute underlying *Dewakuku,* but rather was found liable for the condition of a building built under HUD auspices. HUD also relies on *Marshall v. Cuomo*, 192 F.3d 473 (4th Cir. 1999), which also did not involve any determination of whether a building was "decent, safe and sanitary." A prior dispute between the parties regarding the condition of the building had been "resolved through a settlement agreement" between a contractor and HUD. *Id.* at 482.

Finally, HUD cites to *United States v. Intervest Corp.*, 67 F. Supp. 2d 637, 647 (S.D. Miss. 1999), again for the proposition that courts have affirmed default terminations by

HUD. Like *Dewakuku* and *Marshall*, *Intervest* did not arise from a default termination by HUD. Rather, HUD sought restitution of payments made under HAP vouchers for units that purportedly were not "decent, safe and sanitary." In entering judgment *against* HUD, the *Intervest* court found that HUD continued to process HAP vouchers despite its knowledge of the condition of the building. Accordingly, the Court found that there was no "material" need to maintain the building in decent, safe and sanitary condition to obtain HAP payments. *Id.* at 649 (noting "[t]he fact that a HAP is intended to be used as a corrective tool indicates that the property for which a HAP is sought is not expected to be in perfect shape at the time a HAP voucher is filed.") HUD quotes from the decision (HUD Br. at 49), but fails to explain that the Court's "finding" was premised upon a view of all the facts "in a light most favorable to" HUD, and was made only for purposes of a Motion for Summary Judgment against HUD. *Id.* at 647.

HUD cites only *Dewakuku*, *Marshall,* and *Intervest* in support of its argument that the standard "decent, safe and sanitary" is readily understood, and that HUD enforcement actions based on the standard are routinely affirmed. But these cases support a different proposition – that courts are rarely called upon to decide the application of the "decent, safe and sanitary standard," and when they are, HUD's opinion is entitled to no weight whatsoever. The *Dewakuku* court noted that "the determination of what constitutes 'decent, safe and sanitary' housing is not committed to agency [HUD] discretion by law." *Id.*

HUD's unsuccessful search for authority supporting its invocation of "decent, safe and sanitary" as a proper means to terminate a HAP Contract matches the inadequate collection of anecdotal evidence it offered at trial to support its affirmative defense of prior breach. Englewood's witnesses presented coherent testimony regarding the condition of South Pointe. HUD did not. HUD has not met its burden to show South Pointe was in sufficient

disrepair to qualify as a "prior material breach" excusing HUD's breach of the October 2000 Housing Assistance Payments Contract.

**III. HUD FAILS TO MEET ITS BURDEN TO PROVE ERROR AND AMENDMENT.**

Surprisingly, HUD clings to its defenses of error and amendment, attempting to convince the Court that it should ignore the written term of the parties' signed agreement, and instead find that the parties' agreement was "amended" through unilateral handwritten edits of HUD staff. At trial and in its initial brief, Englewood demonstrated that HUD's arguments regarding "error" and "amendment" are a fallacy. There was no "error," and HUD did not (and could not) amend the parties' agreement without the written authorization of Englewood. (Englewood Br. at 47-53.)

Remarkably, HUD's Brief completely fails to consider the testimony of Englewood witnesses who explained that there was never a discussion of an "error" before or immediately after the execution of the October 2000 Agreement. (Tr. 453.) HUD also fails to explain its witnesses' inability to describe how the error was made, why there are no documents referring to the error other than the altered contracts and Ms. Coleman's correspondence, and why HUD failed to retract its request for a full year of subsidy payments. (Englewood Br. at 18-21.) In so doing, HUD cites to the testimony of Ms. Thomas and Mr. Coleman – ignoring the contrary testimony of Mr. Sanders and Mr. Hayes, and the inconsistencies in HUD's witnesses' own testimony. (*See id.*) Significantly, the HUD witnesses who were responsible for the preparation and execution of the 2000 HAP contract – Ms. Anderson and Mr. Tessler – were not called to testify on these topics.

Rather, HUD simply presents the "error" and "amendment" as a certainty. (HUD Br. at 10.) HUD acted in the same manner in 2000 and 2001 – disregarding its obligation to obtain Englewood's written authorization of any amendment, and simply declaring that

Englewood's four-year contract was actually a three-month agreement. (*See* Englewood Br. at 47-53.) HUD completely failed to justify its defenses of error and amendment.

## IV. HUD DOES NOT MEANINGFULLY DISPUTE THAT THE PARTIES ENTERED A BINDING CONTRACT IN OCTOBER 2000 PROVIDING FOR A ONE-YEAR TERM WITH THREE AUTOMATIC ONE-YEAR RENEWALS.

HUD's Brief presents virtually no refutation of Englewood's proof of the elements of its breach of contract claim. Both parties quote from the same case regarding those basic elements:

> To recover for breach of contract, a party must allege and establish: (1) a valid contract between the parties, (2) an obligation or duty arising out of the contract, (3) a breach of that duty, and (4) damages caused by the breach.

