`

# In the United States Court of Federal Claims

**No. 03-2209C**
**Filed: November 30, 2007**

| | | |
|---|---|---|
| * * * * * * * * * * * * * * | | |
| | * | **Trial; Breach of Housing Assistance Payment Contract by the Department of Housing and Urban Development; Termination for Default; Housing Standard: Decent, Safe and Sanitary Condition.** |
| **ENGLEWOOD TERRACE LIMITED PARTNERSHIP, a Michigan Limited Partnership,** | * * * * | |
| **Plaintiff,** | * | |
| **v.** | * * | |
| **UNITED STATES,** | * * | |
| **Defendant.** | * | |
| * * * * * * * * * * * * * * | | |

**Peter V. Baugher**, Schopf & Weiss LLP, Chicago, Illinois, for the plaintiff. Of counsel, **William B. Berndt**, Schopf & Weiss LLP, Chicago, Illinois.

**Douglas K. Mickle**, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for the defendant. With him were **Peter D. Keisler**, Assistant Attorney General, **Jeanne E. Davidson**, Director, and **Brian M. Simkin**, Assistant Director, Commercial Litigation Branch. Of counsel, **Gregory G. Gustin**, **Maria T. Baguio**, **Russell J. Cohen**, and **Lorraine C. Shoto**, Office of General Counsel, United States Department of Housing and Urban Development, Chicago, Illinois.

## O P I N I O N

**HORN, J.**

## FINDINGS OF FACT

Plaintiff Englewood Terrace Limited Partnership (Englewood) alleges that the United States Department of Housing and Urban Development (HUD) breached a Housing Assistance Payment (HAP) contract between Englewood and HUD. The HAP contract at issue provided for rent subsidies to be used at South Pointe Towers (South Pointe), a 23-

story, 303-unit apartment building in Chicago, Illinois.

South Pointe is owned by Englewood Terrace Limited Partnership. John J. Hayes was the President of P.M. Group, Englewood's general partner until December, 2002 when new ownership took over. On December 13, 2002, DSSA New Englewood Terrace LLC (DSSA), a sole proprietorship of Don S. Samuelson, replaced P.M. Group as Englewood's general partner. Earlier, on December 1, 2001, DSSA Management, Inc., which was affiliated with DSSA New Englewood Terrace LLC, replaced P.M. One as South Pointe's managing agent.

HAP contracts are authorized by Section 8 of the United States Housing Act of 1937, as amended, which provides:

> (a) Authorization for assistance payments
> For the purpose of aiding low-income families in obtaining a decent place to live and of promoting economically mixed housing, assistance payments may be made with respect to existing housing in accordance with the provisions of this section.

United States Housing Act of 1937, ch. 896, tit. I, § 8 (Sept. 1, 1937) (codified as amended at 42 U.S.C. § 1437f(a) (2000)). Under the Section 8 program, HUD pays rent subsidies to private building owners such as Englewood, on behalf of their tenants. Tenants pay a portion of their monthly income for the housing, and HUD pays the remainder. See 42 U.S.C. §§ 1437a(a)(1), 1437f(c)(3).

**HAP Contract Provisions and HUD Regulatory Provisions**

Englewood's complaint stems from HUD's termination of its HAP contract with HUD. HUD issued a Notice of Abatement[1] and Termination of Englewood's HAP contract on November 30, 2001. The HAP contract at South Pointe ended on September 30, 2002, after tenants had been given housing vouchers permitting them to either remain at South Pointe or relocate. HUD has stated that it based its termination on the provision in the HAP contract at paragraph 6(a), requiring Englewood "to provide decent, safe, and sanitary housing including the provision of all the services, maintenance and utilities." In this regard, HUD regulations provide that:

> HUD housing must be decent, safe, sanitary and in good repair. Owners of housing . . . must maintain such housing in a manner that meets the physical condition standards set forth in this section in order to be considered decent, safe, sanitary

[1] According to paragraph 6(d) of Englewood's HAP contract, "abatement" refers to a reduction or suspension of housing assistance payments.

> and in good repair. These standards address the major areas of the HUD housing: the site; the building exterior; the building systems; the dwelling units; the common areas; and health and safety considerations.

24 C.F.R. § 5.703, titled "Physical condition standards for HUD housing that is decent, safe, sanitary and in good repair (DSS/GR)" (April 1, 2000).[2] As to these major areas, the HUD regulations provide, variously, that the housing must be operable, in good repair, free of health and safety hazards, and habitable. See 24 C.F.R. § 5.703(a) - (g).

Paragraph 6(b)(2) of Englewood's HAP contract addressed HUD inspections: "HUD shall inspect or cause to be inspected at such times as may be necessary to ensure that the Owner [Englewood] is meeting its obligation to maintain the units in decent, safe, and sanitary condition including the provision of the agreed-upon utilities and other services." (bracketed material added).

The HAP contract, at paragraph 6(c), further provided that: "If HUD notifies the Owner that it has failed to maintain a dwelling unit in decent, safe, and sanitary condition and the Owner fails to take corrective action within the time prescribed in the notice," HUD may take action under the default clause of the contract. The HAP contract defines what constitutes a default by the property owner at paragraph 20(b)(1):

> (i) The Owner has violated or failed to comply with any provision of, or obligation under, this Contract or of any Lease, including failure to correct any deficiencies identified by HUD in connection with any inspection; or
> (ii) The Owner has asserted or demonstrated an intention not to perform some or all of its obligations under this Contract or under any Lease . . . .

Pursuant to paragraph 20(b)(2) of the HAP contract, upon a determination by HUD that a default has occurred, HUD notifies the property owner of

> (i) The nature of the default,
> (ii) The actions required to be taken and the remedies to be applied on account of the default (including actions by the Owner to cure the default), and

[2] The April 1, 2000 version of HUD's physical condition standards, which remains unchanged to date, was operative at the time the HAP contract at issue was executed (October 1, 2000), at the time the Notice of Default and Continuing Notice of Default were issued (April 9, 2001 and May 16, 2001, respectively), at the time the Notice of Abatement and Termination was issued (November 30, 2001), and when Englewood's HAP contract ended, on September 30, 2002.

(iii) The time within which the Owner shall respond with a showing that all the required actions have been taken.

Paragraph 20(b)(2) of the HAP contract continued, If Englewood failed "to respond or take action to the satisfaction of HUD," HUD had the right to take corrective action or terminate the contract. See also 24 C.F.R. § 886.323(e) (April 1, 2000) ("If HUD notifies the owner that he/she has failed to maintain a dwelling in decent, safe, and sanitary condition, and the owner fails to take corrective action within the time prescribed in the notice, HUD may exercise any of its rights or remedies under the contract, or Regulatory Agreement, if any, including abatement of housing assistance payments . . . ."). Paragraph 21 of the HAP contract provided that the contract, including the exhibits, was the entire agreement between the parties, and that "[n]o changes in this Contract may be made except in writing signed by both the Owner and HUD."

Robert J. Pendergast signed the 1998 HAP contract on behalf of Englewood. John J. Hayes signed the 1999 HAP contract, and most of the other HAP contracts discussed below. Both individuals signed the contracts as officers of P.M. Group, Englewood's general partner. The January 1, 2002 HAP contract was signed by Daniel D. Armistead, also on behalf of Englewood's general partner. Don S. Samuelson never signed a HAP contract, because the HAP contracts ended September 30, 2002, and Mr. Samuelson took over as general partner of Englewood on December 13, 2002. In examining Mr. Samuelson's role, he toured South Pointe in the summer of 2001, resulting in his submission of an analysis of problems at South Pointe to Edward Hinsberger, Director of the Chicago Office of Multi-Family Housing for HUD, on August 6, 2001. At Mr. Hayes' request, and in anticipation of becoming the general partner of Englewood, Mr. Samuelson submitted a request for contract renewal and for a rent increase to Mr. Hinsberger on August 21, 2001. Mr. Samuelson's management agent, DSSA Management, Inc., took over the management of South Pointe on December 1, 2001. Mr. Samuelson's ownership interest in Englewood began December 13, 2002.

Years 1998 and 1999 HAP Contracts

Englewood and HUD executed a Housing Assistance Payment (HAP) contract for South Pointe in 1998.[3] The 1998 HAP contract's one-year term was October 1, 1998 through September 30, 1999. The 1998 HAP contract between Englewood and HUD was renewed in 1999, for the one-year term of October 1, 1999 through September 30, 2000. All of the provisions of the 1998 HAP contract remained unchanged for the 1999 HAP contract, except for the rent adjustment provisions.

---

[3] The complaint states that Englewood and HUD entered into an initial, renewable, five-year HAP contract in October, 1992, which led to the 1998 HAP contract renewal discussed above.

Year 2000 HAP Contract Renewal

For the year 2000 HAP renewal contract, the provisions of the expiring 1999 contract again were renewed between HUD and Englewood, with adjustments to the rent provisions. Englewood also agreed to an addendum to the HAP contract, as a condition of renewal, which stated that:

> in the event HUD's Real Estate Assessment Center (REAC) issues a physical inspection report to the Owner that has a score which evidences Owner failure to comply with HUD's Uniform Physical Condition Standards and Physical Inspection Requirement, . . . HUD may terminate the Contract after the renewal providing the Owner a reasonable period, as determined by HUD, to correct deficiencies or if the Owner fails to perform under an approved Correction Action Plan to Repair.

The term in the 2000 HAP contract was for one-year, from October 1, 2000 through September 30, 2001, however, unlike the 1998 and 1999 HAP contracts, the 2000 HAP contract also stated that: "After expiration of the initial term, this Contract shall renew automatically for 3 additional one-year terms, subject to the availability of appropriations in any year." The 2000 HAP contract was signed on October 16, 2000 by Mr. Hayes, as President of P.M. Group, the general partner of Englewood. For HUD, the contract was signed on October 18, 2000 by Benjamin Tessler, on behalf of Mary Anderson, the Chicago Director of Operations for HUD.

Edward Hinsberger, Director of the Chicago Office of Multifamily Housing for HUD, however, offered testimony that the HAP contract's one-year term, plus three automatic renewals, each for a one-year term, was an error, and that what HUD had intended was a three-month HAP contract renewal term:

Q [defendant's counsel] Okay. And what specifically about the HAP Contract was decided?

A [Mr. Hinsberger] Well, we decided to enter into a three month contract as opposed to renewing the, the [sic] contract for the full year.

Q Okay. Now you also testified yesterday that it was brought to your attention on October 18th, 2000, that there was an error with respect to the HAP Contract that was issued to the owner, is that correct?

A Correct.

Q Okay. And what was that error?

A The error was the, the [sic] contract was prepared as a one year contract with renewal options, or with renewal periods.

A changed copy of the 2000 HAP contract, reflecting a three-month term, was submitted into the record before the court. On the changed copy, the one-year term had been altered by pen and ink from “1 Year” to “3 months,” the expiration date was changed from “09/30/2001" to “12/31/00,” and the three additional, automatic terms were changed from “3" to “0,” by Gwendolyn Thomas, HUD Project Manager, Office of Multifamily Housing. Mr. Hinsberger testified that the intended short-term contract was “an incentive for the owner to move forward.” Ms. Thomas also testified that she noticed the mistake in the term of the HAP contract, and that the term should have been for three months:

Q [plaintiff's counsel] So what makes you think that this, this [original 2000 HAP] contract, Joint Exhibit 21, was in error?

A [Ms. Thomas] Because it was decided that a three-month short-term contract would be given to the owners to push them to make the repairs of the property because it was, it wasn't in decent, safe and sanitary condition. We were trying to get the owner to make the repairs of the property.

* * *

Q Well, who told you that this contract was in error?

A The contract was in error because the decision had been made by the director to only renew the contract for three months at a time, short-term increments, to see if the owner would make the repairs of the physical conditions of the property.

Ms. Thomas testified that her director, Veronica Coleman, informed Englewood of the error in the 2000 HAP contract on October 18, 2000, the same day it was signed by HUD representative Tessler on behalf of Ms. Anderson. Ms. Coleman, Director of Project Management for the Chicago HUD Office of Multifamily Housing, testified that the error was communicated to Englewood's representative, Ken Horton, on October 18, 2000, and that no Englewood objections to the correction were received, either then or later. Ms. Coleman continued her testimony: “And prior to October 18th, they were fully aware that they were going to get a three month contract and this contract was issued in error. It was a mistake.” Carl Sanders, Englewood's area property manager, acknowledged that he and Ken Horton attended a meeting on October 18, 2000 with HUD representatives, including Gwendolyn Thomas and Veronica Coleman, but deny that the three-month term, versus the one-year term plus automatic renewals was discussed.

Nearly two months later, on December 6, 2000, Ms. Coleman sent a letter to Englewood, indicating that HUD had changed the HAP contract from one base year plus three, automatic, one-year renewals to a three-month contract, with no renewals:

> This letter is to inform you that we have amended your Section 8 HAP Contract from (one) 1 year to a (three) 3 month short term renewal with zero (0) renewal terms. The contract you received, with the (one) 1 year extension, with a (three) 3 year renewal term was in error.
>
> As we stated in our meeting on October 18, 2000, the contract will be renewed under a three (3) month short term contract, due to the current physical conditions of the subject property. Once you provide our office with an acceptable plan to cure the physical deficiencies, we will renew the contract as needed. It is critical that an acceptable plan is submitted no later than December 11, 2000. The physical condition of this property continues to deteriorate with no foreseeable resolution.

Mr. Hayes, who had signed the 2000 HAP contract on behalf of Englewood on October 16, 2000, acknowledged receipt of the above December 6, 2000 letter from Ms. Coleman and the enclosed, altered 2000 HAP contract. At the time, he did not register an objection on the matter of the original HAP contract with renewals, versus the three-month term of the altered HAP contract.

Ken Horton, Vice President of P.M. Group, indirectly acknowledged the contract amendment in a January 22, 20001 e-mail to Ms. Coleman, on the occasion of changing the term of the amended 2000 HAP contract from "three months," back to one year: "On a separate note, pursuant to my conversation with Ms. Thomas last week, she informed me that the HAP contract would be further amended to reflect the original expiration date of September 30, 2001. Please forward the amended, amended HAP contract to my attention at the following address." (repetition in original). Mr. Horton was referring to HUD's return to a one-year term for the 2000 HAP contract, from October 1, 2000 through September 30, 2001, from the three-month term. The automatic, three additional one-year terms were not restored.

The record also contains a copy of the 2000 HAP contract, with a pen and ink extension of the contract term, from three months back to one year, with the expiration date changed from "12/31/00" to "9/30/2001." The initials beside these changes were "GT," for Gwendolyn Thomas, and were made on "1/10/01." Ms. Thomas acknowledged making the annotations. The space for the automatic, one-year terms remained at "0." At trial, Ms. Thomas characterized the situation differently, as follows: the first short-term contract was for three months, then a second short term contract was for nine months, totaling the year, from October 1, 2000 to September 30, 2001.

