**No. 03-2209C**
**Judge Marian Blank Horn**

---

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**ENGLEWOOD TERRACE LIMITED PARTNERSHIP, a Michigan Limited Partnership,**

**Plaintiff,**

**v.**

**UNITED STATES OF AMERICA and MEL MARTINEZ, Secretary of the Department of Housing and Urban Development,**

**Defendants.**

---

# PLAINTIFF ENGLEWOOD'S POST-TRIAL BRIEF IN SUPPORT OF AN AWARD OF DAMAGES FOR HUD'S FAILURE TO INCREASE RENTS AND REIMBURSE ENERGY EXPENSES

---

**Peter V. Baugher**
**William B. Berndt**
**Schopf & Weiss LLP**
**One South Wacker Drive**
**28th Floor**
**Chicago, IL 60606**
**312.701.9300**

**January 25, 2008**

At trial, HUD asserted that Englewood was not entitled to a rent increase or energy reimbursement because its contract with HUD was in default. In finding HUD, not Englewood, liable for breach of contract, this Court has already ruled against HUD's principal objection to a rent increase or energy reimbursement to Englewood. In its November 30, 2007 Opinion, this Court also rejected HUD's argument that this Court lacks jurisdiction to rule on Englewood's damage claims for failure to implement a rent increase and for energy reimbursements. HUD's remaining objections to such damages should likewise be rejected. HUD's refusal to award a rent increase or energy reimbursement to Englewood followed directly from the unlawful termination of the parties' agreement. These amounts should therefore be included in the damages awarded to Englewood.

## INTRODUCTION

In its Opinion, this Court found HUD liable for breach of contract. *Englewood Terrace, L.P. v. United States*, 79 Fed. Cl. 516 (Fed. Cl. 2007). The Court found that HUD wrongfully declared Englewood in default, and never allowed Englewood a meaningful opportunity to respond to HUD's decision to terminate the parties' agreement. *Id.* The Court ordered the parties to confer regarding the damages caused by HUD's breach.

The Court requested further briefing[1] on two issues relating to Englewood's damage claim:

(1) whether Englewood is entitled to damages for HUD's failure to process and approve a rent increase in 2001 (70 Fed. Cl. at 550); and

[1] The Court also directed the parties at the January 9, 2008 status conference to conduct meaningful discussions regarding the issues relating to Englewood's damage claims. Englewood and HUD have conferred and met five times over the last two weeks, and Englewood will continue to work to reduce the parties' discussions to stipulations that will focus the issues that remain for the Court to decide.

(2) whether Englewood is entitled to damages for HUD's failure to allow Englewood to participate in an energy reimbursement program, despite HUD's suggestion that Englewood's default precluded an energy reimbursement (*Id.* at 551).

The answer to both questions is "Yes" – Englewood is entitled to these damages. HUD's denial of both the rent increase and energy reimbursement was predicated on its termination of Englewood's contract. As this Court's Opinion makes clear, the termination was not justified. There is no valid reason for the denial of Englewood's request for a rent increase and energy reimbursement in 2001.

## STATEMENT OF FACTS

### I. ENGLEWOOD PROPERLY SUBMITTED A RENT INCREASE REQUEST.

In August 2001, Englewood requested a rent increase through a submission prepared by Mr. Samuelson (JX 104 at 1120-34), at the request of Mr. Hayes (Tr. at 975-77). The submission was supported by a rent comparability study prepared by Renzi and Associates, an independent expert. (JX 221 at 2413-52.)

At trial, despite Mr. Hayes' testimony to the contrary, HUD said that Englewood's request for a rent increase was unsigned. (Tr. at 704.) The record is otherwise. (Tr. at 977-78.) Mr. Hayes explained that he asked Mr. Samuelson to prepare the rent request. (Tr. at 976.) Mr. Samuelson was conducting due diligence on the property at the time, and thus had gathered information about rents in the relevant market at the time. (Tr. at 976-77.) Mr. Samuelson prepared the rent increase, and Mr. Hayes signed it. (Tr. at 977-78.) Mr. Hayes favored the rent increase. (*Id.*) Indeed, Englewood had sought a rent increase every year since 1999. (JX 210 at 1982; JX 60 at 949; Tr. at 880-81.)

