**No. 03-2209C**
**Judge Marian Blank Horn**

---

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

---

**ENGLEWOOD TERRACE**
**LIMITED PARTNERSHIP,**

**Plaintiffs,**

**v.**

**THE UNITED STATES,**

**Defendant.**

---

# DEFENDANT'S POST-TRIAL BRIEF ON WHETHER ENGLEWOOD PROVED AT TRIAL THAT THE GOVERNMENT WAS LIABLE FOR A BUDGET-BASED RENT INCREASE IN 2002 AND A FISCAL YEAR 2001 ENERGY REIMBURSEMENT CLAIM

---

**Respectfully submitted,**

**JEFFREY S. BUCHOLTZ**
**Acting Assistant Attorney General**

**JEANNE E. DAVIDSON**
**Director**

**BRIAN M. SIMKIN**
**Assistant Director**

**DOUGLAS K. MICKLE**
**Trial Attorney**
**Commercial Litigation Branch**
**Civil Division**
**U.S. Department of Justice**
**Attn: Classification Unit, 8th Floor**
**1100 L Street, N.W.**
**Washington, D.C. 20530**
**Tel. (202) 307-0383**
**Fax (202) 307-0972**

**OF COUNSEL:**

**GREGORY G. GUSTIN**
**MARIA T. BAGUIO**
**RUSSELL J. COHEN**
**LORRAINE C. SHOTO**

**Office of General Counsel**
**U.S. Department of Housing and Urban Development**

**February 8, 2008**

**Attorneys for Defendant**

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ISSUES PRESENTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

STATUTORY AND REGULATORY BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

I. The Section 8 Program As It Relates To The Rent Increase Request And Energy Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

II. Rent Increase Requests . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

III. Fiscal Year 2001 Energy Reimbursement Program . . . . . . . . . . . . . . . . . . . . . . . . . 8

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

I. Englewood's Claim For A Budget-Based Rent Increase Beginning In Fiscal Year 2002 Fails . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

A. Don Samuelson's August 21, 2001 Request For A Budget-Based Rent Increase For South Pointe Was Not Authorized . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

B. Even If the August 21, 2001 Request Was Authorized By Englewood, Englewood Is Not Entitled to a Budget-Based Rent Increase Absent HUD's Approval . . . . . . . . . . . . . . . . . . . . . . . . . 14

C. Englewood Waived Its Right To Claim A Rent Increase When It Agreed To Rents In The September 2001 HAP Contract . . . . . 15

II. Englewood's Claim For Energy Costs Reimbursements Also Fails . . . . . . . . . . 17

A. Englewood's Energy Reimbursement Claim Was Incomplete . . . . . . . . 18

B. Even If the August 6, 2001 Submission Was Complete, Englewood Would Not Have Been Entitled to Receive Payment Because it Was Neither Acceptably Managed Nor in Decent, Safe and Sanitary Condition ("In Good Standing") . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

**TABLE OF AUTHORITIES**

**CASES** **PAGES**

Brighton Vill. Assocs. v. United States,
52 F.3d 1056 (Fed. Cir.1995) . . . . . . . . . . 9

St. Christopher Associates, L.P. v. United States,
No. 2007-5069, 2008 WL 80671 at * 7 (Fed. Cir. Jan. 9, 2008) . . . . . . . . . . 17

Cuyahoga Metro. Hous. Auth. v. United States,
57 Fed. Cl. 751 (2003) . . . . . . . . . . 9

E. Walters & Co. v. United States,
576 F.2d 362 (Ct. Cl. 1978) . . . . . . . . . . 15

Englewood Terrace L.P. v. United States,
79 Fed. Cl. 516 (2007) . . . . . . . . . . passim

Park Properties Assocs., L.P. v. United States,
74 Fed. Cl. 264 (2006) . . . . . . . . . . 9

Whittaker Elect. Systs. v. Dalton Security,
124 F.3d 1443 (Fed. Cir. 1997) . . . . . . . . . . 15

**STATUTES**

42 U.S.C. § 1437f . . . . . . . . . . 5, 16

42 U.S.C. § 1437f(a) . . . . . . . . . . 5

42 U.S.C. § 1437f(c)(2)(A) . . . . . . . . . . passim

42 U.S.C. § 1437f(c)(2)(B) . . . . . . . . . . passim

42 U.S.C. § 1437f note (“MAHRA”) . . . . . . . . . . passim

**REGULATIONS**

24 C.F.R. § 886.312(b) . . . . . . . . . . 6, 9

24 C.F.R. § 886.312(c) . . . . . . . . . . 9

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **ENGLEWOOD TERRACE LIMITED PARTNERSHIP,** | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **No. 03-2209C** |
| | ) | **(Judge Marian Blank Horn)** |
| **THE UNITED STATES,** | ) | |
| **Defendant.** | ) | |

**DEFENDANT'S POST-TRIAL BRIEF ON WHETHER ENGLEWOOD PROVED AT TRIAL THAT THE GOVERNMENT WAS LIABLE FOR A BUDGET-BASED RENT INCREASE IN 2002 AND A FISCAL YEAR 2001 ENERGY REIMBURSEMENT CLAIM**

