**No. 03-2209C**
**Judge Marian Blank Horn**

---

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**ENGLEWOOD TERRACE LIMITED PARTNERSHIP, a Michigan Limited Partnership,**

**Plaintiff,**

**v.**

**UNITED STATES OF AMERICA and MEL MARTINEZ, Secretary of the Department of Housing and Urban Development,**

**Defendants.**

---

# PLAINTIFF ENGLEWOOD'S POST-TRIAL BRIEF IN SUPPORT OF AN AWARD OF DAMAGES FOR LOST EQUITY

---

**Peter V. Baugher**
**William B. Berndt**
**Schopf & Weiss LLP**
**One South Wacker Drive**
**28th Floor**
**Chicago, IL 60606**
**312.701.9300**

**August 8, 2008**

**TABLE OF CONTENTS**

**INTRODUCTION** ........ **1**

**STATEMENT OF FACTS** ........ **3**

I. SOUTH POINTE'S FINANCIAL VIABILITY DEPENDED ON THE RENTAL SUBSIDY PROVIDED BY THE CONTRACT WITH HUD. ........ 3

II. AFTER HUD BREACHED THE CONTRACT AND CUT OFF PAYMENTS, SOUTH POINTE'S REVENUES DROPPED PRECIPITOUSLY. ........ 4

III. THE SHARP DECLINE IN SOUTH POINTE RENTAL REVENUE LED TO ENGLEWOOD'S DEFAULT ON ITS MORTGAGE LOAN WITH THE COMMUNITY INVESTMENT CORPORATION, AND THE 2002 FORECLOSURE ACTION. ........ 5

IV. THE TERMINATION OF THE HAP CONTRACT AND RESULTING REDUCED RENTAL REVENUE CAUSED THE 2004 DEFAULT AND FORECLOSURE. ........ 6

V. THE VALUE OF ENGLEWOOD'S EQUITY WAS $4 MILLION. ........ 8

A. Englewood Established That Mr. Samuelson Is Qualified To Testify Regarding The Value Of South Pointe. ........ 8

B. Englewood Presented Four Analyses Of The Value Of South Pointe And Englewood's Lost Equity. ........ 9

1. The First Valuation: Englewood's Equity As Of March 31, 2001 Was $3,967,723. ........ 10

2. The Second Valuation: Englewood's Equity As Of December 2001 Was $3,947,814. ........ 12

3. The Third Valuation: Englewood Equity Was $4,329,618 As Of September 30, 2004. ........ 13

4. The Fourth Valuation: Based On A 2005 Comparable Sale, Englewood's Equity Interest Was $4,477,900. ........ 14

VI. HUD MADE NO EFFORT TO CHALLENGE ENGLEWOOD'S TESTIMONY OR EVIDENCE ON THE VALUE OF LOST EQUITY OR TO PRODUCE ANY CONTRARY EVIDENCE OF ITS OWN. ........ 15

**ARGUMENT** ........ **16**

I. THE LOSS OF ENGLEWOOD'S EQUITY WAS FORESEEABLE TO HUD. ........ 18

II. THE LOSS OF ENGLEWOOD'S EQUITY WAS CAUSED BY HUD'S BREACH OF CONTRACT. .......... 20

III. HUD MADE NO ATTEMPT TO PROVE ENGLEWOOD'S EFFORTS TO MITIGATE ITS DAMAGES WERE NOT REASONABLE. .......... 22

IV. ENGLEWOOD PROVED THE AMOUNT OF ITS LOST EQUITY - $4 MILLION. .......... 24

**CONCLUSION .......... 26**

# TABLE OF AUTHORITIES

## Cases

*A.B. Dick Co. v. Burroughs Corp.*, 798 F.2d 1392 (Fed. Cir. 1986) .......................................... 19

*Anchor Savings Bank v. United States*, 81 Fed. Cl. 1 (2008) ...................................................... 20

*Bean Dredging Corp. v. United States*, 19 Cl. Ct. 561 (Cl. Ct. 1990).......................................... 20

*Brasseler U.S.A. I, L.P. v. Stryker Sales Corp.,* 267 F.3d 1370 (Fed. Cir. 2001)......................... 19

*California Federal Bank. v. United States*, 395 F. 3d 1263 (Fed. Cir. 2005)............................... 20

*Citizens Federal Bank v. United States*, 474 F.3d 1314 (Fed. Cir. 2007).............................. 16, 20

*Energy Capital Corp. v. United States,* 302 F. 3d 1314 (Fed. Cir. 2002)........................ 16, 18, 21

*Englewood Terrace, L.P. v. United States*, 79 Fed. Cl. 516 (Fed. Cl. 2007)............................. 1, 3

*Gill v. United States*, 1997 WL 820963 (Fed. Cl. 1997) ............................................................ 20

*Home Savings of America v. United States,* 399 F. 3d 1341 (Fed. Cir. 2005)............................. 23

*Indiana Michigan Power Company v. United States*, 422 F. 3d 1369 (Fed. Cir. 2005)............... 16

*Lincor Contractors, Ltd. v. Hyskell,* 692 P. 2d 903 (Wash. App. 1984) ..................................... 17

*Markowitz and Co. v. Toledo Metropolitan Housing Authority*, 608 F. 2d 699 (6th Cir. 1979).. 17

*Robinson v. United States*, 305 F. 3d 1330 (Fed. Cir. 2002) ....................................................... 23

*San Carlos Irrigation and Drainage Dist. v. United States*, 111 F.3d. 1557 (Fed. Cir. 1997)..... 16

*Seravalli v. United States*, 845 F.2d 1571 (Fed. Cir. 1988).................................................. 14, 24

*Slattery v. U.S.*, 69 Fed. Cl. 573 (Fed. Cl. 2006) ......................................................................... 22

*Speck v. United States,* 28 Fed. Cl. 254 (Fed. Cl. 1993)............................................................. 20

*Suess v. United States,* 52 Fed. Cl. 221 (2002) ............................................................................ 21

*United States v. 179.26 Acres of Land,* 644 F.2d 367 (10th Cir. 1981)....................................... 24

**Treatises**

E. Allan Farnsworth, CONTRACTS, § 12.1 (3d ed. 2004) ............................................................. 20

RESTATEMENT (SECOND) OF CONTRACTS 350 (1981) ..................................................................... 23

## INTRODUCTION

HUD breached its contract with Englewood. That breach caused damages – including the loss of Englewood's equity interest in South Pointe. HUD knew that its failure to perform its obligations under the contract would cause those damages. At trial, Englewood presented detailed evidence of lost equity damages in the amount of $4,000,000. HUD offered virtually no evidence and conducted almost no cross-examination in response. This Court should award Englewood the full amount of its lost equity damages.

