No. 03-2209C
(Judge Marian Blank Horn)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

ENGLEWOOD TERRACE LIMITED PARTNERSHIP,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

# DEFENDANT'S POST-TRIAL BRIEF AS TO WHETHER THE DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT IS LIABLE FOR ENGLEWOOD TERRACE LIMITED PARTNERSHIP'S LOST EQUITY CLAIM

GREGORY G. KATSAS
Assistant Attorney General

JEANNE E. DAVIDSON
Director

BRIAN M. SIMKIN
Assistant Director

DOUGLAS K. MICKLE
Trial Attorney
Department of Justice
Civil Division
Commercial Litigation Branch
1100 L Street, N.W.
Attn: Classification Unit, 8th Floor
Washington, D.C. 20530

Attorneys for Defendant

OF COUNSEL:
GREGORY G. GUSTIN
MARIA T. BAGUIO
LORRAINE C. SHOTO
Office of General Counsel
U.S. Department of Housing
and Urban Development
Chicago, Illiniois

SEPTEMBER 12, 2008

# TABLE OF CONTENTS

**PAGE(S)**

DEFENDANT'S POST-TRIAL BRIEF AS TO WHETHER THE DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT IS LIABLE FOR ENGLEWOOD TERRACE LIMITED PARTNERSHIP'S LOST EQUITY CLAIM ..... 1

STATEMENT OF FACTS ..... 4

ARGUMENT ..... 14

I. Englewood Waived Any Lost Equity Claim By Not Including It In The Complaint ..... 14

II. Englewood Failed To Meet Its Burden Of Establishing All Elements Of Its Claim For Lost Equity Damages – Foreseeability, Causation And Reasonable Certainty ..... 15

A. Englewood Has Failed To Prove That The Default And Foreclosure Upon A HUD-Insured Loan In 2005 Were Foreseeable In 2000 When The Governing HAP Contract Was Executed ..... 15

B. Englewood Has Failed To Prove That It Lost South Pointe Because The HAP Contract's Termination In 2001 Caused The Foreclosure And Loss Of Equity By A Foreclosure Action Brought In 2005 ..... 21

1. Englewood Faced Foreclosure Even When the HAP Contract Was Paid In Full ..... 24

2. Englewood Cannot Claim The HAP Contract Termination Caused Its Default Upon A HUD-Insured Loan That Closed Over A Year After The Notice Of Termination Of HAP, And Which Englewood Agreed To With Full Knowledge That No Further Project-Based HAP Payments Were Forthcoming ..... 28

C. Englewood Has Failed To Prove Its Damages With Reasonable Certainty ..... 35

III. Englewood's Alleged Mitigation Of Damages Is Not Reasonable ..... 38

CONCLUSION ..... 40

# TABLE OF AUTHORITIES

**CASES** **PAGE(S)**


American Sci. & Eng'g, Inc. v. United States,
8 Cl. Ct. 129 (1985) .......... 22

Argus Inc. v. Eastman Kodak Co.,
801 F.2d 38 (2nd Cir. 1986) .......... 29

Barrow Utils. & Elec. Co-op. v. United States,
20 Cl. Ct. 113 (1990) .......... 35

California Fed. Bank v. United States,
395 F.3d 1263 (Fed. Cir. 2005) .......... 21

Casa de Cambio Comdiv. S.A., de. C.V. v. United States,
291 F.3d 1356 (Fed. Cir. 2002) .......... 14

Cienega Gardens v. United States,
503 F.3d 1266 (Fed. Cir. 2007) .......... 29

Citizens Federal Bank v. United States,
474 F.3d 1314 (Fed. Cir. 2007) .......... 16

Claude R. Smith v. United States,
34 Fed. Cl. 313 (1995) .......... 19

Columbia First Bank v. United States,
60 Fed. Cl. 97 (2004) .......... 23

Englewood Terrace Limited Partnership v. United States,
79 Fed. Cl. 516 (2007) .......... passim

Fawick Corp. v. United States,
149 Ct. Cl. 623 (1960) .......... 22

General Dynamics Corp. v. United States,
218 Ct. Cl. 40, 585 F.2d 457 (1978) .......... 19

Indiana Michigan Power Company v. United States,
422 F.3d 1369 (Fed. Cir. 2005) .......... 15, 21, 38

Info. Sys. & Networks, Corp. v. United States,
81 Fed. Cl. 740 (2008) ........................................................................................ 31

J.D. Hedin Constr. Co. v. United States,
197 Ct. Cl. 782, 456 F.2d 1315 (1972) .................................................................. 22, 28

Land Movers, Inc., ENGBCA No. 5656,
91-1 B.C.A. ¶ 23,317 (1990) .................................................................................. 19

Landmark Land Co. v. Federal Deposit Insur. Corp.,
256 F.3d 1365 (Fed. Cir. 2001) .............................................................................. 16, 19

Lewis Jorge Constr. Mgmt, Inc. v. Pomona Unified Sch. Dist.,
102 P.3d 257 (2004) ................................................................................................ 20

Markowitz and Co. v. Toledo Metropolitan Housing Authority,
608 F. 2d 699 (6th Cir. 1979) .................................................................................. 19

Menne v. Celotex Corp.,
861 F.2d 1453 (10th Cir. 1988) ............................................................................... 21

Midwest Indus. Painting of Fla., Inc. v. United States,
4 Cl. Ct. 124, 133 (1983) ........................................................................................ 38

Moden v. United States,
404 F.3d 1335 (Fed. Cir. 2005) .............................................................................. 33

Myerle v. United States,
33 Ct. Cl. 1 (1897) .............................................................................. 19, 20, 22, 33

Old Stone Corp. v. United States,
450 F.3d 1360 (Fed. Cir. 2006) .............................................................................. 19, 20

Point Productions A.G. v. Sony Music Entertainment, Inc.,
215 F. Supp. 2d 336 (S.D.N.Y. 2002) ..................................................................... 21

Precision Pine & Timber, Inc. v. United States,
63 Fed. Cl. 122 (2004) ........................................................................................... 18

Olin Jones Sand Co. v. United States,
225 Ct. Cl. 741 (1980) ............................................................................................ 3

Quiman, S.A. de C.V. v. United States,
39 Fed. Cl. 171 (1997),
aff'd, 178 F.3d 1313 (Fed. Cir. 1999) ..................................................................... 19, 20

Ramsey v. United States,
121 Ct. Cl. 101 F. Supp. 353 (1951) .......... 20

Roseburg Lumber Co. v. Hadigan,
978 F.2d 660 (Fed. Cir. 1992) .......... 35

San Carlos Irrigation and Drainage Dist. v. United States,
111 F.3d 1557 (Fed. Cir. 1997) .......... 19, 22

Sterling Savings Ass'n v. U.S.,
80 Fed. Cl. 497 (Fed. Cl., 2008) .......... 38

Tyger Construction Co., Inc. v. United States,
31 Fed. Cl. 177 (1994) .......... 29

United Med. Supply Co., Inc. v. United States,
63 Fed. Cl. 430 (2005) .......... 3

Wells Fargo Bank, N.A. v. United States,
88 F.3d 1012 (Fed. Cir. 1996),
cert. denied, 117 S. Ct. 1245 (1997) .......... 19, 35

White v. Delta Contruction Int'l., Inc.,
285 F.3d 1040 (Fed. Cir. 2002) .......... 38

Willems Indus., Inc. v. United States,
155 Ct. Cl. 360, 295 F.2d 822 (1961) .......... 23

William Green Constr. Co. v. United States,
201 Ct. Cl. 606, 477 F.2d 930 (1973) .......... 3, 35

Yankee Atomic Electric Company v. United States,
Nos. 2007-5025/5031/5026/5032/5027/5033, 2008 WL 3089032 (Fed. Cir. Aug. 7, 2008) .......... 22

**STATUTES**

42 U.S.C. § 1437f(a) .......... 5

**MISCELLANEOUS**

Joseph M. Perillo, 11 Corbin on Contracts, § 351 cmt. a (2005 rev. ed.) .................................. 16

1 Dan B. Dobbs, Law of Torts, § 171, at 415 (2001) .................................................................. 21

Prosser and Keeton, The Law Of Torts, 266-68 (5th ed. 1984) .................................................. 21
Restatement (Third) Of Torts (Proposed Final Draft), § 26 cmt. j (2006) .................................. 21

Restatement (Second) of Contracts § 350 (1) ................................................................................ 38

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **ENGLEWOOD TERRACE LIMITED PARTNERSHIP,** | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **No. 03-2209C** |
| | ) | **(Judge Marian Blank Horn)** |
| **THE UNITED STATES,** | ) | |
| **Defendant.** | ) | |

**DEFENDANT'S POST-TRIAL BRIEF AS TO WHETHER THE DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT IS LIABLE FOR ENGLEWOOD TERRACE LIMITED PARTNERSHIP'S LOST EQUITY CLAIM**[1]

Pursuant to this Court's orders dated July 16, 2008 and August 28, 2008, defendant, the United States ("Defendant" or "Government"), respectfully submits this brief demonstrating why the United States Department of Housing and Urban Development ("HUD") is not liable for Englewood Terrace Limited Partnership's ("Englewood") alleged lost equity in South Pointe Towers Apartments ("South Pointe"). Englewood's brief correctly notes that Englewood bears the burden of proving that HUD is liable for Englewood losing South Pointe, and that to do so, Englewood must prove that the loss of South Pointe was foreseeable, caused by HUD, and reasonable. However, after acknowledging the legal standard for proving damages, Englewood's brief falls far short of meeting it.

[1] Englewood's "Post-Trial Brief in Support of An Award of Damages for Lost Equity" ("Pl. Br.") addressed all of Englewood's claims and calculations for damages. However, pursuant to the Court's July 16, 2008 order, and the status conference held that same day, the parties were instructed to brief only "the lost equity issue," and to defer briefing upon all damages issues. Accordingly, our brief focuses upon the issue of whether Englewood proved at trial that HUD is liable for any lost equity in South Pointe Towers. If the Government's understanding of this Court's July 16, 2008 order is incorrect, defendant respectfully requests the opportunity to address any damages arguments in a separate brief.