*San Carlos Irr. and Drainage Dist. v. United States*, 877 F.2d 957, 959 (Fed. Cir. 1989). Notably, HUD does not deny that the parties executed a written contract that provided for an effective four years of subsidy payments to Englewood. HUD does not dispute that such a contract was processed by HUD staff, and that the first year of funding for the agreement was reserved by HUD Chicago. HUD does not dispute that HUD, nonetheless, did not pay Englewood for four years of subsidies.

HUD's only direct attack on Englewood's affirmative claim relates to whether Englewood properly requested a renewal of the HAP Contract. As Englewood explained in its opening brief, Englewood was not required to request a renewal – the term "automatic" means that Englewood need not take any action. *Statesman II Apartments, Inc. v. United States*, 66 Fed. Cl. 608, 616-17 (Fed. Cl. 2005); *see also Cuyahoga Metropolitan Housing Authority v. United States*, 57 Fed. Cl. 751, 759 (Fed. Cl. 2003) ("[t]he 'automatic' references in these provisions, as well as the annual periodicity established therein, plainly reveal an intent that the adjustments would occur without [the owner] having to take any significant action" *citing American Heritage*

*Dictionary of the English Language* 122 (4th ed. 2000) (defining "automatic" as "[a]cting or operating in a manner essentially independent of external influence or control").

In any case, Englewood did request such a renewal, through a request for a contract renewal and rent increase submitted for Englewood by Don Samuelson in August 2001. (JX 104 at 1120-34.) HUD may now protest that the renewal request was unsigned by Mr. Hayes (HUD Br. at 77, n.1), but HUD knew that Mr. Samuelson was working for Englewood at the time, and even began to process the rental increase which was submitted with the request for contract renewal. (JX 107 at 1144; Tr. 631-34.) The contract was not renewed because, as Hinsberger wrote in April 2001, months before receiving Englewood's renewal and rent increase papers, "we are going to proceed to abate the Sec. 8." (JX 167 at 1608.)

## V. HUD VIOLATED ITS DUTY OF GOOD FAITH AND FAIR DEALING.

Englewood demonstrated at trial that HUD persistently violated its duty of good faith and fair dealing – through delay and outright hindrance of Englewood's performance under the parties' agreement. (Englewood Br. at 68-72.) Englewood showed that HUD refused to respond to Englewood's updates regarding its efforts to repair South Pointe in response to the 1999 REAC inspection, repudiated the agreement only four days after the Notice of Default was issued in April 2001, and returned Englewood's response to the March 2001 REAC inspection without review.

HUD's Brief attempts to respond to this evidence by arguing that Englewood has not met the burden to prove a violation of the duty of good faith and fair dealing. Citing a series of cases, none decided later than 1994, HUD argues that Englewood must show by "well nigh irrefragable proof" that HUD took "bad faith" actions that expressly relate to "the specific contract performance matters at issue." (HUD Br. at 44-46.) Yet again, HUD misstates the applicable standard.

**A. HUD Misstates The Law Of Good Faith And Fair Dealing.**

HUD's arguments regarding the decisions of this Court and the Federal Circuit Court of Appeals misperceive the holdings of the cases it cites. It clams that *Bradley v. Chiron*, 136 F.3d 1317, 1326 (Fed. Cir. 1999), holds that the duty of good faith and fair dealing is limited to "the express terms of the contract," and purports to quote from the ruling of *Bradley*. (HUD Br. at 44.) In fact, HUD takes language from a parenthetical summary of a California state court decision that was only tangentially related to the issues in *Bradley*. 136 F.3d at 1326. Indeed, *Bradley* did not involve a claim for violation of the duty of good faith and fair dealing. *Id.* Rather, the court dismissed the plaintiff's claim for constructive fraud – a claim not alleged by Englewood. *Id.* The remainder of the cases relied upon by HUD are all more than a dozen years old. (HUD Br. at 44-46.) In relying exclusively on historical authority, HUD avoids this Court's more recent jurisprudence, which affirms that government actors have the same duties of good faith as any other party to a contract, and that the government is not entitled to any presumption that it performed its agreements in good faith.

**B. HUD Is Not Entitled To Any Presumption Of Good Faith.**

This Court and the Federal Circuit Court of Appeals have repeatedly held that "actions that unreasonably cause delay or hindrance to contract performance" violate the duty of good faith and fair dealing. *C. Sanchez and Son, Inc. v. United States,* 6 F.3d 1539, 1542 (Fed. Cir. 1993); *see also Malone v. United States,* 849 F.2d 1441, 1445 (Fed. Cir. 1998) (holding that subterfuges, evasions, lack of diligence and failure to cooperate in the other party's performance violate the implied obligation of good faith and fair dealing): *Lewis-Nicholson, Inc. v. United States*, 213 Ct. Cl. 192, 550 F.2d 26, 32 (Ct. Cl. 1977) (holding that government delay violated the implied covenant of good faith and fair dealing). This court has embraced these principles for more than 50 years. *Kehm Corp. v. United States,* 119 Ct. Cl. 454, 93 F. Supp. 620, 623 (Ct.