Although the 1998 and 1999 HAP contracts were for one-year terms, Englewood had requested a four-year term for the 2000 HAP contract to facilitate refinancing. For its part, HUD indicated it was using the short-term contracts as enforcement actions, to incentivize Englewood to improve its performance. HUD nevertheless had requested

funding for South Pointe tenants for a full year, and extended the 2000 HAP contract for the full year. The record contains no objections from Englewood to the extension of the contract to one year, ending September 30, 2001. As noted above, Mr. Horton acknowledged the extension in his January 22, 2001 e-mail to Ms. Coleman, wherein he requested a copy of the "amended, amended HAP contract to my attention at the following address." Englewood's position is that it did not agree to HUD's unilateral annotations to the 2000 HAP contract by Ms. Thomas.

Don S. Samuelson sent an August 21, 2001 letter to Mr. Hinsberger, noting that Englewood general partner P.M. Group intended to convey its partnership interest to Mr. Samuelson's own company, DSSA, Inc., and also that the current HAP contract expired September 30, 2001. Mr. Samuelson sought renewal of the HAP contract. The letter also acknowledged that:

> The property is facing a number of significant problems, including structural and financial problems. The financial problems include the fact that the property has not had a rental increase since 1998. The property has been running for the past two years at a $200K annual deficit. Cash deficits, past due bills and deferred maintenance have resulted from the current financing structure.
>
> * * *
>
> Clearly, this is a project with a long and somewhat troubled history, and one with which the HUD office is entirely too familiar.

Mr. Samuelson did take over from Mr. Hayes, as Englewood's general partner, on December 13, 2002.

Subsequent Contract Renewals

Englewood and HUD executed a renewal contract for 90 days beginning on October 1, 2001 and expiring on December 31, 2001. Mr. Hayes signed the HAP contract for Englewood. The next short-term renewal began January 1, 2002, for 180 days, expiring June 30, 2002. Daniel D. Armistead, Mr. Hayes' Vice President, signed the 180-day renewal for Englewood. The next, and final, short-term renewal was for 90 days. This last South Pointe HAP contract began on July 1, 2002, and expired on September 30, 2002. Mr. Hayes signed the renewal on behalf of Englewood. In contrast, the original one-year term, plus three automatic, one-year renewals, beginning on October 1, 2000, would have expired two years later, on September 30, 2004.

**Inspections of Englewood's Performance at South Pointe**

April 28, 1999 Real Estate Assessment Center (REAC) Inspection

On April 28, 1999, HUD's Real Estate Assessment Center (REAC) conducted an inspection of 25 tenant units of the 303 units at South Pointe, as well as the site, building exterior, building systems and common areas. The REAC Inspection Report reflected a score of 42.1 points out of 100 possible points, and a draft Final Action Plan in the record suggested that South Pointe should have received an even lower score than 42.1, based on a Chicago Enforcement Center site visit a few days before the REAC inspection.

On May 19, 1999, Pinnacle Realty Management Company, a HUD contractor, conducted a limited inspection of South Pointe, including some of the April 28, 1999 REAC findings, but did not visit any tenant units. Pinnacle's formal report concluded that of the REAC Inspection's seven "severe" findings on April 28, 1999, five had not been corrected, and of the REAC Inspection's seven "major" findings, none of the seven had been corrected. Pinnacle's conclusion was that Englewood had "not corrected conditions that adversely affect the provision of decent, safe, and sanitary housing as required by the HAP Contract." In a June 14, 1999 letter to HUD, Englewood stated that it had not yet received the April 28, 1999 REAC inspection report, and requested a copy of it in order to make the corrections, though Englewood indicated in the letter that it had begun to correct some of the obvious problems.

In an August 20, 1999 letter to Mr. Hinsberger, Mr. Hayes stated that all health and safety Items had been corrected. HUD's Final Team Report, dated January 26, 2000, cited the April 28, 1999, REAC inspection at South Pointe, and concluded that:

> The property is in poor physical condition; however the owner has corrected some of the identified repairs revealed by the REAC Inspection Report. They are in the process of entering into contracts to correct the remainder of the items cited by REAC and the DEC. The owners have started repairs, and are showing good faith by starting some repairs with their own funds. In addition, they are attempting to secure a loan to offset the cost of the remaining work.

September 23, 1999 City of Chicago Inspection

About a month after Mr. Hayes' August 20, 1999 letter reported that all health and safety items had been corrected, on September 23, 1999, the City of Chicago Department of Buildings conducted their own inspection, and found missing fire extinguishers and fire hoses, defective and missing smoke detectors, roach and rodent infestation, trash, and toilets not functioning. The scope of the inspection was not specified, but a review of the findings indicated a limited, as opposed to a 100% inspection. In his testimony, Mr. Hayes acknowledged that items found in the City of Chicago inspection, such as roach infestation,

broken light fixtures, damages doors, and broken window panes, also had been found during the earlier, April 28, 1999, REAC inspection. However, a comparison of tenant unit numbers between the two inspections reveals that the units inspected were different, such that the same deficiency in a given unit was not re-identified.

<u>March 14, 2000 HUD Management and Occupancy Review</u>

HUD project manager Gwendolyn Thomas and HUD staff conducted a management and occupancy review at South Pointe on March 14, 2000, which included an inspection of some portions of the common areas and three occupied units. Ms. Thomas reported problems with drugs and gangs, missing screens, broken windows, garbage, broken elevators, graffiti, broken fixtures, broken emergency lighting, broken smoke detectors, broken fire doors, missing fire extinguishers and fire hoses, roach and rodent infestation, and water damage. In a July 10, 2000 letter, Englewood responded that corrective action either had been taken on the discrepancies found, or corrective action had been scheduled.

<u>November 3, 2000 Englewood Physical Inspection</u>

The record reflects that, on November 3, 2000, Englewood conducted its own inspection, a 100% inspection, of South Pointe. Englewood's inspectors wrote up many items, among others, closet doors needing replacement, unsanitary trash chutes, and that "[t]he elevators are constantly out of order and it's always the same problem." For example, the REAC inspection of April 28, 1999, had identified the elevators as inoperable. With regard to the trash chutes, Englewood area property manager Sanders testified as follows:

> Q [defendant's counsel] And once again your hundred percent review [on November 3, 2000] noted that the trash chutes are also problematic.
>
> A [Mr. Sanders] Yes.
>
> Q Which is another restatement of the April 1999 REAC report. Correct?
>
> A Restatement, been repaired, and re-damaged –
>
> Q And the City of Chicago report, didn't that also find problems with trash?
>
> A Sure.
>
> Q So let me get this straight. In April 1999, you were put on notice that you had problems with trash.
>
> A Um-hmm.
>
> Q In October 1999, the City of Chicago put you on notice you had problems

with trash.

A Yes, sir.

Q And your own inspection said that you had problems be it the trash chutes, or some other item of refuse removal. Correct?

A Yes, sir.

The April 28, 1999 REAC inspection, cited above, also had reported that South Pointe was infested with rats and roaches. Similarly, Mr. Sanders testified as to finding roaches, and acknowledged the November 3, 2000 physical inspection report, which also found evidence of rodent infestation.

February 19, 2001 HUD Management and Occupancy Review

On February 19, 2001, Ms. Thomas and other HUD staff personnel conducted a management and occupancy review of South Pointe, assigning an "Unsatisfactory" rating. Common areas were inspected, as well as some tenant units, but no unit numbers were included in the report. Ms. Thomas' testimony reflected her belief that the property was in "horrible" condition. The HUD inspectors identified deficiencies found during earlier inspections: torn and missing window screens, overflowing garbage, trash chutes not functioning, missing fire hoses, missing fire extinguishers, missing smoke detectors, graffiti, roach and rodent infestation, water damage, inoperative elevators, and drug[4] and gang-related problems. Ms. Thomas reported that she re-inspected one particular unit, as to which Englewood previously had indicated that corrective action had been taken:

> The one unit that I went in here before, I went back to that particular unit, just to see, because management replied to my occupancy review that, that [sic] they had fixed it. That they were, you know, we accepted it and closed them in their occupancy review. They said they fixed it. Of course, I'm going to verify it a year later to make sure, and it looks like they tried to do some work, but they didn't fix the plumbing problem, because again, in the shower, there was the damaged shower head, with the water damaged wood, the still rusted tub, the peeling paint in the units. So the unit, and any other units I went into, [sic] consistent. Rusted tubs, plumbing problems, roaches, complaints of mice from residents. There was [sic] missing screens, broken, some had cracked or broken windows, no shades. Again, peeling paint and still, but

[4] In a July 2, 2001 letter from the Office of the State's Attorney for Cook County, Illinois, South Pointe was declared a public nuisance based on drug activity in the building.

> basically, I mean, the same condition. It had not changed ....

March 2, 2001 Real Estate Assessment Center (REAC) Inspection

On March 2, 2001, REAC conducted an inspection of South Pointe. Englewood's resulting score of 31 points out of 100 possible on the inspection was lower than the 42.1 points earned on the April 28, 1999, REAC inspection of South Pointe.[5] The score of 31 points was based upon a sample of 25 units inspected by HUD during the March 2, 2001 REAC inspection. Englewood was required by HUD to conduct its own survey of South Pointe, "to determine if any additional deficiencies exist."

Englewood's corrective action plan in response to the REAC inspection, in a Management Improvement Operating Plan (MIOP) format, was due at HUD within 30 days. However, "exigent health and safety [EH&S] deficiencies" identified during the March 2, 2001 inspection were required to be corrected within 72 hours. HUD construction analyst Lillye R. Simmons defined health and safety items basically as serious hazards to a tenant's health and safety. Health and safety items were identified in the HUD inspection report itself as: "air quality, electrical hazards, elevator, emergency/fire exits, flammable materials, garbage and debris, hazards, infestation." Health and safety items at the REAC inspection included an expired fire extinguisher, uncovered electrical panel, inoperable parking gate, uncovered electrical outlets, missing electrical breakers, broken window, roaches, exposed nails, bare electrical wires, and an inoperable exit door.

On March 6, 2001, Mr. Hayes submitted Englewood's certification that all exigent health and safety items were corrected. On March 7, 2001, Ms. Thomas and construction analyst Simmons conducted a subsequent review of the exigent health and safety items at South Pointe. The results of the review were included in a March 9, 2001 letter from HUD to Mr. Hayes:

> Our review confirmed that only a few of the EHS items had been mitigated and not all as you certified. . . .
>
> This letter is to advise that the EHS items cited on your REAC inspection of March 2, 2001, remain open. Also, the fact that your property is not in good repair places you in violation of your Housing Assistance Payment (HAP) Contract (refer to

[5] A few days later, on March 8, 2001, 61 of the 303 units at South Pointe were inspected by personnel from the Illinois Housing Development Authority. The State inspection cited missing smoke detectors, broken electrical outlets, water damage, exposed electrical wires, missing fire hose, missing fire extinguisher, and inoperable fire alarm. Mr. Hayes acknowledged at trial that these were "primarily the same items that had been cited previously" in the March 2, 2001 REAC inspection.

> Section 524(a) Addendum).
>
> As stated above, the EHS findings are open and you are still required to mitigate each one and provide an accurate certification statement. Please keep in mind that false certifications and contract violations are serious infractions that HUD will not tolerate. Should actions like these continue, we will not hesitate to exercise our rights and/or remedies under the HAP contract, including reduction, suspension, abatement or termination of the Section 8 Assistance Payments.

Mr. Hayes responded for Englewood on March 16, 2001, indicating that the allegations of false certification were of "extreme concern," but also stood by the original certification of compliance, based on a review by Englewood's property manager, Carl Sanders, and photographs demonstrating compliance, as to the exigent health and safety items in question.

As noted above, Englewood's corrective action plan for the March 2, 2001 REAC inspection was due at HUD within 30 days, in a Management Improvement Operating Plan (MIOP) format. Part of the corrective action plan was a requirement for a survey of South Pointe: "Before you can prepare your Plan [of Correction] you are required to conduct a survey of your property to determine if any additional deficiencies exist. You should use the findings of the REAC inspection and the random sample unit inspections as the basis for the survey."

HUD issued a Notice of Default to Englewood on April 9, 2001, citing the low score of 31 out of 100 points on the March 2, 2001 REAC inspection, and the exigent health and safety items identified at the March 2, 2001 inspection which Englewood had certified as corrected, to which Ms. Thomas and Ms. Simmons indicated disagreement, believing that not all of the exigent health and safety items had been corrected. The Notice of Default also noted that, on April 3, 2001, HUD had rejected Englewood's application for a funding commitment, stating that Englewood's proposed repairs were inadequate when compared to the needs of the facility.[6] The April 3, 2001 rejection of the funding commitment also

---

[6] The April 3, 2001 letter from Mr. Hinsberger to Mr. Hayes, rejecting the request for a funding commitment, stated:

> HUD emphasized that the entire property must be surveyed by the owner, and that all of the physical problems be addressed. The application which was finally submitted on March 19, 2001 for mortgage insurance does not address all of our concerns and is being rejected due to the deficiencies listed below:
>
> 1. **Repairs:** The repairs outlined in your application are inadequate when

observed that HUD had allowed 23 months from the date of the April 28, 1999 REAC inspection to bring the property into compliance. The April 9, 2001 Notice of Default continued:

> Pursuant to Paragraph 6(a) of the HAP Contract, you have agreed to maintain the Project's units and related facilities in decent; safe and sanitary condition. All of the Project, its units, systems, common areas and building(s) must satisfy HUD's Physical Condition Standards, 24 CFR Part 5, Subpart G. The REAC inspection confirms that the Project suffers from ongoing serious neglect, disrepair, and unsafe and unsanitary conditions throughout the units, common areas, and the building. The failure to keep and maintain the Project in a decent, safe, and sanitary condition is a default of the HAP Contract.
>
> Pursuant to Paragraph 20 of the HAP Contract, the Owner is hereby notified that if the foregoing events of default are not corrected to the satisfaction of HUD within 30 days from the date of this Notice, HUD may seek any and all available remedies; including, without limitation, suspending or abating the HAP Contract.

At an April 13, 2001 meeting, HUD discussed with Mr. Hayes the need for new ownership and management at South Pointe. On May 16, 2001, HUD issued a Notice of Continuing Default to Englewood, reiterating the basis for the April 9, 2001 Notice of Default, and adding concerns about the need for new ownership and management at South

---

compared to the needs of the property. Construction Analyst Raymond Etzkorn of our staff inspected the property on March 22nd and 23rd of this year [2001]. His repair estimate and scope of work are substantially higher [$6,221,800.00] than what is proposed in your application [$3,514,568.00]. He estimates the needs of the project in excess of $6 million. This level of repair needs was based on his visit, your application, and an engineering report provided by management during the on-site visit. [bracketed material added].