Mr. Hinsberger claimed not to have received a signed request, but HUD knew that Mr. Samuelson was working with Englewood at the time, and began to process the rental increase which was submitted with the request for contract renewal. (JX 107 at 1144; Tr. at 631-34.) At trial, Mr. Hinsberger reported that HUD's appraiser said that Englewood's Rent Comparability Study supported the proposed rents. (Tr. at 633-34.) Mr. Hinsberger had instructed Mr. Hayes to find a new owner and manager for South Pointe on April 13, 2001 (Tr. at 966-67). Mr. Hinsberger had known since early May 2001 that Mr. Hayes was working with Mr. Samuelson regarding the Englewood property. (JX 91 at 1096.)

HUD *approved* Englewood's application for a rent increase, based on costs and a rent comparability study, but then declined to implement the increase. Specifically, in September 2001, Mr. Hinsberger wrote to Mr. Samuelson that the Rent Comparability Study supported the proposed rents, stating "[t]he rent comp study supports the proposed rents." (Jt. Stmt. ¶ 107; JX 107 at 1144.) Accordingly, HUD acknowledged that a rent increase for South Pointe was appropriate in September 2001.

With the rent increase HUD agreed was warranted, annual HAP Contract revenue to Englewood would have been $2,804,658 ($2,891,400 less a 3% vacancy factor) for each of the three remaining years of the contract. (PX 3 at 4249; JX 104 at 1123, top line "budget".) Gross rent revenue without the increase would have been $2,600,830 ($2,681,268 less the same 3% vacancy factor) for three years. (JX 104 at 1123, top line "statement of profit/loss".) The effect of the rent increase on aggregate revenue is thus approximately $203,828 per year ($2,804,658 - $2,600,830) times three years, or $611,484.

## II. ENGLEWOOD PROPERLY SUBMITTED A CLAIM FOR ENERGY REIMBURSEMENT.

In 2001, HUD issued guidelines pursuant to which property owners could request reimbursement the spike in energy costs caused by an especially harsh winter. (JX 208 at 1961, referencing "the long cold winter.") The purpose of the program was to reimburse owners in good standing for the extraordinary energy costs they had experienced during the winter of 2000-01. (JX 218 at 2298-99, 2301.) HUD offered a one time lump sum adjustment to the rents in the HAP contract, not a regular HUD program. (JX 218 at 2298.)

Englewood accepted HUD's offer. On August 6, 2001, Englewood submitted a request for reimbursement of $55,230.29 for extraordinary gas costs during the winter of 2000-2001. (JX 103 at 1119; Tr. at 984-85.) The amount of the excess cost reimbursement requested was eventually determined by Englewood to be $139,187. (JX 273 at 4201.)

There is no evidence in the record that HUD reviewed or processed Englewood's energy submission. HUD waited months to deny the request. Despite the fact that such requests were not due until September 2001 (if then, the guidance documents did not prescribe a due date), HUD asserted that the request was "late," but did not suggest any other deficiencies in Englewood's submission. (Tr. at 985.) Englewood submitted a supplement to the claim in 2002. (JX 273 at 4195-205.) The submissions themselves demonstrate that the energy costs were actually incurred and paid by Englewood, which HUD did not and does not contest. (*Id.*)

## ARGUMENT

## I. ENGLEWOOD IS ENTITLED TO DAMAGES FOR HUD'S REFUSAL TO IMPLEMENT A PROPERLY SUBMITTED REQUEST FOR A RENTAL INCREASE.

Englewood submitted a request for a rent increase in August 2001, demonstrating that Englewood was entitled to such an increase. (JX 104 at 1120-34.) In a cover letter in

support, Mr. Samuelson explained that a rent increase was justified – rents had not been increased at the property since 1998. (JX 104 at 1121.) Mr. Samuelson also explained that a rent increase was urgently needed to fund improvements at the property. (*Id.*) The submission included a rent comparability study which was the document required to substantiate the request for a rental increase. (JX 221 at 2413-2453.) Indeed, Paul Seliga, who reviewed the rent comparability study for HUD, wrote that the rent comparability study submitted in support of the rent increase showed that the rent increase was appropriate. (JX 106 at 1143.) Despite the clear justification for a rent increase, HUD refused to fully process the request.

HUD's bases for denial of the rent increase – Englewood's purported default or a missing signature by John Hayes – do not justify HUD's refusal to implement the rent increase request. Englewood submitted a rent comparability study, and HUD knew from Mr. Samuelson's detailed memorandum of August 6, 2001 that Englewood was losing an average of $200,000 a year and desperately needed the rent increase. (JX 102 at 1111.) This Court should award damages for Englewood's loss of the benefit of the rental increase to which it was entitled because of HUD's failure to implement the request as part of the HAP contract renewal request.