Pursuant to this Court's order dated January 9, 2008, defendant, the United States, respectfully submits this brief demonstrating why plaintiff, Englewood Terrace Limited Partnership ("Englewood"), failed to prove that the United States Department of Housing and Urban Development ("HUD") was liable for a rent increase pursuant to the Housing Assistance Payments ("HAP") contract between the two parties or for Englewood's claim for reimbursement of extraordinary energy costs in fiscal year 2001.[1]

**PRELIMINARY STATEMENT**

In its November 30, 2007 decision,[2] this Court determined that it possessed jurisdiction to entertain Englewood's claim for a rent increase in fiscal year 2002 as well as Englewood's claim

[1] Throughout this brief we will use the following acronyms: page from the joint exhibit ("JX __, p. __"); paragraph in the complaint ("Compl. ¶ __"); paragraph in the joint stipulation of facts ("Jt. Stip. of Fact ¶ __"); page and line from the record of trial transcript ("Record _ : __"). We will refer to Englewood's January 25, 2008 Post-Trial Brief In Support Of An Award Of Damages For HUD's Failure To Increase Rents And Reimburse Energy Expenses as "Pl. Br."

[2] The Court's decision is reported at Englewood Terrace L.P. v. United States, 79 Fed. Cl. 516 (2007) and will be referred to in this brief as the Court's "opinion" or "decision."

for energy reimbursement costs for fiscal year 2001. Englewood Terrace L.P., 79 Fed. Cl. 516 at 550, 551. However, the Court noted that it required additional briefing upon these issues because the record was not complete. Id. In regard to Englewood's claim for a rental increase, the Court noted that it is concerned that the parties failed to produce "a complete and properly signed request for a rent increase" which it described as a "basic, threshold requirement." Id. at 550. Similarly, regarding Englewood's claim for energy reimbursement for increased costs in fiscal year 2001, the Court expressed its concern whether a "complete energy claim was timely submitted" by Englewood. Id. at 551. During a status conference with the parties on January 9, 2008, the Court further instructed the parties that when they brief these two issues, the parties should discuss the applicable statutory, regulatory or other authority regarding the rent increase request and energy reimbursement claim.

Accordingly, because both the rent increase request and the energy reimbursement claim are derivative of Section 8 of the United States Housing Act of 1937, we will initially set forth the underlying statutory basis for these programs. We will then specifically address how this statute and applicable HUD guidance affects these two claims.

We will then address the merits of Englewood's claims, first demonstrating that Englewood failed to prove that it was entitled to the fiscal year 2002 rent increase it claims. Specifically, we will show that Englewood's August 21, 2001 request for a future rent increase submitted by Don Samuelson was not proper because he did not have authority to make the request. Moreover, even if Englewood had submitted an authorized, complete and properly signed request, it was not entitled to a budget-based rent increase as a matter of law. In regards to Englewood's claim for reimbursement for energy costs incurred in fiscal year 2001, we will

show that the evidence adduced at trial demonstrates that Englewood's claim fails because it was not properly submitted in fiscal year 2001.

For these reasons, and as described in more detail below, Englewood's claims for a rent increase and energy reimbursement should be denied.

## ISSUES PRESENTED

Pursuant to the Court's decision and January 9, 2008 order, there are two issues that the Court instructed the parties to brief:

1. Whether any contract or provision of law confers an entitlement to Englewood for a rent increase requested in 2001.

2. Whether any contract or provision of law confers an entitlement to Englewood for reimbursement for energy costs in fiscal year 2001.

In light of arguments raised in Englewood's opening brief upon these two issues, the Government respectfully submits that there is a third issue that the Court should consider at this time, and that is: What is the precise nature of the breach that the Court found that HUD committed? The United States contends that the Court determined that HUD breached the Section 8 HAP contract by not giving Englewood an opportunity to cure the project's physical problems found in a Real Estate Assessment Center ("REAC") inspection. Englewood Terrace L.P., 79 Fed. Cl. at 542.[3] Englewood, however, appears to contend that, not only did the Court

[3] Our position is based upon the Court's finding that "[a]lthough the HAP contract afforded Englewood the opportunity to cure deficiencies at South Pointe, HUD's decision to default Englewood was made before HUD even received Englewood's Plan of Correction for the March, 2001 REAC inspection." Id. at 540. Furthermore, in support of this finding, the Court pointed out that a notice of suspension and abatement was drafted, though never sent out, on March 15 and that the notice of default was "completed and ready for distribution" on April 6, while HUD did not receive Englewood's response to the March 8 REAC report until April 8. Id.

conclude that HUD failed to provide Englewood with a meaningful opportunity to cure the deficiencies at the project, South Pointe Towers ("South Pointe"), but that the Court also determined that HUD's termination of the HAP contract in 2002 was otherwise wrongful or unjustified, presumably because Englewood was properly maintaining South Pointe Towers in decent, safe and sanitary condition. Pl. Br. at 1. Resolving this aspect of the Court's decision is important, not only because it affects the treatment of the issues here, but also because whether South Pointe was in decent, safe and sanitary condition also affects the damages' portion of this case that will be briefed in the future. Accordingly, we respectfully submit a third issue for the Court's consideration at this time, which is:

3. Whether the Court's decision also found that HUD breached the 2000 HAP contract because HUD's notices of default, based upon the conditions of the property, were incorrect.