On November 30, 2007, after a full trial in which all parties had the opportunity to introduce evidence on both liability and damages, this court determined that HUD breached its 2000 HAP contract with Englewood. *Englewood Terrace, L.P. v. United States*, 79 Fed. Cl. 516, 535 (Fed. Cl. 2007) The court also rejected HUD's affirmative defense that there had been a prior default by Englewood. *Id*. at 548. At the Court's direction, this brief focuses on the appropriate amount of damages to be awarded Englewood for lost equity. At trial, Englewood submitted comprehensive explanations of equity valuations between $3.9 million and $4.5 million. Englewood's evidence on the value of its lost equity in South Pointe was not challenged or refuted by HUD.

What HUD says it disputes is whether Englewood's lost equity is an appropriate category of damages. Under the legal standard for awarding damages in the Federal Circuit, and in light of the largely uncontested record on damages in this case, Englewood's loss of the equity it had in South Pointe through the foreclosure of its mortgage was clearly foreseeable by HUD and resulted from HUD's breach of contract. It is therefore recoverable as a proper component of compensatory damages.

At trial, Englewood demonstrated by a preponderance of the evidence that HUD's breach of contract caused Englewood to lose $4 million in equity in South Pointe. Englewood

showed that HUD's breach caused South Pointe's precipitous loss of rental revenue. The cut off of HUD's subsidy payment (1) was responsible for Englewood's mortgage default, foreclosure, and loss of equity, (2) was foreseeable by HUD (as its witnesses conceded at trial), and (3) led to lost equity whose value was proven with reasonable certainty.

The trial testimony overwhelmingly supports an award of lost equity to Englewood. Freddie Batchelor, a former employee of HUD's Departmental Enforcement Center ("DEC"), John Hayes and Don Samuelson all testified that South Pointe would not be able to pay its bills without the continuation of the HAP contract, which accounted for approximately 85% of the building's revenues at the time of the breach. HUD witnesses agreed. John Schneider, Veronica Coleman and Edward Hinsberger confirmed that Englewood was not financially viable without the HAP subsidy. The most knowledgeable HUD witnesses on South Pointe finances and market conditions in the Englewood neighborhood – Mr. Schneider and Ms. Anderson – did not challenge this testimony.

Through Mr. Samuelson, Englewood provided four alternative valuations that demonstrate that Englewood's lost equity amounts to at least $4 million. (Englewood substantiated equity valuations between $3.9 million and $4.77 million.) His testimony and all of his exhibits were received in evidence without objection. HUD did not contest any of the facts, calculations or methodologies used by Mr. Samuelson in his valuation testimony on Englewood equity. HUD produced no lost equity damage evidence of its own.

Englewood satisfied its burden of proof with respect to all of the elements of its lost equity damages claim. This court should award Englewood $4 million in lost equity.[1]

[1] The Court's July 16, 2008 Order instructed Englewood to direct this brief to issues relating to lost equity. In the event that they are unable to reach a compromise in this matter, the parties will file further briefs regarding Englewood's claim to $4,368,907 in lost revenue. (PX

## STATEMENT OF FACTS

### I. SOUTH POINTE'S FINANCIAL VIABILITY DEPENDED ON THE RENTAL SUBSIDY PROVIDED BY THE CONTRACT WITH HUD.

This Court found that HUD and Englewood entered a housing assistance payments ("HAP") contract in October 2000, which provided for an initial one-year term to be "automatically" renewed for three additional years. *Englewood Terrace*, 79 Fed. Cl. at 519-20. HUD breached that agreement. *Id.* at 535.

At the time HUD and Englewood entered their contract in the fall of 2000, both parties knew that South Pointe required "deep subsidy" assistance to survive. South Pointe required that level of subsidy assistance for a number of reasons. South Pointe was a Section 8 project with a use restriction limiting its market to very low income families with rent payments limited to 30 percent of their adjusted gross income. (JX 197 at 1909-10.) More than 88 percent of South Pointe's operating revenue was derived from rental subsidies under the HAP contract. (PX 18 at 4356; PX 19 at 4359.)

In December 1999, John Schneider, HUD's Chief Appraiser, reported to Mr. Hinsberger and Ms. Anderson that Englewood could not survive in the very low income Englewood marketplace without the benefit of the deep subsidy under a HAP contract, project-based funding that had been the principal source of South Pointe income since 1992. (JX 255 at 3966.) Mr. Schneider's report was prepared in the context of Englewood's request for a comprehensive rehabilitation loan that HUD would insure. (JX 255 at 3961.) He concluded that: "[c]urrent market experience strongly suggests that South Pointe Terrace *will not be able to survive*, in a market sense, without deep subsidy assistance," and that "Englewood's apartment

---

2A at 4247A.) (HUD saved millions of dollars through its breach.) The parties have briefed Englewood's additional claims for lost rental increases and energy reimbursement costs. (*See* Docket Nos. 145-148.) Englewood's damages total $8,508,094. (PX 2A at 4247A.)

market is predominantly subsidized and is likely to remain a predominantly subsidized rental market in the foreseeable future." (JX 255 at 3965-6) (emphasis added). Mr. Schneider found the Englewood market in late 1999 did not support any apartment projects that were operating successfully without the deep subsidy assistance provided by project based Section 8 HAP contracts, and that would be the case for the foreseeable future. (JX 255 at 3964-65.)

The trial testimony and evidence introduced at trial supports Mr. Schneider's conclusions. Ms. Batchelor, the HUD Departmental Enforcement Center ("DEC') project manager for South Pointe, concurred with Mr. Schneider's assessment, and testified that South Pointe would not survive without the HAP contract subsidy. (Tr. 141-42.) Mr. Hayes stated that Mr. Schneider's conclusion was "very correct." (Tr. 996.) Veronica Coleman wrote in a January 21, 2001 email to John Hayes: "Abating the contracts would stop the bulk of project revenue which would result in bills being unpaid." (JX 72 at 1015.) Mr. Hinsberger testified that he knew in both September 2001 and 2000 that without the revenue supplied by a HAP subsidy Englewood could not pay its bills or operate the building. (Tr. 625, 627.) The lack of a HAP subsidy would devastate the operating economics of the building. And tenants would not receive services. (Tr. 625.) Mr. Hinsberger explained that the lost revenue – and resulting sudden loss in Englewood's ability to provide tenant services – was the purpose of the subsidy extensions entered by Englewood and HUD in 2001 and 2002. (Tr. 627.)