We demonstrate below that Englewood's loss of South Pointe, the result of a 2005 foreclosure action, was not foreseeable in 2000, when the parties entered into the Housing Assistance Payments ("HAP") contract the Court found controlling. Englewood produced no one at trial who testified to the contrary – certainly no signatory to that contract. Indeed, even at the time Englewood filed this lawsuit, Englewood did not view the loss of South Pointe as a foreseeable consequence of the breach of the HAP contract, as Englewood failed to plead that claim in its complaint. Moreover, Englewood never sought leave to amend its complaint to include its claim for lost equity, nor has it ever attempted to rebut the United States' consistent assertion that the lost equity claim was never properly before the Court. See Document 81, "Joint Stipulation Regarding Issues," p. 5, ¶¶ 11-13; Document 136, "Amended Joint Statement of Issues," p. 8, ¶¶ 25-28.[2]

Even assuming Englewood's claim for losing South Pointe was implicitly pled, Englewood has failed to show the requisite nexus between HUD's declaration to terminate the HAP contract in November 2001, its termination in 2002, and Englewood's loss of South Pointe by a separate foreclosure action brought in 2005; which was the direct result of Englewood's breach of a loan contract not before this Court, that arose after the HAP contract was terminated, and to which the United States was no longer a party. In fact, it was Englewood's poor management practices, questionable business decisions, poor financial condition and failure to resolve numerous deficiencies identified by HUD, local authorities and Englewood itself, all ignored in Englewood's brief, that caused the default and subsequent foreclosure of South

---

[2] Similarly, despite an affirmative request for such information during discovery, Englewood failed to provide any information to the Government upon this issue.

Pointe, not the loss of the HAP contract which was terminated long before Englewood agreed to, and then defaulted upon, the HUD-insured loan.

Even if Englewood could blame the Government for its failure, at best, Englewood's damage claim is one for nonrecoverable consequential damage to Englewood's business, because South Pointe was its business. Cf. William Green Constr. Co. v. United States, 201 Ct. Cl. 616, 626, 477 F.2d 930, 936 (1973) (holding that, in a breach of contract case, there would be no recovery for the claimed loss of the plaintiff company's entire net worth); United Med. Supply Co., Inc. v. United States, 63 Fed. Cl. 430, 440 (2005) (noting the rejection of claims that Government conduct under a contract led to the destruction of the contractor's business). Such damages are generally barred because they are too speculative. Olin Jones Sand Co. v. United States, 225 Ct. Cl. 741, 743 n.3 (1980).

And, even if Englewood's claim is cognizable, it is far from reasonable. Indeed, the record shows that Englewood's claim, if accepted, would result in a tremendous windfall for Englewood. That result contradicts well-settled precedent that a damages award may not place the plaintiff in a better position than if no breach had occurred. Moreover, Englewood breached its duty to mitigate or take reasonable measures to avoid its loss. Instead, Englewood took a HUD-insured loan in the amount of $11.6 million, and a $750,000.00 Illinois Housing Development Authority ("IHDA") loan, and squandered even more money, while failing to address the weakness of its business that resulted in its eventual loss.

In sum, Englewood has failed to meet its evidentiary burden and HUD is not liable for Englewood's claim for lost equity damages.

## STATEMENT OF FACTS[3]

Englewood demands lost equity damages from a foreclosure, brought in 2005, of New Englewood Terrace, formerly South Pointe Towers, a 303-unit apartment building in Chicago, Illinois. It claims this foreclosure was caused by HUD's November 30, 2001 termination notice of the October 16, 2000 HAP contract.

Englewood is a limited partnership formed under the laws of the state of Michigan. P. M. Group was the general partner of Englewood until December 13, 2002, when P. M. was replaced by DSSA New Englewood Terrace LLC, a sole proprietorship of Don S. Samuelson. Englewood took ownership of South Pointe Towers in the early 1990s following a HUD auction. Record: 861: 24, 862: 1. Englewood later secured financing through a five million dollar mortgage with the Community Investment Corporation ("CIC") and from an equity infusion through the sale of Government-sponsored tax credits. Record: 862: 12-22. As a condition of that acquisition, Englewood accepted a "Use Agreement" that, among other provisions, required Englewood, "to the extent practicable," maintain South Pointe as affordable to very low, low and moderate income tenants. JX 197 p. 1907 at 1909, ¶ 3(b). The "Use Agreement" was in effect for the "remaining useful life" of the property, unless HUD determined a lesser period. JX 197 p. 1907 at 1908, ¶ 2.

Although Englewood does not cite to evidence in the record or to any exhibit, its brief states that, in 1992, Englewood entered into its first project-based HAP contract with HUD for South Pointe. Pl. Br. P. 21. Section 8 of the United States Housing Act provides financial

---

[3] Throughout this brief we will use the following acronyms: page from the joint exhibit ("JX __, p. __"); page from Plaintiff's Trial Exhibits ("PX __ at __"); paragraph in the complaint ("Compl. ¶ __"); page and line from the record of trial transcript ("Record _ : _").

assistance to "aid [] low-income families in obtaining a decent place to live." 42 U.S.C. § 1437f(a). It establishes two main types of HAP housing subsidies: Individual Housing Choice vouchers that attach to the tenants and can be moved from facility to facility; and, project-based HAP subsidies that attach to the housing complex itself and are paid to the owner on behalf of the tenants, whenever the owner can rent apartments, and if it is meeting the contract and statutory authority requirements, to eligible tenants. Id. Englewood's initial project-based HAP contract extended through 1997, whereupon it was renewed in 1998, 1999 and, as the Court found, for the last time on October 16, 2000. JX 19 p. 677; JX 20 p. 691; JX 21 p. 696.

In the years when the HAP contract was being paid in full, Englewood's financial position deteriorated. All the evidence shows several years of losses, although the record contains varying calculations of how large the losses were. The financial analysis for South Pointe contained in PX 4 lists a negative net cash flow of $351,037.00 in 1999, and $322,678.00 in 2000. PX 4, p. 4250 at 4250. These totals were compiled by Don Samueslon based upon Englewood's financial statements. Record 1135: 1-11. In his letter to HUD on August 6, 2001 evaluating DSSA/Samuelson as a potential acquirer, Don Samuelson calculated a negative net cash flow of $134,767.00 for 1999 and $161,241.00 for 2000. JX 102 p. 1110 at 1111. He estimated that a negative cash flow of $241,340.00 would result by the end of 2001. Id.

These losses were attributed, by various witnesses, to South Pointe's increasing operating expenses and to the large debt service payments on its mortgage to CIC. Freddie Batchelor testified that payments on the CIC loan "didn't leave enough cash to come into the property." Record 87: 23. Carl Sanders testified that when he began working at South Pointe in 1998, the project had "much more due to go out than we had coming in in terms of finance." Record 389:

9-11. As a result, 10 percent of accounts payable were over six months past due and vendors refused to do work for Englewood because they were not getting paid. Record 389: 12-13. In fact, Englewood's former manager at South Pointe, Mr. Sanders, stated that with respect to Englewood's 100 percent inspection of South Pointe in the fall of 2000, the findings were "that most of the problems were in the area of maintenance repairs that we basically, if we had had the, supplies and the funds to get the supplies that, stuff like cabinet doors, leaking water faucets, those type of things could have been repaired." Record 456: 13-17. While Englewood ignores it, by the end December 2001, Englewood also had a $775,234.00 balance on a loan from Michigan National Bank, in addition to CIC, and accrued management fees of $612,120.00. PX 7 p. 4260 at 4264. South Pointe management believed rents needed to increase. JX 31 p. 787 at 787. However, in his purported rental increase request of August 21, 2001, Don Samuelson estimated that, even with a rent increase and an assumption that administrative expenses could be cut by over $200,000.00 in one year, South Pointe would still have a negative net cash flow of $10,877.00. JX 104, p. 1120 at 1123-1124.

In addition to its high debt service, at the time that Englewood entered into the October 2000 HAP contract with HUD, Englewood also was unsuccessfully struggling to maintain the physical condition of South Pointe. South Pointe faced repeated violation notices from the City of Chicago Department of Buildings and citations from the Chicago Fire Department. JX 41 p. 820 at 821; JX 165 p. 1587; JX 194 p. 1764; Record 508:3-21; Record 1005: 25 - 1007: 13. In addition, complaints from tenants and city officials brought South Pointe to the attention of HUD's Director of Multifamily Housing for the Chicago Hub, Edward Hinsberger. Record 624:2-14. On September 13, 1998, South Pointe was referred to HUD's Departmental

Enforcement Center ("DEC") for failure to maintain South Pointe in decent, safe and sanitary condition. JX 29 p. 779 at 779.

After over a year, South Pointe emerged from DEC oversight in 2000, to finalize a plan to make repairs to South Pointe, JX 47 p. 860, but conditions at South Pointe continued to fall short of the contractual standard. The building had persistent problems maintaining a secure environment, available safety equipment, functioning elevators, working appliances in units, as well as failing to eliminate infestations of rodents and roaches. Record 324: 4 - 326:20; JX 28, p. 767 at 769-775, JX 69 p. 975 at 975. See generally, Englewood Terrace Limited Partnership v. United States, 79 Fed. Cl. 516, 522-23 (2007)

HUD entered into the controlling HAP contract with Englewood in October 2000. Englewood Terrace, 79 Fed. Cl. at 535. Because of South Pointe's poor physical condition, HUD provided notices of HAP contract default in April and May of 2001. Englewood Terrace, 79 Fed. Cl. at 537-38; JX 89 p. 1090 and JX 94 p. 1099. The notices advised Englewood of the basis for the default and that Englewood's failure to cure the default could result in the suspension or abatement of the HAP contract. JX 89 p. 1090 at 1091; JX 94 p. 1099 at 1100. However, the record is devoid of any contemporaneous evidence of Englewood's claim that Englewood would lose South Pointe without the revenues from a HAP contract.[4] In fact, John Hayes met with HUD on April 13, 2001, during which he was given a copy of the HAP contract default notice. Record 688:3-7, 689: 3-5. Mr. Hayes did not state that he was compelled to

[4] The CIC mortgage that Englewood signed did not consider the loss of the HAP contract an event of default. In fact, the Mortgage Loan Rider, JX 269 p. 4139 at 4181, provided that if Englewood's HAP contract was not extended beyond its 1997 expiration, the loan would reduce to $2.5 million with an amortization over a 14-year period. Id.

accept a HUD loan to avoid foreclosure. See Englewood Terrace, 79 Fed. Cl. at 521; Record 689:18-24.