Cl. 1950) ("[the promissee] must not only not hinder his promisor's performance, he must do whatever is necessary to enable him to perform. The implied obligation is as binding as if were spelled out.")

HUD's contention that Englewood must show "well-nigh irrefragable proof" of a violation of the duty of good faith and fair dealing has recently been rejected. In *Tecom, Inc. v. United States,* 66 Fed. Cl. 736 (Fed. Cl. 2005), the court comprehensively reviewed the origins and evolution of "good faith and fair dealing." *Tecom* analyzed *Am-Pro Detective Agency, Inc. v. United States,* 281 F.3d 1234 (Fed Cir. 2002), and found the government was entitled to a presumption only in situations involving accusations of fraud or quasi criminal wrongdoing by government officials. *Id.* at 769. In contrast, "when the government actions that are alleged are not formal, discretionary actions, but instead the actions that might be taken by any party to a contract, the presumption of good faith has no application." *Id.* The court held:

> The Court concludes that claims of a breach of the implied covenant of good faith and fair dealing – including claims that the duties to cooperate and not hinder performance of a contract have been breached – are to be treated like any other claim for breach of contract. The presumption of good faith conduct of government officials has no relevance. Were it otherwise, and were the presumption considered particular to government officials, it would no longer be the case that the duty applies to the government just as it does to private parties. This would be a rejection of the long-held notion that 'the principles which govern inquiries as to the conduct of individuals, in respect to their contracts, are equally applicable where the United States are a party.

*Id.* at 771. *Tecom* has been followed in a number of decisions of the Court of Federal Claims. *See H&S Manufacturing, Inc. v. United States,* 66 Fed. Cl. 301, 311-12 (Fed. Cl. 2005) (noting "[t]he Government's long touted desideratum that "irrefragable proof" is needed to demonstrate the absence of good faith in the administration of government contracts has been given its last rights."); *Helix Electric, Inc. v. United States,* 68 Fed. Cl. 571, 588 (Fed. Cl. 2005); *Rodriguez v. United States,* 69 Fed. Cl. 487, 500 (Fed. Cl. 2006); *Renda Marine v. United States,* 71 Fed. Cl.

378 (Fed. Cl. 2006). Accordingly, "the presumption of good faith conduct of government officials has no relevance" in a court's consideration of claims that the duties to cooperate and not hinder performance have not been breached. *Tecom*, 66 Fed. Cl. at 771.

### C. HUD Breached Its Contract Obligation Of Good Faith And Fair Dealing.

#### 1. HUD Violated Its Duty Of Good Faith And Fair Dealing By Failing To Respond To Englewood's MIO Plan Updates In 2000.

HUD refused to follow the directive of the Final Team Report to "continue the finalization" Englewood's MIO Plan over the eight month period from February through October 2000. (*See* JX 47 at 867; Tr. 405, 423, 426.) HUD's failure to process the MIO Plan reflects HUD Multi-Family's persistent refusal to work with Englewood on its efforts to repair and renovate South Pointe. Englewood repeatedly sought feedback from HUD on the ongoing renovations at South Pointe. (Tr. 405, 423, 426.) Ms. Thomas not only failed to respond, *she failed to read the MIO Plans submitted by Englewood.* (Tr. 252.) Had HUD engaged in a dialogue with Englewood before reaching its decision to take an "enforcement" action and ultimately default Englewood, the present dispute and Englewood's damages could have been avoided.

#### 2. HUD Breached Its Obligation to Respond to Englewood's REAC Response As It Was Directed By The REAC Report.

As described in Englewood's initial Brief, the March 8, 2001 REAC Report imposed obligations on both Englewood and HUD. (Englewood Br. at 60-61.) The Report obligated HUD to review Englewood's Response to the REAC Report, and to contact Englewood to discuss any required amendments or modifications. (JX 28 at 768.) HUD made no review or evaluation. In fact, HUD drafted its Notice of Default, in effect rejecting Englewood's response, on Friday, April 6, 2001, three days *before* the date upon which Englewood's response was due, on Monday, April 9, 2001. (Jt. Stip. Fact ¶ 87.) HUD then

waited a month to acknowledge Englewood's response to the REAC inspection – and then merely returned the package of Englewood's submissions. In Ms. Coleman's letter rejecting the response, she stated that HUD was "beyond that point." (JX 93 at 1098.) In other words, HUD had no interest in talking with Englewood about HUD's declaration that the building was not decent, safe and sanitary, or discussing Englewood's efforts to correct the problem, as both the REAC Report and fair dealing required.

### 3. HUD Violated Its Duty Of Good Faith And Fair Dealing By Repudiating The Contract On April 13, 2001.

Four days after the issuance of the Notice of Default, John Hayes attended a meeting at HUD to discuss the March 2001 REAC Inspection, Englewood's response, and the rejection of Englewood's request for a HUD-insured loan. (Tr. 965-66.) HUD declined to discuss these issues. (Tr. 966.) Rather, HUD told Mr. Hayes that he was out as owner of South Pointe, and that Englewood's current management company could no longer work at the building. (Tr. 966-67.) At the time, HUD had not carefully reviewed (or responded to) Englewood's response to the March 2001 REAC inspection, and had rejected Englewood's loan application only a week before.