* * *

3. **Management:** P.M. One is listed as the management agent for this property. During a meeting of March 8, 2001, between your organization and ours, Edward Hinsberger expressly stated that we would not process this refinancing with P.M. One remaining in the position of management agent due to their poor past performance. Your application indicated that P.M. One would continue to manage the project.

Pointe:

> HUD met with you [Mr. Hayes] and amplified your need for immediate action; including the need to change Project ownership and management.
>
> * * *
>
> The Owner's default of the HAP Contract is uncured and continues. HUD urges you to provide adequate, timely information describing the immediate efforts that the Owner is making to address the HAP default and the sale of the Project and proposed assumption of the HAP Contract. In the interim, HUD intends to contact the potential acquirers you have listed to determine their interest and ability to succeed the current Owner and management for the Project. Because of HUD's ongoing concerns for your delays and for the tenants, HUD is proceeding with its process to secure vouchers[7] for relocation of eligible tenants.

On June 11, 2001, Mary Anderson, the Director of Operations for HUD's Chicago Office of Multifamily Housing, sent an internal e-mail to other HUD personnel, stating that "we are abating the Sec. 8 contract for this development [South Pointe] as of 9/30/01. The vouchers [for tenants] need to be in place by 10/1/01. The Chicago Housing Authority will administer the contract."

On September 4, 2001, a revised rehabilitation loan request was submitted to Mr. Hinsberger on behalf of Englewood, reflecting an expanded scope of work, an impending change in the general partner to Don Samuelson, and an impending change in management at South Pointe from P.M. One to DSSA, Inc. On September 6, 2001, Mr. Hinsberger sent an e-mail to Mr. Samuelson indicating, inter alia, that the rent comparability study supported the proposed rents, and that the HAP contract would be extended with a short-term, 90-day, renewal contract, from October 1, 2001 to December 31, 2001. On September 25, 2001, Mr. Hinsberger requested additional information in support of the revised rehabilitation loan, and on September 28, 2001, a response was submitted to Mr. Hinsberger on behalf of Englewood.

As indicated earlier, Englewood and HUD executed a short-term renewal contract for 90 days, beginning on October 1, 2001. Mr. Hayes signed the HAP contract for Englewood; Mr. Hinsberger signed for HUD. On the same day, October 1, 2001, Mr.

---

[7] Section 8 vouchers are subsidies paid on behalf of tenants for housing. Project-based vouchers are for families in specific housing developments, such as South Pointe. In contrast, tenant-based vouchers, which were provided to South Pointe tenants for potential relocation, are not tied to a specific facility, but can be used at any facility that has a voucher program. <u>See</u> 24 C.F.R. § 982.1(b) (2000).

Hinsberger sent an e-mail to Mr. Hayes and Mr. Samuelson, stating:

> The [Chicago] Housing Authority has advised us that they will begin issuing vouchers for the residents at South Pointe today. The residents have been advised that they will be receiving them beginning today. As a result, the Sec. 8 contract will be terminated once all of the residents receive their vouchers. The residents can remain in the project if their individual units pass the CHAC [Chicago Housing Authority] inspection. If they care to move, the voucher is portable and they will be able to do that too.
>
> We will continue to process the loan application for the refinance unless you advise otherwise. Since the rents that we would approve in a refinance would be the street rents, the absence of project based Section 8 should have little impact on the success of the project. Good screening and good management will determine the success of the project.

Mr. Hayes responded in an October 1, 2001 e-mail, that the issuance of tenant-based vouchers to South Pointe residents, permitting them to use the housing subsidy vouchers elsewhere, was "unconscionable and unfair." Mr. Hinsberger's reply e-mail to Mr. Hayes later that same day, October 1, 2001, was extensive:

> For many many months we have told you that unless the problems and physical conditions at the building were resolved, the Sec. 8 contract would be abated. [repetition in original]. We agreed to allow you to submit a mortgage application to finance the rehab. We waited for that application for [sic] long period of time, approximately 23 months from the time of the initial REAC inspection. We finally had to give you a deadline and the last day of that period an application was submitted that was substantially incomplete. Below is part of a message that was sent to the PM group back on 1/23/01 addressing the same issue:
>
> "Let me encourage you to expedite this process with your Contractor and Architect. Please keep in mind that we gave you a 3 month extension on your contract pending an enforcement action, due to the physical condition of your property and the fact that we do not have your loan application in-house. Your plan to correct the problems at Southpointe [sic] was to submit an application for mortgage insurance and substantially repair the property. Submission of this loan application has taken far too long. A pre-application

conference was held December, 1999 and we are now into January, 2001. The property continues to deteriorate and we are still paying subsidy with the anticipation that this property will be restored to fiscal and physical soundness. The only reason that we've continued to pay subsidy is to protect the tenants. Abating the contracts would stop the bulk of project revenue which would result in bills being unpaid and tenants would suffer by not having normal routine maintenance services. Also, it would take approximately 6 months or more for residents to receive vouchers, not to mention relocation efforts for approximately 303 families. The Department has been extremely tolerant with this matter, however, we will not continue down the same road in 2001. While you are working to submit your loan application, I will concurrently be working to get vouchers. I feel it necessary at this point to pursue vouchers due to the lack of progress to date.

When you submit your loan application, be sure that the rents reflect the market. Alan Cravitz has discussed this with our Appraiser, John Schneider and a comparable rent has been determined. I advised you during our October meeting, that the scope of work must be comprehensive addressing the needs of the entire project. Your original plan was to only address a percent of the units and this was unacceptable.

The Department will continue to work with you, but is [sic] imperative that we are prepared to issue vouchers should the need arise. Confirming your statement below, I will expect the loan application on or before March 19, 2001. If the application is not submitted by this date, I will make the request to our Office of Public Housing to secure vouchers for the residents at South Point."

After your application for mortgage insurance was rejected, the Sec. 8 vouchers were ordered. You were aware of this. There were many different conversations that ensued after that, but the constant message was unless the physical conditions were resolved, the Sec. 8 would be abated and that we would not stop the process while waiting for you to develop a plan. To accommodate you further, we even allowed you the opportunity to sell the project and were willing to let the purchaser use mortgage insurance to finance the rehab. Throughout the many months that we have been waiting, I have constantly said that if there is not a plan in place that is fully documented and approved by us, the abatement process

> would not be stopped. In email [sic] messages as recent as August 6th and September 21, 2001, I reminded you that you were running out of time that when vouchers were issued, the contract would end. The HAP was extended to protect the residents, not the owners. The desire was to keep funds flowing to allow for the basic services that the tenants are entitled to receive. We have been advised by the HA [Chicago Housing Authority] that vouchers are being issue to the residents. We are doing what we told you many many times we would do. [repetition in original]. We are abating the Sec. 8 contract. [bracketed material added].
>
> However, again to accommodate you, and the prospective purchaser, we are willing to continue to process the mortgage insurance application once a complete application is received that addresses the deficiencies identified [sic] the letter dated 9/25/01. Since the rents being proposed in the application are market comparable, there should be little problem attracting residents who are either market or voucher holders to the building, especially if it is rehabbed to the level we are requiring.

October 19, 2001 HUD Inspection

On October 19, 2001, HUD construction analyst Lillye R. Simmons and other HUD personnel conducted an inspection of "some of the units and common areas" at South Pointe. Ms. Simmons testified that the purpose of the visit was "to see if the conditions at the property had improved." The team concluded they had not. Deficiencies included missing window screens, trash, missing smoke detectors, missing fire hoses, missing fire doors, missing light fixtures, inoperable emergency lighting, outlets and switches with protruding wiring, broken garbage chutes, rodent infestation, missing plumbing fixtures, and inoperable elevators. Ms. Simmons testified that "[t]he first thing [you observed] when you entered the building was the smell of urine. The floors were dirty. It was nasty. And it was poorly lit." John Schneider, Senior Appraiser at HUD's Chicago Office of Multifamily Housing, who also was on the October 19, 2001 inspection, testified that "[m]y first impression was that the building was in, [sic] was being neglected in extreme disrepair as evidenced by boarded up windows on the outside, areas of the lawn that were bare." Mr. Schneider testified that he had visited over 200 multi-family facilities in his 13 years at HUD, and "I have seen properties that are in worse disrepair in worse condition but none of them were occupied."

On October 29, 2001, Englewood filed suit in United States District Court, seeking declaratory and injunctive relief for HUD's failure to renew the HAP contract, and for the issuance of tenant-based vouchers, which could be used by South Pointe tenants at other facilities. See Englewood Terrace Limited Partnership v. United States, No. 01C-8285

(N.D. Ill.). Englewood argued that there had been no formal notice of termination and no opportunity to cure any alleged defects. Englewood also complained in District Court that the issuance of tenant-based vouchers would effectively undermine the HAP contract with Englewood, which had been supported by project-based vouchers usable only at South Pointe. On November 15, 2001, United States District Court Judge Ruben Castillo denied Englewood's motion for preliminary injunctive relief, based on the court's finding that HUD had not yet formally terminated the HAP contract. See Englewood Terrace Limited Partnership v. United States, No. 01C-8285, slip op. at 4, 6.

November 30, 2001 Notice of Abatement and Termination of the HAP Contract

On November 30, 2001 HUD issued to Englewood a Notice of Abatement and Termination of the HAP contract at South Pointe. The November 30, 2001 Notice recounted that HUD had issued an earlier Notice of Default, on April 9, 2001, based on Englewood's failure to maintain South Pointe in decent, safe and sanitary condition. The Notice of Default had provided 30 days to correct the cited deficiencies. A continuing Notice of Default was issued by HUD on May 16, 2001. The November 30, 2001 Notice of Abatement and Termination of the HAP contract concluded that, "[t]o date, Owner has not cured the conditions complained of in the notice of default issued on April 9, 2001 and as more fully described in HUD's May 16, 2001 writing." The November 30, 2001 termination notice continued:

> Owner has failed to maintain the property according to the physical conditions standards acceptable to HUD despite Owner's receipt of the notice of default and a reasonable opportunity (almost 240 days since the notice of default) to cure. Accordingly, pursuant to paragraph 20(b)(3) of the HAP Contract this is Owner's notice that HUD intends to abate the HAP Contract.
>
> Further, pursuant to Section 516(a) and (b) of the Multifamily Assisted Housing Reform and Affordability Act of 1997 ("MAHRA") HUD will terminate the HAP Contract upon HUD's determination that the relocation process of eligible residents at the Project is concluded.
>
> Pursuant to MAHRA, this is Owner's notice to provide, within 30 days from receipt of this notice, written objection to this notice of termination of HAP or to cure the underlying basis for the default. If the Owner does not submit a written objection or cure the underlying basis for the default to the satisfaction of HUD during this 30-day period, HUD's decision to terminate the HAP Contract will become a final determination under Section 516(c) of MAHRA and is not subject to judicial review.

> As Owner has been previously notified, HUD will abate the HAP subsidy for the Project's units as eligible residents receive their vouchers and timely opt to use those vouchers at the Project, if possible, or elsewhere. HUD also intends to abate the subsidy for ineligible residents, if any, and other residents that do not timely act with respect to their vouchers, at the time that HUD terminates the HAP Contract. As units are abated from the HAP Contract, the owner may not again lease those units to project-based Section 8 residents.
>
> The HAP Contract will be terminated when HUD has, in concert with CHAC [Chicago Housing Authority], completed its voucher and relocation process for all eligible residents at the Project. The foregoing description of HUD's intended method of abatement provides the course that HUD has determined best serves the interests of the residents as of the date of this notice. HUD does not intend that this notice limit the actions that HUD may otherwise properly take in protection of the residents. For example, if Ownership fails to continue to provide basic necessary services for the residents, HUD may elect to redirect HAP Contract payments for particular uses in protection of the residents.
>
> Please also be advised that the voucher and relocation process may extend beyond the expiration date of the current HAP Contract Renewal. To safeguard the residents, and not affecting HUD's determinations as set forth above, HUD will provide Owner with a HAP Contract Renewal with Addendum. Please execute the extension and return it to HUD promptly.

On December 21, 2001, Englewood objected to the Notice of Abatement and Termination, stating, in part, that: "Englewood recognized the causes of frustration but strongly believes that all of the deficiencies cited by HUD in the Default Letter have been addressed and complied with, leaving no cause for termination of the project based Section 8 contract for Englewood." Englewood also pursued an administrative appeal within HUD channels. On February 7, 2002, HUD issued a final decision upholding the termination of the HAP contract. On May 2, 2002, HUD's Deputy Director of the Office of Asset Management affirmed the final decision. The HAP contract at South Pointe ended on September 30, 2002.

After plaintiff filed a complaint in this court, the case originally was assigned to another judge at this court, who issued an earlier opinion, denying defendant's motion to dismiss for lack of subject matter jurisdiction. See Englewood Terrace Ltd. P'ship v. United States, 61 Fed. Cl. 583, 593, recons. denied (2004). The originally assigned judge accepted as true Englewood's factual allegations, for purposes of the motion to dismiss,

id. at 584, which we do not for purposes of deciding Englewood's breach of contract claim after trial. The trial of the facts was held in Chicago, Illinois, and the parties submitted post-trial briefs on the issues. The parties briefed only entitlement for this stage of the case.

Englewood has voluntarily dismissed and withdrawn the following claims in its complaint: claims arising from alleged vacancies at South Pointe, cited in the complaint at paragraph 94(c); and special claims arising from unpaid tenant rents and damages to units caused by tenants of South Pointe, cited in the complaint at paragraph 94(d). Plaintiff also moved to voluntarily dismiss, with prejudice, a claim for loss of business as to the plaintiff in this case, Englewood Terrace Limited Partnership. Englewood's counsel stated that the claim for loss of business belonged to the following entities not party to this lawsuit: DSSA and DSSA Management, Inc., P.M. Group, Don Samuelson and John Hayes. The loss of business claim arose from HUD's alleged imposition of HUD Form 2530 program participation restrictions. These claims, however, are not found in the plaintiff's complaint, but are referenced in paragraphs 6(t) and 6(bb), at page 5, and paragraph 7(f), at page 7, of the parties' December 27, 2006 Joint Statement of Issues of Fact and Law. Plaintiff now believes that these alleged program participation restriction claims relate not to the plaintiff in this action, Englewood Terrace Limited Partnership, but to other entities, named above, which are not plaintiffs in this action. Plaintiff moves to dismiss the alleged program participation restriction claims against Englewood Terrace Limited Partnership, with prejudice, but without prejudice to non-parties to this lawsuit. Inasmuch as the alleged program participation restriction claims are not found in the plaintiff's complaint, there are no claims to dismiss. Had the plaintiff's complaint been amended to add such claims, then there would have been a foundation for the voluntary dismissal, with prejudice, plaintiff seeks.