### A. There Is No Requirement That An Owner Sign A Request For A Rent Increase.

HUD has consistently, but wrongly, suggested that John Hayes did not sign Englewood's request for a rent increase, and that without his signature, Englewood's request is invalid. HUD is wrong on both the facts and the law. As described above, Mr. Hayes stated that he did sign the request for a rent increase. (Tr. at 977-78.) And, at trial and to this day, HUD has failed to point to any legal basis – statutory, regulatory or contractual – establishing a *requirement* that an owner personally sign a request for a rent increase.

All parties agree that Mr. Samuelson, in submitting the August 2001 rent increase application, was acting on behalf of Mr. Hayes and Englewood. Mr. Hayes testified to that fact, and no one doubted he favored higher rents. (Tr. at 975-78.) HUD received and reviewed the rent increase request, and corresponded with Mr. Hayes about the request for a rental increase. (JX 111 at 1160 "a comparable rent has been determined".) Agents of Englewood, like the mortgage broker Alan Cravitz, regularly communicated with HUD on behalf of Mr. Hayes and Mr. Samuelson. (*See, e.g.*, JX 110 at 1151-52.)

**B. HUD Is Liable To Englewood For Failure To Implement A Rent Increase.**

This Court has already ruled that it has jurisdiction to review HUD's failure to implement an appropriate request for a rent increase. 70 Fed. Cl. at 550. As the Court noted, the parties' agreement states that rent adjustments will be processed in accordance with Section 524(c) of Multifamily Assisted Housing Reform and Affordability Act of 1997 ("MAHRA"). That provision states:

> Rent Adjustments After Renewal of Contract.-
>
> (1) Required.-After the initial renewal of a contract for assistance under section 8 of the United States Housing Act of 1937 pursuant to subsection (a), (b)(1), or (e)(2), the Secretary shall annually adjust the rents using an operating cost adjustment factor established by the Secretary (which shall not result in a negative adjustment) or, upon the request of the owner and subject to approval of the Secretary, on a budget basis.

Pub.L. 106-74, § 531, 113 Stat. 1109, 1113 (1999). As this Court noted, the language "'shall annually adjust the rents' is an imperative." (70 Fed. Cl. at 549.) Accordingly, HUD was *required* to adjust the rents at Englewood on an annual basis.

**C. HUD Failed To Fully Process The Rent Increase.**

Courts have repeatedly held HUD liable when the agency fails to properly process a request for a rent increase. *See, e.g., Crest A Apartments v. United States*, 52 Fed. Cl. 607,

612-13 (Fed. Cl. 2002) (Court of Claims has jurisdiction over claimed breach of HAP contract by failure to properly process rent increases); *see also Brighton Vill. Assocs. v. United States*, 52 F.3d 1056 (Fed. Cir. 1995) (Tucker Act vests Court of Federal Claims with jurisdiction over claims that HUD failed to grant rent increases in a HAP contract); *Cuyahoga Metropolitan Housing Authority v. United States*, 57 Fed. Cl. 751 (Fed. Cl. 2003) (considering denial of rent increases); *Christopher Village, L.P. v. United States*, 360 F.3d 1319 (Fed. Cir. 2004) (no APA jurisdiction because adequate remedy available under Tucker Act).

Here, HUD *approved* Englewood's application for a rent increase, based on costs and a rent comparability study, but then failed to implement the increase. Specifically, in September 2001, HUD approved an August 2001 application for a rent increase submitted by Englewood. (Jt. Stmt. ¶ 107; JX 107 at 1144.) Mr. Hinsberger wrote to Mr. Samuelson, stating "[t]he rent comp study supports the proposed rents." (*Id.*) Accordingly, HUD acknowledged that a rent increase for South Pointe was appropriate in September 2001. Relying on its Notice of Default, HUD simply declined to implement the rent increase. HUD's reason for refusing to process the rent increase request has now been rejected in this Court's Opinion – and HUD is liable for damages for the amount of that increase, by which rents would have been increased.