---

Finally, the exhaustive recitation of the evidence regarding the poor conditions at South Pointe, to include evidence adduced at site visits by HUD personnel in October 2001 and June 2002, as well as Englewood's own admissions regarding the conditions of the property in September 2002, is why we contend that the Court was not endorsing these conditions or that South Pointe was being maintained in decent, safe and sanitary condition. Instead, we contend that the Court found that HUD failed to give Englewood an appropriate period to cure the deficiencies at South Pointe and thus the contract termination was not justified. In sum, our argument is that if there was no default by Englewood regarding its maintenance of South Pointe, then there was no need for the Court to determine that there was not a "meaningful to opportunity to cure" a default since, without a default, there is no need to cure anything.

## STATUTORY AND REGULATORY BACKGROUND

### I. The Section 8 Program As It Relates To The Rent Increase And Energy Claims

Section 8 of the United States Housing Act of 1937 provides for financial assistance to "aid[] lower-income families in obtaining a decent place to live . . . ." 42 U.S.C. § 1437f(a). Pursuant to the Section 8 program, HUD pays subsidies to private landlords upon behalf of their low-income tenants. Tenants pay 30 percent of their monthly income toward a maximum monthly rent that a HAP Contract provides that the owner is to receive, and HUD pays the remainder. Id. §§ 1437f(c)(3) and 1437a(a)(1). In return, the owner agrees in a HAP Contract to, inter alia, provide "decent, safe, and sanitary" housing for the tenants. JX 019, p. 677 at 679; Jt. Stip. of Fact ¶ 16. HUD makes rental assistance payments to the owner in reliance upon the owner's monthly certification that the project and its dwelling units are "in decent, safe, and sanitary condition." JX 019, p. 677 at 679 ( 5(e)(2)).

Upon expiration of a contract for project-based assistance under section 8 of the United States Housing Act of 1937, such as Englewood's contract, HUD may renew assistance pursuant to that contract if the owner requests, subject to available appropriations. See Section 524(a)(1) of the Multifamily Assisted Housing Reform and Affordability Act of 1997, 42 U.S.C. § 1437f note ("MAHRA") (Title V of Public Law No.105 65, October 27, 1997, 111 Stat. 1384), as amended by section 531(a) of the Departments of Veterans Affairs and Housing and Urban Development, Independent Agencies Appropriations Act, 2000 (Public Law No. 106-74, October 20, 1999,113 Stat. 1109) ("Section 524" or "Section 524 as amended").

## II. **Rent Increase Requests**

Prior to the expiration of a section 8 program contract, contract rents are adjusted pursuant to section 8(c)(2)(A) of the United States Housing Act of 1937. 42 U.S.C. § 1437f(c)(2)(A). This provision states that a HAP contract shall "provide for adjustment annually or more frequently . . . on the basis of a reasonable formula." Id. HUD has implemented this provision by providing owners, with contracts that have not yet been renewed pursuant to MAHRA, the opportunity to have contract rents adjusted either by the application of an annual adjustment factor ("AAF") or upon a budget basis. 24 C.F.R. § 886.312(b).

However, for HAP contracts that have been renewed pursuant to MAHRA, such as the HAP contract with Englewood,[4] pursuant to section 524(a) of MAHRA,

> the Secretary shall annually adjust the rents using an operating cost adjustment factor established by the Secretary (which shall not result in a negative adjustment) or, **upon the request of the owner and subject to approval of the Secretary, on a budget basis**.[5]

Section 524(c)(1) of MAHRA, as amended (emphasis added). This rent adjustment provision limits HUD to making adjustments to contract rents for contracts renewed under MAHRA upon either a budget basis or by application of an OCAF as opposed to an AAF. For this reason, any provisions outside of MAHRA pertaining to adjustment of contract rents, such as section 8(c)(2)(A) of the United States Housing Act of 1937, do not apply to MAHRA contracts, such as the contract at issue here. Thus, all renewal contracts entered into pursuant to MAHRA reflect

---

[4] Englewood's 2000 HAP contract in effect in 2001 had been renewed pursuant to MAHRA. See JX 21, p. 696.

[5] Englewood did not seek a operating cost adjustment factor increase ("OCAF"). Instead, Englewood sought a budget-based increase. JX 104, p. 1120.

that all terms of the preceding contracts, such as pre-MAHRA contracts, are renewed except those pertaining to contract rent and rent adjustment. This is why the HAP contract entered into by Englewood on October 16, 2000 states in the fourth paragraph that,

> HUD and the Owner desire to renew for the term specified below the Expiring Contract EXCEPT for the Contract Rent and Rent Adjustment Provisions.