## II. AFTER HUD BREACHED THE CONTRACT AND CUT OFF PAYMENTS, SOUTH POINTE'S REVENUES DROPPED PRECIPITOUSLY.

On October 1, 2001, despite Englewood having met the conditions that HUD had set in order to renew the 2000 Housing Assistance Payments Renewal Contract, HUD did not "automatically renew" the contract as it was required to do. (JX 111 at 1160; 79 Fed. Cl. at 526.) Instead, Mr. Hinsberger emailed to Englewood on October 1, confirming HUD's intention to

terminate the 2000 Housing Assistance Payments Contract. (Jt. Stip. Fact ¶ 111.) HUD restricted Englewood from attempting to release units made available by tenants leaving the building: "As units are abated from the HAP contract, the owner may not again lease those units to project-based Section 8 residents." (JX 117 at 1177; 79 Fed. Cl. at 539.) While there were relatively few move-outs from South Pointe from October 2001, when there was only 1% vacancy, through December 2001 when there was a 3% vacancy, Ms. Thomas testified at trial that as tenants moved out of South Pointe in 2001 and 2002, not surprisingly revenues were greatly reduced. (JX239 at 2902; Tr. 377.)

Englewood's rental revenue at South Pointe from October 2001 through June 2002 declined from $218,000 to $149,000, an amount sufficient to cover most operating expenses but not Englewood's heavy debt service, a special burden well known to HUD. (Tr. 87; PX 3A at 4249B.) Only 20% of South Pointe tenants had used their vouchers to leave South Pointe by March 31, 2002. (Tr. 1060.) Tenants moved out rapidly in April and May 2002, however, leading to a significant revenue shortfall. (Tr. 1060-61.) Englewood was unable to pay real estate taxes and insurance on its monthly mortgage payment, and thus faced foreclosure. (Tr. 1060-61.)

## III. THE SHARP DECLINE IN SOUTH POINTE RENTAL REVENUE LED TO ENGLEWOOD'S DEFAULT ON ITS MORTGAGE LOAN WITH THE COMMUNITY INVESTMENT CORPORATION, AND THE 2002 FORECLOSURE ACTION.

As tenants moved out, their units were abated and could not be rented. Rent revenues fell from $218,197 in October 2001, to $149,977 in June 2002, and to $75,576 in October 2002. (PX 3A at 4249B.) When, unable to pay its bills, Englewood defaulted on its mortgage loan, its lender filed a foreclosure action in May 2002. (JX 269 at 4139; Tr. 1061-62). After filing for foreclosure, the lender agreed to hold its suit in abeyance on the condition that

Englewood obtain a HUD rehab and refinancing loan. (Tr. 1062). Englewood executed the HUD loan in December 2002 to pay off the existing debt and to obtain dismissal of the foreclosure action. (Tr. 1070.)

By agreeing to take on another loan, Englewood saved South Pointe from foreclosure. Mr. Hayes testified that but for HUD's willingness to refinance the existing Community Investment Corporation loan in 2002, that loan would have been foreclosed. (Tr. 994-95.) Mr. Hinsberger agreed with Mr. Hayes, noting that it was "probably true" that the foreclosure action in May 2002 would have been completed but for a new HUD-insured loan that paid off the existing loan in December 2002. (Tr. 651.)

From October 2001 through September 2002, Englewood employed administrative and legal actions to try to force HUD to reconsider its failure to perform its obligations under the 2000 housing assistance payments contract. (Tr. 1059-60.) When HUD refused to reverse its decision, Englewood filed suit in the Northern District of Illinois and later in the Court of Federal Claims, and pursued its administrative remedies at HUD, as well. (JX 1 at 12; JX 3 at 30.) Englewood attempted through these legal actions to persuade or compel HUD to reinstate the 2000 HAP contract. (Tr. 1066-68.)

## IV. THE TERMINATION OF THE HAP CONTRACT AND RESULTING REDUCED RENTAL REVENUE CAUSED THE 2004 DEFAULT AND FORECLOSURE.

Nevertheless, HUD refused to reinstate its contract with Englewood. Consequently, revenue from South Pointe fell from January 2003 through September 2004 to less than 40% of the monthly revenue generated during the 4th quarter of 2001 ($220,000 per month). (PX 3A at 4249B.) Through determined promotional efforts, and work with existing tenants, Englewood increased its rental revenue from $79,103 in January 2003 to $111,539 in December 2003. (*Id.*) But this was not sufficient to pay its operating expenses and the

mortgage. Interest real estate taxes and insurance were capitalized in the HUD loan, so that Englewood did not have to pay these expenses for the first 14 months after the refinancing. When that period ended, however, without the HAP revenues, Englewood was again unable to pay its bills. Reilly Mortgage (the lender for the HUD-insured loan entered in 2002) then foreclosed and DSSA Management was replaced with a receiver in May 2004. (Tr. 1073-74.)

Mary Anderson testified, in her very circumscribed testimony, that interest, real estate taxes and insurance were capitalized in the HUD loan:

A There were no principle [*sic*], principle [*sic*] payments were not due during the construction period. Construction loan interest was due and that came out of the loan.

Q And when you say it came out of the loan, what do you mean?

A It was paid from loan proceeds.

(Tr. 1181.)

Ms. Anderson also explained that while South Pointe was partially occupied at the time of December 2002 HUD-insured loan, it continued paying operating expenses equivalent to those while the building was fully occupied:

Q Well, the building was open and operating and there were residents there at the time, right?

A Yes.

Q And all of the regular expenses of the building had to be paid.

A Yes.

Q Like the utility bills that you just mentioned, right?

A Yes.

Q So those expenses continued throughout the time that this loan was in place, right?

A Correct.

Q And there's no interruption of those that you're aware of.

A Correct.

(Tr. at 1198-99.)

When the capitalized expenses for mortgage interest, real estate taxes and insurance were exhausted in April 2004, Englewood defaulted on its loan, the HUD-insured mortgagee initiated foreclosure proceedings and a receiver was appointed (at a $10,000 per month management fee or more) to replace DSSA Management which had been managing South Pointe from January 2003 through April 2004 for no fee. (PX 48 at 4515; PX 49 at 4525; PX 50 at 4571; Tr. 1072-74.) The foreclosure suit was filed in May 2004 and was completed at the end of 2005. (Tr. 1074.)

At trial, HUD did not challenge the reasonableness of Englewood's attempts at mitigation of this imminent foreclosure and certain complete loss of equity by entering into the HUD insured loan and promoting South Pointe to voucher and market-rate tenants. There was no cross-examination of Mr. Hayes regarding the impending foreclosure in 2002 or the need for a new loan to prevent the immediate end of the project. (Tr. 997-1017.) There was no cross-examination of Mr. Samuelson concerning these issues either. (Tr. 1355-78.)