On October 1, 2001, HUD informed Englewood that in light of Englewood's failure to establish decent, safe and sanitary conditions, HUD would begin to abate the HAP contract by issuing individual Housing Choice vouchers to the eligible South Pointe tenants that could be used to rent acceptable accommodations. Englewood Terrace, 79 Fed. Cl. at 526; JX 111, p. 1160 at 1161. The vouchers were to be administered by the local contracting agency, "CHAC." Record 691: 2-5. Tenants also could elect to use their individual Housing Choice voucher at South Pointe, if the individual unit they were living in passed an inspection from CHAC. JX 112, p. 1162 at 1162. Of note, when Englewood responded, JX 112 p. 1162, again, Englewood did not argue or present evidence that Englewood would lose South Pointe without the HAP contract.

Englewood prevented HUD from acting upon its intentions to abate the HAP contract by filing a lawsuit seeking injunctive relief in the United States District Court for the Northern District of Illinois on October 29, 2001. JX 1 p. 1; Englewood Terrace, 79 Fed. Cl. at 528. That action was eventually dismissed, and HUD then issued a formal notice of abatement and termination of the HAP contract to Englewood on November 30, 2001. Englewood Terrace, 79 Fed. Cl. at 528; JX 117, p. 1176 at 1176. However, the voucher issuance was suspended while Englewood administratively appealed HUD's decision to terminate the HAP contract, and then filed a second action in the Federal district court to stop HUD's decision to terminate.[5] JX 2 p.

---

[5] The second district court action was dismissed with prejudice in 2003, a copy of which was produced as part of Defendant's Exhibit B in Document 140, "Defendant's Response to Plaintiff's Post Trial Brief."

15; JX 118 p. 1178; JX 119 p. 1179; JX 120 p. 1181. The project-based HAP payments finally ended on September 30, 2002. Englewood Terrace, 79 Fed. Cl. at 529; JX 26 p. 746.

The process for abatement and termination of Englewood's HAP contract was that the project-based payments would end permanently for a unit whenever an eligible tenant opted to use the HAP voucher either to leave, or, if the unit was acceptable, to use it at South Pointe. Englewood Terrace, 79 Fed. Cl. at 526; JX 117, p. 1176 at 1177; Record 642: 18 – 643: 4. HUD also permanently abated HAP project-based payments when a unit that had received the subsidy became vacant for any other reason. JX 173, p. 1676 at 1676. In the meantime, Englewood continued to receive project-based HAP payments for units that were occupied by tenants that Englewood certified were eligible for vouchers who had either not received them or not made use of them. PX 1, p. 4220 at 4245. Englewood refused to inject money into South Pointe to address physical deficiencies and no provision in the HAP contract allowed HUD to compel the injection of funds. Record 689: 11-13; 829: 11-14, 836: 4-7.

Vouchers were not issued in any significant numbers until well into 2002. PX 1, p. 4220 at 4237-4244. According to Englewood's records, only one voucher was activated for a departing South Pointe tenant in calendar year 2001. PX 1, p. 4220 at 4239. Ten other units were vacated between October 1, 2001 and the end of the year without a voucher being used. PX 1, p. 4220 at 4237-4244. For all but one of these, Englewood received monthly

project-based HAP payments through December 2001.[6] Id. Englewood has not disputed that, through the end of 2001, Englewood received the full benefit of the HAP contract, if not more.

Nevertheless, by January 1, 2002, Englewood failed to make a payment due upon its mortgage to CIC and thus was, in fact, in default of that mortgage. JX 269, p. 4139 at 4145; Record 1017:2-4. This January default led to a foreclosure action filed by CIC, which was voluntarily withdrawn in March 2002.[7] Englewood, however, remained unwilling or unable to pay its mortgage debt. JX 269 p. 4139 at 4145. The CIC foreclosure action was reinstated in May 2002. JX 269, p. 4139 at 4147; Record: 1061: 6-9, 15-20. This action was withdrawn only after the lenders received assurances that Englewood would receive a new loan, facilitated by HUD, that would pay off the old mortgage in full and provide funds for a complete rehabilitation of the building. Record: 1062: 7-13. However, the "assurances" were not based upon the continuation of the HAP contract because the evidence shows that the Notice of Termination of South Pointe had already been declared and affirmed by HUD, and the Federal district court had already twice denied Englewood relief by the time the second CIC foreclosure action was withdrawn. JX 117, p. 1176; JX 126, p. 1223.

By 2001, HUD had been in discussions with Englewood for several years about a loan to help turn the project. Record: 585:16-21. Despite Englewood's failure to file the needed loan

---

[6] Units 1014, 1103, 1104, 1110, 1405, 1407, 2003, 2011, 6413, 6433, and 6437 were vacated between October 1, 2001 and December 31, 2001. Notwithstanding, Englewood claimed and received a December 2001 HAP payment for all of those units except Unit 1110. PX 1 p. 4220 at 4237-4244.

[7] Englewood's brief argues and emphasizes only the May 2002 CIC foreclosure action. However, as Mr. Hayes admitted, Englewood had been in default by January 2002, and as the May 2002 complaint references, a previous foreclosure action was filed in 2002 by CIC. JX 269, p. 4139 at 4145.

application with HUD, even after HUD moved to terminate the project-based HAP contract, HUD continued to express its willingness to consider a request for such a loan. HUD officials repeatedly explained to Englewood representatives, and Englewood knew, that the new loan would be designed to give Englewood an opportunity for a viable future without project-based HAP subsidy. JX 111, p. 1160; JX 113, p. 1163 at 1164. The complete renovation of South Pointe would allow it to compete in the rental market and to keep or attract the holders of individual HAP vouchers. Id.

The last HAP contract payments were received by Englewood in September 2002. Englewood Terrace, 79 Fed. Cl. at 522. Three months later, in December 2002, the new $11.6 million HUD-insured loan was finalized. Record 1179: 25 - 1180: 1. Of that amount, $6.5 million was used to fund the rehabilitation of South Pointe, Record 1070:15-18; and Englewood's old loans were retired including CIC's loan, as personally guaranteed by John Hayes. Record 1017: 8-17. Although the new loan was provided through a private financial institution, HUD insured the loan against default through the Federal Housing Administration ("FHA"). While HUD typically required recipients of such loans to make a financial investment as well, Englewood in this case received an additional $750,000.00 loan from IHDA – where Mr. Samuelson, who is Englewood's current principal, was once an Assistant Director – to help defray initial operating deficits.[8] Record 1072: 1-7; Record 1026: 7-17. The loan provided that Englewood would not be required to make any debt service payments while the rehabilitation

[8] Englewood does not dispute that IHDA was not a party to the HAP contract. Moreover, the fact that IHDA also agreed to give Englewood a substantial loan subsequent to termination of the HAP contract shows IHDA was confident South Pointe was viable without project-based assistance.

construction was ongoing, and in addition to the initial operating deficit fund, a working capital fund was provided for the operation of the building once the rehabilitation neared its end. Record 1182: 9 – 1183: 19.

There is no evidence in the record that, during the negotiations for the $11.6 million HUD-insured loan, or the $750,000.00 IHDA loan, that Englewood expressed to HUD that it foresaw that it would lose South Pointe as a result of the loss of project-based HAP payments if it got the loan.

As Englewood's rehabilitation work began in early 2003, 92 of 303 units in South Pointe were occupied. PX 9, p. 4290 at 4290. The majority of tenants had elected to move out in a six month period beginning in February 2002.[9] Id. By its own testimony, Englewood management used the voucher process to encourage some tenants to leave, while encouraging others to stay and use their vouchers at South Pointe. Record 1063: 4-19; JX 14, p. 570 at 605-606.

As construction work continued in 2003 at South Pointe, a number of problems developed that eventually led to Englewood's default on the new HUD-insured loan. For several reasons, Englewood struggled to attract new tenants, either through the individual HAP voucher process or from the unsubsidized rental market. First, Englewood continued to fall short in providing attractive or even decent living conditions for its tenants. Of the first 17 units inspected by CHAC in order to approve the use of an individual HAP voucher, only two passed physical inspection. JX 198, p. 1919 at 1919. Second, Englewood decided, of its own accord, to

---

[9] As a result of Englewood's administrative and judicial appeals, while tenants may have elected to move without vouchers or at Englewood's efforts, as early as February, vouchers did not issue until June 2002. Record 693:12-15; see also Record 1059: 19 - 1060:3 ("residents hadn't moved out really very much by the end of March [2002]").

halt the marketing of apartments for several months while construction of a new lobby was ongoing. Record 708: 17 - 709 : 2. Third, Englewood believes that it was "shut out" of the voucher market, because CHAC managed the individual HAP voucher program with a greater emphasis upon discouraging the concentration of racial and low income minorities, thereby, as Englewood claims, hindering its ability to attract new tenants with vouchers. Record 1073: 9-15.

Apart from its inability to retain and attract sufficient numbers of tenants, Englewood also spent its available loan money from HUD and IHDA remarkably quickly. Both Hub Director Hinsberger and his Director of Operations, Mary Anderson, testified that the initial operating deficit fund, which was intended to fund operations as construction work neared its end, was drawn down by Englewood management to nothing within months of the loan closing. Record 708: 3-14, 1182: 9 - 1183: 10. In addition, the working capital deposit, intended to defray "renting and equipping the project once construction is complete," was entirely drawn down while construction was ongoing to fund operating deficits. Record 1183: 11 - 1184: 9. Moreover, Englewood management depleted all available funds for rehabilitation construction before the rehabilitation itself was complete, something Director Anderson had seen only once before in 27 years of Government service. Record 1184: 22 - 1185: 3. The trial record shows that all funds were quickly depleted by Englewood, despite Englewood never having to make principal or interest payments during the construction period. Record 1181: 4-11.

Again, while Englewood had full access to all of these funds, funds that exceeded the amount of all post-termination project-based HAP payments in their aggregate, Englewood never complained that, because of the loss of the HAP contract, Englewood was going to lose South Pointe.