HUD's repudiation of the contract at the April 13, 2001 meeting constitutes an independent violation of its duty of good faith and fair dealing. Without any contractual right, HUD demanded that Mr. Hayes replace himself as owner and replace the current manager. (*See* Englewood Br. at 45-46.) HUD also refused to discuss the default notice that sabotaged Englewood's efforts to refinance the property. (Tr. 966-67.) HUD's actions hindered Englewood's ability to perform under the parties' agreement.

**4. HUD Breached Its Duty Of Good Faith By Failing To Fully Process Englewood's Request For A Renewal And Rent Increase.**

By not automatically renewing the contract in October 2001, HUD breached. But it also exercised its rights under the REAC Addendum to require Englewood to continue to house tenants even as they were being encouraged to use vouchers to move out. Despite this fact, HUD refused to process the rent increase it had already found appropriate. This reduced subsidy payments to Englewood, increasing Englewood's damages and cutting off funds otherwise available to maintain the condition of South Pointe. At the same time, HUD refused to even process Englewood's request for a contract renewal.

**5. HUD's Actions Reveal A Pattern Of Violations Of HUD's Duty Of Good Faith And Fair Dealing.**

As discussed in Englewood's initial Brief (at 72-73), HUD's actions reveal a pattern of hostility toward Englewood and contempt for Englewood's contractual rights. HUD delayed its responses to Englewood's requests for rent increases and special claims needed for the renovation of South Pointe. (Tr. 166, 410, 414-15.) HUD repeatedly repudiated its obligations under the parties' agreement by purporting to issue unilateral "amendments" in December 2000 and January 2001. (JX 22 at 705; JX 23 at 712.) Ms. Thomas and Ms. Coleman *were* actively hostile to Englewood. (Tr. 132-38.) Ms. Thomas made false statements about Englewood to other HUD staff members. (Tr. 236-38.) Likewise, HUD told Judge Castillo in November 2001 that it had not yet "commence[d] suspension of abatement of the contract." (*Id.*) By November 2001, more than seven months had passed since HUD repudiated the contract at the April 13, 2001 meeting, and more than a month after Mr. Hinsberger's email announcing the imminent issuance of vouchers to South Pointe residents. HUD's conduct cannot be explained as a simple error – HUD's actions represent knowing breaches of HUD's duty of good faith and fair dealing.

## VI. THE SHORT-TERM SUBSIDY EXTENSIONS DID NOT EXTINGUISH ENGLEWOOD'S RIGHTS.

As acknowledged by all parties to this action, Englewood and HUD entered into short-term subsidy extensions in late 2001 and 2002 for the sole purpose of allowing HUD to issue vouchers to South Pointe residents in an orderly process. Had the parties not entered into such agreements, South Pointe tenants would have quickly lost their means to pay rent, and Englewood would have quickly lost the means to operate the building. HUD waited until well after this litigation had begun to argue that the extensions acted as a release of Englewood's rights to future years of payments. It said nothing about these extensions in two successive federal court suits in 2001 and 2002.

Implicitly conceding that there is no evidence in the record suggesting that Englewood intended to release its rights under the 2000 HAP Contract, HUD argues that this Court is constrained to review only the four corners of the renewals. HUD also argues that the parties expressed intention for the execution of the renewals – "there is no question that HUD's motivation for agreeing to each HAP renewal contract was so that Englewood's tenants would be protected" (HUD Br. at 70) – is irrelevant to the Court's determination of the meaning of the renewals. Finally, HUD argues that the complete absence of consideration to Englewood for its release of its claim for millions of dollars of future subsidy payments is likewise irrelevant.

HUD's belated interpretation of the short-term renewals is belied by all of the following: (a) the parties' addendum agreement on the availability of subsidy extensions as part of the October 2000 Housing Assistance Payments contract; (b) the fact that HUD had decided to terminate the October 2000 Housing Assistance Payments contract, triggering that addendum provision, and allowing Englewood to mitigate its damages; (c) the failure of HUD to prove (or even mention) the elements of the only conceivably relevant defenses that HUD plead in its

Answer; (d) the clear purpose of the renewals to aid residents, and the parties' agreement to enter such renewals as part of the October 2000 Housing Assistance Payments contract; (e) the lack of any consideration for Englewood's purported release of claims.

**A. Short Term Subsidy Extensions Were Contemplated In The Parties' October 2000 Housing Assistance Payments Contract.**

As HUD acknowledged at trial, in preparing and forwarding subsidy extension contracts to Englewood, HUD was exercising its rights under the REAC Addendum to the October 2000 Housing Assistance Payments Contract. (Tr. 627-28.) That provision states, in pertinent part:

> HUD may, at its option, continue the contract or renew said contract for such reasonable time (not to exceed 180 days) as may be necessary to relocate eligible residents with Section 8 Vouchers.