## DISCUSSION

Englewood argues that HUD's termination of its HAP contract was an improper breach of the contract. HUD responds that the last, short-term HAP contract renewal expired on its own terms on September 30, 2002, and was not renewed by HUD. HUD also argues that Englewood defaulted on the HAP contract through its failure to maintain South Pointe in "decent, safe and sanitary condition," as required by statute (42 U.S.C. § 1437f(a)), HUD regulations (24 C.F.R. § 5.703) and the HAP contract itself (paragraph 6(a)), and that, therefore, HUD's termination of the HAP contract on September 30, 2002 was justified.

### Expiration of Englewood's HAP Contract on September 30, 2002

The year 2000 HAP contract document between the parties initially provided for a one-year term, as the 1998 and 1999 HAP contracts had provided, but added, "[a]fter expiration of the initial term, this Contract shall renew automatically for 3 additional one-year terms, subject to the availability of appropriations in any year." Enforcement of this term, with the automatic renewals, would have taken the HAP contract through September 30, 2004. HUD contends, however, that this extended term, effectively providing for a four-

year contract, was an error. HUD proceeded under its error theory to impose a series of short-term contracts on Englewood: first, for 90 days (from October 1, 2000 to December 31, 2000), then for 270 days, then 90 days, then 180 days, and finally, for 90 days, culminating on a final close-out date of September 30, 2002, two years short of when the original 2000 HAP contract would have ended with the three automatic, one-year renewals. Defendant argues that HUD's rationale for the series of short-term contracts was to incentivize Englewood to improve its performance under the HAP contract. Plaintiff argues that HUD breached the 2000 HAP contract as originally executed through not fully implementing the original one-year term, plus the three automatic, one-year renewals.

John Hayes, general partner of Englewood, testified that he found out about HUD's unilateral action to change the term of the original 2000 HAP contact in December, 2000. On December 6, 2000, Veronica Coleman, the Director of Project Management, Chicago Multifamily Housing, wrote to Mr. Hayes, stating verbatim:

> The letter is to inform you that we have amended your Section 8 HAP Contract from (one) 1 year to a (three) 3 month short term renewal with zero (0) renewal terms. The contract you received, with the (one) 1 year extension, with a (three) 3 year renewal term was in error.
>
> As we stated in our meeting on October 18, 2000, the contract will be renewed under a three (3) month short term contract, due to the current physical conditions of the subject property. Once you provide our office with an acceptable plan to cure the physical deficiencies, we will renew the contract as needed. It is critical that an acceptable plan is submitted no later than December 11, 2000. The physical condition of this property continues to deteriorate with no foreseeable resolution.
>
> Enclosed is your copy of the amended Section 8 HAP contract. We look forward to hearing from you shortly. Should you have any questions regarding this matter, please feel free to contact Gwendolyn Thomas, Project Manager at [telephone number].

The original 2000 HAP contract term, which began October 1, 2000, was executed by Mr. Hayes for Englewood on October 16, 2000 and by Mr. Tessler for HUD on October 18, 2000. This original, 2000 HAP contract document was changed from a one-year contract with three automatic, one-year renewals to a three-month contract with no renewals, as indicated in the above December 6, 2000 HUD letter. The changed contract was provided to Mr. Hayes with the December 6, 2000 letter. Carl Sanders, Englewood's area property manager, acknowledged that both he and Ken Horton, Vice President of P.M. Group and Englewood representative, attended a meeting with Ms. Thomas and Ms. Coleman on October 18, 2000, as indicated in Ms. Coleman's December 6, 2000 letter, but testified that any error in the length of the HAP contract term was not mentioned at the

meeting. Nor do the handwritten minutes of the October 18, 2000 meeting, which are contained in the record, reflect that an error in the HAP contract term was discussed at the meeting. For that matter, HUD budgeted for the full first year of the contract, as reflected in the 2000 HAP contract itself, at Exhibit B, under "Funding." Ms. Coleman also testified that the funding was for one full year, and that the funding had been requested prior to execution of the 2000 HAP contract.

Furthermore, the record reflects that Englewood had requested a four-year contract, which would have provided some contract stability, useful with respect to Englewood's intention to seek refinancing. On July 27, 2000, Mr. Hayes requested a contract renewal of four years in the "Owner's Checklist for Use at Contract Expiration." Mr. Hayes testified that Englewood's existing mortgage at the time was for 11 years, at 8.5%, requiring debt service of about $645,000.00 each year, which consumed a large share of South Pointe's revenue. Mr. Hayes further indicated that if a 30- or 40-year mortgage could be obtained, at around 7%, the debt service could be cut in half, thereby providing more funds for security and repairs. The following colloquy with Mr. Hayes occurred at the trial:

> Q [plaintiff's attorney] Now, were there other matters that you had to get in place before you would be able to get a refinancing from Community Investment Corporation?
>
> A [Mr. Hayes] There would, yes. There are a number of things when you're looking for refinancing, the primary one is that there's a stream of revenue that your lender can count on to service the debt.
>
> Q And what did that mean in this instance?
>
> A That we had a HAP, we needed a HAP Contract, a Housing Assistance Payment Contract, that would be extended out for multiple years rather than a one year.
>
> Q And why did you need that?
>
> A Because it would, it would give the lender, Community Investment Corporation in this case, or any other lender the comfort level that they're looking for that there's a stream of revenue over more than one year to service their debt every year.

Ms. Coleman asserted at trial, however, that even prior to the October 18, 2000 meeting mentioned in her December 6, 2000 letter, Englewood was aware that the HAP contract would be for only three months. She stated that, "prior to October 18th, [2000] they were fully aware that they were going to get a three month contract and this [original 2000 HAP] contract was issued in error. It was a mistake." However, the trial revealed no Englewood representatives who acknowledged this alleged understanding. Mr. Hayes, for example, testified as follows:

Q [by plaintiff's counsel] What is Joint Exhibit 71, Mr. Hayes?

A This is a letter that I received shortly after December 6th [2000] from Veronica Coleman, as Director of Project Management in Chicago HUD, informing me that, that the HAP Contract – [pause for sirens]

A The letter is, the letter Veronica sent to me was to inform me that the HAP Contract that we had executed in October [2000] was being changed from one year to three months with no automatic renewals.

* * *

Q And what was your reaction to that?

A I, I'm sure I had a number of thoughts in my mind at the time, but probably the primary one was well, how can they do that. They didn't even talk to me about it. We executed a contract on October 16th and 18th and there was no discussion about there was a mistake or they needed to amend it or anything. I just get the letter.

Similarly, South Pointe property manager Carl Sanders testified that he prepared a contract renewal request for a four-year renewal term. When HUD representative Ben Tessler signed the one-year contract with three automatic, one-year renewals, Mr. Sanders was present. The contract Mr. Tessler signed was consistent with Mr. Sanders' understanding.

In addition to this testimony from Mr. Hayes and Mr. Sanders, which the court finds to be credible on this issue, defendant has not drawn the court's attention to any documents in the record, dated prior to the October, 2000 execution of the contract, which reflected a prior understanding on the part of Englewood representatives that the 2000 HAP contract was going to be a three-month, short-term contract, markedly different from the prior HAP contracts between Englewood and HUD. Under the facts and circumstances of this case, defendant has not demonstrated the existence of a mutual mistake. Defendant has only demonstrated, at best, a unilateral mistake on the part of HUD, when the HUD representative executed the 2000 HAP contract containing a one-year term, plus three, automatic, one-year extensions.

There is a marked difference in the law applicable to the treatment of mutual mistakes and unilateral mistakes. Defendant's counsel asserts the existence of a mutual mistake when he argues, "Englewood knew that the HAP contract with the base term of one year with three automatic renewals was in error." The record, however, fails to demonstrate the first, basic element of a mutual mistake, that "the <u>parties</u> to the contract were mistaken in their belief regarding a fact . . . ." <u>Short Bros., PLC v. United States</u>, 65 Fed. Cl. 695, 796 (2005) (quoting <u>Dairyland Power Coop. v. United States</u>, 16 F.3d 1197, 1202 (Fed. Cir. 1994)) (emphasis added). Reformation of contract terms is an available remedy for mutual mistakes. However, reformation of a contract term, such as the length

of a contract, is normally not available for a unilateral mistake. See Cheyenne-Arapaho Tribes of Indians of Okla. v. United States, 229 Ct. Cl. 434, 443-44, 671 F.2d 1305, 1311 (1982); Brown v. County of Geness, 872 F.2d 169, 174-75 (6th Cir. 1989); Short Bros., PLC v. United States, 65 Fed. Cl. at 797.

Defendant argues that "HUD's own internal computer system reflected that the 2000 HAP Contract was renewed for a short-term period of three months." (emphasis added). Defendant is referring to a HUD generated computer page in HUD records on South Pointe which reflected a short-term renewal date of "10/1/2000," and an expiration date of "12/31/2000." Defendant does not argue, however, that HUD's "internal" computer system was available to Englewood. The computer page, which has the words, "Last Modified: October 9, 2000," may provide support for the proposition that HUD may have been contemplating a short-term contract, but offers no support for the proposition that Englewood similarly contemplated a short-term contract. In other words, HUD's internal computer page merely supports a possible unilateral mistake on the part of HUD, not a mutual mistake on the part of both parties to the 2000 HAP contract.

Defendant also argues that Englewood representatives acknowledged the correction to the 2000 HAP contract by not objecting at the time they received the amended contract with the shortened term attached to HUD's December 6, 2000 letter, a date only three weeks before HUD argues the short-term contract was to expire, on December 31, 2000. Defendant further notes that Englewood representatives subsequently executed a series of short-term contracts with HUD, again, not objecting to the short-term extensions which ultimately ended on the final, short-term HAP contract close-out date of September 30, 2002. Defendant's summarizes its argument as follows:

> In this case, it is beyond dispute[8] that Englewood signed repeated renewal contracts that indicated that the terms of the HAP contract would be extended for short term periods until September 2002. . . . Englewood's willingness to sign these agreements in order to collect more HUD subsidy cannot change the agreements' basic terms. . . . The undisputed fact that the parties agreed to numerous subsequent bilateral HAP renewal contracts also defeats Englewood's allegation that HUD improperly unilaterally amended these contracts. Even assuming HUD did improperly amend an earlier version of the [2000] HAP renewal contract, parties may modify any contract through subsequent agreements.

Defendant cites 29 Williston on Contracts § 73.17, titled "–Inconsistent subsequent contract," in support of the above proposition that the subsequent, short-term contracts

---

[8] The court notes that on a contested issue, the phrase, "it is beyond dispute," often is a flag for the court to examine whether a lurking weakness on the issue exists.

signed by the parties control, and rescind provisions on the length of the contract specified in the original 2000 HAP contract. The Williston treatise states that:

> A contract containing a term inconsistent with a term of an earlier contract between the same parties is interpreted as including an agreement to rescind the inconsistent term in the earlier contract. . . . [T]he parties to a contract may by their mutual agreement accept the substitution of a new contract for the old one with the intent to extinguish the obligation of the old contract, but one party to a contract cannot by its own acts release or alter its obligations; the intention must be mutual.
>
> The subsequent agreement must also have sufficient consideration or a substitute. Therefore, if the undertaking by one party is simply to perform the whole or part of what it promised in the original contract, this will not support a promise by the other party to perform what it had previously agreed to do and something more, or, to put the same matter in other words, an existing contract cannot be altered by mutual assent by an agreement merely to give one party a right or privilege, or subject the other party to a burden that it did not previously have.

29 Samuel Williston, Williston on Contracts § 73.17 at 53, 55-56 (Richard A. Lord 4th ed. 2003) (emphasis added, footnotes omitted). However, application of the Williston comments to the facts and circumstances of this case does not assist defendant.

Plaintiff's counsel stated that Englewood initially had hoped that HUD's short-term contract extensions would total the four-year term effectively contained in the original 2000 and, in fact, the short-term extensions did cover a full two years of the four-year term executed in October, 2000 in the HAP contract document, from October 1, 2000 to September 30, 2002. Plaintiff's counsel explained that:

> Englewood proceeded in good faith through the summer of 2001 to find a new owner and obtain a rehabilitation loan for South Pointe. Until HUD refused to renew the contract for an additional year, Englewood hoped that HUD would reconsider and extend the Contract in accordance with the terms signed by the parties in October 2000. That hope ended on October 1, 2001.

Englewood identifies the date of October 1, 2001, immediately above, as the beginning of the end, based on the October 1, 2001 e-mail Mr. Hinsberger sent to Mr. Hayes, indicating that portable housing vouchers would be issued to South Pointe residents, and that, "[a]s a result, the Sec. 8 contract will be terminated once all of the

residents receive their vouchers." Beginning on October 1, 2001, the HAP contract was extended for 90 days, then another 180 days, then a final 90 days, while housing vouchers were issued to South Pointe tenants. Had HUD continued the short-term contracts through September 30, 2004, the length of contract contained in the original 2000 HAP contract, then, arguably, Englewood would have been made whole, at least as to this part of its claim. However, HUD's last short-term extension ended September 30, 2002, once the portable housing vouchers had been provided to the tenants at South Pointe, despite HUD's encouragement to obtain new ownership and management of South Pointe, which ultimately was accomplished when Mr. Samuelson took over management and then ownership.

Shortly after "hope ended on October 1, 2001," in plaintiff's counsel's words, on October 29, 2001, Englewood sought declaratory and injunctive relief in United States District Court for HUD's refusal to renew the HAP contract, and for the issuance of the tenant-based vouchers, usable by South Pointe tenants at other facilities. See Englewood Terrace Limited Partnership v. United States, No. 01C-8285 (N.D. Ill. filed Oct. 29, 2001). As noted above, on November 15, 2001, the District Court denied Englewood's motion for preliminary injunctive relief, based on the court's finding that HUD had not yet formally terminated the HAP contract. See Englewood Terrace Limited Partnership v. United States, No. 01C-8285, slip op. at 4, 6. Subsequently, Englewood's judicial complaint was filed in this court.

There remains the issue of how to read the length of contract provided for in the original 2000 HAP contract, signed by the parties, against the inconsistent, short-term extensions of the contract term, also signed by the parties. The Williston treatise, relied on by defendant and quoted above, notes that a subsequent agreement between the parties could supercede a term in an earlier agreement by the same parties, if that was the mutual intent of the parties, with the caveat that, "[t]he subsequent agreement must also have sufficient consideration . . . ." 29 Williston on Contracts § 73.17 at 55-56. The treatise continued, "an existing contract cannot be altered by mutual assent by an agreement merely to give one party a right or privilege, or subject the other party to a burden that it did not previously have." 29 Williston on Contracts § 73.17 at 56 (emphasis added).

The record reflects that, for the year from October 1, 2000 through September 30, 2001, HUD used short-term contracts (90-day and 270-day extensions) to incentivize Englewood's performance under the HAP contract. Mr. Hinsberger testified that short-term contracts were "an incentive for the owner to move forward." Ms. Thomas testified that the idea was "to push" Englewood to make repairs and improve the physical condition of South Pointe.