## II. ENGLEWOOD IS ENTITLED TO DAMAGES FOR HUD'S FAILURE TO PROCESS ITS REQUEST TO REIMBURSE ENERGY COSTS.

This Court ruled that it has jurisdiction to decide whether HUD is liable for failing to reimburse Englewood for extraordinary energy costs in the winter of 2000-01. 70 Fed. Cl. at 551. In 2001, HUD issued guidelines under which property owners could request reimbursement for high energy costs incurred because of the especially harsh winter. (JX 208 at 1961; JX 218 at 2298.) Although the guidance documents themselves do not state any deadline (JX 208 at 1961-77), a cover letter from Mr. Hinsberger to property owners asked that requests for reimbursement

be submitted by September 30, 2001 (JX 218 at 2298). HUD has never presented any evidence that the deadline in Mr. Hinsberger's letter was binding. Moreover, Mr. Hinsberger's letter did not foreclose supplemental requests after an initial request, and stated that the property's "project manager" would be available to respond to questions about the reimbursement program. (*Id.*)

On August 6, 2001, Englewood accepted HUD's offer and submitted a request for reimbursement of $55,230.29 for extraordinary gas costs during the winter of 2000-01. (Jt. Stmt. ¶ 105; JX 103 at 1119.) Englewood later determined the amount of the excess cost reimbursement to be $139,187 in Rent Adjustments for Escalating Energy Costs, and submitted a supplemental request.[2] (Jt. Stmt. ¶ 105; JX 273 at 4201.) HUD does not contest that those costs were ultimately incurred and paid by Englewood.

At trial, HUD relied on two bases for the denial of the reimbursement request. First, HUD claimed that all such requests must have been submitted by September 30, 2001, and that Englewood's claims were late. (Tr. at 704-06.) The parties stipulated, however, that Englewood's submission was made on August 6, 2001 – more than a month and a half before Mr. Hinsberger's arbitrary deadline. (Jt. Stip. Facts ¶ 105: "On August 6, 2001, Englewood submitted a request for reimbursement of $55,230.29 for extraordinary gas costs during the winter of 2000-2001.") Mr. Hayes confirmed the date of the submission during his testimony at trial. (Tr. at 984.) Mr. Hinsberger testified that HUD never received a request by Englewood for energy reimbursements, but was not involved in processing the requests, and therefore did not have personal knowledge on the subject. (Tr. at 706-07.)

---

[2] The supplemental submission (JX 273 at 4196-219) includes copies of the invoices showing the increased energy costs incurred by Englewood in the harsh winter of 2000, as well as a People's Energy account ledger, showing Englewood's payments. (*Id.* at 4218-19.)

Second, HUD claimed that Englewood was in default on its HAP Contract, and was therefore ineligible for an energy reimbursement. (Tr. at 705; discussing need for project to be in "good standing".) As this Court found, HUD's default was wrongful, and cannot justify denial of the energy reimbursements. 70 Fed. Cl. at 550-51. Accordingly, Englewood is entitled to the value of its lost reimbursements as damages caused by HUD's breach of the parties' agreement. *San Carlos Irrigation & Drainage Dist. v. United States*, 111 F.3d 1557, 1562-63 (Fed. Cir. 1997).

HUD's refusal to grant energy reimbursements to Englewood is inconsistent with the purpose of the program – which was developed to assist owners who had incurred substantial costs supplying residents with heat and energy during an especially cold winter. There is no dispute that Englewood actually incurred and paid the costs that it sought at trial. (JX 273 at 4218-19.) Such costs should now be awarded to Englewood.

## CONCLUSION

Where the Government breaches a contract, it should be held to account for damages. The evidence shows that HUD unjustifiably declared Englewood in default and itself repudiated and breached the parties' HAP Contract. Relying on that purported default, HUD deprived Englewood of needed funds in a variety of ways, including the denial of a rent increase and energy reimbursement. The amount of those two items is $611,484 in increased rents and $139,187 in unreimbursed extraordinary energy costs. Englewood is entitled to recover those funds in addition to other damages caused by HUD's breach.

Dated: January 25, 2008

s/Peter V. Baugher
One of the Attorneys for Plaintiff
Englewood Terrace Limited Partnership

Peter V. Baugher
Schopf & Weiss LLP
One South Wacker Drive
28th Floor
Chicago, IL 60606
312.701.9300

**CERTIFICATE OF SERVICE**

I, Peter V. Baugher, one of the attorneys for Plaintiff Englewood Terrace Limited Partnership, state that on January 25, 2008, I caused a copy of **Plaintiff Englewood's Post-Trial Brief In Support Of An Award Of Damages For HUD's Failure To Increase Rents And Reimburse Energy Expenses** to be served electronically on:

Mr. Douglas K. Mickle
Commercial Litigation Branch
Civil Division, United States Department of Justice
11 L Street, N.W.
Room 10130
Washington, DC 20005

s/Peter V. Baugher