JX 21, p. 696 (Emphasis in original). Additionally, Englewood's HAP contract states in paragraph 5:

> After rent levels have initially been established under section 524(a) of MAHRA, all subsequent adjustments to Contract Rents shall be determined in accordance with section 524(c) of MAHRA.

JX 21, p. 696 at 697.

Finally, during the relevant time period, HUD had not promulgated any applicable regulation that governed the adjustment of HAP contract rents during the term of a contract that was renewed pursuant to section 524(a) of MAHRA. Thus, because Engelwood's HAP contract was renewed pursuant to section 524(a) of MAHRA, there is no regulation for the Court to consider in this case. However, on January 19, 2001, HUD issued a guidebook for renewal of project-based section 8 contracts entitled "Section 8 Renewal Policy" ("Section 8 Renewal Guide").[6] The Section 8 Renewal Guide establishes the procedure an owner must follow when requesting a rental increase, whether it be one for OCAF, or budget-based as here, after the

[6] An extract of the Section 8 Renewal Guidance is attached to this brief as an appendix for ease of referencing.

initial renewal of a contract pursuant to MAHRA. Specifically, the Section 8 Renewal Guide states at section 4-3:

> For rent adjustments for existing multi-year contracts, at least 120 days before the anniversary date of the contract, the Owner submits: 1. OCAF Worksheet. Attachment 3; or 2. Budget. If applicable, a budget-based rent increase request in accordance with the requirements of HUD Handbook 4350.1, Chapter 7, and Attachment 5 of this Guide.

See Defendant's Appendix, Chapter 4, § 4-3 at p. 2.

## III. Fiscal Year 2001 Energy Reimbursement Program

The statutory authority for the fiscal year 2001 energy reimbursement program is a function of whether the property's controlling HAP contract had been renewed pursuant to MAHRA at the time the owner requested reimbursement. For contracts that had not yet been renewed, the statutory authority for any rent increase is either section 8(c)(2)(A) or section 8(c)(2)(B) of the United States Housing Act of 1937. 42 U.S.C. §§ 1437f(c)(2)(A) and 1437f(c)(2)(B). Section 8(c)(2)(a) is the basis for those HAP contracts where the contract rents were previously adjusted upon a budget basis.[7] 42 U.S.C. § 1437f(c)(2)(A). However, if the contract rents had been previously adjusted using an AAF, which is not the case here, Section 8(c)(2)(B) controlled.[8] See 42 U.S.C. § 1437f(c)(2)(B). The corresponding regulatory authority

---

[7] Adjustments to the HAP contract payments that were made pursuant to the energy reimbursement program were calculated based upon an increase in actual energy expenses. In other words, these adjustments were made upon a "budget basis." Thus, contracts that had rents adjusted upon the basis of a budget received energy reimbursement adjustments pursuant to 42 U.S.C. § 1437f(c)(2)(A) because the normal method of adjusting rents was adequate to capture the increase in expenses.

[8] Unlike budget-based rent increase requests, actual expenses are not taken into account by HUD when considering a rent increase that is based upon an AAF. As a consequence, contracts with rent increases previously calculated using an AAF received the energy

for the energy reimbursement program would have been 24 C.F.R. § 886.312(b) for contracts where the rents had previously been adjusted on a budget basis, and 24 C.F.R. § 886.312(c) for contracts whose rents were previously adjusted using an AAF.

As explained above, during the term of a HAP contract, such as Englewood's 2000 HAP contract, contract rents are adjusted pursuant to section 524(c)(1) of MAHRA either by the application of an OCAF, or, if the owner requests, and the Secretary approves, upon a budget basis. Because MAHRA explicitly contains provisions that govern the adjustment of renewal rents for contracts renewed pursuant to MAHRA, the rental adjustment authority set forth at section 8(c)(2)(A) of the United States Housing Act of 1937 no longer applies to such contracts. For contracts that were renewed pursuant to MAHRA, whether subsequent rent increases were made using an OCAF or upon a budget basis, the statutory authority to make any rent adjustment, such as the energy reimbursement program, is section 524(c)(1) of MAHRA.[9]

---

reimbursement adjustment pursuant to 42 U.S.C. § 1437f(c)(2)(B). This provision allows HUD to make rent adjustments necessary to reflect increases in the actual and necessary expenses of owning and maintaining the contract units which have resulted from substantial general increases in costs such as real property taxes and utility rates that are not adequately compensated for by the normal budget-based rental adjustment methods contained in 42 U.S.C. § 1437f(c)(2)(A). This is not the case with Englewood's HAP contract.