## V. THE VALUE OF ENGLEWOOD'S EQUITY WAS $4 MILLION.

### A. Englewood Established That Mr. Samuelson Is Qualified To Testify Regarding The Value Of South Pointe.

Mr. Samuelson, the general partner in Englewood, is an attorney with almost 40 years of experience in government and affordable housing, beginning with his role as the first Assistant Director of the Illinois Housing Development Authority ("IHDA") in 1969. (Tr. 1026-28; JX 272 at 4191.) In 1994, he worked on LIHPRHA cases for between 40-50 owners and was

the first consultant in the country to take a project through LIHPRHA, including the unusual "tie breaking" third appraisal. Mr. Samuelson represented 40 owners from 1992 through 1996 dealing with the central question of the value of HUD properties, and managing the appraisal disputes through to resolution. (Tr. 1027-28.) At HUD's requests, he made presentations to HUD appraisers and owners during this period. (Tr. 1027-28.) As recently as 2006, Department of Justice attorneys in Washington deposed Mr. Samuelson regarding the LIHPRHA valuation of a Florida property. (Tr. 1028-29, 1375-78.)

### B. Englewood Presented Four Analyses Of The Value Of South Pointe And Englewood's Lost Equity.

Through the testimony of Mr. Samuelson, Englewood offered four alternative valuations of Englewood – each of which reflected appropriate and accepted methods for valuing real property. Mr. Samuelson testified that he used standard appraisal methodologies at four different valuation time periods to calculate a reconciled Englewood equity value of $4,000,000. (Tr. 1122.) Englewood introduced the following information into evidence through Mr. Samuelson's testimony and a chart at trial (PX 4A at 4254A):

| | | |
|---|---|---|
| **South Pointe Value as of 3/31/01** | | **$3,967,723** |
| Appraised Value | $6,750,000 | |
| Debt as of 3/31/01 | $2,782,277 | |
| Equity | $3,967,723 | |
| **South Pointe Value as of 12/31/01** | | **$3,947,814** |
| Appraised Value | $6,282,327 | |
| NOI $691,056 | | |
| Capitalization Rate = 11% | | |
| Debt as of 12/31/01 | $2,334,513 | |
| Equity | $3,947,814 | |
| **South Pointe Value as of 9/30/04** | | **$4,329,618** |
| Appraised Value | $8,729,618 | |

| | |
|---|---|
| NOI $960,258 | |
| Capitalization Rate = 11% | |
| Debt as of 9/30/04 | $4,400,000 |
| Equity | $4,329,618 |

| | |
|---|---|
| **South Pointe Value Per Comparable Sale in 2005** | **$4,477,900** |
| **Southwind Apartments – 6531 S. Lowe, adjacent to South Pointe** | |

Southwind Apartments
Sales Price = $5,500,000
188 units at $29,300/unit

| | |
|---|---|
| South Pointe | |
| 303 units at $29,300/unit | $8,877,900 |
| Debt as of 9/30/04 | $4,400,000 |
| | $4,477,900 |

These four valuations are discussed below.

**1. The First Valuation: Englewood's Equity As Of March 31, 2001 Was $3,967,723.**

A certified appraisal was conducted to determine the fair market value at South Pointe in November 2000. (JX 239 at 2806-2937.) It followed Uniform Standards of Professional Appraisal ("USPAP") guidelines and determined that the "As-Is" market value at South Pointe was $6,750,000 as of November 2000. (JX 239 at 2866.) The appraisal was prepared in compliance with HUD's Section 221(d)(4) Loan Project Valuation Requirements, and in accordance with the Uniform Standard of Professional Appraisal Practice. (JX 239 at 2807.)

> "In completing this appraisal, we conducted an inspection of the subject property on May 16, 2000 and an exterior inspection on November 15, 2000. Our approach to valuation is based on HUD 221(d)(4) guidelines for substantial rehabilitation. Under these guidelines, the "As Is" analysis considers only the Income and Direct Sales Comparison Approach to Value."[2]

[2] The definition of market value as used in this respect, as defined by Title XI of the Financial Institution Reform Recovery and Enforcement Act ("FIRREA") of 1989 as follows:

(JX 239 at 2815.)

The appraisal continued: "This is a Self Contained Appraisal Report which is intended to comply with the reporting requirements set forth under Standard Rule 2-1(A) of the Uniform Standards of Professional Appraisal Practice for a Self-Contained Appraisal Report." (JX239 at 2867.) "The vacancy rate for the residential units of the subject property has been relatively consistent at 97 percent." (JX239 at 2902.)

At trial, Mr. Hayes explained the three appraisal methods used by the appraiser to determine fair market value: (a) the capitalization of net operating income, (b) gross income multiplier, and (c) comparable sales. (Tr. 917-918.) Mr. Hayes testified that the only difference between the Englewood and HUD determinations of value in March of 2001 related to estimates of operating expenses. (Tr. 932.) HUD did not cross-examine Mr. Hayes regarding his testimony concerning the appraisal and value of South Pointe (Tr. 997-1017), and declined to

---

> The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently, knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:
>
> (a) buyer and seller are typically motivated;
>
> (b) both parties are well informed or well advised and each acting in what he consider his own best interest;
>
> (c) a *reasonable time is allowed for exposure in the open market*; (emphasis added)
>
> (d) payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and
>
> (e) the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions by anyone associated with the sale. (JX 239 at 2816.)

allow Mr. Schneider, a HUD appraiser, to testify regarding the March 31, 2001 appraisal or Mr. Hayes' testimony. (Tr. 1207-08.) Accordingly, the appraiser's valuation – $6,750,000 – stands unrebutted.

Mr. Samuelson explained how he determined Englewood's equity interest in South Pointe by reducing the appraiser's valuation for South Pointe ($6,750,000) by the outstanding debt on the property ($2,782,277). (PX 4A at 4254A.) Mr. Samuelson concluded that the resulting equity on March 31, 2001 was $3,967,723 ($6,750,000 - $2,782,277). (Tr. 1124.) HUD did not cross-examine Mr. Samuelson on this point, invite Mr. Schneider or anyone else to provide alternative testimony, or offer any other pertinent evidence.

**2. The Second Valuation: Englewood's Equity As Of December 2001 Was $3,947,814.**

Mr. Samuelson testified that he also calculated Englewood's equity interest as of December 31, 2001. (Tr. 1125.) Mr. Samuelson calculated a "normalized" net operating income for South Pointe for 2001 using Englewood's 2001 financial statements. (Tr. 1125; PX 4 at 4250, 4254A; Tr. 932-34.) The net operating income of $691,056 was divided by a capitalization rate of 11 – the same capitalization rate used for the March 31, 2001 appraisal. (Tr. 1126.) Mr. Samuelson calculated the fair market to be $6,282,327. (Tr. 1128.) The debt was $2,334,513. (Tr. 1128.) The resulting equity was thus $3,947,814 ($6,282,327 - $2,334,513). (Tr. 1125-29.) Both the first and second calculations of Englewood equity were calculated as of 2001, the year in which HUD breached the 2000 HAP contract.