After depleting all the funds loaned to it, Englewood defaulted on the HUD-insured mortgage and ceased managing the property, forcing Reilly Mortgage ("Reilly"), the private mortgage holder, to assume responsibility for management beginning May 21, 2004, and to advance even more funds to keep South Pointe operating. PX 48, p. 4483 at 4486-4487. Thereafter, Reilly filed action in the local circuit court for the appointment of receiver and foreclosure of South Pointe and, Englewood now admits there were "clearly defaults under the mortgage and [Englewood] didn't present any defense to the foreclosure . . ." Record 1074: 11-16. South Pointe was placed under court-ordered receivership on July 15, 2004. PX 48, p. 4483 at 4486. Reilly subsequently assigned the mortgage to the ultimate insurer, HUD, and HUD eventually sold the mortgage to a private party that finally filed for foreclosure of South Pointe in 2005. Record 655: 11-16; 1074: 3-9, 11-16.

## ARGUMENT

### I. Englewood Waived Any Lost Equity Claim By Not Including It In The Complaint

Apart from its failure of proof of any lost equity damages, Englewood's lost equity claim is barred by Englewood's failure to include it in its complaint. Englewood owned South Pointe at the time that it filed its complaint on September 22, 2003. However, Englewood lost South Pointe in a subsequent third party foreclosure action filed in 2005; trial in this matter was in 2007, yet Englewood never sought to amend its complaint to include a lost equity claim. Failure to plead a claim constitutes a waiver of the claim. Casa de Cambio Comdiv. S.A., de. C.V. v. United States, 291 F.3d 1356, 1366 (Fed. Cir. 2002). Pursuant to Rule 15 of the Rules of the Court of Federal Claims ("RCFC"), Englewood's failure to amend its complaint at any point bars the claim unless Englewood can show the issue was tried with the "express or implied consent"

of the Government. RCFC 15(b). No such consent has been demonstrated. In fact, the Government has consistently argued that Englewood's claim was not properly before the court. See Document 81, "Joint Stipulation Regarding Issues," p. 5, para. 11-13; Document 136, "Amended Joint Statement of Issues," p. 8, para. 25-28.

Accordingly, Englewood has waived this claim.[10]

## II. Englewood Failed To Meet Its Burden Of Establishing All Elements Of Its Claim For Lost Equity Damages – Foreseeability, Causation And Reasonable Certainty

The United States Court of Appeals for the Federal Circuit has defined the scope of Englewood's burden of proof, noting that a party seeking damages must "prove foreseeability, causation, and reasonableness." Indiana Michigan Power Company v. United States, 422 F.3d 1369, 1376 (Fed. Cir. 2005). As a threshold matter, and as a means of demonstrating that the lost equity damages that it incurred were "caused" by HUD's faulty termination of the HAP contract, Englewood must prove that it would not have incurred the alleged loss of South Pointe, regardless of any breach. Englewood has not done so.

### A. Englewood Has Failed To Prove That The Default And Foreclosure Brought Upon By A HUD-Insured Loan In 2005 Were Foreseeable In 2000 When The Governing HAP Contract Was Executed

Englewood has failed to prove that on October 16, 2000 (the day the governing contract was executed, and five years before Englewood began to lose South Pointe to foreclosure

---

[10] This Court has previously recognized the effect of failing to amend the complaint in this matter, in noting when Englewood attempted to dismiss several other claims at trial that also were not in Englewood's complaint, that "[i]nasmuch as the alleged program participation restriction claims are not found in the plaintiff's complaint, there are no claims to dismiss. Had the plaintiff's complaint been amended to add such claims, then there would have been a foundation for the voluntary dismissal, with prejudice, plaintiff seeks." Englewood Terrace, 79 Fed. Cl. at 530.

because of Englewood's default of a debt obligation that arose after the HAP contract payments were terminated in 2002), the lost equity damages Englewood seeks here were foreseeable by HUD. Englewood must demonstrate that both the magnitude and type of damages were foreseeable at the time of contract formation. See Landmark Land Co. v. Federal Deposit Insur. Corp., 256 F.3d 1365, 1378 (Fed. Cir. 2001). "The mere circumstance that some loss was foreseeable, or even that some loss of the same general kind was foreseeable, will not suffice if the loss that actually occurred was not foreseeable." Restatement (Second) of Contracts § 351 cmt. a (cited in Landmark Land, 256 F.3d at 1378). Put in another way, "the injury actually suffered must be one of a kind that the defendant had reason to foresee and of an amount that is not beyond the bounds of reasonable prediction." Joseph M. Perillo, 11 Corbin on Contracts § 56.7 at 108 (2005 rev. ed.) (quoted in Citizens Federal Bank v. United States, 474 F.3d 1314, 1321 (Fed. Cir. 2007).

The loss of South Pointe in the foreclosure of a new loan was not foreseeable on October 16, 2000, when the parties entered into the controlling HAP contract. None of the parties to that contract testified that he or she believed that, at the time of contract execution, the loss of project-based HAP payments would result in the loss of South Pointe through foreclosure of a subsequent, new loan.

Englewood argues that its equity loss was foreseeable because HUD knew South Pointe could not survive without a "deep subsidy." Pl. Br. p. 3. Englewood refers to a memo purportedly drafted but unsigned and undated by HUD appraiser John Schneider that states "What is known is that ongoing apartment rehabilitation activity in the vicinity of [South Pointe], such as in the market-rate project Lowe Terrace down the street from South Pointe, still

depends on attracting Section 8 certificate holders for tenants . . . Current market experience strongly suggests that South Pointe [ ] will not be able to survive, in a market sense, without deep-subsidy assistance." See JX 255 p. 3954 at 3966. However, Englewood presented no evidence to define the term "deep subsidy," instead implying in its brief that it means only project-based Section 8 assistance. Pl. Br. pp. 3-4. That is simply incorrect; as previously noted, Section 8 of the United States Housing Act established both project-based assistance and Housing Choice vouchers.[11] Moreover, Englewood's argument fails to acknowledge that, absent careful management and effective marketing (Englewood's failure here), there is no "subsidy" to which Englewood was entitled that could have kept the project afloat. Englewood's argument in effect is, "if you stop paying whatever happens is your fault."

Englewood also ignores a host of other facts. First, the so-called "Schneider memo," which purports to complete a preapplication loan review of South Pointe, even if valid, cites to properties in the area receiving other types of "deep subsidy," such as tenant-based vouchers. As noted, the "Schneider memo" specifically refers to a property in the area, "Lowe Terrace Apartments," and now known as Englewood's Southwind "comp," as receiving tenant-based vouchers when it makes a reference to projects needing "deep subsidy" to survive. Second, Englewood fails to acknowledge that subsidies were contemplated for South Pointe with its new HUD loan in the form of the tenant based voucher program, just as in Lowe Terrace. Third, Englewood had the opportunity, if not the duty, to rent-up its vacating units with Section 8

---

[11] Vouchers and certificates are essentially the same and were, in fact, merged pursuant to section 545 of the Quality Housing and Work Responsibility Act of 1998. Title V of P.L. 105-276, H.R. 4194-259. Indeed, the "Schneider memo" itself refers to "Section 8 certificate holders for tenants," i.e. section 8 vouchers. JX 255, p. 3954 at 3966.

voucher holders and market tenants, yet it opted instead to take advantage of the relocation process in aggressively removing what Englewood perceived to be "bad" tenants. JX 14, p. 570 at 606; Record 1063: 4-19. There was no evidence presented at trial that Englewood aggressively attempted to re-let the vacating units as they became available with any other tenants (either voucher-based or market based), or act other than to exhaust the funds from a new HUD-insured loan. Fourth, Don Samuelson, who had no ownership interest in South Pointe at the time of either the Notice of Termination of HAP contract, or the time that the last HAP contract payments were received in September 30, 2002, sought to acquire South Pointe from PM Group and then closed on the new HUD-insured loan three months after the last HAP payment was received. Thus, even with hindsight (relative to the 2000 contract date), Englewood's own principal did not foresee the failure at issue – let alone HUD's culpable liability.

Finally, it is inconceivable that it was foreseeable in 2000, when the parties agreed to the HAP contract, that a loss of HAP payments would directly result in the loss of South Pointe, especially after Englewood received a substantial HUD-insured loan, when Englewood itself was unable to "foresee" this consequence in 2003, when it filed its complaint.

In light of these factors HUD certainly could not have foreseen that as a consequence of, at that time, a theoretical HAP contract breach, Englewood would default upon a HUD-insured loan that was not even closed until over two years after the execution of the HAP contract the Court found controlling, and over a year after the issuance of the notice of HAP contract termination. Thus, instead of being a natural and probable consequence of a breach, the new loan, attenuated by time and circumstance, was at best, "remote and speculative" at the time of

the HAP contract's formation, and therefore, unrecoverable now. Precision Pine & Timber, Inc. v. United States, 63 Fed. Cl. 122, 134 (2004).

Additionally, the requirement that both the magnitude and type of damages be foreseeable "as a probable result of the breach" requires a showing that the damages be more than a "merely remote or possible" consequence.[12] Old Stone Corp. v. United States, 450 F.3d 1360, 1375 (Fed. Cir. 2006) (considering proximate causation in connection with its foreseeability analysis); Landmark Land, 256 F.3d at 1372. For this reason, Englewood has the burden to prove that its equity loss was a direct result of HUD's decision to stop project-based HAP payments and not Englewood's inability, for example, to secure market and voucher-based tenants; or avoid CIC's foreclosure with market, project-based or voucher-based assistance. Myerle v. United States, 33 Ct. Cl. 1, 27 (1897); Quiman, S.A. de C.V. v. United States, 39 Fed.

---

[12] The element of "forseeability" of the magnitude and type of damages at the time of contract formation demonstrates why Englewood's reliance upon Markowitz and Co. v. Toledo Metropolitan Housing Authority, 608 F. 2d 699 (6th Cir. 1979) is misplaced. Contrary to Englewood's claim that Markowitz is directly on point, Pl. Br. 17, the court in Markowitz simply found that the breaching party was "fully aware" of the claimed consequential damages at the time of contracting and knew the construction project "would inevitably collapse." Markowitz, 608 F.2d at 707. As we demonstrate in this section, that is far from the case here for many reasons. Notwithstanding Englewood's assertion that its loss of equity was "compensatory," Pl. Br. at 1, losses or increased costs due to cross-contractual effects, like Englewood is arguing here, constitute consequential damages. See, e.g., General Dynamics Corp. v. United States, 585 F.2d 457, 465 (Ct. Cl. 1978); Claude R. Smith v. United States, 34 Fed. Cl. 313, 326 (1995). Contractors should be precluded from recovering such damages from the United States as a matter of law. See, e.g., Claude R. Smith, 34 Fed. Cl. at 326; Land Movers, Inc., ENGBCA No. 5656, 91-1 B.C.A. ¶ 23,317 at 116,931 (1990)("damages arising from other contracts or work have been held, as a matter of law, to be too remote and speculative to be allowable")(citations omitted). It is well-settled precedent that consequential damages are generally not recoverable in a breach of contract action. See San Carlos Irrigation and Drainage Dist. v. United States, 111 F.3d 1557, 1562 (Fed. Cir. 1997); Wells Fargo Bank, N.A. v. United States, 88 F.3d 1012, 1022-23 (Fed. Cir. 1996), cert. denied, 117 S. Ct. 1245 (1997). Accordingly, because Englewood's lost equity claim is one for consequential damages that resulted from the foreclosure of a separate and distinct loan agreement, it should be dismissed as a matter of law.