(JX 21 at 699.) Accordingly, when HUD elected to terminate Englewood's contract and issue vouchers to the tenants of South Pointe, HUD also exercised its right to grant short term subsidy extensions to relocate residents. (Tr. 627-28.) HUD now argues that Englewood "regrets its decision to execute the short-term HAP renewal contracts." (HUD Br. at 75.) But Englewood did not have a decision to make – it was obligated to cooperate in the short-term subsidy extensions.

Now, six years later, HUD argues that by exercising its right under the contract to grant only a short term renewal, HUD also extinguished Englewood's claim for contract damages for HUD's wrongful failure to pay Englewood subsidies for the full term of the contract. If HUD's argument regarding the short-term subsidy extensions were accepted, HUD would essentially have the right to terminate Englewood's contract at will. At any time, HUD could declare a default and then present the contractor with a short-term subsidy extension while vouchers were processed. According to HUD, the fact of the short term renewal would then act

as a release of the contractor's claim for damages for wrongful termination. If HUD can breach contracts without consequence, then HUD contracts are illusory. Courts reject interpretations of contracts that would lead to such conclusions. *New Valley Corporation v. United States*, 119 F.3d 1576, 1583-84 (Fed. Cir. 1997).

**B. Englewood Entered The Short Term Renewals After HUD Had Already Repudiated The Parties' Agreement.**

HUD entered the first of the short-term renewal agreements more than five months after HUD repudiated the October 2000 Housing Assistance Payments Contract during an April 13, 2001 meeting at HUD. HUD never retracted that repudiation. On the contrary, in June it ordered vouchers to be distributed October 1, at the end of the first year of the contract. (*See* Englewood Br. at 36.) In view of HUD's repudiation, Englewood signed these subsidy extensions, rather than risk a charge of failure to fulfill its contract duty to co-operate, or to mitigate damages.

Englewood did not release its rights to future renewals by attempting to save the deal after HUD's repudiation. When one party repudiates a contract, the other may wait until the time for performance is due to take any action. *Franconia Assoc. v. United States*, 536 U.S. 129, 143 (2002) (*citing Roehm v. Horst*, 178 U.S. 1, 13 (1900) (repudiation "give[s] the promisee the right of electing either to . . . wait till the time for [the promisor's] performance has arrived, or to act upon [the renunciation] and treat it as a final assertion by the promisor that he is no longer bound by the contract"). At oral argument on HUD's motion to dismiss in this action the court asked the government's attorney: "[I]s there anything in the subsequent contracts in which the Plaintiff waived any right it had under any previous contract?" (Order Denying Mot. For Reconsideration, Docket No. 23 at 2.) Defendant's counsel replied: "*I don't think they waived their rights*." (*Id.*) HUD should not be allowed to change course now.

### C. Englewood Entered The Short Term Subsidy Extensions To Mitigate Its Damages.

As a general rule, a party to a contract must act reasonably under the circumstances to mitigate its damages. *See White v. Atlantic Richfield Co.*, 945 F.2d 1130, 1133 (9th Cir. 1991); *Engle Investors v. United States*, 21 Cl. Ct. 543, 549 (Cl. Ct. 1989); *see also* RESTATEMENT (SECOND) OF CONTRACTS § 350 (1981). This means the breaching party is not liable for damages, which the nonbreaching party "could have avoided with reasonable effort and without undue risk or expense." *Engle Investors*, 21 Cl. Ct. at 549.

These principles are illustrated in *Sun Cal, Inc. v. United States*, 25 Cl. Ct. 426 (Cl. Ct. 1992). There, the government wrongfully terminated a lease agreement. The plaintiff then transferred the leased property to another entity, which in turn modified the property and leased a portion of it to a third party. The government argued that the plaintiff's action constituted an acceptance of the government's offer to surrender the lease and a waiver of the plaintiff's claim against the government for breach of contract. *Id.* at 428. Rejecting the government's argument, the court held that general contract principles apply to lease agreements and, hence, the plaintiff as lessor was obligated to take reasonable steps to mitigate its damages resulting from the government's repudiation of the agreement. *Id.* at 434. The court then concluded:

> For the reasons explained above, where anticipatory breach and mitigation apply, there is no sound basis on which to imply that these post-breach actions by the lessor necessarily amount to an agreement to accept a surrender or an acknowledgement by the lessor that it no longer can seek full damages for the breach. To the contrary, these post-breach actions typically will constitute merely an attempt to mitigate damages, and that attempt is totally consistent with an intent to seek full damages.

*Id*.

Here, once HUD repudiated the HAP contract, Englewood was obligated to mitigate its damages. These actions were not inconsistent with a right to enforce the contract.

Englewood also filed suit to enforce its rights under the contract at the very time that HUD now asserts Englewood voluntarily relinquished those rights.

### D. HUD Never Plead Any Conceivably Relevant Defense Other Than Accord And Satisfaction, And Cannot Prove That Defense.

With its *Amended* Answer, filed in February 2006, HUD added prior breach to its original affirmative defenses of estoppel and accord and satisfaction. (*See* Aff. Defenses, Am. Ans. to Compl., Docket No. 70, at ¶¶ 98-100.) HUD fails to connect its argument regarding the subsidy extensions with any legal theory. HUD appears to argue that the extensions operated as some sort of accord and satisfaction by resolving an existing dispute between the parties regarding the term of the agreement. (HUD Br. at 72-74.)