The record further reflects that, for the year from October 1, 2001 through September 30, 2002, the end of the HAP contract with Englewood, HUD used short-term contracts (90-day, 180-day, and 90-day extensions) to provide subsidized housing at South Pointe, while portable vouchers were being distributed to South Pointe tenants. As noted above, Mr. Hinsberger sent Mr. Hayes an October 1, 2001 e-mail, indicating that portable

housing vouchers would be issued to South Pointe residents, and that, "[a]s a result, the Sec. 8 contract will be terminated once all of the residents receive their vouchers."[9] The tenants were given their portable vouchers, and the HAP contract with Englewood ended September 30, 2002.

Under these facts and circumstances, there was no "mutual assent," in the words of Williston, to substitute the short-term contracts for what was reasonably anticipated to be a four-year contract. Based on the record, such substitution was a unilateral act, on the part of HUD, imposed on Englewood. It is not logical, or based on the record, to conclude that Englewood, while seeking refinancing, and encouraged by HUD to transfer management and ownership of Englewood to a new entity so that the property could be improved and maintained in better condition for the tenants, was a willing participant in converting its anticipated four-year contract into uncertain, short-term contracts of varying length. Nor was there "sufficient consideration," in the words of Williston, for Englewood to give up its anticipated four-year HAP contract term. In the original 2000 HAP contract, HUD provided housing subsidies to tenants, and Englewood provided housing to tenants. In the short-term contracts, HUD provided housing subsidies to tenants, and Englewood provided housing to tenants. The only substantive change in the equation was the unilateral rescission of the contract length of one base year, plus three automatic, one-year terms, and the unilateral substitution of uncertain, varying, short-term contract lengths. A mutual mistake in this case has not been demonstrated in the record. As to whether HUD was justified in terminating the HAP contract for default is another matter, discussed below. Here, the issue is whether, absent grounds for default discussed below, HUD may avoid the terms of original 2000 HAP contract it executed on October 18, 2000. The court finds that it may not.

In retrospect, HUD treated the HAP contract document executed by plaintiff on October 16 and by HUD on October 18, 2000 far too casually. The record contains government assertions that the alleged error was identified by HUD the same day that a HUD representative signed the original 2000 HAP contract document, on October 18, 2000, but HUD did not take action until December 6, 2000, some seven weeks later, when it sent a contract document with the revised contract length to Englewood. That revised contract document was to terminate later that same month it was received, on December 31, 2000. The minutes of the October 18, 2000 meeting between HUD and Englewood inexplicably contain no hint that HUD considered the term in the HAP contract signed the same day to be an error that required correction. Nor is there written evidence that the contract document itself was revised on October 18, 2000, or in any sort of timely fashion thereafter. The one-year initial term, plus three automatic, one-year terms, which defendant labels an error, in addition to being in the contract document itself, and signed by HUD and

[9] The 2000 HAP contract also contained an "Addendum to Section 8 HAP Contract Renewal," which stated that HUD may, at its option, renew the HAP contract for the purpose of relocating tenants with Section 8 vouchers. "Upon relocation of such residents the Contract shall be terminated."

Englewood representatives, was equivalent to the four-year contract term sought by Englewood for purposes of contract stability, as Englewood sought to refinance. The record contains written documentation of Englewood's request for a four-year contract term. Also, HUD budgeted for the full base year of the 2000 HAP contract. Defendant has argued that the error was a mutual mistake, warranting reformation, but no documents, and no Englewood representatives, have been found to corroborate defendant's contention that Englewood knew that the 2000 HAP contract term was to be three months and not the longer period Englewood had requested. For that matter, the record does not even indicate how the "error" was made. If the error was discovered on October 18, 2000, as the government alleges, the court would expect more timely corrective action, rather than the casual approach taken by HUD. In any event, the record does not demonstrate that the contract term reflected a mutual mistake. Counsel for the defendant ably represented his client. The knowledgeable, government witnesses on this topic, however, did not appear credible to the trial judge during the testimony on this issue, nor did the documents provided support the defendant's position. Under these facts and circumstances, defendant should be held to the terms of the original HAP contract it made in October, 2000.

**Default Termination of Englewood's HAP Contract on September 30, 2002.**

Defendant argues that, regardless of the normal expiration date of the HAP contract, "HUD cannot be held liable for breach of contract for ending its contractual relationship with Englewood because Englewood violated the terms of the HAP contract by failing to maintain South Pointe in decent, safe and sanitary condition." Defendant argues that HUD was exercising its rights under the HAP contract when it defaulted Englewood for failing to maintain South Pointe in such decent, safe, and sanitary condition.

The HAP contract between the parties states, at paragraph 6(a): "Maintenance and Operation. The Owner agrees to maintain and operate the Contract Units, unassisted units, if any, and related facilities to provide decent, safe, and sanitary housing including the provision of all the services, maintenance and utilities." See also 24 C.F.R. § 5.703 ("HUD housing must be decent, safe, sanitary and in good repair.").

Defendant's counsel summarizes the case for default, as follows:

> In sum, at the time the HAP contract was terminated (and at the time of all prior notices and inspections), South Pointe was overrun with gangs and drug dealers, and had numerous other safety and security failures, including: holes in the walls, broken and unreliable elevators, broken windows, broken lights, missing fire hoses, expired fire extinguishers, broken doors, broken locks, and smoke detectors that didn't work. Clearly the common areas and units at South Pointe were not "decent," or "safe," or "sanitary" either. The uncontroverted evidence showed that units had damaged or missing stoves,

> leaky faucets, trash overflowing the broken garbage chutes, sticky floors and hallways that smelled of urine, mold, grimy paint, damaged plumbing, leaky faucets, and rats, mice and cockroaches galore.

Defendant argues that the deficiencies listed in the various inspections and management and occupancy reviews reflect that "South Pointe was in a constant state of disrepair, managed by owners who were doing nothing more than reacting to outside forces, such as HUD, Chicago Department of Buildings, the Illinois State's Attorney, and the Illinois Housing Authority . . . ."

The record reflects that Englewood itself was under no illusions about conditions at South Pointe. Englewood itself conducted a 100% physical inspection of South Pointe on November 3, 2000. Deficiencies identified included the following: closet doors required replacement, many of the peepholes had been ripped from the doors, requiring replacement; each of the units had an average of six mouse holes; and over 95% of the units needed to be painted. Englewood's conclusion from its inspection was that:

> The building in [sic] not in as bad of shape as we may have thought, but there is cause for concern. The common areas of the building such as stairwells and corridors are way too dark. They need to be painted a brighter color. The [garbage] Chute room doors are in very bad shape and need to be replaced as well as the chute doors themselves. It's unsanitary and it poses a danger to young children (sharp edges) that may have to make use of it.
>
> The elevators are constantly out of order and it's always the same problem (address matter to elevator contractor). Many of the water leak [sic] in the building are due to tuckpointing or lack thereof. I was told by several tenants that the building had undergone a complete rehab about 6 years ago. We need to find out who the contractor(s) was/were in order to avoid the mistake of hiring them again.

Don S. Samuelson, who assumed the role of general partner of Englewood on December 13, 2002, had toured South Pointe earlier, in June and July, 2001. Mr. Samuelson put his candid views into an August 6, 2001, comprehensive report to HUD's Mr. Hinsberger, stating:

> There are four major problem areas at South Pointe. **First**, there are a variety of physical problems: the layout of the first floor, the security and life safety systems, the design and function of the mechanical systems in the penthouse, exterior spalling and tuckpointing, improvements to be made to the

> individual units, and a general upgrading of the decorating and curb appeal of both the exterior, grounds and common areas. **Second**, there are a number of tenant related costs that need to be brought under control: vacancy, collections, evictions and associated legal costs. **Third**, both the staff and resident populations need to be better managed. The staff is relatively non-productive. Security is not effective. The residents need the discipline of certification, meeting antisocial behavior and housekeeping standards and general compliance with house rules and lease requirements. **Fourth**, the ten year amortization of the CIC first mortgage loan and its current principal payments of greater than $500K a year puts an unreasonable burden on current operations. The property has not had a rental increase since 1998. And it has been running for the past two years at a $134K to $241K annual deficit. Cash deficits, past due bills and deferred maintenance result from the current financing structure. (emphasis in original).

At trial, Mr. Samuelson also acknowledged deficiencies at South Pointe, as well as acknowledging his earlier-stated view, that: "This was a property that was not for the faint-hearted." Nonetheless, at HUD's urging Mr. Samuelson was willing later to manage South Pointe and then to assume ownership of the property with a clear purpose to improve the property to the benefit of the tenants, including creative programs to improve their lives and their living conditions.

In a September 26, 2002 letter to HUD from the new President of South Pointe's property manager, P.M. One, Michael G. McGhie similarly acknowledged that "problems did exist in the operation of P.M. Group properties in Chicago," and that P.M. One would "take all steps necessary to insure that the problems that existed in the past do not recur in the future and that we will operate and maintain each of the properties managed by P.M. One in a decent, safe and sanitary condition according to HUD policies and requirements." In his letter, Mr. McGhie also offered to be placed on probation by HUD while South Pointe's problems were addressed.

The HAP contract indicated, at paragraph 20(b)(1), what constituted a default by the property owner. Under the HAP contract, a default could be based on the following broad standards:

> (i) The Owner [Englewood] has violated or failed to comply with any provision of, or obligation under, this Contract or of any Lease, including failure to correct any deficiencies identified by HUD in connection with any inspection; or
> (ii) The Owner has asserted or demonstrated an intention not to perform some or all of its obligations under this Contract or under any Lease . . . .

Under the HAP contract, once HUD had decided to default Englewood, HUD was required, under paragraph 20(b)(2), to notify Englewood of

> (i) The nature of the default,
> (ii) The actions required to be taken and the remedies to be applied on account of the default (including actions by the Owner to cure the default), and
> (iii) The time within which the Owner shall respond with a showing that all the required actions have been taken.If the Owner fails to respond or take action to the satisfaction of HUD, HUD shall have the right to take corrective action to achieved compliance . . . or to terminate this Contract with HUD approval, in whole or in part or to take other corrective action to achieve compliance in its discretion, or as directed by HUD.

In addition, the 2000 HAP contract contained an "Addendum to Section 8 HAP Contract Renewal," which stated that, if HUD's Real Estate Assessment Center (REAC) issued a physical inspection report indicating that South Pointe was in substandard condition, "HUD may terminate the Contract after the renewal providing the Owner a reasonable period, as determined by HUD, to correct deficiencies or if the Owner fails to perform under an approved Correction Action Plan to Repair."

On April 9, 2001, HUD issued a Notice of Default regarding Englewood's HAP contract, which stated, in relevant part:

> The Project [South Pointe] was inspected on March 2, 2001 by HUD's Real Estate Assessment Center (REAC) and, out of a possible 100 points, scored a 31c*.[10] Some of the outstanding deficiencies noted in the inspection include: holes and cracks in hallway and unit walls; broken windows; inoperable stoves and faucets; cockroaches in the units; and ponding on the roof.
>
> On March 9, 2001, the Chicago Multifamily Hub sent the Owner a letter addressing the Exigent Health and Safety (EHS) items cited in the REAC inspection. The letter advised the Owner that few of the EHS items had been mitigated at the time. The letter also addressed that the Project was not in good repair, placing the Owner in violation of the Housing Assistance Payment (HAP) contract.

---

10 The "c" denotes that one or more exigent health and safety deficiencies were observed. The "*" denotes health and safety deficiencies with respect to smoke detectors.

> The Chicago Multifamily Hub received the Owner's letter dated March 16, 2001, in which the Owner claimed that the EHS items were corrected. The letter further stated that General Partner relies "solely on information received from the property management company," and that "we will begin the process of responding to [the REAC inspection report from March 2, 2001] within the thirty day period." [bracketed material in original].
>
> On April 3, 2001, the Chicago Multifamily Hub rejected the Owner's application for a firm commitment of funding pursuant to Section 221(d)(4). In rejecting the application, HUD noted that the "repairs outlined in your application are inadequate when compared to the needs of the property." The letter notes that HUD has allowed 23 months from the date of the April 28, 1999 REAC inspection for this Owner to bring this property into compliance.
>
> Pursuant to Paragraph 6(a) of the HAP Contract, you have agreed to maintain the Project's units and related facilities in decent, safe and sanitary condition. All of the Project, its units, systems, common areas and building(s) must satisfy HUD's Physical Condition Standards, 24 CFR Part 5, Subpart G. The REAC inspection confirms that the Project suffers from ongoing serious neglect, disrepair, and unsafe and unsanitary conditions throughout the units, common areas, and the building. The failure to keep and maintain the Project in a decent, safe, and sanitary condition is a default of the HAP Contract.
>
> Pursuant to Paragraph 20 of the HAP Contract, the Owner is hereby notified that if the foregoing events of default are not corrected to the satisfaction of HUD within 30 days from the date of this Notice, HUD may seek any and all available remedies, including, without limitation, suspending or abating the HAP Contract.

On May 16, 2001, HUD issued a Notice of Continuing Default of Englewood's HAP contract at South Pointe, stating that the default of the HAP contract was uncured and continuing, and reiterating the low point score on the March 2, 2001 REAC inspection and HUD's belief that not all EHS deficiencies were corrected within 72 hours, as required, despite Englewood's March 6, 2001 certification that all EHS items had been corrected. The Notice of Continuing Default also noted that, on April 3, 2001, Englewood's application for a refinancing commitment from HUD was rejected, citing as a reason that the repairs contemplated in Englewood's application were deemed insufficient compared to the extensive repair needs of South Pointe. Another reason cited for the rejection of the

refinancing commitment was that Englewood had received a score of 42 on the April 28, 1999 REAC inspection and, nearly 23 months later, Englewood's score had declined to 31 on the March 2, 2001 REAC inspection. HUD's Notice of Continuing Default also expressed interest in a change in Englewood's ownership and management, and indicated that HUD was proceeding with the process to secure vouchers for the relocation of South Pointe tenants.