[9] The Court's decision indicated that the authority for the energy reimbursement program with respect to Englewood's HAP contract was 42 U.S.C. § 1437f(c)(2)(B) and the regulatory authority was 24 C.F.R. § 886.312(c). Englewood Terraces L.P., 79 Fed. Cl. at 551. We agree that these provisions would have been applicable if Englewood's HAP contract had not been renewed pursuant to MAHRA, and instead contained rents adjusted using an AAF. However, as we discussed above, Englewood's HAP contract had been renewed pursuant to MAHRA. Accordingly, only section 524(c) of MAHRA applies to Englewood's rent adjustment claims. For this reason, the process for approving rent adjustments pursuant to the terms of Englewood's HAP renewal contract is different from the process discussed in Brighton Vill. Assocs. v. United States, 52 F.3d 1056 (Fed. Cir.1995); Park Properties Assocs., L.P. v. United States, 74 Fed. Cl. 264 (2006); and, Cuyahoga Metro. Hous. Auth. v. United States, 57 Fed. Cl. 751 (2003).

As mentioned above, no applicable regulation existed in 2001 that governed the adjustment of contract rents during the term of Englewood's HAP contract because it was renewed pursuant to MAHRA Section 524(a). Thus, because the energy reimbursement program was based upon authority set forth in section 524(c) of MAHRA, there are no regulations governing the energy reimbursement program for the Court to apply here.

HUD did, however, set forth guidance in 2001 explaining to property owners how they could request reimbursement for unusually high energy costs incurred in fiscal year 2001. See Guidance for Processing Renewal Adjustment for Escalating Energy Costs at 3 (JX 90, p. 1092); Memo To Owners Re: Guidance for Processing Renewal Adjustment for Escalating Energy Costs, dated May 10, 2001 (JX 92, p. 1097) ("Memo to Owners"). Consistent with the fiscal year budget process, the Memo to Owners set September 30, 2001 as the cut-off date for applying for reimbursement. JX 92, p. 1097. The program guidance further stated that "[i]n order for owners to take advantage of the opportunity for a utility lump sum adjustment," properties had to be "acceptably managed and the owner must be in good standing with all Business Agreements signed with the Department." JX 90, p. 1092 at 1094; Record 705: 19-25. These guidelines are not incorporated into, or even mentioned, in any of the parties' HAP contracts.

## ARGUMENT

### I. Englewood's Claim For A Budget-Based Rent Increase Beginning In Fiscal Year 2002 Fails

There is no evidence that Englewood ever submitted a proper request for a budget-based rent increase. The August 21, 2001 request for a rent increase submitted by Don Samuelson, JX 104, which is the sole basis for Englewood's claim here, was not proper because Mr. Samuelson did not have authority to make the request. Furthermore, even if Englewood submitted a complete and properly signed request by an authorized representative, it was not entitled to a budget-based rent increase as a matter of law because it was never approved by HUD. Finally, the parties had already agreed upon the rents for the period at question in the HAP contract that was in effect; and, there is no evidence that the parties intended to amend the HAP contract in effect and adjust rents to take effect in fiscal year 2002 as Englewood now asserts.

#### A. Don Samuelson's August 21, 2001 Request For A Budget-Based Rent Increase For South Pointe Was Not Authorized

Englewood argues that an August 21, 2001 letter from Mr. Samuelson to HUD Multifamily Housing Hub Director Edward Hinsberger, requesting a contract renewal and budget-based rental increase for South Pointe Apartments (JX 104), was proper and should have been implemented. Pl. Br. p. 4-7. This argument lacks merit because Mr. Samuelson was neither the owner nor the management agent for the property. Indeed, Mr. Samuelson submitted his request on the letterhead of his own management company, DSSA Management Incorporated, and specifically noted that,

> [a]s you are aware, Englewood Terrace Limited Partnership (the "Partnership") is the owner of the Property. PM Group, the General Partner of the Partnership ("PM") intends to enter into an agreement to convey its partnership interest to DSSA, Inc.

> ("DSSA"). DSSA Management Inc. ("DSSA Management") would also replace PM as the Managing Agent for the Property.

JX 104, p. 1120.

In addition to explicitly disavowing any ownership or agency relationship, two "acknowledgment" lines were included within the letter for, and upon behalf of, PM Group for signature by the then-representative of the owner, John Hayes. Contrary to Englewood's apparent contention that Mr. Samuelson was authorized to act for Englewood, since no such signed document was ever produced, Englewood argues incongruously that Mr. Hayes in fact signed the request. Pl. Br. at 5-6.

Furthermore, Englewood misrepresents to the Court that the parties "agree" that Mr. Samuelson was acting upon behalf of Mr. Hayes and Englewood. Pl. Br. at p. 6. We do not agree that Mr. Samuelson was officially acting upon behalf of Englewood when he made the August 21, 2001 request for a rent increase. In fact, the parties stipulated that in August 2001, when Mr. Samuelson requested the renewal of the HAP contract for another year, Mr. Samuelson had neither replaced PM One as Englewood's management agent nor replaced the owner's general partner. Jt. Stip. of Fact ¶¶ 3, 4; Record 975: 2-18. Noteworthy is that nowhere in these letters does Mr. Samuelson allege that he is an agent of Mr. Hayes, PM One, or Englewood. Moreover, there is no contemporaneous record evidence where Mr. Hayes, or anyone associated with Englewood, states that, at that time, Mr. Samuelson was working for them. Indeed, in an e-mail dated September 6, 2001 to Mr. Samuelson from HUD's Multifamily Housing Hub Director, Ed Hinsberger, Mr. Hinsberger noted that the request was made by Mr. Samuelson but needed to be endorsed by "the owner or the current managing agent." JX 106 p. 1142; JX 107, p. 1144; Record 632: 1-15, 703: 24-25, 704:1.