Again, HUD elected not to cross-examine Mr. Samuelson on this topic, did not ask Mr. Schneider or any other witness to provide alternative testimony or sponsor contrary evidence, or otherwise attempt to refute Mr. Samuelson's conclusion.

**3. The Third Valuation: Englewood Equity Was $4,329,618 As Of September 30, 2004.**

Mr. Samuelson calculated Englewood's equity as of September 30, 2004, reflecting the equity value that Englewood should have realized at the end of the four year HAP contract had it not been breached by HUD. (Tr. 1129.) Mr. Samuelson's calculation began with his analysis of the rental revenues South Pointe would have generated had HUD performed its obligations under the HAP Contract. Mr. Samuelson reviewed past Englewood expenses and revenues, and the rehab program that Englewood had proposed to HUD in March 2001. (Tr. 1129-30.) Mr. Samuelson used these figures to create a cash flow schedule for the period between October 1, 2001 and September 30, 2004 that reflected the implementation of the rehabilitation program proposed by Englewood on March 19, 2001. (PX 4 at 4250-54.)

Mr. Samuelson's calculations were based on approved annual rents of $2,804,658, a vacancy rate of 3%, a rehab loan of $4,000,000 at 7%, the paydown of the debt through operating income and operating expenses that were consistent with prior operating expenses, and efficiencies that would result from the rehab loan improvements. (PX 4 at 4250-54, Tr. 1129-32.) Once Englewood had obtained new financing and eliminated the heavy principal payments under the Community Investment Corporation loan, the project would generate cash flow that would enable the initial debt of $2,500,000 and the new debt of $4,000,000 to be paid down to $4,400,000 by September 30, 2004. (Tr. 1129-32.)

The result would have been net operating income of $960,258. (Tr. 1129.) Mr. Samuelson then divided the net operating income by the capitalization rate of 11 to generate a fair market value of $8,729,618, and an equity value of $4,329,618 after the reduction of the debt of $4,400,000 ($8,729,618 - $4,440,000). (PX 4 at 4250-54, Tr. 1131-32.)

HUD made no attempt to challenge or refute Mr. Samuelson's testimony, introduced no evidence of its own, and declined to ask its own witnesses – notably Mr. Schneider and Ms. Anderson – to comment on any of Mr. Samuelson's assumptions or calculations. (Tr. 1202; Tr. 1178.)

**4. The Fourth Valuation: Based On A 2005 Comparable Sale, Englewood's Equity Interest Was $4,477,900.**

Mr. Samuelson's fourth calculation of Englewood equity was based on a 2005 sale of a comparable 188-unit multistory apartment building (Southwind) that was immediately to the south of South Pointe.[3] (Tr. 1132.) It had an asking price of $6,000,000 and a sales price before any rehabilitation of $5,500,000. (JX 236 at 2782.) The sales price reflected a valuation of $29,255 per unit ($5,500,000 divided by 188 units). (*Id.*)

Photographs entered during trial showed that while Southwind was similar in unit distribution and unit size, it had a significantly poorer appearance than South Pointe. (JX 236 at 2782, and JX 232 (photographs at 2722, 2726, 2627, 2728, 2729 and 2730).) Nonetheless, applying Southwind's (lower) $29,255 per unit sales price to the 303 units at South Pointe results in a fair market value of $8,877,900 for South Pointe. Less the $4,400,000 improvement program debt, Mr. Samuelson explained that this results in an equity value of $4,477,900 ($8,877,900 - $4,400,000). (Tr. 1132-34.)

This valuation (and the comparable sale at Southwind) are consistent with the redevelopment of the neighborhood surrounding South Pointe from 2001 to 2004. Englewood demonstrated at trial that the conditions of the (Englewood) neighborhood improved during the period from 2001 through 2004: new single family housing developed to the east of South

[3] *See, e.g. Seravalli v. United States*, 845 F.2d 1571, 1575 (Fed. Cir. 1988) (noting that comparable sales are a favored method of determining fair market value, and that the government contended that comparable sales are the *only* method for determining the value of real property).

Pointe (Tr. 1038; JX 232 at 2734, 2736, 2737, 2739, 2740 at 2741), new commercial and public building construction on 63rd and Halsted Streets within a block of South Pointe (Tr. 1038-39; JX 232 at 2707, 2708, 2712, 2714), the proximity of South Pointe to the Kershaw School (Tr. 1039) and to mass transit (Tr. 1037-38) and the new $200 million Kennedy-King College on eight square blocks on Lowe Street, immediately to the west of South Pointe. (Tr. 1036-1038; JX 232 at 2711, 2743, 2744, 2747 and 2749.)

## VI. HUD MADE NO EFFORT TO CHALLENGE ENGLEWOOD'S TESTIMONY OR EVIDENCE ON THE VALUE OF LOST EQUITY OR TO PRODUCE ANY CONTRARY EVIDENCE OF ITS OWN.

HUD made no effort to challenge or refute any of the methodologies, calculations or fact assumptions Mr. Samuelson used in his damages testimony. (Tr. 1355-1378.) HUD also chose not to question Ms. Anderson, HUD's Director of Operations, regarding damages issues. (Tr. 1178, 1185-1194.) Instead, Ms. Anderson's testimony was limited to the December 2002 HUD insured loan rather than the marketplace conditions requiring the multiyear HAP contract in October 2000 or Englewood's value in March 2001. (Tr. 1178-85.)

HUD elected to question its appraiser Mr. Schneider only on the digital photos he took of Englewood in October 2001. It did not ask him about his December 1999 memo to Mr. Hinsberger and others, stating that South Pointe could not survive financially without its HAP contract. (Tr. 1202-08.) Despite Englewood's request to cross-examine Mr. Schneider on topics beyond his photographs, including property valuation (his professional expertise and role at HUD), and damages, Mr. Mickle demurred: "As before, we believed that the testimony he was going to provide has already been provided. So that's why we limited it to his October site visit." (Tr. 1207.)

HUD elected not to provide any such evidence on multiple occasions at trial. HUD could have: (a) cross-examined Mr. Hayes regarding the value of South Pointe; (b) cross-

examined Mr. Samuelson regarding the value of South Pointe and his damages calculations; (c) put on affirmative testimony from Mr. Schneider or Mr. Anderson regarding the value of South Pointe; (d) called Mr. Hayes as a rebuttal witness when the trial resumed in February 2007; (e) called Mr. Schneider, Ms. Anderson or others as rebuttal witnesses on damages issues after the resumption of the trial; or (f) cross-examined Mr. Samuelson regarding lost equity issues after the one-month recess and his second turn on the witness stand. HUD chose not to do so.