Cl. 171, 183 (1997), aff'd, 178 F.3d 1313 (Fed. Cir. 1999). For example, in finding that the plaintiff's bankruptcy was not the result of the Government's failure to timely pay on the contract price, the court in Ramsey v. United States, 121 Ct. Cl. 426, 101 F. Supp. 353 (1951), found that "[f]or a damage to be direct there must appear no intervening incident . . . ; the cause must produce the effect inevitably and naturally, not possibly nor even probably." Ramsey, 121 Ct. Cl. at 434, 101 F. Supp. at 357 (no assurance that even if the government paid the corporate plaintiff on time, the funds would have "diverted" financial difficulty); see Quiman, 39 Fed. Cl. at 171. In other words, "[t]here must not be two steps between cause and damage." Myerle, 33 Ct. Cl. at 27. Here, there are many "steps" between HUD's termination of the HAP contract and Englewood's loss of South Pointe through foreclosure on the HUD-insured loan several years later.[13] For example, the following intervening acts, or in the parlance of the Myerle court, "steps," interrupted the natural progression of events: 1) Englewood's decision to accept the

[13] The Federal Circuit's discussion of foreseeability and proximate causation in Old Stone confirms the continuing viability of the directness requirement. In support of its statement that losses must be proximately caused by the breach, the court noted Lewis Jorge Constr. Mgmt, Inc. v. Pomona Unified Sch. Dist., 102 P.3d 257, 265 (2004), which the court described as holding that a "breach did not 'directly or necessarily cause [the contractor's] loss,' where [the] contractor alleged [that the] breach caused the contractor's surety to reduce [the] contractor's 'bonding' rating, and that reduction in bonding rating caused [the] loss of other prospective contracts." Old Stone, 450 F.3d at 1375. Englewood's claim is no different. In Lewis Jorge Construction, the loss claimed was not proximately caused by the breach, because the chain of causation between the breach (the termination of a construction contract by a school district) and the adverse consequences (the contractor's loss of future contracts) was interrupted by the intervening actions of a third party, specifically, the surety's decision to reduce the contractor's bonding rating. Here, though Englewood offered no proof, it claimed that its damages proceeded from the fact that no other lender other than HUD would give Englewood a mortgage. But that is no different than the two-step causation theory rejected in Lewis Jorge Contruction. Moreover, the loss of project-based assistance could have benefitted Englewood by reducing the CIC loan through the re-amortization of the loan an additional three years, which itself breaks any "chain" of Englewood's alleged consequences.

new $11.6 million HUD-insured loan; 2) Englewood's failure to market the property while Englewood rehabbed the lobby; 3) Englewood's failure to market its vacated units; 4) Englewood's active effort to move problem tenants out; 5) tenants moving from South Pointe of their own volition; 6) CHAC's unwillingness - at least in Englewood's eyes - to route tenants to South Pointe; 7) city and fire code violations citing physical and safety issues; 8) Englewood's refusal to inject needed capital to address South Pointe's physical deficiencies; and, 9) Englewood's disregard of the potential value of Mr. Hayes's personal guarantee.

Englewood has failed to meet its burden of proof that its claim for the loss of South Pointe was foreseeable in 2000, and thus its claim for loss of equity damages should be rejected.

### B. Englewood Has Failed To Prove That It Lost South Pointe Because The HAP Contract's Termination In 2001 Caused The Foreclosure And Loss Of Equity By A Foreclosure Action Brought In 2005

In addition to proving that its claimed damages were foreseeable, Englewood also must prove that the breach was a substantial cause of its damages, or that "but for" the breach, Englewood would not have incurred its damages. Compare Indiana Michigan, 422 F.3d at 1373 (plaintiff must show the "breach is a substantial causal factor in the damages")[14] with California

[14] The substantial factor test originated in tort law to analyze concurrent cause cases. See Keeton et al., Prosser and Keeton On The Law Of Torts, 266-68 (5th ed. 1984). However, even in tort cases, the substantial factor test has not "replaced the need for each liable defendant to be a but for and substantial contributor to the indivisible injury," Menne v. Celotex Corp., 861 F.2d 1453, 1461 (10th Cir. 1988), and, when as here, the claimed contract damages could have resulted from multiple factors, the plaintiff must establish that the breach "standing alone" would have been "sufficient" to cause the claimed damage. Point Productions A.G. v. Sony Music Entertainment, Inc., 215 F. Supp. 2d 336, 341 (S.D.N.Y. 2002) (citing 1 Dan B. Dobbs, Law of Torts § 171, at 415 (2001)). Recently, the drafters of the Restatement (Third) of Torts have announced their intention to abandon the "substantial factor" test in tort cases because of its widespread misapplication by courts. Restatement (Third) of Torts (Proposed Final Draft) § 26 cmt. j (2006). As the drafters recognized, "[t]he [causation] element that must be established by whatever standard of proof is the but-for or necessary-condition standard of this Section." Id.

Fed. Bank v. United States, 395 F.3d 1263, 1267 68 (Fed. Cir. 2005) (rejecting the substantial factor test and utilizing "but-for"). The trial court has the discretion to apply either test; however, the "preferred" test is the traditional "but-for" test. Yankee Atomic Electric Company v. United States, Nos. 2007-5025/5031/5026/5032/5027/5033, 2008 WL 3089032, at *2 - 3 (Fed. Cir. Aug. 7, 2008).

As Yankee Atomic recognizes by preferring the "more traditional 'but for' test", id., historically, a plaintiff has been required to introduce clear proof that it was injured as a direct result of the defendant's breach. In short, "[t]here must not be two steps between cause and damage." Myerle, 33 Ct. Cl. at 27. To satisfy this burden, Englewood must establish that the loss is one that, "but for" the breach of contract, would not have been suffered. Fawick Corp. v. United States, 149 Ct. Cl. 623, 637 (1960); see San Carlos Irrigation & Drainage Dist., l11 F.3d 1557 at (Fed. Cir. 1997) ("[a] plaintiff must show that but for the breach, the damages alleged would not have been suffered" (emphasis added)).[15]

---

Accordingly, the proposed final draft of section 26 of the Restatement (Third) of Torts provides the following test for causation, in place of the "substantial factor" test: "Conduct is a factual cause of harm when the harm would not have occurred absent the conduct."

[15] Even if the Court were to apply the substantial factor test, that test is no less demanding than the traditional "but-for" standard for determining causation as, even under the substantial factor test, Englewood has failed to show that the breach was the primary or predominant cause of the loss. Columbia First Bank v. United States, 60 Fed. Cl. 97, 105 (2004) (plaintiff is required to show that the breach "directly and primarily" caused the alleged loss). This is consistent with the Federal Circuit's longstanding causation principles applicable to cases involving multiple causes. For example, in J.D. Hedin Constr. Co. v. United States, 197 Ct. Cl. 782, 456 F.2d 1315 (1972), the court barred a claim for borrowing costs where the plaintiff's financial trouble resulted from both the breach and other factors, because "the proof is not sufficient to show that plaintiff's financial stringency leading to the borrowing of these funds was attributable solely to, and was therefore directly caused by, the improper termination." J.D. Hedin Constr., 456 F.2d at 1330. Englewood must show that "there [a]re no other substantial causes" for its alleged damages. American Sci. & Eng'g, Inc. v. United States, 8 Cl. Ct. 129, 139

In sum, regardless of which test is applied, to be awarded damages in this case, Englewood must prove that HUD's failure to perform the HAP contract "directly and primarily" caused Englewood's loss, and that, "but for" that direct and primary cause, Englewood would not have lost South Pointe. The mere evidence that it has incurred a loss is "irrelevant." Willems Indus., Inc. v. United States, 155 Ct. Cl. 360, 376, 295 F.2d 822 (1961) ("the measure of damages to be applied in the particular case is irrelevant until the claimant has established the fact of losses that were the natural and proximate result of the breach of contract.").

The record established at trial shows that while it was receiving the full HAP contract payments it was due, Englewood was operationally insolvent. Indeed, Englewood's own witnesses agreed that South Pointe operated at a deficit for many years. Record 87: 20-23; 389: 7-19; 1047: 18-22. In part that was because Englewood struggled to meet its debt service. Englewood also struggled – and failed – to meet a burgeoning inventory of repairs. Record 456: 11-17. In fact, Englewood was under notice from HUD and the City of Chicago to resolve several physical deficiencies by the time HUD and Englewood entered into the October 2000 HAP contract. JX 27 p. 760, JX 41 p. 820. The record also is clear that Englewood believed many of the tenants Englewood chose to rent to contributed to South Pointe's problems. JX 14 p. 570 at 605-6.

Whistling past the graveyard, Englewood argues that even with those issues, there was no foreclosure of South Pointe while it had a HAP contract. Pl. Br. p. 21. While it is true that South Pointe had not been legally and conclusively foreclosed, it was only a matter of time. Indeed, long before the HAP contract's termination, Englewood was in fact in default of its

---

(1985) – which we demonstrate herein – Englewood has not done.

existing mortgage. Record 1017: 2-4. In fact, Englewood's mortgagee had filed an earlier foreclosure action in 2002 than the May action Englewood's brief only acknowledges.[16] In any event, Englewood presented no record evidence that even if the HAP contract continued in full force, Englewood could have evaded the foreclosure of its CIC mortgage; to the contrary, its own evidence demonstrates that even if HUD fully performed, Englewood would have lost South Pointe.