HUD does not mention accord and satisfaction in its brief, however, and it cannot meet the elements of that defense. Accord and satisfaction provides that where there has been a meeting of minds that additional consideration if offered and accepted as full satisfaction of a contractor's claim, then the claim is satisfied. *Green Management Corp. v. United States*, 42 Fed. Cl. 411 (1998) (dispute settled by new contract for new consideration). Here, the Government refused to continue its October 2000 contract with Mr. Hayes. And, without discussion, negotiation, or additional consideration, HUD issued vouchers to the tenants and presented Mr. Hayes the voucher extension contract. The doctrine of accord and satisfaction only applies where the parties intend to settle a dispute. HUD's decision to extend the HAP subsidy while tenants were using vouchers to find new homes did not settle a dispute, it generated one, almost immediately causing Englewood to sue for an injunction. There is no evidence that Englewood intended to settle a dispute by entering the short-term subsidy extensions.

The failure of HUD to show any new consideration to Englewood likewise dooms HUD's argument. HUD relies on WILLISTON ON CONTRACTS, Section 73:17, for the proposition that "parties may amend or alter even an integrated contract with subsequent written agreements." (HUD Br. at 75.) That section, however, states the long-established rule that "if the undertaking by one party is simply to perform the whole or part of what it promised in the original contract," that promise will not support an alteration of the contract to give "one party a right or privilege" that did not exist under the original contract. WILLISTON ON CONTRACTS, § 73:17. In this case, HUD argues that Englewood gave up its rights to *three years* of future renewals in return for continued subsidy payments – payments that were already due under the parties' October 2000 agreement. Accordingly, under the very authority relied upon by HUD, the short-term renewals cannot strip Englewood of its rights to automatic renewals under the October 2000 contract.

**E. HUD'S Current Interpretation Of The Renewals Is Inconsistent With The Intent Of The Parties.**

HUD *expressly concedes* that it entered short term renewals to protect against the interruption of subsidy payments. In fact, HUD has *stipulated* to that fact. (Jt. Stmt. Facts ¶ 26.) HUD argues, however, that the renewals had an additional benefit for HUD – one not discussed or even considered by the parties – the renewals purportedly bar Englewood's rights to future subsidies under the 2000 HAP Contract. HUD's argument ignores black-letter law holding that a contract must be interpreted in accordance with the intent of the parties. WILLISTON ON CONTRACTS § 601 ("in the case of contracts the avowed purpose and primary function of the court is the ascertainment of the intention of the parties.")

Moreover, "this court has held that the interpretation of a contract by the parties to it before the contract becomes the subject of controversy is deemed to be of great, if not

controlling weight." If the parties intend a contract to have a certain meaning, this court "will not allow their proven intention to be thwarted by a technicality" or ambiguity presented by the terms used by the parties. *Chase & Rice, Inc. v. United States*, 354 F.2d 318, 321-22 (Ct. Cl. 1965).

The circumstances surrounding the execution of the subsidy extensions show that the parties intended the renewals to protect South Pointe residents. (Englewood Br. at 74.) The subsidy extensions avoided the immediate eviction of 300 tenants, an unacceptable result for HUD. It also provided the funding so that the necessary services could continue: water, gas, electricity, security, waste removal, elevator operations, and on-site janitorial and maintenance services.

There was never any discussion that the renewals were executed for any reason other than continuing to make HAP payments to enable tenants to stay current on their existing rent (avoiding eviction), and to provide funding so that South Pointe could continue to furnish essential housing services while tenants – now with vouchers – looked for new housing. At trial, Mr. Hinsberger summarized what led to the renewals:

> Q Well, and you have a right to insist, under the contract, that you'd be able to extend that contract and require the owner to continue to provide services to the residents under the Housing Assistance Program contract addendum, right?
>
> A Correct.
>
> Q All right. So, you, you exercised that authority and you sent out a ninety-day contract out in 2001, right?
>
> A Correct.
>
> Q And then, again, that was to take care of the residents and make sure that they didn't, weren't put out of the building or were without heat and water and air, right?
>
> A Correct.

(Tr. 627-28.) The parties did not intend to affect HUD's rights under the 2000 HAP Contract. Rather, HUD merely exercised its authority under the REAC addendum to grant short term subsidy extensions while the voucher process moved forward.

## VII. THIS COURT HAS JURISDICTION OVER ENGLEWOOD'S CLAIMS FOR A RENT INCREASE AND ENERGY REIMBURSEMENT.

### A. This Court Has Jurisdiction Over Englewood's Claim For The Implementation Of An Approved Rent Increase.

Ignoring ample authority to the contrary, HUD argues that Englewood's claims for rent increases under the HAP Contract are not subject to judicial review. (HUD Br. at 76-83.) HUD seeks immunity for its failure to award an *approved* rent increase in September 2001. (Jt. Stmt. ¶ 107; JX 107 at 1144.) At the time of the critical events in this dispute – from late 2000 through 2002 – Englewood's rents remained at 1998 levels, causing Englewood substantial losses. (Tr. 977.) HUD's argument that its failure to award rent increases are not subject to judicial review is erroneous as a matter of law, where, as here HUD *approved* a rent increase in August 2001 but refused to implement it. (Jt. Stmt. ¶ 107; JX 107 at 1144.)