On November 30, 2001, HUD issued a Notice of Abatement and Termination of the HAP contract at South Pointe. The notice stated, in part:

> To date, Owner has not cured the conditions complained of in the notice of default issued on April 9, 2001 and as more fully described in HUD's May 16, 2001 writing. Owner has failed to maintain the property according to the physical conditions standards acceptable to HUD despite Owner's receipt of the notice of default and a reasonable opportunity (almost 240 days since the notice of default) to cure. Accordingly, pursuant to paragraph 20(b)(3) of the HAP Contract, this is Owner's notice that HUD intends to abate the HAP Contract.
>
> Further, pursuant to Section 516(a) and (b) of the Multifamily Assisted Housing Reform and Affordability Act of 1997 ("MAHRA") HUD will terminate the HAP Contract upon HUD's determination that the relocation process of eligible residents at the Project is concluded.
>
> Pursuant to MAHRA, this is Owner's notice to provide, within 30 days from receipt of this notice, written objection to this notice of termination of HAP or to cure the underlying basis for the default. If the Owner does not submit a written objection or cure the underlying basis for the default to the satisfaction of HUD during this 30-day period, HUD's decision to terminate the HAP Contract will become a final determination under Section 516(c) of MAHRA and is not subject to judicial review.
>
> As Owner has been previously notified, HUD will abate the HAP subsidy for the Project's units as eligible residents receive their vouchers and timely opt to use those vouchers at the Project, if possible, or elsewhere. HUD also intends to abate the subsidy for ineligible residents, if any, and other residents that do not timely act with respect to their vouchers, at the time that HUD terminates the HAP Contract. As units are abated from the HAP Contract, the owner may not again lease those units to project-based Section 8 residents.

> The HAP Contract will be terminated when HUD has, in concert with CHAC [Chicago Housing Authority], completed its voucher and relocation process for all eligible residents at the Project. The foregoing description of HUD's intended method of abatement provides the course that HUD has determined best serves the interests of the residents as of the date of this notice. HUD does not intend that this notice limit the actions that HUD may otherwise properly take in protection of the residents. For example, if Ownership fails to continue to provide basic necessary services for the residents, HUD may elect to redirect HAP Contract payments for particular uses in protection of the residents.
>
> Please also be advised that the voucher and relocation process may extend beyond the expiration date of the current HAP Contract Renewal. To safeguard the residents, and not affecting HUD's determinations as set forth above, HUD will provide Owner with a HAP Contract Renewal with Addendum. Please execute the extension and return it to HUD promptly.

Mr. Hinsberger testified that the March 2, 2001 REAC inspection was the basis for the April 9, 2001 Notice of Default. The Notice of Default itself indicated that the default was based on deficiencies identified in the March 2, 2001 REAC inspection, and resulting March 8, 2001 REAC inspection report. The March 8, 2001 REAC report directed Englewood to use the findings of the REAC inspection as the basis for a survey of South Pointe, to determine if additional deficiencies exist, and to submit a Plan of Correction, in Management Improvement Operating Plan (MIOP) format, within 30 days of the REAC report.

Plaintiff's counsel first argues that the Notice of Default merely refers to the findings of the REAC report, providing no further detail regarding the nature of the default or the corrective actions to be taken by Englewood. Plaintiff's counsel offers the conclusion that the Notice of Default, therefore, was procedurally defective. The court is not persuaded by plaintiff's argument. The Notice of Default, by incorporating the REAC report by reference, provided sufficient detail, and notice, to Englewood of the nature of deficiencies requiring correction. For example, the first entry for the first unit listed in the REAC report, unit number 1007, stated "Missing Door," and the first entry for the next unit listed, unit number 1013, stated "Plumbing - Leaking Faucet/Pipes." These and similar entries on the REAC report placed Englewood on notice of the basis for the default, and were sufficiently clear to explain the nature of the problems. Even if plaintiff's counsel was confused as to the nature of the default and the corrective action to be taken, plaintiff Englewood was not similarly confused, having submitted, on April 8, 2001, a responsive Plan of Correction, in Management Improvement Operating Plan format, in response to the Notice of Default.

Englewood also argues that the standard against which it is being measured by

HUD, that of "decent, safe and sanitary condition," is so subjective, vague and ambiguous as to be virtually meaningless. The court disagrees. Common sense, and the standards promulgated by HUD in its regulations, titled "Physical Condition Standards and Inspection Requirements," 24 C.F.R. §§ 5.701 - 5.705, provide the necessary concreteness as to what was expected of Englewood at South Pointe in this regard. See 24 C.F.R. § 5.703 ("HUD housing must be decent, safe, sanitary and in good repair," providing standards for the building site (e.g., no excess accumulations of trash); building exterior (e.g., doors and fire escapes operable and in good repair); building systems (e.g., elevators and sanitary system operable and in good repair); tenant units (e.g., smoke detectors operable and in good repair); common areas (e.g., lighting operable and in good repair); and health and safety concerns (e.g., free of infestation by rats, mice or other vermin)).

Englewood believes that they were defaulted based on the March 2, 2001 REAC inspection, without a fair and meaningful opportunity to respond to the REAC inspection's discrepancies. In this regard, the court agrees. Although the HAP contract afforded Englewood the opportunity to cure deficiencies at South Pointe, HUD's decision to default Englewood was made before HUD even received Englewood's Plan of Correction for the March, 2001 REAC inspection. Gwendolyn Thomas testified that, sometime before January, 2001, Mr. Hinsberger made the decision to extend the HAP contract at South Pointe only until portable vouchers could be obtained for South Pointe tenants. Ms. Thomas made an entry on HUD internal computer records on January 10, 2001, indicating that the HAP contract at South Pointe would be "extended until [vouchers] can be obtained." The record also contains a March 15, 2001, draft of a Notice of Section 8 Suspension and Abatement, never sent out, but with language suspending and abating housing subsidy payments to all units at South Pointe. The Notice of Default ultimately issued by HUD was dated April 9, 2001, but the parties have stipulated that it was completed and ready for distribution on April 6, 2001, before HUD had even received Englewood's April 8, 2001 response to the March 8, 2001 REAC report. The court concludes that Englewood was not afforded a meaningful opportunity to cure the deficiencies in the March 8, 2001 REAC inspection report, as required by the HAP contract. At trial, the court observed numerous witnesses, including Ms. Thomas, Ms. Coleman, and Ms. Simmons, who, although appearing sincere in their efforts to improve housing conditions for tenants in properties within their jurisdiction, gave testimony demonstrating reluctance to acknowledge improvements, even when a new manager (and later owner), Mr. Samuelson, subsequently took over the leadership of the project. Mr. Hinsberger, although removed from the day-to-day operations and inspections, similarly also appeared reluctant to acknowledge improvements, or utilize HUD's resources in a positive manner, despite urging that South Pointe be placed under new management and ownership, suggestions taken seriously and implemented by Englewood.

Both the Notice of Default and Continuing Notice of Default cited HUD's belief that Englewood had not corrected all of the Exigent Health and Safety (EHS) items identified during the March 2, 2001 REAC inspection within 72 hours, as required. Although the hand written March 2, 2001 EHS list is difficult to read, there are about 13 items on the list,

including items such as missing outlet covers, a missing exhaust fan cover, missing fuses, a broken window, a missing light fixture, missing smoke detector batteries, and a missing fire extinguisher tag. Plaintiff notes that all of the items were easily correctable, and were timely corrected when identified. South Pointe Property Manager Carl Sanders testified that the EHS items were corrected either on the spot, the same day they were identified, or the next day. In a letter dated March 6, 2001, Mr. Hayes certified on behalf of Englewood that all of the EHS items were corrected. However, in a March 9, 2001 letter to Mr. Hayes, Veronica Coleman stated that "only a few of the EHS items had been mitigated and not all as you certified." HUD's letter, however, did not identify the uncorrected exigent health and safety items. Furthermore, Gwendolyn Thomas, who was on the exigent health and safety re-inspection, testified that she could not identify the uncorrected exigent health and safety items, and was unable to produce a list or photographs of the allegedly uncorrected items. Similarly, Lillye Simmons, who also was on the re-inspection with Ms. Thomas, did not identify the uncorrected exigent health and safety items, and produced no notes or photographs identifying the allegedly uncorrected items.

Carl Sanders testified that he was out of town during Ms. Thomas' and Ms. Simmons' exigent health and safety review, and that an Englewood maintenance supervisor accompanied the HUD representatives. Upon returning to South Pointe, Mr. Sanders spoke with the maintenance supervisor, reviewed all of the exigent health and safety discrepancies, item by item, and re-affirmed the accuracy of Englewood's original certification that corrective action had been taken for all identified items. Mr. Sanders' review is detailed in a March 12, 2001 memorandum in the record. He testified that it appeared Ms. Thomas had reviewed a maintenance room at South Pointe, during her exigent health and safety revisit, which had not been toured during the March 2, 2001 REAC inspection, where she observed a fixture with wires hanging from it, which had not been written up on the original exigent health and safety list. Mr. Sanders identified the maintenance room visited by Ms. Thomas as being used for storage, and as containing fixtures which were to be reused at South Pointe, as needed, rather than currently operating fixtures. In a March 16, 2001 letter to Ms. Coleman, Mr. Hayes included Mr. Sander's March 12, 2001 memorandum, and stated that his (Mr. Hayes') original certification that exigent health and safety items had been corrected was accurate, and also suggested that Ms. Thomas' review might have been favorable had Property Manager Sanders been available to accompany her. Mr. Hayes' response to HUD enclosed photographs to demonstrate each of the corrected exigent health and safety items. Both Mr. Hayes and Mr. Sanders testified that they never heard from HUD further on the matter of exigent health and safety corrections from the March 2, 2001 REAC inspection. Evaluating the credibility of the statements made by Mr. Sanders, Mr. Hayes and the supporting Englewood documents in the record favorably on these particular issues, the court finds that Englewood attempted to address the exigent health and safety items from the March 2, 2001 REAC inspection and corrected them in timely fashion, thus not providing a basis for the subsequent default of Englewood.

As for the other deficiencies identified in the March 8, 2001 REAC inspection report,

Englewood argues that its response to the REAC inspection did not justify the default. The court agrees. HUD inspected a sample of 25 units on the March 2, 2001 REAC, in addition to common areas at South Pointe. Englewood's Management Improvement Operating Plan (MIOP), dated April 5, 2001, was provided to Joan Kiening, HUD Enforcement Analyst in Chicago, and also in an attachment to an April 8, 2001 letter to Veronica Coleman, Director of Project Management, Chicago Multifamily Hub. Englewood's MIOP reflected that the majority of the March, 2001 REAC deficiencies had been corrected by the April 5, 2001 date of the Englewood report, and the remainder of the deficiencies listed the estimated completion dates for their correction. Plaintiff's counsel summarized the March, 2001 REAC inspection report, as follows:

> [T]he March 8, 2001 REAC Report does not establish that South Pointe was not in decent, safe and sanitary condition. Its Health and Safety "findings" related to one broken window, one TV cable across a doorway, and three instances of roaches in kitchen cabinets. The broken window and cable realignment were easily repaired. The roaches required regular exterminating services and better tenant housekeeping. The REAC Inspection found no deficiencies with respect to the structural and mechanical systems. On those categories, South Pointe received a perfect score.
>
> The Report made no findings of overflowing garbage containers, garbage in the halls, rats, mice, or urine in the stairwells. All entry doors had working locks. The REAC Report did not mention the absence of hot and cold running water in any of the units. The vast majority of the appliances inspected were operational. Other than one clogged toilet, the toilets worked. Sinks drained. The floors, ceilings and walls were structurally sound. There were no findings of lead based paint. The Report found no problems with the operation of the elevators. The Report does not list any problem with heating and cooling of the units or the building in general. The only repair problems that occurred in more than 25 percent of the units related to stove burners and ovens, faucets and drains, closet doors, and the need for replacement hardware on doors. Like the EH&S [exigent health and safety] items noted by the inspectors, the items listed on the REAC Report were generally minor items that could be corrected through routine maintenance work orders.

Mr. Hayes testified that most of the March, 2001 REAC deficiencies could be corrected by the maintenance staff at South Pointe and, in fact, most of the items were corrected by April 5, 2001, within 30 days of the March 8, 2001 REAC report, as reflected in the Plan of Correction Englewood submitted in MIOP format on April 5, 2001. The

remaining items not corrected listed their estimated completion dates.

HUD, however, points out that Englewood was required to do more than correct the deficiencies identified in HUD's 25-unit sample. The March 8, 2001 REAC inspection report directed Englewood also to conduct a survey of South Pointe, using the REAC inspection's 25-unit sample as the basis for the survey, to determine if additional deficiencies existed at South Pointe. Mr. Hinsberger testified that Englewood never conducted a 100% survey of South Pointe, citing this omission as a major defect in Englewood's response to the March, 2001 REAC inspection.

Englewood argues, to the contrary, that a 100% survey of South Pointe was conducted, by architect Teddy D. Dunaj. At trial, Mr. Dunaj testified that his assignment from Englewood was "[t]o prepare contract documents for whatever repair work and maintenance would have to be done for the building as it stood." He stated that it took him four weeks to survey every single unit at South Pointe, and that he identified the items that needed repair or replacement in each of the units. His survey began in October or November of 2000, and was completed in December, 2000. That was not the end of the process, however. Mr. Dunaj then prepared contract documents for bids on the repair work identified. He prepared detailed plans not only for the individual units, but for the entire building. The record contains the detailed, "Specifications for Exterior and Interior Repairs" at South Pointe, dated March 4, 2001, supplementing the plans and drawings. Mr. Dunaj worked with BABCO Construction, Inc. to produce a scope of work to repair South Pointe, dated March 19, 2001, which was attached to the April 8, 2001 Englewood letter to Ms. Coleman, titled "REAC Inspection [Report] on 3/8/01 for Southpointe Tower." As indicated above, the process involving Mr. Dunaj's and BABCO Construction's survey, plans, drawings and specifications began in October/November, 2000, before the March 2, 2001 REAC inspection, and concluded after the REAC inspection with the scope of work, dated March 19, 2001. Englewood argues that the resulting scope of work "was completely responsive to all of the deficiencies noted in the REAC Report as well as the additional work recommended by Mr. Dunaj to make the building fully operational." Reviewing the detailed drawings, specifications, and scope of work contained in the record, the court agrees. In fact, it would have been difficult if not impossible to have provided such comprehensive and detailed repair plans and specifications within 30 days of HUD's March 8, 2001 REAC inspection report, had Mr. Dunaj and BABCO Construction not begun the process of identifying the relatively obvious deficiencies at South Pointe before the confirming REAC inspection report was received.

The court finds that HUD did not afford Englewood a fair and meaningful opportunity to respond to the March, 2001 REAC-identified deficiencies. The March 8, 2001 REAC inspection report stated that: "Upon receipt of the Plan [Englewood's Plan of Correction], the Project manager will review it to ensure that it has sufficient detail regarding plans and resources for correction, and that the time frames are appropriate. The Project Manager will contact you to discuss any required amendments and the process that will be used to verify completion of the Plan." Rather than contacting Englewood to discuss its Plan of Correction, any changes to the plan needed, and the process to be used to verify

completion of the repairs, Ms. Coleman informed Mr. Hayes by letter dated May 15, 2001 that, given the poor condition of South Pointe, Englewood's response to the March, 2001 REAC inspection would not be accepted and was being returned. The next day, May 16, 2001, HUD issued a Continuing Notice of Default to Englewood. Given Englewood's detailed, comprehensive, April 8, 2001 submission, HUD's refusal to even consider the submission undermines HUD's default action.