Mr. Hinsberger further informed Mr. Samuelson that HUD would only implement a rent increase if it was properly submitted and after Mr. Samuelson completed his purchase of the project. JX 107, p. 1144. This condition precedent was never met. Mr. Hinsberger further noted that the current management agent for Englewood had been in HUD's office, and he "had no knowledge of what was going on" and that Mr. Hayes "needs to tell the management staff what is going on so that there is absolutely no confusion." Id. Mr. Hinsberger also testified at trial that at the time of Mr. Samuelson's request, Mr. Hinsberger only was aware of Mr. Samuelson's due diligence efforts in acquiring South Pointe and potentially managing the property.[10] Record 699: 23 - 702: 18.

The Court's opinion correctly found that the absence of a "complete and properly signed request" was a "threshold requirement" that needs to be met before the Court can determine whether the request for a rent increase was proper. Englewood Terrace L.P., 79 Fed. Cl. at 550. Although Englewood argued at trial that Mr. Hayes signed the request, Record 977: 25 - 978: 3, the parties advised the Court at the status conference of January 9, 2008 that no such document could be located.

Accordingly, given that Mr. Samuelson's alleged relationship with the owner and/or the management agent of South Pointe was not made clear to HUD, at least until the time of trial,

---

[10] The record evidence shows that it was not until December 2002, that Mr. Samuelson assumed ownership of Englewood and also agreed to a HUD-insured mortgage of $11.6 million dollars. Englewood Terrace L.P., 79 Fed. Cl. at 517 Record 1179: 25 - 1180: 1; Jt. Stip. of Fact ¶ 3. Moreover, the record shows that Mr. Samuelson did not become a managing agent for Englewood until December 2001 – several months after Englewood now alleges he was Englewood's agent. Englewood Terrace L.P., 79 Fed. Cl. at 517; Jt. Stip. of Fact ¶ 4. Thus, unlike other actual agents of the owner that HUD dealt with in this case, i.e., management agents and mortgage brokers, there is ample evidence that HUD questioned Mr. Samuelson's authority.

and that no documents signed by an official representative of the owner or management agent endorsing the rent increase request have ever been provided, the August 21, 2001 request for a rent increase was not proper. HUD is not liable for the budget-based rent increase that Englewood now seeks.

### B. Even If the August 21, 2001 Request Was Authorized By Englewood, Englewood Is Not Entitled to a Budget-Based Rent Increase Absent HUD's Approval

Englewood incorrectly argues that HUD was required to provide it with the budget-based rent increase that Mr. Samuelson requested, allegedly pursuant to Section 524(c) of MAHRA. Pl. Br. pp. 6-7. Englewood's claim is based upon its misinterpretation of MAHRA.

As the Court's opinion correctly notes, after the initial renewal of a contract, pursuant to section 524(a) of the MAHRA, "the Secretary shall annually adjust the rents using an operating cost adjustment factor established by the Secretary (which shall not result in a negative adjustment) or, upon request of the owner and **subject to approval of the Secretary**, on a budget basis." Section 524(c) of MAHRA (emphasis added).

Accordingly, pursuant to the statute, two actions are necessary for Englewood to receive a budget-based rent increase. First, any request for a budget-based rent increase, like the increase sought by Englewood, must be made "upon request of the owner." Id. Second, the budget-based rent increase request must then be approved by the Secretary. Id. Neither of these events occurred here. Even if the August 21, 2001 submission from Mr. Samuelson was in fact an authorized, complete and proper submission from Englewood, it would not have been entitled to a budget-based rent increase because HUD did not approve the request.

Englewood's claim is based upon nothing more than its misreading of a September 6, 2001 e-mail from Mr. Hinsberger, in which Mr. Hinsberger stated that he would permit rents to "kick in" at the time of closing. JX 107, p. 1144. The "rents" mentioned by Mr. Hinsberger were rents that HUD would approve only if Englewood obtained a major rehabilitation loan for much needed work at South Pointe. Record 632: 16-24. The rent comparability study which "support[ed] the proposed rents," was with respect to the HUD-insured loan application. JX 107, p. 1144; Record 632: 25, 633: 1-3. Thus, there was never the requisite meeting of the minds regarding the basis for the rent adjustments other than in the context of underwriting a new HUD-insured loan; a loan that Englewood, not a new owner, ultimately received in December 2002, without any nexus to a HAP contract to which the alleged rent increase would have attached.