## ARGUMENT

"[T]he remedy for breach of contract is damages sufficient to place the injured party in as good a position as it would have been in had the breaching party fully performed." *Indiana Michigan Power Company v. United States*, 422 F. 3d 1369, 1373 (Fed. Cir. 2005) *citing San Carlos Irrigation and Drainage Dist. v. United States*, 111 F.3d. 1557, 1562 (Fed. Cir. 1997). Had HUD not breached its contract with Englewood, there would have been no foreclosure and Englewood would have had revenue sufficient to pay its expenses. (PX 3A at 4249B.) If HUD had performed its obligations, Englewood would have had sufficient revenue to keep current on its mortgage obligation and avoid default, foreclosure and the loss of its equity in South Pointe.

Breach of contract damages are recoverable where: (1) the damages were reasonably foreseeable by the breaching party at the time of contracting; (2) the breach is a substantial causal factor in the damages; and (3) the damages are shown with reasonable certainty. *Citizens Federal Bank v. United States*, 474 F.3d 1314, 1318 (Fed. Cir. 2007); *see also Energy Capital Corp. v. United States,* 302 F. 3d 1314, 1320 (Fed. Cir. 2002). The standard applied to all three elements is "preponderance of the evidence." *Energy Capital*, 302 F.3d at 1324-25. The record demonstrates that Englewood has satisfied these elements, and that lost equity damages should be awarded in the amount of $4 million.

Lost equity damages have been awarded in the context of disputes involving subsidized housing, and in circumstances similar to those in the present case. In *Markowitz and Co. v. Toledo Metropolitan Housing Authority*, 608 F. 2d 699 (6th Cir. 1979), the court affirmed an award for lost equity on facts nearly identical to those here. In that case, the Toledo Metropolitan Housing Authority refused to honor its lease commitment to the plaintiff, the owner of an apartment complex. When the housing authority breached, the lender holding the mortgage for the property foreclosed. The owner sued, seeking damages for both lost rent and lost equity. The trial court ruled for the building owner, and awarded both rent and lost equity damages.

The Court of Appeals reasoned that an award of *both* lost rent and lost equity would "place [the plaintiff] in as good a position as it would have been if [the housing authority] had not breached." *Id.* at 706. The appellate court specifically noted that the housing authority was liable for "consequential damages" – the loss of equity due to the lender's foreclosure – because the housing authority "knew that the cash flow expected to be generated by [the housing authority's] rental payments would be the sole source of funds to pay off the [building owner's] mortgage." *Id.* at 707. Accordingly, the housing authority knew that if it failed to perform under its lease with the owner "the project would inevitably collapse." *Id.*; *see also Lincor Contractors, Ltd. v. Hyskell,* 692 P. 2d 903 (Wash. App. 1984) ("the lender breaching its loan commitment can be liable for the borrower's loss of equity in the subject property," or from the failure of a tenant to make lease payments).

Englewood's loss of South Pointe is virtually the same in its basic facts. Over 88% of Englewood's rental income derived from HAP subsidy payments at the time of the breach. (PX 18 at 4356; PX 19 at 4359.) South Pointe was therefore completely dependent on the HUD HAP subsidy payments for its economic viability. HUD knew of these circumstances,

and the devastating effect that its breach of the 2000 HAP Contract and cutoff of subsidy funds would have on Englewood's finances and ability to survive.

## I. THE LOSS OF ENGLEWOOD'S EQUITY WAS FORESEEABLE TO HUD.

At trial, HUD conceded that without the HAP subsidy, Englewood would not be able to meet South Pointe's expenses including its mortgage payment. Therefore, the risk of foreclosure created by HUD's breach was foreseeable, and it was foreseen by the parties at the time of contracting. *See, e.g., Energy Capital,* 320 F.3d at 1325 (noting that damages "caused by the breach [were] within the contemplation of the parties because the loss was foreseeable or because the defaulting party had knowledge of special circumstances at the time of contracting.") As described above, the use-restriction restraints on Englewood's ability to rent South Pointe units to market-rate tenants were well-known to HUD, and doomed the project after HUD breached the HAP contract, as Englewood's witnesses testified. (Tr. 141-42, 996.)

This Court need not rely on the testimony of Englewood's witnesses alone. HUD employees acknowledged that termination of the HUD subsidy payments would threaten South Pointe's financial survival. The December 1999 memorandum from Mr. Schneider proves that HUD knew that South Pointe required "deep subsidy" assistance to remain viable. (JX 255 at 3965-66.) Indeed, in explaining his rationale for entering short-term HAP agreements with Englewood after October 2001, Mr. Hinsberger suggested that elimination of the HUD subsidy would mean an immediate loss of services in the building, potentially stranding Englewood's tenants. (Tr. 627.) Mr. Hinsberger knew that HUD's actions would imperil Englewood and likely lead to the loss of its equity in South Pointe.

Likewise, Ms. Batchelor, the HUD Departmental Enforcement Center project manager for South Pointe, testified that South Pointe would not survive without the HAP contract subsidy. (Tr. 141-42.) And Veronica Coleman, the HUD supervisor assigned to South

Pointe, wrote to Englewood in January 2001 that the HAP payment was the primary revenue source for South Pointe and without it the project could not pay its bills. (JX 72 at 1015.)

HUD failed to present any evidence rebutting or contradicting the obvious – HUD knew that its actions would severely threaten South Pointe and Englewood. Not only did HUD fail to introduce any contrary evidence, it failed to question its own witnesses with relevant information. Mr. Schneider was Chicago HUD's chief appraiser, yet HUD elected not to call him to testify on questions of forseeability or equity value. Ms. Anderson was the Director of Operations at HUD Chicago, and a recipient of Mr. Schneider's December 1999 market assessment. Neither witness, while called for limited purposes by HUD to testify at trial, were questioned regarding issues related to lost equity. Indeed, HUD objected when Englewood attempted to explore topics beyond its direct examinations.[4]

This Court may draw an adverse inference against HUD because of its failure to present evidence regarding lost equity from its most knowledgeable witnesses on the topic. *Brasseler U.S.A. I, L.P. v. Stryker Sales Corp.,* 267 F.3d 1370, 1384 n. 7 (Fed. Cir. 2001) (court draws unfavorable inference where party knew of witness within its control with information on material issue, but chose not to call him); *A.B. Dick Co. v. Burroughs Corp.*, 798 F.2d 1392, 1400 n. 9 (Fed. Cir. 1986) ("When a party knows of witnesses on a material issue and they are within his control to produce, if the party chooses to not call the witnesses, the fact finder may draw the inference that the testimony would have been unfavorable."). Indeed, "[i]t has long

[4] The Court noted HUD's strategy at trial, and advised HUD to consider whether it would elicit further testimony from these witnesses. (Tr. 1191-92.) The Court went so far as to allow HUD a recess to confer and to further consider how it wished to proceed. (Tr. 1191-92.) Nevertheless, HUD declined the Court's invitation to present any additional evidence or testimony from Mr. Schneider or Ms. Anderson. (Tr. 1193.) HUD failed to present Mr. Schneider, Ms. Anderson, or to call Mr. Hayes or mortgage broker Alan Cravitz (as it said it might) as rebuttal witnesses after Englewood concluded its damages case one month later, in February 2007 (Tr. 1159, 1383 where HUD says it has no rebuttal witnesses.)

been held that 'the unexplained failure to call any known non-hostile person who has direct knowledge of facts being developed by the party raises the inference that the testimony would be unfavorable, or at least would not support the case.'" *Gill v. United States*, 1997 WL 820963 at *50 (Fed. Cl. 1997) (citations omitted); *Speck v. United States,* 28 Fed. Cl. 254, 312-13 (Fed. Cl. 1993); *Bean Dredging Corp. v. United States*, 19 Cl. Ct. 561, 581 (Cl. Ct. 1990) ("It is well established that the failure to produce evidence which would allegedly support the assertions of that party warrants an adverse inference in the absence of an adequate explanation for its omission.")