### 1. Englewood Faced Foreclosure Even When the HAP Contract Was Paid In Full

The record is unequivocal that Englewood experienced years of substantial losses while the HAP contract was still in effect. Although there are varying estimates of their precise extent, all estimates showed negative cash flow. The financial analysis for South Pointe contained in PX 4 lists a negative cash flow of $351,070.00 in 1999 and $322,678.00 in 2000. PX 4, p. 4250 at 4250. In his letter to HUD on August 6, 2001 evaluating his potential acquisition of South Pointe, Don Samuelson calculated a negative net cash flow of $134,767.00 for 1999 and $161,241.00 for 2000. JX 102 p. 1110 at 1111. He estimated a negative cash flow of $241,340.00 would result in 2001. Id. At trial, Mr. Samuelson testified that he believed South Pointe had been losing $200,000.00 per year from 1998 until 2000, and that "the expenses of the project was simply greater than the revenues it was handling." Record 1047: 18-22.

These losses stemmed not from passing difficulties, but from two chronic and intractable financial problems. First, ignoring Englewood's Michigan National Bank mortgage loan which

---

[16] The May 2002 foreclosure action alleges at Count I, paragraph 3K: "This loan cannot be reinstated since it was previously reinstated pursuant to Illinois Mortgage Foreclose Act, 735 ILCS 5/15-1602, Code of Civil Procedure in Case No. 02 CH 1340 on March 8, 2002." JX 269, p. 4139 at 4142 (emphasis added).

had a balance over $800,000.00 at the end of fiscal year 2000, PX 7 p. 4260 at 4261, as all of Englewood's witnesses stated, the debt service paid each year on the CIC mortgage was too high for the sustainable operation of the building. Given an 11 year amortization of the mortgage, Englewood had to pay between $650,000.00 and $700,000.00 in debt service each year. PX 7 p. 4260 at 4261, Record: 870: 9-24. Second, Englewood's operating expenses steadily increased as it struggled to deal with ongoing security problems and the deteriorating physical condition of the South Pointe building. JX 102, p. 1110 at 1111. John Hayes admitted that operating cost would have been much lower if South Pointe was rehabbed and tenant screening improved. Record 934: 6-11. At trial, Englewood management also attributed their problems to the lack of a rent increase since 1998. However, in his purported rental increase request on August 21, 2001, Don Samuelson estimated that South Pointe still would have had a negative net cash flow of $10,877.00, even with a rent increase and, if, administrative expenses could somehow be cut by $200,000.00 in one year. JX 104, p. 1120 at 1123-1124. Englewood's financial situation was too severe for any rental increase to rescue, and Englewood itself refused to inject the needed funds, including the funds that even Englewood admitted were necessary to bring South Pointe into physical compliance. Record 689: 8-13, 829: 11-14, 836: 4-7.

Further, by the time the October 2000 HAP contract was executed, Englewood had received notices from the City of Chicago Department of Buildings to correct numerous violations, in addition to tenant complaints that earned Englewood its referral to HUD's Departmental Enforcement Center, and HUD's 1999 physical inspection that confirmed those complaints. JX 27 p. 760; JX 41 p. 820; JX 47 p. 860; Record 624: 2-14.

In a "but-for" world where HUD continued to perform on the HAP contract, what Englewood established at trial was that Englewood was in deep financial debt and yet was required to make costly repairs cited by both Federal and local authorities – repairs for which Englewood admitted it would no longer invest any of its own capital. Record 689: 8-13; 829:11-14; 836: 4-7. If the physical repairs could not be resolved, the local authorities had the ability to essentially "shut down" South Pointe, as the City of Chicago intended to do in its March 2002 complaint for injunction. JX 174, p. 1678. Not only was Englewood under threat of losing South Pointe in a foreclosure action from CIC for financial default, but it was under threat of losing South Pointe because the City of Chicago was threatening its survival because Englewood was failing to maintain South Pointe in proper physical condition. See, JX 174 at 1681. Further, Englewood's failure to maintain South Pointe "in good order, condition and repair" also was a defaulting event under CIC's mortgage. JX 269 p. 4139 at 4154.

Englewood also was moving towards financial collapse even with full HAP payments. Indeed, while still receiving the full financial benefit of the HAP contract, Englewood defaulted on its CIC mortgage on January 1, 2002, leading to the filing of a foreclosure action that was dismissed on March 8, 2002 and reinstated in May 2002. According to Englewood's own records, by January 1, 2002 only 11 units out of 303 had been vacated, and Englewood had received at least the December 2001 HAP payments for all but one of these units. PX 1, p. 4220 at 4237-4244. Englewood had thus suffered only a negligible decline in HAP contract revenues at the time of its January 1, 2002 default,[17] and the HAP payments had not yet been terminated.

---

[17] The same is true for CIC's May 2002 foreclosure. As previously noted, abatement and voucher issuance was suspended for the first injunction action filed in the Northern District of Illinois, while Englewood exhausted its administrative appeal to HUD, and then again until

Englewood argues that "[t]enants moved out rapidly in April and May 2002 . . . leading to a significant revenue shortfall. (Tr. 1060-61.) Englewood was unable to pay real estate taxes and insurance on its monthly mortgage payment, and thus faced foreclosure. . ." Pl. Br. p. 5. But in fact, as noted in the May 2002 CIC complaint, the mortgage had been in default in January 2002, and that the first installment of real estate taxes in 2001 had not been paid. JX 269 p. 4139 at 4142. Thus, Englewood's failure to make, or at least timely make, these payments could not have been impacted by the termination of the HAP contract which occurred subsequent to the events of default alleged in the pre-March and May 2002 foreclosure complaints.

Even by Englewood's own calculations, the HAP contract termination produced at most $46,113.00 in lost payments from October 1, 2001 to the end of 2001. PX 3A, p. 4249A at 4249B. But this estimate is undoubtedly too large, because this calculation assumes $233,722.00 in HAP payments and a three percent vacancy rate. Id. Yet, Englewood's own records show that it did not receive this amount per month when the HAP contract was being paid in full.[18] For the first nine months of 2001, Englewood averaged $214,291.00 in monthly rental income from all sources, both HAP contract and tenant rents. PX 6, p. 4256 at 4256. This indicates it suffered

---

June 2002 when Englewood filed its second district court action that was ultimately dismissed with prejudice.

[18] Mr. Samuelson stated in a declaration that he believed that part of the ideal solution in the fall of 2001 ". . . was to use vouchers to get rid of bad tenants who could qualify for vouchers . . . ." JX 18 p. 671 at 673. Mr. Samuelson observed that he had successfully pursued this strategy at other properties he managed. JX 570 at 587. Englewood presented no testimony that it marketed or otherwise sought acceptable residents to replace those tenants it was aggressively moving out. JX 14 p. 570 at 606; Record 1063: 8-19, 1065: 1-16. The only tact it took to replace tenants was to go to CHAC and "recruit people in late 2002." Record 1065: 1-16.

little or no lost HAP revenue at all in 2001, given that average rental income for October, November and December was $218,351.00.[19] PX 3A, p. 4249A at 4249B. In short, even if the HAP contract had been continued, Englewood would have suffered the same January 2002 default and foreclosure action.[20]

Thus, given its financial and physical condition, Englewood has not established a "but for" world in which it avoids foreclosure if HUD continued to pay on the HAP contract. Accordingly, Englewood's conclusory and unsupported lost equity claim should be denied.

**2. Englewood Cannot Claim The HAP Contract Termination Caused Its Default Upon A HUD-Insured Loan That Closed Over A Year After The Notice Of Termination Of HAP, And Which Englewood Agreed To With Full Knowledge, That No Further Project-Based HAP Payments Were Forthcoming**

Apart from the fact that Englewood twice faced foreclosure, even with the HAP payments continued in full, the termination of the HAP contract in September 2002 did not cause the foreclosure of the new loan that was filed in 2005, the actual cause of Englewood's loss of any equity. To demonstrate causation, Englewood must show that claimed damages are "attributable solely to, and . . . therefore directly caused by" the contract breach. J.D. Hedin at 456 F.2d at 1330. Englewood lost South Pointe only after it defaulted upon a HUD-insured loan

---

[19] Alternatively, using the same table in which the rest of the 2001 data is reported, there is a monthly average for October, November, and December of $216,103.00, which is still above the $214,291.00 average for the nine months before the October 1, 2001 e-mail that addressed abatement. PX 6, p. 4256 at 4256.

[20] CIC's foreclosure may have been averted had Englewood actually sought and obtained lower-cost refinancing of the CIC mortgage. But Englewood presented no evidence at trial that it sought any such financing. Further, Englewood now claims it obtained the $11.6 million dollar HUD-insured mortgage, and apparently the $750,000.00 IHDA mortgage, to mitigate losses from the HAP contract termination, not to reduce its operating expenses.

that closed over a year after the November 30, 2001 Notice of HAP contract termination, a loan it agreed to after being repeatedly advised that the HAP contract would not be renewed. Englewood presented no evidence that it complained the HAP contract was needed or the loan was doomed ab initio. Instead, Englewood filed its loan application – alleging now that it did so to mitigate its damages because the loan was doomed to fail – and took the Government's money, in addition to IDHA's, a non-party to this litigation.

This claim is beyond belief, and certainly lacks any contemporaneous support in the record. Because statements in contemporaneous documents are more reliable than post hoc, self-serving post-trial argument, in situations like here, where an allegedly significant event is not reflected in the contemporaneous documents, the lack of any contemporaneous documents upon this issue is fatal to Englewood's claim. Argus Inc. v. Eastman Kodak Co., 801 F.2d 38, 42-43 (2nd Cir. 1986) ("The failure of a business' management to note at the time what is later claimed by its lawyers to have been a mortal commercial wound weighs heavily against such a claim."). See also Tyger Construction Co., Inc. v. United States, 31 Fed. Cl. 177, 181 (1994) ("In reviewing the testimony and documentary and physical evidence, the court deems that the true picture of this beknighted contractual relationship emerges through a chronological history, with principal reliance on documents contemporaneously generated. . . . In these circumstances the court reposes a great deal of confidence in the documentary record."); Cienega Gardens v. United States, 503 F.3d 1266, 1291 (Fed. Cir. 2007) (litigation-formulated claims concerning the expected value of property in the period following the breach are definitively belied by "contemporaneous offering memoranda.").