#### 1. HUD Approved A Rent Increase for Englewood, But Failed to Implement The Increase.

HUD's Brief relies on its purported unfettered discretion to deny rent increases, arguing that such decisions are not subject to judicial review. (HUD Br. at 78.) HUD claims that "[t]his rule is sensible," asserting that "courts are ill-equipped to superintend economic managerial decisions of the kind involved when HUD must decide whether to grant a rent increase request." (HUD Br. at 78) (quotations omitted). Here, HUD *approved* Englewood's application for a rent increase, based on costs and a rent comparability study, but simply failed to implement the increase. Specifically, in September 2001, HUD approved an August 2001 application for a rent increase submitted by Englewood. (Jt. Stmt. ¶ 107; JX 107 at 1144.)

Chicago HUB Director Hinsberger wrote to an Englewood representative, stating "[t]he rent comp study supports the proposed rents." (*Id.*) Hinsberger further stated "[w]e will allow the new rents to kick in at the time of closing." No rehab loan closed. (*Id.*) Accordingly, Englewood's claim does not require this Court to "superintend [an] economical managerial decision" of HUD. HUD acknowledged that a rent increase for South Pointe was appropriate in September 2001.

**2. Federal Courts May Hear Claims Arising From HUD's Failure To Implement An Approved Rent Increase.**

This Court has held that it has jurisdiction over claims that HUD failed to follow its obligation to properly process rent increases. *See, e.g., Crest A Apartments v. United States*, 52 Fed. Cl. 607, 612-13 (Fed. Cl. 2002) (Court of Claims has jurisdiction over claimed breach of HAP contract by failure to properly process rent increases). Accordingly, this Court has jurisdiction over HUD's failure to *implement* – as distinguished from approving – a rent increase for Englewood.

Indeed, courts have repeatedly held that claims for rent increases under the Tucker Act are subject to the jurisdiction of this Court. *Brighton Vill. Assocs. v. United States*, 52 F.3d 1056 (Fed. Cir. 1995) (Tucker Act vests Court of Federal Claims with jurisdiction over claims that HUD failed to grant rent increases in a HAP contract); *Cuyahoga Metropolitan Housing Authority v. United States*, 57 Fed. Cl. 751 (Fed. Cl. 2003) (considering denial of rent increases); *Christopher Village, L.P. v. United States*, 360 F.3d 1319 (Fed. Cir. 2004) (no APA jurisdiction because adequate remedy available under Tucker Act). As these decisions illustrate, HUD's assertion that "HUD's decisions regarding whether to grant a rent increase request are not subject to judicial review" is simply erroneous.

**3. The Rent Increase Denied In October 2001 Caused Damages Arising From HUD's Wrongful Notice of Default.**

In failing to implement rent increases, HUD cited (and continues to cite) Englewood's purported default as its basis. (HUD Br. at 76.) Englewood has shown that HUD's finding of default was wrongful. Accordingly, lost rents are due as damages flowing from HUD's breach of contract. The Federal Circuit Court of Appeals explained: "The general rule in common law breach of contract cases is to award damages sufficient to place the injured party in as good a position as he or she would have been had the breaching party fully performed." *San Carlos Irrigation & Drainage Dist. v. United States*, 111 F.3d 1557, 1562-63 (Fed. Cir. 1997). If HUD had not wrongly declared a default, Englewood would have received rent increases after September 2001. In other words, but for HUD's breach of the 2000 HAP Contract, Englewood would have been granted those rent increases. This Court thus has jurisdiction over Englewood's claim to the value of those lost rent increases as damages in this action.

**4. Englewood Did Not Waive Its Rights To A Rent Increase By Accepting Subsidy Extension Payments After HUD Repudiated The October 2000 Housing Assistance Payments Contract.**

HUD argues that the extensions operated as a "waiver" of Englewood's rights to the rent increase (HUD Br. at 82), although it does not use the term in describing the impact of the subsidy extensions on Englewood's right to renewals. HUD has waived any defense of waiver by failing to plead the defense as an affirmative defense with its answer. *See* RCFC 8(c) (requiring defendants to plead "waiver" with answer).

Moreover, HUD mistakes mitigation for waiver. In contrast to mitigation, a waiver is an intentional relinquishment of a known right. *United States v. Olano*, 507 U.S. 725, 733 (1993); *A Olympic Forwarder, Inc. v. United States*, 33 Fed. Cl. 514, 521 (Fed. Cl. 1995);

*Roxco, Ltd. v. United States*, 60 Fed. Cl. 39 (Fed. Cl. 2004). "Waivers of rights must be voluntary, knowing, and intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences." *Krzeminski v. United States*, 13 Cl. Ct. 430, 438 (Cl. Ct. 1987) (*citing Brady v. United States*, 397 U.S. 742, 748 (1970). In other words, a waiver requires:

> (1) The existence at the time of the waiver a right, privilege, advantage or benefit that may be waived; (2) the actual or constructive knowledge thereof; and (3) an intention to relinquish such right, privilege, advantage or benefit.