HUD argues, however, that Englewood's response to the March, 2001 REAC never identified a source of funding with which to correct problems, listing this as a major defect in the Plan of Correction. In this regard, Ms. Coleman testified, as follows

> I think it's important that we never received a Management Improvement and Operating Plan from the owner, so the document that they proposed to be a Management Improvement and Operating Plan was not a plan that HUD could have or would have accepted. A Management Improvement and Operating Plan is a comprehensive plan. It provides a full scope, full details of all repairs that's needed at a property, a 100 percent unit inspection survey, sources and uses of funding. . . . Sources and uses of funding, that's critical.

Mr. Hayes addressed source of funds in his testimony, indicating that most of the repairs would be in house:

> Q [plaintiff's attorney] Now, taking those more frequently cited items in this [March 8, 2001 REAC] report, can you describe what sort of repairs would be required in order to fix those?
>
> A [Mr. Hayes] Most of these could be fixed by the maintenance staff.
>
> Q And how would that be accomplished?
>
> A We'd give them a work order on the specific unit numbers that are identified in this REAC inspection. And we'd have them go to work on these.
>
> Q And how does that work get paid for?
>
> A Well, it's paid out of the property because they're on the payroll.

The fact that most of the repairs were made by April 5, 2001, within 30 days of the March 8, 2001, REAC inspection report, supports Mr. Hayes' testimony that the primary funding source would be the payroll for the South Pointe maintenance staff, which made those repairs.

Ms. Coleman's May 15, 2001 letter to Mr. Hayes, rejecting Englewood's response to the March, 2001 REAC inspection, however, turned on refinancing issues. According to Ms. Coleman's letter, Englewood's response was not accepted, but returned due to impending negotiations with HUD, "concerning your proposed refinance and substantial rehabilitation of the property." Her letter continues, "[a]lthough the letter from REAC directs you to prepare a Management Improvement and Operating (MIO) Plan subject to our approval, the condition of this property is beyond that point as acknowledged by your application to refinance that we rejected due to major deficiencies."

In its search for more favorable refinancing, Englewood had submitted a loan application to HUD on March 19, 2001. Mr. Hinsberger rejected the application on April 3, 2001, as proposing a scope of work and repair estimate to address South Pointe's physical condition needs which was substantially lower than HUD's own estimate of over $6 million. Mr. Hinsberger also indicated in his rejection letter that any HUD refinancing commitment was conditioned upon a change of management at South Pointe. In addition to the rejection of Englewood's application for a HUD funding commitment on April 3, 2001, six days later, on April 9, 2001, HUD issued a Notice of Default which, in plaintiff's counsel's words, "effectively thwarted Englewood's efforts to obtain refinancing from other sources . . . ." Later in the year, on September 4, 2001, Englewood resubmitted a revised loan application to HUD, with the expanded scope of work desired by HUD and also with the notice of management change from P.M. One to DSSA, Inc., also desired by HUD. But the search for favorable refinancing does not change the fact that most of the REAC identified repairs could be and were corrected by the in-house South Pointe maintenance staff, as had been the repairs made by Englewood in response to the earlier, April 28, 1999 REAC inspection. The refinancing had more to do with Englewood extricating itself from an unfavorable, short term, high interest mortgage, which was consuming more revenue than it should or needed to, discussed earlier, and also with putting South Pointe into "like new" condition. As Mr. Hayes testified, concerning Ms. Coleman's May 15, 2001 letter to him, returning Englewood's response to the March, 2001 REAC inspection, and citing the rejection of Englewood's loan application:

> Well, the summation of [Ms. Coleman's] letter is that they were in receipt of [Englewood's] response to the REAC inspection . . . , the MIO [Management Improvement and Operating] plan, and that she wasn't going to accept it. And her comment was it's not being accepted due to impending negotiations with HUD concerning your proposed refinance and substantial rehabilitation of the property. And she's getting things mixed up here. I mean, they're two separate things. The REAC inspection was one thing that had a process pursuant to HUD requirements that we were working on. The loan application was a totally different process. It was a different reason that we were doing it. A REAC inspection gets the property back up to decent, safe and sanitary. The loan application was to refinance to get lower debt service payment, longer

amortization, more cash to the property to help it financially, and to do some big improvements. But they weren't absolutely needed for decent, safe and sanitary housing. And she mixes up the two of them in here as if because the loan application is rejected, she's rejecting the REAC inspection MIO plan. The two are, they're mutually exclusive. And she uses the loan application rejection as the reason she's rejecting the REAC. I honestly don't get it.

Mr. Hinsberger, in discussing this last point, appeared to agree with Mr. Hayes that Englewood's loan application was with a view toward a "like new" building, as opposed to a building in decent, safe and sanitary condition:

A [Mr. Hinsberger] . . . What, the, the [sic] route that we were going down, the route that the owner had indicated they wanted to proceed down was the, the [sic] new mortgage, was the 221(d)(4) mortgage.

Q [plaintiff's counsel] Well, that was to get a building which you say was supposed to be like new.

A Well, that was at their [Englewood's] option. They, they, they [sic] elected to go that route. I didn't force them to do that.

Q But what you say you wanted was a building like new.

A If they used a, [sic] our insurance program, the 221(d)(4) program, the, yes, they would have to repair it to a level that, that [sic] meets that program.

Q And a building like new is not required in order to meet the standard of decent, safe and sanitary –

A Correct.

Q – housing, correct?

A Correct, yes, correct.

Returning to Englewood's response to the REAC inspection, plaintiff's counsel's examination of Mr. Hinsberger, continued:

Q [plaintiff's counsel] Can you tell from looking at Joint Exhibit 84 [Englewood's April 5, 2001 response to the March 8, 2001 REAC inspection report], is this a way of tracking back into the items identified in the Real Estate Assessment Center Inspection Center

Inspection that the Real Estate Assessment Center believed needed correction?

A [Mr. Hinsberger] Yes.

Q And it tracks item for item, correct?

A It does, and unit by unit that they inspected.

Q So for example, on page 1078 [of Joint Exhibit 84] where the text begins with each unit, that [South Pointe tenant] unit 1007 is at the top of the page and that corresponds to the deficiencies noted in the inspection.

A Correct.

Q Correct?

A Yes, correct.

Q And as you can see, looking at that page as an example, every item on the entire page with the exception of one had already been completed as of April 5th, 2001, right?

A Yes.

Q And many with tenant signatures, right?

A Yes.

Q And the only item that hadn't been completed was a damaged wall which was going to be finished, well, it says to be completed April 25th, 2001, right?

A I might have to look, but –

Q Well, we're in the middle of page 1078 [Joint Exhibit 84].

A Oh, on this page? Yes.

Q Yes.

A You're right.

Q And the types of items that are listed there, none of them, I mean,

taking, just take this page 1078 [Joint Exhibit 84] as an example, none of them are substantial items that are there.

A The stuff that's listed, no.

Q None of them require large outlays of funds, right?

A Well, stoves missing, refrigerators missing, that would be money. I don't know the extent of damaged cabinets, that would, could –

Q Well, where does it say that a stove or a refrigerator was missing?

A In the kitchen in unit . . . 1112 [stove].

Q The total cost of a stove is not that substantial, is it?

A I don't know. It depends, I can't, who's defining substantial?

Englewood's response to the March 8, 2001 REAC inspection report indicated correction completed, with a confirmatory tenant signature beside the unit 1112 missing stove.[11] Unit 1201 also had similar entries for a stove (missing/damaged/inoperable) and a refrigerator (missing/damaged/inoperable), both of which were reported as corrected, both with tenant confirming signatures. Unit 1701 had "damaged cabinets," cited by Mr. Hinsberger as a potential high cost item, which Englewood indicated in its April 5, 2001 report would be corrected by April 12, 2001. Unit 1907 had a "missing" stove entry, and also a completed correction entry. Unit 1914 had a damaged cabinets entry, and a correction to be completed by April 13, 2001 entry. Unit 402 had a bathroom cabinets damaged entry and a correction completed entry, and also a stove "missing" entry and a correction to be completed by May 31, 2001 entry. Unit 407 had a stove "missing" entry and a correction completed entry. Unit 811 had a refrigerator "missing" entry, and a correction to be completed by May 31, 2001 entry. Finally, unit 906 had a stove "missing" entry, and a correction completed entry. The above entries were identified by Mr. Hinsberger as potentially high cost items which might not be correctable, quickly, by the South Pointe maintenance staff, but might instead require approval of the loan application which he rejected on April 3, 2001. To the contrary, these items were not structural and may not have been major, but more important, as noted, were summarily corrected, or were to be corrected in the reasonably near term.

Apparently looking beyond the March, 2001 REAC inspection, HUD also argues that

[11] The unit 1112 entry actually states: "Range/Stove-Missing/Damaged," so it may or may not have been missing. The same entry is repeated in the units discussed below in the text.

the poor physical conditions at South Pointe were not only "deplorable," but "chronic" and, therefore, clearly not in decent, safe and sanitary condition. Mr. Hinsberger, however, testified that the default was based on the March, 2001 REAC inspection, not on other inspections.

An earlier REAC inspection had been conducted on April 28, 1999. Englewood submitted a December 8, 1999 MIO Plan, and HUD issued a Final Team Report dated January 26, 2000. HUD concluded, as follows, in its final report on the 1999 inspection:

> 2. Project Summary
>
> South Pointe Towers is located in Chicago, Illinois. It has 303 units all of which have Section 8 assistance. The property is a high rise development with elevators. This is an uninsured property and in need of extensive physical repairs. The REAC inspection was done on April 28, 1999, and was scored 42*b [sic].[12] The apartments in this property are spacious and in demand. The area surrounding the site is undergoing revitalization and was recently designated an Enterprise Zone. The property has a number of deferred maintenance items, foremost among this [sic] were the elevators. The curb appeal of the property has improved. The owner has infused $770,000 in the property and continues to add additional funds in order to correct all physical deficiencies identified in the REAC inspection.
>
> * * *
>
> 6. Physical Condition
>
> Current: The owner submitted a [December 8, 1999] MIO [Management Improvement Operating] Plan to this office on December 8, 1999. The MIO has been tentatively accepted [by HUD] with two modifications. The HUB office has requested the owner to add on the MIO Plan the source of funding. The owner has already infused capital into the property totaling $770,000. He has committed to completing all the necessary items identified in the REAC inspection report that was conducted on 4/29/99 with the property receiving a score of 42b* . . . . By infusing capital into the property the owner has shown a good faith effort to correct REAC deficiencies identified. . . . This project has a history of poor

---

[12] The letter "b" denotes that one or more non-life threatening health and safety deficiencies (that is, no exigent fire/safety deficiencies), were obsserved. The "*" denotes deficiencies with respect to smoke detectors.

physical maintenance. Drug activity within and around the project has decreased since the owners changed security firms. In 1996, this property received a Special Rent Increase for Crime Prevention Activities in the amount of $200,570.

* * *

10. Occupancy

There are a total of 303 units in this project. 60 - 1 bedroom, 140 2-bedroom, 23 - town house units, and 80 - 3 bedroom. Currently the property is 92% occupied. The number of occupants is constantly decreasing due to increased drug evictions and other lease violations.

11. Neighborhood/Residency

The property is a physically distressed development in a high crime and blighted neighborhood. The property has a reputation of having been drug infested and controlled by gangs. Off-duty Chicago and Cook County police provide security for the property. The agent has hired a new security firm which has caused the number of drug and gang crimes to decrease. The area surrounding the site is in similar conditions. The area is severely distressed and economically depressed with no signs of investment. Much of the area is filled with vacant lots. There is an elementary school across the street in front of the property.

12. Problem Statement

The property is in poor physical condition; however the owner has corrected some of the identified repairs revealed by the [April 28, 1999] REAC Inspection Report. They are in the process of entering into contracts to correct the remainder of the items cited by [the April 28, 1999] REAC and the DEC [HUD's Departmental Enforcement Center]. The owners have started repairs, and are showing good faith by starting some repairs with their own funds. In addition, they are attempting to secure a loan to offset the cost of the remaining work.

14. Next Steps/Recommendations

Substantial progress has now been made on the findings outlined in the [April 28, 1999] REAC report, therefore the DEC should return the case to the Chicago Multifamily HUB Office for servicing.

> The Chicago HUB Office should continue the finalization of the MIO received on December 8, 1999. [bracketed material added].

The Final Team Report on the April 28, 1999 REAC was dated January 26, 2000, and signed by Mr. Hinsberger on February 1, 2000. The report was quoted from extensively above because it reflects the challenges faced at South Pointe, and progress made by Englewood, according to HUD itself. HUD's Final Team Report is inconsistent with the default action at issue. Nor was any default action taken as a result of the April 28, 1999 REAC inspection. The record reflects that Englewood's MIO Plan for the April 28, 1999 REAC inspection was accepted by HUD. The record also reflects that HUD found Englewood's response to the year 2000 Occupancy Review acceptable, and closed it out. These major, formal inspections/reviews were resolved and closed out, leaving the March, 2001 REAC, as indicated by Mr. Hinsberger, as the basis for HUD's default action. However, as discussed earlier, the March, 2001 REAC did not provide a reasonable basis for the default action and, therefore, did not excuse HUD's breach of contract.

Freddie Batchelor was tasked to conduct a review of the two REAC inspections at South Pointe, and Englewood's responses. Ms. Batchelor was an Enforcement Analyst in HUD's Enforcement Center, in Chicago. She worked on the Final Team Report on South Pointe for the April 28, 1999 REAC, quoted extensively above, and was listed as the Enforcement Analyst on the front of the report. With respect to the first REAC inspection, Ms. Batchelor testified that corrections were 85 to 90% complete, and that:

> The conclusion I came to was that he [the owner] as well as his staff was showing a good faith effort to correct all of the Real Estate Assessment Center deficiencies that had been identified in that April [1999 REAC] report. And even other things that had been identified that they were aware that need correction. So they were on the road to great strides in doing and following through what the contract, the Housing Assistance Payment contract had asked them to do. And indeed the enforcement center had requested them to do.

Ms. Batchelor testified that one of her functions at HUD had been to monitor the finalization of Englewood's MIOP to the April, 1999 REAC inspection. She also testified that she was asked to analyze the two REAC inspections (in April, 1999 and March, 2001) and Englewood's responses to the two inspections in April, 2001:

> I had to do an Excel spreadsheet. I had to put in accordance to severity the items that had been corrected, completed if it was any outstanding items from the first [REAC] report inspection. And for the second [REAC] report. And to come up with a percentage of, you know, of completeness. And that

> was the entire project. . . . I reported to [Margarita Maisonet, Director of HUD's Departmental Enforcement Center] that Southpoint [sic] was on track with their corrections of the problems. And that as stated previous in the MIO and the early onset that they were still moving forward with correcting identified problems. And that a question was asked of me about the Housing Assistance Payment contract and I stated that I still recommended and agreed as I did early on that the Housing Assistance Payment contract stay in force. Simply also again because the building comprised of approximately 300, close to 301 units maybe occupied by 200 and something, 200, a little over 200 people and that these were hard to house individuals. And so it behooved HUD to continue trying to work with the individuals as well as the owner to keep the contract in force. So that was my recommendation.