### C. Englewood Waived Its Right To Claim A Rent Increase When It Agreed To Rents In The September 2001 HAP Renewal Contract

Finally, when Englewood agreed to a HAP Renewal Contract in September 2001, that contract contained mutually agreed upon rents to take effect in fiscal year 2002. JX 24, p. 719 at 733. Thus, Englewood waived any right to challenge HUD's decision not to adjust rents in August 2001. See Whittaker Elect. Systs. v. Dalton Security, 124 F.3d 1443, 1446 (Fed. Cir. 1997) (The "doctrine of waiver precludes a contractor from challenging the validity of a contract . . . where it fails to raise the problem prior to execution, or even prior to litigation, on which it later bases its challenge."); E. Walters & Co. v. United States, 576 F.2d 362, 367-68 (Ct. Cl. 1978) (holding that failure to object to alleged improper exercise of option constituted waiver and estoppel). The September 2001 HAP Renewal contract – which was executed for Englewood by John Hayes, not Mr. Samuelson – reiterated what the parties had agreed upon

regarding a maximum monthly rent that Englewood is entitled to receive pursuant to the HAP contract in effect for the period in question. Thus, despite asserting that it is entitled to a budget-based rent increase, Englewood ignores the fact that it signed this contract, and a subsequent HAP contract on June 26, 2002, memorializing the same, unchanged, agreed-upon contract rents.[11] See JX 21, p. 696 at 701, and compare JX 24 p. 719 at 729, 733; JX 26, p. 746 at 747 (all agreements state the same agreed upon rents).

By making its current claim for a rent increase, Englewood is, in effect, unilaterally altering the terms of the four-year HAP contract the Court has found in force to reflect increased rents for the term of that HAP contract. However, Englewood has not established where the parties memorialized these new rents in a HAP contract. Indeed, given the Court's finding that HUD improperly terminated the 2000 HAP contract, the terms of that contract were still in effect, including the rents memorialized therein.

HUD has the authority to regulate the rents charged by owners receiving HUD-funded HAP contract subsidies. 42 U.S.C. § 1437f note. Thus, unless HUD agrees to a rent increase, an owner cannot exceed the agreed upon rent levels that are expressed in the parties' HAP contract. In this case, Englewood had an enforceable HAP contract with agreed upon rents. JX 21, 696 at 701.

---

[11] The short-term HAP renewal contracts that the Court found inapplicable nonetheless do memorialize the same agreed rent and the parties' actual intentions. On this point, paragraph 4 of the 2000 Renewal Contract provided that: "All terms of the Expiring Contact are renewed except for those provisions relating to Contract Rents and rent adjustments." JX 21, p. 696. If Englewood actually believed it was entitled to higher rents based upon a request filed in August 2001, it could have declined to sign a renewal contract in September 2001 reiterating the parties' agreed-upon rents. Englewood did not. JX 24, p. 719 at 733; JX 26, p. 746 at 747.

In sum, Englewood's position upon this issue is without merit because: (1) HUD never received a document that Mr. Hayes signed, JX 104, p. 1120 at 1121, 1122; Record 630: 4-12, and the relationship between Mr. Samuelson and Englewood was unclear at this time; (2) the budget-based rent increase is discretionary, and HUD did not approve the alleged rent increase request; and, (3) Englewood agreed to the rents it could charge in the 2000 HAP contract that the Court found controlling.

Accordingly, because there is no statutory, regulatory, or contractual authority that mandates the budget-based rent increase Englewood is seeking here, Englewood's claim for a budget-based rent increase should be denied.

## II. Englewood's Claim For Energy Costs Reimbursements Also Fails

Englewood also alleges that HUD failed to provide it "an energy cost reimbursement for extraordinary energy costs for the 4th quarter of 2000 and the 1st quarter of 2001." Compl. ¶ 94. However, no provision of the parties' 1998 HAP Contract or any subsequent HAP renewal contract between the parties obligates HUD to provide Englewood with reimbursement for energy costs. The reimbursement for energy costs was a unique program for 2001, and Englewood failed to comply with the stated terms of the program to be eligible for these funds.

HUD issued guidelines pursuant to which property owners could request reimbursement for high energy costs. JX 208, p. 1961; Record 705: 2-20. These guidelines are not incorporated into any of the parties' agreements, and thus, are not contractual commitments as Englewood alleges in its brief at pages 4 and 8. See St. Christopher Associates, L.P. v. United States, No. 2007-5069, 2008 WL 80671 at * 7 (Fed. Cir. Jan. 9, 2008). Furthermore, as we discussed previously, for projects with HAP contracts such as Englewood's, i.e., a contract renewed

pursuant to MAHRA, the only authority to grant a rent adjustment for extraordinary energy costs is section 524(c) of MAHRA and is made upon a budget basis. As with a budget-based rent increase request, Englewood was required to timely submit the request and receive HUD approval in order to receive the energy claim as a rent adjustment. No approval was granted by HUD.

### A. Englewood's Energy Reimbursement Claim Was Incomplete

The parties stipulated that on August 6, 2001, Englewood submitted a request for reimbursement of extraordinary energy costs.[12] JX 103. The worksheet required owners to "attach September 1999-March 2000 invoices and September 2000-March 2001 invoices to support increased amounts." Id. No invoices were attached to the requested amount of $55,230.29. Id.