## II. THE LOSS OF ENGLEWOOD'S EQUITY WAS CAUSED BY HUD'S BREACH OF CONTRACT.

HUD caused the loss of Englewood's equity in South Pointe. Courts describe the required showing of causation in two ways – the breach must be either a "substantial factor" or a "definitively established" cause of the plaintiff's damages. *Compare Citizens Federal Bank v. United States*, 474 F.3d 1314, 1319-20 (Fed. Cir. 2007) (using "substantial factor" theory of causation) *and California Federal Bank. v. United States*, 395 F. 3d 1263, 1268 (Fed. Cir. 2005) (using "definitively established" standard of causation but holding that there was insufficient proof that the damages would have not have occurred "but for" the breach). This court may choose the test for causation appropriate to the facts. *Citizens Federal*, 474 F.3d at 1319-20.

Under either standard, the breach need not be the sole cause of the plaintiff's damage. *California Federal Bank.* 395 F.3d at 1268 ("That is not to say that the breach must be the sole factor or sole cause … The existence of other factors operating in confluence with the breach will not necessarily preclude recovery based on the breach.") *citing* E. Allan Farnsworth, CONTRACTS, § 12.1 at 150-51 (3d ed. 2004); *see also Anchor Savings Bank v. United States*, 81 Fed. Cl. 1, 60 (2008) ("The causation standard applied in a contracts case is not quite so rigid as

the 'proximate causation' standard often employed in tort cases.") In sum, HUD is held to an ordinary standard of loss causation when it breaches its contracts. *Energy Capital Corp. v. United States*, 302 F. 3d 1314 (Fed. Cir. 2002).

These standards of loss causation apply to cases involving loss of equity. *See Suess v. United States,* 52 Fed. Cl. 221 (2002). The *Suess* decision, in the *Winstar* line of cases, found that a breach of a commitment by bank regulators was the "substantial factor" that contributed to the loss of the bank's equity (its market capitalization). The court summarized its conclusion:

> These are classic contract damages because it was both foreseeable and actually foreseen that breach of the contractual promise regarding the regulatory treatment of goodwill would push the thrift into insolvency and subject it to seizure. Further, the breach was the substantial factor in the seizure of Franklin. In short, but for the breach, Franklin would have a going concern with a market value of $35 million. Because of the breach its equity value is now effectively zero. Based on the evidence in the record, Franklin's market capitalization on the day prior to the breach was $35 million, and this is the proper award of damages.

*Id.* at 231. Accordingly, the *Suess* plaintiff was awarded the entirety of its lost equity – $35,000,000 in damages. *Id.*

There was no foreclosure at South Pointe during the 10 years (from 1992 through 2001) that the HAP contract was in effect, despite difficult conditions. It was only after the HAP contract was terminated, subsidized leases could not be renewed, vouchers were issued to residents, and residents moved out, that the rental revenue declined to such a level that debt service payments could not be made. At that point, Englewood's lender declared default and started foreclosure proceedings against Englewood. It is obvious that once the revenue source by which South Pointe received 88% of its income was terminated, Englewood would not be able to pay its bills and would be put out of business.

This Court has found that the government "caused" a plaintiff's loss in similar circumstances. In *Slattery v. U.S.*, 69 Fed. Cl. 573 (Fed. Cl. 2006), a derivative suit was brought by a failed thrift's shareholder alleging that changed regulations which breached the contract forced the thrift to shut down. The Court concluded that it was foreseeable that government's action would lead to the failure of the thrift. The Court held that the plaintiffs were entitled to damages based on the equity value of the thrift, and found the loss would not have occurred but for the breach. *Id.* at 583-84.

The *Slattery* court awarded the plaintiffs their lost equity. *Id*. at 581. With respect to causation, the court concluded that the thrift's loss of equity was not caused by poor quality assets, poor liquidity, operating problems or other causes proposed by the government. The court concluded that the loss of equity was caused by the breach of contract. In rejecting the government's arguments that other factors caused a portion of the plaintiff's loss of equity, the court phrased it: "[T]his is like saying a victim of a gunshot dies from loss of blood not the gunshot." *Id*. at 583. The court held that the government's breach set in motion a chain of events that effectively "doomed the bank." *Id.* The *Slattery* court awarded the plaintiff $276,000,000 in damages for lost equity. *Id.* at 585.

As in *Slattery*, HUD's termination of subsidy payments created a chain of events that led to the loss of Englewood's equity. When HUD breached the HAP contract, the resulting loss of revenue caused Englewood's default, triggering suit by the lender, appointment of a receiver, and the final foreclosure of Englewood's interest in the property in 2004 and 2005.

## III. HUD MADE NO ATTEMPT TO PROVE ENGLEWOOD'S EFFORTS TO MITIGATE ITS DAMAGES WERE NOT REASONABLE.

Englewood entered into the HUD-insured loan as an attempt to mitigate (prevent) the loss of equity that would result from a foreclosure of the Community Investment Corporation

loan in 2002. HUD may argue that that loan precludes Englewood from recovering lost equity. But general rule is that a party can – in fact, must – take reasonable steps to mitigate its damages. A plaintiff cannot recover for damages for loss that it could have avoided by reasonable effort, and that its mitigation is appropriate where a reasonable person, in light of the known facts and circumstances would have taken steps to avoid damages. *Robinson v. United States*, 305 F. 3d 1330, 1333-34 (Fed. Cir. 2002), *citing* RESTATEMENT (SECOND) OF CONTRACTS 350 cmt. b (1981). It is HUD's burden to prove by a preponderance of the evidence that Englewood's effort to mitigate damages was not reasonable. *Home Savings of America v. United States,* 399 F. 3d 1341, 1353 (Fed. Cir. 2005). HUD has produced no evidence on this point.