On October 1, 2001, Hub Director Edward Hinsberger clearly stated that any new loan would not depend or contemplate a revival of the project-based HAP contract. JX 111, p. 1160 at 1161. Instead, the loan was intended to finance a thorough rehabilitation of South Pointe which would eventually allow Englewood to keep and attract renters "who are either [from the unsubsidized] market or [individual HAP] voucher holders."[21] Id. In a subsequent email, Mr. Hinsberger explained that this meant "the absence of project based Section 8 [HAP] payments would have little impact on the success of the project." JX 113, p. 1163 at 1164. Rather than causing the default on the HUD-insured loan, the HAP contract's termination was a presupposition of the new loan's formation.

Englewood asks the Court to find HUD liable for its equity loss because, as Englewood argues, the "Schneider memo" evidences HUD knew that Englewood could not survive without a project-based Section 8 assistance -- "deep subsidy"-- and thus the equity loss was both causal and foreseeable.[22] Ignoring that the memo itself refers to tenant-based assistance in the form of

---

[21] This was consistent with HUD's actions in the comparable property Englewood uses at trial and in its brief, Southwind Apartments, formerly known as Lowe Terrace Apartments. Without a HAP contract, Southwind, Englewood claims, is a comparative success story, while Englewood, for reasons it incorrectly attributes to an absent HAP contract, failed miserably.

[22] As previously stated, the "Schneider memo" is neither signed nor dated, and when questioned by counsel for Englewood as an adverse witness, Director Hinsberger not only could not recall seeing the document, but he specifically disagreed with the conclusion that South Pointe could not survive without deep subsidy. Record 652: 19-22; 654: 23-25. As the Court is aware, and to the astonishment of the Government, Englewood failed to call either Operations Director Anderson or Mr. Schneider in their case in chief. Accordingly, given this apparent mistake, Englewood now attempts to shift the burden to the Government and argue that we had the burden to call these witnesses on this issue. This argument is wrong as a matter of fact and law. It is wrong as a matter of fact because the Government never listed Mr. Schneider or Operations Director Anderson as witnesses who could discuss what the parties foresaw when the HAP contract was executed in 2000. See Def. Amended Proposed Witness List, Docket # 121, pp. 6, 10. Englewood's argument fails as a matter of law because Englewood has the burden of

vouchers was a form of “deep subsidy” at other projects such as Lowe Terrace, Englewood’s position disregards that the author of the memo had no authority to bind HUD by such determinations.[23] Mr. Schneider is a staff appraiser. Record 652: 15-16; 1202: 15-17. As Hub Director, Mr. Hinsberger had the authority, upon behalf of HUD, to regard or disregard staff advice. Director Hinsberger testified that he disagreed with the memo’s conclusion that the project could not survive without “deep subsidy.” Record 654: 2 – 655: 6. Director Hinsberger's disagreement was evidenced by his willingness in authorizing the $11.6 million dollar loan to Englewood. In fact, using Englewood's definition of "deep subsidy" to exclude vouchers when it made the loan, Englewood, too, apparently disagreed with the conclusion of the memo, because it never claimed otherwise at anytime until trial. Otherwise, if Englewood concurred with the conclusion of the purported “Schneider memo,” Englewood could not in good faith have proceeded with its mortgage loan, two-and-a-half months after the last HAP contract payment was made.

Englewood asks this Court to disregard Englewood’s own conduct and the delegated authority of HUD’s personnel. The credible evidence shows that in order to get its $11.6 million HUD-insured loan and another $750,000.00 from IHDA, Englewood agreed with Director

---

proof on this issue, not HUD.

[23] HUD cannot be held liable for any loss of equity claim based upon the draft “Schneider memo.” At best, it was a staff view with which the HUD delegated authority, Director Hinsberger, did not agree. It is, of course, axiomatic that the United States “cannot be subjected to liability based upon the conduct of those not authorized to act in a particular regard.” Info. Sys. & Networks, Corp. v. United States, 81 Fed. Cl. 740, 747 (2008). With respect to the $11.6 million dollar loan that Englewood knowingly received without a HAP contract, the “conduct” that Englewood attributes to HUD, as a result of a staff memo, cannot be the basis of liability against the Government.

Hinsberger that project-based Section 8 assistance was unnecessary. Only now, because it defaulted on its separate loan contract obligations and lost South Pointe to foreclosure does Englewood elevate Mr. Schneider's unsigned memo above its own loan contracts, and Director Hinsberger's elections.

Englewood appears to advance the amazing position that, although HUD knew at the time of contract formation that South Pointe could not survive without any project-based HAP assistance, HUD still deliberately and willingly insured a mortgage two-and-a-half times greater than the original CIC mortgage, knowing that South Pointe would default.[24]

The loan was designed, as Englewood agreed when it made the loan, to make project-based HAP subsidies unnecessary by alleviating the two chronic problems that had Englewood facing financial disaster even while the HAP contract was still in operation. First, it relieved Englewood of the crushing burden of servicing its ten year mortgage with CIC by paying it off and substituting an HUD-insured 40 year mortgage. This slashed Englewood's annual debt service from over $600,000.00 to under $350,000.00, and Englewood was relieved of having to make any loan payments at all during the initial period of construction work to upgrade the building. Record 1181: 4-14. As Operations Director Anderson testified, no principal payments were made during the construction period, and all interest payments were covered by the loan itself. Record 1181: 4-11. Second, it financed a $6,500,000.00

[24] Englewood's insistence at pages 19 and 20 of its brief that the Court draw a negative inference from defendant's failure to present the testimonies of witnesses Mary Anderson and John Schneider to accommodate Englewood's own trial strategy were previously addressed in the Government's Response to Plaintiff's Post-Trial Brief, Docket # 140, and need not be addressed again. In sum, despite Englewood's unsupported speculative claim to the contrary, the Government called every witness known to possess relevant, material non-cumulative evidence to the Court.

rehabilitation of the building, intended to end Englewood's increasingly expensive struggles with South Pointe's deteriorating physical condition by restoring it to a "like new" condition. Record 576: 2 – 577: 4. This would allow South Pointe to become competitive in the unsubsidized rental market and the individual HAP voucher market.

Against the stated expectations of both HUD and Englewood, and the loan documents that state no other purpose or intent for the HUD-insured loan, Englewood ultimately failed to attract enough tenants in either the unsubsidized market or among the holders of individual HAP vouchers to achieve beyond the approximately 40 percent occupancy rates. Record 1065: 17-21. This obviously played a large part in Englewood's eventual default on the HUD-insured loan and the subsequent foreclosure on South Pointe. However, this failure to attract tenants cannot be attributed to the termination of the HAP contract but, rather, Englewood's own derelictions.

Unexpected events and Englewood's own failures in foresight and judgment were decisive, which means Englewood cannot demonstrate the HAP contract termination caused its damages. For a damages claim to be successful, there must be no intervening cause and the damages must be the natural and inevitable result of the breach. Myerle v. United States, 33 Ct. Cl. at 26, Moden v. United States, 404 F.3d 1335, 1344 (Fed. Cir. 2005).

Indeed, Englewood exacerbated its own alleged crisis. First, Englewood played a substantial part in driving its occupancy rates low. By its own testimony, Englewood management seized the opportunity of the individual HAP voucher issuance process to encourage some tenants to go while encouraging other ones to stay. Record 1063: 4-19. Englewood wanted to be rid of tenants it felt created difficulties, such as missing payments on their reduced share of the subsidized rent. Id.

Second, Englewood continued to fall short in providing attractive or even decent living conditions for its tenants. Of the first 17 units inspected by CHAC in order to approve the use of an individual HAP voucher, only two passed. JX 198, p. 1919 at 1919. Following Englewood's HUD-insured loan default, in 2004 the court-appointed receiver reported chronic problems with the elevators and with rat and roach infestations, indicating that Englewood never gained control of the problems that led to the termination of the HAP contract several years before, despite the Government's, not Englewood's, infusion of millions of dollars. PX 48, p. 4483, at 4487-4488; PX 49 p. 4518, at 4520-4522; PX 50, p. 4546 at 4550-4551.

Third, Englewood of its own accord decided to halt marketing efforts for several months while construction of a new lobby was ongoing. Record 708: 17 – 709: 2.

Fourth, Englewood itself attributed the major share of the blame for its inability to attract new tenants to a decision, not by HUD, but by CHAC, the local administrator of the individual HAP vouchers, to place a stronger emphasis on avoiding the residential concentration of racial and low income minorities, which made them more reluctant to approve individual HAP voucher holders going to South Pointe. Record 1073: 9-15. This decision by CHAC was certainly not a result, foreseeable or otherwise, of the HAP contract termination.

But apart from the failure to attract enough new tenants, Englewood's own financial management of the loan contributed to its eventual default. Englewood spent its available loan money remarkably quickly. Operations Director Anderson testified the initial operating deficit fund, which was intended to fund operations as construction work neared its end, was drawn down to zero in the first six months of the loan. Record 1182: 9 – 1183: 10. In addition, the working capital deposit, intended to defray "renting and equipping [South Pointe] once

construction is complete," was entirely drawn down while construction was ongoing to fund operating deficits. Record 1183: 11 – 1184: 10. Moreover, all available funds for rehabilitation construction were depleted before the rehabilitation was complete, something Operations Director Anderson had seen only once before in 27 years of government service. Record 1184: 22 – 1185: 3.

In sum there is no direct chain of causation between Englewood's loan default and the termination of the HAP contract. Englewood did not sustain its burden that HUD's termination of the HAP contract caused its alleged lost equity.[25]

### C. Englewood Has Failed To Prove Its Damages With Reasonable Certainty

Even assuming Englewood could prove forseeability and causation – which we demonstrated it cannot – Englewood also must prove "reasonable certainty" as to each item within its damages claims. Wells Fargo Bank, N.A., 88 F.3d at 1023 (1996); see also Restatement (Second) of Contracts § 352 cmt. a ("[a] party cannot recover damages for breach of a contract for loss beyond the amount that the evidence permits to be established with reasonable certainty"). Moreover, to support its claim, Englewood must provide appropriate documentary or other credible support from its records to establish its damages claim. See, Roseburg Lumber Co. v. Hadigan, 978 F.2d 660, 667 (Fed. Cir. 1992) (plaintiff must provide adequate support for claimed costs). A contractor's failure to present any documentary support for its assertions that

---

[25] Indeed, Englewood's lost equity claim is a good example of why courts have traditionally been reluctant to grant lost equity or lost business damages at all. At common law, there was "no recovery for general loss of business at all," the entire class of claims being considered too "remote and speculative" to allow recovery. William Green Const. Co. v. United States, 477 F.2d at 936. These concerns are particularly relevant for Government contracts in which the public fisc is too tempting a target for poorly performing contractors seeking a bailout of their struggling businesses. That is precisely what Englewood seeks here.

it incurred costs, precluding the Government from verifying that the costs were incurred and the reasons for their incurrence, precludes any recovery of those costs. Barrow Utils. & Elec. Co-op. v. United States, 20 Cl. Ct. 113, 121 (1990). At best, Englewood presented conflicting, often not credible, evidence that prohibits the Court from determining any claims with "reasonable certainty." Accordingly, Englewood's claim must be denied.