*A Olympic Forwarder*, 33 Fed. Cl. at 521 (*quoting Youngdale & Sons Construction Co. v. United States*, 22 Cl. Ct. 345, 346 (Cl. Ct. 1991)). To determine whether a waiver has occurred, the court should analyze the non-breaching party's actions to ascertain whether such actions actually represent an effort to mitigate damages. *See Northern Helex Co. v. United States*, 455 F.2d 546, 553 (Ct. Cl. 1972).

As in *Sun Cal,* discussed in Section VI(C) above, once HUD repudiated the HAP contract, Englewood attempted to mitigate its damages, to salvage whatever it could of the benefit of its bargain. 25 Cl. Ct. at 434. These actions were not inconsistent with a right to enforce the contract. Englewood also filed suit to enforce its rights under the contract at the very time that HUD now asserts Englewood voluntarily relinquished those rights. (JX 1 at 1-14.) Just as Englewood did not waive its right to future renewals under the October 2000 Housing Assistance Payments contract through the subsidy extensions, Englewood also did not waive its right to a rental increase.

**B. This Court Has Jurisdiction Over Englewood's Claim For Energy Reimbursements.**

Citing the same authority that it uses to support its argument regarding rent increases, HUD argues that this Court lacks jurisdiction to hear claims regarding HUD's failure

to reimburse energy costs. For the same reasons that this Court has jurisdiction over the claims for implementation of an approved rent increase, the Court also has jurisdiction over Englewood's claims for reimbursements.

In 2001, HUD issued guidelines under which property owners could request reimbursement for high energy costs incurred because of the especially harsh winter. (JX 90 at 1092; JX 92 at 1097.) On August 6, 2001, Englewood submitted a request for reimbursement of $55,230.29 for extraordinary gas costs during the winter of 2000-2001. (Jt. Stmt. ¶ 105; JX 103 at 1119.) Englewood later determined the amount of the excess cost reimbursement to be $139,187 in Rent Adjustments for Escalating Energy Costs. (Jt. Stmt. ¶ 105; JX 273 at 4201.)

Based on its determination that Englewood was in default on its HAP Contract, HUD refused Englewood's request for an energy reimbursement. (HUD Br. at 82.) As discussed above, HUD's finding of default was wrong. If Englewood prevails on its claim that HUD wrongly issued the default, Englewood is entitled to the value of its lost reimbursements as damages caused by HUD's breach of the parties' agreement. *San Carlos Irrigation*, 111 F.3d at 1562-63. Moreover, because HUD failed to *even review* Englewood's claim for energy reimbursement, this Court has jurisdiction over those claims. *Crest A Apartments*, 52 Fed. Cl. at 612-13 (fact dispute regarding whether HUD reviewed application for rent increase precluded summary judgment).

HUD's failure to reimburse Englewood for energy costs also violates an implied contract between the parties – a basis for jurisdiction expressly provided for in the Tucker Act. 28 U.S.C. § 1491(a)(1); *see also Centex Corp. v. United States*, 395 F.3d 1283, 1291 (Fed. Cir. 2005) (affirming Court of Claims jurisdiction and judgment for corporation for implied contract with government). All of the "necessary elements of an implied contract--mutuality of intent,

offer and acceptance, and consideration" (*Id.*) are present in the agreement between HUD and Englewood. HUD offered the reimbursement plan; Englewood accepted, and it both submitted a claim, and continued to provide utility services in reliance on HUD's offer. (Jt. Stmt. ¶ 105; JX 103 at 1119; JX 273 at 4201.)

**CONCLUSION**

For the foregoing reasons, Englewood respectfully requests this Court to find HUD liable to Englewood for breach of contract. Englewood met its burden to prove that HUD breached a valid agreement between the parties – the October 18, 2000 Housing Assistance Payments contract. HUD has fallen far short of meeting its burden on any of its defenses to Englewood's claims. Judgment should be entered for Englewood.

Dated: May 2, 2007

s/Peter V. Baugher
One of the Attorneys for Plaintiff
Englewood Terrace Limited Partnership

Peter V. Baugher
William B. Berndt
Schopf & Weiss LLP
One South Wacker Drive
Chicago, IL 60606
312.701.9300

**CERTIFICATE OF SERVICE**

I, Peter V. Baugher, one of the attorneys for Plaintiff Englewood Terrace Limited Partnership, state that on May 2, 2007, I caused a copy of **Englewood's Reply To HUD's Post-Trial Brief,** to be served electronically on:

Mr. Douglas K. Mickle
Commercial Litigation Branch
Civil Division, United States Department of Justice
11 L Street, N.W.
Room 10130
Washington, DC 20005

s/Peter V. Baugher
Peter V. Baugher