Although her spreadsheet has not been provided for the record, Ms. Batchelor testified that a little over 92% of the items from the two REAC inspections had been corrected and that Englewood was on track on their MIO Plan:

> Q [by plaintiff's counsel] Did you consider Southpoint [sic] in April of 2001 based on that review that you were conducting to be an indecent, unsafe or unsanitary condition?
>
> A No. I considered it as a property that was moving forward in transition to do the right thing and getting the other monies put into it would be a beautiful property and a beautiful area for the residents.

Ms. Batchelor's recommendation was not acted on; instead, on April 9, 2001 HUD issued the Notice of Default on South Pointe to Englewood, based on the March, 2001 REAC inspection. However, as discussed earlier, when HUD rejected and returned Englewood's response to the March, 2001 REAC inspection report, citing HUD's rejection of the application for a HUD loan, HUD failed to consider that repairs also were made after the April 28, 1999 REAC inspection, with maintenance staff, and without major refinancing; that most of the repairs for the March 8, 2001 inspection report had been or were scheduled to be made in the near term with maintenance staff, and without major refinancing; that the refinancing was sought to get out from under a relatively onerous mortgage, and also to put South Pointe in "like new" condition, a condition beyond, as Mr. Hinsberger acknowledged, the decent, safe and sanitary condition standard. The court finds that HUD's default defense to the breach of contract is not supported by the record and, therefore, does not provide justification for the breach.

**Englewood's Claim for a Rent Increase at South Pointe**

Mr. Samuelson sent an August 21, 2001 letter to Mr. Hinsberger, subject: "Contract Renewal and Budget Based Rent Increase for South Pointe Apartments," on DSSA Management, Inc. letterhead, indicating that DSSA, Inc. intended to obtain a partnership interest in Englewood, and that DSSA Management, Inc. intended to become the managing agent for South Pointe. Mr. Samuelson's letter also stated that South Pointe had not had a rental increase since 1998, and requested a rent increase with "rent levels increased to market comparables." Mr. Samuelson's justification for the rental increase stated that:

> First, South Pointe is operating in 2001 on a 1998 income schedule. There have been three years without a rental increase. Second, Operations have resulted in deficits of approximately $200K a year in 1999 and 2000. Gas costs have risen dramatically over the past year. While vacancy and collection losses, and legal and security costs can be reduced in the future after the improvement program has been put in place, they will not be able to be reduced meaningfully during the remainder of 2001 and 2002. Third, rent comparables in the neighborhood support an average rental increase of $56 per unit per month. Such an increase would increase income potential by $200K per year, enough to offset the operating deficits that have been experienced in past years.

Mr. Samuelson included a Rent Comparability Study with his request for a rent increase. A September 5, 2001 internal HUD e-mail reflected that a desk review of this Rent Comparability Study for South Pointe was conducted, and that the study was found acceptable. As a result, in a September 6, 2001 response to Mr. Samuelson, Mr. Hinsberger wrote: "The rent comp study supports the proposed rents. The submission was made by you [Mr. Samuelson]. It needs to be signed by the owner of the current managing agent. There was a spot on your 8/21/01 letter authorizing you to submit, but Mr. Hayes didn't sign it. Please resubmit the 8/21/01 letter with John Hayes' signature. We will allow the new rent to kick in at the time of closing [of a rehabilitation loan for South Pointe]." Mr. Hayes' recollection was that he had signed off on a request for the rent increase, however, Mr. Hinsberger stated that HUD never received a rental request signed by Mr. Hayes. Neither party has produced a document signed by Mr. Hayes.

Defendant also argues that the rent comparability study "was with respect to the HUD-insured loan application," rather than the request for a rent increase. However, this dual use of the rent comparability study, for refinancing and for a rent increase, apparently was not an issue for Mr. Hinsberger in September, 2001 when he only asked for Mr. Hayes' signature. Nor does defendant cite to authority, or provide any rationale, for prohibiting a rent comparability study from being utilized for both a loan application and rental increase.

Mr. Hinsberger also testified that the rent increase request was incomplete, though he did not so state in his September 6, 2001 e-mail, quoted above, in which he only cited

the need for Mr. Hayes' signature. Mr. Hinsberger stated at trial that "you couldn't tell what year those numbers were for . . . ." This is the sort of omission which could easily have been corrected had HUD informed Englewood of the need for such clarification at the time of the rental increase request, rather than years later during litigation. Mr. Hinsberger did send a September 25, 2001 letter to the Developers Mortgage Corporation, which the latter responded to, on September 28, 2001, but oriented toward the loan application and not the rental increase.

As a threshold matter, defendant argues that there is no money-mandating statute or regulation or contract provision conferring jurisdiction on this court to review the denial of a request for a rent increase. In support of this proposition, defendant cites Reynolds Associates v. United States, 31 Fed. Cl. 335, 340 (1994), in which the court declined to enforce the provisions of HUD's Insured Project Servicing Handbook 4350.1 (Sept. 1970). The Handbook placed time limits on HUD's review of requests for rent increases, but was not promulgated as a regulation with the force and effect of law, was not incorporated into the housing contract and, for that matter, did not even apply to the particular housing project at issue in the Reynolds case. Id. at 335, 336, 338-40. The HUD Handbook and its time limits for review of requests for rent increases are not at issue in this case. Defendant also cites Reiner v. West Village Associates, 768 F.2d 31, 32, 33-34 (1st Cir. 1985), in which the tenants of a housing project challenged, unsuccessfully, a retroactive rent increase HUD granted the landlord. Such a challenge is not before the court. Defendant also cites Frakes v. Pierce, 700 F.2d 501, 502-03, 505 (9th Cir. 1983), in which tenants sought retroactive reduction of their rent based on the reduction of property taxes (and expenses) for California property owners, including the owners of subsidized housing, stemming from California's passage of Proposition 13. The court's decision that HUD's determination of rental charges was not reviewable turned on whether or not the Administrative Procedure Act (APA), 5 U.S.C. § 701-706 (1976), was applicable. The court determined that the APA was not applicable under the circumstances. Id. at 505. The APA is not at issue before this court. Other cases cited by defendant similarly involved tenants seeking judicial review of rent increases in United States District Courts and do not assist defendant.

The starting place for an evaluation of whether this court may review a rental increase request by Englewood is the HAP contract itself. Section 5 of the HAP contract commencing on October 1, 2000 stated that: "After rent levels have initially been established under section 524(a) of MAHRA [Multifamily Assisted Housing Reform and Affordability Act], all subsequent adjustment to Contract Rents shall be determined in accordance with section 524(c) of MAHRA." The preamble to the 2000 HAP contract referenced the Multifamily Assisted Housing Reform and Affordability Act of 1997, Public Law No. 105-65, Title V, Subtitle A, 111 Stat. 1384-1409 (1997), 42 U.S.C. § 1437f note (2000), which did not initially contain section 524(c), and also referenced the amendments to MAHRA, contained in Public Law 106-74, § 531, 113 Stat. 1109, 1113 (1999), which added section 524(c) to MAHRA.

Section 524(c) stated that:

> Rent Adjustments After Renewal of Contract. –
> (1) Required.–After the initial renewal of a contract for assistance under section 8 of the United States Housing Act of 1937 pursuant to subsection (a), (b)(1), or (e)(2), the Secretary shall annually adjust the rents using an operating cost adjustment factor established by the Secretary (which shall not result in a negative adjustment) or, upon the request of the owner and subject to approval of the Secretary, on a budget basis.

Pub. L. 106-74, § 531, 113 Stat. 1109, 1113 (1999). "[S]hall annually adjust the rents" is an imperative. The United States Court of Appeals for the Federal Circuit considered similarly imperative language in Brighton Village Associates v. United States:

> The assistance contract *shall provide* for adjustment annually or more frequently in the maximum monthly rents for units covered by the contract to reflect changes in the fair market rentals established in the housing area for similar types and sizes of dwelling units or, if the Secretary determines, on the basis of a reasonable formula.

Brighton Vill. Assocs. v. United States, 52 F.3d 1056, 1061 (Fed. Cir. 1995) (quoting 42 U.S.C. § 1437f(c)(2)(A) (1988)) (emphasis added by the Federal Circuit). The Federal Circuit's conclusion in Brighton Village was that "the statute uses the imperative 'shall,' which indicates that the HAP contract must provide for at least annual adjustments of contract rents." Id. The quoted statutory language was the same in 2000, and is the same today.

The Federal Circuit noted in Brighton Village that HUD's rent adjustment regulations did not contain the same imperative of the statute. The operative regulation stated that contract rents

> *may* be adjusted annually, at HUD's option, either (1) on the basis of a written request for a rent increase submitted by the owner . . . or (2) by applying, on each anniversary date of the contract, the applicable automatic annual adjustment factor [AAAF] most recently published by HUD in the Federal Register.

Brighton Vill. Assocs. v. United States, 52 F.3d at 1061 (quoting 24 C.F.R. § 886.312(b) (1994)) (emphasis, omission, and acronym added by the Federal Circuit) The Federal Circuit in Brighton Village read the statute as providing for annual adjustments and, giving effect to the statutory language, read HUD's regulatory language as providing that HUD

may choose the method of annual adjustment. Brighton Vill. Assocs. v. United States, 52 F.3d at 1061. "By failing to make [rent] adjustments during 1985 and 1986, HUD breached the HAP contract." Id. This quoted language in HUD's regulations remained unchanged in the 2000 regulations, which are applicable to Englewood. See also Park Properties Assocs., L.P. v. United States, 74 Fed. Cl. 264, 266-69, 273-74 (2006) (providing extensive background on HUD rent adjustments, and finding that HUD breached its HAP contracts with the claimants by failing to make automatic annual rent adjustments); Cuyahoga Metro. Hous. Auth. v. United States, 57 Fed. Cl. 751, 759 n.12 (2003) (discussing Brighton Vill. Assocs. v. United States, 52 F.3d at 1061). Based on the foregoing discussion, defendant has not persuaded the court that it is without jurisdiction to review Englewood's rental increase claims.

Defendant also argues that the August 21, 2001 request for a rental increase was "post-default," essentially that Englewood had failed to properly maintain South Pointe and, therefore, was not eligible to receive a rental increase. The request for a rent increase did occur after HUD's April 9, 2001 Notice of Default and May 16, 2001 Continuing Notice of Default, but the matter of default was not raised in Mr. Hinsberger's September 6, 2001 favorable response to Mr. Samuelson's request for a rent increase, which only indicated that Mr. Hayes should sign the request. In any event, the court concluded earlier that the default of Englewood was without merit and, therefore, does not justify breach of contract. Nor should the invalidated default provide a basis to deny a proper rent increase. The court, however, is concerned about the failure of either party to produce for the record a complete and properly signed request for a rent increase. After all of the above discussion, this would seem to be a basic, threshold requirement. The parties, therefore, shall consult, and be prepared to address the rental increase claim in light of the court's above discussion at a status conference which will be scheduled by separate order.

**Englewood's Claim for Energy Reimbursement at South Pointe**

On April 20, 2001, HUD issued guidance for the reimbursement of higher energy costs. The record contains a copy of an energy reimbursement form signed and dated August 6, 2001. Mr. Hinsberger testified that the deadline for submission of the energy reimbursement request was September, 2001, but without citing the source for the deadline, and stated that Englewood had not submitted its request in time. However, in addition to the signed copy dated August 6,2001 found in the record, the parties have stipulated to the submission on August 6, 2001 of the energy reimbursement request. Defendant, nevertheless, also points out that the energy reimbursement program precluded owners in default from participation. However, the court earlier found HUD's default of Englewood to be without a reasonable basis.

Defendant also argues that energy reimbursement is not based on a money-mandating provision, but vests discretion as to energy reimbursements with the agency. In this regard, HUD's April 20, 2001 Guidelines state that: "[T]he Department will consider providing temporary, emergency utility cost relief, at HUD's discretion, for units where contract rents are paid pursuant to a HAP contract that has been renewed under MAHRA

. . . ."

Similarly, HUD regulations afford HUD discretion in this regard:

> Special adjustments in the contract rents shall be requested in writing by the owner and may be authorized by HUD to the extent HUD determines such adjustments are necessary to reflect increases in the actual and necessary expenses of owning and maintaining the contract units which have resulted from substantial general increases in real property taxes, utility rates or similar costs (i.e., assessments and utilities not covered be [sic] regulated rates) which are not adequately compensated for by the adjustment authorized by paragraph (b) of this section.

24 C.F.R. § 886.312(c) (2000).

However, the low-income housing assistance statute itself provided that:

> The contract shall further provide for the Secretary to make additional adjustments in the maximum monthly rent for units under contract to the extent he determines such adjustments are necessary to reflect increases in the actual and necessary expenses of owning and maintaining the units which have resulted from substantial general increases in real property taxes, utility rates, or similar costs which are not adequately compensated for by the adjustment in the maximum monthly rent authorized by subparagraph (A).

42 U.S.C. § 1437f(c)(2)(B) (2000). While HUD's regulations state that an energy adjustment "may be authorized by HUD," the above-quoted statute does not provide unfettered discretion to the agency, instead directing that the HAP contract "shall" provide for energy adjustments to reflect higher energy costs, such that defendant has not convinced the court that it is without jurisdiction to review energy claims under a HAP contract.

Defendant further argues that Englewood's energy submission was incomplete, in that copies of the paid utility bills were required to be attached to it. The record contains a May 31, 2002 letter from Mr. Samuelson to Mr. Hinsberger, with energy invoices attached, but it is difficult for the court to determine from the Englewood letter whether the invoices were paid. The court is concerned whether a complete energy claim was timely submitted. The parties shall consult, and be prepared to address the energy claim in light of the court's above discussion at a status conference which will be scheduled by separate order.

## CONCLUSION

For the foregoing reasons, the court finds for the plaintiff on the issue of liability. Defendant breached the 2000 HAP contract, and was not justified in doing so by the claimed default on the part of Englewood. As previously agreed to by the parties, the post-trial briefing to date focused on liability, and not on damages. Therefore, in light of the court's decision today on liability, a status conference will be scheduled, by separate order, to address damages, as well as Englewood's claims for rent and energy increases. In the interim, the parties are urged to confer to determine whether they can reach an agreement regarding damages, or, in the alternative, to agree to a schedule to resolve the remaining issues in the case.

**IT IS SO ORDERED.**

s/Marian Blank Horn
**MARIAN BLANK HORN**
**Judge**