Englewood subsequently submitted a new claim on May 31, 2002. JX 273. Englewood argued in its new claim that its August 6, 2001 submission was incorrect, and then compounded its prior error by providing invoices covering not only September 2000 through March 2001, but also November 2001 through March 2002, a period for which reimbursement was not allowed. Englewood also included a "Customer Activity Report" covering May 1998 through April 2002, however Englewood failed to include invoices from September 1999 through March 2000.

---

[12] When we agreed to this stipulation, we made clear to Englewood that we were doing so because we had no evidence to contravene any statement made by Mr. Hayes that it was not submitted to HUD. However, we have further maintained that there is no evidence that HUD ever received the request in 2001. Indeed, there was consistent testimony on this point. Record 706: 1-4; 772: 19-23. Moreover, Government counsel reiterated this position during trial. Record 769: 16 – 772: 23. Nevertheless, it is not material to HUD's overall liability for this claim whether Englewood's application in 2001 was actually received because, assuming Mr. Hayes submitted a claim for energy reimbursement, it was grossly incomplete.

The very fact that Englewood submitted a subsequent energy reimbursement claim in May 2002 demonstrates that the August 6, 2001 submission was deficient and the corrected submission untimely. Indeed, Mr. Samuelson testified during his deposition that the request Englewood allegedly filed in August 2001 was inaccurate. JX 014, p. 570 at 595. The subsequent application that Mr. Samuelson submitted recalculated the amount of Englewood's claim, as he asked for more than $139,000 in energy reimbursements in May 2002. JX 273, p. 4195A at 4195B.

Englewood now also argues for the first time that HUD provided no support for the contention that energy claims must be submitted by September 30, 2001. Pl. Br. p. 8. This claim is without evidentiary support however, because the letter that Mr. Hinsberger sent to all owners in 2001 clearly stated that the application must be submitted by September 30, 2001. JX 92. Furthermore, the form upon which each owner was required to submit its claim contained the 2001 fiscal year restriction upon the first page. JX 273, p. 4195A, at 4202. Finally, nowhere does Englewood produce any record or testimonial evidence that contradicts the date restriction in Mr. Hinsberger's letter.

**B. Even If the August 6, 2001 Submission Was Complete, Englewood Would Not Have Been Entitled to Receive Payment Because it Was Neither Acceptably Managed Nor in Decent, Safe and Sanitary Condition ("In Good Standing")**

In order for Englewood to be eligible to receive an energy reimbursement payment, HUD required that "properties must be acceptably managed and the owner must be in good standing with all its Business Agreements signed with the Department." JX 90, 1092 at 1094. South Pointe was neither. Englewood admitted that it was not acceptably managed and offered to be placed upon probation. Englewood Terrace L.P., 79 Fed. Cl. at 537. Additionally,

communications between HUD and Englewood indicated that HUD did not believe that the property was being acceptably managed. JX 94 p. 1099; Jt. Stip. of Fact ¶ 98.

Further, to date, there has been no finding that South Pointe was being maintained in a decent, safe and sanitary condition, as required by its HAP contract. JX 21, 696, at p. 697. Although this Court has determined that HUD's termination of the HAP contract was improper because HUD failed to allow an appropriate period to cure the deficiencies, the Court further made factual findings that there were serious physical deficiencies at the property as observed not only by HUD, but by other governmental agencies as well as Englewood. Englewood Terrace L.P., 79 Fed. Cl. at 522-524. In fact, even Mr. Samuelson acknowledged the poor physical condition of the property. JX 14 p. 570 at 584-590.

Given that there has been no finding that South Pointe was being properly maintained at the time it made a request for energy costs reimbursement in 2001, or its belated request in 2002, and that Englewood admitted that it was not properly managed, HUD had additional reasons for not agreeing to any request by Englewood for energy reimbursement costs.

## CONCLUSION

For these reasons, the United States respectfully requests that the Court dismiss Englewood's claims for a budget-based HAP contract rent increase for contract year 2002 and energy reimbursement for costs incurred in fiscal year 2001.

Respectfully submitted,

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/ Brian M. Simkin
BRIAN M. SIMKIN
Assistant Director

s/ Douglas K. Mickle
DOUGLAS K. MICKLE
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit, 8th Floor
Washington, D.C. 20530
1100 L Street, N.W.
Tel: (202) 307-0383
Fax: (202) 307-0972

Attorneys for Defendant

OF COUNSEL:

GREGORY G. GUSTIN
MARIA T. BAGUIO
RUSSELL J. COHEN
LORRAINE C. SHOTO

Office of General Counsel
U.S. Department of Housing
and Urban Development

February 7, 2008

**CERTIFICATE OF FILING**

I hereby certify that on February 8, 2008, a copy of the foregoing "**DEFENDANT'S POST-TRIAL BRIEF ON WHETHER ENGLEWOOD PROVED AT TRIAL THAT THE GOVERNMENT WAS LIABLE FOR A BUDGET-BASED RENT INCREASE IN 2002 AND A FISCAL YEAR 2001 ENERGY REIMBURSEMENT CLAIM**" with appendix was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Douglas K. Mickle
Douglas K. Mickle