HUD knew that the Community Investment Corporation foreclosed on Englewood in May 2002 because of Englewood's failure to generate sufficient income to pay its bills after the termination by HUD of the 2000 HAP contract. Despite this fact, HUD was willing to insure a new loan replacing the former loan then in default and foreclosure. HUD's willingness to make this loan represented the chance for Englewood to mitigate or avoid the immediate loss of its equity – and a subsequent damage claim against HUD. (Tr. 994-95.) Indeed, it defies logic that HUD now argues that Englewood's actions in agreeing to the 2002 HUD-insured-loan was unreasonable, as *HUD was a party to the same transaction.*

In the end, despite comprehensive repairs and an aggressive marketing program, Englewood could not generate the replacement rental income required to avoid defaulting on the HUD-insured loan. If HUD had honored the 2000 HAP Contract, HAP payments would have allowed Englewood to offer "deep subsidy" housing to families who met the stringent income limits and other eligibility requirements. This is the basis under which South Pointe operated and the HAP payment funding that had enabled it to keep the building at 97-99% occupancy.

HUD did not reconsider its breach of that agreement, however, despite Englewood's repeated requests and legal actions pressed for years after the breach. Consequently, Englewood's efforts to mitigate its damages though the 2002 loan were unsuccessful. That failure, however, does not mean that Englewood's attempts to mitigate were unreasonable. They were reasonable – and thus the 2002 loan is not a ground for denying Englewood damages for lost equity.

## IV. ENGLEWOOD PROVED THE AMOUNT OF ITS LOST EQUITY - $4 MILLION.

"The law is not wedded to any particular formula or method for determining the fair market value as the measure of just compensation … It may be based on comparable sales, reproduction costs, capitalization of net income, or an interaction of those determinants." *Seravalli v. United States*, 845 F.2d 1571, 1575 (Fed. Cir. 1988) (affirming award of damages based on valuation), *quoting United States v. 179.26 Acres of Land*, 644 F.2d 367 (10th Cir. 1981). Accordingly, this Court may use a "single method or some combination of different methods" to determine the value of South Pointe and the resulting loss of Englewood's equity. *Id.* In *Seravalli*, the court affirmed the trial court's award of damages for the value of a Section 8 housing project that did not have any significant vacancies and had guaranteed rents. *Id.*

Englewood provided evidence at trial of the value of South Pointe based on four different valuations using the capitalization of net income and comparable sales methods. (PX 4A at 4254A.) HUD did not object to the receipt of Englewood's evidence and testimony on lost equity, and chose not to provide its own estimates of the value of South Pointe. Accordingly, Englewood's evidence stands unrebutted.

First, Englewood offered an appraisal of South Pointe that was prepared by a licensed appraiser as of March 31, 2001. (JX 239 at 2806-2937.) The appraisal was entered into evidence without objection from HUD. (Tr. 1123.) The appraisal found a value for South Pointe as of March 31, 2001 of $6,750,000. (JX 239 at 2811.) At trial, Mr. Samuelson explained that

the appraisal used three methods to determine the value of South Pointe: capitalization of net operating income, a gross income multiplier and a comparable sales analysis. (Tr. 1123-24.) Mr. Samuelson simply reduced the value of the property (as found by the appraisal) by the outstanding debt as of March 31, 2001 to determine the value of Englewood's equity on that date: $3,967,723. (PX 4A at 4254A; Tr. 1124.)

Second, Englewood offered Mr. Samuelson's analysis of the value of the property as of December 31, 2001. (PX 4A at 4254A; Tr. 1125-29.) Mr. Samuelson explained that he calculated the normalized net operating income from South Pointe, and applied a conservative capitalization rate of 11. (Tr. 1125-29.) The calculation resulted in a value for South Pointe of $6,282,327. (Tr. 1128.) After reducing the value by the outstanding debt, Mr. Samuelson concluded that Englewood had $3,947,814 in equity on December 31, 2001. (Tr. 1129.)

Third, Mr. Samuelson testified to the value of South Pointe as of September 30, 2004. (PX 4A at 4254A; Tr. 1129-32.) Mr. Samuelson applied a calculation based on the net operating income that Englewood would have received had HUD not breached its agreement. (*Id.*) Mr. Samuelson determined the net operating income, multiplied that income by a capitalization rate, and reduced the resulting value of the property by his estimate of the outstanding debt. (PX4 at 4250-53; Tr. 1129-32.) Mr. Samuelson concluded using this approach that, but for HUD's breach, Englewood would have had $4,329,618 in equity as of September 30, 2004. (Tr. 1132.)

Fourth, Mr. Samuelson presented a comparable sales valuation of Englewood. Without objection, Mr. Samuelson introduced evidence regarding the 2005 sale of the Southwind apartment complex, just to the South of the South Pointe building (and thus observed by HUD witnesses on their visits to South Pointe). (JX 236 and JX 232 (photographs at 2722, 2726,

2627, 2728, 2729 and 2730); Tr. 1132-33.) He noted that the sale price (per unit) for the building was $29,300. (Tr. 1134.) Applying that same price per unit metric to South Pointe resulted in a value for South Pointe of $8,877,900, and, after subtracting debts, equity for Englewood of $4,477,900. (PX4A at 4254A; Tr. 1133-34.)

Based on those four valuations, Mr. Samuelson estimated the value of HUD's lost equity as $4,000,000. (Tr. 1134.) HUD offered no evidence in response, and thus Englewood clearly has satisfied its burden to prove, by a preponderance of the evidence, the value of Englewood's lost equity with reasonable certainty.

## CONCLUSION

Where the Government breaches a contract, it should be held to account for damages. The issue now before the court is whether Englewood proved its claim for lost equity damages by a preponderance of the evidence, and whether HUD proved on the same standard that Englewood's efforts to mitigate its lost equity were not reasonable. The evidence shows that HUD's breach led to the loss of Englewood's $4,000,000 equity interest in South Pointe. HUD produced no challenge to Englewood's mitigation evidence. Englewood is entitled to recover these losses in addition to other damages caused by HUD's breach.

Dated: August 8, 2008

s/Peter V. Baugher
One of the Attorneys for Plaintiff
Englewood Terrace Limited Partnership

Peter V. Baugher
Schopf & Weiss LLP
One South Wacker Drive
28th Floor
Chicago, Illinois 60606
312.701.9300

**CERTIFICATE OF SERVICE**

I, Peter V. Baugher, one of the attorneys for Plaintiff Englewood Terrace Limited Partnership, state that on August 8, 2008, I caused a copy of **Plaintiff Englewood's Post-Trial Brief In Support Of An Award Of Damages For Lost Equity** to be served electronically on:

Mr. Douglas K. Mickle
Commercial Litigation Branch
Civil Division, United States Department of Justice
11 L Street, N.W.
Room 10130
Washington, DC 20005

s/Peter V. Baugher