Englewood's evidence of its loss were based upon estimates of lost value, two of which were based upon a net operating income ("NOI") calculation of South Pointe's post-termination appraised value. See PX 4, p. 4250 at 4254A. However, for one calculation, Englewood did not utilize South Pointe's actual audited financial statements to determine NOI; the 2001 financial statement identifies NOI as $350,768.00, not $691,056.00, as Englewood uses in its table at PX 4. Compare PX 4 p. 4250 at 4254A with PX 7 p. 4260 at 4265. The other NOI calculation is based upon a projection that assumed Englewood would have obtained a third party loan at a specific rate and debt service. Record 1129: 18 – 1130: 6. However, Englewood presented no documentary or other evidence that it ever affirmatively attempted to obtain this hypothetical third party loan. Record 1129: 18 – 1131: 24. Another lost equity calculation assumes that a project one-and-a-half times smaller than South Pointe (see JX 236, p. 2782 at 2783) is a valid comparable for Englewood's purposes, although Mr. Samuelson, who provided the calculations, is not an appraiser and was not admitted as an expert.

Englewood's most simple calculation also is suspect. In its first estimation, Englewood subtracted the outstanding debts from the appraised value of South Pointe to estimate its lost equity. However, HUD's investigation showed a much-lower "as-is" value for South Pointe - $3,645,000.00, compared to Englewood's $6,750,000.00. Compare JX 82 p. 1071 at 1072 with

JX 239 p. 2806 at 2811. At trial, the owner of South Pointe at the time the HAP contract at issue was agreed upon, Mr. Hayes, speculated that he believed the difference in estimates was attributable to HUD's use of a higher annual operating expense than that used by Englewood's appraiser. Record 932: 1-10. The Englewood appraiser utilized a value of what the building “should have operated at,” while HUD uses South Pointe's actual self-reported financial statements. Record 932:15- 933:6. The large expenses were attributed by Mr. Hayes to security and tenant/eviction issues – expenses that would continue for a new owner for some time. See Record 933: 3- 934: 11. Further, Englewood presented no evidence to support the basis for the reduced calculations in determining operating expenses. Rather, Englewood merely asserted that it “should be” at a particular rate.[26] Id. Contrary to Englewood’s assertion that the appraiser's valuations stand unrebutted, Pl. Br. p. 12, HUD noted these inconsistencies in its communications with Englewood, arguing that Englewood's appraised value was questionable, precisely for the reasons just stated. JX 82 p. 1071 at 1072.

Accordingly, because Englewood’s damages were largely speculative, and Englewood provided insufficient evidence to support its calculations, Englewood’s alleged lost equity claim can not be determined with reasonable certainty and should be denied.

---

[26] A review of Englewood’s appraiser report shows that part of the discrepancy lies in the total operating expenses attributed to South Pointe. The appraiser’s report of December 2000, assumes total operating expenses of $1,858,050.00, including real estate taxes; but the financial statement for South Pointe reveals that operating expenses actually were $2,117,214.00. JX 239 p. 2806 at 2842, 2848-2849; PX 7 p. 4260 at 4262. The appraiser also overstated rental income by nearly $60,000. Compare JX 239, p. 2806 at 2841 with PX 7 p. 4260 at 4262.

## III. Englewood's Alleged Mitigation Of Damages Is Not Reasonable

The law of mitigation is straight-forward. The non-breaching party has a duty to mitigate damages. See Midwest Indus. Painting of Fla., Inc. v. United States, 4 Cl. Ct. 124, 133 (1983) (holding injured party must take reasonable steps to avoid incurring damage as a result of the breach); Restatement (Second) of Contracts § 350 (1) (1981) ("[D]amages are not recoverable for loss that the injured party could have avoided without undue risk, burden, or humiliation."). Sterling Savings Ass'n v. U.S., 80 Fed. Cl. 497, 512-513 (Fed. Cl., 2008). However, the non-breaching party cannot be placed in a better position than if the breach had not occurred. White v. Delta Contruction Int'l., Inc., 285 F.3d 1040, 1043 (Fed. Cir. 2002). Further, a party cannot recover for lost damages that could have been reasonably avoided. Indiana Michigan, 422 F. 3d 1369 at 1375. Here, Englewood failed its duty to mitigate its alleged damages from the HAP contract termination.

Englewood's only response is that it accepted the $11.6 million HUD-insured loan to mitigate its damages. See Pl. Br. pp. 22-24. However, taking money (and the associated debt) is one thing; applying it to mitigating the effects of a deteriorating business is another. Englewood's failure to "rent-up" vacant units; CHAC's refusal to refer tenants to South Pointe; Englewood's, at best, tardy repairs and marketing; and, Englewood's failure to ask HUD to release it from the conditions of the "Use Agreement," as was its contractual right, would have been reasonable steps to avoid any damages. Englewood took none of these steps.

Moreover, it was not reasonable for Englewood to obtain an $11.6 million HUD-insured loan, and a $750,000 loan from IHDA, an unrelated party, to mitigate its alleged HAP contract

damages.[27] By itself, the HUD-insured loan far exceeded the future gross payment stream of the HAP contract. Indeed, Englewood's steps were not reasonably intended to avoid incurring damages, they ultimately incurred damages. They culminated in an immense windfall for Englewood that Englewood squandered by its default of those new contracts.

It also was not reasonable for Englewood to pay-off its CIC indebtedness, relieve John Hayes of his personal guarantee, pay-off its Michigan National Bank debt, agree to make repairs and rehabilitate South Pointe, and enjoy excused debt service of the HUD-insured loan while the repairs and rehabilitation were occurring by using the Government’s funds in the undisclosed and belated ruse of mitigation. Again, by its belated mitigation assertion, Englewood unnecessarily and unreasonably transferred all of its past and future risks and burdens for South Pointe to the Government. Moreover, the immense loss that Englewood’s default of the HUD-insured and IHDA loans caused, a loss as to HUD that far exceeded any damages Englewood conceivably incurred by termination of the HAP contract, placed Englewood in a

[27] Furthermore, Englewood’s default of the $11.6 million HUD-insured mortgage loan and the $750,000 IHDA mortgage loan is admitted. Englewood cannot dispute that, when it accepted the benefits and obligations of those loans, it did so without stated reservation, condition or claim. Indeed, Englewood can not dispute that at no time did anyone associated with Englewood write Mr. Hinsberger at the time the HAP contract was being terminated, vouchers were being issued, or when the loan was being negotiated and, most importantly, consummated and state: “Even with the $11.6 million loan, South Pointe is lost without the project based HAP payments.” Now, either Englewood must admit that its mitigation theory is erroneous, and that the loss of South Pointe was caused by several intervening circumstances and events not foreseen even at loan closing by Englewood (and HUD for that matter), or in secreting away its mitigation theory until some time after its default of the loans, given the void of credible evidence in support of its belated mitigation assertion, Englewood must acknowledge that it obtained a Federally insured loan upon false pretense. While those choices remain Englewood’s, if the Court does not deny the Government’s liability for lost equity on the grounds already argued, the Court may elect to deny the mitigation assertion on traditional grounds.

better position than Englewood would have found itself had the HAP contract breach not occurred.[28]

For the foregoing reasons, it is simply incredulous that Englewood now claims that its loan with HUD (and necessarily IHDA), and its default of those separate contracts, justifies its disregard of Englewood's own failures in those separate matters as Englewood's mitigation of damages. Englewood's breach of those loan contracts was the actual cause of its alleged equity loss. In truth, Englewood's so-called breach-of-contract-mitigation efforts accrued in a huge loss to HUD, IHDA and the taxpayers. It unnecessarily and unreasonably posed undue risk on the Government in order to place itself in a better position than it would have been without any HAP contract breach. But, more important to the matter at hand, Englewood's breach of its formerly HUD-insured loan was the cause of its loss of South Pointe at foreclosure.

## CONCLUSION

For these reasons, the United States respectfully requests that the Court deny Englewood's unplead claim for lost equity damages.

Respectfully submitted,

GREGORY G. KATSAS
Assistant Attorney General

JEANNE E. DAVIDSON
Director

---

[28] Indeed, the HUD-insured loan made Englewood solvent. The HUD and IHDA loans gave Englewood, immediately, more funds than it would have been paid under the terminated HAP contract, extinguished CIC's foreclosure and Mr. Hayes's personal guarantee, provided funds to make repairs (even the $1 million repairs Englewood admitted were necessary, JX 14, p. 570 at 592) that had plagued South Pointe for years, gave Englewood a survival plan that Englewood pursued with no other lender, and extinguished all debt service.

s/ Brian M. Simkin
BRIAN M. SIMKIN
Assistant Director

s/ Douglas K. Mickle
DOUGLAS MICKLE
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit, 8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tel: (202) 307-0383
Fax: (202) 307-0972

OF COUNSEL:
GREGORY G. GUSTIN
MARIA T. BAGUIO
LORRAINE C. SHOTO
Office of General Counsel
U.S. Department of Housing
and Urban Development
Chicago, Illinois

September 12, 2008

**CERTIFICATE OF FILING**

I hereby certify that on September 12, 2008, a copy of the foregoing "**DEFENDANT'S POST-TRIAL BRIEF AS TO WHETHER THE DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT IS LIABLE FOR ENGLEWOOD TERRACE LIMITED PARTNERSHIP'S LOST EQUITY CLAIM**" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Douglas K. Mickle
Douglas K. Mickle